SNOW SPENCE GREEN LLP
Ross Spence (TX SBN 18918400)
ross@snowspencegreen.com
Carolyn Carollo (TX SBN 24083437)
carolyncarollo@snowspencegreen.com
2929 Allen Parkway, Suite 2800
Houston, Texas 77019
Telephone: (713) 335-4800
Facsimile:  (713) 335-4848

*Attorneys for the County of Santa Barbara, California; Harry E. Hagen, as Treasurer-Tax Collector of the County of Santa Barbara, California; and Santa Barbara County Air Pollution Control District*

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA BARBARA DIVISION

| | |
|---|---|
| In re:<br><br>HVI Cat Canyon, Inc.,<br><br>Debtor. | Case No.: 9:19-bk-11573-MB<br><br>Chapter 11<br><br>**SANTA BARBARA COUNTY AIR POLLUTION CONTROL DISTRICT, COUNTY OF SANTA BARBARA, AND HARRY E. HAGEN, TREASURER-TAX COLLECTORS' SUPPLEMENTAL RESPONSE TO DEBTOR'S MOTIONS REGARDING USE OF CASH COLLATERAL**<br>(No Hearing Required Unless Requested)<br><br>Crtm:    303<br>Judge:   Hon. Martin R. Barash |

**TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, AND ALL INTERESTED PARTIES:**

The Santa Barbara County Air Pollution Control District, the County of Santa Barbara, California, and Harry E. Hagen, Treasurer-Tax Collector of the County of Santa Barbara[1] ("S.B. Parties"), supplement their responses to the debtor's Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 Approving Use of Cash Collateral, Providing Adequate Protection and Setting Final Hearing Pursuant to Bankruptcy Rule 4001 [Dkt. 11] and debtor's Motion to Surcharge Collateral Pursuant to 11 U.S.C. §§ 506(c) and 552(b) [Dkt. 55] ("Motions") as follows:

## Factual Background

HVI Cat Canyon, Inc. (the "debtor") filed its chapter 11 bankruptcy petition on July 25, 2019. It has continued to operate its assets and properties in Santa Barbara County as a debtor in possession.

The debtor and USB have largely ignored the S.B. Parties on the subject of the cash collateral budget. Indeed, the debtor's court-ordered Status and Pending Motion Report does not even mention the S.B. Parties' prior response to the Motions [at ECF 153], even though the S.B. Parties specifically negotiated with the debtor an extension

---

[1] Hagen, Treasurer-Tax Collector does not submit to the jurisdiction of this Court for determination of the Debtor's tax liabilities.

of time to file that response. The S.B. Parties were not consulted on the original budget or any of the various changes in the budget made after the S.B. Parties' response.

The S.B. Parties support this debtor having use of cash collateral for purposes of regulatory compliance, operating under the law, and marketing of the assets on a going-concern, rather than liquidation, basis.  However, the debtor is failing to pay for the ongoing regulatory costs and property taxes this debtor owes the S.B. Parties and this cannot continue.

In order to preserve and protect the environment and the debtor's assets and operations, the debtor must pay for all the regulatory health, safety, and environmental oversight provided by Santa Barbara County and the Santa Barbara County Air Pollution Control District (APCD).  A large portion of the regulation of this oil and gas company debtor is at the Santa Barbara County level.

The debtor incurs numerous ongoing regulatory compliance costs in the ordinary course of its business. To operate lawfully, the debtor must have and continue to have permits from numerous departments or divisions of the County, including, for example

   a. the Energy & Minerals Division which has permit processing fees,

   b. the System Safety & Reliability Review Committee which passes through the costs the County incurs for consultants to review the debtor's facility safety plans, perform audits, and perform similar tasks relating to the debtor's facilities,

c. the Building & Safety Division which determines fines under the Administrative Fine Ordinance (County Code, Chapter 24A) when the debtor does not timely abate its violations, which have been many for this debtor,

d. the Petroleum Division for permits which require additional inspections that are not included in the annual inspection cycle at the Petroleum Staff's hourly rate as well as Restoration Accounts for the soil remediation/restoration activities of this debtor,

e. for Petroleum Ordinance (County Code, Chapter 25) violations,

f. for County Fire Department fees, inspections, and permits for inspecting leases, wells, pipelines, compressors, offices, buildings and facilities, and tank batteries,

g. the ongoing Planning & Development Department's (P&D) inspections, fees, and ongoing regulatory issues, which, for this debtor are very significant, and

h. for Santa Barbara Environmental Health/CUPA, which has regulatory authority over the debtor's hazardous materials.

