1   ERIC P. ISRAEL (State Bar No. 132426)
    *eisrael@dgdk.com*
2   JOHN N. TEDFORD, IV (State Bar No. 205537)
    *jtedford@dgdk.com*
3   AARON E. DE LEEST (State Bar No. 216832)
    *adeleest@dgdk.com*
4   DANNING, GILL, DIAMOND & KOLLITZ, LLP
    1901 Avenue of the Stars, Suite 450
5   Los Angeles, California 90067-6006
    Telephone: (310) 277-0077
6   Facsimile: (310) 277-5735

7   Proposed Attorneys for Michael A. McConnell,
    Chapter 11 Trustee
8

9               UNITED STATES BANKRUPTCY COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                   NORTHERN DIVISION

12

13  In re                              Case No. 9:19-bk-11573-MB

14  HVI CAT CANYON, INC.,              Chapter 11

15              Debtor.                **TRUSTEE'S NOTICE OF MOTION AND
                                       EMERGENCY MOTION FOR AN
16                                     ORDER: (1) AUTHORIZING THE
                                       TRUSTEE TO OBTAIN SECURED
17                                     PRIMING SUPERPRIORITY
                                       FINANCING; (2) AUTHORIZING
18                                     CONTINUED USE OF CASH
                                       COLLATERAL; (3) SCHEDULING A
19                                     FINAL HEARING; AND (4) GRANTING
                                       RELATED RELIEF; MEMORANDUM OF
20                                     POINTS AND AUTHORITIES,
                                       DECLARATIONS OF MICHAEL A.
21                                     MCCONNELL AND TIM SKILLMAN,
                                       AND REQUEST FOR JUDICIAL NOTICE
22                                     IN SUPPORT THEREOF**

23                                     Date:    November 8, 2019
                                       Time:    9:00 a.m.
24                                     Place:   Courtroom 201
                                                1415 State Street
25                                              Santa Barbara, California

26                                     [ALL PARTIES ARE PERMITTED TO
                                       APPEAR TELEPHONICALLY]
27

28

1565756.1  26932

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................9

II.   STATEMENT OF FACTS ....................................................................................10

    A.    OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS...........................10

    B.    THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S
         APPOINTMENT ...............................................................................................11

    C.    SECURED LIABILITIES ..................................................................................11

         1.    UBS and GLR ...............................................................................11

         2.    Santa Barbara ................................................................................13

         3.    The State Controller .....................................................................13

         4.    Northern California Collection Services .....................................13

    D.    THE MOST RECENT ORDER AUTHORIZING USE OF CASH
         COLLATERAL ..................................................................................................14

    E.    THE TRUSTEE'S NEED FOR CONTINUED USE OF CASH
         COLLATERAL ..................................................................................................15

    F.    THE FINANCING FACILITY AND CREDIT AGREEMENT.................................17

III.  RELIEF REQUESTED ........................................................................................18

    A.    THE COURT SHOULD AUTHORIZE THE TRUSTEE TO OBTAIN
         CREDIT PURSUANT TO 11 U.S.C. § 364...................................................18

    B.    THE COURT SHOULD AUTHORIZE THE TRUSTEE'S CONTINUED
         USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363......................22

    C.    THE PROPOSED ADEQUATE PROTECTION FOR THE PROPOSED
         PRIMING CREDIT AGREEMENT AND USE OF CASH COLLATERAL
         SHOULD BE APPROVED ..................................................................................23

         1.    UBS Consents to the Motion .......................................................23

         2.    GLR and California Collection are Not Entitled to Adequate
            Protection ......................................................................................24

         3.    Santa Barbara and the State Controller are Adequately Protected .....24

    D.    IT IS APPROPRIATE TO APPROVE THE CARVE-OUT....................................25

    E.    IT IS APPROPRIATED TO GRANT A LIMITED LIEN ON AVOIDING
         POWER CLAIMS ..............................................................................................26

1

## TABLE OF CONTENTS
### (Continued)

2
Page

3    F.    IT IS APPROPRIATE TO WAIVE THE RIGHT OF FIRST REFUSAL.................26

4    G.    NOTICE WITH RESPECT TO INTERIM ORDER.................................................27

5    H.    NOTICE WITH RESPECT TO FINAL HEARING...............................................27

6    I.    WAIVER OF RULE 6004(A) AND 6004(H) ........................................................27

7  IV.   CONCLUSION.....................................................................................................28

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

Page

**CASES**

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ........................................ 18, 19, 25

*In re Aqua Assocs.*
   123 B.R. 192 (Bankr. E.D. Pa. 1991) ........................................................ 19

*In re Constable Plaza Associates, L.P.*, 125 B.R. 98 (Bankr. S.D.N.Y. 1991) ........................ 25

*In re Crouse Group. Inc.*
   71 B.R. 544 (Bankr. E.D. Pa. 1987) ........................................................ 19

*In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ........................... 21

*In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ........................................ 23

*In re Los Angeles Dodgers, LLC*
   457 B.R. 308 (Bankr. D. Del. 2011) ........................................................ 19

*In re Mellor*, 734 F.2d 1393, 1400 (9th Cir. 1984) .................................................... 24

*In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987) ............................ 22

*In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982) ....................... 22

*In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713 (Bankr. D. Del. 1996) ....................... 25

*In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Co. 1985) .................................... 19

*In re Sky Valley, Inc.*
   100 B.R. 107 (Bankr. N.D. Ga. 1998) ........................................................ 20

*In re Snowshoe Co.*
   789 F.2d 1085 (4th Cir. 1986) ........................................................ 19

*Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir.
   1987) ........................................................ 23

*McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Properties VI,
   Ltd.)*, 88 B.R. 261, 265-66 (Bankr. C.D. Cal. 1988) ........................................ 22

*Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug
   Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) .................................. 18

*Stein v. FHA (In re Stein)*, 19 B.R. 458, 460 (Bankr. E. D. Pa. 1982) ............................. 22

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S.
   365 (1988) ........................................................ 22

*Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re
   Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) ..................... 21

1

## TABLE OF AUTHORITIES
(Continued)

2                                                                                          Page

3   **STATUTES**

4   11 U.S. C. § 362(c)(3) ................................................................................ 18

5   11 U.S.C. § 361 ........................................................................................... 19

6   11 U.S.C. § 363 ........................................................................................... 22

7   11 U.S.C. § 363(c)(2) .................................................................................. 22

8   11 U.S.C. § 363(e) ................................................................................. 22, 23

9   11 U.S.C. § 364 ........................................................................................... 18

10  11 U.S.C. § 364(a) ...................................................................................... 18

11  11 U.S.C. § 364(b) ...................................................................................... 18

12  11 U.S.C. § 364(c) ................................................................................. 18, 19

13  11 U.S.C. § 364(d) ............................................................................. 19, 20, 32

14  11 U.S.C. § 364(d)(1) ................................................................................. 19

15  11 U.S.C. § 364(d)(1)(B) ............................................................................ 23

16  11 U.S.C. § 365(c) ...................................................................................... 26

17  11 U.S.C. § 506 ........................................................................................... 13

18  11 U.S.C. § 506(a) ...................................................................................... 24

19  Cal. Rev.& Tax. Code § 2192.1 ................................................................. 13

20

21

22

23

24

25

26

27

28

1    **PLEASE TAKE NOTICE** that on **November 8, 2019**, at **9:00 a.m.**, in Courtroom 201 of

2    the U.S. Bankruptcy Court for the Central District of California, located at 1415 State Street, Santa

3    Barbara, California, Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of

4    HVI Cat Canyon, Inc. (the "Debtor"), will and does hereby move the Court, **on an emergency**

5    **basis**, for an order (1) authorizing the Trustee to obtain secured priming superpriority financing; (2)

6    authorizing the continued use of cash collateral; (3) scheduling a final hearing; and (4) granting

7    related relief (the "Motion"). **According to the Court's instructions, all parties are permitted to**

8    **appear telephonically at the hearing on the Motion.**

9            In accordance with Fed. R. Bankr. P. 4001(b)(1)(A) and (c)(1)(A), the proposed order is

10    attached as Exhibit "1" hereto and a copy of the proposed Credit Agreement with UBS is attached

11    as Exhibit "3" to the Trustee's Declaration. A copy of the Trustee's proposed budget is attached as

12    Exhibit "2" to the Declaration of Tim Skillman.

13            **PLEASE TAKE FURTHER NOTICE** that this Motion has been filed on an emergency

14    basis because the Trustee needs the funds to pay payroll on November 8, 2019, and to pay certain

15    other expenses on November 8, 2019, or as soon thereafter as possible.

16            **PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9075-1, a hearing on this

17    motion is set for **November 8, 2019**, at **9:00 a.m.**

18            In accordance with the Court's instructions given to the Trustee's counsel, telephonic notice

19    of the hearing on this Motion will be given to counsel for the following promptly after the Motion

20    is filed:

21            • the Debtor;
            • the Official Committee of Unsecured Creditors;
22            • UBS AG, London Branch;
            • County of Santa Barbara, California;
23            • California State Lands Commission;
            • Buganko, LLC;
24            • GIT, Inc.;
            • the Office of the United States Trustee; and
25            • parties that have requested special notice.

26        Telephonic notice will also be given to GLR, LLC and other lienholders.

27

28

**PLEASE TAKE FURTHER NOTICE** that oppositions to the Motion, or to the setting of the hearing on this Motion on an emergency basis, may be presented orally at the hearing.  If you do not have any objection to this Motion, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that in accordance with Federal Rule of Bankruptcy Procedure 4001(b)(1)(A) and (c)(1)(A), the following table summarizes the significant terms of the proposed use of cash collateral and the Credit Agreement:[1]

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| Amount | Maximum principal amount of $3 million (plus additional funding of up to $500,000) | § 2.01 | ¶ 2 |
| Interest rate | Prime + 1.5% | § 2.03 | N/A |
| Maturity date | Six months from the initial closing date | § 1.01 | N/A |
| Events of default | See the Credit Agreement.  **This is a summary only:**  failure to pay any principal, interest, or any other amount of the loan when due and payable;  inaccuracy of any representation or warranty;  failure to observe or perform covenants;  default in the performance of or compliance with any term contained in any loan document  entry of an order (A) authorizing the Trustee to obtain additional financing or authorizing any person to recover | § 7.01 | N/A |

[1]  Because this table is provided, the Trustee requests that the Court waive the requirement in LBR 4001-2 that the Trustee file a separate *Statement Regarding Cash Collateral or Debtor in Possession Financing.*

1565756.1  26932

2

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| | from the collateral under § 506(c), authorizing the use of cash collateral without UBS' consent, (B) terminating the Trustee or appointing an examiner, (C) dismissing the bankruptcy case, (D) granting relief from the automatic stay, (E) modifying the orders approving the loan agreement, (F) filing a chapter 11 plan without UBS' consent, (G) consolidating or combining the Debtor with another person except pursuant to a plan with UBS' consent, (H) approving (or arising) an administrative claim senior to the claim of UBS,(I) invalidity of the claims or interests of UBS in connection with new loan (J) confirming a plan that does not provide for payment of the loan amount on the effective date, (K) the commencement of a challenge to UBS' pre-petition loan and or priority.  revocation, suspension or non-renewal of approval by a governmental agency  entry of judgments or orders for postpetition liability not adequately covered by insurance  invalidity of liens granted with respect to the loan. | | |
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Superpriority administrative expense claim and priming lien on all assets of the Debtor's estate, including avoidance actions. | § 2.04(b) | ¶ 11 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case or the use of property of the estate or credit obtained under § 364 to make cash | Adequate protection in the form of Replacement and additional liens and a superpriority administrative claim for diminution in value of the prepetition collateral of UBS. | N/A | ¶ 20; ¶21 |

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| payments on account of the claim | | | |
| Cross-collateralization – i.e., clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law | None. | N/A | N/A |
| Roll-up – i.e., provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other than as provided in § 552(b) | None. | N/A | N/A |
| Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | None. | N/A | N/A |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien security the claim | There is a 30 day challenge period after which such claims become valid. | N/A | ¶ 43 |
| A waiver or modification of Code provisions or applicable rules relating to the automatic stay | Modification of the stay to allow UBS to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Financing Liens | N/A | ¶ 11; ¶ 30 |

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| | granted to them pursuant to the proposed order<br><br>Modification of the stay to allow UBS to perform any act authorized by the proposed order.<br><br>No stay if default under post-petition borrowing. | | |
| Automatic relief from the automatic stay upon occurrence of certain events | Yes – upon default with five day notice provision. | § 7.01 | N/A |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364 | The consent of UBS is required to file a plan or modify the terms of the loan through a plan. Any plan must provide for payment of the loan amount in full on the effective date. | § 7.01 | N/A |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | None. | N/A | N/A |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Borrowing liens perfected without recording or filing of financial statements<br><br>Perfection for adequate protection liens is provided by the order; not waiver of foreclosure or enforcement provisions. | § 2.04 | ¶ 23 |

1565756.1  26932

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Parties shall have 30 days after entry of the proposed order to challenge the validity, perfection enforceability priority, or extent of UBS' prepetition loan obligations or prosecuted fraudulent transfers or conveyances or asserting or prosecuting any avoidance power claims against UBS on behalf of the estate. | N/A | ¶ 43 |
| The indemnification of any entity | The Trustee agrees to indemnify UBS. | § 8.06 | N/A |
| A release, waiver, or limitation of any right under § 506(c) | All rights of the Debtor, the Trustee, and the estate to surcharge the collateral of UBS are waived with regard to any period during which cash collateral of UBS is used pursuant to the proposed order and until all borrowing obligations are paid in full. | N/A | ¶ 32 |
| The granting of any lien on any claim or cause of action arising under § 506(c) | Superpriority lien on all assets of the Debtor's estate, including avoidance actions. The lien does not secure the prepetition loan of UBS. | § 2.04(b) | ¶ 11 |
| The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Superpriority lien on all assets of the Debtor's estate, including avoidance actions. The lien does not secure the prepetition loan of UBS. | § 2.04(b) | ¶ 11 |
| With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | There are separate line items in the budget for the Trustee and his professionals and for the Committee's Professionals, and a supporting carve-out. | Exhibit "2" to Motion | N/A |
| Pay down prepetition principal owed to a creditor | None | N/A | N/A |

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| Findings of fact on matters extraneous to the approval process | None | N/A | N/A |
| Other | (i) Waiver of the right of first refusal for Debtor to purchase debt upon sale by UBS provided in prepetition credit facilities.<br><br>(ii) Within thirty (30) days after the date of the loan agreement, obtain entry of the Final Borrowing Order by the Court.<br><br>(iii) No later than November 18, 2019, commission an independent third-party petroleum engineering consultancy firm acceptable to UBS on terms acceptable to UBS to prepare and deliver a full year end reserve report, including unproven reserves, for 2019.<br><br>(iv) No later than November 18, 2019, commission an independent third-party expert acceptable to UBS<br><br>(v) No later than November 18, 2019, deliver a go forward 13 week budget. | § 8.18 | N/A |

1    The Trustee's Motion is based upon this notice and Motion, the accompanying

2    Memorandum of Points and Authorities, Declaration of Michael A. McConnell, Declaration of Tim

3    Skillman, and Request for Judicial Notice, the separate proof of telephonic notice of the hearing,

4    the papers and pleadings on file in this case, and such other evidence as may be presented to the

5    Court.

6

7    DATED:  November ___, 2019          DANNING, GILL, DIAMOND & KOLLITZ, LLP

8

9                                          By: _____

10                                             AARON E. DE LEEST
                                               Proposed Attorneys for Michael A. McConnell,
11                                             Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## <u>INTRODUCTION</u>

Michael A. McConnell, the Chapter 11 trustee (the "Trustee") of HVI Cat Canyon, Inc. (the "Debtor"), has endeavored to hit the ground running in this complex Chapter 11 case. As reported at the hearing on October 25, 2019, almost immediately after his appointment, the Trustee met with the Debtor's officers and discovered that, due a variety of reasons including alleged pre-payments and a variety of asserted setoffs, the estate would have insufficient funds to make payroll and pay related payroll taxes for employees which were due only two days later. Eventually, the affiliate who was purchasing the Debtor's product relented and advanced some money to the Debtor to allow it to make payroll and cover payroll taxes, although under its contract it claimed that the payments otherwise were not due until November 20, 2019. That concluded week 13 of the Agreed Cash Collateral Budget which the Court had approved prior to the Trustee's appointment.

In the interim, the Trustee has formulated a budget for the next five weeks through which the Trustee is seeking to stabilize operations, address ongoing health and safety issues, including regulatory compliance, begin investigation and review of various arrangements and agreements with affiliates, and retain and provide for compensation to various key professionals. The five week period was chosen by the Trustee with assistance from his professionals because projection beyond that time was deemed speculative.

The budget requires a cash infusion of almost $2 million over the five week period to accomplish these goals. The Trustee has negotiated at arms' length with the Debtor's existing senior secured lender, UBS AG, London Branch ("UBS AG, London"), for a loan facility from its related entity UBS AG, Stamford Branch ("UBS AG, Stamford" and together with UBS AG, London, "UBS") that he can draw down against to pay budgeted bills as they arise. The facility is for $3 million, approximately $2 million of which is committed, while the additional $1 million is uncommitted and subject to UBS' discretion. At this time, the Trustee did not have sufficient basis to request a commitment of this additional amount by UBS, but it is hoped that the Trustee, with

1   the consent of UBS, may also commence repairing equipment and facilities that are in need of

2   repairs due to serious deferred maintenance to increase productivity and health and safety, and for

3   any other needs that arise during that time.  The agreement provides for consensual operations for

4   up to another two weeks and further advances up to another $500,000.

5        The loan will be secured by a first priority priming lien, ahead of UBS' first lien and the

6   junior lien of GLR, LLC ("GLR"), an affiliate of the Debtor, and ahead of the lien securing real

7   property taxes in favor of the County of Santa Barbara ("Santa Barbara").  The loan is to be treated

8   as a super-priority administrative expense, other than the expenses provided in the carve-out budget

9   and as otherwise may be agreed.  UBS is also requiring that the Trustee waive a provision under

10   the prepetition credit agreements that gave the Debtor a right of first refusal if UBS sought to sell

11   the loan.  The Trustee believes that the loan terms are reasonable and appropriate, and indeed the

12   loan is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, and

13   the Trustee requests that the Court make such a finding regarding the credit facility.

14        The Trustee respectfully requests that the Court grant the motion, approve the proposed

15   borrowing under the terms proposed on an interim basis, including cash collateral use per the 5

16   week budget, and set a final hearing on the motion.  The Trustee further prays for all other

17   appropriate relief.

18

19                    **II.**

20             **STATEMENT OF FACTS**

21   **A.**    **OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS**

22        The Debtor is a Colorado corporation authorized to conduct business in the state of

23   California.  It is the owner and operator of producing oil and gas interests in California.  According

24   to the Debtor, it owns an approximately 100% working interest and an average 85% net revenue

25   interest in several oilfields in the Santa Maria Valley of Santa Barbara County ("SMV"), North

26   Belridge in Kern County ("Belridge"), and Richfield East Dome Unit in Orange County ("Redu").[2]

27

28      [2] Docket no. 16, pp. 1-2, ¶ 2.

