(b) In addition, Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from the execution, delivery or registration of, or otherwise with respect to, this Agreement (collectively, "Other Taxes").

(c) Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 3.06), in each case paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor. The Lender will reasonably cooperate in good faith with Borrower to provide such forms or representations as may establish an exemption or reduction in rate of any such Taxes or Other Taxes.

(d) Within thirty (30) days after the date of any payment of Taxes, Borrower will furnish to the Lender, at its address referred on the signatures pages attached hereto, the original or a certified copy of a receipt evidencing payment thereof.

SECTION 3.07. **Survival**. This Article 3 shall survive termination of this Agreement and will expire concurrently with the expiration of the applicable statute of limitations.

## ARTICLE 4
## CONDITIONS OF LENDING

SECTION 4.01. **Conditions Precedent to the Closing Date**. The effectiveness of this Agreement is subject to the following conditions precedent:

(a) the Lender shall have received the following, in form and substance satisfactory to the Lender:

(i)     an executed copy of this Agreement delivered by Borrower to the Lender;

(ii)    executed copies of all other Loan Documents;

(iii)   an executed copy of a Borrowing Request;

(iv)    the Initial Agreed Budget;

(v)     the Interim Borrowing Order shall have been entered by the Court and be in full effect and unstayed;

(vi)    in form and substance satisfactory to the Lender and its counsel, such other documents as the Lender may reasonably request;

(vii)   an executed copy of the Trustee Release; and

15

(b) no order, judgment or decree of any court (including, without limitation, the Court), arbitrator or governmental authority shall purport to enjoin or restrain the Lender from making the Advances.

SECTION 4.02. **Conditions Precedent to All Advances**. The obligation of the Lender to fund any part of each Advance hereunder shall be subject to the following conditions precedent that on the date of such Advance:

(a) the representations and warranties contained in <u>Section 5.01</u> are true and correct as though made on and as of such date;

(b) no event or condition has occurred and is continuing, or would result from the making of such Advance, which constitutes an Event of Default or Potential Event of Default;

(c) no pleading or application shall have been filed in the Court by any party in interest which is not withdrawn, dismissed or denied within ten (10) days after filing seeking (i) to dismiss or convert the Chapter 11 Case to a Chapter 7 case, (ii) the removal of Trustee, or the appointment of an examiner having enlarged powers relating to the operation of the business of Borrower (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (iii) the granting of a super-priority claim or a Lien *pari passu* or senior to that of the Lender granted pursuant to any Collateral Documents, the Interim Borrowing Order or the Final Borrowing Order, (iv) to stay, reverse, vacate, or otherwise modify the Interim Borrowing Order or the Final Borrowing Order without the prior written consent of the Lender, or (v) relief from the automatic stay (or any other injunction having similar effect) so as to allow a third party to proceed against any material property or assets of Borrower;

(d) the Lender shall have received from Trustee a Borrowing Request;

(e) the Lender shall have received a certificate executed by Trustee certifying to the Lender that Trustee is not aware of any information contained in the applicable Agreed Budget which is false or misleading or of any omission of information which causes such Agreed Budget to be false or misleading and that the proceeds of such Advance to be funded on such date promptly shall be applied solely in accordance with, and for the purposes identified in, such Agreed Budget;

(f) the aggregate outstanding Advances, after giving effect to such proposed Advance, shall not exceed the Aggregate Advance Limit; and

(g) no order, judgment or decree of any court (including, without limitation, the Court), arbitrator or governmental authority shall purport to enjoin or restrain the Lender from making such Advance.

16

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

SECTION 5.01. **Representations and Warranties**. Borrower represents and warrants as follows:

(a) Organization. Michael A. McConnell is the duly appointed and acting Chapter 11 Trustee for HVI CC.

(b) Authorization. The execution, delivery and performance by Borrower of the Loan Documents and the incurrence of the Advances hereunder, (i) are within Borrower's powers, and (ii) have been duly authorized by the Court.

(c) Governmental Consents. To the best of Borrower's understanding without making inquiry, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body, except for the Court, is required for the due execution, delivery and performance by Borrower of the Loan Documents.

(d) Validity. The Loan Documents are the binding obligations of Borrower, enforceable in accordance with their respective terms.

(e) Financial Condition. Since the date of this Agreement, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(f) Disclosure. To the best of Borrower's information, no information, exhibit or report furnished to the Lender by or on behalf of Borrower for use in connection with the transactions contemplated by this Agreement contains any untrue statement of a material fact or omits to state a material fact (known to Borrower, in the case of any document not furnished by it) necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made.

(g) Governmental Regulation. To the best of Borrower's information without making inquiry, Borrower is not subject to regulation under the Federal Power Act, the Interstate Commerce Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Debt or which may otherwise render all or any portion of the Obligations unenforceable.

(h) Use of Proceeds; Margin Regulations. No part of the proceeds of any Advance hereunder will be used to purchase or carry, or to extend credit to others for the purpose of purchasing or carrying, any Margin Stock in violation of Regulations T, U and X.

(i) Chapter 11 Case. To the best of the Borrower's information without inquiry, the Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof has been, and of the hearing for the approval of the Final Borrowing Order will be, given as identified in the certificate of service filed with the Court.

(j) Protective Advances. All proceeds from the Advances are advances to protect and preserve the Prepetition Collateral, including under the Existing Credit Facilities.

# ARTICLE 6
# COVENANTS

SECTION 6.01. **Affirmative Covenants**. So long as any Obligation shall remain unpaid, Borrower will, unless the Lender shall otherwise consent in writing:

(a) Financial Information. Furnish to the Lender:

(i)    Yearly Financials: as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower, a copy of Borrower's balance sheet as at the end of each fiscal year and the related statements of income, retained earnings and cash flow for such year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail and certified by a duly authorized officer of Borrower that they fairly present, in all material respects, the financial condition of Borrower as at the dates indicated and the results of its operations and cash flows for the periods indicated, in each case in conformity with GAAP, and accompanied by an unqualified report and opinion thereon of an independent public accountant of recognized national standing acceptable to the Lender;

(ii)    Monthly Operating Reports and Quarterly Financials: (i) as soon as available and in any event within thirty (30) days after the end of each calendar month, copies of any monthly operating report delivered to the United States Trustee; and (ii) as soon as available, but in any event within sixty (60) days after the end of each of the first three (3) fiscal quarters of Borrower, Borrower's unaudited balance sheet as at the end of such period and the related unaudited statement of income for such period and year to date, setting forth in each case in comparative form the figures as at the end of the previous fiscal year as to the balance sheet and the figures for the previous corresponding period as to the other statement, all in reasonable detail and certified by a duly authorized officer of Borrower that they fairly present, in all material respects, the financial condition of Borrower as at the dates indicated and the results of its operations for the periods indicated, in each case in conformity with GAAP, subject to changes resulting from audit and normal year-end adjustments;

(iii)    Monthly Sales Receipts: as soon as available and in any event within five (5) days after the end of each calendar month, a report of all sales receipts within such month, including copies of all invoices and such other documents as Lender may reasonably request related thereto;

(iv)    Weekly Variance Reports: as soon as available and in any event not later than the third (3rd) Business Day of each week, consolidated and consolidating cash flow statements, consistent with the applicable Agreed Budget and otherwise in form and substance satisfactory to the Lender, reflecting on a line-item basis Cash receipts and disbursements for Borrower and a Variance Report;

(v)    <u>Compliance Certificates</u>: concurrently with any delivery of financial statements under Section 6.01(i) or (ii), a Compliance Certificate;

(vi)    <u>Bankruptcy Information</u>: promptly after the same is available, all pleadings, motions, applications, judicial information, financial information, reports, and other documents filed by or on behalf of Borrower with the Court or the United States Trustee in the Chapter 11 Case or distributed by or on behalf of Borrower to any official committee appointed in the Chapter 11 Case and without limiting the generality of the foregoing, Borrower shall promptly deliver to, and discuss with, the Lender and its counsel any and all information and developments in connection with any proposed Asset Sale, the status of satisfying the requirements set forth in <u>Section 6.01(d)</u>, and any other event or condition which is reasonably likely to have a material effect on Borrower or the Chapter 11 Case, including, without limitation, the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization;

(vii)    <u>Communication from Bidders</u>: promptly upon receipt by Borrower or the broker hired in connection with any Asset Sale, copies of all communication received from bidders or potential bidders in connection with such Asset Sale;

(viii)    <u>Bank Statements</u>: as soon as possible and in any event no later than ten (10) days prior to the beginning of the immediately succeeding calendar month, monthly bank statements with respect to the Designated Account and any revenue and operating accounts of HVI CC;

(ix)    <u>Agreed Budget</u>: (i) no later than November 18, 2019, and thereafter on a monthly basis as soon as practicable and in any event no later than ten (10) days prior to the beginning of the immediately succeeding calendar month, Borrower shall deliver to the Lender a proposed update to the Agreed Budget, in form and substance satisfactory to the Lender, depicting cash flow projections for the 13-week period commencing on November 18, 2019 for the proposed budget delivered on November 18, 2019 and, for each proposed update thereafter, the 13-week period commencing on the first day of such immediately succeeding month, together with an explanation of the material assumptions on which such projections are based; provided, however, that nothing in this Agreement shall be construed to obligate the Lender to agree to any proposed budget or update, supplement or modification to any Agreed Budget after the Initial Agreed Budget; and

(x)    <u>Stabilization Efforts</u>: as soon as available and in any event not later than November 18, 2019, a report of stabilization efforts with respect to HVI CC's business, including efforts to maximize sale revenues for the benefit of the estate, in form and substance satisfactory to the Lender.

(b)    <u>Notices and Information</u>. Deliver to the Lender:

(i)    promptly upon any officer of Borrower obtaining knowledge (A) of any condition or event which constitutes an Event of Default or Potential Event of Default, (B) that any Person has given any notice to Borrower or taken any other action with respect to a claimed default or event or condition of the type referred to in <u>Section 7.01(f)</u>, (C) of

the institution of any litigation involving an alleged liability (including possible forfeiture of property) of Borrower or any adverse determination in any litigation involving a potential liability of Borrower, in each case to the extent not covered by insurance, (D) of any notice or other communication from the California State Lands Commission or other governmental authority regarding any Lease, or (E) of a condition or events that could reasonably be expected to cause a Material Adverse Effect, in each case, an officer's certificate specifying the nature and period of existence of any such condition or event, or specifying the notice given or action taken by such holder or Person and the nature of such claimed default, Event of Default, Potential Event of Default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto, and a copy of any such notice or other communication; and

(ii)    promptly, and in any event within ten (10) days after request, such other information and data with respect to Borrower as from time to time may be reasonably requested by the Lender, including invoices and documentation related to Borrowers' expenses and compliance with the Agreed Budget.

(c)    Further Assurances.

(i)    Assurances. Without expense or cost to the Lender, Borrower shall from time to time hereafter execute, acknowledge, file, record, do and deliver all and any further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, security agreements, hypothecations, pledges, charges, assignments, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Lender may from time to time reasonably request and that do not involve a material expansion of Borrower's obligations or liabilities hereunder in order to carry out more effectively the purposes of this Agreement, the other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, including to subject any Collateral, intended to now or hereafter be covered, to the Liens created by this Agreement, the Collateral Documents, the Interim Borrowing Order or the Final Borrowing Order, to perfect and maintain such Liens, and to assure, convey, assign, transfer and confirm unto the Lender the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that Borrower may be or may hereafter become bound to convey or to assign to the Lender or for carrying out the intention of or facilitating the performance of the terms of this Agreement, any other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, registering or recording this Agreement or any other Loan Document. Without limiting the generality of the foregoing, Borrower shall deliver to the Lender, promptly upon receipt thereof, all instruments received by Borrower after the Closing Date and take all actions and execute all documents necessary or reasonably requested by the Lender to perfect the Lender's Liens in any such instrument or any other investment acquired by Borrower;

(ii)    Filing and Recording Obligations. Borrower shall pay all filing, registration and recording fees and all expenses incident to the execution and acknowledgement of any Loan Document, including any instrument of further assurance described in Section 6.01(c)(i), and shall pay all mortgage recording taxes, transfer taxes, general intangibles taxes and governmental stamp and other taxes, duties, imposts,

assessments and charges arising out of or in connection with the execution, delivery, filing, recording or registration of any Loan Document, including any instrument of further assurance described in Section 6.01(c)(i), or by reason of its interest in, or measured by amounts payable under, any Loan Document, including any instrument of further assurance described in Section 6.01(c)(i), (excluding income, franchise and doing business Taxes), and shall pay all stamp Taxes and other Taxes required to be paid on any Loan Document; provided, however, that Borrower may contest in good faith and through appropriate proceedings, any such Taxes, duties, imposts, assessments and charges; provided further, however, that Borrower shall pay all such Taxes, duties, imposts and charges when due to the appropriate taxing authority during the pendency of any such proceedings if required to do so to stay enforcement thereof. If Borrower fails to make any of the payments described in the preceding sentence within ten (10) days after notice thereof from the Lender (or such shorter period as is necessary to protect the loss of or diminution in value of any Collateral by reason of tax foreclosure or otherwise, as determined by the Lender) accompanied by documentation verifying the nature and amount of such payments, the Lender may (but shall not be obligated to) pay the amount due and Borrower shall reimburse all amounts in accordance with the terms hereof;

(iii)    Costs of Defending and Upholding the Lien. The Lender may, upon at least five (5) days' prior notice to Borrower, (i) appear in and defend any action or proceeding, in the name and on behalf of the Lender or Borrower, in which the Lender is named or which the Lender in its sole discretion determines is reasonably likely to materially adversely affect any Collateral, the Lien thereof or any other Loan Document and (ii) institute any action or proceeding which the Lender reasonably determines should be instituted to protect the interest or rights of the Lender in any Collateral or under this Agreement or any other Loan Document. Borrower agrees that all reasonable costs and expenses expended or otherwise incurred pursuant to this Section 6.01 (including reasonable attorneys' fees and disbursements) by the Lender shall be paid pursuant to Section 8.05 hereof.

(d)    Chapter 11 Deadlines.

(i)    Within thirty (30) days after the date of this Agreement, obtain entry of the Final Borrowing Order by the Court.

(ii)    No later than November 18, 2019, commission an independent third-party petroleum engineering consultancy firm acceptable to the Lender on terms acceptable to the Lender to prepare and deliver a full year end reserve report, including unproven reserves, for 2019.

(iii)    No later than November 18, 2019, commission an independent third-party expert acceptable to the Lender on terms acceptable to the Lender to prepare and deliver a Phase 1 environmental report.

SECTION 6.02. Negative Covenants. So long as any Obligation shall remain unpaid, Borrower will not, without the written consent of the Lender:

(a) <u>Liens, Etc</u>. Create or suffer to exist any Lien upon or with respect to any of its assets or properties, that could reasonably be expected to result in a Material Adverse Effect, whether now owned or hereafter acquired, or assign or grant a security interest in any right to receive income that could reasonably be expected to result in a Material Adverse Effect, in each case to secure any Debt or Contingent Obligation of any Person, or apply to the Court for the authority to do any of the foregoing, other than (i) Liens in favor of the Lender (A) pursuant to the Collateral Documents or (B) authorized by the Interim Borrowing Order or the Final Borrowing Order; (ii) Liens in favor of UBS London authorized by the Interim Borrowing Order, the Final Borrowing Order or any other order authorizing the use of cash collateral; and (iii) Liens in existence as of the Petition Date as set forth in the schedules of liabilities filed with the Court by HVI CC on September 9, 2019.

