1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@DanningGill.com*
3  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
4  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
5  Facsimile: (310) 277-5735

6  Attorneys for Michael A. McConnell,
   Chapter 11 Trustee
7

8             **UNITED STATES BANKRUPTCY COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10                    **NORTHERN DIVISION**

11

| | |
|---|---|
| In re | Case No. 9:19-bk-11573-MB |
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | **TRUSTEE'S NOTICE OF MOTION AND MOTION FOR AN ORDER: (1) AUTHORIZING THE TRUSTEE TO OBTAIN FINANCING ON THE SAME TERMS PREVIOUSLY AUTHORIZED IN THE COURT'S FINAL ORDER SUBJECT TO CERTAIN MODIFICATIONS; (2) AUTHORIZING CONTINUED USE OF CASH COLLATERAL; (3) SCHEDULING A FINAL HEARING; AND (4) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF MICHAEL A. MCCONNELL AND TIM SKILLMAN, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| | Date:  December 16, 2019<br>Time:  10:30 a.m.<br>Place:  Courtroom 202<br>1415 State Street<br>Santa Barbara, California |

1569477.2  26932

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................10

I. INTRODUCTION .................................................................................................................10

II. STATEMENT OF FACTS ...................................................................................................12

    A.    OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS ..........................12

    B.    THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S
        APPOINTMENT ..........................................................................................................12

    C.    SECURED LIABILITIES ...........................................................................................13

        1.    UBS and GLR ...............................................................................................13

        2.    Santa Barbara, Orange & Kern Counties .....................................................14

        3.    The State Controller ......................................................................................14

        4.    Northern California Collection Services .......................................................15

    D.    THE DEBTOR'S ORDER AUTHORIZING USE OF CASH
        COLLATERAL .............................................................................................................15

    E.    THE TRUSTEE'S IMMEDIATE CASH FLOW NEEDS AND MOTION
        TO ACCEPT AN ADVANCE FROM CAP ...............................................................16

    F.    THE TRUSTEE'S FIRST REQUEST FOR POSTPETITION FINANCING
        AND USE OF CASH COLLATERAL .......................................................................17

    G.    CAP'S FAILURE TO PAY FOR PURCHASES AND THE TRUSTEE'S
        REJECTION MOTIONS ..............................................................................................18

    H.    THE TRUSTEE'S NEED FOR FURTHER POSTPETITION FINANCING
        AND USE OF CASH COLLATERAL .......................................................................19

    I.    THE SECOND AMENDMENT TO THE CREDIT AGREEMENT .......................22

III. RELIEF REQUESTED ........................................................................................................23

    A.    THE COURT SHOULD AUTHORIZE THE TRUSTEE TO OBTAIN
        CREDIT PURSUANT TO 11 U.S.C. § 364 ...............................................................23

        1.    Applicable Legal Standard ............................................................................23

        2.    The Proposed Borrowing is Appropriate ......................................................25

    B.    THE COURT SHOULD AUTHORIZE THE TRUSTEE'S CONTINUED
        USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 ........................28

**<u>TABLE OF CONTENTS</u>**
(Continued)

**Page**

C.   THE PROPOSED ADEQUATE PROTECTION FOR THE PROPOSED
PRIMING AND USE OF CASH COLLATERAL SHOULD BE
APPROVED ....................................................................................................29

    1.   UBS Consents to the Motion ..........................................................29

    2.   Adequate Protection for GLR .........................................................30

    3.   California Collection is Not Entitled to Adequate Protection ........31

    4.   Santa Barbara is Adequately Protected and/or No Further Adequate
Protection is Required.....................................................................31

    5.   Orange County, Kern County and the State Controller are Adequately
Protected .........................................................................................31

D.   THE CARVE-OUT IS APPROPRIATE ........................................................32

E.   IT IS APPROPRIATE TO CONTINUE GRANTING A LIMITED LIEN
ON AVOIDING POWER CLAIMS ...............................................................33

F.   THE INCREASED INTEREST RATE IS APPROPRIATE ...........................33

G.   NOTICE WITH RESPECT TO INTERIM ORDER.......................................34

H.   NOTICE WITH RESPECT TO FINAL HEARING .......................................34

I.   WAIVER OF RULE 6004(A) AND 6004(H) .................................................34

IV. CONCLUSION ..........................................................................................................35

DECLARATION OF MICHAEL A. MCCONNELL...........................................................36

DECLARATION OF TIM SKILLMAN..............................................................................43

REQUEST FOR JUDICIAL NOTICE................................................................................45

1569477.2  26932

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Ames Dept. Stores, Inc.*,
    115 B.R. 34, 40 (S.D.N.Y. 1990) ................................................................. 24, 32

*In re Aqua Assocs.*,
    123 B.R. 192 (Bankr. E.D. Pa. 1991) .............................................................. 24

*In re Constable Plaza Associates, L.P.*,
    125 B.R. 98 (Bankr. S.D.N.Y. 1991) ............................................................... 31

*In re Crouse Group. Inc.*,
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ................................................................ 24

*In re Farmland Indus., Inc.*,
    294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) .................................................. 27

*In re Heatron, Inc.*,
    6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ...................................................... 29

*In re Los Angeles Dodgers, LLC*,
    457 B.R. 308 (Bankr. D. Del. 2011) ............................................................... 24

*In re Mellor*,
    734 F.2d 1393, 1400 (9th Cir. 1984) .............................................................. 31

*In re Orlando Trout Creek Ranch*,
    80 B.R. 190 (Bankr. N.D. Cal. 1987) .............................................................. 28

*In re Pine Lake Village Apartment Co.*,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982) .............................................................. 29

*In re Pursuit Athletic Footwear, Inc.*,
    193 B.R. 713 (Bankr. D. Del. 1996) ............................................................... 31

*In re Simasko Production Co.*,
    47 B.R. 444, 448-9 (D. Co. 1985) ................................................................... 25

*In re Sky Valley, Inc.*,
    100 B.R. 107 (Bankr. N.D. Ga. 1998) ............................................................ 25

*In re Snowshoe Co.*,
    789 F.2d 1085 (4th Cir. 1986) ........................................................................ 25

*Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*,
    808 F.2d 1393, 1397-98 (10th Cir. 1987)....................................................... 29

*McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Properties VI, Ltd.)*,
    88 B.R. 261, 265-66 (Bankr. C.D. Cal. 1988) ............................................... 28

# TABLE OF AUTHORITIES
**(Continued)**

**Page**

*Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug
    Stores, Inc.),*
    145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ........................................................ 23

*Stein v. FHA (In re Stein),*
    19 B.R. 458, 460 (Bankr. E. D. Pa. 1982) ...................................................... 28

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,*
    484 U.S. 365 (1988) .......................................................................................... 28

*Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re
    Ellingsen MacLean Oil Co.),*
    65 B.R. 358, 365 n.7 (W.D. Mich. 1986) ........................................................ 27

## STATUTES

11 U.S.C. § 361 ........................................................................................................ 25

11 U.S.C. § 362(c)(3) ............................................................................................... 24

11 U.S.C. § 363 ........................................................................................................ 28

11 U.S.C. § 363(c)(2) ............................................................................................... 28

11 U.S.C. § 363(e) ............................................................................................... 28, 29

11 U.S.C. § 364 ................................................................................................... 23, 24

11 U.S.C. § 364(a) .................................................................................................... 24

11 U.S.C. § 364(b) .................................................................................................... 24

11 U.S.C. § 364(c) ............................................................................................... 24, 25

11 U.S.C. § 364(c)(1) ................................................................................................ 26

11 U.S.C. § 364(d) ................................................................................. 24, 25, 26, 41

11 U.S.C. § 364(d) .................................................................................................... 26

11 U.S.C. § 364(d)(1) ................................................................................................ 24

11 U.S.C. § 364(d)(1)(B) ........................................................................................... 29

11 U.S.C. § 506 ........................................................................................................ 14

11 U.S.C. § 506(a) .................................................................................................... 31

11 U.S.C. § 507(b) .................................................................................................... 30

# TABLE OF AUTHORITIES
### (Continued)

**Page**

**OTHER AUTHORITIES**

Cal. Rev.& Tax. Code § 2192.1 ................................................................................. 14, 31

**RULES**

Fed. R. Bankr. P. 2002 ............................................................................................... 34

Fed. R. Bankr. P. 4001(b) .......................................................................................... 34

Fed. R. Bankr. P. 4001(c) ........................................................................................... 34

Fed. R. Bankr. P. 6004(a) .......................................................................................... 34

Fed. R. Bankr. P. 6004(h) .......................................................................................... 34

**PLEASE TAKE NOTICE** that on **December 16, 2019**, at **10:30 a.m.**, in Courtroom 202 of the U.S. Bankruptcy Court for the Central District of California, located at 1415 State Street, Santa Barbara, California, Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), will and does hereby move the Court for an order (1) authorizing the Trustee to obtain financing on the same terms previously authorized in the Court's final order subject to certain modifications; (2) authorizing the continued use of cash collateral; (3) scheduling a final hearing; and (4) granting related relief (the "Motion").

The Motion seeks to obtain additional postpetition financing and use of cash collateral on the same terms previously approved by the Court in its *Final Order for Emergency Priming and Superpriority Financing and Consensual Use of Cash Collateral by the Chapter 11 Trustee (docket no. 572)* (the "Final Order") approving postpetition financing with UBS, subject to certain modifications. The modifications include: (1) additional funding of about $3.5 million; (2) an extended six week budget period; (3) increased interest rate of prime plus 3.5%; and (3) new milestones and conditions. The Trustee is not changing the terms of the priming lien and superpriority administrate claim approved by the Court in the Final Order.

In accordance with Fed. R. Bankr. P. 4001(b)(1)(A) and (c)(1)(A), the proposed interim order is attached as Exhibit "1" hereto and a copy of the proposed Second Amendment to the Credit Agreement with UBS is attached as Exhibit "3" to the Trustee's Declaration. A copy of the Trustee's proposed budget is attached as Exhibit "2" to the Declaration of Tim Skillman.

**PLEASE TAKE FURTHER NOTICE** that the Court set a hearing on the Motion for December 16, 2019, at 10:30 a.m., in Courtroom "202" of the United States Bankruptcy Court for the Central District of California, Northern Division, located at 1415 State Street, Santa Barbara, California. Written oppositions, if any, must be filed and served no later than December 16, 2019, at 9:00 a.m. Oppositions and any replies may also be made orally at the hearing.

1

**PLEASE TAKE FURTHER NOTICE** that, in accordance with Federal Rule of Bankruptcy Procedure 4001(b)(1)(A) and (c)(1)(A), the following table summarizes the significant terms of the proposed use of cash collateral and the Second Amendment to the Credit Agreement:[1]

| Material Term or Type of Provision | Summary of Provision(s) (Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| Amount | Maximum principal amount of $6,910,039 less $3,410,272 already funded for a total of $3,499,767 (plus additional funding of up to $500,000) | SA § 2.1 | ¶ 6 |
| Interest rate | Prime + 3.5% | SA § 2.2 | ¶ 7 |
| Maturity date | Six months from the initial closing date | CA § 1.01 | ¶ 1 |
| Events of default | See the Credit Agreement. Most of the provisions were in the previously approved Credit Agreement and are not altered by the instant amendment and motion. **This is a summary only:** failure to pay any principal, interest, or any other amount of the loan when due and payable; inaccuracy of any representation or warranty; failure to observe or perform covenants; | CA § 7.01 | ¶ 1 |

[1] Because this table is provided, the Trustee requests that the Court waive the requirement in LBR 4001-2 that the Trustee file a separate *Statement Regarding Cash Collateral or Debtor in Possession Financing.*

[2] Citations in the chart are as follows: Credit Agreement ("CA") (*docket no. 474*, pp. 73-119); Second Amendment ("SA") Exhibit "3" hereto; and Final Order ("FO") (*docket no. 572*).

| Material Term or Type of Provision | Summary of Provision(s)<br><br>(Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
|  | default in the performance of or compliance with any term contained in any loan document<br><br>entry of an order (A) authorizing the Trustee to obtain additional financing or authorizing any person to recover from the collateral under § 506(c), authorizing the use of cash collateral without UBS' consent, (B) terminating the Trustee or appointing an examiner, (C) dismissing the bankruptcy case, (D) granting relief from the automatic stay, (E) modifying the orders approving the loan agreement, (F) filing a chapter 11 plan without UBS' consent, (G) consolidating or combining the Debtor with another person except pursuant to a plan with UBS' consent, (H) approving (or arising) an administrative claim senior to the claim of UBS, (I) invalidity of the claims or interests of UBS in connection with new loan (J) confirming a plan that does not provide for payment of the loan amount on the effective date, (K) the commencement of a challenge to UBS' pre-petition loan and or priority.<br><br>revocation, suspension or non-renewal of approval by a governmental agency<br><br>entry of judgments or orders for postpetition liability not adequately covered by insurance<br><br>invalidity of liens granted with respect to the loan. |  |  |

| Material Term or Type of Provision | Summary of Provision(s)<br><br>(Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| A grant of priority or a lien on property of the estate under § 364(c) or (d) | Superpriority administrative expense claim and priming lien (subject to valid, perfected and senior ad valorem taxes of Santa Barbara County) to the extent provided in FO) on all assets of the Debtor's estate, including certain lien on avoidance actions. The instant amendment and motion do not alter this. | CA § 2.04(b)<br><br>FO § 11 | ¶ 1; ¶ 6 |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | Adequate protection in the form of replacement and additional liens and a superpriority administrative claim for diminution in value of the prepetition collateral of UBS and GRL. The instant amendment and motion do not alter this. | FO ¶ 20-24 | ¶ 1; ¶6 |
| Cross-collateralization – i.e., clauses that secure prepetition debt by postpetition assets in which the secured party would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law | None. | N/A | N/A |
| Roll-up – i.e., provisions deeming prepetition debt to be postpetition debt or using postpetition loans from a prepetition secured party to pay part or all of that secured party's prepetition debt, other | None. | N/A | N/A |

| Material Term or Type of Provision | Summary of Provision(s) (Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| than as provided in § 552(b) | | | |
| Grant a replacement lien in an amount in excess of the dollar amount of the lien on cash collateral as of the petition date | None. | N/A | N/A |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien security the claim | A 60 day challenge period was previously set of January 13, 2020, subject to extension for cause, after which such claims become valid. The instant amendment and motion do not alter this. | FO ¶ 43 | ¶ 1 |
| A waiver or modification of Code provisions or applicable rules relating to the automatic stay | Modification of the stay to allow UBS to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Financing Liens granted to them pursuant to the proposed order

Modification of the stay to allow UBS to perform any act authorized by the proposed order.

