ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
GEORGE E. SCHULMAN (State Bar No. 64572)
*gschulman@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Michael A. McConnell,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re | Case No. 9:19-bk-11573-MB |
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | **CHAPTER 11 TRUSTEE'S OPPOSITION TO MOTION [CASE DOC. NO. 900] TO RECONSIDER ORDER [CASE DOC. NO. 866] DENYING MOTION FOR RELIEF FROM STAY [CASE DOC. NO. 767]; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF MICHAEL A. MCCONNELL, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF** |
| | Date:    None[1] |
| | Time:    None |
| | Crtrm.: None |

---

[1]    Pursuant to the Court's scheduling order for this motion, no hearing date has been set.  Case doc. no. 950, entered April 20, 2020.  Any replies must be filed and served by May 8, 2020.

1587884.1   26932

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 5

I. INTRODUCTION ................................................................................................... 5

II. FACTUAL BACKGROUND .................................................................................. 6

III. DISCUSSION ....................................................................................................... 12

    A.    The Trustee has Segregated the Insider Royalties ......................................... 12

    B.    GRL Must Proceed, if at all in the Pending Adversary Proceeding .............. 14

    C.    GRL Has Not Made Out a Case for Reconsideration .................................... 17

IV. CONCLUSION ..................................................................................................... 20

DECLARATION OF MICHAEL A. MCCONNELL ................................................... 21

REQUEST FOR JUDICIAL NOTICE ......................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bear v. Coben (In re Golden Plan of Cal., Inc.)*
  829 F.2d 705 (9th Cir. 1986) .................................................................. 15

*Colorado River Water Conservation Dist. v. United States*
  424 U.S. 800, 96 S. Ct. 1236 (1976) ...................................................... 16

*Computer Commc'ns, Inc. v. Codex Corp. (In re Computer Commc'ns, Inc.)*
  824 F.2d 725 (9th Cir. 1987) .................................................................. 15

*GMAC Mortgage Corp. v. Salisbury (In re Loloee)*
  241 B.R. 655 (B.A.P. 9th Cir. 1999) ...................................................... 15

*In re Cruz*
  516 B.R. 594 (B.A.P. 9th Cir. 2014) ...................................................... 19

*In re Johnson*
  346 B.R. 190 (B.A.P. 9th Cir. 2006) ...................................................... 15

*In re Plumberex Specialty Prod., Inc.*
  311 B.R. 551 (Bankr. C.D. Cal. 2004) ................................................... 15

*In re Van Ness*
  399 B.R. 897 (Bankr. E.D. Cal. 2009) ................................................... 14

*Jones v. Aero/Chem Corp.*
  921 F.2d 875 (9th Cir. 1990) .................................................................. 19

*Khachikyan v. Hahn (In re Khachikyan)*
  335 B.R. 121 (B.A.P. 9th Cir. 2005) ................................................ 15, 16

*Kona Enters, Inc. v. Estate of Bishop*
  229 F.3d 734 (9th Cir. 2000) .................................................................. 19

*McDowell v. Calderon*
  197 F.3d 1253 (9th Cir. 1999) ................................................................ 19

*United States v. Valley Nat'l Bank (In re Decker)*
  199 B.R. 684 (B.A.P. 9th Cir. 1996) ...................................................... 15

*Zimmerman v. City of Oakland*
  255 F.3d 734 (9th Cir. 2001 ................................................................... 19

## STATUTES

11 U.S.C. § 362(d) .......................................................................... 9, 15, 16

11 U.S.C. § 365 ........................................................................................ 8

11 U.S.C. § 502(d) ................................................................................................. 9

11 U.S.C. § 541 ................................................................................................... 16

11 U.S.C. § 542 ..................................................................................................... 8

11 U.S.C. § 547 ..................................................................................................... 8

11 U.S.C. § 548 ..................................................................................................... 8

11 U.S.C. § 550 ..................................................................................................... 8

## OTHER AUTHORITIES

Christopher Klein, *Bankruptcy Rules Made Easy (2001): A Guide to the Federal Rules of Civil Procedure that Apply in Bankruptcy*, 75 Am. Bankr. L.J. 35, 38 (Winter 2001) ................................................................ 15

S. Rep. No. 95–989, at 55 (1978), as reprinted in 1978 U.S.C.C.A.N. 5841) ........... 15

## RULES

Fed. R. Bankr. P. 59 ....................................................................................... 18, 19

Fed. R. Bankr. P. 60 ............................................................................................. 18

Fed. R. Bankr. P. 60(b) ........................................................................................ 18

Fed. R. Bankr. P. 60(b)(2) ............................................................................... 18, 19

Fed. R. Bankr. P. 7001 ..................................................................................... 14, 16

Fed. R. Bankr. P. 7001(1) ..................................................................................... 14

Fed. R. Bankr. P. 7001(6) ..................................................................................... 14

Fed. R. Bankr. P. 7001(9) ..................................................................................... 14

Fed. R. Bankr. P. 7001-7087 ................................................................................. 14

Fed. R. Bankr. P. 9014 ......................................................................................... 15

Fed. R. Bankr. P. 9023 ................................................................................ 6, 17, 18

Fed. R. Bankr. P. 9024 .................................................................................... 6, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Michael A. McConnell, as Chapter 11 Trustee ("Trustee") hereby opposes GRL, LLC's ("GRL") *Motion to Reconsider Denial of Motion with Points and Authorities* (case doc. no. 900) ("GRL Motion to Reconsider"). GRL seeks reconsideration of the Court order (case doc. no. 866) denying GRL's relief from stay motion (case doc. no. 767) ("GRL Relief from Stay Motion").

GRL's principal focus in its two motions has been its claim that it is entitled to be paid royalties by the Debtor, that the Bankruptcy Court ought to direct the Trustee to pay GRL its claimed royalties, and that GRL ought to be authorized to serve "Oil and Gas Division Orders" upon persons who owe the estate money for oil and gas in the future requiring them to pay GRL directly. GRL bases its claim on the unfounded assertion that the Trustee has not set aside sufficient funds in a manner GRL would like in the court-required "insider royalty" account.

GRL's Motion for Reconsideration ought to be denied for three reasons:

First, the Trustee has set aside funds for GRL in an "insider royalty" account. Thus, GRL's interest, if any, is protected. The funds are protected as the Court directed. As new funds come in, they are added in the ordinary course.

Second, whether or not GRL is entitled to those funds at all, or whether the Trustee has offsetting claims, is subject to litigation in a pending adversary proceeding.[2] The Bankruptcy Court's denial of GRL's Motion for Relief for Stay specifically provided that its denial was without prejudice to GRL's pursuit of those claims in the already pending adversary proceeding. The fact that there is a pending adversary proceeding on this precise subject means that to the extent GRL seeks a

---

[2] *McConnell v. GLR, LLC and GRL, LLC*, adv. case no. 9:20-ap-01006-MB.

1  prejudgment remedy, it must comply with the applicable Federal Rules of

2  Bankruptcy Procedure and seek that remedy in the very proceeding in which it is

3  making the substantive claim.

4         Third, in order to seek reconsideration (of an interim denial without prejudice,

5  no less), GRL must show change in law, newly discovered evidence, or that the

6  Court committed clear error.  GRL makes only a passing reference to the law (two

7  cites without discussion to Bankruptcy Rules 9023 and 9024), made scant effort to

8  find out the facts before it filed the Relief from Stay Motion, and can't make, and

9  indeed, does not try to make, any clear error claim.  Moreover GRL has not cured

10  other myriad problems with its Motion for Relief from Stay, including sustained

11  objections to the evidence it originally offered.

12         GRL's Motion to Reconsider should therefore be denied.

13

14                                    **II.**

15                          **FACTUAL BACKGROUND**

16         On July 25, 2019, the Debtor filed its voluntary Chapter 11 petition

17  commencing this bankruptcy case.  The case was originally filed in the Southern

18  District of New York.  The case was transferred to the Northern District of Texas,

19  and then later to the Central District of California.

20         On August 14, 2019, the presiding court in this case (then in New York)

21  entered an interim cash collateral order, which stated, in pertinent part:

22         9.      Absent further order of the Court or written consent of the
       Secured Lender UBS for payments specifically designated as a royalty
23     payment or surface lease payment to an insider or affiliate, the Debtor
       shall not make the following payments: (i) any royalty payments or
24     surface lease payments to insiders or affiliates of the Debtor or (ii) any
       payment of legal fees for the Debtor or any committee, but the Debtor
25     shall hold such payments in an interest-bearing escrow or segregated
       account. All such issues are expressly reserved for future determination.
26     The Cash Collateral Budget attached hereto includes certain items for
       accounting purposes only; this Order does not permit payment of these
27     items under this Order. Notwithstanding anything to the contrary, Cash
       Collateral shall only be used to pay those items in the Cash Collateral
28     Budget that have been specifically approved. For the avoidance of

1
2
3
4

> doubt, the Debtor has no authority to make any (i) insider or affiliate royalty payments, (ii) insider or affiliate surface lease payments, (iii) professional fee payments, or (iv) other payments which are listed below the line in the Cash Collateral Budget for accounting purposes but not authorized by this Order, regardless of whether any such payments listed in (i)-(iv) are included in the Cash Collateral Budget.

5   Case doc. no. 43 at 8-9, ¶ 9.

6       On October 8, 2019, this Court entered an interim order on consensual use of

7   cash collateral.  It provided for the same limitations provided in the above quoted

8   paragraph 9.  Case doc. no. 375 at pp. 6-7.

9       On October 16, 2019, the Court entered its order directing the United States

10  Trustee to appoint a Chapter 11 trustee.  Case doc. no. 431.  That order granted the

11  motions of two creditors, who alleged a variety of problems with the Debtor

12  including, but not limited to, the Debtor's transactions with affiliates and/or insiders.

13  Case doc. nos. 356, 363.  GRL is listed on the Debtor's Statement of Financial

14  Affairs as an insider.  Case doc. no. 171, p. 294.  Excerpts of the Schedules and

15  Statement of Financial Affairs are attached to the Request for Judicial Notice as

16  Exhibit "1."  The order approving the Trustee's appointment was entered on October

17  22, 2019.  Case doc. no. 431.

18      On November 27, 2019, this Court entered its final cash collateral order,

19  which included the following language:

20
21
22
23
24
25
26
27
28

> Absent further order of the Court or written consent of UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, neither Debtor nor the Trustee shall make the following payments directly or indirectly: (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments provided for in the Budget in an interest-bearing escrow or segregated account. All such issues are expressly reserved for future determination. The Budget includes certain items for accounting purposes only; this Final Order does not permit payment of these items. Notwithstanding anything to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those items in the Budget that have been specifically approved by UBS or Huron and to escrow payments as set forth above. For the avoidance of doubt, neither the Debtor nor the Trustee has any authority to make, directly or indirectly, any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii)

1   professional fee payments, except payments authorized for the Trustee's
    professionals or Committee's professionals under this Final Order; or
2   (iv) other payments which are listed below the line in the Budget for
    accounting purposes but not authorized by this Final Order, regardless
3   of whether any such payments listed in (i)-(iv) are included in the
    Budget.
4

5   Case doc. no. 572 at pp. 12-13, ¶15.  A copy of such order is attached to the Request

6   for Judicial Notice as Exhibit "2."  Thus, at least three orders have been entered

7   prohibiting the estate from paying royalties to insiders or affiliates.

8        Upon the Trustee's appointment, the Debtor turned over to the Trustee

9   $39,752.85 in an insider royalty account, on account of royalties owed to GRL.  See

10  Trustee's declaration at ¶ 22.  The day after his appointment, on October 23, 2019,

11  the Trustee opened a new bank account for the insider royalties allegedly owed to

12  GRL, and deposited the $39,752.85.  That account was and remains at Wells Fargo

13  Bank, account number ending in 0268 (the "Insider Escrow Deposit Account").  Id.

14       On January 9, 2020, the Trustee filed a complaint against GRL and its affiliate,

15  GLR, LLC ("GLR"), seeking turnover, and avoidance of preferential and or

16  fraudulent transfers under 11 U.S.C. §§ 542, 547, 548 and 550, commencing

17  adversary proceeding number 9:20-ap-01006-MB (the "Avoidance Action").  By the

18  Avoidance Action, the Trustee seeks to recover oil and gas lease interests which

19  were transferred from the Debtor to GRL and GLR just 6 days before the Debtor's

20  bankruptcy filing.  On February 3, 2020, the same date that GRL filed the Relief

21  from Stay Motion, GRL and GLR filed an answer and counterclaim in the Avoidance

22  Action seeking, among other relief, payment of the very royalties addressed by the

23  Motion for Relief From Stay.[3]

24

25
_____

26  [3] The Trustee has filed another complaint, commencing an action seeking declaratory
    relief regarding the applicability of 11 U.S.C. § 365 to oil and gas leases, against
27  GRL and hundreds of other defendants, as adversary proceeding number 9:20-ap-
    01011-MB.
28

1    On that same day that GRL and GLR filed their answer and counterclaim in

2    the Avoidance Action, GRL filed its Relief from Stay Motion, factually supported

3    solely by a declaration from Mr. Grewal, as a principal of GRL.  Case doc. no. 767.

4    Mr. Grewal signed the Debtor's Schedules and Statement of Financial Affairs, as the

5    Debtor's Chairman.  Case doc. no. 171, pages 288, 316.

6    The Trustee filed an opposition to the Relief from Stay Motion, identifying

7    five grounds: (1) the Relief from Stay Motion was a disguised attempted to

8    reconsider the prior insider royalty orders; none of which were even mentioned in the

9    Relief from Stay Motion; (2) the Relief from Stay Motion was procedurally

10    improper, as it needed to be brought in an adversary proceeding because of the relief

11    the motion actually sought; (3) GRL failed to argue cause under section 362(d); (4)

12    GRL's claims were subject to disallowance under section 502(d); and (5) the

13    calculation of amounts due, if any, were complicated, by among other things, the

14    failure of another affiliate, California Asphalt Production, Inc. ("CAP"), to pay for

15    oil.  The Trustee also noted the failure of GRL to use the required form for relief

16    from stay motions.  Case doc. no. 787.  The Trustee also filed objections to the

17    evidence proffered.  Case doc. no. 789.

18    Opposition to the GRL Motion for Relief from Stay was filed by UBS, AG, on

19    February 11, 2020.  Case doc. no. 784.  UBS AG also filed objections to Mr.

20    Grewal's declaration.  Case doc. no. 785.  In brief, UBS AG argued that the relief

21    sought by GRL could only be sought through an adversary proceeding; that GRL had

22    recently filed a counterclaim in an adversary proceeding seeking relief as to claimed

23    royalties against the Trustee, and that, in any event, GRL had inadequate evidentiary

24    support.

25    Opposition (in the form of a joinder) filed by a number of state and local

26    governmental agencies as well as a private entity Buganko, LLC. See case doc. nos.

27    790, 791.

28

1    A reply was filed by GRL.  Case doc. no. 808.  GRL did not fix any of the

2    identified issues in its Relief from Stay Motion.

3    On February 25, 2020, a hearing was held on GRL's Relief from Stay Motion,

4    and it was denied.  Case doc no. 825.  At the hearing, the Court opened oral

5    argument by noting that the Relief from Stay Motion was improper because GRL

6    failed to use the mandatory court form.  As the Court noted, "for those reasons alone

7    I could deny the motion." Transcript, page 7, lines 2-3.  A copy of the February 25,

8    2020 hearing transcript is attached to the Request for Judicial Notice as Exhibit "3."

9    A copy of the tentative ruling for the February 25, 2020 hearing is attached to the

10   Request for Judicial Notice as Exhibit "4."

11   Throughout oral argument, the Court made a number of comments expressing

12   the Court's views on issues, including:

13   •    On the merits of the Relief from Stay Motion, first, the Court observed

14   that the relief requested in the motion was relief that needed to be brought by

15   adversary proceeding.  Indeed, the Court observed, "these are the same claims that

16   are actually made" by the Movant "in a counterclaim" in the Avoidance Action, yet

17   the Movant "didn't [] mention that" in the Relief from Stay Motion.  Id. at page 8,

18   lines 19-20.  The Court indicated its view that the Relief from Stay Motion was not

19   an appropriate vehicle for such disputes.

20   •    The Court said that the Relief from Stay Motion lacked sufficient legal

21   or factual explanation and support in favor of the service of division orders.  The

22   Court stated, "this is a different industry and it's governed by different substantive

23   law and this motion really hasn't done a very good job of walking me through that at

24   all." Id. at page 13, lines 1-4.  The Court observed that there were issues with

25   commingled oil and gas interests and monies that were both not easy to resolve in a

26   summary proceeding and not properly addressed in the motion.  E.g., id. at page 13,

27   lines 17-22 ("it's kind of a problem when those real property rights are

28   transformed…. Then it becomes money and money is commingled. And so none of

1   your pleadings really address that and none of your California cases really address

2   that either.").

3       •     Based on its review of the documents attached the Relief from Stay

4   Motion, the Court does not understand "how this adds up to what [GRL] wants." Id.

5   at page 27, lines 3-4.

6       •     At another point, the Court noted that evidentiary objections relating to

7   declarations filed by Movant (all of which were sustained) probably did not matter

8   because, "Procedurally this motion has so many problems." Id. at page 24, lines 14-

9   15.

10       Toward the end of the hearing, the Court stated its ruling on the record, which

11   can be summarized as follows:

12       1.     The Movant is impermissibly seeking to overturn a prior Court

13   order without any support, or even invoking applicable law, for

14   reconsideration. Id. at page 42, lines 14-18. "To the extent the motion sought

15   relief from a prior order," the Court held that the motion was "procedurally

16   defective as well as substantively defective." Id. at page 43, lines 14-16.

17       2.     The Court held that the determinations of the parties' interests in

18   royalties must be by adversary proceeding. Id. at lines 21-24 ("making a

19   determination about the nature and extent of the insider's interests in these

20   leases in the particular – in the royalties…requires an adversary proceeding.");

21   id. at page 44, lines 11-17 ("the motion for relief [] is procedurally improper

22   for a similar reason which is [] inherent in it is a determination of the nature

23   and extent of the [] moving party's interest and I don't think those have been

24   determined and I don't think it's appropriate to determine them in a summary

25   proceeding.")

26       3.     The motion sought property from the estate which would interfere

27   with the Trustee's sale of estate assets. Id. at page 45, lines 4-11.

28

4.    The Court sustained all of the evidentiary objections to the declaration of Mr. Grewal, leaving no admissible evidence in support of the motion.  Even if that were not the case, as mentioned above, the facts and law alleged were inadequate.  Id. at lines 12-17.

5.    Finally, even if there were no factual disputes requiring an adversary proceeding, GRL was adequately protected by the escrowing of the royalty amount. Id. at page 46, line 20.

On March 23, 2020, the Court entered its Order Denying the Relief from Stay Motion.  Case doc. no. 866.  A copy of the order is attached to the Request for Judicial Notice as Exhibit "5."  The Order provides that the Relief from Stay Motion is denied "without prejudice to Movant pursuing relief in the related adversary proceeding."  This make sense since GRL is seeking payment of the same royalties in the Avoidance Action.

# III.

## DISCUSSION

**A.    The Trustee has Segregated the Insider Royalties**

The Trustee has segregated the insider royalties, as required by prior Court Orders.  Upon his appointment, the Trustee received $39,752.85 from the Debtor in Possession, which was set aside in a bank account as alleged royalties owed to GRL. The Trustee maintained those in a segregated bank account, Wells Fargo bank account number ending in 0268.  See Trustee's declaration at ¶ 21.

The Court's cash collateral order requires the Trustee to do as follows:

Absent further order of the Court or written consent of UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, neither Debtor nor the Trustee shall make the following payments directly or indirectly: (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments provided for in the Budget in an interest-bearing escrow or segregated account. All such issues are expressly reserved for future determination. The Budget

includes certain items for accounting purposes only; this Final Order does not permit payment of these items. Notwithstanding anything to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those items in the Budget that have been specifically approved by UBS or Huron and to escrow payments as set forth above. For the avoidance of doubt, neither the Debtor nor the Trustee has any authority to make, directly or indirectly, any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii) professional fee payments, except payments authorized for the Trustee's professionals or Committee's professionals under this Final Order; or (iv) other payments which are listed below the line in the Budget for accounting purposes but not authorized by this Final Order, regardless of whether any such payments listed in (i)-(iv) are included in the Budget.

Case doc. no. 572 at pages 12-13, paragraph 15..

The Trustee is required to "hold [royalty payments or surface lease payments to insiders or affiliates of the Debtor] provided for in the Budget in an interest-bearing escrow **or** segregated account" (emphasis added).  The Trustee is required to do the same thing for the royalties of insiders and affiliates as for estate professionals.  Consistent with this instruction, the Trustee accounted for the professional fees and insider or affiliate royalties incurred during his tenure, setting aside such monies for accounting purposes.  Prior to February 24, 2020, the Trustee did not deposit such monies in segregated bank accounts, but segregated them on the estate's books and Court-approved budgets.  However, in February, 2020, after consideration of increasingly adversarial filings and actions by the Debtor's affiliates, including redundant filings by GRL, such as GRL's Relief From Stay Motion (Case doc. no. 767), GLR's administrative rent motion (Case doc. no. 801), and GRL and GLR's counterclaim seeking the same relief in the Avoidance Action (Adversary Proceeding No. 9:20-ap-01006-MB), the Trustee decided to transfer the monies which were set aside for GRL and GLR to the segregated bank account which already existed, the Wells Fargo bank account number ending in 0268.  See Trustee's declaration at ¶¶ 24-27. On February 24, 2020, the Trustee deposited $84,621.05 into such account, as reflected in Exhibit B to the Reconsideration Motion, Case doc. no. 900 at page 17.  See Trustee's declaration at ¶ 28.

1    The document attached to the Reconsideration Motion at Exhibit C correctly

2 shows the funds in the Wells Fargo Bank account number ending in 0268 on

3 February 25, 2020, the date of the hearing on relief from stay, and provides an

4 accounting showing both the surface lease and oil royalty components, allegedly

5 owed to GLR.  See Case doc. no. 900 at page 34.

6    As of April 20, 2020, the balance in Wells Fargo Bank account number ending

7 in 0268 was $137,066.39, including: (a) $4,136.72 deposited on March 11, 2020 for

8 January royalties; and (b) $8,555.77 deposited on April 16, 2020 for February

9 royalties.  See Trustee's declaration at ¶ 30.  The Trustee continues to segregate

10 insider royalties in the separate account.  See Trustee's declaration at ¶ 31.

11

12 **B.    GRL Must Proceed, if at all in the Pending Adversary Proceeding**

13    GRL's basic contentions are two-fold: first, that the royalties are not property

14 of the estate, and second, that it ought to be allowed to deliver "Division Orders" to

15 people buying the Debtor's oil, instructing them to pay GRL instead of the Debtor.

16 Determinations as to what is and is not property of the estate, and whether third

17 parties can be directed to pay an alleged creditor directly, are properly decided in an

18 adversary, with the full range of procedural protections for the parties.  Proceedings

19 to "recover money or property" from a bankruptcy estate, "to obtain an injunction or

20 other equitable relief," or to "obtain declaratory judgment" are adversary proceedings

21 under FRBP 7001.  *See* FRBP 7001(1), (6), and (9).  Adversary proceedings are

22 lawsuits in bankruptcy, and are subject to the notice, discovery and other procedural

23 due process attributes of a federal civil action, set forth in the Bankruptcy Rules.  *See*

24 FRBP 7001-7087.  As one court has observed: "An adversary proceeding under

25 Federal Rule of Bankruptcy Procedure 7001 is essentially indistinguishable from a

26 civil action under the Federal Rules of Civil Procedure." *In re Van Ness*, 399 B.R.

27 897, 904 (Bankr. E.D. Cal. 2009) (citing Christopher Klein, *Bankruptcy Rules Made*

28

1  *Easy (2001): A Guide to the Federal Rules of Civil Procedure that Apply in*

2  *Bankruptcy*, 75 Am. Bankr. L.J. 35, 38 (Winter 2001)).

3      In contrast, requests for relief from stay brought under 11 U.S.C. § 362(d) are

4  "contested matters" governed by Fed. R. Bankr. P. 9014.[4]

5      [A] contested matter under [FRBP] 9014 is a motion procedure
    susceptible of more expeditious resolution than an adversary

6      proceeding. In particular, the pleading rules that entail complaint,
    answer, counterclaim, cross claim, and third-party practice are

7      dispensed with in favor of a simple motion procedure.

8  *Id*. (citing *In re Johnson*, 346 B.R. 190, 195 (B.A.P. 9th Cir. 2006); *Khachikyan v.*

9  *Hahn (In re Khachikyan)*, 335 B.R. 121, 125–26 (B.A.P. 9th Cir. 2005); *GMAC*

10  *Mortgage Corp. v. Salisbury (In re Loloee)*, 241 B.R. 655, 660 (B.A.P. 9th Cir.

11  1999); *United States v. Valley Nat'l Bank (In re Decker)*, 199 B.R. 684, 690 (B.A.P.

12  9th Cir. 1996) (concurring op.); Klein, 75 Am. Bankr. L.J. at 40–41).  Relief from

13  stay motions are summary proceedings encompassing limited issues.  *In re*

14  *Plumberex Specialty Prod., Inc*., 311 B.R. 551, 557–58 (Bankr. C.D. Cal. 2004)

15  ("Stay litigation is confined to the issues of []'lack of adequate protection, the

16  debtor's equity in the property, and the necessity of the property to an effective

17  reorganization of the debtor, or the existence of other cause for relief from the

18  stay.'[]" (quoting *Computer Communications, Inc. v. Codex Corp. (In re Computer*

19  *Communications, Inc.)*, 824 F.2d 725, 729 (9th Cir. 1987) (quoting S. Rep. No. 95–

20  989, at 55 (1978), reprinted in 1978 U.S.C.C.A.N. at 5841))).

21      Further, "[i]t is settled that a Rule 9014 motion cannot be used to circumvent

22  the requirement of an adversary proceeding."  *Id.* (citing *Bear v. Coben (In re Golden*

23  *Plan of Cal., Inc.)*, 829 F.2d 705, 711–12 (9th Cir. 1986); *Loloee*, 241 B.R. at 660–

24  62).

