O'MELVENY & MYERS LLP
Evan M. Jones (S.B. # 115827)
Brian M. Metcalf (S.B. # 205809)
400 South Hope Street, 18th Floor
Los Angeles, CA  90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
E-mail:  ejones@omm.com
E-mail:  bmetcalf@omm.com

Samantha M. Indelicato (N.Y. SBN:  5598263)
(appearing *pro hac vice*)
Seven Times Square
New York, NY  10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
E-mail:  sindelicato@omm.com

*Attorneys for UBS AG, London Branch
and UBS AG, Stamford Branch*

# UNITED STATES BANKRUPTCY COURT FOR

# THE CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>HVI CAT CANYON INC.,<br><br>Debtor. | Case No. 9:19-bk-11573-MB<br><br>Chapter 11<br><br>**SUPPLEMENTAL BRIEF OF UBS AG, LONDON BRANCH AND UBS AG, STAMFORD BRANCH IN SUPPORT OF TRUSTEE'S MOTION TO EXPUNGE NOTICES OF OIL AND GAS LIENS FILED BY CALIFORNIA ASPHALT PRODUCTION, INC., GTL1, LLC, AND GIT, INC.; DECLARATION OF BRIAN M. METCALF IN SUPPORT THEREOF**<br><br><u>Hearing</u><br>Date:    May 19, 2020<br>Time:    10:30 a.m.<br>Place:    Courtroom 201<br>            1415 State Street<br>            Santa Barbara, California  93101 |

OMM_US:77793174.2

1

## I.    **INTRODUCTION**

2      California Asphalt Production, Inc. ("CAP"), GTL1, LLC ("GTL1"), and GIT, Inc. ("GIT",

3  and together with CAP and GTL1, the "Lien Claimants") and their counsel willfully violated the

4  automatic stay by attempting to create postpetition liens against property of the estate to secure

5  postpetition claims for materials and services allegedly provided to HVI Cat Canyon, Inc. (the

6  "Debtor").   They now seek to evade expungement of the liens and potential contempt sanctions

7  through deliberate misrepresentations of law and fact.

8      To salvage their liens, the Lien Claimants rely on a narrow exception to the automatic stay

9  that permits the postpetition perfection of liens that arose and already existed under applicable

10  nonbankruptcy law before commencement of the bankruptcy case.[1]  Following strict instruction

11  from the Court to stop obfuscating the matter, the Lien Claimants' counsel reluctantly conceded

12  that the liens are based exclusively on claims for materials and services that were supposedly

13  provided to the Debtor after it filed for bankruptcy.[2]  Apparently viewing the Court's directive in

14  isolation, the Lien Claimants then immediately returned to deception by pivoting to a fictional

15  construction of the California Oil and Gas Lien Act[3] that "provides for a relation back [of the liens]

16  to the beginning of the contractual relationship between the entities".[4]   This implausible

17  characterization of the statute violates the clear and unambiguous terms of the California Oil and

18  Gas Lien Act.  Even worse, it flatly contradicts the notices of oil and gas liens the Lien Claimants'

19  counsel filed with the Court that provide "the liens relate back to the date of the furnishing of the

20  first item of material or services or the date of performance of the first labor for which [the] lien is

21  claimed".[5]

22

23  [1]    UBS AG, London Branch and UBS AG, Stamford Branch (collectively, "UBS") dispute that CAP, GTL1 and
GIT are entitled to any liens or claims under the California Oil and Gas Lien Act.

24  [2]    See *Declaration of Brian M. Metcalf* at Exhibit A (Transcript of Hearing Re: [875] Motion to Expunge (Re:
Related Document(s) 821 Notice, 822 Notice, 823 Notice), Trustee's Notice of Motion and Motion to Expunge: (1)
Notice of Oil and Gas Lien; (2) Notice of Oil and Gas Lien; and (3) Notice of Oil and Gas Lien; Memorandum of

25  Points and Authorities and Request for Judicial Notice, In Support Thereof) (the "Transcript"), 192:5-16.

26  [3]    See Cal. Code of Civ. Proc. §§ 1203.50 – 1203.66.
[4]    Transcript at 193:14-17.

27  [5]    *Notice of Oil and Gas Lien* (Docket No. 821) at 2 (internal quotation marks omitted); *Notice of Oil and Gas
Lien* (Docket No. 822) at 2 (internal quotation marks omitted); *Notice of Oil and Gas Lien* (Docket No. 823) at 2
(internal quotation marks omitted).

28

2

1    As a matter of law, liens under the California Oil and Gas Lien Act can never be created or

2    arise beyond the six-month period that precedes recording a statement of lien.  In pertinent part, the

3    statute provides that eligible claimants "shall be entitled to a lien . . . for the amount due [them] for

4    any such labor performed, or materials or services furnished, <u>within six months prior to the date of</u>

5    <u>recording the statement of lien</u> . . . ."[6]  As the statute makes clear, recording the lien statement is

6    the operative act that creates the lien and sets the period of time it covers.  Therefore, if an eligible

7    claimant does not record the statement of lien, it never obtains any lien at all.[7]  However, even if

8    the claimant properly records the statement of lien, the lien that is created will be limited to amounts

9    due for services or materials provided by the claimant within six months prior to the recording date.

10    Similarly, the statute provides that the lien "arises on the date of the furnishing of the first

11    item of material or services or the date of performance of the first labor <u>for which a lien is claimed</u>

12    <u>under the provisions of this chapter</u>".[8]  In other words, the lien arises and relates back only to the

13    first date that a lien may be claimed under the California Oil and Gas Lien Act.  Since that date is

14    always statutorily limited to services or materials provided "within six months prior to the date of

15    recording the statement of lien", the lien securing the claim can never arise any earlier than six

16    months before the lien statement is recorded.

17    Taken together, these provisions plainly establish that liens under the California Oil and

18    Gas Lien Act cannot be created, arise, or relate back more than six months before the claimant has

19    recorded a statement of lien.  In this case, the Lien Claimants did not file the notices of oil and gas

20    liens until February 24, 2020, so the earliest possible time their lien claims could arise under the

21    California Oil and Gas Lien Act is sometime in August 2019.  That period falls after the petition

22    date of July 25, 2019 and outside of the exception to the automatic stay on which the Lien Claimants

23    rely.

24    But the Court does not have to review or interpret the California Oil and Gas Lien Act to

---

25    [6]    Cal. Code of Civ. Proc. § 1203.52 (emphasis added).

26    [7]    To create an effective lien under the California Oil and Gas Lien Act, the Lien Claimants were required to
record lien statements in the counties where the Debtor's oil and gas leases are situated within six months after the date
materials and services were furnished to the Debtor.  <u>See</u> Cal. Code of Civ. Proc. § 1203.58.  It is not clear that the
27    Lien Claimants ever recorded lien statements with any county recorder.

28    [8]    Cal. Code of Civ. Proc. § 1203.56 (emphasis added).

3

reach this conclusion.  Rather, the Court can simply refer to the Lien Claimants' own notices of oil and gas liens that assert "[t]he liens relate back to the 'date of the furnishing of the first item of material or services or the date of performance of the first labor for which [the] lien is claimed.' Cal. Civ. Proc. Code § 1203.56.  Here, that date is August 2019."[9]  Although CAP, GTL1, GIT, and other affiliates controlled by Randeep Grewal have frequently resorted to chicanery to plunder the estate, their new effort to mislead the Court into believing that liens under the California Oil and Gas Lien Act arose and relate back to some undefined prepetition point in time is particularly indefensible.  The argument advanced by counsel that the liens relate back "to the beginning of the contractual relationship between the entities" cannot be reconciled with either the notices of oil and gas liens they filed on behalf of the Lien Claimants or the terms of the California Oil and Gas Lien Act.  The Court should expunge the Lien Claimants' notices of oil and gas liens.

## II.    ARGUMENT

The Lien Claimants' efforts to distract and confuse the Court through convoluted analogies and lengthy expositions on mechanic's lien statutes cannot alter the express language of the California Oil and Gas Lien Act.  Nor can their claim that the statute must be liberally construed, which the Lien Claimants appear to believe gives them license to ignore its plain terms.  Despite their insistence, the provisions of the statute governing the creation of liens are straightforward and easy to apply based on the undisputed facts in this case.  The fundamental rules of statutory interpretation under California law mandate enforcement of the statute according to its clear terms, and that requires expungement of the Lien Claimants' notices of oil and gas liens because they arose postpetition.

In Coates v. Shell Western E & P, Inc., 5 Cal. App. 4th 904 (Cal. Ct. App. 1992), the court interpreted the California Oil and Gas Lien Act and considered its application to claims for dismantling and removing transport pipes from wells after they had stopped producing oil.  While acknowledging that the California Oil and Gas Lien Act "is to be given a liberal construction", the court rejected the notion that it could deviate from the clear terms of the statute.  Id. at 910, 915-

---

[9]    *Notice of Oil and Gas Lien* (Docket No. 821) at 2 (emphasis added); *Notice of Oil and Gas Lien* (Docket No. 822) at 2 (emphasis added); *Notice of Oil and Gas Lien* (Docket No. 823) at 2 (emphasis added).

4

16.   The court explained that "[t]he language of an enactment controls the construction, though extraneous aids may be resorted to where the language is ambiguous and the legislative intent not clearly ascertainable.  But if the legislative intent is clearly expressed on the face of the statute, its meaning cannot be challenged.  A construction that will lead to a conclusion not contemplated by the Legislature, occasion great inconvenience, inequality, or injustice, or lead to absurd and unfair consequences is to be avoided." Id. at 915 (internal citations omitted).  Applying these principles, the court held that the California Oil and Gas Lien Act did not apply to the claims because the statute on its face was limited to materials, work or labor furnished while oil was still being produced. Id.

Here, the provisions of the California Oil and Gas Lien Act that control the creation of liens are equally clear and unambiguous on their face, and they do not "provide[] for a relation back to the beginning of the contractual relationship between the entities" as the Lien Claimants now contend.[10]  Quite the opposite, they strictly limit the lien to a six-month period before the claimant records a statement of lien.  The provision granting the right to a lien provides that:

> Any person who shall, under contract with the owner of any leasehold for oil or gas purposes perform any labor or furnish any material or services used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well upon such leasehold, or in the constructing, putting together, or repairing of any material so used or employed, or furnished to be so used or employed, shall be entitled to a lien under this chapter, whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, for the amount due him for any such labor performed, or materials or services furnished, within six months prior to the date of recording the statement of lien as provided in Section 1203.58, including, without limitation, shipping and mileage charges connected therewith, and interest from the date the same was due.

Cal. Code Civ. P. § 1203.52 (emphasis added).

"[R]ecording the statement of lien as provided in Section 1203.58" is the action that creates the lien and establishes the period of time it covers.  Id.  Until that happens, the eligible claimant does not have an effective lien.  See Cal. Code. Civ. P. § 1203.58 ("The statement of lien must be recorded within six months after the date on which the claimant's labor was performed or his

---

[10]      Transcript at 193:14-17.

5

materials or services were furnished to be effective as to such labor, materials, or services."). But even after that occurs, the claimant is still only entitled to a lien for "the amount due [to the claimant] for any such labor performed, or materials or services furnished, within six months prior to the date of recording the statement of lien." Cal. Code Civ. P. § 1203.52. Stated differently, it excludes claims for labor, materials or services that were provided more than six months before the statement of lien was recorded. In short, the lien created under the California Oil and Gas Lien Act is statutorily limited to claims within six months from the date the claimant records the statement of lien and never extends beyond that period.

In turn, the first date that a lien may be claimed under the California Oil and Gas Lien Act establishes the date that the lien arises. The provision setting the date the lien arises provides that:

> The lien provided for in this chapter arises on the date of the furnishing of the first item of material or services or the date of performance of the first labor <u>for which a lien is claimed under the provisions of this chapter</u>. Upon compliance with the provisions of Section 1203.58, such lien shall be preferred to all other titles, charges, liens or encumbrances which may attach to or upon any of the property upon which a lien is given by this chapter subsequent to the date the lien herein provided for arises.

Cal. Code Civ. P. § 1203.56 (emphasis added).

Simply put, the lien arises and relates back to the first date that the claimant is eligible to claim a lien under the California Oil and Gas Lien Act. As explained above, that date is statutorily restricted to claims for services or materials provided by the claimant "within six months prior to the date of recording the statement of lien" and does not extend beyond that period. Cal. Code Civ. P. § 1203.52. Because the period for "which a lien is claimed under the [California Oil and Gas Lien Act]" can never exceed six months from the date the claimant records the statement of lien, the earliest possible time that the lien can arise also is six months from the recording date. Cal. Code Civ. P. § 1203.56.

In tandem, these provisions establish a simple coextensive framework for the creation of liens under the California Oil and Gas Lien Act. The claimant is only able to claim a lien for labor, materials or services that it provides within the six-month period prior to recording the statement of lien. <u>See</u> Cal. Code Civ. P. § 1203.52. Once the statement of lien is recorded, the lien arises and

6

1    relates back to the first date that the claimant is eligible to claim a lien under the statute, i.e., at

2    some point within the same six-month period.  To illustrate, if the claimant records the statement

3    of lien within three months of providing materials and services, the lien arises and relates back to

4    the first date the materials and services were furnished within that three-month period and secures

5    the full amount of the claim.  However, if the claimant provides materials and services for eight

6    months before it records the statement of lien, the earliest the lien can arise and relate back is six

7    months from the recording date and only part of the claim will be secured.

8        In sum, the California Oil and Gas Lien Act imposes a maximum period for eligible lien

9    claims, and they cannot be created, arise, or relate back more than six months before the claimant

10   has recorded a statement of lien.  Because the Lien Claimants filed their notices of oil and gas liens

11   on February 24, 2020, their liens could not arise under the statute any earlier than some point in

12   August 2019.  Given that the Debtor's bankruptcy case was commenced on July 25, 2019, the liens

13   asserted by the Lien Claimants did not exist until after the petition date and the limited exception

14   to the automatic stay that permits the postpetition perfection of liens is inapplicable.

15       Incredibly, even though the Lien Claimants' counsel now declares that the statute "provides

16   for a relation back to the beginning of the contractual relationship between the entities", the notices

17   of oil and gas liens they filed on behalf of the Lien Claimants interpret and apply the statute in

18   exactly the same manner.  Indeed, they even identify the <u>same date</u> that the liens arise and relate

19   back under the same provisions of the statute.  Specifically, the Lien Claimants expressly provide

20   in each of their notices of oil and gas liens that "<u>[t]he liens relate back to the 'date of the furnishing</u>

21   <u>of the first item of material or services or the date of performance of the first labor for which [the]</u>

22   <u>lien is claimed</u>.'  Cal. Civ. Proc. Code § 1203.56.  <u>Here, that date is August 2019</u>."[11]

23       The Lien Claimants' admission that their liens may only relate back to August 2019 is

24   dispositive.  Moreover, it is correct.  Even had the Lien Claimants not conceded that the liens arose

25   postpetition, their tortured construction of the statute contradicts its clear and unambiguous terms

26   and leads to absurd consequences, and they cite no authority to support it.  Plainly stated, the statute

27

28   _____
[11]    *Notice of Oil and Gas Lien* (Docket No. 821) at 2 (emphasis added); *Notice of Oil and Gas Lien* (Docket No. 822) at 2 (emphasis added); *Notice of Oil and Gas Lien* (Docket No. 823) at 2 (emphasis added).

does not provide that the lien relates back to "the beginning of the contractual relationship between the entities". In fact, it does not even refer to a contractual relationship when setting the date that the lien arises. Rather, the statute on its face provides that the lien "arises on the date of the furnishing of the first item of material or services or the date of performance of the first labor for which a lien is claimed under the provisions of this chapter". Cal. Code Civ. P. § 1203.52. If the California legislature intended the lien to relate back to "the beginning of the contractual relationship between the entities", it would have provided as much in the statute. For instance, the statute could provide that the lien "arises on the date of the furnishing of the first item of material or services or the date of performance of the first labor under the contractual relationship between the entities". But the legislature did not draft the statute in that manner. Instead, it specifically tied the time that the lien arises to the date the claimant is eligible to claim a lien under the statute.

The Lien Claimants' unsupportable construction not only violates those plain terms, it leads to an absurd scenario where the lien relates back to some ancient point in time where the claimant could not even assert a claim under the statute. It does not make any sense for a lien to relate back to a date that is ineligible to support a claim under the statute, and the California legislature did not intend that result when it enacted the California Oil and Gas Lien Act. Again, the statute does not state that the lien "arises on the date of the furnishing of the first item of material or services or the date of performance of the first labor even if a lien cannot be claimed for any such material, services or labor under the provisions of this chapter". To the contrary, the statute clearly provides that the lien arises on the first date that a lien for materials, services or labor can be claimed under the California Oil and Gas Lien Act and must be enforced according to those terms. See Coates, 5 Cal. App. 4th at 915.[12]

Engaging in base misdirection, the Lien Claimants seek to borrow the well-known rule for mechanic's liens that relate back to the commencement of a "work of improvement" or project and

---

[12]    The Lien Claimants alternatively posit that their liens arose prepetition under Bankruptcy Code Section 502(g) due to the rejection of contracts they had with the Debtor. This claim also has no merit. As an initial matter, the California Oil and Gas Lien Act does not apply to claims for damages arising from the rejection of a contract under the Bankruptcy Code. Further, claims for contract rejection damages are classified as general unsecured claims against the estate. See 11 U.S.C. § 365(g)(1); In re TreeSource Indus., Inc., 363 F.3d 994, 998 (9th Cir. 2004). They do not grant any interest in property that could support a lien under the California Oil and Gas Lien Act.

1    import it into the California Oil and Gas Lien Act.  See Cal. Civ. Code § 8400 et seq.  While

2    mechanic's liens and oil and gas liens may share some similarities, they are not the same and have

3    distinct rules that govern their creation.  Thus, as the authorities cited by the Lien Claimants even

4    recognize, "[o]il and gas mechanics' and materialmen's liens may differ significantly from typical

5    mechanics' and materialmen's liens on construction or repair of a residential or commercial

6    structure on realty."  Robert L. Schmid, The Fundamentals of Oil and Gas Mechanics' Liens, 23

7    Tulsa L.J. 573, 575 (1988).

8        In particular, the relation back rules for mechanic's liens and oil and gas liens under the

9    California Oil and Gas Lien Act are significantly different and purposely designed to address

10   different situations.  For example, a mechanic's lien arises in a "work of improvement" or

11   construction project and may relate back to the time the projected was started.  See Cal. Civ. Code

12   § 8450.  A lender can prioritize its lien by recording it before the project starts or requiring a

13   cessation of work on the project that lasts long enough to "cure" any lien that may be senior.  See

14   California Civ. Code § 8412 (requiring recordation of mechanic's lien within sixty days of notice

15   of cessation of work).  If the mechanic's lien claimant does not record during the period that work

16   on the project stops, it loses the lien.

17       In contrast, an ongoing oil and gas operation cannot be shut down every time that it needs

18   new financing.  As evidenced by the Debtor's oil and gas leases, some oil and gas operations

19   continue for decades, and shutting down production may actually forfeit those types of leases under

20   their habendum clauses, as well as physically damage wells.  It is unlikely that the California

21   legislature intended to discourage the availability of financing for oil and gas producers by exposing

22   new loans to unrecorded oil and gas liens that relate back in virtual perpetuity.  The California Oil

23   and Gas Lien Act balances these competing interests by strictly limiting the creation and relation

24   back of liens to six months from the date a statement of lien is recorded.  As a result, while the

25   seniority of a lender's lien may be subject to an oil and gas lien that extends at maximum to six

26   months from the date the statement of lien is recorded, it is not vulnerable to the unlimited and

27   unforeseeable period of time that the Lien Claimants urge.  The Lien Claimants ignore the

28   instruction from their own authorities that "[s]ince mechanics' and materialmen's liens are

9

legislative products, it is essential to read relevant state statutes to determine the details of this legal device."  23 Tulsa L.J. at 573.  The Court should not be misled by the Lien Claimants' inapt analogies to mechanic's lien statutes.

Of course, the Trustee's motion to expunge the liens does not implicate allowance of the Lien Claimants' claims or their priority.  Nevertheless, the Lien Claimants' counsel aggressively argued that under their relation back theory "if this lien is valid it would be prior to the imposition of a 2016 lien asserted by UBS".[13]  As shown above, the Lien Claimants' construction of the statute violates its clear terms and has no merit.  UBS reserves the right to show that the Lien Claimants' position is contrary to this Court's prior orders and subordination agreements between the parties. UBS also disputes that the Lien Claimants are entitled to any liens or claims under the California Oil and Gas Lien Act.

III.     **CONCLUSION**

The Lien Claimants do not qualify for the limited exception to the automatic stay that permits the postpetition perfection of liens because the liens they assert could not exist or arise under the California Oil and Gas Lien Act until after the petition date.  The Lien Claimants and their counsel willfully violated the automatic stay and the notices of oil and gas liens are invalid and should be expunged.

---

[13]     Transcript at 218:4-6.

OMM_US:77793174.2

1      Dated:   May 8, 2020

2                                              EVAN M. JONES
                                               BRIAN M. METCALF
3                                              SAMANTHA INDELICATO
                                               O'MELVENY & MYERS LLP
4

5
                                               By:      /s/ Brian M. Metcalf
6                                                         Brian M. Metcalf

7                                              *Attorneys for UBS AG, London Branch
                                               and UBS AG, Stamford Branch*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         11

# DECLARATION OF BRIAN M. METCALF

I, Brian M. Metcalf, declare as follows:

1.     I am an attorney at O'Melveny & Myers LLP, counsel of record for UBS AG, London Branch and UBS AG, Stamford Branch in this matter.  I am admitted to practice in the State of California and before this Court.  I submit this declaration in support of the *Supplemental Brief of UBS AG, London Branch and UBS AG, Stamford Branch in Support of Trustee's Motion to Expunge Notices of Oil and Gas Liens Filed by California Asphalt Production, Inc., GTL1, LLC, and GIT, Inc.*.  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration and, if called and sworn, could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of the *Transcript of Hearing Re: [875] Motion to Expunge (Re: Related Document(s) 821 Notice, 822 Notice, 823 Notice), Trustee's Notice of Motion and Motion to Expunge: (1) Notice of Oil and Gas Lien; (2) Notice of Oil and Gas Lien; and (3) Notice of Oil and Gas Lien; Memorandum of Points and Authorities and Request for Judicial Notice, In Support Thereof.*

I declare under penalty of perjury under the laws of the United States that the foregoing is true to the best of my knowledge, information, and belief.

Dated this 8th day of May, 2020.

    */s/ Brian M. Metcalf*
                    Brian M. Metcalf

OMM_US:77793174.2

# EXHIBIT A

```
1                UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION

3                          --oOo--

4   In Re:                        )  Case No. 9:19-bk-11573-MB
                                  )
5   HVI CAT CANYON, INC.,         )  Chapter 11
                                  )
6   Debtor,                       )  Santa Barbara, California
                                  )  April 17, 2020
7   ------------------------------)  Friday, 10:00 A.M.
    MCCONNELL, Chapter 11 Trustee )
8                                 )
                 Plaintiff,       )
9                                 )
                 v.               )  Adv. No. 9:20-ap-01006-MB
10                                )
    GLR, LLC, a Delaware limited  )
11  Liability company,            )
                                  )
12               Defendant.       )
    ------------------------------X
13  MCCONNELL, Chapter 11 Trustee )
                                  )
14               Plaintiff,       )
                                  )
15               v.               )  Adv. No. 9:20-ap-01011-MB
                                  )
16  AANERUD, et al.,              )
                                  )
17               Defendants.      )
    ------------------------------)
18
                                    HEARING RE: [812] MOTION TO
19                                  ASSUME LEASE OR EXECUTORY
                                    CONTRACT - TRUSTEE'S NOTICE
20                                  OF MOTION AND MOTION FOR AN
                                    ORDER:
21                                  (1) SETTING PROCEDURES FOR
                                    ASSUMPTION OF OIL AND GAS
22                                  LEASES;
                                    (2) AUTHORIZING ASSUMPTION OF
23                                  SURFACE LEASES; AND

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.
```

1    (3) AUTHORIZING REJECTION OF
THE LAKEVIEW OFFICE AND
2    WAREHOUSE LEASE; MEMORANDUM
OF POINTS AND AUTHORITIES,
3    DECLARATION OF MICHAEL
MCCONNELL AND REQUEST FOR
4    JUDICIAL NOTICE IN SUPPORT
THEREOF; PROOF OF SERVICE (DE
5    LEEST, AARON)

6    HEARING RE: [875] MOTION TO
EXPUNGE (RE: RELATED
7    DOCUMENT(S) 821 NOTICE, 822
NOTICE, 823 NOTICE),
8    TRUSTEE'S NOTICE OF MOTION
AND MOTION TO EXPUNGE:
9    (1) NOTICE OF OIL AND GAS
LIEN;
10   (2) NOTICE OF OIL AND GAS
LIEN; AND
11   (3) NOTICE OF OIL AND GAS
LIEN; MEMORANDUM OF POINTS
12   AND AUTHORITIES AND REQUEST
FOR JUDICIAL NOTICE, IN
13   SUPPORT THEREOF, WITH PROOF
OF SERVICE (SINGH, SONIA)
14
HEARING RE: [909] MOTION FOR
15   PROTECTIVE ORDER

16   STATUS CONFERENCE RE: CHAPTER
11 VOLUNTARY PETITION FOR
17   NON-INDIVIDUAL (TRANSFERRED
FROM NEW YORK SOUTHERN ON
18   89/29/2019) [TRANSFERRED FROM
TEXAS NORTHERN ON 9/16/2019]
19
HEARING  RE: [939] EMERGENCY
20   MOTION - TRUSTEE'S NOTICE OF
EMERGENCY MOTION AND FOURTH
21   MOTION FOR AN ORDER:
(1) AUTHORIZING THE TRUSTEE
22   TO OBTAIN ADDITIONAL POST-
PETITION FINANCING;
23   (2) AUTHORIZING CONTINUED USE
OF CASH COLLATERAL;
24   (3) SCHEDULING A FINAL
HEARING;

25

1   (4) GRANTING RELATED RELIEF;
    AND
2   (5) RESPONSE TO COMMITTEE'S
    OBJECTION TO FIFTH AMENDMENT;
3   MEMORANDUM OF POINTS AND
    AUTHORITIES, DECLARATIONS OF
4   MICHAEL A. MCCONNELL AND TIM
    SKILLMAN, AND REQUEST FOR
5   JUDICIAL NOTICE IN SUPPORT
    THEREOF; PROOF OF SERVICE (DE
6   LEEST, AARON)

7   STATUS HEARING RE: [1]
    ADVERSARY CASE 9:20-AP-01006.
8   COMPLAINT BY MICHAEL A.
    MCCONNELL, CHAPTER 11 TRUSTEE
9   AGAINST GLR, LLC, A DELAWARE
    LIMITED LIABILITY COMPANY,
10  GRL, LLC, A DELAWARE LIMITED
    LIABILITY COMPANY (CHARGE TO
11  ESTATE). CHAPTER 11 TRUSTEE'S
    COMPLAINT:
12  (1) TO AVOID AND RECOVER
    PREFERENTIAL TRANSFERS;
13  (2) TO AVOID AND RECOVER
    FRAUDULENT TRANSFERS; AND
14  (3) FOR TURNOVER AND
    ACCOUNTING NATURE OF SUIT:
15  (12 (RECOVERY OF
    MONEY/PROPERTY - 547
16  PREFERENCE)), (13 (RECOVERY
    OF MONEY/PROPERTY - 548
17  FRAUDULENT TRANSFER)), (11
    (RECOVERY OF MONEY/PROPERTY -
18  542 TURNOVER OF PROPERTY))

19  STATUS HEARING RE: [6]
    COUNTERCLAIM BY GLR, LLC A
20  DELAWARE LIMITED LIABILITY
    COMPANY, GRL, LLC, A LIMITED
21  LIABILITY COMPANY

22  HEARING RE: [85] MOTION TO
    INTERVENE IN TRUSTEE'S ACTION
23  FOR DECLARATORY RELIEF;
    MEMORANDUM OF POINTS AND
24  AUTHORITIES IN SUPPORT
    THEREOF

25

```
 1                                  HEARING RE: [170] MOTION TO
                                    SEVER CLAIMS AGAINST AND
 2                                  COUNTERCLAIM OF, BRADLEY LAND
                                    COMPANY; MEMORANDUM OF POINTS
 3                                  AND AUTHORITIES IN SUPPORT;
                                    PROOF OF SERVICE
 4
                                    STATUS HEARING RE: [1]
 5                                  ADVERSARY CASE 9:20-AP-01011.
                                    COMPLAINT BY MICHAEL A.
 6                                  MCCONNELL, CHAPTER 11 TRUSTEE
                                    AGAINST DONNA JEAN AANERUD,
 7                                  RICHARD W. ACKERMAN, JANE A.
                                    ADAMS, JOHN S. ADAMS, CHARLES
 8                                  C. ALBRIGHT (CHARGE TO
                                    ESTATE). TRUSTEE'S COMPLAINT
 9                                  FOR DECLARATORY RELIEF NATURE
                                    OF SUIT: (91 (DECLARATORY
10                                  JUDGMENT)) (SHECHTMAN, ZEV)

11
                   TRANSCRIPT OF TELEPHONIC PROCEEDINGS
12               BEFORE THE HONORABLE MARTIN R. BARASH
                     UNITED STATES BANKRUPTCY JUDGE
13

14   APPEARANCES:

15   For Chapter 11 Trustee:  MICHAEL ARTHUR MCCONNELL, ESQ.
                              201 Main Street
16                            Suite #2500
                              Fort Worth, Texas  76102
17
                              ERIC D. ISRAEL, ESQ.
18                            GEORGE SCHULMAN, ESQ.
                              SONIA SINGH, ESQ.
19                            ZEV SHECTMAN, ESQ.
                              AARON DE LEEST, ESQ.
20                            Danning Gill Israel &
                                Krasnoff, LLP
21                            1901 Avenue of the Stars
                              Suite #450
22                            Los Angeles, California  90067

23   For UBS AG, London       EVAN M. JONES, ESQ.
     Branch:                  O'Melveny & Myers, LLP
24                            400 South Hope Street
                              18th Floor
25                            Los Angeles, California 90071
```

```
 1   For California State        MARC S. COHEN, ESQ.
     Lands Commission:           ALICIA CLOUGH, ESQ.
 2                               Loeb & Loeb, LLP
                                 10100 Santa Monica Boulevard
 3                               Suite #02200
                                 Los Angeles, California 90067
 4
     For the Official            MAXIM B. LITVAK, ESQ.
 5   Committee of Unsecured      Pachulski Stang Ziehl Young &
     Creditors:                     Jones, LLP
 6                               150 California Street
                                 15th Floor
 7                               San Francisco, California  94111

 8   For GLR, LLC:               WILLIAM C. BEALL, ESQ.
                                 Beall & Burkhardt
 9                               1114 State Street
                                 Suite 200
10                               Santa Barbara, California 93101

11   For California              ANTHONY AUSTIN, ESQ.
     Department of Toxic         Deputy Attorney General
12   Substances Control:         1300 I Street
                                 Suite #125
13                               Sacramento, California  94244

14   For Jane Adams:             NICHOLAS DELLEFAVE, ESQ.
                                 Enterprise Counsel Group
15                               3 Park Plaza
                                 Suite #1400
16                               Irvine, California  92614

17   For Environmental           KARL FINGERHOOD, ESQ.
     Protection Agency and       U.S. Department of Justice
18   the U.S. Coast Guard:       Environmental Enforcement Section
                                 Environment & Natural
19                                  Resources Division
                                 PO Box 7611
20                               Washington, D.C.  20044

21   For Corian Cross            DONALD FISHER, ESQ.
     Holding:                    Palmieri Tyler Wiener Wilhelm &
22                                  Waldron, LLP
                                 1900 Main Street
23                               Suite #700
                                 Irvine, California  92614

24

25
```



```
 1    For Chamberlin Oil, LLC:  GISELE GOETZ, ESQ.
                                Hollister & Grace, ASPC
 2                              1126 Santa Barbara Street
                                Santa Barbara, California  93102
 3
      For GIT, Inc.:            PATRICIA TOMASCO, ESQ.
 4                              MAYER OLIVARES, ESQ.
                                RAZMIG IZAKELIAN, ESQ.
 5                              Quinn Emanuel Urquhart & Sullivan
                                711 Louisiana Street
 6                              Suite #500
                                Houston, Texas  77002
 7
      For BUGANKO, LLC:         KAREN GRANT, ESQ.
 8                              Law Offices of Karen L. Grant
                                924 Anacapa Street
 9                              Suite #1M
                                Santa Barbara, California  93101
10
      For Bradley Land          BRIAN HOLMAN, ESQ.
11    Company:                  Musick, Peeler & Garrett, LLP
                                624 S. Grand Avenue
12                              Suite #2000
                                Los Angeles, California  90017
13
      For Lance H. Brown:      MITCHELL LANGBERG, ESQ.
14                             Brownstein Hyatt Farber
                                 Schreck, LLP
15                             100 North City Parkway
                               Suite #1600
16                             Las Vegas, Nevada  89106

17    For CMT:                 JERRY NAMBA, ESQ.
                               Law Office of Jerry Namba
18                             504 East Chapel Street
                               Santa Maria, California  93454
19
      For Goodwin "A" Mineral  EDWARD RENWICK, ESQ.
20    Owners Group:            Hanna & Morton, LLP
                               444 South Flower Street
21                             Suite #2500
                               Los Angeles, California  90071
22
      For Laor Liquidating     ALEXANDRA RHIM, ESQ.
23    Associates, LP,          Hemar Rousso & Heald, LLP
      Guarantee Royalties,     15910 Ventura Boulevard
24    Inc.:                    12th Floor
                               Encino, California  91436
25
```

```
 1   For County of Santa        ROSS SPENCE, ESQ.
     Barbara:                   Snow Spence Green, LLP
 2                              2929 Allen Parkway
                                Suite #2800
 3                              Houston, Texas  77019

 4   For Adam Family Trust;     VINCENT MARTINEZ, ESQ.
     Morganti Ranch; Bognuda    Twitchell & Rice, LLP
 5   Trust; Candace Evenson;    215 North Lincoln Street
     Escolle:                   Santa Maria, California  93458
 6
     Court Recorder:            Brad Handy
 7                              U.S. Bankruptcy Court
                                Central District of California
 8                              1415 State Street
                                Santa Barbara, California 93101
 9                              (805) 884-4884

10   Court Transcriptionist:    Ruth Ann Hager, C.E.T.**D-641
                                Ben Hyatt Certified Deposition
11                              Reporters
                                17835 Ventura Boulevard
12                              Suite #310
                                Encino, California 91316

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page                                                                    8

1          SANTA BARBARA, CALIFORNIA, FRIDAY, APRIL 17, 2020

2                             10:02 A.M.

3                             --oOo—

4          THE CLERK:  Please come to order.  This court is

5    now in session, the Honorable Martin R. Barash presiding.

6          THE COURT:  All right.  Good morning, everybody.

7    Today is -- I'm going to ask everybody to start out by

8    muting their lines, their party lines.  We're getting a lot

9    of feedback.  And if you're on a computer taking advantage

10   of the video feed, it clears any audio coming through, you

11   should go ahead and mute this on your computer also to help

12   avoid the feedback.

13         You're welcome.  This is our omnibus hearing date

14   in HVI Cat Canyon and we have a lot on the calendar.  Let

15   me start with a few admonitions.  This hearing is in the

16   first instance telephonic and that is how the court record

17   will be made and preserved based on the audio.  In order to

18   maintain an environment in which everybody can hear

19   everybody else, it's essential that we talk one at a time

20   and that those of you that have appeared in my court before

21   know that even when we are live together, I implore

22   everybody to please not interrupt one another and I'm going

23   to make that same request.

24         Today is not an evidentiary hearing.  We're not

25   examining witnesses.  There is no reason to interrupt with

 1  any sort of objection.  I will do everything I can to make

 2  sure everybody who wants to be heard is heard and

 3  contributes to the conversation.  So if you have

 4  something -- a burning desire to say something, instead of

 5  interrupting please write it down and share it when we get

 6  around to you and hearing from you.

 7          Okay.  I also want to mention and hereby order

 8  that no person or entity is permitted to record this

 9  hearing by electronic means and you're specifically ordered

10  not to do so, whether it's audio or video.  There is but

11  one court record that is being made by the court staff and

12  preserved electronically and any other recording is not

13  permitted.

14          All right.  Preliminaries out of the way.

15          Now I'm going to go through the list of folks

16  that requested a live telephone line from CourtCall and

17  those are the folks that I assume intended to make some

18  kind of appearance and in the first instance I'm going to

19  skip over anybody that's listed as having requested a

20  listen-only line, but I will stop at the end and make sure

21  everybody that wants to make an appearance has made an

22  appearance.  When I call your name, please go ahead and

23  make your appearance and say who you are, who you

24  represent.

25          We'll start with Mr. Austin.

Page                                                                10

1              MR. AUSTIN:  Good morning, Your Honor.  This is

2    Anthony Austin from the California Attorney General's

3    Office appearing on behalf of the California Department of

4    Toxic Substances Control, the creditor and --

5              THE COURT:  Very good.

6              MR. AUSTIN:   -- interested party.

7              THE COURT:  Thank you.

8              Mr. Beall.

9              MR. BEALL:  Good morning, Your Honor.  William

10   Beall, Beall & Burkhardt, on behalf of GRL, LLC and GLR,

11   LLC on various items.  Thank you.

12             THE COURT:  Okay.  GLR and GRL.  All right.

13             Ms. Clough.

14             MS. CLOUGH:  Good morning, Your Honor.  Alicia

15   Clough from Loeb & Loeb on behalf of the California State

16   Lands Commission.

17             THE COURT:  Very good.

18             Mr. Cohen.

19             MR. COHEN:  Good morning, Your Honor.  Marc Cohen

20   from Loeb for the State Lands Commission on their claim.

21             THE COURT:  Very good.  All right.

22             Mr. de Leest:

23             MR. de LEEST:  Good morning, Your Honor.  Aaron

24   de Leest, Danning Gill Israel & Krasnoff, for the Trustee.

25             THE COURT:  Okay.  Mister -- and I apologize if I

Page                                                                11

1   mispronounce it -- Dellefave.

2            MR. DELLEFAVE:  Good morning, Your Honor.

3   Nicholas Dellefave, Enterprise Counsel Group, on behalf of

4   Jane Adams and John Adams, Trustee of the Jane Adams Family

5   Trust.

6            THE COURT:  Oh, very good.  All right.

7            Mr. Fingerhood.

8            MR. FINGERHOOD:  Good morning, Your Honor.  Karl

9   Fingerhood with the U.S. Department of Justice,

10  Environmental Enforcement Section on behalf of the U.S. EPA

11  and U.S. Coast Guard.

12           THE COURT:  Very good.

13           Mr. Fisher.

14           MR. FISHER:  Good morning, Your Honor.  Don

15  Fisher for defendant Croian Cross Holdings, LP.  It's a

16  defendant in the Trustee's adversary proceeding.

17           THE COURT:  Very good.  All right.

18           Ms. Goetz.

19           MS. GOETZ:  Good morning, Your Honor.  Gisele

20  Goetz with Hollister & Brace, appearing on behalf of

21  Chamberlin Oil, LLC, lessors.

22           THE COURT:  Very good.

23           Ms. Grant.

24           MS. GRANT:  Good morning, Your Honor.  Karen

25  Grant on behalf of BUGANKO and also Janet Ganong,

Page                                                                    12

1  creditors.

2          THE COURT:  Very good.  Thank you.

3          Mr. Holman.

4          MR. HOLMAN:  Brian Holman, Musick Peeler &

5  Garrett, on behalf of Bradley Land Company.

6          THE COURT:  Okay.

7          Ms. Hunckler.

8          MS. HUNCKLER:  Yes, this is Tracy Hunckler and I

9  still have some to be at hearing listen only.  I'm here as

10 an interested party because I practice in this area but I'm

11 not here on behalf of any client.

12         THE COURT:  Very good.  Thank you.  All right.

13         Mr. Israel.

14         MR. ISRAEL:  Good morning, Your Honor.  Eric

15 Israel of Danning Gill Israel & Krasnoff, LLP, attorneys

16 for the Trustee.

17         THE COURT:  All right.

18         Mr. Izakelian.

19         MR. IZAKELIAN:  Good morning, Your Honor.  Razmig

20 Izakelian of Quinn Emanuel Urquart & Sullivan on behalf of

21 GIT, Cat and GCL.

22         THE COURT:  Very good.  Thank you.

23         Mr. Jones.

24         MR. JONES:  Good morning, Your Honor.  Evan Jones

25 of O'Melveny & Myers on behalf of UBS.

Page                                                                    13

1          THE COURT:  All right.  Mr. Langberg.

2          MR. LANGBERG:  Good morning, Your Honor.

3    Mitchell Langberg, Brownstein Hyatt Farber Schreck, on

4    behalf of creditor and adversary defendants several:  Lance

5    Brown, Trustee of the second Brown Trust; Jerome Brevoort

6    Dwight, Lela Minturn Dwight, Jonathan Ashley Dwight, John

7    A. Feliciano, Trustee of the family Feliciano Revocable

8    Trust, Louise H. Feliciano, trustee; and the Louise H.

9    Feliciano Revocable Trust; Adam B. Firestone; Katherine S.

10   Hanberg, William Hanberg, Alice Sedgwick, deceased, her

11   estate by personal representative Susanna Sedgwick,

12   trustee, and Alice Sedgwick Wohl.

13          THE COURT:  Okay.  All right.

14          Mr. Litvak.

15          MR. LITVAK:  Good morning, Your Honor.  Pachulski

16   Stang Ziehl & Jones on behalf of the Creditors' Committee.

17   I'm also appearing by video.  Can you see me as well?

18          THE COURT:  I can.  You're coming through loud

19   and clear, both physically and audio.

20          MR. LITVAK:  Thank you.

21          THE COURT:  Mr. McConnell.

22          MR. MCCONNELL:  Yes, good morning, Your Honor.

23   Michael McConnell, the Chapter 11 Trustee.

24          THE COURT:  Good morning.

25          Mr. Namba.

Page                                                              14

1          MR. NAMBA:  Good morning, Your Honor.  Jerry

2     Namba for CMT, LLC.

3          THE COURT:  Very good.  Okay.

4          Mr. Olivares.

5          MR. OLIVARES:  Good morning.  Mayer Olivares on

6     behalf of GIT, GTL and Cat.

7          THE COURT:  Thank you.  All right.

8          Mr. Renwick.

9          MR. RENWICK:  Yes, Your Honor.  Edward S. Renwick

10    of Hanna & Morton appearing for the Goodwin "A" Mineral

11    Owners Group, the Presson Vera Rivera OC Land Group,

12    Mr. and Mrs. Frank Boisseranc, and Mr. Waldo A. Gillette.

13         THE COURT:  Thank you.

14         Ms. Rhim.

15         MS. RHIM:  Good morning, Your Honor.  Alexandra

16    Rhim, Hemar Rousso & Heald, on behalf of Laor Associates

17    and Guarantee Royalties.

18         THE COURT:  Okay.  That's how you pronounce it,

19    huh?  Laor.  All right.

20         Mr. Schulman.

21         MR. SCHULMAN:  Good morning, Your Honor.  George

22    Schulman, Danning Gill Israel & Krasnoff, on behalf of the

23    Trustee.

24         THE COURT:  Mr. Shectman.

25         MR. SHECTMAN:  Good morning, Your Honor.  Zev

Page                                                          15

1   Shectman of Danning Gill Israel & Krasnoff on behalf of the

2   Trustee.

3           THE COURT:  Ms. Singh.

4           MS. SINGH:  Good morning, Your Honor.  Sonia

5   Singh of Danning Gill Israel & Krasnoff, for the Chapter 11

6   Trustee.

7           THE COURT:  All right.

8           Mr. Skillman.

9           MR. SKILLMAN:  Good morning, Your Honor.  Tim

10  Skillman with CR3 Partners and chief operating officer for

11  the Trustee.

12          THE COURT:  Mr. Spence.

13          MR. SPENCE:  Good morning, Your Honor.  Ross

14  Spence on behalf of Santa Barbara County and related

15  parties.

16          THE COURT:  And last, but not least, Ms. Tomasco.

17          MS. TOMASCO:  Good morning, Your Honor.  This is

18  Patty Tomasco with Quinn Emanuel.  I'm here on behalf of

19  California Asphalt Production, Inc., GTL-1, LLC and GIT,

20  Inc.

21          THE COURT:  Very good.

22          All right.  Now, before I move on is there anyone

23  that would like to state their appearance for the record

24  that did not get a chance to do so?

25          MR. MARTINEZ:  Good morning, Your Honor.  Vincent

P 888.272.0022  F 818.343.7119         BENHYATT   www.benhyatt.com
                                       Certified Deposition Reporters

Page                                                                16

1   Martinez.   I believe I was listed for live appearance for

2   the telephone.

3             THE COURT:   Okay.

4             MR. MARTINEZ:   And I --

5             THE COURT:   I don't know what happened but,

6   Mr. Martinez, why don't you tell us who you represent,

7   please.

8             MR. MARTINEZ:   Yes.   Good morning again and

9   Vincent Martinez of the law firm Twitchell & Rice.   I

10  represent five parties:   Adam Family Trust; Candace

11  Evenson; Escolle Tenants in Common; Bognuda Family Trust;

12  and the last is Morganti Ranch, a limited partnership.

13            THE COURT:   Very good.   Thank you.

14            All right.   There was someone else that wanted to

15  make their appearance.   And here -- someone else that

16  wanted to make their appearance that didn't get to?   Okay.

17  All right, then.   All right.

18            It's off camera, but if you can imagine the court

19  bench is covered wall to wall with paper so I can find

20  everything, hopefully, when we need to.

21            All right.   Look, we have a lot on the calendar

22  and it seems to me that there are -- the best way to do

23  this is try to field with the matters that involve the most

24  number of people first so that when they're done if they

25  choose to leave -- and I'll just say in advance, if you're

1  done, you're free to leave without asking for my

2  permission.  Some people are more formal in telephonic

3  conferences.  You can just leave.  You don't have to ask

4  for permission.

5           But I'm going to try to do the things that I

6  again think involved the most people first.  And so I'm

7  going to go slightly out of order from what the -- slightly

8  out of order from what you see on the Court's calendar.

9  And the way I plan to proceed is I'm -- it seems to me

10 that, number one, which is the motion seeking relief with

11 respect to certain surface leases, as well as oil and gas

12 leases, is in many ways related to the adversary proceeding

13 that's seeking declaratory relief as to the oil and gas

14 leases.  And many of the folks that are on today for the

15 status conference in that adversary are also on because

16 they filed an objection to the motion in #1.00.

17          So I'm going to deal with the motion of #1.00 and

18 then probably the adversary status conferences in the

19 declaratory action and related matters first and then work

20 my way backwards in some way or another to the other

21 things.  I think that will get most of you out of here

22 sooner.

23          All right.

24          MR. JONES:  Your Honor?

25          THE COURT:  Yes.

Page                                                                18

1           MR. JONES:  I apologize, Your Honor.  This is

2    Evan Jones on behalf of UBS.  We had discussed with the

3    Trustee's counsel the financing motion seeks money that we

4    understand the Trustee would like to receive today to meet

5    payroll and so we had discussed with the Trustee and

6    understand they agree that that matter might be taken up

7    first.  As Your Honor knows, we're trying to advance money

8    on the East Coast and we're worried about the wire transfer

9    window closing.

10          THE COURT:  Okay.  All right.  I'm willing to

11   take things out of order.

12          Mr. Israel.

13          MR. ISRAEL:  Yes, Your Honor.

14          THE COURT:  Mr. Israel, by the way, I see that

15   you've logged into the video call but I can't see you.  I

16   don't know if you've turned your camera on or clicked the

17   button that said, go ahead and share my video.  It's not

18   essential that I see you because I can hear you, but if it

19   was your intention to be seen, I just want you to know that

20   I can't see you.

21          MR. ISRAEL:  Thank you, Your Honor.  Yes.  When I

22   logged on I could see several people and when I clicked the

23   button at the bottom that currently has a video with a

24   slash through it, it says my camera isn't set up, so --

25          THE COURT:  Okay.  All right.

Page                                                                          19

1              MR. ISRAEL:  -- I am dressed up on the assumption

2    that I was going to be seen, but --

3              THE COURT:  All right.  No problem.

4              MR. ISRAEL:  If you can hear me okay, then I can

5    see you and several -- you know, the other parties that

6    have videos.

7              THE COURT:  Okay.  I'd like to --

8              MR. ISRAEL:  Okay.  Your Honor --

9              THE COURT:  Obviously you're the moving party and

10   this is on shortened time.

11             I did see Mr. Litvak's pleading, which was filed,

12   I think, before you had filed the latest emergency motion.

13   We'll give him an opportunity to speak in a few minutes.  I

14   assume that his objection to the latest revision of the

15   budget is similar to his objection to this latest DIP

16   motion.  So I'd like you to start by addressing that and

17   I'll say to anybody else that wants to make oral objection

18   to this post-petition financing motion, I will in a few

19   moments ask you to speak up and tell me who you are because

20   this matter is on shortened time.

21             But let me start with the Trustee and -- and

22   what's your -- what's your response?  I mean, I thought we

23   had established early on that I expected the fees of the

24   committee going forward to be accounted for in the post-

25   petition budget.  I understand from Mr. Litvak's pleading

1  that he's even -- you know, his clients have even moderated

2  what I had said was the amount I thought appropriate and

3  agreed to accept something less, at least for a couple

4  months, and yet they were carved out of the budget.  So

5  what's going on?

6         MR. ISRAEL:  Thank you, Your Honor.  First of

7  all, I'd like to thank Your Honor for hearing this on an

8  emergency basis, this interim hearing.  Ongoing

9  negotiations over the terms of any additional borrowings

10 and the Trustee's decision about how to proceed with this

11 case has since been overtaken by events largely outside of

12 everyone's control.

13         The budget that -- that is submitted is a very

14 short-term budget.  It actually has no carveout for -- goes

15 through April 24th.  It has no carveout for professionals,

16 including the professionals of the Trustee at this time.

17 We are in negotiations with UBS on April.  I have confirmed

18 that the Committee's budget for -- set aside for March was

19 made and sold for $35,000, but no set-aside has been made

20 as of this time and it's not in the current budget.  Again,

21 this goes through the end of April and we are in

22 discussions with UBS on that matter.

23         This is really a bare bones budget just to

24 continue operations while UBS decides whether it can make

25 further advances, whether it will make further advances.

Page                                                                    21

1              THE COURT:  Right.

2              MR. ISRAEL:  And for the Trustee to decide what

3    to do.

4              I know the Trustee wanted to make a status report

5    and I don't know this might be a good time for the Trustee

6    to make a brief supplemental report on what the recent

7    events in the case -- in the case.  Many of them are set

8    forth in the motion, but I know we just filed that

9    yesterday, so is this a good time for the Trustee to make

10   that little presentation?

11             THE COURT:  All right.  Well, okay.  Yeah.  I

12   really am sensitive to the fact that we have a virtual

13   courtroom for people who may or may not be interested in

14   this, but why don't you go ahead and then I'll hear from

15   Mr. Litvak.

16             But before I do that, let me just ask you, so --

17   from your perspective.  I'll hear from Mr. Litvak in a

18   minute.  Your position is that the funds, that basically

19   $30,000 in March was set aside for the Committee?

20             MR. ISRAEL:  Yes.  And -- and that they didn't --

21             THE COURT:  Okay.

22             MR. ISRAEL:  -- use all of it.  My understanding

23   was that there was 10,000 left and UBS's position is that

24   the $10,000 would be available for use in April without

25   prejudice to whatever the negotiations result in with

Page                                                                    22

1   carveout for the Trustee's professionals, as well as from

2   Committee.

3            THE COURT:  Okay.  And have there been any sums

4   set aside for any estate professional under any budget,

5   whether it's the one that was agreed to pursuant to the

6   supplemental extension authority or in this motion?  Is

7   there any money that anybody is being asked to set aside

8   for state professionals for April?

9            MR. ISRAEL:  No, not as of this time.

10           THE COURT:  Okay.  All right.  Good.  I mean,

11  look.  UBS doesn't have to put any more money into this.

12  You know, doesn't have to loan any additional money.  My

13  chief concern, as I think I articulated early on in our

14  financing hearings, was that there is some measure of

15  fairness.  And that to the extent there was money being

16  lent in order to make a Chapter 11 case here work that, you

17  know, the Committee still has a statutory role and it still

18  has to be provided for, but if everybody is being treated

19  the same at the moment, then maybe it's not -- you know,

20  maybe it's not a problem.  You know, we'll hear from

21  everybody in a minute.  But let me start -- or at least go

22  to Trustee McConnell, as you requested.  And, Mr.

23  McConnell, you're welcome to give everybody an update.

24           I will say to everybody, this is not testimony.

25  He's not being sworn in.  At least not yet.  And -- but at

Page                                                                    23

1    these hearings and this is also a Chapter 11 status

2    conference, I do welcome the Trustee to tell me in his own

3    words what's going on.  And so I think it's helpful to

4    everybody.

5            So go ahead, Mr. McConnell.

6            MR. MCCONNELL:  Yes, Your Honor.  Thank you very

7    much.  And I'll be brief because I know there are several

8    matters on the docket and there's a lot of attorneys on the

9    phone, but I just want to make some general comments.

10            First of all, Your Honor is here and everybody

11   else is aware there's been incredible change in the

12   environment for the production and sale of oil and gas

13   since the last time we were together.  However, I can

14   report that right now we have resumed operations on several

15   of our properties in the San Maria Valley, the Bell Ridge

16   leases in Kern County and the Richmond Estone (phonetic)

17   unit in Orange County.

18            In addition, since the last time we were together

19   we have made a number of capital improvement on the leases

20   that brought several wells back into production that had

21   been inoperative and we have obtained interim authority

22   from the Fish & Game Commission to operate all of our wells

23   subject to additional paperwork that has to be done in the

24   near term.

25            In addition, we have obtained a 90-day extension

Page                                                                    24

1    from the Air Pollution and Control District of Santa

2    Barbara for use of certain non-compliant burners in our

3    heater treaters on the properties.  The regulations

4    concerning what standards we had to meet changed January

5    1st of this year.  We applied for a variance to allow us to

6    continue to produce on these leases until we could get

7    replacement equipment.  We were granted an interim variance

8    and a final variance for the full 90 days which will expire

9    in June.

10          Heater treaters, Your Honor, are a way of drying

11   the crude to make it ready for transport to the refineries.

12   We are having an average daily production from all of our

13   fields of about 400 to 600 barrels a day.  We have

14   contracts through May on our Bell Ridge and redo -- or

15   Richmond Estone unit leases, but our contracts in the Santa

16   Maria Valley expire at the end of this month.  Because of

17   what you're witnessing in the press, demand for oil and gas

18   has dropped precipitously and accordingly prices are going

19   down with it.  And the fact we're all facing is that a

20   number of the refineries are not even taking crude at this

21   time because they have enough in storage to last in a

22   significant period of time.

23          So we are -- our primary purchaser is Phillips

24   66.  We are continuing discussions with them about

25   obtaining hopefully some contracts in the month of May, but

Page                                                                    25

1   right now our Phillips 66 contracts for Santa Maria Valley

2   expires the end of this month and we are not alone in that,

3   Your Honor.  Many of the producers in the Santa Maria

4   Valley are either voluntarily shutting down their

5   production or having to shut production because of the same

6   advance that the refineries are simply not taking crude

7   orders at this time.

8            So that's pretty much on an operational level.

9   In addition, Your Honor, we had engaged Ten Oaks Advisory

10  Services in Dallas, Texas to explore potential sales of all

11  of the oil and gas assets of the company, as well as

12  individual and crude leases.  They have been soliciting

13  offers for those properties.  None of their offers at this

14  time have been acted upon or even with -- the counters

15  because we're in a very distressed situation.

16           THE COURT:  Right.

17           MR. MCCONNELL:  With re --

18           THE COURT:  So -- I'm sorry.  Go ahead.

19           MR. MCCONNELL:  Okay.  Two other points, Your

20  Honor.  With respect to the regulators, we had been in

21  daily contact with the Air Pollution Control District in

22  Santa Barbara County and have been in constant contact with

23  all of the other regulators on oil and gas in the state of

24  California, as well as the federal government.

25           As the Court may remember, at the time I took

Page                                                                    26

1 over as trustee we had 1400 notices in violation that had

2 to be dealt with.  We have reduced that number

3 significantly and we are in cooperation with the Air

4 Pollution Control District out of State of California

5 regarding those notices of violation and also certain

6 pending litigation.

7            Finally, Your Honor, as you know from the docket,

8 we have been in constant communication with Union Bank of

9 Switzerland regarding continued financing for me as trustee

10 in this incredibly difficult environment we're dealing with

11 right now.  You can imagine that there are many people that

12 are involved in this process.  We have before you a motion

13 for the use of cash collateral and for additional

14 financing, which I need to continue operations.

15            So that's a general overview, Your Honor.

16            THE COURT:  Okay.  I still have one question.

17 You mentioned the production right now of about 4 to 600

18 barrels a day.  At one time I recall you said -- and maybe

19 it was not actual production but capacity was about 1,000.

20 And I understand it was a different world just, you know, a

21 couple months ago, but that you were doing things to try to

22 expand the production capacity of the debtor's assets by

23 about 50 percent.

24            The 4 to 600 barrels is that -- is that -- you

25 know, why isn't that 1,000?  Is that because you don't --

1   there's not enough demand so it doesn't make sense to

2   operate at full capacity or have you learned something new

3   about these assets?  Is 4 to 600 really just like a

4   capacity or have you elected to produce at that rate?

5           MR. MCCONNELL:  Your Honor, that present 4 to 600

6   barrels a day is a reflection of a number of factors

7   including demand, needed capital improvements on the

8   properties, et cetera.  Certainly these properties can

9   produce what certain improvements are made at a 1500 to

10  1600 barrel capacity.  Right now we have no buyers for that

11  capacity.  We have ordered certain capital equipment that

12  would allow us to get to those levels, but we have not

13  installed it yet and some of it we have simply put on hold

14  because of the present pricing environment.

15          So 4 to 600 is what we're doing now, but

16  certainly with some additional improvements we can get up

17  to the 1600 barrel a day what I had mentioned earlier.

18  It's all a function of price --

19          THE COURT:  Right.

20          MR. MCCONNELL:  -- at the end of the day, Your

21  Honor, and demand.

22          THE COURT:  Right.  Okay.  Is it all -- if it

23  made economic sense to do so.  Okay.  All right.  I

24  appreciate that.

25          Okay.  So let's get back to the financing motion.

Page                                                                     28

1   And Mr. Israel, before I turn to the others, is there

2   anything, any significance differences about the terms of

3   this request in post-petition financing from the last one?

4           MR. ISRAEL:  No, Your Honor.  There's very, very

5   limited changes.  There's one extension of the draw period

6   from April 4th to April 24th.  There is another optional

7   two weeks -- up to two weeks, up to $500,000 term that

8   was -- that was part of the original credit agreement and

9   one or two of the prior amendments.

10          And there was one -- the other change was a

11  milestone for filing the summary judgment motion in the 365

12  adversary proceeding and there was an extension from

13  April 20th to, I believe, it was May 4th, so we get about a

14  two-week extension to file that summary judgment motion.

15  It's just to our benefit.

16          So again, it's a very bare bones short-term

17  extended budget.  And, in fact, part of it is to obtain

18  permission to -- for -- to advance funds that all -- the

19  Trustee already has and are to be advanced but still within

20  the limits of the fourth amendment -- I guess the fifth

21  amendment that was already agreed and the fifth amendment

22  is the one that was -- that notice was just served on.

23          I will say that -- a couple things.  One, we did

24  serve the same parties with telephonic notice by noon

25  yesterday as directed by the Court.  We filed Mr. de

Page                                                                29

1   Leest's declaration.  He's on the -- he's on the call, but

2   I believe it's docket #945.

3          Since yesterday we had one minor amendment to the

4   sixth -- to the sixth amendment to the credit agreement and

5   the minor amendment, it's been filed.  It's docket #948

6   this morning in redline.  And the only substantive change

7   was, again, in the -- to benefit the Trustee and for the

8   convenience of UBS and the Trustee that the advance could

9   be made if the Court approved it on -- it doesn't have to

10  wait for the order to be entered or at least they have the

11  option not to have to do that so that we could, if Your

12  Honor approves it, that we -- we weren't sure what the

13  procedure for immediately entering an order was.  And

14  anyway, so that's -- the redline was docket #940.

15         THE COURT:  Well, that's how I've answered my

16  last --

17         MR. ISRAEL:  Your Honor --

18         THE COURT:  How it answers my last question,

19  which is, how come an interim order on this emergency

20  motion which I'm being asked to deal with to address an

21  East Coast wire deadline has no lodged order?  I mean, no

22  lodged order.  I would have been happy, you know, if --

23  assuming I grant it and it needed to be entered right away,

24  I could have arranged to have it entered right away but I

25  can't with no lodged order, so that's that.

Page                                                                    30

1          MR. ISRAEL:  Your Honor --

2          THE COURT:  Let me -- yeah, Mr. Israel?

3          MR. ISRAEL:  Yes, I think Mr. de Leest

4  (indiscernible) --

5          MR. de LEEST:  (Indiscernible) here.

6          THE COURT:  I'm sorry.  Whoever is speaking, I

7  can't hear you.

8          MR. de LEEST:  I apologize, Your Honor.  It's

9  Mr. d Leest.  I will lodge the order.  It had -- and I can

10  do it while we're on the call.  I wanted to make sure that

11  the Court was able to and willing to approve it before I

12  did so.

13          THE COURT:  Yeah, okay.  All right.

14          Mr. Litvak, you represent the Official Committee

15  of Unsecured Creditors.  Let me hear from you now, please.

16          MR. LITVAK:  Yes, Your Honor.  Max Litvak,

17  Pachulski Stang Ziehl & Jones on behalf of the Creditors'

18  Committee.  Your Honor, we would have no objection to the

19  additional financing that's requested.  The Court

20  referenced the objection that we had filed with respect to

21  the budget, the prior budget for this file.  And it had not

22  been provided to us in advance, so we were a little

23  surprised to see it when I saw it filed, but it didn't have

24  anything in there for us.

25          Now we've got a new further financing motion, new

1  budget.  Also, there's nothing in there for us but I also

2  understand there's nothing in there for the Trustee

3  professionals as well.

4         We have gone back and looked at our bills and, as

5  the Court noted, we are willing to take a reduction on our

6  further budgeted amounts in this case due to the

7  unprecedented situation certainly facing the oil industry

8  generally as well as this debtor and this Trustee.

9         The -- we have had no certainty, Your Honor, that

10 the $35,000 that the Court had ordered to be provided for

11 the Committee was, in fact, missed for March.  We had

12 inquired about that on more than one occasion, but not

13 gotten any confirmation from the Trustee or the counsel and

14 then we did now get that confirmation prior to this

15 hearing.

16        So with that additional $35,000 that's more than

17 enough frankly for the amount of fees that we've incurred

18 in March and we are prepared to roll that over to April

19 without any further funding in April, Your Honor.  I would

20 just ask that to the extent that amounts have been funded

21 over the last few months and we have not used the full

22 amount that's been funded on our fees that we be authorized

23 to apply any further fees that we may incur against

24 those -- against that -- that amount.  And we have come in

25 under budget, Your Honor, for the last few months -- couple

Page                                                                    32

1  months at least, so we do have some room and I think we can

2  utilize that for some period of time.

3        But certainly once we get later into May and

4  June, depending on what is happening in the case and how

5  involved we are, we're going to need some further funding,

6  but it's not an urgent situation that needs to be addressed

7  right now with that clarification that we can roll over

8  effectively on these amounts in subsequent months.

9        THE COURT:  Okay.  All right.  I appreciate that,

10 Mr. Litvak.  I was getting some feedback.  I just muted

11 you --

12        MR. LITVAK:  (Indiscernible) -- yes.

13        THE COURT:  (Indiscernible) - if that had

14 anything to do with it.  So hopefully we figured out how to

15 fix that.  All right.

16        Before I turn to Mr. Israel again and -- or

17 Mr. Jones who usually likes to speak in favor of financing

18 that his client is providing, is there anyone that wants to

19 be heard in opposition to this latest emergency post-

20 petition financing motion?

21        MR. BEALL:  Your Honor --

22        MS. TOMASCO:  Your Honor, this is Patty Tomasco.

23        THE COURT:  Okay.  Hold on.  Ms. Tomasco.  Who

24 else?

25        MR. BEALL:  William Beall, Beall & Burkhardt.

Page                                                                33

1          THE COURT:  Okay.  All right.  Let me start with

2    Ms. Tomasco, please.

3          MS. TOMASCO:  Your Honor, on behalf of GIT and

4    its subsidiaries, we express the same concern as the

5    Committee does.  Insofar as there are administrative

6    expenses that have been incurred and have not been paid, we

7    just reserve all rights.

8          THE COURT:  Okay.  All right.  Mister -- is that

9    it?

10         MS. TOMASCO:  That's it.

11         THE COURT:  Okay.  All right.  Mr. Beall.

12         MR. BEALL:  Yes, Your Honor.  The problem is that

13   there's nothing in the budget to pay royalties of any

14   party, including that of mine and if you look at the motion

15   it seems reasonably likely, perhaps better than 50/50.  But

16   as of May 1st there's no money at all.  This case is

17   Chapter 7 and yet they're collecting oil revenues from

18   April.  They need to have some provision to pay the

19   royalties, not just to my client but to all those other

20   royalty claimants that are out there, when there's no money

21   or if there's no money as of May 1st.

22         And in addition, Your Honor, I have consistently

23   requested from counsel for the Trustee evidence that the

24   escrow account which funded from my client as of March 1st

25   and April 1st and no matter how many times I ask, I get no

Page                                                                   34

1    response whatsoever.  So I do not believe that the escrow

2    account has been funded as of March 1st or April 1st, let

3    alone making provision for the royalties during the month

4    of April, which would be due May 1st.

5           THE COURT:  Okay.  All right.  Mr. Israel, I want

6    to hear from you.  We -- I think we've, you know,

7    established that -- well, let me back up.  I shouldn't say

8    "established."

9           This concern has been raised before that oil is

10   being taken out of the ground, that royalty owners under

11   California law have a property interest in that oil that

12   commingles with other people's oil and then sold.  But I

13   have always been comforted by the fact that the budget was

14   setting aside and placing in a reserve the royalties

15   attributable to oil being taken from ground and sold.  And

16   if the budget -- if the budget does not provide that then I

17   think we may have a problem, at least to the extent that

18   the debtor seeks to operate and continue to sell oil, part

19   of which is the property interest of the royalty holders.

20          MR. ISRAEL:  Thank you, Your Honor --

21          THE COURT:  What's your response?

22          MR. ISRAEL:  Yes, Your Honor.  The Trustee has

23   been paying royalties.  Current -- current there are delays

24   by the district per counties, that there are offsets to

25   calculate what the royalties are.  I believe that the

Page                                                                    35

1  Trustee just signed a check yesterday.  I would ask --

2          THE COURT:  Okay.  I'm not -- I'm not

3  concerned --

4          MR. ISRAEL:  -- a number of --

5          THE COURT:  -- about the -- I want you to

6  start -- talk about April.  I mean, we've got a separate

7  issue with Mr. Beall's client because those are supposed to

8  go in a reserve for the time being and aren't being paid.

9  So his clients are in a special situation, have been in a

10 special situation for much of the case.

11         But respond to his allegation, please, that the

12 budget for April, which is -- you know, it's not just a

13 formula for advances by the lender, but it's a cash flow.

14 It's a cash collateral budget as well.  Does it not provide

15 for the payment and/or reserve of that portion of the oil

16 that is taken out of the ground in April and sold?

17         MR. ISRAEL:  Your Honor, the payment of royalties

18 is paid in the following month.  So what would be paid in

19 April would be for the month of March, if I recall.

20 Mr. Skillman is on the phone.  He can confirm, but I would

21 note that his budget doesn't go through the end of April,

22 so there's -- there -- there's -- it's envisioned that the

23 payments would be in that last week of April.

24         Mr. Skillman, can you --

25         THE COURT:  But isn't that -- isn't that --

1           MR. ISRAEL:  -- verify?

2           THE COURT:  -- a concession?  Isn't that a

3    concession by you that the royalty holders are not

4    adequately protected for the use of their property?  I

5    mean --

6           MR. ISRAEL:  Your Honor, that --

7           THE COURT:  -- what if the case tanks?  What if

8    the case tanks and there is no budget and there is no money

9    left and you had taken their oil and sold it and turned it

10   into money and spent that money?  How are they protected?

11          MR. ISRAEL:  Your Honor, the history and course

12   of this business and I'm told in general in the oil

13   industry is that we don't even get paid for March sales

14   until April 20th.  That's normally the true-up date for the

15   prior month and --

16          THE COURT:  Okay.

17          MR. ISRAEL:  -- then from that point --

18          THE COURT:  And that was fine.

19          MR. ISRAEL:  -- it (indiscernible) --

20          THE COURT:  That was fine.  When UBS was putting

21   money into this thing, okay, when they were making a

22   commitment that was more than a couple weeks, okay, that

23   was -- I was comfortable with that.  You just had the

24   Trustee give me a report to tell me that things were bad,

25   okay, that he was having trouble finding people to buy the

Page                                                                    37

1   oil.

2          And now I've got this budget and you're telling

3   me, well, the budget really isn't fair to the royalty

4   holders because the budget doesn't include the last day of

5   the month.  Well, what if the last day of the month doesn't

6   come?  What if the money is all gone and you have taken

7   their oil and sold it and spent the money?  I don't think

8   they're adequately protected.

9          Sorry.  I know I interrupted you, but I just --

10  you're telling me things I know.  I know what the timing

11  is.  This was an issue in every other one of our early

12  hearings where we had objections.  I'm familiar with the

13  timing, but I was comfortable because we had -- we had

14  money coming in from UBS asked, you know, the end of the

15  budget whether there was good reason to believe that they

16  would last and things were looking up.

17         Now things are looking down and so I think we

18  need to be careful and make sure that the property that is

19  being used, that is the oil that belongs to royalty

20  holders, the use of that property is adequately protected.

21  So I'm just not convinced that that's the case.  Maybe Mr.

22  Skillman -- it sounds like you want to hand it over to

23  Mr. Skillman to address the Court and that's fine, but --

24         MR. SKILLMAN:  Thank you, Your Honor.  Tim

25  Skillman on behalf of the Trustee.  Proceeds from oil sales

Page                                                                      38

1  in January have been distributed or credited to the escrow

2  royalty reserve account.  And as Mr. Israel said, proceeds

3  for sales of oil for February were credited to the escrow

4  royalty reserve account and are being disbursed as we

5  speak.  The checks were signed yesterday.

6         Proceeds of oil sales in March will be received

7  on April 20th at which time we would credit 13 percent of

8  those receipts to the escrow royalty reserve account

9  pending accounting.  The accounting takes a month for us to

10 do and it's partly because we're selling crude through

11 Texican.  In February we sold some crude through another

12 neighbor who processed it for us.  And in March they're

13 selling oil through Texican and we're also selling it

14 through another neighbor who in turn sells it to P 66.

15        When we get the money, the money goes into the

16 escrow royalty reserve account which currently stands at

17 $109,285.  That money is reserved for the royalty interest

18 donors and will not be disbursed.  In fact, even though we

19 have been short on cash because of the immediate funding

20 need, we have not touched any of the reserve accounts, the

21 royalty interest donors, surface rents or the UCC

22 professionals.

23        So I would argue that they are more than

24 adequately secured.  In the event this deal goes sideways,

25 that money is there and is not sufficient to pay what we

1  believe is contractually owed currently through the month

2  of February.   And when we get sales from March, we'll put

3  13 percent of those proceeds into the escrow account for

4  March sales.   They will still be exposed from April sales,

5  though, and I don't know that there's a solution for that

6  at this time.

7          (Parties speaking simultaneously.)

8          THE COURT:  Well, you could sock away money for

9  those.   I mean, it's one solution.   The other solution I

10 guess is if you're -- if your lienholders were to

11 acknowledge -- and maybe they have previously and I just --

12 I don't know where in this stack of paper it is.   I mean,

13 maybe if UBS acknowledged that it can't take a lien and

14 property that doesn't belong to them and that the funds

15 that are delivered from royalties for oil sold in April are

16 going to be available to a party whose oil was sold.   Maybe

17 that would solve it.

18         Mr. Jones?

19         MR. JONES:  Thank you, Your Honor.   Your Honor,

20 certainly UBS acknowledged that when the first financing

21 for the Trustee was done that we can't take a lien on

22 something that the Trustee doesn't own.   So if it is true

23 that there are funds that are not owned by the estate or

24 the Trustee, UBS doesn't have a lien on them.   I do

25 understand, as Mr. Skillman says, that there are reserves

Page                                                                40

1   for the royalty taken each month and that those are in the

2   current budget.

3           Your Honor, if I can step back for a moment, we

4   certainly agree that it is appropriate to take up the

5   Committee's objection to the fifth amendment today to get

6   guidance from the Court on the Committee fees going

7   forward.  I believe that the discussion since the objection

8   is filed has satisfied Mr. Litvak that the $35,000 that the

9   Court ordered be set aside for Committee fees in March was,

10  in fact, set aside.  I think that Mr. Israel has confirmed

11  that and I've told Mr. Litvak that I will state on the

12  record that was ordered by the Court.  It must be done and

13  my understanding, although I don't have personal knowledge,

14  but it was, in fact, done.

15          If I understand what Mr. Litvak has said, the

16  Committee is agreeable under these extraordinary

17  circumstances and I won't go into detail on those to have

18  its fee allocation for April be a roll-over of the funds

19  that have already been set aside and which have not been

20  used for the Committee fees and we applaud the Committee

21  for that, Your Honor.

22          As we said in our response, we certainly

23  understand the Court's order was $35,000 on a monthly

24  basis.  We submit that that was in circumstances that are

25  no longer applicable and we appreciate the willingness of

1  the Committee, if I understand Mr. Litvak correctly, to

2  accept a roll-over of the allocations that have already

3  been reserved for the month of April.

4         We all understand that there are going to have to

5  be very difficult decisions made about what happens after

6  April 24th.  And I do want to emphasize -- Your Honor asked

7  a question and I want it to be very clear, what does this

8  amendment do?  This amendment does not increase the

9  availability to the Trustee.  That number was set in the

10 fifth amendment.

11        The fifth amendment by its terms, which have been

12 authorized by the Court's earlier order, permitted the

13 Trustee and UBS to agree to extend the time period in which

14 that amount could be drawn and for better or worse that

15 time period closed.  And so what the Trustee is asking for

16 today is permission to extend -- to keep the window open,

17 to draw the approximately $500,000 that is already

18 authorized, but the window had closed.  And, Your Honor, I

19 can assure you there were serious discussions over whether

20 such an amendment was even material and required the Court

21 approval.  We decided under the circumstances it was

22 appropriate to cut very square corners.  And so what we're

23 asking the Court for today is permission to advance the

24 $500,000 that was already authorized by the fifth

25 amendment.

Page                                                                    42

1          Your Honor, Mr. Israel mentioned we made a last-

2     minute change.  The document not surprisingly said we

3     needed an entered order to make this advance since we

4     agreed we might cut square corners.  Last night with the

5     concern about just what the process for walking an order

6     through is -- and, Your Honor, I apologize.  I thought that

7     the Trustee had uploaded a draft order.  But in any event,

8     we changed the agreement last night to permit UBS if it's

9     satisfied by oral approval of the Court today to go ahead

10    and make this advance.  We understand the Trustee needs the

11    money now.

12          And so we would suggest that it is appropriate

13    for the Court to approve the sixth amendment.  We would

14    make clear in the order that the reserve that has been set

15    aside for the Committee could be rolled forward to the

16    month of April and obviously if it is -- there is further

17    financing and, as the Trustee said, the parties are

18    in intense discussions on what the best course for this

19    case is and it is not a secret that the Trustee has

20    mentioned that many operators are shutting in wells.  We

21    hope that's not the conclusion.

22          And by the way, Your Honor, I would note we

23    recognize that even were the Trustee to conclude that wells

24    need to be shut in, they need to be operated -- or they

25    need to be monitored.  "Operated" is not the right word,

BENHYATT
Certified Deposition Reporters

Page                                                                          43

1  but you can't simply shut these wells in and go home.

2          And so the Trustee and UBS are in discussions to

3  determine what the way forward is in the interests of all

4  creditors.  And obviously UBS wants what's best for it, but

5  we recognize that it's not appropriate to have these wells

6  abandoned.  It is best if there's at least the possibility

7  of creditors receiving something through a Chapter 11 plan

8  or otherwise.

9          But, Your Honor, we're in a very tough

10  situation -- everyone.  And as the Trustee mentioned, the

11  pricing for his oil has dropped over 50 percent since the

12  start of the year.  He was just getting back operating from

13  the OSTR shutdown orders and then with COVID-19 and the oil

14  crisis he suddenly faces buyers, who as you'll recall he

15  had a hard time arranging.  He suddenly faces spot buyers

16  saying they don't plan to buy any more oil in the month of

17  May.  It's an extraordinary circumstance and the Trustee

18  and his professionals/employees are doing the best they

19  can.  And at this point this is what UBS is prepared to do

20  to support that effort and we're all going to have to

21  figure out where we go next.

22          THE COURT:  Okay.  All right.  I appreciate that,

23  Mr. Jones.  And I -- you know, I -- nobody should construe

24  anything I said today as -- you kind of know my views.  I

25  just think if there is a Chapter 11 case, if there is a

Page                                                                        44

1   budget, a cash collateral and financing budget, I think --
2   and there are provisions for the estate professional I
3   think there needs to be some sort of fairness to those.

4          And most the statements I made -- all the
5   statements I made were when the facts were very different.
6   I don't think my sense that those things need to be fair
7   will have changed but, you know, maybe the negotiations
8   lead to different conclusions about what the lender is
9   willing to fund and what should be funded if the posture of
10  the case changes.  I don't want to interfere with that -- I
11  don't want to interfere with that negotiation and nothing
12  I've said should be construed that way.

13         I do acknowledge that my views were based on the
14  facts as I knew them at the time and the facts may have
15  changed, although certainly my sense of fairness hasn't
16  changed, but certainly the facts may have or my sense of
17  what's fair in terms of treating state professionals
18  fairly.  So --

19         MR. JONES:  Thank you, Your Honor.

20         THE COURT:  Yeah.  I guess I --

21         MR. JONES:  I'm sorry.  I didn't mean to
22  interrupt.

23         THE COURT:  No, no, no.  That's okay.  That's
24  okay.  I guess I -- I paused.  You didn't really interrupt.

25         So anyway, I -- and I appreciate Mr. Litvak

Page                                                                    45

1   having made the objection and filed the request for hearing

2   acknowledging that he's since -- he's since gotten

3   assurances regarding the funds that are -- you know, that I

4   thought had been committed for March had been set aside and

5   I accept all of those representations.

6          Kind of working backwards now to what Mr.

7   Skillman had talked about, which was -- and Mr. Israel in

8   response to the issue raised by Mr. Beall, there is and

9   always has been a timing issue.  But I'm comfortable based

10  on Mr. Jones' reiteration of his client's view that they

11  are not going to try to take money generated from oil and

12  doesn't belong -- didn't bel -- never belonged to the

13  debtor and take that money and climate fairs (phonetic).

14  So -- and I'm going to, you know, hold them to that

15  concept.  I don't think they could have taken a lien and

16  property that didn't belong to the debtor in the first

17  place.

18          And, Mr. Beall, as you've argued on multiple

19  occasions California law recognizes the oil is the -- part

20  of the oil, some undivided percentage interest has a

21  property interest and it's my intention to preserve that

22  recognition.  But I'm comfortable that that -- that this

23  motion that's before me asking to bless the extended budget

24  does not do harm to that principle.  I noted in particular

25  that it's a cash budget and it doesn't include the last day

1  of the month.  But I'm comfortable with Mr. Jones'

2  representation.

3          I am a little concerned that Mr. Beall --

4          MR. ISRAEL:  Your Honor --

5          THE COURT:  Hold on a second.  I'll hear from you

6  in a second.  I am concerned that Mr. Beall is asserting

7  that he's asked for assurances regarding the amounts that

8  have been escrowed and feels like he hasn't gotten it and I

9  didn't hear a response to that yet.

10         So I'll start with Mr. Israel.  You can pass it

11 over to Mr. Skillman if you need to, but what's the story

12 with the clients that Mr. Beall represents and why can't we

13 get him some assurance that the royalties for his clients

14 are -- or attributable to his clients' interests aren't

15 actually being set aside?

16         MR. ISRAEL:  Your Honor, this is Eric Israel.

17 Your Honor, Mr. Beall has asked for many things.  I know

18 that it was confirmed that once he wanted to -- insisted on

19 seeing the bank statements and the Trustee and his staff

20 could then stretch then with all the events that have been

21 occurring on the accounting side especially.  And, you

22 know, we have -- I have tried to respond to him promptly.

23 I did tell him that the money had been set aside and, you

24 know, in terms -- he was asking about, you know, periods

25 that hadn't  even passed yet.

Page                                                              47

1          But in any event, we're not purposely ignoring

2    him.  I'm trying to respond as I can.  There were disputes

3    about other matters I won't even put on the record now that

4    was filed that he claimed were erroneously taken and we had

5    to get to dispute.  It's another matter on the docket.

6          In any event, the Trustee is trying to respond

7    promptly to all inquiries by parties in interest, including

8    Mr. Beall.

9          THE COURT:  Okay.  Well, I think it -- you know,

10   the one thing I observed is that it's not the first time

11   I've heard this and I -- look, I don't -- I'm not -- I'm

12   not going to ascribe blame to either side.  Think I know

13   better than to get sucked into that without knowing the

14   facts of what exactly has been asked and what's been the

15   response.

16         But I do observe that Mr. Beall could file a Rule

17   2004 motion which would be granted in due course or if it

18   related to a contested matter he could propound discovery

19   to get at that information and that's probably a more

20   expensive way for everybody to deal with each other.

21         And so, you know, I would maybe re-double your

22   efforts to try to -- you know, without reason.  I'm not --

23   I try not to pick sides here, but try to move it up on the

24   burner because I do keep hearing about this.  And I think

25   it's reasonable for his clients to want some sort of

Page                                                                                              48

1  affirmative evidence other than your word.  And I don't
2  question the value of your word, Mr. Israel, but I think
3  it's a reasonable request by Mr. Beall to get some kind of
4  evidence that the money is actually there and been set
5  aside for his clients.
6          MR. BEALL:  Your Honor, may I be heard briefly on
7  that, Your Honor?  William Beall.  May I be heard briefly
8  on that?
9          THE COURT:  Yes, of course.  Of course.
10         MR. BEALL:  Okay.
11         THE COURT:  Go ahead.
12         MR. BEALL:  Okay.  First of all, I did have to do
13 discovery in the adversary in order to get the documents.
14 I received information that went through at least February.
15 It is a continuing demand and I have received no further
16 information despite the fact that we have discovery demand
17 because it's a continuing demand.
18         What Mr. Skillman just said, although he tried
19 not to say it, is that the March 1st payment is then made
20 sometime soon and the April 1st payment is going to be made
21 Sunday.  Now, the March 1st payment was due 45 days ago to
22 the escrow account.  It has not been made.  The April 1st
23 payment was due 17 days ago to the escrow account.  It has
24 not been made.  That is what Mr. Skillman just told you.
25 The May 1st payment Mr. Skillman's line was "that's at

1  risk." That means it isn't going to be paid.

2          So what the Trustee has admitted is that the

3  escrow account is not being funded. If you listen to what

4  they said today, they tried not to say it, but that's what

5  they're saying.

6          So, Your Honor, you just can't accept it that

7  it's being funded when I have demanded, I have requested, I

8  have formally demanded. I'm not getting any information

9  because the account is not being funded, not ever timely

10  and not mostly at all. This is just inappropriate, Your

11  Honor. Mr. Jones said there's court orders. It has to be

12  done. There are court orders and it isn't being done.

13          THE COURT: Okay. Mr. Skillman --

14          MR. ISRAEL: Your Honor, this is Eric Israel.

15          THE COURT: All right. Mr. Israel, go ahead.

16          MR. ISRAEL: We dispute that. It is being done.

17  We are doing it in the best and most timely way we can do

18  it. In terms of April, the payments -- we will receive on

19  May 20th the payment for April. And at that point the

20  money will be set aside and that -- that's what's -- that's

21  what in general we've been doing. But in terms of --

22          THE COURT: Okay. All right. I'll --

23          MR. ISRAEL: When someone said it was at risk,

24  it's at risk to the extent that, yes, if we don't get paid

25  on May 20th for April royalties for April sales, once we

1  get them, the Trustee has been setting aside 13 percent

2  and -- but the checks and the accounting don't occur until

3  later.

4          Mr. Skillman, is that correct?

5          MR. SKILLMAN:  Yes.  Yes.  Your Honor, that's

6  absolutely right.  We are setting this money aside.  And

7  what I was referencing was we don't have -- we don't have

8  the money for our April sales yet.  As you'll recall, we

9  had sales in November and December that we didn't get paid

10  for either.  So it's still an issue.

11          THE COURT:  Right, right.

12          MR. BEALL:  There has been no deposits since

13  February 24th.  No deposits.  Zero.

14          THE COURT:  Okay.  Stop.  Stop, stop, stop.

15  First of all, every time you speak you need to state your

16  name.  Okay.  And I have recognized Mr. Skillman.  I had

17  not recognized anyone else.  So, Mr. Beall, just hold your

18  horses.  I know you're excited.  All right.

19          Mr. Skillman, did you not say that the March oil

20  sales -- you said something about April 20th.  Is that when

21  you're paid or is that when you plan to distribute to

22  royalty holders and to the escrow account on March sales?

23          MR. SKILLMAN:  Crude that is delivered in the

24  month of March is paid to HVI Cat Canyon on or around

25  April 20th.  At that time we will reserve the money for 13

Page                                                              51

1  percent of the sales, which is approximately equal to the

2  totaling of royalty requirements for March sales.

3            THE COURT:  Right.  Today is April 17th.  You

4  don't have that money yet, do you?

5            MR. SKILLMAN:  No.

6            THE COURT:  Okay.

7            MR. SKILLMAN:  No, we don't, Your Honor.

8            THE COURT:  For February sales you should have

9  been paid.  Was the February -- in March.  Were those funds

10 received and were they put on deposit?

11           MR. SKILLMAN:  They were received and put on

12 deposit.

13           THE COURT:  Okay.  And the same thing is true of

14 January funds?

15           MR. SKILLMAN:  January funds were received, put

16 on deposit, and disbursed pursuant to the court order.

17           THE COURT:  Okay.  And if I had to put you on the

18 witness stand, the -- you -- this is what you would testify

19 to?

20           MR. SKILLMAN:  Yes, Your Honor.

21           THE COURT:  Okay.  Mr. Beall, tell me what about

22 that is a problem because they're not going to set aside

23 money for sales they haven't received yet.

24           MR. BEALL:  Your Honor, William Beall --

25           THE COURT:  And I'm not going to --

Page                                                                52

1            MR. BEALL:  -- (indiscernible) --

2            THE COURT:  And I'm not going to require them to

3    do that.  Go ahead, Mr. Beall.

4            MR. BEALL:  There was no deposit made on

5    March 20th nor has there been one since.  That's a problem.

6            THE COURT:  Well, there wouldn't have been one --

7    there wouldn't have been any more since March 20.

8            Mr. Skillman -- well, hold on.

9            Mr. Beall, why do you say that?  Do you have

10   evidence --

11           MR. BEALL:  The commission -- yes, okay.

12           THE COURT:  No.

13           MR. BEALL:  First of all --

14           THE COURT:  Evidence.  Do you have evidence.

15           MR. BEALL:  I have a document demand --

16           THE COURT:  I (indiscernible) --

17           MR. BEALL:  I have a document demand that

18   requires the bank statements to be sent to me and I have

19   not received one.  Mr. Skillman just said --

20           THE COURT:  Okay.  Well, that's different.

21           MR. BEALL:  -- there hasn't been a deposit.

22           THE COURT:  That's different.

23           MR. BEALL:  He just said it.

24           THE COURT:  That's different.  Just because you

25   haven't gotten the documents you asked for doesn't mean the

1  facts don't exist.  Okay?  Please, please stop with that

2  kind of argument.  I really don't appreciate it.  Okay.  I

3  really don't appreciate it.  That's a huge logical leap,

4  you didn't get the documents and therefore the money hasn't

5  been deposited.  Okay.  And none of it has anything to do

6  with the motion that's in front of me today which motion is

7  hereby granted.  I've heard enough from all of it and I'm

8  sick of this issue.  And Mr. Beall, I'm getting sick of

9  your arguments.

10        You have a -- if you have a problem with

11  compliance with an order bring an appropriate motion.  Back

12  it up with evidence.  We'll have a hearing on it.  This

13  motion is granted.  We're moving on.

14        MR. BEALL:  Your Honor, may I --

15        MR. ISRAEL:  Thank you, Your Honor.

16        MR. BEALL:  -- have one moment?

17        MR. ISRAEL:  Thank you, Your Honor.

18        MR. BEALL:  May I be heard once with regard to

19  the Court's last comments?

20        THE COURT:  Yes.

21        MR. BEALL:  I did make a motion.  It has not been

22  set for a hearing.  It's backed up by --

23        THE COURT:  What's your motion?

24        MR. BEALL:  The motion to reconsider the denial

25  of motion for relief from stay; it has not been set for

Page                                                                            54

1  hearing.

2           THE COURT:  That has nothing to do with --

3           MR. BEALL:  It's docket (indiscernible) --

4           THE COURT:  -- post -- that has nothing to do

5  with post-petition financing.  If you have a problem with

6  compliance with my financing orders, then you bring a

7  motion.  A motion to reconsider a motion regarding relief

8  from stay is not a motion for relief from a court's

9  financing order or for sanctions or for corrective action.

10           THE COURT:  And by the way, just, you know, so

11  you don't get your hopes up, I don't expect that motion for

12  reconsideration to be granted but I need to study it more

13  carefully.  But I've got to tell you, I didn't see

14  anything -- any new evidence in there, any new law that you

15  didn't argue previously.  It's still based on this kooky

16  premise that you should be able to interfere with the

17  Trustee's exercising his duties to sell property of the

18  estate which may be commingled with royalty oil that you

19  couldn't show was segregated or segregable in any way.  But

20  I'm not having a hearing on it now.  And I am not required

21  to set a hearing on a motion for reconsideration and I'll

22  deal with it in due course.  Now we're moving on.

23           MR. ISRAEL:  Your Honor --

24           THE COURT:  Let's talk about --

25           MR. ISRAEL:  This is Eric Israel.  Could we get a

Page                                                                                   55

1   final hearing on this motion because this is an interim

2   hearing.

3            THE COURT:  Yeah, when do you propose?

4            MR. ISRAEL:  (No response.)

5            THE COURT:  When do you propose to have that

6   hearing?

7            MR. ISRAEL:  Yeah, I think we have to give 15

8   days' notice so -- or it'd have to be a minimum of 15 days.

9   So from yesterday.  Anytime after May (indiscernible), I

10  think.  Let me pull up my calendar.

11           MR. JONES:  Your Honor, Evan Jones.  If I might

12  suggest, the final hearing to the extent it's required and

13  it's never been clear to me an amendment requires the two-

14  stage hearing, but it will occur after the funds are

15  advanced, so I'd like to suggest we set it for the next

16  omnibus hearing to avoid burden on the Court's calendar.

17           THE COURT:  That -- that's fine.  I mean, I don't

18  know.

19           MR. ISRAEL:  Yes, that's --

20           THE COURT:  That's fine with me.  Any objection

21  to that?  When's our next omnibus hearing?

22           MR. JONES:  It would be May 19th at 10:30.

23           THE COURT:  Okay.  Fine.

24           MR. ISRAEL:  Thank you, Your Honor.

25           THE COURT:  Go ahead and no -- go ahead and

1  notice it.

2          All right.  Now let's get back to -- and by the

3  way, I -- because we're conducting these hearings even if

4  there's -- even if there's an order lodged now I don't know

5  how I can review it and keep these hearings going.  So if

6  it had been lodged earlier I would have looked at it before

7  the hearing.  Is that going to be a problem or do I need to

8  stop the hearing and review the order?

9          MR. ISRAEL:  Your Honor, with the revised --

10          THE COURT:  Ms. Israel?

11          MR. ISRAEL:  Yes, this is Eric Israel.  I'm

12  sorry.  With the revised sixth amendment we should be okay.

13  Actually, the order is -- I think it's attached to the

14  motion as Exhibit 3.

15          MR. JONES:  Your Honor, this is Evan Jones --

16          THE COURT:  (Indiscernible) --

17          MR. JONES:  I don't believe that the Court need

18  interrupt the hearing.  My clients are on the phone.

19  Whether they can make the lawyer (phonetic) deadline today,

20  I don't know, but I believe your court -- Your Honor's

21  statement will be sufficient to try.

22          THE COURT:  Okay.  Thanks.

23          MR. JONES:  Thank you, Your Honor.

24          THE COURT:  Okay.  Let me just ask you,

25  Mr. Israel, are there going to be changes from what was

Page                                                                57

1  attached to the motion?

2          MR. ISRAEL:  I think it's filling in the blank

3  for the final hearing date and --

4          THE COURT:  Okay.

5          MR. ISRAEL:  -- noting the fact that there was an

6  amendment -- a minor amendment that I explained earlier

7  that in the sixth amendment we would just refer to that

8  with the docket number.

9          THE COURT:  Okay.  Does any --

10         MR. ISRAEL:  And also -- and also -- and also --

11         THE COURT:  Does any -- go ahead.

12         MR. ISRAEL:  -- on that -- I'm sorry.  And also

13  the Committee -- the resolution of the Committee objection.

14         THE COURT:  Just acknowledging.  Okay.  All

15  right.  Does anyone have -- does anyone object to my

16  signing the order as soon as I get it given those

17  representations?  Okay, then.  All right.  We'll go ahead

18  and lodge the order when you can and we'll still do

19  everything we can to sign it quickly, but there's only one

20  of me so I'm going to keep on doing this.  All right.

21         Okay.  Let's talk about #1.00.  I'm going to work

22  backwards.  You try to do three things in the motion.

23  There's procedures for assuming oil and gas leases

24  authorizing assumption of the surface leases and

25  authorizing rejection of the Lakeview office and warehouse

Page                                                                58

1   lease.  I kind of want to deal with these in reverse order.

2   So I want to first talk about the rejection of the Lakeview

3   office and warehouse lease.

4          Mr. Israel, with respect to rejection of those

5   two leases did you get any -- did you receive any

6   opposition at all?  The (indiscernible) --

7          MR. ISRAEL:  No, no, I --

8          THE COURT:  -- doesn't reflect that we got any.

9          MR. ISRAEL:  No, Your Honor.  There was no -- I

10  received no responses or oppositions to the rejection of

11  (indiscernible).

12         THE COURT:  Okay.  All right.  I'm going to go

13  ahead and grant that part of the motion and the -- I'm

14  going to ask you to serve a notice of -- maybe you could

15  just build it into the order.  If you could do a separate

16  order but -- on the motion, but if it's -- if there's one

17  order on the motion, maybe a separate notice to the

18  counter-party to those leases, I'm going to establish June

19  12, 2020 as the bar date for any rejection claims arising

20  from this rejection.

21         MR. ISRAEL:  Okay.  We'll include that in the

22  order.

23         THE COURT:  Okay.  All right.  And then I just --

24  I want you to give them notice of the dea -- the order

25  should say you'll give them notice of the deadline.  Maybe

Page                                                                    59

1  that's --

2         MR. BEALL:  Your Honor, William Beall.  We're the

3  other party.  Your Honor, I'm on the call.  It's -- GLR is

4  the lessor.  It's actually a month-to-month lease.  There

5  won't be any rejection damage, per se.

6         THE COURT:  Okay.

7         MR. BEALL:  Whatever the Court rules is fine.  We

8  do not oppose the motion.  It's not writ -- it says lease,

9  but it's really a month-to-month (indiscernible), okay.

10        THE COURT:  I see.  And is GLR the landlord on

11 both of them?

12        MR. BEALL:  Yes.

13        THE COURT:  Oh, okay.  Well --

14        MR. BEALL:  But there's no fault involved.

15        THE COURT:  Yeah.  So Mr. Israel, I'd still like

16 you to just go through the motions and create a bar date

17 just so we have finality on that issue, just in case

18 somebody's got some theory.  But -- then they think it'd be

19 between now and the bar date.  But I appreciate, Mr. Beall,

20 you stepping up to tell us that there probably won't be any

21 claim there, so thank you.

22        Okay.  In general, Mr. Israel, can you confirm

23 other than -- other than the agreements with Bradley Land

24 and Morganti Ranch -- or Morganti Ranch, which in your

25 supplement are described as both oil and gas and surface

Page                                                          60

1  leases, can you confirm for me that the oil and gas leases

2  are separate written agreements from the surface leases

3  because here's -- here's my concern.  Even if they're --

4  even if there is no objection or an objection that we could

5  resolve today or resolve -- you know, let's just say it

6  looks good and the Trustee can confirm or should be able to

7  confirm surface leases, if it's part of a document that is

8  also an oil and gas lease, then there's this sort of issue

9  about whether the same instrument can be deemed two

10  different executory contracts where you might be, you know,

11  treating one part of it differently than the other part of

12  it, what can you tell me about the -- the oil and gas and

13  surface leases other than -- again, Bradley Oil and

14  Morganti Ranch, are they separate?

15          MR. ISRAEL:  Your Honor, those are the -- some of

16  the Bradley documents and the Morganti were -- they're not

17  all Bradley -- were in the same oil and gas lease.  And we

18  did consult with our oil and gas counsel and that's why we

19  moved in the supplement -- I believe it was by five Bradley

20  leases -- from the surface lease category of this motion to

21  the mineral -- the oil and mineral lease section of the

22  motion.  And they -- their advice to us was that this --

23  those were the ancillary rights relating to the oil and gas

24  leases.

25          And as our 365 adversary proceeding alleges, and

Page                                                              61

1   they're seeking a declaratory judgment there, those are not

2   true lease.  Those are properly interests and not -- should

3   not be subject to 365.

4          THE COURT:  I know that.  Okay.  I get that.  But

5   other than the Bradley Land and the Morganti leases, that's

6   just a few of them, right?

7          MR. ISRAEL:  Right.  And the rest --

8          THE COURT:  Everything -- everything else --

9   everything else that you're asking the Court to assume as a

10  surface lease, is it in the same document as an oil and gas

11  lease or were they all separate documents?

12         MR. ISRAEL:  The others are separate documents,

13  Your Honor.

14         THE COURT:  Okay.  That's what I'm getting at.

15  Yeah.  All right.  I mean, it's kind of hard to tell

16  looking at exhibits -- you know, at the exhibits the way

17  they were structured whether -- whether that was true.

18  Okay.  I'm going to keep going based on that

19  representation.

20         Secondly --

21         MR. MARTINEZ:  Well, Your Honor, I -- Vincent

22  Martinez of Twitchell and Rice.  I represent Morganti.

23         THE COURT:  Yeah.  We'll get to you.

24         MR. MARTINEZ:  I don't know if I can -- oh, I

25  didn't know if -- since you were on the issue of Morganti

Page                                                                62

1   and you're trying to understand that issue.

2          THE COURT:  No, I'm not.  I'm not.  That's the

3   frustration I'm having.

4          MR. MARTINEZ:  Okay.

5          THE COURT:  I'm trying to say --

6          MR. MARTINEZ:  Okay.

7          THE COURT:  -- except for Morganti and we're

8   not -- that's what I'm trying to --

9          MR. MARTINEZ:  I'll (indiscernible).  Sorry about

10  that.

11         THE COURT:  I'm going to go through -- I'm going

12  to go through all of the parties that filed an objection

13  and I'll even give an opportunity for other people to

14  speak.  I will.  I promise.  I just -- I just wanted to

15  make sure that with respect to these other documents they

16  really were separate.  Okay.  And I will -- Mr. Martinez, I

17  will get back to you.  I'm not -- don't take it personally.

18  I'm just trying to maintain order.

19         Okay.  I want to ask the Trustee one other

20  general question.  So you're asking that as to oil and gas

21  leases that the Court continue the hearing and see what

22  happens in the adversary.  I get that.  That sort of makes

23  sense what you're asking for.

24         Based on some of the -- one or more of the

25  objections expressed concern that you were trying to -- the

1    Trustee was trying to preclude any lessor from filing an

2    administrative priority expense for post-petition royalties

3    in the event the Trustee ultimately decides to reject an

4    oil and gas lease during this interest and -- between now

5    and when you're asking me to continue the motion as to the

6    oil and gas leases.  Is it the Trustee's intention that a

7    lessor not be able to file an administrative expense for

8    post-petition, you know, royalties generated from post-

9    petition oil fields?

10           MR. ISRAEL:  No, Your Honor.  That was not our

11   intent and the post-petition period they -- they should

12   file to the extent that surface lease payments haven't been

13   made, I believe the Trustee should be current.  But from

14   the DIP period, I'm not sure that they were all paid.

15           But from the Trustee period, I believe they are.

16   But if there are post-petition periods that were unpaid

17   they should file a request for administrative hearing --

18   payment.

19           THE COURT:  Okay.  Okay.  All right.  I

20   appreciate your clarifying your position.  We'll hear some

21   folks as we go through these.

22           Now I'm going to go through the various folks

23   that filed an opposition and I apologize because my minutes

24   are organized by -- are more or less alphabetical as

25   opposed to by attorney.  So I may be calling upon you more

Page                                                                64

1  than once, but I'd like to try to just kind of go through

2  the way my notes are.  That is the best -- that will

3  increase the chances that the judge will keep decent notes

4  and do the right thing with respect to the right people.

5          Adam Family Trust asks the Court to deny the

6  motion as to the request to assume the Adam Family Trust

7  pipeline lease.  Is there someone representing Adam

8  Trust -- Adam Family Trust?

9          MR. MARTINEZ:  This is Vincent Martinez with

10  Twitchell & Rice.

11          THE COURT:  Okay.  Is that your position?  Do you

12  want me to deny the motion?

13          MR. MARTINEZ:  Yes.  Yes, but with the caveat

14  that this is an expired lease by its own terms and --

15          THE COURT:  Oh, yeah.

16          MR. MARTINEZ:  -- they've been indicated with

17  exhibit to the motion.  And I understand from the footnote

18  included within the original motion, which is at page 6,

19  that I just wanted to make sure that this item, which is

20  before the Court, is just for informational purposes only

21  as they indicate because --

22          THE COURT:  All right.  And I'm only talking

23  about the pipeline lease right now.

24          MR. MARTINEZ:  Correct.

25          THE COURT:  Okay.  I'm trying to deal with the

Page                                                                    65

1   surface leases.

2         So let me ask, Mr. Israel, is the Trustee trying

3   to assume a pipeline lease that expired by its terms on

4   July 1, 2019?

5         MR. ISRAEL:  (No response.)

6         THE COURT:  If you're speaking, I can't hear you.

7   I don't know if you've muted your phone, Mr. Israel.

8         MR. ISRAEL:  Oh, I'm sorry.  I did mute my phone.

9         THE COURT:  Okay.  It's okay if you --

10        MR. ISRAEL:  My --

11        THE COURT:  -- need time to think about it, too.

12        MR. ISRAEL:  Yeah.

13        THE COURT:  Just tell me.  But I -- there was a

14  long silence.

15        MR. ISRAEL:  No, I -- I had muted my phone.

16        THE COURT:  There's a --

17        MR. ISRAEL:  I apologize.  Your Honor --

18        THE COURT:  No problem.

19        MR. ISRAEL:  If I could, I just got a text from

20  Aaron de Leest who's on the call.  I believe he knows the

21  answer on that one, specifically on this lease, which I

22  could ask him to --

23        THE COURT:  All right.

24        MR. ISRAEL:  -- to speak particularly on that.

25        THE COURT:  All right.  Mr. de Leest.

Page                                                                        66

1          MR. de LEEST:  Yes, Your Honor.  It's not the

2    Trustee's intention to assume an expired lease.  I don't

3    believe we're asked to do that and we've prepared this

4    chart and I thought I was explicit when I did it.

5    Sometimes things don't always look the way that they do in

6    your mind to the Court or other parties.  But it looked, as

7    Mr. Martinez has said, for informational purposes just to

8    have all the surface leases in one place.

9          THE COURT:  Okay.  So let me just say I expect

10   any order on this motion to include a provision.  What

11   you're saying is that's something you never asked for.  I'm

12   not exactly going to say I'm denying your request.  I'd

13   like the order to clarify that notwithstanding anything in

14   the motion that the Trustee wasn't seeking and the

15   assumption and the Court is not approving assumption of the

16   Adam Family Trust pipeline lease.  Okay.

17         MR. MARTINEZ:  Yes, Your Honor.  I think we would

18   say we're not assuming an expired lease, yes.

19         THE COURT:  Okay.  All right.  I have another

20   question for the Trustee.  This relates to the Bognuda

21   Trust.  Apologies if I'm mispronouncing Bognuda.  I'd like

22   to ask the Trustee if there's -- I have some confusion over

23   what your -- again, whether this is like a perforation

24   (phonetic) purposes only or not.  There is an easement

25   agreement attached to proof of claim #161.  It's not

1  mentioned in the motion.  It's not mentioned in Exhibits 2

2  and 3 that there is a surface lease in the form of -- well,

3  it's an easement agreement.  Okay.  I don't know if you

4  consider that a surface lease or not.  Certainly not an oil

5  and gas leak.

6           What, if anything, was the Trustee's intention

7  with respect to the easement agreement that's attached to

8  proof of claim #161 and are there any other surface leases

9  that you're --

10          MR. de LEEST:  Your Honor, Aaron de Leest --

11          THE COURT:  -- (indiscernible).

12          MR. de LEEST:  Oh, I'm sorry, Your Honor.

13          THE COURT:  Yeah.  No, go ahead.

14          MR. de LEEST:  No, it's not on our list.  It was

15 our intention that that particular easement -- and I don't

16 have the proof of claim in front of me -- wasn't something

17 we considered a surface lease to be assumed.

18          THE COURT:  Okay.  All right.

19          MR. de LEEST:  But I don't have it particularly

20 in mind.

21          THE COURT:  Yeah, that's fine.  And who knows?

22 You know, an easement agreement cannot be an unexpired

23 lease or an executory contract in any event.  It may create

24 something that runs with the land.  Who knows?  All right.

25 Just have a very diligent staff and they noticed proof of

Page                                                              68

1   claim #161 had an easement agreement.

2          Who is on the phone representing the Bognuda

3   Trust?

4          MR. MARTINEZ:  Vincent Martinez with Twitchell &

5   Rice, Your Honor.

6          THE COURT:  Okay.  Mr. Martinez, are you

7   comfortable with the Trustee's representation that there's

8   no surface lease with Bognuda Trust that's subject to this

9   motion and there's no release that they're seeking with

10  respect to the easement agreements?

11         MR. MARTINEZ:  Yes, I'm comfortable with that,

12  Your Honor.

13         THE COURT:  Okay.  All right.  I'm not sure that

14  you need to put anything in the order on this specifically

15  because, honestly, that's not something that was mentioned

16  in Exhibit 2 and 3, but I'll leave that up to you.  I'm not

17  going to require that.  All right.

18         Bradley Land Company, it appears that the

19  Trustee's supplement withdraws all the release requested in

20  the motion as to the Bradley surface leases and states that

21  the Trustee will treat all agreements with Bradley as oil

22  and gas leases.  It doesn't appear that there's any relief

23  requested today with respect to immediate assumption of

24  anything with -- of a surface lease with Bradley Land.  Is

25  that right, Mr. de Leest?

Page                                                                    69

1           MR. de LEEST:  Your Honor, it's a little finer

2    than that and thank you for pointing that out.  Bradley has

3    a lot of agreements and to clarify that I can go through

4    them.  And attached to our supplement -- actually, it's

5    attached to our reply.  Excuse me.  We submitted another

6    version of -- version of Exhibit 2 to sort of help the

7    Court see this by number.  We actually numbered the

8    agreements so that there wasn't any confusion.

9           THE COURT:  Yes.

10          MR. de LEEST:   Again, sometimes when I prepare

11   these things it's a reflection that you see that maybe it's

12   not as clear as it should be.  But however -- but Bradley

13   may have -- it's essentially, let's call it, 15 agreements

14   that are on the Exhibit 2 which basically numbers 2 through

15   22.  Five of those agreements, which I've numbered in sort

16   of the supplemented exhibits to, Number 6, 9, 11, 12 and 13

17   are the ones mentioned in our supplement that are being

18   moved essentially from the surface lease category to the

19   mineral lease category.  And those are the subject of the

20   supplemented.  So there are other agreements specifically

21   that are considered surface agreements or surface leases

22   that we are trying to assume.

23          THE COURT:  Ah, okay.  All right.  Hold on.  6,

24   9, 11, 17.

25          MR. MARTINEZ:  6, 9, 11, 12 and 13.

Page                                                                    70

1           THE COURT:  6, 9, 11, 12 and 13.  Okay.  All

2   right.

3           Who is on representing Bradley Land Company?

4           MR. HOLMAN:  Brian Holman of Musick Peeler &

5   Garrett.

6           THE COURT:  Ah, Mr. Holman.  Okay.  Mr. Holman,

7   are you clear on what is and isn't being treated under the

8   motion and to the extent it's not one of these items that's

9   being moved to the oil and gas category is there any

10  objection to assumption of the -- what I assume are purely

11  surface leases?

12          MR. HOLMAN:  Yes, Your Honor.  As set forth in

13  our opposition, we object on the grounds that the Trustee

14  is not proposing to make immediate payments of the past-due

15  amounts and we believe particularly in light of the

16  discussion we had earlier today on the financing that the

17  Trustee can't provide reasonable assurance that there will

18  be cash to pay amounts owing on a going-forward basis.

19          THE COURT:  Okay.  All right.  What's the

20  Trustee's -- what's the Trustee's response?  Mr. Israel or

21  Mr. de Leest?

22          MR. de LEEST:  Your Honor -- oh, sorry, Your

23  Honor.  I was speaking through (indiscernible) -- answer.

24  Mr. de Leest here.  You know, the Trustee's perspective is

25  laid out in our reply where we think we've met our burden,

Page                                                                71

1    that we have met all of the elements to assume them.

2              THE COURT:  Well, show me.  What's your response?

3    I've got a lot of paper.

4              MR. de LEEST:  Sure enough.

5              THE COURT:  Have a lot of things --

6              MR. de LEEST:  Give me a moment here.

7              THE COURT:  Yeah.  Okay.  While you're looking --

8    while you look for the paper, Mr. Holman, can you remind

9    the Court what arrearages you assert and please distinguish

10   between prepetition arrearage and post-petition arrearage.

11             MR. HOLMAN:  Your Honor, I believe at this point

12   there's only prepetition arrears and it's about $15,000.

13             THE COURT:  Oh, okay.  Well, that makes it a

14   little easier.  A little easier, but we're talking about

15   assumption.

16             So then I guess the question, Mr. de Leest, is

17   the -- let me pull out the Code here.  The Code talks

18   about -- oh, I want to get it right.  365(b)(1)(A), one of

19   the elements is "cures or provides adequate assurance that

20   the trustee will promptly cure such defaults" other than

21   default, you know, relating to account (phonetic)

22   provisions, et cetera.

23             So explain to me what the cure or adequate

24   assurance of prompt cure is separate and apart from

25   adequate assurance of future performance, although they're

Page                                                                    72

1  not unrelated.

2           MR. de LEEST:  Your Honor, the Trustee's

3  perspective is that we have sufficient funds, particularly

4  here with Bradley where the amount of the issue between

5  Bradley and the Trustee is not in dispute.  It's very

6  minimal.  I think we said that it was about $14,891.

7  Bradley's number was in the 15,000 range, about $200 apart.

8  And given that number, the Trustee has the ability to cure

9  that.

10           As to future performance, we --

11           THE COURT:  Okay.  Well, stop -- stop right

12  there.  So when -- you have the ability.  Do you intend to

13  write them a check once that discrepancy is resolved --

14           MR. de LEEST:  Your Honor, we hope that --

15           THE COURT:  -- if I grant the order?

16           MR. de LEEST:  It was hopeful and as set forth in

17  our papers that it would be cured when those leases are

18  sold as part of a sale because of the cash situation that

19  the Trustee is in --

20           THE COURT:  (Indiscernible) --

21           MR. de LEEST:  -- the total amount that's been --

22  the total amount of the assumed leases is -- it's a bit

23  more.  It's in the $300,000 range and cash is tight, as we

24  said.  But as to Bradley it's only about $15,000 or -- it's

25  actually less if we move those -- some leases into the 365

1  mineral lease category, but total is quite minimal.

2          THE COURT:  So with respect to Bradley -- with

3  respect to Bradley how could -- how could I grant your

4  motion to assume today?  I mean, maybe I could continue it.

5  But you're basically saying to Bradley who's objecting --

6  okay.  The parties that didn't object, that's a different

7  story.  But Bradley objected and they're saying -- and

8  Bradley is saying, you want it ordered now assuming the

9  lease but I'm not getting an immediate cure or adequate

10 assurance of a prompt cure because the cure depends on the

11 Trustee being able to sell these assets.  A sale which I

12 don't think there's any evidence in the record is likely --

13 I mean, we all hope it'll happen but we don't know if a

14 sale is possible, you know, or feasible.

15         So how could I possibly allow you to assume

16 today?

17         MR. de LEEST:  Your Honor, I can address that in

18 two respects.  First, with respect to prompt cure that the

19 authority we provided gives that in the discretion of the

20 Court and the Trustee is requesting that the prompt be sort

21 of an extent -- not extended in the sense of long, but that

22 we be given time up to a sale to provide that you're in

23 that fashion.

24         If the Court thinks that's unreasonable we'll

25 leave it with the Court.  We would then request that you

BEN HYATT
Certified Deposition Reporters

Case 9:19-bk-11573-MB   Doc 986   Filed 05/08/20   Entered 05/08/20 15:06:25   Desc
Main Document   Page 87 of 257

Page                                                                    74

1   continue it so that we can discuss with the Trustee and

2   Mr. Skillman, you know, and the bank, for that matter, how

3   we can provide a cure that the Trustee -- or that Bradley

4   and the Court is requiring.

5           THE COURT:  Yeah, I don't know how I feel.  I'm

6   testing -- I'm posing questions to you.  I don't know what

7   I'm going to do, but it seems to me that it's a -- it's

8   arguably a stretch.  I mean, it's one thing to say prompt

9   cure when you're able to put some time frame around it,

10  right.  It's two months or three months or six months and

11  you say, Judge, you know, come on.  This is prompt because

12  we know -- or it's likely that this will happen -- adequate

13  assurance that it will happen in a prompt period.

14          Here it's a little different than that because

15  I'm being asked to, again, assume it today based on the

16  possibility not even -- I don't think I have enough

17  evidence to judge it a probability but a possibility that

18  there's a sale and so I don't know.  I don't know.  And the

19  assumption is the Trustee, you know, assuming all of those

20  obligations and maintaining a sort of contractual right to,

21  you know, enforce that agreement.

22          Of course, on the other hand, since I think it

23  was BAPCPA, suggesting to be the inference in the Code that

24  one can assume a contract and then still reject it after

25  assuming it and -- I don't know what to make of that.  I

P 888.272.0022  F 818.343.7119              www.benhyatt.com

Page                                                                    75

1   just -- I'm not saying necessarily that anybody has to

2   write the counter-party objecting today, but I'm not sure

3   that I can grant the motion today without knowing, you

4   know, if and, you know, when and if it's going to be cured.

5           I mean, the section that they talk about if talks

6   about, you know, adequate assurance of prompt care, this

7   doesn't -- it assumes that it will be cured and

8   handicapped.  How likely the debtor will be able -- if the

9   estate will be able to do it, I guess you could collapse

10  the probability of a sale somehow into that, but I'm -- but

11  do I have evidence on the probability of a sale or the

12  likelihood that a buyer would want to pay for the

13  assumption of these things?

14          MR. de LEEST:  Yes, Your Honor.  We -- and the

15  Trustee is on the line and Mr. Skillman is also on the

16  line.  They can speak to the probability of a sale at this

17  point given the financial extent (phonetic) of the world

18  per issue with respect to oil that may be -- been asked and

19  brought from that as well.

20          But it -- in the motion I believe we did say that

21  it was -- the Trustee was hopeful that the sale would take

22  place towards the end of the summer.  Now, that was maybe

23  contemplated when the world was a little bit different and,

24  again, the Trustee could speak to that, potentially could

25  allow.

Page                                                                76

1          THE COURT:  Yeah.

2          MR. MCCONNELL:  Your Honor, this is Mike

3   McConnell, the Trustee.  There is no sale with -- currently

4   in process.  I can't give the Court a timeline when a sale

5   might take place.

6          THE COURT:  Okay.  That's what I figured.  I

7   appreciate your candor.  All right.

8          Let me -- before I move on to the other parties,

9   let me just ask Mr. Holman, was there anything else you

10  wanted to say at this point?

11         MR. HOLMAN:  Your Honor, may client told me there

12  might be a $300 post-petition penalty due.

13         THE COURT:  Okay.  Fair enough.  Let me ask

14  you -- let me ask you this, Mr. Holman.  If the Court were

15  to continue its hearing on the motion, it doesn't really

16  affect the ability of your client -- or rather it doesn't

17  affect the entitlement of your client to post-petition

18  performance, but it would sort of put on hold the question

19  of whether and when the Trustee might need to cure the

20  prepetition amount.  Do you have any problem with a

21  continuance?

22         MR. HOLMAN:  Yes, Your Honor.  The Bankruptcy

23  Code provides limitation on a date by which the Trustee

24  must assume or reject.  You know, in the Ninth Circuit the

25  courts have held that a deadline can be extended as the

Page                                                                    77

1    Trustee makes a motion to assume, but I don't think the

2    intent is that the mere filing of the motion to assume has

3    affected it be continued, you know, on and on and on.

4    We're entitled to a prompt decision to assume or reject.

5    If the Trustee elected to assume he's required to make the

6    cure, provide prompt assurance of cure, and not to extend

7    the time to assume or reject indefinitely by continuing

8    to --

9              THE COURT:  Well, he's -- the Trustee is not

10   asking me --

11             MR. HOLMAN:  -- (indiscernible) --

12             THE COURT:  The Trustee is not asking me to

13   continue this, is he?

14             MR. HOLMAN:  I think he was proposing that it

15   would be continued.

16             THE COURT:  No, I -- I'm just talking about the

17   surface leases, not the oil and gas lease.

18             MR. HOLMAN:  Right.

19             THE COURT:  Okay.  All right.  Let me go through

20   the others.  BUGANKO, LLC.

21             MS. GRANT:  Karen Grant.

22             THE COURT:  Hello.

23             MS. GRANT:  Yes, Your Honor.  We filed a -- we

24   filed it as a joinder, but we also made similar objections

25   that have been raised already by prior counsel, which is

Page                                                                          78

1  that there -- this assumption feels like it's a tentative

2  assumption.  The --

3          THE COURT:  Okay.  I just want to focus on the --

4          MS. GRANT:  -- (indiscernible) --

5          THE COURT:  -- narrative.  Can you focus on the

6  surface lease?  We'll talk about the oil and gas lease

7  separately.

8          MS. GRANT:  Well, I -- it relates to both of

9  those because --

10         THE COURT:  Okay.  All right.  That's fine.

11         MS. GRANT:  -- so with regard to the surface

12 lease there is a provision in their motion that says, you

13 know, if we -- we retain the right to reject it if the

14 buyer doesn't want it.  So they're not really proposing to

15 assume.

16         THE COURT:  Right.

17         MS. GRANT:  In concrete terms.  They're making it

18 somewhat tentative and I don't think that that 365 provides

19 for that.

20         Now, the other part is to cure and they're not

21 providing for that either at this point as the Trustee's

22 counsel indicated.  They're hoping that they have a buyer

23 someday that will come up with that money, but that's not

24 what 365 provides for.

25         My client is -- BUGANKO is -- the cure amount in

Page                                                                79

1  their motion is 91,000.  It's one of the largest ones

2  listed.  And there actually are -- proof of claim is a

3  little higher.  It had some post-petition.  I think that

4  those have been paid, so the -- even --

5          THE COURT:  Is the 91,000 on -- is the 91,000 on

6  surface leases or oil and gas?

7          MS. GRANT:  That's on the surface lease.  The

8  surface -- a rental agreement.  We have two different --

9  BUGANKO has the surface rental agreement and then Janet

10 Ganong has the oil and gas lease, so they're two

11 separate --

12         THE COURT:  Okay.

13         MS. GRANT:  -- obligations and leases.  And with

14 regards to the BUGANKO and its surface lease, that's 91,000

15 that they're asking to, yes, we will assume but -- but

16 maybe we'll assume or maybe we won't assume and we might

17 see the money and we might not.

18         And given the state of this case, you know, it's

19 kind of -- we don't have a buyer now, so they can't come

20 and assure this court that there would be even a prompt

21 payment or provide adequate assurance that that won't

22 happen.

23         THE COURT:  Okay.  Maybe it is more efficient

24 while we're -- while I'm going through these just to ask if

25 there is anything else you want to say about the oil and

Page                                                                    80

1  gas leases.  I mean, the oil and gas leases are in a

2  different -- in a different posture because they are the

3  subject of an adversary proceeding and they -- they may

4  turn out that they may or may not be subject to Section

5  365.  Doesn't that kind of put them in a different posture?

6           MS. GRANT:  Certainly the Trustee's adversary --

7  Karen Grant.  Certainly the Trustee's adversary actions has

8  made an issue as to whether 365 applies and if it doesn't

9  apply, you know, we're not talking about this anymore.  But

10 if it does, I think they still have to meet the

11 requirements under 365.  And, you know, I understand the

12 Court is more in doubt with possibility of continuing to

13 let that -- continuing that portion of the motion to let

14 that happen.  But that -- with regards to the surface

15 settle (phonetic) agreements, you know, that's not even

16 part of the issue here, that it clearly is an executory

17 contract.

18           THE COURT:  Okay.  All right.  I appreciate that.

19           MR. HOLMAN:  Your Honor --

20           THE COURT:  Thank you.  Yes.

21           MR. HOLMAN:  This is Brian Holman.  We also made

22 that same argument.

23           THE COURT:  On the -- oh, with respect to oil and

24 gas?

25           MR. HOLMAN:  No, with respect to the surface

1  leases.

2        THE COURT:  Tell me which argument it is that you

3  made that's different than what you said before.

4        MR. HOLMAN:  No, it's not different.  I'm saying

5  we're also asserting that assumption or rejection should be

6  present and not preferred until there's some sale.

7        THE COURT:  Okay.  All right.  Very good.  I

8  understood that, but thank you for clarifying before moving

9  on.

10       All right.  Let's -- let me move on to the

11  Escolle Tenants In Common.  And who is representing those

12  parties?

13       MR. MARTINEZ:  Vincent Martinez of Twitchell &

14  Rice appearing on behalf of Escolle Tenants In Common.

15       THE COURT:  Very good.  All right.  So there

16  seems to be -- the main issue here, if I understand it, is

17  a discrepancy between the cure amounts.  There -- you filed

18  a proof of claim at claim #115 asserting the $13,500.  Is

19  that right?  But you seemed to be okay with --

20       MR. MARTINEZ:  That's --

21       THE COURT:  -- with the Trustee's number of

22  $9,000.

23       MR. MARTINEZ:  Vince Martinez speaking.  Yes,

24  Your Honor.  I put that in there in the proof of claim, but

25  to be honest with the Court is we don't have any record of

Page                                                                    82

1   the surface agreement that was listed within Exhibit 2 of

2   the motion.

3            THE COURT:  Okay.

4            MR. MARTINEZ:  So I did it more in the sense

5   of --

6            THE COURT:  You're --

7            MR. MARTINEZ:  -- safety in regards to --

8            THE COURT:  Okay.

9            MR. MARTINEZ:  -- and finding the agreement.

10  Yes.

11           THE COURT:  I understand.  Okay.  Do you -- at

12  this point do you oppose -- does Escolle -- do the Escolle

13  Tenants In Common oppose assumption of Escolle's surface

14  leases?

15           MR. MARTINEZ:  Yes, we would because we -- again,

16  I'm ignorant of the fact of whether or not it is part of

17  the -- any of the original oil leases.  I just don't know

18  where this document ties into.

19           THE COURT:  Okay.  Mr. de Leest, do you have

20  Escolle's surface leases that you could produce them to

21  Mr. Martinez?

22           MR. de LEEST:  If we're talking about -- Your

23  Honor, Aaron de Leest here.  Thank you again.

24           The one Escolle agreement that I'm aware of is

25  the -- I don't believe is -- relates to any one of

BENHYATT
Certified Deposition Reporters

Page                                                                    83

 1  Mr. Martinez's clients.  It's #35 on the list and so I -- I

 2  don't think that there are any surface leases relating to

 3  Mister -- he said -- and I'm looking at our chart, relates

 4  to directing his clients -- think only agreements that he

 5  has are oil and gas leases.

 6          THE COURT:  Okay.  Well, when you say "his

 7  clients," is there an Escolle surface lease or are you

 8  saying you're not aware of any?

 9          MR. de LEEST:  I'm saying I'm not aware of one.

10  The one reference on the chart, #35, relates I believe to

11  the Rogetti (phonetic) family.

12          THE COURT:  Okay.  So any order on this motion

13  would make it clear that you're not -- you didn't ask for

14  any relief and you're not getting any relief with respect

15  to any surface lease of the Escolle Tenants In Common?

16          MR. de LEEST:  Again, to the extent they're not

17  on the chart.  I don't believe that they are, but --

18          THE COURT:  Okay.

19          MR. de LEEST:  I mean, as far as to act our --

20  you know, our land lawyer, but I -- I did --

21          THE COURT:  Okay.

22          MR. de LEEST:  -- (indiscernible) see them and I

23  wasn't aware of any in their reply -- or opposition either.

24          THE COURT:  All right.  All right.  Hold on a

25  second.

Page                                                                        84

1            (Pause)

2            Very tiny print.  Switch glasses here.

3            (Pause)

4            All right.  On page 79 of your motion in the

5   middle of -- this is in Exhibit 3, in the middle of the

6   page that's Bates stamped 79, is a right-of-way agreement

7   and it says the lease name is Escolle and it has the name

8   of the parties as the Escolle Tenants In Common.

9            So it looks like Mr. Martinez does have a client

10  affected by -- you know, that has a surface lease that's

11  affected by the motion (phonetic).

12           MR. de LEEST:  I think -- is that -- that's the

13  right-of-way agreement dated November 9, 2001.

14           THE COURT:  Right.

15           MR. de LEEST:  I believe that may be a --

16  that's -- so I'll have to sort that out, Your Honor.  I

17  believe that might be a typo.  I'm actually looking at the

18  right-of-way agreement that says it's with the rest --

19  Earnest and Rogetti (phonetic) to -- Ernest Rogetti Trust.

20  To the extent those are his clients, maybe he could give us

21  that information.

22           THE COURT:  Okay.

23           MR. de LEEST:  But I don't believe so.  I think

24  that's the --

25           THE COURT:  All right.  Well --

Page                                                                    85

1              MR. de LEEST:  -- (indiscernible) yeah.

2              THE COURT:  So I'll put them in your chart.

3              Mr. Martinez, do you represent the Ragetti

4    entities?

5              MR. MARTINEZ:  I do not.

6              THE COURT:  Okay.  All right.  So we have an open

7    issue there.  All right.

8              And Mr. Martinez, do you want to say anything

9    about the relief regarding the oil and gas lease?

10             MR. MARTINEZ:  I believe that that's just stayed

11   for the adversary hearing from what I understood from

12   (indiscernible) and --

13             THE COURT:  Well --

14             MR. MARTINEZ:  I mean, we do oppose --

15             THE COURT:  Okay, then maybe we can simply add --

16             MR. MARTINEZ:  We do oppose the assumption, yes.

17             THE COURT:  You oppose the assumption, okay.

18             MR. MARTINEZ:  Yes.

19             THE COURT:  Do you oppose the requested

20   continuance of that request so that we can deal with the

21   adversary?

22             MR. MARTINEZ:  Correct.

23             THE COURT:  I'm sorry.  You do or you don't?

24             MR. MARTINEZ:  I'm sorry, I'm not understanding

25   the Court right now.

Page                                                                      86

1              THE COURT:  Okay.

2              MR. MARTINEZ:  I'm thinking that when the --

3              THE COURT:  Part of the relief that's being

4    requested in the motion, #1.00 on the calendar today, is

5    to -- is to sort of recognize that the Trustee is asked to

6    assume oil and gas leases if it turns out they are subject

7    to Bankruptcy Code Section 365, which is the essential

8    question being asked by the adversary.

9              So if they lose the adversary they're trying to

10   preserve the ability to assume the lease and have asked

11   with respect to that assumption of any oil and gas leases

12   if the Court leaves a motion on the books and simply

13   continue the hearing until later in the year when

14   presumably the Court would rule on they hope in motions for

15   summary judgment or cross-motions or whatever.  Do you have

16   a view on their request that the assumption issue be

17   continued?

18             MR. MARTINEZ:  Via the notice of this motion.

19   Via the motion itself right now before the Court.

20             THE COURT:  Yes.

21             MR. MARTINEZ:  I have no opposition for them to

22   be continuing the motion in light of what's going to happen

23   in the adversarial proceedings.  No, Your Honor.

24             THE COURT:  Okay.  That's what I'm getting at.

25   Thank you so much.

Page                                                                87

1          I think in terms of the -- in terms of the -- of

2    whether or not there's a surface lease subject to the

3    motion, that's probably a reason in and of itself to

4    continue with respect to the Escolle parties.  But I

5    appreciate that.  Okay.

6          Let's talk about Candace Lane Evenson.  I'm going

7    to ask Trustee's counsel to confirm for me that Evenson

8    is -- only has an oil and gas lease.

9          MR. ISRAEL:  Yes, Your Honor.  Let me --

10         THE COURT:  The objection was kind of vague as to

11   what she thought she had, so can you tell me what you're

12   asking for?

13         MR. ISRAEL:  Let me double-check my chart

14   (phonetic), Your Honor.  One second.

15         THE COURT:  Sure.

16         MR. ISRAEL:  My records indicate that she only

17   has oil and gas lease and we were not -- we're requesting

18   relief relating to a surface lease, Your Honor.

19         THE COURT:  Okay. All right.  Very good.  All

20   right.  Let me turn to the -- oh, I know you mentioned it,

21   Ms. Rhim, and I've already forgotten how to pronounce Laor

22   or Laor Liquidating Associates and Guarantee Royalties.

23         MS. RHIM:  Yes, Your Honor.  It is Laor.

24         THE COURT:  Laor.  Laor.  Okay.  All right.  With

25   respect to the surface leases involving your clients,

Page                                                                88

1   Ms. Rhim, there didn't seem to be a dispute about cure

2   amounts.

3           MS. RHIM:  Well, Your Honor --

4           THE COURT:  Or --

5           MS. RHIM:  -- can --

6           THE COURT:  Yeah.

7           MS. RHIM:  Can I address that?  I think our --

8   our situation is a little bit different.  Laor and

9   Guarantee holds oil and gas leases I guess you -- for lack

10  of a better way to describe it on adjacent parcels of land.

11  And these agreements were entered into long ago, since the

12  '20s and '50s and so forth.

13          More recently there was -- there were disputes

14  and defaults regarding non-payment of royalties and other

15  breaches under those leases and, as a result, there was a

16  state court action filed in 2005.  There was a settlement

17  agreement reached in 2009 and it looks to me that the

18  Trustee is considering that settlement agreement to be a

19  surface lease.  It's a little bit of a surprise to me that

20  it was characterized that way.  I'm not sure that we really

21  have surface leases, but that's the agreement they seem to

22  peg the surface lease to.

23          There are certain ancillary rights that are

24  afforded under the oil and gas leases to provide access and

25  such to be able to extract those rights obviously from the

Page                                                                89

1   ground, but we don't have a separate surface lease.  But

2   certainly I would be happy if we had clarification in the

3   order that there's no assumption of any surface lease

4   that's not really applicable because here I think the

5   bigger issue is regarding the nature of the oil and gas

6   lease that's the subject of the adversary proceeding and

7   also my client's counterclaim or I should say cross-claim.

8   So I --

9             THE COURT:  All right.

10            MS. RHIM:  -- that's my take on all of this, that

11   I don't think --

12            THE COURT:  Okay.

13            MS. RHIM:  -- I think there was a

14   mischaracterization.  So we would in kind have no relief

15   granted as against my client as to the surface leases.

16            THE COURT:  Okay.  All right.

17            Mr. de Leest, do you want to respond to that?

18            MR. de LEEST:  Your Honor, I -- you know, counsel

19   is correct in I think the way she's characterizing the

20   agreement.  It's a 2009 -- March 26, 2009 recorded document

21   called grant of easement.  It's a partial surrender and

22   quitclaim deed and granted easement of surface use.  I

23   think the Trustee would be fine in treating that along with

24   a mineral lease and the mineral lease rights with respect

25   to the adversary proceeding rather than a surface lease.

Page                                                                      90

1  But we put these things in because they are -- it's --
2  it's -- there is some surface use rights in this document.
3          THE COURT:  Okay.  So you're not seeking relief
4  with respect to any surface agreement?
5          MR. de LEEST:  There is no separate surface
6  lease.  It is just -- it's part of --
7          THE COURT:  Okay.
8          MR. de LEEST:  -- this -- I think the way I
9  characterized this document, I mean the counsel agrees we
10 can -- or we would treat it as part of their mineral lease.
11 That is fine with respect to the Trustee's position.
12         THE COURT:  Okay.  So let me go back to you,
13 Ms. Rhim, and ask what is your view of the relief requested
14 as to the oil and gas leases in this #1.00 which is (a) you
15 know, we want to assume them if we lose in the adversary
16 and really just want you to continue the hearing till then.
17         MS. RHIM:  Your Honor, I think our first request
18 would be that the motion be denied as a substantive matter
19 because we believe our leases have already terminated.  But
20 certainly I understand where things stand and if the Court
21 is inclined to defer all rulings with respect to the
22 assumption issue, you know, we're fine with that, too.  I
23 mean, we filed cross-claims and, you know, it sounds like
24 all of those issues would just be deferred to a later time
25 and I'm okay with that again with the clarification that

Page                                                                91

1   there are no surface leases.  All those issues be wrapped

2   up and considered as part of the oil and gas leases.

3           THE COURT:  Okay.  All right.  I appreciate that.

4   I think -- you know, in your case there is this -- there is

5   this sort of issue that has to be resolved pursuant to the

6   adversary I think and not whether -- whether there's a

7   lease to -- you know, counter that issue now with

8   everything else in the adversary whether the lease expired

9   or not, although presumably it seems like -- well, maybe

10  it's not.  Maybe it's not easy to settle that issue.  It

11  may be very factored (phonetic), but I don't know.  So

12  okay, I appreciate that.

13          I want to ask the Trustee as to Morganti Ranch.

14  Can you confirm whether the motion is seeking any relief as

15  to Morganti Ranch as a surface lease or everything is in

16  the oil and gas category?

17          MR. ISRAEL:  There is -- we moved one over to the

18  oil and gas category, but there is one surface lease listed

19  as -- one second -- it will be #33, right-of-way agreement

20  dated August 20, 1943 and there's a back rent due on that

21  agreement of about $75.00 and it is a stand-alone

22  agreement.

23          THE COURT:  Okay.  Who's on the phone that

24  represents Morganti?

25          MR. MARTINEZ:  Vincent Martinez with Twitchell &

Page                                                                92

1   Rice, Your Honor.

2           THE COURT:  Okay.  Mr. Martinez, what -- all

3   right, it sounds like there's one surface lease, sort of

4   a -- putting aside the oil and gas leases that are

5   conceptually for a second.

6           Do you have any objection to the assumption of

7   that one surface lease?

8           MR. MARTINEZ:  I do have an objection, but it's

9   more of a clarity, I would say, is that we have no record

10  of any letter agreement dated August 20th of 1943.  The

11  only right-of-way which correlates with the $75 is a

12  document, which is dated the 16th of April 1946.

13          THE COURT:  Yes.

14          MR. MARTINEZ:  And it's split with the Alfonso

15  Bell Corporation (phonetic).  That's what ties to the $75.

16          THE COURT:  All right.  And have you shared that

17  with Trustee's counsel?

18          MR. MARTINEZ:  No, Your Honor.  No.

19          THE COURT:  Okay.  All right.  So that -- there's

20  an outstanding issue there.

21          And what is Morganti Ranch's view on the oil and

22  gas leases and the requested -- same position?  You're sort

23  of okay that those -- you know, any sort of assumption on

24  the oil and gas leases be considered after the adversary?

25          MR. MARTINEZ:  Yes, Your Honor.



Page                                                                        93

1              THE COURT:  Okay.  All right.

2              MR. MARTINEZ:  And, Your Honor, I can ship -- I

3     will email moving party's counsel --

4              THE COURT:  Who's speaking?

5              MR. MARTINEZ:  I'm sorry.  Vincent Martinez, Your

6     Honor.

7              THE COURT:  Okay.

8              MR. MARTINEZ:  Yes.  Sorry about that.  I will

9     send over the copy of the agreement that I referred to just

10    before the Court right now to moving party's counsel.

11             THE COURT:  Okay.

12             MR. MARTINEZ:  Yes.

13             THE COURT:  Sounds good.  Thank you.

14             All right.  Mr. de Leest, Manford Sanders is on

15    your chart.  It's in Exhibit 2 and 3 but it's described as

16    having expired September 30, 2018, if you look at Bates

17    stamp page 80.

18             So are you seeking any relief with respect to a

19    surface lease that expired?

20             MR. de LEEST:  We are not, Your Honor.

21             THE COURT:  (Indiscernible) chart?

22             MR. de LEEST:  No, Your Honor.

23             THE COURT:  Okay.  Very good.

24             All right.

25             MR. de LEEST:  And I -- that would be number 44

Page                                                              94

1  on the chart with -- where I added the numbers, which is in

2  our reply.

3           THE COURT:  Okay.  All right.  State College, is

4  there anyone representing State College?

5           (No response.)

6           Okay.  Here's the issue I have with State

7  College.  I know they didn't -- they didn't object, but

8  they had filed proofs of claim 33, 34 and 35.  And they

9  were -- they were filed -- hold on a second.  They appear

10  to have been filed prior to the motion, but the motion

11  doesn't really address those proofs of claim and I really

12  would -- I'm uncomfortable where that's the fact pattern

13  necessarily granting relief by default when there are also

14  these claims out there that are, you know, deemed -- deemed

15  allowed if they haven't been objected to.  I don't think

16  the motion is adequate as an objection to claims.  I don't

17  think there's a -- you know, it doesn't say this is a claim

18  objection to these proofs of claim but that's effectively

19  would be the result.

20          So on -- with respect to State College there's --

21  some things are going to be continued today.  With respect

22  to State College I'm going to want you to, you know,

23  supplement the motion explaining why I should basically

24  treat those claims as disallowed or file an objection to

25  the claims themselves.

Page                                                          95

1              Mr. de Leest, do you have any issue generally

2       with the notion of my continuing that for some better

3       procedural clarification?

4              MR. de LEEST:  I do not, Your Honor.  Thank you

5       for that.

6              THE COURT:  Okay.  All right.  And then I have

7       Robert -- let's see.  Robert Thompson.  Again, I -- that

8       sort of started out with talking about certain

9       (indiscernible), although we meandered a little and I will

10      give everyone a chance to be heard on everything by the

11      time we're done.

12             Is there anybody representing Robert Thompson?

13             MR. RENWICK:  Yes, this is Edward Renwick.  I

14      represent Robert Thompson.  He's actually -- he's part of

15      the group -- that group that I represent, but he did file

16      individually initially also and he did file objections, I

17      know.

18             THE COURT:  Okay.  All right, Mr. Renwick.

19             The -- focusing on the surface lease --

20             MR. RENWICK:  Yes.

21             THE COURT:  -- you filed a -- or he filed a proof

22      of claim #90.

23             MR. RENWICK:  Yeah, and --

24             THE COURT:  That is a slightly different amount

25      than the cure amount proposed for the -- Mr. Thompson's

Page                                                                    96

1   surface lease in the Trustee's motion.

2          MR. RENWICK:  Well, yes, probably.  The -- I

3   can --

4          THE COURT:  I don't think -- yeah, go ahead.

5          MR. RENWICK:  His creditor's claim has been

6   superseded by a -- by another claim.  I though we had put

7   that in.  The -- that has been superseded by a claim filed

8   by the Presson Vera OC Land Group and initially he had just

9   filed a claim on his own for his percentage share.  So

10  they're now all --

11         THE COURT:  We're just talk -- we're just talking

12  about surface rent.  We're not talking about percentage

13  here.

14         MR. RENWICK:  I --

15         THE COURT:  (Indiscernible) --

16         MR. RENWICK:  I understand.  But what I'm saying

17  is that he has -- he filed his objection based on his --

18  for just his percentage share of both unpaid royalties and

19  his share of the unpaid surface rents as well.

20         THE COURT:  Okay.

21         MR. RENWICK:  That's the confusion.

22         THE COURT:  Okay.

23         MR. RENWICK:  The -- now -- now, I think the

24  answer is he doesn't have any objection to the -- his

25  surface is essential -- the essential -- the surface of

Page                                                                 97

1  that group is essential to the operation of the -- of redo.

2  And they have -- my clients have no objection to the -- to

3  that claim being accepted or to the -- to the lease --

4  surface lease being accepted by the Trustee and he has to

5  have it in order to operate the unit and we wants the unit

6  to be operated successfully.

7          We can fight later about how much money they're

8  owed and when they get paid.

9          THE COURT:  Okay.  Well --

10         MR. RENWICK:  That --

11         THE COURT:  Certainly the when to be paid is kind

12 of inherent in the motion.  That is kind of put off in the

13 future and what the Trustee requested.

14         MR. RENWICK:  Well, he --

15         THE COURT:  The Trustee's motion listed $7500

16 even as the surface lease rent amount owing.  But your

17 client's proof of claim asserts $7,843.56.  So my question

18 really is to the --

19         MR. RENWICK:  Yes, that is --

20         THE COURT:  -- to the Trustee is it's $300

21 difference.  Would you concede that the cure amount is the

22 higher amount that's reflected in the proof of claim?

23         MR. de LEEST:  I would, Your Honor.

24         THE COURT:  Okay.  Very good.  So -- all right.

25 Hold on.  I'm trying to -- all right.  Okay.

Page                                                                98

1              Again, I'm trying to -- I'm trying to sort of

2     keep these conceptually separate.  With respect to --

3              MR. de LEEST:  Yeah.

4              THE COURT:  -- any party that has a surface lease

5     that is the subject of the Trustee's motion is there

6     anybody that wants to be heard on the issue of assumption

7     of their surface lease that hasn't been heard so far?

8              (No response.)

9              Okay.  Now I made a big deal about the judge

10    taking notes in the order appeal and I want to just double-

11    check I make sure I have the right -- kind of the right

12    party.

13             In terms of the parties that continue to --

14    putting aside people that had clarification that we've

15    clarified or would be clarified in order, it seems to me

16    that there are a handful of parties with surface leases

17    that object to the assumption of the surface leases.  I

18    want to make sure I have them identified.  Okay.

19             I heard BUGANKO.  I heard Bradley Land.  Are

20    there other parties that I didn't -- that maybe I didn't

21    write down properly that have surface leases that continue

22    to object to the assumption of the surface leases?

23             (No response.)

24             All right.  So it's BUGANKO and Bradley Land are

25    the outstanding objections.

Page                                                                          99

1          So this is what I think I'm going to do with

2    respect to the relief requested on the surface lease.  A

3    lot of what we went through was clarification and Mr. de

4    Leest explained in most cases if the Trustee was not

5    seeking  relief and -- or that clarified where they were or

6    I heard people say that they don't have objection to the

7    assumption of the surface leases and in one case we

8    clarified the cure amount, I think in one or two instances

9    involving Mr. Martinez's client there maybe is an open

10   issue with respect to whether there is a surface lease and

11   which surface lease it is.  And I think that was -- there

12   was one on Morganti and was it Escolle, Mr. de Leest, that

13   we have an open issue?

14          MR. de LEEST:  Yes, Your Honor.

15          THE COURT:  Yeah, okay.  All right.

16          So what I'm prepared to do is enter an order

17   granting the relief requested with respect to all of the

18   surface leases in which there was no objection.  That's how

19   our system works the -- with the exception -- arguable

20   exception of those two of Mr. Martinez's clients, Morganti

21   and Escolle, which with respect to BUGANKO and Bradley Land

22   I'm going to continue the hearing for a brief period of

23   time for me to do some more thinking about the arguments

24   that were made with respect to assumption of the BUGANKO

25   and Bradley Land surface leases, and I believe our next

Page                                                                100

1   omnibus hearing is May 19.

2          So with respect to those, the hearing will be

3   continued to May 19 at which time now that we've started to

4   narrow down the number of parties out there, I can focus in

5   on the arguments that they have made with respect to the

6   surface leases understanding, of course, that may also

7   relate to the oil and gas leases.

8          What I'd like to do now is sort of go through and

9   see if there's anyone that has anything additional; we have

10  argument on the oil and gas leases other than what a few

11  people have mentioned, make sure everyone has a chance to

12  be heard.

13         As I said earlier, with respect to the oil and

14  gas leases essentially the Trustee has filed a motion

15  seeking to assume the oil and gas leases if they -- if the

16  Trustee is unsuccessful in the adversary proceeding.

17  That's basically what I'm being asked to do to continue

18  that request and consider it further if the Trustee is

19  unsuccessful.

20         I want to go through sort of all of the parties

21  we have and see if anybody wants to say anything more about

22  that request -- that particular request as it relates to

23  oil and gas.  Okay.

24         So we heard from counsel for Mr. Thompson who

25  indicated that there was no objection -- well, there was no

Page                                                            101

1   objection on assuming the surface and it didn't sound like

2   you had an objection, sir, to basically allowing the motion

3   with respect to the oil and gas leases to remain pending

4   and be continued until after the adversary is resolved.  Is

5   that fair?

6           MR. RENWICK:  Edward Renwick here.  Yes, Your

7   Honor, that is -- that is fair and I gather we're going to

8   have some discussion about the -- because this is also --

9   also scheduled today is the status conference for that

10  motion and I think there's probably a good deal we will

11  have to say about that.

12          THE COURT:  Okay.  Very good.  I appreciate it.

13  All right.

14          Adam Family Trust.

15          MR. MARTINEZ:  Your Honor, Vincent Martinez

16  speaking.  We don't have an oil and gas lease on -- it was

17  just my client which was already addressed in the motion.

18          THE COURT:  Okay.  I'm sorry, you don't have an

19  oil and gas or you don't have -- you're saying you don't

20  have objection on that point?

21          MR. MARTINEZ:  We don't have an objection, but I

22  just wanted to clarify we have no oil and gas lease claim.

23          THE COURT:  Okay.  Okay.  No objection.  No oil

24  and gas lease.  Okay.  All right.

25          Morganti Ranch.

Page                                                              102

1          MR. MARTINEZ:  We have no objection in regards to

2    receive -- I'm sorry (indiscernible).

3          THE COURT:  Okay.  Thank you.  Evenson?

4          MR. MARTINEZ:  No objection, Your Honor.  Again,

5    Vince Martinez.

6          THE COURT:  Thank you.  Bognuda Trust?

7          MR. MARTINEZ:  No objection.  Again, Vincent

8    Martinez speaking.

9          THE COURT:  All right.  And the Escolle Tenants

10   In Common?

11         MR. MARTINEZ:  No objection, Your Honor.

12         THE COURT:  Okay.  Thank you.  Okay.  Chamberlin

13   Oil.

14         MS. GOETZ:  Gisele Goetz appearing on behalf of

15   Chamberlin Oil, Your Honor.  We --

16         THE COURT:  I'm sorry.  Could you say your name

17   again because I didn't hear you.

18         MS. GOETZ:  Gisele Goetz.

19         THE COURT:  Oh, Ms. Goetz.  Okay.  Very good.

20   Thank you.  Go ahead.

21         MS. GOETZ:  And Chamberlin Oil.  So, Your Honor,

22   we -- I need a clarification perhaps because as I've been

23   listening to the Trustee, the Trustee has been indicating

24   that they are, in fact, paying royalties 60 days in arrears

25   which would be normal, but we have been producing and not

Page                                                                103

1  getting paid.  So part of our objection had to do with four

2  or five months of not getting paid.

3        We have received some sporadic payments, so it --

4  it's very difficult to tie them into any particular month.

5  I think we've gotten two.  So as I've been listening I'm

6  realizing that there's some process in place, but it just

7  doesn't seem to be happening and I'm wondering since part

8  of our objection is based on not getting paid for another

9  four or five months whether, in fact, we are going to

10  receive to the extent that we're producing right away which

11  I understand that clarification, and the Trustee is able to

12  sell the oil, are we going to get paid.

13        THE COURT:  Okay.  Ms. Goetz, let me ask you.

14        MS. GOETZ:  Um-hum.

15        THE COURT:  Of course, your client is -- is

16  undoubtedly -- well, I shouldn't say "undoubtedly," but may

17  have amounts -- royalty amounts that accrued before the

18  bankruptcy that were not paid.  Are you -- are you sort of

19  excluding that?

20        MS. GOETZ:  I am.

21        THE COURT:  Like when you said -- okay.

22  Because --

23        MS. GOETZ:  Yes, I am.  I'm talking during the

24  course of the --

25        THE COURT:  Okay.  Okay.



Page                                                              104

 1          MS. GOETZ:  -- bankruptcy.

 2          THE COURT:  Okay.  During the course of

 3  bankruptcy.  Okay.

 4          Mr. Israel, you'd be in a position to respond to

 5  that?  I mean, I -- it -- it sounds like Ms. Goetz's

 6  client, Chamberlin, the objection has to do with, you know,

 7  oil being sold and not getting paid royalties post-petition

 8  versus the other sorts of arguments that are being made by

 9  BUGANKO and Bradley Land, which have issues with the notion

10  of the Trustee trying to assume whether it's a surface

11  lease or an oil and gas leak, sort of assume now and hold

12  it in abeyance until and unless there's a sale.  That

13  doesn't sound like Ms. Goetz's issue.  What can you say

14  about -- or am I wrong?

15          MS. GOETZ:  No, you're -- you are correct because

16  the amount we're due prepetition was pretty small so the

17  client is very pragmatic.  The Chamberlins are very

18  pragmatic.

19          We do have another part of our objection and that

20  is simply our effort to preserve our rights with respect to

21  the whole rabbit hole argument that a lease is not a lease

22  because in the state of California should everything go

23  wrong here and should we have -- and that with the lease

24  with orphaned wells we have lease remedies.  This is very

25  specific to a lease being a lease and we have an ability to

1    pursue prior lessees who assumed our lease at some point in

2    time to require plugging in abandonment and cure

3    environmental liabilities.  And I have no idea what happens

4    to those arguments after a bankruptcy determination that a

5    lease is not a lease.

6              So again, we actually --

7              THE COURT:  Well, that -- that --

8              MS. GOETZ:  -- preserve our rights.  But that

9    would be -- sorry?

10             THE COURT:  That relates more to the subject of

11   the adversary, does it not?

12             MS. GOETZ:  It does relate to the adversary

13   proceeding.

14             THE COURT:  Okay.

15             MS. GOETZ:  So again --

16             THE COURT:  So much (indiscernible) -- you know,

17   okay.  Not so much the bankruptcy issue of filing a motion

18   to assume, but that's kind of putting it on ice, so --

19             MS. GOETZ:  The -- so the client does not like

20   that, but the client understands that because in this

21   environment that is -- you know, delay is inevitable.

22             THE COURT:  Okay.  Thank you.  I think I

23   understand.

24             Mr. Israel or who -- whichever of your colleagues

25   is anointed, what -- what's your response on Goetz?  It

1  sounds like their objection has to do with getting their

2  post-petition royalties and maybe -- maybe that can be

3  sorted out.

4          MR. ISRAEL:  Your Honor, this is Eric Israel.

5  Yes, I don't have the royalty chart.  There were many

6  checks that's allowed, you know, each time the royalties

7  are cut.  And I know the debtor's payback wasn't always

8  correct about addresses, so I don't know if this is in the

9  category of, you know, the check went to a wrong address or

10 these wells aren't being -- you know, weren't producing in

11 particular months, but I can say if Ms. Goetz calls or

12 emails me we will get it figured out.

13         THE COURT:  Okay.  All right.  I'm going to make

14 a little note here.  I understand the issue.  I appreciate

15 it.

16         Now, I note that BUGANKO filed something in the

17 nature of a joinder and I don't really -- and I saw the

18 Trustee's reply.  I don't -- I don't really get what

19 BUGANKO's issue is here and maybe counsel for BUGANKO can

20 explain.  Is there relief being requested with respect

21 to --

22         MS. GRANT:  Yes.

23         THE COURT:  Okay.  And did you file an objection?

24         MS. GRANT:  Karen Grant -- well, Karen Grant on

25 behalf of BUGANKO.  And as I indicated initially, we filed

Page                                                                   107

1   a joinder, probably titled it wrong, but we also put -- you

2   can brief objections in it and one of them was that with

3   regard to the oil and gas leases the Trustee's assumption

4   was somewhat tentative and --

5             THE COURT:  No, I understand.

6             MS. GRANT:  -- (indiscernible) their rights,

7   so --

8             THE COURT:  I understand.

9             MS. GRANT:  -- we did put that in the pleading.

10            THE COURT:  But you -- okay, but -- and something

11  you titled a joinder --

12            MS. GRANT:  I --

13            THE COURT:  -- to an opposition.  Yeah, okay.

14            MS. GRANT:  I --

15            THE COURT:  Procedurally I don't think that's

16  kosher, but the Trustee did -- you know, the Trustee did

17  reply to it.  I'll have to figure out what to do with that.

18            Okay.  All right.  Bradley Lighthouse.

19            MS. GRANT:  Your Honor, Karen Grant.

20            THE COURT:  Yes.

21            MS. GRANT:  We don't have an opposition to the

22  continuance of the motion with regards to the leases.

23            THE COURT:  Oh, you don't?

24            MS. GRANT:  No.  We have objection to the motion

25  with regards to the oil and gas leases, but if the Court is

Page                                                                108

1   going to continue this matter, we have no objection to

2   that.

3           THE COURT:  All right.  Well, that -- I

4   appreciate that.  That's an important clarification.  If

5   that's true, then I believe the only outstanding objection

6   to the continuance of the motion is from Bradley Land.

7           Ms. Grant, is that true also -- now I'm trying to

8   remember here.  You have a -- now, is that your -- you

9   know, and can you clarify?  We talked earlier about the

10  BUGANKO surface lease.  You still have a substantive issue

11  with assumption of the surface lease?

12          MS. GRANT:  Correct.

13          THE COURT:  Which is something the Trustee --

14          MS. GRANT:  With regards to again what was --

15          THE COURT:  Okay.

16          MS. GRANT:  -- stated was that it -- it -- there

17  was no provision for cure for -- or adequate assurance.

18          THE COURT:  Okay.

19          MS. GRANT:  And --

20          THE COURT:  Now --

21          MS. GRANT:  -- if we continue that issue that's

22  related to the May 19th, that's fine.

23          THE COURT:  Okay.  All right.  Now I get it.

24  You're clarifying, though, as to oil and gas leases and the

25  request that that be continued until after the adversary is

Page                                                                109

1   adjudicated or resolved.  When it comes to oil and gas

2   leases, you have no objection.  Is that correct?

3           MS. GRANT:  Well, other than the fact that

4   they -- they are reserving their right to not assume it if

5   it's determined to be a 365.  I mean, it is applicable

6   but --

7           THE COURT:  Okay.  So you do have --

8           MS. GRANT:  -- if the Court wants to --

9           THE COURT:  You do have an issue with

10  continuance.

11          MS. GRANT:  No, I -- no, I mean, I --

12          THE COURT:  That's what I'm trying to

13  (indiscernible) --

14          MS. GRANT:  Not -- no, I want to be clear, Your

15  Honor.  I don't have an issue with the continuance of that

16  portion of the motion to let that be determined, but they

17  still have to clarify in their motion whether they're going

18  to assume or not assume.

19          THE COURT:  Okay.  I think there -- I hear what

20  you're saying, but I -- sort of.  I mean, they're asking

21  for -- and I get your position on the surface lease.

22          On the oil and gas leases -- well, on the surface

23  leases they're expressly asking that they be allowed to

24  assume those today with cure later and I get you object to

25  that and that issue is continued to May 19th, fully

1  preserved.  We're on the same page.

2          With respect to your oil and gas leases, they're

3  asking that the -- in a -- in a hearing on assumption of

4  the oil and gas leases not take place until September or

5  thereafter whenever the adversary has been adjudicated or

6  otherwise resolved and so when you say you don't have an

7  objection to continuing they're asking that that be

8  continued much farther out.

9          MS. GRANT:  I understand, Your Honor.

10          THE COURT:  Until after the adversary and you

11  don't have an --

12          MS. GRANT:  I understand, Your Honor.

13          THE COURT:  -- objection to that?

14          MS. GRANT:  No.

15          THE COURT:  Okay.  Got it.  Perfect.  Thank you.

16          Okay.  That -- okay.  So then we have Bradley

17  Land and Laor and I think you made your views clear

18  earlier, which is you -- you object though to assumption of

19  the -- assumption of the surface leases under the current

20  circumstances or maybe you didn't have any.  But you

21  definitely objected to the continuance of the relief on the

22  oil and gas leases.  Is that right?

23          MS. RHIM:  Your Honor, this is Alexandra Rhim on

24  behalf of Laor and Guarantee.  That is true.  I would add

25  just as a clarification that if the Court is inclined to

Page                                                                    111

1   defer all of the issues regarding the oil and gas leases

2   that that is without prejudice to the ability of parties to

3   seek other relief.  For instance, if facts come to light or

4   there are circumstances that require rejection prior to a

5   full determination of the adversary and I understand the

6   factors, you know, there's some overlap there.  There may

7   be, but I just want to make that clear.  It's without

8   prejudice to those sorts of rights.

9           THE COURT:  Okay.  Mr. de Leest, do you want to

10  respond to that, because I --

11          MR. de LEEST:  Sorry, Your Honor.  I had you on

12  mute.  I think if I understand counsel's position as to

13  Laor in here it is that they don't oppose the request in

14  the motion that though this should be put off until the

15  adversary proceeding is concluded or the issue is resolved

16  in the adversary proceeding probably more accurately

17  stated.  Is that correct?

18          THE COURT:  Ms. Rhim, you want to clarify?

19          MS. RHIM:  That is correct, that we do not have a

20  problem with the issues being deferred.  However, I don't

21  want that to be construed as time on my hands and

22  channeling those issues into -- into that determination

23  because as a practical matter, what I'm fearful is that

24  this adversary proceeding, if it were to go on for six

25  months or longer, we don't get a ruling until then.  But if

Page                                                                      112

1  there are circumstances or something happens where we need

2  sooner relief with respect to our leases, I want to be able

3  to file a motion and I don't want it to be deemed, you

4  know, a waiver of that ability to get sooner relief.

5          THE COURT:  Okay.  I think I get it.  Did you get

6  it, Mr. de Leest?

7          MR. de LEEST:  I do, Your Honor.  And I -- I

8  don't think we opposed that.  I'm not certain what that

9  form of relief would take, but I don't think we're close to

10  that preservation.

11          THE COURT:  Okay.  All right.  And so then that

12  leaves Bradley.

13          MR. HOLMAN:  Yes, Your Honor.  This is Brian

14  Holman, Musick Peeler & Garrett, for Bradley.  Our petition

15  with respect to the oil and gas leases is essentially

16  similar to that with respect to the surface leases.  First

17  we have the substantive objections that there's no prompt

18  assurance of cure -- any cure is to be deferred until it's

19  when there is a sale.

20          With respect to the oil and gas leases we have

21  post-petition defaults, we've only received two payments,

22  even though there's been production for many months after

23  the bankruptcy.

24          THE COURT:  Okay.

25          MR. HOLMAN:  And also --



Page                                                                    113

1            THE COURT:  Well, so -- so -- and I understand

2     the substantive -- in terms of sort of substantively

3     they're not being cured now, but there's sort of a request

4     that the hearing on assumption of the oil and gas leases be

5     continued until the issues in the adversary are sorted out.

6     And so you oppose that, right?

7            MR. HOLMAN:  Well --

8            THE COURT:  Or do you?

9            MR. HOLMAN:  To be precise --

10            THE COURT:  Wait.  Oh, this --

11            MR. HOLMAN:  -- we reserve --

12            THE COURT:  If you get -- if you get comfortable

13    that you're getting paid your post-petition royalty are you

14    as concerned?

15            MR. HOLMAN:  Your Honor, we reserve the objection

16    that this is not a true assumption of rejection.  If the

17    Trustee is seeking an extension of time to make a selection

18    the adversary proceeding can come out perhaps one of two

19    ways:  one is what the Trustee seeks a declaration that

20    these are not executory contracts for unexpired leases of

21    non-residential real property; and second, the Court could

22    find they're executory contracts and not subject to the

23    February 22 deadline for assumption or rejection; or,

24    third, the Court could find they are leases of non-

25    residential real property in which case it would be our

Page                                                                      114

1    argument that the Trustee failed to assume them timely and

2    therefore can no longer assume them.

3          I don't mind having the hearing deferred as long

4    as it's not deemed a waiver of our objection that the

5    leases were not properly assumed in a timely fashion.

6          THE COURT:  Okay.  Mr. de Leest, do you want to

7    respond to that because if -- and I'm not trying to put

8    pressure on you, but if -- if you're -- if that's relief

9    that the Trustee can live with and the parties can work

10   out -- you know, work out a form of order that they're

11   comfortable with as to your relief on the oil and gas

12   leases that you're asking for today, which is essentially

13   that the hearing be continued, I think there's no

14   opposition left.  If not, then I'll -- you know, I may have

15   to continue it to our main calendar but I'll, you know,

16   focus in on the arguments of Bradley and rule.

17         But it sounds like Bradley is giving you an out

18   if you -- you know, it's not an out.  You know, sort of a

19   description of the issue that they're trying to preserve

20   and maybe -- maybe their objection if you're willing to

21   allow them to preserve that issue, their remaining

22   objection goes away.  So what's your response?

23         MR. de LEEST:  Your Honor, I think counsel's

24   suggestion is very reasonable.  We're okay with that.

25         THE COURT:  Okay.  All right, then.

Page                                                                    115

1          Now, is there anyone that wants to be heard on

2     the -- on a request for relief as it is today with respect

3     to the oil and gas leases, which is that the motion remain

4     pending and be continued to -- what's the date in September

5     you asked for, Mr. de Leest?

6          MR. de LEEST:  Your Honor, my apologies.  I can

7     look it up.  I don't recall.  We said three to four months

8     and it would be at the next September stacking date.

9          THE COURT:  Okay.  Hold on.  I can tell you.

10    That's September 29th.  Okay.

11         MS. RHIM:  Your Honor, this is Alexandra Rhim.

12    Could I be heard on the scheduling issue?

13         THE COURT:  Yes, please.

14         MS. RHIM:  My understanding is that the Trustee

15    is intending to bring a dispositive motion by I think it

16    was May 4, which is the extended date.  So I'm not sure how

17    we would track that motion because that motion may dispose

18    of all of the contract assumption issues and I know the

19    motion hasn't been filed, so we don't know when that will

20    be heard, but I want to be mindful of that and not continue

21    out this motion longer than it needs to be.

22         THE COURT:  All right.  Well, I'm also concerned

23    about continuing things more than we need to and I would

24    certainly if subsequent events are such that, you know,

25    there's no need for that additional time, you can always

Page                                                                        116

1    being a motion for cause, argue that the hearing ought to

2    be advanced.

3              MS. RHIM:  Your Honor, just as a last comment

4    then, is it -- would it --

5              THE COURT:  Yeah.

6              MS. RHIM:  -- be possible at all to continue this

7    to the May 19 date, which is the date of the continuance

8    for the service leases, and at that time we would know

9    whether the motion for summary judgment has been brought

10   and we would know the hearing date on that?

11             THE COURT:  Okay.  Mr. de Leest?

12             MR. de LEEST:  My only comment, Your Honor, is

13   that it's stated -- it would make more sense to continue

14   that further and then allow us to advance the hearing, if

15   need be, to an earlier date once we have that.  The hearing

16   on the MSJ, even if it's filed by the 4th, won't be for 30

17   days or more depending on the Court's availability and I

18   would think that that may be too soon if we get the May

19   19th date and we'll suggest a later date if appropriate.

20             THE COURT:  Okay.  Ms. Rhim, I understand your

21   concern and I'm not trying to prejudice your client's

22   rights, but it -- we can -- I am happy again for a couple

23   of pages of paper.  You know, you can bring a motion and

24   ask me to advance it if circumstances change.

25   Realistically this is sort of a big issue.  I am -- I'm not

Page                                                                117

1  likely to rule from the bench.  I rarely do on summary

2  judgment motions and there's some, you know, intricately

3  issues here.  So I'd just as soon leave us the briefing

4  room and not have everybody coming back on the motion

5  prematurely, but it's absolutely without prejudice to your

6  ability to -- to seek to advance that hearing if you think

7  there's good reason to.  Okay.

8            MS. RHIM:  Your Honor, that's fine.  I just

9  wanted to air my concerns and with that, that's fine.

10           THE COURT:  Your concerns are duly noted and

11  like not just noted on the record.  They're noted with me.

12  I get it.

13           All right.  So with respect to the oil and gas

14  leases and, again, this continuance, are there any -- is

15  there anyone else that wanted to be heard that hasn't had a

16  chance to be heard.  I believe all of the objections that

17  we've heard are essentially being accommodated and will be

18  accommodated in the form of order in the form of, you know,

19  preservation of rights and clarifications and whatnot.

20           Anyone else want to be heard?  All right --

21           MR. ROTH-MOORE:  Your Honor, I --

22           THE COURT:  Yes?

23           MR. ROTH-MOORE:  This is Andrew Roth-Moore.  I'm

24  with Brownstein Hyatt Farber Schreck.  I'm co-counsel with

25  Mitch Langberg.  We represent Grundoon (phonetic), LLC who



Page                                                                118

1  has a surface lease.  Unfortunately, Mr. Langberg's line

2  has dropped and he hasn't been able to get back on.  I have

3  a pending *pro hac* motion that has not been signed yet, but

4  I did just want to --

5           THE COURT:  That's fine.

6           MR. ROTH-MOORE:  -- speak up on a point.

7           THE COURT:  That's fine.  I'll --

8           MR. ROTH-MOORE:  I do apologize.

9           THE COURT:  I'm happy to admit you for purposes

10  of the hearing.  That's fine.  Go ahead.

11           MR. ROTH-MOORE:  Thank you.  I do apologize for

12  the delay.  As I said, Grundoon, LLC holds a surface lease.

13  We had not read the motion to request the release to be

14  able to assume now and reject as to the surface leases.  We

15  had read it as that's part of the release talking about,

16  you know, being able rejection of futures being limited to

17  the oil and gas leases.  You know, we'd ask if it's

18  possible if we could lump ourselves in on the continuation

19  recognizing that we did not file an objection as to the

20  issue of the -- just that limited issue of whether or not

21  the Trustee can go back at a later date and say we're now

22  going to reject not just because it would allow rejection

23  but, you know, in case it opens up arguments that, you

24  know, now that this has been rejected all the payments that

25  have been made through a certain period given all that, you

Page                                                                          119

1   know, at -- just on the issue of being able to reject that

2   the (indiscernible), the only issue that we -- we didn't

3   read correctly.

4          THE COURT:  Okay.  Mr. de Leest?

5          MR. de LEEST:  Your Honor, I would oppose the

6   request because it's been noticed properly.  We've proposed

7   a cure amount.  I don't think they're objecting to the cure

8   amount and the terms in the motion --

9          THE COURT:  Am I being asked to rule today on

10  your ability to reject and assume the surface lease at a

11  future date?  Is that part of the relief you were asking

12  for?

13         MR. de LEEST:  I'm sorry, Your Honor.  Was that

14  to me?

15         THE COURT:  Yes, to Mr. de Leest.

16         MR. de LEEST:  Okay.

17         THE COURT:  Is the Trustee asking me to opine and

18  order once and for all time that if the -- if a lease --

19  surface lease is assumed it may be rejected in the future?

20  I understand there's an argument about that, but is that --

21  you're asking for a ruling today on that issue?

22         MR. de LEEST:  The motion did request that we --

23  you know, that we have the ability up through the time of

24  assumption to reject the leases if we had a dispute

25  particularly with a cure amount.  Here there's no dispute

Page                                                              120

1  with respect to --

2          THE COURT:  Up until the time of assumption.

3  Well --

4          MR. de LEEST:  -- cure amount.

5          THE COURT:  Okay.  You are -- you're asking me

6  for an order assuming the leases presently so --

7          MR. de LEEST:  Correct.

8          THE COURT:  -- what -- when is the motion of

9  assumption if not when the order is entered of the

10 surface --

11         MR. de LEEST:  Your Honor, if you give us an

12 order as to the surface lease that's when they would be

13 assumed.

14         THE COURT:  Okay.  So as you asking for the

15 ability to reject up until the time an order is entered on

16 the surface leases or at sometime in the future after that

17 assumption?

18         MR. de LEEST:  Your Honor, with

19 (indiscernible) --

20         THE COURT:  That's (indiscernible) different

21 things.

22         MR. de LEEST:  Yes.  No, I understand.

23         THE COURT:  Go ahead.

24         MR. de LEEST:  No.  I think you're only asking up

25 until the time of assumption, particularly if there's a

1  dispute as to a cure amount.  Here there is no dispute, it

2  seems.  There's not a dispute of a cure amount.  They

3  haven't filed papers.

4          THE COURT:  Right.  Okay.  So then let me turn --

5  and I'm sorry.  Do you -- I had Mr. Lambert's name down but

6  I didn't get your name -- his colleague who stepped in.

7          MR. ROTH-MOORE:  Mr. Roth-Moore.  Andy Roth-

8  Moore.  Last name is hyphenated.  It's R-O-T-H hyphen M-O-

9  O-R-E.

10          THE COURT:  Okay.  Very good.  Roth-Moore.  Thank

11  you, sir.

12          So Mr. Roth-Moore, the clarification that's

13  offered is that they're only trying to assert the ability

14  to change their mind up until entry of -- entry of this

15  order on approving the assumption of the surface leases.

16  If that's the case I don't think it's terribly

17  controversial and I -- but, you know, I ask you if you're

18  pressing your objection subject to that clarification.

19          MR. ROTH-MOORE:  I -- we do not contest the

20  amount of cure.  To the extent that they're now

21  representing that once the Trustee gets an order assuming

22  the surface leases they are not going to read the order

23  granting this motion as giving them authority to then

24  subsequently reject when we get to the time of the sale, I

25  agree with Your Honor.  We do not have an issue.

Page                                                          122

1          If, however, they're saying, you know, we assume

2   subject to this tale of ability to reject that would be the

3   sole issue that we would -- we would ask leave to be able

4   to file late objections, too.

5          THE COURT:  Okay.  All right.

6          Mr. de Leest, and you're comfortable with your

7   clar -- if you're comfortable with that and that really was

8   your intent, then it sounds like the objection is, you

9   know, resolved.  If on further contemplation that's not

10  what your intention is, it really was sort of broader

11  relief to which, you know, nobody responded I'm -- I'd say,

12  you know, you should carve Mr. Roth-Moore's client out and

13  continue the matter to the May date in which case he can

14  file his opposition two weeks before; you could file your

15  reply one week before.

16         But if you're comfortable that all you were doing

17  was trying to preserve, you know, the ability to reject up

18  until the time of this order on these surface leases as

19  entered, then I think the objection goes away and you can

20  include him.  Mr. de Leest, do you want to say anything?

21         MR. de LEEST:  I apologize again, Your Honor.

22  I've had you on mute.  I will include him in the order.

23         THE COURT:  Okay.  All right.

24         MS. GRANT:  Your Honor --

25         THE COURT:  All right.  Sorry.  It's been a

Page                                                                123

1   long -- yes.  Ms. Grant.

2          MS. GRANT:  Again, I just want clarification

3   having heard what Mr. de Leest has said because in the

4   motion on page 7 it states the Trustee reserves the right

5   in the future to reject any of the surface leases if

6   appropriate including if such leases are not included as

7   part of a sale.  If they are amending that, then I need --

8   that provision then, you know, I think they need to be

9   clear about that.

10          THE COURT:  Okay.  Are you asking for any relief

11   from the Court with respect to that statement?  I mean, you

12   know, people can reserve rights till they're blue in the

13   face unless they get an order from the Court recognizing

14   that right then, you know, reservation of rights may or may

15   not be affected.

16          Mr. de Leest?

17          MR. de LEEST:  Your Honor, I think the -- the

18   reason I -- we're talking about a couple of different

19   things.  Here there's -- there's the opportunity to reject

20   the four assumptions and then there are cases out there

21   that talk about what you do after assumption in the event

22   that a rejection is necessary.  The Trustee still has that

23   option I think, you know, to reject -- after assumption

24   whether or not we reserved it if that's what the case law

25   provides.

Page                                                                124

1          THE COURT:  Right.  But you -- again, just to

2    clarify, you're not asking me to rule on any post -- on

3    your ability to -- one way or the other.  You'd have to,

4    you know, do it and people would have to have a chance to

5    respond to your request to do it and that presumably would

6    be the time to argue over whether you -- whether the

7    Trustee could or couldn't do it.  You're not asking me to

8    do anything today in the order you're asking for today with

9    respect to the circumstances that would adjudicate that

10   issue, right?

11         MR. de LEEST:  That's correct.

12         THE COURT:  Okay.  Ms. Grant, does that clarify

13   for you?

14         MS. GRANT:  Yes, Your Honor.

15         THE COURT:  Okay.  All right.  Good.  Last call.

16   Anybody else?  All right.  On the oil and gas leases -- on

17   the oil and gas leases the court will go ahead and grant

18   the relief requested in the short term subject to all the

19   caveats we've discussed.  And by that I mean, continuing

20   the hearing on the relief requested with respect to the oil

21   and gas leases to September 29.

22         Again, just to recap with respect to the surface

23   leases the hearing is continued with respect to BUGANKO and

24   Bradley Land.  I'm not inviting any additional briefing but

25   now that we've kind of cleared the deck a little I can

Page                                                                    125

1    focus on the particular argument, the legal authority that

2    the Trustee on the one hand and BUGANKO and Bradley Land on

3    the other hand offer with respect to the assumption of the

4    surface lease at this time under the circumstances

5    presented and under the terms proposed by the Trustee.

6    There were -- there's outstanding issues with respect to

7    Morganti and Escolle and so relief as to surface leases if

8    they exist for Morganti and Escolle, that will be continued

9    and hopefully the parties will work -- will work that out.

10           Is there anything on #1.00, the motion for

11   relief with respect to assumption, rejection, et cetera,

12   anything that somebody thinks I need to clarify or say that

13   I haven't already said?

14           MR. RHIM:  Your Honor, this is Alexandra Rhim.

15   Question about the continued hearing set for September

16   29th.  Will that be treated as a status conference or --

17   okay, because that is what was requested in the motion and,

18   therefore, if we required additional briefing or

19   evidentiary hearing those can be heard at another time.

20           THE COURT:  Yeah.  No, certainly not going to

21   grant this request and then allow anyone to feel sandbagged

22   about evidence.  And I do think that if -- you know, if

23   the -- if the need for the -- you know, depending on what

24   happens in the adversary proceeding we'll have to see.  And

25   then if there's still a live motion I think, you know,

Page                                                                  126

1   we're going to have to get evidence of the world as it

2   exists then in order to assess so we'll have to set some

3   dates and give everybody an opportunity to be heard and to

4   create a record.  Okay.

5            All right.  Then, Mr. de Leest, I'm going to

6   charge you because it's probably you or others that work

7   for the Trustee to prepare orders that memorialize today's

8   release.  I think, you know, it might make sense at least

9   to break off the order on the rejection of the

10  (indiscernible) and the warehouse lease and maybe even

11  break out a separate order the relief with respect to the

12  surface leases as opposed to the oil and gas leases, but

13  I'll leave it to you whatever you think is more efficient.

14           We have a process in our district for resolving

15  the form of an order -- or I should say there's a formal

16  process and an informal process.  The infor -- I much

17  prefer the informal process and I don't think that there's

18  any emergency that justifies at least not trying to

19  circulate to all parties that appeared and any way objected

20  or even if they get a protective objection or sought a

21  clarification that those folks should be given the

22  opportunity before you lodge the order to review it and

23  comment on it and try to resolve the terms of the order

24  after which if they're satisfied they would sign the order

25  indicating that they approve as to form or have no

Page                                                                127

1  objection to the form of the order.  Either one of those is

2  acceptable.

3          People sometimes ask me, Judge, how do you do

4  that because, you know, you have to lodge an order

5  electronically in Microsoft Word.  The answer is that you

6  can lodge an exhibit to a proposed order and that exhibit

7  should be the scanned .pdf file containing the various

8  lawyers' signatures.

9          If you are not able to obtain the signature of

10 every lawyer who -- with respect to the form of the order,

11 then, Mr. de Leest, I would recommend to you our process

12 for filing a notice of lodgment lodging the order and

13 giving notice to parties of their opportunity to file a

14 formal objection to the form of the order, which they have

15 said that they would do.  And I don't see an urgency here

16 to shorten that time if you are not able to do it

17 consensually.

18         So like I said, there's the informal -- and those

19 of you that, you know, have pending objections, the -- it's

20 only -- you're only being asked to sign the -- you know,

21 sign into the form of the order, not necessarily agree with

22 my ruling, so -- just to underscore that for anybody that's

23 unfamiliar with our process.  Any questions about that?

24         (No response.)

25         All right.  We've been going for a little over

Page                                                                128

1  three hours.  I think it's time for everyone to have a

2  break to get up and stretch and use the restroom if you

3  need to.  When we come back from our recess we will take up

4  the status conference on the adversaries and then hopefully

5  sort of pick up the momentum and clear -- clear off the

6  rest of our calendar.  Let's take ten minutes.  What does

7  my clock say?  My clock says it's 1:14.  We'll reconvene at

8  about 1:24.  The line will stay open.

9           Let me just ask the courtroom deputy in Santa

10 Barbara, would you prefer that we simply stay on the record

11 or can we go off the record for those ten minutes and then

12 restart?

13          THE CLERK:  Yeah, we can go off the record and

14 then pick it up in ten minutes.

15          THE COURT:  Okay.  All right.  Then let's do

16 that.  We'll go off the record but we'll leave everybody,

17 you know, on the line and I'll see you in a few minutes.

18 Thank you.

19          (Off the record at 1:15 p.m.  Back on the record

20 at 1:24 p.m.)

21          THE COURT:  Okay.  We're back on the record.  One

22 just sort of clean-up matter -- oh, I just wanted to

23 mention, Mr. de Leest, that I had tried to summarize kind

24 of things where we were on #1.00, the assumption and

25 rejection related matter at motion and I neglected to

Page                                                                129

1  mention State College.  That's one where sort of have to

2  address in the order.  We'll continue that one, I guess.  I

3  gave you some options concerning dealing with it.  Does

4  that make sense, Mr. de Leest?

5          MR. ISRAEL:  Your Honor, this is Eric Israel.

6  Mr. de Leest dropped off thinking that the matter was over,

7  but I will tell him to continue State College as well if

8  that's your -- what should be in the order as well?

9          THE COURT:  Yeah, yeah.  And then, you know, I

10 sort of suggested a couple of different ways.  I mean, if

11 you -- if you think you can ignore the proofs of claim that

12 were filed and do a *de facto* claims objection, sort of

13 invited you to brief that or just file an objection to the

14 claims or get him to withdraw the claims that you don't

15 agree with, just kind of created a problem there where

16 the -- where it seems -- and I know when there are lots of

17 contracts sometimes it's confusing, but it seems that the

18 cure amount was inconsistent with the proofs of claim

19 collectively and was sort of the *sub rosa* objection.  So

20 I'm open-minded, but I need you to address it.

21         MR. ISRAEL:  We will do so, Your Honor.  Thank

22 you.

23         THE COURT:  Okay.  All right.  Very good.  All

24 right.  Let's see.  I don't know -- I'm assuming everybody

25 is back in terms of the audio conference.  I note that some

Page                                                                    130

1  of the folks that were participating by video are no longer

2  participating, but that's okay.  I'm going to keep going.

3  All right.  Where's my chart?

4          So, Mr. Israel, are you going to handle the

5  status conference on the adversary or is that another one

6  of your colleagues?

7          MR. ISRAEL:  That will be Mr. Zev Shectman.

8          THE COURT:  Okay.  Mr. Shectman, you're up.

9  Mr. Shectman, I sort of have an over-arching question about

10 the litigation that was raised by one of the parties'

11 objection pleading and that had to do with discovery and

12 whether it would be streamlined by uploading documents to

13 a -- you know, a document room and making them available to

14 parties.  What can you say about that?  Is that something

15 that --

16         MR. SHECTMAN:  Thank you, Your Honor.  Thank you,

17 Your Honor.  Zev Shectman of Danning Gill on behalf of the

18 Trustee plaintiff and counter-claimant in this adversary

19 proceeding.

20         The answer to that is we have a lot of lease

21 documents.  We have hundreds of .pdfs and we have actually

22 been in the process and are nearly completing the process

23 of assembling a ten-volume appendix of the leases that I

24 think is what people are referring to.  For purposes of the

25 motion for summary judgment we believe that's the primary

1    source that may be relevant to parties and

2    the plan will be to create a navigable e-filing appendix.

3              The way that I envision it is that there's about

4    ten volumes ranging from under 100 pages to hundreds and

5    hundreds of pages and it's organized with an index so that

6    the hope is that those of us who are e-filers will be able

7    to accept everything with ease and if Your Honor that would

8    be how we would -- how we would handle that.

9              My hope is that we have that --

10             THE COURT:  Let me stop -- let me stop there and

11   make sure I understand what you're saying.  So you're

12   not -- there are key documents that are relevant to this

13   litigation.  You're asking me to determine whether, for

14   instance, a particular instrument is a lease for purposes

15   of Section 365.  If you're not exchanging those with the

16   parties that have appeared in the matter, which I believe

17   you have an obligation to do under Rule 26, you're just

18   going to kind of hold onto them and wait until you file a

19   motion for summary judgment, that's your plan?

20             MR. SHECTMAN:  We provided -- in our initial

21   disclosures we provided what we were going to do with it.

22   We look -- we've been going through a process of assembling

23   these documents.  We didn't want to do it in a half-baked,

24   you know --

25             THE COURT:  Well, I get that.

Page                                                          132

```
 1           MR. SHECTMAN:  -- messy fashion.
 2           THE COURT:  I get that.  Nobody wants messy.
 3  We're all against messy.
 4           Hey, Mr. Jones, are you against messy?
 5           MR. JONES:  (No response)
 6           THE COURT:  I saw you smile.  Sorry to put you on
 7  the spot.  It's okay.
 8           Yeah, it's fine.  I get that.  But it's -- that's
 9  not the same as complying with your obligation under
10  Rule 26.  Whether it's a dispute over a contract, you know,
11  it seems to me that there is no -- there is no question
12  that the contract is one of those things that you have an
13  obligation to provide in the initial disclosure under
14  Rule 26.  Did I understand you to say that you didn't
15  actually provide it?  Ands again, we're only talking about
16  the parties that have appeared.  The parties that have not
17  appeared have not appeared.  You can't have a conversation
18  with them.  But the parties that have appeared, I think you
19  have an obligation to give them the contract or contracts
20  of theirs that are the subject of this dispute.  And I
21  don't think having them wait for this contract to be in a
22  motion for summary judgment to which they have only so many
23  weeks to reply is complying with Rule 26.  I just don't.
24           MR. SHECTMAN:  Well, there's a few points that I
25  can address there.  First of all, we believe that the
```

1  motion for summary judgment addresses a legal issue and

2  that -- and that the factual issues that could arrive with

3  respect to the contract are not germane to the legal issue

4  that we are --

5          THE COURT:  Okay.  I'll stop --

6          MR. SHECTMAN:  -- going to be asking you to

7  resolve.

8          THE COURT:  I'll stop you there.  I've heard

9  that -- I've heard that argument.  I mean, I've seen that

10 argument in the papers.  I'm not yet persuaded that that is

11 true and I think that's an invitation for disaster.  I

12 think that could be reversal error for me to characterize a

13 contract without looking at the contract.

14         All right.  Go ahead.  I'm not in love with that

15 argument.  Keep going.

16         MR. SHECTMAN:  The other thing that I wanted to

17 say is that we are not against giving people the time that

18 they need to address issues that we are raising and, in

19 fact, we -- we have a consensus surrounding giving people

20 the time that's necessary to work out these issues in an

21 appropriate way.  And we can also -- you know, given that

22 there's a more finite number of people who have answered,

23 we can produce -- we can talk to everybody who has answered

24 and is participating and make sure that they have the

25 documents that we have that they need to see.  We can do

Page                                                                    134

1    that in advance --

2              THE COURT:  Thank you.  That's all I'm asking.

3              MR. SHECTMAN:  -- of -- in advance of -- in

4    advance of the filing.

5              THE COURT:  Okay.  Thank you.  That's all I'm

6    asking.

7              MR. SHECTMAN:  Okay.

8              THE COURT:  Okay.  At least at this point.  We're

9    going to go through and hear from everybody that is

10   attending, but --

11             MR. SHECTMAN:  We can focus on getting them what

12   they need.

13             THE COURT:  You know, look.  I understand -- I

14   get it.  You go and explain this and there's a lot of

15   contracts and some of them are written on, you know,

16   parchment or papyrus.  They're old and maybe can't find

17   them all and you're trying to organize them and analyze

18   them.  You know, but you've got to, you know, presumably be

19   scanning them into something so that you can then fulfill

20   your obligations under Rule 26.  So okay.  Well, that makes

21   me feel a little better.

22             Let me just say generally -- and this sort of --

23   tell everybody how we're going to go through these.  First

24   of all, I am dividing the world into those adversaries.

25   Obviously we have the adversaries where people aren't here

1  and I'll deal with that -- I think we'll deal with that at

2  the end.  But I think the less complicated ones in a sense

3  are the ones where there are no counterclaims or cross-

4  claims.  And so I'm going to go through those parties first

5  and invite their counsel to be heard.

6          But first what I want to tell you is where --

7  where I think I'm going so that counsel can respond to it.

8  I'm inclined to set July 17, 2020 -- July 17 -- 7/17/2020

9  as (1) the discovery cutoff, (2) the deadline to amend the

10 pleadings with the understanding that discovery might be

11 likely -- might be to carry open in some form -- in some

12 posture or another if it's determined that those gas leases

13 are subject to Section 365 and cure amounts become a

14 relevant issue.  Right now they aren't.

15         And right now, Mr. Shectman has said that the

16 parties that have appeared and answered are going to as

17 soon as practicable get a copy of the -- those are their

18 agreements that are the subject of the lawsuit.  So those

19 are probably, you know, the bulk of the discovery given

20 that these are declaratory relief actions.  Again, it's set

21 for the counterclaims and the cross-claims.

22         I would set August 11, 2020 as the deadline for

23 the filing of case dispositive motions and set September 29

24 as the deadline for those motions to be heard.  All right.

25 Other than that, I don't have any plans to set any other

1  dates.  Oh, let me just say as a general matter before we

2  get -- we drill down that I would continue the status

3  conference to May 19th at 10:00 a.m., which is the date set

4  by the clerk's office for a status conference in those

5  matters that have counterclaims or cross-claims.  I'm not

6  really sure why the -- why the clerk's office did that, but

7  they did and I would require an updated joint status report

8  to be filed by May 4th but only as to those parties who did

9  not participate in this amended joint status report.

10        So if you've got some folks that emerge that

11  suddenly show up and want to participate, you know, want to

12  supplement your joint status report, other than that I

13  don't need any more joint status reports.  Okay.  That's --

14  that's kind of my -- that's my proposal for setting

15  deadlines in dealing with these adversaries.  And by the

16  way, I'm referring to #7.00 on today's calendar, #7.00, the

17  stat conference in the declaratory relief action.  We'll

18  talk about the other adversary separately.

19        Before I ask the defendants, Mr. Shectman, have

20  any issues with my tentative schedule?

21        MR. SHECTMAN:  No issues.  That all sounds good.

22  I might have some other housekeeping matters, but in

23  general this is fine.

24        THE COURT:  Okay.  Any of your other general

25  housekeeping matters, things that make sense to mention now

1  before the defendants could go one by one through the

2  defendants to respond or does it relate to other parties?

3          MR. SHECTMAN:  I guess one of these -- one of

4  this I guess substantive issues would be that as to

5  discovery one question would be whether that needs to be

6  considered in light of the timing of the motion for summary

7  judgment and whether -- I think if the Court sets a cutoff

8  date whether that's going to make sense in light of the

9  timing of the motion for summary judgment in light of

10 timing and the mediation and how we treat the complaint

11 vis-à-vis the -- or, you know, versus counterclaim.  That's

12 one issue.

13         THE COURT:  Okay.  Mr. Shectman, did you switch

14 to a speaker phone?

15         MR. SHECTMAN:  Oh, sorry about that.

16         THE COURT:  I'm not hearing -- I'm not -- no, no,

17 it's okay.  I -- if it -- if it works well, I don't care,

18 but I couldn't hear you as well.

19         MR. SHECTMAN:  Oh, I'm sorry.  I'll -- I can do

20 this.

21         THE COURT:  Oh, that's much better.  Thank you.

22 I'm sure everybody appreciates that.

23         MR. SHECTMAN:  Yes.

24         THE COURT:  Okay.  So there's an issue of

25 discovery and what you're saying is, hey, we're going to

Page                                                                      138

1   file a summary judgment motion, you know, in let's say May.

2   What are you asking?  Are you asking that I shorten the

3   discovery cutoff or extend the discovery cutoff?

4            MR. SHECTMAN:  I'm asking -- I'm suggesting that

5   we talk about extending it much further beyond July.

6            THE COURT:  Why is that?

7            MR. SHECTMAN:  Well, for two reasons that I can

8   think of off the top of my head and one is that there may

9   be settlement or mediation; two is that the summary

10  judgment hearing if it's filed May -- if the motion is

11  filed May 4th, the first day that it could be heard using

12  the Court's ordinary procedures would be 42 days later

13  which I believe, if my math is correct, is June 15th, which

14  is one of the stacking hearings.  So --

15           THE COURT:  Right.

16           MR. SHECTMAN:  -- do we want to be focused on

17  discovery during that time period or do you want to be

18  focused on the motion for summary judgment on the Trustee's

19  one claim for relief?  And I mean, I would think the

20  counter-claimants to the extent they have issues would want

21  to have their issues addressed in more time.

22           THE COURT:  Why would the -- okay.  I'm not sure

23  why the argument would be focused -- why the argument would

24  be affected by the discovery cutoff if you think that

25  argument is going to take place in June or July in the

1  sense that any party that has an issue with -- you know,

2  their argument is under Rule 56(e) if they're arguing that

3  their -- that the Court should not rule on the motion

4  because more discovery has to take place.  That -- that

5  sort of question is governed by Rule 56(e).  It really

6  doesn't have anything to do with the cutoff in Augu -- in

7  July.  I mean, if I -- someone makes a 56(e) argument and I

8  sustain a 56(e) argument there's clearly cause for me to

9  extend the discovery cutoff.

10        Now, you know, but it -- you -- you're -- what

11 you're concerned about is then that if it's coming up in

12 July that people will be concerned about completing

13 discovery that they possibly could put off, is that your

14 argument?

15        MR. SHECTMAN:  So I think the main -- the main

16 argument is probably that the MSJ that we plan to file is

17 about one claim for relief and there are ancillary issues

18 that we don't think are dispositive as to our claim for

19 relief that may or may not still be relevant after our

20 MSJ -- our motion for summary judgment is resolved and

21 though -- you know, those issues if they need to be

22 addressed should be addressed later in discovery if

23 necessary at all.  We don't really think that discovery is

24 necessary to -- we don't -- we do not think that discovery

25 is necessary to resolve our MSJ on the Trustee's complaint.

1          The other thing I just want to point out is if

2     there's actual discovery that needs to happen in the

3     different climate where we're doing these type of hearings

4     telephonically and such, the same -- you know, there's

5     going to be issues with discovery broadly in every case and

6     particularly this case large in the bankruptcy case and in

7     every proceeding that discovery is necessary.

8          So we really need to be thinking about, you know,

9     giving a little bit more time for discovery than we

10    ordinarily we would, you know, handling depositions, how

11    they're going to be done, they can be done I think through

12    video but we're going to need to figure all that stuff out.

13         THE COURT:  Okay.  So what was your -- what --

14    remind me, then, what was your ask?

15         MR. SHECTMAN:  To make -- to put it further out

16    without prejudice to extending it out further beyond that.

17    Maybe around the September period would be appropriate.

18         THE COURT:  All right.  So as I go through with

19    each of the defendants let me -- I'm going to want to hear

20    from you.  You know what?  Before we do that, I want to

21    take up #5.00.  #5.00 is UBS's motion to intervene and this

22    kind of affects who the universe of parties is.  There was

23    no objection to UBS's motion to intervene.  I just want to

24    offer anybody that's not the opportunity to speak up if I

25    have that wrong.  Is there anyone that's attending the

Page                                                                141

1  hearing that objects to UBS's motion to intervene?  And I

2  know that the Trustee was not.  I note the written non-

3  opposition.  Is there anyone else that wants to be heard?

4           (No response.)

5           Okay.  I -- that motion is granted.  Okay.

6           MR. JONES:  Your Honor, thank you.  Evan Jones on

7  behalf of UBS.  We will submit an appropriate order.

8           THE COURT:  Okay.  Very good.  All right.  So let

9  me start with -- and again, I'm kind of sorted out -- I'm

10 going to deal with the folks who don't have counterclaims

11 or cross-claims first.

12          Mr. Beall representing GRL, LLC.  Your client --

13          MR. BEALL:  Yes.

14          THE COURT:  Well, actually, I don't think you

15 have an issue as to timing because your client --

16          MR. BEALL:  No.

17          THE COURT:  -- doesn't oppose the relief.

18 Generally just wants to be in on the discussion regarding

19 the judgment.  So you have no issue with the calendar?

20          MR. BEALL:  That's correct, Your Honor.  William

21 Beall, Bell & Burkhardt.  Whatever the Court decides and

22 the other parties decide is fine with us.

23          THE COURT:  Okay.  All right.  Very good.

24          Mr. Wagner representing Candace Lane Evenson and

25 the Morganti Ranch.  Is Mr. Wagner on with us?

Page                                                                    142

1              (No response.)

2              MR. MARTINEZ:  Your Honor, this is Vincent

3    Martinez --

4              THE COURT:  (Indiscernible) yeah.  Okay.

5              MR. MARTINEZ:  Yeah.  Um-hum.

6              THE COURT:  Someone put your partner's name in my

7    chart.

8              MR. MARTINEZ:  Yes.

9              THE COURT:  No problem.  So I guess that was --

10   unless you wanted to distinguish between the -- or also ask

11   about the -- well, the (indiscernible) trust.  Any

12   objection to a September 30 discovery cutoff and the other

13   dates that I mentioned?

14             MR. MARTINEZ:  None, Your Honor.  And also we'll

15   be speaking for Escolle Tenants In Common.

16             THE COURT:  I'm sorry, for which?

17             MR. MARTINEZ:  Escolle, E-S-C-O-L-L-E.

18             THE COURT:  Yeah.  Escolle, of course.  Hold on.

19   Why is that not on the chart?  Does Escolle have a

20   counterclaim?

21             MR. MARTINEZ:  Not right now, no, Your Honor.

22   No.

23             THE COURT:  Okay.  Okay.  All right.  I'm

24   actually going to revise my suggestion.  Let me just tell

25   you the reason why you're not on the chart, Mr. Martinez,

1  is we did not see an answer filed by Escolle on the docket.

2  So you may want to (indiscernible) that.

3          MR. MARTINEZ:  Yes, Your Honor.

4          THE COURT:  And the one (indiscernible) --

5          MR. MARTINEZ:  And --

6          THE COURT:  Yeah, go ahead.

7          MR. MARTINEZ:  I was going to say that we are --

8  Escolle didn't appear on the motion -- on the adversarial

9  appeal.  That's one of the main parts of the exhibits.

10 That's why that occurred.

11         THE COURT:  Okay.  So you're not representing

12 Escolle on the adversary?

13         MR. MARTINEZ:  Because it's not in the

14 (inaudible).

15         THE COURT:  Because what?  I'm sorry.  I didn't

16 hear you.

17         MR. MARTINEZ:  It's not a main party.

18         THE COURT:  It's not a main party.  All right.

19 Very good.  If we're good with the discovery cutoff, what I

20 think we ought to do -- well, let me go back to

21 Mr. Shectman.  If we're going to extend the discovery

22 cutoff -- and let's say I made it October 16th and we

23 would -- wouldn't we want to extend the deadline for case

24 dispositive motion to be filed and heard?

25         MR. SHECTMAN:  That would -- I think that would

Page                                                          144

1   be a reasonable adjustment.

2           THE COURT:  All right.  So I guess my proposal

3   that I'm asking everybody to respond to is 10/16 discovery

4   cutoff and deadline to amend, add parties or sick leave if

5   leave is required, October 27 to file case dispositive

6   motion and December 15 would be the deadline to hear

7   dispositive motions.

8           But I really do think that people -- people's

9   positions with respect to -- some people's position with

10  respect to the prior motion were premised on the idea that

11  you're going to file your motion in May and we're going to

12  have a hearing in September.

13          I guess I'll go around the horn and see what

14  people think.  Are you wanting to change that timetable

15  really?  I don't want to put words into your mouth or

16  change a calendar in a way that you're not even asking me

17  to change.

18          MR. SHECTMAN:  So my thought about the MSJ is

19  that we're going to file it May 4 but I didn't think we

20  would have the hearing as late as September.  Thought we

21  would have it sooner.

22          THE COURT:  Okay.  All right.  Well, how about

23  this.  I started out by saying -- I started out by -- first

24  my -- where are my notes?  Well, I started out by saying we

25  have the -- August 11th would be the deadline to file case

Page                                                                      145

1  dispositive motions and 929 for such motions to be heard.

2          I'm going to leave -- I'm going to carve out --

3  how do I want to say this?  I think that should be the

4  schedule with respect to the Trustee's contemplated summary

5  judgment motion.  It could be if the case goes on beyond

6  that there might be case dispositive motions on other

7  claims and so that's why I'm trying to provide more time.

8          MR. SHECTMAN:  This is Zev Shectman again.

9          THE COURT:  I think we should go back to what I

10 originally said, which was August 11th and September 29th,

11 on the claim for declaratory relief and any case

12 dispositive motions on other claims would have a different

13 schedule and that would be -- that'd have to be filed by

14 October 27th and heard by December 15th.  Does that make

15 sense?

16         MR. SHECTMAN:  Let me just recap what the Court

17 is saying.  The Court is saying that with respect to the

18 Trustee is one point for relief, August 11th would be the

19 date to -- the deadline to file any case dispositive

20 motions; September 29th would be the hearing date.  Is that

21 correct so far?

22         THE COURT:  Well, on this -- on this issue that

23 you've described, it's partial summary judgment.  I know

24 what the right words are.  But you said that -- you know --

25         MR. SHECTMAN:  And so --



Page                                                                    146

1          THE COURT:  If that doesn't go your way there

2     might be discovery issues.

3          MR. SHECTMAN:  And --

4          THE COURT:  And other -- other elements of the

5     claim that need to be adjudicated, right?

6          MR. SHECTMAN:  Well, so I was thinking that the

7     hearing on the motion for summary judgment would be a

8     little bit earlier, perhaps -- perhaps.  But if that's what

9     the Court wants to do, then that's what we'll do.  We could

10    be ready to go earlier than that and -- because we're

11    planning to file the motion for summary judgment.  At this

12    point we're going to file it May 4.

13         THE COURT:  Okay.  All right.  I'm going to keep

14    it simple.  We'll set the -- we'll set the discovery cutoff

15    for now at September 30, again subject to hearing

16    objection. Discovery cutoff will be September 30.

17    September -- I'm sorry, August 11th will be the deadline to

18    file a case dispositive motion and September 29th will be

19    the deadline for such motions to be heard.

20         I expect your motion for summary judgment will be

21    heard earlier than that, but we'll just leave those dates.

22    But I will give you the extra room on the discovery

23    deadline.  All right.

24         MR. SHECTMAN:  Okay.  And we're not doing

25    additional --

Page                                                                              147

1          THE COURT:  Part of this thing --

2          MR. SHECTMAN:  Excuse me.

3          THE COURT:  We're not having two sets of dates.

4   One set of dates.

5          MR. SHECTMAN:  Got it.  Understood.

6          THE COURT:  We can all -- if there's some -- and

7   maybe I'm just worrying too much about hypotheticals.  If

8   there is some reason to alter the schedule under Rule 16,

9   we'll deal with it then.  You know, later on after the

10  summary judgment motion.  Sorry I'm making things more

11  complicated.

12         All right.  Mr. Martinez, any -- having clarified

13  what the Court's tentative ruling is, any issues with that?

14         MR. MARTINEZ:  I have no problem with that, Your

15  Honor.  It's --

16         THE COURT:  All right.

17         MR. MARTINEZ:  -- (indiscernible).

18         THE COURT:  Okay.  Ms. Goetz on behalf of

19  Chamberlin.

20         MS. GOETZ:  I don't have an issue with that, Your

21  Honor.

22         THE COURT:  Okay.  All right.  Mr. Holman.

23         MR. HOLMAN:  Yes.

24         THE COURT:  I know you raised the issue of the

25  data room but I think, you know, just to simplify matters

Page                                                                 148

1   it sounds like because I do think that, you know, the

2   relevant agreements between the debtor or as towards the

3   debtor as successor, whatever, on the debtor's side and

4   your client's side, those to me are basic documents that

5   under Rule 26 need to be exchanged.

6          And so assuming that the Trustee provides those

7   to you, pursuant to Rule 26 do you still think you need an

8   online discovery repository and what do you -- what's your

9   view of the proposed calendar deadline?

10         MR. HOLMAN:  Yes, Your Honor.  Thank you.  This

11  is Brian Holman.  The data room came up because in our

12  meet-and-confer it was suggested by counsel to the Trustee

13  that's what they would do and establish some kind of data

14  room so that he could have access to all the documents that

15  are relevant.  Those documents would be provided pursuant

16  to Rule 26 that otherwise, well, then becomes unnecessary.

17  It's a bit premature to (indiscernible) --

18         THE COURT:  That doesn't -- that's doesn't

19  preclude them from producing them by uploading them to a

20  website so you can download them, but I -- you know, I'm

21  most concerned about the parties that have appeared and I

22  think they need to get those to you so that's what's going

23  to happen.  I'm sorry.  Go ahead.  I interrupted you.

24         MR. HOLMAN:  Well, I was going to say that later

25  today will be concerning our motion to sever to the extent

1  that there's not a severance and all of these contracts are

2  going to be decided.  And when proceeding then we would

3  also require access to the contracts involving everyone

4  else.

5             THE COURT:  Okay.  All right.  We'll come back to

6  that, but I -- I would note your issue.  Thank you.

7             All right.  Ms. Grant, I believe that the Janet

8  Ganong Estate Living Trust is named as a defendant and does

9  not have any counterclaims or cross-claims, is that right?

10            MS. GRANT:  That's correct.

11            THE COURT:  Okay.  What's the Trustee's view of

12  the litigation calendar that -- as described?

13            MS. GRANT:  We have no objection.

14            THE COURT:  Okay.  Okay.  Okay.  Is Allen Condren

15  (phonetic) on?  I don't believe that someone has made an

16  appearance on behalf of Stephen Fisher as trustee for the

17  Nancy Ashton Revocable Trust, Elizabeth Esser (phonetic)

18  and the Roman Catholic Archbishop of Los Angeles.  Somebody

19  on for those parties?

20            (No response.)

21            Mr. Shectman, is there any reason that you know

22  of why they're not here?

23            MR. SHECTMAN:  I'm not aware of any reason why

24  they're not here.

25            THE COURT:  Okay.  It's not like they threw in

Page                                                                    150

1    the towel and sent it to release.

2         MR. SHECTMAN:  Not to my specific knowledge, no.

3         THE COURT:  Okay.  You know, I neglected to ask

4    you about mediation and what the Trustee's view is.  I

5    think that in the joint status report the Trustee, you

6    know, checked the box expressing openness to mediation.

7    And many of the folks on the phone in their joint -- their

8    part of the joint status report also did.  Is that

9    something that the Trustee is asking me to do anything

10   about today or is that something you're just sort of going

11   to manage just before with the dual tracks with your MSJ?

12        MR. SHECTMAN:  Right.  I think -- I'm not

13   prepared to propose something specific at this moment.  I

14   can say that there's an interest and some of the parties

15   are more interested than others.  But I think across the

16   board there's a consensus that this -- that the issues in

17   this case, both this adversary proceeding and the overall

18   case, would be -- you know, should be -- should be resolved

19   through some kind of consensual resolution.

20        THE COURT:  Okay.

21        MR. SHECTMAN:  But I think we'd like to --

22        THE COURT:  All right.

23        MR. SHECTMAN:  -- defer it later on that.

24        THE COURT:  Yeah, that's fine.  I just wanted to

25   clarify.  You're real -- you're not asking me to do

1   anything today about mediation and I guess I'd say another

2   part of my tentative is I don't think today -- I don't

3   think it's a good idea to order anybody to go to mediation

4   at this stage of the process.  I think there needs to be an

5   exchange of the basic documents.  Maybe after people have

6   seen the summary judgment motion and the opposition to it

7   might be a more productive time to deal with that, but I --

8   and I'm hoping to -- that other people have a different

9   point of view, but I'm not inclined to order anybody to do

10  that today.

11          MR. SHECTMAN:  I would just add that --

12          THE COURT:  All right.  Yeah.

13          MR. SHECTMAN:  Your Honor, I would just add that,

14  you know, the Trustee is -- is open to mediation.  He

15  thinks that mediation could be successful and we wouldn't

16  have any -- any objection to an order if that's why the

17  Court did have it.

18          THE COURT:  Okay.  All right.  All right.  Well,

19  again, I'm not -- I'm not inclined to -- I'm not inclined

20  to do that today.  I think more -- some more things have to

21  happen to make that though as well (phonetic) exercised.

22          Okay.  Then we have Mr. Langberg or his partner

23  on be -- Mr. Roth-Moore on behalf of Lance Brown as

24  trustee.  I'm going to refer to these folks as shorthand.

25  Lance Brown as trustee; Jerome Verboort Dwight, Lela

Page                                                                152

1    Minturn Dwight, Jonathan Dwight, John Feliciano as trustee,

2    Louise Feliciano as trustee, Adam Firestone, Katherine

3    Hanberg, William Hanberg and Alice Sedgwick, deceased,

4    Estate of Alice Sedgwick through its personal

5    representative, Trustee Susanne Sedgwick, Alice Sedgwick

6    Wohl.  I think those are all your clients and you're

7    welcome to distinguish between them if they have a

8    different position, but how they would be proposed

9    litigation calendar?

10          MR. ROTH-MOORE:  We have no objection.  This

11   Andrew Roth-Moore for that group.  We have no objection.

12          THE COURT:  Okay.  Very good.  Okay.  And then

13   Jane Adams and John Adams as trustee.  That's

14   Mr. Dellefave.

15          MR. DELLEFAVE:  Yes, Your Honor.  We don't have

16   any specific objection to the calendaring post.  I would

17   just add that we are also very much in favor of mediation.

18          THE COURT:  Okay.  Well, I'm sure Mr. Shectman is

19   going to write that down and seek you out and try to do

20   that sooner rather than later when the two sides think it's

21   appropriate.

22          All right.  Corian Cross Holdings represented by

23   Mr. Fisher.

24          MR. FISHER:  Yes, Your Honor.  Donald Fisher.  I

25   am.  And your schedule sounded very reasonable to me.  No

Page                                                                    153

1    objection.

2             THE COURT:  Thank you, sir.

3             All right.  All right.  Let's see.  Mr. Renwick,

4    you represent folks that are in, if I'm not mistaken, two

5    different categories.

6             MR. RENWICK:  I --

7             THE COURT:  You've got the Goodwin "A" Mineral

8    holders who do have cross-claims.

9             MR. RENWICK:  Yes, and --

10            THE COURT:  (Indiscernible) --

11            MR. RENWICK:  And --

12            THE COURT:  (Inaudible) --

13            MR. RENWICK:  As does Waldo (indiscernible).  I

14   represent the four groups, two of them in redo (phonetic),

15   two of them in the Santa Maria area.  Those in the Santa

16   Maria area have cross-claims.  Those in redo do not.  Well,

17   we filed -- that -- we have a counterclaim which is just

18   the reverse.  We're asking for a -- just because I

19   sometimes do this -- we're asking -- we're not

20   (indiscernible) the Trustee's motion for summary judgment

21   but we're asking for a summary judgment on the same issue.

22            THE COURT:  Okay.

23            MR. RENWICK:  And so -- but -- and we had done

24   that in -- for the two parties, the two groups of parties

25   that we have in redo.  We have not done that and -- we have

Page                                                                                                        154

1   not done that and we -- well, we've gone further in the --

2   in the two cases that -- or the two parties that are

3   represented in the Santa Maria area.  There we have alleged

4   that our leases have terminated for various reasons.  One,

5   because we were underway and stopped over by the -- we had

6   given notice of termination for breach of contract and we

7   had only -- we were stopped by the automatic stay and then

8   we have also alleged that this was terminated for failure

9   to produce in paying quantities prior to the filing of the

10  petition in bankruptcy.  That's in the Santa Maria area.

11           THE COURT:  Okay.

12           MR. RENWICK:  So we're in both categories.

13           THE COURT:  Okay.

14           MR. RENWICK:  We'll talk now or later, whatever

15  (indiscernible).

16           THE COURT:  And with respect -- so your -- your

17  clients either have counterclaims or cross-claims, right?

18           MR. RENWICK:  Yes.  Right.

19           THE COURT:  Okay.  That's a fair statement.  All

20  right.  So I -- I would not have gotten yet a joint status

21  report with respect to your clients, right?

22           MR. RENWICK:  No, the only joint status report

23  that you have is the one that was filed for the Goodwin

24  "A" -- would you -- Goodwin "A" Group.  That was -- that

25  was filed.

Page                                                                                    155

1          THE COURT:  Oh, okay.  That one is.  All right.

2    So is there any reason -- I'll ask you first and then I'll

3    go back to Mr. Israel.  Is there any reason to -- with

4    respect to the Goodwin "A" defendants adopt a different set

5    of dates and deadlines?

6          MR. RENWICK:  I don't think so but, you know, I

7    have to confess I must not be as smart as all these other

8    people because I have a scribbled piece of paper here with

9    a lot of cross-offs.  And would you please tell me again

10   what the dis -- well, I know that the MSJ --

11         THE COURT:  Yes, right.

12         MR. RENWICK:  -- will be filed on May 4th.  What

13   is the discovery cutoff?  Give me the time and date that is

14   settled on because --

15         THE COURT:  Fair enough.  Fair enough.  And

16   that's the Judge's fault entirely because I was all over

17   the place since I was thinking out loud, so my apologies.

18   The discovery cutoff would be September 30th.

19         MR. RENWICK:  Okay.

20         THE COURT:  Deadline to file case dispositive

21   motions would be August 11th and the deadline for any such

22   motions to be heard would be September 29th.  Now, I'm not

23   setting it as --

24         MR. RENWICK:  Okay.

25         THE COURT:  -- deadline, but the Trustee has

Page                                                                              156

1  indicated that he plans to file his motion because he has

2  to under his financing agreement.  He's got to get that on

3  file in May --

4          MR. RENWICK:  Okay.

5          THE COURT:  -- and the earliest that it could be

6  heard would be 42 days after that.  Because you're

7  contemplating a cross-motion, you know, I don't think our

8  Local Rules really talk about cross-motion.  I'd really

9  like it if the two sides were -- can confer on that.  Maybe

10 you have and so we have kind of an organized process.

11         Would it be your -- would it be your notion,

12 Mr. Renwick, that you would file your summary judgment

13 motion at the same time that the Trustee filed his?

14         MR. RENWICK:  No.  I would probably do general

15 cross-motions for summary judgment.  We could -- I would

16 only seek a cross-motion -- I have a cross-motion for

17 summary judgment only on the 365 issue.  I wouldn't be

18 trying to bring a summary judgment on the termination

19 issues.

20         THE COURT:  No, I understand.  So why wouldn't

21 you file your --

22         MR. RENWICK:  So I would --

23         THE COURT:  -- cross-motion?  Why wouldn't you

24 file your cross-motion --

25         MR. RENWICK:  Well, because --



Page                                                              157

1              THE COURT:  -- on that issue the same time he

2      files his?

3              MR. RENWICK:  Because I'd like to see what they

4      say first.  I mean, typically a cross-motion comes in

5      later.

6              THE COURT:  Yeah.

7              MR. RENWICK:  You tell -- you --

8              THE COURT:  I don't --

9              MR. RENWICK:  -- won't (indiscernible) -- I will

10     do it at certain times if you wanted a particular time.

11             THE COURT:  Yeah.  I don't think our Local Rules

12     address that.

13             Mr. Israel, do you want to say anything about

14     this issue of cross-motion and how the timing should work?

15     Do you have any problem with what Mr. Renwick proposes is

16     if he decides to file his own motion for summary judgment?

17     You'd -- certainly under the litigation counsel we're

18     discussing he'd be able to do that at any time of his

19     choosing.  It might create a kerfuffle if his can't be

20     heard at the same time yours is scheduled to be heard.  So

21     that's why I sort of talk about coordinating.  Have you

22     given any thought for this?

23             MR. ISRAEL:  Well, Your Honor, this is Eric

24     Israel.  That (indiscernible) responding, but I -- I --

25             THE COURT:  Okay.

Page                                                          158

1           MR. ISRAEL:  -- would say that we should file our

2    motion.  We currently have a deadline under the -- it's one

3    of the milestones and, you know, subject to, you know,

4    scheduling them 42 days' notice or one of your stacking

5    dates, we will -- you know, the present intention is to try

6    to use the date, which I think is June 15th if we're able

7    to get the motion on file and count back 42 days.  But if

8    Mr. Renwick files a cross-motion -- I'm not sure he needs

9    one.  It's just to deny -- you know, to rule the other way

10   on the declaratory relief action but --

11          MR. RENWICK:  Maybe I don't.

12          MR. ISRAEL:  Yeah, but that's what he does he

13   can -- he can file it and we'll arrange, you know, the

14   schedule and some way that makes sense, you know, for

15   everybody.

16          THE COURT:  Okay.

17          MR. JONES:  Your Honor, this is Evan Jones on

18   behalf of UBS.  If I might be heard on this --

19          THE COURT:  Yes.

20          MR. JONES:  -- since we've now been granted

21   intervention.  We didn't participate in these status

22   discussions as we weren't yet (indiscernible) parties but

23   not surprisingly it is important to UBS that this be

24   resolved as soon as possible.  And Mr. de Leest and

25   Mr. Shectman -- I'm sorry, Mr. Israel and Mr. Shectman have

Page                                                                                      159

1   mentioned the milestone date in the credit agreement.

2   Understanding that those milestones have had to be changed

3   before we hoped not to have to change that one and so we

4   would like to see the Trustee file his motion on May 4th.

5          It would seem to me that if Mr. Renwick wants to

6   file his own cross-motion knowing that, he should plan to

7   do it on May 4th also or they -- they may well be on a

8   different schedule and we would not want to see the

9   Trustee's motion delayed for determination because a cross-

10  motion has had filled.  So, you know, Mr. Renwick can file

11  his motion whenever he chooses to, but we would certainly

12  suggest to the Court if that happens that it not delay

13  ruling on the Trustee's motion because we do want to get

14  this resolved.

15         THE COURT:  Right.  So Mr. Renwick, here's --

16  Mr. Renwick, here's the dilemma.  Okay.  We know that the

17  Trustee's motion on this -- they view it as a pure legal

18  issue but whatever everyone characterizes it, okay, on the

19  365 issue, if it's -- you know, typically our Local Rules

20  require that a motion for summary judgment be heard not

21  less than 42 days after its filed.  All right.  Now, I

22  understand your desire to see their motion.  Of course,

23  you're going to get an opportunity to oppose it, but you

24  want to file your own summary judgment motion, okay, and

25  you're asking or suggesting that you might do that after

Page                                                          160

1   they file theirs.

2           What Mr. Jones is raising is the problem that

3   then arises which is we had a summary judgment motion.

4   It's calendared.  We have your cross-motion of which then

5   under our Local Rules, absent a further order of the Court,

6   can't be heard on less than 42 days' notice.  He's trying

7   to deal with the likelihood that you're going to come to

8   this court and ask me not to rule on the Trustee's motion

9   at the date that's set for that hearing and instead,

10  continue it to the date that you set your cross-motion.

11  This always happens with these cross-motion situations

12  and --

13          MR. RENWICK:  Well --

14          THE COURT:  -- the Trustee is functioning under a

15  set of milestones that they agreed to as a condition of for

16  getting the relief and seeings as how, you know, it's

17  April 17th and we're having this discussion now, I would

18  like to figure out how we're going to resolve this and not

19  be in a position where you're asking me to put off a

20  hearing on the Trustee's half of the equation because

21  yours -- because you chose to file yours later than the

22  Trustee filed his.

23          MR. RENWICK:  I will coordinate with Mr. Israel

24  and I guarantee you it will be done in such a way that

25  there will be no need to do what you and Mr. Jones are

Page                                                                    161

1   concerned about.

2               THE COURT:  Okay.  Sounds good.  So you're okay

3   with the -- with -- at least with the -- with the

4   litigation deadlines that we've gone through?

5               MR. RENWICK:  Yes, I am.

6               THE COURT:  Okay.  And on behalf --

7               MR. RENWICK:  Let --

8               THE COURT:  On behalf of --

9               MR. RENWICK:  -- (indiscernible).

10              THE COURT:  -- (indiscernible).

11              MR. RENWICK:  Yes.

12              THE COURT:  Yes.

13              MR. RENWICK:  It's fine for all my clients.

14  However, I -- at some point in time, and maybe that's the

15  present time, I'd like to say a little something about

16  settlement because settlement -- as far as I'm concerned

17  settlement is already under -- settlement discussions are

18  already underway to -- I've had several conversations with

19  Mr. Israel and two -- two days ago, I think, I submitted to

20  him a fairly -- well, it's a generalized, more detailed

21  outline than before, but what I think a global settlement

22  would look like in this case.

23              There's not much money rolling around in anyone's

24  pocket in this case and we ought to be spending our time I

25  think trying to get it resolved, rather than having a lot

Page                                                                162

1    of fun fighting with one another.

2              THE COURT:  Right.  Now, I certainly understand

3    that perspective.  I mean, you know, just without prejudice

4    to people's rights I understand there are some folks here

5    that are owed a lot of money, but I certainly -- and I

6    understand that the -- they're entitled to press their

7    rights.  I understand why the Trustee would be pushing to

8    try to get the relief that he is asking for so that the

9    thing can be sold and perhaps these leases might go back

10   someday back into production and put money in people's

11   pockets.

12             MR. RENWICK:  Well, that's what my clients --

13             THE COURT:  And (indiscernible) --

14             MR. RENWICK:  -- want.  That's what my clients

15   want --

16             THE COURT:  Yeah.

17             MR. RENWICK:  -- and that's exactly what my -- is

18   what the settlement that we have proposed or the outline of

19   the settlement that we have proposed would accomplish we

20   think.

21             THE COURT:  Okay.  Well, I'm glad to hear it.

22   I'm not going to ask anybody to reveal the -- their

23   confidential settlement negotiations, but I'm glad to hear

24   that you're working on it and hopefully some of this

25   litigation stuff that we're planning will become

Page                                                                   163

1   unnecessary, so --

2           MR. RENWICK:  That's what we're hoping.

3           THE COURT:  -- thank you for sharing that.

4           MR. RENWICK:  That's what we're hope -- yeah,

5   that's what we're hoping for.

6           THE COURT:  All right.  Very good.  Okay.

7           Ms. Rhim and your clients, anything you want to

8   say about the schedule?

9           MS. RHIM:  No, Your Honor.  I think it's -- it

10  sounds fine.  Thank you.

11          THE COURT:  Okay.  Is there any defendant

12  who's -- has a representative here today who I've not

13  called on to respond to the proposed litigation schedule?

14          (No response.)

15          All right.  Then, Mr. Shectman, I think we have

16  vehement (phonetic) -- it's not vehement in agreement;

17  vehement on objection to the dates that I reiterated a

18  moment ago and I'd ask you to lodge the scheduling order.

19          MR. SHECTMAN:  Will do, Your Honor.  There's a

20  couple other housekeeping items, one or two.

21          THE COURT:  Okay.  Well, we're still in -- under

22  the umbrella of status conference.  Go right ahead.

23          MR. SHECTMAN:  Yes.  Thank you very much.  I

24  wanted to mention the fact that there's -- we're also

25  working on defaults and we've been filing requests for

Page                                                                      164

1    enter  of default in this action --

2             THE COURT:  Right.

3             MR. SHECTMAN:  -- or I'm sorry, file default

4    judgment motion.  And I mean, probably it could be heard at

5    the same time as the MSJ, but I also wanted to note that as

6    the Court may already be aware from reviewing the status

7    report is that we have some issues with service of some of

8    the defendants.

9             THE COURT:  Yes.  I believe I read that 99 of

10   them came back in the mail.

11            MR. SHECTMAN:  Yes, Your Honor.  And we also were

12   told that some of the people we named as defendants have

13   passed away.

14            THE COURT:  Yeah.

15            MR. SHECTMAN:  And, you know, issues of that

16   nature which are important and we want to make sure we

17   address them to the best that we can.  And I -- I think the

18   way to deal with it is something that was contemplated when

19   we filed the complaint, which is that there -- there could

20   be Doe defendants or amendments to address the fact that we

21   have -- that these situations which for on an ongoing basis

22   we've heard from people that -- that, you know, one way or

23   another something needs to be corrected for naming

24   purposes, whether it's meeting with the estate

25   representative or, you know, the address that we have is,

1   you know, 20 years old or whatever it is.

2           So we just wanted to make sure I brought up this

3   issue in terms of how we're going to address that kind of

4   procedural matter, whether that's an amended motion, other

5   amended complaint or rather something more like the Doe --

6   naming the Doe defendant process that is in -- you know,

7   more common in state court.

8           THE COURT:  Okay.  Well, I don't -- I don't want

9   to inadvertently make any sort of advisory opinion but

10  just, you know, for the sake of discussion reacting to what

11  you said.  We are governed by the Federal Rules of Civil

12  Procedure and so I think the answers to most questions are

13  there and in the federal case law that construes them.

14          I will be the first to admit that I am not an

15  expert on state procedure.  So when you refer to have those

16  that are named in the state court, I'm not about to endorse

17  that even -- even unofficially.

18          My, you know, sort of -- you know, sort of over-

19  arching view -- and this is, of course, to be subject to

20  being educated by briefs and case authority -- is that the

21  fundamental issue is one of -- you know, when you're

22  talking about service is due process, that there is federal

23  law that allows you to deal with the inability in some

24  degree to locate defendants when you seek relief against

25  them.

1            I think generally you have to know who the

2   defendants are or at least who they take from and sort of

3   naming a Doe -- saying Doe in a complaint might preserve

4   your ability later to amend the complaint when you get

5   better information.  I'm not sure that naming someone as a

6   Doe -- well, not naming them is really what you're doing.

7   You know, Doe Number 1, you know, that gives notice to

8   nobody as to who you have in mind.

9            So I would just as a general matter say focus on,

10  you know, the Federal Rules, focus on the case law that

11  deals with service of process of parties that are difficult

12  to locate and, you know, the appropriate (indiscernible),

13  entertain whatever motion you had to make.  But I'm very

14  unlikely to adopt the procedure from, you know, sort of

15  California practice on an issue that's governed by federal

16  law.

17            MR. SHECTMAN:  Thank you.

18            THE COURT:  Anymore you were looking -- looking

19  from me for -- looking for from me?

20            MR. SHECTMAN:  I wanted to preview the issue I

21  think that we also sort of previewed in the joint status

22  report and just wanted to get a feel for how you're

23  thinking of it.  I think that's helpful, Your Honor.  Thank

24  you very much.

25            The other thing, one final note I think following

1  up on some of the positive comments regarding settlement

2  discussions I would just suggest that we leave it open for

3  discussion on -- in May and perhaps sooner than that if

4  there's an appropriate timeline made with respect to

5  ordering the parties to mediation and that, you know, we

6  all keep an open mind about that process and definitely

7  talk about it again after next status conference.

8          THE COURT:  Okay.  All right.  Let us -- before

9  we -- while we're still on this adversary proceeding let's

10  talk about the motion to sever.  And let me -- let me

11  really start with Mr. Renwick and ask what -- kind of what

12  your -- what you're trying to achieve by severing your --

13  the matters involving your clients from the rest of the

14  adversary.

15          MR. RENWICK:  Think that goes to Mr. Holman.

16          THE COURT:  As a (indiscernible) --

17          MR. RENWICK:  Mr. Holman.

18          THE COURT:  Mr. Holman, I'm sorry.

19          MR. RENWICK:  You mean, Mr. Holman.

20          THE COURT:  I do mean Mr. Holman.  I apologize.

21          MR. HOLMAN:  Your Honor, we simply don't want to

22  be involved in the litigation concerning the

23  characterization of how many other oil and gas leases may

24  be the subject of this litigation.  I don't know how many

25  those are but if there's, you know, 10 or 20 or 30 or 40

1  there's going to be one court ruling that encompasses

2  characterization of all of those agreements based on the

3  terms of the agreements, I think we would be required to

4  examine them, review them, argue about why they're the same

5  or why there's a different (indiscernible) agreements and

6  that's a lot of burden.

7           THE COURT:  I see.  I would -- you know, look --

8  kind of when I looked at the Trustee's complaint I have to

9  admit that didn't come to mind.  I mean, I -- I sort of

10 looked at the complaint and assumed that although they're

11 part of a single complaint and it's done in a -- it's not

12 as economical way as you could, you know, with a single

13 complaint and so, you know, generally speaking the pleading

14 without getting into the details of each agreement in the

15 complaint itself, I still look at that complaint in my

16 reaction as -- well, they're really asking for -- they're

17 really suing each counter-party to each of the agreements

18 with respect to the agreements of those counter-parties and

19 nothing else.  I mean, I don't look at it -- and I

20 understand your point, though, that technically one could

21 say, you know, you're being -- you're being sued for a

22 declaration regarding everybody else's agreement.

23           But I don't think that's what the complaint does

24 and I guess, you know, if a motion to sever clarifies that

25 maybe, you know, depending on -- I've got to hear from the

Page                                                                      169

1    Trustee.  Maybe that's the simple answer to give you the

2    comfort you're looking for on that issue.  That doesn't

3    mean that even if I were to sever it that I wouldn't keep

4    the matters administratively consolidated because I do

5    think there are economies that have scale to be considered.

6            You want to respond to that before I ask the

7    Trustee to respond?

8            MR. HOLMAN:  I think you've identified the issue

9    and our concerns.

10            THE COURT:  Okay.  All right.  Who's going to

11    respond on behalf of Trustee?  Mr. Shectman, I can't hear

12    you.  I see your mouth moving.

13            MR. SHECTMAN:  Got it.

14            THE COURT:  Okay.

15            MR. SHECTMAN:  Can you hear me now?  Okay.

16            THE COURT:  Yes.

17            MR. SHECTMAN:  Okay.  Thank you, Your Honor.  So

18    we're -- we filed one claim for relief against hundreds of

19    parties and it's one legal issue we believe that impacts

20    hundreds of parties.  We think it would be a big mistake to

21    start lopping off individual parties.  The whole bankruptcy

22    process as in a case with hundreds of parties is designed

23    to avoid piecemeal litigation and this would be the

24    definition of piecemeal litigation.

25            We think the Court has broad discretion on an

Page                                                    170

1   issue such as this and for all the reasons we set in our

2   opposition we believe that it just makes sense from the

3   perspective of the standards that courts look at to keep

4   everybody together.  And, in fact, it would be -- it would

5   be problematic from a due process perspective to start

6   separating them out and if -- that as a practical matter if

7   the Court says the Court ended up, you know, keeping

8   everybody's schedule anyway, what would really be the

9   point?  So we think that --

10          THE COURT:  Well, but I think -- you don't -- you

11   think your complaint is so clear and unambiguous that it is

12   clear that Mr. Holman isn't -- isn't being asked to respond

13   to the issues of the other whatever it is, 500 leases.  I

14   don't know that it's that clear.

15          MR. SHECTMAN:  I believe it is.

16          THE COURT:  And so, you know, maybe there's

17   something -- some clarification in the complaint that -- I

18   agree with you that having separate hearings and treating

19   it completely separately might be cumbersome.  I think that

20   Mr. Holman, if he's got an argument, that the Court cannot

21   give a legal ruling in a vacuum.  Well, he's going to make

22   that argument and I'm going to figure that out.

23          Actually, if he's still part of the same lawsuit

24   there's a chance that that could have an affect on your --

25   on the release you're seeking with respect to other

Page                                                                        171

1   parties.  I haven't really thought that through.  I mean,

2   I'm not sure why you wouldn't agree to sever or somehow to

3   clarify your complaint to address his concern, which is

4   that he doesn't want to be responsible for litigating

5   issues with respect to other contracts, which he might have

6   to do just to protect his own position.

7           MR. SHECTMAN:  Your Honor, I think those are not

8   invalid thoughts.  They're legitimate considerations and

9   they're legitimate for all 420 named defendants.  And if

10  somebody has the wherewithal and the desire to respond to

11  the complaint with facts that make their position special

12  for one reason or another or important for one reason or

13  another, they need to do it in this adversary proceeding.

14  And if somebody else thinks that those facts are relevant

15  to them, they will say so and if someone doesn't they don't

16  need to say so.

17          But if we start separating these out into 400

18  difference pieces of litigation we have a due process

19  problem because there's stuff that may affect one per --

20  one defendant that's gone on in a separate adversary

21  proceeding, whereas if we keep it altogether we don't have

22  that issue and we don't have really big judicial and estate

23  economy issues.  So I don't think we want to go down this

24  path and there really isn't a good basis laid out in the

25  motion to do it.

Page                                                                  172

1              THE COURT:  Okay.  Anyone else want to be heard?

2              MR. JONES:  Your Honor, Evan Jones on behalf of

3     UBS.  We agree with the Trustee.  I'm frequently reminded

4     the Federal Rules of Civil Procedure, as well as the

5     Federal Rules of Bankruptcy Procedure, Rule 1, they are to

6     be construed to obtain a just, speedy and inexpensive

7     resolution of matters.

8              If we were to sever these into 400 separate

9     actions it --

10             THE COURT:  Okay.  I'm going to --

11             MR. JONES:  -- simply takes up more time.

12             THE COURT:  Nobody is asking for that.  I have

13    one motion to sever from one group of defendants with a

14    very particular argument which is --

15             MR. JONES:  Well, but --

16             THE COURT:  -- they don't -- they don't want to

17    have to answer for everybody else's agreement.  It seems to

18    me that severance might be the answer or there might be a

19    more elegant solution.  I just don't feel like the -- I

20    don't think -- I get that that's not what the Trustee --

21    not a burden the Trustee intended to put on this defendant,

22    but I'm also not convinced that the complaint is so

23    unambiguous.  It really seems to me that the parties need

24    to meet-and-confer further.

25             I'm going to continue this to our May date and if

Page                                                                    173

1  you haven't resolved it by then, I'll rule.

2            MR. JONES:  Thank you, Your Honor.

3            THE COURT:  Okay?  I just -- it just seems like

4  a -- kind of a silly thing that could be resolved, but

5  maybe I'm wrong and I'll be prepared if you haven't

6  resolved it consensually to give you a ruling then.

7            All right.  Hold on.  I'm going to look at my

8  notebook here.  Where did I put it?  Hold on a second.

9            (Pause)

10           Okay.  Let's talk about #3.00 and #4.00.  I'm not

11 sure why they were calendared separately.  I think the

12 clerk's office probably just when the counterclaim came in,

13 you know, kind of treated it as a separate matter.  I think

14 going forward there should only be one -- I think there

15 should only be one status conference.

16           MR. SHECHTMAN:  Your Honor --

17           THE COURT:  Yes.  Who's speaking.

18           MR. SHECHTMAN:  -- so if I'm reading the calendar

19 correctly, #3.00 and #4.00 are different adversary

20 proceeding.  They're the Trustee's s adversary proceeding

21 against GLR and GRL which is a different adversary number?

22           THE COURT:  Yeah.  I'm not sure why they were

23 assigned different numbers either.  Maybe that's standard

24 practice, but I'd --

25           MR. SHECHTMAN:  Well, it's a different complaint.

BEN HYATT
Certified Deposition Reporters

Page                                                                    174

1          THE COURT:  -- have to look into that.  Well,

2    it's a counterclaim, though, is it?

3          MR. SHECHTMAN:  No.  I mean, there is a

4    counterclaim but it's a separate -- the Trustee filed a

5    separate complaint against just GRL, LLC and GLR, LLC and

6    then GRL and GLR filed a counterclaim.

7          THE COURT:  Right.  Ordinarily --

8          MR. SHECHTMAN:  Okay.

9          THE COURT:  -- those aren't treated as separate

10   adversaries with separate status conferences.

11         MR. SHECHTMAN:  Got it.  Understood.

12         THE COURT:  Okay.  So that's all I'm getting at.

13         MR. SHECHTMAN:  Okay.

14         THE COURT:  Okay.  All right.

15         MR. HOLMAN:  Your Honor --

16         THE COURT:  So -- yes.  Who's speaking?

17         MR. HOLMAN:  Your Honor, this is Brian Holman

18   appearing for Bradley Land Company.  I'm confused.  We have

19   our counterclaim which essentially in our view is an

20   extension of resolution of the issues raised by the

21   Trustee's complaint.  Are you saying we don't need to file

22   a notice of hearing status report for BAP to answer in that

23   period?  It wouldn't possibly be anything different than

24   what we've said already, which is we expect everything to

25   be resolved at summary judgment.

Page                                                                            175

1          THE COURT:  Yeah, I don't think so.

2          Mr. Shectman, is that -- is there any reason for

3   that to be governed by a different set of dates and

4   deadlines or is there a need for an additional status

5   report?

6          MR. SHECHTMAN:  So the people who filed

7   counterclaims are all here, the attorneys.  The only

8   thing -- the only caveat that I would put there is that

9   there were -- there were two or three -- there were three

10  answers filed very recently, like this week, maybe on

11  Monday of this week by Mr. Renwick.  And I think they all

12  include counterclaims, so they weren't parties to be joint

13  status reports so I don't want to speak for him.

14         THE COURT:  Well, okay.  All right.  Well, I --

15  we'll go back to Mr. Renwick in a second, but I think -- I

16  think he was fine with the schedule governing his --

17  Mr. Holman I think asked me for clarification on his.

18         MR. SHECHTMAN:  Well, I would say that we should

19  use these dates and deadlines for all the parties,

20  including Mr. Renwick.

21         THE COURT:  All right.  In which case -- in which

22  case we don't need a joint status report -- any more joint

23  status reports.

24         MR. RENWICK:  And this is Edward Renwick.  We do

25  to need them.  There are nothing -- nothing has -- in those

1   three recently filed complaints.  There are -- answers and

2   counter-claims.  There is nothing that isn't already

3   included in the first one that I filed, so there -- they

4   track the same issues and should be governed by --

5             THE COURT:  Right.  Okay.

6             MR. RENWICK:  -- the same procedures.

7             THE COURT:  Got it.  That was my working

8   assumption, but I think Mr. Holman --

9             MR. JONES:  Your Honor --

10            THE COURT:  -- (indiscernible) do -- whether he

11  needs to do something separate.  Yeah, go ahead.

12            MR. JONES:  I'm sorry, Your Honor.  Evan Jones

13  for UBS.  I just want to make sure.  We are a defendant in

14  a number of the cross-claims.  My understanding of the

15  discovery deadlines that the Court set out before that

16  those would not apply or would be subject to being

17  revisited.  Were the Court to deny the Trustee's summary

18  judgment motion because the counterclaims set forth

19  obviously factual issues, that I don't understand the

20  Court's earlier deadlines apply to if we need -- if we need

21  to go there.

22            THE COURT:  I stated the Court's intention to

23  revisit those if need be.

24            MR. JONES:  Thank you, Your Honor.

25            THE COURT:  Okay.  But getting back to

1   Mr. Holman's question I don't think you need a new joint

2   status report.

3           MR. SHECHTMAN:  This is Zev Shectman again.

4           THE COURT:  Okay.

5           MR. SHECHTMAN:  Your Honor --

6           THE COURT:  I don't think -- I don't think we

7   need Mr. Holman's clients and Mister -- actions involving

8   Mr. Holman's clients, Mr. Renwick's clients.  We don't need

9   another joint status report on that.  We're all agreed on

10  the litigation schedule and all is subject to being

11  revisited if I need to.

12          MR. SHECHTMAN:  Very well.

13          THE COURT:  Okay.  All right.  Just trying to be

14  practical.  I agree, there's no point to more paper on --

15  you know, taking notice from calendaring and respond to

16  that.

17          All right.  So #3.00 and #4.00 are the complaint

18  and the counter-complaint, if you will, or counterclaim in

19  *McConnell v. GLR and GRL*.  And who's on as representing GLR

20  and GRL?

21          MR. BEALL:  Your Honor, William Beall, Beall &

22  Burkhardt, and still here.

23          THE COURT:  Very good.  I just wanted to make

24  sure.

25          MR. BEALL:  Sure.

Page                                                                                        178

1              And Mr. Shectman, are you handling this also?

2              MR. SHECHTMAN:  Yes, Your Honor.

3              THE COURT:  Okay.  All right.  So I see this

4    litigation as different than the other adversary that

5    involved declaratory relief and I actually would like to

6    kind of put it on a different -- a different track.  I

7    would -- this is what I would propose, that we set

8    August 28th as the discovery cutoff, as well as the

9    deadline to amend the pleading, add parties or seek leave

10   to do so if leave is required.  September 17th is the

11   deadline for case dispositive motion and November 5th is

12   the deadline for any such motions to be heard.

13             I will now hear from the plaintiff and then the

14   defendant on your reaction to those dates.  Oh, and I would

15   continue this status conference to July 2nd at 10:00 a.m.

16   and check in with you then.

17             MR. SHECHTMAN:  Your Honor, so I've got an

18   August 28th discovery cutoff.  Here normally that would

19   probably be okay.  I would just say that here, kind of like

20   with every other litigation, we just want to make sure that

21   that's without prejudice and consideration for the issues

22   with discovery that we may have including getting witnesses

23   deposed in this action --

24             THE COURT:  Well --

25             MR. SHECHTMAN:  -- prior to that date.

Page                                                                        179

1          THE COURT:  If you're concerned that you need

2    more time, I mean, there's -- that's really not a thing.

3    You know, there's like once I set a calendar scheduling

4    order under Rule 16 there's a whole set of case law on what

5    it takes to get me to amend a Rule 16 scheduling order and

6    you would be bound by that case law.

7          If you're concerned that it's not going to

8    happen -- that that's not enough time reasonably to get all

9    this done, then say so now because once I set it,

10   revisiting it is subject to the Rule 16 standards for

11   revisiting the calendar.

12         MR. SHECHTMAN:  Thank you for that, Your Honor.

13   I think we should push it out.  I think we should push

14   it -- I think we should push the dates out at least a

15   couple months.

16         THE COURT:  Okay.  And would you then propose to

17   move -- because usually -- usually the deadline for case

18   dispositive motions I set comes after discovery is

19   completed.  Would you then have me set the other deadlines

20   out?

21         MR. SHECHTMAN:  So I would propose here that we

22   move the August date to October by -- 60 days the end of

23   October and then push the other dates out commensurately.

24         THE COURT:  Okay.  All right.  Mr. Beall.

25         MR. BEALL:  I'm fine with Mr. Shectman's

Page                                                                    180

1   suggestions, Your Honor.  I think that between the pandemic

2   and then we have some particular issues in this case that

3   may take a little bit longer on discovery than otherwise

4   and I think that that's reasonable.

5           The dates that I'm more concerned about is that

6   July 2nd date.  I don't really love that date but I guess I

7   could appear telephonically if my family goes off somewhere

8   for the long weekend.

9           THE COURT:  Okay.  Well, I'm happy to -- I'm

10  happy to look at my calendar and find a different date.  If

11  you're able to take a vacation I would want you to take it.

12  You know, Lord only knows whether any of us will be able to

13  take vacations.

14          MR. SHECHTMAN:  Well, we may be having our

15  vacation by Zoom, Your Honor.  It's hard to know.

16          THE COURT:  Yeah, yeah.  Yeah, yeah.  Okay.

17  Well, I'll actually take a look at that one in a second,

18  but let me just figure out.

19          So discovery cutoff -- October 30th is a Friday

20  and I want to make -- I'd say October 31, but I don't want

21  to be making it on a weekend.  So discovery cutoff of

22  October 30 and then we -- excuse me.  Yeah, let's say a

23  deadline before the Thanksgiving holiday to file any case

24  dispositive motions of November 20.

25          And then what did I give there?  Couple -- a

Page                                                                    181

1   month and a half.  Hasn't heard.  We run into the holidays.
2   All right.  All right.  So I don't even have -- I don't
3   have my 2021 calendar.  All right.  All right.  Discovery
4   cutoff of October 30.  The deadline to file any case
5   dispositive motion of December 4th.  And then because
6   honestly I just don't have my 2021 calendar set yet -- I
7   need to work on that -- I'm going to leave that open and we
8   can revisit it at our next status conference.  Let me
9   figure out when that will be that it's not the week -- the
10  first week of September.  How -- or I'm sorry, the first
11  week of July.
12          Anybody have an issue with having a continued
13  status conference in this adversary on July 15 at 2:30?
14          MR. BEALL:  That should be fine for me, Your
15  Honor.  William Beall.
16          THE COURT:  Mr. Shectman?
17          MR. SHECHTMAN:  Checking my calendar.  That
18  should be fine.
19          THE COURT:  Okay.  Great.  Mr. Shectman, I'll ask
20  you to prepare the scheduling order, such as it is.  That
21  discovery deadline October 30th also will be the deadline
22  to amend the pleadings, add additional parties or seek
23  leave as leave is required.  Okay.
24          I'm going to ask the parties before the -- no
25  later than 14 days before July 15th so no later than July 1

1  and maybe you should get it then earlier, if -- if Mr.

2  Beall is going on vacation, a short updated status report.

3  And by "short updated status report," I mean you don't have

4  to use the court form because they don't need all that

5  stuff that I've already read in your initial joint status

6  report.  I just want to know has anything changed, are

7  there any problems.  Okay.  And in -- preferably in one

8  piece of paper that sets forth sort of those status

9  positions.  If there's nothing to report just, you know,

10  file a short single page that says, hey, we're all just

11  tootling along and we've got nothing new to report.  But at

12  least I've got something to look at and prepare in advance

13  of the status conference and know what to expect.

14          MR. SHECHTMAN:  Okay.

15          THE COURT:  Okay.  All right.  All right.  Thank

16  you.

17          MR. BEALL:  Thank you.

18          THE COURT:  Let's see.  Thank you, thank you.

19  Okay.  So working backwards, we've done #7.00.  Done #6.00

20  continued.  #5.00 is the motion to intervene is granted.

21  #3.00 and #4.00 we've dealt with and #1.00 we've dealt

22  with.  All right.  I need a -- I just need a second to kind

23  of reorganize my stack of paper.  Oh, and we've also done

24  #2.30 which is the financing.

25          So what that leaves is #2.00, #2.10, and #2.20.

Page                                                                    183

1   Is there any -- anybody that's on the line for some other

2   matter other than those three matters that -- you know,

3   that wants to be heard that didn't think I gave them an

4   opportunity to be heard?  Speak now or forever hold your

5   peace.

6           (No response.)

7           All right.

8           MR. ISRAEL:  Your Honor, this is Eric Israel.  On

9   #2.20 I think we already did that with the Trustee's oral

10  report, but if Your Honor wanted more we can.

11          THE COURT:  Oh, the Chapter 11 status conference.

12  That's fair.  Is there anyone that had anything to say or

13  wanted to say anything more about the Chapter 11 status

14  conference?

15          (No response.)

16          Okay.  I'm good and no one else has any questions

17  so I guess that one is done, too.  Thank you.

18          Oh, let's see.  Expunging is #2.00.  I gave it

19  the wrong number.  Okay.  I've got that.  I've got the

20  protective order motion.  Okay.  That's done, that's done.

21  That's done for today.  Okay.

22          All right.  Let's -- let's take up the #2.00, the

23  motion to expunge lien.  All right.  Just tell me first off

24  who will argue on behalf of the Trustee on this one and who

25  is representing the respondent.

Page                                                                    184

1          MR. ISRAEL:  Your Honor, this is Eric Israel.  I

2    will be arguing the assumption motion.

3          THE COURT:  Okay.

4          MS. TOMASCO:  Your Honor, this is Patty Tomasco.

5    I'll be arguing on behalf of the claimant.

6          THE COURT:  Okay.  All right.  Mr. Israel, I know

7    this is a little bit of a shift because with so many other

8    things I do and I've done today I kind of started off by

9    telling you what I wanted to do, but I'm really to treat

10   this as -- these last two items are -- are substantive and

11   so I'm going to treat this as an oral argument and invite

12   you -- and partly because we've been going for so many

13   hours as it will help put me back in the right frame of

14   mind, ask you to, you know, make a presentation in support

15   of your motion, walk me through your arguments will get me

16   back on track.  And then I'll hear from Ms. Tomasco in

17   opposition.

18         MR. ISRAEL:  Thank you, Your Honor.  I'd be glad

19   to.  Without repeating too much that is in the motion,

20   Sections 546(d) and 362(b)(3) together very narrow

21   exceptions the scope of the automatic stay.  Section 546(d)

22   expressly requires that a notice under that statute relates

23   to a prepetition interest in property for which under state

24   law an interest such as a lien could have been perfected

25   absent the intervention of the bankruptcy filing.

1            The three lien notices that we're challenging

2     filed by the Breca affiliates (phonetic) all rely on the

3     California oil and gas --

4            THE COURT:  Okay.  Stop.   Stop, stop, stop, stop,

5     stop.

6            Somebody had some music on and I'm sure you

7     didn't mean to interrupt, but if you could mute the

8     background music that would be great.  I just want to make

9     sure we get a good record.

10           Why don't you pick up before your last sentence,

11    Mr. Israel?  Go ahead.

12           MR. ISRAEL:  Okay.  Section 546(b) expressly

13    requires that the notice relate to a prepetition interest

14    in properties which under state law -- for which under

15    state law in interest such as a lien could have been

16    perfected absent the intervention of the bankruptcy filing.

17           The three notices if our -- filed by Breca

18    affiliates all rely on the California oil and gas lien

19    statutes under California Code of Civil Procedures.

20    However, those statutes only allow for a lien to secure

21    goods and services delivered within 180 days before the

22    notice was filed.  To try to fit themselves within the oil

23    and gas lien statutes, the notices all state expressly that

24    they cover the period starting August of 2019.  The

25    petition date for this case was July 25, 2019, so on their

Page                                                                        186

1  face the notices only cover post-petition periods.

2          However, Section 546(b) does not apply to post-

3  petition rights.  Indeed --

4          THE COURT:  Right.

5          MR. ISRAEL:  -- the statutes submits that

6  otherwise the strong bankruptcy policy of avoiding rushes

7  to the courthouse by multiple creditors would be violated

8  if Section 546(b) applies to post-petition debts.

9          In any event, after repeated the Trustee's motion

10  to expunge the notices on that basis the insider creditors

11  all did a complete about-face arguing that, oops, contrary

12  to everything that they argued in their own notices they

13  had some sort of prepetition rights to record a lien.  It's

14  stated in the Trustee's reply that this isn't so.

15          The oil and gas statutes the insiders rely on

16  require the notices be recorded within 180 days.  If they

17  actually have prepetition interest in the assets of HVI Cat

18  Canyon, which could have been perfected under the oil and

19  gas lien statutes, they were required to file their 546(b)

20  notices within 180 days of the petition date or on or about

21  January 25, 2020.  Instead, the notices of bar were not

22  filed until February 24, 2020, a whole month later.

23          I note that the Trustee --

24          THE COURT:  I'm sorry.  Say that one more time.

25  So January 25 is -- is the petition date, plus 180 days.

1  So if there were any goods and services -- irrespect --

2  money that are -- irrespective of what the 546(b) notice of

3  lien says, it'd be impossible to use that mechanism

4  because, you know, for anything that was prepetition based

5  on when the 546(b) notice was actually filed.

6           MR. ISRAEL:  Exactly, exactly.

7           THE COURT:  Okay.  And on top of that you're

8  arguing that the 546(b) notice actually doesn't identify

9  any goods and services or alleged goods and services were

10  provided prepetition.  Is that -- is that also your

11  argument?

12           MR. ISRAEL:  Yes, the notices say that they --

13  when they're counting back is August and that's the date

14  they come forward from.

15           THE COURT:  So --

16           MR. ISRAEL:  So the whole premise of the notices

17  is based on post-petition delivery of services from -- and

18  goods.

19           THE COURT:  Right.  So --

20           MR. ISRAEL:  That doesn't exclude --

21           THE COURT:  So to sum up your argument so far,

22  one is you can't use that notice to create a lien of post-

23  petition goods and services.  It was too late to create a

24  lien -- perfect the lien, I should say, too late to perfect

25  any lien for prepetition services because the -- it was

Page                                                                          188

1   filed on February 24th; and third, could not have perfected

2   a lien in any prepetition goods and services because it

3   does mean by its terms (indiscernible).

4            MR. ISRAEL:  Well, I think the last point is that

5   it can't be -- I'm flipping around a little bit, but it

6   can't be -- it can't apply to post-petition services or

7   goods because 546(d) doesn't only apply to interest that

8   were created prepetition that could have otherwise but for

9   the bankruptcy filing had been perfected but -- the time is

10  still open, so it still has to be a prepetition event.

11           THE COURT:  No, no.  I understand that as a

12  matter of law, but --

13           MR. ISRAEL:  Right.

14           THE COURT:  -- aren't you also arguing that when

15  you look at this -- and maybe you're not arguing this, that

16  there's nothing in here that -- did they -- did they

17  identify any prepetition goods and services as to which

18  they're attempting to perfect a lien?

19           MR. ISRAEL:  Not in the notice.

20           THE COURT:  On every --

21           MR. ISRAEL:  The notice says -- yeah, the notice

22  says --

23           (Parties speaking simultaneously.)

24           MR. ISRAEL:  Yeah, (indiscernible) --

25           THE COURT:  (indiscernible) -- yeah, might



Page                                                                189

1  (indiscernible) --

2           MR. ISRAEL:  But -- okay, the notice says that

3  date -- I'm quoting -- that date is August 2019 and it

4  starts with August 19th which is obviously a post-petition

5  date and goes forward from that to the 180 days terminating

6  the -- on the date they filed their notice -- their 536

7  notice in February.

8           THE COURT:  So again, just to -- just to

9  reiterate --

10           MR. ISRAEL:  (Indiscernible) --

11           THE COURT:  They don't -- they don't identify

12  goods and prepetition -- in the notice of lien prepetition

13  goods and services as to which they're purporting to

14  perfect a lien?

15           MR. ISRAEL:  Right.  The lien notice says it only

16  applies to post-petition from August forward.

17           THE COURT:  Right.  Okay.  All right.  Go ahead.

18  I interrupted you.  Go ahead.

19           MR. ISRAEL:  No, but that -- that's the summary

20  of the argument.  I note that the Trustee also disputes the

21  underlying debts asserted by the insiders on the merit and

22  he also disputes that they ever had lien rights under those

23  statutes.

24           Among other arguments those statutes don't cover

25  either the purchase or sale of crude, the rendering of back

Page                                                              190

1   room accounting services or equipment rental subject -- the

2   court doesn't even have to go there on the merits which for

3   today's purposes the lien notice -- notices are untimely on

4   their face and the underlying lien statute is inapplicable

5   to the notice that should be expunged.

6           THE COURT:  Okay.  All right.  Thanks.  I

7   understand your position.

8           Ms. Tomasco.

9           MS. TOMASCO:  Your Honor, first I'd like to say

10  the -- they were filed within -- first we'll start with the

11  statute and I also want to say that what was in the motion

12  to expunge is not a concept of the amount of the merits of

13  the liens.  Only thing is in the liens it's such --

14          THE COURT:  Okay.  Hold on.  Let me -- hold on.

15  Hold on.  All right.  Are you speaking on a speaker phone

16  and do you have the option of a headset?  You're a little

17  muffled.  Oh, I see.  You've got the --

18          MS. TOMASCO:  Earbuds.

19          THE COURT:  Yeah.

20          MS. TOMASCO:  Does that work better?  Okay.

21          THE COURT:  Yeah, a little bit.  Thank you.

22          MS. TOMASCO:  All right.  Okay.  Just the problem

23  is that we have a motion to expunge and part of me wants to

24  say this is actually sort of a lien dispute.  I mean, if it

25  weren't for the allegation it was a stay violation we're

Page                                                                191

1   really talking about, you know, these substantive rights

2   and I don't (indiscernible) listen to my argument because I

3   think the Trustee approaches it from a backwards analysis

4   compared to where I approach it from.

5         But the first thing that I thought is it

6   shouldn't be in an adversary because we're really talking

7   about, you know, whether or not you have a lien.  And in

8   fact for the stay violation you might have put that in

9   there and I do think that in a certain respect we do not

10  have a sale -- we don't have any sale proceeds.  There's

11  nothing that these particular main assertions can attach

12  to.

13        There's also filed yesterday applications for

14  administrative expenses because there's one thing that's

15  true about all of these charges.  They were done post-

16  petition and they benefitted the estate.  And if there

17  is --

18            THE COURT:  Okay.  Stop, stop there.  Stop there.

19            MS. TOMASCO:  Okay.

20            THE COURT:  I have the notices of lien in front

21  of me.

22            MS. TOMASCO:  Um-hum.

23            THE COURT:  And it's docket #822 -- 21, 22 and

24  23.  Can you walk me through where they assert prepetition

25  amounts for goods and services provided prepetition?



Page                                                                        192

1          MS. TOMASCO:  They are asserting for the amounts

2    that are owed that they're -- all of the amounts are

3    asserted for contracts that existed prepetition.  So in

4    other words, if you look at the --

5          THE COURT:  That's not -- that's not what I

6    asked.  It's not what I asked.  If they don't pertain to

7    goods and services delivered prepetition, then please,

8    please just concede the point and tell me your argument is

9    really about the contract under which they arrived.  Okay.

10   But I don't have patience for obfuscation.  Are any of

11   these goods and services --

12         MS. TOMASCO:  There --

13         THE COURT:  Are any of these goods and services,

14   were any of them delivered to the debtor prepetition?

15         MS. TOMASCO:  Not according to the lien notices,

16   Your Honor.

17         THE COURT:  Okay.  Thank you.  All right.  Go

18   ahead.  I'm all ears now.

19         MS. TOMASCO:  Okay.  I will say that there --

20   that there is -- you know, there is -- the statute

21   contemplates that there is a relation back to the date that

22   the goods and services were provided, but the first date

23   that goods and services were provided to the mineral estate

24   by the lienholders.  Now, that time is going to be a date

25   on which the services as between the mineral lease and the

Page                                                                    193

1    lienholder first arose under the contract.

2           So if you will look at -- I was -- let me finish

3    this point that I was making before and that is that, first

4    of all, I think this is premature, essentially moot if the

5    administrative claims are allowed.  So to the extent that

6    it's moot -- and those are set for hearing on the May 19th

7    of this year.

8           THE COURT:  Okay.

9           MS. TOMASCO:  To the extent it's moot -- it's

10   making an advisory opinion that the Court doesn't need to

11   give and we have no sales proceeds so there's no reason to

12   address these issues today.  This is not an evidentiary

13   hearing.  It is only a motion hearing.

14          So I will go into the statute and explain to you

15   why the statute provides for a relation back to the

16   beginning of the contractual relationship between the

17   entities.  So 2002 is the beginning date of the Cat

18   contract.  Now, I believe it's asserted under this -- the

19   lien notice for approximately two million dollars but the

20   proof of (phonetic) point is 12 million dollars.  And so

21   that's a recognition that not all of the charges that are

22   owed to Cat would qualify for a lien.  In addition, the --

23   and you can look at the proof of claim filed by Cat which

24   is a proof of claim #125.

25          Now, proof of claim #126 the DIP has been

1  providing all of the personnel administrative functions for

2  the debtor and that prepetition amount that GIT reported as

3  proof of claim meeting those dollars asserts a lien for 1.2

4  million dollars and it asserts an administrative claim for

5  those services of approximately $900,000.

6          GTL actually trusts from the wells to whatever

7  the purchaser's location is, whether that's Cat or some

8  other purchaser.  Those trucking services were provided by

9  HVI managing $979,000 on a post-petition basis.  And so

10 these are -- these are services that clearly qualify for a

11 mineral use but for which the Trustee has not paid.

12         Now, so what we're looking at here and we put it

13 in our briefing, which I think covers the bases, but the

14 California lien statute which is found at Section 1203.56

15 of the California Code (indiscernible) states:

16         "The lien provided for in this chapter arises on

17    a date of the furnishing of the first item of material

18    or services from the date of performance of the first

19    waiver for which a lien is claimed under the

20    provisions of this chapter."

21         So we know that in a lien contest on which the

22 mineral lien statute was based that if -- if you're

23 providing services over time, it's the date you first

24 started providing these services and it's not some other

25 thing.  It's going to relate back in time for a practical

1  reason in which you don't want your mineral lien from this

2  to have to file a lien every six months just in order to

3  have a right to (indiscernible) your position out to other

4  claimants.

5        And this particular statute has not been

6  interpreted what it means.  What the Trustee says that it

7  means I don't think it could mean that for a couple of

8  reasons.  One is that it says specifically that it arises

9  on the day of the proceeds of the first item of material or

10 service or the date of the performance of the first waiver.

11 There's no reason to have the word "first" in there unless

12 you're talking about the inflection of a contractual

13 relationship which I recited to you.  And this is all in

14 our responsive papers.

15       And so there's another reason and they are

16 seeking a lien for the first item of material or service or

17 the date specifically and what that -- what that indicates

18 is that that is -- stands by itself.  Why would you have

19 the word "first" in there?  And so, Your Honor, I think

20 that before, you know, we go too far ahead you have to

21 recognize that this particular provision has not been

22 construed by any in the case.

23       So we do know a couple of things.  We know that

24 it's well understood in the industry that a mechanics lien

25 and (indiscernible) arrive on the first date the materials

Page                                                                    196

1    or services were provided in the course of the contractual

2    relationship.  Well, why do we know the contractual

3    relationship is important?  If you look at California Civil

4    Code 1203.52 it says that the person who's entitled to a

5    lien is a person who shall under contract perform services.

6    And it talks about the future, to be used (indiscernible),

7    shall be entitled to a lien.

8          So the contractual relationship is the focus of

9    the statute and just like in (indiscernible) we all know

10   that if -- if I go out and I start building a building and

11   then -- and then a lien is filed on the building, the date

12   that I first started excavating and the date that I

13   delivered the materials to the building site is my relation

14   back date.  And the mineral lien statute understands it

15   should be different for the mineral lien statute.  In fact,

16   everybody -- every commentator talking about the California

17   lien statute says specifically that.  We cite in our papers

18   our motion in front of (phonetic) oil and gas mechanics

19   lien citing specifically California Civil Procedure 1203.56

20   and stating that it gives the priority dating back from the

21   first labor or the first formation of material, even though

22   a specific lien claimant may not have done this work or

23   furnished its material until a later time.

24         And so for purposes of 546(d) when you look at

25   the statute and they combine it with the state statute and

1  what the state statute provides, we also know that the

2  California Oil and Gas Lien Act was enacted to limit the

3  scope of the property encumbered by a mechanics lien.

4  Prior to the enactment of the statute oil and gas claimants

5  would simply file a (indiscernible) but it would attach to

6  the entirety of the real estate and not just the mineral

7  estate.  So California enacted this to effect -- in effect

8  give *in rem* relief to oil and gas workers, but only

9  attached to the real estate and not to the entire real

10 property.

11      It was not enacted to change mineral lien

12 (indiscernible) and we know from all of the cases

13 interpreting (indiscernible) lien that those liens relate

14 back to the date when the first construction was done, even

15 to the lease's bills were for years later.  And that's

16 exactly what the California Legislature meant here,

17 albeit I will admit that there is not a case that says

18 specifically that.  There is a lot of (indiscernible)

19 evidence that that's what they meant.

20      In *Huntley v. U.S. Development and Guaranty*

21 (phonetic), the California Supreme Court said that

22 constrained mechanic lien, which is their assistance

23 (phonetic), is the only reasonable construction of the

24 corresponding provisions of the governing oil and gas

25 liens.  And so you have some evidence that the California

Page                                                                198

1   Supreme Court believed that these things have to be

2   interpreted consistently with each other.  And we all know

3   that California mechanics liens relate back to the first

4   date work was performed under the contract.

5           And so the argument that if you -- if you only

6   limit the lien -- the right to the lien or whether it

7   arose -- whether it arose prepetition it's clear that it

8   arose when the parties entered into a contract for services

9   because the California Legislature and the Bankruptcy Code

10  recognizes that it's not inappropriate to allow the oil and

11  case liens extracted using the labor of the non-debtor and

12  then not pay that non-debtor even though that oil and gas

13  couldn't have been extracted but for that labor.

14          So this is the interest arrived under the

15  statute.  The prepetition interest in property evidenced by

16  the -- by the contractor and then to interim cash to the

17  proofs of claim (indiscernible) --

18          THE COURT:  Could you say that again?  I didn't

19  get that.

20          MS. TOMASCO:  The interest in -- okay, the

21  interest in property arises under the contracts that are

22  attached to the proofs of claim.  The notice that is

23  required under 546(b) can be as simple as a phone call

24  that's found to be sufficient under their (indiscernible).

25  The fact that the notices don't attach to the contract or

BENHYATT
Certified Deposition Reporters

1 | otherwise provide the legal line going way back (phonetic)
2 | has not prevented any court from holding that they relate
3 | back under state law nonetheless.
4 |         So what we're talking here is the Trustee is
5 | attempting to take a notice that is not technically
6 | required, can be (indiscernible).  It says, well, when you
7 | called and said, hey, look, I'm going to assert this lease,
8 | that was held to be sufficient and it was also held to be
9 | sufficient to say that even though he filed a lien
10 | (indiscernible) he still had good liens.  And so that's the
11 | situation here.
12 |         What's in the motion simply note here asserting
13 | the lien, if you look at the proof of claim all of the
14 | contracts are cash, all of the invoices are attached.  We
15 | asserted the lien for things that are proper under the
16 | statute and so that -- that is -- that is the gist of what
17 | we have here.  And relying on what is not in -- in -- is
18 | not in the motive is improper under the present
19 | (indiscernible).
20 |         So we get into this issue about whether or not
21 | the fact that services were provided previous post-petition
22 | and that has likewise not been intended to having a new
23 | (indiscernible) Rule 16.  In particular, there's a couple
24 | of cases that we cite and that involve environmental liens.
25 | In the *Corona Brothers* it was a case -- a case in which

Page                                                                200

1  the -- all that had been done prepetition was that the

2  environmental agency that had the right to assert a lien

3  under the state statute said, hey, you need to clean this

4  up or we're not -- or we're going to have to do it and then

5  we'll assert a lien.  That's all that happened prepetition.

6          And then post-petition the debtor didn't clean it

7  up and the state agency came in and cleaned it up, inserted

8  the lien, 100 percent post-petition services and the court

9  upheld the lien.  And it doesn't matter because it's

10 related to a prepetition time period.  Specifically the

11 statute says the environmental agency will have a lien that

12 is superior to all of their liens for cleaning up the

13 statute.  And the state agency gave the debtor notice

14 prepetition that if you don't pay this for this -- for this

15 to be cleaned up we're going to clean it up and we're going

16 to assert a lien.  And so the fact that all of the work is

17 done post-petition is of no moment under the cases.

18         But the final reason why this relates to the

19 prepetition time period is because of 502(g) and that is

20 these were all services performed under executory contract.

21 The Trustee asserts that 502(g) doesn't give rise to any

22 particular trailing of claims and that's also not true.

23         We all know that then a lien arises for purposes

24 of the Bankruptcy Code doesn't dictate whether or not it's

25 secured or unsecured and we all know that, for example, if

Page                                                                    201

1  I'm representing a landlord and I have a landlord's lien or

2  if it's enforceable or if I have a -- I have a security

3  deposit, I apply that and then apply my 502(b)(6) claim.  I

4  don't apply it to my administrative expense claim and I

5  certainly don't have to give it back to the Trustee simply

6  because my claim is a prepetition claim under 502(g).  I

7  can go to those cases.  They all are -- are briefing.  I

8  will just point out a couple of them.

9         We pointed out that the 502(g) claims were worked

10  purposely with the rejections indicated under an executory

11  contract.  The case is *In Re: Ashley*, 4116 and 7

12  (phonetic).  It says that without an attorney charging the

13  trustee in a Chapter 7 case there it can assume -- that the

14  contract can continue to be contract binding.  And the

15  claimant argued that the charging lien for the attorneys

16  was going to be a secured claim secured by the lien and the

17  court upheld that.

18         More recently in California in (Indiscernible)

19  *Factory*, 470 B.R. 510 (phonetic), that case holds that a

20  prepetition security deposit is applied in the rejection

21  liens that are also part of 502(g) claims by operation of

22  Section 502.

23         Here what we have is that all of these services

24  were provided under executory contracts that are attached

25  to the proof of claim.  Each of those contracts have been

Page                                                                202

1  rejected.  That's set forth in our papers.  And the

2  rejection is equivalent to a breach and here the breach is

3  not just rejection, but the fact that post-petition

4  services were provided weren't paid for but it's also

5  provided as a nexus to the present -- pre-bankruptcy past

6  that provides the banks were saying that these were

7  prepetition funds.

8          In addition to the -- the important thing the

9  state statute said specifically the lien arises for

10 purposes of priority among different claimants on the date

11 that the services were first provided.  You can see why it

12 is an important protection.  If I am a -- if I'm providing

13 (indiscernible) completion services on a particular lien,

14 if I'm drilling several wells, not all those are going to

15 be drilled contiguously.  There may be a drilling here, a

16 drilling there, and if I provided the services under a

17 drilling contract and I'm doing it for more than six months

18 and all of a sudden somebody comes in and says, well, I

19 have a (indiscernible), you're basically cutting off that

20 drilling completion provider so that I would be able to

21 have a lien that was superior to someone who comes in and

22 puts the deed of trust after all of the services have been

23 provided and by (indiscernible) on the lease because those

24 wells continue to produce.

25          The construction of the statute that the Trustee

Page                                                                      203

1  expounded (phonetic) makes no sense in real life and it

2  doesn't comport with the plain language of the California

3  statute.  I'll answer any questions if you have any, Your

4  Honor.

5            THE COURT:  Okay.  I was going to ask you what

6  that beeping sound is, but that is my earpiece telling me

7  that we're losing juice.  So I'm going to switch.  I'm

8  going to let it charge and I'm going to switch to my

9  speaker phone on the desk which is not as good, but it will

10  have to do from now on.  Can you hear me?

11            MR. ISRAEL:  Yes.

12            MS. TOMASCO:  Yes.

13            THE COURT:  All right.  I think I'll get these

14  charged.  I think I'd rather test with stand-alone.  I

15  (indiscernible).  All right.

16            Ms. Tomasco, thank you.  I understand your

17  argument.  Let me -- before I hear from the Trustee is

18  there anyone out there that want to be heard on this?

19            MR. LITVAK:  Your Honor, this is --

20            THE COURT:  Yes.

21            MR. LITVAK:  This is Max Litvak on behalf of the

22  Creditors' Committee.

23            THE COURT:  Mr. Litvak.

24            MR. LITVAK:  I just wanted to -- yes, Your Honor.

25  I just wanted to chime in in support of the Trustee's

Page                                                                204

1   position on this.

2          THE COURT:  Okay.  So noted.  All right.

3          Mr. Israel, you want to respond to Ms. Tomasco's

4   oral argument?

5          MR. ISRAEL:  Yes, Your Honor.  The -- Your Honor,

6   the three issues that Your Honor identified are still --

7   are still germane and I submit positive here.  The notice

8   doesn't say anywhere that it relates to prepetition

9   invoices.  In fact, it expressly says on the notice that

10  date is August, quote, unquote, 2019.  And that's the --

11  that's the -- what the notice purports to give a lien for.

12  And even if this were -- even if they instead were

13  referring or meant to refer to the prepetition period,

14  that's all relevant to it.  But the deadline under the

15  state statute to the Court -- after the bankruptcy you

16  still have to file a notice within 180 days.  In Section

17  546(b) it says you have to file the notice in the

18  bankruptcy case within the period that the law provides.

19          Well, that's still 180 days which would have been

20  January, so filing this notice even if it legitimately were

21  to refer or deemed to refer to prepetition debts, it's

22  still too late because they didn't file this until

23  February.  The filing 502(g) argument, Your Honor, I -- I

24  don't even understand.  502 refers to a claim from

25  rejection of a lease for executory contracts and that's

Page                                                                          205

1   clearly a prepetition claim.  So there's no independent

2   lien right under 502(g) and they can't add the two together

3   again because 546(b) says it has to be done -- a notice has

4   to be filed within the period authorized by state law.  And

5   state law --

6              THE COURT:  I think the argument -- I think the

7   argument is -- I'm not so -- (indiscernible) suggest that

8   I'm persuaded by it necessarily but I think the argument is

9   that 502(g) relegates -- rejects damages to prepetition

10  status.  I don't think there's any dispute about that

11  that's what the statute says.  These are post-

12  petition dates and services.  But the argument I think Ms.

13  Tomasco is making is that -- trying to make is that the

14  debt -- these debts don't have to become prepetition debts

15  and, therefore, appropriately subject to this lien that

16  she's trying -- they're trying to perfect.  And I think

17  the -- kind of the logic on particular point is that it's

18  rejection damages that become the prepetition claim.  To

19  take somebody's goods and services post-petition and the

20  debtor didn't pay for them, that's not -- that debt is a

21  result from -- those aren't damages resulting from the

22  projection.  Those are damages that result from post-

23  petition performance and a failure to pay those post-

24  petition, right?

25             MS. TOMASCO:  Your Honor, rejection simply means

1  that the -- that the -- they repudiate the contract

2  including payments simply because -- I agree --

3          THE COURT:  Yeah.

4          MS. TOMASCO:  I agree that's rare.  I agree that

5  it's rare you provide goods and services for the property

6  post-petition, but that doesn't mean that the damages are

7  not the same.  If you -- if you reject the contract and you

8  have a sub-hearing that is not otherwise entitled to

9  administrative priority because it didn't benefit the

10  estate, there are plenty of cases which say that those

11  damages are still rejection damages because the Trustee

12  decided to not assume the contract and cure those defaults.

13         THE COURT:  Okay, is that something that the

14  parties briefed?  I don't remember that.  I don't remember

15  those cases.

16         MS. TOMASCO:  Yeah, (indiscernible) not --

17         THE COURT:  That's something (indiscernible) --

18         MS. TOMASCO:  -- not that partic -- it's

19  certainly not in the Trustee's papers.  We do make the

20  argument that the damages from a 502(g) claim are

21  prepetition damages and can be treated as a secured claim.

22         THE COURT:  Okay.  That --

23         MS. TOMASCO:  And (indiscernible) --

24         THE COURT:  -- is a different argument.  That's a

25  different argument.

1          MS. TOMASCO:  Right.

2          THE COURT:  I mean, what we're talking -- what

3    we're talking about here is this -- your -- you're trying

4    to -- 6502(g) talks about a claim for damages resulting

5    from the debtor's rejections.  Okay.  And if there have

6    been goods and services provided post-petition and they

7    haven't been paid for, I think that's probably post-

8    petition obligation.  I don't think that those are damages

9    arising from the debtor's (indiscernible) performance.  I

10   don't think those -- I don't think those (indiscernible)

11   damages but I'm not sure.

12         Anyway, we interrupted Mr. Israel.  Go ahead,

13   Ms. Israel.

14         MR. ISRAEL:  Well, Your Honor, I think that has

15   pretty much addressed the income.  There are unpaid post-

16   petition claims that are -- that they claim so file a

17   request for an administrative claim, which they did I think

18   two days ago and it's now been set for a hearing and we'll

19   deal with that there.

20         As I mentioned, the Trustee disputes that,

21   disputes who much is owed on the merits on many levels, but

22   that -- those post-petition (indiscernible) do not sit

23   within 546(d).  That is limited to a lien member -- the oil

24   and gas statute limited to prepetition obligations and a

25   notice still has to be filed within 180 days which here

Page                                                                           208

1   would have been limited to -- which would have fallen in

2   January.  They would have had a right at that point from

3   the prepetition for whatever was short, but it was still

4   within the 180-day window but they didn't file it then.

5   They filed it in February.  So you can't --

6              MS. TOMASCO:  Your Honor --

7              THE COURT:  Hold on.

8              Go ahead, Mr. Israel.

9              MR. ISRAEL:  No, and, Your Honor, we did discuss

10  the 502(b) argument in our reply at pages 7 and 8 and the

11  rejection damages are for repeating the contract or

12  prepetition -- treat a prepetition claim and

13  (indiscernible) unsecured claim for that.  Even -- we have

14  these already more than 180 days and can't relate back.

15  I'm not sure if it -- even otherwise, but, you know,

16  because they waited too long to file it.  They didn't have

17  to wait until they -- you rejected the agreement to file

18  the lien notice.  That could have been done -- that could

19  have been done back in August.

20             THE COURT:  Okay.

21             MR. ISRAEL:  But they didn't file a lien.

22             MS. TOMASCO:  And --

23             THE COURT:  All right.  Thank you, Mr. Israel.

24             MS. TOMASCO:  Also --

25             THE COURT:  As to all your general in relation

1   back doctrine in oil and gas liens you -- and I guess that,

2   you know, pertains, you know, generally to disputes about

3   lienholders with respect to priority and really general

4   principle we have a very specific statute here, the

5   California statute which says (indiscernible), which says

6   that you've got to file, you know, (indiscernible) de facto

7   lien within 180 days providing goods and services.

8           Your suggestion that the relation back --

9           MS. TOMASCO:  Right, Judge.

10          THE COURT:  -- the relation back doctrine somehow

11  trumps that and says, you know --

12          MS. TOMASCO:  Yeah.

13          THE COURT:  -- well, really all goes back to the

14  very beginning of the contractual relationship.  I don't

15  follow that.

16          MS. TOMASCO:  No.  Your Honor, I think you're

17  conflating a couple of different arguments.  First of all,

18  the statute is more like a range finder.  We go -- the case

19  should go back for six months of services so whether it's

20  August to January or September to February, the statute

21  limits you to look at a six-month look-back, not a month of

22  preference period.  So whenever you filed the lien that's

23  how much of a look-back you get.

24          So instead of filing a lien, which 546(b) allows

25  you to file (indiscernible), so if we have a property lien

Page                                                                    210

1  on a real property record in California and it's not the

2  invoice date but it's the service date that controls and I

3  think that's what the Trustee's argument is, well, fine.

4  That means that our lien reaches back six months.

5           It still doesn't change the fact that the statute

6  gives you six months of look-back liens from the moment you

7  filed your lien notice under this California statute.

8  That's how it works.

9           Just a couple of things to make sure I get them

10 on the record because I want the record to be complete,

11 that is, the statute has not been interpreted by any case

12 in terms of what it means by these particular things.  We

13 know from *Rincon Island* that the notice can be oral.  It

14 doesn't have to be in writing and so any kind of notice

15 will do.  And the -- the statute doesn't provide a

16 deadline.  It gives you a look-back period.

17          So, for example, what if I'd been providing

18 services on the oil and gas lease for a year and I haven't

19 paid for the whole year and then I file a lien?  Well, then

20 my lien is good for six months of those services.  It's

21 just little -- how far back you can assert a lien.  It

22 doesn't -- it's not a deadline in that respect.

23          The second thing I want to say is that the

24 statute -- the way the Trustee reads the statute it

25 conflates a couple of provisions.  The statute says the

Page                                                                 211

1   lien provided for in this chapter arises on the date of the

2   furnishing of the first item of material or services or --

3   big pause -- the date of performance of this first labor

4   for which a lien claimed under the provisions of this

5   chapter.

6              So for material of services it arises on the date

7   of the first furnishing, but remember the statute requires

8   there be a contract for those goods.  And I would like

9   you -- to cite to the Court, which is not in the papers, is

10  the case of *White v. County of Sacramento*, which is 31 Cal.

11  3d. 676, for the proposition that this is a -- it is a

12  statutory construction item is that the first antecedent

13  principle, not as a qualifying version for (indiscernible)

14  could be applied to work that he had received and not

15  (indiscernible) work to including others more of the note

16  (indiscernible) or right the County affect

17  (indiscernible) --

18             THE COURT:  Why is that not in your papers?

19             MS. TOMASCO:  Because it was in response to an

20  issue raised in the Trustee's reply papers which we are

21  allowed to talk about at the hearing.

22             THE COURT:  Okay.  All right, what's the

23  citation?

24             MS. TOMASCO:  31 Cal. 3d. 676.

25             THE COURT:  Okay.



Page                                                          212

1              MS. TOMASCO:   Every single -- every single

2    penalty statute is interpreted to provide for relation back

3    to the date that the services under the contract were first

4    performed and California statute should be interpreted more

5    differently.   Each one of the secondary sources confirm

6    that the statute relates back to the prepetition period

7    which was this point which the contract services began.

8    And then the six-month window is how far back your lien

9    will reach in terms of (indiscernible) and that's how 90

10   percent of mineral lien statutes are interpreted.   It's not

11   unlike an (indiscernible) statute on which this statute is

12   based and that's how it looks in California, Dallas, Texas

13   and Oklahoma and (indiscernible).   So the idea that you can

14   sort of do a "gotcha" in terms of timing doesn't really

15   comport with the statute.

16              And the most important thing about California

17   Civil Code under 1203.66 says specifically that the statute

18   is to be interpreted literally in favor of plaintiff.

19   That's why the statute was enacted.   So if there is any

20   ambiguity about how the statute is to be applied, it has to

21   be applied in favor of the claimant.   And here the claimant

22   is -- has provided services in order to enable this estate

23   to extract or redact and to receive proceeds and the

24   claimant has not been paid for those services.   And while

25   the Trustee says that he does not agree with those amounts,

Page                                                                    213

1  in his papers he does not object to any of the evidence

2  that is -- the claimants put forward including the amounts

3  that were owed for -- for the services provided at the well

4  head.

5          MR. ISRAEL:  Your Honor, this is Eric Israel.  I

6  wanted (indiscernible) --

7          MS. TOMASCO:  The statute --

8          THE COURT:  Hold on.  Let me (indiscernible) --

9          MS. TOMASCO:  The statute per --

10         THE COURT:  Go ahead.  Go Ms. Tomasco.

11         MS. TOMASCO:  Okay.  I'm not -- okay.  The cases

12 interpreting 546 have distinguished between establishment

13 of a lien and the instance of a prepetition interest in

14 property.  The Trustee's argument makes a fatal flaw in

15 that he conflates the existence of a lien by filing the

16 notice and the existence of a prepetition property right.

17 The property right has been recognized as being less co-

18 extensive (phonetic) to more broadly interpreted as a lien

19 have included that, as we said, anything that ties the

20 parties to a prepetition time period coupled with the right

21 to assert a lien prepetition.

22         So the right to assert a lien prepetition, for

23 example, is the *Corona* case and in the *229 Main Street*

24 *Partnership* case, which is at 262 F.3d 1, that's a First

25 Circuit case, makes a point that an interest in property is

Page                                                                          214

1  not limited to having actual lien rights.  An interest in

2  property that's anchored in the prepetition time period can

3  be anything that gives rise to the right to file a lien.

4  Obviously, the California mineral lien statute provides for

5  a relation back in a priority scheme that recognizes that

6  the estate that we first provided the services on the well

7  head is when your lien arises.  And if your lien arises or

8  attaches when you (indiscernible) on that date, the

9  perfection is not the creation of a lien, but simply the

10 perfection of a lien, which is not the lien creation

11 perfection completion.  This is actually under the statute

12 the creation is a creature of statute and the statute here

13 clearly establishes that the lien is created on this date,

14 if the parties first provide services to their mineral

15 estate owners and those dates are set forth in the proof of

16 claim.

17          THE COURT:  So your argument is that the lien

18 attached -- again, I'm going to take your invitation and

19 read Article 9 because I'm a little more comfortable with

20 it.  The lien attached one that was created prepetition but

21 the -- but the 180-day statute merely only refers to the

22 extent to which one may perfect that lien.  But your

23 argument is that that lien, although in the post-petition

24 period and services that were -- that provides -- you know,

25 continued to be provided, continued to be secured they're

1   only protected from the hypothetical rights of the Trustee

2   and the lienholder to the extent of the 180 days from the

3   notice.  But the lien is not -- not perfected 180 days

4   here, but the lien itself you're arguing was created when

5   the goods were asserted to be first provided with an outlet

6   (phonetic).

7            MS. TOMASCO:  Correct, Your Honor.

8            THE COURT:  All right.

9            MS. TOMASCO:  So we think it -- so you think

10  about it if I -- if the debtor has rights in the collateral

11  and I sign a security interest with the lender, well, the

12  lien is good as between those parties.  It's not good if

13  the third party (indiscernible).  In this case the lien was

14  good under the statute on the first date that the

15  contractor provided services to the mineral lease holder

16  and that's the date that's attached.  Perfection is what

17  546(b) allows you to do after the fact.

18           THE COURT:  Yeah, okay.  All right.  I'm not sure

19  that -- who I agree with, but I understand that.

20           Mr. Israel, do you want to respond?  Hopefully

21  you'll wrap it up here.

22           MR. ISRAEL:  Yes.  Your Honor, again, I would

23  note that since the lien notices are recorded and referred

24  all prepetition and this is all late, Your Honor, the

25  notices that they -- the insiders are relying on.  But I

Page                                                                    216

1   would -- and there's really outside the bankruptcy perhaps
2   there's a liberal construction policy, but I would submit
3   inside of bankruptcy we are having very specific ways --
4   546(d) is a very narrow exception to the Trustee's power to
5   take free and clear an unprotected lien, liens that aren't
6   of record and that these weren't of record.  Then, you
7   know, they were ol -- they were either cash collateral
8   motions.  Their counsel is there, but those are said at any
9   point the actions or the junior liens to everybody, you
10  know, to the essential lienholder and the other insider,
11  ECL, that 546 is very -- to put an (indiscernible)
12  situation where they complied with what 546(d) says, do
13  they get a lien to come ahead of the Trustee?  They didn't
14  do that because they didn't file it within the time period
15  that California ECP requires.  And, you know, again, the
16  policy in bankruptcy is this is just the opposite of what a
17  liberal construction permit is.  You've got to do it right
18  or leave it.
19          THE COURT:  Well, I think what Ms. Tomasco is
20  arguing, Mr. Israel, is that it was timely and this -- the
21  goods and services that they're claiming were provided
22  again 180 days of the notice that -- sort of treating that
23  separately and distinctly from the argument about whether
24  those needing services -- providing goods and services are
25  somehow secured by a lien which is presumed to have a lien

Page                                                                              217

1  prepetition.

2         I agree it's strange -- feels like a strange

3  argument in bankruptcy law, but oil and gas liens are a

4  clouded universe of themselves and then when

5  (indiscernible) the bankruptcy law it gets messy.  So I

6  mean, I'm not saying I necessarily agree with her, but I'm

7  also -- at the moment I don't think we're arguing as your

8  character (indiscernible).

9         I think her argument is that the notice of lien

10 was the fact that you go back 180 days in goods and

11 services which happen to have been delivered post-petition

12 but which are entitled to the perfection of a lien that

13 arose during the prepetition period.  That's her argument

14 and it -- it -- this is quite -- I think this creates a

15 difficult (indiscernible).  I don't think it's so clear for

16 either of you, not at the moment.  I'm not going to make --

17        MS. TOMASCO:  Your Honor, thank you for

18 (indiscernible) --

19        THE COURT:  Yeah, go ahead quickly.

20        MS. TOMASCO:  This is one more thing.  Apparently

21 this new argument has been lodged by the Trustee that we

22 somehow waive the fact that we have separate liens by not

23 objecting to the various cash collateral orders.  First of

24 all, we didn't realize the Trustee was not going to pay us

25 for goods and services.  And during that time period I

Page                                                                218

 1   think a person who provided services post-petition that are

 2   crucial to the extraction of oil and gas is somewhat

 3   surprised and then certainly we don't get paid for it.

 4           The second thing is that if this lien is valid

 5   it would be prior to the imposition of a 2016 lien asserted

 6   by UBS.  So the fact that we haven't asked for adequate

 7   protection is no labor at all and labor doesn't appear just

 8   in the Trustee's papers so it's a new argument.  We just

 9   wanted to respond to it.

10           THE COURT:  Okay.

11           MR. JONES:  Your Honor, this is Evan Jones.

12           THE COURT:  Hold on, hold on.  Stop.

13           MR. JONES:  Yes, Your Honor.

14           THE COURT:  Stop, (indiscernible).  Back up.

15           Mr. Israel, first let me hear from you and then

16   I'll hear from Mr. Jones.  Anything you want to put in

17   response to that last comment.

18           MR. ISRAEL:  Your Honor, I -- Ms. Tomasco has

19   raised some new authorities that were not in her brief.  I

20   didn't understand her relationship back argument to be

21   quite the way that she's submitting it now and in her

22   opposition, which again was very different from the lien

23   notices that we've filed a motion to expunge.

24           THE COURT:  Okay.

25           MR. ISRAEL:  But I will also submit I'm not aware

1  of any order that says under 546(b) that this can apply as

2  to the two post-petition (indiscernible) and, you know, I

3  can certainly go to -- yeah, that they didn't cite that we

4  weren't going to pay them.  Well, they didn't pay us for

5  1.6 million dollars of (indiscernible) the debtor in

6  possession here, so --

7            THE COURT:  Right.  Well, I'm not --

8            MR. ISRAEL:  Okay.

9            THE COURT:  I'm not -- I'm trying to focus on the

10  issues and not try to cite (indiscernible) back out.  I get

11  that.  And at the end I'll consider whether a lien

12  (indiscernible).  Let me hear from Mr. Jones.

13            MR. JONES:  Yes, thank you, Your Honor.  Evan

14  Jones on behalf of UBS.  Your Honor, we did not file

15  pleadings on this because the issue of lien priority is not

16  before the Court.  Ms. Tomasco has just raised for the very

17  first time a suggestion that somehow this lien based on a

18  fact sheet that is not the one it arises under relates

19  back.

20            And I do have to point out, Your Honor, and I

21  think it's important, Ms. Tomasco repeatedly says, well, if

22  this were a different lien it would relate back and she

23  says liens are supposed to be construed liberally in favor

24  of a mechanics and material lien.  This is not a mechanics

25  and material lien and the statute specifically addresses

Page                                                                      220

1  what its priority is so when Ms. Tomasco says, well, let's

2  go pick up a different statute and pick its term, I want to

3  make sure that the Court is not misled by that into

4  thinking this is a priority argument.  It is not.

5           THE COURT:  Well, I understand.  I haven't been

6  asked to rule on priority.  I've been asked to expunge some

7  notices and liens.  But when you talk about the relation-

8  back doctrine it's -- in respect to material meaning

9  liens -- oil and gas leases it can have implication --

10 priority implications.

11          So I think the thing to do here where these

12 are -- I think this is a more -- at least as presented

13 today a more difficult issue than maybe the papers

14 suggested and there are people arguing who aren't even

15 involved.  I don't think it matters.  I just think in

16 fairness the discussion is widening and people on both

17 sides I think the argument (indiscernible) introduced and

18 UBS asserts -- feels like maybe they didn't have notice

19 this is where the discussion was going and it could have

20 implications for UBS's position.

21          So what I'm going to do is to permit additional

22 briefing, you know, based on the discussion we had today.

23 I think we have to widen.  In *County* -- in fact *Meadow*

24 case, 31 Cal. 37, 676 back (indiscernible) as well as

25 addressing people's arguments -- parties' arguments as they

1   are now understood, my intention would be to give anybody

2   that wants to chime in an opportunity to participate in

3   that additional briefing that I'm inclined to do -- I'm not

4   sure that (indiscernible).  Okay.

5          This isn't a requirement new (phonetic) and I'll

6   hear you out if you disagree with the schedule.  I'm

7   inclined to continue the matter so our hearing on May 19

8   beginning at 10:30 by -- any and all parties that want to

9   file a supplemental brief needs to do so no later than

10  May 8th, which is what (indiscernible) today and that's

11  kind of everybody on all sides.  And then we'll have

12  simultaneous responses a week later on May 15th.  Anybody

13  have an issue with that?

14         MR. JONES:  Your Honor, Evan Jones.  Just I want

15  to be real clear.  We don't plan to participate in the

16  motion as filed.  It is a motion to expunge.  I don't

17  understand the Court to be saying that that motion is now

18  being turned into an adversary proceeding on priority liens

19  which certainly we would participate in.

20         THE COURT:  Not that all, but as to the extent

21  you're concerned it may come off as argument if I were to

22  adopt them in the context of the motion to expunge them --

23  motion to expunge it might have implications for your

24  client and (indiscernible), Mr. Jones.  Anything else?

25         MR. JONES:  Your Honor, I apologize.  I remain

1   confused.  If what you're telling me is I have to address

2   for priority argument now then we have turned it into a

3   priority.

4           THE COURT:  Of course not.  Of course not.  It's

5   not an adversary proceeding (indiscernible).  I'm just

6   saying your -- she's making argument that might have

7   implications for your client.  If you want those

8   arguments -- if you want to prevent me from saying

9   something that is wrong in this context that may make it

10  more difficult for you in some way at another time that I'm

11  giving you the opportunity to participate, I'm not

12  requiring you --

13          MR. JONES:  Thank you, Your Honor.

14          THE COURT:  -- to participate and I'm not making

15  any ruling that is, you know, preclusions of fact or

16  whatever.  But I'm trying to be sensitive to the

17  fact that -- that those issues have been raised and I'm

18  giving the opportunity to anybody and everybody that is

19  here participating in the hearing to submit supplemental

20  briefing and respond to the argument that they now

21  understand because everybody's understanding on both sides

22  it's only (indiscernible) involvement.  You are welcome

23  to --

24          MR. JONES:  Thank you, Your Honor.

25          THE COURT:  -- (indiscernible) argue.  All right.

Page                                                                 223

1  That's what I meant.  I didn't try it (indiscernible).

2          MR. JONES:  Your Honor, I understand and thank

3  you.

4          THE COURT:  Okay.  Anything else on this?

5          MR. ISRAEL:  Your Honor, this is Eric -- this is

6  Eric Israel.

7          THE COURT:  Yes.

8          MR. ISRAEL:  Let me -- may I have a brief

9  response to this?

10         THE COURT:  Yes.  So let's see.  So simultaneous

11 supplemental briefs by any party that wishes to file them

12 will be due on May 8th and then one week later anybody that

13 wishes to reply to anybody's supplemental filings may do so

14 no later than May 15th and then we'll have our hearing on

15 May 19th.

16         MR. ISRAEL:  Judge, should there be --

17         THE COURT:  Okay.

18         MR. ISRAEL:  Will we need a notice or scheduling

19 order with this?

20         THE COURT:  No, I don't think so.  The only

21 people that pertain to it are people that were -- cared

22 enough to show up for the hearing.

23         MR. ISRAEL:  Okay.  Thank you, Your Honor.

24         THE COURT:  Okay.  And I have obviously had --

25 well, it depends on what I get.  I'm not promising you

Page                                                                    224

1   (indiscernible) that I'm going to limit (indiscernible).  I
2   might need to write something and whatever I do somebody is
3   probably going to be unhappy.  So -- but anyway, we'll have
4   further argument.  I will read the pleadings.  I will read
5   the cases and then we'll deal with it on the 19th if I can
6   let go (phonetic).  But if it continues to be promulgated
7   and nuanced as it sounds, I may have to write something
8   just to manage everybody's (indiscernible).  Okay.
9           I think now we can move on to the last item on
10  today's calendar and thank everybody for your patience so
11  far.  This was a motion for protective order and so the
12  moving party -- and Ms. Tomasco, you are the lawyer to be
13  heard on this also or just the last?
14          MS. TOMASCO:  No, just me, Your Honor,
15  (indiscernible).  Can you hear me (indiscernible)?
16          THE COURT:  All right.  I'm sorry?
17          MS. TOMASCO:  Can you hear me okay on speaker?
18          THE COURT:  Okay, (indiscernible).  So
19  (indiscernible) served against GIT with a subpoena to copy
20  a server that is in GIT's possession and I'll call it
21  GIT -- GIT from (indiscernible) IT administrative services
22  to the debtor for what it is and the debtor -- or GIT on
23  behalf of the debtor placed documents on that server.  The
24  Trustee and its personnel apparently it had access to the
25  debtor's emails and documents on the server for four

Page                                                                      225

1  months, but the debtor would like to make a copy of those.

2  And that -- or the Trustee, I should say, which is

3  different than the debtor.

4          And so, Ms. Tomasco, you're asking for a

5  protective order that does what, that as bankruptcy trustee

6  you don't get any access?

7          MS. TOMASCO:  Your Honor, the premise of the art

8  of the question is not consistent with the facts.  The

9  Trustee sent a 2004 notice that says essentially if you

10 look ECF #909 it says you're supposed to produce the

11 server, not HVI's information on the server, but you're

12 supposed to produce the server and let the Trustee have

13 access to the whole thing.

14         And so as we set forth in the papers, the server

15 hosts the debtor's emails and there's approximately 55

16 people who have emails on that server that aren't or were

17 HVI employees.  The server also hosts emails from --

18         THE COURT:  I'm sorry, from (indiscernible)?

19         MS. TOMASCO:  -- 19 --

20         THE COURT:  You said 55 people from the debtor

21 had access to and stored the documents on the server?

22         MS. TOMASCO:  They had access to their emails and

23 their documents on the server.  They didn't have access to

24 everybody's emails and --

25         THE COURT:  Okay.

Page                                                                  226

1          MS. TOMASCO:  -- if you look at our reply you'll

2    see that that's supported by a declaration.  So it's

3    segmented.  Just like any other server or cloud service

4    it's not as if you can send an email -- I mean, a subpoena

5    and say, give me all of the emails on your cloud because

6    they belong to various companies that store their

7    information there.  So the --

8          THE COURT:  And the --

9          MS. TOMASCO:  -- Trustee --

10         THE COURT:  Wasn't the information neatly

11   partitioned?  Is there an HVI --

12         MS. TOMASCO:  Yes, it --

13         THE COURT:  -- Cat Canyon section of the server?

14         MS. TOMASCO:  There are HV -- there are HVI

15   individual employees have their own desktop where they keep

16   their own files.  And so they would have -- the Trustee

17   already has the desktop computers and then the email server

18   has on top of that their emails.  But it's just like you

19   can't look at my emails and I can't look at your emails

20   even if we were on the same server.  It's not as if he even

21   had access to them.  So what we're talking about is -- and

22   I made a -- I think a valiant effort --

23         MR. ISRAEL:  Think that's (indiscernible) --

24         MS. TOMASCO:  -- to propose the relation --

25         (Parties speaking simultaneous.)

Page                                                          227

1              MS. TOMASCO:  -- (indiscernible) stipulations --

2              THE COURT:  I'm sorry.  Somebody needs to mute.

3    I'm hearing (indiscernible) CourtCall (indiscernible).

4              MS. TOMASCO:  Okay.

5              THE COURT:  We get (indiscernible) --

6              MS. TOMASCO:  So --

7              THE COURT:  Hold on, hold on.  Okay.  The fuser

8    is on now.  Go ahead.

9              MS. TOMASCO:  Okay.  So we made that stipulation.

10   We can find that that ECF --

11             THE COURT:  I can't hear you now, ma'am.  I can't

12   hear Ms. Tomasco.  You need to stop -- stop, stop, stop.

13             COURTCALL OPERATOR:  Yeah, this is the operator.

14   Ms. Tomasco's line just disconnected.

15             THE COURT:  Okay.  I wish she would have entered

16   video feed.  Got to stop, stop, stop, stop.  Oh.

17             Ms. Tomasco, we can't hear a thing you said.  Do

18   you have a number for her to dial her back, by any chance?

19             COURTCALL OPERATOR:  I can try to dial her on the

20   number that she connected on.

21             THE COURT:  Yes, please.

22             COURTCALL OPERATOR:  Okay.  One moment, please.

23             THE COURT:  Thank you.

24             (Pause)

25             MR. SCHULMAN:  Your Honor, this is George

Page                                                                    228

1   Schulman.  I'll be arguing for the Trustee --

2           THE COURT:  Okay.

3           MR. SCHULMAN:  -- on Ms. Tomasco and emails that

4   she's disconnected.

5           THE COURT:  Okay.  Thank you.

6           COURTCALL OPERATOR:  Your Honor, I did get the

7   voicemail for Ms. Tomasco.

8           THE COURT:  Okay.  Well, hopefully she'll try to

9   call in.  We all need to sort of be on hold so we can get

10  her back.  She's checked her email.  She's looking at

11  (indiscernible).

12          (Extended pause)

13          COURTCALL OPERATOR:  Sorry for interruption, Your

14  Honor.  Ms. Tomasco has returned.

15          THE COURT:  Okay.  Ms. Tomasco, we really didn't

16  hear anything you said since the last time you and I had a

17  colloquy.  So why don't you repeat yourself and

18  (indiscernible) -- no words just repetitive I don't think

19  we heard from today.

20          MS. TOMASCO:  Well, it was great, Your Honor.

21  I'll try to imitate it.

22          THE COURT:  Yeah, I'm sure it was.

23          MS. TOMASCO:  Okay.  So I believe about 55

24  employees.  I proposed a stipulation to the Trustee.  You

25  can find that at ECF #909 along about page 44 and 41.

1    That's the stipulation as proposed.  Okay.  We provided you

2    with all this stuff and here is what we think and deliver

3    sort of HVI material then.  Here's how we plan to propose

4    to give it to you.  We're going to give you without review

5    approximately 50 employees' emails without -- because the

6    Trustee owns privilege and there's no issues.

7           And so I made that proposal early on the morning

8    of April 6th knowing that we had a deadline of April 6th to

9    file our motions for protective order because obviously,

10   you know, just like Google can't, you know, give other

11   people's -- you know, other companies' emails just because

12   they're subpoenaed to another company that's what the

13   Trustee is essentially asking for.

14          I provided Mr. Skillman with lots of information

15   about the server, how many sites are on there, how many

16   company emails are on there, how they're protected from

17   each other.  We sent emails.  We had a meet-and-confer on

18   that Friday, which is the 3rd, and he said, "Make a

19   proposal."  So I got with the client, worked through all

20   the technical issues and said, "This is what we can do,"

21   and I never heard back from him.

22          So my (indiscernible) is a couple -- is two-fold.

23   I would like the Judge to look at the stipulation we

24   proposed.  It provides 90 percent -- 95 percent of the

25   information that is HVI's information on the server that

Page                                                            230

1   hasn't already been provided and contained a Bates label

2   for these documents we provided which is upwards of 10,000

3   documents in addition to all of the informal requests that

4   I can also provide to Your Honor but they were too

5   voluminous for me to attach, imagine.

6          And then we want to provide this information to

7   the Trustee but what we cannot do is simply take a server

8   that has ten different companies' information that has

9   nothing to do with the debtor and turn that over to the

10  Trustee simply because he doesn't want to articulate

11  individual document requests to which we can respond.  If

12  he says turn over the server and only one company's

13  information is what he seeks, then he needs to make that in

14  the request, but what he requested was the entire server

15  without limitation and that's the objection, Your Honor.

16         THE COURT:  Okay.  All right.  Mr. Schulman?

17         MR. SCHULMAN:  Yes, thank you, Your Honor.

18  George Schulman for the Trustee.  What we found through

19  this process is some additional information about a server

20  that the Trustee didn't have when he first made the request

21  and the Trustee certainly didn't have at the time of the

22  meet-and-confer.  In the motion that is attached a

23  declaration from Mr. Alverez (phonetic) -- I hope I

24  pronounce that right; I apologize if I didn't -- it says

25  the server included information from there entities

Page                                                                231

1   including Cat and GTLI.

2            In reply there's a new declaration from

3   Mr. Alverez which says that the server attaches information

4   from about seven entities and it's at least that.  So we

5   still don't have an indication of who all of the people are

6   on the server.

7            In the original declaration --

8            THE COURT:  Okay.  Stop for -- stop for --

9            MR. SCHULMAN:  -- (indiscernible) --

10           THE COURT:  Mr. Schulman, Mr. Schulman --

11           MR. SCHULMAN:  -- (indiscernible) --

12           THE COURT:  Mr. Schulman.

13           MR. SCHULMAN:  Yes.

14           THE COURT:  Mr. Schulman.

15           MR. SCHULMAN:  Yes.

16           THE COURT:  Stop there for a second.  I know it's

17  hard, but I really want to stop.  This is an important

18  point to stop on.  What are you getting at?  Are you trying

19  to get at -- are you trying to obtain documents from other

20  companies regarding their transactions with the debtor or

21  --

22           MR. SCHULMAN:  No.

23           THE COURT:  Okay.  Or are you just -- is what

24  you're asking for -- do you want the debtor's documents?

25           MR. SCHULMAN:  That's it.

Page                                                                232

1            THE COURT:  Okay.  So what does it matter --
2    okay, what -- who -- other people -- other entities'
3    documents are that you're not getting or is that your only
4    request -- why should you get the copy, eat terabytes
5    that -- some portion of which is not responsive to your
6    request?  That's what I'm trying to understand.
7            MR. SCHULMAN:  Right, I understand that, Your
8    Honor.  The request is still open for -- for our
9    property -- for the Trustee's property but we still don't
10   fully understand how to describe that on the server, if I
11   may go on with the problems.  We're now getting in better
12   shape with who else is on the server.  As I say, in the
13   original motion there is no mention of separate folders or
14   (indiscernible) folders.  In the reply Mr. Alverez says
15   that there is -- there are separate folders which makes it
16   easy for them to give up basically HVI's folders and nobody
17   else's folders.
18           But he also says that the limit is set
19   (indiscernible) folders that he doesn't (indiscernible) and
20   perhaps the public folder is an Outlook file for everybody
21   who ever had access to the server.  Perhaps it's their
22   Microsoft Word documents.  We simply do not know.  And
23   the -- and GIT has not been forthcoming with a description
24   of what that is of precisely how that's proposed to come
25   down.  As I said, we're only interested in the debtor's

Page                                                                  233

1  documents.

2          They also -- they gave us some documents that

3  belonged -- that Ms. Tomasco says 55 people.  We don't have

4  a list of 55 people so we can who's included and we can

5  say, you left out Joe or you've included somebody who we

6  have to tell you in good faith doesn't belong.  And when we

7  give you an idea of people who we want to know whether

8  they're on the list.  Those would include Mr. Randeep

9  Grewald, who is the director of the debtor and is an

10 officer of the debtor.  We would want to include Mr.

11 Dimitrijevic.  I hope I pronounced that right.  Who is the

12 chief executive officer.  We would want to include the Sal

13 Alaverez (phonetic), who was the secretary for a while.  So

14 it's important to know who's included and not just say,

15 well, there's a lot of people we propose to get emails

16 from.  We're not here to buy a pig in a poke.

17         And it may even be that even when they tell us

18 who's on the list that we feel missed somebody because

19 accountants back in New York are doing the tax returns

20 doing accounting functions for the debtor is filing a

21 consolidated tax return for other entities are not on the

22 list and we're entitled to know who's on the list.  I'm

23 happy to narrow it if I get some factual description of

24 what's going on, how the server is broken down, what files

25 are actually on the server, what partitions are actually on

Page                                                                    234

1    the server so I can determine what areas are HVI's, which

2    areas are not HVI's, and then a third bucket of what areas

3    of which Ms. Tomasco and I can't agree we might have to

4    come back to Your Honor for some sort of resolution.

5            But we didn't even have as much information we

6    have until the reply which was filed yesterday and we still

7    don't have complete information.  But what we're after is

8    the debtor's documents on the server and it's if GIT wants

9    to engage in a process to tell us what is -- how that

10   server is broken down and how the files are kept and who

11   will make a move to give us files about it, then we'll have

12   a better idea what it is we've been getting.

13           Let me add, they all refer to -- they've given us

14   desktop computers.  I don't know what's on those desktop

15   computers for those employees versus what's on the server.

16   I can tell you from my desktop computer at Danning Gill, it

17   has no stored email on it unless I tell it to store emails

18   in a folder on my desktop computer.  I'm sure  all are

19   stored in the central server.  The same is true for every

20   document that I work on.  And my experience is, is that's

21   how -- that's how modern computer systems work.

22           Now, perhaps Ms. Tomasco has explained why that's

23   not so, how everybody gets their own emails on their own

24   computers 100 percent of the time, but that's not how

25   Outlook works in an environment where a whole bunch of

Page                                                                  235

1   people have access to all of them.

2          THE COURT:  Well, to be more precise I mean if

3   there's an Outlook server it's very likely that there are

4   emails on the server.  In the old days Outlook had files --

5   has GIT files in an individual instance that's not

6   necessarily connected to a server.

7          I'm not particularly impressed with arguments of

8   the type that say, well, you know, we gave them the

9   computer -- the desktop computers and so we shouldn't have

10  to give them the stuff that's on the server.  It may be

11  different.  I'm not -- again, I'm not impressed with that

12  argument because sometimes what's on the desktop is not the

13  same as what's on the server and it's unfair to parties to

14  make that assumption without producing the electronically

15  stored information from each of those separate sources

16  which isn't better information.  You know, some of it may

17  turn out to be duplicative.

18          But look, my sense of this is that, you know,

19  demands are being made.  Ms. Tomasco's client hasn't

20  reached a resolution, self-compelled to file this motion

21  for protective order, but it feels like even in the last so

22  many days the parties are learning more and should probably

23  continue their efforts to defer and solve this without

24  judicial intervention.  I tend to think that that is

25  usually a better resolution.

Page                                                                    236

1          I will give you some guidance, though, and that

2    is that at the moment I'm not impressed with the arguments

3    they gave us the whole server.  On the other hand I'm not

4    impressed with its position.  You know, we offered them --

5    you know, the short list of things without all of the

6    necessary -- all of the information necessary that goes

7    into getting comfortable, that those things aren't

8    sufficiently responsive, so I think there's some merit on

9    both sides.

10          I don't think this is sufficiently right and my

11   inclination would be to just to continue to our May 19th

12   date and implore both sides to continue having this

13   dialogue and sharing information.  I don't like -- I think

14   the kinds of questions that Mr. Schulman is asking in terms

15   of how the electronically stored information is, in fact,

16   stored, how the partitions were set up, what's the

17   relationship between those and the desktop is, what were

18   the -- you know, what were the procedures and how can the

19   information be segregated and produced are all appropriate

20   questions.

21          And it sounds like there's some inadvertent

22   progress in sharing information in connection with the

23   pleadings that were filed, but I still don't think that I

24   have enough of a picture to rule in this and I really would

25   like the parties to try to sort it out.  So my inclination

Page                                                                237

1  is to continue it with that guidance and those caveats.

2  Anybody want to say anything else?

3          MS. TOMASCO:  Your Honor, I suppose the

4  stipulations on April 6th that the Trustee never responded

5  to, I --

6          THE COURT:  All right.

7          MS. TOMASCO:  In light --

8          THE COURT:  Well, I can respond as part of your

9  continued meet-and-confer process.  I can respond and tell

10 you what's -- you know, what's wrong with it or what they

11 propose in response.

12         MR. SCHULMAN:  Your Honor, this is --

13         MS. TOMASCO:  Now, I just want --

14         MR. SCHULMAN:  -- George Schulman.  I would like

15 GIT to provide to us two things that would help move the

16 discussion along that I've already mentioned:  a list of

17 the people whose documents they propose to give us, the

18 names of those people so we know who's included in that

19 universe; and number two, the file structure on the server

20 which is not going to be disclosing anything privileged

21 unless it's a file that says here's where the bodies are

22 buried in the south 40.

23         THE COURT:  Right.  Ms. Tomasco, I think those

24 are reasonable requests.

25         MS. TOMASCO:  We have -- I have a list of



Page                                                                    238

1    employees.  In terms of the file architecture as long as I

2    can, you know -- there are -- there are -- as I said, given

3    our money companies that store their information on there,

4    they're each entitled to not have their information shared

5    absent a directed request from the Trustee.  The Trustee is

6    entitled to all of HVI's information, he is entitled to all

7    of HVI's privilege and that's why I've been endeavoring to

8    get to him but I can't -- I can't do it under the sword of

9    Damocles of give me the entire server.

10          THE COURT:  All right.  Well, good.  You got your

11   motion on file.  We've had preliminary discussions -- no,

12   no, no.  Stop.  Stop talking.  I really don't want to

13   prolong this any more than we absolutely have to.  You got

14   your motion for protective order on -- you saw I'm not

15   ready to rule on it because I don't think -- and I don't

16   fault you for filing it to protect your client, but it

17   seems to me that there's an opportunity here for the

18   parties to keep talking and resolve this consensually.

19          I do think that the information that Mr. Schulman

20   is asking is all a reasonable request.  I realize the list

21   of employees might be more important, you know, time-wise

22   and may be a little quicker to get that in than additional

23   information on how the server is organized, but in the next

24   week or two it seems to me you should be able to provide

25   that to him and you guys can go from there.

Page                                                                    239

1          But I'm not going to force either of the

2   options -- any of the options I can give him I'm not going

3   to force as an order of the Court a stipulation, as to the

4   information Mr. Schulman was looking for.  I'm not going to

5   give the Trustee *carte blanche* to copy all eight terabytes

6   and I'm certainly not going to shield GIT from having to

7   produce the debtor's documents, so I don't know what more I

8   can tell you at this point.

9          Mr. Schulman, what --

10          MR. SCHULMAN:  It wasn't --

11          THE COURT:  Mr. Schulman?

12          MR. SCHULMAN:  Yes, thank you.  That point, we

13   will work towards that.  But if I don't get those pieces

14   because somebody thinks that even giving me that

15   information is privileged, we'll be back on the 19th.

16          THE COURT:  Well, yeah, and that will probably be

17   a ridiculous position.  I'm not sure how the architecture

18   how information is stored why that would be privileged.

19   It's only communications between -- the substance of

20   communications really that would be privileged and not -- I

21   don't see that -- I really don't see how the architecture

22   how information is organized and partitioned and whatnot

23   would reveal that.  And I don't think it's Ms. Tomasco's

24   taking that position either, so --

25          MS. TOMASCO:  I'm not, Your Honor.

Page                                                            240

1          THE COURT:  Yeah.  So go back, keep talking.  I'm

2    not ruling on that today.  That's continued to May 19th.

3          All right.  Is there anything -- is there

4    anything the Court -- that was on the calendar that the

5    Court has not disposed of that someone wants to be heard

6    on?

7          MR. JONES:  Your Honor, it's Evan Jones.  That --

8    I would just note for the Court's information we have

9    uploaded -- or the debtor -- the Trustee has uploaded the

10   owner on the borrowing.  However, I do want to inform the

11   Court that I'm informed and believe that the money has been

12   lawyered already so the Court need not spend the evening

13   looking at that order.

14         THE COURT:  Okay.  All right.  I appreciate that.

15   I appreciate the -- would consider UBS's willingness to do

16   that as an act of good faith and professional courtesy.

17   Again I appreciate it.  Thank you.  I will take up the

18   order tomorrow.  It doesn't sound like there was any -- by

19   the time we were done talking there really wasn't any

20   controversy left with respect to that order, but I will

21   pick it up and that should be,  assuming I don't have any

22   issues with it, signed and entered tomorrow.

23         MR. JONES:  Thank you, Your Honor.

24         THE COURT:  Okay.  All right.  Anything else?

25   All right.  I appreciate everyone's patience with regards

Page                                                                241

1   to the technology and for those of you that participated by

2   video, thank you.  Certainly made it better for me in terms

3   of being able to connect with each of you and to be able to

4   see you and hopefully, you know, you (indiscernible) the

5   Judge, but I won't have (indiscernible) to comment on that.

6   So thank you.

7         I hope you all please stay healthy and safe and I

8   will see and hear from you if not sooner on May 19th.

9   Thank you.

10        PARTIES:  Thank you.

11        THE COURT:  All right.

12  (End at 4:25 p.m.)

13              * * * * * * *

14        I certify that the foregoing is a correct

15  transcript from the electronic sound recording of the

16  proceedings in the above-entitled matter.

17

18

19  _____      Date:  5/2/2020

20  RUTH ANN HAGER, C.E.T.**D-641

21

22

23

24

25

P 888.272.0022  F 818.343.7119      BENHYATT      www.benhyatt.com
                                    Certified Deposition Reporters

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:400 S Hope St, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled SUPPLEMENTAL BRIEF OF UBS AG, LONDON BRANCH AND UBS AG, STAMFORD BRANCH IN SUPPORT OF TRUSTEE'S MOTION TO EXPUNGE NOTICES OF OIL AND GAS LIENS FILED BY CALIFORNIA ASPHALT PRODUCTION, INC., GTL1, LLC, AND GIT, INC.; DECLARATION OF BRIAN M. METCALF IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 05/08/20, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**see attached page**

☒ Service information continued on

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) 05/08/20, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**see attached page**

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*), I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/08/20 | Lee Lattin | /s/ Lee Lattin |
|----------|------------|----------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## ADDITIONAL SERVICE INFORMATION

## 1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

- William C Beall    will@beallandburkhardt.com, carissa@beallandburkhardt.com
- Alicia Clough    aclough@loeb.com, mnielson@loeb.com,ladocket@loeb.com
- Marc S Cohen    mscohen@loeb.com, klyles@loeb.com
- Alec S DiMario    alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com
- Karl J Fingerhood    karl.fingerhood@usdoj.gov, efile_ees.enrd@usdoj.gov
- H Alexander Fisch    Alex.Fisch@doj.ca.gov
- Don Fisher    dfisher@ptwww.com, tblack@ptwww.com
- Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
- Gisele M Goetz    gmgoetz@hbsb.com, ggoetz@collegesoflaw.edu
- Karen L Grant    kgrant@silcom.com
- Ira S Greene    Ira.Greene@lockelord.com
- Matthew C. Heyn    Matthew.Heyn@doj.ca.gov, mcheyn@outlook.com
- Brian L Holman    b.holman@musickpeeler.com
- Eric P Israel    eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
- Razmig Izakelian    razmigizakelian@quinnemanuel.com
- Alan H Katz    akatz@lockelord.com
- John C Keith    john.keith@doj.ca.gov
- Jeannie Kim    jkim@friedmanspring.com
- Maxim B Litvak    mlitvak@pszjlaw.com
- Michael Authur McConnell (TR)    Michael.mcconnell@kellyhart.com
- Brian M Metcalf    bmetcalf@omm.com
- David L Osias    dosias@allenmatkins.com, bcrfilings@allenmatkins.com,kdemorest@allenmatkins.com,csandoval@allenmatkins.com
- Darren L Patrick    dpatrick@omm.com, darren-patrick-1373@ecf.pacerpro.com
- Jeffrey N Pomerantz    jpomerantz@pszjlaw.com
- Todd C. Ringstad    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Mitchell E Rishe    mitchell.rishe@doj.ca.gov
- Sonia Singh    ssingh@DanningGill.com, danninggill@gmail.com,ssingh@ecf.inforuptcy.com
- Daniel A Solitro    dsolitro@lockelord.com, ataylor2@lockelord.com
- Ross Spence    ross@snowspencelaw.com, janissherrill@snowspencelaw.com;donnasutton@snowspencelaw.com;brittanyDecoteau@snowspencelaw.com
- Christopher D Sullivan    csullivan@diamondmccarthy.com, mdomer@diamondmccarthy.com;kmartinez@diamondmccarthy.com
- Jennifer Taylor    jtaylor@omm.com
- John N Tedford    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
- Salina R Thomas    bankruptcy@co.kern.ca.us

- Patricia B Tomasco    pattytomasco@quinnemanuel.com, barbarahowell@quinnemanuel.com;cristinagreen@quinnemanuel.com

- Fred Whitaker      lshertzer@cwlawyers.com
- William E. Winfield      wwinfield@calattys.com, scuevas@calattys.com
- Richard Lee Wynne      richard.wynne@hoganlovells.com,
  tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com
- Emily Young      pacerteam@gardencitygroup.com,
  rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com
- Aaron E de Leest      adeleest@DanningGill.com,
  danninggill@gmail.com;adeleest@ecf.inforuptcy.com

## 2. SERVED BY UNITED STATES MAIL

Debtor
HVI Cat Canyon, Inc.
c/o Capitol Corporate Services, Inc.
36 S. 18th Avenue, Suite D
Brighton, CO 80601

Debtor
HVI Cat Canyon.Inc.
630 Fifth Avenue, Suite 2410
New York, NY 10111

SNOW SPENCE GREEN LLP
Ross Spence
2929 Allen Parkway, Suite 2800
Houston, Texas 77019

LAW OFFICE OF SUSAN WHALEN
Susan Whalen
2806 Alta St.
Los Olivos, CA  93441