Just as an example, the debtor was required to pay $157,812 to SB P&D in advance for Annual Well & Tank fees for 2019 but failed to pay. The County has nevertheless continued inspecting the debtor's approximately 756 facilities, and there are about 500 inspections left to perform this year.

In addition, the debtor must comply APCD's inspections and regulations. This includes permit fees for permit renewals, three-year reevaluations under Rule 201.G,

NSR permits, and Reimbursable Staff Labor, Air Quality Planning Fees, including Annual Emissions, Air Toxics, and AQAP fees, Notices of Violation Penalties. This debtor has 41 active, unresolved NOVs with APCD alone, plus there are 50 open NOVs with the County. Even when this debtor reaches a settlement on NOVs (*see* examples attached as **Exhibit A**), it often fails to perform.

This debtor and UBS are well-aware that regulatory compliance costs are administrative expenses that must be paid if this debtor is to continue to operate in bankruptcy. Each of the many County of Santa Barbara Notices of Violation issued to this debtor clearly informs the debtor that

> The Santa Barbara County Petroleum Code, Chapter 25, among other things, protects the health, safety, public welfare, physical environment and natural resources of the county by the reasonable regulation of onshore petroleum facilities and operations, including but not limited to: exploration; production; storage; processing; transportation; disposal; plugging and abandonment of wells; and of operations and equipment accessory and incidental thereto.

This debtor did include some line items in its cash collateral budgets for payment of County and APCD regulatory costs. Perplexingly, however, even though there are budgeted monies to be spent for regulatory compliance costs, <u>this debtor did not pay those budgeted amounts</u>.

Below is a table of the amounts budgeted by the debtor and court-approved which appear[2] to be payable to the County and APCD through week 8 (ending today)

---

[2] The budget line item names do not match up to County departments, so it is possible that some of these line items are not for payment to the County.

per the Interim Order on cash collateral (ECF 43) and then the two-week bridge Order (ECF 182)

|  | Week 1 29-Jul-19 | Week 2 5-Aug-19 | Week 3 12-Aug-19 | Week 4 19-Aug-19 | Week 5 26-Aug-19 | Week 6 2-Sep-19 | Week 7 9-Sep-19 | Week 8 16-Sep-19 | Total through Week 8 |
|---|---|---|---|---|---|---|---|---|---|
| Weed Abatement |  | 5,000 | 5,000 | 5,000 | 5,000 | 5,268 | 10,000 | 10,268 | 45,536 |
| Well Analysis |  |  | 3,000 | 3,478 | 3,000 | 3,000 | 3,000 | 3,000 | 18,478 |
| Compliance (ALG) |  |  | 4,723 | 38,463 |  |  | 10,000 | 10,000 | 63,186 |
| Fire Department |  |  |  | 36,730 |  | 5,000 | 36,730 |  | 78,460 |
| EHS CUPA |  | 8,509 |  |  |  |  |  |  | 8,509 |
| APCD |  | 4,211 | 2,000 | 2,000 | 60,000 | 2,000 | 62,000 | 2,000 | 134,211 |
| Settlement Agreement |  |  |  | 29,500 |  |  |  | 29,500 | 59,000 |
| Total |  | 17,720 | 14,723 | 115,171 | 68,000 | 15,268 | 121,730 | 54,768 | 407,380 |

To the knowledge of the County and APCD, none of those amounts were paid, so the debtor is already $407,380 in arrears[3] of what the debtor itself promised to pay for post-petition regulatory costs to the S.B. Parties.

The budgeted amounts will not cover the ongoing regulatory costs of this debtor. For example, the unpaid compliance costs of this debtor with APCD for the 2019-2020 budget year are approximately $162,488 for reevaluations and $45,000 for

---

[3] $134,211 for APCD and $273,169 for County = $407,380.

fees (AQAP, annual emission fees, source test fees, etc.), not even counting the penalty assessments for Notices of Violations. This debtor's annual penalty assessments with APCD alone average $91,474.20 per year over the prior five fiscal years, but, significantly, those penalty assessments have recently been much higher than the average; to-wit, $163,250 (FY 2018-19) and $160,000 (FY 2017-18) in the immediate past two fiscal years.