1　The Trustee is advised that the Debtor has over 1,000 oil wells, although many of them are

2　currently idle.

3

4　**B.     THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S APPOINTMENT**

5　　　On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under

6　Chapter 11 of title 11 of the United States Code (the "Code").  The case was originally filed in the

7　Southern District of New York.  It was transferred to the Northern District of Texas, and then later

8　to the Central District of California.

9　　　The Debtor initially operated its business as a "debtor in possession," allowing it to exercise

10　substantially all rights of a trustee in the bankruptcy case.

11　　　On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was

12　appointed.

13　　　On or about October 16, 2019, the Court entered its *Agreed Order Granting Motion for*

14　*Appointment of a Chapter 11 Trustee*.

15　　　On or about October 21, 2019, the Court approved the appointment of Michael A.

16　McConnell as the Chapter 11 trustee in this case.

17

18　**C.     SECURED LIABILITIES**

19　　　**1.     UBS and GLR**

20　　　Prior to the commencement of the bankruptcy case, the Debtor and UBS had entered into

21　certain loan arrangements evidenced by: (i) that certain First Lien Credit Agreement among the

22　Debtor, Rincon Island Limited Partnership, GOGH, LLC, and UBS AG, London dated as of May

23　20, 2016 in the original principal amount of $50 million; and (ii) that certain Second Lien Credit

24　Agreement among the Debtor, Rincon Island Limited Partnership, GOGH, LLC and UBS AG,

25　London dated as of May 20, 2016 in the original principal amount of $50 million (collectively, the

26　"Prepetition Credit Agreements" and the obligations arising thereunder, the "UBS Secured Debt").

27　　　The Prepetition Credit Agreements, at Section 9.04(b)(i)(A), provide that in the event of an

28　assignment by UBS of the rights and obligations under the agreement, that UBS shall "first offer to

1    assign such rights and obligations" under the agreement to the Debtor pursuant to a notice (the

2    "ROFR").[3] A copy of the pertinent portion of the Prepetition Credit Agreements containing the

3    ROFR is attached as Exhibit "4" to the Trustee's Declaration.

4              The Debtor is also a party to that certain Amended and Restated Credit Agreement, as

5    amended, with GLR dated as of May 20, 2016 (the "GLR Secured Debt").  Substantially all of

6    Debtor's assets are pledged as collateral for its obligations under the UBS Secured Debt, which is

7    in first position, and the GLR Secured Debt.[4]  GLR is an affiliate and insider of the Debtor.

8              UBS and GLR are parties to that certain Subordination and Intercreditor Agreement

9    ("Subordination Agreement") dated as of May 20, 2016. The Subordination Agreement provides,

10   among other things, that GLR's liens, right to payment and right to exercise remedies are

11   subordinate to those of UBS.[5]

12             According to the Debtor, on the Petition Date the outstanding amount due to UBS was

13   approximately $114 million, and the outstanding amount due to GLR was approximately $104

14   million.  UBS asserts that the current outstanding amount due to UBS is at least $128 million which

15   is disputed by Debtor.[6]

16             UBS's expert valuation of the Debtor's assets concluded that they are worth between $50

17   million and $75 million.[7]

18

19

20

21

22

---

23       [3] Docket no. 365-19 (Exhibit UBS-22), p. 124 of 135.

24       [4] Docket no. 43, p. 2 of 14, ¶ C.

25       [5] Docket no. 11, p. 3 of 10.

26       [6] Docket no. 43, p. 2 of 14, ¶ C.

27       [7] Docket no. 121, p. 8 of 31, ¶ 8.

28

The Court agreed with UBS' valuation during the evidentiary hearings conducted on October 3 and 4, 2019, in connection with the Debtor's cash collateral motion.[8] Thus, pursuant to 11 U.S.C. § 506, UBS is an undersecured creditor and GLR is entirely unsecured.

**2.    Santa Barbara**

Santa Barbara asserts that it has a secured tax claim for real property taxes owed by the Debtor in excess of $4.7 million.[9] However, Santa Barbara's real property tax liens do not extend to the Debtor's revenues and income generated by the Debtor's business. *See* Cal. Rev.& Tax. Code § 2192.1. Therefore, the revenues and income proposed to be used by the Trustee are not the cash collateral of Santa Barbara, and Santa Barbara is not entitled to any adequate protection in relation to cash collateral use.[10] However, Santa Barbara's real property tax liens will be affected by the propose lien priming.

**3.    The State Controller**

The Debtor's schedules also reflect that the California State Controller Tax Administration Section ("State Controller") has a claim for unpaid "production assessments" in the amount of $1,304,573.87, secured by real property in Orange and Santa Barbara Counties.[11]

**4.    Northern California Collection Services**

The Debtor's schedules also reflect that that Northern California Collection Service, Inc. ("Collection Service") has an abstract of judgment in the amount of $175,703.75, secured by real

---

[8] The Court stated that the value of the company ranged from $50 to 75 million. Oct. 4, 2019 Tr. at 335:9-16.

[9] Santa Barbara appears to concede that its tax lien is only on the Debtor's real property interests in Santa Barbara County. Docket no. 206, p. 11 of 20. Santa Barbara also did not cite to any authority at the hearing that its lien extended to the Debtor's cash. Oct. 8, 2019 Tr. at 16:10-16, 17:4-14, 36:17-25.

[10] Orange County and Kern County have filed proofs of claim, docketed as Claim No. 7 and Claim No. 2 on the Court's Claims Register, that assert secured tax claims against the Debtor. The Trustee's analysis with respect to use of cash collateral and priming the real property tax liens of Santa Barbara is equally applicable to those counties and if the Motion is granted the Trustee will also be priming the secured tax claims of Orange County and Kern County.

[11] Docket no. 171, p. 73 of 316.

1  property in Santa Barbara County and JL-1 judgment lien filed with the Secretary of State.[12]

2  Collection Service's JL-1 judgment lien was filed with Secretary of State after the UCC-1

3  financing statements of UBS and GLR and is junior to those interests.

4

5  **D.    THE MOST RECENT ORDER AUTHORIZING USE OF CASH COLLATERAL**

6        On or about October 8, 2019, the Court entered its *Agreed Order for Consensual Use of*

7  *Cash Collateral* (the "Prior Cash Collateral Order").  The Prior Cash Collateral Order, which

8  covered weeks one through thirteen, provided, in relevant part, as follows:

9        •    The Debtor was authorized to use Cash Collateral <u>through October 25, 2019</u> to pay
            ordinary course operating expenses in accordance with a budget that was attached to
10           the Prior Cash Collateral Order (the "Approved Budget").

11       •    Without a court order or written consent of UBS and Santa Barbara, the Debtor was
            *not* authorized to make "any royalty payments or surface lease payments to insiders
12           or affiliates of the Debtor."  The Debtor was required to hold such payments in an
            interest-bearing escrow or segregated account.

13

14       •    Subject to certain conditions (including the consent of the Committee and Santa
            Barbara), UBS may, by written agreement, amend the Approved Budget to extend
            the date through which Cash Collateral may be used and to increase the amount of
15           Cash Collateral that may be used thereunder.

16       •    "[T]he Trustee is specifically authorized to use Cash Collateral pursuant to the
            terms" of the Prior Cash Collateral Order.

17

18       The Debtor's (and Trustee's) authorization to use cash collateral ended on October 25,

19  2019.  Again, the Trustee was only appointed on October 21, 2019.

20       On October 23, 2019, two days before authority for use of cash collateral expired under the

21  Prior Cash Collateral Order, the Trustee and UBS learned that the Debtor did not have sufficient

22  cash to fund payroll and other operating expenses scheduled for payment.  To address the

23  immediate cash need, on October 24, 2019, the Trustee filed his *Emergency Motion for (1)*

24  *Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production,*

25  *Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such*

26  *Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)* (the "Emergency Motion").

27

28  ──────────
    [12] Docket no. 171, p. 73 of 317.

1    Following the October 25, 2019 emergency hearing, the Court entered the *Order Granting*

2  *Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed*

3  *by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain*

4  *"Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)*,

5  granting authorizing the Trustee to accept a partial prepayment from California Asphalt Production,

6  Inc. ("CAP").

7    Thereafter, the Trustee requested that CAP advance $311,000 against October 2019

8  shipments.  However, CAP advanced $115,817.37 of the $311,000 needed for payment of payroll,

9  payroll taxes, and royalties.  The money advanced by CAP was not sufficient to pay royalties or the

10  Debtor's other operating needs.

11

12  **E.    THE TRUSTEE'S NEED FOR CONTINUED USE OF CASH COLLATERAL**

13    The Trustee is seeking authority to continue to use cash collateral for <u>five weeks</u> (i.e. weeks

14  13 to 18) from <u>October 26, 2019</u> through <u>November 29, 2019</u> (the "Budget Period").  The Trustee

15  requires the use of cash collateral to pay payroll and related taxes, and all ordinary and necessary

16  expenses incurred or to be incurred in operating the Debtor and the costs associated with

17  administering the estate.  Without the continued use of cash collateral, the Trustee will not have the

18  funds required to pay the Debtor's employees, operate the Debtor, protect public health and safety

19  and maximize the value of this estate.  Accordingly, the Trustee seeks authority to use cash

20  collateral from <u>October 26, 2019</u> through <u>November 29, 2019</u> (i.e., the Budget Period), in

21  accordance with the Trustee's proposed budget that is attached as Exhibit "2" to the Declaration of

22  Tim Skillman hereto (the "First Budget"), with a 10% cumulative variance.

23    The Trustee elected to proceed with a five week budget because it will take some time to

24  investigate alternatives on a variety of levels, including possibly replacing certain back office

25  employee services which are provided by an affiliate, obtaining quotes to address deferred

26  maintenance and other changes that may be appropriate.  Those decisions will affect the types and

27  amounts of future expenses, and the Trustee determined that a five week budget would be prudent.

28  The Trustee is also preparing a 13 week budget for the period of time after the Budget Period.

1    The First Budget reflects that the Debtor's operations currently do not generate sufficient

2  cash to pay its expenses and, over the course of the Budget Period, result in a net negative cash

3  flow of approximately $2 million.  The Trustee's First Budget includes, over the Budget Period,

4  $2,069,948 for operating expenses (payroll, consultants, utilities, electricians, welders,

5  maintenance, gasoline, transportation, vacuum trucks, utilities, and permit fees, among other

6  items), $907,910 in general and administrative expenses (bank charges payable to depositary banks

7  (i.e., not UBS which receives no payments under the Budget), professional fees, U.S. Trustee fees,

8  and insurance, among other items), and $310,547 in health and safety expenses for SMV, Belridge

9  and Redu.

10    In preparing the First Budget, the Trustee and his professionals were particularly sensitive

11  to health and safety issues.  The health and safety category accounts for approximately $ 310,000

12  of the First Budget.  It appears to the Trustee that UBS shares his strong commitment to health and

13  safety, and it is the goal of the First Budget to adequately provide for it.

14    Because the cash flow is negative, as discussed below, the Trustee needs to obtain financing

15  and the right to use cash collateral.  UBS has agreed to lend the Trustee up to $3 million over the

16  Budget Period to meet the Trustee's ongoing expenses of operating the Debtor as set forth in the

17  First Budget.[13]

18    To address timing variances for any line item in the Trustee's First Budget between when

19  the expense is projected to be incurred and when it is actually paid, the Trustee seeks authority to

20  pay any expense in the Trustee's First Budget in the week it is projected to be incurred or in the

21  following week (or weeks), whenever it is actually paid.

22    Because projections are forward-looking, they can never be entirely accurate.  Thus, to

23  protect the Trustee from fluctuations in expenses and costs, the Trustee seeks permission to exceed

24  any line item in the First Budget by up to ten percent (10%) tested on a cumulative basis by

25  disbursement categories contained in the First Budget, subject to the aggregate budget limit.

26

27    _____

[13] The order also allows, but does not require, UBS and the Trustee to extend the budget for up

28  to two more weeks and advance up to $500,000.

1565756.1 26932                              16

1    The Trustee's First Budget also includes a reserve for the fees and costs of the Trustee and

2    his professionals and the Committee's professionals.  The estimate is subject to many variables

3    and, accordingly, the Trustee is not seeking authority to pay those fees at this time.  Payment

4    requests will be the subject of separate proceedings at the appropriate time.  The funds in the First

5    Budget for professionals to be provided by UBS will be deposited into two segregated accounts

6    held by the Trustee (one account for the Trustee and his professionals, and one account for the

7    Committee's counsel).  The funds in the segregated accounts will only be distributed by the Trustee

8    after he receives authority from the Court to do so.

9

10    **F.    THE FINANCING FACILITY AND CREDIT AGREEMENT**

11    The Trustee and UBS have negotiated for a written loan facility as set forth in a written

12    credit agreement (the "Credit Agreement") in substantially the same form as the agreement

13    attached to the Trustee's Declaration as Exhibit "3" hereto.  The negotiations were conducted at

14    arm's length over a period of less than one week.

15    The proposed Credit Agreement contains reasonable terms.  UBS has agreed to advance up

16    to $3 million to fund operations for the five week period covered by the First Budget.

17    Without limiting the terms set forth in the Credit Agreement, the documents appended

18    thereto, and the above chart required by Federal Rule of Bankruptcy Procedure 4001(b)(1)(A) and

19    (c)(1)(A), the following is a brief summary of significant loan terms:

20    1.    The loan amount is in the maximum principal amount of $3 million.

21    2.    The interest rate is Prime +1.5%

22    3.    The maturity date is six months from the initial closing date.

23    4.    The loan will be due in full on the maturity date or upon termination of the facility.

24    5.    The loan will be perfected by a first priority priming security lien on all assets of the

25    Debtor's estate, <u>including avoiding power claims</u>, and will be afforded superpriority administrative

26    expense status.

27

28

As noted above, the Trustee and UBS have agreed to extend the budget for up to two more weeks and advance up to $500,000 more.  The Trustee does not believe that any other financing than that offered by UBS under the Credit Agreement is available to him.

## III.

## RELIEF REQUESTED

**A.    THE COURT SHOULD AUTHORIZE THE TRUSTEE TO OBTAIN CREDIT PURSUANT TO 11 U.S.C. § 364**

Section 364 allows the Court to authorize postpetition financing and expressly allows courts to authorize protections designed to assure repayment of the postpetition loans. *Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992).  Section 364 establishes a series of possible postpetition transactions by which a trustee might obtain credit:

(i) unsecured credit with administrative expense status  (Sections 364(a) and (b));

(ii) unsecured credit with priority over all other administrative expenses (i.e., superpriority) (Section 364(c)(1));

(iii) credit secured by a lien on unencumbered priority; (Section 364(c)(2);

(iv) credit secured by a junior lien on encumbered property (Section 364(c)(3); and

(v) credit secured by a lien on encumbered property senior or equal to existing liens provided that adequate protection is provided to holders of existing liens (Section 364(d)).

The Court has discretion to approve proposed postpetition financing, which should be exercised as long as the proposed financing does not leverage the bankruptcy process or its purpose and the benefit to the estate remains of paramount interest as opposed to the individual interests of the parties. *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Generally, courts apply a three-part test to determine whether a trustee or debtor in possession may obtain credit under § 364(c).  Under such test, a trustee or debtor may incur postpetition financing pursuant to § 364(c) if it demonstrates that (a) it cannot obtain credit unencumbered or without superpriority status, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the loan are fair, reasonable and adequate. *See In re Crouse Group.*

1 | *Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *In re Aqua Assocs.*, 123 B.R. 192, 195-96

2 | (Bankr. E.D. Pa. 1991); *In re Los Angeles Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).

3 | Section 364(d) authorizes a trustee or debtor in possession to obtain credit or incur debt secured by

4 | a senior or equal lien on property of the estate that is subject to a lien if the trustee or debtor is

5 | unable to obtain such credit otherwise and the interests of secured creditors whose liens are being

6 | primed are adequately protected. 11 U.S.C. § 364(d)(1); *see also Aqua Assocs.*, 123 B.R. at 196.

7 |       Against this statutory backdrop, courts will evaluate the facts and circumstances of a

8 | debtor's case and accord significant weight to the necessity for obtaining the financing. *See, e.g.,*

9 | *Ames*, 115 B.R. at 40-41. A debtor in possession or trustee is generally permitted to exercise their

10 | business judgment consistent with their fiduciary duties when evaluating the necessity of proposed

11 | protections for a party extending credit under § 364. *Id.* at 38. The Court should give broad

12 | deference to the business decision of the debtor or trustee, particularly with respect to the need for

13 | and proposed use of funds. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Co.

14 | 1985) (authorizing interim financing agreement where debtor's best business judgment indicated

15 | financing was necessary and reasonable for the benefit of the estate); *Ames,* 115 B.R. at 38 (with

16 | respect to postpetition credit, courts "permit debtors in possession to exercise their basic business

17 | judgment consistent with their fiduciary duties").

18 |       To show that the credit required is not obtainable on an unsecured basis, a trustee or debtor

19 | needs only to demonstrate "by a good faith effort that credit was not available" without the

20 | protections afforded to potential lenders by § 364(c) or (d). *In re Snowshoe Co.*, 789 F.2d 1085,

21 | 1088 (4th Cir. 1986). Of course, the Code "imposes no duty to seek credit from every possible

22 | lender before concluding that such credit is unavailable." *Id.* If a trustee or debtor is unable to

23 | obtain credit under § 364(c), they may obtain credit secured by a senior or equal lien on property of

24 | the estate as long as there is adequate protection of any pre-existing secured creditor's interests in

25 | the property. Although the Code does not explicitly define "adequate protection," § 361 provides

26 | that it may take the form of a cash payment or periodic cash payments to the extent that there is a

27 | decrease in the lien holder's property interest, an additional or replacement lien to the extent that

28 | there is a decrease in the lien holder's property interest, or other relief that will result in a secured

1    party's realizing the indubitable equivalent of its property interest.  Where the proposed use of

2    funds from additional postpetition financing augment the value of the secured creditor's collateral,

3    adequate protection exists.  *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1998).

4         In this case, it should go without saying that the Trustee is unable to obtain financing on an

5    unsecured basis or secured by a junior lien on the Debtor's assets.  UBS is the Debtor's senior

6    secured creditor and, as set forth above, the total amount owed to UBS is not less than $114

7    million.  All of the Debtor's assets are collateral for UBS' debt.  Santa Barbara asserts a tax lien for

8    about $4.7 million, which is senior to UBS on real property interests.  GLR asserts a junior lien of

9    $104 million.  With a value of the Debtor's assets in the $50 million to $75 million range, there are

10   no lenders that would agree to lend on an unsecured or secured junior lien basis.  Any subordinated

11   loan that the Trustee could obtain would in effect be unsecured because there is no collateral value

12   over and above what UBS is owed.

13        Therefore, one would expect that the Trustee look to UBS, as the Debtor's largest secured

14   creditor, to obtain postpetition financing because UBS has the most to gain from seeing the Trustee

15   succeed in preserving the Debtor's business operations.  UBS has agreed to provide the Trustee

16   with such credit secured by a senior superpriority "priming" lien pursuant to § 364(d) and an

17   allowed superpriority administrative claim pursuant to section 364(c)(1).  The proposed terms take

18   into account the interests of, on the one hand, UBS (in ensuring that its postpetition investment is

19   protected) and, on the other hand, the necessity of the Trustee in obtaining the proposed

20   postpetition financing on reasonable terms.