(b) <u>Debt and Contingent Obligations</u>. Create or suffer to exist any Debt or Contingent Obligations that could reasonably be expected to result in a Material Adverse Effect, other than: (i) Debt owed to the Lender; (ii) Prepetition Debt without giving effect to any extensions, renewals, refinancings, supplemental borrowings or other incurrences thereof; (iii) Debt incurred in connection with the rejection of leases and executory contracts in the Chapter 11 Case; <u>provided</u>, that the obligation of Borrower in respect of such Debt shall be determined by a Final Order of the Court entered at the time of such rejection, to be a general, unsecured, non-priority claim; and (iv) Contingent Obligations in existence on the Petition Date and as set forth in the schedules of liabilities filed with the Court by HVI CC on September 9, 2019.

(c) <u>Consolidation, Merger</u>. Consolidate with or merge into any other corporation or entity.

(d) <u>Conduct of Business</u>. Engage in any business other than the business engaged in by Borrower on the date hereof and similar or related businesses.

(e) <u>Amendments to Organizational Documents</u>. Amend the certificate of incorporation of HVI CC in any way that is adverse to the Lender.

(f) <u>Transactions with Partners and Affiliates</u>. Enter into or permit to exist any new transactions (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Borrower on terms that are less favorable to Borrower than those that might be obtained at the time from Persons who are not such an Affiliate.

(g) <u>Chapter 11 Claims</u>. Without limiting the provisions of <u>Section 6.02</u> hereof, incur, create, assume, suffer or permit any claim or Lien or encumbrance against its or any of its property or assets in the Chapter 11 Case to be *pari passu* with or senior to the claims of the Lender against Borrower in respect of the Obligations hereunder, or apply to the Court for authority to do so, except to the extent permitted herein.

(h) <u>Limitation on Repayments</u>. Except as otherwise permitted in the applicable Agreed Budget: (i) make any payment or prepayment on or redemption or acquisition for value (including, without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Debt or other pre-Petition Date obligations of such Person, (ii) pay any interest on any Prepetition Debt of such

94

Person (whether in cash, in kind securities or otherwise), (iii) make any payment or create or permit any Lien pursuant to any provision of the Bankruptcy Code, or apply to the Court for the authority to do any of the foregoing, in the case of each of clauses (i) through (iii) other than in respect of the Existing Credit Facilities, or (iv) make any payment or prepayment on or redemption or acquisition for value of principal of, premium, if any, or interest on any intercompany Debt.

(i) <u>Agreements</u>. Assume, reject, cancel, terminate, breach or modify (whether pursuant to Section 365 of the Bankruptcy Code, or any other applicable law), (i) any Prepetition Debt, (ii) any Material Contract, or (iii) any other agreement, contract, instrument or other document to which it is a party which assumption, rejection, cancellation, termination, breach or modification could reasonably be expected to result in a Material Adverse Effect.

(j) <u>Agreed Budget</u>. Make cash disbursements during any Budget Period set forth in the applicable Agreed Budget for (A) an amount that is more than the amount provided in such Agreed Budget for any item, provided that such cash disbursements may exceed the amount provided for any such item in such Agreed Budget by not more than ten percent (10%) on a cumulative basis for each disbursement category set forth in the Agreed Budget so long as the aggregate cash disbursements during such period do not exceed the total amount provided in such Agreed Budget, (B) an item that is not provided for in such Agreed Budget without the Lender's consent, (C) with respect to a particular Advance, an item that is not described on the applicable Borrowing Request Attachment or (D) Deferred Maintenance without the prior written consent of the Lender.

(k) <u>Designated Account</u>. Permit (i) any Person other than Trustee to access or be authorized to access funds in the Designated Account or (ii) the use of funds in the Designated Account for any purpose other than in accordance with an Agreed Budget.

(l) <u>Minimum Monthly Sales Receipts</u>.  Permit monthly sales receipts of the Borrower to be less than $750,000 as of the last day of any month.

(m) <u>Environmental Matters</u>. Cause or permit any of its Property to be in violation of, or do anything or permit anything to be done which will subject any such Property to a Release or threatened Release of Hazardous Materials, exposure to any Hazardous Materials, or to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property where such violations, Release or threatened Release, exposure, or Remedial Work could reasonably be expected to have a Material Adverse Effect;

## ARTICLE 7
## EVENTS OF DEFAULT

**SECTION 7.01. <u>Events of Default</u>**. If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a) Borrower shall fail to pay all or any part of the principal when due, or shall fail to pay any installment of interest or other amount payable hereunder within three (3) Business Days of the date when due;

23

(b) any representation or warranty made by Borrower herein or by Borrower (or any of its respective officers) in connection with this Agreement shall prove to have been incorrect in any material respect when made;

(c) any of the following shall prove to no longer be true and correct and such failure to be true and correct could be reasonably expected to result in a Material Adverse Effect;

(i) <u>Organization</u>. HVI CC is duly organized, validly existing and in good standing under the laws of the state of Colorado, and, subject to compliance with any applicable provisions of the Bankruptcy Code, has all requisite corporate power and authority to own and operate its properties and to carry out its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. HVI CC is also duly qualified and in good standing in all applicable jurisdictions to carry on its businesses and is in compliance with its organizational, formation and governing documents and all applicable orders of the Court.

(ii) <u>No Conflict</u>. The execution, delivery and performance by Borrower of the Loan Documents do not (i) violate HVI CC's certificate of incorporation, (ii) violate any law or regulation (including Regulations T, U and X) or any order, judgment or decree of any court (including, without limitation, the Court) or governmental agency body binding on Borrower, or (iii) result in a breach of or a default under, or result in or require the imposition of a Lien pursuant to any contract or an applicable order of the Court binding on Borrower.

(iii) <u>Litigation</u>. There is no pending or threatened action or proceeding affecting Borrower before any court, governmental agency or arbitrator.

(iv) <u>Payment of Taxes</u>. Except as set forth in HVI CC's schedules of liabilities filed with the Court on the Petition Date, all tax returns and reports of Borrower required to be filed by it have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon Borrower and its properties, assets, income, business and franchises that are due and payable have been paid when due and payable. Borrower knows of no proposed tax assessment against Borrower that is not being actively contested by Borrower in good faith and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

(d) Borrower shall fail to perform or observe any other term, covenant or agreement contained in Section 6.01(a)(ix), 6.01(d)(ii), or 6.01(d)(iii) of this Agreement and such failure continues for a period of more than five (5) days (or such longer period as the Lender may agree in its sole discretion);

(e) Borrower shall fail to perform or observe any other term, covenant or agreement contained in this Agreement on its part to be performed or observed;

(f) Borrower shall default in the performance of or compliance with any term contained in any Loan Document other than this Agreement and such default shall not have been remedied or waived within any applicable grace period;

(g) (i) the entry of an order which has not been withdrawn, dismissed or reversed (A) authorizing Borrower in the Chapter 11 Case to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code, or authorizing any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (except as provided in the Interim Borrowing Order or the Final Borrowing Order) authorizing the use of cash collateral without the Lender's prior written consent under Section 363(c) of the Bankruptcy Code; (B) terminating Trustee or appointing an examiner in the Chapter 11 Case; (C) without the prior written consent of the Lender, dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; (D) the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (1) to allow any creditor to execute upon or enforce a Lien on any Collateral or on any other property or assets of Borrower that could reasonably be expected to result in a Material Adverse Effect, or (2) with respect to any Lien of, or the granting of any Lien on any Collateral or any other property or assets of Borrower to, any State or local environmental or regulatory agency or authority, that could reasonably be expected to result in a Material Adverse Effect; (E) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Borrowing Order, the Final Borrowing Order or this Agreement or any other Loan Document or the Lender's rights, benefits, privileges or remedies under the Interim Borrowing Order, the Final Borrowing Order, this Agreement or any other Loan Document; (F) without the prior written consent of the Lender, filing a Chapter 11 plan for Borrower or any modification thereto; (G) consolidating or combining Borrower with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Lender as contemplated in the plan of reorganization; (H) approving, or there shall arise, any other administrative expense claim (other than those specifically referred to in Section 2.04) having any priority over, or being *pari passu* with the administrative expense priority of the Obligations in respect of the Chapter 11 Case; (I) invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, the claims or interests of the Lender or the lenders in connection with the Existing Credit Facility; (J) confirming a Chapter 11 plan for Borrower that does not provide for the payment in full in cash of the Obligations on the effective date of such plan; or (K) or the commencement of any Challenge Proceeding (as defined in the Borrowing Order); or (ii) the filing by Borrower of a motion, application or other petition to effect or consent to any order referred to in the foregoing clause (i);

(h) any Governmental Approval shall have been (a) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the ordinary course for a full term or (b) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such Governmental Approval or that could result in the Governmental Authority taking any of the actions described in clause (a) above, and such decision or such revocation, rescission, suspension, modification or non-renewal (i) causes, or could reasonably be expected to cause, a Material Adverse Effect, or (ii) adversely affects the legal qualifications of Borrower to hold such Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be

expected to affect the status of or legal qualifications of Borrower to hold any Governmental Approval in any other jurisdiction;

(i) (i) one or more judgments or orders as to post-Petition Date liability or Debt shall be entered against Borrower, in amounts greater than ten thousand dollars ($10,000) individually or thirty-five thousand dollars ($35,000) in the aggregate and not adequately covered by insurance, as to which a solvent and unaffiliated insurance company has acknowledged coverage and either (A) enforcement proceedings shall have been commenced and shall be continuing by any creditor upon such judgment or orders or (B) there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgments or orders, by reason of a pending appeal or otherwise, shall not be in effect; or (ii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against Borrower which could reasonably be expected to result in a Material Adverse Effect and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j) at any time after the execution and delivery thereof: (i) any Loan Document or any provision thereof, for any reason other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void; (ii) the Lender shall not have or shall cease to have a valid and perfected and unavoidable Lien prior to all other perfected and unavoidable Liens in any Collateral purported to be covered by the Collateral Documents, the Interim Borrowing Order or the Final Borrowing Order, in either case for any reason other than the failure of the Lender to take any action within its control; or (iii) Borrower shall contest the validity or enforceability of any Loan Document or any provision thereof in writing or deny in writing that it has any further liability, including with respect to future advances by the Lender, under any Loan Document or any provision thereof to which it is a party;

**THEN** upon the occurrence and during the continuance of any Event of Default, the Lender may (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court) by written notice to Borrower declare (i) the unpaid principal amount of and accrued interest on the Advances and (ii) all other Obligations immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower, and the same shall forthwith become, immediately due and payable, and any obligation of the Lender to make Advances shall thereupon terminate, it being understood that the Lender shall have no obligation under this Agreement to make any Advances other than the initial Advance to be made on the Closing Date.

Further upon the occurrence and during the continuance of any Event of Default, the Lender may (i) exercise all rights and remedies of the Lender set forth in any of the Collateral Documents, in addition to all rights and remedies allowed by, the United States and of any state thereof, including but not limited to the UCC, and (ii) revoke the Borrower's rights to use cash collateral in which the Lender has an interest; provided that, any other provision of this Agreement or any other Loan Document to the contrary notwithstanding, with respect to the foregoing, the Lender shall give Borrower and counsel to any official committees in respect of the Chapter 11 Case and the office of the United States Trustee five (5) days' prior written notice (which notice shall be delivered by facsimile or overnight courier) of the exercise of its rights and remedies with

respect to the Collateral and file a copy of such notice with the clerk of the Court. The Lender shall not have any obligation of any kind to make a motion or application to the Court to exercise its rights and remedies set forth or referred to in this Agreement or in the other Loan Documents. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

Borrower waives, (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the Lender on which Borrower may in any way be liable and hereby ratify and confirm whatever the Lender may lawfully do in this regard, (ii) subject to the notice provisions of the preceding paragraph, all rights to notice and hearing prior to the Lender's taking possession or control of, or to the Lender reply, attachment or levy upon, the Collateral, or any bond or security which might be required by any court prior to allowing the Lender to exercise any of its remedies, and (iii) the benefit of all valuation, appraisal and exemption laws. Borrower acknowledges it has been advised by counsel of its choice with respect to the effect of the foregoing waivers and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

## ARTICLE 8
## MISCELLANEOUS

**SECTION 8.01. Amendments, Etc.** No amendment or waiver of any provision of the Loan Documents nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**SECTION 8.02. Notices, Etc.** Except as otherwise set forth in this Agreement, all notices and other communications provided for hereunder shall be in writing (including telegraphic, telex or telecopy communication) and mailed or telegraphed or telexed or sent by telecopy or delivered:

if to Borrower:

HVI Cat Canyon, Inc.
c/o Michael McConnell
201 Main Street, Suite 2500
Fort Worth, TX 76102
Facsimile: (817) 878-9769
Telephone: (817) 878-3569

with a copy (which shall not constitute notice) to:

Danning, Gill, Diamond & Kollitz, LLP
1901 Avenue of the Stars, Suite 450

Los Angeles, CA 90066—6
Attention: Eric P. Israel, Esq.

and if to the Lender:

UBS AG, Stamford Branch
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, CT 06901
Facsimile: (203) 719-3888
Telephone: (203) 719-4319
Email: Agency-UBSAmericas@ubs.com, primarysettlements@ubs.com and Ol-Greka-Reporting@ubs.com

with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Attention: Evan M. Jones, Esq.
Facsimile: (213) 430-6407
Email: ejones@omm.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties. All such notices and communications shall be effective when deposited in the mails, delivered to the telegraph company, sent by telex or sent by telecopy, respectively, except that notices and communications to the Lender pursuant to Article 2 or 7 shall not be effective until received by the Lender.

    **SECTION 8.03.  Right of Setoff.** In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, and notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, upon and after the occurrence and during the continuation of any Event of Default, the Lender is hereby authorized by Borrower, at any time and from time to time, without notice, to set off against, and to appropriate and apply to the payment of, the obligations and liabilities of Borrower under the Loan Documents (whether matured or unmatured, fixed or contingent or liquidated or unliquidated) any and all amounts owing by the Lender to Borrower (whether payable in Dollars or any other currency, whether matured or unmatured, and, in the case of deposits, whether general or special, time or demand and however evidenced).