UBS may seek relief from stay on five days' notice if default under postpetition borrowing.

The instant amendment and motion do not alter this. | FO ¶ 31 | ¶ 1 |
| Automatic relief from the automatic stay upon occurrence of certain events | None. | N/A | N/A |

| Material Term or Type of Provision | Summary of Provision(s) (Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364 | UBS's prior consent to file a Chapter 11 plan is only required if the proposed Chapter 11 plan does not provide for payment of the Obligations in full in cash on the effective date.<br><br>The instant amendment and motion do not alter this. | CA § 7.01<br><br>FO ¶ 9 | ¶ 1 |
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | None. | N/A | N/A |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | Borrowing liens perfected without recording or filing of financial statements<br><br>Perfection for adequate protection lien is provided by the order; not waiver of foreclosure or enforcement provisions.<br><br>The instant amendment and motion do not alter this. | CA § 2.04<br><br>FO ¶ 23 | ¶ 1 |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Parties shall have until January 13, 2020, or later date agreed to by UBS, or ordered by Court for good cause shown before the expiration of any applicable period, to challenge the validity, perfection enforceability priority, or extent of UBS' prepetition loan obligations or prosecuted fraudulent transfers or conveyances or asserting or | FO ¶ 43 | ¶ 1 |

| Material Term or Type of Provision | Summary of Provision(s)<br><br>(Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| | prosecuting any avoidance power claims against UBS on behalf of the estate. | | |
| The indemnification of any entity | The Trustee agrees to indemnify UBS for certain claims.<br><br>The instant amendment and motion do not alter this. | CA § 8.06 | ¶ 1 |
| A release, waiver, or limitation of any right under § 506(c) | All rights of the Debtor, the Trustee, and the estate to surcharge the collateral of UBS are hereby waived for rights accruing during the period that the Trustee receives advances or is authorized to use Cash Collateral pursuant to the Final Order or the Credit Agreement, provided that, as consideration for such waiver, the Trustee shall be authorized to obtain advances and use Cash Collateral for expenses in the Budget prior to any Event of Default or Termination Date, and further provided that the waiver shall apply whether or not the Trustee actually uses such advance or Cash Collateral for a specific expense set forth in the Budget or uses them for another purpose so long as such funds are actually disbursed by the Trustee.<br><br>The instant amendment and motion do not alter this. | FO ¶ 33 | ¶ 1 |
| The granting of any lien on any claim or cause of action arising under § 506(c) | Superpriority lien on all assets of the Debtor's estate, including lien on certain avoidance actions, but junior to *ad valorem* tax lien of Santa Barbara County to the extent provided in the FO. The lien does not secure the prepetition loan of UBS. | FO ¶11 | ¶ 1 |

| Material Term or Type of Provision | Summary of Provision(s)<br><br>(Nearly all of the applicable provisions were approved in the Final Order and are made applicable to the additional advances under the Second Amendment) | Location in Loan Agreement and/or Loan Documents[2] | Location in Proposed Interim Order |
|---|---|---|---|
| | The instant amendment and motion do not alter this. | | |
| The granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a) | Superpriority lien on all assets of the Debtor's estate, including lien on certain avoidance actions, but junior to *ad valorem* tax lien of Santa Barbara County to the extent provided in the FO.  The lien does not secure the prepetition loan of UBS.<br><br>The instant amendment and motion do not alter this. | FO ¶11 | ¶ 1 |
| With respect to a professional fee carve out, disparate treatment for professionals retained by a creditors' committee from that provided for the professionals retained by the debtor | There are separate line items in the budget for the Trustee and his professionals and for the Committee's Professionals, and a supporting carve-out. | FO ¶ 16 | ¶ 1; ¶ 8 |
| Pay down prepetition principal owed to a creditor | None | N/A | N/A |
| Findings of fact on matters extraneous to the approval process | None | N/A | N/A |
| Other | New milestones and conditions in Second Amendment | SA §2.3; 4.1 | N/A |

1        The Trustee's Motion is based upon this notice and Motion, the accompanying

2    Memorandum of Points and Authorities, Declaration of Michael A. McConnell, Declaration of Tim

3    Skillman, and Request for Judicial Notice, the papers and pleadings on file in this case, and such

4    other evidence as may be presented to the Court.

5

6    DATED:  December 11, 2019            DANNING, GILL, ISRAEL & KRASNOFF, LLP

7

8                                        By: _____

9                                            ERIC P. ISRAEL

10                                           Attorneys for Michael A. McConnell,
                                             Chapter 11 Trustee

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1569477.2  26932                              9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for HVI Cat Canyon, Inc. (the "Debtor"), has been the Trustee in this complex Chapter 11 case for a little more than seven weeks. During this initial period, the Trustee obtained Court approval for postpetition financing, on a final basis, to begin stabilizing the Debtor's operations, address critical health and safety issues, including regulatory compliance, review the various arrangements and agreements with the Debtor's affiliates, and retain key professionals to assist him in these tasks. Now that the initial period has passed, the Trustee requires Court approval of additional postpetition financing and cash collateral to operate the Debtor for the next six weeks – through January 24, 2020.

The Trustee requires additional postpetition financing to continue his efforts to stabilize the Debtor's operations and transition the Debtor away from its contractual relationships with its affiliates and toward reliable paying customers and market rate service providers. Doing so, the Trustee believes, will position the Debtor for an eventual sale. The Trustee's efforts have been complicated by the defaults of California Asphalt Production, Inc. ("CAP"), an affiliated entity, not paying for most of its October 2019 crude purchases, leaving an amount due of $828,250 for October 2019. As a result, revenues actually received by the Trustee are not what was originally forecast, and the Trustee does not believe that any additional funds will be forthcoming from CAP. Due to CAP's failure to pay for all its purchases, as of November 27, 2019, the Trustee ceased delivering oil and gas to CAP and determined, in his business judgment, to reject the agreements with the Debtor's affiliates, including CAP. The Trustee's two motions seeking Court approval to reject certain agreements with the Debtor's affiliates were heard by the Court on December 10, 2019, and approved by the Court at that time.

The new proposed budget contemplates the Trustee's efforts to stabilize the Debtor, transition the Debtor's operations away from its affiliates, and prepare it for an eventual sale. However, the Trustee now projects that the Debtor will not receive any additional income from CAP during the budget period. The new budget requires a cash infusion of about $2.82 million

over the six week period to maintain the Debtor's operations and accomplish the Trustee's goals of righting the ship, disentangling with the Debtor's affiliates, and preparing the Debtor's operating business for an eventual sale. The Trustee has, again, negotiated at arms' length with the Debtor's existing senior secured lender, UBS AG, London Branch ("UBS AG, London"), for an amendment to the previously approved loan facility from its related entity UBS AG, Stamford Branch ("UBS AG, Stamford" and together with UBS AG, London, "UBS") that he can draw down against to pay budgeted bills as they arise. The amendment is for additional funding of about $3.5 million, plus the flexibility to extend additional funding for consensual operations of up to $500,000 for up to two additional weeks upon mutual consent of UBS AG, Stamford and the Trustee without further order of the Court.[3]

The amendment will be extended to the Trustee largely on the same terms previously approved by the Court in its prior final order approving postpetition financing with UBS, subject to certain modifications. The modifications include the additional funding of about $3.5 million, an extended six week availability period, increased interest rate of prime plus 3.5%, and new milestones and conditions. The Trustee is not changing the terms of the priming lien and superpriority administrative claim approved by the Court in the Final Order or other terms that the Court approved as modified. The Trustee believes that the amended loan terms are reasonable and appropriate, and indeed the loan is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, and the Trustee requests that the Court make such a finding regarding the amendment and extended loan.

The Trustee respectfully requests that the Court grant the motion, approve the proposed borrowing under the terms proposed on an interim basis, including cash collateral use pursuant to the new proposed budget, and set a final hearing on the motion. The Trustee further prays for all other appropriate relief.

---

[3] The maximum principal amount of authorized advances is $6,910,039 less $3,410,272 already funded for a total of $3,499,767 of new financing availability (plus additional funding of up to $500,000). Of the newly available financing, $2,827,297 is committed for the purposes set forth in the budget and $672,470 may be advanced for Deferred Maintenance and other purposes not contemplated in the budget at the sole discretion of UBS AG, Stamford.

## II.

## STATEMENT OF FACTS

**A.    OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS**

The Debtor is a Colorado corporation authorized to conduct business in the state of California. It is the owner and operator of producing oil and gas interests in California. According to the Debtor, it owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County ("SMV"), North Belridge in Kern County ("Belridge"), and Richfield East Dome Unit in Orange County ("Redu").[4] The Trustee is advised that the Debtor has over 1,000 oil wells, although many of those are currently idle.

**B.    THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S APPOINTMENT**

On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Code"). The case was originally filed in the Southern District of New York. It was transferred to the Northern District of Texas, and then later to the Central District of California.

The Debtor initially operated its business as a "debtor in possession," allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was appointed.

On or about October 16, 2019, the Court entered its *Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee*.

On or about October 21, 2019, the U.S. Trustee appointed Michael A. McConnell as the Chapter 11 trustee in this case and, on or about October 22, 2019, Court entered its order approving the appointment.

---

[4] Docket no. 16, pp. 1-2, ¶ 2.

C.    **SECURED LIABILITIES**

1.    **UBS and GLR**

Prior to the commencement of the bankruptcy case, the Debtor and UBS AG, London had entered into certain loan arrangements evidenced by: (i) that certain First Lien Credit Agreement among the Debtor, Rincon Island Limited Partnership, GOGH, LLC, and UBS AG, London dated as of May 20, 2016 in the original principal amount of $50 million; and (ii) that certain Second Lien Credit Agreement among the Debtor, Rincon Island Limited Partnership, GOGH, LLC and UBS AG, London dated as of May 20, 2016 in the original principal amount of $50 million (collectively, the "Prepetition Credit Agreements" and the obligations arising thereunder, the "UBS Secured Debt").

The Debtor is also a party to that certain Amended and Restated Credit Agreement, as amended, with GLR dated as of May 20, 2016 (the "GLR Secured Debt").  Substantially all of the Debtor's assets are pledged as collateral for its obligations under the UBS Secured Debt, which is in first position, and the GLR Secured Debt.[5]  GLR is an affiliate and insider of the Debtor.

UBS AG, London and GLR are parties to that certain Subordination and Intercreditor Agreement ("Subordination Agreement") dated as of May 20, 2016. The Subordination Agreement provides, among other things, that GLR's liens, right to payment and right to exercise remedies are subordinate to those of UBS AG, London.[6]

According to the Debtor, on the Petition Date the outstanding amount due to UBS AG, London was approximately $114 million, and the outstanding amount due to GLR was approximately $104 million.  UBS asserts that the current outstanding amount due to UBS is at least $128 million which is disputed by Debtor.[7]

---

[5] Docket no. 43, p. 2 of 14, ¶ C.

[6] Docket no. 11, p. 3 of 10.

[7] Docket no. 43, p. 2 of 14, ¶ C.

1    UBS's expert valuation of the Debtor's assets concluded that they are worth between $50

2    million and $75 million.[8]

3    The Court agreed with UBS' valuation during the evidentiary hearings conducted on

4    October 3 and 4, 2019, in connection with the Debtor's cash collateral motion.[9] Thus, pursuant to

5    11 U.S.C. § 506, UBS is an undersecured creditor and GLR is entirely unsecured.

6    **2.    Santa Barbara, Orange & Kern Counties**

7    Santa Barbara asserts that it has a secured tax claim for *ad valorem* real property taxes owed

8    by the Debtor in excess of $4.7 million.[10]  However, Santa Barbara's real property tax liens do not

9    extend to the Debtor's revenues and income generated by the Debtor's business. *See* Cal. Rev.&

10   Tax. Code § 2192.1.  Therefore, the revenues and income proposed to be used by the Trustee are

11   not the cash collateral of Santa Barbara, and Santa Barbara is not entitled to any adequate

12   protection in relation to cash collateral use.  Pursuant to the Court's Final Order, as defined below,

13   the Trustee is not proposing to prime Santa Barbara's real property tax liens.  However, Orange

14   County and Kern County have filed proofs of claim, docketed as Claim No. 7 and Claim No. 2 on

15   the Court's Claims Register, that assert secured tax claims against the Debtor.  The tax liens of

16   Orange County and Kern County will be affected by the proposed lien priming, as was the case

17   under the Final Order.

18   **3.    The State Controller**

19   The Debtor's schedules also reflect that the California State Controller Tax Administration

20   Section ("State Controller") has a claim for unpaid "production assessments" in the amount of

21

22

23

---

[8] Docket no. 121, p. 8 of 31, ¶ 8.

24

25   [9] The Court stated that the value of the company ranged from $50 to 75 million.  Oct. 4, 2019
Tr. at 335:9-16.

26   [10] Santa Barbara appears to concede that its tax lien is only on the Debtor's real property
interests in Santa Barbara County.  Docket no. 206, p. 11 of 20.  Santa Barbara also did not cite to
27   any authority at the hearing that its lien extended to the Debtor's cash.  Oct. 8, 2019 Tr. at 16:10-
16, 17:4-14, 36:17-25.
28

$1,304,573.87, secured by real property in Orange and Santa Barbara Counties.[11]  As discussed below, the State Controller is adequately protected by the equity cushion afforded by its recorded tax liens on the Debtor's real property interests.