25

26

27  ---
[4]  References hereafter to the Federal Rules of Bankruptcy Procedure shall be to

28  "FRBP" and to the Federal Rules of Civil Procedure as "FRCP."

The Motion was fashioned as a "Motion for Relief from the Automatic Stay or for Order Confirming that the Stay Does Not Apply."  However, despite the moniker, the Motion did not resemble a motion for relief from stay consistent with the custom and practice of this Court.  The document was not on the Court's mandatory form, a defect the Court viewed as fatal in itself.  The absence of a court form also emphasizes the difference between the relief sought by GRL and the types of relief available under 11 U.S.C. § 362(d).

The relief requested in the Relief from Stay Motion was not that the stay be lifted so that, for example, the movant can continue to prosecute a state court proceeding or pursue its rights under applicable non-bankruptcy law.  Rather, the primary relief sought was an express finding that certain property is not property of the estate under 11 U.S.C. § 541 and for turnover from the estate of certain monies.  Such relief is squarely within the ambit of FRBP 7001 requiring that injunctive, turnover and declaratory relief be brought by adversary proceeding.  The Relief from Stay Motion was an attempted end-run around the due process afforded by an adversary proceeding.

Further, to the extent the Movant is entitled to payment of any royalties, the estate may have setoff rights and other defenses and counterclaims creating disputes which are also only appropriately litigated in the context of an adversary proceeding.  *Khachikyan*, 335 B.R. at 125.  Finally, the Movant is actually seeking similar, if not identical, relief in the Avoidance Action, conceding that the relief is appropriately sought through an adversary proceeding (Avoidance Action at docket no. 6) which renders this contested matter duplicative.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236 (1976) ("[T]he general principle is to avoid duplicative litigation.").

Despite this issue having been raised in the original oppositions and having been discussed at the hearing on the Motion for Relief From Stay, GRL has done absolutely nothing to cure this problem, focusing its Motion for Reconsideration

1    entirely on its murky unsupported insinuations regarding adequate protection.  The

2    Motion for Reconsideration ignores the procedural and substantive issues that were

3    dispositive the first time around.

4

5    **C.    GRL Has Not Made Out a Case for Reconsideration**

6        GRL asserts that the basis of its Motion for Reconsideration is the discovery of

7    evidence that the Trustee has allegedly not funded the account holding insider

8    royalties, and that the Court had previously found that GRL was adequately

9    protected.  Case doc. no. 900, at pages 1-2.  That argument is a misrepresentation of

10   the Court's order, in addition to being frivolous in its inaccurate (vague) factual

11   insinuations.  As the Court's order makes clear, GRL is free to pursue its claims in

12   the pending adversary proceeding, where GRL actually made such claims in its filed

13   counterclaim.  And as GRL's Motion to Reconsider makes clear, some of the

14   documents on which it relies were actually obtained by GRL in that pending

15   adversary proceeding.  Case doc. no. 900, at 2.[5]

16       The Motion to Reconsider makes no attempt to cure the prior evidentiary

17   issues, as the Court sustained all objections.  In particular, and as expounded on at

18   length by the Court at the hearing, no attempt has been made to analyze the leases

19   and explain the calculation of the Division Orders.

20       GLR's Motion to Reconsider relies not only on alleged evidence that existed at

21   the time of the February 25, 2020, hearing, but also evidence that did not exist until

22   after the hearing.  GLR makes no attempt to argue why post-hearing evidence is even

23   admissible in the context of a reconsideration motion.

24       The Motion to Reconsider also lacks any legal analysis.  The sole legal

25   argument made is that a motion for reconsideration may be made under Rule 9023 if

26

27   _____
[5]  If the point of the discovery in the adversary was to obtain evidence to use for this

28   motion, that was an abuse of the discovery process.

1    it is made within 14 days of the entry of the order, as if that is the sole requirement of

2    a motion for reconsideration.  There is also a reference to Rule 9024, implying that

3    the basis for involving Rule 9024 is the attachment of evidence which allegedly

4    could not have been discovered at the prior hearing.

5        As discussed above, GRL's Motion to Reconsider includes no discussion of

6    the procedural issue identified by the Trustee and others, discussed extensively by

7    the Court at the hearing, and memorialized in the Order, that GRL cannot obtain the

8    relief it seeks through a motion, it must be sought in an adversary proceeding, and

9    that adversary proceeding is, in fact, already pending.  Nor does the Motion to

10   Reconsider make any attempt to argue why the Trustee is not entitled to offset his

11   alleged damages against the royalties allegedly owed to GRL, pursuant to section

12   502.

13       As to Rule 9024, it is inapplicable here for two reasons.  First, the order for

14   which GRL seeks reconsideration, denial of its Relief from Stay Motion, is not final,

15   as the Court preserved for GRL the opportunity to seek relief in the adversary.  By its

16   terms, Rule 60(b) only applies to final orders.  The 1946 commentary to Rule 60

17   makes clear:  "The addition of the qualifying word "final" emphasizes the character

18   of the judgments, orders or proceedings from which Rule 60(b) affords relief; and

19   hence interlocutory judgments are not brought within the restrictions of the rule, but

20   rather they are left subject to the complete power of the court rendering them to

21   afford such relief from them as justice requires."

22       Moreover, Rule 60(b)(2) is expressly not applicable if the movant can bring a

23   timely motion under Rule 59.  However, any analysis of the plain language of the

24   Rule is ignored by GRL.  GRL also provides no analysis for application of Rule 59.

25       It appears GRL's sole basis under Rules 9023 and 9024 is purported newly

26   discovered evidence.  GRL makes no attempt to explain why it could not have sought

27   admissible evidence before it filed its Relief from Stay Motion.  In the Ninth Circuit,

28   motions for reconsideration "should not be granted unless the District Court is

1  presented with newly discovered evidence, committed clear error, or if there has

2  been an intervening change in the law.  *McDowell v. Calderon*, 197 F.3d 1253, 1255

3  (9th Cir. 1999); *see also Kona Enterprises, Inc. v. Estate of Bishop,*  229 F.3d 734,

4  740 (9th Cir. 2000); and *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir.

5  2001.)  The only basis upon which GRL seems to rest is newly discovered evidence.

6  But the record GRL has made evidences only that GRL did little to assemble

7  evidence before the February 25, 2020, hearing, had no admissible evidence at the

8  hearing, and only obtained what it now claims as evidence by abusing the discovery

9  process in the pending adversary proceeding, after the hearing on the Relief from

10 Stay Motion.  Evidence on a motion for reconsideration must be evidence that

11 <u>existed</u> at the time of the trial or hearing that the movant could not have presented,

12 despite diligence.  Evidence that did not exist at the time of the trial or hearing is not

13 admissible at all.  Relief under Rule 60(b)(2) requires that the evidence: (1) existed at

14 the time of the trial; (2) could not have been discovered through due diligence; and

15 (3) was of such magnitude that production of it earlier would have been likely to

16 change the disposition of the case.  *In re Cruz*, 516 B.R. 594, 604–05 (B.A.P. 9th Cir.

17 2014) (citing *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir. 1990).  The

18 same rule applies to Rule 59 motions.  *Jones v. Aero/Chem Corp,* 921 F.2d at 878.

19        Moreover, as shown above, the Trustee has done what the Court has

20 previously ordered the Debtor-in-Possession and its successor, the Trustee, to do:

21 segregate the funds believed to be insider royalties, pending further order of the

22 Court.

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1

# IV.

## CONCLUSION

The Motion for Reconsideration should be denied, without prejudice to GRL pursuing its claims, if any, in the pending adversary proceeding.

DATED: May 1, 2020

DANNING, GILL, ISRAEL & KRASNOFF, LLP


By:    /s/ GEORGE E. SCHULMAN

GEORGE E. SCHULMAN
ZEV SHECHTMAN
Attorneys for Michael A. McConnell, Chapter 11 Trustee

## DECLARATION OF MICHAEL A. MCCONNELL

I, Michael A. McConnell, declare and state as follows:

1.    I am the Chapter 11 trustee ("Trustee") of HVI Cat Canyon, Inc. ("Debtor").  I was appointed as Trustee by order of this Court (doc. no. 431) entered on October 22, 2019 .

2.    I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently with respect to such facts.

3.    I make this declaration in support of the above opposition to the Motion to Reconsider (doc. no. 900) (the "Reconsideration Motion") the order (doc. no. 866) denying the relief from stay motion (doc. no. 767) filed by GRL, LLC ("Movant" or "GRL").

### Debtor's Background and Bankruptcy Filing

4.    The Debtor is a Colorado corporation conducting business in the State of California.  It is the owner and operator of producing oil and gas interests in California.

5.    On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code.  The case was originally filed in the Southern District of New York.  It was transferred to the Northern District of Texas, and then later to the Central District of California.

6.    The Debtor initially operated its business as a "debtor in possession," allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

7.    The assets of the Debtor's estate include the Debtor's rights to extract oil and/or gas and/or minerals from numerous properties located in Santa Barbara, Kern, and Orange Counties (the "Oil and Gas Rights").

8.      The Oil and Gas Rights are memorialized in documents described as oil, gas, and/or mineral leases recorded in the relevant county recorders' offices (the "Oil and Gas Leases").

**The Debtor's Affiliates and Insiders**

9.      The Debtor has a number of affiliates and insiders including, among others:

        a.      California Asphalt Production, Inc., formerly known as Greka Refining Company, formerly known as Santa Maria Mining Company, a California corporation ("CAP"), operating in Santa Barbara County, California.  See doc. no. 171 at ECF p. 296 (identifying CAP as an insider and affiliate).  RJN Exhibit "1."

        b.      GLR, LLC, a Delaware limited liability company ("GLR").  See doc. no. 171 at ECF p. 294, 296 (identifying GLR as an insider and affiliate).  RJN Exhibit "1."

        c.      GRL, LLC, a Delaware limited liability company ("GRL").  See doc. no. 171 at ECF p. 294, 295 (identifying GRL as an insider and affiliate).  RJN Exhibit "1."

10.     The person who signed the Debtor's Statement of Financial Affairs under penalty of perjury is Randeep S. Grewal, as Chairman of the Debtor.  See doc. no. 171 at ECF p. 288.  RJN Exhibit "1."  As discussed further below, Mr. Grewal also signed, as GRL's principal, the declaration in support of the relief from stay motion underlying the order that is the subject of the current Reconsideration Motion.  Doc. no. 767 at ECF pp. 7-8.

11.     Prior to and since the Petition Date, CAP operated and operates a refinery in Santa Maria, California (the "Refinery").

12.     Until, as Trustee, I rejected them, the Debtor had written agreements with CAP.

13.    The Debtor and later I, as Trustee, delivered crude oil to CAP.

14.    CAP was required to pay the Debtor and the estate for the crude oil the Debtor delivered to CAP.

15.    In or around November 2019 I billed CAP $1.8 for crude oil shipped to CAP in October 2019 crude oil, and CAP paid the estate only $300,000.

**Cash Collateral Orders, Treatment of Royalty Payments Allegedly Owed to Insiders or Affiliates of Debtor, and Appointment as Chapter 11 Trustee**

16.    On August 14, 2019, the presiding court in this case (then in New York) entered an interim cash collateral order, which stated, in pertinent part:

> 9.    Absent further order of the Court or written consent of the Secured Lender UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, the Debtor shall not make the following payments: (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of legal fees for the Debtor or any committee, but the Debtor shall hold such payments in an interest-bearing escrow or segregated account. All such issues are expressly reserved for future determination. The Cash Collateral Budget attached hereto includes certain items for accounting purposes only; this Order does not permit payment of these items under this Order. Notwithstanding anything to the contrary, Cash Collateral shall only be used to pay those items in the Cash Collateral Budget that have been specifically approved. For the avoidance of doubt, the Debtor has no authority to make any (i) insider or affiliate royalty payments, (ii) insider or affiliate surface lease payments, (iii) professional fee payments, or (iv) other payments which are listed below the line in the Cash Collateral Budget for accounting purposes but not authorized by this Order, regardless of whether any such payments listed in (i)-(iv) are included in the Cash Collateral Budget.

Doc. no. 43 at pp. 8-9, ¶ 9 (emphasis added).

17.    On October 8, 2019, this Court entered an interim order on consensual use of cash collateral.  It provided for the same limitations provided in the above quoted paragraph of the August 14, 2019 interim cash collateral order.  See doc. no. 375 at pp. 6-7.

18.     On or about October 16, 2019, the Court entered its order directing the United States Trustee to appoint a Chapter 11 trustee (doc. no. 431).  That order granted the motions of two creditors, who alleged a variety of problems with the Debtor including, but not limited to, the Debtor's transactions with affiliates and/or insiders (doc. nos. 356, 363).

19.     The order approving my appointment as Trustee was entered on October 22, 2019 (doc. no. 431)

20.     On November 27, 2019, this Court entered its cash collateral order, which included the following language:

> Absent further order of the Court or written consent of UBS for payments specifically designated as a royalty payment or surface lease payment to an insider or affiliate, neither Debtor nor the Trustee shall make the following payments directly or indirectly: (i) any royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments provided for in the Budget in an interest-bearing escrow or segregated account. All such issues are expressly reserved for future determination. The Budget includes certain items for accounting purposes only; this Final Order does not permit payment of these items. Notwithstanding anything to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those items in the Budget that have been specifically approved by UBS or Huron and to escrow payments as set forth above. For the avoidance of doubt, neither the Debtor nor the Trustee has any authority to make, directly or indirectly, any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii) professional fee payments, except payments authorized for the Trustee's professionals or Committee's professionals under this Final Order; or (iv) other payments which are listed below the line in the Budget for accounting purposes but not authorized by this Final Order, regardless of whether any such payments listed in (i)-(iv) are included in the Budget. Doc. no. 572 at pp. 12-13, ¶15.  Thus, at least three orders have been entered which I understand prohibit the estate from paying royalties to insiders or affiliates.

RJN Exhibit "4."


**The GRL Royalties**

21.     Upon my appointment, I received $39,752.85 from the Debtor on account of royalties owed to GRL, which were in a segregated account.  The day after my appointment, on October 23, 2019, I opened a new bank account for the

insider royalties allegedly owed to GRL, and deposited the $39,752.85 which I received from the Debtor. That account was and remains at Wells Fargo Bank, account number ending in 0268 (the "Insider Escrow Deposit Account").

22. At the time that these monies (i.e., $39,752.85) were turned over to me by the Debtor, the account was substantially underfunded for the months when the Debtor was in possession at the time of payment, August and September 2019. In the period prior to my appointment and in years before the bankruptcy filing, the Debtor typically did not pay (non-insider) royalty claimants except, to some extent, if claimants litigated or threatened termination.

23. In the ordinary course, the Debtor receives payments for shipments of crude oil on the twentieth day of the month following the shipment. For example, payment for March 2020 crude oil shipments was due on April 20, 2020. Royalties are calculated and paid (or segregated) by the week following the date of collection of crude revenue. Thus, for example, for shipments in March 2020, payment to royalty claimants would be the week after April 20, 2020."

24. Upon my appointment, I understood that I was required to "hold" royalty payments or surface lease payments to insiders or affiliates of the Debtor "provided for in the Budget in an interest-bearing escrow or segregated account" (emphasis added). I understood based on the provisions of the cash collateral orders quoted above that I was required to account for the royalties of insiders and affiliates and estate professionals in much the same way. That is, I was required to segregate funds on account of those estate obligations subject to further Court orders. Consistent with this instruction, I accounted for the professional fees and insider or affiliate royalties incurred during my tenure, setting aside and accounting for those monies.

25. Although I accounted for the funds, during the period from November 20, 2019 through February 24, 2020, I did not deposit further monies in the Insider Escrow Deposit Account during that time period.

26.    Until February 24, 2020, I segregated royalties allegedly belonging to GRL on the books of the estate.

27.    However, in February, 2020, after consideration of multiplying, increasingly adversarial and duplicative filings by the Debtor's affiliates, GRL and GLR, in the Debtor's main case and the already pending avoidance action I filed against GRL and GLR (Adversary Proceeding No. 9:20-ap-01006-MB), I decided to transfer the monies set aside for GRL and GLR to the Insider Escrow Deposit Account.

28.    Accordingly, on February 24, 2020, I deposited $84,621.05 into the Insider Escrow Deposit Account on account of remaining royalties for oil sales in July through October 2019 and December 2020 ($32,121.05) and the Lakeview rent for August 2019 through February 2020 ($52,500), as reflected in Exhibit B to the Reconsideration Motion, at page 17.

29.    The document attached to the Reconsideration Motion at Exhibit C correctly shows the funds in the Wells Fargo bank account number ending in 0268 on February 25, 2020 (i.e. $124,373.90), the date of the hearing on the Relief from Stay Motion, and provides an accounting showing both the surface lease component owed to GLR and the oil royalty components owed to GRL.

30.    As of April 20, 2020, the balance in Wells Fargo Bank account number ending in 0268 was $137,066.39, including: (a) $4,136.72 which I deposited on March 11, 2020 for January royalties; and (b) $8,555.77 which I deposited on April 16, 2020 for February royalties.

31.    I continue to segregate insider royalties in the separate account.

32.    Accounting in this case has been hampered by longstanding financial and management problems of the Debtor, not least of which is the tangled web of relationships with and among the Debtor's affiliates, all of which are controlled by Mr. Grewal.  Those accountings were further hampered and complicated by the fact that CAP on November 20, 2019 paid me only $300,000 on account of a $1.8 million

invoice for crude oil CAP had purchased from the Debtor during the month of October 2019. CAP paid the Debtor nothing for crude oil CAP received from the Debtor in November 2019.  Production was largely stopped due to governmental order in December 2019, resulting in very minimal sales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 1st day of May, 2020, at Fort Worth, Texas.


    /s/ MICHAEL A. McCONNELL
Michael A. McConnell

# <u>REQUEST FOR JUDICIAL NOTICE</u>

Michael A. McConnell, as Chapter 11 Trustee ("Trustee") hereby respectfully requests that the Court take judicial notice of the following facts under Fed. R. Evid. 201:

1.      On July 25, 2019, the Debtor filed its voluntary Chapter 11 petition commencing this bankruptcy case.  The case was originally filed in the Southern District of New York.  The case was transferred to the Northern District of Texas, and then later to the Central District of California.

2.      On August 14, 2019, the presiding court in this case (then in New York) entered an interim cash collateral order.  Case doc. no. 4.

3.      On October 8, 2019, this Court entered an interim order on consensual use of cash collateral.  Case doc. no. 375.

4.      On October 16, 2019, the Court entered its order directing the United States Trustee to appoint a Chapter 11 trustee.  Case doc. no. 431.  That order granted the motions of two creditors. Case doc. nos. 356, 363.

5.      GRL, LLC and GLR, LLC are listed on the Debtor's Statement of Financial Affairs as an affiliate and insider.  See Exhibit "1" hereto, excerpts from Schedules and Statement of Financial Affairs, Case doc. no. 171, pages 294-296.

6.      Mr. Grewal signed the Debtor's Schedules and Statement of Financial Affairs, as the Debtor's Chairman.  Case doc. no. 171, pages 288, 316. Exhibit "1."

7.      The order approving the Trustee's appointment was entered on October 22, 2019.  Case doc. no. 431.

8.      On November 27, 2019, this Court entered its cash collateral order. Case doc. no. 572.  A copy of such order is attached hereto as Exhibit "2."

9.      On January 9, 2020, the Trustee filed a complaint against GRL, LLC and GLR, LLC, commencing adversary proceeding number 9:20-ap-01006-MB (the "Avoidance Action").

10.    On February 3, 2020, GRL, LLC and GLR, LLC  filed an answer and counterclaim in the Avoidance Action.

11.    On February 3, 2020, GRL, LLC filed its Relief from Stay Motion.  Case doc. no. 767.

12.    The Trustee filed an opposition to the Relief from Stay Motion.  (Case doc. no. 787.)  The Trustee also filed objections to the evidence proffered.  (Case doc. no. 789.)

13.    Opposition to the GRL Motion for Relief from Stay was filed by UBS, AG, on February 11, 2020 (case doc. no. 784).

14.    UBS AG also filed objections to Mr. Grewal's declaration.  (Case doc. no. 785.)

15.    Oppositions were also filed by the State Lands Commission (case doc. no. 790); and Buganko, LLC (case doc.  no. 791).

16.    A reply was filed by GRL.  Case doc. no. 808.

17.    On February 25, 2020, a hearing was held on GRL's Motion for Relief from Stay, and it was denied.  Case doc no. 825.

18.    A copy of the February 25, 2020 hearing transcript is attached hereto as Exhibit "3."

19.    A copy of the tentative ruling for the February 25, 2020 hearing is attached hereto as Exhibit "4."

1        20.    On March 23, 2020, the Court entered its Order Denying the Relief from

2 Stay Motion.  Case doc. no. 866. A copy of such order is attached hereto as Exhibit

3 "5."

4

5 DATED: May 1, 2020             DANNING, GILL, ISRAEL &

6                            KRASNOFF, LLP

7

8                      By:      /s/ GEORGE E. SCHULMAN

9                           GEORGE E. SCHULMAN

10                           ZEV SHECHTMAN

11                           Attorneys for Michael A. McConnell,
Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

**Fill in this information to identify the case:**

Debtor name: HVI Cat Canyon, Inc.

United States Bankruptcy Court for the: Northern District of

TX          19-32857

☐ Check if this is an amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property          12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
|---|---|

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand**          $ 5,000.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|
| 3.1. See Attachment | | | $ 48,448.73 |
| 3.2. | | | $ |

4. **Other cash equivalents** *(Identify all)*

   4.1. _____          $ _____
   4.2. _____          $ _____

5. **Total of Part 1**          $ 53,448.73
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

| Part 2: | Deposits and prepayments |
|---|---|

6. **Does the debtor have any deposits or prepayments?**

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit
   7.1. See Attachment          $ 728,828.58
   7.2. _____          $ _____

**0032**

| Debtor | HVI Cat Canyon, Inc. | Case number (if known) | 19-32857 |
|---|---|---|---|
| | Name | | |

---

**Name and address of recipient**

30.2

Name

Street

City                    State        ZIP Code

Relationship to debtor

---

**31.** Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?
☐ No
☐ X Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|
| GIT, Inc. | EIN: 91-1986286 |

**32.** Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?
☐ X No
☐ Yes. Identify below.

| Name of the pension fund | Employer Identification number of the pension fund |
|---|---|
| | EIN: __ __ - __ __ __ __ __ __ __ |

---

| **Part 14:** | **Signature and Declaration** |
|---|---|

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    09/06/2019
              MM / DD / YYYY

X _____    Printed name    Randeep S. Grewal
Signature of individual signing on behalf of the debtor

Position or relationship to debtor    Chairman

---

Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?
☐ No
☐ X Yes

---

Attachment to Part 2

Official Form 207

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**          04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form.
On the top of any additional pages, write the debtor's name and case number (if known).

Debtor name: HVI CAT Canyon, Inc.                    Case number: 19-32857

**Part 2:**  **List Certain Transfers Made Before Filing for Bankruptcy**

4.      **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing
this case on debts owed to an insider or guaranteed or cosigned by an insider unless the
aggregate value of all property transferred to or for the benefit of the insider is less than $6,825.
(This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases
filed on or after the date of adjustment.) Do not include any payments listed in line 3.
Insiders include officers, directors, and anyone in control of a corporate debtor and their
relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and
insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

| Insider's Name and address | Dates | Total amount of value | Reason for payment or transfer |
|---|---|---|---|
| 4.1 | | | |
| GLR, LLC | 8/6/2018 | $112,500 | Payment of Rent |
| 45 Rockefeller Plaza, Suite 2410 | 4/19/2019 | | |
| New York, NY 10111 | | | |
| **Relationship to debtor** | | | |
| Affiliate | | | |
| 4.2 | | | |
| GRL, LLC | 7/31/2018 | $330,346 | Royalty Payments |
| 45 Rockefeller Plaza, Suite 2410 | Through | | |
| New York, NY 10111 | 10/26/2018 | | |
| **Relationship to debtor** | | | |
| Affiliate | | | |
| 4.3 | | | |
| Greka Construction, LLC | 8/1/2018 | $108,000 | Construction/Maintenance Services |
| 2617 Clark Avenue | Through | | |
| Santa Maria, CA 93454 | 1/18/2019 | | |
| **Relationship to debtor** | | | |
| Affiliate | | | |

**0034**

Attachment to Part 2

Official Form 207

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form.
On the top of any additional pages, write the debtor's name and case number (if known).

Debtor name: HVI CAT Canyon, Inc.                    Case number: 19-32857

**Part 2:** List Certain Transfers Made Before Filing for Bankruptcy

4.    **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing
this case on debts owed to an insider or guaranteed or cosigned by an insider unless the
aggregate value of all property transferred to or for the benefit of the insider is less than $6,825.
(This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases
filed on or after the date of adjustment.) Do not include any payments listed in line 3.
Insiders include officers, directors, and anyone in control of a corporate debtor and their
relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and
insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

| | | | | |
|---|---|---|---|---|
| 4.4 | GTL1, LLC<br>1700 Sinton Road<br>Santa Maria, CA 93458 | 7/30/2018<br>Through<br>4/1/2019 | $1,808,000<br>. | Transportation Services |
| | **Relationship to debtor** | | | |
| | Affiliate | | | |
| 4.5 | GIT, Inc.<br>1700 Sinton Road<br>Santa Maria, CA 93458 | 7/30/2018<br>Through<br>7/19/2019 | $2,292,000 | Admin Services |
| | **Relationship to debtor** | | | |
| | Affiliate | | | |
| 4.6 | GRL, LLC<br>45 Rockefeller Plaza, Suite 2410<br>New York, NY | Jan-19 | Returned defaulted,<br>non-producing property | Lease Termination due to<br>non-payment of shut in<br>royalties |
| | **Relationship to debtor** | | | |
| | Affiliate | | | |

0035

Case 9:19-bk-11573-MB    Doc 967    Filed 05/09/20    Entered 05/09/20 06:24:16    Desc
Main Document    Page 25 of 316

Attachment to Part 2

Official Form 207

## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form.
On the top of any additional pages, write the debtor's name and case number (if known).