Notwithstanding the foregoing, if the $407,380 total in the foregoing table is all payable to the County and APCD, and if the debtor were to pay to the County and APCD the $407,380 already budgeted and approved and then pay the same amounts in each of the following 8-week periods of this case, then that would be satisfactory for the County and APCD to continue their regulatory oversight services, though it would not address the ongoing taxes owed, which are discussed below. If the $407,380 is not all payable to the County and APCD, then this debtor needs to include all County and APCD obligations in its budget.

The Court needs to understand that this debtor has an entirely unacceptable history of non-compliance. The outstanding unpaid prepetition obligations of the debtor to the S.B. Parties, not including all penalties and interest, are

| S.B. Party | Per S.B. Parties | Per Debtor's Schedules |
|---|---|---|
| APCD | $1,701,344.67 | $145,681.43 plus $7,867.00 plus "unknown" [actually it is a $99,000 judgment entered against the debtor on July 16, 2019 in Santa Barbara Superior Court Case No. |

|  |  | 19CV01372. Copy attached as **Exhibit B**] |
|---|---|---|
| SB P&D | $891,840.60 (as of August 1, 2019) | $16,627.11 plus $703,708.05 |
| SB Fire and EHS | $40,126.00 plus $7,992.50 | $1,469 plus $353 plus $15,114.99 |
| SB Flood Control |  | $245 |
| SB County Clerk |  | $57 |
| SB Franchise Fees | $20,200.87 |  |
| Harry E. Hagen, Treasurer-Tax Collector | $4,759,786.96 (as of August 1, 2019) | $4,654,443.79 |
| **Totals** | **$7,421,291.60** | **$5,644,566.37 plus unknown** |

This pattern of not paying for environmental, health, and safety regulation or any County services should not be permitted to continue post-petition. These $7,421,291.60 in regulatory and tax debts have built up over more than a year. Meanwhile, in the past year alone, the Statement of Financial Affairs signed by Randeep Grewal [ECF 171 at 294-296 of 316] shows that, instead of paying the S.B. Parties, the debtor has made at least the following payments to insiders/affiliates:

| **Insider** | **Payment** |
|---|---|
| GLR, LLC | $112,500 |
| GLR, LLC | Transfer of lease |
| GRL, LLC | $330,346 |
| GRL, LLC | Transfer of lease |
| Greka Construction, LLC | $108,000 |
| GTL1, LLC | $1,808,000 |

| GIT, Inc. | $2,292,000 |
|---|---|
| California Asphalt Production, Inc. | $7,176,390 |
| **Total** | **$11,827,236 plus lease transfers** |

This debtor operates its oil and gas business utilizing numerous non-debtor affiliates, such as GCL1, LLC, GTL1, LLC, GRL, LLC, Greka Construction, LLC, GLR, LLC, GSR, LLC, Glnv, Inc., and California Asphalt Production, Inc. (CAP).[4] Those affiliates, such as CAP, are not paying their safety and environmental costs, their Notices of Violation, or their ad valorem taxes, either. Just as examples, CAP owes $127,584.41 to APCD alone, and Greka Land Holdings, LLC, CAP, and GSR, LLC collectively owe $628,935.87 in back property taxes.

Not only are the past and ongoing regulatory costs entitled to administrative expense treatment in this bankruptcy case under § 503(b), but they can become liens against the debtor's assets under Santa Barbara County Code § 24A-8.

The stated purpose of the debtor's use of cash collateral is for the debtor to be able to have a reasonable opportunity to reorganize and to maintain the integrity of the debtor's assets and the debtor's asset values. Regulatory compliance by the debtor preserves and enhances the value of the debtor's assets pledged as collateral to the debtor's lender -- UBS. This debtor has announced that it desires to sell assets and

---

[4] *See Pereira v. Grecolas Ltd. (In re Saba Enterprises)*, 421 B.R. 626 (Bankr. S.D.N.Y. 2009)(opinion regarding trustee action for fraudulent transfers among some of these same affiliates).

9

SNOW SPENCE GREEN LLP    I:\Client\SBCO0006 HVI Cat Canyon\BK\CA-SUPP RSP to Cash Collateral Motions.docx    S.B. PARTIES' SUPPLEMENTAL RESPONSE TO DEBTOR'S MOTIONS REGARDING USE OF CASH COLLATERAL

pay off its UBS debt. However, this debtor cannot continue to operate without funding the regulatory oversight needed for safe operations. The County and APCD cannot continue providing that regulatory oversight for free.