21        Here, based on the existing financial condition of the Debtor and the totality of the relevant

22   circumstances, the Trustee exercised his sound business judgment in determining that postpetition

23   financing proposed in the Credit Agreement is appropriate and necessary under the circumstances.

24   The Trustee does not believe that he would have been able to obtain postpetition financing from

25   another source on terms more favorable than those described herein.  CAP has been unwilling or

26   unable to advance the funds.

27        The Trustee has also determined that it is in the estate's best interests that he borrow the

28   funds from UBS that he needs to fund the Trustee's First Budget in order to avoid immediate and

1   irreparable harm to the estate and preserve the Debtor's ongoing business operations and the

2   estate's assets.  As described herein, the Trustee needs the postpetition financing to pay the

3   ongoing expenses set forth in the Trustee's First Budget.  The Trustee's immediate acquisition of

4   credit from UBS is in the best interests of the estate and the creditors and is necessary for the

5   continued business operations due to the <u>negative cash flow</u> reflected in the Trustee's First Budget.

6   The Trustee needs the cash to fund the First Budget, including, meeting the <u>November 8, 2019</u>

7   <u>payroll</u> and paying certain other expenses that the Trustee and his proposed CRO have identified as

8   high-priority items.  Absent the financing and use of the cash collateral, requested herein, the

9   Trustee will be unable to operate the Debtor's business and the Trustee will not be able to preserve

10   the assets of the estate.  The Trustee simply believes that the proposed financing is necessary, as set

11   forth in the First Budget, to preserve the value of the estate for the benefit of all creditors and other

12   parties in interest.

13         Finally, in considering whether the terms of postpetition financing are fair and reasonable,

14   courts consider the terms in light of the relative circumstances and disparate bargaining power of

15   both the debtor and potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr.

16   W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

17   *Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor

18   may have to enter into hard bargains to acquire funds).  Here, the terms of the Credit Agreement

19   were negotiated in good faith and at arm's length between the Trustee and UBS, resulting in an

20   agreement designed to permit the Trustee to continue to operate the Debtor's business going

21   forward and address the immediate needs set forth in the First Budget over the next five weeks.

22   The Credit Agreement contemplates UBS loaning the Trustee the maximum amount of $3 million.

23         The interim relief and order are necessary to preserve the business as an ongoing concern

24   and thereby prevent immediate and irreparable harm to the Debtor's business and the estate

25   pending a final hearing.

26

27

28

1565756.1  26932

21

**B.    THE COURT SHOULD AUTHORIZE THE TRUSTEE'S CONTINUED USE OF**

**CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363**

The Trustee's use of cash collateral is governed by 11 U.S.C. § 363, which permits a Trustee to use cash collateral only if: (a) each entity having an interest in the cash collateral consents to such use; or (b) the Court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c)(2).  In addition, 11 U.S.C. § 363(e) provides that, at the request of a party with an interest in the cash collateral, the Court shall prohibit or condition the use of cash collateral "as is necessary to provide adequate protection of" any interest asserted in the cash collateral.  11 U.S.C. § 363(e).

Pursuant to § 363(e), a secured creditor is only entitled to adequate protection to the extent that the use of the collateral will result in a decrease in "the value of such entity's interest in such property." *See, e.g., United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988); *McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Properties VI, Ltd.)*, 88 B.R. 261, 265-66 (Bankr. C.D. Cal. 1988) (applying *Timbers* to hold that secured creditor's interest in cash and proceeds derived from a debtor's operations was adequately protected where the value of the collateral was not declining during the bankruptcy case). However, "[w]here the value of the collateral is increasing, the passage of time in itself constitutes adequate protection." *In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987) (bankruptcy court ordered debtor to continue to use cash collateral to cover operating expenses without further protection for the secured creditor where value of collateral is maintained or increased simply through continued operation of the debtor's business).

In other words, the Court may allow the Trustee's continued use of cash collateral, whether consensual or not, where such use maintains, preserves or enhances the value of the Debtor's estate.  For example, in *Stein v. FHA (In re Stein)*, 19 B.R. 458, 460 (Bankr. E. D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was under-secured, finding that the use of the cash collateral was necessary to the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." *Stein*, 19 B.R. at 460; *see also, In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to

1    enhance the value of real property and secured creditor's claim). Further, it is well-established that

2    a bankruptcy court, where possible, should resolve issues in favor of maximizing value for all

3    creditors, not just the secured creditors. *Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808

4    F.2d 1393, 1397-98 (10th Cir. 1987); *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980).

5           The Trustee should be authorized to use the cash collateral for the proposed <u>five week</u>

6    Budget Period in the ordinary course of business pursuant to the Trustee's First Budget because the

7    secured creditors' interest in the cash collateral is adequately protected, as discussed below, by the

8    use of cash collateral to operate, preserve and maintain the Debtor's business, as set forth in the

9    Trustee's First Budget.

10

11   **C.      THE PROPOSED ADEQUATE PROTECTION FOR THE PROPOSED PRIMING**

12         **CREDIT AGREEMENT AND USE OF CASH COLLATERAL SHOULD BE**

13         **APPROVED**

14          As set forth above, parties with an interest in cash collateral or collateral that may be used

15   to secure postpetition financing are entitled to adequate protection. 11 U.S.C. § 363(e). In addition,

16   a trustee may obtain postpetition credit "secured by a senior or equal lien on property of the estate

17   that is subject to a lien only if" the trustee, among other things, provides "adequate protection" to

18   those parties whose liens are primed. 11 U.S.C. § 364(d)(1)(B).

19          **1.      UBS Consents to the Motion**

20          UBS has consented to the use of cash collateral as set forth in the Motion, proposed order

21   (Exhibit "1"), and subject to the terms of this Motion, the Credit Agreement, and the proposed First

22   Budget. UBS consented because the Trustee proposes to grant UBS a senior secured super priority

23   lien and administrative expense claim in exchange for the financing set forth in the Credit

24   Agreement. The Trustee was required by UBS to provide the aforementioned priming lien,

25   administrative expense claim, and additional adequate protection, as set forth below, in order to

26   obtain the Credit Agreement and UBS's consent to use cash collateral.

27          The additional adequate protection set forth in the proposed order (Exhibit "1" at ¶¶ 20-23)

28   that is proposed to be given to UBS for the use of its cash collateral consists of:

1565756.1  26932                                23

(a)    <u>additional and replacement security interests and liens</u>, to the full extent of any

diminution in value of UBS' collateral, consisting of (a) a perfected first priority senior security

interest in and lien upon all cash of Debtor and any investment of the funds of Debtor, whether

existing on the Petition Date or thereafter acquired; and (b) a perfected first priority senior security

interest in and lien upon all other pre- and postpetition property of Debtor, whether existing on the

Petition Date or thereafter acquired; and

(b)    to the extent that the postpetition collateral granted above does not provide adequate

protection of UBS' cash collateral, <u>a super-priority administrative expense claim under § 507(b) of

the Code</u>.

(c)    The adequate protection liens <u>shall not</u> attach to avoidance power claims.

The Trustee believes that such adequate protection is reasonable under the circumstance and

anticipates that the aforementioned first priority liens and security interests will adequately protect

UBS from any diminution in the value of its interest in their collateral resulting from the use of the

cash collateral and is consistent with the non-exclusive factors set forth in § 361.

**2.    <u>GLR and California Collection are Not Entitled to Adequate Protection</u>**

GLR and California Collection's judgment lien are not entitled to adequate protection

because their secured liens are "out of the money" in light of the $50 to $75 million valuation of

the Debtor's assets and are entirely unsecured pursuant to § 506(a) of the Code.

**3.    <u>Santa Barbara and the State Controller are Adequately Protected</u>**

With respect to the interests of Santa Barbara[14] and the State Controller, their tax liens are

adequately protected from the "priming" superpriority lien proposed in Credit Agreement.  First,

Santa Barbara and the State Controller are adequately protected by the equity cushion afforded by

their recorded tax liens on the Debtor's real property interests.   The value of the Debtor's real

property interests far exceeds the amounts of the recorded liens. *See In re Mellor*, 734 F.2d 1393,

1400 (9th Cir. 1984).

---

[14] And any interests of Orange County and Kern County.

1    Second, they are adequately protected because the Trustee proposes to use the funds set

2    forth in the First Budget to operate and maintain the Debtor's business.  It is black-letter law that a

3    secured creditor is adequately protected where, as here, the cash collateral is used to maintain and

4    preserve the creditor's collateral.  *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713

5    (Bankr. D. Del. 1996); *see also, In re Constable Plaza Associates, L.P.*, 125 B.R. 98 (Bankr.

6    S.D.N.Y. 1991) (secured creditor adequately protected where cash collateral used to preserve value

7    of assets).  The cash collateral and financing proposed in the Credit Agreement, will be used by the

8    Trustee, as reflected in the Trustee's First Budget, to continue to operate the Debtor's business for

9    an additional five weeks through November 29, 2019, and maintain and preserve the value of the

10    Debtor's business for the benefit of all creditors.  UBS, and all secured creditors, will be adequately

11    protected by the Trustee's use of cash collateral and the proposed financing, as reflected in the

12    Trustee's First Budget, to operate,  maintain and preserve the Debtor's ongoing business

13    operations.

14    Accordingly, the Court should find that the secured creditors are adequately protected and

15    approve the Trustee's use of cash collateral and the Credit Agreement on terms substantially the

16    same as those set forth in the proposed order attached to the Trustee's Declaration as Exhibit "1"

17    hereto.

18

19    **D.    IT IS APPROPRIATE TO APPROVE THE CARVE-OUT**

20    The proposed order (Exhibit "1" at ¶ 16) contains a carve out for the fees and expenses for

21    the Trustee's professionals for the remaining 20% of their fees that are not included in the First

22    Budget.  As set forth in the First Budget, only 80% of the estimated fees of the Trustee's

23    professionals are being deposited into a segregated account, while 100% of the fees of the

24    Committee's counsel are being deposited into the other segregated account.  The carve-out in the

25    proposed order ensures that the remaining 20% of fees incurred by the Trustee's professionals will

26    be paid and protects against the administrative insolvency of the estate by providing mechanism for

27    payment thereof, notwithstanding the grant of liens and claims under the Credit Agreement.  *See*

28    *Ames*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing

1 | parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all
2 | parties-in-interest are sorely prejudiced").

3 |

4 | **E.**    **IT IS APPROPRIATED TO GRANT A LIMITED LIEN ON AVOIDING POWER**
5 | **CLAIMS**

6 | UBS is receiving a first priority lien on the estate's avoidance power claims <u>only</u> for the
7 | maximum amount of $3 million (plus additional funding of up to $500,000) in postpetition funds to
8 | be loaned in connection with the Credit Agreement. UBS is <u>not receiving</u> a replacement lien on
9 | avoidance power claims as adequate protection for the Trustee's use of its cash collateral.

10 | UBS is requiring the lien on avoidance power claims in order for the Trustee to obtain the
11 | loan. The superpriority lien will be paid first because it is ahead of all other liens of the estate,
12 | including the prepetition lien of UBS. The Trustee believes that this is one of the rare
13 | circumstances where giving a lien on avoidance power claims is appropriate. However, because of
14 | uncertainty in value of the collateral for the post-petition loan UBS has insisted, and under the
15 | circumstances the Trustee agrees that it is reasonable to agree to this request. UBS has not sought a
16 | roll-over or roll-up of its prepetition debt, has provided needed operating funds and funding of
17 | professional costs of the Trustee and Committee, and provided a reasonable -- albeit thirty day --
18 | challenge period and investigation budget for both the Trustee and Committee. Again, on balance
19 | the Trustee believes these are reasonable compromises.

20 |

21 | **F.**    **IT IS APPROPRIATE TO WAIVE THE RIGHT OF FIRST REFUSAL**
22 | The Credit Agreement provides for a waiver of the ROFR in the Prepetition Credit
23 | Agreements. The portion of the Prepetition Credit Agreements containing the ROFR is attached
24 | Exhibit "4" hereto. Simplified, the provision provided the Debtor the right to match and thereby
25 | purchase UBS' claims if UBS sought to sell its loans. UBS is requiring the waiver of the ROFR as
26 | a condition to obtaining the loan. UBS asserts that Trustee cannot assume the Prepetition Credit
27 | Agreements because it is a financial accommodation that is unassumable under § 365(c) of the
28 | Code. UBS further asserts that even if it were assumable, the Trustee and the estate are not in

1   position to assume the contract as this would require it to demonstrate an ability to pay the

2   underlying obligation to UBS in full.  UBS asserts that were the Trustee to assume the Credit

3   Agreements, which it would have to do to take advantage of the ROFR, the ROFR would become

4   immaterial as UBS would be unlikely to sell a fully protected administrative loan.  Of course, the

5   Trustee is not in position to provide assurance it could perform an assumed Credit Agreement, nor

6   would it appear prudent to even seek to do so as the Court has found the loans significantly

7   undersecured.  Finally, the Trustee believes that the estate is not in a position to raise financing to

8   fund a purchase of the obligation to UBS.  Therefore, the Trustee has concluded, in his business

9   judgment, that it is in the best interest of the estate to waive the ROFR in order to obtain

10   postpetition financing from UBS.

12   **G.**    **<u>NOTICE WITH RESPECT TO INTERIM ORDER</u>**

13        The Trustee submits that, given the Debtor's financial condition, and the estate's immediate

14   need for authorization to use cash collateral and obtain credit, an expedited hearing as contemplated

15   by Fed. R. Bankr. P. 4001(b) and (c) is warranted.

17   **H.**    **<u>NOTICE WITH RESPECT TO FINAL HEARING</u>**

18        Pursuant to Fed. R. Bankr. P. 4001(b) and (c), the Trustee respectfully requests that he be

19   authorized to provide notice of the final hearing to be scheduled by the Court no sooner than 15

20   days after service of the Motion by serving a copy of the Motion (to the extent not previously

21   served) together with any interim order granting this Motion, on interested parties.  The Trustee

22   submits such notice constitutes sufficient notice of the final hearing pursuant to Fed. R. Bankr. P.

23   4001(b) and 2002.

25   **I.**    **<u>WAIVER OF RULE 6004(A) AND 6004(H)</u>**

26        To implement the foregoing successfully, the Trustee requests that the interim order to be

27   entered by the Court provide that notice of the relief requested herein satisfies Fed. R. Bankr. P.

28   6004(a) and that the Trustee has established cause to exclude such relief from the 14-day stay

1  period under Fed. R. Bankr. P. 6004(h), with respect to the interim order submitted herewith so that

2  there will be no interruption of the Trustee's ability to operate the Debtor's business.

3

4  **IV.**

5  **CONCLUSION**

6      For the reasons set forth above, the Court should enter the interim order, substantially in

7  the form attached as Exhibit "1" hereto, and granting the relief requested herein and such other

8  relief is just and proper under the circumstances.

9

10  DATED: November 7, 2019       DANNING, GILL, DIAMOND & KOLLITZ, LLP

11

12                  By:  _____

13                       AARON E. DE LEEST

14                       Proposed Attorneys for Michael A. McConnell,
                     Chapter 11 Trustee

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1565756.1  26932                  28

# DECLARATION

## DECLARATION OF MICHAEL A. MCCONNELL

I, Michael A. McConnell, declare and state as follows:

1.      I am the Chapter 11 trustee (the "Trustee") of HVI Cat Canyon, Inc. (the "Debtor").

2.      I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently with respect to such facts.

3.      I am a practicing attorney and am admitted in Texas, the U.S. Supreme Court, Supreme Court of Texas, and the U.S. Court of Appeals, Fifth, Eleventh, and Tenth Circuits, and the Northern District of Texas, among others.  I am also a former U.S. Bankruptcy Judge from the Northern District of Texas.  In my over 40 years of practice I have represented secured and unsecured creditors, trustees, committees, and debtors in some of the most significant bankruptcy cases in Texas and the surrounding region.  I have also previously served as an operating Chapter 11 trustee and Chapter 11 examiner in several complex Chapter 11 cases, including in numerous oil and gas cases.

4.      The Debtor is a Colorado corporation authorized to conduct business in the state of California.  It is the owner and operator of producing oil and gas interests in California.  According to the Debtor, it "owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in Kern County, and Richfield East Dome Unit in Orange County.  The Debtor has over 10,000 oil wells, but many of them are currently idle.

5.      Following my appointment as Chapter 11 trustee on October 22, 2019, I retained the services of CR3 Partners, LLC ("CR3") to obtain financial advisory services and to provide the services of Tim Skillman to act as my Chief Restructuring Officer.  I also retained Danning, Gill, Diamond & Kollitz, LLP, subject to Court approval, led by Eric P. Israel.

6.      On October 23, 2019, Tim Skillman, Eric P. Israel, and I met with the Debtor's officers and we discovered that, due to a variety of reasons, including alleged pre-payments and a variety of asserted setoffs, the estate would have insufficient funds to make payroll and pay related

1    payroll taxes for employees which were due on October 25, 2019.

2        7.    With the assistance of Mr. Skillman, I explored various options for funding the

3    Debtor's immediate needs. In that regard, I approached UBS, AG, London Branch ("UBS, AG

4    London") with a request that it agree to loan funds to the estate to cover the payroll and other

5    priority expenses. I also approached the Debtor's affiliate California Asphalt Production, Inc.

6    ("CAP") and requested that it agree to fund the Debtor's immediate needs.

7        8.    Ultimately, CAP agreed to meet the Debtor's immediate needs by prepaying a

8    portion of the payment it would normally make on or about November 20, 2019, to the Debtor.

9        9.    On October 24, 2019, I filed *Emergency Motion for (1) Authority to Accept a Partial*

10   *Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the*

11   *Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of*

12   *any Stay Imposed by FRBP 6004(h)* (the "Emergency Motion"), requesting authority to accept a

13   partial prepayment from CAP.

14       10.   Following the October 25, 2019 emergency hearing, the Court entered the *Order*

15   *Granting Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the*

16   *Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for*

17   *Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed*

18   *by FRBP 6004(h)*, granting authorizing me to accept a partial prepayment from California Asphalt

19   Production, Inc. ("CAP").

20       11.   During this time, my negotiations for a loan and financing facility from UBS AG,

21   London continued.

22       12.   I asked Mr. Skillman and CR3 to prepare a budget that would address the Debtor's

23   immediate financial concerns, including a budget that will: (1) stabilize the Debtor's operations;

24   and (2) address ongoing health and safety issues, including regulatory compliance. In addition, the

25   budget also needed to fund an investigation and review of various arrangements and agreements

26   between the Debtor and its affiliates, and permit me to retain and provide for compensation to

27   various key professionals.

28

1565756.1 26932                                30

13.     In response to my request, Mr. Skillman and CR3 prepared an interim five week budget, October 26, 2019 through November 29, 2019 (the "Budget Period"), which is attached as Exhibit "1" to Mr. Skillman's declaration appended hereto (the "Frist Budget").