    **SECTION 8.04.  No Waiver; Remedies.** No failure on the part of the Lender to exercise, and no delay in exercising, any right under any of the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**SECTION 8.05. <u>Costs and Expenses</u>**. Whether or not the transactions contemplated hereby shall be consummated, Borrower shall reimburse the Lender for (i) all the actual and reasonable costs and expenses of preparation of the Loan Documents and any consents, amendments, waivers or other modifications thereto; (ii) all the costs of confirming Borrower's performance of and compliance with all agreements and conditions on its part to be performed or complied with under this Agreement and the other Loan Documents including with respect to confirming compliance with environmental and insurance requirements; (iii) the reasonable fees, expenses and disbursements of counsel to the Lender (including allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower; (iv) all the actual costs and reasonable expenses of creating and perfecting Liens in favor of the Lender pursuant to any Collateral Document, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums, and reasonable fees, expenses and disbursements of counsel to the Lender and of counsel providing any opinions that the Lender may request in respect of the Collateral Documents or the Liens created pursuant thereto; (v) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any auditors, accountants or appraisers and any environmental or other consultants, advisors and agents employed or retained by the Lender and its counsel) of obtaining and reviewing any appraisals, environmental audits or reports provided for hereunder; (vi) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any consultants, advisors and agents employed or retained by the Lender and its counsel) in connection with the custody or preservation of any of the Collateral; (vii) after the occurrence of an Event of Default, all costs and expenses, including reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by the Lender in enforcing any Obligations of or in collecting any payments due from Borrower hereunder or under the other Loan Documents by reason of such Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to the Chapter 11 Case, or any other insolvency or bankruptcy proceedings; and (viii) all reasonable expenses of the Lender in connection with its due diligence analysis and credit approval with respect to the financing transaction contemplated hereby. Without limiting the generality of the foregoing, if, at any time or times, regardless of the existence of an Event of Default, the Lender shall incur reasonable expenses itself or employ counsel or other professional advisors, including, but not limited to, environmental, financial and management consultants, for advice or other representation or shall incur legal, appraisal, accounting, consulting or other reasonable costs and expenses in connection with: (i) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Lender, Borrower or any other Person) in any way relating to the Collateral, any of the Loan Documents, or any other agreements to be executed or delivered in connection therewith or herewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against Borrower or any other Person that may be obligated to the Lender by virtue of the Loan Documents, under the Bankruptcy Code, or any other applicable Federal, state, or foreign bankruptcy or other similar law; (ii) any attempt to enforce any rights or remedies of the Lender against Borrower, or any other Person that may be obligated to the Lender by virtue of being a party to any of the Loan Documents; (iii) any attempt to appraise, inspect, verify, protect, collect, sell, liquidate or

29

otherwise dispose of the Collateral, including without limitation, obtaining and reviewing any environmental audits or reports provided for hereunder; or (iv) the Chapter 11 Case (including, without limitation, the on-going monitoring by the Lender of the Chapter 11 Case, including attendance by the Lender and its counsel at hearings or other proceedings and the on-going review of documents filed with a Court in respect thereof) and the Lender's interests with respect to Borrower (including, without limitation, the on-going review of Borrower's business, assets, operations, prospects or financial condition as the Lender shall deem necessary), the Collateral or the Obligations; then, and in any such event, the reasonable fees and expenses incurred by the Lender and such attorneys and other professional advisors and consultants arising from such services, including those of any appellate proceedings, and all reasonable expenses, costs, charges and other fees incurred by such counsel or other professionals in any way or respect arising in connection with or relating to any of the events or actions described in this <u>Section 8.05</u> shall be payable by Borrower to the Lender in accordance with the Agreed Budgets, provided that all such expenses, costs, charges and other fees in excess of the amounts provided in the Agreed Budget, if any, shall be paid no later than the earlier of (i) the Maturity Date and (ii) acceleration of the Obligations pursuant to <u>Article 7</u> hereof, and all such expenses, costs, charges and other fees shall be additional Obligations secured under any Collateral Documents and the other Loan Documents. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: paralegal fees, costs and expenses; accountants' and experts' fees, costs and expenses; appraisers' fees, costs and expenses; management and other consultants' fees, costs and expenses; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; communication charges, air express charges; telegram charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other professional services.

SECTION 8.06. <u>Indemnity</u>. Borrower agrees to indemnify, pay and hold the Lender, and the shareholders, officers, directors, employees and agents of the Lender (each, an "<u>Indemnified Person</u>"), harmless from and against any and all claims, liabilities, losses, damages, costs and expenses (whether or not any of the Indemnified Persons is a party to any litigation), including, without limitation, reasonable attorneys' fees and costs (including, without limitation, the reasonable estimate of the allocated cost of in-house legal counsel) and costs of investigation, document production, attendance at a deposition, or other discovery, with respect to or arising out of this Agreement or the Loan Documents or the Chapter 11 Case or any use of proceeds hereunder, or any claim, demand, action or cause of action being asserted against Borrower (collectively, the "<u>Indemnified Liabilities</u>"), <u>provided</u> that Borrower shall have no obligation hereunder with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of any such Indemnified Persons. If any claim is made, or any action, suit or proceeding is brought, against any Indemnified Person pursuant to this <u>Section 8.06</u>, the Indemnified Person shall notify Borrower of such claim or of the commencement of such action, suit or proceeding, and Borrower will assume the defense of such action, suit or proceeding, employing counsel selected by Borrower and reasonably satisfactory to the Indemnified Person, and pay the fees and expenses of such counsel. This covenant shall survive termination of this Agreement.

SECTION 8.07. <u>Assignments; Participations</u>.

(a) The Lender may assign all or part of its rights and obligations outstanding under the Loan Documents, <u>provided</u> that any such assignment shall be in compliance with the applicable

federal and state securities laws; and provided, further, that any assignee agrees to be bound by the terms and conditions of this Agreement. The Lender may, in connection with any actual or proposed assignment, disclose to the actual or proposed assignee, any information relating to Borrower; and

(b) The Lender may, without the consent of, or notice to, Borrower, grant participations in all or part of the obligations of Borrower outstanding under the Loan Documents, provided that any such participation shall be in compliance with the applicable federal and state securities laws; and provided, further, that any participant agrees to be bound by the terms and conditions of this Agreement; provided, however, that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's right and obligations under this Agreement. The Lender may, in connection with any actual or proposed participation, disclose to the actual or proposed participant, any information relating to Borrower.

SECTION 8.08. **Effectiveness; Binding Effect; Governing Law**. This Agreement shall become effective when it shall have been executed by Borrower and the Lender and thereafter shall be binding upon and inure to the benefit of Borrower and the Lender and their respective successors and assigns, except that Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD REQUIRE APPLICATION OF ANOTHER LAW.

SECTION 8.09. **Waiver of Jury Trial**. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.

SECTION 8.10. **Consent to Jurisdiction**. DURING THE PENDENCY OF THE CHAPTER 11 CASE, EACH OF THE BORROWER AND LENDER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN NEW YORK COUNTY IN THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE

PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION. BORROWER IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 8.10.

SECTION 8.11. **Entire Agreement**. This Agreement with Exhibits, Schedules and the other Loan Documents embody the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof.

SECTION 8.12. **Separability of Provisions; Headings**. In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. Section headings in this Agreement are included for convenience of reference only and shall not be given any substantive effect.

SECTION 8.13. **Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 8.14. **Parties Including Trustees; Court Proceedings**. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender, and the assigns, transferees and endorsees of the Lender. The security interests and Liens created in this Agreement, the Borrowing Order, any other Collateral Documents and the other Loan Documents shall be and remain valid and perfected, and the claims of the Lender hereunder valid and enforceable in accordance with the terms hereof, notwithstanding the discharge of Borrower pursuant to 11 U.S.C. § 1141, the conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to cases under Chapter 7 of the Bankruptcy Code, the dismissal of the Chapter 11 Case or any subsequent Chapter 7 case or the release of any Collateral from the property of Borrower. The security interests and Liens created in this Agreement, the Borrowing Order, any other Collateral Documents and the other Loan Documents shall be and remain valid and perfected without the necessity that the Lender file financing statements or otherwise perfect its security interests or Liens under applicable law. This Agreement, the claims of the Lender hereunder, and all security interests or Liens created hereby or pursuant hereto or by or pursuant to the Borrowing Order, any other Collateral Documents or any other Loan Document shall at all times be binding upon Borrower, the estate of Borrower, Trustee, any subsequent trustee appointed in the Chapter 11 Case or any Chapter 7 case, or any other successor in interest to Borrower. This Agreement shall not be subject to Section 365 of the Bankruptcy Code.

**SECTION 8.15.** **USA Patriot Act**. The Lender hereby notifies Borrower and Trustee that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies Trustee and Borrower, which information includes the name and address of Trustee and Borrower and other information that will allow the Lender to identify Trustee and Borrower in accordance with the Patriot Act. Trustee and Borrower shall, promptly following a request by Lender, provide all documentation and other information that the Lender requests that is required in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**SECTION 8.16.** **Actions by Borrower**. For the avoidance of doubt, any action permitted or required to be done by Borrower under this Agreement, including, without limitation, with respect to any proposed budget or Agreed Budget, disbursement of funds received as part of any Advance or delivery of any Borrowing Request, shall be done by or under the direction of Trustee.

**SECTION 8.17.** **Borrowing Order Controls**. All of the terms and agreements of the Borrowing Order are incorporated in this Agreement by reference. In the event of any direct conflict or inconsistency between the provisions of this Agreement and the Borrowing Order, the provisions of the Borrowing Order shall control.

**SECTION 8.18.** **Waiver of Right of First Refusal**. HVI CC hereby waives its Right of First Refusal and any notice requirements with respect thereto in connection with the rights and obligations under the Existing Credit Facilities. Immediately upon entry of the Borrowing Order, this waiver shall be effective both retroactively and prospectively and shall be applicable to all parties to the Existing Credit Facilities. All other provisions of the Existing Credit Facilities shall remain in full force and effect.

**SECTION 8.19.** **Third Party Beneficiary**. UBS London shall be a third party beneficiary to this Credit Agreement and shall have the right to enforce this Credit Agreement directly to the extent it may deem such enforcement necessary or advisable to protect its rights or the rights of the Lender hereunder.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

HVI CAT CANYON, INC.

By: _____

Name: Michael McConnell

Title:   Chapter 11 Trustee for the estate of HVI Cat
      Canyon, Inc.

**THE LENDER:**

UBS AG, STAMFORD BRANCH

By: _____
Name:
Title:


By: _____
Name:
Title:

# EXHIBIT "A"

## EXHIBIT A

### INITIAL AGREED BUDGET

(See Attached)

| Notes | HVI CAT CANYON INC. weeks 14-18 budget — week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 1 | Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |
| | **Cash Inflows** | | | | | | |
| 2 | SMV | - | 12,000 | - | 1,460,858 | - | 1,472,858 |
| 3 | Redu | - | - | - | 49,917 | - | 49,917 |
| | Belridge | - | - | - | 58,155 | - | 58,155 |
| | **Total Cash Inflows** | - | 12,000 | - | 1,568,931 | - | 1,580,931 |
| 4 | Royalties | - | (118,392) | - | (141,171) | - | (259,562) |
| 5 | Escrow Royalties | - | (27,690) | - | (27,148) | - | (54,838) |
| | **Total Net Cash Inflows** | - | (134,081) | - | 1,400,611 | - | 1,266,530 |
| | **Cash Outflows** | | | | | | |
| 6 | **Operating Expenses** | | | | | | |
| 7 | Payroll Checks | - | 76,000 | - | 76,000 | - | 152,000 |
| 8 | Payroll Taxes | 28,763 | - | 29,000 | - | 29,000 | 86,763 |
| | Garnishment & Child Support | - | 2,011 | - | 1,006 | - | 3,017 |
| 9 | Surface Rents | - | 75,634 | - | - | - | 75,634 |
| 10 | Consultants | - | 9,008 | - | 9,008 | - | 18,015 |
| 11 | Phones | - | 2,500 | - | 2,000 | - | 4,500 |
| 12 | Power PG&E | - | 30,000 | - | 170,000 | - | 200,000 |
| 13 | Power SoCalEdison | - | 20,000 | - | - | - | 20,000 |
| | Waste Management | - | 2,100 | - | - | 2,100 | 4,200 |
| | Water | - | 1,000 | 2,000 | - | - | 3,000 |
| | SouthernCalGas | - | 75 | 75 | - | 75 | 225 |
| | Portable Restrooms | - | 1,100 | - | 1,500 | - | 2,600 |
| | Alarms | - | - | 500 | - | - | 500 |
| | Cafeteria | - | - | - | 250 | - | 250 |
| | Copies | - | - | - | 250 | - | 250 |
| 14 | Chemicals | - | 10,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| 15 | Pumps | - | 25,000 | 10,000 | 10,000 | 10,000 | 55,000 |
| 16 | Gasoline | - | 25,000 | 12,500 | 12,500 | 12,500 | 62,500 |
| 17 | Transportation | - | - | - | 150,000 | - | 150,000 |
| 18 | Vacuum Trucks | - | - | - | 56,000 | - | 56,000 |
| 19 | LCR | - | - | - | 575,000 | - | 575,000 |

110

| Notes | HVI CAT CANYON INC.<br>weeks 14-18 budget<br>week starting | Forecast<br>Week 14<br>28-Oct-19 | Forecast<br>Week 15<br>4-Nov-19 | Forecast<br>Week 16<br>11-Nov-19 | Forecast<br>Week 17<br>18-Nov-19 | Forecast<br>Week 18<br>25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 20 | Electricians | - | 10,000 | 5,000 | 10,000 | 5,000 | 30,000 |
| 21 | Welders | - | 5,000 | 2,500 | 2,500 | 2,500 | 12,500 |
| 22 | Supplies (Belts-Parts) | - | 2,000 | 1,500 | 1,500 | 1,500 | 6,500 |
| 23 | Parts (Compressor, Pipe, others) | - | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 |
| 24 | Clean Chemical towers | - | 3,000 | 1,500 | 1,500 | 1,500 | 7,500 |
| 25 | Vehicle maintenance | - | 16,000 | - | 8,000 | - | 24,000 |
|  | Drink Water | - | 150 | - | 150 | - | 300 |
| 26 | Weed abatement | - | 15,000 | 10,000 | 10,000 | 10,000 | 45,000 |
| 27 | Well Analysis | - | 3,000 | - | 3,000 | - | 6,000 |
| 28 | Compliance | - | 25,000 | - | 25,000 | - | 50,000 |
|  | Fire Department | - | - | - | - | - | - |
| 29 | APCD | - | 2,000 | 2,000 | 2,000 | 2,000 | 8,000 |
| 30 | SBP - APCD | - | - | - | 146,436 | - | 146,436 |
| 31 | SBP - P&D | - | - | - | 159,843 | - | 159,843 |
| 32 | SBP - FD | - | - | - | 16,440 | - | 16,440 |
| 33 | SBP - EHS | - | - | - | 10,475 | - | 10,475 |
| 34 | SBP - Tax | - | 7,500 | - | - | - | 7,500 |
| 35 | Escrow - Surface Rents | - | - | - | - | 25,000 | 25,000 |
|  | Netherland and Sewell Reserve Report | - | - | - | - | - | - |
|  | **Total Operating Expenses** | 28,763 | 373,078 | 86,575 | 1,470,357 | 111,175 | 2,069,948 |
|  | **G&A Expenses** | | | | | | |
|  | Bank Charges & fees | 100 | 100 | 100 | 100 | 100 | 500 |
| 36 | Insurances | - | 9,000 | 9,000 | 19,000 | - | 37,000 |
| 37 | Chapter 11 Trustee Professionals | 228,834 | 108,894 | 108,894 | 108,894 | 108,894 | 664,410 |
| 38 | Unsecured Creditor Committee Professionals | - | 25,000 | - | - | 25,000 | 25,000 |
| 39 | U.S. Trustee Payment | - | - | - | 156,000 | - | 156,000 |
| 40 | Backoffice & Administrative | - | - | - | - | - | - |
|  | Interest | - | - | - | - | - | - |
|  | **Total G&A** | 228,934 | 142,994 | 117,994 | 283,994 | 133,994 | 907,910 |
| 41 | **Health and Safety** | | | | | | |
| 42 | SMV Health and Safety | - | 28,000 | 88,000 | 56,000 | 16,000 | 188,000 |
| 43 | Belridge Health and Safety | - | 4,500 | 5,000 | 20,000 | 3,000 | 32,500 |

| Notes | HVI CAT CANYON INC. weeks 14-18 budget week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 44 | Redu Health and Safety | - | 31,047 | 3,000 | 16,000 | 40,000 | 90,047 |
|  | Total Health and Safety | - | 63,547 | 96,000 | 92,000 | 59,000 | 310,547 |
| 45 | Total Cash Outflows | 257,697 | 579,618 | 300,569 | 1,846,351 | 304,169 | 3,288,405 |
|  | Net Cash Flow | (257,697) | (713,699) | (300,569) | (445,740) | (304,169) | (2,021,875) |
|  | Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |
|  | Net Cash Flow | (257,697) | (713,699) | (300,569) | (445,740) | (304,169) | (2,021,875) |
|  | Net Borrowing/(Pay Down) | 220,913 | 713,699 | 300,569 | 445,740 | 304,169 | 1,985,091 |
|  | Ending Cash Balance | - | - | - | - | - | - |
| 46 | Loan Balance | 220,913 | 934,613 | 1,235,182 | 1,680,922 | 1,985,091 | 1,985,091 |

**Book Bank Balance Reconciliation**

| | |
|---|---|
| Starting Balance 10/24/19 | 18,022 |
| Transfer for net amount for Sept Revenue | 23,810 |
| Transfer #1 against October Revenue | 60,000 |
| Transfer #2 against October Revenue | 20,000 |
| Balance as of 10/25/19 | 121,832 |
| Total Check Disbursements on 10/25/19 | 85,048 |
| Net Available book balance 10/28/19 | 36,784 |

1  Forecast dependent on actual volume of delivered barrels, price and gravity adjustments.
The price per barrel is calculated for Santa Maria Valley using the average price per barrel posted by Chevron, Union 76, Exxon and Shell for Midway Sunset crude less $7.
The price per barrel for Redu is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $5.75.
The price per barrel for Belridge is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $0.75.
All pricing is subject to adjustments based upon the gravity of the oil produced.  The prior month's revenue is collected on the 20th of the following month.
See the October 2019 Revenue Projection schedule for a detailed build up of the forecasted revenue.