  **4.**  **Northern California Collection Services**

  The Debtor's schedules also reflect that Northern California Collection Service, Inc. ("Collection Service") recorded an abstract of judgment in the amount of $175,703.75, secured by real property in Santa Barbara County and JL-1 judgment lien filed with the Secretary of State.[12] Collection Service's JL-1 judgment lien was filed with Secretary of State after the UCC-1 financing statements of UBS and GLR and is junior to those interests.  As discussed below, Collection Service is not entitled to adequate protection for its judgment lien because it is "out of the money" and entirely unsecured pursuant to § 506(c) of the Code.

**D.**  **THE DEBTOR'S ORDER AUTHORIZING USE OF CASH COLLATERAL**

  On or about October 8, 2019, the Court entered its *Agreed Order for Consensual Use of Cash Collateral* (the "Prior Cash Collateral Order").  The Prior Cash Collateral Order, which covered weeks one through thirteen, provided, in relevant part, as follows:

-  The Debtor was authorized to use Cash Collateral through October 25, 2019, to pay ordinary course operating expenses in accordance with a budget that was attached to the Prior Cash Collateral Order (the "Approved Budget").

-  Without a court order or written consent of UBS and Santa Barbara, the Debtor was *not* authorized to make "any royalty payments or surface lease payments to insiders or affiliates of the Debtor."  The Debtor was required to hold such payments in an interest-bearing escrow or segregated account.

-  Subject to certain conditions (including the consent of the Committee and Santa Barbara), UBS may, by written agreement, amend the Approved Budget to extend the date through which Cash Collateral may be used and to increase the amount of Cash Collateral that may be used thereunder.

-  "[T]he Trustee is specifically authorized to use Cash Collateral pursuant to the terms" of the Prior Cash Collateral Order.

---

[11] Docket no. 171, p. 73 of 316.

[12] Docket no. 171, p. 73 of 317.

1    The Debtor's (and Trustee's) authorization to use cash collateral ended on October 25,

2    2019. Again, the Trustee was appointed on October 21, 2019.

3

4    **E.    THE TRUSTEE'S IMMEDIATE CASH FLOW NEEDS AND MOTION TO**

5    **ACCEPT AN ADVANCE FROM CAP**

6    On or about October 23, 2019, two days before authority for use of cash collateral expired

7    under the Prior Cash Collateral Order, the Trustee and UBS learned that the Debtor did not have

8    sufficient cash to fund payroll and other necessary operating expenses.

9    Due to the urgency, the Trustee requested that the Debtor's affiliate, CAP, fund the

10    Debtor's immediate needs.  CAP operates a certain refinery in Santa Maria, California.

11    Ultimately, CAP agreed to do so and, on or about October 24, 2019, the Trustee filed his

12    *Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by*

13    *California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain*

14    *"Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)*

15    (the "Emergency Motion").

16    Following the October 25, 2019 emergency hearing, the Court entered the *Order Granting*

17    *Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed*

18    *by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain*

19    *"Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)*,

20    granting authorizing the Trustee to accept a partial prepayment from CAP.

21    Thereafter, the Trustee requested that CAP advance $311,000 against October 2019

22    shipments.  However, CAP advanced only $115,817.37 of the $311,000 needed for payment of

23    payroll, payroll taxes, and royalties.  The money advanced by CAP was not sufficient to pay

24    royalties or the Debtor's other operating needs.

25

26

27

28

1569477.2 26932                                                16

**F.    THE TRUSTEE'S FIRST REQUEST FOR POSTPETITION FINANCING AND USE OF CASH COLLATERAL**

Due to the Trustee's continued immediate need for use of postpetition financing and cash collateral, the Trustee negotiated at arm's length with UBS and on or about November 7, 2019, filed his *Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing the Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief (docket no. 474)* (the "First Borrowing Motion").

The First Borrowing Motion sought authorization to obtain postpetition financing from UBS pursuant to a written loan facility set forth in a written credit agreement (the "Credit Agreement") attached as Exhibit "3" to the First Borrowing Motion, in the initial amount of $3,000,000 and use of cash collateral for five weeks (i.e. weeks 13 to 18) from October 26, 2019 through November 29, 2019, plus up to another two weeks of operations and further advances of up to another $500,000.

On or about November 8, 2019, the Court conducted an initial interim hearing on the First Borrowing Motion and entered its *Interim Order on Trustee's Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief (docket no. 480)* (the "Interim Order"), authorizing up to $267,317 of borrowings through a further interim hearing on November 12, 2019.

On or about November 12, 2019, the Court conducted a further interim hearing and authorized postpetition financing on an interim basis.  On or about November 18, 2019, the Court entered the *Second Interim Order on Trustee's Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief (docket no. 524)* (the "Second Interim Order").

On or about November 21, 2019, the Court conducted a final hearing on the First Borrowing Motion and authorized postpetition financing on a final basis.  On or about November 27, 2019, the Court entered its *Final Order for Emergency Priming and Superpriority Financing*

*and Consensual Use of Cash Collateral by the Chapter 11 Trustee* (docket no. 572) (the "Final Order"). A copy of the Final Order is attached as Exhibit "4" hereto.

Thereafter, on or about December 5, 2019, pursuant to the Final Order, the Trustee entered into an Amendment to Credit Agreement with UBS (the "First Amendment") which extended the term of the financing in the Credit Agreement for the two additional weeks and increased the advance limit by $500,000, up to $3,500,000. A copy of the First Amendment is attached as Exhibit "5" hereto. The First Amendment extended the use of cash collateral and postpetition borrowing through December 13, 2019 (i.e. week 20).

Notice of the First Amendment was filed with the Court as required on or about December 6, 2019 (*docket no. 595*).

## G.    CAP'S FAILURE TO PAY FOR PURCHASES AND THE TRUSTEE'S REJECTION MOTIONS

Since the Petition Date, CAP has failed to pay the Debtor in full for the crude oil delivered by the Debtor to CAP and has purported to set off pre-petition and post-petition amounts owed by the Debtor to CAP against amounts owed by CAP to the Debtor. CAP has also purported to set off amounts owed by CAP to the Debtor for amounts the Debtor purportedly owes to its affiliates GIT, Inc. and GTL1, LLC, in violation of the automatic stay. The latter "triangular setoffs" have included payments to attorneys and insiders in violation of the Bankruptcy Code.

This conduct continued after the Trustee's appointment. In particular, on or about November 20, 2019, CAP paid the Trustee only $300,000 of the $1,128,250 that it owed to the Debtor for the month of October 2019. The Trustee initially extended the due date for the $828,250 that was still due for October 2019 to November 27, 2019. However, on November 27, 2019, CAP failed to pay the Trustee the outstanding amount that was due for October 2019, or any other sum. The Trustee was subsequently told that CAP was having a liquidity problem and that CAP would not be making any more payments to the Debtor for CAP's purchases in the month of October 2019. As a result, the Trustee ceased virtually all shipments to CAP on that day – November 27, 2019.

1    Accordingly, on or about November 27, 2019, the Trustee filed a *Motion for Order*

2   *Authorizing the Rejection of Oil Purchase Contracts (Contract No. COP-003 for Belridge Crude*

3   *Oil and All Amendments and Contract No. COP-004 for Richfield Heavy Crude Oil and All*

4   *Amendments) with California Asphalt Production, Inc., formerly known as Santa Maria Refining*

5   *Co. and Greka Refining Company (docket no. 573)* (the "First Rejection Motion") seeking to reject

6   the Debtor's supply agreements with CAP relating to Redu and Belridge.

7    Thereafter, on or about December 4, 2019, the Trustee filed his *Motion for Order*

8   *Authorizing the Rejection of All Contracts and Agreements with California Asphalt Production,*

9   *Inc., Formerly Known as Santa Maria Refining Co. and Greka Refining Company, and GTL1, LLC,*

10   *Not Previously Included in Prior Motion to Reject (Docket No. 573) (docket no. 586)* (the "Second

11   Rejection Motion") seeking to reject all remaining agreements between the Debtor and CAP,

12   including with respect to SMV, and any agreements with GTL1, LLC.

13    At the request of the Trustee, the Court advanced the hearing on the First Rejection Motion

14   and shortened the time for the hearing on the Second Rejection Motion for December 10, 2019, at

15   11:00 a.m.  The Court granted the First Rejection Motion and the Second Rejection Motion in

16   orders entered on or about December 11, 2019 *(docket nos. 612 and 613)*.

17

18   **H.    THE TRUSTEE'S NEED FOR FURTHER POSTPETITION FINANCING AND USE**

19   **OF CASH COLLATERAL**

20    The Trustee is now seeking authority for further postpetition financing and to use cash

21   collateral for an additional six weeks (i.e. weeks 21 to 26) from December 16, 2019 through

22   January 24, 2020 (the "Second Budget Period").  The Trustee requires the use of cash collateral to

23   pay payroll and related taxes, and all ordinary and necessary expenses incurred or to be incurred in

24   operating the Debtor and the costs associated with administering the estate.  Without the continued

25   use of cash collateral, the Trustee will not have the funds required to pay the Debtor's employees,

26   operate the Debtor, protect public health and safety and maximize the value of this estate.

27   Accordingly, the Trustee seeks authority to use cash collateral from December 16, 2019 through

28   January 24, 2020 (i.e., the Second Budget Period), in accordance with the Trustee's proposed

1569477.2 26932                                    19

budget that is attached as Exhibit "2" to the Declaration of Tim Skillman hereto (the "Second Budget"), with a 10% cumulative variance.

The Trustee elected to proceed with a <u>six week</u> budget because he has now determined that it is necessary to disentangle the Debtor from its prepetition relationships with its affiliates in order to move forward. This decision will affect the types and amounts of future expenses, and the Trustee determined that a six week budget provided for in the Second Budget would be prudent.

The Second Budget reflects the anticipated failure of CAP to make any further payments loss of income from CAP for purchases of SMV, Belridge and Redu oil and gas. In addition, the Debtor's operations will not generate sufficient cash to pay its expenses over the course of the Second Budget Period, and will result in a net negative cash flow of approximately $2.82 million. The Trustee's Second Budget includes, over the Second Budget Period, $2.32 million for operating expenses (payroll, consultants, utilities, electricians, welders, maintenance, gasoline, transportation, vacuum trucks, utilities, and permit fees, among other items), $804,493 of general and administrative expenses (bank charges payable to depositary banks (i.e., not UBS which receives no payments under the Budget), professional fees, U.S. Trustee fees, and insurance, among other items), and $420,000 of health and safety expenses for SMV, Belridge and Redu.

In preparing the Second Budget, the Trustee and his professionals were, again, particularly sensitive to health and safety issues. The health and safety category accounts for approximately $420,000 of the Second Budget. It appears to the Trustee that UBS shares his strong commitment to health and safety, and it is the goal of the Second Budget to adequately provide for it. As with the initial Credit Agreement, UBS agreed to every request of the Trustee in the Second Budget with respect of health and safety.

Because the cash flow is negative, as discussed below, the Trustee needs to obtain further financing and the right to use cash collateral. This second borrowing motion proposes to increase the Trustee's authority to borrow up to an additional $3.5 million from UBS AG, Stamford over the Second Budget Period to meet the Trustee's ongoing expenses of operating the Debtor as set forth

in the Second Budget.[13]  Between the amounts previously approved by this Court and the additional amounts proposed by this second borrowing motion, the aggregate authorized borrowing is $6,910,039.

To address timing variances for any line item in the Trustee's Second Budget between when the expense is projected to be incurred and when it is actually paid, the Trustee seeks authority to pay any expense in the Trustee's Second Budget in the week it is projected to be incurred or in the following week (or weeks), whenever it is actually paid.

Because projections are forward-looking, they can never be entirely accurate.  Thus, to protect the Trustee from fluctuations in expenses and costs, the Trustee seeks permission to exceed any line item in the Second Budget by up to ten percent (10%), tested on a cumulative basis by disbursement categories contained in the Second Budget, subject to the aggregate budget limit.

The Trustee's Second Budget also includes reserves for the fees and costs of the Trustee and his professionals and the Committee's professionals.  The estimate is subject to many variables and, accordingly, the Trustee is not seeking authority to pay those fees at this time.  Interim payments have been authorized by separate order (*docket no. 610*) (the Fee Procedures Order").  The funds in the Second Budget for professionals to be provided by UBS AG, Stamford will be deposited into two segregated accounts held by the Trustee (one account for the Trustee and his professionals, and one account for the Committee's professionals).  The funds in the segregated accounts will only be distributed by the Trustee only after the professionals comply with the requirements of the Fee Procedures Order.  The Second Budget provides for an additional $20,000 per month to the Committee on a pro-rated basis commencing on the consensual extension of the initial Budget on December 1 (i.e. the Second Budget provides for a pro rata allocation during that extended period).

---

[13] Of the newly available financing, $2,827,297 is committed for the purposes set forth in the budget and $672,470 may be advanced for Deferred Maintenance and other purposes not contemplated in the budget at the sole discretion of UBS AG, Stamford.  The proposed order also allows, but does not require, UBS and the Trustee to extend the budget for up to two more weeks and advance up to an additional $500,000.

## I.    THE SECOND AMENDMENT TO THE CREDIT AGREEMENT

The Trustee proposes to obtain additional postpetition financing from UBS AG, Stamford pursuant to the Second Amendment to the Credit Agreement (the "Second Amendment") on the same terms approved by the Court in the Final Order, subject to a few modifications. UBS AG, Stamford has agreed to advance up to $2,827,297 for the purposes set forth in the Second Budget and an additional $672,470 may be advanced for Deferred Maintenance and other purposes not contemplated in the budget at the sole discretion of UBS AG, Stamford. A copy of the Second Amendment is attached as Exhibit "3" hereto.

The Court previously approved the terms of the Credit Agreement, subject to the limitations of the Final Order, and UBS is not requesting, and the Trustee is not seeking, to provide UBS with any further protections. As set forth in the Final Order, UBS was granted a first priority priming lien and superpriority administrative expense claim on all assets of the Debtor's estate other than the carve-out for professional fees and any valid, senior perfected and non-avoidable ad valorem tax liens in favor of Santa Barbara County. As set forth in the Final Order, the priming lien and allowed superiority administrative expense claim granted to UBS do not attach to (a) avoidance claims of the estate against any party other than the Debtor's current and former insiders and affiliates or (b) the proceeds thereof. UBS also agreed, for the benefit of the Trustee and the Committee, that it will not look to recover from avoidance claims or proceeds without first making a reasonable good faith effort to collect from its prepetition collateral. *See* Exhibit "4" at par. 11.