Debtor name: HVI CAT Canyon, Inc.    Case number: 19-32857

**Part 2:** List Certain Transfers Made Before Filing for Bankruptcy

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing
this case on debts owed to an insider or guaranteed or cosigned by an insider unless the
aggregate value of all property transferred to or for the benefit of the insider is less than $6,825.
(This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases
filed on or after the date of adjustment.) Do not include any payments listed in line 3.
Insiders include officers, directors, and anyone in control of a corporate debtor and their
relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and
insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

| 4.7 | | | | |
|---|---|---|---|---|
| GLR, LLC<br>45 Rockefeller Plaze, Suite 2410<br>New York, NY | Jan-19 | Returned defaulted,<br>non-producing property | Lease Termination due to<br>non-payment of shut in<br>royalties |
| **Relationship to debtor** | | | | |
| Affiliate | | | | |

| 4.8 | | | | |
|---|---|---|---|---|
| California Asphalt Production, Inc.<br>1660 Sinton Road<br>Santa Maria, CA 93458 | 7/26/2018<br>Through<br>7/25/2019 | $7,176,390 | Supplier |
| **Relationship to debtor** | | | | |
| Affiliate | | | | |

**0036**

Fill in this information to identify the case and this filing:

Debtor Name    HVI Cat Canyon, Inc.

United States Bankruptcy Court for the:    Northern    District of    TX
                                                                        (State)

Case number (If known):    19-32857

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ■ Schedule A/B: Assets–Real and Personal Property (Official Form 206A/B)
- ■ Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)
- ■ Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)
- ■ Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)
- ■ Schedule H: Codebtors (Official Form 206H)
- ■ Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)
- ☐ Amended Schedule _____
- ☐ Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (Official Form 204)
- ☐ Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    09/06/2019    ✗_____
               MM / DD / YYYY                Signature of individual signing on behalf of debtor

                                      Randeep S. Grewal
                                      Printed name

                                      Chairman
                                      Position or relationship to debtor

**EXHIBIT "2"**

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@dgdk.com*
2  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@dgdk.com*
3  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@dgdk.com*
4  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
5  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  *Proposed Attorneys for Michael A. McConnell,*
   *Chapter 11 Trustee*

8

**FILED & ENTERED**

**NOV 27 2019**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY handy     DEPUTY CLERK

CHANGES MADE BY COURT

9

10                **UNITED STATES BANKRUPTCY COURT**

11                **CENTRAL DISTRICT OF CALIFORNIA**

12                        **NORTHERN DIVISION**

13

14  In re:                                  Case No. 9:19-bk-11573-MB

15  HVI CAT CANYON, INC.,                    Chapter 11

16       Debtor.                            **FINAL   ORDER   FOR   EMERGENCY
                                            PRIMING    AND    SUPERPRIORITY**
17                                          **FINANCING AND CONSENSUAL USE OF
                                            CASH COLLATERAL BY THE CHAPTER**
18                                          **11 TRUSTEE**

19                                          Hearing
                                           Date:   November 21, 2019
20                                          Time:   2:30 p.m.
                                           Place:  Courtroom 201
21                                                  1415 State Street
                                                   Santa Barbara, California
22

23

24

25

26

27

28

This *Final Order for Emergency Priming and Superpriority Financing and Consensual Use of Cash Collateral by the Chapter 11 Trustee* (this "Final Order") is entered as of November [21], 2019, with respect of the following facts:

On October 4, 2019 the Court denied the *Debtor's Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 Approving Use of Cash Collateral, Providing Adequate Protection and Setting Final Hearing Pursuant to Bankruptcy Rule 4001*[ECF No. 11] (the "Cash Collateral Motion") and the *Motion of the Debtor to Surcharge Collateral Pursuant to 11 U.S.C. §§ 506(c) and 552(b)* [ECF No. 55] (the "Surcharge Motion").

On October 8, 2019, the Court entered an *Agreed Order for Consensual Use of Cash Collateral* [ECF No. 375] (the "Consensual Cash Collateral Order"), whereby UBS AG, London Branch ("UBS AG, London Branch"), the debtor and debtor in possession (the "Debtor"), the Official Committee of Unsecured Creditors (the "Committee"), and GIT, Inc. ("GIT"), in anticipation of a hearing on motions seeking appointment of a Chapter 11 trustee, agreed to use of cash collateral (as that phrase is defined in Section 363(a) of the Bankruptcy Code, "Cash Collateral") for an interim period ending October 25, 2019.  On October 16, 2019, the Court entered the *Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee* [ECF No. 409] and approved appointment of Michael McConnell as the Chapter 11 trustee in this case (the "Trustee") on October 22, 2019 [ECF No. 431].

Shortly before authority for use of Cash Collateral expired under the Consensual Cash Collateral Order, the Trustee and UBS AG, London Branch learned that the Debtor did not have sufficient cash to fund payroll and other operating expenses scheduled for payment.  To address the immediate cash need, on October 24, 2019, the Trustee filed his *Notice of Motion and Trustee's Emergency Motion for (1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt Production, Inc. to the Estate, or in the Alternative for Authority to Obtain*

- 2 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0040

*"Credit" in the Form of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h);*

*and Memorandum of Points and Authorities, Declaration of Tim Skillman, and Request for Judicial*

*Notice in Support Thereof* [ECF No. 439] (the "Emergency Motion").  Following the October 25,

2019 emergency hearing, the Court entered the *Order Granting Trustee's Emergency Motion for*

*(1) Authority to Accept a Partial Prepayment of the Amount Owed by California Asphalt*

*Production, Inc. to the Estate, or in the Alternative for Authority to Obtain "Credit" in the Form*

*of Such Prepayment, and (2) Waiver of any Stay Imposed by FRBP 6004(h)* [ECF No. 449], granting

authorizing the Trustee to accept a partial prepayment from California Asphalt Production, Inc.

("CAP").

On November 7, 2019, the Trustee filed his *Emergency Motion for an Order: (1)*

*Authorizing the Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing The*

*Continued Use of Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief*

[ECF No. 474] (the "Motion") for authorization to obtain post-petition financing from UBS AG,

Stamford Branch ("UBS AG, Stamford Branch" and together with UBS AG, London Branch,

"UBS") and continue to use the Cash Collateral of UBS AG, London Branch.

On November 8, 2019, the Court conducted an initial interim hearing on the Motion and

entered the *Interim Order on Trustee's Emergency Motion for an Order: (1) Authorizing the*

*Trustee to Obtain Secured Priming Superpriority Financing; (2) Authorizing Continued Use of*

*Cash Collateral; (3) Scheduling a Final Hearing; and (4) Granting Related Relief* [ECF No. 480]

(the "Interim Order"), authorizing up to $267,317 borrowings through a further interim hearing on

November 12, 2019.

On November 12, 2019, the Court conducted the further interim hearing and authorized

post-petition financing on an interim basis.  On November 18, 2019, the Court entered the *Second*

*Interim Order on Trustee's Emergency Motion for an Order: (1) Authorizing the Trustee to Obtain*

- 3 -

*Secured Priming Superpriority Financing; (2) Authorizing Continued Use of Cash Collateral; (3)*
*Scheduling a Final Hearing; and (4) Granting Related Relief* [ECF No. 524] (the "<u>Second Interim</u>
<u>Order</u>").

Based upon the Motion, and the financing pursuant to the credit agreement attached to the
Motion and the Trustee's use of Cash Collateral, such use being found necessary to avoid
immediate and serious harm to the estate and potential harm to the public health and safety as
contemplated by Bankruptcy Rule 4001(b) and (c), a final hearing to consider approval of the
Motion having been held on November 21, 2019 (the "<u>Final Hearing</u>"), notice and opportunity for
hearing being sufficient under the circumstances, and upon the findings of fact and conclusions of
law made by the Court at the interim hearings and the Final Hearing, all of which are incorporated
herein by reference, and good cause appearing therefor,

**IT IS HEREBY FOUND AND ORDERED AS FOLLOWS:**

1.    <u>Motion Granted</u>.  The Motion is granted on a final basis and the Facility (as defined
below) and the Credit Agreement attached as Exhibit 3 to the Trustee's Declaration (as amended,
supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>") are approved
subject to limitations expressly set forth herein.  Any objection to the Motion with respect to entry
of this Final Order that have not been withdrawn, waived or settled, and any reservation of rights
included therein, are hereby denied and overruled except as expressly set forth herein.  ~~Except as~~
~~specifically amended, supplemented, or otherwise modified by this Final Order, all provisions of~~
~~the Second Interim Order remain in full force and effect and are hereby ratified by this Final Order~~
~~and incorporated herein by reference as though set forth fully below.~~

2.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction over this matter pursuant to 28
U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory
predicates for the relief granted herein are section 364 of the Bankruptcy Code and Bankruptcy

- 4 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0042

Rule 4001(c).  Venue of this Chapter 11 proceeding and the Motion is proper in this district pursuant

to 28 U.S.C. § 1408 and 1409.

3.      <u>Hearing Held; Notice</u>.  The Final Hearing was held pursuant to Bankruptcy Rules

4001(c)(2).  Notice of the Final Hearing and the relief requested in the Motion was given as set

forth in the proof of service filed by the Trustee.

4.      <u>No Credit Available on More Favorable Terms</u>.  The Trustee, on behalf of the

Debtor and the Debtor's estate, is unable to find sufficient financing from sources other than UBS

AG, Stamford Branch on terms more favorable than the terms for the term loan facility (the

"<u>Facility</u>") described in the Credit Agreement.

5.      <u>Need for Post-Petition Financing and Use of Cash Collateral</u>.  This financing is

critical for the Debtor to continue its operations in the ordinary course.  The Facility, the Trustee's

entry into the Credit Agreement, and related relief is necessary to avoid immediate and irreparable

harm to the Debtor's estate, its employees, and all parties-in-interest.  The Facility is the best source

of financing available to the Debtor under the circumstances and was entered into in good faith and

at arm's-length.

6.      <u>Protective Advances</u>.  The advances under the Facility shall constitute advances to

protect and preserve the collateral under that certain First Lien Credit Agreement dated as of May

20, 2016 and that certain Second Lien Credit Agreement dated as of May 20, 2016 among the

Debtor, Rincon Island Limited Partnership, GOGH, LLC and UBS AG, London Branch

(collectively, the "<u>Prepetition Credit Agreements</u>" and the obligations arising thereunder the

"<u>Prepetition Obligations</u>") and shall remain subject to any guarantee provided thereunder.  For the

avoidance of doubt, all proceeds of the Facility shall constitute Cash Collateral.

7.      <u>Authorization for Emergency Financing</u>.  The Trustee is authorized on a final basis

to borrow, and UBS AG, Stamford Branch is authorized to advance, up to $3 million in financing,

- 5 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0043

under the Credit Agreement, subject to the terms of this Final Order, and in accordance with the budget attached hereto as Exhibit 1 (including all terms and conditions set forth therein and as may be updated from time to time in accordance with the Credit Agreement, the "Budget"), subject to a line-item variance of ten percent (10%) of the expenses set forth in the Budget tested on a cumulative basis by disbursement categories contained in the Budget (the "Permitted Variance"). The Trustee and UBS AG, Stamford Branch are authorized to extend the availability period under the Credit Agreement by up to two weeks and increase the amount of financing by an aggregate amount of up to $500,000 upon mutual agreement of the Trustee and UBS AG, Stamford Branch without further order of this Court.  All advances provided by UBS AG, Stamford Branch under the Facility prior to the Final Hearing, including but not limited to the $197,516 advanced by UBS AG, Stamford Branch on an emergency basis pursuant to the Interim Order and the $994,346 advanced by UBS AG, Stamford Branch pursuant to the Second Interim Order, shall ~~be subject to the terms of the Second Interim Order~~ remain subject to the terms of those orders, ~~as incorporated into this Final Order and,~~ notwithstanding anything to the contrary in this Final Order.~~, shall remain senior in priority to all other liens~~.  Any advances provided by UBS AG, Stamford Branch under the Facility after November 21, 2019 shall be subject to the terms of this Final Order and, to the extent Santa Barbara has valid, senior, perfected, and non-avoidable liens for ad valorem taxes under applicable law, shall be junior in priority and subject to such valid, senior, perfected, and non-avoidable ad valorem tax liens in favor of Santa Barbara.  Immediately upon entry of this Final Order, the Trustee shall, and is hereby authorized on a final basis to, execute and deliver to UBS AG, Stamford Branch the Credit Agreement and all other loan documents required to be executed and delivered under the Facility.  The Trustee and counsel acting on behalf of the Trustee are further authorized to take any such actions that may be necessary to implement the Facility and borrow funds under the Credit Agreement as approved in this Final Order, including without limitation to

- 6 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0044

issue, execute and deliver any such certificates, borrowing requests or other documents and directions that may be requested by UBS AG, Stamford Branch. Nothing in this Final Order shall create any obligation of UBS to advance or lend any money to the Trustee or the Debtor, and any such advances or loans shall be made by UBS AG, Stamford Branch only in accordance with the terms and conditions of the Credit Agreement and this Final Order. UBS respectfully notes that, should it agree to any additional financing beyond that provided pursuant to the terms of the Credit Agreement as in effect on the date hereof, and it undertakes no commitment to do so, it anticipates the interest rate for such financing will be higher than that provided hereunder to reflect limitations on the lien granted by this Order and the additional risk associated with such financing. Any funds advanced or loaned by UBS AG, Stamford Branch shall constitute a bona fide extension of credit to a non-affiliated borrower for purposes of the secured creditor exemption under the Comprehensive Environmental Response, Compensation Liability Act and comparable federal, state and local law. UBS AG, Stamford Branch shall not be deemed an operator or owner of the Debtor or any of its properties or incur any environmental or similar liabilities, including but not limited to, liability for environmental compliance, remediation, restoration or natural resource damages under any federal, state or local law solely as a result of providing funding, credit or advances to the Trustee.

8.     Based on the record before this Court, it appears (and the Trustee on behalf of the Debtor has stipulated) that the terms of the Facility, the Credit Agreement and this Final Order are fair and reasonable and are supported by reasonably equivalent value and fair consideration. The Court further finds that the Trustee's agreement to the terms of the Facility and Credit Agreement on behalf of the Debtor is a sound exercise of business judgment and should be approved as set forth herein.

- 7 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0045

9.      Amendment of the Credit Agreement.  Following entry of this Final Order, the Trustee is authorized to enter into any non-material amendment or modification to the Credit Agreement and the loan documents entered into in connection therewith without further order of this Court.  The Trustee shall promptly provide notice of any such amendment or modification to the Court, the United States Trustee, the Committee and Harry E. Hagen, as Treasurer-Tax Collector of the County of Santa Barbara, California ("Santa Barbara").  To the extent that such modification or amendment is material, such material modification or amendment shall only be permitted pursuant to an order of this Court on notice pursuant to Local Rule 2002-1(b) and a hearing.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions of the Credit Agreement shall be effective unless set forth in writing, signed by the Trustee and UBS AG, Stamford Branch.  For the avoidance of doubt, an amendment of the availability period of the Facility by up to two weeks and an increase of the amount of the Facility by up to $500,000 in accordance with paragraph 7 of this Final Order shall not constitute a material amendment.  Notwithstanding anything to the contrary in the Credit Agreement, UBS's prior consent to file a Chapter 11 plan is only required if the proposed Chapter 11 plan does not provide for payment of the Obligations in full in cash on the effective date.

10.     Use of Funds.  The Trustee may use funds advanced under the Facility, on the terms and conditions set forth herein and in the Credit Agreement, *provided that* all such funds are used to pay approved operating expenses solely in accordance with the Budget (including all terms and conditions set forth therein).  The Trustee is authorized to use funds advanced under the Facility to pay, or to fund a segregated account to pay, the reasonable fees and expenses for the Trustee's professionals and the Committee' professionals, only to the extent such fees and expenses for the Trustee's professional and the Committee's professionals are included in the Budget and accrued prior to an Event of Default.  The provisions for escrowing of funds shall differ for the Trustee's

- 8 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0046

professionals and for the Committee professionals, each of whom agrees to such difference. The

Budget amount for the Committee professionals shall be $70,000 for the five-week period (which

includes the total Investigation Budget (as defined below)) and shall be requested promptly by the

Trustee and escrowed immediately upon receipt. Accordingly, once such funds are escrowed, the

Committee professionals shall not enjoy the benefits of the Carve-Out set forth in paragraph 16 of

this Final Order. The liens of UBS and GLR are subordinated in such escrow funds to the extent

professional fees and expenses are awarded to the professionals. With regard to the Trustee's

professionals, in addition to the escrowed fund, they shall enjoy the benefit of the Carve-Out set

forth in paragraph 16 of this Final Order. For the avoidance of doubt, the funds advanced under

the Facility shall not be used for payment of any expense not specifically included and/or not

approved for payment under the Budget or otherwise authorized by this Final Order.

11.     <u>Liens, Collateral and Obligations</u>. Without limiting the approval set forth above, the

Court grants as follows:

(i)     Except as set forth below, pursuant to section 364(c) and 364(d) of the Bankruptcy
Code, UBS AG, Stamford Branch is granted valid and perfected first priority
priming and senior security interests and liens (the "<u>Financing Liens</u>") in all property
of the estate of the Debtor, including, but not limited to all of the Debtor's rights in
tangible and intangible assets, including without limitation, all prepetition and post-
petition assets of the Debtor's estate, whether existing on or as of the Petition Date
or thereafter acquired, including without limitation, the Debtor's interest in oil and
gas properties (and as-extracted collateral, goods, fixtures and hydrocarbons relating
thereto), wells, accounts receivable, other rights to payment, any right to receive any
residual of any retainer provided to any professionals after payment of such
professional's allowed fees and expenses, cash, inventory, general intangibles,
contracts, servicing rights, swap and hedge proceeds and termination payments,
servicing receivables, securities, chattel paper, owned real estate, real property
leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights,
trademarks, trade names, rights under license agreements and other intellectual
property, claims and causes of action (including those arising under sections 510 or
542 through 553 of the Bankruptcy Code, except as noted below), commercial tort
claims, and the proceeds of all of the foregoing (the "<u>Collateral</u>") or proceeds
thereof. The Financing Liens granted to UBS AG, Stamford Branch are valid,
perfected and enforceable first priority priming and senior liens on all the Collateral
that are superior to all other prepetition or post-petition liens, claims or security

- 9 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0047

interests in favor of any other lienholder, other than the Carve-Out (as defined below) and any valid, senior, perfected and non-avoidable ad valorem tax liens in favor of Santa Barbara (subject to the limitation set forth in paragraph 38 below). For the avoidance of doubt, the Financing Liens granted to UBS AG, Stamford Branch under the Second Interim Order for funds advanced prior to the Final Hearing shall remain senior in priority to any valid and perfected ad valorem tax liens. Notwithstanding anything to the contrary herein, the Financing Liens granted herein shall not attach to (a) avoidance claims of the estate against any party other than the Debtor's current and former insiders and affiliates or (b) the proceeds thereof. The Financing Lien shall only secure the Obligations (as defined below). UBS agrees, for the benefit of the Trustee and the Committee, that it will not look to recover from avoidance claims or proceeds without first making a reasonable good faith effort to collect from Prepetition Collateral (as defined below) to satisfy the Obligations.

(ii)     The Financing Liens against the assets of the Debtor and the Collateral shall be, and hereby are, confirmed, and extend to and secure all obligations and indebtedness of the Trustee on behalf of the Debtor and the Debtor's estate to UBS AG, Stamford Branch under the Facility and the Credit Agreement (the "Obligations"). The Financing Liens shall be, and are hereby determined to be, first priority priming and senior liens that are superior to all other liens, claims or security interests, pre- or post-petition, other than the Carve-Out (as defined below) and any valid, senior, perfected and non-avoidable ad valorem tax liens in favor of Santa Barbara (subject to the limitation set forth in paragraph 38 below), except as specifically set forth in this Final Order. This Final Order shall be deemed to grant and perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the Financing Liens. UBS AG, Stamford Branch may, but shall not be required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Financing Liens granted to them pursuant to this Final Order, and the stay imposed under section 362 of the Bankruptcy Code is hereby modified solely to permit the same. If UBS AG, Stamford Branch shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of and the Financing Liens, the Financing Liens granted herein shall be deemed perfected at the time and on the date of entry of this Final Order. Upon request by UBS AG, Stamford Branch, the Trustee is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments as may be necessary to enable UBS AG, Stamford Branch to further perfect, preserve and enforce the Financing Liens granted to UBS AG, Stamford Branch by this Final Order.

(iii)    For all Obligations, UBS AG, Stamford Branch is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Financing Superpriority Claim") having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Trustee on behalf of the Debtor and/or the Debtor, whether now in existence or incurred by the Trustee on behalf of the Debtor and/or the Debtor after the Petition Date, and over any and all

- 10 -

administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(b), 507(a), 364(c)(1), 564(c), or 726 of the Bankruptcy Code, other than the Carve-Out (as defined below). Notwithstanding anything to the contrary herein, the Financing Superpriority Claim granted herein shall not be payable from (a) avoidance claims of the estate against any party other than the Debtor's current and former insiders and affiliates or (b) the proceeds thereof.  UBS agrees, for the benefit of the Trustee and the Committee, that it will not look to recover from avoidance claims or proceeds without first making a reasonable good faith effort to collect from Prepetition Collateral (as defined below) to satisfy the Obligations.  UBS agrees to observe any requirements of marshaling under applicable law.

12.    <u>Use of Cash Collateral</u>.  The Trustee may use Cash Collateral, on the terms and conditions set forth herein solely in accordance with the Budget until the date that is the earliest of (a) November 29, 2019, (b) the occurrence of an Event of Default (as defined in the Credit Agreement), and (c) the breach or failure of the Trustee or the Debtor to comply with the terms of this Final Order (the date of the occurrence of the earliest of (a), (b) and (c), the "<u>Termination Date</u>").  To the extent the Debtor holds an interest, all funds and cash investments of Debtor, including any funds on deposit at any banks or other institutions as of the Petition Date, are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a).  In addition, all cash proceeds of the Prepetition Collateral (as defined below) (and investments thereof) received by the Debtor, the Trustee, or the estate of the Debtor after the Petition Date are Cash Collateral of UBS AG, London Branch within the meaning of 11 U.S.C. § 363(a).  The Trustee shall not use any Cash Collateral except as permitted herein or as otherwise approved by this Court.

13.    <u>Compliance with the Budget</u>.  Except as otherwise set forth herein, the Trustee is hereby authorized to use all Cash Collateral until the Termination Date to pay the ordinary course operating expenses of Debtor's estate solely in accordance with the Budget (including all terms and conditions set forth therein), subject to the Permitted Variance.

14.    <u>Limitations on Use of Proceeds and Cash Collateral</u>.  The Trustee shall notify Huron Consulting Group ("<u>Huron</u>"), via email to both mkehl@huronconsultinggroup.com and

- 11 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0049

azughayer@huronconsultinggroup.com, of any payments that exceed $7,500 not less than 36 hours

prior to initiating such payment (a "Proposed Payment").  If Huron does not object to the Proposed

Payment within 36 hours by email to the Trustee at michael.mcconnell@kellyhart.com, the Trustee

may proceed to make such payment.  Should Huron object to the Proposed Payment, such payment

shall not be made without further order of the Court.  The Trustee and UBS consent to judicial

intervention on an expedited basis to determine whether such Proposed Payment may proceed.  Any

payments to be made under the Budget to Santa Barbara, departments or agencies of the County of

Santa Barbara, and the Santa Barbara County Air Pollution Control District (the "APCD") must be

approved by Huron.  If approved, such payments shall be made timely in accordance with the

Budget.  For the avoidance of doubt, no payments shall be made to GIT pursuant to this Final Order

for prepetition work or claims other than reimbursement with regard to the Debtor's employees.

None of the Cash Collateral or the proceeds of the Facility, subject only to the Investigation Budget

(as defined below), shall be used (i) to challenge UBS's claims and/or liens or (ii) to prevent or

hinder UBS from exercising its rights or remedies.

15.     Absent further order of the Court or written consent of UBS for payments

specifically designated as a royalty payment or surface lease payment to an insider or affiliate,

neither Debtor nor the Trustee shall make the following payments directly or indirectly:  (i) any

royalty payments or surface lease payments to insiders or affiliates of the Debtor or (ii) any payment

of professional fees for the Debtor or any committee, but the Trustee shall hold any such payments

provided for in the Budget in an interest-bearing escrow or segregated account.  All such issues are

expressly reserved for future determination.  The Budget includes certain items for accounting

purposes only; this Final Order does not permit payment of these items.  Notwithstanding anything

to the contrary, the proceeds of the Facility and Cash Collateral shall only be used to pay those

items in the Budget that have been specifically approved by UBS or Huron and to escrow payments

- 12 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0050

as set forth above.  For the avoidance of doubt, neither the Debtor nor the Trustee has any authority to make, directly or indirectly, any (i) insider or affiliate royalty payments; (ii) insider or affiliate surface lease payments; (iii) professional fee payments, except payments authorized for the Trustee's professionals or Committee's professionals under this Final Order; or (iv) other payments which are listed below the line in the Budget for accounting purposes but not authorized by this Final Order, regardless of whether any such payments listed in (i)-(iv) are included in the Budget.