The County and APCD have spent many employee hours trying to work with this debtor on getting its compliance costs brought up to date. Agreements have been negotiated and entered into, only to be breached by this debtor. *See*, for example, documents attached as **Exhibit C** and **Exhibit D**. The County and APCD need assurances that this debtor will fund the safe operations of its facilities. Santa Barbara County Code § 25-14 states in relevant part

> The petroleum administrator shall have the primary responsibility for enforcing the provisions of this chapter. In the event the petroleum administrator is unable to obtain compliance with any of the terms and provisions of this chapter, or of any resolution of the board of supervisors adopted pursuant thereto, he/she may order immediate cessation of operations.

The County's preference is that the debtor voluntarily come into compliance, but it is not clear the debtor shares that intent.

Use of cash collateral to pay for regulatory compliance costs preserves and enhances the value of UBS's collateral. There is no escaping the taxes and regulatory costs. If the automatic stay were lifted for UBS to foreclose on its collateral, then that collateral would still be subject to the superior tax liens and UBS would be incurring all of the regulatory costs that the S.B. Parties are requesting be included in the budget. For these reasons, it is appropriate to surcharge UBS's collateral with these costs.

This debtor has not been paying its ad valorem taxes. As shown from its schedules, the debtor was in arrears on ad valorem taxes owed to Harry E. Hagen, Treasurer-Tax Collector of the County of Santa Barbara in the amount of $4,654,443.79 on the petition date. The actual total per the Treasurer-Tax Collector is $4,759,786.96 as of August 1, 2019.

Additionally, as of January 1, 2019, the debtor incurred the 2019 taxes as a lien on the debtor's property. Those 2019 taxes are in the approximate amount of $696,556.64, which has not yet been billed. The debtor's budgets do not contain any line items for payment of any of these taxes. [ECF 43 and ECF 182]. To pay down the debtor's current and back taxes over a lengthy 52-week period, the debtor would have to budget and pay $104,929.68 every week ($4,759,786.96 + $696,556.64 = $5,456,343.60 ÷ 52 = $104,929.68). The debtor has been treating itself as a tax-free business at the expense of the taxpayers of Santa Barbara County.

The debtor asserts that it owes the County $1,303,358.37 for what the debtor calls "secured claim" taxes and $3,351,085.42 for "unsecured claim" taxes, for a total of $4,654,443.79. [ECF 1 at 6, 15]. As discussed below, the debtor is wrong. The County has priority lien status afforded to property assessed on the secured roll for nearly all of these taxes.

## Arguments and Authorities

Santa Barbara County is a political subdivision of the State of California which possesses the authority to assess and collect ad valorem taxes on real and personal property. Cal. Rev. & Tax. Code § 121. A debtor in possession must pay its ad valorem taxes. *In re Gifaldi*, 207 B.R. 54, 56 (Bankr. W.D.N.Y. 1997); *In re United Refuse LLC*, 2007 Bankr. LEXIS 1974 *86-87 (Bankr. E.D. Va. 2007)("Taxing authorities are no different than any other administrative expense creditor whose claim is incurred in the ordinary course of the debtor's business, except that they are not optional. They arise simply because the debtor is operating its business. They have always been treated as administrative expenses to be paid in the ordinary course of business."); *Schechter v. Dept. of Revenue (In re Markos Gurnee P'ship)*, 182 B.R. 211, 227 (Bankr. N.D. Ill. 1995)("taxes incurred by the estate are an administrative expense").

> Such taxes are a proper expense of administration. Indeed, the debtors were obliged to pay the real estate taxes as they became due and owing. Section 959(b) of Title 28 mandates that a debtor-in-possession 'manage and operate the property in his possession … according to the requirements of the valid laws of the State in which such property is situated.' Having assumed the role of trustee, the debtors held the status of agents conducting business under authority of a United States Court. Under the provisions of 28 U.S.C. § 960, the Gifaldis were, therefore, 'subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation.'