14.     The First Budget reflects that the Debtor's operations currently do not generate sufficient cash to pay its expenses and, over the course of the Budget Period, combined with administrative expenses incurred before my appointment, result in a need of approximately $2 million for that period of time.

15.     According, I require the use of cash collateral and postpetition financing to fund the First Budget and pay payroll, payroll taxes, and all the ordinary and necessary expenses incurred in operating the Debtor and the costs associated with administering the estate. Without the use of cash collateral and postpetition financing, I will not have the funds required to pay the Debtor's employees, operate the Debtor and maximize the value of this estate.

16.     I have now negotiated the material terms of a loan facility with UBS AG, Stamford Branch ("UBS AG, Stamford" and together with UBS AG, London "UBS"), an entity related to UBS AG, London, as set forth in a written credit agreement (the "Credit Agreement"). A true and correct copy of the Credit Agreement is attached as Exhibit "3" hereto. The Credit Agreement provides the postpetition financing I require at this time on a secured basis.

17.     The facility and Credit Agreement provide a maximum of $3 million in funding for the Debtor for the Budget Period, plus I have the ability to extend the availability period under the Credit Agreement for an additional two weeks and increase the amount of the funding by an aggregate amount of $500,000 more. UBS and I negotiated in good faith and at arm's-length over a couple of weeks in reaching the terms set forth in the Credit Agreement.

18.     One of the conditions of the Credit Agreement is a waiver of the right of first refusal ("ROFR") in the Prepetition Credit Agreements. The ROFR gives the Debtor a right to match a sale price for UBS' for its loan. The pertinent portion of the Prepetition Credit Agreements containing the ROFR is attached Exhibit "4" hereto. UBS is requiring the waiver of the ROFR as a condition to obtaining the loan. I have concluded, in my business judgment, that waiving the ROFR as a condition for obtaining postpetition financing from UBS is prudent.

19.     I believe that the Debtor and the estate will suffer immediate and irreparable harm if the loan facility and postpetition funding set forth in the Credit Agreement are not approved. Without the loan facility and Credit Agreement from UBS, I will be unable to operate the Debtor's business and preserve the assets of the estate and value therein.  The proposed financing from UBS is critically necessary to preserve and maximize the value of the Debtor's business.

20.     I do not believe I would be able to obtain financing on an unsecured basis or secured by a junior lien on the Debtor's assets in the amounts required by the First Budget.  I believe this is because UBS, as the Debtor's senior secured creditor, is owed not less than $114 million and all of the Debtor's assets are collateral for UBS' debt. Santa Barbara asserts a tax lien for about $4.7 million, which appears to be senior to UBS on real property interests.  GLR asserts a junior lien of $104 million.  With a value of the Debtor's assets in the $50 million to $75 million range, I do not believe that there are any lenders that would agree to lend on an unsecured or secured junior lien basis.  Any subordinated loan that I could obtain would in effect be unsecured because there is no collateral value over and above what UBS is owed.

21.     UBS has agreed to provide me with postpetition credit only if secured by a senior superpriority "priming" lien pursuant to § 364(d) and an allowed superpriority administrative claim pursuant to section 364(c)(1).

22.     Based on the existing financial condition of the Debtor and the totality of the relevant circumstances, I believe in my business judgment that the postpetition financing proposed in the Credit Agreement is appropriate and necessary under the circumstances.  I do not believe in my experience and business judgement that I would be able to obtain postpetition financing from another source on terms more favorable than those set forth in the Credit Agreement.

1    23.    I also believe that the interim relief and order are necessary to preserve the Debtor's

2  business as an ongoing concern and thereby prevent immediate and irreparable harm to the

3  Debtor's business and the estate pending a final hearing.

4

5      I declare under penalty of perjury that the foregoing is true and correct.  Executed on

6  November 7, 2019 at Fort Worth, Texas.

7

8                              MICHAEL A. MCCONNELL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1565756.1  26932                              33

# DECLARATION

## DECLARATION OF TIM SKILLMAN

I, Tim Skillman, declare and state as follows:

1.      I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently with respect to such facts.

2.      I am a partner at CR3 Partners, LLC ("CR3").  CR3 is a national turnaround and performance improvement firm.  CR3 offers advisory services and our professionals often serve as officers to assist clients in need of crisis management and other turnaround services.  I have served as Chief Restructuring Officer to two companies, and as a C-level executive for other companies in need of someone to help navigate crises in and out of bankruptcy.

3.      Subject to Court approval, Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), will be retaining CR3 in this case. I will be working as, or in a capacity similar to, a Chief Restructuring Officer.

4.      In the limited time since the Trustee's appointment, CR3 has undertaken a review of the Debtor's business operations, financial condition and expenses that the Trustee needs to pay going forward for the Debtor and the Trustee.

5.      In that regard, and under my direction, a five (5) week budget was prepared for the Trustee to stabilize operations, address ongoing health and safety issues, including regulatory compliance, begin investigation and review of various arrangements and agreements with affiliates, retain and provide for compensation to various key professionals and begin the process of getting the Debtor into shape to sell or propose a plan of reorganization.  A true and correct copy of the budget is attached as Exhibit "2" hereto (the "First Budget").

6.      Due to the Debtor's financial condition, the First Budget requires a cash infusion of $2 million over the five week period.

7.      Pursuant to prior authority granted by the Court, California Asphalt Production, Inc. ("CAP"), an affiliate of the Debtor, was requested to advance $311,000 against October 2019 shipments to fund the immediate financial needs of the Debtor, including payroll and payroll taxes.

8.    CAP advanced $115,817.37 of the $311,000 needed for payment of payroll, payroll taxes, and royalties.  The money advanced by CAP was not sufficient to pay royalties or the Debtor's other operating needs.  It was clear from my interactions with CAP that it would not fund the $2 million shortfall reflected in the First Budget or provide a financing facility comparable to the one proposed by UBS AG, Stamford Branch, which totals $3 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November $\overline{7}$, 2019, at Santa Maria, California.

Tim Skillman

1565756.1  26932

35

# REQUEST FOR JUDICIAL NOTICE

## REQUEST FOR JUDICIAL NOTICE

Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), requests that the Court take judicial notice of the following:

On July 25, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.

The Debtor filed its petition in the Southern District of New York.  The case was transferred to the Northern District of Texas, and then to the Central District of California.

Initially, the Debtor operated its business as a debtor in possession, allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was appointed.

On October 8, 2019, the Court entered its Agreed Order for Consensual Use of Cash Collateral.

On October 16, 2019, the Court entered its Agreed Order Granting Motion for Appointment *of a Chapter 11 Trustee.*

On or about October 22, 2019, the Court entered an order approving the appointment of Michael A. McConnell as the Chapter 11 trustee for the Debtor's estate.

DATED: November 7, 2019          DANNING, GILL, DIAMOND & KOLLITZ, LLP


By: _____

AARON E. DE LEEST
Proposed Attorneys for Michael A. McConnell,
Chapter 11 Trustee

# EXHIBIT "1"

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@dgdk.com*
2  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@dgdk.com*
3  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@dgdk.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   1901 Avenue of the Stars, Suite 450
5  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  *Proposed Attorneys for Michael A. McConnell,*
   *Chapter 11 Trustee*

8

9

10          **UNITED STATES BANKRUPTCY COURT**

11           **CENTRAL DISTRICT OF CALIFORNIA**

12                  **NORTHERN DIVISION**

13

14  In re:                              Case No. 9:19-bk-11573-MB

15  HVI CAT CANYON, INC.,               Chapter 11

16        Debtor.                       **ORDER FOR EMERGENCY PRIMING
                                        AND SUPERPRIORITY FINANCING AND
17                                      CONSENSUAL USE OF CASH
                                        COLLATERAL BY THE CHAPTER 11
18                                      TRUSTEE**

19                                      Hearing
                                        Date:  November 8, 2019
20                                      Time:  9:00 a.m.
                                        Place: Courtroom 201
21                                             1415 State Street
                                               Santa Barbara, California
22

23

24       This Order for Emergency Priming and Superpriority Financing and Consensual Use of

25  Cash Collateral by the Chapter 11 Trustee (this "Order") is entered as of November [__], 2019,

26  with respect of the following facts:

27       On October 4, 2019 the Court denied the *Debtor's Motion for Interim and Final Orders*

28  *Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 Approving Use of Cash Collateral, Providing*

*Adequate Protection and Setting Final Hearing Pursuant to Bankruptcy Rule 4001*[ECF No. 11]

(the "Cash Collateral Motion") and the *Motion of the Debtor to Surcharge Collateral Pursuant to*

*11 U.S.C. §§ 506(c) and 552(b)* [ECF No. 55] (the "Surcharge Motion").

On October 8, 2019, the Court entered an *Agreed Order for Consensual Use of Cash Collateral* [ECF No. 375] (the "Consensual Cash Collateral Order"), whereby UBS AG, London Branch ("UBS AG, London Branch"), the debtor and debtor in possession (the "Debtor"), the Official Committee of Unsecured Creditors (the "Committee"), GIT, Inc. ("GIT"), and Harry E. Hagen, as Treasurer Tax Collector of the County of Santa Barbara, California ("Santa Barbara"), in anticipation of a hearing on motions seeking appointment of a Chapter 11 trustee, agreed to use of cash collateral (as that phrase is defined in Section 363(a) of the Bankruptcy Code, "Cash Collateral") for an interim period ending October 25, 2019. On October 16, 2019, the Court entered the *Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee* [ECF No. 409] and approved appointment of Michael McConnell as the Chapter 11 trustee in this case (the "Trustee") on October 22, 2019 [ECF No. 431].

Shortly before authority for use of Cash Collateral expired under the Consensual Cash Collateral Order, the Trustee and UBS AG, London Branch learned that the Debtor does not have sufficient cash to fund payroll and other operating expenses scheduled for payment. To address the immediate cash need, on October 24, 2019, the Trustee filed his *Notice of Motion and Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h); and Memorandum of Points and Authorities, Declaration of Tim Skillman, and Request for Judicial Notice in Support Thereof* [ECF No. 439] (the "Emergency Motion"). Following the October 25, 2019 emergency hearing, the Court entered the *Order Granting Trustee's Emergency Motion for*

- 2 -

1 | *(1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt*

2 | *Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form*

3 | *of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)* [ECF No. 449], granting

4 | authorizing the Trustee to accept a partial prepayment from California Asphalt Production, Inc.

5 | ("CAP").

6 |

7 | On November 7, 2019, the Trustee filed his *Emergency Motion for an Order: (1)*

8 | *Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) authorizing The*

9 | *Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related*

10 | *Relief]* (the "Motion") for authorization to obtain post-petition financing from UBS AG, Stamford

11 | Branch ("UBS AG, Stamford Branch" and together with UBS AG, London Branch, "UBS") and

12 | continue to use the Cash Collateral of UBS AG, London Branch.

13 | Based upon the Motion, and the financing pursuant to the credit agreement attached to the

14 | Motion and the Trustee's use of Cash Collateral, such use being found necessary to avoid

15 | immediate and serious harm to the estate and potential harm to the public health and safety as

16 | contemplated by Bankruptcy Rule 4001(b) and (c), a hearing to consider approval of the Motion

17 | having been held on November 8, 2019 (the "Hearing"), notice and opportunity for hearing being

18 | sufficient under the circumstances, and upon the findings of fact and conclusions of law made by

19 | the Court at the Hearing, all of which are incorporated herein by reference, and good cause

20 | appearing therefor,

21 |

22 | **IT IS HEREBY FOUND AND ORDERED AS FOLLOWS:**

23 | 1.    Motion Granted.  The Motion is granted and the Facility (as defined below) and the

24 | Credit Agreement attached as Exhibit 3 to the Trustee's Declaration (as amended, supplemented or

25 | otherwise modified from time to time, the "Credit Agreement") are approved.

- 3 -

2.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief granted herein are section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c).  Venue of this Chapter 11 proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.

3.    <u>Hearing Held; Notice</u>.    The Hearing was held pursuant to Bankruptcy Rules 4001(c)(2).  Notice of the Hearing and the relief requested in the Motion was given as set forth in the proof of service filed by the Trustee.

4.    <u>No Credit Available on More Favorable Terms</u>.    The Trustee, on behalf of the Debtor and the Debtor's estate, is unable to find sufficient financing from sources other than UBS AG, Stamford Branch on terms more favorable than the terms for the term loan facility (the "<u>Facility</u>") described in the Credit Agreement.

5.    <u>Need for Post-Petition Financing and Use of Cash Collateral</u>.  Immediate financing is critical for the Debtor to continue its operations in the ordinary course.  The Facility, the Trustee's entry into the Credit Agreement, and related relief is necessary to avoid immediate and irreparable harm to the Debtor's estate, its employees, and all parties-in-interest.  The Facility is the best source of financing available to the Debtor under the circumstances and was entered into in good faith and at arm's-length.

6.    <u>Protective Advances</u>.  The advances under the Facility shall constitute advances to protect and preserve the collateral under that certain First Lien Credit Agreement dated as of May 20, 2016 and that certain Second Lien Credit Agreement dated as of May 20, 2016 among the Debtor, Rincon Island Limited Partnership, GOGH, LLC and UBS AG, London Branch (collectively, the "<u>Prepetition Credit Agreements</u>" and the obligations arising thereunder the

- 4 -

"Prepetition Obligations") and shall remain subject to any guarantee provided thereunder. For the avoidance of doubt, all proceeds of the Facility shall constitute Cash Collateral.

7.    Authorization for Emergency Financing. The Trustee is authorized to borrow, and UBS AG, Stamford Branch is authorized to advance, up to $3 million in financing on an interim basis prior to the final hearing set forth below, under the Credit Agreement, subject to the terms of this Order, and in accordance with the budget annexed to the Declaration of Tim Skillman as Exhibit 2 (including all terms and conditions set forth therein and as may be updated from time to time in accordance with the Credit Agreement, the "Budget"), subject to a line-item variance of ten percent (10%) of the expenses set forth in the Budget tested on a cumulative basis by disbursement categories contained in the Budget (the "Permitted Variance"). The Trustee and UBS AG, Stamford Branch are authorized to extend the availability period under the Credit Agreement by up to two weeks and increase the amount of financing by an aggregate amount of up to $500,000 upon mutual agreement of the Trustee and UBS AG, Stamford Branch without further order of this Court. Immediately upon entry of this Order, the Trustee shall, and is hereby authorized to, execute and deliver to UBS AG, Stamford Branch the Credit Agreement and all other loan documents required to be executed and delivered under the Facility. The Trustee and counsel acting on behalf of the Trustee are further authorized to take any such actions that may be necessary to implement the Facility and borrow funds under the Credit Agreement as approved in this Order, including without limitation to issue, execute and deliver any such certificates, borrowing requests or other documents and directions that may be requested by UBS AG, Stamford Branch. Nothing in this Order shall create any obligation of UBS to advance or lend any money to the Trustee or the Debtor, and any such advances or loans shall be made by UBS AG, Stamford Branch only in accordance with the terms and conditions of the Credit Agreement and this Order. Any funds advanced or loaned by UBS AG, Stamford Branch shall constitute a bona fide extension of credit to a non-affiliated

- 5 -

borrower for purposes of the secured creditor exemption under the Comprehensive Environmental Response, Compensation Liability Act and comparable federal, state and local law. UBS AG, Stamford Branch shall not be deemed an operator or owner of the Debtor or any of its properties or incur any environmental or similar liabilities, including but not limited to, liability for environmental compliance, remediation, restoration or natural resource damages under any federal, state or local law as a result of any such loans or advances to the Trustee.

8. Based on the record before this Court, it appears (and the Trustee on behalf of the Debtor has stipulated) that the terms of the Facility, the Credit Agreement and this Order are fair and reasonable and are supported by reasonably equivalent value and fair consideration. The Court further finds that the Trustee's agreement to the terms of the Facility and Credit Agreement on behalf of the Debtor is a sound exercise of business judgment and should be approved as set forth herein.

9. Amendment of the Credit Agreement. Following entry of this Order, the Trustee is authorized to enter into any non-material amendment or modification to the Credit Agreement and the loan documents entered into in connection therewith without further order of this Court, provided that the Trustee provides notice of any such amendment or modification to the Court, the United States Trustee, the Committee and Santa Barbara. To the extent that such modification or amendment is material, such material modification or amendment shall only be permitted pursuant to an order of this Court on notice pursuant to Local Rule 2002-1(b) and a hearing. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the Credit Agreement shall be effective unless set forth in writing, signed by the Trustee and UBS AG, Stamford Branch. For the avoidance of doubt, an amendment of the availability period of the Facility by up to two weeks and an increase of the amount of the Facility by up to $500,000 in accordance with paragraph 7 of this Order shall not constitute a material amendment.

- 6 -

1

10.    _Use of Funds._ The Trustee may use funds advanced under the Facility, on the terms

2    and conditions set forth herein and in the Credit Agreement, provided that all such funds are used

3    to pay approved operating expenses solely in accordance with the Budget (including all terms and

4    conditions set forth therein).  The Trustee is authorized to use funds advanced under the Facility to

5    pay up to eighty percent (80%) of reasonable fees and expenses for the Trustee's professionals only

6    to the extent such fees and expenses are included in the Budget.  For the avoidance of doubt, the

7    funds advanced under the Facility shall not be used for payment of any expense not specifically

8

9    included and/or not approved for payment under the Budget or otherwise authorized by this Order.

10    11.    _Liens, Collateral and Obligations._ Without limiting the approval set forth above, the

11    Court grants as follows:

12
        (i)    Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, UBS AG, Stamford
13             Branch is granted valid and perfected first priority priming and senior security
               interests and liens (the "Financing Liens") in all property of the estate of the Debtor,
14             including, but not limited to all of the Debtor's rights in tangible and intangible
               assets, including without limitation, all prepetition and post-petition assets of the
15             Debtor's estate, whether existing on or as of the Petition Date or thereafter acquired,
               including without limitation, the Debtor's interest in oil and gas properties (and as-
16             extracted collateral, goods, fixtures and hydrocarbons relating thereto), wells,
               accounts receivable, other rights to payment, any right to receive any residual of any
17             retainer provided to any professionals after payment of such professional's allowed
               fees and expenses, cash, inventory, general intangibles, contracts, servicing rights,
18             swap and hedge proceeds and termination payments, servicing receivables,
19             securities, chattel paper, owned real estate, real property leaseholds, fixtures,
               machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade
20             names, rights under license agreements and other intellectual property, claims and
               causes of action (including those arising under sections 510 or 542 through 553 of
21             the Bankruptcy Code), commercial tort claims, and the proceeds of all of the
               foregoing (the "Collateral") or proceeds thereof.  The Financing Liens granted to
22             UBS AG, Stamford Branch are valid, perfected and enforceable first priority
23             priming and senior liens on all the Collateral that are superior to all other prepetition
               or post-petition liens, claims or security interests in favor of any other lienholder,
24             other than the Carve-Out (as defined below).
25
        (ii)    The Financing Liens against the assets of the Debtor and the Collateral shall be, and
26             hereby are, confirmed, and extend to and secure all obligations and indebtedness of
               the Trustee on behalf of the Debtor and the Debtor's estate to UBS AG, Stamford
27             Branch under the Facility and the Credit Agreement (the "Obligations").    The
28
- 7 -

Financing Liens shall be, and are hereby determined to be, first priority priming and senior liens that are superior to all other liens, claims or security interests, pre- or post-petition, other than the Carve-Out (as defined below), except as specifically set forth in this Order. This Order shall be deemed to grant and perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the Financing Liens. UBS AG, Stamford Branch may, but shall not be required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Financing Liens granted to them pursuant to this Order, and the stay imposed under section 362 of the Bankruptcy Code is hereby modified solely to permit the same. If UBS AG, Stamford Branch shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of and the Financing Liens, the Financing Liens granted herein shall be deemed perfected at the time and on the date of entry of this Order. Upon request by UBS AG, Stamford Branch, the Trustee is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments as may be necessary to enable UBS AG, Stamford Branch to further perfect, preserve and enforce the Financing Liens granted to UBS AG, Stamford Branch by this Order.