2

3  Affiliate California Asphalt Production, Inc. advanced $80k of the forecasted revenue for October to HVI in week 13 and an additional $12k in week 15 to cover a surface lease payment to Boisseranc.

| Notes | HVI CAT CANYON INC.<br>weeks 14-18 budget<br>week starting | Forecast<br>Week 14<br>28-Oct-19 | Forecast<br>Week 15<br>4-Nov-19 | Forecast<br>Week 16<br>11-Nov-19 | Forecast<br>Week 17<br>18-Nov-19 | Forecast<br>Week 18<br>25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|

4 — In aggregate, monthly royalties are approximately 13% of production which is approximately 1 month's revenue less the LCR shipments.

5 — Escrow Royalties are based upon an insider's 2.5% overriding royalty on 1 month's production which is approximately 1 month's revenue less the LCR shipments.

6 — Due to cash flow constraints in Week 14, the majority of forecasted disbursements for the week were rolled into the forecasted disbursements for week 15.

7 — Bi-weekly payroll for HVI's 41 employees, including insider Alex Dimitrijevic's compensation that, as the President and COO of HVI, is subject to a 15 day objection period prior to disbursement.

8 — Schedule of payroll taxes due to State and Federal Taxing Authorities due on week 13:

| | |
|---|---|
| Federal Income Tax Withholding | 8,993.87 |
| Social Security Tax Withholding | 12,234.18 |
| Medicare Tax Withholding | 2,872.94 |
| Total Form 941 Liability | 24,156.99 |
| Federal Unemployment Insurance Liability | 35.30 |
| State Income Tax Withholding | 3,215.65 |
| CA SDI Tax Withholding | 990.09 |
| State Unemployment Insurance | 334.81 |
| Total Form DE-9 Liability | 4,571.15 |
| Total Liability for 10-25-2019 Payroll | 28,763.44 |

9 — Surface Rent Sub schedule

Surface Lease Owner:

| | Amount | Timing |
|---|---|---|
| Boisseranc | $ 11,956 | Due on the 1st of each month |
| Buganko | $ 41,878 | Due on the 1st of the month.  This amount includes $27k for unpaid surface lease payments from prior post-petition budgets. |
| Medema (1/2) Thomson (1/4) (- McLaughlin (1/4) | $ 7,500 | Due on the 1st of each month |
| (3) Etchandy family members | $ - | Lease to be rejected, no amount due |
| State College, LLC (Evelyn Roper) | $ - | $1,5851.33 due on an annual basis - has been paid for 2019. |
| Adam Family Trust | $ - | No amount due |
| Orcutt Fee, LLC | $ - | $5,000 due on Annual - paid for 2019 |
| Marianne Friedl | $ - | $3,700 due on Annual - paid for 2019 |
| C.M.T LLC | $ - | $100 will be due in January 2020. |
| Manfred Sander | $ 6,800 | Due before the end of October 2019 |
| E & B Natural Resources | $ - | Under review, no amount currently due |
| Grundoon, LLC (Firestone) | $ 7,500 | Due on the 1st of each month |

113

## HVI CAT CANYON INC.
### weeks 14-18 budget

| Notes | week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | Morganti Ranch | $ - | | | | | $5,500 on a monthly basis but lease is currently shut-in so no amount due. |
| | Morganti Ranch | $ - | | | | | Under review, no amount currently due |
| | Morganti Ranch | $ - | | | | | Under review, no amount currently due |
| | Railroad | $ - | | | | | $454 due in December 2019 |
| | (4) Righetti family members | $ - | | | | | $3,000 per quarter, next payment due in December 2020 |
| | (3) Judy A. Rogers, Ronald H. Souza, Jr., Michael J. Souza | $ - | | | | | $750 due in January 2020 |
| | Roland and Sandy Miller | $ - | | | | | $300 due in December 2019 |
| | Multiple Bradley Lands | | | | | | No amount due in October or November 2019 |
| 10 | Total amount due in week 14 | $ 75,634 | | | | | |

HVI pays the following 3 consultants on a biweekly basis:

| Name and Description: | Amount: |
|---|---|
| i) William LaFleur - Landman | $ 3,000 |
| ii) Innovative Consulting Solutions - production accountant for royalty calculations | $ 1,923 |
| iii) Alliance-Hydro - Geologist | $ 4,085 |
| Total Amount due to Consultants | $ 9,008 |

| Notes | |
|---|---|
| 11 | Amounts include HVI's office line at their East Clarke office and cell phones for all field employees. |
| 12 | Per adequate assurance order, $30k deposit due in Week 15 and $170k due in Week 17 (prior to the 20th). |
| 13 | Amount due for prior month's power usage. |
| 14 | Chemicals used for H2S removal that are critical to production - currently on COD terms with chemicals vendor |
| 15 | Pump maintenance and rework costs that are critical to production. |
| 16 | HVI makes daily gasoline purchases for the tankers used to haul oil and gas production with a weekly run rate of approximately $12,500. Week 15 assumes weekly run rate and payment of approximately $12.5k of overdue invoices. |
| 17 | Amount due to affiliate GTL1 for transportation costs for hauling crude and LCR, vehicle leasing and insurance costs and demurrage charges. GTL1 pays drivers $17.50/hr. for demurrage but charges HVI $80/hr. |
| 18 | Amount due to affiliate GTL1 for vacuum trucks, HVI pays $80/hr., has a monthly run rate between 600-700 hours, and week 17 assumes a 700 hour month. |
| 19 | Per Ernesto Olivares, as of 10/27/19, HVI has received 7,476 BBLS of Light Crude ("LCR") deliveries priced at $76.50 per BBL. Approximately 100 additional BBLS are estimated to be delivered before month's end. |
| 20 | The weekly run rate for electricians is approximately $5k and week 15 assumes payment of approximately $5k of overdue invoices. |
| 21 | The weekly run rate for welders is approximately $2.5k and week 15 assumes payment of approximately $2.5k of overdue invoices. |

114

| Notes | HVI CAT CANYON INC.<br>weeks 14-18 budget<br>week starting | Forecast<br>Week 14<br>28-Oct-19 | Forecast<br>Week 15<br>4-Nov-19 | Forecast<br>Week 16<br>11-Nov-19 | Forecast<br>Week 17<br>18-Nov-19 | Forecast<br>Week 18<br>25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 22 | Assumes a weekly run rate of $1.5k with an additional approximately $1k of overdue invoices to be paid in week 15. | | | | | | |
| 23 | Assumes a weekly run rate of $5k. | | | | | | |
| 24 | Assumes a weekly run rate of $1.5k for H2S fluid and week 15 assumes payment of $1.5k of invoices due in week 14. | | | | | | |
| 25 | Assumes $8k bi-weekly run rate for the maintenance costs for all oil field service vehicles, including rigs. Week 15 assumes payment of an overdue invoice for approximately $8k for rig maintenance. | | | | | | |
| 26 | Weekly run rate for critical safety and fire protection for HVI's 700+ wells and reduction of Notice of Voilation ("NOV") fines. Currently understaffed in this area and run rate assumes increasing team size from 1 to approximately 2 five man teams. | | | | | | |
| 27 | Per Alex D, up to date on well inspections through week 14 so run rate assumes bi-weekly maintenance needed in November 2019. | | | | | | |
| 28 | Weekly run rate for 3rd party consultants for critical compliance requirements such as SPC ("Spill Prevention and Countermeasure") plans and APCD ("Air Pollution and Control District") plans that need to be submitted before year-end to mitigate future fines and penalties from regulatory bodies. | | | | | | |
| 29 | Related to administrative invoicing for APCD post-petition inspections related to 35 permits necessary to mitigate potential fines and penalties. | | | | | | |
| 30 | Passed due post-petition Permit to Operate ("PTO") fees from the APCD for the following 13 HVI leases, excluding 1 lease quitclaimed to an insider. Subject to revision if additional permit fees for quitclaimed leases to insiders are identified: | | | | | | |

Facility | Fee
--- | ---
Armelin Lease PTO No. 07775 - R8 | $ 7,895
Battles Lease PTO No. 08219 - R11 | $ 7,323
Bradley Lands/Bradely Consolidated Lease PTO No. 070 | $ 41,123
Continental Lease PTO No. 08222 - R11 | $ 5,425
Cross Development Lease PTO No. 08863 - R9 | $ 458
East Valley Farms Lease PTO No. 08864 - R9 | $ 458
Fullerton Lease PTO No. 08868 - R13 | $ 7,551
Jim Hopkins Lease PTO No. 09310 - R8 | $ 13,796
Lakeview Gas Plant PTO No. 10108 - R8 | $ 38,032
Lakeview Lease PTO No. 10096 - R8 | $ 7,385
Los Flores PTO No. 07307 - R12 | $ 16,074
McKenzie Lease PTO No. 10079 - R8 | $ 458
Olean Lease PTO No. 10080 - R8 | $ 458
**Total due for APCD Permits to Operate** | **$ 146,436**

Excluded PTO fee due to a quitclaimed lease to an insider.

| Notes | HVI CAT CANYON INC. weeks 14-18 budget week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | Golco Lease PTO No. 10078 - R8 | $    4,679 | | | | | |
| 31 | Amount is based upon the following County of Santa Barbara Planning and Development post-petition facility and lease inspection fees.  Subject to revision if additional permit fees for quitclaimed leases to insiders are identified: | | | | | | |
| | Account Number/Permit ID Number: | Amount: | | | | | |
| | Permit ID # 19ACB-00000-00914 for 500 post-petition un-inspected facilities | $   110,452 | | | | | |
| | 19ACT-00880 | $        210 | | | | | |
| | 19ACT-00922 | $     6,560 | | | | | |
| | 19ACT-00920 | $          10 | | | | | |
| | 19ACT-00914 | $        350 | | | | | |
| | 19ACT-00921 | $     6,280 | | | | | |
| | 19ACT-00926 | $   12,640 | | | | | |
| | 19ACT-00928 | $     9,032 | | | | | |
| | 19ACT-00938 | $        108 | | | | | |
| | 19ACT-00930 | $          10 | | | | | |
| | 19ACT-00932 | $          10 | | | | | |
| | 19ACT-00934 | $        108 | | | | | |
| | 19ACT-00936 | $        108 | | | | | |
| | 19ACT-00887 | $        262 | | | | | |
| | 19ACT-00878 | $        420 | | | | | |
| | 19ACT-00877 | $        210 | | | | | |
| | 19ACT-00879 | $        210 | | | | | |
| | 19ACT-00881 | $        220 | | | | | |
| | 19ACT-00924 | $   12,640 | | | | | |
| | **Total due to P&D for inspection fees** | $   159,843 | | | | | |
| 32 | Amount is based upon the following Santa Barbara County Fire Department Post-Petition California Fire Code Inspection Permit Fees. Subject to revision if permits for additional quitclaimed leases to insiders are identified: | | | | | | |
| | Site Name | Amount: | | | | | |
| | Battles | $     1,370 | | | | | |
| | Blochman | $     1,370 | | | | | |
| | Bell Gas Compressor | $     1,370 | | | | | |
| | Bell Lease | $     1,370 | | | | | |
| | Casmalia/Morganti | $     1,370 | | | | | |

| Notes | HVI CAT CANYON INC.<br>weeks 14-18 budget<br>week starting | Forecast<br>Week 14<br>28-Oct-19 | Forecast<br>Week 15<br>4-Nov-19 | Forecast<br>Week 16<br>11-Nov-19 | Forecast<br>Week 17<br>18-Nov-19 | Forecast<br>Week 18<br>25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| | Chamberlin B | $ 1,370 | | | | | |
| | Chamberlin | $ 1,370 | | | | | |
| | Davis B | $ 1,370 | | | | | |
| | Davis | $ 1,370 | | | | | |
| | Fullerton Lease | $ 1,370 | | | | | |
| | Jim Hopkins | $ 1,370 | | | | | |
| | Los Flores | $ 1,370 | | | | | |
| 33 | **Total due for Fire Department CFC Permits** | $ 16,440 | | | | | |