Now, as set forth above, the Trustee seeks to obtain additional postpetition financing from UBS on the terms previously approved in the Final Order and modified by the Second Amendment.

Without limiting the terms set forth in the Final Order, the Second Amendment, and the above chart required by Federal Rule of Bankruptcy Procedure 4001(b)(1)(A) and (c)(1)(A), the following is a brief summary of the modifications to the Credit Agreement set forth in the Second Amendment:

1.    The Second Amendment increases the maximum principal amount available under the Credit Agreement by up to an additional $3,499,767, of which $2,827,297 is committed for the

purposes set forth in the Second Budget and $672,470 may be advanced for Deferred Maintenance and other purposes not contemplated in the budget at the sole discretion of UBS AG, Stamford.

2.    The interest rate for advances after the effective date of the Second Amendment is prime plus 3.5%.  The Trustee believes this is a fair change to reflect the limitations on priming liens granted by the Court in approving the Credit Agreement as well as the revenue defaults occasioned by CAP's failure to pay.

3.    The "Availability Period" is extended to January 24, 2020.

4.    New milestones and covenants are included in sections 2.3 and 4.1 of the Second Amendment.

As noted above, the Trustee seeks authority to extend the budget for up to two more weeks and advance up to $500,000 beyond the amount provided in the Second Amendment without further order of the Court, although neither the Trustee nor UBS AG, Stamford are committed to do so.  The Trustee does not believe that any other financing than that offered by UBS under the Second Amendment to the Credit Agreement is available to him.  The negotiations were conducted at arm's length.  The proposed Second Amendment contains reasonable terms, and the Trustee believes that it is in conformity with the critical  terms of the Final Order previously approved by the Court.

## III.

## RELIEF REQUESTED

A.    **THE COURT SHOULD AUTHORIZE THE TRUSTEE TO OBTAIN CREDIT PURSUANT TO 11 U.S.C. § 364**

1.    **Applicable Legal Standard**

Section 364 allows the Court to authorize postpetition financing and expressly allows courts to authorize protections designed to assure repayment of the postpetition loans. *Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992).  Section 364 establishes a series of possible postpetition transactions by which a trustee might obtain credit:

1    (i) unsecured credit with administrative expense status  (Sections 364(a) and (b));

2    (ii) unsecured credit with priority over all other administrative expenses (i.e., superpriority)
     (Section 364(c)(1));

3

4    (iii) credit secured by a lien on unencumbered priority; (Section 364(c)(2);

5    (iv) credit secured by a junior lien on encumbered property (Section 364(c)(3); and

6    (v) credit secured by a lien on encumbered property senior or equal to existing liens
     provided that adequate protection is provided to holders of existing liens (Section 364(d)).

7         The Court has discretion to approve proposed postpetition financing, which should be

8    exercised as long as the proposed financing does not leverage the bankruptcy process or its purpose

9    and the benefit to the estate remains of paramount interest as opposed to the individual interests of

10   the parties. *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

11        Generally, courts apply a three-part test to determine whether a trustee or debtor in

12   possession may obtain credit under § 364(c).  Under such test, a trustee or debtor may incur

13   postpetition financing pursuant to § 364(c) if it demonstrates that (a) it cannot obtain credit

14   unencumbered or without superpriority status, (b) the financing is necessary to preserve assets of

15   the estate, and (c) the terms of the loan are fair, reasonable and adequate. *See In re Crouse Group.*

16   *Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *In re Aqua Assocs.*, 123 B.R. 192, 195-96

17   (Bankr. E.D. Pa. 1991); *In re Los Angeles Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).

18   Section 364(d) authorizes a trustee or debtor in possession to obtain credit or incur debt secured by

19   a senior or equal lien on property of the estate that is subject to a lien if the trustee or debtor is

20   unable to obtain such credit otherwise and the interests of secured creditors whose liens are being

21   primed are adequately protected.  11 U.S.C. § 364(d)(1); *see also Aqua Assocs.*, 123 B.R. at 196.

22        Against this statutory backdrop, courts will evaluate the facts and circumstances of a

23   debtor's case and accord significant weight to the necessity for obtaining the financing. *See, e.g.,*

24   *Ames*, 115 B.R. at 40-41.  A debtor in possession or trustee is generally permitted to exercise its

25   business judgment consistent with its fiduciary duties when evaluating the necessity of proposed

26   protections for a party extending credit under § 364.  *Id.* at 38.  The Court should give broad

27   deference to the business decision of the debtor or trustee, particularly with respect to the need for

28   and proposed use of funds. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Co.

1569477.2 26932                                    24

1    1985) (authorizing interim financing agreement where debtor's best business judgment indicated

2    financing was necessary and reasonable for the benefit of the estate); *Ames,* 115 B.R. at 38 (with

3    respect to postpetition credit, courts "permit debtors in possession to exercise their basic business

4    judgment consistent with their fiduciary duties").

5         To show that the credit required is not obtainable on an unsecured basis, a trustee or debtor

6    needs only to demonstrate "by a good faith effort that credit was not available" without the

7    protections afforded to potential lenders by § 364(c) or (d). *In re Snowshoe Co.*, 789 F.2d 1085,

8    1088 (4th Cir. 1986). Of course, the Code "imposes no duty to seek credit from every possible

9    lender before concluding that such credit is unavailable." *Id.* If a trustee or debtor is unable to

10   obtain credit under § 364(c), they may obtain credit secured by a senior or equal lien on property of

11   the estate as long as there is adequate protection of any pre-existing secured creditor's interests in

12   the property. Although the Code does not explicitly define "adequate protection," § 361 provides

13   that it may take the form of a cash payment or periodic cash payments to the extent that there is a

14   decrease in the lien holder's property interest, an additional or replacement lien to the extent that

15   there is a decrease in the lien holder's property interest, or other relief that will result in a secured

16   party's realizing the indubitable equivalent of its property interest. Where the proposed use of

17   funds from additional postpetition financing augment the value of the secured creditor's collateral,

18   adequate protection exists. *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1998).

19        **2.    The Proposed Borrowing is Appropriate**

20        In this case, it should go without saying that the Trustee is unable to obtain financing on an

21   unsecured basis or secured by a junior lien on the Debtor's assets. UBS is the Debtor's senior

22   secured creditor and, as set forth above, the total amount owed to UBS is not less than $128

23   million. All of the Debtor's assets are collateral for UBS' debt. Santa Barbara asserts a tax lien for

24   about $4.7 million, which is senior to UBS' prepetition lien on real property interests and some of

25   its postpetition lien. GLR asserts a lien junior to UBS of $104 million. With a value of the

26   Debtor's assets in the $50 million to $75 million range, there are no lenders that would agree to

27   lend on an unsecured or junior secured basis. Any subordinated loan that the Trustee could obtain

28

1569477.2 26932                                    25

1  would in effect be unsecured because there is no collateral value over and above what UBS is

2  owed.

3      Therefore, one would, again, expect that the Trustee would look to UBS, as the Debtor's

4  largest secured creditor, to obtain postpetition financing because UBS has the most to gain from

5  seeing the Trustee succeed in preserving the Debtor's business operations.

6      UBS has agreed to provide the Trustee with additional postpetition credit secured by a

7  senior superpriority "priming" lien pursuant to § 364(d) and an allowed superpriority

8  administrative claim pursuant to section 364(c)(1) on the same material terms set forth in the Final

9  Order.  UBS does not request that the nature of the lien previously approved by the Court change.

10  The proposed terms take into account the interests of, on the one hand, UBS (in ensuring that its

11  postpetition investment is protected) and, on the other hand, the necessity of the Trustee in

12  obtaining the proposed postpetition financing on reasonable terms.

13      Here, based on the existing financial condition of the Debtor and the totality of the relevant

14  circumstances, the Trustee exercised his sound business judgment in determining that the

15  additional postpetition financing proposed on the same terms set forth in the Final Order, as

16  modified by the Second Amendment, is appropriate and necessary under the circumstances.  The

17  Trustee does not believe that he would have been able to obtain additional postpetition financing

18  from another source on terms more favorable than those described herein.  Particularly here where

19  UBS has already been granted a senior superpriority "priming" lien pursuant to § 364(d) and an

20  allowed superpriority administrative claim pursuant to section 364(c)(1) and CAP has failed to pay

21  all the postpetition amounts that are due to the Debtor.

22      The Trustee has also determined that it is in the estate's best interests that he borrow funds

23  from UBS that he needs to fund the Trustee's Second Budget in order to avoid immediate and

24  irreparable harm to the estate and preserve the Debtor's ongoing business operations and the

25  estate's assets.  As described herein, CAP has not paid the Trustee for most of the amounts that are

26  due the Debtor for October 2019 and anticipating no payments for November 2019, the Trustee

27

28

1    rejected the agreements between the Debtor and CAP.[14]  Without the funds from CAP and

2    additional postpetition financing (which current financing authorized by the Final Order ends on

3    December 13, 2019), the Trustee needs the postpetition financing to pay the ongoing expenses set

4    forth in the Trustee's Second Budget.  The Trustee's immediate acquisition of credit from UBS is

5    in the best interests of the estate and the creditors and is necessary for the continued business

6    operations due to the negative cash flow reflected in the Trustee's Second Budget.  The Trustee

7    needs the cash to fund the Second Budget, including, meeting payroll and paying certain other

8    expenses that the Trustee and his proposed CRO have identified as high-priority items.  Absent the

9    financing and use of the cash collateral, requested herein, the Trustee would be unable to operate

10   the Debtor's business and the Trustee would be unable to preserve the assets of the estate,

11   including addressing the health and safety items and deferred maintenance.  The Trustee simply

12   believes that the proposed financing is necessary, as set forth in the Second Budget, to preserve the

13   value of the estate for the benefit of all creditors and other parties in interest.

14        Finally, in considering whether the terms of postpetition financing are fair and reasonable,

15   courts consider the terms in light of the relative circumstances and disparate bargaining power of

16   both the debtor and potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr.

17   W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

18   *Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor

19   may have to enter into hard bargains to acquire funds).  Here, the terms of the Second Amendment

20   were negotiated in good faith and at arm's length between the Trustee and UBS, resulting in an

21   amendment (i.e., the Second Amendment) to the Credit Agreement, as modified by the Final Order,

22   that is designed to permit the Trustee to continue to operate the Debtor's business going forward

23   and address the immediate needs set forth in the Second Budget over the next six weeks.  The

24   Second Amendment contemplates UBS loaning the Trustee an additional $3.5 million on the same

25   material terms of the Final Order.

26

27   _____

[14] Replacement revenues are not expected to start from third party buyers until January 20,

28   2020.

1       The interim relief and order are necessary to preserve the business as an ongoing concern

2 and thereby prevent immediate and irreparable harm to the Debtor's business and the estate

3 pending a final hearing.

4

5 **B.**     **THE COURT SHOULD AUTHORIZE THE TRUSTEE'S CONTINUED USE OF**

6     **CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363**

7       The Trustee's use of cash collateral is governed by 11 U.S.C. § 363, which permits a

8 Trustee to use cash collateral only if: (a) each entity having an interest in the cash collateral

9 consents to such use; or (b) the Court, after notice and a hearing, authorizes such use.  11 U.S.C. §

10 363(c)(2).  In addition, 11 U.S.C. § 363(e) provides that, at the request of a party with an interest in

11 the cash collateral, the Court shall prohibit or condition the use of cash collateral "as is necessary to

12 provide adequate protection of" any interest asserted in the cash collateral.  11 U.S.C. § 363(e).

13       Pursuant to § 363(e), a secured creditor is only entitled to adequate protection to the extent

14 that the use of the collateral will result in a decrease in "the value of such entity's interest in such

15 property." *See, e.g., United Savings Association of Texas v. Timbers of Inwood Forest Associates,*

16 *Ltd.*, 484 U.S. 365 (1988); *McCombs Properties VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs*

17 *Properties VI, Ltd.)*, 88 B.R. 261, 265-66 (Bankr. C.D. Cal. 1988) (applying *Timbers* to hold that

18 secured creditor's interest in cash and proceeds derived from a debtor's operations was adequately

19 protected where the value of the collateral was not declining during the bankruptcy case). However,

20 "[w]here the value of the collateral is increasing, the passage of time in itself constitutes adequate

21 protection." *In re Orlando Trout Creek Ranch*, 80 B.R. 190 (Bankr. N.D. Cal. 1987) (bankruptcy

22 court ordered debtor to continue to use cash collateral to cover operating expenses without further

23 protection for the secured creditor where value of collateral is maintained or increased simply

24 through continued operation of the debtor's business).

25       In other words, the Court may allow the Trustee's continued use of cash collateral, whether

26 consensual or not, where such use maintains, preserves or enhances the value of the Debtor's

27 estate.  For example, in *Stein v. FHA (In re Stein)*, 19 B.R. 458, 460 (Bankr. E. D. Pa. 1982), the

28 court allowed a debtor to use cash collateral where the secured party was under-secured, finding

1569477.2 26932

28

that the use of the cash collateral was necessary to the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." *Stein*, 19 B.R. at 460; *see also, In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash collateral generated from rental income to enhance the value of real property and secured creditor's claim). Further, it is well-established that a bankruptcy court, where possible, should resolve issues in favor of maximizing value for all creditors, not just the secured creditors. *Mbank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397-98 (10th Cir. 1987); *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980).

The Trustee should be further authorized to use the cash collateral for the proposed <u>six week</u> Second Budget Period in the ordinary course of business pursuant to the Trustee's Second Budget because the secured creditors' interests in the cash collateral is adequately protected, as discussed below, by the use of cash collateral to operate, preserve and maintain the Debtor's business, as set forth in the Trustee's Second Budget.