16.    Carve-Out.  There shall be a subordination of the Financing Liens and Financing Superpriority Claim granted to UBS AG, Stamford Branch on the Collateral, and the Adequate Protection Liens (as defined below) granted to UBS AG, London Branch on the Post-Petition Collateral and GLR on the Prepetition Collateral, and Adequate Protection Superpriority Claim (as defined below) granted to UBS AG, London Branch on the Post-Petition Collateral for the aggregate amount of reasonable professional fees and expenses for the Trustee's professionals, provided that such amount for the Trustee's professionals shall not exceed 25% of the amounts set forth in the Budget and accrued prior to occurrence of an Event of Default (the "Carve-Out").  If, for any reason, any portion of the sum of $70,000 budgeted for the Committee's professionals (up to $50,000 of which is for the Committee's Investigation Budget (as defined below)) is not funded to an escrowed account by the Trustee pursuant to paragraph 10 hereof, then such amount shall also constitute a part of the Carve-Out.  Notwithstanding the foregoing, following the occurrence of an Event of Default, the Carve-Out shall include any withheld portion of the fees and expenses for the Trustee's professionals accrued prior to such date and set forth in the Budget, and an additional amount not exceed $15,000 in the aggregate from and after a written notice of default.  It is the intention of this Final Order that the combination of the escrowed amounts under paragraph 10 plus the Carve-Out equals 100% of the Budgeted fees and expenses for the Committee's professionals and 125% of the Budgeted fees and expenses for the Trustee's professionals accrued prior to an

- 13 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0051

Event of Default plus the $15,000 provided in the prior sentence after a written notice of default, if applicable.  All such professionals having consented to the differential mechanics.  Nothing in this Final Order shall be construed to impair the ability of UBS to object to any fees, expenses, reimbursements, or compensation sought by the Trustee.  The Carve-Out shall not be used to investigate or commence or continue any action or proceeding against UBS, subject only to the Investigation Budget (as defined below).

17.    <u>Reporting Requirements</u>.  As a condition to use funds advanced under the Facility and Cash Collateral, the Trustee shall provide to UBS and the Committee a variance report reasonably acceptable to UBS on a weekly basis during the period for which use of such funds and Cash Collateral is permitted under this Final Order and any subsequent order, which shall be delivered by the Wednesday of the following week.  Reporting of monthly sales revenue shall be no later than 5 business days following the end of the month.  In addition, the Trustee and its representatives and agents shall provide to UBS and the Committee weekly reports, oral and/or written, regarding the status of operations and financial matters as well as any additional information reasonably requested by UBS.

18.    <u>Additional Covenants</u>.

(i)    No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to provide a reserve report regarding the Debtor's hydrocarbon assets.

(ii)    No later than November 18, 2019, the Trustee shall file an application in form and substance reasonably acceptable to UBS to retain persons acceptable to UBS on terms acceptable to UBS to conduct a Phase I environmental study regarding the Debtor's hydrocarbon assets and operations.

(iii)    On or before November 18, 2019, the Trustee shall provide one or more reports to UBS as to the Trustee's efforts to stabilize and improve Debtor's operations and revenues, including efforts to maximize sale revenues for the benefit of the estate.

- 14 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0052

(iv)     No later than November 18, 2019, the Trustee shall provide UBS with a 13-week cash flow budget in form and substance reasonably acceptable to UBS.

(v)     The Debtor shall obtain and collect a minimum monthly sales revenue of $750,000, measured as of the last day of each month.

19.     <u>Adequate Protection</u>.  UBS AG, London Branch is entitled, pursuant to 11 U.S.C. §§ 361 and 363(e), to adequate protection from any diminution in value of its interests in the collateral securing the Prepetition Obligations, including the Cash Collateral (collectively, the "<u>Prepetition Collateral</u>"), including, without limitation, any such diminution resulting from use by Debtor or the Trustee of Cash Collateral and any other collateral, and the imposition of the automatic stay pursuant to 11 U.S.C. § 362 (such diminution in value the "<u>Adequate Protection Obligations</u>").  Based on the Court's prior findings regarding the value of Prepetition Collateral in connection with the Cash Collateral hearings, Santa Barbara is adequately protected for priming and use of Cash Collateral under this Final Order.

20.     <u>Adequate Protection – Replacement and Additional Liens</u>.  As partial adequate protection for the Adequate Protection Obligations, effective upon the commencement of this case and without the necessity of the execution by Debtor, the Trustee or UBS AG, London Branch of any mortgages, security agreements, pledge agreements, financing statements or otherwise, the following additional and replacement security interests and liens are hereby granted to UBS AG, London Branch (the "<u>Senior Adequate Protection Liens</u>"), subject only to (i) liens on the Collateral in favor of UBS AG, Stamford Branch to secure the Obligations, (ii) valid and perfected non-avoidable liens in existence on the Petition Date that are senior in priority to the liens securing the prepetition claims of UBS AG, London Branch, and (iii) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by 11 U.S.C. § 546(b) that are senior in priority to the liens securing the prepetition claims of UBS AG, London Branch (subject to the limitation set forth in paragraph 38 below) ((i)–(iii) collectively, the "<u>Permitted Liens</u>"):  (a)

- 15 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0053

to the full extent of any diminution in value of the Prepetition Collateral, a perfected first priority senior security interest in and lien upon all cash of Debtor and any investment of the funds of Debtor, whether existing on the Petition Date or thereafter acquired as of the date hereof and as of the Petition Date; and (b) to the full extent of any diminution in value of the Prepetition Collateral, a perfected first priority senior security interest in and lien upon all other pre- and post-petition property of Debtor, whether existing on the Petition Date or thereafter acquired, including, without limitation, all accounts, cash, Cash Collateral, deposit accounts, chattel paper, instruments, documents, investment property, supporting obligations, customer lists, letter of credit rights, inventory, fixtures, equipment, general intangibles, goods, patents, copyrights and trademarks as well as all products and proceeds of any of the foregoing and books and records relating to any of the foregoing and to Debtor's business and the proceeds of all of the foregoing (collectively, the "Post-Petition Collateral").  For the avoidance of doubt, in accordance with paragraph 24 of this Final Order, the Senior Adequate Protection Liens granted herein shall not attach to avoidance claims of the estate or proceeds thereof.  The Senior Adequate Protection Liens granted under this Final Order shall be junior only to the Permitted Liens and the Carve-Out.

21.    GLR, LLC ("GLR") shall be entitled to, as adequate protection for its interest in Prepetition Collateral, effective upon the appointment of the Trustee and without the necessity of the execution by Debtor, the Trustee or GLR of any mortgages, security agreements, pledge agreements, financing statements or otherwise, the following additional and replacement security interests and liens which are hereby granted to GLR (the "Junior Adequate Protection Liens" and together with the Senior Adequate Protection Liens, the "Adequate Protection Liens"), subject only to the Permitted Liens to the full extent of any diminution in value of the Prepetition Collateral, and only to the extent of the validity, priority, and enforceability of GLR's prepetition lien in the Prepetition Collateral, a perfected replacement security interest in and lien upon the Prepetition

- 16 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0054

Collateral and all proceeds thereof, whether existing on the Petition Date or thereafter acquired.
For the avoidance of doubt, in accordance with paragraph 24 of this Final Order, the Junior
Adequate Protection Liens granted herein shall not attach to avoidance claims of the estate or
proceeds thereof.  The Junior Adequate Protection Liens shall be junior only to the Permitted Liens,
the Carve-Out, and the Senior Adequate Protection Liens.

22.    <u>Adequate Protection for the Use of Cash Collateral – Superpriority Claim</u>.  To the
extent the Post-Petition Collateral granted to UBS AG, London Branch herein does not provide
adequate protection of its interests in the Cash Collateral, the Adequate Protection Obligations shall
constitute a super-priority administrative expense claim under Section 507(b) of the Bankruptcy
Code ("<u>Adequate Protection Superpriority Claim</u>").  The Adequate Protection Superpriority Claim
shall have priority over all administrative expenses of any kind or any subsequently filed
bankruptcy case under any Chapter of the Bankruptcy Code in any court of competent jurisdiction,
including such administrative expenses of the kinds specified in, or allowable under, Sections 105,
326, 330, 331, 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code, subject only to the
Financing Superpriority Claim and the Carve-Out.  Additionally, no:  (i) costs or expenses of
administration which have been or may be incurred (a) in the Chapter 11 Case; (b) after conversion
of the Chapter 11 Case to a case proceeding under Chapter 7 of the Bankruptcy Code, or (c) in any
other proceeding related hereto; and/or (ii) priority claims as defined in Section 507(a) of the
Bankruptcy Code are, or will be, senior to or *pari passu* with the Adequate Protection Superpriority
Claim other than the Financing Superpriority Claim and the Carve-Out.  For the avoidance of doubt,
in accordance with paragraph 24 of this Final Order, the Adequate Protection Superpriority Claims
granted herein shall not attach to avoidance claims of the estate or proceeds thereof.

23.    <u>Perfection of Adequate Protection Liens</u>.  This Final Order shall be deemed to grant
and perfect, and be sufficient and conclusive evidence of the validity, perfection and priority of the

- 17 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0055

Adequate Protection Liens as of the Petition Date.  UBS AG, London Branch may, but shall not be required, to file or record financing statements, mortgages, notices of lien, or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Adequate Protection Liens granted to them pursuant to this Final Order, and the stay imposed under section 362 of the Bankruptcy Code is hereby modified solely to permit the same.  If UBS AG, London Branch shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments or otherwise confirm perfection of and the Adequate Protection Liens, the Adequate Protection Liens granted herein shall be deemed perfected at the time and on the date of entry of this Final Order.  Upon request by UBS AG, London Branch, the Trustee is authorized, without the further consent of any party, to take any actions and to execute and deliver such instruments as may be necessary to enable UBS AG, London Branch to further perfect, preserve and enforce the Adequate Protection Liens granted to UBS AG, London Branch by this Final Order.

24.     The Adequate Protection Liens granted by this Final Order and the Adequate Protection Superpriority Claim granted by this Final Order shall not attach to avoidance claims of the estate or proceeds thereof.  For the avoidance of doubt, nothing in this Final Order shall prevent UBS from asserting claims against or participating in such claims or proceeds under any other basis, including with respect to the Financing Liens.  Without limiting the foregoing, this provision shall not be retroactive, such that nothing in the Final Order shall alter or change the status of, or impose any limitation or agreement on, any lien or claim against such avoidance actions of proceeds thereof with regard to use of Prepetition Collateral or Cash Collateral granted by any order entered in this case prior to the date hereof.  Nothing herein shall impair or modify UBS AG, London Branch's rights to seek additional adequate protection pursuant to section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to UBS AG, London Branch hereunder is

- 18 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0056

insufficient to compensate for any diminution in value of its interests in the Cash Collateral or any other Prepetition Collateral during this case or any successor case.

25.    Termination of Cash Collateral Use.  On the Termination Date, the Trustee's right to use the Cash Collateral on the terms and conditions set forth in this Final Order shall terminate automatically.  By written agreement, UBS AG, London Branch may agree to waive such termination in full or permit only limited use of Cash Collateral in any manner following such event.

26.    Budget Amendments.  UBS may, but is not required to, by written agreement, amend the Budget, including to, among other things, extend the date through which Cash Collateral may be used and to increase the amount of Cash Collateral that may be used thereunder; *provided, however*, that any amendment to the Budget made pursuant to the authority set forth in this Final Order shall be subject to the following conditions and limitations:

(a) any such amendment shall not alter the nature and types of payments that were authorized under this Final Order; and

(b) any such amendment shall require the consent of the Trustee.

The foregoing conditions and limitations are intended to apply only to consensual changes to the Budget that are made pursuant to the authority of this Final Order.

27.    Upon entry of a written amendment in compliance with the foregoing, the new agreed budget shall constitute the Budget for all purposes under this Final Order and the Credit Agreement.

28.    Promptly following the amendment of the Budget in accordance with the foregoing, the Trustee shall promptly file notice with this Court, and provide notice of such entry to all parties entitled to notice.

- 19 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0057

29.    <u>Reservation of Rights</u>.  The right of the Trustee to seek additional or different use of Cash Collateral is specifically preserved, *provided that* upon filing of any such request, UBS AG, London Branch may by written notice terminate authorization to use Cash Collateral pursuant to this Final Order, or may agree to permit only use of Cash Collateral in any limited manner following such event; *provided, however*, any action seeking additional or different use of Cash Collateral without the express written consent of UBS shall immediately result in the occurrence of the Termination Date.

30.    <u>Remedies on Event of Default</u>.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right without any notice of further order of the Court to take any and all actions and pursue all remedies permitted under the Credit Agreement and applicable law in response to such Event of Default, subject to the requirements of paragraph 31 below.  UBS AG, Stamford Branch shall have the right to exercise any remedies under the Credit Agreement and applicable law on five days' notice to the Trustee, the Committee, the United States Trustee, and Santa Barbara.

31.    The automatic stay of section 362(a) of the Bankruptcy Code shall be and hereby is modified and vacated without further order, notice or application to the Court to the extent necessary to allow UBS to perform any act authorized by this Final Order.  If an Event of Default occurs, UBS AG, Stamford Branch shall have the right to seek an order on five days' notice to the Trustee, the Committee, the United States Trustee, and Santa Barbara lifting the automatic stay to permit UBS AG, Stamford Branch to foreclose on the Collateral or alternatively, compelling the Trustee to sell the Collateral pursuant to section 363(b) of the Bankruptcy Code.  Such motion may be accompanied by an affidavit on behalf of UBS AG, Stamford Branch stating that an Event of Default has occurred and setting forth the facts of such Event of Default.  Any party opposing the

- 20 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0058

relief requested by UBS AG, Stamford Branch shall have the burden of proof why the automatic

stay should not be lifted with respect to the Collateral.

32. <u>Further Assurances</u>.  No further actions shall be required to reflect the Financing

Liens or Adequate Protection Liens granted to UBS or the Obligations or Adequate Protection

Obligations incurred by the Trustee or the Debtor.  Notwithstanding the foregoing, the Trustee and

UBS are granted authority to take any such actions and execute any such documents as they may

deem appropriate to reflect the Financing Liens and the Adequate Protection Liens granted to UBS

or the Obligations incurred by the Trustee or the Debtor, including without limitation execution

and delivery of one or more notes, deeds of trust, financing agreements and all other actions as

UBS may reasonably request.

33. <u>Section 506(c) Waiver</u>.  All rights of the Debtor, the Trustee, and the estate to

surcharge the collateral of UBS are hereby waived for rights accruing during the period that the

Trustee receives advances or is authorized to use Cash Collateral pursuant to this Final Order or

the Credit Agreement, provided that, as consideration for such waiver, the Trustee shall be

authorized to obtain advances and use Cash Collateral for expenses in the Budget prior to any Event

of Default or Termination Date, and further provided that the waiver shall apply whether or not the

Trustee actually uses such advance or Cash Collateral for a specific expense set forth in the Budget

or uses them for another purpose so long as such funds are actually disbursed by the Trustee.

34. <u>Right to Credit Bid</u>.  UBS shall have the right to credit bid up to the full amount of

its outstanding Obligations and Prepetition Obligations in connection with any sale of the Debtor's

assets, the Prepetition Collateral, the Post-Petition Collateral or the Collateral under section 363 of

the Bankruptcy Code.  If UBS transfers all or any portion of its claims, the right of the transferee

to credit bid shall remain subject to a challenge "for cause" under section 363(k) of the Bankruptcy

Code solely based upon the transfer, the actions of the transferee, or events arising after such

- 21 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0059

transfer.  All defenses to any such challenge to the credit bid rights of a transferee are preserved.
Nothing herein shall constitute consent by UBS to any sale of such assets, Prepetition Collateral,
the Post-Petition Collateral or the Collateral.

35.   <u>Successors and Assigns</u>.  The provisions of this Final Order shall be binding upon
UBS, the Debtor, the Trustee and their respective successors and assigns (including any other
trustee hereinafter appointed or elected for the Debtor's estate) and inure to the benefit of UBS, the
Trustee and the Debtor and their respective successors and assigns.

36.   <u>Compliance with Laws</u>.  Nothing in this Final Order or the Budget shall permit the
Debtor or the Trustee to violate 28 U.S.C. § 959(b), and nothing in this Final Order or the Budget
shall in any way diminish the obligation of any entity, including the Debtor and the Trustee, to
comply with environmental laws.

37.   <u>Priority</u>.  Except as set forth herein with respect to the Financing Liens, nothing in
this Final Order shall determine or effect the relative priority of any senior prepetition lien or post-
petition lien, and all rights are expressly reserved in that regard.  All rights are expressly reserved
with respect to whether any asset is cash collateral for any entity other than UBS and thus any
entitlement of such other entities to adequate protection, including without limitation any
superpriority claim.

38.   To the extent Santa Barbara has valid, senior, perfected, and non-avoidable liens for
ad valorem taxes, penalties, interest, and attorneys' fees under applicable law, the Financing Liens
and Adequate Protection Liens granted to secure Obligations incurred under the Facility after the
Final Hearing on November 21, 2019 in accordance with this Final Order shall be junior in priority
and subject to such valid, senior, perfected, and non-avoidable ad valorem tax liens in favor of
Santa Barbara only to the extent of such lien on the Collateral.  For the avoidance of doubt, the
Financing Liens, Financing Superpriority Claim, Adequate Protection Liens, and the Adequate

- 22 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0060

Protection Superpriority Claim granted to UBS AG, Stamford Branch under the Second Interim

Order to secure all Obligations advanced by UBS AG, Stamford Branch pursuant to the Interim

Order and Second Interim Order prior to November 21, 2019 are valid, perfected and enforceable

first priority priming and senior liens on all the Collateral that are superior to all other prepetition

or post-petition liens, claims or security interests in favor of any other lienholder (including any

valid, perfected, enforceable and non-avoidable ad valorem tax liens), other than the Carve-Out.

Nothing in this Final Order shall determine the priority, amount, and extent of the Santa Barbara

ad valorem tax liens or claims.  All rights with regard to priority, amount, and extent of the Santa

Barbara tax liens or claims are fully preserved.

39.    <u>Effect of Final Order</u>.  If any or all of the provisions of this Final Order are hereafter

reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay, shall not affect

(i) the validity of any Adequate Protection Obligations incurred before the actual receipt of written

notice by UBS AG, London Branch of the effective date of such reversal, modification, vacatur or

stay or (ii) the validity or enforceability of any lien or priority authorized or created hereby.

Notwithstanding any such reversal, modification, vacatur or stay, any use of the Facility proceeds

or Cash Collateral or Obligations or Adequate Protection Obligations incurred by Debtor or the

Trustee to UBS before the actual receipt of written notice by UBS of the effective date of such

reversal, modification, vacatur or stay, shall be governed in all respects by the original provisions

of this Final Order, and UBS shall be entitled to all the rights, remedies, privileges and benefits

granted in section 363(m) of the Bankruptcy Code and this Final Order with respect to all uses of

the Facility proceeds or Cash Collateral and the Obligations or Adequate Protection Obligations.

40.    Except as expressly provided in this Final Order, the Financing Liens, the

Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims

and all other rights and remedies of UBS granted by the provisions of this Final Order shall survive,

- 23 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0061

and shall not be modified, impaired or discharged by (i) the entry of an order converting the case

to a case under chapter 7, dismissing of the case, or by any other act or omission or (ii) the entry of

an order confirming a plan in the case.  The terms and provisions of this Final Order shall continue

in this case, or in any superseding chapter 7 case under the Bankruptcy Code, and the Financing

Liens, the Superpriority Claims, the Adequate Protection Liens, the Adequate Protection

Superpriority Claims, and all other rights and remedies of UBS granted by the provisions of this

Final Order shall continue in full force and effect until the Obligations and the Adequate Protection

Obligations are indefeasibly paid in full.

41.     <u>Findings of Fact and Conclusions of Law</u>. This Final Order shall constitute findings

of fact and conclusions of law of the Court and shall take effect immediately upon execution hereof.

42.     <u>Filing</u>. This Final Order may be filed in any state or local jurisdiction in order to

evidence and perfect UBS's liens and security interests, as granted and confirmed herein.  At the

request of UBS's counsel, the clerk of court shall issue a certified copy of this Final Order and shall

execute such other certificates or affidavits of authenticity as may be reasonably necessary to put

this Final Order in a form that may be accepted by the applicable filing office.

43.     <u>Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy</u>

<u>Code</u>.  The terms of the Facility, Credit Agreement, and this Final Order were negotiated in good

faith and at arms' length among the Trustee and UBS.  Financing provided under the Facility and

the Credit Agreement shall be deemed to have been extended in good faith and for valid business

purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code.

44.     <u>Stipulations</u>.  Effective upon the expiration of the Challenge Period (as defined

below), the Trustee will be deemed to have admitted, acknowledged, agreed and stipulated that:  (i)

the amount due to UBS under the Prepetition Credit Agreements, as of June 30, 2019, is

approximately $127 million, plus such allowable interest, fees and charges as may accrue

- 24 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0062

thereafter; (ii) the Prepetition Obligations constitute legal, valid, enforceable and binding

obligations of the Debtor; (iii) no offsets, defenses or counterclaims to the Prepetition Obligations

exist; (iv) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction

or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (v) the

Prepetition Credit Agreements are valid and enforceable by UBS AG, London Branch against the

Debtor; (vi) the liens and security interests in the Prepetition Collateral securing the Prepetition

Obligations (the "Prepetition Liens") were perfected as of the Petition Date and constitute legal,

valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not

subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or

subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens

had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens

expressly permitted by the Prepetition Credit Agreements (to the extent any such permitted liens

were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens

as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code); (vii) the

Prepetition Obligations constitute allowed secured claims against the Debtor's estate to the extent

of the Collateral; and (viii) the Debtor and its estate have no claim, objection, challenge or cause

of action against UBS or any of its affiliates, parents, subsidiaries, partners, controlling persons,

agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under

applicable state or federal law (including, without limitation, any recharacterization, subordination,

avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the

Bankruptcy Code), in connection with any of the Prepetition Credit Agreements (or the transactions

contemplated thereunder), the Prepetition Obligations or the Prepetition Liens, including without

limitation, any right to assert any disgorgement or recovery.

- 25 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0063

45.    <u>Effect of Stipulations on Third Parties</u>.  The stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in this case, and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including the Trustee in all circumstances and for all purposes unless:  (a) any party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing granted by the Court or, in the case of the Committee, upon the filing of a motion seeking such standing, has timely and properly filed an adversary proceeding, contested matter, or as to the Committee, motion seeking standing (subject to the limitations contained herein) by no later than a date that is the later of (i) January 13, 2020; (ii) any later date agreed to by UBS AG, London Branch in writing in its sole discretion; and (iii) any such later date ordered by the Court for good cause shown after notice and an opportunity to be heard, *provided that* the motion seeking such relief is filed before the expiration of any applicable period as set forth in clauses (i)–(iii) of this sentence (the "<u>Challenge Period</u>"), (A) objecting to or challenging the validity, perfection, enforceability, priority or extent of the Prepetition Obligations, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims through or on behalf of the Debtor's estate against UBS AG, London Branch (collectively, the "<u>Challenge Proceeding</u>"); and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge Proceeding; *provided, however*, that any pleadings filed in connection with any Challenge Proceeding shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If any such Challenge Proceeding is timely filed during the Challenge Period, such filing shall immediately result in the occurrence of the Termination Date.

- 26 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0064

46.    If no such Challenge Proceeding is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding:  (i) any and all Challenge Proceedings or potential Challenge Proceedings shall be deemed to be forever waived and barred; (ii) all stipulations, admissions, agreements and releases contained in this Final Order shall be irrevocably and forever binding on all parties in interest; (iii) the Prepetition Liens shall be deemed to constitute valid, binding, and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtor shall be deemed to have released, waived and discharged UBS AG, London Branch from any and all obligations and liabilities to the Debtor and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date.

47.    If any such Challenge Proceeding is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Final Order shall nonetheless remain binding and preclusive on all persons and entities, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.  UBS AG, London Branch reserves all of its rights to contest on any grounds any Challenge Proceeding. Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in this case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate.

48.    The Trustee may use the funds advanced under the Facility to investigate (i) the claims and liens of UBS AG, London Branch and (ii) potential claims, counterclaims, causes of action or defenses against UBS AG, London Branch; *provided that* no more than an aggregate of $5,000 of the funds advanced under the Facility may be used by the Trustee in respect of any such investigation (the "Trustee's Investigation Budget") and $50,000 of the funds advanced under the

- 27 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0065

Facility may be used by the Committee in respect of any such investigation (the "Committee's Investigation Budget" and together with the Trustee's Investigation Budget, the "Investigation Budget").  The Committee's Investigation Budget represents the total amount of funds advanced under the Facility that may be used by the Committee in respect of any such investigation during this bankruptcy case.

49.    No Stay.  There is no stay of this Final Order, including no stay pursuant to Federal Rule of Bankruptcy Procedure 6004(h) (to the extent applicable).