*In re Gifaldi, supra.* In *Gifaldi*, a lender had a prior lien on the debtor's real estate. *Id*. at 55. The cash collateral order provided that the debtor could only pay normal

and usual expenses and any payments above $1,000 had to first be approved by the lender. *Id*. Without the consent of the lender, the debtor used cash collateral to pay $212,683.26 on account of post-petition real estate taxes. *Id*. at 56. The lender was under-secured and was entitled to adequate protection in the monies paid to the taxing authorities. *Id*. at 56. However, the court held

> Lennar correctly notes that it was entitled to receive adequate protection of its interest in the mortgage. The issue is whether that adequate protection should extend to payments that the taxing authorities have received. As to this question, Lennar urges reliance on 11 U.S.C. § 361(3), which states that adequate protection includes such other relief 'as will result in the realization of the indubitable equivalent of such entity's interest in such property.' The difficulty with Lennar's argument is that a reallocation of payments would assure not an indubitable equivalent, but a position of superior value. Notwithstanding the failure of the cash collateral order to authorize payment of post-petition **[*57]** taxes, such obligations are properly chargeable to the secured creditor pursuant to section 506(c) of the Bankruptcy Code. It provides that 'the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving … such property to the extent of any benefit to the holder of such claim.' Even when post-petition taxes do not give rise to a real estate lien, they do represent a reasonable and necessary expense for that property. Real property taxes are presumed to constitute payment for benefits rendered to the real estate. Otherwise, they would create administrative liabilities that would survive the disposition of the property. Because these taxes are properly chargeable to the mortgagee under section 506(c), Lennar's interest is subject to that potential claim. A reallocation of tax payments seeks, therefore, to give Lennar something greater than the indubitable equivalent of an interest that would be subject to payment of post-petition taxes.

*Id*. at 56-57; *see also Harold & Williams Dev. Co. v. Crestar Bank (In re Harold & Williams Dev. Co.*), 163 B.R. 77, 80-81 (Bankr. E.D. Va. 1994)(despite free and clear terms of 363 sale, bank ordered to disgorge proceeds of sale to pay city taxes). Thus,

the debtor must pay its ad valorem taxes, whether or not they are in the budget as they should be, and the debtor has the right to surcharge UBS's collateral for such tax payments. *See Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 86 (3rd Cir. 1989)(taxes must be paid as administrative expenses and may also be paid as a surcharge under 506(c)). There is no basis for not including the County taxes in the cash collateral order budget and requiring that they be paid.

The debtor, and perhaps UBS also, is also under the mistaken belief that some of the ad valorem taxes owed to the County are "unsecured." They are not. All but $18,155.90 of the $4,759,786.96 taxes for prior years were assessed on the "secured roll." A portion of these secured taxes were moved to the "unsecured roll" solely in order to initiate collection against HVI Cat Canyon, Inc. as opposed to foreclosing the lien against the property itself at that time. In no way did this eliminate the County's tax lien against the debtor's property. *Barer v. County of Riverside*, (1997) 57 Cal. App. 4th 558 [67 Cal. Rptr. 2d 241], pet. review denied, 1997 Cal. LEXIS 8292 (Cal. 1997). In *Barer*, as in this case, taxes were assessed on the secured roll then, after the taxes became delinquent, they were transferred to the unsecured roll for collection. *Id*. at 561. Quoting from California Revenue and Tax Code § 107, the court stated

> Leasehold estates for the production of gas, petroleum and other hydrocarbon substances… are sufficient security for the taxes levied thereon. These estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll. If the tax on any possessory interest or leasehold estate for the production of gas, petroleum and other hydrocarbon substances is unpaid when any installment of secured taxes becomes delinquent, the tax collector may

14

> use those collection procedures which are available for collection of assessments on the unsecured roll. [P] If the tax on any possessory interest or leasehold estate for the production of gas, petroleum and other hydrocarbon substances remains unpaid at the time set for the declaration of default for taxes carried on the secured roll, the possessory interest tax together with any penalty and costs which may be accrued thereon while on the secured roll shall be transferred to the unsecured roll.

*Id*. at n.2. Transferring the delinquent taxes to the unsecured roll is not a transfer of the assessment of those taxes. *See id*. at 561.