(iii)    For all Obligations, UBS AG, Stamford Branch is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Financing Superpriority Claim") having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Trustee on behalf of the Debtor and/or the Debtor, whether now in existence or incurred by the Trustee on behalf of the Debtor and/or the Debtor after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(b), 507(a), 364(c)(1), 564(c), or 726 of the Bankruptcy Code, other than the Carve-Out (as defined below).

12.    Use of Cash Collateral. The Trustee may use Cash Collateral, on the terms and conditions set forth herein solely in accordance with the Budget until the date that is the earliest of (a) November 29, 2019, (b) the occurrence of an Event of Default (as defined in the Credit Agreement), and (c) the breach or failure of the Trustee or the Debtor to comply with the terms of this Order (the date of the occurrence of the earliest of (a), (b) and (c), the "Termination Date"). To the extent the Debtor holds an interest, all funds and cash investments of Debtor, including any funds on deposit at any banks or other institutions as of the Petition Date, are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a). In addition, all cash proceeds of the Prepetition Collateral (as defined below) (and investments thereof) received by the Debtor,

- 8 -

the Trustee, or the estate of the Debtor after the Petition Date are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a).  The Trustee shall not use any Cash Collateral except as permitted herein or as otherwise approved by this Court.

13.    <u>Compliance with the Budget</u>.  Except as otherwise set forth herein, the Trustee is hereby authorized to use all Cash Collateral until the Termination Date to pay the ordinary course operating expenses of Debtor's estate solely in accordance with the Budget (including all terms and conditions set forth therein), subject to the Permitted Variance.

14.    <u>Limitations on Use of Proceeds and Cash Collateral</u>.  The Trustee shall notify Huron Consulting Group ("<u>Huron</u>"), via email to both mkehl@huronconsultinggroup.com and azughayer@huronconsultinggroup.com, of any payments that exceed $7,500 not less than 36 hours prior to initiating such payment (a "<u>Proposed Payment</u>").  If Huron does not object to the Proposed Payment within 36 hours by email to the Trustee at michael.mcconnell@kellyhart.com, the Trustee may proceed to make such payment.  Should Huron object to the Proposed Payment, such payment shall not be made without further Order of the Court.  The Trustee and UBS consent to judicial intervention on an expedited basis to determine whether such Proposed Payment may proceed.  Any payments to be made under the Budget to Santa Barbara, departments or agencies of the County of Santa Barbara, and the Santa Barbara County Air Pollution Control District (the "<u>APCD</u>") must be approved by Huron.  If approved, such payments shall be made timely in accordance with the Budget.  For the avoidance of doubt, no payments shall be made to GIT pursuant to this Order for prepetition work or claims other than reimbursement with regard to the Debtor's employees.  None of the Cash Collateral or the proceeds of the Facility, subject only to the Investigation Budget (as defined below), shall be used (i) to challenge UBS's claims and/or liens or (ii) to prevent or hinder UBS from exercising its rights or remedies.

- 9 -

15.    Absent further order of the Court or written consent of UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, neither Debtor nor the Trustee shall make the following payments:  (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments provided for the in Budget in an interest-bearing escrow or segregated account.  All such issues are expressly reserved for future determination.  The Budget includes certain items for accounting purposes only; this Order does not permit payment of these items.  Notwithstanding anything to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those items in the Budget that have been specifically approved by UBS and to escrow payments as set forth above.  For the avoidance of doubt, neither Debtor nor the Trustee has any authority to make any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii) professional fee payments, except payments authorized for the Trustee's professionals under this Order; or (iv) other payments which are listed below the line in the Budget for accounting purposes but not authorized by this Order, regardless of whether any such payments listed in (i)-(iv) are included in the Budget.

16.    <u>Carve-Out</u>.  There shall be a subordination of the Financing Liens granted to UBS AG, Stamford Branch on the Collateral and the Adequate Protection Liens granted to UBS AG, London Branch on the Post-Petition Collateral for the aggregate amount of reasonable professional fees and expenses for the Trustee's professionals that are not authorized for payment under paragraph 10 of this Order, provided that the amount does not exceed twenty percent (20%) of the total fees and expenses for the Trustee's professionals set forth in the Budget (the "<u>Carve-Out</u>").  Notwithstanding the foregoing, following the occurrence of an Event of Default, the Carve-Out shall include any withheld portion of Trustee's fees and expenses accrued prior to such date and set forth in the Budget, and an additional amount not exceed $15,000 in the aggregate from and after

- 10 -

a written notice of default.  Nothing in this Order shall be construed to impair the ability of UBS to object to any fees, expenses, reimbursements, or compensation sought by the Trustee.  The Carve-Out shall not be used to investigate or commence or continue any action or proceeding against UBS, subject only to the Investigation Budget (as defined below).

17.    <u>Reporting Requirements</u>.  As a condition to use funds advanced under the Facility and Cash Collateral, the Trustee shall provide to UBS a variance report reasonably acceptable to UBS on a weekly basis during the period for which use of such funds and Cash Collateral is permitted under this Order and any subsequent order, which shall be delivered by the Wednesday of the following week.  Reporting of monthly sales revenue shall be no later than 5 business days following the end of the month.  In addition, the Trustee and its representatives and agents shall provide to UBS weekly reports, oral and/or written, regarding the status of operations and financial matters as well as any additional information reasonably requested by UBS.

18.    <u>Additional Covenants</u>.

(i)    No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to provide a reserve report regarding the Debtor's hydrocarbon assets.

(ii)    No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to conduct a Phase I environmental study regarding the Debtor's hydrocarbon assets and operations.

(iii)    On or before November 18, 2019, the Trustee shall provide one or more reports to UBS as to the Trustee's efforts to stabilize and improve Debtor's operations and revenues, including efforts to maximize sale revenues for the benefit of the estate.

(iv)    No later than November 18, 2019, the Trustee shall provide UBS with a 13-week cash flow budget in form and substance reasonably acceptable to UBS.

(v)    The Debtor shall obtain and collect a minimum monthly sales revenue of $750,000, measured as of the last day of each month.

- 11 -

19.    Adequate Protection.  UBS AG, London Branch is entitled, pursuant to 11 U.S.C. §§ 361 and 363(e), to adequate protection from any diminution in value of its interests in the collateral securing the Prepetition Obligations, including the Cash Collateral (collectively, the "Prepetition Collateral"), including, without limitation, any such diminution resulting from use by Debtor or the Trustee of Cash Collateral and any other collateral, and the imposition of the automatic stay pursuant to 11 U.S.C. § 362 (such diminution in value the "Adequate Protection Obligations").  Based on the Court's prior findings regarding the value of Prepetition Collateral in connection with the Cash Collateral hearings, Santa Barbara is adequately protected for priming and use of Cash Collateral under this Order.

20.    Adequate Protection – Replacement and Additional Liens.  As partial adequate protection for the Adequate Protection Obligations, effective upon the commencement of this case and without the necessity of the execution by Debtor, the Trustee or UBS AG, London Branch of any mortgages, security agreements, pledge agreements, financing statements or otherwise, the following additional and replacement security interests and liens are hereby granted to UBS AG, London Branch (the "Adequate Protection Liens"), subject only to (i) liens on the Collateral in favor of UBS AG, Stamford Branch to secure the Obligations, (ii) valid and perfected non-voidable liens in existence on the Petition Date that are senior in priority to the liens securing the prepetition claims of UBS AG, London Branch and (iii) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by 11 U.S.C. § 546(b) that are senior in priority to the liens securing the prepetition claims of UBS AG, London Branch ((i), (ii), and (iii) collectively, the "Permitted Liens"):  (a) to the full extent of any diminution in value of the Prepetition Collateral, a perfected first priority senior security interest in and lien upon all cash of Debtor and any investment of the funds of Debtor, whether existing on the Petition Date or thereafter acquired as of the date hereof and as of the Petition Date; and (b) to the full extent of any

- 12 -

diminution in value of the Prepetition Collateral, a perfected first priority senior security interest in and lien upon all other pre- and post-petition property of Debtor, whether existing on the Petition Date or thereafter acquired, including, without limitation, all accounts, cash, Cash Collateral, deposit accounts, chattel paper, instruments, documents, investment property, supporting obligations, customer lists, letter of credit rights, inventory, fixtures, equipment, general intangibles, goods, patents, copyrights and trademarks as well as all products and proceeds of any of the foregoing and books and records relating to any of the foregoing and to Debtor's business and the proceeds of all of the foregoing (collectively, the "Post-Petition Collateral").  For the avoidance of doubt, in accordance with paragraph 23 of this Order, the Adequate Protection Liens granted herein shall not attach to avoidance claims of the estate or proceeds thereof. The Adequate Protection Liens shall be junior only to the Permitted Liens and the Carve-Out.

21.    Adequate Protection for the Use of Cash Collateral – Superpriority Claim.  To the extent the Post-Petition Collateral granted to UBS AG, London Branch herein does not provide adequate protection of its interests in the Cash Collateral, the Adequate Protection Obligations shall constitute a super-priority administrative expense claim under Section 507(b) of the Bankruptcy Code ("Adequate Protection Superpriority Claim").  The Adequate Protection Superpriority Claim shall have priority over all administrative expenses of any kind or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code in any court of competent jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code, subject only to the Financing Superiority Claim and the Carve-Out.  Additionally, no:  (i) costs or expenses of administration which have been or may be incurred (a) in the Chapter 11 Case; (b) after conversion of the Chapter 11 Case to a case proceeding under Chapter 7 of the Bankruptcy Code, or (c) in any other proceeding related hereto; and/or (ii) priority claims as defined in Section 507(a) of the

- 13 -

1    Bankruptcy Code are, or will be, senior to or *pari passu* with the Adequate Protection Superpriority

2    Claim other than the Financing Superpriority Claim and the Carve-Out.

3        22.    <u>Perfection of Adequate Protection Liens</u>. This Order shall be deemed to grant and

4 perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the

5 Adequate Protection Liens as of the Petition Date. UBS AG, London Branch may, but shall not be

6 required, to file or record financing statements, mortgages, notices of lien, or similar instruments

7 in any jurisdiction or take any other action in order to validate and perfect the Adequate Protection

8 Liens granted to them pursuant to this Order, and the stay imposed under section 362 of the

9 Bankruptcy Code is hereby modified solely to permit the same. If UBS AG, London Branch shall,

10 in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar

11 instruments or otherwise confirm perfection of and the Adequate Protection Liens, the Adequate

12 Protection Liens granted herein shall be deemed perfected at the time and on the date of entry of

13 this Order. Upon request by UBS AG, London Branch, the Trustee is authorized, without the

14 further consent of any party, to take any actions and to execute and deliver such instruments as may

15 be necessary to enable UBS AG, London Branch to further perfect, preserve and enforce the

16

17 Adequate Protection Liens granted to UBS AG, London Branch by this Order.

18

19        23.    The Adequate Protection Liens granted by this Order and the Adequate Protection

20 Superpriority Claim granted by this Order shall not attach to avoidance claims of the estate or

21 proceeds thereof. For the avoidance of doubt, nothing in this Order shall prevent UBS from

22 asserting claims against or participating in such claims or proceeds under any other basis, including

23 with respect to the Financing Liens. Without limiting the foregoing, this provision shall not be

24 retroactive, such that nothing in the Order shall alter or change the status of, or impose any

25 limitation or agreement on, any lien or claim against such avoidance actions of proceeds thereof

26 with regard to use of Prepetition Collateral or Cash Collateral granted by any order entered in this

27

28

- 14 -

case prior to the date hereof.  Nothing herein shall impair or modify UBS AG, London Branch's rights to seek additional adequate protection pursuant to section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to UBS AG, London Branch hereunder is insufficient to compensate for any diminution in value of its interests in the Cash Collateral or any other Prepetition Collateral during this case or any successor case.

24.    Termination of Cash Collateral Use.  On the Termination Date, the Trustee's right to use the Cash Collateral on the terms and conditions set forth in this Order shall terminate automatically.   By written agreement, UBS AG, London Branch may agree to waive such termination in full or permit only limited use of Cash Collateral in any manner following such event.

25.    Budget Amendments.   UBS may, but is not required to, by written agreement, amend the Budget, including to, among other things, extend the date through which Cash Collateral may be used and to increase the amount of Cash Collateral that may be used thereunder; *provided, however*, that any amendment to the Budget made pursuant to the authority set forth in this Order shall be subject to the following conditions and limitations:

(a) any such amendment shall not alter the nature and types of payments that were authorized under this Order; and

(b) any such amendment shall require the consent of the Trustee.

The foregoing conditions and limitations are intended to apply only to consensual changes to the Budget that are made pursuant to the authority of this Order.

26.    Upon entry of a written amendment in compliance with the foregoing, the new agreed budget shall constitute the Budget for all purposes under this Order and the Credit Agreement.

- 15 -

27.    Promptly following the amendment of the Budget in accordance with the foregoing, the Trustee shall promptly file notice with this Court, and provide notice of such entry to all parties entitled to notice.

28.    Reservation of Rights.  The right of the Trustee to seek additional or different use of Cash Collateral is specifically preserved, provided that upon filing of any such request, UBS AG, London Branch may by written notice terminate authorization to use Cash Collateral pursuant to this Order, or may agree to permit only use of Cash Collateral in any limited manner following such event; provided, however, any action seeking additional or different use of Cash Collateral without the express written consent of UBS shall immediately result in the occurrence of the Termination Date.

29.    Remedies on Event of Default.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right without any notice of further order of the Court to take any and all actions and pursue all remedies permitted under the Credit Agreement and applicable law in response to such Event of Default.

30.    The automatic stay of section 362(a) of the Bankruptcy Code shall be and hereby is modified and vacated without further order, notice or application to the Court to the extent necessary to allow UBS to perform any act authorized by this Order.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right to submit an order on five days' notice to the Trustee, the Committee, and the United States Trustee lifting the automatic stay to permit UBS AG, Stamford Branch to foreclose on the Collateral or alternatively, compelling the Trustee to sell the Collateral pursuant to section 363(b) of the Bankruptcy Code.  The proposed order shall be accompanied by an affidavit on behalf of UBS AG, Stamford Branch stating that an Event of Default has occurred and setting forth the facts of such Event of Default.  Any party opposing the

- 16 -

1  relief requested by UBS AG, Stamford Branch shall have the burden of proof why the automatic

2  stay should not be lifted with respect to the Collateral.

3      31.    <u>Further Assurances</u>.  No further actions shall be required to reflect the Financing

4  Liens or Adequate Protection Liens granted to UBS or the Obligations or Adequate Protection

5  Obligations incurred by the Trustee or the Debtor.  Notwithstanding the foregoing, the Trustee and

6
7  UBS are granted authority to take any such actions and execute any such documents as they may

8  deem appropriate to reflect the Financing Liens and the Adequate Protection Liens granted to UBS

9  or the Obligations incurred by the Trustee or the Debtor, including without limitation execution

10  and delivery of one or more notes, deeds of trust, financing agreements and all other actions as

11  UBS may reasonably request.

12      32.    <u>Section 506(c) Waiver</u>.  All rights of the Debtor, the Trustee, and the estate to

13
14  surcharge the collateral of UBS are hereby waived with regard to any period during which Cash

15  Collateral is used pursuant to this Order and until all Obligations are paid in full.

16      33.    <u>Right to Credit Bid</u>.  UBS shall have the right to credit bid up to the full amount of

17  its outstanding Obligations and Prepetition Obligations in connection with any sale of the Debtor's

18  assets, the Prepetition Collateral, the Post-Petition Collateral or the Collateral under section 363 of

19  the Bankruptcy Code.  Nothing herein shall constitute consent by UBS to any sale of such assets,

20  Prepetition Collateral, the Post-Petition Collateral or the Collateral.

21      34.    <u>Successors and Assigns</u>.  The provisions of this Order shall be binding upon UBS,

22
23  the Debtor, the Trustee and their respective successors and assigns (including any other trustee

24  hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of UBS, the Trustee

25  and the Debtor and their respective successors and assigns.

26      35.    <u>Compliance with Laws</u>.  Nothing in this Order or the Budget shall permit the Debtor

27  or the Trustee to violate 28 U.S.C. § 959(b), and nothing in this Order or the Budget shall in any

28

- 17 -

way diminish the obligation of any entity, including the Debtor and the Trustee, to comply with environmental laws.

36.    <u>Priority</u>.  Except as set forth herein with respect to the Financing Liens, nothing in this Order shall determine or effect the relative priority of any senior prepetition lien or post-petition lien, and all rights are expressly reserved in that regard.  All rights are expressly reserved with respect to whether any asset is cash collateral for any entity other than UBS and thus any entitlement of such other entities to adequate protection, including without limitation any superpriority claim.

37.    <u>Effect of Order</u>.  If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay, shall not affect (i) the validity of any Adequate Protection Obligations incurred before the actual receipt of written notice by UBS AG, London Branch of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any lien or priority authorized or created hereby.  Notwithstanding any such reversal, modification, vacatur or stay, any use of the Facility proceeds or Cash Collateral or Obligations or Adequate Protection Obligations incurred by Debtor or the Trustee to UBS before the actual receipt of written notice by UBS of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the original provisions of this Order, and UBS shall be entitled to all the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code and this Order with respect to all uses of the Facility proceeds or Cash Collateral and the Obligations or Adequate Protection Obligations.

38.    Except as expressly provided in this Order, the Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of UBS granted by the provisions of this Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the case to a case under chapter 7, dismissing of the case, or by any other act or omission or (ii) the entry of an order

- 18 -

confirming a plan in the case.  The terms and provisions of this Order shall continue in this case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of UBS granted by the provisions of this Order shall continue in full force and effect until the Obligations and the Adequate Protection Obligations are indefeasibly paid in full.

39.    <u>Findings of Fact and Conclusions of Law</u>. This Order shall constitute findings of fact and conclusions of law of the Court and shall take effect immediately upon execution hereof.

40.    <u>Filing</u>. This Order may be filed in any state or local jurisdiction in order to evidence and perfect UBS's liens and security interests, as granted and confirmed herein.  At the request of UBS's counsel, the clerk of court shall issue a certified copy of this Order and shall execute such other certificates or affidavits of authenticity as may be reasonably necessary to put this Order in a form that may be accepted by the applicable filing office.