Per Docket #308, Declaration of James Ray, California Unified Program Agency Supervisor for the Santa Barbara County Environmental Health Services ("EHS"), amounts due for the following Santa Barbara Post-petition Environmental Health Services Permit Fees - *originally forecast to be distributed in week 2*:

| | Permit ID: | Permit Fee for 2020: | | | | | |
|---|---|---|---|---|---|---|---|
| | FA0010063 | $ 1,857 | | | | | |
| | FA0010325 | $ 555 | | | | | |
| | FA0010326 | $ 555 | | | | | |
| | FA0011176 | $ 555 | | | | | |
| | FA0011177 | $ 555 | | | | | |
| | FA0012015 | $ 555 | | | | | |
| | FA0012328 | $ 555 | | | | | |
| | FA0012329 | $ 555 | | | | | |
| | FA0012330 | $ 555 | | | | | |
| | FA0012495 | $ 555 | | | | | |
| | FA0013065 | $ 555 | | | | | |
| | FA0013112 | $ 555 | | | | | |
| | FA0013113 | $ 555 | | | | | |
| | FA0013114 | $ 555 | | | | | |
| | FA0013136 | $ 555 | | | | | |
| | FA0015899 | $ 848 | | | | | |
| | **Total amount due for EHS permits** | $ 10,475 | | | | | |
| 34 | Rent due on HVI East Clarke office - not approved under Interim Cash Collateral Order | | | | | | |
| 35 | Chapter 11 Trustee negotiated a progress payment plan with Netherland & Sewell for a 2019 Reserve Report.  The $100-$120k total fee can be paid on weekly basis for $25k a week once they start work. | | | | | | |

| Notes | HVI CAT CANYON INC. weeks 14-18 budget / week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 36 | Per Ernesto Olivares, a total of $18k for worker's comp insurance to be paid in weeks 15 and 16 and $19k to renew $1MM bond due in week 17. | | | | | | |
| 37 | Chapter 11 Trustee professionals agree to a 20% deferral of professional fees incurred during this 5-week period, assuming the bank agrees to carve out the remaining 20%. Per Professional Fee Budget, weekly payments for Chapter 11 Trustee, Counsel and Financial Advisor will be put in escrow during this 5-week budget. Payments to professionals to be made only after employment applications are approved and payments authorized. | | | | | | |
| 38 | Per Professional Fee Budget, Unsecured Creditors Committee Counsel has a forecasted $25k monthly run rate and payments will be put in escrow during this 5-week budget. | | | | | | |
| 39 | Per Professional Fees budget, US Trustee payment for Q3 2019 forecasted for week 15 based upon 1% of debtors disbursements in Q3 2019 of approximately $2.5M per August and September Monthly Operating Reports ("MOR"). | | | | | | |
| 40 | Per Ernesto Olivares on 10/30/2019, affiliate GIT's October 2019 invoice for back office and administrative services will be approximately $156k. GIT allocates expenses among the affiliated entities based upon headcount of each respective entity. Per Cost and Sale Summary schedule, GIT's allocation and the Legal Fee summary schedule details of the pre-petition invoices offset against revenue due to HVI in Week 13. | | | | | | |
| 41 | Per the draft 13-week Health and Safety Budget to be presented in 2-weeks. | | | | | | |
| 42 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total SMV Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $275k but should reduce compliance violation fines and environmental risks. | | | | | | |
| 43 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Belridge Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $66k but should reduce compliance violation fines, environmental risks and, by reducing these liabilities, potentially make the field more attractive to prospective buyers. | | | | | | |
| 44 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Redu Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $337k but should reduce compliance violation fines, environmental risks, and, by reducing these liabilities, potentially make the field more attractive to prospective buyers. | | | | | | |
| 45 | Total Cash Outflows for Operating, General and Administrative, and Health and Safety Expenses but not including royalties. | | | | | | |
| 46 | Estimated Funding required for the 5-week period ending week 18, excluding interest, is approximately $2M. Interest to be added to the 13-week budget to be presented in 2-weeks. | | | | | | |

**HVI CAT CANYON INC.**
**Professional Fees Budget**
week starting

| | Assumptions | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| **Professional Fees - Run Rate** | | | | | | | |
| Chapter 11 Trustee Fees | $25k per month | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 125,000 |
| Ch. 11 Trustee Counsel | paid monthly, 20% holdback | 64,000 | 32,000 | 32,000 | 32,000 | 32,000 | 192,000 |
| CRO and Financial Advisors | Normal hourly rates reduced by 20%; paid monthly, 20% holdback | 139,834 | 51,894 | 51,894 | 51,894 | 51,894 | 347,410 |
| UCC counsel | $25k per month | - | 25,000 | - | - | - | 25,000 |
| US Trustee | 1% of disbursements; paid quarterly | - | - | - | - | 25,000 | 25,000 |
| **Total** | | 228,834 | 133,894 | 108,894 | 108,894 | 133,894 | 714,410 |
| **Professional Fees - Payment** | | | | | | | |
| Chapter 11 Trustee Fees | | - | - | - | - | - | - |
| Ch. 11 Trustee Counsel | | - | - | - | - | - | - |
| Ch. 11 Trustee Financial Advisor | | - | - | - | - | - | - |
| UCC counsel | | - | - | - | - | - | - |
| US Trustee | | - | 25,000 | - | - | - | 25,000 |
| **Total** | | - | 25,000 | - | - | - | 25,000 |
| **Ch. 11 Trustee** | | | | | | | |
| Michael McConnell | $25k a week | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |

**CRO and Financial Advisors**

| | | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | |
|---|---|---|---|---|---|---|---|
| | | Weekly Hours | | | | | |
| Tim Skilliman | Rate | 670 | 670 | 670 | 670 | 670 | |
| | Hours | 100 | 50 | 50 | 50 | 50 | week 14 includes week 13's time |
| | Total | 67,000 | 33,500 | 33,500 | 33,500 | 33,500 | |
| James Baring | Rate | 450 | 450 | 450 | 450 | 450 | |
| | Hours | 120 | 50 | 50 | 50 | 50 | week 14 includes week 13's time |
| | Total | 54,000 | 22,500 | 22,500 | 22,500 | 22,500 | |
| Greg Baracato | Rate | 695 | 695 | 695 | 695 | 695 | |
| | Hours | 50 | - | - | - | - | |
| | Total | 34,750 | 695 | 695 | 695 | 695 | |
| **Grand Total** | | 124,600 | 44,800 | 44,800 | 44,800 | 44,800 | |
| Expenses | | | | | | | |
| | Hotel | 3,960 | 1,800 | 1,800 | 1,800 | 1,800 | |
| | Food | 900 | 600 | 600 | 600 | 600 | |
| | Mileage | 464 | 464 | 464 | 464 | 464 | |
| | Airfare | 1,600 | - | - | - | - | |
| | Total | 15,234 | 7,094 | 7,094 | 7,094 | 7,094 | |

| July MOR | August MOR | September MOR | Total |
|---|---|---|---|
| | 1,003,706 | 1,479,506 | 2,483,212 |
| Q3 2019 Trustee Fee | | 1% | 24,832 |

**US Trustee Fee Schedule**

| TOTAL QUARTERLY DISBURSEMENTS | QUARTERLY FEE |
|---|---|
| $0 to $14,999.99 | $325.00 |
| $15,000 to $74,999.99 | $650.00 |
| $75,000 to $149,999.99 | $975.00 |
| $150,000 to $224,999.99 | $1,625.00 |
| $225,000 to $299,999.99 | $1,950.00 |
| $300,000 to $999,999.99 | $4,875.00 |
| $1,000,000 or more | 1% of quarterly disbursements or $250,000, whichever is less |

119

# EXHIBIT "B"

## EXHIBIT B

## FORM OF INTERIM BORROWING ORDER

(See Attached)

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@dgdk.com*
2  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@dgdk.com*
3  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@dgdk.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   1901 Avenue of the Stars, Suite 450
5  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  *Proposed Attorneys for Michael A. McConnell,*
   *Chapter 11 Trustee*

8

9

10  **UNITED STATES BANKRUPTCY COURT**

11  **CENTRAL DISTRICT OF CALIFORNIA**

12  **NORTHERN DIVISION**

13

14  In re:                                    Case No. 9:19-bk-11573-MB

15  HVI CAT CANYON, INC.,                     Chapter 11

16      Debtor.                               **ORDER FOR EMERGENCY PRIMING**
                                              **AND SUPERPRIORITY FINANCING AND**
17                                            **CONSENSUAL    USE    OF    CASH**
                                              **COLLATERAL BY THE CHAPTER 11**
18                                            **TRUSTEE**

19                                            <u>Hearing</u>
                                              Date:  November 8, 2019
20                                            Time:  9:00 a.m.
                                              Place: Courtroom 201
21                                                   1415 State Street
                                                     Santa Barbara, California
22

23

24          This Order for Emergency Priming and Superpriority Financing and Consensual Use of

25  Cash Collateral by the Chapter 11 Trustee (this "<u>Order</u>") is entered as of November [__], 2019,

26  with respect of the following facts:

27          On October 4, 2019 the Court denied the *Debtor's Motion for Interim and Final Orders*

28  *Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 Approving Use of Cash Collateral, Providing*

1  *Adequate Protection and Setting Final Hearing Pursuant to Bankruptcy Rule 4001*[ECF No. 11]

2  (the "Cash Collateral Motion") and the *Motion of the Debtor to Surcharge Collateral Pursuant to*

3  *11 U.S.C. §§ 506(c) and 552(b)* [ECF No. 55] (the "Surcharge Motion").

4      On October 8, 2019, the Court entered an *Agreed Order for Consensual Use of Cash*

5  *Collateral* [ECF No. 375] (the "Consensual Cash Collateral Order"), whereby UBS AG, London

6  Branch ("UBS AG, London Branch"), the debtor and debtor in possession (the "Debtor"), the

7  Official Committee of Unsecured Creditors (the "Committee"), GIT, Inc. ("GIT"), and Harry E.

8  Hagen, as Treasurer Tax Collector of the County of Santa Barbara, California ("Santa Barbara"),

9  in anticipation of a hearing on motions seeking appointment of a Chapter 11 trustee, agreed to use

10  of cash collateral (as that phrase is defined in Section 363(a) of the Bankruptcy Code, "Cash

11  Collateral") for an interim period ending October 25, 2019. On October 16, 2019, the Court entered

12  the *Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee* [ECF No. 409] and

13  approved appointment of Michael McConnell as the Chapter 11 trustee in this case (the "Trustee")

14

15  on October 22, 2019 [ECF No. 431].

16      Shortly before authority for use of Cash Collateral expired under the Consensual Cash

17  Collateral Order, the Trustee and UBS AG, London Branch learned that the Debtor does not have

18  sufficient cash to fund payroll and other operating expenses scheduled for payment. To address

19  the immediate cash need, on October 24, 2019, the Trustee filed his *Notice of Motion and Trustee's*

20  *Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by*

21  *California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain*

22

23  *"Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h);*

24  *and Memorandum of Points and Authorities, Declaration of Tim Skillman, and Request for Judicial*

25  *Notice in Support Thereof* [ECF No. 439] (the "Emergency Motion"). Following the October 25,

26  2019 emergency hearing, the Court entered the *Order Granting Trustee's Emergency Motion for*

27

28

- 2 -

1    *(1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt*

2    *Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form*

3    *of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)* [ECF No. 449], granting

4    authorizing the Trustee to accept a partial prepayment from California Asphalt Production, Inc.

5    ("CAP").

6
       On November 7, 2019, the Trustee filed his *Emergency Motion for an Order: (1)*

7    *Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) authorizing The*

8    *Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related*

9

10   *Relief]* (the "Motion") for authorization to obtain post-petition financing from UBS AG, Stamford

11   Branch ("UBS AG, Stamford Branch" and together with UBS AG, London Branch, "UBS") and

12   continue to use the Cash Collateral of UBS AG, London Branch.

13
       Based upon the Motion, and the financing pursuant to the credit agreement attached to the

14
     Motion and the Trustee's use of Cash Collateral, such use being found necessary to avoid

15
     immediate and serious harm to the estate and potential harm to the public health and safety as

16

17   contemplated by Bankruptcy Rule 4001(b) and (c), a hearing to consider approval of the Motion

18   having been held on November 8, 2019 (the "Hearing"), notice and opportunity for hearing being

19   sufficient under the circumstances, and upon the findings of fact and conclusions of law made by

20   the Court at the Hearing, all of which are incorporated herein by reference, and good cause

21
     appearing therefor,
22

23       **IT IS HEREBY FOUND AND ORDERED AS FOLLOWS:**

24       1.    Motion Granted.  The Motion is granted and the Facility (as defined below) and the

25   Credit Agreement attached as Exhibit 3 to the Trustee's Declaration (as amended, supplemented or

26   otherwise modified from time to time, the "Credit Agreement") are approved.

27

28                                                - 3 -

2.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief granted herein are section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c).  Venue of this Chapter 11 proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.

3.    <u>Hearing Held; Notice</u>.  The Hearing was held pursuant to Bankruptcy Rules 4001(c)(2).  Notice of the Hearing and the relief requested in the Motion was given as set forth in the proof of service filed by the Trustee.

4.    <u>No Credit Available on More Favorable Terms</u>.  The Trustee, on behalf of the Debtor and the Debtor's estate, is unable to find sufficient financing from sources other than UBS AG, Stamford Branch on terms more favorable than the terms for the term loan facility (the "<u>Facility</u>") described in the Credit Agreement.

5.    <u>Need for Post-Petition Financing and Use of Cash Collateral</u>.  Immediate financing is critical for the Debtor to continue its operations in the ordinary course.  The Facility, the Trustee's entry into the Credit Agreement, and related relief is necessary to avoid immediate and irreparable harm to the Debtor's estate, its employees, and all parties-in-interest.  The Facility is the best source of financing available to the Debtor under the circumstances and was entered into in good faith and at arm's-length.

6.    <u>Protective Advances</u>.  The advances under the Facility shall constitute advances to protect and preserve the collateral under that certain First Lien Credit Agreement dated as of May 20, 2016 and that certain Second Lien Credit Agreement dated as of May 20, 2016 among the Debtor, Rincon Island Limited Partnership, GOGH, LLC and UBS AG, London Branch (collectively, the "<u>Prepetition Credit Agreements</u>" and the obligations arising thereunder the

- 4 -
ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

125

"Prepetition Obligations") and shall remain subject to any guarantee provided thereunder. For the avoidance of doubt, all proceeds of the Facility shall constitute Cash Collateral.

7.    Authorization for Emergency Financing.  The Trustee is authorized to borrow, and UBS AG, Stamford Branch is authorized to advance, up to $3 million in financing on an interim basis prior to the final hearing set forth below, under the Credit Agreement, subject to the terms of this Order, and in accordance with the budget annexed to the Declaration of Tim Skillman as Exhibit 2 (including all terms and conditions set forth therein and as may be updated from time to time in accordance with the Credit Agreement, the "Budget"), subject to a line-item variance of ten percent (10%) of the expenses set forth in the Budget tested on a cumulative basis by disbursement categories contained in the Budget (the "Permitted Variance").   The Trustee and UBS AG, Stamford Branch are authorized to extend the availability period under the Credit Agreement by up to two weeks and increase the amount of financing by an aggregate amount of up to $500,000 upon mutual agreement of the Trustee and UBS AG, Stamford Branch without further order of this Court. Immediately upon entry of this Order, the Trustee shall, and is hereby authorized to, execute and deliver to UBS AG, Stamford Branch the Credit Agreement and all other loan documents required to be executed and delivered under the Facility.  The Trustee and counsel acting on behalf of the Trustee are further authorized to take any such actions that may be necessary to implement the Facility and borrow funds under the Credit Agreement as approved in this Order, including without limitation to issue, execute and deliver any such certificates, borrowing requests or other documents and directions that may be requested by UBS AG, Stamford Branch.  Nothing in this Order shall create any obligation of UBS to advance or lend any money to the Trustee or the Debtor, and any such advances or loans shall be made by UBS AG, Stamford Branch only in accordance with the terms and conditions of the Credit Agreement and this Order.  Any funds advanced or loaned by UBS AG, Stamford Branch shall constitute a bona fide extension of credit to a non-affiliated

- 5 -

borrower for purposes of the secured creditor exemption under the Comprehensive Environmental Response, Compensation Liability Act and comparable federal, state and local law.  UBS AG, Stamford Branch shall not be deemed an operator or owner of the Debtor or any of its properties or incur any environmental or similar liabilities, including but not limited to, liability for environmental compliance, remediation, restoration or natural resource damages under any federal, state or local law as a result of any such loans or advances to the Trustee.

8.    Based on the record before this Court, it appears (and the Trustee on behalf of the Debtor has stipulated) that the terms of the Facility, the Credit Agreement and this Order are fair and reasonable and are supported by reasonably equivalent value and fair consideration.  The Court further finds that the Trustee's agreement to the terms of the Facility and Credit Agreement on behalf of the Debtor is a sound exercise of business judgment and should be approved as set forth herein.