## C.     THE PROPOSED ADEQUATE PROTECTION FOR THE PROPOSED PRIMING AND USE OF CASH COLLATERAL SHOULD BE APPROVED

As set forth above, parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection. 11 U.S.C. § 363(e). In addition, a trustee may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the trustee, among other things, provides "adequate protection" to those parties whose liens are primed. 11 U.S.C. § 364(d)(1)(B). These terms are the same material terms previously authorized by the Court in the Final Order, except that they will apply to the funds advanced pursuant to the Second Amendment.

### 1.     UBS Consents to the Motion

UBS has consented to the use of cash collateral as set forth in the Motion, proposed order (Exhibit "1"), and subject to the terms of the Final Order, this Motion, Credit Agreement, Second Amendment, and the proposed Second Budget. UBS consented because the Trustee proposes to grant UBS a senior secured super priority lien and administrative expense claim (subject to *ad*

*valorem* taxes of Santa Barbara) in exchange for the financing set forth in the Second Amendment. The Trustee was required by UBS to provide the aforementioned priming lien, administrative expense claim, and additional adequate protection, as set forth below, in order to obtain the Second Amendment to the Credit Agreement and UBS's consent to use cash collateral.

The additional adequate protection previously authorized by the Final Order, agreed to by UBS, and again proposed herein, as set forth in the proposed order (Exhibit "1" at ¶ 1), to UBS for the use of its cash collateral consists of:

(a)    additional and replacement security interests and liens, to the full extent of any diminution in value of UBS' collateral, consisting of (a) a perfected first priority senior security interest in and lien upon all cash of Debtor and any investment of the funds of Debtor, whether existing on the Petition Date or thereafter acquired; and (b) a perfected first priority senior security interest in and lien upon all other pre- and postpetition property of Debtor, whether existing on the Petition Date or thereafter acquired; and

(b)    to the extent that the postpetition collateral granted above does not provide adequate protection of UBS' cash collateral, a super-priority administrative expense claim under § 507(b) of the Code.

(c)    The adequate protection liens shall not attach to avoidance power claims.

The Trustee believes that such adequate protection is reasonable under the circumstance and anticipates that the aforementioned first priority liens and security interests will adequately protect UBS from any diminution in the value of its interest in its collateral resulting from the use of the cash collateral and is consistent with the non-exclusive factors set forth in § 361.

**2.    Adequate Protection for GLR**

As set forth in the Final Order and again proposed herein, GLR will be provided adequate protection for its junior prepetition interest on the Debtor' assets with additional and replacement security interests and liens to the extent of any diminution in value of GLR's prepetition collateral. As set forth in the Final Order, and as proposed herein, the junior adequate protection liens shall not attach to avoidance claims of the estate or proceeds thereof and shall be junior only to permitted liens, the carve-out for professionals, and UBS' senior adequate protection liens.

1    **3.    California Collection is Not Entitled to Adequate Protection**

2    California Collection's judgment lien is not entitled to adequate protection because its

3    secured lien is "out of the money" in light of the $50 to $75 million valuation of the Debtor's assets

4    and are entirely unsecured pursuant to § 506(a) of the Code.

5    **4.    Santa Barbara is Adequately Protected and/or No Further Adequate**

6    **Protection is Required**

7    With respect to the use of cash collateral, as set forth above, Santa Barbara is not entitled to

8    adequate protection because Santa Barbara's real property tax liens do not extend to the Debtor's

9    revenues and income generated by the Debtor's business. *See* Cal. Rev.& Tax. Code § 2192.1.

10    With respect to the priming lien, as set forth in the Final Order, and again as proposed

11    herein, the Trustee is not proposing to prime Santa Barbara's real property tax liens for the new

12    advances.  Santa Barbara is adequately protected by a significant equity cushion, thus no adequate

13    protection is required.

14    **5.    Orange County, Kern County and the State Controller are Adequately**

15    **Protected**

16    With respect to the interests of Orange County, Kern County and the State Controller, their

17    tax liens are adequately protected from the "priming" superpriority lien authorized in the Final

18    Order and again proposed herein for the Second Amendment.  First, Orange County, Kern County

19    and the State Controller are adequately protected by the equity cushion afforded by their recorded

20    tax liens on the Debtor's real property interests.   The value of the Debtor's real property interests

21    far exceeds the amounts of the recorded liens. *See In re Mellor*, 734 F.2d 1393, 1400 (9th Cir.

22    1984).

23    Second, they are adequately protected because the Trustee proposes to use the funds set

24    forth in the Second Budget to operate and maintain the Debtor's business.  It is black-letter law that

25    a secured creditor is adequately protected where, as here, the cash collateral is used to maintain and

26    preserve the creditor's collateral. *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713

27    (Bankr. D. Del. 1996); *see also, In re Constable Plaza Associates, L.P.*, 125 B.R. 98 (Bankr.

28    S.D.N.Y. 1991) (secured creditor adequately protected where cash collateral used to preserve value

1  of assets).  The cash collateral and financing proposed in the Second Amendment, will be used by

2  the Trustee, as reflected in the Trustee's Second Budget, to continue to operate the Debtor's

3  business for an additional six weeks through January 24, 2020, and maintain and preserve the value

4  of the Debtor's business for the benefit of all creditors.  UBS, and all secured creditors, will be

5  adequately protected by the Trustee's use of cash collateral and the proposed financing, as reflected

6  in the Trustee's Second Budget, to operate,  maintain and preserve the Debtor's ongoing business

7  operations.

8         Accordingly, the Court should find that the secured creditors are adequately protected and

9  approve the Trustee's use of cash collateral and the Second Amendment to the Credit Agreement

10  on terms substantially the same as those set forth in the proposed order attached to the Trustee's

11  Declaration as Exhibit "1" hereto.

12

13  **D.     THE CARVE-OUT IS APPROPRIATE**

14         The proposed order authorizes a further carve out for the fees and expenses for the Trustee,

15  the Trustee's professionals and the Committee's professionals.  The carve-out conforms to the

16  terms previously approved in the Final Order and provides for the fees and expenses of the Trustee

17  and his professionals and the Committee's professionals, as set forth in the Second Budget.  The

18  carve-out protects the Trustee and his professionals and the Committee's professionals in whol or

19  in part for their work, as set forth in the Second Budget, and protects against the administrative

20  insolvency of the estate by providing a mechanism for payment thereof, notwithstanding the grant

21  of liens and claims under the Final Order and subsequent orders of the Court.  *See Ames*, 115 B.R.

22  at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest

23  because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are

24  sorely prejudiced").

25

26

27

28

**E.    IT IS APPROPRIATE TO CONTINUE GRANTING A LIMITED LIEN ON AVOIDING POWER CLAIMS**

UBS is requesting that the limited lien on the estate's avoidance power claims, as previously approved in the Final Order only against the Debtor's current and former insiders and affiliates, apply to the additional amount of about $3.5 million advanced in connection with the Second Amendment (plus additional funding of up to $500,000). UBS does not request that the nature of the lien previously approved by the Court change. UBS is not receiving a replacement lien on avoidance power claims as adequate protection for the Trustee's use of its cash collateral.

UBS is requiring the lien, which the Court previously approved in the Final Order, on avoidance power claims only against the Debtor's current and former insiders and affiliates in order for the Trustee to obtain the loan. The superpriority lien will be paid first because it is ahead of all other liens of the estate, including the prepetition lien of UBS. However, UBS has agreed, as it previously did under the Final Order, that it will not look to recover from avoidance claims or proceeds without first making a reasonable good faith effort to collect from is prepetition collateral. The Trustee believes that this is a reasonable compromise.

**F.    THE INCREASED INTEREST RATE IS APPROPRIATE**

Although the interest rate applicable under the Credit Agreement is increasing from prime plus 1.5% to prime plus 3.5% pursuant to the Second Amendment, the Trustee believes, based on his experience with debtor in possession and trustee financing, that the increased interest rate is appropriate and reasonable under the circumstances. In particular, though the Court approved certain protections requested in the initial financing, it ultimately did not provide all of the protections which had been proposed. In addition, CAP defaulted on payment for the estate's oil, creating another default under the financing. Both of these factors create additional risk for UBS's additional financing under the Second Amendment and UBS must account for the additional risk that it is taking with respect to the additional postpetition financing by increasing the interest rate. The Trustee also notes that UBS is not charging any points or fees in connection with the proposed loan.

1569477.2 26932

33

**G.    NOTICE WITH RESPECT TO INTERIM ORDER**

The Trustee submits that, given the Debtor's financial condition, and the estate's immediate need for authorization to use cash collateral and obtain credit, an expedited hearing as contemplated by Fed. R. Bankr. P. 4001(b) and (c) is warranted.

**H.    NOTICE WITH RESPECT TO FINAL HEARING**

Pursuant to Fed. R. Bankr. P. 4001(b) and (c), the Trustee respectfully requests that he be authorized to provide notice of the final hearing to be scheduled by the Court no earlier than 14 days after service of the Motion by serving a copy of the Motion (to the extent not previously served) together with any interim order granting this Motion, on interested parties.  The Trustee submits such notice constitutes sufficient notice of the final hearing pursuant to Fed. R. Bankr. P. 4001(b) and 2002.

**I.    WAIVER OF RULE 6004(A) AND 6004(H)**

To implement the foregoing successfully, the Trustee requests that the interim order to be entered by the Court provide that notice of the relief requested herein satisfies Fed. R. Bankr. P. 6004(a) and that the Trustee has established cause to exclude such relief from the 14-day stay period under Fed. R. Bankr. P. 6004(h), with respect to the interim order submitted herewith so that there will be no interruption of the Trustee's ability to operate the Debtor's business.

1

IV.

2

**CONCLUSION**

3       For the reasons set forth above,  the Court should enter the interim order, substantially in

4   the form attached as Exhibit "1" hereto, and granting the relief requested herein and such other

5   relief is just and proper under the circumstances.

6

7   DATED: December ⎵⎵, 2019            DANNING, GILL, ISRAEL & KRASNOFF, LLP

8

9                                      By: _____

10                                         ERIC P. ISRAEL
                                           Attorneys for Michael A. McConnell,
11                                         Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1569477.2  26932                        35

# DECLARATION OF

# MICHAEL A MCCONNELL

## DECLARATION OF MICHAEL A. MCCONNELL

I, Michael A. McConnell, declare and state as follows:

1. I am the Chapter 11 trustee (the "Trustee") of HVI Cat Canyon, Inc. (the "Debtor").

2. I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true. If called as a witness, I could and would testify competently with respect to such facts.

3. I am a practicing attorney and am admitted in Texas, the U.S. Supreme Court, Supreme Court of Texas, and the U.S. Court of Appeals, Fifth, Eleventh, and Tenth Circuits, and the Northern District of Texas, among others. I am also a former U.S. Bankruptcy Judge from the Northern District of Texas. In my over 40 years of practice, I have represented secured and unsecured creditors, trustees, committees, and debtors in some of the most significant bankruptcy cases in Texas and the surrounding region. I have also previously served as an operating Chapter 11 trustee and Chapter 11 examiner in several complex Chapter 11 cases, including in numerous oil and gas cases.

4. The Debtor is a Colorado corporation authorized to conduct business in the state of California. It is the owner and operator of producing oil and gas interests in California. According to the Debtor, it "owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County ("SMV"), North Belridge in Kern County ("Belridge"), and Richfield East Dome Unit in Orange County ("Redu"). The Debtor has over 10,000 oil wells, but many of them are currently idle.

5. Following my appointment as Chapter 11 trustee, on or about, on October 22, 2019, I retained the services of CR3 Partners, LLC ("CR3") to obtain financial advisory services and to provide the services of Tim Skillman to act as my Chief Restructuring Officer. I also retained Danning, Gill, Israel & Krasnoff, LLP ("Danning-Gill"), led by Eric P. Israel.

6. On October 23, 2019, Tim Skillman, Eric P. Israel, and I met with the Debtor's officers and we discovered that, due to a variety of reasons, including alleged pre-payments and a variety of asserted setoffs, the estate would have insufficient funds to make payroll and pay related payroll taxes for employees which were due on October 25, 2019.

1569477.2 26932

7.      With the assistance of Mr. Skillman, I explored various options for funding the Debtor's immediate needs. In that regard, I approached UBS, AG, London Branch ("UBS, AG London") with a request that it agree to loan funds to the estate to cover the payroll and other priority expenses. I also approached the Debtor's affiliate California Asphalt Production, Inc. ("CAP") and requested that it agree to fund the Debtor's immediate needs.

8.      Ultimately, CAP agreed to meet the Debtor's immediate needs by prepaying a portion of the payment it would normally make on or about November 20, 2019, to the Debtor.

9.      On October 24, 2019, I filed my *Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)* (the "Emergency Motion"), requesting authority to accept a partial prepayment from CAP.

10.     Following the October 25, 2019 emergency hearing, the Court entered the *Order Granting Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)*, granting authorizing me to accept a partial prepayment from California Asphalt Production, Inc. ("CAP").

11.     During this time, my negotiations for a loan and financing facility from UBS AG, London continued.

12.     I was able to come to terms with UBS AG, London and its related entity UBS AG, Stamford Branch ("UBS AG, Stamford" and together with UBS AG, London, "UBS") for postpetition financing pursuant to a budget (the "First Budget") for six weeks (i.e. weeks 13 to 18) from October 26, 2019 through November 29, 2019, plus up to another two weeks of operations and further advances up to another $500,000.

13.     On November 7, 2019, I filed my *Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing the Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief (docket no.*

1 | *474*) (the "First Borrowing Motion").

2 |     14.    The First Borrowing Motion sought authorization to obtain postpetition financing

3 | from UBS pursuant to a written loan facility set forth in a written credit agreement (the "Credit

4 | Agreement") attached as Exhibit "3" to the First Borrowing Motion, in the initial amount of

5 | $3,000,000 and use of cash collateral for six weeks (i.e. weeks 13 to 18) from October 26, 2019

6 | through November 29, 2019, plus up to another two weeks of operations and further advances up to

7 | another $500,000.

8 |     15.    On November 8, 2019, the Court conducted an initial interim hearing on the First

9 | Borrowing Motion and entered its *Interim Order on Trustee's Emergency Motion for an Order: (1)*

10 | *Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing*

11 | *Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related*

12 | *Relief* (docket no. *480*) (the "Interim Order"), authorizing up to $267,317 borrowings through a

13 | further interim hearing on November 12, 2019.