# # #

Date: November 27, 2019

_Martin R. Barash_

Martin R Barash
United States Bankruptcy Judge

- 28 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0066

1
###

2

3
**Agreed as to form only:**

4
**PACHULSKI STANG ZIEHL & JONES LLP**

5
By: *[signature]*

6
Jeffrey N. Pomerantz
Maxim B. Litvak

7
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067

8
(310) 277-6910

9
Email: jpomerantz@pszjlaw.com
        mlitvak@pszjlaw.com

10
**COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

11

12
**SNOW SPENCE GREEN LLP**

13
By:_____

14
W. Ross Spence
2929 Allen Parkway, Suite 2800

15
Houston, Texas 77019
(713) 335-4800

16
Email: ross@snowspencelaw.com

17
**ATTORNEYS FOR THE COUNTY OF SANTA BARBARA, CALIFORNIA; HARRY E.**

18
**HAGEN, AS TREASURER-TAX COLLECTOR OF THE COUNTY OF SANTA
BARBARA, CALIFORNIA; AND THE SANTA BARBARA COUNTY AIR POLLUTION**

19
**CONTROL DISTRICT**

20
**Agreed as to form only, and shall not indicate that this Final Order satisfies condition under**

21
**the Credit Agreement nor that the condition is waived:**

22
**O'MELVENY & MYERS LLP**

23
By:_____

24
Evan M. Jones
400 South Hope Street, 18th Floor

25
Los Angeles, California 90071-2899

26
(213) 430-6000
Email: ejoines@omm.com

27
**ATTORNEYS FOR UBS AG, LONDON BRANCH AND UBS AG, STAMFORD BRANCH**

28
- 28 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

**0067**

1                                    ###

2       **Agreed as to form only:**

3       **PACHULSKI STANG ZIEHL & JONES LLP**

4       By:_____

5       Jeffrey N. Pomerantz
        Maxim B. Litvak
6       10100 Santa Monica Blvd., 13th Floor
7       Los Angeles, California 90067
        (310) 277-6910
8       Email: jpomerantz@pszjlaw.com
9               mlitvak@pszjlaw.com

10      **COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

11

12      **SNOW SPENCE GREEN LLP**

13      By:_____
        W. Ross Spence
14      2929 Allen Parkway, Suite 2800
        Houston, Texas 77019
15      (713) 335-4800
        Email: ross@snowspencelaw.com
16

17      **ATTORNEYS FOR THE COUNTY OF SANTA BARBARA, CALIFORNIA; HARRY E.
        HAGEN, AS TREASURER-TAX COLLECTOR OF THE COUNTY OF SANTA**
18      **BARBARA, CALIFORNIA; AND THE SANTA BARBARA COUNTY AIR POLLUTION
        CONTROL DISTRICT**
19

20      **Agreed as to form only, and shall not indicate that this Final Order satisfies condition under**
21      **the Credit Agreement nor that the condition is waived:**

22      **O'MELVENY & MYERS LLP**

23      By:_____

24      Evan M. Jones
        400 South Hope Street, 18th Floor
25      Los Angeles, California 90071-2899
        (213) 430-6000
26      Email: ejoines@omm.com

27      **ATTORNEYS FOR UBS AG, LONDON BRANCH AND UBS AG, STAMFORD BRANCH**
                                    - 28 -
28      ────────────────────────────────────────────────────
        FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
        CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

# EXHIBIT 1

| HVI CAT CANYON INC. weeks 14-18 budget | Forecast | Forecast | Forecast | Forecast | Forecast | TOTAL |
|---|---|---|---|---|---|---|
| | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | |
| Notes  week starting | 28-Oct-19 | 4-Nov-19 | 11-Nov-19 | 18-Nov-19 | 25-Nov-19 | |
| 1  Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |
| 2  Cash Inflows | | | | | | |
| 3  SMV | - | 12,000 | - | 1,460,858 | - | 1,472,858 |
| Redu | - | - | - | 49,917 | - | 49,917 |
| Belridge | - | - | - | 58,155 | - | 58,155 |
| Total Cash Inflows | - | 12,000 | - | 1,568,931 | - | 1,580,931 |
| 4  Royalties | - | (118,392) | - | (141,171) | - | (259,562) |
| 5  Escrow Royalties | - | (27,690) | - | (27,148) | - | (54,838) |
| Total Net Cash Inflows | - | (134,081) | - | 1,400,611 | - | 1,266,530 |
| Cash Outflows | | | | | | |
| 6  Operating Expenses | | | | | | |
| 7  Payroll Checks | - | 76,000 | - | 76,000 | - | 152,000 |
| 8  Payroll Taxes | 28,763 | - | 29,000 | - | 29,000 | 86,763 |
| Garnishment & Child Support | - | 2,011 | - | 1,006 | - | 3,017 |
| 9  Surface Rents | - | 75,634 | - | - | - | 75,634 |
| 10  Consultants | - | 9,008 | - | 9,008 | - | 18,015 |
| 11  Phones | - | 2,500 | - | 2,000 | - | 4,500 |
| 12  Power PG&E | - | 30,000 | - | 170,000 | - | 200,000 |
| 13  Power SoCalEdison | - | 20,000 | - | - | - | 20,000 |
| Waste Management | - | 2,100 | - | - | 2,100 | 4,200 |
| Water | - | 1,000 | 2,000 | - | - | 3,000 |
| SouthernCalGas | - | 75 | 75 | - | 75 | 225 |
| Portable Restrooms | - | 1,100 | - | 1,500 | - | 2,600 |
| Alarms | - | - | 500 | - | - | 500 |
| Cafeteria | - | - | - | 250 | - | 250 |
| Copies | - | - | - | 250 | - | 250 |
| 14  Chemicals | - | 10,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| 15  Pumps | - | 25,000 | 10,000 | 10,000 | 10,000 | 55,000 |
| 16  Gasoline | - | 25,000 | 12,500 | 12,500 | 12,500 | 62,500 |
| 17  Transportation | - | - | - | 150,000 | - | 150,000 |
| 18  Vacuum Trucks | - | - | - | 56,000 | - | 56,000 |
| 19  LCR | - | - | - | 575,000 | - | 575,000 |
| 20  Electricians | - | 10,000 | 5,000 | 10,000 | 5,000 | 30,000 |
| 21  Welders | - | 5,000 | 2,500 | 2,500 | 2,500 | 12,500 |
| 22  Supplies (Belts-Parts) | - | 2,000 | 1,500 | 1,500 | 1,500 | 6,500 |

| Notes | HVI CAT CANYON INC. weeks 14-18 budget week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|
| 23 | Parts (Compressor, Pipe, others) | - | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 |
| 24 | Clean Chemical towers | - | 3,000 | 1,500 | 1,500 | 1,500 | 7,500 |
| 25 | Vehicle maintenance | - | 16,000 | - | 8,000 | - | 24,000 |
| | Drink Water | - | 150 | - | 150 | - | 300 |
| 26 | Weed abatement | - | 15,000 | 10,000 | 10,000 | 10,000 | 45,000 |
| 27 | Well Analysis | - | 3,000 | - | 3,000 | - | 6,000 |
| 28 | Compliance | - | 25,000 | - | 25,000 | - | 50,000 |
| | Fire Department | - | - | - | - | - | |
| 29 | APCD | - | 2,000 | 2,000 | 2,000 | 2,000 | 8,000 |
| 30 | SBP - APCD | - | - | - | 146,436 | - | 146,436 |
| 31 | SBP - P&D | - | - | - | 159,843 | - | 159,843 |
| 32 | SBP - FD | - | - | - | 16,440 | - | 16,440 |
| 33 | SBP - EHS | - | - | - | 10,475 | - | 10,475 |
| | SBP - Tax | - | - | - | - | - | |
| 34 | Escrow - Surface Rents | - | 7,500 | - | - | - | 7,500 |
| 35 | Netherland and Sewell Reserve Report | - | - | - | - | 25,000 | 25,000 |
| | Total Operating Expenses | 28,763 | 373,078 | 86,575 | 1,470,357 | 111,175 | 2,069,948 |
| | **G&A Expenses** | | | | | | |
| | Bank Charges & fees | 100 | 100 | 100 | 100 | 100 | 500 |
| 36 | Insurances | - | 9,000 | 9,000 | 19,000 | - | 37,000 |
| 37 | Chapter 11 Trustee Professionals | 228,834 | 108,894 | 108,894 | 108,894 | 108,894 | 664,410 |
| 38 | Unsecured Creditor Committee Professionals | - | - | - | 50,000 | - | 50,000 |
| 39 | U.S. Trustee Payment | - | 25,000 | - | - | - | 25,000 |
| 40 | Backoffice & Administrative | - | - | - | 156,000 | - | 156,000 |
| | Interest | - | - | - | - | - | - |
| | Total G&A | 228,934 | 142,994 | 117,994 | 333,994 | 108,994 | 932,910 |
| 41 | **Health and Safety** | | | | | | |
| 42 | SMV Health and Safety | - | 28,000 | 88,000 | 56,000 | 16,000 | 188,000 |
| 43 | Belridge Health and Safety | - | 4,500 | 5,000 | 20,000 | 3,000 | 32,500 |
| 44 | Redu Health and Safety | - | 31,047 | 3,000 | 16,000 | 40,000 | 90,047 |
| | Total Health and Safety | - | 63,547 | 96,000 | 92,000 | 59,000 | 310,547 |
| 45 | Total Cash Outflows | 257,697 | 579,618 | 300,569 | 1,896,351 | 279,169 | 3,313,405 |
| | Net Cash Flow | (257,697) | (713,699) | (300,569) | (495,740) | (279,169) | (2,046,875) |
| | Beginning Cash Balance | 36,784 | - | - | - | - | 36,784 |

| HVI CAT CANYON INC. | Forecast | Forecast | Forecast | Forecast | Forecast | TOTAL |
|---|---|---|---|---|---|---|
| weeks 14-18 budget | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | |
| Notes *week starting* | 28-Oct-19 | 4-Nov-19 | 11-Nov-19 | 18-Nov-19 | 25-Nov-19 | |
| Net Cash Flow | (257,697) | (713,699) | (300,569) | (495,740) | (279,169) | (2,046,875) |
| Net Borrowing/(Pay Down) | 220,913 | 713,699 | 300,569 | 495,740 | 279,169 | 2,010,091 |
| Ending Cash Balance | - | - | - | - | - | - |
| 46  Loan Balance | 220,913 | 934,613 | 1,235,182 | 1,730,922 | 2,010,091 | 2,010,091 |

| 1 | Book Bank Balance Reconciliation | |
|---|---|---|
| | Starting Balance 10/24/19 | 18,022 |
| | Transfer for net amount for Sept Revenue | 23,810 |
| | Transfer #1 against October Revenue | 60,000 |
| | Transfer #2 against October Revenue | 20,000 |
| | Balance as of 10/25/19 | 121,832 |
| | Total Check Disbursements on 10/25/19 | 85,048 |
| | Net Available book balance 10/28/19 | 36,784 |

2 Forecast dependent on actual volume of delivered barrels, price and gravity adjustments.
The price per barrel is calculated for Santa Maria Valley using the average price per barrel posted by Chevron, Union 76, Exxon and Shell for Midway Sunset crude less $7.
The price per barrel for Redu is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $5.75.
The price per barrel for Belridge is calculated using the average price per barrel posted by the same 4 corporations for Buena Vista crude less $0.75.
All pricing is subject to adjustments based upon the gravity of the oil produced. The prior month's revenue is collected on the 20th of the following month. See the October 2019 Revenue Projection schedule for a detailed build up of the forecasted revenue.

3 Affiliate California Asphalt Production, Inc. advanced $80k of the forecasted revenue for October to HVI in week 13 and an additional $12k in week 15 to cover a surface lease payment to Boisseranc.

4 In aggregate, monthly royalties are approximately 13% of production which is approximately 1 month's revenue less the LCR shipments.

5 Escrow Royalties are based upon an insider's 2.5% overriding royalty on 1 month's production which is approximately 1 month's revenue less the LCR shipments.

6 Due to cash flow constraints in Week 14, the majority of forecasted disbursements for the week were rolled into the forecasted disbursements for week 15.

7 Bi-weekly payroll for HVI's 41 employees, including insider Alex Dimitrijevic's compensation that, as the President and COO of HVI, is subject to a 15 day objection period prior to disbursement.

| | HVI CAT CANYON INC. weeks 14-18 budget | Forecast Week 14 | Forecast Week 15 | Forecast Week 16 | Forecast Week 17 | Forecast Week 18 | TOTAL |
|---|---|---|---|---|---|---|---|
| Notes | week starting | 28-Oct-19 | 4-Nov-19 | 11-Nov-19 | 18-Nov-19 | 25-Nov-19 | |

**8** Schedule of payroll taxes due to State and Federal Taxing Authorities due on week 13:

| | |
|---|---|
| Federal Income Tax Withholding | 8,999.87 |
| Social Security Tax Withholding | 12,284.18 |
| Medicare Tax Withholding | 2,872.94 |
| Total Form 941 Liability | 24,156.99 |
| Federal Unemployment Insurance Liability | 35.30 |
| State Income Tax Withholding | 3,215.65 |
| CA SDI Tax Withholding | 990.69 |
| State Unemployment Insurance | 364.81 |
| Total Form DE-9 Liability | 4,571.15 |
| Total Liability for 10/25/2019 Payroll | 28,763.44 |

**9** Surface Rent Sub schedule

| Surface Lease Owner: | Amount | Timing |
|---|---|---|
| Boisseranc | $ 11,956 | Due on the 1st of each month |
| Buganko | $ 41,878 | Due on the 1st of the month. This amount includes $27k for unpaid surface lease payments from prior post-petition budgets. |
| Medema (1/2) Thomson (1/4) (- McLaughlin (1/4) | $ 7,500 | Due on the 1st of each month |
| (3) Etchandy family members | $ - | Lease to be rejected, no amount due |
| State College, LLC (Evelyn Roper) | $ - | $1,5851.33 due on an annual basis - has been paid for 2019. |
| Adam Family Trust | $ - | No amount due |
| Orcutt Fee, LLC | $ - | $5,000 due on Annual - paid for 2019 |
| Marianne Friedl | $ - | $3,700 due on Annual - paid for 2019 |
| C.M.T LLC | $ - | $100 will be due in January 2020. |
| Manfred Sander | $ 6,800 | Due before the end of October 2019 |
| E & B Natural Resources | $ - | Under review, no amount currently due |
| Grundoon, LLC (Firestone) | $ 7,500 | Due on the 1st of each month |
| Morganti Ranch | $ - | $5,500 on a monthly basis but lease is currently shut-in so no amount due. |
| Morganti Ranch | $ - | Under review, no amount currently due |
| Morganti Ranch | $ - | Under review, no amount currently due |
| Railroad | $ - | $454 due in December 2019 |
| (4) Righetti family members | $ - | $3,000 per quarter, next payment due in December 2020 |
| (3) Judy A. Rogers, Ronald H. Souza, Jr., Michael J. Souza | $ - | $750 due in January 2020 |
| Roland and Sandy Miller | $ - | $300 due in December 2019 |
| Multiple Bradley Lands | $ - | No amount due in October or November 2019 |
| **Total amount due in week 14** | **$ 75,634** | |

**10** HVI pays the following 3 consultants on a biweekly basis:

Name and Description:          Amount:

| HVI CAT CANYON INC. | Forecast | Forecast | Forecast | Forecast | Forecast | TOTAL |
|---|---|---|---|---|---|---|
| weeks 14-18 budget | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | |
| Notes *week starting* | 28-Oct-19 | 4-Nov-19 | 11-Nov-19 | 18-Nov-19 | 25-Nov-19 | |
| i) William LaFleur - Landman | $ 3,000 | | | | | |
| ii) Innovative Consulting Solutions - production accountant | $ 1,923 | | | | | |
| iii) Alliance-Hydro - Geologist | $ 4,085 | | | | | |
| Total Amount due to Consultants | $ 9,008 | | | | | |

11    Amounts include HVI's office line at their East Clarke office and cell phones for all field employees.

12    Per adequate assurance order, $30k deposit due in Week 15 and $170k due in Week 17 (prior to the 20th).

13    Amount due for prior month's power usage.

14    Chemicals used for H2S removal that are critical to production - currently on COD terms with chemicals vendor

15    Pump maintenance and rework costs that are critical to production.

16    HVI makes daily gasoline purchases for the tankers used to haul oil and gas production with a weekly run rate of approximately $12,500. Week 15 assumes weekly run rate and payment of approximately $12.5k of overdue invoices.

17    Amount due to affiliate GTL1 for transportation costs for hauling crude and LCR, vehicle leasing and insurance costs and demurrage charges. GTL1 pays drivers $17.50/hr. for demurrage but charges HVI $80/hr.

18    Amount due to affiliate GTL1 for vacuum trucks, HVI pays $80/hr., has a monthly run rate between 600-700 hours, and week 17 assumes a 700 hour month.

19    Per Ernesto Olivares, as of 10/27/19, HVI has received 7,476 BBLs of Light Crude ("LCR") deliveries priced at $76.50 per BBL. Approximately 100 additional BBLs are estimated to be delivered before month's end.

20    The weekly run rate for electricians is approximately $5k and week 15 assumes payment of approximately $5k of overdue invoices.

21    The weekly run rate for welders is approximately $2.5k and week 15 assumes payment of approximately $2.5k of overdue invoices.

22    Assumes a weekly run rate of $1.5k with an additional approximately $1k of overdue invoices to be paid in week 15.

23    Assumes a weekly run rate of $5k.

24    Assumes a weekly run rate of $1.5k for H2S fluid and week 15 assumes payment of $1.5k of invoices due in week 14.

25    Assumes $8k bi-weekly run rate for the maintenance costs for all oil field service vehicles, including rigs. Week 15 assumes payment of an overdue invoice for approximately $8k for rig maintenance.

26    Weekly run rate for critical safety and fire protection for HVI's 700+ wells and reduction of Notice of Voilation ("NOV") fines. Currently understaffed in this area and run rate assumes increasing team size from 1 to approximately 2 five man teams.

27    Per Alex D, up to date on well inspections through week 14 so run rate assumes bi-weekly maintenance needed in November 2019.

28    Weekly run rate for 3rd party consultants for critical compliance requirements such as SPC ("Spill Prevention and Countermeasure") plans and APCD ("Air Pollution and Control District") plans that need to be submitted before year-end to mitigate future fines and penalties from regulatory bodies.

29    Related to administrative invoicing for APCD post-petition inspections related to 35 permits necessary to mitigate potential fines and penalties.

30    Passed due post-petition Permit to Operate ("PTO") fees from the APCD for the following 13 HVI leases, excluding 1 lease quitclaimed to an insider. Subject to revision if additional permit fees for quitclaimed leases to insiders are identified:

| Facility | Fee |
|---|---|
| Armelin Lease PTO No. 07775 - R8 | $ 7,895 |

| | HVI CAT CANYON INC. | | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Notes | weeks 14-18 budget week starting | | | | | | | |
| | Battles Lease PTO No. 08219 - R11 | $ | 7,323 | | | | | |
| | Bradley Lands/Bradely Consolidated Lease PTO No. 07( | $ | 41,123 | | | | | |
| | Continental Lease PTO No. 08222 - R11 | $ | 5,425 | | | | | |
| | Cross Development Lease PTO No. 08863 - R9 | $ | 458 | | | | | |
| | East Valley Farms Lease PTO No. 08864 - R9 | $ | 458 | | | | | |
| | Fullerton Lease PTO No. 08868 - R13 | $ | 7,551 | | | | | |
| | Jim Hopkins Lease PTO No. 09310 - R8 | $ | 13,796 | | | | | |
| | Lakeview Gas Plant PTO No. 10108 - R8 | $ | 38,032 | | | | | |
| | Lakeview Lease PTO No. 10096 - R8 | $ | 7,385 | | | | | |
| | Los Flores PTO No. 07307 - R12 | $ | 16,074 | | | | | |
| | McKenzie Lease PTO No. 10079 - R8 | $ | 458 | | | | | |
| | Olean Lease PTO No. 10080 - R8 | $ | 458 | | | | | |
| | Total due for APCD PTOs | $ | 146,436 | | | | | |
| | Excluded PTO fee due to a quitclaimed lease to an insider. | | | | | | | |
| | Golco Lease PTO No. 10078 - R8 | $ | 4,679 | | | | | |
| 31 | Amount is based upon the following County of Santa Barbara Planning and Development post-petition facility and lease inspection fees. Subject to revision if | | | | | | | |
| | additional permit fees for quitclaimed leases to insiders are identified: | | | | | | | |
| | Account Number/Permit ID Number: | Amount: | | | | | | |
| | Permit ID # 19ACB-00000-00914 for 500 post-petition | | | | | | | |
| | un-inspected facilities | $ | 110,452 | | | | | |
| | 19ACT-00880 | $ | 210 | | | | | |
| | 19ACT-00922 | $ | 6,560 | | | | | |
| | 19ACT-00920 | $ | 10 | | | | | |
| | 19ACT-00914 | $ | 350 | | | | | |
| | 19ACT-00921 | $ | 6,280 | | | | | |
| | 19ACT-00926 | $ | 12,640 | | | | | |
| | 19ACT-00928 | $ | 9,032 | | | | | |
| | 19ACT-00938 | $ | 108 | | | | | |
| | 19ACT-00930 | $ | 10 | | | | | |
| | 19ACT-00932 | $ | 10 | | | | | |
| | 19ACT-00934 | $ | 108 | | | | | |
| | 19ACT-00936 | $ | 108 | | | | | |
| | 19ACT-00887 | $ | 262 | | | | | |
| | 19ACT-00878 | $ | 420 | | | | | |
| | 19ACT-00877 | $ | 210 | | | | | |
| | 19ACT-00879 | $ | 210 | | | | | |
| | 19ACT-00881 | $ | 220 | | | | | |

| HVI CAT CANYON INC. weeks 14-18 budget Notes week starting | Forecast Week 14 28-Oct-19 | Forecast Week 15 4-Nov-19 | Forecast Week 16 11-Nov-19 | Forecast Week 17 18-Nov-19 | Forecast Week 18 25-Nov-19 | TOTAL |
|---|---|---|---|---|---|---|
| 19ACT-00924 | $ 12,640 | | | | | |
| Total due to P&D for Inspection fees | $ 159,843 | | | | | |

32 Amount is based upon the following Santa Barbara County Fire Department Post-Petition California Fire Code Inspection Permit Fees. Subject to revision if
permits for additional quitclaimed leases to insiders are identified:

| Site Name | Amount: |
|---|---|
| Battles | $ 1,370 |
| Blochman | $ 1,370 |
| Bell Gas Compressor | $ 1,370 |
| Bell Lease | $ 1,370 |
| Casmalia/Morganti | $ 1,370 |
| Chamberlin B | $ 1,370 |
| Chamberlin | $ 1,370 |
| Davis B | $ 1,370 |
| Davis | $ 1,370 |
| Fullerton Lease | $ 1,370 |
| Jim Hopkins | $ 1,370 |
| Los Flores | $ 1,370 |
| Total due for Fire Department CFC Permits | $ 16,440 |

33 Per Docket #308, Declaration of James Ray, California Unified Program Agency Supervisor for the Santa Barbara County Environmental Health Services ("EHS"),
amounts due for the following Santa Barbara Post-petition Environmental Health Services Permit Fees - *originally forecast to be distributed in week 2* :

| Permit ID: | Permit Fee for 2020: |
|---|---|
| FA0010063 | $ 1,857 |
| FA0010325 | $ 555 |
| FA0010326 | $ 555 |
| FA0011176 | $ 555 |
| FA0011177 | $ 555 |
| FA0012015 | $ 555 |
| FA0012328 | $ 555 |
| FA0012329 | $ 555 |
| FA0012330 | $ 555 |
| FA0012495 | $ 555 |
| FA0013065 | $ 555 |
| FA0013112 | $ 555 |
| FA0013113 | $ 555 |
| FA0013114 | $ 555 |
| FA0013136 | $ 555 |

| | HVI CAT CANYON INC. weeks 14-18 budget | Forecast | Forecast | Forecast | Forecast | Forecast | TOTAL |
|---|---|---|---|---|---|---|---|
| Notes | week starting | Week 14 28-Oct-19 | Week 15 4-Nov-19 | Week 16 11-Nov-19 | Week 17 18-Nov-19 | Week 18 25-Nov-19 | |
| | FA0015899 | $ 848 | | | | | |
| | Total amount due for EHS permits | $ 10,475 | | | | | |

| Notes | |
|---|---|
| 34 | Rent due on HVI East Clarke office - not approved under Interim Cash Collateral Order |
| 35 | Chapter 11 Trustee negotiated a progress payment plan with Netherland & Sewell for a 2019 Reserve Report. The $100-$120k total fee can be paid on weekly basis for $25k a week once they start work. |
| 36 | Per Ernesto Olivares, a total of $18k for worker's comp insurance to be paid in weeks 15 and 16 and $19k to renew $1MM bond due in week 17. |
| 37 | Chapter 11 Trustee professionals agree to a 20% deferral of professional fees incurred during this 5-week period, assuming the bank agrees to carve out the remaining 20%. Per Professional Fee Budget, weekly payments for Chapter 11 Trustee, Counsel and Financial Advisor will be put in escrow during this 5-week budget. Payments to professionals to be made only after employment applications are approved and payments authorized. |
| 38 | Per Professional Fee Budget, Unsecured Creditors Committee Counsel has a forecasted $50k monthly run rate and payments will be put in escrow during this 5-week budget. |
| 39 | Per Professional Fees budget, US Trustee payment for Q3 2019 forecasted for week 15 based upon 1% of debtors disbursements in Q3 2019 of approximately $2.5M per August and September Monthly Operating Reports ("MOR"). |
| 40 | Per Ernesto Olivares on 10/30/2019, affiliate GIT's October 2019 invoice for back office and administrative services will be approximately $156k. GIT allocates expenses among the affiliated entities based upon headcount of each respective entity. Per Cost and Sale Summary schedule, GIT's allocation and the Legal Fee summary schedule details of the pre-petition invoices offset against revenue due to HVI in Week 13. |
| 41 | Per the draft 13-week Health and Safety Budget to be presented in 2-weeks. |
| 42 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total SMV Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $275k but should reduce compliance violation fines and environmental risks. |
| 43 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Belridge Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $66k but should reduce compliance violation fines, environmental risks and, by reducing these liabilities, potentially make the field more attractive to prospective buyers. |
| 44 | The amounts reflected here reflect the first 4-weeks of the draft 13-week total Redu Health and Safety Budget. Over the full 13-week period forecasted expenses are approximately $337k but should reduce compliance violation fines, environmental risks, and, by reducing these liabilities, potentially make the field more attractive to prospective buyers. |
| 45 | Total Cash Outflows for Operating, General and Administrative, and Health and Safety Expenses but not including royalties. |
| 46 | Estimated Funding required for the 5-week period ending week 18, excluding interest, is approximately $2M. Interest to be added to the 13-week budget to be presented in 2-weeks. |

**Agreed as to form only:**

**PACHULSKI STANG ZIEHL & JONES LLP**

By:_____
Jeffrey N. Pomerantz
Maxim B. Litvak
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
(310) 277-6910
Email: jpomerantz@pszjlaw.com
         mlitvak@pszjlaw.com

**COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**SNOW SPENCE GREEN LLP**

By:_____
W. Ross Spence
2929 Allen Parkway, Suite 2800
Houston, Texas 77019
(713) 335-4800
Email: ross@snowspencelaw.com

**ATTORNEYS FOR THE COUNTY OF SANTA BARBARA, CALIFORNIA; HARRY E. HAGEN, AS TREASURER-TAX COLLECTOR OF THE COUNTY OF SANTA**

- 29 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0077

BARBARA, CALIFORNIA; AND THE SANTA BARBARA COUNTY AIR POLLUTION
CONTROL DISTRICT

**Agreed as to form only, and shall not indicate that this Final Order satisfies condition under
the Credit Agreement nor that the condition is waived:**

**O'MELVENY & MYERS LLP**

By:_____
Evan M. Jones
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
(213) 430-6000
Email: ejoines@omm.com