In *Barer*, a bank foreclosed on the property after the delinquent taxes were moved to the unsecured roll for collection, and then the buyer from the foreclosure sold to another buyer with no knowledge of any prior tax lien. *Id*. at 562. There were no exceptions in the title commitment or policy "because the title company believed (mistakenly) that the liens had been eliminated by the foreclosure sale." *Id*. The buyer filed an action for declaratory judgment that the property was free and clear of any tax liens asserting that "when he purchased the property, such purported tax liens were not shown on the secured rolls where real property taxes were shown and therefore he was a bona fide purchaser for value." *Id*. at 562-63. The County and the buyer filed cross motions for summary judgment. The trial court entered judgment for the County on the basis that (a) § 107 forced the County to transfer secured delinquent taxes to the unsecured roll for collection, (b) "Barer had an obligation to search the prior years' secured and unsecured rolls to determine what, if any, delinquent taxes were due against the subject property," (c) the "tax liens have priority over all other liens regardless of the time of their creation," (d) "although Barer did not have actual

notice of the delinquent taxes at the time he [Barer] purchased the subject property, he [Barer] was on constructive notice of the delinquencies based upon his obligation to conduct such a search of the secured and unsecured rolls," (e) "although the delinquent taxes did not show on the current secured roll for 1994 when Barer purchased the property, it was Barer's obligation as a matter of law to search prior years' secured and unsecured rolls for real property tax delinquencies," and (f) "as a matter of law, the non-judicial foreclosure sale conducted under the First Fidelity Deed of Trust did not eliminate or wipe out the 1991-92 and 1992-93 delinquent real property tax liens on the subject property." *Id*. at 565-66.

The court of appeals affirmed the *Barer* trial court's decision on all grounds. *Id*. at 573. Barer argued that it is extremely difficult for the general public to search both the secured and unsecured tax rolls, but the court pointed out that the lender had the capacity to do that and, regardless of difficulty, "plaintiff's contention that he should not be required to search such indexes is without merit." *Id*. at 573. "Generally the Legislature is supreme in the field of taxation." *Id*. at 571. The court noted that "section 2192.1 provides that '[e]very tax declared in this chapter to be a lien on real property … has priority over all other liens on the property, *regardless of the time of their creation*.'" *Id*. at 566 (emphasis in original). The procedure for assessing taxes on oil and gas interests as secured property taxes are separable from the proceedings for collecting the taxes. *Id*. at 570, citing *Picchi v. Montgomery* (1968) 261 Cal. App. 2d 246, 253 [67 Cal. Rptr. 880].

The $4,759,786.96 of unpaid prepetition ad valorem taxes will have to be paid along with the 2019 taxes of approximately $696,556.64 and future taxes. Indeed, the post-petition taxes of this debtor constitute both secured claims as well as administrative priority claims. *In re Soltan*, 234 B.R. 260, 272-73 (Bankr E.D.N.Y. 1999). To amortize the prepetition taxes of $4,759,786.96 over a six-month (26-week) period, and not including penalties and interest, would require payments of $183,068.72 per week. To pay the 2019 post-petition taxes of $628,935.87 over a six-month (26-week) period, and not including penalties and interest, would require payments of $24,189.84 per week. But nothing is in the budget for payment of any taxes, pre- or post-petition.

Payment of taxes is an ordinary part of a debtor in possession's business and requires no notice or court approval. 11 U.S.C. § 363(c)(1). The failure to pay taxes is a basis for conversion to chapter 7. 11 U.S.C. § 1112(b)(4)(I); *In re Builders Group & Dev. Corp.*, 2014 WL 1873412, 2014 Bankr. LEXIS 2092 *22 (Bankr. D. P.R. 2014).

Harry E. Hagen, Treasurer-Tax Collector does not consent, under 11 U.S.C. 363(c)(2)(A) or otherwise, to any interim or final cash collateral orders that do not provide for the payment of the taxes owed to the County. The past, current, and future taxes owed to the County are liens which cannot be avoided or delayed by the debtor's bankruptcy. 11 U.S.C. § 362(b)(18), § 503(b), § 546(b), and § 547(c)(6). The cash collateral orders should provide for the payment of the taxes and make clear that the

taxes are a first lien on the debtor's property in Santa Barbara County under Cal. Rev. & Tax. Code § 2192.1 and that this will continue for future years' taxes. If UBS were entitled to any adequate protection lien, which is disputed because UBS is over-secured, UBS would not be entitled to any adequate protection lien that would put UBS ahead of the County.