41.    <u>Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code</u>.  The terms of the Facility, Credit Agreement, and this Order were negotiated in good faith and at arms' length among the Trustee and UBS.  Financing provided under the Facility and the Credit Agreement shall be deemed to have been extended in good faith and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code.

42.    <u>Stipulations</u>.  Effective upon the expiration of the Challenge Period (as defined below), the Trustee will be deemed to have admitted, acknowledged, agreed and stipulated that: (i) the amount due to UBS under the Prepetition Credit Agreements, as of June 30, 2019, is approximately $127 million, plus such allowable interest, fees and charges as may accrue thereafter; (ii) the Prepetition Obligations constitute legal, valid, enforceable and binding obligations of the Debtor; (iii) no offsets, defenses or counterclaims to the Prepetition Obligations

- 19 -

exist; (iv) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the Prepetition Credit Agreements are valid and enforceable by UBS AG, London Branch against the Debtor; (vi) the liens and security interests in the Prepetition Collateral securing the Prepetition Obligations (the "Prepetition Liens") were perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens expressly permitted by the Prepetition Credit Agreements (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code); (vii) the Prepetition Obligations constitute allowed secured claims against the Debtor's estate; and (viii) the Debtor and its estate have no claim, objection, challenge or cause of action against UBS or any of its affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the Prepetition Credit Agreements (or the transactions contemplated thereunder), the Prepetition Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

43.    Effect of Stipulations on Third Parties.  The stipulations, admissions, agreements and releases contained in this Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in this case, and

- 20 -

any other person or entity acting or seeking to act on behalf of the Debtor's estates, including the

Trustee in all circumstances and for all purposes unless:  (a) any party in interest (subject in all

respects to any agreement or applicable law that may limit or affect such entity's right or ability to

do so), in each case, with requisite standing granted by the Court, has timely and properly filed an

adversary proceeding or contested matter (subject to the limitations contained herein) by no later

than a date that is the later of (i) the date that is 30 days after entry of this Order and (ii) any later

date agreed to by UBS AG, London Branch in writing in its sole discretion (the "Challenge

Period"), (A) objecting to or challenging the validity, perfection, enforceability, priority or extent

of the Prepetition Obligations, or (B) otherwise asserting or prosecuting any action for preferences,

fraudulent transfers or conveyances, other avoidance power claims through or on behalf of the

Debtor's estate (collectively, the "Challenge Proceeding") against UBS AG, London Branch; and

(b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge

Proceeding; *provided, however*, that any pleadings filed in connection with any Challenge

Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges

or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever,

waived, released and barred.  If any such Challenge Proceeding is timely filed during the Challenge

Period, such filing shall immediately result in the occurrence of the Termination Date.

44.    If no such Challenge Proceeding is timely and properly filed during the Challenge

Period or the Court does not rule in favor of the plaintiff in any such proceeding:  (i) any and all

Challenge Proceedings or potential Challenge Proceedings shall be deemed to be forever waived

and barred; (ii) all stipulations, admissions, agreements and releases contained in this Order shall

be irrevocably and forever binding on all parties in interest; (iii) the Prepetition Liens shall be

deemed to constitute valid, binding, and enforceable encumbrances, and not subject to avoidance

pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtor shall be

- 21 -

deemed to have released, waived and discharged UBS AG, London Branch from any and all obligations and liabilities to the Debtor and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date.

45.    If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Order shall nonetheless remain binding and preclusive on all persons and entities, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. UBS AG, London Branch reserves all of its rights to contest on any grounds any Challenge Proceeding. Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in this case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estates.

46.    The Trustee may use the funds advanced under the Facility to investigate (i) the claims and liens of UBS AG, London Branch and (ii) potential claims, counterclaims, causes of action or defenses against UBS AG, London Branch; *provided* that no more than an aggregate of $5,000 of the funds advanced under the Facility may be used by the Trustee in respect of any such investigation (the "Trustee's Investigation Budget") and $20,000 of the funds advanced under the Facility may be used by the Committee in respect of any such investigation (the "Committee's Investigation Budget" and together with the Trustee's Investigation Budget, the "Investigation Budget").

47.    No Stay.  There is no stay of this Order, including no stay pursuant to Federal Rule of Bankruptcy Procedure 6004(h) (to the extent applicable).

48.    Final Hearing.  The Motion is set for a final hearing to be held at [_____] (prevailing Pacific Time), on [_____], 2019 (the "Final Hearing").  Advancement of any funds

- 22 -

under the Facility prior to the Final Hearing shall be governed by the terms and conditions of the Credit Agreement and entitled to the full protections granted under this Order, the Credit Agreement, the Bankruptcy Code, and any other applicable law.

###

- 23 -

ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

# EXHIBIT "2"

**HVI CAT CANYON INC.**
weeks 14-18 budget

| Notes | week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |
| | **Cash Inflows** | | | | | | |
| 2 | SMV | - | 12,000 | - | 1,460,858 | - | 1,472,858 |
| 3 | Redu | - | - | - | 49,917 | - | 49,917 |
| | Belridge | - | - | - | 58,155 | - | 58,155 |
| | Total Cash Inflows | - | 12,000 | - | 1,568,931 | - | 1,580,931 |
| 4 | Royalties | - | (118,392) | - | (141,171) | - | (259,562) |
| 5 | Escrow Royalties | - | (27,690) | - | (27,148) | - | (54,838) |
| | Total Net Cash Inflows | - | (134,081) | - | 1,400,611 | - | 1,266,530 |
| | **Cash Outflows** | | | | | | |
| | **Operating Expenses** | | | | | | |
| 6 | Payroll Checks | - | 76,000 | - | 76,000 | - | 152,000 |
| 7 | Payroll Taxes | - | 2,011 | - | 1,006 | - | 3,017 |
| 8 | Garnishment & Child Support | 28,763 | - | 29,000 | - | 29,000 | 86,763 |
| 9 | Surface Rents | - | 75,634 | - | - | - | 75,634 |
| 10 | Consultants | - | 9,008 | - | 9,008 | - | 18,015 |
| 11 | Phones | - | 2,500 | - | 2,000 | - | 4,500 |
| 12 | Power PG&E | - | 30,000 | - | 170,000 | - | 200,000 |
| 13 | Power SoCalEdison | - | 20,000 | - | - | - | 20,000 |
| | Waste Management | - | 2,100 | - | - | 2,100 | 4,200 |
| | Water | - | 1,000 | 2,000 | - | - | 3,000 |
| | SouthernCalGas | - | 75 | 75 | - | 75 | 225 |
| | Portable Restrooms | - | 1,100 | 500 | 1,500 | - | 2,600 |
| | Alarms | - | - | - | - | - | 500 |
| | Cafeteria | - | - | - | 250 | - | 250 |
| 14 | Copies | - | - | - | 250 | - | 250 |
| | Chemicals | - | 10,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| 15 | Pumps | - | 25,000 | 10,000 | 10,000 | 10,000 | 55,000 |
| 16 | Gasoline | - | 25,000 | 12,500 | 12,500 | 12,500 | 62,500 |
| 17 | Transportation | - | - | - | 150,000 | - | 150,000 |
| 18 | Vacuum Trucks | - | - | - | 56,000 | - | 56,000 |
| 19 | LCR | - | - | - | 575,000 | - | 575,000 |

**HVI CAT CANYON INC.**
weeks 14-18 budget
*week starting*

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 20 | Electricians | - | 10,000 | 5,000 | 10,000 | 5,000 | 30,000 |
| 21 | Welders | - | 5,000 | 2,500 | 2,500 | 2,500 | 12,500 |
| 22 | Supplies (Belts-Parts) | - | 2,000 | 1,500 | 1,500 | 1,500 | 6,500 |
| 23 | Parts (Compressor, Pipe, others) | - | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 |
| 24 | Clean Chemical towers | - | 3,000 | 1,500 | 1,500 | 1,500 | 7,500 |
| 25 | Vehicle maintenance | - | 16,000 | - | 8,000 | - | 24,000 |
| 26 | Drink Water | - | 150 | - | 150 | - | 300 |
| 26 | Weed abatement | - | 15,000 | 10,000 | 10,000 | 10,000 | 45,000 |
| 27 | Well Analysis | - | 3,000 | - | 3,000 | - | 6,000 |
| 28 | Compliance | - | 25,000 | - | 25,000 | - | 50,000 |
| 29 | Fire Department | - | - | - | 8,000 | - | 8,000 |
| 30 | APCD | - | 2,000 | 2,000 | 2,000 | 2,000 | 8,000 |
| 30 | SBP - APCD | - | - | - | 146,436 | - | 146,436 |
| 31 | SBP - P&D | - | - | - | 159,843 | - | 159,843 |
| 32 | SBP - FD | - | - | - | 16,440 | - | 16,440 |
| 33 | SBP - EHS | - | - | - | 10,475 | - | 10,475 |
| 33 | SBP - Tax | - | - | - | - | - | - |
| 34 | Escrow - Surface Rents | - | 7,500 | - | - | - | 7,500 |
| 35 | Netherland and Sewell Reserve Report | - | - | - | - | 25,000 | 25,000 |
| | **Total Operating Expenses** | 28,763 | 373,078 | 86,575 | 1,470,357 | 111,175 | 2,069,948 |
| | **G&A Expenses** | | | | | | |
| 36 | Bank Charges & fees | 100 | 100 | 100 | 100 | 100 | 500 |
| 37 | Insurances | - | 9,000 | 9,000 | 19,000 | - | 37,000 |
| | Chapter 11 Trustee Professionals | 228,834 | 108,894 | 108,894 | 108,894 | 108,894 | 664,410 |
| 38 | Unsecured Creditor Committee Professionals | - | - | - | - | 25,000 | 25,000 |
| 39 | U.S. Trustee Payment | - | 25,000 | - | - | - | 25,000 |
| 40 | Backoffice & Administrative | - | - | - | 156,000 | - | 156,000 |
| | Interest | - | - | - | - | - | - |
| | **Total G&A** | 228,934 | 142,994 | 117,994 | 283,994 | 133,994 | 907,910 |
| 41 | **Health and Safety** | | | | | | |
| 42 | SMV Health and Safety | - | 28,000 | 88,000 | 56,000 | 16,000 | 188,000 |
| 43 | Belridge Health and Safety | - | 4,500 | 5,000 | 20,000 | 3,000 | 32,500 |

**HVI CAT CANYON INC.**
weeks 14-18 budget
*week starting*

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | Redu Health and Safety | - | 31,047 | 3,000 | 16,000 | 40,000 | 90,047 |
| 44 | Total Health and Safety | - | 63,547 | 96,000 | 92,000 | 59,000 | 310,547 |
| 45 | Total Cash Outflows | 257,697 | 579,618 | 300,569 | 1,846,351 | 304,169 | 3,288,405 |
| | Net Cash Flow | (257,697) | (713,699) | (300,569) | (445,740) | (304,169) | (2,021,875) |
| | Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |
| | Net Cash Flow | (257,697) | (713,699) | (300,569) | (445,740) | (304,169) | (2,021,875) |
| | Net Borrowing/(Pay Down) | 220,913 | 713,699 | 300,569 | 445,740 | 304,169 | 1,985,091 |
| | Ending Cash Balance | - | - | - | - | - | - |
| 46 | Loan Balance | 220,913 | 934,613 | 1,235,182 | 1,680,922 | 1,985,091 | 1,985,091 |

| | |
|---|---|
| 1 | Book Bank Balance Reconciliation |
| | Starting Balance 10/24/19 |
| | Transfer for net amount for Sept Revenue | 18,022 |
| | Transfer #1 against October Revenue | 23,810 |
| | Transfer #2 against October Revenue | 60,000 |
| | Balance as of 10/25/19 | 20,000 121,832 |
| 2 | Total Check Disbursements on 10/25/19 | 85,048 |
| | Net Available book balance 10/28/19 | 36,784 |

1  Forecast dependent on actual volume of delivered barrels, price and gravity adjustments.
The price per barrel is calculated for Santa Maria Valley using the average price per barrel posted by Chevron, Union 76, Exxon and Shell for Midway Sunset crude less $7.
The price per barrel for Redu is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $5.75.
The price per barrel for Belridge is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $0.75.
The prior month's revenue is collected on the 20th of the following month.
All pricing is subject to adjustments based upon the gravity of the oil produced.
See the October 2019 Revenue Projection schedule for a detailed build up of the forecasted revenue.

2  Affiliate California Asphalt Production, Inc. advanced $80k of the forecasted revenue for October to HVI in week 13 and an additional $12k in week 15 to cover a surface lease payment to Boisseranc.

3

## HVI CAT CANYON INC.
### weeks 14-18 budget

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|

**4** In aggregate, monthly royalties are approximately 13% of production which is approximately 1 month's revenue less the LCR shipments.
Escrow Royalties are based upon an insider's 2.5% overriding royalty on 1 month's production which is approximately 1 month's revenue less the LCR shipments.

**5** Due to cash flow constraints in Week 14, the majority of forecasted disbursements for the week were rolled into the forecasted disbursements for week 15.

**6** Bi-weekly payroll for HVI's 41 employees, including insider Alex Dimitrijevic's compensation that, as the President and COO of HVI, is subject to a 15 day objection period prior to disbursement.

**7** Schedule of payroll taxes due to State and Federal Taxing Authorities due on week 13:

| | |
|---|---|
| Federal Income Tax Whitholding | 8,598.87 |
| Social Security Tax Whitholding | 12,204.16 |
| Medicare Tax Whitholding | 2,872.94 |
| Total Form 941 Liability | 24,156.93 |
| Federal Unemployment Insurance Liability | 38.30 |
| State Income Tax Withholding | 3,219.85 |
| CA SDI Tax Withholding | 950.89 |
| State Unemployment Insurance | 334.81 |
| Total Form DE-9 Liability | 4,571.15 |
| Total Liability for 10-25-2019 Payroll | 28,763.44 |

**8** Surface Rent Sub schedule
Surface Lease Owner:
Boisseranc
Buganko

**9**

| | Amount | Timing |
|---|---|---|
| Boisseranc | $ 11,956 | Due on the 1st of each month |
| Buganko | $ 41,878 | Due on the 1st of the month. This amount includes $27k for unpaid surface lease payments from prior post-petition budgets. |
| Medema (1/2) Thomson (1/4) (- McLaughlin (1/4) | $ 7,500 | Due on the 1st of each month |
| (3) Etchandy family members | $ - | Lease to be rejected, no amount due |
| State College, LLC (Evelyn Roper) | $ - | No amount due |
| Adam Family Trust | $ - | $1,5851.33 due on an annual basis - has been paid for 2019. |
| Orcutt Fee, LLC | $ - | $5,000 due on Annual - paid for 2019 |
| Marianne Friedl | $ - | $3,700 due on Annual - paid for 2019 |
| C.M.T LLC | $ - | $100 will be due in January 2020. |
| Manfred Sander | $ 6,800 | Due before the end of October 2019 |
| E & B Natural Resources | $ - | Under review, no amount currently due |
| Grundoon, LLC (Firestone) | $ 7,500 | Due on the 1st of each month |

## HVI CAT CANYON INC.
### weeks 14-18 budget
week starting

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | Morganti Ranch | $ - | $5,500 on a monthly basis but lease is currently shut-in so no amount due. | | | | |
| | Morganti Ranch | $ - | Under review, no amount currently due | | | | |
| | Morganti Ranch | $ - | Under review, no amount currently due | | | | |
| | Railroad | $ - | $454 due in December 2019 | | | | |
| (4) | Righetti family members | $ - | $3,000 per quarter, next payment due in December 2020 | | | | |
| (3) | Judy A. Rogers, Ronald H. Souza, Jr., Michael J. Souza | $ - | $750 due in January 2020 | | | | |
| | Roland and Sandy Miller | $ - | $300 due in December 2019 | | | | |
| | Multiple Bradley Lands | $ - | No amount due in October or November 2019 | | | | |
| 10 | HVI pays the following 3 consultants on a biweekly basis: | | | | | | |
| | Name and Description: | Amount: | | | | | |
| | i) William LaFleur - Landman | $ 3,000 | | | | | |
| | ii) Innovative Consulting Solutions - production accountant for royalty calculations | $ 1,923 | | | | | |
| | iii) Alliance-Hydro - Geologist | $ 4,085 | | | | | |
| | **Total Amount due to Consultants** | **$ 9,008** | | | | | |
| | **Total amount due in week 14** | **$ 75,634** | | | | | |

11  Amounts include HVI's office line at their East Clarke office and cell phones for all field employees.

12  Per adequate assurance order, $30k deposit due in Week 15 and $170k due in Week 17 (prior to the 20th).

13  Amount due for prior month's power usage.

14  Chemicals used for H2S removal that are critical to production - currently on COD terms with chemicals vendor

15  Pump maintenance and rework costs that are critical to production.

16  HVI makes daily gasoline purchases for the tankers used to haul oil and gas production with a weekly run rate of approximately $12.5k of overdue invoices.

17  Amount due to affiliate GTL1 for transportation costs for hauling crude and LCR, vehicle leasing and insurance costs and demurrage charges. GTL1 pays drivers $17.50/hr. for demurrage but charges HVI $80/hr.

18  Amount due to affiliate GTL1 for vacuum trucks, HVI pays $80/hr., has a monthly run rate between 600-700 hours, and week 17 assumes a 700 hour month.

19  Per Ernesto Olivares, as of 10/27/19, HVI has received 7,476 BBLs of Light Crude ("LCR") deliveries priced at $76.50 per BBL.  Approximately 100 additional BBLs are estimated to be delivered before month's end.

20  The weekly run rate for electricians is approximately $5K and week 15 assumes payment of approximately $5K of overdue invoices.

21  The weekly run rate for welders is approximately $2.5k and week 15 assumes payment of approximately $2.5k of overdue invoices.

**HVI CAT CANYON INC.**
weeks 14-18 budget
week starting

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|

22. Assumes a weekly run rate of $1.5k with an additional approximately $1k of overdue invoices to be paid in week 15.

23. Assumes a weekly run rate of $5k.

24. Assumes a weekly run rate of $1.5k for H2S fluid and week 15 assumes payment of $1.5k of invoices due in week 14.

25. Assumes $8k bi-weekly run rate for the maintenance costs for all oil field service vehicles, including rigs. Week 15 assumes payment of an overdue invoice for approximately $8k for rig maintenance.

26. Weekly run rate for critical safety and fire protection for HVI's 700+ wells and reduction of Notice of Voliation ("NOV") fines. Currently understaffed in this area and run rate assumes increasing team size from 1 to approximately 2 five man teams.

27. Per Alex D, up to date on well inspections through week 14 so run rate assumes bi-weekly maintenance needed in November 2019.

28. Weekly run rate for 3rd party consultants for critical compliance requirements such as SPC ("Spill Prevention and Countermeasure") plans and APCD ("Air Pollution and Control District") plans that need to be submitted before year-end to mitigate future fines and penalties from regulatory bodies.

29. Related to administrative invoicing for APCD post-petition inspections related to 35 permits necessary to mitigate potential fines and penalties.