9.    Amendment of the Credit Agreement.  Following entry of this Order, the Trustee is authorized to enter into any non-material amendment or modification to the Credit Agreement and the loan documents entered into in connection therewith without further order of this Court, provided that the Trustee provides notice of any such amendment or modification to the Court, the United States Trustee, the Committee and Santa Barbara.  To the extent that such modification or amendment is material, such material modification or amendment shall only be permitted pursuant to an order of this Court on notice pursuant to Local Rule 2002-1(b) and a hearing.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the Credit Agreement shall be effective unless set forth in writing, signed by the Trustee and UBS AG, Stamford Branch.  For the avoidance of doubt, an amendment of the availability period of the Facility by up to two weeks and an increase of the amount of the Facility by up to $500,000 in accordance with paragraph 7 of this Order shall not constitute a material amendment.

- 6 -

10.    <u>Use of Funds</u>.  The Trustee may use funds advanced under the Facility, on the terms and conditions set forth herein and in the Credit Agreement, provided that all such funds are used to pay approved operating expenses solely in accordance with the Budget (including all terms and conditions set forth therein).  The Trustee is authorized to use funds advanced under the Facility to pay up to eighty percent (80%) of reasonable fees and expenses for the Trustee's professionals only to the extent such fees and expenses are included in the Budget.  For the avoidance of doubt, the funds advanced under the Facility shall not be used for payment of any expense not specifically included and/or not approved for payment under the Budget or otherwise authorized by this Order.

11.    <u>Liens, Collateral and Obligations</u>. Without limiting the approval set forth above, the Court grants as follows:

(i)    Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, UBS AG, Stamford Branch is granted valid and perfected first priority priming and senior security interests and liens (the "<u>Financing Liens</u>") in all property of the estate of the Debtor, including, but not limited to all of the Debtor's rights in tangible and intangible assets, including without limitation, all prepetition and post-petition assets of the Debtor's estate, whether existing on or as of the Petition Date or thereafter acquired, including without limitation, the Debtor's interest in oil and gas properties (and as-extracted collateral, goods, fixtures and hydrocarbons relating thereto), wells, accounts receivable, other rights to payment, any right to receive any residual of any retainer provided to any professionals after payment of such professional's allowed fees and expenses, cash, inventory, general intangibles, contracts, servicing rights, swap and hedge proceeds and termination payments, servicing receivables, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action (including those arising under sections 510 or 542 through 553 of the Bankruptcy Code), commercial tort claims, and the proceeds of all of the foregoing (the "<u>Collateral</u>") or proceeds thereof.  The Financing Liens granted to UBS AG, Stamford Branch are valid, perfected and enforceable first priority priming and senior liens on all the Collateral that are superior to all other prepetition or post-petition liens, claims or security interests in favor of any other lienholder, other than the Carve-Out (as defined below).

(ii)    The Financing Liens against the assets of the Debtor and the Collateral shall be, and hereby are, confirmed, and extend to and secure all obligations and indebtedness of the Trustee on behalf of the Debtor and the Debtor's estate to UBS AG, Stamford Branch under the Facility and the Credit Agreement (the "<u>Obligations</u>").  The

- 7 -

Financing Liens shall be, and are hereby determined to be, first priority priming and senior liens that are superior to all other liens, claims or security interests, pre- or post-petition, other than the Carve-Out (as defined below), except as specifically set forth in this Order. This Order shall be deemed to grant and perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the Financing Liens. UBS AG, Stamford Branch may, but shall not be required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Financing Liens granted to them pursuant to this Order, and the stay imposed under section 362 of the Bankruptcy Code is hereby modified solely to permit the same. If UBS AG, Stamford Branch shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of and the Financing Liens, the Financing Liens granted herein shall be deemed perfected at the time and on the date of entry of this Order. Upon request by UBS AG, Stamford Branch, the Trustee is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments as may be necessary to enable UBS AG, Stamford Branch to further perfect, preserve and enforce the Financing Liens granted to UBS AG, Stamford Branch by this Order.

(iii)    For all Obligations, UBS AG, Stamford Branch is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Financing Superpriority Claim") having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Trustee on behalf of the Debtor and/or the Debtor, whether now in existence or incurred by the Trustee on behalf of the Debtor and/or the Debtor after the Petition Date, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(b), 507(a), 364(c)(1), 564(c), or 726 of the Bankruptcy Code, other than the Carve-Out (as defined below).

12.    Use of Cash Collateral. The Trustee may use Cash Collateral, on the terms and conditions set forth herein solely in accordance with the Budget until the date that is the earliest of (a) November 29, 2019, (b) the occurrence of an Event of Default (as defined in the Credit Agreement), and (c) the breach or failure of the Trustee or the Debtor to comply with the terms of this Order (the date of the occurrence of the earliest of (a), (b) and (c), the "Termination Date"). To the extent the Debtor holds an interest, all funds and cash investments of Debtor, including any funds on deposit at any banks or other institutions as of the Petition Date, are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a). In addition, all cash proceeds of the Prepetition Collateral (as defined below) (and investments thereof) received by the Debtor,

- 8 -

the Trustee, or the estate of the Debtor after the Petition Date are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a). The Trustee shall not use any Cash Collateral except as permitted herein or as otherwise approved by this Court.

13.    <u>Compliance with the Budget</u>. Except as otherwise set forth herein, the Trustee is hereby authorized to use all Cash Collateral until the Termination Date to pay the ordinary course operating expenses of Debtor's estate solely in accordance with the Budget (including all terms and conditions set forth therein), subject to the Permitted Variance.

14.    <u>Limitations on Use of Proceeds and Cash Collateral</u>. The Trustee shall notify Huron Consulting Group ("<u>Huron</u>"), via email to both mkehl@huronconsultinggroup.com and azughayer@huronconsultinggroup.com, of any payments that exceed $7,500 not less than 36 hours prior to initiating such payment (a "<u>Proposed Payment</u>"). If Huron does not object to the Proposed Payment within 36 hours by email to the Trustee at michael.mcconnell@kellyhart.com, the Trustee may proceed to make such payment. Should Huron object to the Proposed Payment, such payment shall not be made without further Order of the Court. The Trustee and UBS consent to judicial intervention on an expedited basis to determine whether such Proposed Payment may proceed. Any payments to be made under the Budget to Santa Barbara, departments or agencies of the County of Santa Barbara, and the Santa Barbara County Air Pollution Control District (the "<u>APCD</u>") must be approved by Huron. If approved, such payments shall be made timely in accordance with the Budget. For the avoidance of doubt, no payments shall be made to GIT pursuant to this Order for prepetition work or claims other than reimbursement with regard to the Debtor's employees. None of the Cash Collateral or the proceeds of the Facility, subject only to the Investigation Budget (as defined below), shall be used (i) to challenge UBS's claims and/or liens or (ii) to prevent or hinder UBS from exercising its rights or remedies.

- 9 -

15.    Absent further order of the Court or written consent of UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, neither Debtor nor the Trustee shall make the following payments:  (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments provided for the in Budget in an interest-bearing escrow or segregated account.  All such issues are expressly reserved for future determination.  The Budget includes certain items for accounting purposes only; this Order does not permit payment of these items.  Notwithstanding anything to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those items in the Budget that have been specifically approved by UBS and to escrow payments as set forth above.  For the avoidance of doubt, neither Debtor nor the Trustee has any authority to make any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii) professional fee payments, except payments authorized for the Trustee's professionals under this Order; or (iv) other payments which are listed below the line in the Budget for accounting purposes but not authorized by this Order, regardless of whether any such payments listed in (i)-(iv) are included in the Budget.

16.    Carve-Out.  There shall be a subordination of the Financing Liens granted to UBS AG, Stamford Branch on the Collateral and the Adequate Protection Liens granted to UBS AG, London Branch on the Post-Petition Collateral for the aggregate amount of reasonable professional fees and expenses for the Trustee's professionals that are not authorized for payment under paragraph 10 of this Order, provided that the amount does not exceed twenty percent (20%) of the total fees and expenses for the Trustee's professionals set forth in the Budget (the "Carve-Out").  Notwithstanding the foregoing, following the occurrence of an Event of Default, the Carve-Out shall include any withheld portion of Trustee's fees and expenses accrued prior to such date and set forth in the Budget, and an additional amount not exceed $15,000 in the aggregate from and after

- 10 -

a written notice of default. Nothing in this Order shall be construed to impair the ability of UBS to object to any fees, expenses, reimbursements, or compensation sought by the Trustee. The Carve-Out shall not be used to investigate or commence or continue any action or proceeding against UBS, subject only to the Investigation Budget (as defined below).

17.    <u>Reporting Requirements</u>. As a condition to use funds advanced under the Facility and Cash Collateral, the Trustee shall provide to UBS a variance report reasonably acceptable to UBS on a weekly basis during the period for which use of such funds and Cash Collateral is permitted under this Order and any subsequent order, which shall be delivered by the Wednesday of the following week. Reporting of monthly sales revenue shall be no later than 5 business days following the end of the month. In addition, the Trustee and its representatives and agents shall provide to UBS weekly reports, oral and/or written, regarding the status of operations and financial matters as well as any additional information reasonably requested by UBS.

18.    <u>Additional Covenants</u>.

(i)      No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to provide a reserve report regarding the Debtor's hydrocarbon assets.

(ii)     No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to conduct a Phase I environmental study regarding the Debtor's hydrocarbon assets and operations.

(iii)    On or before November 18, 2019, the Trustee shall provide one or more reports to UBS as to the Trustee's efforts to stabilize and improve Debtor's operations and revenues, including efforts to maximize sale revenues for the benefit of the estate.

(iv)    No later than November 18, 2019, the Trustee shall provide UBS with a 13-week cash flow budget in form and substance reasonably acceptable to UBS.

(v)     The Debtor shall obtain and collect a minimum monthly sales revenue of $750,000, measured as of the last day of each month.

- 11 -

19.    <u>Adequate Protection</u>.  UBS AG, London Branch is entitled, pursuant to 11 U.S.C.

§§ 361 and 363(e), to adequate protection from any diminution in value of its interests in the

collateral securing the Prepetition Obligations, including the Cash Collateral (collectively, the

"<u>Prepetition Collateral</u>"), including, without limitation, any such diminution resulting from use by

Debtor or the Trustee of Cash Collateral and any other collateral, and the imposition of the

automatic stay pursuant to 11 U.S.C. § 362 (such diminution in value the "<u>Adequate Protection</u>

<u>Obligations</u>").  Based on the Court's prior findings regarding the value of Prepetition Collateral in

connection with the Cash Collateral hearings, Santa Barbara is adequately protected for priming

and use of Cash Collateral under this Order.

20.    <u>Adequate Protection – Replacement and Additional Liens</u>.  As partial adequate

protection for the Adequate Protection Obligations, effective upon the commencement of this case

and without the necessity of the execution by Debtor, the Trustee or UBS AG, London Branch of

any mortgages, security agreements, pledge agreements, financing statements or otherwise, the

following additional and replacement security interests and liens are hereby granted to UBS AG,

London Branch (the "<u>Adequate Protection Liens</u>"), subject only to (i) liens on the Collateral in

favor of UBS AG, Stamford Branch to secure the Obligations, (ii) valid and perfected non-voidable

liens in existence on the Petition Date that are senior in priority to the liens securing the prepetition

claims of UBS AG, London Branch and (iii) valid liens in existence on the Petition Date that are

perfected subsequent to the Petition Date as permitted by 11 U.S.C. § 546(b) that are senior in

priority to the liens securing the prepetition claims of UBS AG, London Branch ((i), (ii), and (iii)

collectively, the "<u>Permitted Liens</u>"):  (a) to the full extent of any diminution in value of the

Prepetition Collateral, a perfected first priority senior security interest in and lien upon all cash of

Debtor and any investment of the funds of Debtor, whether existing on the Petition Date or

thereafter acquired as of the date hereof and as of the Petition Date; and (b) to the full extent of any

- 12 -

diminution in value of the Prepetition Collateral, a perfected first priority senior security interest in and lien upon all other pre- and post-petition property of Debtor, whether existing on the Petition Date or thereafter acquired, including, without limitation, all accounts, cash, Cash Collateral, deposit accounts, chattel paper, instruments, documents, investment property, supporting obligations, customer lists, letter of credit rights, inventory, fixtures, equipment, general intangibles, goods, patents, copyrights and trademarks as well as all products and proceeds of any of the foregoing and books and records relating to any of the foregoing and to Debtor's business and the proceeds of all of the foregoing (collectively, the "Post-Petition Collateral"). For the avoidance of doubt, in accordance with paragraph 23 of this Order, the Adequate Protection Liens granted herein shall not attach to avoidance claims of the estate or proceeds thereof. The Adequate Protection Liens shall be junior only to the Permitted Liens and the Carve-Out.

21. <u>Adequate Protection for the Use of Cash Collateral – Superpriority Claim</u>. To the extent the Post-Petition Collateral granted to UBS AG, London Branch herein does not provide adequate protection of its interests in the Cash Collateral, the Adequate Protection Obligations shall constitute a super-priority administrative expense claim under Section 507(b) of the Bankruptcy Code ("Adequate Protection Superpriority Claim"). The Adequate Protection Superpriority Claim shall have priority over all administrative expenses of any kind or any subsequently filed bankruptcy case under any Chapter of the Bankruptcy Code in any court of competent jurisdiction, including such administrative expenses of the kinds specified in, or allowable under, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code, subject only to the Financing Superpriority Claim and the Carve-Out. Additionally, no: (i) costs or expenses of administration which have been or may be incurred (a) in the Chapter 11 Case; (b) after conversion of the Chapter 11 Case to a case proceeding under Chapter 7 of the Bankruptcy Code, or (c) in any other proceeding related hereto; and/or (ii) priority claims as defined in Section 507(a) of the

- 13 -

Bankruptcy Code are, or will be, senior to or *pari passu* with the Adequate Protection Superpriority Claim other than the Financing Superpriority Claim and the Carve-Out.

22.    <u>Perfection of Adequate Protection Liens</u>.  This Order shall be deemed to grant and perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the Adequate Protection Liens as of the Petition Date.  UBS AG, London Branch may, but shall not be required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Adequate Protection Liens granted to them pursuant to this Order, and the stay imposed under section 362 of the Bankruptcy Code is hereby modified solely to permit the same.  If UBS AG, London Branch shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of and the Adequate Protection Liens, the Adequate Protection Liens granted herein shall be deemed perfected at the time and on the date of entry of this Order.  Upon request by UBS AG, London Branch, the Trustee is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments as may be necessary to enable UBS AG, London Branch to further perfect, preserve and enforce the Adequate Protection Liens granted to UBS AG, London Branch by this Order.

23.    The Adequate Protection Liens granted by this Order and the Adequate Protection Superpriority Claim granted by this Order shall not attach to avoidance claims of the estate or proceeds thereof.  For the avoidance of doubt, nothing in this Order shall prevent UBS from asserting claims against or participating in such claims or proceeds under any other basis, including with respect to the Financing Liens.  Without limiting the foregoing, this provision shall not be retroactive, such that nothing in the Order shall alter or change the status of, or impose any limitation or agreement on, any lien or claim against such avoidance actions of proceeds thereof with regard to use of Prepetition Collateral or Cash Collateral granted by any order entered in this

- 14 -

case prior to the date hereof.  Nothing herein shall impair or modify UBS AG, London Branch's rights to seek additional adequate protection pursuant to section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to UBS AG, London Branch hereunder is insufficient to compensate for any diminution in value of its interests in the Cash Collateral or any other Prepetition Collateral during this case or any successor case.