14 |     16.    On November 12, 2019, the Court conducted the further interim hearing and

15 | authorized postpetition financing on an interim basis. On November 18, 2019, the Court entered

16 | the *Second Interim Order on Trustee's Emergency Motion for an Order: (1) Authorizing the*

17 | *Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing Continued Use of*

18 | *Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief* (docket no. *524*)

19 | (the "Second Interim Order").

20 |     17.    On November 21, 2019, the Court conducted a final hearing on the First Borrowing

21 | Motion and authorized postpetition financing on a final basis. On November 27, 2019, the Court

22 | entered its *Final Order for Emergency Priming and Superpriority Financing and Consensual Use*

23 | *of Cash Collateral by the Chapter 11 Trustee* (docket no. *572*) (the "Final Order"). A true and

24 | correct copy of the Final Order is attached as Exhibit "4" hereto.

25 |     18.    On December 5, 2019, pursuant to the Final Order, I entered into an Amendment to

26 | Credit Agreement (the "First Amendment") which extended the term of the financing in the Credit

27 | Agreement for two additional weeks and increased the advance limit by $500,000, up to

28 | $3,500,000. A true and correct copy of the First Amendment is attached as part of Exhibit "5"

1569477.2 26932

38

1  hereto.  The First Amendment extended the use of cash collateral and postpetition borrowing

2  through <u>December 13, 2019</u> (i.e. week 20).

3      19.    I now require additional postpetition financing to continue my efforts to stabilize the

4  Debtor's operations and transition the Debtor away from its contractual relationships with its

5  affiliates and toward reliable paying customers and market rate service providers.  I believe doing

6  so will position the Debtor for an eventual sale.

7      20.    I believe it is necessary to transition away from the Debtor's agreements with its

8  affiliates because, following my appointment, the Debtor's affiliate, CAP, the sole purchaser for

9  the Debtor's oil and gas failed to pay the Debtor in full for the crude oil delivered by the Debtor to

10  CAP and purported to set off pre-petition and post-petition amounts owed by the Debtor to CAP

11  against amounts owed by CAP to the Debtor.  CAP also purported to set off amounts owed by CAP

12  to the Debtor for amounts the Debtor purportedly owes to its affiliates GIT, Inc. and GTL1, LLC,

13  that have included payments to attorneys and insiders.

14      21.    CAP also failed to perform under the terms of its contracts and agreements with the

15  Debtor.  In particular, CAP is not paying me for most of the amounts that are due under all of the

16  agreements, including for October 2019.  On November 20, 2019, CAP paid me only $300,000 of

17  the $1,128,250 that was owed to the Debtor for the month of October 2019, leaving an amount due

18  of $828,250 for October 2019.  CAP also owes the Debtor for November 2019.

19      22.    I do not believe that any additional funds will be forthcoming from CAP and, as of

20  November 27, 2019, I ceased virtually all deliveries to CAP.

21      23.    I now require authority to continue to use cash collateral and for postpetition

22  financing.  I asked Mr. Skillman and CR3 to prepare a six week budget that would address my

23  continued efforts to stabilize the Debtor, disentangle the Debtor's operations away from its

24  affiliates, and prepare the Debtor for an eventual sale.  The new budget also needed to address the

25  likelihood that the Debtor would not receive any additional income from CAP or any third party

26  customers during the budget period.

27      24.    In response to my request, Mr. Skillman and CR3 prepared a six week budget, for

28  December 17, 2019 through January 24, 2020 (i.e., the Second Budget Period), which is attached as

1569477.2 26932                                39

1    Exhibit "2" to Mr. Skillman's declaration appended hereto (the "Second Budget").

2        25.    I elected to proceed with a six week budget because I have now determined that it is

3    necessary to transition the Debtor away from its prepetition relationships with its affiliates in order

4    to move forward.   This decision will affect the types and amounts of future expenses that the

5    Debtor will incur and I determined that a six week budget, provided for in the Second Budget,

6    would be prudent.

7        26.    The Second Budget reflects the loss of income from CAP for SMV, Belridge and

8    Redu, reflects that the Debtor operations will not generate sufficient cash to pay its expenses over

9    the course of the Second Budget Period, and will result in a net negative cash flow of about $2.82

10   million.

11       27.    The Second Budget requires a cash infusion of about $2.82 million over the six

12   week period to maintain the Debtor's operations and accomplish my goals of righting the ship,

13   disentangling the Debtor from its affiliates, and preparing the Debtor's operating business for an

14   eventual sale. I also require the use of postpetition financing to pay payroll and related taxes, and

15   all ordinary and necessary expenses incurred or to be incurred in operating the Debtor and the costs

16   associated with administering the estate.   Without the continued postpetition financing and use of

17   cash collateral, I will not have the funds required to pay the Debtor's employees, operate the

18   Debtor, protect public health and safety and maximize the value of this estate.

19       28.    I negotiated at arms' length with UBS to obtain additional postpetition financing

20   from UBS as required by and pursuant to the terms of the Second Amendment to the Credit

21   Agreement (the "Second Amendment").   UBS agreed to advance up to about $3.5 million in the

22   Second Amendment to fund operations for the six week period covered by the Second Budget.  A

23   true and correct copy of the Second Amendment is attached as Exhibit "3" hereto.  The parties also

24   have the option of extending the availability period under the Second Amended for an additional

25   two weeks and increase the amount of the funding by an aggregate amount of $500,000.

26       29.    The Second Amendment will be extended to me on the same terms previously

27   approved by the Court in its Final Order approving postpetition financing with UBS, with certain

28   modifications, which include an increase amount of funds advanced, an increase in the interest rate,

and updated milestones and conditions.  The terms relating to UBS' senior superpriority "priming" lien pursuant to § 364(d) and allowed superpriority administrative claim pursuant to section 364(c)(1) will stay the same as set forth in the Final Order and will apply to the funds advanced pursuant to the Second Amendment.

30.    I believe that the Second Amendment is reasonable and appropriate, and indeed the loan is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, and I request that the Court make such a finding regarding the amendment and extended loan.

31.    I do not believe I would be able to obtain financing on an unsecured basis or secured by a junior lien on the Debtor's assets in the amounts required by the Second Budget.  I believe this is because UBS, as the Debtor's senior secured creditor, is owed not less than $128 million and all of the Debtor's assets are collateral for UBS' debt.  Santa Barbara asserts a tax lien for about $4.7 million, which appears to be senior to UBS' prepetition lien on real property interests and some of it postpetition lien.  GLR, LLC asserts a lien junior to UBS of $104 million.  With a value of the Debtor's assets in the $50 million to $75 million range, I do not believe that there are any lenders that would agree to lend on an unsecured or junior secured basis.  Any subordinated loan that I could obtain would in effect be unsecured because there is no collateral value over and above what UBS is owed.

32.    In addition, based on my experience with debtor in possession and trustee financing, the new increased interest rate proposed by UBS in the Second Amendment, which is prime plus 3.5%, appears to be commercially reasonable in light the fact that it is no longer seeking or being afforded a lien ahead of the County of Santa Barbara and the additional risk it is taking with respect to the additional postpetition financing it is offering.

33.    Based on the existing financial condition of the Debtor and the totality of the relevant circumstances, I believe in my business judgment that the new postpetition financing proposed in the Second Amendment is appropriate and necessary under the circumstances.  I do not believe in my experience and business judgement that I would be able to obtain postpetition financing from another source on terms more favorable than those set forth in the Second Amendment.

1569477.2 26932

41

34.    I also believe that the interim relief and order are necessary to preserve the Debtor's business as an ongoing concern and thereby prevent immediate and irreparable harm to the Debtor's business and the estate pending a final hearing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 11ᵗʰ, 2019 at Fort Worth, Texas.

MICHAEL A. MCCONNELL

# DECLARATION OF

# TIM SKILLMAN

## <u>DECLARATION OF TIM SKILLMAN</u>

I, Tim Skillman, declare and state as follows:

1.  I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently with respect to such facts.

2.  I am a partner at CR3 Partners, LLC ("CR3").  CR3 is a national turnaround and performance improvement firm.  CR3 offers advisory services and our professionals often serve as officers to assist clients in need of crisis management and other turnaround services.  I have served as Chief Restructuring Officer to two companies, and as a C-level executive for other companies in need of someone to help navigate crises in and out of bankruptcy.

3.  Since the Trustee's appointment I have been working as, or in a capacity similar to, a Chief Restructuring Officer for Michael A. McConnell, the chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor") .

4.  Since the Trustee's appointment, CR3 reviewed the Debtor's business operations, financial condition and expenses that the Trustee needs to pay going forward for the Debtor and the Trustee.

5.  On November 20, 2019, California Asphalt Production, Inc. ("CAP") paid the Trustee only $300,000 of the $1,128,250 that was owed to the Debtor for shipments in the month of October 2019.

6.  On or about November 20, 2019, I was told by Ernesto Olivares, the CFO of CAP and GIT, Inc., that CAP was short on cash but expected additional collection of receivables in the next several days.

7.  Thereafter, on November 26, 2019, Mr. Olivares told me that CAP does not have the ability to pay the outstanding amounts that are due the Debtor for October 2019.

8.  On November 27, 2019, Mr. Olivares told me that CAP was having a liquidity problem and that CAP will not be making any additional payments to the Debtor for deliveries to CAP in the month of October 2019.



1569477.1  26932

43

1    9.    CAP has not made any further payments to the Trustee since the $300,000 payment

2  on November 20, 2019 and I do not expect that it will make any more.

3    10.    At the Trustee's request and under my direction, CR3 prepared a six week budget

4  (i.e. weeks 21 to 26) for  December 13, 2019 through January 24, 2020 (the "Second Budget

5  Period") to address the Trustee's continued efforts to stabilize the Debtor, transition the Debtor's

6  operations away from its affiliates, and prepare the Debtor for an eventual sale.  The new budget

7  also needed to address the likelihood that the Debtor would not receive any additional income from

8  CAP or any third party customers during the budget period.  A true and correct copy of the budget

9  is attached as Exhibit "2" hereto (the "Second Budget").

10    11.    Due to the Debtor's financial condition, the First Budget requires a cash infusion of

11  about $2.82 million over the six week period.

12

13    I declare under penalty of perjury under the laws of the United States of America that the

14  foregoing is true and correct.

15  Executed on December ⁄⁄, 2019, at Santa Maria, California.

16

17  Tim Skillman

18

19

20

21

22

23

24

25

26

27

28

1569477.1  26932

44

# REQUEST FOR JUDICIAL NOTICE

**REQUEST FOR JUDICIAL NOTICE**

Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), requests that the Court take judicial notice of the following:

1.      On or about July 25, 2019, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.

2.      The Debtor filed its petition in the Southern District of New York. The case was transferred to the Northern District of Texas, and then to the Central District of California.

3.      Initially, the Debtor operated its business as a debtor in possession, allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

4.      On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was appointed.

5.      On or about October 8, 2019, the Court entered its Agreed Order for Consensual Use of Cash Collateral.

6.      On or about October 16, 2019, the Court entered its Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee.

7.      On or about October 21, 2019, the U.S. Trustee appointed Michael A. McConnell as the Chapter 11 trustee in this case and, on October 22, 2019, Court entered its order approving the appointment.

8.      On or about October 24, 2019, the Trustee filed his Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h).

9.      On or about October 25, 2019, the Court entered the Order Granting Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h).

10.      On or about November 7, 2019, the Trustee filed his Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2)

1  Authorizing the Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4)

2  Granting Related Relief (the "First Borrowing Motion").

3      11.    On or about November 8, 2019, the Court conducted an initial interim hearing on

4  the First Borrowing Motion and entered its Interim Order on Trustee's Emergency Motion for an

5  Order: (1) Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2)

6  Authorizing Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting

7  Related Relief.

8      12.    On or about November 12, 2019, the Court conducted the further interim hearing

9  and authorized postpetition financing on an interim basis.

10     13.    On or about November 18, 2019, the Court entered the Second Interim Order on

11  Trustee's Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain Secured Priming

12  Superpriority Financing; (2) Authorizing Continued Use of Cash Collateral; (3) Scheduling a Final

13  Hearing; and (4) Granting Related Relief.

14     14.    On or about November 21, 2019, the Court conducted a final hearing on the First

15  Borrowing Motion and authorized postpetition financing on final basis.

16     15.    On or about November 27, 2019, the Court entered its Final Order for Emergency

17  Priming and Superpriority Financing and Consensual Use of Cash Collateral by the Chapter 11

18  Trustee (the "Final Order").  A true and correct copy of the Final Order is attached as Exhibit "4"

19  hereto.

20     16.    On or about November 27, 2019, the Trustee filed a Motion for Order Authorizing

21  the Rejection of Oil Purchase Contracts (Contract No. COP-003 for Belridge Crude Oil and All

22  Amendments and Contract No. COP-004 for Richfield Heavy Crude Oil and All Amendments)

23  with California Asphalt Production, Inc., formerly known as Santa Maria Refining Co. and Greka

24  Refining Company (*docket no. 573*) (the "First Rejection Motion").

25     17.    On or about December 4, 2019, the Trustee filed his Motion for Order Authorizing

26  the Rejection of All Contracts and Agreements with California Asphalt Production, Inc., Formerly

27  Known as Santa Maria Refining Co. and Greka Refining Company, and GTL1, LLC, Not

28  Previously Included in Prior Motion to Reject (Docket No. 573) (the "Second Rejection Motion").

1569477.2 26932                                   46

18.    The Court set a hearing on the First Rejection Motion and the Second Rejection Motion on shortened notice for December 10, 2019, at 11:00 a.m.  The Court granted the First Rejection Motion and the Second Rejection Motion in orders entered on or about December 11, 2019 (*docket nos. 612 and 613*).