**ATTORNEYS FOR UBS AG, LONDON BRANCH AND UBS AG, STAMFORD BRANCH**

- 30 -

FINAL ORDER FOR EMERGENCY PRIMING AND SUPERPRIORITY FINANCING AND
CONSENSUAL USE OF CASH COLLATERAL BY THE CHAPTER 11 TRUSTEE

0078

# EXHIBIT "3"

```
 1              UNITED STATES BANKRUPTCY COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION

 3                         --oOo--

 4   In Re:                    )  Case No. 9:19-bk-11573-MB
                               )
 5   HVI CAT CANYON, INC.,     )  Chapter 11
                               )
 6   Debtor,                   )  Santa Barbara, California
                               )  February 25, 2020
 7   ------------------------------)  Tuesday, 10:30 A.M.

 8                            HEARING RE: [767] NOTICE OF
                              MOTION AND MOTION IN
 9                            INDIVIDUAL CASE FOR ORDER
                              CONFIRMING TERMINATION OF
10                            STAY UNDER 11 U.S.C. 362(j)
                              OR THAT NO STAY IS IN EFFECT
11                            UNDER 11 U.S.C.
                              362(c)(4)(A)(ii) ROYALTY
12                            INTERESTS WITH PROOF OF
                              SERVICE (BEALL, WILLIAM)

13
                      TRANSCRIPT OF PROCEEDINGS
14             BEFORE THE HONORABLE MARTIN R. BARASH
                  UNITED STATES BANKRUPTCY JUDGE
15

16   APPEARANCES:

17   For the Chapter 11        ERIC P. ISRAEL, ESQ.
     Trustee:                  Danning Gill Israel &
18                               Krasnoff, LLP
                               1900 Avenue of the Stars
19                             11th Floor
                               Los Angeles, California 90067
20
     For UBS AG, London        EVAN M. JONES, ESQ.
21   Branch:                   O'Melveny & Myers, LLP
                               400 South Hope Street
22                             18th Floor
                               Los Angeles, California 90071
23

24
     Proceedings produced by electronic sound recording;
25   transcript produced by transcription service.
```

| | | |
|---|---|---|
| 1 | For California State<br>Lands Commission: | MARC S. COHEN, ESQ.<br>Loeb & Loeb, LLP |
| 2 | | 10100 Santa Monica Boulevard<br>Suite #02200 |
| 3 | | Los Angeles, California 90067 |
| 4 | For GLR, LLC: | WILLIAM C. BEALL. ESQ.<br>Beall & Burkhardt |
| 5 | | 1114 State Street<br>Suite 200 |
| 6 | | Santa Barbara, California 93101 |
| 7 | For BUGANKO, LLC: | KAREN L. GRANT, ESQ.<br>Law Offices of Karen L. Grant |
| 8 | | 924 Anacapa Street, Suite 1M<br>Santa Barbara, California 93101 |
| 9 | | |
| 10 | For California<br>Department of Fish & | ALEXANDER FISCH, ESQ.<br>Office of the Attorney General |
| 11 | Wildlife; California<br>Regional Water Quality | 300 South Spring Street<br>Suite #2200 |
| 12 | Control Board: | Los Angeles, California  90067 |
| 13 | For GIT, Inc.:<br>(Via Telephone) | RASMIG IZAKELIAN, ESQ.<br>Quinn Emanuel Urquhart & |
| 14 | | Sullivan, LLP<br>865 South Figueroa Street |
| 15 | | Floor 10<br>Los Angeles, California  90017 |
| 16 | | |
| 17 | For California<br>Geological:<br>(Via Telephone) | WYATT SLOAN-TRIBE, ESQ.<br>Office of the Attorney General<br>300 South Spring Street |
| 18 | | Suite #1702<br>Los Angeles, California  90013 |
| 19 | | |
| 20 | Court Recorder: | Brad Handy<br>U.S. Bankruptcy Court |
| 21 | | Central District of California<br>1415 State Street |
| 22 | | Santa Barbara, California 93101<br>(805) 884-4884 |
| 23 | Court Transcriptionist: | Ruth Ann Hager, C.E.T.**D-641 |
| 24 | | Ben Hyatt Certified Deposition<br>Reporters<br>17835 Ventura Boulevard |
| 25 | | Suite #310<br>Encino, California 91316 |

Page                                                                    3

1        SANTA BARBARA, CALIFORNIA, TUESDAY, FEBRUARY 25, 2020

2                               10:39 A.M.

3                              --oOo—

4              THE COURT:  Okay.  All right.  Today is Tuesday,

5    February 25th, and this is our omnibus hearing in HVI Cat

6    Canyon.  We have only one matter on calendar, #1.00 GRL's

7    motion regarding termination of the stay, determination

8    that there is no stay, et cetera.  Let me have appearances,

9    please.

10             MR. ISRAEL:  Good morning, Your Honor.  Eric

11   Israel of Danning Gill Israel & Krasnoff, LLP, attorneys

12   for the Trustee and the Trustee is also present.

13             MR. BEALL:  Good morning, Your Honor.  William

14   Beall, Beall & Burkhardt, on behalf of GLR, LLC, the moving

15   party.

16             MR. JONES:  Good morning, Your Honor.  Evan Jones

17   of O'Melveny & Myers, representing UBS.

18             MR. FISCH:  Good morning, Your Honor.  Alex Fisch

19   from the California Attorney General's Office here on

20   behalf of various state agencies.

21             MS. GRANT:  Good morning.  Karen Grant on behalf

22   of BUGANKO and Janet K. Cognin (phonetic) Estate and Living

23   Trust.  We have joined in the opposition.

24             MR. COHEN:  Good morning, Your Honor.  Marc Cohen

25   and Alicia Clough from Loeb & Loeb from the California

Page                                                                    4

 1  State Lands Commission.

 2          THE COURT:  All right.

 3          MR. IZAKELIAN:  Good morning, Your Honor.  Razmig

 4  Izakelian --

 5          THE COURT:  Hold on, hold on, hold on.

 6          MR. IZAKELIAN:  -- from Quinn Emanuel on behalf

 7  of GIT, Inc.

 8          THE COURT:  Hold on, hold on, hold on.

 9          Okay.  I'm sorry.  Go ahead.  Say it again.  Is

10  that Mr. Izakelian?

11          MR. IZAKELIAN:  Exactly.  It's Razmig Izakelian

12  from Quinn Emanuel for GIT, Inc.

13          THE COURT:  All right.  Very good.  And then

14  Wyntt Sloan-Tribe, go ahead.

15          MR. SLOAN-TRIBE:  Good morning, Your Honor.

16  Wyatt Sloan-Tribe from the Office of the Attorney General

17  appearing on behalf of California Geological Management

18  Division.

19          THE COURT:  Okay.  Thank you.

20          And then Ms. Mosco (phonetic).

21          (No response.)

22          Is Ms. Mosco on?

23          UNIDENTIFIED VOICE:  I don't think she's going to

24  be on (indiscernible).  I'll be on this one.

25          THE COURT:  Okay.  Yeah.  Very good.

Page                                                                    5

1          All right.  Mr. Beall.

2          MR. BEALL:  All right.  So first of all, let's

3   talk about completely undisputed are hundreds of pages of

4   recorded documents that were properly recorded, they were

5   properly perfected.

6          THE COURT:  Okay.  And --

7          MR. BEALL:  No dispute about any of that.

8          THE COURT:  -- actually, let's start before.

9          MR. BEALL:  Okay.

10          THE COURT:  Okay.  There's some disagreement

11   about what this thing is.  Some of the opposing parties

12   said, wait a second.  This is a relief from stay motion.

13   He didn't use the required form.  And some people said,

14   well, no, it's not a relief from stay motion because

15   they're asking for something that has nothing to do with

16   relief from stay.

17          Seems to me, first of all, your motion is a

18   little bit of both, right?  On the one hand it's not relief

19   from stay per se, but you want either to terminate the stay

20   or comfort order, the stay doesn't apply because we want to

21   be able to serve this Division order on purchasers of the

22   oil and we don't want anyone to claim we did something

23   wrong.  And we also want to get paid for that part of the

24   oil that was brought to the surface of the grant since the

25   petition date, right?

Page                                                                          6

1               MR. BEALL:  I actually don't think today is the

2       day that I -- I don't think relief from stay gives me the

3       right to get that escrow account, Your Honor.  I think

4       that --

5               THE COURT:  Because you asked for it in your

6       motion.

7               MR. BEALL:  Fair enough.  I --

8               THE COURT:  Okay.

9               MR. BEALL:  But we're really looking at

10      perspective relief.  I mean, from -- we're talking about

11      tomorrow's royalties.

12              THE COURT:  Okay.

13              MR. BEALL:  That's what this motion is about.

14              THE COURT:  So there are two prongs I want to

15      know.  First of all, it -- under our Rule 4001 you are

16      supposed to use one of the forms.  Okay.  And people around

17      here all the time -- okay, and I'm sure if I went and dug

18      into some old files, some case of yours, use the form and

19      then just added a memo of Qs and As that explain what was

20      different about this animal.  Okay.  So you didn't do that.

21              And there's a reason -- I mean, I know -- half of

22      the people love our forms; half the people tease us, but

23      those are the rules.  Okay.  You didn't use the form.  And

24      secondly, Rule 4001 of our Local Rules, 4001-1(c)(4) says

25      you're not supposed to combine.  Okay.  You're supposed to

Page                                                                      7

1   bring a separate motion and you've combined them.

2          So for those reasons alone I could deny the

3   motion.  I'm going to reserve judgment on that and we're

4   going to -- we're all here.  We're going to talk about the

5   merits.  But I would appreciate it if there's a little more

6   compliance with our Local Rules.

7          MR. BEALL:  All right.  So, Your Honor, obviously

8   this isn't relief from stay real property to do a

9   foreclosure.  The forum doesn't -- it doesn't fit.  So what

10  I actually did if you look at my motion is the language of

11  the Local Rule form is repeated verbatim to the extent that

12  it was applicable to this situation.

13         THE COURT:  All right.  But this rule says these

14  are mandatory forms.

15         MR. BEALL:  I understand, Your Honor.

16         THE COURT:  And there are very few areas that are

17  mandatory.  This is one of them, so if it said

18  substantially in compliance with like the Federal Rules say

19  a lot of things, it'd be different.

20         So I said -- I said we're going to move on and

21  talk about the substance of it.  I don't want to get -- but

22  I -- I want to just ask you to try harder next time to

23  follow the rules.

24         Secondly, let's start where you started which is

25  you wanted to say there is undisputed facts and we put a

Page                                                                    8

1   stack of oil and gas leases in.  That's great.  So it's a

2   stack of oil and gas leases, but I don't -- I'm not an oil

3   and gas expert and I don't know that these oil and gas

4   leases, what exactly they entitle you to.  The motion makes

5   no effort to walk me through it, to tie these to any

6   percentage that comes out of a well head or, you know, a

7   loaded point.  There are illusions to that in your papers,

8   but I don't have evidence of that.

9           And it seems to underscore for me that what

10  you're asking -- part of what you're asking for in this is

11  that the determination of the extent of your client's

12  interest in the oil and where it's entitlement to the

13  proceeds of the oil.  And that is traditionally something

14  that happens only in an adversary proceeding.  I'm getting

15  it as a motion.

16          MR. BEALL:  Well --

17          THE COURT:  And by the way, I think every -- many

18  of the parties filing oppositions were fair to say, huh,

19  you know, what, these are the same claims that are actually

20  made in a counterclaim and why didn't you mention that.

21          So procedurally that's another problem.  Forget

22  about the form.  Okay.  We talked about the form, but

23  procedurally I'm not sure that this is the appropriate way

24  to go about this.  You know, you're -- that whatever your

25  client's interest in the oil, I mean, I don't have any of

Page                                                                          9

1   the facts.  Okay.  So I don't know, for instance, which --

2   how many wells are on your parcels and how many parcels are

3   adjacent and how the oil is combined and -- what's the word

4   I'm thinking of -- collective.  Okay.

5            And at what point does the oil come out of a

6   pipe?  Is it 100 percent your client's oil?  Unlikely.  I

7   haven't had -- I've never seen a case where that is the

8   case where someone had 100 percent and you could segregate

9   the oil or the cash.  So your -- I think you've over-

10  simplified the situation.  You're asking the Court to

11  determine once and for all your entitlement to certain oil

12  that's commingled with oil of the estate and oil of other

13  interest holders and  all I've got is a motion, you know,

14  on a very summary proceeding.

15           MR. BEALL:  My turn?  Thanks.  Okay.  So first of

16  all, Your Honor, you do this every single Tuesday.  You get

17  a deed of trust attached to a motion for relief from the

18  automatic stay.  If somebody thinks the deed of trust is on

19  the wrong property, if they think it's not properly

20  perfected, if they think it's not properly recorded, they

21  need to raise that.  Happens every day for you, Your Honor.

22           So the idea of it being a summary proceeding is,

23  yes, there was a lot of this, but on the other hand, the

24  Trustee has also been involved now for five minutes.  Sued

25  my clients GRI, LLC twice, so they've been looking at it

Page                                                                    10

1   and yet there wasn't one single word of we're concerned

2   about this or we want to look at that.

3          Now, in terms of evidence that I submitted you

4   have my declaration that the Trustee appeared at the first

5   meeting of creditors and said, he's going to pay royalties

6   according to HVI Cat Canyon's pay deck.  And so --

7          THE COURT:  You'll have your chance.  Don't

8   interrupt.  This is not evidence.  There's no jury.  Just

9   make a note and come back to it later.

10          MR. BEALL:  Well, okay.  It was in my

11   declaration, so --

12          THE COURT:  No, I'm talking to Mr. Israel.

13          MR. BEALL:  Okay.

14          THE COURT:  Okay.

15          MR. BEALL:  And furthermore, you have

16   Mr. Oliveros's declaration saying, we got the percentages

17   that are put in those proposed pay orders from the pay

18   deck.  Now, if the Trustee has concerns about whether

19   they're correct the Trustee needs to raise them and he

20   needs to say, we have concerns, but we got nothing like

21   that, Your Honor.  So this is normal to be done in a relief

22   from stay level.  Here's my secured documents, do you have

23   a problem.  This happens all the time procedurally.

24   That's -- I mean, that's the facts and --

25

Page                                                                11

1            THE COURT:  Okay.  And where -- where in either

2   of your motion or your responsive pleading is there any

3   legal authority, statutory, regulatory, common law that

4   entitles you to survey "pay order" -- "divisional order" on

5   anybody.

6            MR. BEALL:  Well, okay.  So both the Ninth

7   Circuit in *Consolidated v. Ashton* and again, the Delaware

8   Bankruptcy Court in interpreting California law in *Delta*

9   *Petroleum* were very clear.  These rights of my client are

10  real property rights and they are not property of the

11  estate.

12           THE COURT:  Okay.  That wasn't what I asked.

13           MR. BEALL:  No, but it is, Your Honor, because if

14  it --

15           THE COURT:  Where is the law that says there's

16  such thing -- if there even is such thing as a division

17  order and how it works?  I don't think it's talked about in

18  those cases.

19           MR. BEALL:  But the point is, Your Honor, if it's

20  not property of the estate that the stay is not, it's not

21  impacted.  So --

22           THE COURT:  Well, that's easy to say when there's

23  a house because there's no way to commingle the house.  But

24  we're talking about commodity and it's commingled with

25  other people's -- with other people's commodities.

Page                                                                    12

1            MR. BEALL:  In the motion you have the

2    declaration of Mr. Grewal that states that division orders

3    are commonly used in this industry.  He's certainly an

4    experienced player in this industry.  As a matter of fact,

5    I believe that the Trustee is using them in other

6    situations as well, Your Honor.

7            These Division orders are the normal way of

8    paying royalties through the two -- from the purchaser of

9    the property to divide up who gets what.  And that's in Mr.

10   Grewal's declaration attached to the motion if you need me

11   to come up with the exact paragraph.

12           THE COURT:  That's okay.  Go ahead.

13           MR. BEALL:  And again, nobody has disputed that.

14   Nobody said a pay order is an inappropriate way of doing --

15   dealing with this.

16           THE COURT:  Okay.  But -- okay, but you're asking

17   for relief from stay to do a thing and, you know, we know

18   for instance from the *Beal* case, which is a slightly

19   different posture because there someone was challenging the

20   lender's, you know, ability to enforce a note.  But the

21   circuit -- I'm sorry, the BAP said something to the effect

22   of, well, you have to show that you have a colorable right

23   to do that thing that you're asking us to give you relief

24   from stay to do.  And I'm just not seeing where the legal

25   right to deliver a -- some sort of an order on the

Page                                                                    13

1   purchaser is.  I mean, this -- you know, this is a

2   different industry and it's governed by different

3   substantive law and this motion really hasn't done a very

4   good job of walking me through that at all.

5           MR. BEALL:  Do you need expert testimony on

6   Division orders?

7           THE COURT:  Well, maybe.  I mean, I don't think

8   this is procedurally proper in the first place, but I find

9   it difficult to do what you want me to do without a better

10  factual record.

11          MR. BEALL:  So it's clear, Your Honor, there's no

12  argument that these are our real property rights and

13  they're not property of the estate.  And so --

14          THE COURT:  Well, you keep saying they're real

15  property rights and I understand that.  There's ancient

16  California case law that says that and it means something

17  for some reason, but it's kind of a problem when those real

18  property rights are transformed -- transmuted, converted,

19  sold into money.  Okay.  Then it becomes money and money is

20  commingled.  And so none of your pleadings really address

21  that and none of your California cases really address that

22  either.

23          MR. BEALL:  It's the difference between what

24  happened last month and what happens next month, Your

25  Honor.  Frankly, as soon as it turns into money it's a

1  personal property right, but when it's still in the ground

2  it's a real property right.

3          And what I want to do, what I'm looking for is an

4  order that prevents them from taking our real property

5  right next month because that's what's going on.  And

6  they're taking our real property right and converting it.

7  That's what's going on.  And the stay --

8          THE COURT:  Would you like to get it in kind

9  instead?  Want to send a truck?  I'm going to ask the

10  Trustee in a minute.

11          MR. BEALL:  That's not what the contract is, Your

12  Honor.  The way the royalties work is you've got a producer

13  and then you've got a royalty claimant and the royalty

14  claimants aren't responsible --

15          THE COURT:  I believe under California law a

16  royalty claimant can take it in kind or in cash.  Somebody

17  cited something to that effect to me.  I didn't make that

18  up.  I read it somewhere, I know.

19          Anyway, I mean, I think this is a problem.  You

20  know, what's happening -- the concern I have -- besides I

21  have many procedural concerns which I've made clear, is you

22  have an estate, you have oil that is commingled.  Even if

23  it's traceable, even if you have some kind of a property

24  right in it you're asking for it to be treated separately

25  and you want the Trustee to sell it for you, but you want

Page                                                                    15

1   to take the money right away and I don't know if the

2   Trustee has to do that.

3           MR. BEALL:  Contractually --

4           THE COURT:  Maybe the Trustee could -- maybe the

5   Trustee can segregate 100th of a percent or whatever it is

6   and put it in a -- and put it in a barrel to save it for

7   you.  I don't know.  What I'm saying is, is this is a lot

8   more complicated than you're making it out to be.

9           MR. BEALL:  If the Trustee thought that that's

10  what he wanted to do, Your Honor, and that that's what he

11  had a right to do contractually he would have put that in

12  his opposition.

13          THE COURT:  The Trustee made the point in his

14  opposition that this whole thing is procedurally improper

15  because it should have been an adversary proceeding and if

16  ultimately I agree with the Trustee then I -- I don't think

17  you can draw too many conclusions from the fact that the

18  Trustee didn't try to cram an adversary's worth of

19  information into his opposition.  He's entitled to object

20  on the ground that it's procedurally improper without you

21  making an inference that he didn't respond to your

22  arguments.

23          I understand.  Maybe you'll persuade me that it

24  is procedurally proper and I'll give your arguments more

25

1  credence but right now I'm having a hard time with that

2  notion.

3          MR. BEALL:  Well, again, the question is if, as I

4  have said several times and no one has given you any law

5  and we've given you plenty of law in favor of this, it's

6  not property of the estate then this is the proper vehicle

7  because if it's not property of the estate then the stay is

8  not impacted and my client has a right to do what is

9  contractually appropriate.  And these oil and gas division

10  orders we contend are.  If they're not contractually

11  appropriate, we'll be sued for breach of contract.

12          Certainly the Trustee is not loathe to sue us.

13  They've done it already.  My client.  And so -- but they

14  all -- this is a contractually appropriate way to get the

15  royalty share that is due to my client that is it's -- for

16  next month it's current real property right, not property

17  of the estate.

18          And this is -- the *Delta Petroleum* says this

19  isn't a claim you could discharge.  The *Ashton* case says

20  this is a right that is a real property right.  Now, I know

21  it's an act case, but California law hasn't changed and

22  both the Ninth Circuit in *Ashton* and Delaware Bankruptcy

23  Court in *Delta Petroleum* interpreted California law.

24          THE COURT:  Um-hum.

25          MR. BEALL:  And there's been not -- as a matter

Page                                                                17

1  of fact, the Trustee has filed a complete -- complaint

2  against 400-and-something defendants in which he takes

3  essentially the same position that these are not contracts

4  because they don't have -- they're not executory contracts

5  that have to be assumed or rejected.

6          THE COURT:  Um-hum.

7          MR. BEALL:  They're real property rights and

8  that, therefore, they don't have to assume or reject them.

9  This is the flip side of the exact same argument.

10         THE COURT:  Okay.  But my point is you're just --

11 you're making a logical leap.  You know, they start out --

12 it starts out as -- it starts out as a real property

13 interest but then something happens when it comes to the

14 surface and nobody is really dealing with that issue of

15 how -- you know, what happens when it's commingled

16 necessarily.  In fact, it's probably commingled when it

17 comes up because you're only -- you only have a fractional

18 interest.

19         So I don't think it's as clear.

20         MR. BEALL:  But this is exactly what happens.

21 Then (a) gets X percent and (b) gets X percent and (c) gets

22 Z percent.

23         THE COURT:  Oh.

24         MR. BEALL:  And that -- Division orders are

25 exactly how --

Page                                                                    18

1            THE COURT:  But we also -- we also have a --

2            MR. BEALL:  -- that is accomplished.

3            THE COURT:  -- cash collateral order, okay, which

4    says fin -- cash collateral financing.  I don't remember

5    which -- that says what we're calculating the royalty and

6    we're putting it in an account.

7            MR. BEALL:  Until further order of the Court.

8            THE COURT:  Yeah.

9            MR. BEALL:  And I want further order of the

10   Court.

11           THE COURT:  Yeah, okay, well --

12           MR. BEALL:  That's just what I'm asking for.

13           THE COURT:  I understand that.  I'm not --

14           MR. BEALL:  It's been now six months.

15           THE COURT:  I'm not --

16           MR. BEALL:  It's been six months and whet her our

17   money has been properly escrowed or not we -- I --

18   Mr. Skillman gave me something this morning which showed

19   something in -- really the first accounting we've ever had

20   from the Trustee about what's been placed in the escrow

21   account which I'm very grateful to have received it, but

22   it's the first time we've seen anything.  Trustee has been

23   involved for four -- five months.

24           So this is not a brand new case anymore.  And

25   it's time that --

Page                                                                    19

1              THE COURT:  No.

2              MR. BEALL:  What?

3              THE COURT:  We -- this case -- sometime of this

4    case was spent with your client's affiliate in charge and

5    that wasn't going very well.  So be careful about how you

6    count the months.

7              MR. BEALL:  The wells were open when my client's

8    affiliate was in charge.  Just saying.  I mean, I --

9    everybody's --

10             THE COURT:  All right.

11             MR. BEALL:  -- anxious to pile onto all things

12   Randy Grewal, but the fact of the matter is, we were

13   producing oil.

14             THE COURT:  Okay.  Anything else?

15             MR. BEALL:  I think that's all, Your Honor.

16             THE COURT:  Okay.  All right.  Let me just say

17   for the record as noted in the -- in the tentative I

18   posted, I reviewed the evidentiary objections on all sides

19   and they're all granted, they were all well taken.

20             MR. BEALL:  There was a tentative.  I looked four

21   times yesterday.  I don't know when it got posted.  Okay.

22   Didn't see it.  I apologize.

23             THE COURT:  Yeah.  So anyway, I thought the

24   evidentiary objections were well taken.  People can feel

25   free to address that when it's their turn.

Page                                                                     20

1              MR. BEALL:  Oh, that's already -- okay.

2              THE COURT:  I don't think it's determinative -- I

3    don't think it's --

4              MR. BEALL:  I --

5              THE COURT:  -- cased -- you know, motion

6    determinative here.

7              MR. BEALL:  Okay.

8              THE COURT:  Mr. Cohen.

9              MR. COHEN:  Marc Cohen for one of the five

10   joining parties.  The point of order and maybe shortcuts

11   this and maybe it doesn't, I liked what you said before

12   about rules and we've tried to understand the rules and

13   maybe you could just educate some of us today.  But my

14   understanding was regardless of whether the tentatives are

15   sustained or not, that when there is a controverted

16   declaration the declarant must show up and I don't see the

17   movant's declarant in court.

18             I brought up my objected-to declarant for

19   Ms. Clough and I don't see Mr. Grewal in court.  And if

20   that's the case, shouldn't the motion be denied, period?

21             THE COURT:  So let me try to clarify and try to

22   distinguish between what I understand the Local Rules to

23   say and what my own practice is and what my practice has

24   been in this case because it -- many of the motions have

25   been presented to me kind of on an emergency basis.

Page                                                              21

1          So our Local Rules such as they are say basically

2    unless the Judge says something otherwise, unless I issue

3    an order two days before hearing saying I want witnesses,

4    that witnesses don't have to show up at the hearing, it's

5    treated as sort of a preliminary hearing and the Court has

6    the discretion to say, well, you know, on the record before

7    me I -- you know, I think I want to hear witnesses.