Trustees and debtors in possession must, of course, comply with all laws and regulations as they operate, whether in chapter 11 or chapter 7. *See* 28 U.S.C. §§ 959, 960. Oil and gas operators who operate as debtors in possession must comply with the laws and regulations governing their operations. *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434 (5th Cir. 1998)(plugging and abandonment obligations owed to state agency were administrative expenses of the estate); *Munce's Superior Petroleum Prods. v. N.H. Dep't of Envtl. Services (In re Munce's Superior Petr. Prods)*, 736 F.3d 567, 571-73 (1st Cir. 2013)(post-petition state agency fines of $1,000 per day against debtor for non-compliance with environmental law which began prepetition but continued post-petition were given administrative expense treatment); *In re Am. Coastal Energy, Inc.*, 399 B.R. 805, 816 (Bankr. S.D. Tex. 2009)(awarding administrative expense treatment of state agency costs against oil and gas debtor and stating "[a] debtor cannot operate an estate in violation of environmental and safety laws."). Compliance with regulations is considered a benefit to the estate for purposes of 11 U.S.C. § 503(b) even if compliance means the cost of plugging old oil wells for environmental reasons. *Texas v. Lowe* at 436-439. Not paying sales taxes and thereby

18

Snow Spence Green LLP    I:\Client\SBCO0006 HVI Cat Canyon\BK\CA-SUPP RSP to Cash Collateral Motions.docx    S.B. PARTIES' SUPPLEMENTAL RESPONSE TO DEBTOR'S MOTIONS REGARDING USE OF CASH COLLATERAL

subjecting the debtor to interest charges by the taxing authority results in the interest charges being treated as administrative expenses. *Id*. at 438.

Even if the automatic stay were lifted for UBS to foreclose on the debtor's properties, UBS would be incurring all of the regulatory costs and taxes that should be paid under the cash collateral orders and budgets.

The debtor cannot avoid the prepetition unpaid regulatory oversight costs. For example, California Government Code § 54988 provides governmental units such as Santa Barbara County with the right to make unpaid regulatory costs a lien against the debtor's property which "may be collected at the same time and in the same manner as property taxes are collected." As set forth above, this debtor owes at least $2,661,504.64 ($7,421,291.60 - $4,759,786.96 = $2,661,504.64)[5] in prepetition regulatory costs, in addition to this debtor's unpaid property taxes.

The S.B. Parties do not support the granting of any lien on estate avoidance actions. Those actions must be preserved for unsecured creditors. *See In re Ludford Fruit Products, Inc.*, 99 B.R. 18, 25 (Bankr. C.D. Cal. 1989)(giving prepetition secured creditor a lien on avoidance actions would violate logic and the policy behind the avoidance powers); *In re Kooh, LLC*, 2010 Bankr LEXIS 5992 *9-10 (Bankr. N.D. Tex. 2010)(cash collateral order excepted chapter 5 causes of action from

---

[5] Per table in the Facts section. In the same table, the debtor's incorrect number is $990,122.58 in prepetition regulatory costs owed ($5,644,566.37 - $4,654,443.79 = $990,122.58)

19

S<small>NOW</small> S<small>PENCE</small> G<small>REEN</small> LLP    I:\Client\SBCO0006 HVI Cat Canyon\BK\CA-SUPP RSP to Cash Collateral Motions.docx    S.B. PARTIES' SUPPLEMENTAL RESPONSE TO DEBTOR'S MOTIONS REGARDING USE OF CASH COLLATERAL

replacement lien and made replacement liens inferior to the liens of ad valorem taxing authorities).

## Conclusion

The budgets that the debtor and UBS attached to the interim [ECF 43] and bridge [ECF 182] cash collateral orders are fatally flawed in that they do not authorize the debtor to pay its property taxes. The budgets do appear to provide for regulatory oversight costs to the County and APCD; however, the debtor has refused to make the payments. The taxes and regulatory costs must be included in the budget and paid or this case will need to be converted and the regulators will need to order cessation of all operations in the County. The S.B. Parties seek such other relief to which they are entitled.

Dated: September 19, 2019           SNOW SPENCE GREEN LLP

By:  */s/ Ross Spence*
       Ross Spence
       Pro Hac Vice Pending

*Attorneys for the County of Santa Barbara, California; Harry E. Hagen, as Treasurer-Tax Collector of the County of Santa Barbara, California; and Santa Barbara Air Pollution Control District*