30. Passed due post-petition Permit to Operate ("PTO") fees from the APCD for the following 13 HVI leases, excluding 1 lease quitclaimed to an insider. Subject to revision if additional permit fees for quitclaimed leases to insiders are identified:

| Facility | Fee |
|---|---|
| Armelin Lease PTO No. 07775 - R8 | $ 7,895 |
| Battles Lease PTO No. 08219 - R11 | $ 7,323 |
| Bradley Lands/Bradley Consolidated Lease PTO No. 070 | $ 41,123 |
| Continental Lease PTO No. 08222 - R11 | $ 5,425 |
| Cross Development Lease PTO No. 08863 - R9 | $ 458 |
| East Valley Farms Lease PTO No. 08864 - R9 | $ 458 |
| Fullerton Lease PTO No. 08868 - R13 | $ 7,551 |
| Jim Hopkins Lease PTO No. 09310 - R8 | $ 13,796 |
| Lakeview Gas Plant PTO No. 10108 - R8 | $ 38,032 |
| Lakeview Lease PTO No. 10096 - R8 | $ 7,385 |
| Los Flores PTO No. 07307 - R12 | $ 16,074 |
| McKenzie Lease PTO No. 10079 - R8 | $ 458 |
| Olean Lease PTO No. 10080 - R8 | $ 458 |
| **Total due for APCD Permits to Operate** | **$ 146,436** |

Excluded PTO fee due to a quitclaimed lease to an insider.

**HVI CAT CANYON INC.**
weeks 14-18 budget
week starting

| Notes | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 31 | Golco Lease PTO No. 10078 - R8 | $ 4,679 | | | | | |
| | Amount is based upon the following County of Santa Barbara Planning and Development post-petition facility and lease inspection fees. Subject to revision if additional permit fees for quitclaimed leases to insiders are identified: | | | | | | |
| | Account Number/Permit ID Number: | Amount: | | | | | |
| | Permit ID # 19ACB-00000-00914 for 500 post-petition un-inspected facilities | $ 110,452 | | | | | |
| | 19ACT-00880 | $ 210 | | | | | |
| | 19ACT-00922 | $ 6,560 | | | | | |
| | 19ACT-00920 | $ 10 | | | | | |
| | 19ACT-00914 | $ 350 | | | | | |
| | 19ACT-00921 | $ 6,280 | | | | | |
| | 19ACT-00926 | $ 12,640 | | | | | |
| | 19ACT-00928 | $ 9,032 | | | | | |
| | 19ACT-00938 | $ 108 | | | | | |
| | 19ACT-00930 | $ 10 | | | | | |
| | 19ACT-00932 | $ 10 | | | | | |
| | 19ACT-00934 | $ 108 | | | | | |
| | 19ACT-00936 | $ 108 | | | | | |
| | 19ACT-00887 | $ 262 | | | | | |
| | 19ACT-00878 | $ 420 | | | | | |
| | 19ACT-00877 | $ 210 | | | | | |
| | 19ACT-00879 | $ 210 | | | | | |
| | 19ACT-00881 | $ 220 | | | | | |
| | 19ACT-00924 | $ 12,640 | | | | | |
| | **Total due to P&D for inspection fees** | **$ 159,843** | | | | | |
| 32 | Amount is based upon the following Santa Barbara County Fire Department Post-Petition California Fire Code Inspection Permit Fees. Subject to revision if permits for additional quitclaimed leases to insiders are identified: | | | | | | |
| | Site Name | Amount: | | | | | |
| | Battles | $ 1,370 | | | | | |
| | Blochman | $ 1,370 | | | | | |
| | Bell Gas Compressor | $ 1,370 | | | | | |
| | Bell Lease | $ 1,370 | | | | | |
| | Casmalia/Morganti | $ 1,370 | | | | | |

## HVI CAT CANYON INC.

| Notes | week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | weeks 14-18 budget | | | | | | |
| | Chamberlin B | $ 1,370 | | | | | |
| | Chamberlin | $ 1,370 | | | | | |
| | Davis B | $ 1,370 | | | | | |
| | Davis | $ 1,370 | | | | | |
| | Fullerton Lease | $ 1,370 | | | | | |
| | Jim Hopkins | $ 1,370 | | | | | |
| | Los Flores | $ 1,370 | | | | | |
| 33 | Total due for Fire Department CFC Permits | $ 16,440 | | | | | |

Per Docket #308, Declaration of James Ray, California Unified Program Agency Supervisor for the Santa Barbara County Environmental Health Services ("EHS"), amounts due for the following Santa Barbara Post-petition Environmental Health Services Permit Fees - *originally forecast to be distributed in week 2*:

| Permit ID: | Permit Fee for 2020: |
|---|---|
| FA0010063 | $ 1,857 |
| FA0010325 | $ 555 |
| FA0010326 | $ 555 |
| FA0011176 | $ 555 |
| FA0011177 | $ 555 |
| FA0012015 | $ 555 |
| FA0012328 | $ 555 |
| FA0012329 | $ 555 |
| FA0012330 | $ 555 |
| FA0012495 | $ 555 |
| FA0013065 | $ 555 |
| FA0013112 | $ 555 |
| FA0013113 | $ 555 |
| FA0013114 | $ 555 |
| FA0013136 | $ 555 |
| FA0015899 | $ 848 |
| Total amount due for EHS permits | $ 10,475 |

34 Rent due on HVI East Clarke office - not approved under Interim Cash Collateral Order

35 Chapter 11 Trustee negotiated a progress payment plan with Netherland & Sewell for a 2019 Reserve Report. The $100-$120k total fee can be paid on weekly basis for $25k a week once they start work.

| Notes | HVI CAT CANYON INC. weeks 14-18 budget | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 36 | Per Ernesto Olivares, a total of $18K for worker's comp insurance to be paid in weeks 15 and 16 and $19K to renew $1MM bond due in week 17. | | | | | | |
| 37 | Chapter 11 Trustee professionals agree to a 20% deferral of professional fees incurred during this 5-week period, assuming the bank agrees to carve out the remaining 20%. Per Professional Fee Budget, weekly payments for Chapter 11 Trustee, Counsel and Financial Advisor will be put in escrow during this 5-week budget. Payments to professionals to be made only after employment applications are approved and payments authorized. | | | | | | |
| 38 | Per Professional Fee Budget, Unsecured Creditors Committee Counsel has a forecasted $25k monthly run rate and payments will be put in escrow during this 5-week budget. | | | | | | |
| 39 | Per Professional Fees budget, US Trustee payment for Q3 2019 forecasted for week 15 based upon 1% of debtors disbursements in Q3 2019 of approximately $2.5M per August and September Monthly Operating Reports ("MOR"). | | | | | | |
| 40 | Per Ernesto Olivares on 10/30/2019, affiliate GIT's October 2019 invoice for back office and administrative services will be approximately $156k. GIT allocates expenses among the affiliated entities based upon headcount of each respective entity. Per Cost and Sale Summary schedule, GIT's allocation and the Legal Fee summary schedule details of the pre-petition invoices offset against revenue due to HVI in Week 13. | | | | | | |
| 41 | Per the draft 13-week Health and Safety Budget to be presented in 2-weeks. | | | | | | |
| 42 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total SMV Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $275k but should reduce compliance violation fines and environmental risks. | | | | | | |
| 43 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Belridge Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $66k but should reduce compliance violation fines, environmental risks and; by reducing these liabilities, potentially make the field more attractive to prospective buyers. | | | | | | |
| 44 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Redu Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $337k but should reduce compliance violation fines, environmental risks, and; by reducing these liabilities, potentially make the field more attractive to prospective buyers. | | | | | | |
| 45 | Total Cash Outflows for Operating, General and Administrative, and Health and Safety Expenses but not including royalties. | | | | | | |
| 46 | Estimated Funding required for the 5-week period ending week 18, excluding interest, is approximately $2M. Interest to be added to the 13-week budget to be presented in 2-weeks. | | | | | | |

## HVI CAT CANYON INC.
### Professional Fees Budget
week ending

| | Assumptions | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Professional Fees - Run Rate** | | | | | | | |
| Chapter 11 Trustee Fees | $25K per month paid monthly, 20% holdback | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 125,000 |
| Ch. 11 Trustee Counsel | Normal hourly rates reduced by 20%, paid monthly; 20% holdback | $ 64,000 | $ 32,000 | $ 32,000 | $ 32,000 | $ 32,000 | 192,000 |
| CRO and Financial Advisors | | $ 139,834 | $ 51,894 | $ 51,894 | $ 51,894 | $ 51,894 | 347,410 |
| UCC counsel | $25K per month | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 25,000 |
| US Trustee | 1% of disbursements; paid quarterly | $ 25,000 | | | | | 25,000 |
| Total | | $ 228,834 | $ 133,894 | $ 108,894 | $ 108,894 | $ 133,894 | 714,410 |
| **Professional Fees - Payment** | | | | | | | |
| Chapter 11 Trustee Fees | | $ - | $ - | $ - | $ - | $ - | |
| Ch. 11 Trustee Counsel | | $ - | $ - | $ - | $ - | $ - | |
| Ch. 11 Trustee Financial Advisor | | $ - | $ - | $ - | $ - | $ - | |
| UCC Counsel | | $ - | $ - | $ - | $ - | $ - | |
| US Trustee | | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 25,000 |
| Total | | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 25,000 |
| **CRO and Financial Advisors** | | Weekly Hours | | | | | |
| Michael McConnell | $25k a week | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | 25,000 |
| Tim Skillman | Rate | 670 | 670 | 670 | 670 | 670 | |
| | Hours | 100 | 50 | 50 | 50 | 50 | |
| | Total | 67,000 | 33,500 | 33,500 | 33,500 | 33,500 | |
| James Baring | Rate | 450 | 450 | 450 | 450 | 450 | |
| | Hours | 120 | 50 | 50 | 50 | 50 | |
| | Total | 54,000 | 22,500 | 22,500 | 22,500 | 22,500 | |
| Greg Baracato | Rate | 695 | 695 | 695 | 695 | 695 | |
| | Hours | 50 | | | | | |
| | Total | 34,750 | 695 | 695 | 695 | 695 | |
| Expenses | Hotel | 3,960 | 1,800 | 1,800 | 1,800 | 1,800 | |
| | Food | 900 | 600 | 600 | 600 | 600 | |
| | Mileage | 464 | 464 | 464 | 464 | 464 | |
| | Airfare | 1,600 | | | | | |
| | Total | 124,600 | 44,800 | 44,800 | 44,800 | 44,800 | |
| Grand Total | | $ 124,600 | $ 44,800 | $ 44,800 | $ 44,800 | $ 44,800 | |

week 14 includes week 13's time

### US Trustee Fee Schedule

| TOTAL QUARTERLY DISBURSEMENTS | QUARTERLY FEE |
|---|---|
| $0 to $14,999.99 | $325.00 |
| $15,000 to $74,999.99 | $650.00 |
| $75,000 to $149,999.99 | $975.00 |
| $150,000 to $224,999.99 | $1,625.00 |
| $225,000 to $299,999.99 | $1,950.00 |
| $300,000 to $999,999.99 | $4,875.00 |
| $1,000,000 or more | 1% of quarterly disbursements or $250,000, whichever is less |

| | |
|---|---|
| July MOR | 1,003,706 |
| August MOR | |
| September MOR | 1,479,506 |
| Total | 2,483,212 |
| Q3 2019 Trustee Fee | 1%  24,832 |

# EXHIBIT "3"

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** is dated as of November [__], 2019, and entered into by and between **Michael McConnell** ("Trustee"), solely in his capacity as Chapter 11 trustee for the estate of **HVI Cat Canyon, Inc.,** a Colorado corporation ("HVI CC" and, together with Trustee, collectively, "Borrower"), and **UBS AG, Stamford Branch** (the "Lender").

## RECITALS

**WHEREAS,** on July 25, 2019 (the "Petition Date"), HVI CC filed a voluntary petition for relief under the Bankruptcy Code (such term and other capitalized terms used in these Recitals without definition have the meanings set forth in Section 1.01 of this Agreement) with the United States Bankruptcy Court for the Southern District of New York. On August 28, 2019, the case was transferred to the United States Bankruptcy Court for the Northern District of Texas. On September 12, 2019, pursuant to the reasons stated on the record at a hearing on September 10, 2019, the court entered an order transferring venue to the United States Bankruptcy Court for the Central District of California, Northern Division (the "Court") (such proceeding being administered under Case No. 9:19-bk-11573-MB is hereinafter referred to as the "Chapter 11 Case"). Commencing on the Petition Date until the appointment of Trustee, HVI CC continued to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** on October 16, 2019, Michael McConnell was appointed as the Chapter 11 Trustee;

**WHEREAS,** Trustee has determined that (a) HVI CC's business requires additional working capital on an immediate basis and is unable to operate generally without obtaining post-petition financing and (b) HVI CC will not be able to pay its operating expenses and other obligations so that it may continue operating to preserve and maintain the value of its assets;

**WHEREAS,** Borrower has requested that the Lender provide one or more advances of funds to Borrower on a post-petition basis on the terms and conditions set forth herein;

**WHEREAS,** UBS AG, London Branch, an affiliate of the Lender ("UBS London"), is the lender under the Existing Credit Facilities (as defined below);

**WHEREAS,** the Lender desires to make advances to protect and preserve the Prepetition Collateral (as defined below) of UBS London; and

**WHEREAS,** the Lender is willing to provide such financing only if all of the Obligations hereunder and under the other Loan Documents (a) constitute allowed super-priority administrative expense claims in the Chapter 11 Case as set forth herein, (b) are secured by a first priority Lien on all of the real, personal and mixed property of Borrower and (c) subject to the terms and conditions provided herein, are authorized by the Interim Borrowing Order and the Final Borrowing Order (each as defined below).

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions

73

and covenants herein contained, Borrower and the Lender hereby agree as follows:

# ARTICLE 1
## DEFINITIONS

SECTION 1.01. **Defined Terms**. As used in this Agreement, the following terms have the following meanings:

"Accounts": All present and future accounts, contract rights, general intangibles, chattel paper, documents and instruments, as such terms are defined in the UCC, of Borrower, including, without limitation, all obligations for the payment of money arising out of the sale, lease or other disposition of goods or other property or rendition of services and all proceeds thereof.

"Advance": As defined in Section 2.01(a).

"Affiliate": As applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreed Budget": (i) Initially, the Initial Agreed Budget, and (ii) thereafter, the cash flow projections for the applicable Budget Period described therein, delivered by Borrower to the Lender and approved by the Lender in writing pursuant to Section 6.01(a)(ix), showing anticipated cash receipts and disbursements of Borrower and such other information as the Lender may request for the applicable Budget Period, in form and substance acceptable to the Lender in its sole discretion, in each case as such Agreed Budget may be amended, restated, supplemented or otherwise modified from time to time upon mutual written agreement of Borrower and the Lender.

"Agreement": This Credit Agreement, as amended, supplemented or modified from time to time.

"Aggregate Advance Limit": An amount equal to three million dollars ($3,000,000).

"Asset Sale": The sale by Borrower to any Person other than Borrower of (i) substantially all of the assets of any division or line of business of Borrower or (ii) any other assets (whether tangible or intangible) of Borrower (other than (a) Hydrocarbons or other Inventory sold in the ordinary course of business, (b) the Cash Equivalents to the extent permitted hereunder, and (c) sales, assignments, transfers or dispositions of Accounts in the ordinary course of business for purposes of collection).

"Availability Period": The period commencing on the Closing Date and ending on the earlier of (i) the date that is five (5) weeks from the Closing Date and (ii) the Maturity Date.

"Bankruptcy Code": Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Base Rate": For any day a fluctuating rate per annum equal to the prime commercial lending rate published by the Wall Street Journal as the "prime rate".

"Borrower": As set forth in the introductory paragraph of this Agreement.

"Borrowing Order":  Prior to the entry of the Final Borrowing Order, the Initial Borrowing Order or, when entered, the Final Borrowing Order.

"Borrowing Request": A request by Trustee, on behalf of Borrower, for an Advance in accordance with Section 2.01(b) substantially in the form of Exhibit C hereto and including Attachment No. 1 attached thereto, or such other form as may be approved by the Lender, appropriately completed and signed by Trustee on behalf of Borrower.

"Borrowing Request Attachment": As defined in Section 2.01(b).

"Budget Period": (i) With respect to the Initial Agreed Budget, the budget period commencing on the Closing Date and ending on the date set forth therein; and (ii) with respect to any subsequent Agreed Budget, the one (1) calendar month period (or such other period as mutually agreed by Trustee and the Lender) set forth therein.

"Business Day": A day other than a Saturday, Sunday or a day on which commercial banks in New York are authorized or required by law to close.

"Capital Lease": As applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of that Person.

"Cash": Money, currency or a credit balance in a Deposit Account.

"Cash Equivalents": As at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States government or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within thirty (30) days after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within thirty (30) days after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either Standard & Poor's Ratings Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"); (iii) commercial paper maturing no more than thirty days from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within thirty (30) days after such date and issued or accepted by the Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than one hundred million dollars ($100,000,000); and (v) shares of any

money market mutual fund that (a) has at least ninety-five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than five hundred million dollars ($500,000,000), and (c) has the highest rating obtainable from either S&P or Moody's.

"Chapter 11 Case": As defined in the recital clauses of this Agreement.

"Closing Date": The date that this Agreement becomes effective pursuant to Section 4.01.

"Collateral": The "Collateral" as defined in the Borrowing Order.

"Collateral Documents": The Initial Borrowing Order, the Final Borrowing Order and any security agreements, pledge agreements, assignments, financing statements or other agreements, documents, instruments or certificates delivered by Borrower pursuant to this Agreement, any other Loan Document or an applicable order of the Court in order to grant the Lender a Lien on any real, personal or mixed property of Borrower as security for the Obligations.

"Compliance Certificate":    A compliance certificate substantially in the form attached hereto as Exhibit E.

"Contingent Obligation": As applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (i) with respect to any Debt, lease or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, or (ii) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings. Contingent Obligations shall include (a) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (b) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (c) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (1) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (2) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described in subclauses (1) or (2) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"Court": As defined in the recital clauses to this Agreement.

"Debt": As applied to any Person, (i) all indebtedness for borrowed money, (ii) that portion of obligations with respect to Capital Leases which is properly classified as a liability on a balance sheet in conformity with GAAP, (iii) notes payable and drafts accepted representing

extensions of credit whether or not representing obligations for borrowed money, (iv) any obligation owed for all or any part of the deferred purchase price of property or services which purchase price is (a) due more than six (6) months from the date of incurrence of the obligation in respect thereof, or (b) evidenced by a note or similar written instrument and (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided, however, that trade payables incurred in the ordinary course of business shall not be considered Debt unless they are (a) due more than 90 days from the date of incurrence of the obligation in respect thereof, or (b) evidenced by a note or similar written instrument.

"Deposit Account": A demand, time, savings, passbook or similar account maintained with a Person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company.

"Designated Account": The deposit account designated in writing by Trustee to the Lender for the deposit of Advances.

"Dollars and $": Dollars in lawful currency of the United States.

"Environmental Laws": Any and all Governmental Requirements pertaining in any way to health, safety, the environment, the preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower is conducting, or at any time has conducted, business, or where any Property of the Borrower is located, including, the Oil Pollution Act of 1990 ("OPA"), the Clean Air Act, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980 ("CERCLA"), the Federal Water Pollution Control Act, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976 ("RCRA"), the Safe Drinking Water Act, the Toxic Substances Control Act, the Superfund Amendments and Reauthorization Act of 1986, the Hazardous Materials Transportation Law, and other environmental conservation or protection Governmental Requirements.