24.    Termination of Cash Collateral Use.  On the Termination Date, the Trustee's right to use the Cash Collateral on the terms and conditions set forth in this Order shall terminate automatically.    By written agreement, UBS AG, London Branch may agree to waive such termination in full or permit only limited use of Cash Collateral in any manner following such event.

25.    Budget Amendments.    UBS may, but is not required to, by written agreement, amend the Budget, including to, among other things, extend the date through which Cash Collateral may be used and to increase the amount of Cash Collateral that may be used thereunder; *provided, however*, that any amendment to the Budget made pursuant to the authority set forth in this Order shall be subject to the following conditions and limitations:

(a) any such amendment shall not alter the nature and types of payments that were authorized under this Order; and

(b) any such amendment shall require the consent of the Trustee.

The foregoing conditions and limitations are intended to apply only to consensual changes to the Budget that are made pursuant to the authority of this Order.

26.    Upon entry of a written amendment in compliance with the foregoing, the new agreed budget shall constitute the Budget for all purposes under this Order and the Credit Agreement.

- 15 -

27.     Promptly following the amendment of the Budget in accordance with the foregoing, the Trustee shall promptly file notice with this Court, and provide notice of such entry to all parties entitled to notice.

28.     Reservation of Rights.  The right of the Trustee to seek additional or different use of Cash Collateral is specifically preserved, provided that upon filing of any such request, UBS AG, London Branch may by written notice terminate authorization to use Cash Collateral pursuant to this Order, or may agree to permit only use of Cash Collateral in any limited manner following such event; provided, however, any action seeking additional or different use of Cash Collateral without the express written consent of UBS shall immediately result in the occurrence of the Termination Date.

29.     Remedies on Event of Default.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right without any notice of further order of the Court to take any and all actions and pursue all remedies permitted under the Credit Agreement and applicable law in response to such Event of Default.

30.     The automatic stay of section 362(a) of the Bankruptcy Code shall be and hereby is modified and vacated without further order, notice or application to the Court to the extent necessary to allow UBS to perform any act authorized by this Order.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right to submit an order on five days' notice to the Trustee, the Committee, and the United States Trustee lifting the automatic stay to permit UBS AG, Stamford Branch to foreclose on the Collateral or alternatively, compelling the Trustee to sell the Collateral pursuant to section 363(b) of the Bankruptcy Code.  The proposed order shall be accompanied by an affidavit on behalf of UBS AG, Stamford Branch stating that an Event of Default has occurred and setting forth the facts of such Event of Default.  Any party opposing the

- 16 -

relief requested by UBS AG, Stamford Branch shall have the burden of proof why the automatic stay should not be lifted with respect to the Collateral.

31.    <u>Further Assurances</u>.  No further actions shall be required to reflect the Financing Liens or Adequate Protection Liens granted to UBS or the Obligations or Adequate Protection Obligations incurred by the Trustee or the Debtor.  Notwithstanding the foregoing, the Trustee and UBS are granted authority to take any such actions and execute any such documents as they may deem appropriate to reflect the Financing Liens and the Adequate Protection Liens granted to UBS or the Obligations incurred by the Trustee or the Debtor, including without limitation execution and delivery of one or more notes, deeds of trust, financing agreements and all other actions as UBS may reasonably request.

32.    <u>Section 506(c) Waiver</u>.  All rights of the Debtor, the Trustee, and the estate to surcharge the collateral of UBS are hereby waived with regard to any period during which Cash Collateral is used pursuant to this Order and until all Obligations are paid in full.

33.    <u>Right to Credit Bid</u>.  UBS shall have the right to credit bid up to the full amount of its outstanding Obligations and Prepetition Obligations in connection with any sale of the Debtor's assets, the Prepetition Collateral, the Post-Petition Collateral or the Collateral under section 363 of the Bankruptcy Code.  Nothing herein shall constitute consent by UBS to any sale of such assets, Prepetition Collateral, the Post-Petition Collateral or the Collateral.

34.    <u>Successors and Assigns</u>.  The provisions of this Order shall be binding upon UBS, the Debtor, the Trustee and their respective successors and assigns (including any other trustee hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of UBS, the Trustee and the Debtor and their respective successors and assigns.

35.    <u>Compliance with Laws</u>.  Nothing in this Order or the Budget shall permit the Debtor or the Trustee to violate 28 U.S.C. § 959(b), and nothing in this Order or the Budget shall in any

- 17 -

way diminish the obligation of any entity, including the Debtor and the Trustee, to comply with environmental laws.

36.    _Priority_. Except as set forth herein with respect to the Financing Liens, nothing in this Order shall determine or effect the relative priority of any senior prepetition lien or post-petition lien, and all rights are expressly reserved in that regard. All rights are expressly reserved with respect to whether any asset is cash collateral for any entity other than UBS and thus any entitlement of such other entities to adequate protection, including without limitation any superpriority claim.

37.    _Effect of Order_. If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay, shall not affect (i) the validity of any Adequate Protection Obligations incurred before the actual receipt of written notice by UBS AG, London Branch of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any lien or priority authorized or created hereby. Notwithstanding any such reversal, modification, vacatur or stay, any use of the Facility proceeds or Cash Collateral or Obligations or Adequate Protection Obligations incurred by Debtor or the Trustee to UBS before the actual receipt of written notice by UBS of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the original provisions of this Order, and UBS shall be entitled to all the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code and this Order with respect to all uses of the Facility proceeds or Cash Collateral and the Obligations or Adequate Protection Obligations.

38.    Except as expressly provided in this Order, the Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of UBS granted by the provisions of this Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the case to a case under chapter 7, dismissing of the case, or by any other act or omission or (ii) the entry of an order

- 18 -

confirming a plan in the case.  The terms and provisions of this Order shall continue in this case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of UBS granted by the provisions of this Order shall continue in full force and effect until the Obligations and the Adequate Protection Obligations are indefeasibly paid in full.

39.    <u>Findings of Fact and Conclusions of Law</u>.  This Order shall constitute findings of fact and conclusions of law of the Court and shall take effect immediately upon execution hereof.

40.    <u>Filing</u>.  This Order may be filed in any state or local jurisdiction in order to evidence and perfect UBS's liens and security interests, as granted and confirmed herein.  At the request of UBS's counsel, the clerk of court shall issue a certified copy of this Order and shall execute such other certificates or affidavits of authenticity as may be reasonably necessary to put this Order in a form that may be accepted by the applicable filing office.

41.    <u>Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code</u>.  The terms of the Facility, Credit Agreement, and this Order were negotiated in good faith and at arms' length among the Trustee and UBS.  Financing provided under the Facility and the Credit Agreement shall be deemed to have been extended in good faith and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code.

42.    <u>Stipulations</u>.  Effective upon the expiration of the Challenge Period (as defined below), the Trustee will be deemed to have admitted, acknowledged, agreed and stipulated that: (i) the amount due to UBS under the Prepetition Credit Agreements, as of June 30, 2019, is approximately $127 million, plus such allowable interest, fees and charges as may accrue thereafter; (ii) the Prepetition Obligations constitute legal, valid, enforceable and binding obligations of the Debtor; (iii) no offsets, defenses or counterclaims to the Prepetition Obligations

- 19 -

1   exist; (iv) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction

2   or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the

3   Prepetition Credit Agreements are valid and enforceable by UBS AG, London Branch against the

4   Debtor; (vi) the liens and security interests in the Prepetition Collateral securing the Prepetition

5   Obligations (the "Prepetition Liens") were perfected as of the Petition Date and constitute legal,

6   valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not

7   subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or

8   subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens

9   had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens

10  expressly permitted by the Prepetition Credit Agreements (to the extent any such permitted liens

11  were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens

12  as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code); (vii) the

13  Prepetition Obligations constitute allowed secured claims against the Debtor's estate; and (viii) the

14  Debtor and its estate have no claim, objection, challenge or cause of action against UBS or any of

15

16

17  its affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors,

18  professionals, officers, directors and employees, whether arising under applicable state or federal

19  law (including, without limitation, any recharacterization, subordination, avoidance or other claims

20  arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in

21  connection with any of the Prepetition Credit Agreements (or the transactions contemplated

22  thereunder), the Prepetition Obligations or the Prepetition Liens, including without limitation, any

23  right to assert any disgorgement or recovery.

24

25      43.    Effect of Stipulations on Third Parties.  The stipulations, admissions, agreements

26  and releases contained in this Order shall be binding upon all other parties in interest, including,

27  without limitation, any statutory or non-statutory committees appointed or formed in this case, and

28

- 20 -

any other person or entity acting or seeking to act on behalf of the Debtor's estates, including the Trustee in all circumstances and for all purposes unless: (a) any party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing granted by the Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than a date that is the later of (i) the date that is 30 days after entry of this Order and (ii) any later date agreed to by UBS AG, London Branch in writing in its sole discretion (the "Challenge Period"), (A) objecting to or challenging the validity, perfection, enforceability, priority or extent of the Prepetition Obligations, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims through or on behalf of the Debtor's estate (collectively, the "Challenge Proceeding") against UBS AG, London Branch; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge Proceeding; *provided, however*, that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred. If any such Challenge Proceeding is timely filed during the Challenge Period, such filing shall immediately result in the occurrence of the Termination Date.

44. If no such Challenge Proceeding is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding: (i) any and all Challenge Proceedings or potential Challenge Proceedings shall be deemed to be forever waived and barred; (ii) all stipulations, admissions, agreements and releases contained in this Order shall be irrevocably and forever binding on all parties in interest; (iii) the Prepetition Liens shall be deemed to constitute valid, binding, and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtor shall be

- 21 -

deemed to have released, waived and discharged UBS AG, London Branch from any and all obligations and liabilities to the Debtor and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date.

45. If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Order shall nonetheless remain binding and preclusive on all persons and entities, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. UBS AG, London Branch reserves all of its rights to contest on any grounds any Challenge Proceeding. Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in this case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estates.

46. The Trustee may use the funds advanced under the Facility to investigate (i) the claims and liens of UBS AG, London Branch and (ii) potential claims, counterclaims, causes of action or defenses against UBS AG, London Branch; *provided* that no more than an aggregate of $5,000 of the funds advanced under the Facility may be used by the Trustee in respect of any such investigation (the "Trustee's Investigation Budget") and $20,000 of the funds advanced under the Facility may be used by the Committee in respect of any such investigation (the "Committee's Investigation Budget" and together with the Trustee's Investigation Budget, the "Investigation Budget").

47. No Stay. There is no stay of this Order, including no stay pursuant to Federal Rule of Bankruptcy Procedure 6004(h) (to the extent applicable).

48. Final Hearing. The Motion is set for a final hearing to be held at [_____] (prevailing Pacific Time), on [_____], 2019 (the "Final Hearing"). Advancement of any funds

- 22 -

1  under the Facility prior to the Final Hearing shall be governed by the terms and conditions of the

2  Credit Agreement and entitled to the full protections granted under this Order, the Credit

3  Agreement, the Bankruptcy Code, and any other applicable law.

4

5                                                ###

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

HVI CAT CANYON, INC.

By: _____
Name: Michael McConnell
Title:    Chapter 11 Trustee for the estate of HVI Cat
            Canyon, Inc.

**HVI CAT CANYON, INC.**


By: _____
Name: Michael McConnell
Title:   Chapter 11 Trustee for the estate of HVI Cat
         Canyon, Inc.

The foregoing certifications and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____, _____ pursuant to Section 6.01(a)(v) of the Credit Agreement.

HVI CAT CANYON, INC.

By: _____

Name: Michael McConnell

Title:   Chapter 11 Trustee for the estate of HVI Cat
          Canyon, Inc.

*Compliance Certificate*

147

**IN WITNESS THEREOF**, the Parties hereto have executed this Release as follows:

HVI Cat Canyon, Inc.

Date:_____    By: _____

Name: Michael McConnell,

Title:   Chapter 11 Trustee for the estate of
HVI Cat Canyon, Inc.

*Trustee Release*

148

# EXHIBIT "C"

## EXHIBIT C

## [FORM OF]
## BORROWING REQUEST

UBS AG, Stamford Branch
Attention: Structured Finance Processing
600 Washington Blvd., 9th Floor
Stamford, CT 06901

Re: <u>HVI CAT CANYON, INC.</u>

[DATE]

Ladies and Gentlemen:

Reference is made to the Credit Agreement dated as of November ____, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), between MICHAEL MCCONNELL ("**Trustee**"), solely in his capacity as Chapter 11 trustee for the estate of HVI Cat Canyon, Inc., a Colorado corporation ("**HVI CC**" and, together with Trustee, collectively, "**Borrower**"), and UBS AG, STAMFORD BRANCH (the "**Lender**"). Capitalized terms used but not defined herein shall have the meaning given them in the Credit Agreement. Borrower hereby gives you notice pursuant to Section 2.01(b) and Section 4.02(e) of the Credit Agreement that Borrower requests an Advance under the Credit Agreement, and in connection therewith, (i) set forth below are the terms on which such Advance is requested to be made and (ii) attached hereto is Attachment No. 1 which specifies the proposed use of proceeds for such Advance:

| | |
|---|---|
| Principal amount of<br>    Advance | $ _____ |
| Requested Advance Date<br>    (which is a Business Day) | _____ |

Borrower hereby represents and warrants that the conditions to lending specified in Section 4.02 of the Credit Agreement are satisfied as of the date hereof.

[Signature Page Follows]

150

**HVI CAT CANYON, INC.**

By: _____

Name: Michael McConnell

Title:   Chapter 11 Trustee for the estate of HVI Cat
Canyon, Inc.

## ATTACHMENT NO. 1
## TO BORROWING REQUEST

This Attachment No. 1 is attached to and made a part of the Borrowing Request dated as of _____, _____.  Subsection references herein relate to subsections of the Credit Agreement. Pursuant to such Borrowing Request, below is a proposed use of the proceeds for the Advance requested by Borrower.

_____
_____
_____
_____
_____
_____

# EXHIBIT "D"

## EXHIBIT D

**TRUSTEE RELEASE**

(See Attached)

## RELEASE AGREEMENT

This **RELEASE AGREEMENT** (this "Release") is entered into as of November [__], 2019, by **Michael A. McConnell** ("Trustee"), solely in his capacity as Chapter 11 trustee for the estate, and on behalf of the estate of HVI Cat Canyon, Inc. (the "Estate"), in favor of **UBS AG, London Branch** ("UBS London"), and **UBS AG, Stamford Branch** ("UBS Stamford" and together with UBS London, "UBS"). Capitalized terms used but not defined in this Release shall have the meanings given to them in the Credit Agreement dated as of November [__], 2019 between the Trustee, solely in his capacity as Chapter 11 trustee for the Estate and UBS Stamford (the "Credit Agreement").

**WHEREAS**, in connection with HVI Cat Canyon, Inc.'s ("HVI CC") Chapter 11 case (such proceeding being administered under Case No. 9:19-bk-11573-MB is hereinafter referred to as the "Chapter 11 Case"), as consideration for this Release and to protect and preserve the Prepetition Collateral of UBS London, (i) UBS Stamford has agreed to provide the Trustee with an Advance and (ii) UBS London has agreed to the continued use of its cash collateral.