19.    On or about December 5, 2019, pursuant to the Final Order, the Trustee entered into an Amendment to Credit Agreement (the "First Amendment") which extended the term of the financing in the Credit Agreement for two additional weeks and increased the advance limit by $500,000, up to $3,500,000.  Notice of the First Amendment was filed with the Court on or about December 6, 2019.  A true and correct copy of the Notice of the First Amendment and First Amendment is attached as Exhibit "5" hereto.

DATED:  December 11, 2019                DANNING, GILL, ISRAEL & KRASNOFF, LLP

By: _____
            ERIC P. ISRAEL
            Attorneys for Michael A. McConnell,
            Chapter 11 Trustee

EXHIBIT 1

1   ERIC P. ISRAEL (State Bar No. 132426)
    *eisrael@dgdk.com*
2   JOHN N. TEDFORD, IV (State Bar No. 205537)
    *jtedford@dgdk.com*
3   AARON E. DE LEEST (State Bar No. 216832)
    *adeleest@dgdk.com*
4   DANNING, GILL, ISRAEL & KRASNOFF, LLP
    1901 Avenue of the Stars, Suite 450
5   Los Angeles, California 90067-6006
    Telephone: (310) 277-0077
6   Facsimile: (310) 277-5735

7   *Attorneys for Michael A. McConnell,*
    *Chapter 11 Trustee*

8

9           UNITED STATES BANKRUPTCY COURT FOR

10          THE CENTRAL DISTRICT OF CALIFORNIA

11                  NORTHERN DIVISION

12

13  In re:                              Case No. 9:19-bk-11573-MB

14  HVI CAT CANYON, INC.,               Chapter 11

15          Debtor.                     **INTERIM ORDER APPROVING**
                                        **SECOND AMENDMENT TO THE**
16                                      **CREDIT AGREEMENT**

17                                      Hearing
                                        Date: December [_], 2019
18                                      Time: [_] [a/p].m.
                                        Place: Courtroom 201
19                                              1415 State Street
                                                Santa Barbara, California 93101
20

21          This *Interim Order Approving Second Amendment to the Credit Agreement* (this "Second

22  Amendment Order") is entered as of December [__], 2019, with respect of the following facts:

23          On October 16, 2019, the Court entered the *Agreed Order Granting Motion for Appointment*

24  *of a Chapter 11 Trustee* [ECF No. 409] and approved appointment of Michael McConnell as the

25  Chapter 11 trustee in this case (the "Trustee") on October 22, 2019 [ECF No. 431].

26          On November 7, 2019, the Trustee filed his *Emergency Motion for an Order: (1)*

27  *Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing*

28

                                        INTERIM ORDER APPROVING SECOND
                                        AMENDMENT TO CREDIT AGREEMENT

EXHIBIT 1

1  *Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief*

2  [ECF No. 474] (the "Emergency Financing Motion") for authorization to obtain post-petition

3  financing from UBS AG, Stamford Branch ("UBS AG, Stamford Branch") and continue to use the

4  cash collateral (as that phrase is defined in Section 363(a) of the Bankruptcy Code, "Cash

5  Collateral") of UBS AG, London Branch ("UBS AG, London Branch" and together with UBS AG,

6  Stamford Branch, "UBS").

7     On November 8, 2019, the Court conducted an initial interim hearing on the Emergency

8  Financing Motion and entered the *Interim Order on Trustee's Emergency Motion for an Order: (1)*

9  *Authorizing the Trustee to Obtain Secured Priming and Superpriority Financing; (2) Authorizing*

10  *Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief* [ECF No.

11  480] (the "Interim Order"), authorizing up to $267,317 borrowings through a further interim

12  hearing on November 12, 2019. Pursuant to the authority granted in the Interim Order, the Trustee

13  entered into that certain Credit Agreement dated as of November 8, 2019, by and between the

14  Trustee and UBS AG, Stamford Branch (as amended, supplemented or otherwise modified from

15  time to time, the "Credit Agreement").

16     On November 12, 2019, the Court conducted the further interim hearing and authorized

17  post-petition financing on an interim basis. On November 18, 2019, the Court entered the *Second*

18  *Interim Order for Emergency Priming and Superpriority Financing and Consensual Use of Cash*

19  *Collateral by the Chapter 11 Trustee* [ECF No. 524] (the "Second Interim Order").

20     Following the final hearing, on November 27, 2019, the Court entered the *Final Order for*

21  *Emergency Priming and Superpriority Financing and Consensual Use of Cash Collateral by the*

22  *Chapter 11 Trustee* [ECF No. 572] (the "Final Order").[1]

23     Pursuant to the authority granted in the Final Order, the Trustee and UBS AG, Stamford

24  Branch entered into that certain Amendment to Credit Agreement, dated December 5, 2019,

25  extending the availability period by two weeks and increasing the amount of financing by $500,000

26  [ECF No. 595].

27

28

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Final Order.

- 2 -

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

Upon the motion (the "<u>Motion</u>") of the Trustee for entry of an order approving and authorizing the Trustee's entry into the Second Amendment to Credit Agreement attached hereto as Exhibit [__] (the "<u>Second Amendment</u>"), notice and opportunity for hearing being sufficient under the circumstances, and upon the findings of fact and conclusions of law made by the Court at the interim hearing (the "<u>Interim Hearing</u>"), all of which are incorporated herein by reference, and good cause appearing therefor,

**IT IS HEREBY FOUND AND ORDERED AS FOLLOWS:**

1.      <u>Motion Granted</u>.  The Motion is granted and the Second Amendment is approved. Any objection to the Motion with respect to entry of this Second Amendment Order that have not been withdrawn, waived or settled, and any reservation of rights included therein, are hereby denied and overruled except as expressly set forth herein.  Except as specifically amended, supplemented, or otherwise modified by this Second Amendment Order, all provisions of the Final Order remain in full force and effect and incorporated herein by reference as though set forth fully below, and for the avoidance of doubt, upon the effectiveness of the Second Amendment, all references to the Credit Agreement and the Facility in the Final Order shall mean the Credit Agreement and the Facility as modified by the terms of the Second Amendment.

2.      <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief granted herein are section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c).  Venue of this Chapter 11 proceeding and the Motion is proper in this district pursuant to 28 U.S.C. § 1408 and 1409.

3.      <u>Hearing Held; Notice</u>.  The Interim Hearing was held pursuant to Bankruptcy Rules 4001(c)(2).  Notice of the Interim Hearing and the relief requested in the Motion was given as set forth in the proof of service filed by the Trustee.

4.      <u>No Credit Available on More Favorable Terms</u>.  The Trustee, on behalf of the debtor and debtor in possession (the "<u>Debtor</u>") and the Debtor's estate, is unable to find sufficient financing from sources other than UBS AG, Stamford Branch on terms more favorable than the

- 3 -

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

terms for the term loan facility (the "Facility") described in the Credit Agreement, including the Second Amendment.

5.    Need for Post-Petition Financing and Use of Cash Collateral.    The continued financing under the Facility, as modified by the Second Amendment, is critical for the Debtor to continue its operations in the ordinary course.    The Trustee's entry into the Second Amendment, and related relief is necessary to avoid immediate and irreparable harm to the Debtor's estate, its employees, and all parties-in-interest.    The continued financing under the Facility, as modified by the Second Amendment, is the best source of financing available to the Debtor under the circumstances and was entered into in good faith and at arm's-length.

6.    Authorization for Emergency Financing.    The Trustee is authorized to borrow, and UBS AG, Stamford Branch is authorized to advance, an amount up to $6,910,039 (as it may be increased in accordance with this Second Amendment Order, the "Aggregate Availability Amount") under the Credit Agreement, subject to the terms of this Second Amendment Order and the Final Order, and in accordance with the budget attached hereto as Exhibit [ ] (including all terms and conditions set forth therein and as may be updated from time to time in accordance with the Credit Agreement, the "Budget"), subject to a line-item variance of ten percent (10%) of the expenses set forth in the Budget tested on a cumulative basis by disbursement categories contained in the Budget (the "Permitted Variance").    The Aggregate Availability Amount includes (a) $3,410,272, which has been funded prior to the date hereof, inclusive of $327,530 that has been funded for Deferred Maintenance (as defined in the Credit Agreement), and (b) $672,470, which shall be advanced on and after the Second Amendment Effective Date (as defined in the Second Amendment) only at the sole and absolute discretion of UBS AG, Stamford Branch, in accordance with the terms of the Credit Agreement. The Trustee and UBS AG, Stamford Branch are authorized to extend the availability period under the Credit Agreement, as amended, by up to two weeks beyond the period provided for in the Second Amendment and increase the amount of financing by an aggregate amount of up to $500,000 beyond the amount provided for in the Second Amendment, in each case, upon mutual agreement of the Trustee and UBS AG, Stamford Branch, without further

- 4 -

51

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

1   order of this Court. Any advances provided by UBS AG, Stamford Branch pursuant to this Second

2   Amendment Order shall be governed by the Final Order. Immediately upon entry of this Second

3   Amendment Order, the Trustee shall, and is hereby authorized to, execute and deliver to UBS AG,

4   Stamford Branch the Second Amendment and all other documents required to be executed and

5   delivered under the Second Amendment. The Trustee and counsel acting on behalf of the Trustee

6   are further authorized to take any such actions that may be necessary to implement the Second

7   Amendment, including without limitation to issue, execute and deliver any such certificates,

8   borrowing requests or other documents and directions that may be requested by UBS AG, Stamford

9   Branch. Nothing in this Second Amendment Order shall create any obligation of UBS to advance

10   or lend any money to the Trustee or the Debtor, and any such advances or loans shall be made by

11   UBS AG, Stamford Branch only in accordance with the terms and conditions of the Credit

12   Agreement, the Final Order, and this Second Amendment Order.

13        7.    Based on the record before this Court, it appears (and the Trustee on behalf of the

14   Debtor has stipulated) that the terms of the Second Amendment and this Second Amendment Order

15   are fair and reasonable and are supported by reasonably equivalent value and fair consideration. In

16   light of the terms of the Final Order with regard to valid, senior, perfected, and non-avoidable ad

17   valorem tax liens in favor of Santa Barbara, the Trustee and UBS have agreed to an increased rate.

18   Any advance, on or after the Second Amendment Effective Date, shall bear interest on the unpaid

19   principal amount thereof at a rate per annum equal to the Base Rate in effect for such advance plus

20   3.50%. The increased rate is reasonable in light of the terms of the Final Order, and the Trustee is

21   unable to find financing on more favorable terms. The Court further finds that the Trustee's

22   agreement to the terms of the Second Amendment on behalf of the Debtor is a sound exercise of

23   business judgment and should be approved as set forth herein.

24        8.    Use of Funds. The Trustee may use funds advanced under the Facility, on the terms

25   and conditions set forth herein and in the Credit Agreement, *provided that* all such funds are used

26   to pay approved operating expenses solely in accordance with the Budget (including all terms and

27   conditions set forth therein). The Trustee is authorized to use funds advanced under the Facility to

28

- 5 -

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

pay, or to fund a segregated account to pay, the reasonable fees and expenses for the Trustee's professionals and the Committee's professionals, only to the extent such fees and expenses for the Trustee's professional and the Committee's professionals are included in the Budget and accrued prior to an Event of Default. Upon the effectiveness of the Second Amendment, the Budget amount for the Committee professionals shall be $20,000 per month thereafter and shall be requested promptly by the Trustee and escrowed immediately upon receipt. Accordingly, once such funds are escrowed, the Committee professionals shall not enjoy the benefits of the Carve-Out set forth in paragraph 16 of the Final Order.

9.    <u>Use of Cash Collateral</u>.  The Trustee may use Cash Collateral, on the terms and conditions set forth in the Final Order, provided that the Termination Date is hereby amended to mean the date that is the earliest of (a) January 24, 2020 or such later date to which the Availability Period (as defined in the Credit Agreement) may be extended in accordance with the terms of this Second Amendment Order, (b) the occurrence of an Event of Default (as defined in the Credit Agreement), and (c) the breach or failure of the Trustee or the Debtor to comply with the terms of this Second Amendment Order.

10.    <u>Stipulations</u>.  The Trustee acknowledges that as of the date hereof, the Existing Events of Default (as defined in the Second Amendment) have occurred and are continuing under the Credit Agreement. UBS AG, Stamford Branch is not waiving and shall not be deemed to have waived any Event of Default. UBS AG, Stamford Branch reserves all of its rights under the Credit Agreement and other loan documents and with respect to the Trustee's use of Cash Collateral.

11.    <u>Successors and Assigns</u>.  The provisions of this Second Amendment Order shall be binding upon UBS, the Debtor, the Trustee, all other parties in interest and their respective successors and assigns (including any other trustee hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of UBS, the Trustee and the Debtor and their respective successors and assigns.

12.    <u>Compliance with Laws</u>.  Nothing in this Second Amendment Order or the Budget shall permit the Debtor or the Trustee to violate 28 U.S.C. § 959(b), and nothing in this Second

- 6 -

1    Amendment Order or the Budget shall in any way diminish the obligation of any entity, including

2    the Debtor and the Trustee, to comply with environmental laws.

3        13.    Priority.  Except as expressly set forth herein or in the Final Order with respect to

4    the Financing Liens, nothing in this Second Amendment Order shall determine or effect the relative

5    priority of any senior prepetition lien or post-petition lien, and all rights are expressly reserved in

6    that regard.  All rights are expressly reserved with respect to whether any asset is cash collateral

7    for any entity other than UBS and thus any entitlement of such other entities to adequate protection,

8    including without limitation any superpriority claim.

9        14.    To the extent Santa Barbara has valid, senior, perfected, and non-avoidable liens for

10    ad valorem taxes, penalties, interest, and attorneys' fees under applicable law, the Financing Liens

11    and Adequate Protection Liens granted to secure Obligations incurred under the Facility in

12    accordance with this Second Amendment Order shall be junior in priority and subject to such valid,

13    senior, perfected, and non-avoidable ad valorem tax liens in favor of Santa Barbara only to the

14    extent of such lien on the Collateral.  Nothing in this Second Amendment Order shall determine

15    the priority, amount, and extent of the Santa Barbara ad valorem tax liens or claims.  All rights with

16    regard to priority, amount, and extent of the Santa Barbara tax liens or claims are fully preserved.

17        15.    Effect of Second Amendment Order.  If any or all of the provisions of this Second

18    Amendment Order are hereafter reversed, modified, vacated or stayed, such reversal, modification,

19    vacatur or stay, shall not affect (i) the validity of any Adequate Protection Obligations incurred

20    before the actual receipt of written notice by UBS AG, London Branch of the effective date of such

21    reversal, modification, vacatur or stay or (ii) the validity or enforceability of any lien or priority

22    authorized or created hereby.  Notwithstanding any such reversal, modification, vacatur or stay,

23    any use of the Facility proceeds or Cash Collateral or Obligations or Adequate Protection

24    Obligations incurred by Debtor or the Trustee to UBS before the actual receipt of written notice by

25    UBS of the effective date of such reversal, modification, vacatur or stay, shall be governed in all

26    respects by the original provisions of the Final Order and this Second Amendment Order, and UBS

27    shall be entitled to all the rights, remedies, privileges and benefits granted in section 363(m) of the

28

-7-

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

Bankruptcy Code and the Final Order and this Second Amendment Order with respect to all uses of the Facility proceeds or Cash Collateral and the Obligations or Adequate Protection Obligations.

16.    The Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims and all other rights and remedies of UBS granted by the provisions of this Second Amendment Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the case to a case under chapter 7, dismissing of the case, or by any other act or omission or (ii) the entry of an order confirming a plan in the case. The terms and provisions of this Second Amendment Order shall continue in this case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Financing Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of UBS granted by the provisions of this Second Amendment Order shall continue in full force and effect until the Obligations and the Adequate Protection Obligations are indefeasibly paid in full.

17.    <u>Findings of Fact and Conclusions of Law</u>.  This Second Amendment Order shall constitute findings of fact and conclusions of law of the Court and shall take effect immediately upon execution hereof.

18.    <u>Filing</u>.  This Second Amendment Order may be filed in any state or local jurisdiction in order to evidence and perfect UBS's liens and security interests, as granted and confirmed herein. At the request of UBS's counsel, the clerk of court shall issue a certified copy of this Second Amendment Order and shall execute such other certificates or affidavits of authenticity as may be reasonably necessary to put this Second Amendment Order in a form that may be accepted by the applicable filing office.

19.    <u>Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code</u>.  The terms of the Second Amendment and this Second Amendment Order were negotiated in good faith and at arms' length among the Trustee and UBS.  Financing provided under the Facility and the Credit Agreement shall be deemed to have been extended in good faith and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code.

- 8 -

1       20.   <u>No Stay</u>.  There is no stay of this Second Amendment Order, including no stay

2   pursuant to Federal Rule of Bankruptcy Procedure 6004(h) (to the extent applicable).

3       21.   <u>Final Hearing</u>.  The Motion is set for a final hearing to be held at [__] [a/p].m.

4   (prevailing Pacific Time), on January [__], 2020, in Santa Barbara, California.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 9 -

INTERIM ORDER APPROVING SECOND
AMENDMENT TO CREDIT AGREEMENT

EXHIBIT 2

| HVI CAT CANYON INC.<br>*WORKING DRAFT* 6-Week Cash Flow Forecast<br>*week starting* | Forecast<br>Week 21<br>16-Dec-19 | Forecast<br>Week 22<br>23-Dec-19 | Forecast<br>Week 23<br>30-Dec-19 | Forecast<br>Week 24<br>6-Jan-20 | Forecast<br>Week 25<br>13-Jan-20 | Forecast<br>Week 26<br>20-Jan-20 | 6-Week<br>TOTAL |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | - | - | - | - | - | - | |
| **1 Cash Inflows (*)** | | | | | | | |
| SMV | - | - | - | - | - | 673,139 | 673,139 |
| Redu | - | - | - | - | - | 53,361 | 53,361 |
| Belridge | - | - | - | - | - | 40,041 | 40,041 |
| Total Cash Inflows | - | - | - | - | - | 766,541 | 766,541 |
| **2** Royalties | - | - | - | - | - | (41,150) | (41,150) |
| **3** Escrow Royalties(**) | - | - | - | - | - | (7,914) | (7,914) |
| Total Net Cash Inflows | - | - | - | - | - | 717,477 | 717,477 |
| **Cash Outflows** | | | | | | | |
| Operating Expenses | | | | | | | |
| Payroll Checks | 76,000 | - | 76,000 | - | 76,000 | - | 228,000 |
| Payroll Taxes | - | 26,000 | - | 26,000 | - | 26,000 | 78,000 |
| Garnishment & Child Supports | 1,500 | - | 1,500 | - | 1,500 | - | 4,500 |
| **4** Surface Rents | 5,600 | - | 62,548 | - | - | - | 68,148 |
| **5** Consultants | 15,100 | - | 15,100 | - | 15,100 | - | 45,300 |
| **6** Phones | 2,500 | - | 2,500 | - | 2,500 | - | 7,500 |
| **7** Power PG&E | 155,000 | - | - | 183,333 | - | - | 338,333 |
| **8** Power SoCalEdison | 500 | - | - | 17,500 | - | - | 17,500 |
| Waste Mangement | 500 | - | 1,500 | 500 | 1,500 | 500 | 4,500 |
| Water | 2,500 | 2,000 | 1,500 | 1,000 | 2,500 | 2,000 | 11,500 |
| SouthernCalGas | 150 | 75 | - | - | 150 | 75 | 450 |
| Portable Restrooms | 1,500 | 1,500 | - | - | 1,500 | 1,500 | 6,000 |
| Alarms | 425 | - | - | - | 425 | - | 850 |
| Cafeteria | 250 | - | - | - | 250 | - | 500 |
| Copies | 250 | - | - | - | 250 | - | 500 |
| **9** Chemicals | 10,000 | 5,000 | 10,000 | 5,000 | 10,000 | 5,000 | 45,000 |
| **10** Pumps | 5,000 | 10,000 | 5,000 | 10,000 | 5,000 | 10,000 | 45,000 |
| **11** Gasoline | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 75,000 |
| **12** Transportation | 22,400 | - | 26,900 | 12,000 | 22,400 | 4,500 | 88,200 |
| **13** Vacuum Trucks | 25,000 | - | 25,000 | - | 25,000 | - | 75,000 |
| **14** LCR | 104,000 | - | - | - | - | 450,000 | 554,000 |
| **15** Electricians | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| **16** Welders | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| **17** Supplies (Belts-Parts, Labor) | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 24,000 |
| **18** Parts (Compressor, Pipe, others) | 2,500 | 5,000 | 2,500 | 5,000 | 2,500 | 5,000 | 22,500 |
| **19** Clean Chemical towers | - | - | 3,000 | - | 3,000 | - | 6,000 |
| **20** Vehicle maintenance | 5,000 | 5,000 | - | 5,000 | - | 5,000 | 20,000 |
| Drink Water | - | - | - | 500 | - | - | 500 |
| **21** Weed abatement | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 60,000 |
| **22** Well Analysis | - | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| **23** Compliance | 15,000 | 10,000 | 15,000 | 10,000 | 15,000 | 10,000 | 75,000 |
| **24** SBP - APCD | [ - | - | 80,000 ] | - | - | - | 80,000 |
| **25** SBP - P&D | [ - | - | - ] | - | - | - | - |
| **26** SBP - FD | [ - | - | - ] | - | - | - | - |
| **27** SBP - EHS | [ - | - | - ] | - | - | - | - |
| SBP - Tax | - | - | - | - | - | - | - |
| OC - Tax | - | - | - | - | - | - | - |
| KC - Tax | - | - | - | - | - | - | - |
| **28** Escrow - Surface Rents(**) | - | - | 7,500 | - | - | - | 7,500 |
| **29** Netherland and Sewell Reserve Report | 25,000 | 20,000 | - | - | - | - | 45,000 |
| **30** GSI Phase 1 Environmental Study | 46,000 | - | - | - | - | - | 46,000 |
| **31** Backoffice & Administrative | 90,000 | - | - | 60,000 | - | - | 150,000 |
| Total Operating Expenses | 647,675 | 127,075 | 378,048 | 378,333 | 227,075 | 562,075 | 2,320,281 |
| **Net Operating Profit** | $ (647,675) | $ (127,075) | $ (378,048) | $ (378,333) | $ (227,075) | $ 155,402 | (1,602,804) |

EXHIBIT  2

| HVI CAT CANYON INC.<br>*WORKING DRAFT* 6-Week Cash Flow Forecast<br>*week starting* | Forecast<br>Week 21<br>16-Dec-19 | Forecast<br>Week 22<br>23-Dec-19 | Forecast<br>Week 23<br>30-Dec-19 | Forecast<br>Week 24<br>6-Jan-20 | Forecast<br>Week 25<br>13-Jan-20 | Forecast<br>Week 26<br>20-Jan-20 | 6-Week<br>TOTAL |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | - | - | - | - | - | - | - |
| **Total Health and Safety & Deferred Maintenance** | | | | | | | |
| 32 Health and Safety | | | | | | | |
| SMV Health and Safety | 56,000 | 16,000 | 33,000 | 40,000 | 12,000 | - | 157,000 |
| Belridge Health and Safety | 20,000 | 3,000 | 3,000 | - | - | 30,000 | 56,000 |
| Redu Health and Safety | 16,000 | 40,000 | 1,000 | 25,000 | - | 65,000 | 147,000 |
| Total Health and Safety | 92,000 | 59,000 | 37,000 | 65,000 | 12,000 | 95,000 | 360,000 |
| 33 Deferred Maintenance | 60,000 | - | - | - | - | - | 60,000 |
| **Total Health and Safety & Deferred Maintenance** | **152,000** | **59,000** | **37,000** | **65,000** | **12,000** | **95,000** | **420,000** |
| Bank Charges & fees | 100 | - | 100 | - | 100 | - | 300 |
| 34 Insurances | - | - | - | 9,879 | - | - | 9,879 |
| Chapter 11 Trustee Professionals | 131,994 | 127,544 | 114,894 | 118,994 | 118,994 | 116,894 | 729,314 |
| Unsecured Creditor Committee Professionals | - | - | 20,000 | - | 20,000 | - | 40,000 |
| U.S. Trustee Payment | - | - | 25,000 | - | - | - | 25,000 |
| 35 Interest | - | - | - | - | - | - | - |
| Bankruptcy Related Expenses | 132,094 | 127,544 | 159,994 | 128,873 | 139,094 | 116,894 | 804,493 |
| **Total Cash Outflows** | **931,769** | **313,619** | **575,042** | **572,207** | **378,169** | **773,969** | **3,544,775** |
| **Net Cash Flow** | **(931,769)** | **(313,619)** | **(575,042)** | **(572,207)** | **(378,169)** | **(56,492)** | **(2,827,297)** |
| Beginning Cash Balance | - | - | - | - | - | - | - |
| Net Cash Flow | (931,769) | (313,619) | (575,042) | (572,207) | (378,169) | (56,492) | (2,827,297) |
| Net Borrowing/(Pay Down) | 931,769 | 313,619 | 575,042 | 572,207 | 378,169 | 56,492 | 2,827,297 |
| Ending Cash Balance | - | - | - | - | - | - | - |
| Loan Balance | 4,342,041 | 4,655,660 | 5,230,702 | 5,802,908 | 6,181,077 | 6,237,569 | 6,237,569 |

(*)Forecast depent on actual delivered barrels and price
(**) Not approved under Interim Cash Collateral Order

1 Forecast dependent on actual volume of delivered barrels, price
and gravity adjustments.
The price per barrel is calculated for Santa Maria Valley using
the average price per barrel posted by Chevron, Union 76,
Exxon and Shell for Midway Sunset crude less $5.
The price per barrel for Redu is calculated using the average
price per barrel posted by the same 4 corporations for Buena
Vista crude less $5.75.
The price per barrel for Belridge is calculated using the average
price per barrel posted by the same 4 corporations for Buena
Vista crude less $0.75.
All pricing is subject to adjustments based upon the gravity of
the oil produced. The prior month's revenue is collected on the
20th of the following month.

2 In aggregate, monthly royalties are approximately 13% of
production which is approximately 1 month's revenue less the
LCR shipments.

3 Escrow Royalties are based upon an insider's 2.5% overriding
royalty on 1 month's production which is approximately 1
month's revenue less the LCR shipments.

4 Surface Rent Sub schedule

| Surface Lease Owner: | Amount | Timing |
|---|---|---|
| Boisseranc | $ 11,956 | Due on the 1st of each month |
| Buganko | $ 14,878 | Due on the 1st of<br>the month. |
| Medema (1/2) Thomson (1/4) (- McLaughlin (1/4) | $ 7,500 | Due on the 1st of each month |
| (3) Etchandy family members | $ - | Lease to be rejected, no amount due |
| State College, LLC (Evelyn Roper) | $ 1,581 | $1,5851.33 due on an annual basis - has been paid for 2019. |
| Adam Family Trust | $ - | No amount due |
| Orcutt Fee, LLC | $ 5,000 | $5,000 due on an annual basis - has been paid for 2019. |
| Marianne Friedl | $ 3,700 | $3,700 due on an annual basis - has been paid for 2019. |
| C.M.T LLC | $ 100 | $100 will be due in January 2020. |
| Manfred Sander | $ 6,800 | Due before the end of October 2019 |
| E & B Natural Resources | $ - | Under review, no amount currently due |
| Grundoon, LLC (Firestone) | $ 7,500 | Due on the 1st of each month |
| Morganti Ranch | $ 5,500 | $5,500 on a monthly basis- lease is currently shut-in, no amount due. |
| Morganti Ranch | $ - | Under review, no amount currently due |
| Morganti Ranch | $ - | Under review, no amount currently due |
| Railroad | $ 454 | $454 due in December 2019 |
| (4) Righetti family members | $ 3,000 | $3,000 per quarter, next payment due in December 2020 |
| (3) Judy A. Rogers, Ronald H. Souza, Jr., Michael J. Souza | $ 750 | $750 due in January 2020 |
| Roland and Sandy Miller | $ 300 | $300 due in December 2019 |
| Multiple Bradley Lands | $ - | No amount due in October or November 2019 |