8          In a number of circumstances when I think of it,

9    I've said, come to this continued hearing and bring your

10   witnesses, because I just want to get it done.  I don't

11   want to go through the, well, let's have a hearing and then

12   I'll say bring your witnesses next time.

13         So I've tried to short-circuit that.  I think the

14   rules -- whether the rules say it or not, I think when I'm

15   presented with an emergency like first-day hearings or some

16   other kind of emergency my view is if the -- if the -- if

17   there are declarants here and they can clarify, I'll just,

18   you know, invite the testimony and so far I haven't had any

19   objections to that.

20         But technically our Local Rules don't

21   automatically say you bring your witness.  It's kind of the

22   bottom line, so I'm not sure that I can declare a default

23   based on that unless I've ordered that in advance, which

24   sometimes I do.

25         MR. COHEN:  Well, there is some ambiguity when

Page                                                                      22

1  you talk about trials, but there are a couple spots in your

2  rules that talk about contested declarations that the party

3  has to show up.  I'm not sure that this is a trial, but

4  should this be continued or --

5          THE COURT:  You mean, the adversary rules?

6          MR. COHEN:  I don't think it says adversary.

7          THE COURT:  Oh, okay.

8          MR. COHEN:  But it seems to me if there is any

9  ambiguity here my suggestion at the end of the day, however

10 you -- but if there's going to be another hearing on this

11 that declarants be ordered to appear because clearly --

12         THE COURT:  Right.

13         MR. COHEN:  -- there's a lot of objected-tos

14 involved.

15         THE COURT:  Yeah.  Yeah, that's fair.  And

16 what -- it may make sense, especially in this case where we

17 have a lot of money at stake and a lot of -- a lot -- you

18 know, every hearing is expensive because there are a lot of

19 people here.  It may make sense to have an administrative

20 order.  I just make that the rule in this case and I'm

21 happy to entertain that.

22         MR. COHEN:  Thank you, Your Honor.  That's why I

23 called it appoint of order --

24         THE COURT:  Okay.  Yeah.

25         MR. COHEN:  -- just for clarification.  Thank

Page                                                                    23

1  you.

2          THE COURT:  All right.  Mr. Israel.

3          MR. ISRAEL:  Thank you, Your Honor.  The Trustee,

4  of course, agrees with Your Honor that the form and

5  procedure were improper in this case.  Your Honor, the

6  reason I had stood up earlier is because Mr. Beall was

7  referring to two declarations, one by himself and one by

8  Mr. Earnesto Oliveros.  The declarations were filed on

9  February 19th, document 808, with the reply.  They're not

10 even referenced in the caption to the reply and I would

11 move that -- Your Honor, the reply is not supposed to

12 include new evidence.  I would ask Your Honor to strike

13 both declarations.

14         THE COURT:  Okay.  All right.  You're talking

15 about their reply?

16         MR. ISRAEL:  Yes.  There were new declarations

17 and that's what Mr. Beall was just referring to, his own

18 declaration that was filed on February 19th, six days ago,

19 although I believe that ECF may have been down, so he

20 probably filed it, you know, seven days before.

21         THE COURT:  Okay.

22         MR. ISRAEL:  But also in the declaration of

23 Mr. Oliveros --

24         THE COURT:  All right.  Well, there's no rule

25 against filing declarations in support of a reply.  It's

Page                                                                    24

1  when it's in the nature of rebuttal, but I -- but what I

2  hear you say is you're making the argument that this raises

3  new information which should have been in the motion

4  itself.

5            MR. ISRAEL:  Yeah, yes.  The one declaration is

6  about the pay deck.  The other one is about -- well,

7  Mr. Oliveros' declaration is about the pay deck and

8  Mr. Beall's declaration is about --

9            THE COURT:  All right.  We can talk about it but

10  I'm not sure it really matters --

11            MR. ISRAEL:  Okay.

12            THE COURT:  -- procedurally.

13            MR. ISRAEL:  Okay.

14            THE COURT:  Procedurally this motion has so many

15  problems.

16            MR. ISRAEL:  The only other -- and then further

17  on the procedural aspect, Your Honor, actually the reply

18  acknowledges this that Mister -- and Your Honor referred to

19  this as well, that Mister -- the GRL raised a cross-claim

20  in the adversary proceeding on these kinds of issues about

21  what -- you know, what royalty they're entitled to and

22  whether and how it gets paid.

23            That properly belongs in an adversary proceeding

24  and it will be handled there.  Does not belong --

25            THE COURT:  Well, what about Mr. Beall's

Page                                                                    25

1   argument?  He says nobody -- nobody really -- nobody is

2   disputing the percentages or anything like that.  It's

3   just -- you know, it's just a calculation.

4           MR. ISRAEL:  Your Honor, the -- this is --

5   characterizes a relief from stay motion.  It's a summary

6   proceeding.  We are -- we saw the deeds that were attached

7   and, as Your Honor said, they -- there's a leap from that

8   to the calculations.

9           Nevertheless, the Trustee has been segregating

10  money on the royalties and there was some segregated money

11  that was turned over to the Trustee by the debtor in

12  possession on royalties.  The Trustee has augmented that.

13  Again, without prejudice to the estate's right that those

14  funds shouldn't be -- or that either the calculations are

15  wrong because we have not confirmed that or that there's

16  some sort of basis to set off or other claims.  Again, as

17  set forth in our opposition we raised the 502(d) argument

18  that there are -- there are -- this entity received --

19          THE COURT:  And some of the -- some of the -- or

20  any of these leases that were attached as Exhibit A are

21  these -- are any of these the same leases subject to the

22  adversary or where the interest --

23          MR. ISRAEL:  They're --

24          THE COURT:  -- of those leases were transferred

25  away.

Page                                                                    26

1              MR. ISRAEL:  They're not the instruments, I

2    believe, but they do relate to some of the oil leases that

3    the Trustee has.

4              THE COURT:  I mean, I just --

5              MR. ISRAEL:  And honestly, because this -- again,

6    this is a summary proceeding, you know, I didn't go through

7    and have our oil and gas counsel --

8              THE COURT:  Right.

9              MR. ISRAEL:  -- confirm.

10             THE COURT:  I mean, it's a stack of quitclaim

11   mineral deeds, assignment documents with, you know, all

12   kinds of -- you know, APN numbers and varied particular

13   descriptions of, you know, lot and block numbers and tract

14   books and that kind of -- I mean, it just -- I don't know

15   what I'm supposed to do with it.  It's not even segregated.

16   It's not even sorted.  There's no index.  I don't know how

17   this ties to any of the alleged percentages that they're

18   claiming.

19             I know Mr. Beall is going to come back and

20   respond after I hear from all the other objecting parties,

21   but, you know, he referred to some contractual arrangement

22   that said that his client is only entitled to cash and not

23   necessarily entitled to receive the oil in kind.  And I

24   don't know which of these papers, if any, says this thing

25   that he's claiming.

Page                                                                27

1           I just -- I don't -- I'm -- I learn a lot every

2    day I come to work and I learn from all of you.  But I'm a

3    reasonably intelligent person -- lawyer and I just don't --

4    I don't get how this adds up to what he wants.

5           MR. ISRAEL:  Your Honor, this is again he set

6    this up as a relief from stay motion it's a summary

7    proceeding and if there were prior orders that the relief

8    from stay motion didn't even reference that ordered these

9    monies segregated, the Trustee is segregating it and if

10   he -- if GRL is asking for some sort of a declaration,

11   that's what is the cross-claim or counterclaim that he

12   filed will resolve in the adversary proceeding.  That's not

13   properly, I would submit, brought to Your Honor today by

14   relief from stay motion and there's no cause that's

15   adequately -- you're going to treat it as a relief from

16   stay motion instead of a 60(b) motion or a request for

17   declaratory relief.  There's no cause because the money is

18   being held and they're adequately protected because the

19   amounts are being segregated and held.

20          THE COURT:  And the amounts are what the -- I

21   assume what the Trustee thinks are the right amounts.

22          MR. ISRAEL:  That's right, Your Honor.  And some

23   of it, as Your Honor mentioned, this case was, what, three

24   months in debtor-in-possession mode where Mr. Grewal who

25   submitted this declaration on behalf of the movant was in

Page                                                          28

1   control of our debtor and that's -- we're assuming those

2   amounts are correct.  We didn't go back and audit that yet.

3               THE COURT:  All right.  Thanks.

4               MR. ISRAEL:  Thank you, Your Honor.

5               MR. JONES:  Your Honor, Evan Jones on behalf of

6   UBS.  I won't repeat everything that's in the papers.

7   There are seven points I'd like to make.  Point one is the

8   wrong procedural device.  Set aside for a second whether

9   it's the wrong form.  I actually have some sympathy for

10  that because I don't always use the right form.

11              But, Your Honor, it's the wrong device.  They're

12  asking for an order requiring the Trustee to make payment

13  to them.  They pretty acknowledged that this is the wrong

14  procedural advice in their reply.  Mr. Beall says, well,

15  this is just like a Tuesday relief hearing.

16              THE COURT:  Well, wait a second.  Does -- when

17  you're -- this argument you're talking about the past, the

18  royalties that are already accrued in -- converted into

19  cash because I thought what with the Division order he's

20  asking purchasers of the estate's product to pay a portion

21  of the consideration directly to them, so that's a little

22  different.

23              MR. JONES:  Your Honor, it's the wrong form to

24  deal with the request to get -- it's the wrong procedure --

25              THE COURT:  Yeah.

Page                                                                    29

1          MR. JONES:  -- to deal with the request to get

2     payments that were already allegedly due.

3          THE COURT:  Okay.

4          MR. JONES:  And Mr. Beall says, well, it's just

5     like a Tuesday relief hearing.  Your Honor, I don't think

6     you're accustomed that the Tuesday relief hearing to

7     ordering that the secured lender gets relief and Mrs. Smith

8     must, therefore, surrender the house immediately.  That's

9     what they're asking for.  They're not just asking for

10    relief.

11         Now, I will talk about the relief as to future

12    payments which shouldn't be granted even if all they've

13    done was bring a motion for relief to get relief to serve

14    that Division order upon the buyers.

15         THE COURT:  Okay.

16         MR. JONES:  But it is the wrong form as to first

17    thing they request, which is to get money.

18         Now, Your Honor, the second point I'd note here

19    is that even this -- if this were a "mere relief motion,"

20    the burden in on the movant to provide evidence and law to

21    show that he's entitled to relief and that brings us to the

22    third point that we note here.

23         As Your Honor has noted and we certainly agree,

24    there's no admissible evidence here.  Nothing.  Mr. Grewal

25    has attached a stack of documents he says, well, these are

Page                                                                      30

1   a bunch of oil and gas leases.  There's no foundation for

2   that.  We don't know what his basis for that is.  Mr. Beall

3   says, well, no one is arguing about the evidence, Your

4   Honor.  If no evidence is presented and it's not material

5   to the issue before the Court, we don't have to -- the

6   counter evidence at the time.

7         THE COURT:  That wasn't in your evidentiary

8   objection.  Your evidentiary objection is to the sole

9   paragraph 2 of Mr. Grewal's --

10        MR. JONES:  Well, Your Honor, I believe the

11  foundation objection was made by other parties.  If we fail

12  to --

13        THE COURT:  Okay.

14        MR. JONES:  -- then we failed to.

15        THE COURT:  All right.

16        MR. JONES:  But Your Honor is correct.

17        THE COURT:  I mean, you can certainly argue that

18  without foundation it's not -- it's of limited probative

19  value.  That -- that's not admissibility, per se.  So I

20  just wanted to make sure I didn't miss something in the

21  evidentiary objection.

22        MR. JONES:  Your Honor, I would have to go back

23  and re-read it.  I admit that it certainly was made by

24  other parties and I think the Court is correct that it

25  shouldn't be -- that the evidence is not admissible.

Page                                                                31

1        Your Honor, I do want to take up the point that

2   Mr. Israel made about the reply declarations, but

3   unfortunately -- I've learned to bring my Bankruptcy Code

4   and rules with me.  I don't have the Local Rules with me.

5   I don't think the Local Rules provide for reply

6   declarations.  The Local Rule says that all of the evidence

7   must be filed with the moving papers.  And, Your Honor, I

8   have had other judges in this district rule that reply

9   declarations are not proper because of that rule.  So I

10  think Mr. Israel is correct on that one.

11        Your Honor, I'd also note that there's no effort

12  by the movant to show that there is cause to grant relief

13  from the stay.

14        THE COURT:  Okay.  I'm sorry.  I was looking at

15  the Local Rules.  So --

16        MR. JONES:  I apologize, Your Honor.

17        THE COURT:  Is this your fourth or your fifth

18  point?

19        MR. JONES:  We're about to the fourth.

20        THE COURT:  Okay.

21        MR. JONES:  Your Honor, the fourth point is the

22  motion effectively acknowledges that delivering the

23  Division order is, in fact, stayed.

24        And, Your Honor, Mr. Beall says, well, it's not

25  property of the estate, therefore, I'm entitled to do

Page                                                                          32

1    whatever I want.  But, Your Honor, the Bankruptcy Code

2    doesn't say the stay applies only to property of the

3    estate.  Section 362(a)(3) says that actions to obtain

4    property of the estate or property from the estate or to

5    exercise control over assets of the estate are all stayed.

6    And, Your Honor, this is the point you were making about

7    these things are commingled.  There is a contract to sell

8    this oil.  This oil is in the possession of the estate.

9    The stay is designed to keep people from coming in and

10   saying, you have my property, give it to me.  That's a

11   matter that is properly brought before this Court by an

12   adversary proceeding.

13          It is clear that if Mr. Beall goes and delivers

14   to buyers of this oil his document that says you owe me the

15   money, that is going to interfere with the Trustee's

16   ability to collect on the contracts he has entered, which

17   are unquestionably property of the estate.  Mr. Beall has

18   reduced the stay from what the Code says it applies to and

19   the fact that he filed the motion asking for relief

20   effectively acknowledges that.  There's no cause shown why

21   this court should grant relief from Section 362(a)(3) even

22   if the oil were completely not property of the estate.

23          And, Your Honor, that brings us to point number

24   six, which I think is very important.  I've pointed out

25   there's no argument for cause beyond it's not property of

1  the estate.   Point six -- and Your Honor has raised this --

2  we need to understand which this division order is.  It's

3  not an order from a competent court.  If we had an order

4  from a competent court and Mr. Beall said, "I want to serve

5  this upon people," maybe some form of dignity of that order

6  would constitute cause to permit him to do so.

7          All this is, is a claim by the creditor or by the

8  owner, we don't know, saying, you have my oil.  Pay me the

9  money that you've contracted to give to the Trustee under

10  what is unquestionably a contract of the estate and for oil

11  that is unquestionably in the possession of the estate.  It

12  is stayed.

13          And, Your Honor, that brings me to the last point

14  I want to make and Your Honor alluded to this.  The amounts

15  that may ultimately -- that GLR may ultimately be -- I'm

16  sorry -- GRL may ultimately be entitled to are not self-

17  evident.

18          As Your Honor noted, the oil comes out of the

19  ground mixed.  There's complex accounting to determine

20  which lease the oil comes from.  We've got declaration from

21  other royalty holders who have suggested that there has

22  been inappropriate accounting for where the oil comes from.

23          Now, the Trustee has said he's doing his best to

24  figure that out, but this is not a matter that should be

25  determined by a motion for relief from stay.  When Your

Page                                                                      34

1  Honor hears the motion on Tuesday that Ms. Smith no longer

2  has the protection of stay for her house, the Court doesn't

3  say, oh, and by the way, I'm hereby finding that Porrell

4  Pool (phonetic) owns the washer and Ford owns the car and

5  someone else owns the solar panels on the house.  Those are

6  adversary proceeding matters.

7          So going back to the beginning, this is the --

8  not the proper device for much of what the movant wants the

9  Court to determine and for the narrow item of should the

10 stay remain in effect the answer is absolutely.  There is

11 no evidence.  There is no law.  Nothing to show cause to

12 permit this creditor to interfere with the operations of

13 the estate further than they've already done.  Thank you,

14 Your Honor.

15         THE COURT:  Thank you, Mr. Jones.

16         Mr. Cohen?

17         MR. COHEN:  Good morning again, Your Honor.  The

18 Attorney General's Office is here as well and I don't know

19 whether they intend to say anything or not, but they joined

20 in on the joinder that we filed.  I'm not adding anything

21 to the joinder other than to point the Court to footnote

22 two of the joinder which summarize the evidentiary

23 objections that we incorporated by reference to the

24 efficacy of the declarant.  And then if we can't to revisit

25 it again to this hearing, there's another one of these

Page                                                                35

1  summary proceedings coming up on March 12th with the same

2  declarant and hopefully we can avoid some of the same

3  issues by getting an advisory as to who's got to show up

4  because I can assure you it's going to be contested.

5           THE COURT:  Um-hum.

6           MR. COHEN:  Thank you.

7           THE COURT:  Okay.  Thank you, Mr. Cohen.

8           Who else would like to be heard?  All right.

9  Mr. Beall, you have the last word.

10          MR. BEALL:  Sure.  So one of the things that was

11 discussed is I think the Court said that the organization

12 wasn't appropriate but, in fact, the deeds are organized by

13 county and by field and there's, in fact, a summary sheet

14 at the beginning of it.

15          I -- there's a lot of stuff here but this is --

16 this is what it's got to be.  If you look at Exhibit A,

17 page 8 through about --

18          THE COURT:  Yeah, I'm looking at it.

19          MR. BEALL:  -- 12 there's at least a

20 summarization of it.  In terms of how confusing --

21          THE COURT:  And where -- and does that chart --

22 that chart contains no arithmetic so there's no --

23          MR. BEALL:  Okay.

24          THE COURT:  You know, this is the assertion that

25 there's a certain percentage here.  There's no -- so first

Page                                                                      36

1   of all that's still a problem.  It's still -- certainly

2   it'd be -- these would be essential exhibits in a trial

3   over what are the -- what are your client's royalty

4   interest rights.  But my point is, is when I picked it up

5   and looked at it it's not self-explanatory.  My experience

6   with oil and gas is nothing is self-explanatory.  And

7   there's a lot of arithmetic that goes into it and they have

8   to connect a lot of dots before you are able to conclude,

9   you know, who are the various interest holders in a

10  particular lease, let alone how oil comes, again, out of --

11  which spigot does it come out of.

12          MR. BEALL:  Well, it's --

13          THE COURT:  Right?  Are the wells -- which wells

14  are connected and where do they come out at the -- at what

15  point is it -- does it go into a truck --

16          MR. BEALL:  So --

17          THE COURT:  -- or into the pipeline.  Where do

18  they measure it?  I mean, these are all -- they all kind of

19  impact, well, who else's oil is in there.

20          MR. BEALL:  Okay.  So, Your Honor --

21          THE COURT:  Okay.  And your argument has been,

22  well, we just -- we just want them to pay they always

23  did -- the way they always did and I don't -- I don't know.

24  I've -- I've heard from people today who -- including the

25  Trustee's counsel.  This is the Trustee is putting the

Page                                                                37

1    money aside based on those numbers but that the Trustee

2    into it all and that it can't be taken for granted.

3              MR. BEALL:  He didn't exactly say that.

4              THE COURT:  Okay.  Okay.  That's what I inferred.

5              MR. BEALL:  And then the summarization is in

6    Exhibit D, Your Honor, and you can see what the proposed

7    order say is -- there are three of them, one for each

8    county.  And they go down each field because that's how the

9    oil is organized is by field.  So for instance --

10             THE COURT:  But your -- Mr. Beall, stop.  Okay.

11   Now you're -- now you are going to say that your statements

12   from the podium are as good as testimony that walks the

13   Court through all these papers and what they mean and it's

14   not.  It's not something self-explanatory.  Those orders

15   are just a request, a demand.  Okay.  They're not proof of

16   anything.

17             MR. BEALL:  Okay.  In terms of the foundation of

18   the leases among other things I think the Court properly

19   mentioned the fact there was no objection to that, but even

20   without that they're all recorded documents.  The Court can

21   take judicial notice of them.  There's no real dispute

22   about any of those documents.

23             Adequate protection.  Adequate protection is only

24   important if this is property of the estate and it is not.

25   Okay.  And again, so if you look at the Division orders,

Page                                                                    38

1   Your Honor, essentially, for example, there might be from

2   the redo field, and I forget the number, but my client is

3   entitled to two percent.  That means 98 percent goes to the

4   Trustee, two percent goes to my client, and it -- there's

5   no -- there's no confusion there.  It doesn't get in the

6   Trustee's way.  There's just nothing wrong with that.  I'm

7   sorry.  Redo is wrong.  We get almost three percent.  One

8   and a half on our overriding enter (phonetic) royalty and

9   1.6 on a royalty.  But -- so it's almost three percent for

10  redo.  That's our page 215.  And there's no confusion.  The

11  buyer juts writes one check to the Trustee and one check to

12  GRL, LLC.

13          362(b)(3) says we can't go against property of

14  the debtor or property of the estate but, again, this is

15  not property of the estate.  The 97 per --

16          THE COURT:  It's property from the estate.

17          MR. BEALL:  No, it isn't.

18          THE COURT:  Oh, yes, it -- oh.  Mr. Beall, it

19  comes out of the ground.  The Trustee is holding it.

20  That's property from the estate.  It's not property of the

21  estate, but it's property from the estate.  He's holding

22  it.  What else could that language mean?  Why did Congress

23  make a distinguish -- make a distinction between property

24  of the estate and property from the estate?

25          MR. BEALL:  You got me there, Your Honor, I have

Page                                                                          39

1  no idea why they would have put that in there.

2         THE COURT:  Okay.  Well, my job is to assume that

3  when Congress uses different words it did so intentionally.

4  That's the rule of -- canon of construction I'm supposed to

5  follow.

6         MR. BEALL:  All right.  Well --

7         THE COURT:  So what else does it mean?

8         MR. BEALL:  So in any event there's no need for

9  adequate protection when it wasn't property of the estate.

10 I mean, that -- it still should just be --

11         THE COURT:  Which is the adequate protection

12 statute, Section of 362?

13         MR. BEALL:  It's 362 -- shoot, I don't have my

14 Code with me.

15         THE COURT:  Or it's 361.

16         MR. BEALL:  Yeah.

17         THE COURT:  Well, 361 is whenever it's required.

18         MR. BEALL:  Right.  And I guess that you're

19 talking -- it's 362(d)(1) so --

20         THE COURT:  Okay.

21         MR. BEALL:  -- so relief should be granted for

22 cause including lack of adequate protection, but cause

23 isn't just lack of adequate protection.  The fact that it's

24 our property is certainly cause.

25

Page                                                                40

1            THE COURT:  Your -- did you offer me any cases

2    under 362(d) that described cause where your property is

3    part of the commingled commodity?

4            MR. BEALL:  I did not give you a case that said

5    that.

6            THE COURT:  Okay.  What else?

7            MR. BEALL:  Mr. Jones suggested that he used the

8    word "claim." He did it in a funny way.  But this is not a

9    claim.  That's what *Delta Petroleum* says.  It's not

10   something that can be discharged.  It's our property and

11   nobody has suggested that *Delta Petroleum* isn't good law.

12   Nobody said that it didn't properly interpret California

13   law and it said you can't discharge it because it isn't a

14   claim.  That's what *Delta Petroleum* said.

15           So when Mr. Jones used the word "claim" he was

16   trying to suggest to the judge -- to you, Your Honor, that

17   this is somehow just a claim we have in the case, but it's

18   not.  It's our property.

19           The other thing I wanted to mention -- oh, lost

20   my train of thought.  Excuse me.

21           In the end, Your Honor, this is our property and

22   what you're being asked, no matter how many senators come

23   up to stick a knife in the back of Caesar, Your Honor, you

24   still have to apply the law.  And what they're talking

25   about is we have our property and all these parties that

Page                                                                41

1  are objecting to this motion want you to take our property

2  so that the Trustee can hang onto it for some vague notion

3  that perhaps there's some kind of offset claim for some --

4  against some other entity that is neither the claim nor the

5  way that they would get around mutuality is described in

6  any way, shape or form.

7          As far as my client is concerned, the only thing

8  that's been suggested is that there's this one quitclaim

9  deed that my client received, which is undisputedly from a

10 field that has been -- no production for years and years

11 and years and the idea that somehow the 502 would be

12 involved is absolutely silly because we don't have a claim.

13 You can't refuse to pay a claim when we don't have a claim.

14 We have a right.

15         So, I mean, 502 is just completely a red herring.

16         THE COURT:  Claim is a right to payment and

17 where -- where the oil has been liquidated and turned into

18 cash, cash is the object of payment.

19         MR. BEALL:  That's exactly what *Delta Petroleum*

20 rejected, exactly.

21         THE COURT:  Well --

22         MR. BEALL:  That's exactly the argument.

23         THE COURT:  This court hasn't ruled on the issues

24 raised in *Delta Petroleum* yet, so -- and I don't think it's

25 been adequately briefed here, but I understand your

Page                                                                42

1  argument.  We'll see.  Maybe I'll get to that issue.  I

2  don't think this motion gets even close.

3          Anything else?

4          MR. BEALL:  No, thank you, Your Honor.

5          THE COURT:  Okay.  All right.  Anybody else?  All

6  right.

7          Look, so we have this hybrid motion.  It's asking

8  for two things.  It's asking the Court to basically undo

9  the prior order of Judge Wiles presiding over this case in

10 the Southern District of New York which said that the

11 royalties owing to insiders ought to be escrowed.  It

12 appears that that's what's going on and I think that it --

13 on the kind of the most basic level that relief has nothing

14 to do with 362.  I'm being asked to just lift that now, but

15 I don't think a very good -- much of any case has been made

16 as to why I should revisit that order now, not the least of

17 which is that Rule 60 wasn't invoked or any of the cases

18 under Rule 60 addressed.

19         But in any event, I don't think that that order

20 which I view as interlocutory, is temporary that it makes

21 sense.  That's the sort of order that is in place  pending

22 some reliable determination that those monies ought to go

23 out the door.  And I -- I understand that there is some

24 animosity towards prior management and while I don't think

25 I have animosity I have observed that I did appoint a

Page                                                                                    43

1   trustee because things weren't going well.  But my mind is

2   open.  I certainly haven't made any decisions as to who's

3   entitled to what.  And, you know, one bad act over here,

4   even if there is a bad act, doesn't necessarily change

5   whether someone is entitled or some entity is entitled to

6   be paid.  So I think all those things are totally separate

7   and I'm keeping them separate in my mind.

8            But I'm being asked to undue with respect to

9   those payments an order that Judge Wiles has put in place,

10  which I think is sensible where there are questions that

11  have been raised about the insider's conduct.  I think

12  it's -- and where.  It's not clear what that entitlement

13  is.

14           But I think the -- to the extent the motion

15  sought relief from a prior order, I think it was

16  procedurally defective as well as substantively defective.

17  It just didn't say that's what we're trying to do.  Didn't

18  brief the law on undoing a prior order of the Court and in

19  any event, didn't really make much of a showing that that's

20  what we ought to do here, especially when it involves

21  making a determination about the nature and extent of the

22  insider's interests in these leases in the particular -- in

23  the royalties.  And I do think that requires an adversary

24  proceeding.

25           If we had been in a different posture, if we had

Page                                                                          44

1    had an adversary proceeding on those issues and the extent

2    of the insider's entitlement had been determined and it was

3    clear, well, maybe that would make sense at that point, but

4    none of that has happened.

5          Secondly, this seeks prospective relief.  It's

6    described as relief from the automatic stay to give a

7    Division order.  Division order is -- ought not be confused

8    with the order of the Court.  Division order is, hey, I

9    claim an ownership interest in some fraction of some oil

10   that you purchaser are buying and you should pay it to me

11   instead of to them.  You know, the motion for relief I

12   think is procedurally improper for a similar reason which

13   is I don't -- I don't -- inherent in it is a determination

14   of the nature and extent of the -- of the moving party's

15   interest and I don't think those have been determined and I

16   don't think it's appropriate to determine them in a summary

17   proceeding.  I just don't.

18          But even if that were not the case, I do think

19   the -- I do think 362(a)(3) is applicable.  I think that's

20   why there was a request for relief from the automatic stay

21   or request for determination that the stay didn't apply.

22   There was certainly desire by the moving party not to run

23   afoul of the automatic stay and I'm -- appreciate that.

24          362(a)(3) says the stay is applicable, not only

25   with respect to -- here let me just read so I don't mess it

1  up.  Not only an act to obtain possession of property of

2  the estate, but also of the property from the estate were

3  to exercise control over property of the estate.

4          And I think that this is property from the

5  estate, even if it's not of the estate that it's commingled

6  with all the other oil -- as far as I know, certainly

7  nobody has demonstrated otherwise it's commingled with all

8  the other oil that the estate is producing.  And so I think

9  it would interfere with -- potentially with the Trustee's

10 process of selling it enough that I think the statute is

11 applicable.

12         I think after having sustained the evidentiary

13 objections to Mr. Grewal's declaration there's really

14 nothing left.  And even if I hadn't excluded most of his

15 declaration I just don't think that cause was shown, even

16 aside from the evidentiary problems and the procedural

17 problems.  I mean, as I've said, I've got a stack of oil

18 and gas leases and I have no -- there was no testimony even

19 inadmissible testimony that explained how all of that

20 translates into the particular entitlement that GRL is

21 asserting here and I think these things are complicated,

22 which is why the drafters said that we need to -- you know,

23 adversary proceeding to determine the extent of property

24 rights.

25         And even if there was no dispute as to the extent

Page                                                                     46

1  of the property rights, I am not persuaded by anything in

2  the record that it would still be a good idea to lift the

3  stay under 362(a)(3) because I believe that the rights of

4  the moving party are adequately protected.  I respectfully

5  disagree with Mr. Beall's argument about 362(d).  I think

6  it doesn't apply here and hold on, let me tell you why but

7  I don't think that cause has been shown.  I'll explain

8  myself here.

9          362(d) "On request of a party in interest after

10 notice of a hearing, the court shall grant relief from

11 stay," et cetera, "for cause including the lack of adequate

12 protection of an interest in property of such party in

13 interest."

14         Well, that doesn't say anything about property of

15 the estate or not being property of the estate.  It's about

16 the property -- adequate protection is a notion that

17 protects the interest of parties that claim they had

18 property interest in a property that is subject of the

19 stay.  Okay.  And I -- I think that interest is adequately

20 protected here by escrowing, you know, the royalty amount

21 that's always been -- you know, that's sort of on the books

22 when they got there.  But I'm not about to say in summary

23 proceeding that that is once and for all time the right

24 royalty amount.

25         And again, to the extent the argument is, well,

1   the cause is that this is our stuff, I get that, but it's

2   just not enough.  I'm not really keen on having the

3   insider, former manager of a company, going to the

4   company's purchasers with anything, especially when they --

5   their interest can be adequately protected.  Their property

6   interest, whatever it is, is adequately protected by the

7   escrowing of the funds.

8        I'm not really going to get into the 502(d)(2)

9   issue.  I don't think I need to today.  I just think

10  there's so many problems with this I don't need to get to

11  that.  And so just in case anybody is trying to read the

12  tea leaves to tell you that it's not, it's not something

13  I'm really relying on or addressing today.

14       I did want to mention while we were talking, I

15  did look at the Local Rules with respect to replies and

16  90131(g) -- hold on a second -- 4 -- well, (g) says that

17  "(1) Sets a deadline for the reply memorandum and

18  declarations are other evidence attached.  Must respond

19  directly to the opposition documents."  (g)(4) says, "New

20  arguments or matters raised for the first time in reply

21  documents will not be considered," so that really sums up

22  the rule which is, yes, there can be declarations attached

23  to a reply and these rules have not changed for as long as

24  I've been in practice.

25       Yes, you can attach a declaration.  Yes,

Page                                                                          48

1  sometimes the Court will ignore it if the Court concludes

2  that the declaration raises new matters, things that

3  perhaps should have been in the motion itself as opposed to

4  true rebuttal testimony.  I don't think I need to get to

5  that.  I don't think that the declarations that were

6  attached to the reply are of a probative value significant

7  enough to move the dial here.  So I'm not going to formally

8  exclude them.

9          But this is just too complicated a matter and

10 they amount to, yeah, you know, you should -- this -- this

11 Division order is kind of the same as what we've always

12 done and so it's fine.  And I'm -- I don't think that's

13 good enough.  So --

14          MR. BEALL:  Your Honor --

15          THE COURT:  The motion will be denied for all

16 those reasons.

17          MR. BEALL:  Your Honor, denial without prejudice,

18 I assume?

19          THE COURT:  Yeah.

20          MR. BEALL:  And I just wanted to say that I hope

21 that the Court maintains an open mind with regard to

22 362(a)(3) which was never raised until Mr. Jones hit the

23 podium today because if I do come back I will brief you

24 about 362(a)(3).

25          THE COURT:  Okay.  Good.

Page                                                                          49

1                MR. BEALL:  Okay.

2                THE COURT:  All right.

3                MR. BEALL:  Thank you.

4                MR. JONES:  Your Honor, shall I prepare the

5      order?

6                THE COURT:  Yes, please.

7                MR. JONES:  Thank you.

8                MR. BEALL:  Thank you, Your Honor.

9                THE COURT:  Mr. Cohen?

10               MR. COHEN:  Your Honor, you earlier indicated

11     when I raised the point of order for clarification about an

12     administrative determination.  We have come -- not to

13     prejudge anything, but we have a request of administrative

14     payment that's set for March 12th.  There's a declaration

15     from the same declarant.  It will --

16               THE COURT:  I'm sorry, there's a -- I'm sorry.

17     There's a motion on March 12th filed by whom?

18               MR. COHEN:  I think it's the same party.

19               MR. BEALL:  No, it's not.  A different entity?

20               MR. COHEN:  Different affiliate.

21               MR. BEALL:  Your Honor, it's GLR, LLC.

22               THE COURT:  Okay.

23               MR. BEALL:  And it's for administrative rent.

24     Neither the debtor nor the Trustee have ever paid our rent.

25     That's all.

Page                                                           50

```
 1              THE COURT:  Okay.

 2              MR. BEALL:  That's all the motion is.

 3              MR. COHEN:  And I'm just raising the issue of so

 4   we don't drag -- go with (indiscernible) unnecessarily.

 5   Whether the Court is going to want contested or objected-to

 6   declarations, whether wants a declarant in court so we

 7   don't have to do a two-step on these things.

 8              THE COURT:  So --

 9              MR. BEALL:  Are there going to be factual

10   (indiscernible) dispute in that motion --

11              THE COURT:  Well, I don't know.  The flip side of

12   creating a rule in advance that everybody has to bring

13   their declarant all the time is that sometimes the facts

14   aren't in dispute.

15              MR. BEALL:  The facts are that there's rent and

16   it hasn't been paid.  I don't think anybody disputes any of

17   that, Your Honor.

18              THE COURT:  So the deadline for objections to a

19   motion being heard on the 12th is February 27th which

20   hasn't happened yet.  So I don't know whether -- I don't

21   know whether there will be a factual dispute and I don't

22   know whether -- here's another thing that our Local Rules

23   don't do very well.  Okay.  And that is that everybody

24   irrespective of whether I think there's a clash of

25   declarations, everybody has the -- really I think the
```

1  constitutional right to assert their right to anyone that's

2  opposing relief to cross-examine the lease.  Even if you

3  haven't created a factual dispute with -- necessarily with

4  the competing declaration.  That's my personal view.

5  Nobody has briefed it.  I haven't ruled on it.  I just

6  think -- the reason right to -- now, you don't see that a

7  lot here.  We see it in other jurisdictions that you

8  practice as people are expected to bring their witnesses

9  and then cross-examine.  So, you know, one of the other --

10  the rule that we could fashion in this case is that, you

11  know, at the time that an opposition and a reply are filed

12  that anybody that wishes to cross-examine moving party's

13  declarant should give notice of that.  That's one thing we

14  could do.

15        And then by requiring that in writing the party

16  who's offered the witness is now on notice the other party

17  wants to cross-examine them at the hearing.  I'm willing to

18  do that in this case because we have a dedicated hearing

19  date.  It's hard for me to do something like this when we

20  have 35 relief from stay motions on the day.  But if the --

21  I don't know what people think about that.  I'm happy to

22  entertain.  This is our omnibus hearing date and we're all

23  here, all the parties who have been participating.  So if

24  you want --

25        MR. BEALL:  I like -- I'd like you to defer to

Page                                                                    52

1  other people --

2           THE COURT:  Okay.

3           MR. BEALL:  -- and just to make clear, Your

4  Honor, for a lot of these simple factual issues, they're

5  related party transactions and whether the amount sought,

6  whether the attraction itself is fair, whether it's

7  appropriate are according to issues.  And so people have

8  questions and it's not in substitution for 2004 or

9  deposition.  Matters are being initiated by the moving

10 party and other parties have the opp -- would like the

11 opportunity to say, huh, before something is ordered we

12 have some questions about the transaction.  So I think it's

13 a very good idea.

14          THE COURT:  Okay.  Our Local Rules, by the way,

15 to the extent they say -- they don't say anything about how

16 somebody requests the opportunity to cross-examine.  All

17 they say is that if the judge wants to hear testimony the

18 judge has to give a notice so many days ahead, which I

19 personally think is inadequate, but, you know, one of these

20 days I'll, you know, get around to try and persuade the

21 Rules Committee to do something about it, but we can create

22 that.

23          Yeah, Mr. Jones.

24          MR. JONES:  Your Honor, Evan Jones on behalf of

25 UBS.  I agree with Mr. Cohen that the Court's suggestion

1  that parties should indicate in their responsive pleadings

2  if they want to have the opportunity to cross-examine the

3  witnesses makes good sense.  And I would note that in a

4  number of other districts there's an equivalent of that.

5  It's not necessarily in the -- in the operative pleadings

6  but --

7          THE COURT:  How do they do it?

8          MR. JONES:  Your Honor, my recollection is that

9  in -- I apologize I'm blanking out whether it's Delaware or

10 New York -- you're to give a notice a certain number of

11 days in advance of the hearing.

12         THE COURT:  Okay.

13         MR. JONES:  Which is effectively what I

14 understand the Court to be suggesting.  And I think putting

15 it in the responsive pleading would make sense.

16         THE COURT:  All right.  Well, I'm going to take a

17 look.  I mean, I may ask you to alternatively -- my

18 administrative order might say, hey, file a single piece of

19 paper just so there's no -- just so it's clear.  I'll look

20 at those two jurisdictions and see what they -- what their

21 rules say.

22         Yeah.

23         MR. MCCONNELL:  Your Honor, the Trustee would

24 support that procedure -- Mr. Cohen's suggested procedure

25 as well.

Page                                                            54

1          THE COURT:  Okay.  All right.  Let me think about

2   it and I will do something about it this week one way or

3   the other.

4          Of course, you also know -- and just as an aside,

5   another thing that our Local Rules aren't very clear on is

6   when you want to take discovery on a motion, what do you

7   do.  And so if I haven't said this before let me tell you,

8   no, no, no, there's some sections on discovery generally

9   but not necessarily a motion practice.

10          I will -- if requested I will entertain an *ex*

11  *parte* request to shorten the discovery periods when

12  somebody wants to take discovery.  We'll have a telephone

13  conference.  It won't truly be *ex parte* but I will do it on

14  an expedited basis without a hearing.

15          If there's a discovery dispute all anybody has to

16  do is call my law clerks and tell them and we'll schedule a

17  conference, whether it's a discovery -- a dispute on timing

18  or dispute on substance.

19          If you want to take discovery on a motion and it

20  doesn't seem like there's enough time, you can always try

21  to negotiate a continuance of the motion amongst yourselves

22  or you can bring a motion to continue it.  Okay.  So I just

23  want to just lay that all out there because I understand

24  that -- I feel like things are heating up here in a

25  different way.  We've sort of started with that operational

Page                                                                    55

1  emergency mode and I think now there are parties with, you

2  know, conflicting rights who are starting to oppose one

3  another.

4        But I'm very flexible on that.  I expect

5  parties -- in motion practice I expect you to cooperate on

6  discovery and do it in a time frame that sort of keeps

7  things reasonably moving the way motion practice is

8  supposed to work.

9        Same thing in adversaries if there are discovery

10  disputes.  My preference is to try to have an informal

11  discovery conference oftentimes by telephone and try to

12  work that out in advance.  And if I -- if something is too

13  complicated or too detailed like people come in and they've

14  got -- you know, I have different objections to each of 38

15  different document requests, you know, I'll say, well, you

16  need to commit that to writing and file a discovery motion.

17  But most things seem to boil down to a few, you know -- a

18  few big issues and sometimes I can help the parties

19  informally.  If I can, I will.  So --

20        MR. BEALL:  Thank you, Your Honor.

21        THE COURT:  Anything else?

22        MR. JONES:  Thank you, Your Honor.

23        THE COURT:  Okay.  Thank you all.  Appreciate it.

24        ATTORNEYS:  Thank you, Your Honor.

25        THE COURT:  Oh, it's 11:55.  Be sure to spend

Page                                                                56

1   some money here in Santa Barbara County before you go back

2   to LA or anywhere else.  Just a pitch for the neighborhood

3   family businesses.  All right.  Our work is done for today.

4   Court is adjourned.

5            ATTORNEYS:  Thank you, Your Honor.

6   (End at 11:55 A.M.)

7                     * * * * * * *

8        I certify that the foregoing is a correct

9   transcript from the electronic sound recording of the

10  proceedings in the above-entitled matter.

11

12

13  _____      Date:  2/28/2020

14  RUTH ANN HAGER, C.E.T.**D-641

15

16

17

18

19

20

21

22

23

24

25



# EXHIBIT "4"

00136

# United States Bankruptcy Court
## Central District of California
### Northern Division
### Judge Martin R. Barash, Presiding
### Courtroom 201 Calendar

**Tuesday, February 25, 2020**                    **Hearing Room    201**

<u>10:30 AM</u>
**9:19-11573    HVI Cat Canyon, Inc.**                    **Chapter 11**

#### #1.00    Hearing
RE: [767] Notice of Motion and Motion in Individual Case for Order Confirming
Termination of Stay under 11 U.S.C. 362(j) or That No Stay is in Effect under 11
U.S.C. 362(c)(4)(A)(ii) royalty interests with proof of service.   (Beall, William)

Docket        767

**Tentative Ruling:**

**<u>Tentative Ruling for February 25, 2020</u>**

Trustee's Evidentiary Objections to Declaration of Randeep S. Grewal

| 1. | ¶ 4, lines 13-14 | SUSTAINED |
|----|------------------|-----------|
| 2. | ¶ 4, lines 15-22 | SUSTAINED |
| 3. | ¶ 5, lines 23-24 | SUSTAINED |
| 4. | ¶ 5, lines 25-28 | SUSTAINED |
| 5. | ¶ 6, lines 1-3 | SUSTAINED |
| 6. | ¶ 5, lines 3-8 | SUSTAINED |

UBS' Evidentiary Objection to Declaration of Randeep S. Grewal

| 1. | ¶ 4, lines 15-22 | SUSTAINED |
|----|------------------|-----------|

GRL's Evidentiary Objection to Declaration of Alicia Clough

| 1. | Entire Declaration | SUSTAINED |
|----|--------------------|-----------|

| **Party Information** |
|:---------------------:|

**<u>Debtor(s):</u>**

HVI Cat Canyon, Inc.                    Pro Se

**<u>Movant(s):</u>**

GRL, LLC, a Delaware limited            Represented By
                                        William C Beall

**<u>Trustee(s):</u>**

Michael Authur McConnell (TR)          Represented By

**00137**

# United States Bankruptcy Court
## Central District of California
### Northern Division
### Judge Martin R. Barash, Presiding
### Courtroom 201 Calendar

**Tuesday, February 25, 2020**                                          **Hearing Room      201**

---

<u>10:30 AM</u>
**CONT...**       **HVI Cat Canyon, Inc.**                                          **Chapter 11**

                                    Eric P Israel
                                    Sonia  Singh
                                    Aaron E de Leest
                                    John N Tedford IV

**00138**

# EXHIBIT "5"

00139

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| ERIC P. ISRAEL (State Bar No. 132426)<br>eisrael@DanningGill.com<br>ZEV SHECHTMAN (State Bar No. 266280)<br>zs@DanningGill.com<br>DANNING, GILL, ISRAEL & KRASNOFF, LLP<br>1901 Avenue of the Stars, Suite 450<br>Los Angeles, California 90067-6006<br>Telephone: (310) 277-0077<br>Facsimile: (310) 277-5735<br><br>☒ _Attorney for **Respondent, Chapter 11 Trustee**_<br>☐ _Movant appearing without an attorney_ | **FILED & ENTERED**<br><br>**MAR 23 2020**<br><br>CLERK U.S. BANKRUPTCY COURT<br>Central District of California<br>BY handy    DEPUTY CLERK<br><br>**CHANGES MADE BY COURT** |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -_NORTHERN_ DIVISION**

| In re:<br><br>HVI CAT CANYON, INC.,<br><br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 9:19-bk-11573-MB<br>CHAPTER: 11 |
|---|---|
|  | **ORDER DENYING MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362** |
|  | DATE: 02/25/2020<br>TIME: 10:30 a.m.<br>COURTROOM: 201<br>PLACE: 1415 State Street, Santa Barbara, CA 93101 |

| **Movant:** GRL, LLC |
|---|

1578044.1  26932 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**00140**

June 2014                                    Page 1                              F 4001-1.RFS.DENY.ORDER

1.  The Motion was:    ☒ Opposed    ☐ Unopposed    ☐ Not Prosecuted

2.  The description of the Property or Nonbankruptcy Action to which this order applies is as follows *(specify street address, legal description, personal property description or Nonbankruptcy Action):*

    Payment of royalty interests of Movant, GRL, LLC; finding that such royalty interests are not property of the estate and permitting service of oil and gas division orders.  See doc. no. 767.

3.  The Motion is denied:    ☒ without prejudice <u>to Movant pursuing relief in the related adversary proceeding.</u>

    ☐    with prejudice    ☐ on the following grounds:

    a.  ☒ Based upon the findings of fact and conclusions of law, <u>and evidentiary rulings</u>, made on the record at the hearing

    b.  ☐ Unexcused non-appearance by Movant

    c.  ☐ Lack of proper service

    d.  ☒ Lack of good cause shown for relief from stay

    e.  ☐ No stay is in effect under:

       (1)  ☐ 11 U.S.C. § 362(c)(2)(A)

       (2)  ☐ 11 U.S.C. § 362(c)(2)(B)

       (3)  ☐ 11 U.S.C. § 362(c)(3)(A)

       (4)  ☐ 11 U.S.C. § 362(c)(4)(A)

    f.  ☐ Other *(specify):*

4.  ☐ Movant may not file another motion for relief from the stay in this bankruptcy case absent a court order authorizing the filing of another motion.

###

Date: March 23, 2020

*Martin R Barash*

Martin R Barash
United States Bankruptcy Judge

1578044.1  26932 This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2014                    Page 2                    F 4001-1.RFS.DENY.ORDER

00141

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  CHAPTER 11 TRUSTEE'S OPPOSITION TO MOTION [CASE DOC. NO. 900] TO RECONSIDER ORDER [CASE DOC. NO. 866] DENYING MOTION FOR RELIEF FROM STAY [CASE DOC. NO. 767]; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF MICHAEL A. MCCONNELL, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  May 1, 2020  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 1, 2020 | Patricia Morris | /s/ Patricia Morris |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1587996.1   26932 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

<u>ADDITIONAL SERVICE INFORMATION</u> (if needed):

**1.** **<u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>**

- Anthony A Austin    anthony.austin@doj.ca.gov
- William C Beall    will@beallandburkhardt.com, carissa@beallandburkhardt.com
- Bradley D Blakeley    blakeley@blakeleylawgroup.com, bradleydblakeley@gmail.com
- Alicia Clough    aclough@loeb.com, mnielson@loeb.com,ladocket@loeb.com
- Marc S Cohen    mscohen@loeb.com, klyles@loeb.com
- Alan D Condren    , berickson@seedmackall.com
- Alec S DiMario    alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com
- Karl J Fingerhood    karl.fingerhood@usdoj.gov, efile_ees.enrd@usdoj.gov
- H Alexander Fisch    Alex.Fisch@doj.ca.gov
- Don Fisher    dfisher@ptwww.com, tblack@ptwww.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
- Ellen A Friedman    efriedman@friedmanspring.com, jquiambao@friedmanspring.com
- Gisele M Goetz    gmgoetz@hbsb.com, ggoetz@collegesoflaw.edu;cecilia@hbsb.com
- Karen L Grant    kgrant@silcom.com
- Ira S Greene    Ira.Greene@lockelord.com
- Matthew C. Heyn    Matthew.Heyn@doj.ca.gov, mcheyn@outlook.com
- Brian L Holman    b.holman@mpglaw.com
- Brian L Holman    b.holman@musickpeeler.com
- Eric P Israel    eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
- Razmig Izakelian    razmigizakelian@quinnemanuel.com
- Alan H Katz    akatz@lockelord.com
- John C Keith    john.keith@doj.ca.gov
- Jeannie Kim    jekim@sheppardmullin.com, lsemeraro@sheppardmullin.com
- Mitchell J Langberg    mlangberg@bhfs.com, dcrudup@bhfs.com
- Maxim B Litvak    mlitvak@pszjlaw.com
- Vincent T Martinez    llimone@twitchellandrice.com, smccomish@twitchellandrice.com
- Michael Authur McConnell (TR)    Michael.mcconnell@kellyhart.com
- Brian M Metcalf    bmetcalf@omm.com, brian-metcalf-9774@ecf.pacerpro.com
- Jerry Namba    nambaepiq@earthlink.net, G23453@notify.cincompass.com;annie_cunningham@ymail.com
- David L Osias    dosias@allenmatkins.com,
  bcrfilings@allenmatkins.com,kdemorest@allenmatkins.com,csandoval@allenmatkins.com
- Darren L Patrick    dpatrick@omm.com, darren-patrick-
  1373@ecf.pacerpro.com;sindelicato@omm.com;ejones@omm.com
- Jeffrey N Pomerantz    jpomerantz@pszjlaw.com
- Benjamin P Pugh    bpugh@ecg.law, mhamburger@ecg.law;calendar@ecg.law
- Edward S Renwick    erenwick@hanmor.com, iaguilar@hanmor.com
- J. Alexandra Rhim    arhim@hrhlaw.com
- Todd C. Ringstad    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Mitchell E Rishe    mitchell.rishe@doj.ca.gov
- George E Schulman    GSchulman@DanningGill.Com, danninggill@gmail.com;gschulman@ecf.inforuptcy.com
- Zev Shechtman    zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- Sonia Singh    ssingh@DanningGill.com, danninggill@gmail.com,ssingh@ecf.inforuptcy.com
- Daniel A Solitro    dsolitro@lockelord.com, ataylor2@lockelord.com
- Ross Spence    ross@snowspencelaw.com,
  janissherrill@snowspencelaw.com;donnasutton@snowspencelaw.com;brittanyDecoteau@snowspencelaw.com
- Christopher D Sullivan    csullivan@diamondmccarthy.com,
  mdomer@diamondmccarthy.com;kmartinez@diamondmccarthy.com;quentin.roberts@diamondmccarthy.com;eri
  ka.shannon@diamondmccarthy.com;aiemee.low@diamondmccarthy.com

1587996.1  26932 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

- Jennifer Taylor    jtaylor@omm.com
- John N Tedford    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
- Salina R Thomas    bankruptcy@co.kern.ca.us
- Meagan S Tom    meagan.tom@lockelord.com,
  autodocket@lockelord.com;taylor.warren@lockelord.com;autodocketdev@lockelord.com
- Patricia B Tomasco    pattytomasco@quinnemanuel.com,
  barbarahowell@quinnemanuel.com;cristinagreen@quinnemanuel.com
- Fred Whitaker    lshertzer@cwlawyers.com, spattas@cwlawyers.com
- William E. Winfield    wwinfield@calattys.com, scuevas@calattys.com
- Richard Lee Wynne    richard.wynne@hoganlovells.com,
  tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com
- Emily Young    pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- Aaron E de Leest    adeleest@DanningGill.com, danninggill@gmail.com;adeleest@ecf.inforuptcy.com

1587996.1    26932 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                     **F 9013-3.1.PROOF.SERVICE**