"Events of Default": As defined in Section 7.01.

"Existing Credit Facilities": Collectively, (i) the First Lien Credit Agreement dated as of May 20, 2016, among Borrower, Rincon Island Limited Partnership, GOGH, LLC, and UBS London, (ii) the Second Lien Credit Agreement dated as of May 20, 2016, among Borrower, Rincon Island Limited Partnership, GOGH, LLC, and UBS London, (iii) all agreements, documents and instruments pursuant to which any interest in collateral is granted or purported to be granted, created, evidenced or perfected pursuant to the foregoing, and (iv) all ancillary agreements as to which any holder of any of the obligations evidenced by any of the foregoing is a party or a beneficiary and all other agreements, instruments, documents and certificates including promissory notes, consents, assignments, contracts, and notices delivered in connection with any of the foregoing or the transactions contemplated thereby, in each case as any of the foregoing may be in effect as of the Closing Date and as the same may be amended, supplemented or otherwise modified from time to time to the extent permitted hereunder.

"<u>Final Borrowing Order</u>": An order of the Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) substantially in the form of the Interim Borrowing Order, with any modifications thereto approved by the Lender in its sole discretion, including such changes as are necessary to reflect the final nature of the order, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent or joinder of the Lender.

"<u>Final Order</u>": An order, judgment or other decree of the Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect and which has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review or rehearing has been waived or (ii) the time to appeal or seek certiorari, review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending.

"<u>GAAP</u>": United States generally accepted accounting principles applied on a consistent basis.

"<u>Governing Body</u>": The board of directors or other body having the power to direct or cause the direction of the management and policies of a Person that is a corporation, partnership, trust or limited liability company.

"<u>Governmental Approval</u>": Any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"<u>Governmental Authority</u>": Any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"<u>Governmental Requirement</u>": Any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, rules of common law, authorization or other directive or requirement, whether now or hereinafter in effect, of any Governmental Authority.

"<u>Hazardous Material</u>": Any substance regulated or as to which liability might arise under any applicable Environmental Law including: (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; (b) Hydrocarbons, petroleum products, petroleum substances, natural gas, oil, oil and gas waste, crude oil, and any components, fractions, or derivatives thereof; and (c) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes.

6

78

"Hydrocarbons": Oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"HVI CC": As set forth in the introductory paragraph of this Agreement.

"Indemnified Liabilities": As defined in Section 8.06.

"Indemnified Person": As defined in Section 8.06.

"Initial Agreed Budget": The Agreed Budget with respect to the Budget Period commencing on the Closing Date and attached hereto as Exhibit A.

"Interim Borrowing Order": An order of the Court entered into in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(e)(2) in the form attached hereto as Exhibit B, with any modifications thereto approved by the Lender in its sole discretion, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent or joinder of the Lender.

"Interest Payment Date": The last Business Day of each month, commencing with the Interest Payment Date occurring on November 30, 2019.

"Internal Revenue Code": The Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter.

"Inventory": Any "inventory," as such term is defined in the UCC, now or hereafter owned or acquired by Borrower, wherever located, and, in any event, including all inventory, merchandise, goods and other personal property which are held by or on behalf of Borrower for sale or lease or are to be furnished under a contract of service or which constitute raw materials, work in process, or materials used or consumed or to be used or consumed in Borrower's business, or in the processing, packaging, advertising, promotion, delivery or shipping of the same, and all finished goods and all proceeds and products thereof.

"Joint Venture": A joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form.

"Leases": Any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any real property (including any oil and gas property constituting real property).

"Lender": As set forth in the introductory paragraph of this Agreement.

"Lien": Any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest).

7

"Loan Documents": This Agreement, the Trustee Release, the Collateral Documents, and any other security agreement, deed of trust, mortgage, guarantee and other document delivered to the Lender in connection with this Agreement and/or the credit extended hereunder.

"Margin Stock": "Margin stock" as such term is defined in Regulation U of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect": (i) A material adverse effect on the business, operations, properties, assets, condition (financial or otherwise) or prospects of Borrower, (ii) the impairment of the ability of Borrower to perform, or the Lender to enforce, the Obligations, (iii) the impairment of the ability of UBS London to enforce the obligations under the Existing Credit Facilities, or (iv) an impairment in the perfection or priority of the Lien securing the Obligations or the obligations under the Existing Credit Facilities; provided that the commencement and pendency of the Chapter 11 Case, including the existence of the automatic stay, shall not, in and of itself constitute a Material Adverse Effect.

"Material Contract": Any contract or other arrangement to which Borrower is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could have a Material Adverse Effect.

"Maturity Date": The earlier of (i) six (6) months from the Closing Date, (ii) the date of any sale, transfer or other disposition of all or substantially all of the assets of Borrower, (iii) the entry of an order from the Court granting relief from the automatic stay to any credit against any material assets of Borrower, (iv) the date of exercise by any landlord or regulatory authority of any remedy with regard to any assets of Borrower, (v) the occurrence of a Material Adverse Effect, and (vi) the acceleration of the Obligations upon the occurrence of an Event of Default in accordance with the terms of this Agreement.

"Net Asset Sale Proceeds": With respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale, net of any bona fide direct costs incurred in connection with such Asset Sale and approved by the Court, if such approval is necessary pursuant to the Bankruptcy Code.

"Net Insurance Proceeds": Any Cash payments or proceeds received by Borrower (i) under any business interruption or casualty insurance policy in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of Borrower by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, in each case net of any actual and reasonable documented costs incurred by Borrower in connection with the adjustment or settlement of any claims of Borrower in respect thereof.

"Obligations": All obligations of every nature of Borrower under the Loan Documents, including, without limitation, any liability of Borrower on any claim, whether or not the right to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether

8

or not such claim is discharged, stayed or otherwise affected by any bankruptcy, insolvency, reorganization or other similar proceeding. Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Borrower under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Lender, in its sole discretion, may elect to pay or advance on behalf of Borrower.

"Other Taxes": As defined in Section 3.06.

"Patriot Act": As defined in Section 8.15.

"Person": An individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, Joint Venture, governmental authority or other entity of whatever nature.

"Petition Date": As defined in the recital clauses to this Agreement.

"Potential Event of Default": A condition or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Prepetition Debt": Debt of Borrower outstanding on the Petition Date.

"Prepetition Collateral": The collateral securing the obligations under the Existing Credit Facilities.

"Property": Any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Regulations T, U and X": Regulations T, U and X, respectively, promulgated by the Board of Governors of the Federal Reserve System, as amended from time to time, and any successors thereto.

"Release": Any depositing, spilling, leaking, pumping, pouring, placing, emitting, discarding, abandoning, emptying, discharging, migrating, injecting, escaping, leaching, dumping, or disposing.

"Remedial Work": Any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligation.

"Right of First Refusal": HVI CC's right of first refusal granted under Section 9.02(b)(i)(A) of the Existing Credit Facilities.

"Taxes": As defined in Section 3.06.

"Trustee": As set forth in the introductory paragraph of this Agreement.

"Trustee Release": The Release in the form attached hereto as Exhibit D.

"Variance Report": A report to be delivered by Borrower to the Lender, in form and substance satisfactory to the Lender and certified as being true and correct to his or her knowledge after diligent inquiry by the Chief Financial Officer of Borrower, on a weekly basis (commencing the first week following the Closing Date) reflecting the actual cash receipts and disbursements on a line item basis for the preceding week (and on a cumulative basis since the Closing Date), the amount and percentage variance of such amounts from those set forth on the applicable Agreed Budget for the preceding week (and cumulatively) and containing a narrative analysis of Borrower's performance for the preceding week and any variance from such period in the applicable Agreed Budget.

## SECTION 1.02.  Other Definitional Provisions.

(a) As used herein and in any certificate or other document made or delivered pursuant hereto, accounting terms not defined in Section 1.01, and accounting terms partly defined in Section 1.01 to the extent not defined, shall have the respective meanings given to them under GAAP.

(b) The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

## ARTICLE 2
## THE ADVANCES

## SECTION 2.01.  The Advances.

(a) The Advances. The Lender agrees, on the terms and conditions hereinafter set forth, to advance amounts of funds (each, an "Advance") to Borrower from time to time during the Availability Period, in accordance with the Agreed Budget, in an aggregate amount for all such Advances not to exceed the Aggregate Advance Limit, provided that any proposed Advance to fund the amounts set forth in the Agreed Budget with respect to Deferred Maintenance (as defined in the Agreed Budget) shall be made only at the sole and absolute discretion of the Lender.

(b) Making Advances. From time to time after the Closing Date, upon receipt of a Borrowing Request, which shall attach detail regarding the use of the proceeds of the requested Advance (a "Borrowing Request Attachment"), delivered by Trustee to the Lender at least one (1) Business Day prior to the requested funding date and subject to the Lender's approval of an Agreed Budget, the Lender shall advance funds to Borrower, in accordance with such Agreed Budget, into the Designated Account; provided that no more than one Advance shall be made per week (unless the Lender, in the exercise of its sole discretion, agrees otherwise). Any items detailed in the Borrowing Request Attachment that are not already set forth in the Agreed Budget shall constitute a request for amendment to the Agreed Budget, which Lender may approve or deny in its sole and absolute discretion. Each Advance shall be made on a Business Day during the Availability Period. Amounts advanced under this Section 2.01(b) and subsequently repaid or prepaid may not be

reborrowed. Nothing contained in this Agreement shall be construed to obligate the Lender to agree to any budget after the Initial Agreed Budget.

(c) <u>Aggregate Advance Limit</u>. Anything contained in this Agreement to the contrary notwithstanding, (i) in no event shall the aggregate principal amount of all Advances made by the Lender pursuant to this Agreement exceed the lesser of (x) the Aggregate Advance Limit and (y) the amount permitted to be outstanding hereunder pursuant to the Borrowing Order, and (ii) Borrower agrees to immediately prepay the Advances in the amounts and at the times as may be necessary to comply with the foregoing clause (i).

**SECTION 2.02. <u>Repayment</u>.**

(a) <u>Optional Prepayment</u>. Borrower may at its option pay any of the Advances, in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid, at any time and from time to time, without payment of premium or penalty.

(b) <u>Prepayments and Reductions from Net Asset Sale Proceeds</u>. No later than the date of receipt of funds by Borrower of any Net Asset Sale Proceeds in respect of any Asset Sale, Borrower shall prepay the Advances in an aggregate amount equal to the lesser of (i) such Net Asset Sale Proceeds and (ii) the amount of the aggregate outstanding Obligations. The application of prepayments made under this <u>Section 2.02(b)</u> shall be determined in accordance with the provisions of <u>Section 3.04</u>.

(c) <u>Prepayments and Reductions from Net Insurance Proceeds</u>. Upon receipt by Borrower or by the Lender as loss payee of any Net Insurance Proceeds, Borrower shall prepay the Advances in an aggregate amount equal to the lesser of (i) the amount of such Net Insurance Proceeds and (ii) the amount of the aggregate outstanding Obligations. The application of prepayments made under this <u>Section 2.02(c)</u> shall be determined in accordance with the provisions of <u>Section 3.04</u>.

(d) <u>Repayment on Maturity or Termination</u>. Borrower shall repay the outstanding Obligations no later than the earlier of (i) the Maturity Date and (ii) termination due to an Event of Default pursuant to <u>Section 7.01</u>.

**SECTION 2.03. <u>Payment Dates and Interest Rates</u>.**

(a) <u>Rate of Interest</u>. The Advances shall bear interest on the unpaid principal amount thereof at a rate per annum equal to the Base Rate in effect for each such Advance plus one and one-half percent (1.5%), calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. Each determination of an interest rate by the Lender pursuant to this Agreement shall be conclusive and binding on Borrower in the absence of manifest error.

(b) <u>Payment of Interest</u>. Interest with respect to the Advances shall be payable in arrears on each Interest Payment Date by increasing the then aggregate principal amount of the Advances outstanding on such date. Accrued interest shall be payable in Cash upon any prepayment of the Advances (to the extent accrued on the amount being prepaid), upon acceleration of the Obligations pursuant to <u>Section 7.01</u> hereof, and on the Maturity Date.

(c) <u>Default Interest</u>. Notwithstanding anything to the contrary contained in <u>Section 2.03(a)</u>, upon the occurrence and during the continuation of any Event of Default, the outstanding principal amount of the Advances shall thereafter bear interest at a rate per annum which is equal to two percent (2.0%) simple interest above the highest rate which would otherwise be applicable pursuant to <u>Section 2.03(a)</u>. Payment or acceptance of the increased rates of interest provided for in this <u>Section 2.03(c)</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights of remedies of the Lender.

(d) <u>Maximum Rate</u>. Notwithstanding the foregoing provisions of this <u>Section 2.03</u>, in no event shall the rate of interest payable by Borrower with respect to the Advances exceed the maximum rate of interest permitted to be charged under all applicable laws.

## SECTION 2.04. <u>Super-Priority Nature of Obligations; Priming Liens</u>.

(a) All Obligations under the Loan Documents shall constitute allowed super-priority administrative expense claims in the Chapter 11 Case against Borrower with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code.

(b) All Obligations under this Agreement and the other Loan Documents shall be secured by, and Borrower hereby grants, pursuant to Section 364(d)(1) of the Bankruptcy Code, priming Liens in all assets senior to all existing Liens, including, without limitation, all real, personal and mixed property, both tangible and intangible, of Borrower, including, without limitation, avoidance actions arising under Chapter 5 of the Bankruptcy Code, pursuant to this Agreement, the Collateral Documents, the Interim Borrowing Order and the Final Borrowing Order. All Liens granted hereunder shall be deemed validly perfected against Borrower, Borrower's bankruptcy estate, Trustee, any subsequent trustee appointed in the Chapter 11 Case (including any trustee appointed upon conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code), Borrower's successors and assigns and all creditors and parties in interest in the Chapter 11 Case, notwithstanding the discharge of Borrower pursuant to Section 1141 of the Bankruptcy Code, the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Case or any subsequent Chapter 7 case or the release of any Collateral. The Liens created in this Agreement, the Collateral Documents, the other Loan Documents, the Interim Borrowing Order and the Final Borrowing Order shall remain valid and perfected without the necessity that the Lender file financing statements, make recordings on real property records or otherwise perfect its Liens under applicable law. All Liens granted hereunder shall be deemed senior to and shall have priority over any set-off rights of third parties. Notwithstanding the foregoing, the Lender may file financing statements and make recordings on real property records to evidence the Liens granted hereunder, and Borrower shall cooperate with the Lender in signing such documents as the Lender may reasonably require to make such filings.

(c) Notwithstanding anything herein to the contrary, the priority status of the Obligations and the Liens securing the same shall be subject to the Carve-out (as defined in the Borrowing Order).

## ARTICLE 3
## GENERAL PROVISIONS CONCERNING THE ADVANCES

**SECTION 3.01.  Use of Proceeds.**

    (a) Subject to the provisions of this Section 3.01, the proceeds of the Advances shall be applied in accordance with this Agreement, the applicable Agreed Budget and the applicable Borrowing Request Attachment. Without limiting the generality of the foregoing, the proceeds of the Advances shall be used, among other purposes expressly provided for in the applicable Agreed Budget, to pay fees and expenses associated with this Agreement, to provide ongoing working capital of Borrower during the Chapter 11 Case, and to provide for other general corporate purposes of Borrower during the Chapter 11 Case, in each case in accordance with, and limited by, those items set forth in the applicable Agreed Budget; provided that no portion of the Advances or any cash collateral shall be used, directly or indirectly, to (i) pay for any Deferred Maintenance without the prior written approval of the Lender, (ii) finance or make any distribution to the equity holders of Borrower; (iii) make any payment or prepayment that is prohibited under this Agreement, including any payment or prepayments in respect of Prepetition Debt; (iv) make any payment in settlement of any claim, action proceeding, before any court, arbitrator or other governmental body; or (v) except as provided in the Borrowing Order, pay any fees or expenses incurred in connection with the investigation, initiation or prosecution or any claims, causes of action or other litigation against the Lender or in connection with invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable the Liens, claims or interests of the Lender or the lenders in connection with the Existing Credit Facility. Nothing herein shall in any way prejudice or prevent the Lender from objecting to any request, motion or application in the Chapter 11 Case, including applications for compensation for services rendered or reimbursement of expenses.

    (b) During the term of this Agreement, and provided Borrower is not in default under this Agreement or any other Loan Document, the Lender consents to Borrower's use of cash collateral in the amounts and for the purposes set forth in the applicable Agreed Budget; provided (i) any use of cash collateral to fund any Deferred Maintenance set forth in the applicable Agreed Budget shall be subject to the Lender's prior written consent in its sole and absolute discretion and (ii) that Borrower's use of cash collateral shall be subject to the terms and conditions of the Borrowing Order.

    **SECTION 3.02.  Payments.** Borrower shall make each payment of principal, interest and fees hereunder, without setoff or counterclaim, not later than 11:00 a.m., New York time, on the day when due, and in no case later than the Maturity Date, in lawful money of the United States to the Lender at the office of the Lender designated from time to time in immediately available funds.

    **SECTION 3.03.  Payment on Non-Business Days.** Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

13

SECTION 3.04. **Application of Payments**. All payments in respect of the principal amount of the Advances shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied to the payment of interest before application to principal. All calculations and determinations of payments due from Borrower by the Lender shall be conclusive and binding on Borrower absent manifest error.

SECTION 3.05. **Application of Proceeds of Collateral and Payments after Event of Default**. Upon the occurrence and during the continuation of an Event of Default, if requested by the Lender, or upon acceleration of the Obligations pursuant to Article 7, (a) all payments received by the Lender, whether from Borrower or otherwise, and (b) all proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document shall be used by the Lender as Collateral for, and (then or at any time thereafter) applied in full or in part by the Lender, in each case in the following order of priority: (i) to the payment of all costs and expenses of such sale, collection or other realization, all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to compensation (including any fees), reimbursement and indemnification under the Loan Document and all advances made by the Lender thereunder for the account of Borrower, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the Loan Documents (including attorneys' fees and expenses), all in accordance with the terms of this Agreement and the other Loan Documents; (ii) thereafter, to the payment of all other Obligations; and (iii) thereafter, to the payment to Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct (including without limitation the Court), provided that such proceeds distributed under this clause (iii) shall constitute Prepetition Collateral of UBS London and shall be subject to the terms and conditions of the Borrowing Order with respect to the use of cash collateral.

SECTION 3.06. **Taxes**.

(a) Any and all payments by Borrower hereunder shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding (i) in the case of the Lender, taxes imposed on its income, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof or in which its principal office is located, (ii) in the case of the Lender, taxes imposed on its net income, and franchise taxes imposed on it, by the jurisdiction of the Lender's lending office or any political subdivision thereof and (iii) in the case of the Lender, taxes imposed by the United States by means of withholding at the source if and to the extent that such taxes shall be in effect and shall be applicable on the date hereof on payments to be made to the Lender's lending office (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities, "Taxes"). If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.06) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

14

86