**WHEREAS**, HVI CC and UBS London are party to (i) that certain First Lien Credit Agreement dated as of May 20, 2016, among HVI CC, GOGH, LLC, and UBS London and (ii) that certain Second Lien Credit Agreement dated as of May 20, 2016, among HVI CC, GOGH, LLC, and UBS London (collectively, the "Existing Credit Facilities").

**WHEREAS**, in connection with the Chapter 11 Case, UBS London agreed to the Estate's use of its cash collateral in accordance with orders entered in the Chapter 11 Case and, as of the date hereof, has agreed to the Estate's continued use of its cash collateral to protect and preserve its Prepetition Collateral.

**WHEREAS**, as a condition to UBS Stamford entering into the Credit Agreement and UBS London consenting to the continued use of its cash collateral under the Existing Credit Facilities, UBS has requested, and the Trustee has agreed, that the Trustee will enter into this Release.

**WHEREAS**, this Release is being entered into after extensive arm's-length discussions and negotiations between the Trustee and UBS.

**WHEREAS**, the Trustee and UBS agree that the Release contemplated herein is a fundamentally fair, adequate and reasonable resolution of potential disputes or causes of action by the Trustee against UBS.

**NOW, THEREFORE**, the undersigned Parties agree as follows:

A.    **RELEASE**

1.    **Release**. Effective on the date of entry of the Borrowing Order (the "Release Date"), the Trustee, on behalf of the Estate and any other entity or individual the Trustee, in his capacity as such, or the Estate, has the power to bind (the "HVI CC Releasors"), does hereby covenant not to sue UBS for any matters arising on or prior to the date hereof and hereby releases, absolves and discharges, to the fullest extent permitted by law, UBS and its successors and assigns, subsidiaries, divisions and affiliates, past and present, and their trustees, directors, officers,

1

155

shareholders, members, agents, attorneys, and employees, past and present, and each of them (hereinafter collectively referred to as "UBS Releasees"), of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity, which any of the HVI CC Releasors ever had, now have, or hereafter can, shall, or may have against any UBS Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the Release Date, including, without in any way limiting the generality of the foregoing, (i) any claim arising out of or in any way relating to the Existing Credit Facilities, and (ii) any currently pending or previously filed claim by any of the HVI CC Releasors against any of the UBS Releasees with any city, county, state or federal agency, commission, office or tribunal whatsoever; provided, however, that the foregoing shall not relieve the UBS Releasees of any obligations under the Release, the Credit Agreement, or the Borrowing Order.

2.      **Waiver.** It is a further condition of the consideration hereof and is the Trustee's intention in executing this Release that the same shall be effective as a bar as to each and every claim, demand and cause of action hereinabove specified to be released and, in furtherance of this intention, the Trustee hereby expressly waives any and all rights or benefits conferred by the provisions of Section 1542 of the California Civil Code or any similar provision of applicable law and expressly consents that this Release shall be given full force and effect according to each and all of its express terms and conditions, including those relating to unknown and unsuspected claims, demands and causes of actions, if any, as well as those relating to any other claims, demands and causes of actions hereinabove specified. Section 1542 provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Trustee acknowledges that he may hereafter discover claims or facts in addition to or different from those which he now knows or believes to exist with respect to the subject matter of this Release and which, if known or suspected at the time of executing this Release, may have materially affected this agreement. Nevertheless, the Trustee hereby waives any right, claim or cause of action that might arise as a result of such different or additional claims or facts. The Trustee acknowledges that he understands the significance and consequence of such release and such specific waiver of Section 1542 or any other similar provision of applicable law.

3.      Notwithstanding anything to the contrary, solely with respect to any potential claim that may be brought in a Challenge Proceeding (as defined in the Borrowing Order) against UBS London, the foregoing release shall be effective upon the expiration of the Challenge Period (as defined in the Borrowing Order).

## B.    MISCELLANEOUS PROVISIONS

1.    This Release together with its WHEREAS clauses constitutes and contains the entire agreement and final understanding concerning the subject matters addressed herein. The WHEREAS clauses are an integral part of this Release and it is intended by the Trustee as a complete and exclusive statement of the terms of the agreement.

2.    **Construction.** This Release shall be deemed to have been executed and delivered within the State of New York, and the rights and obligations of the Trustee hereunder shall be construed and enforced in accordance with, and governed by, the laws of the State of New York without regard to principles of conflict of laws that might cause the application of the laws of any other jurisdiction.

3.    In entering into this Release, the Trustee represents that he has relied upon the advice of his attorneys, who are attorneys of his own choice, and that the terms of this Release have been completely read and explained to him by his attorneys, and that those terms are fully understood and voluntarily accepted by him.

4.    The Trustee represents and warrants that this Release is authorized, executed, and delivered by the Trustee on behalf of the Estate and constitutes a legal, valid, and binding obligation of the Trustee and the Estate, in accordance with the terms of this Release.

*[Remainder of page intentionally left blank]*

157

**IN WITNESS THEREOF**, the Trustee, on behalf of the Estate, has executed this Release as follows:

Date:_____    By: _____
                                  Name: Michael A. McConnell,
                                  Title:  Chapter 11 Trustee for the estate of
                                          HVI Cat Canyon, Inc.

158

# EXHIBIT "E"

## EXHIBIT E

### FORM OF COMPLIANCE CERTIFICATE

(See Attached)

## EXHIBIT E

## [FORM OF]

## COMPLIANCE CERTIFICATE

### THE UNDERSIGNED HEREBY CERTIFIES THAT:

(1)    I am the duly appointed Chapter 11 Trustee for the estate of HVI Cat Canyon, Inc., a Colorado corporation ("**Company**");

(2)    I have reviewed the terms of that certain Credit Agreement dated as of November [    ], 2019, as amended, supplemented or otherwise modified to the date hereof (said Credit Agreement, as so amended, supplemented or otherwise modified, being the "**Credit Agreement**", the terms defined therein and not otherwise defined in this Certificate being used in this Certificate as therein defined), by and among Company and the financial institution listed therein as Lender, and the terms of the other Loan Documents, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Company during the accounting period covered by the attached financial statements;

(3)    The examination described in paragraph (2) above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or potential Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth below.

Set forth below are all exceptions to paragraph (3) above listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Company has taken, is taking, or proposes to take with respect to each such condition or event:

_____; and

(4)    Except as set forth below,  the Company has not changed, nor intends, within the 120-day period commencing on the day hereof, to change, its name, type of organization, jurisdiction of organization or location of its chief executive office:

_____.

[Signature Page Follows]

The foregoing certifications and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____, ____ pursuant to <u>Section 6.01(a)(v)</u> of the Credit Agreement.

**HVI CAT CANYON, INC.**


By: _____
Name: Michael McConnell
Title:  Chapter 11 Trustee for the estate of HVI Cat
Canyon, Inc.

# EXHIBIT "4"

EXECUTION VERSION

$50,000,000

# FIRST LIEN CREDIT AGREEMENT

dated as of May 20, 2016,

among

## HVI CAT CANYON, INC.

and

## RINCON ISLAND LIMITED PARTNERSHIP,

as Borrowers,

## GOGH, LLC,

as Holdings,

## THE LENDERS PARTY HERETO

and

## UBS AG, LONDON BRANCH,

Administrative Agent and Collateral Agent

(b)    Assignments by Lenders.

(i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent:

(A)    if such assignment is to a competitor (as defined in the definition of "Eligible Assignees") of Borrowers and Borrowers have not consented in writing to such assignment (it being understood that withholding of such consent is reasonable), such Lender shall first offer to assign such rights and obligations under this Agreement to Borrowers pursuant to a notice (the "**ROFR Notice**") that includes a disclosure of the parties to such proposed assignment, and all material terms thereof, including a draft assignment agreement, and, if Borrowers have not accepted such offer to acquire all of such rights and obligations proposed to be assigned to such person on substantially the same terms within ten (10) Business Days after receiving such notice (the "**ROFR Period**"), such Lender shall be permitted to make such assignment; *provided further* that, if Borrowers provide notice of their intent to accept such Lender's offer within such ROFR Period, (x) the Borrowers shall provide such Lender with evidence of funding within sixty (60) days of delivery of the ROFR Notice and (y) Borrowers shall consummate the acquisition of such rights and obligations under this Agreement within ten (10) days of delivery of the evidence of funding; if Borrowers have not so delivered any of the ROFR Notice, the evidence of funding or consummated the acquisition within the applicable periods, such Lender shall be permitted to make such assignment; and

(B)    with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an Affiliate of a Lender, or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5.0 million, unless each of the Administrative Agent and, so long as no Default has occurred and is continuing, Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed);

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate tranches on a non-*pro rata* basis; and

116

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  TRUSTEE'S NOTICE OF MOTION AND EMERGENCY MOTION FOR AN ORDER: (1) AUTHORIZING THE TRUSTEE TO OBTAIN SECURED PRIMING SUPERPRIORITY FINANCING; (2) AUTHORIZING CONTINUED USE OF CASH COLLATERAL; (3) SCHEDULING A FINAL HEARING; AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF MICHAEL A. MCCONNELL AND TIM SKILLMAN, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On  November 7, 2019 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:  On  November 7, 2019 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on  November 7, 2019 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Served by Personal Delivery to be delivered by
<u>NOVEMBER 8 , 2019</u>
The Honorable Martin R. Bash
U.S. Bankruptcy Court
1415 State Street
Courtroom "201"
Santa Barbara, CA 93101

Served by Federal Express
Debtor
HVI Cat Canyon, Inc.
630 Fifth Avenue
Suite 2410
New York, NY 10111

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 7, 2019 | Vivian Servin | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

ADDITIONAL SERVICE INFORMATION (if needed):

1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- William C Beall on behalf of Creditor GLR, LLC
  will@beallandburkhardt.com, carissa@beallandburkhardt.com

  Alicia Clough on behalf of Creditor California State Lands Commission
  aclough@loeb.com, mnielson@loeb.com,ladocket@loeb.com

  Marc S Cohen on behalf of Creditor California State Lands Commission
  mscohen@loeb.com, klyles@loeb.com

  Alec S DiMario on behalf of Creditor Direct Energy Business Marketing, LLC d/b/a
  Direct Energy Business
  alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com

  Alec S DiMario on behalf of Creditor Direct Energy Business, LLC
  alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com

  Karl J Fingerhood on behalf of Interested Party United States of America on behalf of
  USEPA and US Coast Guard
  karl.fingerhood@usdoj.gov, efile_ees.enrd@usdoj.gov

  H Alexander Fisch on behalf of Interested Party California Department of Fish & Wildlife
  Alex.Fisch@doj.ca.gov

  H Alexander Fisch on behalf of Interested Party California Regional Water Quality
  Control Board, Central Coast
  Alex.Fisch@doj.ca.gov

  Don Fisher on behalf of Interested Party Interested Party
  dfisher@ptwww.com, tblack@ptwww.com

  Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee
  brian.fittipaldi@usdoj.gov

  Gisele M Goetz on behalf of Interested Party Courtesy NEF
  gmgoetz@hbsb.com, ggoetz@collegesoflaw.edu

  Karen L Grant on behalf of Creditor BUGANKO, LLC
  kgrant@silcom.com

  Ira S Greene on behalf of Interested Party CTS Properties, Ltd.
  Ira.Greene@lockelord.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                   F 9013-3.1.PROOF.SERVICE

Matthew C. Heyn on behalf of Creditor Department of Conservation, Division of Oil, Gas
and Geothermal Reources
Matthew.Heyn@doj.ca.gov, mcheyn@outlook.com

Brian L Holman on behalf of Creditor Bradley Land Company
b.holman@musickpeeler.com

Eric P Israel on behalf of Attorney Courtesy NEF
eisrael@dgdk.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Eric P Israel on behalf of Interested Party Michael A McConnell
eisrael@dgdk.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Razmig Izakelian on behalf of Creditor GIT, Inc.
razmigizakelian@quinnemanuel.com

Alan H Katz on behalf of Interested Party CTS Properties, Ltd.
akatz@lockelord.com

John C Keith on behalf of Creditor California State Lands Commission
john.keith@doj.ca.gov

Jeannie Kim on behalf of Interested Party Pacific Gas and Electric Company
jkim@friedmanspring.com

Brian M Metcalf on behalf of Interested Party UBS AG, London Branch
bmetcalf@omm.com

David L Osias on behalf of Creditor Allen Matkins Leck Gamble Mallory & Natsis LLP
dosias@allenmatkins.com,
bcrfilings@allenmatkins.com,kdemorest@allenmatkins.com,csandoval@allenmatkins.co
m

Darren L Patrick on behalf of Interested Party UBS AG, London Branch
dpatrick@omm.com, darren-patrick-1373@ecf.pacerpro.com

Jeffrey N Pomerantz on behalf of Creditor Committee Official Committee of Unsecured
Creditors
jpomerantz@pszjlaw.com

Todd C. Ringstad on behalf of Interested Party Interested Party
becky@ringstadlaw.com, arlene@ringstadlaw.com

Mitchell E Rishe on behalf of Creditor California Department of Conservation, Division

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    F 9013-3.1.PROOF.SERVICE

of Oil, Gas & Geothermal Resources
mitchell.rishe@doj.ca.gov

Mitchell E Rishe on behalf of Creditor Department of Conservation, Division of Oil, Gas
and Geothermal Reources
mitchell.rishe@doj.ca.gov

Daniel A Solitro on behalf of Interested Party CTS Properties, Ltd.
dsolitro@lockelord.com, ataylor2@lockelord.com

Ross Spence on behalf of Interested Party County of Santa Barbara, California
ross@snowspencelaw.com,
janissherrill@snowspencelaw.com;donnasutton@snowspencelaw.com;brittanyDecoteau
@snowspencelaw.com

Ross Spence on behalf of Interested Party Harry E. Hagen, as Treasurer-Tax Collector of
the County of Santa Barbara, California
ross@snowspencelaw.com,
janissherrill@snowspencelaw.com;donnasutton@snowspencelaw.com;brittanyDecoteau
@snowspencelaw.com

Ross Spence on behalf of Interested Party Santa Barbara Air Pollution Control District
ross@snowspencelaw.com,
janissherrill@snowspencelaw.com;donnasutton@snowspencelaw.com;brittanyDecoteau
@snowspencelaw.com

Christopher D Sullivan on behalf of Creditor Diamond McCarthy LLP
csullivan@diamondmccarthy.com,
mdomer@diamondmccarthy.com;kmartinez@diamondmccarthy.com

Jennifer Taylor on behalf of Interested Party UBS AG, London Branch
jtaylor@omm.com

John N Tedford on behalf of Interested Party Michael A McConnell
jtedford@dgdk.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com

Salina R Thomas on behalf of Interested Party Courtesy NEF
bankruptcy@co.kern.ca.us

Salina R Thomas on behalf of Interested Party Kern County Treasurer Tax Collector
bankruptcy@co.kern.ca.us

Patricia B Tomasco on behalf of Creditor GIT, Inc.
pattytomasco@quinnemanuel.com,
barbarahowell@quinnemanuel.com;cristinagreen@quinnemanuel.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                              F 9013-3.1.PROOF.SERVICE

Fred Whitaker on behalf of Interested Party Eller Family Trust
lshertzer@cwlawyers.com

William E. Winfield on behalf of Attorney Courtesy NEF
wwinfield@calattys.com, scuevas@calattys.com

Emily Young on behalf of Creditor Epiq Corporate Restructuring, LLC Claims Agent
pacerteam@gardencitygroup.com,
rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE