1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@DanningGill.com*
3  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
4  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
5  Facsimile: (310) 277-5735

6  Attorneys for Michael A. McConnell,
   Chapter 11 Trustee
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **NORTHERN DIVISION**

11

12  In re                          | Case No. 9:19-bk-11573-MB

13  HVI CAT CANYON, INC.,          | Chapter 11

14         Debtor.                 | **TRUSTEE'S NOTICE OF MOTION AND
                                   | MOTION FOR ORDERS:**
15                                 | **(I)(A) APPROVING BIDDING
                                   | PROCEDURES FOR THE SALE OF
16                                 | SUBSTANTIALLY ALL OF THE
                                   | ESTATE'S ASSETS, (B) APPROVING
17                                 | PROCEDURES FOR ASSUMPTION AND
                                   | ASSIGNMENT OF CERTAIN
18                                 | EXECUTORY CONTRACTS AND
                                   | UNEXPIRED LEASES, INCLUDING
19                                 | NOTICE OF PROPOSED CURE
                                   | AMOUNTS, (C) AUTHORIZING AND
20                                 | APPROVING THE SELECTION OF A
                                   | STALKING HORSE BIDDER, (D)
21                                 | APPROVING EXPENSE
                                   | REIMBURSEMENT, (E) SCHEDULING
22                                 | (i) AN AUCTION AND (ii) A SALE
                                   | HEARING, (F) APPROVING THE FORM
23                                 | AND MANNER OF ALL PROCEDURES,
                                   | PROTECTIONS, SCHEDULES, AND
24                                 | AGREEMENTS, AND
                                   | **(G) GRANTING RELATED RELIEF;
25                                 | AND (II)(A) APPROVING SALE OF
                                   | SUBSTANTIALLY ALL OF THE
26                                 | ESTATE'S ASSETS, (B) AUTHORIZING
                                   | THE ASSUMPTION AND ASSIGNMENT
27                                 | OF CERTAIN EXECUTORY
                                   | CONTRACTS AND UNEXPIRED
28                                 | LEASES, AND (C) GRANTING**

**RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF MICHAEL A. MCCONNELL, LINDSAY SHERRER, KERMITH BOFFILL AND SAM DELRAHIM AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**

Procedures Hearing

Date:      September 4, 2020
Time:      3:00 p.m.
Place:     Courtroom 201
           1415 State Street
           Santa Barbara, California

Sale Hearing

Date:      October 5, 2020
Time:      10:00 a.m.
Place:     Courtroom 201
           1415 State Street
           Santa Barbara, California

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................15

I. INTRODUCTION ..........................................................................................................15

II. STATEMENT OF FACTS ...........................................................................................17

    A.      OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS..........................17

    B.      THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S
            APPOINTMENT ....................................................................................................17

    C.      SECURED LIABILITIES .......................................................................................18

            1.      Post-Petition UBS Secured Claim ..................................................18

            2.      Prepetition UBS and GLR Secured Claim......................................18

            3.      Santa Barbara, Orange & Kern Counties .......................................20

            4.      Rival Well Services .........................................................................20

            5.      The State Controller .......................................................................21

            6.      Northern California Collection Services .........................................21

            7.      Post-Petition Oil and Gas Notices of California Asphalt Production,
                   Inc., GTL1, LLC and GIT, Inc. .....................................................21

    D.      ROYALTIES AND OVERRIDE ROYALTIES INTERESTS OF INSIDERS........23

    E.      THE TRUSTEE'S EFFORTS TO DISENTANGLE THE DEBTOR FROM
            ITS AFFILIATES ..................................................................................................23

    F.      THE OSPR CEASE AND DESIST ORDER .........................................................25

    G.      COVID-19 AND OIL PRODUCTION AS AN ESSENTIAL BUSINESS .............26

    H.      DROP IN OIL PRICES .........................................................................................26

    I.      THE TRUSTEE'S EMPLOYMENT OF TENOAKS AND MARKETING
            EFFORTS ...............................................................................................................27

    J.      THE TRUSTEE'S DECLARATORY RELIEF ACTION .....................................28

III. THE PROPOSED SALE PROCESS........................................................................30

    A.      MATERIAL TERMS OF THE SALE ...................................................................30

    B.      PROPOSED BIDDING PROCEDURES, INCLUDING ASSUMPTION
            AND/OR ASSIGNMENT PROCEDURES .........................................................31

    C.      KEY DATES AND DEADLINES .........................................................................39

D.      ASSUMPTION AND ASSIGNMENT PROCEDURES ...........................................40

E.      NOTICE PROCEDURES.........................................................................................44

    1.      Sale Notice.................................................................................................44

    2.      Publication Notice ....................................................................................45

    3.      Notice of Successful Bidder ....................................................................45

F.      PAYMENT OF SUCCESS FEE TO TENOAKS ....................................................45

IV. ARGUMENT ....................................................................................................................46

A.      THE PROPOSED SALE OF THE PURCHASED ASSETS SHOULD BE
        APPROVED UNDER 11 U.S.C. § 363(b)................................................................46

B.      THE PROPOSED BIDDING PROCEDURES ARE REASONABLE AND
        APPROPRIATE AND WILL FACILITATE MAXIMIZING THE VALUE
        OF THE PURCHASED ASSETS .............................................................................48

C.      THE EXPENSE REIMBURSEMENT IS REASONABLE AND LIKELY
        TO ENHANCE THE SALES PRICE.......................................................................49

D.      THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES
        ARE REASONABLE AND APPROPRIATE ..........................................................53

E.      ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED
        CONTRACTS IS AUTHORIZED BY THE BANKRUPTCY CODE....................53

F.      THE SALE OF THE ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
        ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. §
        363(f) SHOULD BE APPROVED ...........................................................................56

G.      IF THE TRUSTEE CONSUMMATES THE SALE OF THE ASSETS,
        SUCH ASSETS SHOULD BE SOLD OR ASSUMED FREE AND CLEAR
        OF SUCCESSOR LIABILITY.................................................................................59

H.      THE STALKING HORSE BIDDER ACTED IN GOOD FAITH IN
        CONNECTION WITH THE PROPOSED SALE AND THEREFORE THE
        PROPOSED SALE IS ENTITLED TO THE PROTECTIONS OF
        BANKRUPTCY CODE SECTION 363(m)..............................................................61

I.      PAYMENT TO UBS FROM THE SALE PROCEEDS SHOULD BE
        APPROVED .............................................................................................................62

J.      REQUEST TO VALUE COLLATERAL .................................................................62

K.      REQUEST FOR PERMISSION TO AMEND LEASES AND SURRENDER
        LEASEHOLD...........................................................................................................63

L.      WAIVER OF RULE 6004(h) and 6006(d)...............................................................63

V. NOTICE...............................................................................................................................64

ii

VI. CONCLUSION ................................................................................................................64

DECLARATION OF MICHAEL A. MCCONNELL.............................................................66

DECLARATION OF LINDSAY SHERRER ........................................................................73

DECLARATION OF KERMITH BOFFILL .......................................................................77

DECLARATION OF SAM DELRAHIM..............................................................................78

REQUEST FOR JUDICIAL NOTICE.................................................................................81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*,
    351 B.R. 313, 322 (Bankr. D. Del. 2006) ............................................................. 60

*Callahan v. Martin*,
    3 Cal. 2d 110, 118 (1935) ......................................................................................... 28

*Cinicola v. Scharffenberger*,
    248 F.3d 110, 119 (3d Cir. 2001) ............................................................................. 54

*COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*,
    524 F.3d 373, 382 (2d Cir. 2008) ............................................................................. 54

*Dabney Johnston Oil Corp. v. Walden*,
    4 Cal. 2d 637, 649 (1935) ......................................................................................... 28

*Doehring v. Crown Corp. (In re Crown Corp.)*,
    679 F.2d 774, 775 (9th Cir. 1982) ............................................................................ 49

*Group of Institutional Investors v. Chicago, Mil., St. P.& P.R.R.*,
    318 U.S. 523, 550 (1943) .......................................................................................... 54

*In re 995 Fifth Ave. Assocs., L.P.*,
    96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ................................................................... 50

*In re Am. W. Airlines, Inc.*,
    166 B.R. 908, 913 (Bankr. D. Ariz. 1994) ................................................................ 50

*In re Ayers*,
    137 B.R. 397, 399 (Banker. D. Mont. 1992) ............................................................ 58

*In re Bygaph, Inc.*,
    56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) .......................................................... 55

*In re Channel One Commc'ns, Inc.*,
    117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) ............................................................. 59

*In re Chrysler LLC*,
    405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ............................................................... 60

*In re County of Orange*,
    262 F.3d 1014 (9th Cir. 2001) .................................................................................. 58

*In re Dow Corning Corp.*,
    255 B.R. 445, 468 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir.
    2002) ......................................................................................................................... 59

*In re Equity Funding Corp.*,
    492 F.2d 793, 794 (9th Cir. 1974) ............................................................................ 47

1    *In re Fed. Mogul Global, Inc.*,
          293 B.R. 124, 126 (D. Del. 2003) ................................................................. 47
2
     *In re Gen. Motors Corp.*,
3         407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) .......................................... 60

4    *In re Hupp Indus.*,
          140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ............................................... 52
5
     *In re Integrated Resources, Inc.*,
6         147 B.R. 650 (S.D.N.Y. 1992) ..................................................................... 50

7    *In re Moore*,
          110 B.R. 924, 928 (Bankr. C.D. Cal. 1990) ................................................ 46
8
     *In re Network Access Sols., Corp.*,
9         330 B.R. 67, 75 (Bankr. D. Del. 2005) ....................................................... 54

10   *In re O'Brien Environmental Energy, Inc.*,
          181 F.3d 527, 536-537 (3rd Cir. 1999) ....................................................... 50
11
     *In re Roman Catholic Archbishop of Portland in Or.*,
12        339 B.R. 215, 227 (Bankr. D. Or. 2006) ..................................................... 59

13   *In re Trans World Airlines, Inc.*,
          322 F.3d 283, 288–93 (3d Cir. 2003) .......................................................... 60
14
     *In re Twenver, Inc.*,
15        149 B.R. 954, 956 (Bankr. D. Colo. 1992) ................................................. 49

16   *In re Zante, Inc.*,
          467 B.R. 216, 219 (D. Nev. 2012) ............................................................... 59
17
     *Laugharn v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
18        88 F. 2d 551 (9th Cir. 1937) ........................................................................ 28

19   *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
          4 F.3d 1095, 1099 (2d Cir. 1993) ................................................................ 54
20
     *Paulman v. Gateway Ventures Partners III, L.P. (In re Filtercorp, Inc.)*,
21        163 F.3d 570, 577 (9th Cir. 1998) ............................................................... 61

22   *ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*,
          635 F.3d 312, 319 (7th Cir. 2011) ............................................................... 54
23
     *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*,
24        325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005) ............................................. 47

25   *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie
          Smokeless Coal Co.)*,
26        99 F.3d 573, 585–87 (4th Cir. 1996) ........................................................... 60

27   *Walter v. Sunwest Bank (In re Walter)*,
          83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) .................................................... 46
28

1    **<u>STATUTES</u>**

2    11 U.S.C. § 101(31) ..................................................................................................... 22

3    11 U.S.C. § 363 ............................................................................................................ 60

4    11 U.S.C. § 363(b) .......................................................................................... 30, 46, 47

5    11 U.S.C. § 363(b)(1) ................................................................................................... 46

6    11 U.S.C. § 363(f) ........................................................................................ 30, 56, 57, 60

7    11 U.S.C. § 363(f) (2) ............................................................................................. 57, 58

8    11 U.S.C. § 363(f)(4) ............................................................................................. passim

9    11 U.S.C. § 363(m) ................................................................................................. 61, 65

10    11 U.S.C. § 365 ...................................................................................... 28, 29, 53, 54

11    11 U.S.C. § 365(a) ....................................................................................................... 53

12    11 U.S.C. § 365(b) ....................................................................................................... 53

13    11 U.S.C. § 365(b)(1) .............................................................................................. 53, 54

14    11 U.S.C. § 365(f) ....................................................................................................... 55

15    11 U.S.C. § 365(f)(2) ............................................................................................. 54, 56

16    11 U.S.C. § 502(d) ....................................................................................................... 20

17    11 U.S.C. § 503(b) ....................................................................................................... 50

18    11 U.S.C. § 506 ........................................................................................................... 62

19    11 U.S.C. § 506(a) .......................................................................................... 20, 21, 57

20    11 U.S.C. § 506(d) .......................................................................................... 20, 21, 22, 57

21    11 U.S.C. § 541 ........................................................................................................... 29

22    11 U.S.C. § 546(b) ................................................................................................. 21, 22

23    11 U.S.C. § 554(a) ....................................................................................................... 63

24    11 U.S.C. § 724(a) ....................................................................................................... 58

25    11 U.S.C. § 726(a)(4) ................................................................................................... 58

26    California Civil Procedure Code § 1203.58 ....................................................... 21, 22

27

28

# OTHER AUTHORITIES

Cal. Rev. & Tax Code § 4102.................................................................................58

Cal. Rev. & Tax. Code § 2618.............................................................................58

H.R. Rep. No. 95-595 (1977)..............................................................................58

# RULES

Fed. R. Bankr. P. 2002.......................................................................................53

Fed. R. Bankr. P. 3012..................................................................................57, 62

Fed. R. Bankr. P. 6004(f)(1) .............................................................................48

Fed. R. Bankr. P. 6004(h) .................................................................................63

Fed. R. Bankr. P. 6006(d) .................................................................................63

Local Bankruptcy Rule 6004-1..........................................................................32

Local Bankruptcy Rule 6004-1(b)(6) .............................................................49, 51

**PLEASE TAKE NOTICE** that Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), hereby moves (the "Motion") the Court for entry of <u>two orders</u>:

(1) an order, substantially in the form attached hereto as Exhibit 1 (the "Bidding Procedures Order"), (a) authorizing and approving certain proposed bidding and sale procedures, substantially in the form attached to the Bidding Procedures Order (the "Bidding Procedures"), in connection with one or more transactions (each, a "Sale Transaction") involving the sale ("Sale") of all or a portion of the Debtor's assets (the "Assets"), (b) authorizing and approving certain proposed assumption and assignment procedures in respect of certain executory contracts and unexpired leases (collectively, the "Designated Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), (c) authorizing and approving the selection of Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C. as the stalking horse bidders (collectively the "Stalking Horse Bidder"), (d) approving an expense reimbursement to the Stalking Horse Bidder, (e) scheduling dates for (i) one or more auctions (the "Auction"), including the assets under contract to the Stalking Horse Bidder as may be necessary (the "Purchased Assets"), and an auction or auctions of additional estate assets not under contract to the Stalking Horse Bidder, including but not limited to the REDU Assets (as defined below) and (ii) a hearing (the "Sale Hearing") to consider final approval of the Sale, (f) approving the form and manner of notice of any Auction and the Sale Hearing, and all procedures, protections, notices, and agreements related thereto, and (g) granting related relief; and

(2) following the Sale Hearing, an order or orders (the "Sale Order") to be filed in advance of the Sale Hearing, (a) approving the Sale(s) to the Successful Bidder(s) for the Assets (as defined in the Bidding Procedures), including for the purchase of assets not under contract to the Stalking Horse Bidder including the assets associated with the REDU operations in Orange County (the "REDU Assets") or, if the Successful Bidder(s) fails to consummate the Sale, to the Backup Bidder(s) (as defined in the Bidding Procedures)), which Sale(s) shall be free and clear of all liens, claims, encumbrances, other than Permitted Encumbrances and Assumed Obligations (as each is defined in the asset purchase agreement entered into between the Trustee and the Stalking Horse

Bidder (the "APA"), a copy of which is attached hereto as Exhibit 5), and other interests, (b) authorizing the assumption and assignment of the Designated Contracts which the Successful Bidder(s) (or, should the Successful Bidder fail to consummate the Sale, the Backup Bidder) has selected or will select to be assumed and assigned (collectively, the "Selected Designated Contracts"), and (c) granting related relief.

By this Motion, the Trustee requests entry of the following:

(a)    the Bidding Procedures Order, substantially in the form attached hereto as Exhibit 1:

    (i)    authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order, in connection with the Sale;

    (ii)    authorizing and approving the Assumption and Assignment Procedures in respect of the Designated Contracts and approving the form and manner of service of the Assumption Notice;

    (iii)    authorizing and approving the selection of the Stalking Horse Bidder;

    (iv)    approving an Expense Reimbursement in the amount of up to $300,000;

    (v)    scheduling the Auction, if necessary, to be held on September 23, 2020, at 10:00 a.m. (Pacific Standard Time) virtually via Zoom or similar videoconferencing technology, or such later date and time or such other location as selected by the Trustee, in which event the Trustee shall file a notice at least 24 hours before the Auction;

    (vi)    scheduling the Sale Hearing to be held on October 5, 2020, at 10:00 a.m. (Pacific Standard Time);

    (vii)    approving the form and manner of service of the Sale Notice (as defined herein) and the Assumption Notice; and

    (viii)    granting related relief; and

(b)    following the Sale Hearing, subject to the results of the Auction(s), entry of the Sale Order:

    (i)    approving the APA;

    (ii)    approving and confirming the Sale to the Successful Bidder (or, should the Successful Bidder fail to consummate the Sale, to the Backup Bidder), which sale shall be free and clear of all liens, claims, encumbrances, and other interests other than Permitted Encumbrances and Assumed Obligations;

    (iii)    approving the assumption and assignment of the Selected Designated

Contracts;

(iv)   authorizing the Trustee to make revisions to or to surrender Leases and Contracts to aid in a sale;

(v)   valuing the Purchased Assets and the extent that liens are secured by the collateral;

(vi)   finding that the Successful Bidder and Backup Bidder are good faith purchasers within the meaning of 11 U.S.C. § 363(m);

(vii)   granting related relief; and

(c)   following the Sale Hearing, subject to the results of the Auction(s), entry of the Sale Order:-

(i)   approving the APA with respect to REDU Aassets not under contract to the Stalking Horse Bidder including the assets associated with the REDU operations in Orange County (the "REDU Assets");

(ii)   approving and confirming the Sale to the Successful REDU Bidder (or, should the Successful REDU Bidder fail to consummate the Sale, to the Backup REDU Bidder), which sale shall be free and clear of all liens, claims, encumbrances, and other interests other than Assumed Obligations;

(iii)   approving the assumption and assignment of the Selected Designated Contracts;

(iv)   authorizing the Trustee to make revisions to or to surrender Leases and Contracts to aid in a sale;

(v)   valuing the REDU Assets;

(vi)   finding that the Successful REDU Bidder and any Backup Bidder for the REDU Assets are good faith purchasers within the meaning of 11 U.S.C. § 363(m);

(vii)   granting related relief.

As explained more fully in the attached Memorandum of Points and Authorities, the Trustee has marketed the Purchased Assets as well as the REDU Assets and determined in his sound business judgment that the proposed sale of the Purchased Assets to the Stalking Horse Bidder, subject to overbid, is in the best interest of the estate.  The APA provides for the sale of the Purchased Assets for a purchase price of $26.75 million, consisting of $8.5 million cash, $500,000 cash to be contributed to a litigation fund to pursue avoiding power claims, $500,000 cash to be

5

contributed to an appeal escrow, plus an earn-out Production Payment of approximately $11.75 million (less the real property taxes it is to assume of approximately $5.5 million) plus the assumption of the Assumed Obligations (described in the APA).  The APA further provides that the sale of the Purchased Assets will be subject to higher or otherwise better offers.  Because the Stalking Horse Bid and APA do not include the REDU Assets, the Trustee proposes to offer them for auction at the same time as the Auction of the assets under contract in the Stalking Horse Bidder's APA, separately and jointly with the Assets.

The APA also provides for the creation of a litigation fund of $1 million; $500,000 to be provided by UBS and $500,000 by the Buyer for the Trustee to pursue claims against the Debtor's insiders and affiliates. The APA also provides for a $500,000 reserve to defend any appeals from the Sale Order.

In accordance with Local Bankruptcy Rule 6004-1, the below chart summarizes the Bidding Procedures and the procedures for conducting the Auction:[1]

| Qualification of Bidders | Any party (each, a **"Potential Bidder"**) that submits to the Trustee (i) an executed confidentiality agreement on terms acceptable to the Trustee; (ii) identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and (iii) the most current audited and latest unaudited financial statements (the **"Financials"**) of the Potential Bidder or any such other form of financial disclosure or credit-quality support information demonstrating that such Potential Bidder has the ability to close the Sale, may be granted access to diligence materials.  For the avoidance of doubt, the Stalking Horse Bidder shall be granted access to diligence materials and shall be deemed a qualified bidder in all respects.  The Trustee shall not exclude a party from diligence who has complied with subsections (i) and (ii) above, unless they have first consulted with the Consultation Parties (as defined in the Bidding Procedures) regarding such determination.  UBS and its affiliates are deemed Potential Bidders. |
| --- | --- |

---

[1] The following is a brief summary only and is subject to the Bidding Procedures Order, and in the event of any inconsistency between this summary and the Bidding Procedures Order, the latter shall control.

| | | |
|---|---|---|
| **Qualified Bids** | | A **"Qualified Bid"** is a written offer to enter into a Sale Transaction with the Trustee, by a Bidder and submitted in writing to the Trustee, so as to be received on or before the Bid Deadline that satisfies at least each of the following conditions (provided, that the Trustee, in consultation with the Consultation Parties may waive or modify, except with respect to the minimum Purchase Price and Deposit, the application of such conditions to any Bid):

*Assets*.  Each Bid must clearly state which Assets, including, if applicable, the Purchased Assets or the REDU Assets, and which liabilities of the Debtor the Bidder is agreeing to purchase and assume.  Except with respect to the minimum Purchase Price and Deposit relating to the Purchased Assets, the Trustee may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids.

*Purchase Price*.  Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Asset subject to the applicable asset package (including any assumed liabilities), including and identifying separately any cash and non-cash components (the **"Purchase Price"**).  Any Bid (Purchase Price) for the Purchased Assets shall be not less than the sum of the value under the Stalking Horse Bidder's APA plus the sum of (i) the $300,000 Expense Reimbursement and (ii) a minimum initial overbid increment in the amount of $250,000.  This equates to a $550,000 minimum overbid with $100,000 increments thereafter.

*Deposit*.  On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate cash and non-cash Purchase Price of the Bid (or such other amount as the Trustee determines, in consultation with the Consultation Parties), to be held in an escrow account to be identified and established by the Trustee (the **"Deposit"**); *provided*, *however*, that any party submitting a Bid primarily composed of a credit bid pursuant to Section 363(k) of the Bankruptcy Code shall not be required to submit a Deposit for the portion of the Bid consisting of a credit bid.

*Assumption of Obligations*.  Each Bid must clearly state which liabilities of the Debtor the Bidder is agreeing to assume.  Except as otherwise provided in a purchase agreement to be executed by a Successful Bidder, all of the Debtor's rights, title, and interest in and to the Assets subject thereto will be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein, including without limitation royalties due prior to the date of close of the sale  (collectively, **"Interests"**) to the maximum extent permitted by section 363 of the Bankruptcy Code, with certain specified Interests to attach to the proceeds of |

the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

*Designation of Assigned Contracts and Leases*.  A Bid must identify any and all executory contracts and unexpired leases (collectively, **"Contracts"**) of the Debtor that the bidder wishes to be assumed and assigned to the bidder at closing pursuant to a Sale, subject to modification as set forth in the Qualified Bid Documents (as defined below).

*Adequate Assurances*.  A Bidder must make a representation that it will be able to provide adequate assurance of future performance under any Contracts to be assumed and assigned under section 365 of the Bankruptcy Code, as well as written evidence that the Trustee believes to be sufficient to demonstrate the foregoing.

*Qualified Bid Documents*.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale Transaction and/or Sale contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, as well as all other material documents integral to such Bid (the **"Qualified Bid Documents"**).  To the extent the Bidder seeks to bid on Assets that include or overlap with the Purchased Assets, such documents must be based on and marked against the Stalking Horse Bidder's APA and any other form documents provided by the Trustee.  Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee.

To the extent the Bidder seeks to bid on REDU Assets, such documents must be based on and marked against the REDU APA and any other form documents provided by the Trustee.  Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee.  A form REDU APA to be used for each Bid will be filed by the Trustee in advance of the Procedures Hearing and available in Word form from the Trustee.

*Committed Financing*.  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Trustee, in consultation with the Consultation Parties, that demonstrates that the Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and

conditions acceptable to the Trustee, in consultation with the Consultation Parties.

*Contingencies; No Financing or Diligence Outs*. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of limited, specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Trustee in his business judgment.

*Identity*. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each parent company, equity holder or other financial backer of the applicable Bidder), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that should be contacted regarding such Bid. The Bid must also disclose all connections with the Debtor and other parties in the case, including whether the bidder is an insider or affiliate of the Debtor.

*Demonstrated Financial Capacity*. A Bidder must have, in the Trustee's business judgment, in consultation with the Consultation Parties, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

*Time Frame for Closing*. A Bid by a Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame for closing, with respect to the Purchased Assets, that comports with the time for closing set forth in the APA, and as acceptable to the Trustee, in consultation with the Consultation Parties.

*Binding and Irrevocable*. A Bid shall be binding and irrevocable unless and until the Trustee accepts a higher Bid for such Asset package and such Bidder is not selected as a Backup Bidder, and the Bidder's Deposit has been returned.

*Expenses; Disclaimer of Fees*. Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Bidder, including a Qualified Bidder

(except for the Stalking Horse Bidder), will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

*Authorization*.  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Trustee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

*As-Is, Where-Is*.  Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer which the Bidder believes is necessary for the proposed transaction; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

*Adherence to Bid Procedures*.  By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

*Regulatory Approvals and Covenants*.  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Sale and/or Sale Transaction, if any, and the time period within which the bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Bidder will take to ensure receipt of such approvals as promptly as possible).

*Bid Deadline*.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** by the Trustee, the Stalking Horse Bidder, and the U.S. Trustee on or **before 12:00 p.m. (noon) (Pacific Standard Time) on September 18, 2020** (the "**Bid Deadline**").

| | |
|---|---|
| | For the avoidance of doubt, each Bid that satisfies all of the following criteria in a manner acceptable to the Trustee, consistent with the exercise of his fiduciary duties, shall be deemed a Qualified Bid, and each Bidder who submits a Qualified Bid shall be deemed a "**Qualified Bidder**".  Notwithstanding anything to the contrary in this Motion, the Bidding Procedures or the Bidding Procedures Order, any Bid consisting of a credit bid shall be deemed a Qualified Bid (the "Qualified Credit Bid"), and the Stalking Horse Bidder shall be deemed a Qualified Bidder. |
| | Notwithstanding anything else contained in the Bidding Procedures, UBS shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of its allowed secured claims at the Auction pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable terms of the Trustee Financing and the UBS Secured Debt, respectively. |
| **Bid Protections** | The Bid Protections for the Stalking Horse Bidder are limited to the minimum overbid requirements and reimbursement of documented fees and expenses actually incurred in connection with the APA and sale process up to a maximum aggregate amount of $300,000. There is no "break-up fee" under the APA. |
| | Any competing bid for the Purchased Assets shall be not less than the sum of the value under the Stalking Horse Bidder's APA plus the sum of (i) the Expense Reimbursement and (ii) a minimum initial overbid increment in the amount of $250,000. |
| | No other provision for any type of bid protection is made under the terms of the Qualified Bid Documents or the Bidding Procedures (except with respect to the Stalking Horse Bidder), except that any further Overbid shall be made in increments in an amount to be announced at the Auction, in consultation with the Consultation Parties.  Each Bidder (other than the Stalking Horse Bidder) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or similar form of compensation. |
| **Modification of Bidding and Auction Procedures** | Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine, in consultation with the Consultation Parties, to be in the best interest of the Debtor's estate and in the exercise of his fiduciary duties to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid (other than the Qualified Credit Bid) that is (i) |

11

| | |
|---|---|
| | inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor's estate; (e) impose additional terms and conditions with respect to all Bidders (other than the Stalking Horse Bidder); (f) extend the deadlines set forth herein; (g) continue or cancel the Auction and/or Sale Hearing, including by announcement in open court without further notice; and (h) announce additional procedural rules that are reasonable under the circumstances for conducting the Auction. |
| **Closing with Alternative Backup Bidders** | A Qualified Bid must provide that it is binding and irrevocable unless and until the Trustee accepts a higher Bid for such Asset package and such Qualified Bid is not selected as the Backup Bidder, and the Deposit accompanying the Qualified Bid is returned to the corresponding Qualified Bidder. Each Qualified Bidder further agrees that its Qualified Bid, if not chosen as the Successful Bid, shall serve, without modification, as a Backup Bid (as defined below) for the applicable Asset package, as may be designated by the Trustee after the conclusion of the Auction, if any, but no later than the Sale Hearing, and must be kept open and irrevocable until the earlier of (a) the date that is 90 calendar days after the date of entry of the Sale Order, or (b) the closing date of the Sale with the Successful Bidder. |
| **Date, Time, Place, and Notice of Auction** | The Auction, if necessary, shall take place on **September 23, 2020, at 10:00 a.m. (Pacific Standard Time)** virtually via Zoom or similar videoconference technology, or such later date and time or such other location as selected by the Trustee, in which event the Trustee shall file a notice at least 24 hours before the Auction indicating such change and will serve the same on all Qualified Bidders and all parties who have requested notice pursuant to Local Rule 2002-1(b). The Auction may be postponed, adjourned, or cancelled as the Trustee deems appropriate. |
| **No Collusion** | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, including, without limitation, no agreements to compensate any person with regard to the bid or share ownership of, the proceeds or benefits of the bids or assets purchased each unless fully disclosed on the record at such time; and (ii) its Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder. The Successful Bidder and the Backup Bidder must be prepared to sign a declaration to be prepared by the Trustee to satisfy provisions of the Bankruptcy Code, including 11 U.S.C. §§ 363(m) and 365(b)(1)(C). |
| **Auction Participants** | Only Qualified Bidders and their legal and financial advisors, and the Consultation Parties (including, for the avoidance of doubt, |

12

| | |
|---|---|
| | UBS) shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (via Zoom or similar videoconference technology) and may speak or Bid themselves or through duly authorized representatives.  Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) shall be entitled to Bid at the Auction, unless the Trustee determines otherwise in the exercise of his fiduciary duties.  Each Qualified Bidder must have at least one individual representative with authority to bind the Qualified Bidder attend the Auction in person (via Zoom or similar videoconference technology). |
| **Transcription or Video Recording** | To the extent available, bidding at the Auction will be transcribed or video recorded. No audio or video recordings of the Auction may be made by anyone other than the Trustee. |

This Motion is based on this Notice and Motion, the attached Memorandum of Points and Authorities, the attached declarations, including the Declaration of Michael A. McConnell (the "Trustee Declaration"), the arguments of counsel, the record in the bankruptcy case, and other admissible evidence properly brought before the Court at or before the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that the Motion also seeks authority to pay TenOaks Energy Partners, LLC, the Trustee's Court approved investment banker, its fee[2] in connection with this transaction.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Bidding Procedures Relief on **September 4, 2020 at 3:00 p.m.**, before the Honorable Martin R. Barash, United States Bankruptcy Judge, in Courtroom 201 of the United States Bankruptcy Court for the Central District of California, located at 1415 State Street, Santa Barbara, California. Appearances will only be allowed by ZoomGov.  The hearing will be conducted remotely, using ZoomGov video and audio.  The Zoom connection information for the hearing is as follows:

---

[2] Pursuant to TenOaks' employment agreement the Success Fee for the Transaction(s) will be equal to the greater of: (i) $400,000 (four hundred thousand dollars) (the "Minimum Success Floor"), and (ii) 2.0% (two percent) of that portion of the Aggregate Consideration payable pursuant to the Transaction(s) that is up to and including $40,000,000, 2.5% (two and one half percent) of that portion of the Aggregate Consideration payable pursuant to the Transaction(s) that is greater than $40,000,000 but less than $60,000,000, or 3.0% (three percent) of that portion of the Aggregate Consideration payable pursuant to the Transaction(s) that is greater than $60,000,000.

**Join CACB ZoomGov Meeting**

Phone one-tap:      US: +16692545252,,1611277571#,,1#,661874# or
+16468287666,,1611277571#,,1#,661874#

Meeting URL:      https://cacb.zoomgov.com/j/1611277571
Meeting ID:        161 127 7571
Password:          661874

**Join by Telephone**

For higher quality, dial a number based on your current location.
Dial:

US: +1 669 254 5252 or +1 646 828 7666

Meeting ID:        161 127 7571

Password:          661874

    **Any response or opposition to the Bidding Procedures relief requested in the Motion**

**must be in writing, must otherwise comply with Local Bankruptcy Rules 6004-1(b) and**

**9013, and must be filed with the Court and served upon counsel for the Trustee (by**

**personal delivery, messenger, fax or email) at the address set forth in the upper left-hand**

**corner of the first page of this notice of motion no later than one (1) day before the date of**

**the hearing on the Bidding Procedures relief, unless otherwise ordered by the Court**.

Pursuant to Local Bankruptcy Rule 9013-1(h), the failure to timely file and serve a written

opposition may be deemed by the Court to be consent to the granting of the relief requested

herein. **The Court has set a hearing on October 5, 2020 at 10:00 a.m. (the Sale Hearing), to**

**consider the remaining relief in the Motion.  A separate Sale Notice with the hearing**

**information, including the Zoom information,  will be served as set forth in the Motion.**

DATED:  August 25, 2020                DANNING, GILL, ISRAEL & KRASNOFF, LLP


                                       By:  _____/s/ Eric P. Israel_____
                                            ERIC P. ISRAEL
                                            Attorneys for Michael A. McConnell,
                                            Chapter 11 Trustee

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## INTRODUCTION

4      Since his appointment in October 2019, Michael A. McConnell, as the Chapter 11 trustee

5  (the "Trustee") for HVI Cat Canyon, Inc. (the "Debtor"), has been stabilizing the Debtor's

6  operations in the ordinary course, while preparing the Debtor's assets (the "Assets"), which

7  primarily consist of oil and gas interests, for sale to a responsible operator.  The legal description of

8  all of the Assets is attached as Exhibit 6.  In that regard, in March 2020, the Trustee initiated

9  marketing efforts to obtain the highest and best price for all or a portion of the Assets.  With the

10  assistance of his investment banker, TenOaks Energy Partners, LLC ("TenOaks"), the Trustee

11  reached out to over 10,500 contacts at approximately 4,250 potential buyer companies.

12  Approximately 60 of these potential buyers executed a non-disclosure agreement and reviewed due

13  diligence information regarding the Assets provided by the Trustee.  During this time, the Trustee

14  received an offer from Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C. (collectively

15  the "Stalking Horse Bidder"), and they (through their respective professionals) engaged in arm's-

16  length negotiations regarding the terms of a sale.

17      After several months of negotiations, the Trustee and the Stalking Horse Bidder

18  documented an asset purchase agreement (the "APA"), attached hereto as Exhibit 5,[3] under which

19  the Trustee proposes to sell, subject to higher or otherwise better bids, substantially all of the

20  Assets (but not including the REDU operations in Orange County, among other Assets), except as

21  provided in the APA (collectively, the "Purchased Assets").  This sale will be free and clear of any

22  liens, claims, encumbrances and interests (valid or not) other than Permitted Encumbrances and

23  Assumed Obligations (both as defined in the APA).  The Stalking Horse Bidder has advanced a

24  deposit of $500,000 into a segregated account of the Trustee in accordance with the terms of the

25  APA.  The APA has further potential up-side for the estate because the Stalking Horse Bidder has

26

27  _____

    [3] Contemporaneously herewith the Trustee is filing a motion to file the Allocated Value Letter
28  referenced in the APA and the net revenue interest set forth in the exhibits to the APA under seal
    because they contains sensitive and confidential information relating to the Assets.

15

1    agreed that the Trustee may continue to market the Purchased Assets to search for a higher or

2    otherwise better offer, subject to the requirement that the Trustee must reimburse documented fees

3    and expenses actually incurred in connection with the APA and sale process up to a maximum

4    aggregate amount of $300,000 (the "Expense Reimbursement"), if the Trustee sells the Purchased

5    Assets to a different purchaser.  The APA does not require the Trustee to pay a break-up fee if the

6    Trustee sells the Purchased Assets to a different purchaser.  The Stalking Horse Bidder has also

7    agreed to be a Back-Up Buyer of the Purchased Assets if the Court confirms the sale to another

8    party, but that party defaults in the purchase.  The Expense Reimbursement is to compensate the

9    Stalking Horse Bidder for its time, effort, expense and risk performing due diligence on the Assets

10   and negotiating and documenting the APA and related documents and pleadings, its participation in

11   the sale and auction process, and its commitment to be a Back-Up Buyer.  The Stalking Horse

12   Bidder has also agreed to share certain due diligence reports with the Trustee and the Trustee will

13   share that data with other potential bidders.

14        The Stalking Horse Bidder is not proposing to purchase the Assets associated with the

15   REDU operations in Orange County and certain other leases, and the Trustee will seek offers

16   through the time of, and during, the Auction for the REDU Assets, collectively with the Purchased

17   Assets and separately.

18        Due to the recent decline in oil and gas prices resulting from COVID-19 and other global

19   events, there is a strong present need to sell the Assets within the next 45-60 days.  A sale would

20   eliminate the estate's expenses associated with operating the Debtor's wells, which are not

21   covering even the operating expenses.  Continued operations have only been possible because UBS

22   AG, Stamford Branch has been lending funds monthly for that purpose.  Absent a sale, or

23   additional financing, the Trustee would have to likely stop oil production and shut in wells, or

24   possibly abandon the Assets.[4]  A sale will also facilitate a change to a new, non-Greka operator, as

25   well as eliminate estate expenses associated with operating the Debtor and its mineral interests.

26

27   _____

     [4] The Trustee anticipates filing a motion to abandon any unsold Assets that will also be set for

28   hearing at the same time as Sale Hearing.

1    The Trustee remains engaged with other potential buyers and is hopeful that these other potential

2    buyers will qualify and submit bids for the Assets, including the Purchased Assets and/or the

3    REDU Assets, so that sales at Auction, discussed below, will bring the highest and best aggregate

4    price.

5           The transactions for which Trustee seeks approval are eminently reasonable and patently in

6    the estate's best interest.  Accordingly, the Trustee respectfully requests that the Court approve the

7    Bidding Procedures, including the Expense Reimbursement and grant the other relief contained in

8    the Bidding Procedures Order attached as Exhibit 1, and that, following the Sale Hearing, the Court

9    authorize the Trustee to sell the Assets free and clear of any liens, claims, encumbrances and

10   interests (other than Permitted Encumbrances and Assumed Obligations), grant the other relief

11   requested herein.

12

13                                         **II.**

14                            **STATEMENT OF FACTS**

15   **A.     OVERVIEW AND HISTORY OF THE DEBTOR'S BUSINESS**

16          The Debtor is a Colorado corporation authorized to conduct business in the State of

17   California.  It is the owner and operator of producing oil and gas interests in California.  According

18   to the Debtor, it owns an approximately 100% working interest and an average 85% net revenue

19   interest in several oilfields in the Santa Maria Valley of Santa Barbara County ("SMV"), North

20   Belridge in Kern County ("Belridge"), and Richfield East Dome Unit in Orange County

21   ("REDU").[5]  The Trustee is advised that the Debtor has over 1,000 oil wells, although many of

22   those are currently idle.

23

24   **B.     THE DEBTOR'S BANKRUPTCY FILING AND THE TRUSTEE'S APPOINTMENT**

25          On July 25, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under

26   Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The case was originally

27

28   _____
[5] Docket no. 16, pp. 1-2, ¶ 2.

17

1    filed in the Southern District of New York.  It was transferred to the Northern District of Texas,

2    and then later to the Central District of California.

3         The Debtor initially operated its business as a "debtor in possession," allowing it to exercise

4    substantially all rights of a trustee in the bankruptcy case.

5         On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was

6    appointed.

7         On or about October 16, 2019, the Court entered its *Agreed Order Granting Motion for*

8    *Appointment of a Chapter 11 Trustee*.

9         On or about October 21, 2019, the U.S. Trustee appointed Michael A. McConnell as the

10   Chapter 11 trustee in this case and, on or about October 22, 2019, the Court entered its order

11   approving the appointment.

12

13   **C.**    **SECURED LIABILITIES**

14        **1.**    **Post-Petition UBS Secured Claim**

15        Pursuant to prior orders of the Court, UBS AG, Stamford Branch to date has loaned not less

16   than $11.5 million to the Trustee in post-petition financing (the "Trustee Financing") for the

17   Trustee's operations of the Debtor.  As a result of the Court's prior orders, UBS AG, Stamford

18   Branch has a superpriority post-petition financing lien (and administrative claim) on essentially all

19   of the Debtor's Assets senior to all other liens and interests subject only, to the extent Santa

20   Barbara County has valid, senior, perfected, and non-avoidable liens for *ad valorem* taxes under

21   applicable law, to such valid, senior, perfected and non-avoidable ad valorem tax liens in favor of

22   Santa Barbara County.[6]

23        **2.**    **Prepetition UBS and GLR Secured Claim**

24        Prior to the commencement of the bankruptcy case, the Debtor and UBS AG, London

25   Branch had entered into certain loan arrangements evidenced by: (i) that certain First Lien Credit

26

---

27   [6] Pursuant to Final Order for Emergency Priming and Superpriority Financing and Consensual Use
Of Cash Collateral By The Chapter 11 Trustee (*docket no. 572*) (the "Final Financing Order"),

28   entered on November 27, 2019, the *ad valorem* tax liens of Santa Barbara County are junior to the
$1,191,862 advanced by UBS AG, Stamford on and before to November 21, 2019.

1   Agreement among the Debtor, Rincon Island Limited Partnership, GOGH, LLC, and UBS AG,

2   London Branch dated as of May 20, 2016 in the original principal amount of $50 million; and (ii)

3   that certain Second Lien Credit Agreement among the Debtor, Rincon Island Limited Partnership,

4   GOGH, LLC and UBS AG, London Branc dated as of May 20, 2016 in the original principal

5   amount of $50 million (collectively, the "Prepetition Credit Agreements" and the obligations

6   arising thereunder, the "UBS Secured Debt").

7        The Debtor is also a party to that certain Amended and Restated Credit Agreement, as

8   amended, with GLR, LLC ("GLR") dated as of May 20, 2016 (the "GLR Secured Debt").

9   Substantially all of the Debtor's Assets are pledged as collateral for its obligations under the UBS

10  Secured Debt, which is in first and second position, and the GLR Secured Debt, which is

11  subordinate to the UBS Secured Debt.[7]  The UBS Secured Debt and the GLR Secured Debt are

12  junior to the Trustee Financing.  GLR is an affiliate and insider of the Debtor.

13        UBS AG, London Branch and GLR are parties to that certain Subordination and

14  Intercreditor Agreement ("Subordination Agreement") dated as of May 20, 2016.  The

15  Subordination Agreement provides, among other things, that GLR's liens, right to payment and

16  right to exercise remedies are subordinate to those of UBS AG, London Branch.[8]

17        According to the Debtor, on the Petition Date the outstanding amount due to UBS AG,

18  London Branch was approximately $114 million, and the outstanding amount due to GLR was

19  approximately $104 million.  UBS AG, London Branch asserts and the Trustee stipulated in Final

20  Financing Order that the then current outstanding amount due to UBS AG, London Branch was

21  approximately $128 million.[9]

22        In October 2019, UBS' expert valuation of the Debtor's Assets concluded that they were

23  worth at that time between $50 million and $75 million.[10]

24

25

26  [7] Docket no. 43, p. 2 of 14, ¶ C.
    [8] Docket no. 11, p. 3 of 10.

27  [9] Docket no. 572, p. 24 of 40, ¶ 44; *see also* Docket no. 43, p. 2 of 14, ¶ C ("UBS asserts that the
    current outstanding amount due to UBS is at least $128,000,000").

28  [10] Docket no. 121, p. 8 of 31, ¶ 8.

1        The Court agreed with UBS' valuation during the evidentiary hearings conducted on

2  October 3 and 4, 2019, in connection with the Debtor's cash collateral motion.[11]  Thus, pursuant to

3  11 U.S.C. § 506, UBS is an undersecured creditor and GLR is entirely unsecured. Thus, at the

4  proposed sale price, any claim of GLR is entirely unsecured.  *See* 11 U.S.C. § 506(d).

5        In addition, the Trustee commenced an adversary proceeding against GLR to avoid certain

6  transfers the Debtor made to GLR and GRL, LLC ("GRL"), including certain transfers made

7  approximately 6 days prior to the Petition Date.  As such, the lien of GLR is disputed pursuant to

8  11 U.S.C. §§ 502(d) and 363(f)(4).

9       **3.**    **Santa Barbara, Orange & Kern Counties**

10       Santa Barbara asserts that it has a secured tax claim for *ad valorem* real property taxes owed

11  by the Debtor in excess of $4.7 million as of the Petition Date.[12]  Orange County and Kern County

12  have filed proofs of claim, docketed as Claim No. 7[13] and Claim No. 3[14] on the Court's Claims

13  Register, that assert secured tax claims against the Debtor.  The Trustee disputes portions of the

14  property tax claims, among other bases, because they include penalties, assessments for properties

15  not owned by the Debtor and are based upon overstated assessed values of the properties.

16       **4.**    **Rival Well Services**

17       The Debtor's schedules also reflect that Rival Well Services, Inc. ("Rival") has a secured

18  claim for an oil and gas lien in the amount of $101,556.75, secured by real property in Kern

19  County.[15]  However, to the extent this lien is valid, it is junior to the liens securing the Trustee

20  Financing and the UBS Secured Debt, and at the proposed sale price, any claim of Rival is entirely

21  unsecured.  *See* 11 U.S.C. § 506(a) and (d).

22

23

24

---

[11] The Court stated that the value of the company ranged from $50 to 75 million.  Oct. 4, 2019 Tr.
25  at 335:9-16.
[12] *See* Claim No. 79.
26  [13] Claim No. 7 asserts a unsecured priority claim in the amount of $129,047.80 and a secured claim
in the amount of $107,798.30.
27  [14] Claim No 3 asserts a secured claim in the amount of $16,098.27.  Kern County also filed Claim
No. 2 asserting an unsecured claim in the amount of $33,736.98.
28  [15] Docket no. 171, p. 73 of 316.

5. **The State Controller**

The Debtor's schedules also reflect that the California State Controller Tax Administration Section (the "State Controller") has a claim for unpaid "production assessments" in the amount of $1,304,573.87, secured by real property in Orange and Santa Barbara Counties.[16]  However, this lien is junior to the liens securing the Trustee Financing and the UBS Secured Debt, and at the proposed sale price, any claim of the State Controller is entirely unsecured.  *See* 11 U.S.C. § 506(a) and (d).

6. **Northern California Collection Services**

The Debtor's schedules also reflect that Northern California Collection Service, Inc. ("Collection Service") recorded an abstract of judgment in the amount of $175,703.75, secured by real property in Santa Barbara County and JL-1 judgment lien filed with the Secretary of State.[17] Collection Service's JL-1 judgment lien was filed with the Secretary of State after the UCC-1 financing statements of UBS and GLR and is junior to those interests.  Thus, at the proposed sale price, any claim of Collection Service is entirely unsecured.  *See* 11 U.S.C. § 506(a) and (d).

7. **Post-Petition Oil and Gas Notices of California Asphalt Production, Inc., GTL1, LLC and GIT, Inc.**

On or about February 24, 2020, California Asphalt Production, Inc. ("CAP") purported to file under 11 U.S.C. § 546(b) a Notice of Oil and Gas Lien *(docket no. 821)*, in which it asserts a lien pursuant to California Civil Procedure Code § 1203.58 for unpaid services and materials CAP allegedly provided to the Debtor post-petition between August 1, 2019 and February 4, 2020 in the aggregate amount of $2,240,686.86.

On or about February 24, 2020, GTL1, LLC ("GTL1") purported to file under 11 U.S.C. § 546(b) a Notice of Oil and Gas Lien *(docket no. 822)*, in which it asserts a lien pursuant to California Civil Procedure Code § 1203.58 for unpaid services and rental equipment GTL1 allegedly provided to the Debtor post-petition between August 1, 2019 and December 31, 2019 in the amount of $979,717.20.

---

[16] Docket no. 171, p. 73 of 316.
[17] Docket no. 171, p. 73 of 316.

1    On or about February 24, 2020, GIT, Inc. ("GIT") purported to file under 11 U.S.C.

2  § 546(b) a Notice of Oil and Gas Lien *(docket no. 823)*, in which it asserts a lien pursuant to

3  California Civil Procedure Code § 1203.58 for unpaid services and materials GIT allegedly

4  provided to the Debtor <u>post-petition</u> between August 1, 2019 and January 31, 2020 in the amount

5  of $1,276,779.29.

6    CAP, GTL1 and GIT are all insiders or affiliates of the debtor within the meaning of 11

7  U.S.C. § 101(31).  The Notices of Oil and Gas Liens filed by CAP, GTL1 and GIT are referred to

8  collectively herein as the "Oil and Gas Notices."[18]

9    The Trustee disputes that the Oil and Gas Notices validly created any liens on the Debtor's

10  Assets, and indeed asserts that they violated the automatic stay.  On or about March 26, 2020, the

11  Trustee filed his Motion to Expunge the Oil and Gas Notices filed by CAP, GTL1 and GIT (*docket

12  no. 875*) (the "Motion to Expunge").  As set forth in the Motion to Expunge, the Trustee's reply

13  (*docket no. 920*) and supplemental brief (*docket no. 985)* filed in support thereof, the Trustee does

14  not believe that the Oil and Gas Notices are valid liens against the Debtor's property, and indeed

15  that they violated the automatic stay.  The hearing on the Trustee's Motion to Expunge was

16  continued several times.  At the continued hearing on June 15, 2020, the Court denied the Motion

17  to Expunge without prejudice because it ruled that the Trustee needed to seek this relief through an

18  adversary proceeding.  The Trustee has filed a complaint challenging the Oil and Gas Notices –

19  Adversary No. 9:20-ap-01039-MB.  Those purported liens are subject of a bona fide dispute.  11

20  U.S.C. § 363(f)(4).

21    Moreover, the liens are junior to the senior liens of UBS and GLR and the liens securing the

22  Trustee Financing, and hence the claims of CAP, GTL1 and GIT are entirety unsecured.  *See* 11

23  U.S.C. § 506(d).  Claims, if any, of CAP, GTL1 and GIT are junior to the Trustee Financing and,

24

25

26
_____

27  [18] The Trustee has numerous defenses and setoffs to the asserted obligations underlying each of the
Oil and Gas Notices.  Among other things, the agreements were rejected effective as of earlier
dates.  *See, e.g.*, docket nos. 612 (certain oil sale agreements with CAP rejected as of November 27,

28  2019), 613 (remaining agreements with CAP and agreement with GTL1 all rejected as of
November 27, 2019) and 782 (agreement with GIT rejected as of December 31, 2019).

1  accordingly, the Trustee Financing should be paid in full before any payments are made to CAP,

2  GTL1 and GIT.

3

4  **D.       ROYALTIES AND OVERRIDE ROYALTIES INTERESTS OF INSIDERS**

5         GRL asserts that it has overriding royalty interests ("ORRI") arising under a number of

6  recorded instruments in Santa Barbara, Kern and Orange Counties.[19]    The ORRI is a recorded

7  property interest (not a lease or executory contract), and the arrearage is a pre-petition claim not

8  entitled to a cure.  GRL and GLR did not oppose the Trustee's summary judgment motion.  The

9  hearing, on the motion for summary judgment, as discussed below, was continued to October 8,

10  2020, at 10:00 a.m.

11        In addition, GRL and GSR, LLC ("GSR"), another insider and/or affiliate, assert other

12  direct royalties.  GRL and GSR have filed proofs of claim against the Debtor's estates for royalties,

13  docketed as Claim No. 96 for $1,156,195.75 and Claim No. 114 for $114,216.49, respectively, on

14  the Court's Claims Register.

15        Under cash collateral orders that pre-date the Trustee's appointment, the Trustee is required

16  to deposit any royalties payable to insiders and affiliates, including GRL's interest under the ORRI,

17  and other royalties asserted by GRL and GSR, into a segregated account and not to those insiders

18  and affiliates.  The Trustee and the Buyer will continue depositing royalties in that segregated

19  account pending further Court order.

20

21  **E.       THE TRUSTEE'S EFFORTS TO DISENTANGLE THE DEBTOR FROM ITS**

22  **        AFFILIATES**

23        From and after the Petition Date, CAP failed to pay the Debtor in full for the crude oil

24  delivered by the Debtor to CAP and has purported to set off pre-petition and postpetition amounts

25  purportedly owed by the Debtor to CAP against amounts owed by CAP to the Debtor.  CAP also

26

27  ─────────────────────
[19] Docket no. 767, Exhibit A. pp. 8, 12-13.  In addition to the ORRI identified by GRL, the Trustee

28  is also aware of one recorded with the Santa Barbara County Recorder on April 30, 2013 as
instrument number 2013-0029243.

1    purported to set off amounts owed by CAP to the Debtor for amounts the Debtor purportedly owes

2    to its affiliates GIT and GTL1, in violation of the automatic stay.  The latter "triangular setoffs"

3    have included payments to attorneys and insiders in violation of the Bankruptcy Code.

4        This conduct continued after the Trustee's appointment.  In particular, on or about

5    November 20, 2019, CAP paid the Trustee only $300,000 of the $1,128,250 that it owed to the

6    Debtor for the month of October 2019.  The Trustee initially extended the due date for the

7    $828,250 that was still due for October 2019 to November 27, 2019.  However, on November 27,

8    2019, CAP failed to pay the Trustee the outstanding amount that was due for October 2019, or any

9    other sum.  The Trustee was subsequently told that CAP was having a liquidity problem and that

10    CAP would not be making any more payments to the Debtor for CAP's purchases in the month of

11    October 2019.  As a result, the Trustee ceased virtually all shipments to CAP on that day –

12    November 27, 2019.  Subsequently, CAP has taken the position that the Debtor's crude was not up

13    to "spec" because it was too cold and wet.

14        Accordingly, on or about November 27, 2019, the Trustee filed a *Motion for Order*

15    *Authorizing the Rejection of Oil Purchase Contracts (Contract No. COP-003 for Belridge Crude*

16    *Oil and All Amendments and Contract No. COP-004 for Richfield Heavy Crude Oil and All*

17    *Amendments) with California Asphalt Production, Inc., formerly known as Santa Maria Refining*

18    *Co. and Greka Refining Company* (*docket no. 573*) (the "First Rejection Motion") seeking to reject

19    the Debtor's supply agreements with CAP relating to REDU and Belridge.

20        Thereafter, on or about December 4, 2019, the Trustee filed his *Motion for Order*

21    *Authorizing the Rejection of All Contracts and Agreements with California Asphalt Production,*

22    *Inc., Formerly Known as Santa Maria Refining Co. and Greka Refining Company, and GTL1, LLC,*

23    *Not Previously Included in Prior Motion to Reject (docket no. 573)* (*docket no. 586*) (the "Second

24    Rejection Motion") seeking to reject all remaining agreements between the Debtor and CAP,

25    including with respect to SMV, and any agreements with the Debtor's affiliate GTL1.

26        At the request of the Trustee, the Court advanced the hearing on the First Rejection Motion

27    and shortened the time for the hearing on the Second Rejection Motion to December 10, 2019, at

28

24

1  11:00 a.m.  The Court granted the First Rejection Motion and the Second Rejection Motion in

2  orders entered on or about December 11, 2019 (*docket nos. 612 and 613*).

3          On or about December 24, 2019, the Trustee filed his *Motion for Order Authorizing the*

4  *Rejection of Administration Agreement with GIT, Inc.* (*docket no. 658*), seeking to reject the

5  Administration Agreement between the Debtor and its affiliate, GIT (the "Third Rejection

6  Motion").  Pursuant to the Administration Agreement, GIT provided "general and administrative

7  services, including, without limitation, legal, financing, accounting, administrative /human

8  resources, insurance, IT, compliance /safety, land management including buy/sell transactions, and

9  other services" to the Debtor.  On or about January 17, 2020, the Court heard and granted the Third

10  Rejection Motion, and the order thereon was entered on or about February 10, 2020 (*docket no.*

11  *782*).

12

13  **F.      THE OSPR CEASE AND DESIST ORDER**

14          On or about January 17, 2020, the California Department of Fish & Wildlife Office of Spill

15  Prevention and Response ("OSPR") issued a Cease and Desist Order for all operations of the

16  Debtor within ¼ mile of an inland waterway.  The Cease and Desist Order was due to the Debtor's

17  failure to file with OSPR spill contingency plans, which were due in 2015, and comply with their

18  financial responsibility requirements.  As a result, the Trustee was compelled to immediately shut

19  down all of the Debtor's operations pending plan approval.  The immediate impact of the shutdown

20  was to reduce January 2020 sales by approximately 9,000 barrels which corresponded to a decrease

21  in February 2020 receipts by approximately $450,000.

22          The Trustee worked with OSPR to comply with its requests and has now submitted plans

23  for the Security, Bell, REDU and Bradley/Jim Hopkins facilities.  All plans have been approved in

24  final form, allowing the Trustee to produce at all of the Debtor's currently operational fields.  There

25  are eight other plans that will need to be prepared before certain other facilities can be brought back

26  on line.

27

28

1    **G.      COVID-19 AND OIL PRODUCTION AS AN ESSENTIAL BUSINESS**

2          On or about March 19, 2020, the Governor of the State of California, in response to the

3    threat of the coronavirus COVID-19, issued a stay at home order directing that all residents of

4    California stay at home or their place of residence except as needed to maintain continuity of

5    operations of federal critical infrastructure sectors.  *See* https://covid19.ca.gov/stay-home-except-

6    for-essential-needs/.  The energy sector is a federal critical infrastructure sector, and oil production

7    is expressly included within the definition of essential services.  *See* https://www.cisa.gov/critical-

8    infrastructure-sectors.  In addition, the California State Public Health Officer designated certain

9    workers as "Essential Critical Infrastructure Workers" to include petroleum workers.

10   https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.  Thus, notwithstanding the

11   State of California's March 19, 2020 order, the Debtor's employees are considered "Essential

12   Critical Infrastructure Workers" and permitted to work during the State of California's stay at home

13   order.

14

15   **H.      DROP IN OIL PRICES**

16          Beginning in early March 2020, global oil prices took a steep decline when Saudi Arabia, in

17   a dispute with Russia, cut its price for oil and increased production.  Saudi Arabia's actions,

18   coupled with what the significant reduction in global oil demand due to the coronavirus, resulted in

19   a glut of oil on the world market and a dramatic decrease in the price of oil.  The price of the oil

20   during this time decreased from about $55-60/barrel in December 2019 to under $20/barrel.  At this

21   time, prices have recovered some to about $40/barrel today.  In addition, due to the glut of global

22   oil reserves, the Trustee has had challenges obtaining purchase contracts, although in the end the

23   Trustee has been able to enter into contracts to sell all oil produced.  However, the fall in the price

24   of oil has drastically affected the Trustee's bottom line and ability to fund and reserve for the day to

25   day operations of the Debtor.  The Trustee's July operations, before expenses of the bankruptcy

26   case including professional fees, resulted in the estate losing approximately $430,000 for the

27   month.  August is projected to have a similar shortfall.  Without the continuing loan commitments

28

1   from UBS AG, Stamford Branch the Trustee would have been forced to shut down all operations

2   long ago.

3

4   **I.      THE TRUSTEE'S EMPLOYMENT OF TENOAKS AND MARKETING EFFORTS**

5           On or about February 27, 2020, the Trustee filed his application to employ TenOaks Energy

6   Partners, LLC ("TenOaks"), as his exclusive marketing agent and advisor in connection with the

7   sale of the Assets (the "TenOaks Application") (*docket no. 834*).  Pursuant to an order entered on

8   or about March 24, 2020 (*docket no. 872*), the Court approved the TenOaks Application.

9           The Trustee, with the assistance of TenOaks, undertook a formal marketing process for the

10  Assets.  In particular, the Trustee, through TenOaks, reached out to over 10,500 contacts at

11  approximately 4,250 potential buyer companies.  Approximately 60 potential buyers executed a

12  non-disclosure agreement and reviewed due diligence information regarding the Assets provided

13  by the Trustee and Ten Oaks.  During this time, the Trustee received multiple offers for the Assets,

14  including an offer from the Stalking Horse Bidder, which expressed significant interest in acquiring

15  the Purchased Assets.

16          With the assistance of his professionals, the Trustee engaged in arm's-length negotiations

17  with several bidders, including the Stalking Horse Bidder.  The Trustee also continued to engage

18  during this time with several bidders submitting bids for the Assets.  The Trustee called for parties to

19  submit their highest and best offer to be a stalking horse buyer.  Thereafter, the Trustee negotiated

20  the terms of asset purchase agreements with two primary parties, including the Stalking Horse

21  Bidder.  The negotiations with the multiple bidders, and ultimately, the Stalking Horse Bidder,

22  lasted several months.  Ultimately, considering the asset purchase agreements that were presented

23  to him, the Stalking Horse Bidder offered both the best financial terms and material provisions with

24  respect to the Purchased Assets such that the Trustee, in his business judgment, found it appropriate

25  to finalize the APA and related complex documentation with the Stalking Horse Bidder.  The

26  Trustee has concluded that the Stalking Horse Bidder's offer was the highest and best offer he has

27  received to date.

28

1      The Purchased Assets include the Debtor's rights to extract oil and/or gas and/or minerals

2  from numerous properties primarily located in Santa Barbara and Kern Counties.  Again, the

3  Stalking Horse Bidder is not proposing to purchase the assets of REDU in Orange County.  The

4  Trustee will hold an auction on the REDU Assets that are not under proposed contract to the

5  Stalking Horse Bidder.

6

7  **J.**      **THE TRUSTEE'S DECLARATORY RELIEF ACTION**

8      Under California law, the grant of an oil and gas lease is the grant of a real property interest.

9  When the right to extract oil and gas from the land is severed from ownership of the land and

10  separately held, as is the case when an oil and gas lease is granted to a lessee, the oil and gas rights

11  are an incorporeal interest in real property known as a profit á prendre, which is a burden or

12  encumbrance on the property indistinguishable in effect from an easement.  *Callahan v. Martin*, 3

13  Cal. 2d 110, 118 (1935); *Dabney Johnston Oil Corp. v. Walden*, 4 Cal. 2d 637, 649 (1935).

14      In other words, an oil and gas lease is a burden on the fee simple (so-called "surface") rights

15  in the subject property such that the rights of any "surface owner" are subject to and burdened by:

16  (a) the rights of the lessee to drill for and produce oil and gas; (b) the rights of the lessee to retain

17  the substances brought to the surface, that is, an ownership in the oil and gas if, as, and when

18  produced; and (c) the right, title and interest of the lessee to enter into, occupy, use, and improve

19  the surface of each and all of the subject properties, subject to the applicable lease(s), unit

20  agreements, or other related agreements affecting that property, insofar as is necessary for the

21  lessee to conduct its oil and gas operations.

22      There is no known Ninth Circuit authority addressing whether or not 11 U.S.C. § 365

23  applies to rights in California otherwise characterized as oil, gas, and/or mineral leases.  However,

24  the Trustee believes that California, pre-Code Ninth Circuit (*Laugharn v. Bank of Am. Nat'l Tr. &*

25  *Sav. Ass'n*, 88 F. 2d 551 (9th Cir. 1937)), and court decisions from outside of the Ninth Circuit

26  support a determination that section 365 does not apply to the estate's oil, gas, and/or mineral

27  leases.

28

1    Accordingly, on or about January 21, 2020, the Trustee commenced an adversary

2    proceeding by filing a complaint for declaratory relief, Adv. No. 9:20-ap-01011-MB (the "365

3    Adversary Proceeding"), to eliminate the uncertainty, insecurity and controversy with respect to the

4    applicability or inapplicability of section 365 seeking a judgment determining that the Subject

5    Rights constitute property of the estate under 11 U.S.C. § 541, and are not the subjects of executory

6    contracts or unexpired leases under section 365.  About 45 defendants answered the Trustee's

7    complaint.  As of the date hereof, default has been entered against roughly 250 defendants.  A

8    hearing on the Trustee's motion for default judgment was scheduled for August 19, 2020, at 10:00

9    a.m., and continued to October 8, 2020, at 10:00 a.m..

10    On or about June 25, 2020, the Trustee filed a motion for summary judgment against the

11    answering defendants in the 365 Adversary Proceeding seeking summary judgment that section 365

12    does not apply to the estate's oil, gas and/or mineral leases.  The hearing on the Trustee's motion

13    for summary judgment was also set for August 19, 2020, at 10:00 a.m., and continued to October 8,

14    2020, at 10:00 a.m..

15    If the Trustee is successful in his Adversary Proceeding, the Debtor's oil and gas and

16    mineral interests will not be subject to cure, because section 365 does not apply, but they will be

17    transferred as part of any sale of the Assets.  However, if the Trustee is not successful, the Trustee

18    will assume the Debtor's oil and gas and mineral interests as requested herein (and in his prior

19    motion)[20] but will propose that no cure be paid for pre-petition royalties with respect to the oil and

20    gas and mineral interests.

21    The Trustee has obtained the consent of some interest holders to a sale and is working with

22    others to obtain their consent to a sale prior to the Sale Hearing.  The Trustee is hopeful that he will

23    resolve any disputes with the interest holders prior to the Sale Hearing.

24

25

26

---

27    [20] *See* Trustee's Motion to Assume Lease or Executory Contract -Trustee's Notice of Motion and
Motion for an Order: (1) Setting Procedures for Assumption of Oil and Gas Leases; (2)

28    Authorizing Assumption of Surface Leases; and (3) Authorizing Rejection of the Lakeview Office
and Warehouse Lease *(docket no. 812).*

# III.

## THE PROPOSED SALE PROCESS

### A.    MATERIAL TERMS OF THE SALE

The Trustee is proposing to sell the Assets, which include the Purchased Assets and the REDU Assets, in accordance with the Bidding Procedures Order. The sale will be "as is," "where is," and with no warranty or recourse whatsoever, subject to higher and better bids.

The sale is proposed to be free and clear of all liens, claims, rights, interests, and encumbrances whatsoever, other than as set forth in the APA or the REDU APA, in accordance with Bankruptcy Code section 363(b) and (f). Without limitation, the Assets will be sold free and clear of all royalty claims through the Effective Date of the sale. Certain liens will be removed from the Assets and attach to the net sale proceeds with the same validity, enforceability, and priority, if any, as existed with respect to the Assets as of the Petition Date, including the liens securing the Trustee Financing and the UBS Secured Debt. Provided that the carve-outs are fully paid, the Trustee proposes that cash and non-cash proceeds of the sale be absolutely assigned at the close to UBS in partial satisfaction of its claims, as contemplated by the Stalking Horse Bidder's APA.

With no material dispute as to the validity and priority of UBS' claims and liens, the Trustee believes in his good faith judgment that it is in the best interests of the estate's stakeholders to partially repay UBS' secured claims with the cash sale proceeds, with UBS' liens to continue in the non-cash proceeds. After reservation for taxes, the cost of the Sale, and the Carve-Out, the Trustee seeks authority to repay amounts due on account of UBS' post-petition liens with the cash sale proceeds promptly upon closing. In addition, the Trustee proposes to assign non-cash proceeds to UBS as partial payment of UBS' claims. The Trustee proposes that the value of such non-cash distributions be reasonably determined by the Trustee's investment banker using the same methodology and valuation as used in accepting the Stalking Horse Bid or any other Bid accepted at the Auction, shown in declaration filed in advance of the Sale Hearing, with any dispute to be resolved by the Court. UBS' liens would continue to attach to all sales proceeds until applied to senior ad valorem property taxes, the Carve Out or UBS' loans. The Trustee believes that the

consummation of the Sale to the Stalking Horse Bidder, subject to further marketing efforts and higher or otherwise better bids consistent with the Bidding Procedures, and parallel sale of the REDU Assets will maximize the value of the Purchased Assets.  The Trustee seeks authority to assign and deliver the Production Payment and other non-cash proceeds to UBS after the Carve-Out due the Trustee and his professionals is fully paid.

The material terms of the proposed sale to the Stalking Horse Bidder, subject to Court approval, are as follows:

- Assets to be purchased.  Most of the Debtor's assets but not the REDU Assets.

- Consideration.  Purchase price of $26.75 million, consisting of:  (1) $8.5 million cash, (2) $500,000 for a litigation fund to be matched by UBS AG, (3) $500,000 for an appeal escrow, (4) an earn-out reflected in a Production Payment for $11.75 million, (5) assumption of real property taxes of approximately $5.5 million, and (4) assumption of the Assumed Liabilities.  A deposit of $500,000.

- Bid Protections.  An Expense Reimbursement of up to $300,000 and an initial minimum overbid increment of $250,000.

- Other Terms.  Commitment to invest at least $5 million by December 2023 to maintain and improve production.

- Other Terms.  Creation of a litigation fund of $1 million; $500,000 to be provided by UBS and $500,000 by the Buyer for the Trustee to pursue claims against the Debtor's insiders and affiliates.

- Other Terms.  An appeals escrow account to be funded by the Buyer, from the purchase price, in the amount of $500,000 to cover the fees and expenses associated with any appeals of the Sale Order.

## B.    PROPOSED BIDDING PROCEDURES, INCLUDING ASSUMPTION AND/OR ASSIGNMENT PROCEDURES

The proposed bidding procedures (the "Bidding Procedures") are attached to the Bidding Procedures Order.  The Trustee believes that the proposed Bidding Procedures, summarized below, provide an appropriate framework for marketing and selling the Assets and will enable the Trustee

1  to review, analyze, and compare all bids received to determine which bids are in the best interests

2  of the Debtor's estate.[21]

3      The Bidding Procedures describe, among other things, the procedures for interested parties

4  to access due diligence, the process for written, irrevocable offers ("Bids"), the manner in which

5  each party submitting such a Bid (each, a "Bidder") and Bids become "qualified," the receipt and

6  negotiation of Bids received, the conduct of any Auction, the selection and approval of any

7  ultimately successful bidders (the "Successful Bidder" and, with respect to the REDU Assets, the

8  "Successful REDU Bidder"), and the deadlines with respect to the foregoing.  The Bidding

9  Procedures will allow the Trustee to conduct the Sale process in a controlled, fair and open manner

10  and to maximize value for all stakeholders.

11      In accordance with Local Bankruptcy Rule 6004-1, the below chart summarizes the Bidding

12  Procedures and the procedures for conducting the Auction:

13

| Qualification of Bidders | Any party (each, a **"Potential Bidder"**) that submits to the Trustee (i) an executed confidentiality agreement on terms acceptable to the Trustee; (ii) identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and (iii) the most current audited and latest unaudited financial statements (the **"Financials"**) of the Potential Bidder or any such other form of financial disclosure or credit-quality support information demonstrating that such Potential Bidder has the ability to close the Sale, may be granted access to diligence materials.  For the avoidance of doubt, the Stalking Horse Bidder shall be granted access to diligence materials and shall be deemed a qualified bidder in all respects.  The Trustee shall not exclude a party from diligence who has complied with subsections (i) and (ii) above, unless they have first consulted with the Consultation Parties (as defined in the Bidding Procedures) regarding such determination.  UBS and its affiliates are deemed Potential Bidders. |
|---|---|

---

[21] The following is only a summary. In the event of any inconsistency between the summary and the Bidding Procedures Order (Exhibit 1), the latter shall control.

| Qualified Bids | A **"<u>Qualified Bid</u>"** is a written offer to enter into a Sale Transaction with the Trustee, by a Bidder and submitted in writing to the Trustee, so as to be received on or before the Bid Deadline that satisfies at least each of the following conditions (provided, that the Trustee, in consultation with the Consultation Parties may waive or modify, except with respect to the minimum Purchase Price and Deposit, the application of such conditions to any Bid): |
|---|---|
| | *Assets*.  Each Bid must clearly state which Assets, including, if applicable, the Purchased Assets or the REDU Assets,  and which liabilities of the Debtor the Bidder is agreeing to purchase and assume.  Except with respect to the minimum Purchase Price and Deposit relating to the Purchased Assets, the Trustee may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids. |
| | *Purchase Price*.  Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Asset subject to the applicable asset package (including any assumed liabilities), including and identifying separately any cash and non-cash components (the **"<u>Purchase Price</u>"**).  Any Bid (Purchase Price) for the Purchased Assets shall be not less than the sum of the value under the Stalking Horse Bidder's APA plus the sum of (i) the $300,000 Expense Reimbursement and (ii) a minimum initial overbid increment in the amount of $250,000.  This equates to a $550,000 minimum overbid with $100,000 increments thereafter. |
| | *Deposit*.  On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate cash and non-cash Purchase Price of the Bid (or such other amount as the Trustee determines, in consultation with the Consultation Parties), to be held in an escrow account to be identified and established by the Trustee (the **"<u>Deposit</u>"**); *provided*, *however*, that any party submitting a Bid primarily composed of a credit bid pursuant to Section 363(k) of the Bankruptcy Code shall not be required to submit a Deposit for the portion of the Bid consisting of a credit bid. |
| | *Assumption of Obligations*.  Each Bid must clearly state which liabilities of the Debtor the Bidder is agreeing to assume.  Except as otherwise provided in a purchase agreement to be executed by a Successful Bidder, all of the Debtor's rights, title, and interest in and to the Assets subject thereto will be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein, including without limitation royalties due prior to the date of close of the sale  (collectively, **"<u>Interests</u>"**) to the maximum extent permitted by section 363 of the Bankruptcy Code, with certain specified Interests to attach to the proceeds of |

the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

*Designation of Assigned Contracts and Leases*.  A Bid must identify any and all executory contracts and unexpired leases (collectively, **"Contracts"**) of the Debtor that the bidder wishes to be assumed and assigned to the bidder at closing pursuant to a Sale, subject to modification as set forth in the Qualified Bid Documents (as defined below).

*Adequate Assurances*.  A Bidder must make a representation that it will be able to provide adequate assurance of future performance under any Contracts to be assumed and assigned under section 365 of the Bankruptcy Code, as well as written evidence that the Trustee believes to be sufficient to demonstrate the foregoing.

*Qualified Bid Documents*.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale Transaction and/or Sale contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, as well as all other material documents integral to such Bid (the **"Qualified Bid Documents"**).  To the extent the Bidder seeks to bid on Assets that include or overlap with the Purchased Assets, such documents must be based on and marked against the Stalking Horse Bidder's APA and any other form documents provided by the Trustee.  Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee.

To the extent the Bidder seeks to bid on REDU Assets, such documents must be based on and marked against the REDU APA and any other form documents provided by the Trustee.  Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee.  A form REDU APA to be used for each Bid will be filed by the Trustee in advance of the Procedures Hearing and available in Word form from the Trustee.

*Committed Financing*.  To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Trustee, in consultation with the Consultation Parties, that demonstrates that the Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and

conditions acceptable to the Trustee, in consultation with the Consultation Parties.

*Contingencies; No Financing or Diligence Outs*.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of limited, specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Trustee in his business judgment.

*Identity*.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each parent company, equity holder or other financial backer of the applicable Bidder), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that should be contacted regarding such Bid. The Bid must also disclose all connections with the Debtor and other parties in the case, including whether the bidder is an insider or affiliate of the Debtor.

*Demonstrated Financial Capacity*.  A Bidder must have, in the Trustee's business judgment, in consultation with the Consultation Parties, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

*Time Frame for Closing*.  A Bid by a Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame for closing, with respect to the Purchased Assets, equal to or less than the time for closing set forth in the APA, and as acceptable to the Trustee, in consultation with the Consultation Parties.

*Binding and Irrevocable*.  A Bid shall be binding and irrevocable unless and until the Trustee accepts a higher Bid for such Asset package and such Bidder is not selected as a Backup Bidder, and the Bidder's Deposit has been returned.

*Expenses; Disclaimer of Fees*.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Bidder, including a Qualified Bidder

(except for the Stalking Horse Bidder), will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

*Authorization*.  Each Bid must contain evidence that the Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Trustee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

*As-Is, Where-Is*.  Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer which the Bidder believes is necessary for the proposed transaction; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

*Adherence to Bid Procedures*.  By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

*Regulatory Approvals and Covenants*.  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Sale and/or Sale Transaction, if any, and the time period within which the bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Bidder will take to ensure receipt of such approvals as promptly as possible).

*Other Terms*.  Each Bid must include contribution to the Litigation Fund of $500,000 to satisfy conditions to the sale consents with royalty claimants and match other terms to satisfy terms of those consents.

*Bid Deadline*.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** by the Trustee, the

| | | |
|---|---|---|
| | | Stalking Horse Bidder, and the U.S. Trustee on or **before 12:00 p.m. (noon) (Pacific Standard Time) on September 18, 2020** (the "**Bid Deadline**").<br><br>For the avoidance of doubt, each Bid that satisfies all of the following criteria in a manner acceptable to the Trustee, consistent with the exercise of his fiduciary duties, shall be deemed a Qualified Bid, and each Bidder who submits a Qualified Bid shall be deemed a "**Qualified Bidder**".  Notwithstanding anything to the contrary in this Motion, the Bidding Procedures or the Bidding Procedures Order, any Bid consisting of a credit bid shall be deemed a Qualified Bid (the "Qualified Credit Bid"), and the Stalking Horse Bidder shall be deemed a Qualified Bidder.<br><br>Notwithstanding anything else contained in the Bidding Procedures, UBS shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of its allowed secured claims at the Auction pursuant to Section 363(k) of the Bankruptcy Code or other applicable law, in accordance with the applicable terms of the Trustee Financing and the UBS Secured Debt, respectively. |
| **Bid Protections** | | The Bid Protections for the Stalking Horse Bidder are limited to the minimum overbid requirements and reimbursement of documented fees and expenses actually incurred in connection with the APA and sale process up to a maximum aggregate amount of $300,000. There is no "break-up fee" under the APA.<br><br>Any competing bid for the Purchased Assets shall be not less than the sum of the value under the APA plus the sum of (i) the $300,000 Expense Reimbursement and (ii) a minimum initial overbid increment in the amount of $250,000.<br><br>No other provision for any type of bid protection is made under the terms of the Qualified Bid Documents or the Bidding Procedures (except with respect to the Stalking Horse Bidder), except that any Overbid shall be made in increments in an amount to be announced at the Auction, in consultation with the Consultation Parties.  Each Bidder (other than the Stalking Horse Bidder) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or similar form of compensation. |
| **Modification of Bidding and Auction Procedures** | | Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine, in consultation with the Consultation Parties, to be in the best interest of the Debtor's estate and in the exercise of his fiduciary duties to: (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; |

| | |
|---|---|
| | (d) reject any Bid (other than the Qualified Credit Bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor's estate; (e) impose additional terms and conditions with respect to all Bidders (other than the Stalking Horse Bidder); (f) extend the deadlines set forth herein; (g) continue or cancel the Auction and/or Sale Hearing, including by announcement in open court without further notice; and (h) announce additional procedural rules that are reasonable under the circumstances for conducting the Auction. |
| **Closing with Alternative Backup Bidders** | A Qualified Bid must provide that it is binding and irrevocable unless and until the Trustee accepts a higher Bid for such Asset package and such Qualified Bid is not selected as the Backup Bidder, and the Deposit accompanying the Qualified Bid is returned to the corresponding Qualified Bidder.  Each Qualified Bidder further agrees that its Qualified Bid, if not chosen as the Successful Bid, shall serve, without modification, as a Backup Bid (as defined below) for the applicable Asset package, as may be designated by the Trustee after the conclusion of the Auction, if any, but no later than the Sale Hearing, and must be kept open and irrevocable until the earlier of (a) the date that is 90 calendar days after the date of entry of the Sale Order, or (b) the closing date of the Sale with the Successful Bidder. |
| **Date, Time, Place, and Notice of Auction** | The Auction, if necessary, shall take place on **September 23, 2020, at 10:00 a.m. (Pacific Standard Time)** virtually via Zoom or similar videoconference technology, or such later date and time or such other location as selected by the Trustee, in which event the Trustee shall file a notice at least 24 hours before the Auction indicating such change and will serve the same on all Qualified Bidders and all parties who have requested notice pursuant to Local Rule 2002-1(b).  The Auction may be postponed, adjourned, or cancelled as the Trustee deems appropriate. |
| **No Collusion** | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, including, without limitation, no agreements to compensate any person with regard to the bid or share ownership of, the proceeds or benefits of the bids or assets purchased each unless fully disclosed on the record at such time; and (ii) its Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.  The Successful Bidder and the Backup Bidder must be prepared to sign a declaration to be prepared by the Trustee to satisfy provisions of the Bankruptcy Code, including 11 U.S.C. §§ 363(m) and 365(b)(1)(C). |

| | |
|---|---|
| **Auction Participants** | Only Qualified Bidders and their legal and financial advisors, and the Consultation Parties (including, for the avoidance of doubt, UBS) shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (via Zoom or similar videoconference technology) and may speak or Bid themselves or through duly authorized representatives.  Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder) shall be entitled to Bid at the Auction, unless the Trustee determines otherwise in the exercise of his fiduciary duties.  Each Qualified Bidder must have at least one individual representative with authority to bind the Qualified Bidder attend the Auction in person (via Zoom or similar videoconference technology). |
| **Transcription or Video Recording** | To the extent available, bidding at the Auction will be transcribed or video recorded. No audio or video recordings of the Auction may be made by anyone other than the Trustee. |

## C.    KEY DATES AND DEADLINES

The table below sets forth the proposed key dates and deadlines with respect to the Sale process contemplated by the Trustee:

| | |
|---|---|
| **September 4, 2020, at 3:00 p.m. (Pacific Standard Time)** | Hearing to consider entry of the Bidding Procedures Order (the "**Bidding Procedures Hearing**") |
| Within three days of entry of Bidding Procedures Order | Deadline to serve the Sale Notice on Transaction Notice Parties |
| Within five days of entry of Bidding Procedures Order | Deadline to serve Assumption Notices |
| **September 18, 2020, at 12:00 p.m. (noon) (Pacific Standard Time)** | Bid Deadline |
| **September 21, 2020 (14 Calendar Days Before the Sale Hearing )** | Deadline to assert any objections to the Sale ("**Sale Objections**") and Contract Objections (as defined below) (the "**Sale Objection Deadline**") |
| **September 23, 2020, at 10:00 a.m. (Pacific Standard Time)** | Auction (if necessary) |

| Within one day after the Auction is completed | Deadline for Trustee to file and serve, as necessary, notice of Successful Bidder and amount of Successful Bid |
|---|---|
| **September 28, 2020 (7 Calendar Days Before the Sale Hearing )** | Deadline for Trustee and other parties to file responses to Sale Objections (**"Reply Deadline"**) |
| 1 Calendar Day prior to the commencement of the Sale Hearing | Deadline to assert Supplemental Limited Sale Objections (which shall be limited to objections based on the manner in which the Auction was conducted, selection of the Successful Bidder and the identity of the Successful Bidder(s) or Backup Bidder(s) in the event the Successful Bidder or Backup Bidder(s) are not the Stalking Horse Bidder, including Designated Contract counterparty objections based on inadequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder) ("**Supplemental Limited Sale Objection Deadline**") |
| **October 5, 2020, at 10:00 a.m. (Pacific Standard Time)** | Date of Sale Hearing |

## D.    ASSUMPTION AND ASSIGNMENT PROCEDURES

The Trustee is also seeking approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of certain executory contracts in connection with any Sale.  The Assumption and Assignment Procedures are as follows:

- Assumption Notice.  Within five (5) days after the entry of the Bidding Procedures Order (the "Assumption Notice Deadline"), the Trustee shall file with the Court and serve a notice in substantially the form attached hereto as Exhibit 3 the "Assumption Notice") via first-class mail on all counterparties to the Designated Contracts and all parties entitled to such notice pursuant to Bankruptcy Rule 2002.  The Assumption Notice shall contain (i) a list of Designated Contracts (the "Designated Contracts List"), (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of the Designated Contract(s) and rights thereunder, (iii) the amount of proposed cure payments (the "Cure Amounts") (if any) in connection with each executory contract or unexpired lease, as applicable , and (iv) the procedures for objecting thereto; *provided*, *however*, that service of an Assumption Notice does not constitute an admission that any contract is an executory contract or that the stated Cure Amount related to any contract or unexpired lease constitutes a claim against the Debtor or a right against any Successful Bidder (all rights with respect thereto being expressly reserved), and all rights are reserved for

the Trustee and the Successful Bidder, following the Auction, to assert that any Cure Amount is lower than the Trustee's proposal, subject to each counterparty's opportunity to object. Further, the inclusion of a contract or unexpired lease, as applicable, on the Assumption Notice is not a guarantee that such contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

- Cure Amounts and Adequate Assurance of Future Performance. The payment of the applicable Cure Amounts by the Trustee on behalf of the Debtor shall (i) effect a cure of all defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default. If no Cure Amount is listed on the Designated Contracts List for a particular Designated Contract, the Cure Amount for such Designated Contract shall be deemed to be $0.00.

- Buyer Designation Right. Any time before 5:00 p.m. (Pacific Standard Time) on the date that is three (3) business days prior to the Closing Date (the "Designation Deadline"), the Successful Bidder shall be permitted to designate (the "Buyer Designation Right") any Applicable Contracts (as defined in the APA, to be either (i) assumed by the Trustee and assigned to the Successful Bidder and become Selected Designated Contracts ("Proposed New Designated Contracts") or (ii) excluded by the Successful Bidder from the Designated Contracts List; provided, that in the event, at any time after the Designation Deadline, the Cure Amounts fixed by the Court for any Designated Contract are (i) found to be greater than the amount set forth on the initial schedule of Cure Amounts filed by the Trustee with the Court prior to the Designation Deadline and (ii) are not consented to by the Successful Bidder, then the Successful Bidder shall be permitted, no later than five (5) business days after entry of an order by the Court setting such Cure Amounts, to provide the Trustee with notice of the Successful Bidder's election to revoke its designation of any such Applicable Contract as a Selected Designated Contract and thereupon such Applicable Contract shall be deemed to be an Excluded Contract (as defined in the APA). Before the Designation Deadline, the Trustee shall not reject any of the Applicable Contracts that have not already been assumed, assigned, or rejected as of the date of the entry of the Sale Order, except in accordance with the Sale Order and the APA.

- Addition; Supplemental Assumption Notice. Although the Trustee intends to make a good-faith effort to identify in the Assumption Notice all Designated Contracts that may be assumed and assigned in connection with a Sale Transaction, the Trustee may discover that certain executory contracts were inadvertently omitted from the Designated Contracts List, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Sale Transaction. Accordingly, the Trustee reserves the right at any time after the Assumption Notice Deadline and before 5:00 p.m. (Pacific Standard Time) on the date three (3) business days prior to the closing of the Sale Transaction to (i) supplement the list of Designated Contracts with previously omitted Designated Contracts, (ii) remove Designated Contracts from the list of Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Amount associated with any Designated Contract. In the event the Trustee exercises any of these

reserved rights, the Trustee will promptly file with the Court and serve, by overnight delivery on the applicable counterparties, a revised Assumption Notice (a "Supplemental Assumption Notice"), as applicable, and such counterparties shall file any Contract Objections not later than (a) the Sale Objection Deadline in the event that such Supplemental Assumption Notice was filed and served at least ten (10) days prior to the Sale Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such Supplemental Assumption Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing, and (c) seven (7) days from the date such Supplemental Assumption Notice was filed and served, in the event that such Supplemental Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing; *provided, however*, the Trustee may not add to the list of Designated Contracts an executory contract that has been previously rejected by the Debtor or by the Trustee by order of the Court.  Each Supplemental Assumption Notice will include the same information with respect to listed Designated Contracts as was included in the Assumption Notice.  In the event that the Supplemental Assumption Notice is filed and served less than seven (7) days prior to the commencement of the Sale Hearing, the Trustee shall file with the Court a proposed order authorizing the assumption and assignment of the Proposed New Designated Contracts no later than fourteen (14) days after the date of service of such revised Assumption Notice, which order shall provide (a) that the assumption of the Proposed New Designated Contracts is approved, final and effective, pursuant to section 365 of the Bankruptcy Code, and (b) that the Successful Bidder provided adequate assurance of future performance under such Proposed New Designated Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.

• Elimination; Removal Notice.  In the event that a Designated Contract is removed from the list of Designated Contracts that a Successful Bidder proposes to be assumed and assigned to it in connection with a Sale Transaction, the Trustee shall, as soon as reasonably practicable after identifying such an eliminated contract and in any event no later than five (5) business days following entry of an order setting the Cure Amounts, file with the Clerk of Court and serve a notice (a "Removal Notice") on each of the impacted counterparties and their counsel of record, if any, indicating that the Trustee no longer intends to assign the counterparty's contract or unexpired lease, as applicable, to the Successful Bidder in connection with the Sale Transaction.

• Sale Objections.  Objections, if any, to the Sale must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the grounds for such objection, (iv) be filed with the Clerk of Court on or before the Sale Objection Deadline, and (v) be served upon, so as to be actually received by, the Consultation Parties on or before the Sale Objection Deadline.

• Contract Objections.  Objections, if any, by a counterparty to a Designated Contract on the basis of the proposed assumption and assignment or the Cure Amount proposed with respect thereto, other than Supplemental Limited Sale Objections (as defined below) (a "Contract Objection"), must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the grounds for such objection, including, without limitation,

the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the counterparty believes is required to be paid under Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto, (iv) be filed with the Clerk of Court on or before the Sale Objection Deadline, and (v) be served upon, so as to be actually received by, the Consultation Parties and any other Objection Recipients (as defined in the Assumption Notice) on or before the Sale Objection Deadline.

If no Contract Objection is timely received with respect to a Selected Designated Contract: (i) the counterparty to such Selected Designated Contract shall be deemed to have consented to the assumption by the Trustee and assignment to the Successful Bidder of the Selected Designated Contract and shall be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Amount set forth in the Assumption Notice for such Selected Designated Contract; (iii) the Cure Amount set forth in the Assumption Notice for such Selected Designated Contract shall be controlling, notwithstanding anything to the contrary in such Selected Designated Contract, or any other related document, and the counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Selected Designated Contract against the Debtor and its estate or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order; and (iv) the counterparty to such Selected Designated Contract shall be deemed to have consented to the Sale and to any related relief requested in this Motion.

To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable counterparty under Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; *provided*, *however*, that if the Contract Objection relates solely to a Cure Dispute, with the prior written consent of the Successful Bidder, the Selected Designated Contract may be assumed by the Trustee and assigned to the Successful Bidder provided that the cure amount the counterparty asserts is required to be paid under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the counterparty) is deposited in a segregated account by the Trustee pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

- Supplemental Limited Sale Objections. Objections solely based on the manner in which the Auction was conducted, selection of the Successful Bidder and the identity

43

of the Successful Bidder(s) or Backup Bidder(s) in the event the Successful Bidder or Backup Bidder(s) are not the Stalking Horse Bidder, including objections of counterparties to Designated Contracts based on inadequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder (a "Supplemental Limited Sale Objection") shall be made at least 1 calendar day prior to the commencement of the Sale Hearing (*provided*, *however*, that the deadline to object to the Cure Amount or other matters unrelated to the identity of the Successful Bidder shall not be extended) and served via electronic mail on the Objection Recipients.

- Post-Auction Notice.  No later than noon the calendar day after the conclusion of the Auction, if any, the Trustee shall file and serve, by overnight delivery, on the counterparties to the Designated Contracts that have not filed a notice of appearance on the docket in these Cases and all parties who have requested notice pursuant to Local Rule 2002-1(b), a notice (the "Post-Auction Notice" and, together with the Sale Notice and the Publication Notice, the "Sale Notices"), in substantially in the form attached as Exhibit 4 hereto, identifying the Successful Bidder(s).  The counterparties shall file any Supplemental Limited Sale Objections not later than two (2) hours prior to the commencement of the Sale Hearing; *provided*, that the deadline for any party who did not receive an Assumption Notice prior to the date that is seven (7) days before the Sale Hearing to assert a Contract Objection shall be seven (7) days after the later of (i) the date of service of such Assumption Notice and (ii) the Post-Auction Notice.

- Court Approval of Assumption and Assignment.  The Trustee will seek Court approval of the assumption and assignment only of the Selected Designated Contracts.  The inclusion of a Designated Contract on an Assumption Notice will not (i) obligate the Trustee to assume any Designated Contract listed thereon nor the Successful Bidder(s) to take assignment of such Designated Contract, or (ii) constitute any admission or agreement of the Trustee that such Designated Contract is an executory contract.  The Trustee and the Debtor's estate reserve any and all rights with respect to any Designated Contracts that are not ultimately designated as Selected Designated Contracts.

E.    **NOTICE PROCEDURES**

   1.    **Sale Notice**

Within three (3) days after entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "Mailing Date"), the Trustee shall serve a sale notice, substantially in the form attached hereto as Exhibit 2 (the "Sale Notice") by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (a) the Debtor; (b) all known creditors, including all known lessors and royalty claimants; (c) all entities known to the Trustee to have expressed an interest in a transaction with respect to some or all of the Assets

1  during the past 12 months; (d) all entities known to the Trustee which have asserted any lien or

2  interest in or upon any Assets to be sold; (e) all federal, state, and local regulatory or taxing

3  authorities that have contacted the Trustee and have a reasonably known interest in the relief

4  requested by this Motion; (f) the Internal Revenue Service; (g) those parties who have made the

5  appropriate filings requesting notice of all pleadings filed in the chapter 11 case; (f) the Office of

6  the United States Trustee (the "U.S. Trustee"); (h) the Office of the United States Attorney

7  General; (i) the United States Department of Justice; and (j) counsel to UBS; (collectively, the

8  "Transaction Notice Parties").  Such notice shall be sufficient and proper notice of the Sale

9  Transaction with respect to known interested parties.  Any lessors affected by the Motion will

10  receive the Sale Notice and the Assumption Notice attached as Exhibit "3" hereto.

11      **2.      Publication Notice**

12      Within five (5) business days of the Mailing Date or as soon as practicable thereafter, the

13  Trustee shall publish notice of the proposed Sale Transaction, substantially in the form of the Sale

14  Notice (the "Publication Notice"), in the Los Angeles Times or other suitable regional newspaper,

15  and in the Santa Barbara Independent or other suitable local Santa Barbara newspaper.  The Trustee

16  submits that such Publication Notice shall be sufficient and proper notice of any Sale to any other

17  interested parties whose identities or addresses are unknown to the Trustee.

18      **3.      Notice of Successful Bidder**

19      No later than noon on the calendar day after the conclusion of the Auction, if any, the

20  Trustee shall file and serve in the manner discussed above, the Post-Auction Notice in the form

21  attached as Exhibit 4 hereto.

22

23  **F.      PAYMENT OF SUCCESS FEE TO TENOAKS**

24      The Trustee seeks an order from the Court authorizing him to pay the success fee to

25  TenOaks.

26      Pursuant to TenOaks' employment agreement, TenOaks is entitled to a success fee:

27          equal to the greater of: (i) $400,000 (four hundred thousand dollars),
          the "Minimum Success Floor"), and (ii) 2.0% (two percent) of that
28          portion of the Aggregate Consideration payable pursuant to the

45

1    Transaction(s) that is up to and including $40,000,000, 2.5% (two
     and one half percent) of that portion of the Aggregate Consideration
2    payable pursuant to the Transaction(s) that is greater than
     $40,000,000 but less than $60,000,000, or 3.0% (three percent) of
3    that portion of the Aggregate Consideration payable pursuant to the
     Transaction(s) that is greater than $60,000,000.

4

5        The Trustee proposes to pay TenOaks the success fee on and from the close of the sale as

6    provided in its approved employment agreement, which based on the Purchase Price of $26.75

7    million, would be $400,000.

8

9                                              **IV.**

10                                        **ARGUMENT**

11   **A.    THE PROPOSED SALE OF THE PURCHASED ASSETS SHOULD BE**

12         **APPROVED UNDER 11 U.S.C. § 363(b)**

13        Selling the Assets as proposed herein is critical to maximizing the value of the Debtor's

14   estate and, therefore, should be approved as reflecting a sound exercise of the Trustee's business

15   judgment.  Bankruptcy Code section 363(b) provides that a trustee may, after notice and a hearing,

16   use, sell, or lease property of the estate outside of the ordinary course of business. 11 U.S.C.

17   § 363(b)(1).  A trustee's application of sound business judgment with respect to the use, sale, or

18   lease of estate property outside of the ordinary course of business is subject to great judicial

19   deference.  *See, e.g.*, *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir.

20   1988) (explaining that "there must be some articulated business justification for using, selling, or

21   leasing the property outside the ordinary course of business" and "the bankruptcy judge should

22   consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse

23   interests of the debtor, creditors and equity holders, alike"). "The choice of which type of action

24   (whether it be acceptance of the offer, a counteroffer, negotiation, open bidding, or bringing a

25   formal motion for abandonment) belongs to the trustee within the sound exercise of the trustee's

26   business judgment so long as the trustee fulfills his statutory duties." *In re Moore*, 110 B.R. 924,

27   928 (Bankr. C.D. Cal. 1990).

28

1    A sale of estate assets should be authorized pursuant to section 363(b) if a sound business

2    reason exists.  *See, e.g.*, *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282,

3    288-89 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal

4    value is realized by the estate under the circumstances. . . . Ordinarily, the position of the trustee is

5    afforded deference, particularly where business judgment is entailed in the analysis or where there

6    is no objection."); *In re Fed. Mogul Global, Inc*., 293 B.R. 124, 126 (D. Del. 2003) ("a court

7    should approve a debtor's use of assets outside the ordinary course of business if the debtor can

8    demonstrate a sound business justification for the proposed transaction").  In determining whether

9    a sound business justification exists for the sale of estate property, courts consider, among other

10   factors, the consideration to be paid by the buyer, the financial condition and needs of the estate,

11   the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would

12   decline in value if left in the debtor's possession. *See, e.g.*, *In re Equity Funding Corp.*, 492 F.2d

13   793, 794 (9th Cir. 1974).

14   After thoroughly investigating the Debtor's financial affairs and marketing the Assets, it is

15   the Trustee's business judgment that the proposed sale of the Purchased Assets to the Stalking

16   Horse Bidder (or a successful sale including the Purchased Assets to an overbidder) and designating

17   a Back-Up Buyer is in the best interests of the Debtor and the estate, as well as the best interests of

18   creditors and other stakeholders.  This is because, among other things, (i) a prompt sale will prevent

19   erosion of the value of the Debtor's business (and Assets) that could result from the ongoing drop in

20   global oil prices and economic downturn related to the coronavirus/COVID-19 pandemic, (ii) a

21   prompt sale will limit the estate's incurrence of administrative expenses, and (iii) the Trustee does

22   not have the ability to continue operating the Debtor without ongoing postpetition borrowing.  The

23   Trustee has also determined, in his sound business judgment, that the consideration to be paid by

24   the Stalking Horse Bidder is fair and reasonable in light of all of the terms of the proposed sale.

25   Furthermore, a sale of the Assets remains the most efficient means to obtain the greatest value for

26   the Assets, and provides a process for additional marketing and competitive bidding at an Auction

27   if there are Qualified Bidders prepared to make higher or otherwise better offers for the Assets.

28

Overall, the Trustee believes that the benefits of the proposed sale exceed those of the Trustee's continued operation of the Debtor and of any piecemeal liquidation. The proposed sale is supported by sound business reasons and is in the best interests of the Debtor and the estate.

**B.**    **THE PROPOSED BIDDING PROCEDURES ARE REASONABLE AND APPROPRIATE AND WILL FACILITATE MAXIMIZING THE VALUE OF THE PURCHASED ASSETS**

Bankruptcy Rule 6004(f)(1) provides that sales of estate property outside the ordinary course of business may be by private sale or by auction. The Trustee has obtained a stalking horse bid from the Stalking Horse Bidder for the Purchased Assets and, if there are Qualified Bidders prepared to make higher or otherwise better offers, seeks authority to conduct the Auction. The Bidding Procedures described herein, including the Expense Reimbursement, are reasonably calculated to encourage buyers to submit bids and to maximize the value of the Purchased Assets for the benefit of the Debtor's estate.

The Stalking Horse Bidder will be the stalking horse for competitive bids, potentially leading to further competition by establishing a baseline against which higher or otherwise better offers can be measured. The Trustee, with the assistance of his professionals, will further solicit proposals for the purchase of the Assets prior to the proposed Bid Deadline, including through a formal marketing process conducted by TenOaks. The APA expressly permits the Trustee to solicit higher or otherwise better offers for the Assets. Based on the Trustee's marketing efforts to date and anticipated efforts leading up to the Auction, the Trustee will have more than sufficiently marketed the Assets prior to the Sale Hearing. The Trustee, subject to oversight and approval by the Court, will supervise the bidding process and conduct the Auction in such a manner as to provide the Stalking Horse Bidder and other Qualified Bidders a full, fair, and equal opportunity to participate in the Auction. The Bidding Procedures provide for an open auction process with minimal barriers to entry, and the proposed deadlines provide interested parties with sufficient time under the circumstances to perform due diligence on the Assets and submit offers

1    In sum, the Trustee submits that these Bidding Procedures are fair and appropriate and will

2    maximize the recovery for the Trustee and the Debtor's estate in connection with the sale of the

3    Assets.  Good cause exists to approve such procedures and provisions because they are fair and

4    reasonable under the circumstances and will encourage competitive bidding and the highest and

5    best price for the Purchased Assets.  Indeed, courts frequently approve competitive bidding

6    procedures similar to the proposed Bidding Procedures as a means of ensuring that such sales will

7    maximize value for the estate.  *See, e.g.*, *Doehring v. Crown Corp. (In re Crown Corp.)*, 679 F.2d

8    774, 775 (9th Cir. 1982) (noting that district court required specific minimum overbid amounts,

9    deposits, and comparable deal terms to be used by all overbidders).

10

11   **C.    THE EXPENSE REIMBURSEMENT IS REASONABLE AND LIKELY TO**

12   **ENHANCE THE SALES PRICE**

13   Local Bankruptcy Rule 6004-1(b)(6) addresses breakup fees and other forms of overbid

14   protection, which provides as follows:

15   Break-up Fees. If a break-up fee or other form of overbid protection is requested in
     the Sale Procedure Motion, the request must be supported by evidence establishing:

16
     (A) That such a fee is likely to enhance the ultimate sale price; and

17
     (B) The reasonableness of the fee.

18
     LBR 6004-1(b)(6).

19

20   The Trustee has not found a Ninth Circuit Court of Appeals, Ninth Circuit Bankruptcy

21   Appellate Panel or Central District of California District or Bankruptcy Court published opinion

22   that provides a specific standard applicable to breakup fees and other forms of overbid protection in

23   this Circuit.  Nationally, there are at least three tests that have been applied to breakup fees.

24   First, the "business judgment" test, which typically focuses on these three factors: "(1)

25   whether the relationship of the parties who negotiated the fee is marked by self-dealing or

26   manipulation; (2) whether the fee hampers, rather than encourages, bidding; and, (3) whether the

27   amount of the fee is reasonable in relation to the proposed purchase price."  *In re Twenver, Inc.*,

28   149 B.R. 954, 956 (Bankr. D. Colo. 1992) (citing *In re Integrated Resources, Inc.*, 147 B.R. 650

49

1  (S.D.N.Y. 1992)). The *Twenver* court noted that a 1-2% breakup fee is typically reasonable, while a

2  10% fee under the circumstances of that case would have hampered the prospects for a higher bid.

3  *Id.*[22]

4        The second test is the "best interests" test.  The focus in this test is whether the breakup fee

5  is beneficial or unduly burdensome to the estate.  In *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 913

6  (Bankr. D. Ariz. 1994), the court disapproved of a breakup fee of a multimillion dollar cash

7  payment that would be paid by the estate to the buyer in the event of a breach by the debtor.  The

8  court viewed such a payment as detrimental to creditors.  *Id.*

9        The third test is the "administrative claim" test, which requires a showing that the claim

10  should be allowed as an administrative claim under 11 U.S.C. § 503(b).  That is, the fee is actually

11  necessary to preserve the value of the estate or the fees benefited the estate in a demonstrable way.

12  *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 536-537 (3rd Cir. 1999).

13        Here, the Trustee is not proposing to pay a break-up fee.  Rather, as a condition of

14  submitting its bid for the Purchased Assets and entering the APA, the Stalking Horse Bidder

15  required an Expense Reimbursement fee of up to $300,000 as fair and reasonable consideration for

16  its actual costs and expenses and to help compensate for the risks it has incurred (and will incur) in

17  making its offer and subjecting it to higher or otherwise better offers if it is outbid.  Subject to its

18  commitment to be a Backup Buyer, if the Stalking Horse Bidder is outbid, its deposit shall be

19  returned on the date that is the earlier of seventy-two (72) hours after (a) the closing of the Sale

20  with the Successful Bidder, and (b) thirty (30) days after entry of the Sale Order with the

21  Successful Bidder and its right to payment of its deposit and the Expense Reimbursement shall

22

23        [22] Bankruptcy courts have traditionally approved bidding incentives under the "business

24  judgment rule," which prohibits judicial second-guessing of the actions of the trustee taken in good
   faith and in the exercise of honest judgment.  *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650,

25  656-57 (Bankr. S.D.N.Y. 1992) (noting that break-up fee arrangements are to be reviewed
   according to the deferential "business judgment" standard), *appeal dismissed*, 3 F.3d 49 (2d Cir.

26  1993); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (noting that
   bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding

27  by providing some form of compensation for the risks it is undertaking") (internal quotation marks

28  and citation omitted).

1    constitute an administrative expense in the Bankruptcy Case with priority over any and all

2    administrative expenses, including superpriority administrative expenses.

3        The Stalking Horse Bidder has indicated that it has had to incur significant time, effort

4    and expense in negotiating and documenting an appropriate APA and performing due diligence on the

5    Purchased Assets.  The Stalking Horse Bidder will incur additional significant time, effort, and

6    expense in participating in the sale and auction process.  The interest of the Stalking Horse Bidder

7    and the APA will likely generate competitive interest in the Assets.  In addition, the Buyer has

8    agreed to be a backup buyer under certain circumstances if it is outbid.  The Stalking Horse Bidder

9    also agreed to provide certain due diligence reports that the Trustee will share with prospective

10    bidders.

11        As required by Local Rule 6004-1(b)(6), and discussed below with respect to the various

12    tests, the Trustee believes that the proposed Expense Reimbursement will serve to enhance the

13    ultimate sale price and is reasonable. and should be approved as follows:

14        (1)  The Business Judgment Test.  First, the Expense Reimbursement satisfies the business

15    judgment test, because it was the product of arm's-length good-faith negotiations between the

16    Trustee and the Stalking Horse Bidder and agreed to in the Trustee's sound business judgment.

17    Those negotiations resulted in the Stalking Horse Bidder agreeing to the APA, agreeing to provide

18    certain diligence material to the Trustee to provide to other bidders, establishing a bid standard or

19    minimum for other bidders and placing estate property in a sales configuration mode to attract

20    other bidders for a potential auction, and agreeing to serve as a backup buyer.  Second, the size of

21    the fee will not chill bidding and, rather, has incentivized a Stalking Horse Bidder because it seeks

22    to reimburse the Stalking Horse Bidder for the actual costs, expenses it has incurred (and will

23    incur).  The Expense Reimbursement, like other bidding incentives, encouraged the Stalking Hose

24    Bidder to invest the requisite time, money, and effort to negotiate with the Trustee and perform the

25    necessary due diligence attendant to the acquisition of the Purchased Assets, despite the inherent

26    risks and uncertainties of the chapter 11 process.  "Without such fees, bidders would be reluctant to

27    make an initial bid for fear that their first bid will be shopped around for a higher bid from another

28    bidder who would capitalize on the initial bidder's due diligence."  *In re Hupp Indus.*, 140 B.R. 191,

194 (Bankr. N.D. Ohio 1992).  Third, the Trustee believes that the Expense Reimbursement is reasonable because it represents a maximum of $300,000, which is 3.52% of the cash portion of the Stalking Horse Bid, and 1.12% of the overall $26.75 million Bid.  Furthermore, that amount is reasonable, given the substantial benefits the estate has received and will receive from the presence of the Stalking Horse Bidder and the commitment to serve as a backup buyer.

(2)  The Best Interests Test.  The breakup fee satisfies the "best interests" test.  Again, the focus in this test is whether the breakup fee is beneficial or unduly burdensome to the estate.  Here, there should be no concern that the breakup fee will be paid out of the Trustee's limited cash resources.  The $300,000 is not a liquidated damages provision.  Rather, it will only be paid if a successful overbidder emerges and submits a qualifying bid, which would necessarily generate sufficient cash to pay the Expense Reimbursement and result in a higher and better net bid to the estate.  Furthermore, the Expense Reimbursement also seeks to reimburse the Stalking Horse Bidder for the actual costs and expenses it has incurred (and will incur) for obtaining due diligence reports, including an environmental assessment, that the Trustee would, in any event, need to obtain.  The Stalking Horse Bidder has agreed to share the environmental assessment information with the Trustee so that the Trustee may share such materials with other interested parties to encourage a level playing field of information, which it is hoped will further encourage overbidding.

(3)  Administrative Claim Test - Finally, the Expense Reimbursement satisfies the "administrative claim" test.  Here, the Trustee is seeking to sell the Debtor's assets to the best and highest bidder for the benefit of creditors.  The Stalking Horse Bidder has served this effort in an important and beneficial way by agreeing to participate in an auction where its offer may be outbid through a bankruptcy sale.  The proposed Expense Reimbursement seeks to compensate the Stalking Horse Bidder for its actual and necessary expenses incurred in proceeding with the sale.  As set forth above, the existence of the Stalking Horse Bidder establishes a bid standard or minimum for other bidders and places estate property in a sales configuration mode to attract other bidders for a potential competitive auction.  This is a substantial benefit to the estate.  The Stalking Horse Bidder has agreed to share its environmental assessment information with the Trustee so that

52

1    he may provide them to potential bidders and incentivize overbidding.  If the Trustee had the

2    money to obtain these reports on his own, they would certainly be actual and necessary

3    administrative expenses incurred as part of the sale.  Accordingly, the Trustee submits that the

4    Expense Reimbursement satisfies this test.

5            In sum, the Trustee submits that the Expense Reimbursement should be approved.

6

7    **D.    THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES ARE**

8    **REASONABLE AND APPROPRIATE**

9            In connection with the Sale, the Trustee believes it is necessary to establish a process by

10   which: (a) the Trustee and counterparties to the Designated Contracts can reconcile the Cure

11   Amount proposed by the Trustee, if any, in accordance with section 365 of the Bankruptcy Code,

12   and if appropriate determine whether to consent regardless of the Cure Amount; and (b) the

13   counterparties to such contracts can object to the assumption and assignment of the Designated

14   Contracts and/or related proposed Cure Amount.  As described above, the proposed Assumption

15   and Assignment Procedures comply with Bankruptcy Rule 2002 and provide all counterparties to

16   the Designated Contracts with due and adequate notice of the potential assumption and assignment

17   of their contracts, the deadline to object as set forth in the Assumption Notice, and the time and

18   place for the Sale Hearing.

19

20   **E.    ASSUMPTION AND ASSIGNMENT OF THE DESIGNATED CONTRACTS IS**

21   **AUTHORIZED BY THE BANKRUPTCY CODE**

22           Sections 365(a) and (b) of the Bankruptcy Code authorize a trustee to assume, subject to

23   the court's approval, executory contracts or unexpired leases of the debtor.  Under section 365(a)

24   of the Bankruptcy Code, a trustee, "subject to the court's approval, may assume or reject any

25   executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the

26   Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory

27   contract of a debtor, providing that:

28

1
2

If there has been a default in an executory contract or unexpired lease
of the debtor, the trustee may not assume such contract or lease unless,
at the time of assumption of such contract or lease, the trustee—

3
4

(A)    cures, or provides adequate assurance that the trustee will
promptly cure, such default . . . ;

5
6
7

(B)    compensates, or provides adequate assurance that the trustee
will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party
resulting from such default; and

8

(C)    provides adequate assurance of future performance under such
contract or lease.

9
10

11 U.S.C. § 365(b)(1).

11    Pursuant to Bankruptcy Code section 365, a trustee or debtor-in-possession may

12 "maximize the value of the debtor's estate" by assuming executory contracts that "benefit the

13 estate" and by rejecting those that do not. *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir.

14 2001); *see also COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373,

15 382 (2d Cir. 2008). Section 365 authorizes the proposed assumptions and assignments, provided

16 that any defaults under such contracts are cured and adequate assurance of future performance is

17 provided. 11 U.S.C. §§ 365(b)(1) & (f)(2).

18    The standard applied by courts to determine whether an executory contract or unexpired

19 lease should be assumed is the "business judgment" test, which requires a trustee to determine that

20 the requested assumption or rejection would be beneficial to the debtor's estate. *See, e.g.*, *Group

21 of Institutional Investors v. Chicago, Mil., St. P.& P.R.R.*, 318 U.S. 523, 550 (1943); *see ReGen

22 Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) ("The

23 bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption

24 to determine if it would be beneficial or burdensome to assume the executory contract by

25 evaluating whether assumption would serve the reorganization or whether it would take away

26 funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime Networks, Inc. (In re

27 Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network Access Sols., Corp.*, 330

28 B.R. 67, 75 (Bankr. D. Del. 2005). The business judgment test is satisfied where the trustee

1    determines in good faith that assumption of an executory contract will benefit the estate. *In re*

2    *FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986).

3          Here, the assumption, assignment, and sale of the Designated Contracts (which, as defined

4    above, include any leases) will benefit the Debtor's estate because it is an integral component of a

5    proposed sale that will yield substantial proceeds for the estate. The assumption, assignment, and

6    sale of the Designated Contracts will also benefit the estate by eliminating unsecured claims for

7    rejection damages.

8          With respect to adequate assurance of future performance, it may be provided, among other

9    ways, by demonstrating the assignee's financial health and experience in managing the type of

10   enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.

11   1986) (adequate assurance of future performance is present when prospective assignee of lease

12   from debtor has financial resources and has expressed willingness to devote sufficient funding to

13   business in order to give it strong likelihood of succeeding; chief determinant of adequate

14   assurance is whether rent will be paid). The Trustee contemplates that the Stalking Horse Bidder

15   (or successful overbidder) will be able to provide adequate assurance of future performance in

16   connection with any Designated Contracts because the Stalking Horse Bidder (or successful

17   overbidder) will submit evidence to demonstrate it has the financial wherewithal and ability to

18   contemplate the transactions contemplated in the APA, including future performance of any

19   contracts. Moreover, at the Sale Hearing, the Trustee will provide evidence that all requirements

20   for the assumption, assignment and sale of contracts to be assigned and sold to the Stalking Horse

21   Bidder (or successful overbidder) will be satisfied.

22         To assist in the assumption, assignment and sale of the Designated Contracts, the Trustee

23   also requests that the Sale Order provide that any anti-assignment provisions or consent

24   requirements in the Designated Contracts shall not restrict, limit or prohibit the assumption,

25   assignment and sale of the Designated Contracts and are deemed and found to be unenforceable

26   anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code. The

27   Trustee also seeks to disallow any cure to the extent it includes penalties not recoverable under

28   section 365(b)(2)(D) of the Bankruptcy Code for non-monetary defaults.

1    As discussed above, the Trustee has already obtained some consents to sale from parties to

2  the Designated Contracts and is working on obtaining more consents prior to the Sale Hearing.

3  The Trustee is hopeful that any issue of the assumption and assignment of the Designated Contracts

4  will be resolved prior to the Sale Hearing.

5    Accordingly, the Trustee requests that the Assumption and Assignment Procedures be

6  approved.[23]

7

8  **F.    THE SALE OF THE ASSETS FREE AND CLEAR OF LIENS, CLAIMS,**

9  **ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. § 363(f) SHOULD**

10  **BE APPROVED**

11    In the interest of attracting the best possible offers for the Assets, the Trustee requests that

12  the Court approve the sale of the Purchased Assets and/or any sale of the Assets free and clear of

13  all liens (including any replacement liens), claims, encumbrances, and interests (including royalty

14  interest) (collectively, the "Interests").  Pursuant to Bankruptcy Code § 363(f), the Trustee may sell

15  property free and clear of Interests if one of the following conditions is satisfied:

16
17    (1)    applicable nonbankruptcy law permits sale of such property free and clear
     of such interest;

18    (2)    such entity consents;

19    (3)    such interest is a lien and the price at which such property is to be sold is
     greater than the aggregate value of all liens on such property;

20
21    (4)    such interest is in bona fide dispute; or

22    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept
     a money satisfaction of such interest.

23
24  11 U.S.C. § 363(f)

25

26  _____

27  [23]  To the extent that the Designated Contracts have already been assumed by the Trustee, the
     Trustee seeks to assign such contract to the Stalking Horse Bidder (or successful overbidder) the
     Cure Amount will be the amount previously fixed by the Court and the only issue to be considered

28  will be the adequate assurance of future performance by the assignee of such contract.  *See* 11
     U.S.C. § 365(f)(2).

1     Section 363(f) is written in the disjunctive, and thus satisfaction of any one of its five

2  requirements will suffice to permit the sale of the Assets free and clear of all Interests. In

3  connection with his administration of the Debtor's assets, the Trustee is aware of the Interests

4  disclosed above, which include the Interests of  UBS AG, Stamford Branch, UBS AG, London

5  Branch GLR, Rival, Santa Barbara County, Orange County, Kern County, the State Controller,

6  Collection Service, CAP, GTL1 and GIT.

7     With respect to UBS AG, Stamford Branch and UBS AG, London Branch, the Trustee

8  expects that they will have consented to the Sale and, thus § 363(f) (2) will be satisfied.  With

9  respect to any liens of GRL, CAP, GTL1 and GIT, those liens are in dispute.  As set forth above,

10  the Trustee has already sued GRL, GLR, CAP, GTL1 and GIT.  With respect to the liens of Santa

11  Barbara County, Kern County, Orange County (collectively the "Counties"), the Stalking Horse

12  Bidder will take the Purchased Assets subject to the property tax liens other than certain disputed

13  items including the penalties asserted thereunder (see discussion below).  Therefore, § 363(f)(4) is

14  satisfied.

15     The Trustee proposes that the proceeds of sale after satisfaction of any valid ad valorem

16  taxes not assumed (and escrow of any disputed portion), the payment to Ten Oaks and the Carve-

17  out under the existing trustee financing agreements, be paid over to UBS in partial satisfaction of

18  its claims.  Until payment, the liens of UBS AG, Stamford Branch and UBS AG, London Branch,

19  will attach to the sale proceeds with the same force, validity, enforceability, and priority, if any, as

20  existed with respect to the Purchased Assets as of the Petition Date.  Pursuant to the financing

21  orders and amendments, the post-petition liens in favor of UBS prime everything but remain

22  subject to a portion of the Santa Barbara property tax liens and certain carve-outs with the Trustee

23  and his professionals.

24     In addition, any liens of GRL, Rival, the State Controller, Collection Service, CAP, GTL1

25  and GIT are all junior to the senior liens of UBS AG, Stamford Branch and UBS AG, London

26  Branch.  As a result, their purported claims are entirely unsecured.  *See* 11 U.S.C. §§ 506(a) and

27  (d).  The Court is requested to value the secured interests of GLR, Rival, the State Controller,

28  Collection Service, CAP, GTL1 and GIT at zero pursuant to Fed. R. Bankr. P. 3012.  Therefore,

1    since their claims are not allowed secured claims and are entirely unsecured as of the Petition

2    Date, the Trustee can sell the Purchased Assets and their liens need not attach to sale proceeds.

3            As to the royalty interest holders with respect to the Debtor's oil, gas and mineral

4    interests, it is disputed that the Trustee has to pay them as part of a sale, as set forth in the

5    Trustee's 356 Adversary Proceeding.  In addition, as set forth above, the Trustee has already

6    obtained some consents from such interest holders to a sale and is actively seeking to obtain

7    others.[24]  Thus, § 363(f)(2) and (4) are satisfied.  The Trustee is not proposing to have the

8    royalties attach to the sale proceeds.

9            To the extent that there are any penalties levied against the Purchased Assets, including by

10   one of the lenders or the Counties[25] or included in any demand, these penalty charges may be

11   avoidable pursuant to § 724(a) and subject to subordination under § 726(a)(4).  Here, in a chapter

12   11 context, in conducting a best interests analysis under § 1129(a)(7) the Court must take into

13   account all of the provisions of the Bankruptcy Code that would apply in a chapter 7 case.  *In re*

14   *Ayers*, 137 B.R. 397, 399 (Banker. D. Mont. 1992).   The legislative history for § 1129(a)(7)

15   specifically provides that:

16              In order to determine the hypothetical distribution in a liquidation,
                the court will have to consider the various subordination provisions
17              of proposed 11 U.S.C. 510, 726(a)(3), 726(a)(4), and the
                postponement provisions of proposed 11 U.S.C. 724.
18
     H.R. Rep. No. 95-595 (1977).
19
             Furthermore, numerous cases have taken into account whether a penalty is subject to
20
     subordination under § 726(a)(4) in considering whether a chapter 11 plan meets the "best interests"
21
     of creditors test under § 1129(a)(7) of the Bankruptcy Code and may be confirmed.  *See In re Dow*
22
     *Corning Corp.*, 255 B.R. 445, 468 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir.
23

---

24           [24] The Trustee will file the consent stipulations prior to the Sale Hearing.

25
     [25] Counties in California levy two types of penalties with respect to real property – a one time
26   delinquency penalty of 10% pursuant to Cal. Rev. & Tax. Code § 2618 and a redemption penalty
     equal to 1.5% per month (18% per annum) pursuant to Cal. Rev. & Tax Code § 4102.  Counties
27   often argue that the redemption penalty is not a penalty, but interest.  However, as noted by the
     Ninth Circuit in *In re County of Orange*, 262 F.3d 1014 (9th Cir. 2001), "[i]t is clear from the face
28   of [RTC § 4103] that the redemption penalties are just that, penalties, and not interest."

1    2002); *In re Zante, Inc.*, 467 B.R. 216, 219 (D. Nev. 2012); *In re Roman Catholic Archbishop of*

2    *Portland in Or.*, 339 B.R. 215, 227 (Bankr. D. Or. 2006) ("in order to meet the best interests test

3    for confirmation set out in § 1129(a)(7), the plan must provide that an impaired class receive at

4    least as much as the class would receive in a chapter 7 liquidation").  Therefore, it is appropriate

5    for the Court to determine that a dispute exists with respect to payment of penalties and, as such,

6    pursuant to § 363(f)(4), the Assets may be sold free and clear of any such liens for penalties, with

7    those disputed amounts attaching to like amounts of the net sale proceeds as provided above.

8    The Trustee will also serve the Sale Notice on, *inter alia*, all known creditors of the Debtor

9    and send it to all entities known by the Trustee to have asserted any interest in purchasing the

10    Assets.  To the extent that any party receiving notice of the proposed sale does not file a written

11    objection, such party should be deemed to have consented to the proposed sale of the Purchased

12    Assets free and clear of its asserted Interest.  *See In re Channel One Commc'ns, Inc.*, 117 B.R. 493,

13    496 (Bankr. E.D. Mo. 1990).

14    Accordingly, this Court should approve the sale of the Purchased Assets to the Stalking

15    Horse Bidder (or successful overbidder), and/or some or all of the REDU Assets to another

16    Qualified Bidder in accordance with the Bidding Procedures Order, and any Back-Up Buyer, free

17    and clear of any asserted Interests under Bankruptcy Code section 363(f) and treat such Interests as

18    set forth above.

19

20    **G.**    **IF THE TRUSTEE CONSUMMATES THE SALE OF THE ASSETS, SUCH**

21    **ASSETS SHOULD BE SOLD OR ASSUMED FREE AND CLEAR OF SUCCESSOR**

22    **LIABILITY.**

23    The Successful Bidder is unlikely to be liable for any of the Debtor's liabilities as a

24    successor to the Debtor's business or otherwise, unless the Successful Bidder expressly assumes

25    such liabilities.  However, a provision that any Sale is free and clear of successor liability relating

26    to the Debtor's businesses, except as may be expressly assumed by the Successful Bidder pursuant

27    to the applicable sale agreement, would ensure that any claims premised on the theory that the

28

1  Successful Bidder is a successor in interest to the Debtor may not be asserted against the Successful

2  Bidder.

3        Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy

4  Code section 363 sale takes free and clear from successor liability relating to the debtor's business.

5  *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets

6  pursuant to section 363(f) barred successor liability claims for employment discrimination and

7  rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie*

8  *Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996)

9  (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler*

10  *(In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits

11  a buyer to take ownership of property without concern that a creditor will file suit based on a

12  successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr.

13  S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit

14  GM's assets to pass to the purchaser free and clear of successor liability claims, and in that

15  connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405

16  B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state

17  successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are

18  encompassed by section 363(f) and are therefore extinguished by the Sale.").

19        The purpose of an order authorizing the transfer of assets free and clear of all liens, claims,

20  encumbrances and all other interests would be frustrated if claimants could thereafter use the

21  transfer as a basis to assert claims arising from the Debtor's pre-sale conduct against the Successful

22  Bidder.  Moreover, without such assurances, the Trustee would run the risk that potential bidders

23  may not enter the Auction or, if they do, may do so with lower bid amounts than otherwise.  To that

24  end, the Successful Bidder should not be liable under any theory of successor liability relating to

25  the Debtor's business, but should hold the Assets free and clear.

26

27

28

**H.**    **THE STALKING HORSE BIDDER ACTED IN GOOD FAITH IN CONNECTION WITH THE PROPOSED SALE AND THEREFORE THE PROPOSED SALE IS ENTITLED TO THE PROTECTIONS OF BANKRUPTCY CODE SECTION 363(m)**

The Trustee respectfully requests that the Trustee and the Stalking Horse Bidder (or successful overbidder) be entitled to all protections in Bankruptcy Code section 363(m) as a good faith purchaser of the Purchased Assets.  Section 363(m) protects the sale, conducted under Bankruptcy Code section 363(b), of a debtor's property to a good faith purchaser, notwithstanding that the sale is later reversed or modified on appeal. Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

Although the Bankruptcy Code does not define "good faith," the absence of good faith is "typically shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Paulman v. Gateway Ventures Partners III, L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 577 (9th Cir. 1998) (internal quotations omitted).

The proposed sale to the Stalking Horse Bidder was negotiated in good faith, at arm's-length and without collusion or fraud of any kind.  The parties to the APA were represented by sophisticated counsel.  The Stalking Horse Bidder is not an insider or affiliate of the Debtor. The sale will be exposed to competitive overbidding, further ensuring that, to the extent the Stalking Horse Bidder is not overbid, it has paid a fair price for the Purchased Assets.  Accordingly, this Court should find that the Trustee and the Stalking Horse Bidder acted in good faith within the meaning of Bankruptcy Code section 363(m).[26]

---

[26] If a party other than the Stalking Horse Bidder is the Successful Bidder, the Trustee intends to make an appropriate showing at the Sale Hearing that the purchase agreement with the Successful Bidder is a negotiated, arm's- length transaction, in which the Trustee and the Successful Bidder at all times has acted in good faith in accordance with the standards set forth above.

I.      **PAYMENT TO UBS FROM THE SALE PROCEEDS SHOULD BE APPROVED**

The Trustee also requests authority to partially pay UBS from the cash sale proceeds.  The post-petition liens in favor of UBS prime everything except for certain carve-outs with the Trustee and his professionals and certain other exceptions as expressly set forth in the Final Financing Order.  With no dispute as to the validity and priority of UBS' liens, the Trustee believes in his good faith judgment that it is in the best interests of the estate's stakeholders to repay UBS' post-petition liens from the sale proceeds promptly upon closing of the Sale, to the extent of net cash proceeds.  Accordingly, after reservation for taxes, the costs of the Sale (including the Expense Reimbursement to the extent applicable), and the Carve-Out (as defined in the Final Financing Order and as amended), the Trustee seeks authority to repay, to the extent of cash proceeds, amounts due on account of UBS' post-petition liens with the sale proceeds promptly upon closing. The liens securing any unpaid post and pre-petition obligations to UBS shall attach to any non-cash consideration received by the Trustee.  After receipt of sufficient funds from the earn-out to cover the Carve-Out, the Trustee requests authority to assign the Production Payment to UBS AG.  In addition, the Trustee seeks to assign non-cash proceeds to UBS as partial payment of UBS' claims. The Trustee proposes that the value of such non-cash distributions be reasonably determined by TenOaks, the Trustee's investment banker, using the same methodology and valuation as used in accepting the Stalking Horse Bid or any other Bid accepted at the Auction, shown in a declaration to be filed in advance of the Sale Hearing, with any dispute to be resolved by the Court.  UBS' liens would continue to attach to all sales proceeds until applied to senior ad valorem property taxes, the Carve Out or UBS' loans.

J.      **REQUEST TO VALUE COLLATERAL**

The Trustee requests, pursuant to Federal Rule of Bankruptcy Procedure 3012, that the Court make a finding that the confirmed sale price is the value of the collateral assets, and that the secured claims of GRL, Rival, the State Controller, Collection Service, CAP, GTL1 and GIT are out of the money and are entirely unsecured.  Such a finding is appropriate to support the use of 11 U.S.C. § 506 to properly bifurcate asserted secured claims into secured and unsecured claims.

K.     **REQUEST FOR PERMISSION TO AMEND LEASES AND SURRENDER**
       **LEASEHOLD**

The Trustee anticipates that, as part of and in aid of the sale process and related negotiations, he may need to modify and/or amend leases and executory contracts.  The Trustee is only proposing these concessions to lessors and royalty interest holders, if necessary, to obtain their consent to a sale or sales of the Assets and not to lessors and/or interest holders who do not so consent.  The anticipated modifications to the leases that the Trustee is proposing may include, with the consent of the lessor and the Buyer, a soft consent amendment to the lease whereby future transfers of the lease would require the lessor's consent.

To the extent it becomes necessary to surrender any of the leases and abandon any of the estate's mineral interests that go unsold, the Trustee requests authority to surrender such any such interests to any respective lessor rather than abandon them pursuant to § 554(a) of the Bankruptcy Code.  The Trustee believes that such relief makes sense here, where the contacts and/or leases generally provide that upon termination of the leasehold the leasehold is relinquished to the lessor and the lessee is required to restore the land and/or perform some form of remediation.[27]

The Trustee believes that any such amendments and/or surrender may fall within the ordinary course of business in this Chapter 11 case, but in an abundance of caution, the Trustee requests authority to enter into mutual, consensual amendments with the other parties to leases and executory contracts and authority to surrender any particular lease or contract in his discretion to aid in the sale process and consummate the sale.

L.     **WAIVER OF RULE 6004(h) and 6006(d)**

In order to allow the immediate realization of value from the proposed sale, the Trustee respectfully requests that any orders on the Motion be effective immediately, notwithstanding the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).  As explained above, the

---

[27] Copies of the underlying leases are included in the Appendix of Leases (*docket nos.* 796-807), filed in Adversary Proceeding No. 9:20-ap-01011-MB, captioned *McConnell, Chapter 11 Trustee v. AAnerud et al.*

1    Trustee's goal is to efficiently and expeditiously administer the estate's financial and business

2    affairs.  To preserve the value of the Debtor's estate and limit the costs of administering and

3    preserving the Purchased Assets, it is critical that the sale of Purchased Assets closes as soon as

4    possible after all closing conditions have been met or waived.  A prompt conclusion to the sale

5    process will inure to the benefit of the estate and its creditors. Waiver of any stay will permit the

6    proposed sale to take place as early as possible under the circumstances.

7

8                                                    **V.**

9                                              **NOTICE**

10              Notice of this Motion will be provided initially to: (a) the U.S. Trustee; (b) the Debtor; (c)

11    counsel to UBS; (d) Committee counsel; (e) all parties receiving notice via NEF; and (f) any other

12    party that has requested notice pursuant to Local Rule 2002-1(b).  After the Court fixes the hearing

13    dates, timelines and deadlines, the Trustee will serve notice to the broader list, including all known

14    creditors.  The Trustee will serve notices of intended assumption on known affected parties only.

15    The Trustee respectfully submits that no further notice of this Motion is required under the

16    circumstances.

17

18                                                   **VI.**

19                                          **CONCLUSION**

20              For all of the foregoing reasons, the Trustee respectfully requests that this Court enter an

21    order: (i) granting the Motion; (ii) approving the Bidding Procedures, including the Expense

22    Reimbursement, and other proposed overbid protections as set forth in the Bidding Procedures

23    Order; (iii) following the Sale Hearing, approving the APA and the Sale of the Purchased Assets to

24    the Stalking Horse Bidder (or any or all of the Assets to a successful overbidder or Back-Up

25    Buyer), free and clear of all liens, claims, encumbrances, and interests, subject to the bidding and

26    auction process proposed by the Trustee; (iv) following the Sale Hearing, authorizing the

27    assumption, assignment, and sale of the Designated Contracts; (v) finding that the confirmed sale

28    price is the fair market value of the Assets; (vi) finding that the Successful Bidder and the Backup

1  Bidder are good faith purchasers within the meaning of 11 U.S.C. § 363(m); (vii) authorizing the

2  Trustee to modify or surrender Leases and Contracts as needed to consummate a sale; (viii)

3  authorizing the Trustee to partially pay UBS from the cash sale proceeds and assign the non-cash

4  proceeds after reserves as provided above; and (ix) granting such other and further relief as is just

5  and proper under the circumstances.

6

7  DATED: August 25, 2020                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

8

9
                                           By: _____/s/ Eric P. Israel_____
10                                             ERIC P. ISRAEL
                                               Attorneys for Michael A. McConnell,
11                                             Chapter 11 Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF MICHAEL A. MCCONNELL

I, Michael A. McConnell, declare and state as follows:

1.      I am the Chapter 11 trustee (the "Trustee") of HVI Cat Canyon, Inc. (the "Debtor").

2.      I have personal knowledge of each of the facts herein, except those set forth on information and belief and, as to those matters, I believe them to be true.  If called as a witness, I could and would testify competently with respect to such facts.

3.      I make this declaration in support of my *Notice of Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the Form and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting Related Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting* Related Relief (the "Motion").

4.      I am a practicing attorney and am admitted in Texas, the U.S. Supreme Court, Supreme Court of Texas, and the U.S. Court of Appeals, Fifth, Eleventh, and Tenth Circuits, and the Northern District of Texas, among others.  I am also a former U.S. Bankruptcy Judge from the Northern District of Texas.  In my over 40 years of practice, I have represented secured and unsecured creditors, trustees, committees, and debtors in some of the most significant bankruptcy cases in Texas and the surrounding region.  I have also previously served as an operating Chapter 11 trustee and Chapter 11 examiner in several complex Chapter 11 cases, including in numerous oil and gas cases.

5.      The Debtor is a Colorado corporation authorized to conduct business in the State of California.  It is the owner and operator of producing oil and gas interests in California.  According to the Debtor, it "owns an approximately 100% working interest and an average 85% net revenue interest in several oilfields in the Santa Maria Valley of Santa Barbara County, North Belridge in

1  Kern County, and Richfield East Dome Unit ("REDU") in Orange County.

2      6.    Following my appointment as Chapter 11 trustee on October 22, 2019, I sought and

3  obtained Court approval to retain the services of CR3 Partners, LLC ("CR3") to obtain financial

4  advisory services and to provide the services of Tim Skillman to act as my Chief Restructuring

5  Officer., Danning, Gill, Israel and Krasnoff, LLP, led by Eric P. Israel, to act as my general

6  counsel, and TenOaks Energy Partners, LLC ("TenOaks"), as my exclusive marketing agent and

7  advisor in connection with a sale of the Debtor's assets.

8      7.    Following my appointment as Chapter 11 trustee, I undertook the necessary steps to,

9  among other things,:

10          a.    assume control of the Debtor's operation and assets;

11          b.    retain key professionals to assist me in addressing legal and operational

12  issues;

13          c.    obtain Court approval for postpetition financing, on a final basis, to begin

14  stabilizing the Debtor's operations and prepare it for a sale;

15          d.    develop and start implementing my plan to address deferred maintenance in

16  order to  minimize the risk of health and safety violations and/or product spills;

17          e.    develop an understanding of the relationship and transactions with the

18  Debtor's various non-debtor affiliates, and executed a plan to disentangle the Debtor therefrom,

19  including by filing and obtaining Court approval to reject virtually all of the Debtor's contracts

20  with the non-debtor affiliates;

21          f.    identify opportunities to drive value for the stakeholders including

22  outsourcing back office support, better diluent contracts, better customers contracts, and better field

23  service solutions;

24          g.    commence an adversary proceeding to recover three properties the Debtor

25  quit-claimed to an affiliate, including seeking to avoid transfers made 6 days before the petition

26  date; and

27          h.    commence an adversary proceeding for declaratory relief that the estate's

28  mineral leases are property interest not subject to 11 U.S.C. § 365.

8.      From and after the Petition Date, California Asphalt Production, Inc., formerly

known as Santa Maria Refining Co. and Greka Refining Company ("CAP") failed to pay the

Debtor in full for the crude oil delivered by the Debtor to CAP and purported to set off pre-petition

and postpetition amounts purportedly owed by the Debtor to CAP against amounts owed by CAP

to the Debtor.  CAP also purported to set off amounts owed by CAP to the Debtor for amounts the

Debtor purportedly owes to its affiliates GIT and GTL1, in violation of the automatic stay.  The

latter "triangular setoffs" have included payments to attorneys and insiders in violation of the

Bankruptcy Code.

9.      This conduct continued after my appointment.  In particular, on or about November

20, 2019, CAP paid me only $300,000 of the $1,128,250 that it owed to the Debtor for the month

of October 2019.  I initially extended the due date for the $828,250 that was still due for October

2019 to November 27, 2019.  However, on November 27, 2019, CAP failed to pay me the

outstanding amount that was due for October 2019, or any other sum.  I was subsequently told that

CAP was having a liquidity problem and that CAP would not be making any more payments to the

Debtor for CAP's purchases in the month of October 2019.  As a result, I ceased virtually all

shipments to CAP on that day – November 27, 2019.  Subsequently, CAP has taken the position

that the Debtor's crude was not up to "spec" because it was too cold and wet.

10.     While I was operating the Debtor, on or about January 17, 2020, the California

Department of Fish & Wildlife Office of Spill Prevention and Response ("OSPR") issued a Cease

and Desist Order (the "Cease and Desist Order") for all operations of the Debtor within ¼  mile of

an inland waterway.

11.     The Cease and Desist Order was due to the Debtor's failure to file with OSPR spill

contingency plans, which were due in 2015, and comply with their financial responsibility

requirements.  As a result, after consulting with my environmental counsel, I was compelled to

immediately shut down all of the Debtor's operations pending plan approval.  The immediate

impact of the shutdown was to reduce January 2020 sales by approximately 9,000 barrels, which

correspondingly reduced February 2020 receipts by approximately $450,000.

12.    I worked with OSPR to comply with its requests and have now submitted plans for the Security, Bell, REDU and Bradley/Jim Hopkins facilities.  All plans have been approved in final form, allowing me to produce at all of the Debtor's currently operational fields.  There are eight other plans that will need to be prepared before certain other facilities can be brought back on line.

13.    In addition, during my operations, on or about March 19, 2020, the Governor of the State of California, in response to the threat of the coronavirus COVID-19, issued a stay at home order directing that all residents of California stay at home or their place of residence except as needed to maintain continuity of operations of federal critical infrastructure sectors.  *See* https://covid19.ca.gov/stay-home-except-for-essential-needs/.

14.    I am informed that the energy sector is a federal critical infrastructure sector, and oil production is expressly included within the definition of essential services.  *See* https://www.cisa.gov/critical-infrastructure-sectors.  In addition, the California State Public Health Officer designated certain workers as "Essential Critical Infrastructure Workers" to include petroleum workers.  https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf.  Thus, notwithstanding the State of California's March 19, 2020 order, the Debtor's employees are considered "Essential Critical Infrastructure Workers" and permitted to work.

15.    Furthermore, beginning in early March 2020, global oil prices took a steep decline.  The price of the oil during this time decreased from about $55-60/barrel in December 2019 to under $20/barrel.  At this time, prices have recovered some to about $40/barrel today.  In addition, due to the glut of global oil reserves, I have had challenges obtaining purchase contracts, although in the end I have been able to enter into contracts to sell all oil produced.   However, the fall in the price of oil has drastically affected the estate's bottom line and my ability to fund and reserve for the day to day operations of the Debtor.  I project that July operations, before expenses of the bankruptcy case including professional fees, resulted in the estate losing approximately $430,000 for the month.

16.    With the assistance of TenOaks, I undertook a formal marketing process for the sale of the Debtor's assets  (the "Assets"), which primarily consist of oil and gas interests, to a

69

1    responsible operator.  The legal description of all the Assets is attached as Exhibit 6.

2        17.    In particular, through TenOaks, I reached out to over 10,500 contacts at

3    approximately 4,250 potential buyer companies.  Approximately 60 of these potential buyers

4    executed a non-disclosure agreement and reviewed due diligence information regarding the Assets.

5    During this time, I received an offer from Team Maria Joaquin, L.L.C. and Maria Joaquin Basin,

6    L.L.C.as the stalking horse bidders (collectively the "Stalking Horse Bidder").

7        18.    With the assistance of my professionals, I engaged in arm's-length negotiations with

8    several bidders, including the Stalking Horse Bidder.

9        19.    I also continued to engage during this time with several bidders submitting bids for

10   the Assets.

11       20.    In early July 2020, I called for parties to submit their highest and best offer to be a

12   stalking horse buyer.  Thereafter, I negotiated, at arm's length, the terms of asset purchase

13   agreements with two primary parties, including the Stalking Horse Bidder.  The negotiations with

14   the multiple bidders, and ultimately, the Stalking Horse Bidder lasted several months.

15       21.    Ultimately, after several months of negotiations, the Stalking Horse Bidder and I

16   documented an asset purchase agreement, attached hereto as Exhibit 5 (the "APA"), under which I

17   propose to sell, subject to Court approval and higher or otherwise better bids, substantially all of

18   the Assets, except as provided in the APA (collectively, the "Purchased Assets"), to the Stalking

19   Horse Bidder.

20       22.    Considering the asset purchase agreements that were presented to me, the Stalking

21   Horse Bidder offered both the best financial terms and material provisions with respect to the

22   Purchased Assets such that I, in my business judgment, found it appropriate to finalize the APA

23   and related complex documentation with the Stalking Horse Bidder.

24       23.    I believe that the Stalking Horse Bidder's offer is the highest and best offer I have

25   received to date.

26       24.    I note that the Stalking Horse Bidder does not include the REDU fields in Orange

27   County.  I intend to continue marketing REDU and solicit bids for REDU at the Auction,

28

1    individually and with other assets.  If no acceptable offer is received for REDU, I may seek to

2    continue marketing REDU, shut it down or abandon REDU.

3        25.    I have read the Motion, which my counsel has prepared on my behalf.  I believe that

4    the sale of the Purchased Assets, subject to overbid and the bidding procedures set forth in the

5    Motion, is a fair price based upon evaluation and advice from TenOaks.

6        26.    The Stalking Horse Bidder was procured as a result of the efforts of TenOaks after

7    months of arms-length negotiations.  I have no independent knowledge of or familiarity with the

8    Stalking Horse Bidder.  I have been advised that the Stalking Horse Bidder has no connection with

9    the Debtor or anyone else associated with this estate or the administration of this estate.

10       27.    There is no side compensation being paid to any parties, other than TenOaks as and

11   when approved by the Court, in connection with the proposed sale.

12       28.    I believe it is prudent and in the best interests of the estate to move forward with the

13   Stalking Horse Bidder's offer, subject to overbid.

14       29.    My accountants have advised me that they do not believe that there will be any

15   adverse tax consequences to the estate from of the proposed sale.

16       30.    Barring receipt of an overbid and based upon the facts and circumstances set forth in

17   the Motion, in the exercise of my business judgment, I believe that the proposed sale to the

18   Stalking Horse Bidder and the bidding procedures set forth in the Motion are in the best interests of

19   the estate and should be approved.

20       31.    In connection with the sale, I am seeking to assume and assign certain contract and

21   leases to the Stalking Horse Bidder, or overbidder.

22       32.    Here, with respect to the requirements in 11 U.S.C. § 365 to assume the contracts

23   and leases, I propose to cure, as provided in the Motion, defaults, provide adequate assurance of

24   prompt payment of such defaults, and provided adequate assurance of future performance as

25   required by § 365(b) as part of the sale.

26       33.    In my business judgment, I decided to assume and assign the contracts and leases as

27   part of the sale because doing so will benefit the Debtor's estate.  The assumption, assignment, and

28   sale of the contracts and leases, will benefit the Debtor's estate because they are an integral

71

1  component of a proposed sale that will yield substantial proceeds for the estate.  The assumption,

2  assignment, and sale of the contracts and leases will also benefit the estate by eliminating

3  unsecured claims for rejection damages.

4      34.    With respect to adequate assurance of future performance, I believe that the Stalking

5  Horse Bidder (or successful overbidder) will be able to provide adequate assurance of future

6  performance in connection with any contracts or leases they assume.  In particular, as set forth in

7  the attached declaration of Sam Delrahim, the Stalking Horse Bidder has the financial wherewithal

8  and ability to contemplate the transactions contemplated in the APA, including future performance

9  of any contracts.

10

11      I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct.  Executed on August 24th, 2020 at Fort Worth, Texas.

13

14  _____

15  MICHAEL A. MCCONNELL

## DECLARATION OF LINDSAY SHERRER

I, Lindsay Sherrer, hereby declare under penalty of perjury:

1.      I am a Partner with TenOaks Energy Partners, LLC ("TenOaks").  I have been with TenOaks for approximately five and one-half years and have approximately 10 years of experience marketing oil and gas assets.

2.      I submit this declaration to aid the Court and parties in support of the *Trustee's Notice of Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the Form and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting Related Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Motion") filed  herewith.

3.      Unless otherwise indicated, the facts set forth herein are based upon my personal knowledge and/or my opinions based on my knowledge and experience.  If called as a witness, I could and would testify competently to the facts contained in this declaration.

4.      I am a founding partner of TenOaks.  I earned my Bachelor of Science in Business from Oklahoma State University.  I have worked for the past ten years in oil and gas investment banking with a concentration on the upstream and midstream energy sectors.  I originated and/or executed over $2 billion in transactions for publicly-traded, sponsor-owned, and privately-owned lower middle market companies in a variety of United States oil and gas basins.

5.      Prior to founding TenOaks, I served as Senior Vice President of Energy Spectrum Advisors with a primary focus on upstream divestitures.  Prior to Energy Spectrum, I served in various energy banking roles with the Bank of Oklahoma.  My acquisitions and divestitures ("A&D") engagements have spanned the United States and included operated, non-operated,

1  royalty, and mineral divestitures.  I have also recently sold assets in California that directly offset

2  some of the assets involved in this sale.

3        6.     My partners and I founded TenOaks in January 2015 to provide independent

4  divestiture advisory services to oil and gas companies in the upstream, midstream, and oil field

5  services sector across the continental United States.  The principals of TenOaks have over 60 years

6  of combined energy investment and commercial banking experience with aggregate transaction

7  experience exceeding $6 billion.  The principals of TenOaks have completed over 120 asset

8  divestiture/financial advisory transactions since 2015.  TenOaks has a wide marketing network

9  with contacts throughout North America for prospective buyers.

10        7.     On or about February 27, 2020, Michael A. McConnell, solely in his capacity as

11  Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation (the "Debtor"), employed

12  TenOaks to assist the Trustee in marketing its oil and gas interests and related assets (including,

13  without limitation, leaseholds, marketing agreements, contract rights, producing wells, production

14  facilities, pipelines, gathering systems, and processing and treatment plants associated therewith)

15  located in Kern County, California (the "Belridge Assets"), Santa Barbara County, California (the

16  "Santa Maria Valley Assets") and Orange County, California, the ("REDU Assets"), together the

17  ("Assets").  TenOaks offered the Belridge Assets, the Santa Maria Valley Assets and the REDU

18  Assets to be sold together or separately.

19        8.     Beginning on or about April 1, 2020, TenOaks pursued a comprehensive process to

20  market the Debtor's Assets.  The TenOaks project team consisted of six people in total, with

21  backgrounds in engineering, geology, and finance.   In particular, TenOaks:

22        (a)     collected engineering, operational, geological, land, and oil and gas

23  marketing information regarding the Assets.

24        (b)     prepared a preliminary teaser, one teaser for the Belridge Assets and one

25  teaser for the Santa Maria Valley assets and the REDU Assets and circulated both teasers to over

26  10,000 individual contacts and 4,000 companies.

27        (c)     compiled and created an extended summary of all the Assets included in the

28  sale.  The detailed summary included information on accounting, engineering, land, geology, and

1   marketing of the Assets.  The detailed summary was made available in the online data room for

2   potential bidders that executed a confidentiality agreement.

3           (d)     compiled and presented the inventory of detailed historical data for

4   accounting, engineering, land, geology, and marketing agreements included a master well list and

5   daily production updates for the Assets.  The data was made available in the online data room for

6   potential bidders that executed a confidentiality agreement.

7           (e)     provided a comprehensive engineering reserves database of the Assets and

8   various summaries of the reserves database in the online data room for potential bidders that

9   executed a confidentiality agreement.

10          (f)     hosted virtual data presentations via video calls to potential bidders to

11  provide an overview of the Assets and answer questions related to the Assets and the evaluation of

12  the Assets by bidders.

13          (g)     actively contacted potential bidders via email and phone in order to answer

14  questions related to the Assets and encourage bidding on the Assets.

15      9.      The process resulted in 61 separate parties executing confidentiality agreements in

16  order to obtain access to a detailed information memorandum and electronic data room established

17  and maintained by TenOaks, which materials together contained detailed information related to the

18  Debtor's Assets and operations.  The marketing process resulted in the receipt of approximately 10

19  offers for either a portion of or all of the Assets.

20      10.     On or about July 7, 2020, the Trustee asked TenOaks to go to the companies with

21  the highest bids and ask for their highest and best offer.  Ultimately, after multiple rounds of

22  negotiation where the Trustee and TenOaks negotiated with two groups giving them further

23  opportunities to increase their offers, the Trustee selected Team Maria Joaquin, L.L.C. and Maria

24  Joaquin Basin, L.L.C. as the stalking horse bidders (collectively the "Stalking Horse Bidder").  The

25  Stalking Horse Bidder's bid does not include the REDU Assets.

26      11.     TenOaks continues to market all of the Assets, including the REDU Assets, in an

27  effort to generate overbidders at the Auction and a buyer for the REDU Assets..

28

12.     The scope of TenOaks efforts relating to generating bidders for the Assets, as set forth above, was extensive.  Through these efforts, and others of TenOaks, all interested parties had sufficient access and opportunity to review the necessary information to evaluate the Assets, and potential bidders had adequate time to submit a bid.

13.     I am not aware of any collusion between bidders during the bidding process.

14.     Subject to the final Auction, I believe that the $26,750,000 Purchase Price constitutes the highest or otherwise best offer that the Trustee could obtain under this process and in light of current market conditions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 24, 2020 at Dallas, Texas.

LINDSAY SHERRER

1

## DECLARATION OF KERMITH BOFFILL

2
I, Kermith Boffill, declare as follows:

3
1.      I am a partner of Grobstein Teeple LLP, the accountants for Michael A. McConnell,

4
the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor").

5
2.      I have personal knowledge of the facts in this declaration and, if called as a witness,

6
could testify competently that the facts stated in this declaration are true and correct to the best of

7
my knowledge and information.

8
3.      At the Trustee's request I analyzed the potential tax consequences related to the

9
Trustee's sale of all or a portion of the Debtor's assets (the "Assets"), to Team Maria Joaquin,

10
L.L.C. and Maria Joaquin Basin, L.L.C. (collectively the "Buyer") for a total purchase price of

11
$26.75 million.

12
4.      After reviewing the limited information available from the Debtor and taking into

13
account the offsets available to the Trustee, which include the professional fees that the Trustee has

14
incurred to date, and the approximately $158 million of net operating losses that can be used to

15
offset any gain, I estimate that there will not be any tax liability from any sale of the Assets.

16

17
I declare under penalty of perjury and subject to the laws of the United States that the

18
foregoing statements are true and correct.

19
Executed on August 23 , 2020, at Los Angeles, California.

20
_____

21
KERMITH BOFFILL

22

23

24

25

26

27

28

1606236.1  26932

## DECLARATION OF SAM DELRAHIM

I, Sam Delrahim, hereby declare as follow:

1.      I am an authorized representative of Team Maria Joaquin, L.L.C., a Delaware limited liability company, and of Maria Joaquin Basin, L.LC., a Delaware limited liability company, the proposed buyer (collectively, "Buyer"), of certain assets from Michael A. McConnell, in his capacity as Chapter 11 Trustee (the "Trustee") for HVI Cat Canyon, Inc., the debtor (the "Debtor") as described in that certain Purchase and Sale Agreement between the Trustee and the Buyer, dated as of August 18, 2020 (together with all other documents contemplated thereby, as such agreement may be amended, restated or supplemented, the "Maria Purchase Agreement").

2.      I have personal knowledge of the facts in this declaration and, if called as a witness, could testify competently that the facts stated in this declaration are true and correct to the best of my knowledge and information.

3.      The Buyer, an affiliate of the Five JAB family of companies, has capital commitments in the minimum amount of $15,000,000 in order to fund this transaction and provide for continuing operations. The Buyer, the other affiliates of the Five JAB family of companies, and all of their assets are operated by Team Operating, L.L.C., a Delaware limited liability company and fully integrated oil and gas producer, well service provider, and plug and abandonment contractor. Team Operating, L.L.C. focuses on achieving low cost, efficient operations by utilizing its own oilfield services division to achieve operating efficiencies and competitive advantages. Currently, there are approximately 45 full-time employees that will support the Buyer's operations.

4.      The Buyer is well capitalized and has the financial wherewithal and ability to perform under the various contracts that are being assigned to the Buyer under the Maria Purchase

Agreement. The Buyer estimates that its net monthly operating income (without deduction for depreciation and depletion) over the next twenty-four months will average approximately $250,000 per month.

5.      On or about November 15, 2010, the Five Jab family of companies sold four of their operating subsidiaries to Key Energy Services, Inc. including thirteen rigs and associated equipment for approximately $14.6 million. Subsequently, in 2018 and 2019, fourteen of our affiliated entities divested their entire production and operation portfolio (through assets purchased from oil and gas majors - such as ExxonMobil, EOG Resources, and XTO Energy) in North Dakota, Montana, Mississippi, Texas and Louisiana in several transactions with sales proceeds totaling in excess of $150,000,000. The funds originating from these transactions will be utilized to fund the present transaction and future operations.

6.      In or around March 2020, the Buyer became aware of the Assets as a result of marketing efforts by the Trustee and the Trustee's investment banker TenOaks Energy Partners, LLC ("TenOaks"). Neither the Buyer nor its owners have any association with the Debtor, any of the Debtor's insiders or affiliates, the Trustee or any of the professionals employed by the Trustee. The Buyer became aware of the Assets as the result of an initial summary posted by TenOaks of the possible sale of the Assets. At that time, the Buyer contacted Mr. Lindsay Sherrer of TenOaks regarding the Buyer's possible interest in purchasing some or all of the Assets. The Buyer understood that the Trustee was soliciting interest in the potential sale of the Assets from numerous potential purchasers.

7.      In April 2020 the Buyer began to access and conduct diligence in a virtual data room established by TenOaks. From approximately June 1, 2020 to August 19, 2020, the Buyer and the Trustee, together with our respective counsel, engaged in extensive, arms-length

negotiations regarding a potential transaction focused on the Assets. The Buyer understood that other potential purchasers were submitting offers for the Assets, but at no point did the Buyer collaborate or communicate with any competing purchasers regarding the Assets.

8.      The Buyer submitted various offers for the Assets to the Trustee, commencing in April 2020. Each offer included evolving terms, many of which were more favorable to the Trustee, based on the ongoing negotiations. Between April 4, 2020 and August 3, 2020, the Buyer increased the proposed cash consideration for sale by approximately 300 percent based on negotiations with the Trustee, including the various negotiated bid protections. During that time, I engaged in extensive telephonic negotiations with the Trustee, among others. The Buyer and the Trustee exchanged numerous drafts of an asset purchase agreement and negotiations resulted in the execution of the Maria Purchase Agreement. As a result of the parties' extensive, arm's length negotiations, conducted in good faith, the Buyer and the Trustee entered into the Maria Purchase Agreement.

9.      There are no undisclosed or side agreements not disclosed, contained or referred to in the Maria Purchase Agreement. There is also no compensation or finder's fee being paid by the Buyer to anyone.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 24, 2020 at Los Angeles, California.


SAM DELRAHIM

1

## <u>REQUEST FOR JUDICIAL NOTICE</u>

2        Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat

3   Canyon, Inc. (the "Debtor"), requests that the Court take judicial notice of the following:

4        1.        On or about July 25, 2019, the Debtor filed a voluntary petition for relief under

5   Chapter 11 of title 11 of the United States Code.

6        2.        The Debtor filed its petition in the Southern District of New York.  The case was

7   transferred to the Northern District of Texas, and then to the Central District of California.

8        3.        According to the Debtor's schedules and other filings in the Debtor's case, the

9   following are secured claims against Debtor's assets:

10            a.        UBS AG, Stamford Branch, in the amount of not less than $10.5 million.

11   *See* Final Order for Emergency Priming and Superpriority Financing and Consensual Use Of Cash

12   Collateral By The Chapter 11 Trustee (*docket no. 572*) and subsequent financing orders (*docket*

13   *nos*. *650, 718, 846, 864, 958, 1089, 1103 and 1137*)

14            b.        UBS AG, London Branch, in the amount of not less than $114 Million,

15   which it asserts is approximately $128 million. *See* Schedule D (*docket no. 171*) and Interim Order

16   signed on 8/14/2019 Granting Debtor's Motion Approving Use of Cash Collateral (*docket no. 43*).

17            c.        GLR, LLC, in the amount of not less than $50 million.  *See* Schedule D

18   (*docket no. 171*) and Interim Order signed on 8/14/2019 Granting Debtor's Motion Approving Use

19   of Cash Collateral (*docket no. 43*).

20            d.        Santa Barbara County Treasurer-Tax Collector in the amount of

21   $1,303.358.37.  *See* Schedule D (*docket no. 171*).  *See also* Claims Register Claim No. 79,

22   asserting secured claim in the amount of $4,692,392.50.

23            e.        Rival Well Services, Inc., in the amount of $101,556.75.  *See* Schedule D

24   (*docket no. 171*).

25            f.        Orange County in the amount of $107,798.30.  See Claims Register Claim

26   No. 7.

27            g.        Kern County in the amount of $16,098.27.  *See* Claims Register Claim No. 3

28

h.     California State Controller in the amount of $1,304,573.87. *See* Schedule D (*docket no. 171*).

i.     Northern California Collection Service, Inc., in the amount of $175,703.75. *See* Schedule D (*docket no. 171*).

4.     In October 2019, UBS' expert valuation of the Debtor's assets concluded that they were worth between $50 million and $75 million. *See* docket no. 121, p. 8 of 31, ¶ 8. The Court agreed with UBS AG, London Branch's valuation during the evidentiary hearings conducted on October 3 and 4, 2019, in connection with the Debtor's cash collateral motion. The Court stated that the value of the company ranged from $50 million to 75 million. *See* Oct. 4, 2019 Tr. at 335:9-16.

5.     Initially, the Debtor operated its business as a debtor in possession, allowing it to exercise substantially all rights of a trustee in the bankruptcy case.

6.     On or about August 9, 2019, an Official Creditor's Committee (the "Committee") was appointed.

7.     On or about October 16, 2019, the Court entered its Agreed Order Granting Motion for Appointment of a Chapter 11 Trustee.

8.     On or about October 21, 2019, the U.S. Trustee appointed Michael A. McConnell as the Chapter 11 trustee in this case and, on October 22, 2019, Court entered its order approving the appointment.

9.     On or about November 27, 2019, the Trustee filed a Motion for Order Authorizing the Rejection of Oil Purchase Contracts (Contract No. COP-003 for Belridge Crude Oil and All Amendments and Contract No. COP-004 for Richfield Heavy Crude Oil and All Amendments) with California Asphalt Production, Inc., Formerly Known as Santa Maria Refining Co. and Greka Refining Company ("CAP") (*docket no. 573*) (the "First Rejection Motion").

10.     On or about December 4, 2019, the Trustee filed his Motion for Order Authorizing the Rejection of All Contracts and Agreements with CAP, and GTL1, LLC, Not Previously Included in Prior Motion to Reject (Docket No. 573) (the "Second Rejection Motion").

1    11.    The Court set a hearing on the First Rejection Motion and the Second Rejection

2    Motion on shortened notice for December 10, 2019, at 11:00 a.m.  The Court granted the First

3    Rejection Motion and the Second Rejection Motion in orders entered on or about December 11,

4    2019 (*docket nos. 612 and 613*).

5    12.    On or about January 9, 2020, the Trustee filed a complaint, captioned, *Michael A.*

6    *McConnell, Chapter 11 Trustee  v. GLR, LLC, a Delaware limited liability company; and GRL,*

7    *LLC, a Delaware limited liability company*, Adversary Proceeding No. 9:20-ap-01006-MB, seeking

8    to unwind transfers of valuable mineral rights executed 6 days prior to the petition date.  The

9    Adversary Proceeding remains pending.

10    13.    On or about February 27, 2020, the Trustee filed his application to employ TenOaks

11    Energy Partners, LLC ("TenOaks"), as his exclusive marketing agent and advisor in connection

12    with the sale of the Assets (the "TenOaks Application") (*docket no. 834*).  Pursuant to an order

13    entered on or about March 24, 2020 (*docket no. 872*), the Court approved the TenOaks Application.

14    14.    On or about February 24, 2020, California Asphalt Production, Inc. ("CAP")

15    purported to file under 11 U.S.C. § 546(b) a Notice of Oil and Gas Lien (docket no. 821), in which

16    it asserts a lien pursuant to California Civil Procedure Code § 1203.58 for unpaid services and

17    materials CAP allegedly provided to the Debtor post-petition between August 1, 2019 and February

18    4, 2020 in the aggregate amount of $2,240,686.86.

19    15.    On or about February 24, 2020, GTL1, LLC ("GTL1") purported to file under 11

20    U.S.C. § 546(b) a Notice of Oil and Gas Lien (docket no. 822), in which it asserts a lien pursuant to

21    California Civil Procedure Code § 1203.58 for unpaid services and rental equipment GTL1

22    allegedly provided to the Debtor post-petition between August 1, 2019 and December 31, 2019 in

23    the amount of $979,717.20.

24    16.    On or about February 24, 2020, GIT, Inc. ("GIT") purported to file under 11 U.S.C.

25    § 546(b) a Notice of Oil and Gas Lien (docket no. 823), in which it asserts a lien pursuant to

26    California Civil Procedure Code § 1203.58 for unpaid services and materials GIT allegedly

27    provided to the Debtor post-petition between August 1, 2019 and January 31, 2020 in the amount

28    of $1,276,779.29.

17.     On or about March 26, 2020, the Trustee filed his Motion to Expunge the Oil and Gas Notices filed by CAP, GTL1 and GIT (*docket no 875*) (the "Motion to Expunge). As set forth in the Motion to Expunge and the Trustee' reply (*docket no 920*) filed in support thereof, the Trustee does not believe that the Oil and Gas Notices are valid liens against the Debtor's property. The hearing on the Trustee's Motion to Expunge was continued to May 19, 2020, at 10:30 a.m., and taken under submission by the Court.

18.     The hearing on the Trustee's Motion to Expunge was continued several times.  At the continued hearing on June 15, 2020, the Court denied the Motion to Expunge without prejudice because it ruled that the Trustee needed to seek this relief through an adversary proceeding.

19.     On or about July 9, 2020, the Trustee has filed a complaint against CAP, GTL1 and GIT challenging the Oil and Gas Notices, Adversary No. 9:20-ap-01039-MB.

DATED:  August 25, 2020                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


By:     ___/s/ Eric P. Israel_____
        ERIC P. ISRAEL
        Attorneys for Michael A. McConnell,
        Chapter 11 Trustee

EXHIBIT 1

ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
AARON E. DE LEEST (State Bar No. 216832)
*adeleest@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Michael A. McConnell,
Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re | Case No. 9:19-bk-11573-MB |
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | **ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) ESTABLISHING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) AUTHORIZING AND APPROVING THE SELECTION OF A STALKING HORSE BIDDER, (D) APPROVING EXPENSE REIMBURSEMENT, (E) SCHEDULING AN AUCTION AND SALE HEARING, (F) APPROVING THE FORM AND MANNER OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS, AND (G) GRANTING RELATED RELIEF** |

1606431.1  26932

EXHIBIT 1                                    085

On _____, 2020, at _____ _.m., there came before the United States Bankruptcy Court for the Central District of California, Northern Division (the "Court"), the Honorable Martin R. Barash, United States Bankruptcy Judge, presiding, the *Trustee's Notice of Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the Form and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting Related Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief (docket no. _____)* (the "Motion"), filed by Michael A. McConnell, the Chapter 11 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor").  Eric P. Israel of Danning, Gill, Israel & Krasnoff, LLP, appeared via Zoom.gov on the Motion for the Trustee, and all other appearances were as noted on the record at the hearing.[1]

The Court having read and considered the Motion and all papers filed in support thereof; it appearing that due and sufficient notice of the Motion having been given under the particular circumstances and that no other or further notice is necessary; that the relief requested in the Motion for entry of an order (this "Order") (a) authorizing and establishing the bidding procedures attached hereto as Exhibit A (the "Bidding Procedures") in connection with one or more sale transactions (each a "Sale Transaction") involving certain or all of the Debtor's assets (the "Assets"), (b) establishing procedures for the assumption and assignment of contracts and noticing of related Cure Amounts (the "Assumption and Assignment Procedures"), (c) authorizing and approving the selection of the Stalking Horse Bidder, (d) scheduling (i) a date for an Auction, if necessary, and (ii) a final hearing (the "Sale Hearing") to approve one or more Sale Transactions,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or Bidding Procedures, as applicable.

2

1  and setting other related dates and deadlines, (e) approving the form and manner of notice of any

2  Auction and the Sale Hearing, and all notices related thereto; and it appearing that the relief

3  requested in the Motion is in the best interests of the Debtor, the estate, creditors, and other parties

4  in interest; and that after due deliberation thereon, and good and sufficient cause appearing

5  therefor; it is hereby

6        FOUND, CONCLUDED, AND DETERMINED THAT:

7        A.    Predicates for Relief.  The predicates for relief granted herein are sections 105(a),

8  363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and

9  6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of

10  the Court's Local Bankruptcy Rules (the "Local Bankruptcy Rules"),

11        B.    Best Interests.  The legal and factual bases set forth in the Motion establish just

12  cause for the relief granted herein.  Entry of this Order is in the best interests of the estate,

13  creditors, and all other parties in interest.

14        C.    Bidding Procedures.  The Trustee has articulated good and sufficient reasons for

15  authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate

16  under the circumstances and designed to achieve the highest or otherwise best Bid and to maximize

17  the value of the Debtor's estate.

18        D.    Sufficient Notice of the Motion, the Bidding Procedures Hearing, and the Order.

19  The Trustee's notice of the Motion, the Bidding Procedures Hearing, and the proposed entry of this

20  Order was adequate and sufficient under the circumstances, and such notice complied with all

21  applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy

22  Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures Hearing, or this Order

23  is necessary or required.

24        E.    Business Justification for Relief.  The Trustee has demonstrated a compelling and

25  sound business justification for the Court to grant the relief requested in the Motion, including,

26  without limitation, to (i) approve the Bidding Procedures, including the selection of the Stalking

27  Horse Bidder and the Bid Protections; (ii) establish the Assumption and Assignment Procedures;

28  (iii) approve the form and manner of notice of all procedures, protections, schedules, and

agreements, as applicable, attached to the Motion; (iv) schedule a date for (A) the Auction and (B) the Sale Hearing; and (v) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, among other things, forms the basis for the findings of fact and conclusions of law set forth herein.

F.    Objections Overruled.  Any objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

G.    Sale Notice.  The notice, substantially in the form attached to the Motion as Exhibit 2, provided by the Trustee regarding the Sale, the Auction, and the Sale Hearing (the "Sale Notice"), is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets subject to any Sale; (v) instructions for promptly obtaining a copy of the form purchase agreement; (vi) representations describing any Sale pursuant to section 363 of the Bankruptcy Code as being free and clear of liens, claims, interests, and other encumbrances, with certain liens, claims, interests, and other encumbrances attaching with the same validity and priority to the sale proceeds; and (vii) notice of the proposed assumption of the Designated Contracts by the Debtor and their assignment to the Successful Bidder(s) (as defined in the Bidding Procedures), if applicable, arising from the Auction, if any, and the right, procedures, and deadlines for objecting thereto; and no other or further notice of any Sale shall be required.

H.    Assumption and Assignment Procedures.  The Assumption Notice (as defined below), substantially in the form attached as Exhibit 3 to the Motion, is reasonably calculated to provide counterparties to the Designated Contracts with proper notice of the intended assumption and assignment of their executory contracts, any Cure Amounts, and the Assumption and Assignment Procedures (as defined herein), and is appropriate and no other or further notice is required.

I.      Post-Auction Notice.  The Post-Auction Notice (as defined below), substantially in the form attached as Exhibit 4 to the Motion, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Successful Bid(s) and Backup Bid(s), and no other or further notice is required.

J.      Selection of Stalking Horse Bidder.  The Trustee has articulated good and sufficient reason for the Court to approve his selection, in an exercise of his business judgment, of the Stalking Horse Bidder and to approve the Purchase Agreement (the "APA") by and between the Trustee and the Stalking Horse Bidder, substantially in the form attached as Exhibit 5 to the Motion, which is fair, reasonable, and appropriate under the circumstances and designed to achieve the highest or otherwise best Bid and to maximize the value of the Debtor's estate.

K.      Other Findings.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED to the extent set forth herein.

**Important Dates and Deadlines**

2.      Process Timeline.  The Trustee is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline; provided, that the Trustee may, with the consent of and after consultation with the Consultation Parties, (a) extend or modify any of the following dates by filing a notice of such extension or modification on the Court's docket, (b) with respect to the Auction, adjourn the Auction at or prior to the Auction without further notice, (c) with respect to the Sale Hearing, adjourn the Sale Hearing without further notice, or (d) seek a further order of the Court extending or modifying such dates:

| Date | Event |
|------|-------|
| Within three (3) days of entry of Bidding Procedures Order | Deadline to serve the Sale Notice on Transaction Notice Parties |
| Within five (5) days of entry of Bidding Procedures Order | Deadline to serve Assumption Notices |
| _____, 2020, at ____:00 _.m. (Pacific Standard Time) | Sale Objection Deadline |
| _____, 2020, at ____:00 _.m. (Pacific Standard Time) | Bid Deadline |
| _____, 2020, at ____:00 _.m. (Pacific Standard Time) | Auction (if necessary) |
| Within one day after the Auction is completed | Deadline to file and serve notice of Successful Bidder and amount of Successful Bid |
| _____, 2020, at ____:00 _.m. (Pacific Standard Time) | Reply Deadline |
| One (1) day prior to the commencement of the Sale Hearing | Supplemental Limited Sale Objection Deadline (*e.g.*, deadline for objections which shall be limited to objections based on the manner in which the Auction was conducted, selection of the Successful Bidder and the identity of the Successful Bidder(s) or Backup Bidder(s) in the event the Successful Bidder or Backup Bidder(s) are not the Stalking Horse Bidder, including Designated Contract counterparty objections based on inadequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder) |
| _____, 2020, at ____:00 _.m. (Pacific Standard Time) | Sale Hearing |

3.    <u>Failure to Timely File an Objection</u>.  The failure by a party to timely file an objection in accordance with this Order shall forever bar such party from asserting any objection to the Motion, entry of an order (a) approving the Sale to the Successful Bidder (or, if the Successful Bidder fails to consummate the Sale, to the Backup Bidder), which sale shall be free and clear of all

1    liens, claims, encumbrances, and other interests, (b) authorizing the assumption and assignment of

2    the Designated Contracts, and (c) granting related relief (the "Sale Order") and/or consummation of

3    a Sale Transaction(s), including the assumption and assignment of contracts and leases to the

4    Successful Bidder pursuant to the APA, and shall be deemed to constitute any such party's consent

5    to entry of the applicable order and consummation of the Sale Transaction(s) and all other

6    transactions related thereto.

7        4.    Modifications of Process Timeline and Bidding Procedures.  The Trustee reserves

8    the right, and is authorized to, modify the above timeline and the Bidding Procedures (the

9    "Modifications") in accordance with the Bidding Procedures; provided, that no such Modifications

10   shall be made without (a) the consent of the Consultation Parties, or (b) an Order of the Court, in

11   each case, to the extent that such Modifications adversely affect the interests of the Consultation

12   Parties, the Stalking Horse Bidder or general unsecured creditors.

13       5.    Sale Hearing.  The Sale Hearing will commence on _____, 2020, at ___:00 p.m.,

14   Pacific Standard Time, before the Honorable Martin R. Barash, Courtroom 201, 1415 State Street,

15   Santa Barbara, California.  The hearing will be conducted remotely, using ZoomGov video and

16   audio.  The Zoom connection information will be set forth on the Court's tentative rulings and

17   posted calendar for the date of the Sale Hearing.

18       6.    Sale Objection Deadline.  Objections, if any, to the Sale Motion and the Sale of the

19   Assets to a Successful Bidder, except objections solely based on the manner in which the Auction

20   was conducted, selection of the Successful Bidder and the identity of the Successful Bidder(s) or

21   Backup Bidder(s) in the event the Successful Bidder or Backup Bidder(s) are not the Stalking

22   Horse Bidder, including Designated Contract counterparty objections based on inadequate

23   assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder (any

24   such objection, a "Sale Objection"), must be made by _____, 2020, at ___:00 _.m., Pacific

25   Standard Time (the "Sale Objection Deadline").  Objections solely to the manner in which the

26   Auction was conducted, selection of the Successful Bidder and the identity of the Successful

27   Bidder(s) or Backup Bidder(s) in the event the Successful Bidder or Backup Bidder(s) are not the

28   Stalking Horse Bidder, including Designated Contract counterparty objections based on inadequate

1606431.1  26932                          7

assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder (any

such objection, a "Supplemental Limited Sale Objections") must be made _____, 2020, at ___:00

_.m., Pacific Standard Time (the "Supplemental Limited Sale Objection Deadline"); provided, that

such deadlines may be extended by agreement of the Trustee, the Consultation Parties, and the

affected objecting party.  In each case, all objections must: (a) be in writing; (b) conform to the

applicable provisions of the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the

Court; (c) state with particularity the legal and factual bases for the objection and the specific

grounds therefor; and (d) be filed with the Court no later than the Sale Objection Deadline [or the

Supplemental Limited Sale Objection Deadline, as applicable,] and served on the Objection

Recipients (as defined below).

7.    <u>Response Deadline</u>.  Responses or replies, if any, to Sale Objections must be filed

by _____, 2020, at ___:00 _.m., Pacific Standard Time (the "Reply Deadline"), and responses or

replies, if any, to Supplemental Limited Sale Objections must be filed by 12:00 p.m., prevailing

Pacific Standard Time on the date of the Sale Hearing (or may be presented at the Sale Hearing).

8.    <u>Competitive Bidding</u>.  The following dates and deadlines regarding competitive

bidding are hereby established:

a.    <u>Bid Deadline</u>: _____, 2020, at ___:00 _.m., Pacific Standard Time , the

deadline by which all Qualified Bids (as defined in the Bidding Procedures) must be actually

received in writing in electronic format by the parties specified in the Bidding Procedures (the "Bid

Deadline"); and

b.    <u>Auction</u>: _____, 2020, at ___:00 _.m., Pacific Standard Time, is the date

and time the Auction, if one is needed, will be held virtually via Zoom or similar videoconference

technology, or at such later date and time as the Trustee shall notify all Qualified Bidders that have

submitted Qualified Bids (which shall be deemed to include the Stalking Horse Bidder).   The

Auction may be postponed, adjourned, or cancelled as the Trustee deems appropriate.

**Bidding Procedures and Related Relief**

9.    The Bidding Procedures, substantially in the form attached hereto as Exhibit A and

incorporated by reference as though fully set forth herein, are hereby approved in their entirety.

The Bidding Procedures shall govern the submission, receipt, and analysis of all bids relating to any proposed Sale, and any party desiring to submit a higher or better offer for some or all of the Assets, which include the Purchased Assets and the REDU Assets, must comply with the terms of the Bidding Procedures and this Order.  The Bidding Procedures shall also govern the terms on which the Trustee will proceed with the Auction and the Sale of the Assets pursuant to the APA or any modified version thereof.  The Trustee is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures.

10.    The failure to specifically include or reference any particular provision, section, or article of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision, section, or article, it being the intent of this Court that the Bidding Procedures are authorized in their entirety.

11.    The Trustee is authorized, subject to the terms of this Order and the Bidding Procedures, to take actions reasonably necessary, in the discretion of the Trustee and in consultation with the Consultation Parties, to conduct and implement the Auction.

12.    Only the Trustee, the Consultation Parties, and any Qualified Bidder (including the Stalking Horse Bidder) in the case along with their representatives and counsel, or such other parties as the Trustee shall determine, shall be entitled to attend the Auction, and only such Qualified Bidders (including the Stalking Horse Bidder) will be entitled to make any Bids at the Auction.

13.    The Trustee and his professionals shall direct and preside over the Auction.  Other than as expressly set forth in this Order or the Bidding Procedures, the Trustee may conduct the Auction in the manner he reasonably determines, in consultation with the Consultation Parties, will result in the highest or otherwise best Qualified Bid.

14.    Each Qualified Bidder (including the Stalking Horse Bidder) participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding, the sale of any of the assets described herein, or any other transaction with respect to the Debtor, (b) has reviewed, understands, and accepts the Bidding Procedures, and (c) has consented to the core jurisdiction of this Court and to the entry of a final order by this Court on any matter related to this

1  Order, any Sale, or the Auction, if it is determined that this Court would lack Article III jurisdiction

2  to enter such a final order or judgment absent the consent of the parties.

3        15.    Except as otherwise provided in the Bidding Procedures or this Order, the Trustee

4  (in consultation with the Consultation Parties) reserves the right as he may reasonably determine to

5  be in the best interest of the Debtor's estate and in the exercise of his fiduciary duties to: (a)

6  determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c)

7  determine which Qualified Bid is the highest or otherwise best proposal and which is the next

8  highest or otherwise best proposal; (d) reject any Bid (other than a Qualified Credit Bid by the

9  Stalking Horse Bidder) that is (i) inadequate or insufficient, (ii) not in conformity with the

10  requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (iii)

11  contrary to the best interests of the Debtor and the estate; (e) impose additional terms and

12  conditions with respect to all Potential Bidders (other than the Stalking Horse Bidder); (f) extend

13  the deadlines set forth herein or in the Bidding Procedures (with the approval of the Consultation

14  Parties); and (g) continue or cancel the Auction and/or Sale Hearing, including by announcement in

15  open court without further notice (with the approval of the Consultation Parties).

16        16.    UBS AG, London Branch and UBS AG, Stamford Branch (together, "UBS") shall

17  have the right to credit bid all or any portion of its allowed secured claim at the Auction pursuant to

18  section 363(k) of the Bankruptcy Code, in accordance with the applicable terms of the Trustee

19  Financing and the UBS Secured Debt, respectively.  Any assignee of UBS may only credit bid

20  upon agreement of the Trustee or upon order of the Court.

21        17.    The Bid Protections, as set forth in the APA, including (i) return of the Deposit; (ii)

22  reimbursement of the Stalking Horse Bidder's out-of-pocket fees and expenses incurred in

23  connection with the APA and other agreements, and transactions related thereto, up to a maximum

24  aggregate amount of $300,000 (the "Expense Reimbursement") and,(ii) the provisions governing

25  the minimum purchase price, including a minimum overbid increment in the amount of $250,000,

26  in addition to the $300,000 Expense Reimbursement, are approved in their entirety.

27        18.    The Bid Protections are necessary to facilitate a competitive, value-maximizing

28  transaction.  The Stalking Horse Bidder has provided a material benefit to the Debtor's estate and

1    its creditors by increasing the likelihood that, given the circumstances, the best possible price for

2    the Purchased Assets will be received.  The Bid Protections were a material inducement to, and an

3    express condition of, the willingness of the Stalking Horse Bidder to submit a bid through

4    execution of the APA that will serve as a minimum or floor bid on which the Trustee may rely.

5        19.    The obligation to return the Deposit and the Expense Reimbursement (as defined in

6    the APA), shall, if triggered, be deemed an actual and necessary cost and expense of preserving the

7    Debtor's estate, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, in

8    accordance with the APA. with priority over any and all administrative expenses of a kind specified

9    in sections 503(b) and 507(a) and senior to all other superpriority administrative expenses in the

10   Bankruptcy Case.

11                    **Sale Hearing Notice and Related Relief**

12       20.    A Sale Hearing to (i) approve a sale of a portion or substantialy all of the Assets,

13   which include the Purchased Assets and/or the REDU Assets, to the Successful Bidder(s), (ii)

14   approve designation of a Backup Bid and Backup Bidder in accordance with the Bidding

15   Procedures, and (iii) authorize the assumption and assignment of certain executory contracts and

16   unexpired leases shall be held on _____, 2020, at ___:00 _.m., Pacific Standard Time, and may be

17   adjourned or rescheduled by the Trustee from time to time (in accordance with the Bidding

18   Procedures) without further notice.  Unless the Court orders otherwise, any Sale Hearing shall be

19   an evidentiary hearing on matters relating to the Sale Transaction(s), and there will be no further

20   bidding at such hearing.  In the event that the Successful Bidder(s) cannot or refuses to

21   consummate the Sale Transaction(s) because of breach or failure on the part of such Successful

22   Bidder, the Trustee may, in accordance with the Bidding Procedures, designate the Backup Bid to

23   be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Trustee

24   shall be authorized, but not required, to consummate the applicable transaction with the Backup

25   Bidder without further order of the Court.

26       21.    <u>Sale Notice</u>.  The form of Sale Notice, substantially in the form attached as Exhibit

27   2 to the Motion, is approved.

28

1606431.1  26932                          11

22.      Within three (3) days after the entry of this Order, the Trustee shall serve the Sale Notice, by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the ECF system, by NEF upon (a) the Debtor; (b) all known creditors, including all known lessors and royalty claimants; (c) all entities known to the Trustee to have expressed an interest in a transaction with respect to some or all of the Assets during the past 12 months; (d) all entities known to the Trustee which have asserted any lien or interest in or upon any Assets to be sold; (e) all federal, state, and local regulatory or taxing authorities that have contacted the Trustee and have a reasonably known interest in the relief requested by this Motion; (f) the Internal Revenue Service; (g) those parties who have made the appropriate filings requesting notice of all pleadings filed in the chapter 11 case; (f) the Office of the United States Trustee (the "U.S. Trustee"); (h) the Office of the United States Attorney General; (i) the United States Department of Justice; (j) counsel to the Official Committee of Unsecured Creditors; and (k) counsel to UBS (collectively, the "Transaction Notice Parties").  Such notice shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.  Any lessors affected by the Motion will receive the Sale Notice and the Assumption Notice attached as Exhibit "3" to the Motion.

23.      Service of the Sale Notice as described herein shall be deemed good and sufficient notice of the Sale Transaction with respect to known interested parties.

24.      The Trustee is authorized and directed to publish the Sale Notice, as modified for publication, in the Los Angeles Times or other suitable regional newspaper, and in the Santa Barbara Independent or other suitable local Santa Barbara newspaper within five (5) business days of the date of service of the Sale Notice as set forth herein.

25.      Publication of the Sale Notice as described herein shall be good and sufficient notice of the Sale Transaction with respect to all unknown parties.

26.      The form of Post-Auction Notice, substantially in the form attached as Exhibit 4 to the Motion, is approved.  No later than noon the calendar day after the conclusion of the Auction, if any, the Trustee shall file the Post-Auction Notice identifying any Successful Bidder(s) on the Court's docket and, to the extent that any non-Debtor party to an executory contract or unexpired lease that is proposed to be assumed and assigned to the Successful Bidder(s) has not filed a notice

1    of appearance on the docket in this Case, serve the Post-Auction Notice by overnight delivery on

2    such parties and on all parties who have requested notice pursuant to Local Rule 2002-1.

3    **Assumption and Assignment Procedures**

4        27.    The Assumption and Assignment Procedures, as detailed in the Motion and

5    incorporated herein by reference as if fully set forth in the Order, are approved.

6        28.    The Assumption Notice, substantially in the form attached as Exhibit 3 to the

7    Motion, is approved (the "Assumption Notice").

8        29.    Within five (5) days after the entry of this Order, the Trustee shall file with the

9    Court the Assumption Notice and a list of the Designated Contracts (the "Designated Contracts

10   List"). If no Cure Amount is listed on the Designated Contracts List for a particular Designated

11   Contract, the Trustee's asserted Cure Amount for such Designated Contract shall be deemed to be

12   $0.00. On or before the Assumption Notice Deadline, the Trustee shall serve, via first-class mail,

13   the Assumption Notice that contains (i) the Designated Contracts List, (ii) information necessary

14   and appropriate to provide notice of the relevant proposed assumption and assignment of

15   Designated Contract(s) and rights thereunder, (iii) Cure Amounts, if any, and (iv) the procedures

16   for objecting thereto on all counterparties to the Designated Contracts and all parties entitled to

17   such notice pursuant to Bankruptcy Rule 2002. Service of such Assumption Notice as set forth

18   herein shall be deemed good and sufficient notice of, among other things, the proposed assumption

19   and assignment of the Designated Contracts, the applicable Cure Amounts related thereto, and the

20   procedures for objecting thereto, and no other or further notice is necessary.

21       30.    Any objection by a counterparty to a Designated Contract (a "Contract Objection")

22   other than a Supplemental Limited Sale Objection must (i) be in writing; (ii) comply with the

23   applicable provisions of the Bankruptcy Rules and Local Bankruptcy Rules; (iii) be filed with the

24   Clerk of Court on or before the Sale Objection Deadline; (iv) be served, so as to be actually

25   received on or before the Sale Objection Deadline, upon the Consultation Parties and any other

26   Objection Recipients; and (v) state with specificity the grounds for such objection, including,

27   without limitation, the fully liquidated cure amount and the legal and factual bases for any

28   unliquidated cure amount that the counterparty believes is required to be paid under Bankruptcy

097

1    Code sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with the specific

2    nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the

3    conditions giving rise thereto.

4        31.    Any time before 5:00 p.m. (Pacific Standard Time) on the date that is three (3)

5    business days prior to the Closing Date, the Trustee reserves the right, and is authorized but not

6    directed, to add previously omitted Designated Contracts as contracts to be assumed and assigned

7    to a Successful Bidder in accordance with the definitive agreement for a Sale Transaction, (ii)

8    remove a Designated Contract from the list of Designated Contracts that a Successful Bidder

9    proposes be assumed and assigned to it in connection with a Sale Transaction, or (iii) modify the

10   previously stated Cure Amount associated with any Designated Contract.

11       32.    If, after the mailing of the Assumption Notice, additional executory contracts or

12   unexpired leases of the Debtor are determined to be Designated Contracts in connection with such

13   Sale Transaction(s) including with respect to the REDU Assets, or the Trustee seeks to modify the

14   previously stated Cure Amount associated with any Designated Contract, as soon as practicable

15   thereafter and in no event later than 5:00 p.m. (Pacific Standard Time) on that date that is three (3)

16   business days before the date of the Sale Hearing, the Trustee shall file with the Court and serve, by

17   overnight delivery on the applicable counterparties, a revised Assumption Notice (which shall be

18   deemed to amend and restate the prior Assumption Notice with respect to such Designated

19   Contracts and/or Cure Amounts), and such counterparties shall file any Contract Objections not

20   later than (a) the Sale Objection Deadline in the event that such revised Assumption Notice was

21   filed and served at least ten (10) days prior to the Sale Objection Deadline, (b) two (2) days prior to

22   the Sale Hearing in the event that such revised Assumption Notice was filed and served at least

23   seven (7) days prior to the commencement of the Sale Hearing, and (c) seven (7) days from the date

24   such revised Assumption Notice was filed and served, in the event that such revised Assumption

25   Notice was filed and served less than seven (7) days prior to the commencement of the Sale

26   Hearing.

27       33.    No later than noon the calendar day after the conclusion of the Auction, if any, the

28   Trustee shall file with the Court and serve, by overnight delivery, on the counterparties a notice

substantially in the form attached as Exhibit 4 hereto (the "Post-Auction Notice") identifying the

Successful Bidder(s), and the counterparties shall file any Supplemental Limited Sale Objections

not later than one (1) day prior to the commencement of the Sale Hearing; provided, that the

deadline for any party who did not receive an Assumption Notice prior to the date that is seven (7)

days before the Sale Hearing to assert a Contract Objection shall be seven (7) days after the later of

(i) the date of service of such Assumption Notice and (ii) the Post-Auction Notice.

34.    At the Sale Hearing, the Trustee will seek Court approval of the assumption and

assignment to the Successful Bidder(s) of only those Designated Contracts that have been selected

by such Successful Bidder(s) to be assumed and assigned (collectively, the "Selected Designated

Contracts").  To the extent that any of the Selected Designated Contracts have already been

assumed by the Trustee, the Trustee will seek Court approval of the assignment thereof to the

Successful Bidder(s).  The inclusion of a Designated Contract on an Assumption Notice will not (i)

obligate the Trustee to assume any Designated Contract listed thereon nor the Successful Bidder(s)

to take assignment of such Designated Contract or (ii) constitute any admission or agreement of the

Trustee that such Designated Contract is an executory contract.  The Trustee and the Debtor's

estate reserve any and all rights with respect to any Designated Contracts that are not ultimately

designated as Selected Designated Contracts.

35.    If no Contract Objection is timely received with respect to a Selected Designated

Contract: (i) the counterparty to such Selected Designated Contract shall be deemed to have

consented to the assumption by the Trustee and assignment to the Successful Bidder of the Selected

Designated Contract, and shall be forever barred from asserting any objection with regard to such

assumption and assignment (including, without limitation, with respect to adequate assurance of

future performance by the Successful Bidder); (ii) any and all defaults under the Selected

Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and

compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure

Amount set forth in the Assumption Notice for such Selected Designated Contract; (iii) the Cure

Amount set forth in the Assumption Notice for such Selected Designated Contract shall be

controlling, notwithstanding anything to the contrary in such Selected Designated Contract, or any

1   other related document, and the counterparty shall be deemed to have consented to the Cure

2   Amount and shall be forever barred from asserting any other Claims related to such Selected

3   Designated Contract against the Debtor and the estate or the Successful Bidder, or the property of

4   any of them, that existed prior to the entry of the order resolving the Contract Objections and the

5   Sale Order; and (iv) the counterparty to such Selected Designated Contract shall be deemed to have

6   consented to the Sale and to any related relief.

7       36.    To the extent that the parties are unable to consensually resolve any Contract

8   Objection prior to the commencement of the Sale Hearing, including, without limitation, any

9   dispute with respect to the cure amount required to be paid to the applicable counterparty under

10  Bankruptcy Code sections 365(b)(1)(A) and (B) (any such dispute, a "Cure Dispute"), such

11  Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be

12  fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure

13  Dispute, the Selected Designated Contract may be assumed by the Trustee and assigned to the

14  Successful Bidder provided that the cure amount the counterparty asserts is required to be paid

15  under Bankruptcy Code section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the

16  counterparty) is deposited in a segregated account by the Trustee pending the Court's adjudication

17  of the Cure Dispute or the parties' consensual resolution of the Cure Dispute; *provided* that the

18  Trustee shall only deposit in such segregated account the cure amounts for which the Seller is

19  responsible under the APA, and  the Successful Bidder shall deposit any amounts for which it is

20  responsible.

21                        **Other Related Relief**

22      37.    Except as otherwise provided herein, any objection provided hereunder must (i) be

23  in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and Local

24  Bankruptcy Rules, (iii) state with particularity the legal and factual basis for the objection and the

25  specific grounds therefor, and (iv) be filed with this Court and served so as to be actually received

26  no later than the applicable objection deadline by the following parties: the Trustee, Counsel for the

27  Trustee,  Counsel to UBS, and Committee Counsel (the "Objection Recipients").

28

1606431.1  26932                        16

38.     Any objections to the entry of this Order and the relief granted herein that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

39.     To the extent the deadlines set forth in this Order do not comply with the Local Bankruptcy Rules, such Local Bankruptcy Rules are waived and the terms of this Order shall govern.

40.     To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order shall control.

41.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

42.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

43.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

44.     The Trustee is authorized and empowered to take all actions as may be necessary to implement and effect the terms and requirements established under this Order.

45.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

###

1606431.1  26932

17

101

# EXHIBIT A

## BIDDING PROCEDURES
## FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS

On August [ ● ], 2020, the United States Bankruptcy Court for the Central District of California, Northern Division (the **"Court"**) entered the *Order (A) Establishing Bidding Procedures for the Sale of Substantially All of the Estate's Assets, (B) Establishing Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense Reimbursement, (E) Scheduling an Auction and Sale Hearing, (F) Approving the Form and Manner of All Procedures, Protections, Schedules, and Agreements, and (G) Granting Related Relief* [Docket No. [ ● ]] (the **"Bidding Procedures Order"**),[2] by which the Court approved the following procedures. These Bidding Procedures set forth the process by which the Trustee is authorized to conduct an auction (the **"Auction"**) for the sale (the **"Sale"**) or other transaction (**"Sale Transaction"**) regarding substantially all of the Debtor's assets (collectively, the **"Assets"**).[3]

1.      **Submissions to the Trustee.**

All submissions to the Trustee required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the **"Bid Notice Parties"**):

      A.      **Chapter 11 Trustee.** Trustee Michael A. McConnell, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Michael A. McConnell (michael.mcconnell@kellyhart.com).

      B.      **Chapter 11 Trustee's Counsel.** Counsel to the Trustee, Danning, Gill, Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006, Attn: Eric P. Israel (eisrael@DanningGill.com).

      C.      **Counsel to UBS.** Counsel to UBS AG, London and UBS AG, Stamford Branch (collectively, "UBS"), O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Evan M. Jones (ejones@omm.com).

      D.      **Committee Counsel**. Counsel to the Unsecured Creditors Committee ("Committee Counsel"), Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111-4500, Attn: Maxim Litvak (mlitvak@pszjlaw.com).

2.      **Key Dates.**

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

[3] For the avoidance of doubt, these Bidding Procedures are subject to the terms and conditions contained in any orders entered by this Court authorizing the use of cash collateral.

The key dates for the sale process are as follows, each of which may be extended with the prior written consent of the **UBS and Committee Counsel** (the "**Consultation Parties**"):

(a)    **Key Proposed Auction and Sale-Related Dates (subject to the Court's availability):**

| Event | Proposed Date |
|---|---|
| Deadline to file and serve the Sale Notice on Transaction Notice Parties | Within three days of entry of Bidding Procedures Order |
| Sale Objection Deadline (*e.g.*, deadline for objecting to sale to a Stalking Horse Bidder) | **_____, 2020, at ___:00 _.m. (Pacific Standard Time)** **(14 Calendar Days Before the Sale Hearing )** |
| Bid Deadline | **_____, 2020, at ___:00 _.m. (Pacific Standard Time)** |
| Auction (if necessary) | **_____, 2020, at ___:00 _.m. (Pacific Standard Time)** |
| Deadline to file and serve notice of Successful Bidder and amount of Successful Bid | Within one day after the Auction is completed |
| Supplemental Sale Objection Deadline (*e.g.*, deadline for objecting to sale to a Successful Bidder that is not a Stalking Horse Bidder) | **_____, 2020, at ___:00 _.m. (Pacific Standard Time)** **(14 Calendar Days Before the Sale Hearing )** |
| Sale Hearing | **_____, 2020, at ___:00 _.m (Pacific Standard Time)** |

**(b)    Key Dates Related to Proposed Assumption and Assignment Procedures (subject to the Court's availability):**

| Event | Proposed Date |
|---|---|
| Deadline for objecting to sale to Stalking Horse Bidder | **_____, 2020, at ___:00 _.m. (Pacific Standard Time) (14 Calendar Days Before the Sale Hearing )** |
| Deadline for objecting to sale to Successful Bidder (other than Stalking Horse Bidder) | **_____, 2020, at ___:00 _.m. (Pacific Standard Time) (14 Calendar Days Before the Sale Hearing )** |
| Adequate Assurance Objection Deadline; Sale Hearing | **_____, 2020, at ___:00 _.m. (Pacific Standard Time) (1 Calendar Day Before the Sale Hearing )** |

**3.    Potential Bidders.**

Other than with respect to UBS in the case of a Qualified Credit Bid (as defined below), to participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (a **"Potential Bidder"**) must deliver or have previously delivered to the Bid Notice Parties the following documents:

(i)    an executed confidentiality agreement on terms acceptable to the Trustee and the Consultation Parties (a **"Confidentiality Agreement"**), to the extent not already executed;

(ii)    identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction;

(iii)    unless publicly available in a filing under applicable securities laws or regulations, the most current audited and latest unaudited financial statements (the **"Financials"**) of the Potential Bidder or any such other form of financial disclosure or credit-quality support information demonstrating that such Potential Bidder has the ability to close the Sale.

**4.    Qualified Bidders.**

(a)    A **"Qualified Bidder"** is a Potential Bidder who satisfies the Bidding Procedures and whose Financials, the Financials of its equity holder(s), or whose written commitments, as applicable, demonstrate the financial capability to consummate the Sale, and, as applicable, whose Bid is a Qualified Bid and that the Trustee determines should be considered a Qualified Bidder, in consultation with the Consultation Parties. Within one business day following the Bid Deadline, the Trustee's advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid.

(b)      If any Potential Bidder is determined by the Trustee not to be a Qualified Bidder, the Trustee will refund such Qualified Bidder's Deposit (as defined herein) on or within ten (10) business days after the Bid Deadline.

(c)      Between the date that the Trustee notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Trustee may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

(d)      For purposes of these Bidding Procedures, UBS, and the Stalking Horse Bidder shall be deemed Qualified Bidders.

5.      **Due Diligence.**

Only those Potential Bidders whose Financials, the Financials of their equity holder(s), or whose written commitments, as applicable, demonstrate the financial capability to consummate the Sale shall be eligible to receive due diligence information.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.**  The Trustee will provide or cause to be provided to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request.  For all Potential Bidders, the due diligence period will end on the Bid Deadline and, subsequent to the Bid Deadline, the Trustee shall have no obligation to furnish any due diligence information.

Neither the Trustee nor the Debtor shall furnish any confidential information relating to the Assets, liabilities of the Debtor, or the Sale to any person except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement.  The Trustee and his advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided*, that the Trustee may decline to provide such information to Potential Bidders who, at such time and in the Trustee's reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.  For the avoidance of doubt, the Stalking Horse Bidder shall be granted access to diligence materials.

The Trustee also reserves the right to withhold any diligence materials that the Trustee determines are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Trustee determines is a competitor of the Debtor or is affiliated with any competitor of the Debtor.  Neither the Trustee, the Debtor nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder that intends in good faith to, or has the capacity to, consummate the Sale.

**All due diligence requests must be directed to Danning, Gill, Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006, Attn: Eric P. Israel (eisrael@DanningGill.com).**

      **(a)**      **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, there shall not be any communications between and amongst Potential Bidders without the prior written consent of the Trustee.  To the extent the Trustee approves such communications, all substantive direct communications between and amongst Potential Bidders shall involve the Trustee and the Trustee's advisors.

      **(b)**      **Due Diligence from Potential Bidders.**

Each bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Trustee or his advisors regarding the ability of the Potential Bidder to consummate the Sale or discussions with other Potential Bidders regarding any topic and with any party regarding the Debtor (and their non-Debtor affiliates) and/or any of the Assets.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Trustee to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

The Trustee and each of his respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures.  Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Trustee and the Trustee's advisors may disclose confidential information: (i) with the prior written consent of such bidder and the Trustee; (ii) to the applicable bidder; (iii) to the Consultation Parties; and (iv) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**6.**      **Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of some or all of the Assets, which may include the Purchased Assets and/or the REDU Assets, (each, a "**Bid**") by a bidder that is submitted in writing and satisfies at least each of the following requirements (the "**Bid Requirements**"), as determined by the Trustee, in his reasonable business judgment, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid;**" *provided*, that, if the Trustee receives a Bid before the Bid Deadline that is not a Qualified Bid, the Trustee may provide the bidder with the opportunity to remedy any deficiencies before the Auction in order to render such Bid a Qualified Bid; *provided*, *further*, that for the avoidance of doubt, if any Qualified Bidder (other than the Stalking Horse Bidder) fails to comply with reasonable requests for additional information and due diligence access requested by the Trustee to the satisfaction of the Trustee, the Trustee may, after consulting with the Consultation Parties, disqualify any Qualified Bidder and Qualified Bid and such

Qualified Bidder will not be entitled to attend or participate in the Auction.. Except as set forth herein with respect to the minimum Purchase Price and Deposit, the Trustee may waive or modify any of the above requirements in the exercise of its reasonable business judgment with the prior written consent of the Consultation Parties.

(a)   **Assets.**   Each Bid must clearly state which Assets, including, if applicable the Purchased Assets or the REDU Assets, and which liabilities of the Debtor that the bidder is agreeing to purchase and assume.

(b)   **Purchase Price.**   Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for each individual Asset subject to the applicable asset package (including assumed liabilities), including and identifying separately any cash and non-cash components (the "**Purchase Price**"). Any Bid (Purchase Price) for the Purchased Assets shall be not less than the sum of the value under the Stalking Horse Bidder's APA plus the sum of (i) the $300,000 Expense Reimbursement and (ii) a minimum initial overbid increment in the amount of $250,000.

(c)   **Deposit.**   On or before the Bid Deadline, each Bid, other than a credit bid, must be accompanied by a cash deposit in the amount equal to [ten percent (10%)] of the aggregate cash and non-cash Purchase Price of the Bid, to be held in an escrow account to be identified and established by the Trustee (the "**Deposit**").

(d)   **Assumption of Obligations.**   Each Bid must clearly state which liabilities of the Debtor the bidder is agreeing to assume. Except as otherwise provided in a purchase agreement to be executed by a successful Bidder, all of the Debtor's rights, title, and interest in and to the Assets subject thereto will be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein (collectively, "**Interests**") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

(e)   **Designation of Assigned Contracts and Leases.**   A Bid must identify any and all executory contracts and unexpired leases (collectively, "**Contracts**") of the Debtor that the bidder wishes to be assumed and assigned to the bidder at closing pursuant to a Sale, subject to modification as set forth in the Qualified Bid Documents (as defined below).

(f)   **Adequate Assurances.**   A bidder must make a representation that it will be able to provide adequate assurance of future performance under any Contracts to be assumed and assigned under section 365 of the Bankruptcy Code, as well as written evidence that the Trustee, in consultation with the Consultation Parties, believes to be sufficient to demonstrate the foregoing.

(g)   **Qualified Bid Documents.**   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale Transaction and/or Sale contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid, as well as all other material documents integral to such Bid (the "**Qualified Bid Documents**"). To the extent the Bidder seeks to bid on Assets that include or overlap with the Purchased Assets, such documents must be

based on and marked against the APA (as defined below) and any other form documents provided by the Trustee. Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee, in consultation with the Consultation Parties. To the extent the bidder seeks to bid only on REDU Assets (as defined below), such documents must be based on and marked against the REDU APA and any other form documents provided by the Trustee. Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee in consultation with the Consultation Parties. A form REDU APA to be used for each Bid will be available in Word form from the Trustee upon request.

(h)     **Committed Financing.** To the extent that a Bid is not accompanied by evidence of the bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Trustee, in consultation with the Consultation Parties, that demonstrates that the bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee, in consultation with the Consultation Parties.

(i)     **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Trustee in his business judgment, in consultation with the Consultation Parties.

(j)     **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each parent company, equity holder or other financial backer of the applicable bidder), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Trustee and Danning, Gill, Israel & Krasnoff, LLP should contact regarding such Bid.

(k)     **Demonstrated Financial Capacity.** A bidder must have, in the Trustee's business judgment, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(l)     **Time Frame for Closing.** A Bid by a bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, and must contemplate a time frame for closing, with respect to the Purchased Assets, that comports with  the time for closing set forth

in the APA, and as acceptable to the Trustee, in consultation with the Consultation Parties.

**(m)**   **Binding and Irrevocable.**   A Bid shall be binding and irrevocable unless and until the Trustee accepts a higher Bid for such Asset package and such bidder is not selected as the Backup Bidder, and the bidder's Deposit has been returned.

**(n)**   **Expenses; Disclaimer of Fees.**   Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.   For the avoidance of doubt, no bidder, including a Qualified Bidder will be permitted to request, nor be granted by the Trustee, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code. This paragraph does not apply to the Expense Reimbursement to be allowed to the Stalking Horse Bidder.

**(o)**   **Authorization.**   Each Bid must contain evidence that the bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Trustee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(p)**   **As-Is, Where-Is.**   Each Bid must include a written acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence it needs regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the bidder's Bid.

**(q)**   **Adherence to Bid Procedures.**   By submitting its Bid, each bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

**(r)**   **Regulatory Approvals and Covenants.**   A Bid must set forth each regulatory and third-party approval required for the bidder to consummate the Sale and/or Sale Transaction, if any, and the time period within which the bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the bidder will take to ensure receipt of such approvals as promptly as possible).

**(s)**   **Bid Deadline.**   Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** by the Trustee, Trustee's Counsel, UBS, and Committee Counsel on or before ___:00 p.m. (Pacific Standard Time) on _____, 2020 (the "**Bid Deadline**").

For the avoidance of doubt, each Bid that satisfies all of the afore-stated criteria in a manner acceptable to the Trustee, consistent with the exercise of his fiduciary duties, shall be deemed a Qualified Bid, and each bidder who submits a Qualified Bid shall be deemed a "Qualified Bidder". Except with respect to information that the Trustee in his sole discretion determines may be confidential, copies of bids deemed Qualified Bids by the Trustee shall be furnished by the Trustee to the Stalking Horse Bidder. Notwithstanding anything to the contrary in this Motion, the Bidding Procedures, or the Bidding Procedures Order, the Qualified Credit Bid shall be deemed a Qualified Bid, and the Stalking Horse Bidder shall be deemed a Qualified Bidder.

**7.    Right to Credit Bid.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, TO THE EXTENT THAT UBS MAKES A BID AT ANY TIME BEFORE THE CONCLUSION OF THE AUCTION (INCLUDING ANY BID INVOLVING A CREDIT BID OF ALL OR ANY PORTION OF THE PREPETITION LOAN OBLIGATIONS) (A **"QUALIFIED CREDIT BID"**), (I) UBS WILL CONSTITUTE A QUALIFIED BIDDER, AND ANY SUCH BID WILL CONSTITUTE A QUALIFIED BID, REGARDLESS OF THE FOREGOING REQUIREMENTS, (II) NO GOOD FAITH DEPOSIT WILL BE REQUIRED IN CONNECTION WITH A QUALIFIED CREDIT BID, (III) THE QUALIFIED CREDIT BID WILL NOT SERVE AS A BACKUP BID UNLESS UBS OTHERWISE AGREE, AND (IV) THE PURCHASE PRICE IN CONNECTION WITH A QUALIFIED BID SHALL BE VALUED BY THE TRUSTEE ON A DOLLAR-FOR-DOLLAR BASIS WITHOUT DEDUCTION, REDUCTION, OR OFFSET OF ANY KIND, ANY ASSIGNEE OF UBS CLAIMS MUST BE ACCEPTED BY THE TRUSTEE OR BY ORDER OF THE COURT. NO OTHER CREDITOR MAY SUBMIT A BID THAT, IN WHOLE OR IN PART, INCLUDES A CREDIT BID.

Any prepetition loan obligations that are credit bid as part of a Qualified Credit Bid will be treated as cash consideration at the face amount of such obligations for the purposes of calculating whether such Qualified Credit Bid is the Prevailing Highest Bid. UBS may credit bid, as a Qualified Bid or in a subsequent bid, in its sole and absolute discretion, any portion and up to the entire amount of the Postpetition and Prepetition Secured Obligations, *plus* post-petition interest, if any, that would be due and owing in accordance with the Cash Collateral Order if the Trustee selects an alternative bid as the Successful Bid, including as part or all of an Overbid, in accordance with the Auction procedures set forth herein.

Upon exercise of their Credit Bid, UBS shall not be required to take title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), or be deemed to have taken title to or ownership of, or have any obligation in connection with (in each case, legal, equitable, or otherwise), any assets, and shall have the right to designate any person or entity in their sole and absolute discretion that shall take title to any assets that are subject to the Credit Bid. Except for UBS, or any assignee as set forth above, no other person may credit bid.

**8.    Stalking Horse Bid**

The Trustee has entered into a purchase and sale agreement on behalf of the Debtor, by and between the Trustee and Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C. (collectively the **"Stalking Horse Bidder"**), dated August 18, 2020, a copy of which is attached to the Motion and will be made available to interested parties (the **"APA"**).

The APA contemplates that the Stalking Horse Bidder will acquire certain assets comprising substantially all of the Assets (the "Purchased Assets"), but not including the REDU operations in Orange County (the "REDU Assets"). The Trustee will consider competing bids seeking to acquire some or all of the Assets, which may include the Purchased Assets and/or the REDU Assets, to the extent such bids comply with these Bid Procedures and the Bid Procedures Order.

To the extent the Bidder seeks to bid on assets under contract to the Stalking Horse Bidder, such documents must be based on and marked against the Stalking Horse Bidder's APA and any other form documents provided by the Trustee. Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee.

As set forth above, to the extent the bidder seeks to bid on REDU Assets, such documents must be based on and marked against the form REDU APA and any other form documents provided by the Trustee. Any modifications to the form of documents provided by the Trustee must be in form and substance acceptable to the Trustee. A form REDU APA to be used for each Bid will be made available by the Trustee to interested parties upon written request.

**9.      Auction.**

If the Trustee receives more than one Qualified Bid for an Asset, whether through a Bid for one or more individual Assets or through a Bid for all or substantially all of the Assets, the Trustee will conduct the Auction to determine the Successful Bidders with respect to such Asset or Assets, and any combination thereof, as applicable. If the Trustee does not receive a Qualified Bid for a given Asset, (i) the Trustee will not conduct the Auction as to such Asset, (ii) the Stalking Horse Bid shall be deemed the Successful Bid and the Stalking Horse Bidder shall be deemed the Successful Bidder (as defined below), and (iii) the Trustee shall proceed at the Sale Hearing and seek approval from the Court of the Stalking Horse Bid. To the extent Qualified Bidders are interested in separate individual REDU Assets and/or all or substantially all of the Assets, the Trustee may, with the prior written consent of the Consultation Parties, conduct separate auctions for the Assets, which may include the Purchased Assets and/or the REDU Assets..

No later than one calendar day after the Bid Deadline, at 5:00 p.m. (Pacific Standard Time), the Trustee will notify each Qualified Bidder of the highest or otherwise best Qualified Bid or combination of Qualified Bids for each Asset or Assets, for which such Qualified Bidder submitted a Bid or combination of Bids, as determined in the Trustee's reasonable business judgment, in consultation with the Consultation Parties (the **"Baseline Bid"**), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder and the Consultation Parties. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Trustee reasonably deems, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid to the Debtor's estate, including, among other things: (a) the amount and nature of the total consideration (including the amount of cash paid to or remaining in the estate pursuant to the Bid); (b) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof, including without limitation, views on the Bid by mineral owners and regulatory authorities; (c) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Qualified Bid Documents; and (d) the tax consequences of such Qualified Bid to the estate (collectively, the **"Bid Assessment Criteria"**). For purposes of determining the Baseline Bid, the Stalking Horse Bidder's bid shall be valued at $26.75 million.

The Auction, if necessary, shall take place at _____ a.m. (Pacific Standard Time) on _____, 2020, virtually via Zoom or similar videoconferencing technology, or such later date and time or such other location as selected by the Trustee.  If the date of the Auction is changed, the Trustee will file a notice at least 24 hours before the Auction indicating such change, and will serve the same on all Qualified Bidders and all parties who have requested notice pursuant to Local Rule 2002-1.  The Auction shall be conducted in a timely fashion according to the following procedures:

**(a)    The Trustee Shall Conduct the Auction.**

The Trustee and his professionals shall direct and preside over the Auction.  The Auction will be fairly and evenly administered, and not intended to cause any participating Qualified Bidder to be disadvantaged in any material way with respect to the process as compared to any other participating Qualified Bidder.  At the start of the Auction, the Trustee shall describe the terms of each Baseline Bid.  All incremental Bids made thereafter for a given Asset shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Asset except as otherwise ordered by the Court.  The Trustee shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only Qualified Bidders and their legal and financial advisors (including, for the avoidance of doubt, UBS) shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction virtually and may speak or Bid themselves or through duly authorized representatives.  Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder and UBS) shall be entitled to Bid at the Auction, unless the Trustee determines otherwise in the exercise of his fiduciary duties.  Each Qualified Bidder must have at least one individual representative with authority to bind the Qualified Bidder attend the Auction in person.

**(b)    Terms of Overbid.**

**"Overbid"** means any Bid made at the Auction by a Qualified Bidder subsequent to the Trustee's announcement of the Baseline Bid.  Each applicable Overbid must comply with the following conditions:

(i)    **Minimum Overbid Increment.**  Any Overbid after and above the Baseline Bid or any subsequent Prevailing Highest Bid (as defined below) will be made in increments in an amount to be announced at the Auction.  In order to maximize value, the Trustee reserves the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental Bids (or in valuing such Bids) at any time during the Auction.  Additional consideration in excess of the amount set forth in the respective Baseline Bid may include cash or non-cash consideration; provided, however, that the value for such non-cash consideration will be determined by the Trustee, in consultation with the Consultation Parties, in his reasonable business judgment.

(ii)    **Overbid Alterations.**  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtor's estate than any prior Bid or Overbid, as determined in the

Trustee's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(iii) **Conclusion of Each Overbid Round**.  Upon the solicitation of each round of applicable Overbids, the Trustee may announce a deadline (as the Trustee may, in his business judgment, extend from time to time, the **"Overbid Round Deadline"**) by which time any Overbids must be submitted to the Trustee.

(iv) **Announcing Highest Bid**.  Subsequent to each Overbid Round Deadline, the Trustee shall announce whether the Trustee has identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Trustee as the prevailing highest or otherwise best Bid (the **"Prevailing Highest Bid"**).  The Trustee shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Trustee as the Prevailing Highest Bid as well as the value attributable by the Trustee (after consultation with the Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

**(c)     Consideration of Overbids.**

The Trustee reserves the right, in his reasonable business judgment, with the prior written consent of the Consultation Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Trustee and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Trustee with such additional evidence as the Trustee, in his reasonable business judgment, may require regarding whether the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

**(d)     Closing the Auction.**

(i) The Auction shall continue until there is only one Bid that the Trustee determines, in his reasonable business judgment, and in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Asset. Such Bid shall be declared the **"Successful Bid,"** and such Qualified Bidder, the **"Successful Bidder,"** and with respect to the REDU Assets, the "Successful REDU Bidder", and at which point the Auction will be closed as to that Asset.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Trustee of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.  The Trustee may close the Auction as to a specific Asset without designating a Bid the Successful Bid, so as to consider whether sale of that Asset in lots is most beneficial to the estate.

(ii) If the Successful Bidder is not purchasing all of the Assets, which include the

Purchased Assets and the REDU Assets, the Trustee may in his discretion conduct one or more Auctions for the balance of the Assets (the "Additional Auction"). The Additional Auction shall be on the same terms provided herein for the Auction.

(iii)    Notwithstanding the foregoing, any prepetition loan obligations that are permitted to be credit bid as part of a Qualified Credit Bid will be treated as cash consideration at the face amount of such obligations for the purposes of calculating whether such Qualified Credit Bid is the Prevailing Highest Bid.

(iv)    Except as provided in paragraph 12, the Trustee does not intend to consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid.

(v)    As soon as reasonably practicable after closing the Auction, the Trustee shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

**(e)    No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder; and (iii) it will sign declaration(s) as requested by the Trustee attesting to those facts.

**(f)    Additional Procedures.**

The Trustee, after consulting with the Consultation Parties, may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, so long as such rules are not inconsistent in any material respect with the Bidding Procedures Order.

**10.    Backup Bidder.**

The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the "**Backup Bid**") at the Auction (if the Auction is conducted), as determined by the Trustee in the exercise of his business judgment in consultation with the Consultation Parties, shall be required to serve as a backup bidder (the "**Backup Bidder**"). The Trustee shall announce the identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder after the conclusion of the Auction, if any, but no later than the Sale Hearing. The Backup Bidder (excluding the Stalking Horse Bidder, which sall be subject to the terms for backup bidding under the APA) shall be required to keep its Qualified Bid open and irrevocable until the date (the "**Outside Backup Date**") that is the earlier of (a) the date that is ninety (90) calendar days after the date of entry of the Sale Order, or (b) the closing date of the Sale with the Successful Bidder. The Backup Bidder's Deposit shall be held in a non-interest bearing account by the Trustee until the closing of the transaction with the applicable Successful Bidder. If a Successful Bidder fails to consummate its Successful Bid, the Trustee may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Trustee will be

authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtor's estate, and the Trustee specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

**11.    Adequate Assurance Information**.

Within twenty-four (24) hours of the filing of the notice of the Successful Bidder and the Backup Bidder, the Successful Bidder and the Backup Bidder will send by overnight delivery to each contract counterparty whose contract is part of such Bid, the financial and other commercial information to demonstrate adequate assurance of future performance under such contract.  For the avoidance of doubt, the lessors under the Debtor's mineral and surface leases are not required to receive such adequate assurance information.

**12.    Reservation of Rights.**

The Trustee reserves his rights to modify these Bidding Procedures in his reasonable business judgment, with the prior written consent of the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all bids or Bids.

**13.    Consent to Jurisdiction.**

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court which may hear disputes as a core matter and enter final order(s) and judgment(s) and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

**14.    Sale Hearing.**

The hearing to consider approval of the Sale of certain of the Assets to the Successful Bidder(s) pursuant to section 363 of the Bankruptcy Code (the **"Sale Hearing"**) will take place **on _____, 2020, at ___:00 p.m., Pacific Standard Time, before the Honorable Martin R. Barash, Courtroom 201, 1415 State Street, Santa Barbara, California.**  The hearing will be conducted remotely, using ZoomGov video and audio.  The Zoom connection information will be set forth on the Court's tentative rulings and posted calendar for the date of the Sale Hearing.

**The Sale Hearing may be continued to a later date by the Trustee by sending notice prior to, or making an announcement at, the Sale Hearing and filing such notice on the docket. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Trustee shall present the Successful Bid(s) to the Court for approval.

## 15.    Return of Deposit.

The Deposits of all Qualified Bidders will be held in one or more escrow accounts by the Trustee, but will not become property of the Debtor's estate, or subject to the claims, liens, security interests, or encumbrances of the Debtor's creditors, unless and until such amounts are actually released to the Debtor as provided herein, absent further Court order.  The Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder will be returned to such Qualified Bidder not later than five (5) business days after entry of the Sale Order.  Except as otherwise provided with respect to the Stalking Horse Bidder under the APA, the Deposit of the Backup Bidder, if any, will be returned to the Backup Bidder on the date that is the earlier of seventy-two (72) hours after (a) the closing of the Sale with the Successful Bidder, and (b) the Outside Backup Date.  Upon the return of the Deposits, their respective owners will receive any and all interest that will have accrued thereon.  If the Successful Bidder timely closes the Successful Bid, its Deposit will be credited towards the purchase price.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Trustee will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Trustee on behalf of the Debtor as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtor, and the Trustee shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## 16.    Reservation of Rights of the Trustee.

Except as otherwise provided in the Bidding Procedures Order, these Bidding Procedures, or the Cash Collateral Order, the Trustee reserves the right, as he may reasonably determine to be in the best interest of the Debtor's estate, in consultation with the Consultation Parties, to:  (a) determine which Bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best Bid or combination of Bids and which is the next highest or otherwise best Bid or combination of Bids; (d) reject any Bid (other than the Qualified Credit Bid) that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, (iii) contrary to the best interests of the Debtor and the estate, or (iv) subject to any financing contingency or otherwise not fully financed; (e) waive terms and conditions set forth herein with respect to all bidders; (f) impose additional terms and conditions with respect to all Potential Bidders (other than the Stalking Horse Bidder); (g) extend the deadlines set forth herein; (h) continue or cancel the Auction or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures and implement additional procedural rules that the Trustee determines, in his reasonable business judgment, and with the prior written consent of the Consultation Parties, will better promote the goals of the bidding process.

## 17.    Fiduciary Out.

Nothing in these Bidding Procedures shall require the Trustee to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Trustee determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

EXHIBIT 2

ERIC P. ISRAEL (State Bar No. 132426)
*eisrael@DanningGill.com*
AARON E. DE LEEST (State Bar No. 216832)
*adeleest@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Michael A. McConnell,
Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re | Case No. 9:19-bk-11573-MB |
| HVI CAT CANYON, INC., | Chapter 11 |
| Debtor. | **NOTICE OF PROPOSED SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING** |
| | Proposed Sale Hearing |
| | Date: _____, 2020 |
| | Time: _____ a.m. |
| | Place: Courtroom 201 |
| | 1415 State Street |
| | Santa Barbara, California |

PLEASE TAKE NOTICE that on \_\_\_\_\_, 2020, Michael A. McConnell, the Chapter 11

trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), filed a *Notice of*

*Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially*

*all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C)*

*Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense*

*Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the Form*

*and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting Related*

*Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B) Authorizing the*

1   *Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C)*

2   *Granting Related Relief (docket no. _____ )* (the "Motion"), seeking:

3          (1) entry of an order (the "Bidding Procedures Order") (a) authorizing and approving

4   certain proposed bidding and sale procedures, substantially in the form attached to the Bidding

5   Procedures Order (the "Bidding Procedures"), in connection with one or more transactions (each, a

6   "Sale Transaction") involving the sale ("Sale") of all or a portion of the Debtor's assets (the

7   "Assets"), (b) authorizing and approving certain proposed assumption and assignment procedures

8   in respect of certain executory contracts and unexpired leases (collectively, the "Designated

9   Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), (c)

10  authorizing and approving the selection of Team Maria Joaquin, L.L.C. and Maria Joaquin Basin,

11  L.L.C. as the stalking horse bidders (collectively the "Stalking Horse Bidder"), (d) approving an

12  expense reimbursement to the Stalking Horse Bidder, (e) scheduling dates for (i) one or more

13  auctions (the "Auction"), including the assets under contract to the Stalking Horse Bidder as may

14  be necessary (the "Purchased Assets"), and an auction or auctions of additional estate assets not

15  under contract to the Stalking Horse Bidder, including but not limited to the REDU Assets (as

16  defined below) and (ii) a hearing (the "Sale Hearing") to consider final approval of the Sale, (f)

17  approving the form and manner of notice of any Auction and the Sale Hearing, and all procedures,

18  protections, notices, and agreements related thereto, and (g) granting related relief; and

19         (2) following the Sale Hearing, an order or orders (the "Sale Order") to be filed in advance

20  of the Sale Hearing, (a) approving the Sale(s) to the Successful Bidder(s) for the Assets (as defined

21  in the Bidding Procedures), including for the purchase of assets not under contract to the Stalking

22  Horse Bidder including the assets associated with the REDU operations in Orange County (the

23  "REDU Assets") or, if the Successful Bidder(s) fails to consummate the Sale, to the Backup

24  Bidder(s) (as defined in the Bidding Procedures)), which Sale(s) shall be free and clear of all liens,

25  claims, encumbrances, other than Permitted Encumbrances and Assumed Obligations (as each is

26  defined in the asset purchase agreement entered into between the Trustee and the Stalking Horse

27  Bidder (the "APA"), a copy of which is attached to the Motion as Exhibit 5, and other interests, (b)

28  authorizing the assumption and assignment of the Designated Contracts which the Successful

1    Bidder(s) (or, should the Successful Bidder fail to consummate the Sale, the Backup Bidder) has

2    selected or will select to be assumed and assigned (collectively, the "Selected Designated

3    Contracts"), and (c) granting related relief.[1]

4          PLEASE TAKE FURTHER NOTICE that, on _____ 2020, the Court entered the

5    Bidding Procedures Order *(docket no. _____).*

6          PLEASE TAKE FURTHER NOTICE that any party that wishes to take part in the sale

7    process contemplated by the Bidding Procedures Order and submit a Bid for the Assets must

8    submit its Bid in accordance with the terms and conditions of the Bidding Procedures, including the

9    requirements for submitting a Qualified Bid, by 5:00 p.m. (Pacific Standard Time) on _____,

10    2020 (the "Bid Deadline"), except as otherwise provided in the Bidding Procedures with respect to

11    the Stalking Horse Bidder.

12          PLEASE TAKE FURTHER NOTICE that pursuant to the Bidding Procedures Order, if the

13    Trustee receives more than one timely and acceptable Qualified Bid, the Trustee will conduct the

14    Auction for some or all of the Assets on _____, 2020 at 10:00 a.m. (Pacific Standard Time)

15    virtually via Zoom or similar videoconferencing technology, or such later date and time or such

16    other location as selected by the Trustee or at such later date and time as selected by the Trustee.

17    Only Qualified Bidders and their legal and financial advisors shall be entitled to attend the Auction.

18    The Qualified Bidders shall appear at the Auction virtually and may speak or Bid themselves or

19    through duly authorized representatives.  Only Qualified Bidders (including, for the avoidance of

20    doubt, the Stalking Horse Bidder) will be entitled to Bid at the Auction.  The Zoom connection

21    information will be provided to Qualified Bidders.  All interested or potentially affected parties

22    should carefully read the Bidding Procedures and the Bidding Procedures Order.

23          PLEASE TAKE FURTHER NOTICE that the Trustee has the right to adjourn or cancel the

24    Auction at or prior to the Auction.

25

26

27    _____

      [1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the

28    Motion and Bidding Procedures Order, as applicable.

PLEASE TAKE FURTHER NOTICE that the Trustee's selection of the Stalking Horse Bidder and entry into that certain purchase agreement by and between the Trustee and the Stalking Horse Bidder, dated August 18, 2020 (the "APA"), was authorized pursuant to the Bidding Procedures Order.

PLEASE TAKE FURTHER NOTICE that the Motion also seeks authority to pay TenOaks Energy Partners, LLC, the Trustee's Court approved investment banker, its success fee in connection with this transaction of $400,000 based upon the price of the Stalking Horse Bidder.

PLEASE TAKE FURTHER NOTICE that the Motion seeks to sell the Assets free and clear of successor liability relating to the Debtor's business except as expressly assumed by the Successful Bidder.

PLEASE TAKE FURTHER NOTICE that the Motion also requests authority to partially pay UBS from the cash sale proceeds.

PLEASE TAKE FURTHER NOTICE that the Motion also requests, pursuant to Federal Rule of Bankruptcy Procedure 3012, that the Court make a finding that the confirmed sale price is the value of the collateral assets, and that the junior secured claims of certain purported lienholders as defined in the Motion are out of the money and are entirely unsecured.

PLEASE TAKE FURTHER NOTICE that the Motion seeks additional relief as set forth in the Motion and also requests a finding that the Stalking Horse Bidder (or successful overbidder) be entitled to all protections in Bankruptcy Code section 363(m) as a good faith purchaser and that the Motion be effective immediately, notwithstanding the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

PLEASE TAKE FURTHER NOTICE that the Trustee through the Motion also seeks authority to modify or surrender leases as he deems it necessary for the transactions proposed.

PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of a Sale Transaction(s) and the transfer of the Assets free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f) will take place on _____, 2020, at ___:00 p.m., Pacific Standard Time, before the Honorable Martin R. Barash, Courtroom 201, 1415 State Street, Santa Barbara, California. The hearing will be conducted remotely, using

1  ZoomGov video and audio.  The Zoom connection information will be set forth on the Court's

2  tentative rulings and posted calendar for the date of the Sale Hearing.  The Sale Hearing may be

3  adjourned from time to time without further notice to creditors or other parties in interest other than

4  by announcement of the adjournment in open court or by notice filed on the docket in this case.

5        PLEASE TAKE FURTHER NOTICE that any objections to the Sale Transaction(s) (each,

6  a "Sale Objection") must be filed and served so as to be actually received by the Objection

7  Recipients no later than _____, 2020, at ___:00 _.m. (Pacific Standard Time) (the "Sale Objection

8  Deadline").  The Objection Recipients are: (i) the Trustee, Michael A. McConnell, Kelly Hart &

9  Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Michael A. McConnell;

10 (ii) counsel to the Trustee, Danning, Gill, Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite

11 450, Los Angeles, California 90067-6006, Attn: Eric P. Israel; (iii) Counsel to UBS AG, London

12 and UBS AG, Stamford Branch, O'Melveny & Myers LLP, 400 South Hope Street, 18th Floor, Los

13 Angeles, CA 90071, Attn: Evan M. Jones; and (iv) Counsel to the Committee, Pachulski Stang

14 Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111-4500, Attn:

15 Maxim Litvak (collectively, the "Objection Recipients").

16      <u>CONSEQUENCES OF FAILING TO TIMELY ASSERT A SALE OBJECTION</u>

17      PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO

18 TIMELY FILE AND SERVE A SALE OBJECTION ON OR BEFORE THE SALE OBJECTION

19 DEADLINE IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER

20 WILL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION TO THE SALE,

21 INCLUDING WITH RESPECT TO THE TRANSFER OF THE TRANSFERRED ASSETS OF

22 THE DEBTOR'S ESTATE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND

23 OTHER INTERESTS EFFECTED THEREUNDER.

24      PLEASE TAKE FURTHER NOTICE that, pursuant to Local Bankruptcy Rule 6004-1(c),

25 the Trustee provides the following information:

26      A.    The date, time and place of the hearing on the Motion are set forth above.

27      B.    The Stalking Horse Bidder is, collectively, Team Maria Joaquin, L.L.C. and Maria

28 Joaquin Basin, L.L.C.

1606368.1  26932

5

1    C.    The property to be sold consists of all or a portion of the Assets, which include the

2    Purchased Assets and/or the REDU Assets.

3    D.    The material terms and conditions of the sale.

4    The Trustee is proposing to sell the Assets, which include th Purchased Assets and the

5    REDU Assets, in accordance with the Bidding Procedures Order.  The sale will be "as is," "where

6    is," and with no warranty or recourse whatsoever, subject to higher and better bids.

7    The sale is proposed to be free and clear of all liens, claims, rights, interests, and

8    encumbrances whatsoever, other than as set forth in the APA or the REDU APA, in accordance

9    with Bankruptcy Code section 363(b) and (f).  Without limitation, the Assets will be sold free and

10    clear of all royalty claims through the Effective Date of the sale.  The liens securing the Trustee

11    Financing and the UBS Secured Debt will be removed from the Assets and attach to the net sale

12    proceeds with the same validity, enforceability, and priority, if any, as existed with respect to the

13    Assets as of the Petition Date.  All over liens will be removed from the Assets and not attach to sale

14    proceeds.  Provided that the carve-outs are fully paid, the Trustee proposes that cash and non-cash

15    proceeds of the sale be absolutely assigned at the close to UBS in partial satisfaction of its claims,

16    as contemplated by the Stalking Horse Bidder's APA.

17    With no material dispute as to the validity and priority of UBS' claims and liens, the

18    Trustee believes in his good faith judgment that it is in the best interests of the estate's stakeholders

19    to partially repay UBS' secured claims with the cash sale proceeds, with UBS' liens to continue in

20    the non-cash proceeds.  After reservation for taxes, the cost of the Sale, and the Carve-Out, the

21    Trustee seeks authority to repay amounts due on account of UBS' post-petition liens with the cash

22    sale proceeds promptly upon closing.  In addition, the Trustee proposes to assign non-cash

23    proceeds to UBS as partial payment of UBS' claims.  The Trustee proposes that the value of such

24    non-cash distributions be reasonably determined by the Trustee's investment banker using the same

25    methodology and valuation as used in accepting the Stalking Horse Bid or any other Bid accepted

26    at the Auction, shown in declaration filed in advance of the Sale Hearing, with any dispute to be

27    resolved by the Court.  UBS' liens would continue to attach to all sales proceeds until applied to

28    senior ad valorem property taxes, the Carve Out or UBS' loans. The Trustee believes that the

consummation of the Sale to the Stalking Horse Bidder, subject to further marketing efforts and higher or otherwise better bids consistent with the Bidding Procedures, and parallel sale of the REDU Assets will maximize the value of the Purchased Assets.  The Trustee seeks authority to assign and deliver the Production Payment and other non-cash proceeds to UBS after the Carve-Out due the Trustee and his professionals is fully paid.

The terms and conditions of the sale to the Stalking Horse Bidder are memorialized in the APA attached as Exhibit "1" to the Motion..  The material terms of the proposed sale to the Stalking Horse Bidder, subject to Court approval, are as follows:

- Assets to be purchased.  Most of the Debtor's assets but not the REDU Assets.

- Consideration.  Purchase price of $26.75 million, consisting of:  (1) $8.5 million cash, (2) $500,000 for a litigation fund to be matched by UBS AG, (3) $500,000 for an appeal escrow, (4) an earn-out reflected in a Production Payment for $11.75 million, (5) assumption of real property taxes of approximately $5.5 million, and (4) assumption of the Assumed Liabilities.  A deposit of $500,000.

- Bid Protections.  An Expense Reimbursement of up to $300,000 and an initial minimum overbid increment of $250,000.

- Other Terms.  Commitment to invest at least $5 million by December 2023 to maintain and improve production.

- Other Terms.  Creation of a litigation fund of $1 million; $500,000 to be provided by UBS and $500,000 by the Buyer for the Trustee to pursue claims against the Debtor's insiders and affiliates.

- Other Terms.  An appeals escrow account to be funded by the Buyer, from the purchase price, in the amount of $500,000 to cover the fees and expenses associated with any appeals of the Sale Order.

E.    The Trustee intends to sell the Assets free and clear of all liens, claims, encumbrances, and interests (including royalty interests) (collectively, "Interests") with those Interest removed from the Assets. Certain liens will be removed from the Assets and attach to the net sale proceeds with the same validity, enforceability, and priority, if any, as existed with respect to the Assets as of the Petition Date.  A description of the known liens are as follows:

(a)    Post-Petition UBS Secured Claim

Pursuant to prior orders of the Court, UBS AG, Stamford Branch to date has loaned

1   not less than $11.5 million to the Trustee in post-petition financing (the "Trustee Financing") for

2   the Trustee's operations of the Debtor.  As a result of the Court's prior orders, UBS AG, Stamford

3   has a superpriority post-petition financing lien (and administrative claim) on essentially all of the

4   Debtor's Assets senior to all other liens and interests subject only, to the extent Santa Barbara

5   County has valid, senior, perfected, and non-avoidable liens for ad valorem taxes under applicable

6   law, to such valid, senior, perfected and non-avoidable ad valorem tax liens in favor of Santa

7   Barbara County.  At this time, UBS advises that it is owed over $15 million on account of its post-

8   petition financing loan.

9               (b)      Pre-Petition UBS Secured Claim and GRL Secured Claim

10              Prior to the commencement of the bankruptcy case, the Debtor and UBS AG,

11  London Branch had entered into certain loan arrangements evidenced by: (i) that certain First Lien

12  Credit Agreement among the Debtor, Rincon Island Limited Partnership, GOGH, LLC, and UBS

13  AG, London dated as of May 20, 2016 in the original principal amount of $50 million; and (ii) that

14  certain Second Lien Credit Agreement among the Debtor, Rincon Island Limited Partnership,

15  GOGH, LLC and UBS AG, London dated as of May 20, 2016 in the original principal amount of

16  $50 million (collectively, the "Prepetition Credit Agreements" and the obligations arising

17  thereunder, the "UBS Secured Debt").

18              The Debtor is also a party to that certain Amended and Restated Credit Agreement,

19  as amended, with GLR, LLC ("GLR") dated as of May 20, 2016 (the "GLR Secured Debt").

20  Substantially all of the Debtor's Assets are pledged as collateral for its obligations under the UBS

21  Secured Debt, which is in first and second position, and the GLR Secured Debt, which is

22  subordinate to the UBS Secured Debt.   The UBS Secured Debt and the GLR Secured Debt are

23  junior to the Trustee Financing.  GLR is an affiliate and insider of the Debtor.

24              UBS AG, London and GLR are parties to that certain Subordination and

25  Intercreditor Agreement ("Subordination Agreement") dated as of May 20, 2016.  The

26  Subordination Agreement provides, among other things, that GLR's liens, right to payment and

27  right to exercise remedies are subordinate to those of UBS AG, London.

28              According to the Debtor, on the Petition Date the outstanding amount due to UBS

1  AG, London was approximately $114 million, and the outstanding amount due to GLR was

2  approximately $104 million.  The Trustee proposes that the liens of UBS will be removed to the

3  sale proceeds, but the lien of GLR is entirely unsecured and will not attach to sale proceeds.

4          (c)     <u>Santa Barbara, Orange & Kern Counties</u>

5          Santa Barbara asserts that it has a secured tax claim for ad valorem real property

6  taxes owed by the Debtor in excess of $4.7 million as of the Petition Date.   Orange County and

7  Kern County have filed proofs of claim, docketed as Claim No. 7  and Claim No. 3  on the Court's

8  Claims Register, that assert secured tax claims against the Debtor.  The Trustee disputes portions of

9  the property tax claims, among other bases, because they include penalties, assessments for

10  properties not owned by the Debtor and are based upon overstated assessed values of the

11  properties.

12          (d)     <u>Rival Well Services</u>

13          The Debtor's schedules also reflect that Rival Well Services, Inc. ("Rival") has a

14  secured claim for an oil and gas lien in the amount of $101,556.75, secured by real property in

15  Kern County.   However, to the extent this lien is valid, it is junior to the liens securing the Trustee

16  Financing and the UBS Secured Debt, and at the proposed sale price, any claim of Rival is entirely

17  unsecured.  See 11 U.S.C. § 506(a) and (d).

18          (e)     <u>The State Controller</u>

19          The Debtor's schedules also reflect that the California State Controller Tax

20  Administration Section (the "State Controller") has a claim for unpaid "production assessments" in

21  the amount of $1,304,573.87, secured by real property in Orange and Santa Barbara Counties.

22  However, this lien is junior to the liens securing the Trustee Financing and the UBS Secured Debt,

23  and at the proposed sale price, any claim of the State Controller is entirely unsecured.  See 11

24  U.S.C. § 506(a) and (d).

25          (f)     <u>Northern California Collection Services</u>

26          The Debtor's schedules also reflect that Northern California Collection Service, Inc.

27  ("Collection Service") recorded an abstract of judgment in the amount of $175,703.75, secured by

28  real property in Santa Barbara County and JL-1 judgment lien filed with the Secretary of State.

           9

1   Collection Service's JL-1 judgment lien was filed with the Secretary of State after the UCC-1

2   financing statements of UBS and GLR and is junior to those interests.  Thus, at the proposed sale

3   price, any claim of Collection Service is entirely unsecured.  See 11 U.S.C. § 506(a) and (d).

4            (g)      Post-Petition Oil and Gas Notices of California Asphalt Production, Inc.,

5                     GTL1, LLC and GIT, Inc.

6            On or about February 24, 2020, California Asphalt Production, Inc. ("CAP"), GTL1,

7   LLC ("GTL1"), and GIT, Inc. ("GIT")  purported to each file under 11 U.S.C. § 546(b) a separate

8   Notice of Oil and Gas Lien (*docket no. 821, 822, and 823*), in which they each asserted a lien

9   pursuant to California Civil Procedure Code § 1203.58 for unpaid services and materials CAP,

10  GTL1, and GIT, each, allegedly, provided to the Debtor post-petition between August 1, 2019 and

11  February 4, 2020   in the aggregate amount of $2,240,686.86, $979,717.20, and $1,276,779.29,

12  respectively. The Trustee disputes that the Oil and Gas Notices validly created any liens on the

13  Debtor's Assets and filed a complaint challenging the Oil and Gas Notices – Adversary No. 9:20-

14  ap-01039-MB, which remains pending.

15           F.      The proposed sale is subject to higher and better bids as set forth in the Bidding

16  Procedures Order and Bidding Procedures.

17           G.      The consideration to be received by the bankruptcy estate after commissions, fees,

18  and other costs of sale.  Based upon the terms of the Stalking Horse Bidder's bid, the preliminary

19  estimate of the consideration to be received by the estate is $14,885,564.85 and assumes the estate

20  receives the full benefit of the production bonus payment defined in the APA.  The proceeds of the

21  sale will all go to UBS's post-petition lien and next to its pre-petition lien, subject to the carve-outs

22  it has agreed to.  Other than some of those carve-outs, no free and clear funds will come into the

23  estate.

24           H.      The Trustee also seeks authority from the Court to pay a success fee to his Court-

25  approved investment banker, TenOaks Energy Partners, LLC ("TenOaks"), in connection with a

26  Sale Transaction, which is contemplated to be $400,000 based on the purchase price of the Stalking

27  Horse Bidder.

28           I.      The Trustee is not aware of any adverse tax consequences due to the proposed sale

1    of the Assets.

2        J.      Any objection to the Sale Transactions must be filed and served not later than the

3    Sale Objection Deadline set forth above.

4        PLEASE TAKE FURTHER NOTICE that this Notice is subject to the terms and conditions

5    of the Motion, the Bidding Procedures and the Bidding Procedures Order, with such Bidding

6    Procedures Order controlling in the event of any conflict, and the Trustee encourages parties in

7    interest to review such documents in their entirety.  Parties interested in receiving more information

8    regarding the sale of the Assets and/or copies of any related document, including the Motion or the

9    Bidding Procedures Order, may make a written request to: counsel to the Trustee, Danning, Gill,

10   Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006,

11   Attn: Eric P. Israel.

12

13   DATED:  August___, 2020                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

14

15                                              By:  _____

16                                                   ERIC P. ISRAEL
                                                     Attorneys for Michael A. McConnell,
17                                                   Chapter 11 Trustee

18

19   DATE OF MAILING:  _____, 2020

20

21

22

23

24

25

26

27

28

EXHIBIT 3

1   ERIC P. ISRAEL (State Bar No. 132426)
    *eisrael@DanningGill.com*
2   AARON E. DE LEEST (State Bar No. 216832)
    *adeleest@DanningGill.com*
3   DANNING, GILL, ISRAEL & KRASNOFF, LLP
    1901 Avenue of the Stars, Suite 450
4   Los Angeles, California 90067-6006
    Telephone: (310) 277-0077
5   Facsimile: (310) 277-5735

6   Attorneys for Michael A. McConnell,
    Chapter 11 Trustee

7

8                  **UNITED STATES BANKRUPTCY COURT**

9                  **CENTRAL DISTRICT OF CALIFORNIA**

10                        **NORTHERN DIVISION**

11

12  In re                                  Case No. 9:19-bk-11573-MB

13  HVI CAT CANYON, INC.,                  Chapter 11

14          Debtor.                        **NOTICE OF EXECUTORY CONTRACTS
                                           AND UNEXPIRED LEASES THAT MAY
15                                         BE ASSUMED AND ASSIGNED IN
                                           CONNECTION WITH THE SALE OF
16                                         THE DEBTOR'S ASSETS AND THE
                                           PROPOSED CURE AMOUNTS WITH
17                                         RESPECT THERETO**

18                                         Proposed Sale Hearing

19                                         Date:    _____, 2020
                                           Time:    _____ a.m.
20                                         Place:   Courtroom 201
                                                    1415 State Street
21                                                  Santa Barbara, California

22          **PLEASE TAKE NOTICE THAT YOU ARE RECEIVING THIS NOTICE OF**

23  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED**

24  **AND ASSIGNED IN CONNECTION WITH THE SALE OF THE DEBTOR'S ASSETS**

25  **AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO (THE**

26  **"ASSUMPTION NOTICE") BECAUSE YOU MAY BE A COUNTERPARTY TO AN**

27  **EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH THE DEBTOR.  PLEASE**

28

1606406.1  26932

EXHIBIT 3                                              128

1 **READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE**

2 **TRANSACTIONS DESCRIBED HEREIN.**

3       PLEASE TAKE NOTICE that on _____, 2020, Michael A. McConnell, the Chapter 11

4 trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), filed a *Trustee's*

5 *Notice of Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of*

6 *Substantially all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment*

7 *of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure*

8 *Amounts, (C) Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving*

9 *Expense Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the*

10 *Form and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting*

11 *Related Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B)*

12 *Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired*

13 *Leases, and (C) Granting Related Relief (docket no. _____)* (the "Motion"), seeking:

14       (1) entry of an order (the "Bidding Procedures Order") (a) authorizing and approving

15 certain proposed bidding and sale procedures, substantially in the form attached to the Bidding

16 Procedures Order (the "Bidding Procedures"), in connection with one or more transactions (each, a

17 "Sale Transaction") involving the sale ("Sale") of all or a portion of the Debtor's assets (the

18 "Assets"), (b) authorizing and approving certain proposed assumption and assignment procedures

19 in respect of certain executory contracts and unexpired leases (collectively, the "Designated

20 Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), (c)

21 authorizing and approving the selection of Team Maria Joaquin, L.L.C. and Maria Joaquin Basin,

22 L.L.C. as the stalking horse bidders (collectively the "Stalking Horse Bidder"), (d) approving an

23 expense reimbursement to the Stalking Horse Bidder, (e) scheduling dates for (i) one or more

24 auctions (the "Auction"), including the assets under contract to the Stalking Horse Bidder as may

25 be necessary (the "Purchased Assets"), and an auction or auctions of additional estate assets not

26 under contract to the Stalking Horse Bidder, including but not limited to the REDU Assets (as

27 defined below) and (ii) a hearing (the "Sale Hearing") to consider final approval of the Sale, (f)

28

1    approving the form and manner of notice of any Auction and the Sale Hearing, and all procedures,

2    protections, notices, and agreements related thereto, and (g) granting related relief; and

3        (2) following the Sale Hearing, an order or orders (the "Sale Order") to be filed in advance

4    of the Sale Hearing, (a) approving the Sale(s) to the Successful Bidder(s) for the Assets (as defined

5    in the Bidding Procedures), including for the purchase of assets not under contract to the Stalking

6    Horse Bidder including the assets associated with the REDU operations in Orange County (the

7    "REDU Assets") or, if the Successful Bidder(s) fails to consummate the Sale, to the Backup

8    Bidder(s) (as defined in the Bidding Procedures)), which Sale(s) shall be free and clear of all liens,

9    claims, encumbrances, other than Permitted Encumbrances and Assumed Obligations (as each is

10    defined in the asset purchase agreement entered into between the Trustee and the Stalking Horse

11    Bidder (the "APA"), a copy of which is attached to the Motion as Exhibit 5, and other interests, (b)

12    authorizing the assumption and assignment of the Designated Contracts which the Successful

13    Bidder(s) (or, should the Successful Bidder fail to consummate the Sale, the Backup Bidder) has

14    selected or will select to be assumed and assigned (collectively, the "Selected Designated

15    Contracts"), and (c) granting related relief.[1]

16        PLEASE TAKE FURTHER NOTICE that, on _____ 2020, the Court entered the

17    Bidding Procedures Order *(docket no. _____)*.

18        PLEASE TAKE FURTHER NOTICE that the Bidding Procedures Order, among other

19    things, established procedures for the assumption and assignment of the Designated Contracts to a

20    purchaser and the determination of related Cure Amounts (as defined below).  The Debtor is a

21    party to numerous Designated Contracts and, in accordance with the Bidding Procedures Order,

22    hereby file this notice ("Assumption Notice") identifying (i) the Designated Contracts, which may

23    be assumed and assigned to the Stalking Horse Bidder in connection with the Sale Transaction, and

24    (ii) the proposed amounts, if any, the Trustee believes are owed to the counterparties to the

25    Designated Contracts to cure any defaults or arrears existing under the Designated Contracts (the

26

27    _____
    [1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the

28    Motion and Bidding Procedures Order, as applicable.

1  "Cure Amounts"), both as set forth on Exhibit 1 attached hereto.  Other than the Cure Amounts

2  listed on Exhibit 1, the Trustee is not aware of any amounts due and owing under the Designated

3  Contracts listed therein.

4  PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of a Sale

5  Transaction(s) and the transfer of the Assets free and clear of all liens, claims, interests, and

6  encumbrances in accordance with Bankruptcy Code section 363(f) will take place on _____, 2020,

7  at ___:00 p.m., Pacific Standard Time, before the Honorable Martin R. Barash, Courtroom 201,

8  1415 State Street, Santa Barbara, California.  The hearing will be conducted remotely, using

9  ZoomGov video and audio.  The Zoom connection information will be set forth on the Court's

10  tentative rulings and posted calendar for the date of the Sale Hearing.  At the Sale Hearing, only

11  those Designated Contracts (and the corresponding Cure Amounts) listed on Exhibit 1 that have

12  been selected to be assumed by the Successful Bidder(s) at the Auction (as may be amended in

13  accordance with the terms of the applicable definitive documents, the "Selected Designated

14  Contracts") will be subject to approval by the Court, and the Debtor's rights with respect to all

15  other contracts are fully reserved.  All objections to the Trustee's proposed Cure Amounts will be

16  heard at the Sale Hearing or at a later hearing, as determined by the Trustee.  The Sale Hearing may

17  be adjourned from time to time without further notice to creditors or other parties in interest other

18  than by announcement of the adjournment in open court or by notice filed on the docket in this

19  Case.

20  PLEASE TAKE FURTHER NOTICE that the listing of a Designated Contract on Exhibit 1

21  does not constitute an admission that the Designated Contract is an executory contract or unexpired

22  lease as contemplated by Bankruptcy Code section 365(a) or that the Debtor has any liability

23  thereunder, and the Trustee expressly reserves all rights, claims, causes of action, and defenses of

24  the Trustee and the Debtor with respect to the Designated Contracts listed on Exhibit 1.

25  PLEASE TAKE FURTHER NOTICE that to the extent a counterparty to a Designated

26  Contract listed on Exhibit 1 to this Assumption Notice objects to the proposed assumption and

27  assignment of the applicable Designated Contract (other than a Supplemental Limited Sale

28  Objection (as defined below)) or the proposed Cure Amount, if any, such counterparty must file

1    and serve an objection (a "Contract Objection").  All Contract Objections must (i) be in writing, (ii)

2    comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules,

3    (iii) be filed with the Clerk of Court no later than no later than _____, 2020, at ___:00 _.m.

4    (Pacific Standard Time) (the "Sale Objection Deadline"), (iv) be served on the Objection

5    Recipients (as defined below) so as to actually be received on or before the Sale Objection

6    Deadline, except as set forth below, and (v) state with specificity the grounds for such objection,

7    including, without limitation, the fully liquidated cure amount and the legal and factual bases for

8    any unliquidated cure amount that the counterparty believes is required to be paid under

9    Bankruptcy Code sections 365(b)(1)(A) and (B) for the applicable Designated Contract, along with

10   the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting

11   therefrom, and the conditions giving rise thereto.

12        PLEASE TAKE FURTHER NOTICE that the Objection Recipients are: (i) the Trustee,

13   Michael A. McConnell, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX

14   76102, Attn: Michael A. McConnell; (ii) counsel to the Trustee, Danning, Gill, Israel & Krasnoff,

15   LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006, Attn: Eric P.

16   Israel; (iii) Counsel to UBS AG, London and UBS AG, Stamford Branch, O'Melveny & Myers

17   LLP, 400 South Hope Street, 18th Floor, Los Angeles, CA 90071, Attn: Evan M. Jones; (iv)

18   Committee Counsel, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San

19   Francisco, CA 94111-4500, Attn: Maxim Litvak (collectively, the "Objection Recipients").

20        PLEASE TAKE FURTHER NOTICE THAT IF A COUNTERPARTY TO A

21   DESIGNATED CONTRACT FILES A CONTRACT OBJECTION IN A MANNER THAT IS

22   CONSISTENT WITH THE REQUIREMENTS SET FORTH ABOVE, AND THE PARTIES ARE

23   UNABLE TO CONSENSUALLY RESOLVE THE DISPUTE PRIOR TO THE SALE HEARING,

24   THE AMOUNT TO BE PAID OR RESERVED WITH RESPECT TO SUCH OBJECTION WILL

25   BE DETERMINED AT THE SALE HEARING, SUCH LATER HEARING DATE THAT THE

26   TRUSTEE DETERMINES IN HIS DISCRETION, OR SUCH OTHER DATE DETERMINED

27   BY THE COURT.  ALL OTHER OBJECTIONS TO THE PROPOSED ASSUMPTION AND

28

1  ASSIGNMENT OF THE DEBTOR'S RIGHT, TITLE, AND INTEREST IN, TO, AND UNDER

2  THE DESIGNATED CONTRACTS WILL BE HEARD AT THE SALE HEARING.

3      PLEASE TAKE FURTHER NOTICE that any objections solely to the manner in which the

4  Auction was conducted or the identity of the Successful Bidder(s) or Backup Bidder(s) that are not

5  the Stalking Horse Bidder, including Designated Contract counterparty objections based on

6  inadequate assurance of future performance of a Successful Bidder other than the Stalking Horse

7  Bidder on executory contracts or unexpired leases contemplated to be assumed and assigned (each,

8  a "Supplemental Limited Sale Objection") must be filed with the Court no later than one (1) day

9  prior to the commencement of the Sale Hearing (the "Supplemental Limited Sale Objection

10  Deadline"); provided, that if you are receiving this notice less than seven (7) days prior to the Sale

11  Hearing, your deadline to assert a Contract Objection shall be seven (7) days after the later of (i)

12  the date of service of such Assumption Notice and (ii) the Post-Auction Notice.  The identity of the

13  Successful Bidder(s) and Backup Bidder(s) (if any) shall be disclosed in a subsequent notice to be

14  delivered to counterparties to the applicable Designated Contracts following the Auction (the

15  "Post-Auction Notice").

16      PLEASE TAKE FURTHER NOTICE that if the counterparty to a Designated Contract does

17  not timely file and serve a Contract Objection that is consistent with the requirements set forth

18  above by the Contract Objection Deadline (with respect to all objections other than Supplemental

19  Limited Sale Objections) or the Supplemental Limited Sale Objection Deadline (with respect to

20  Supplemental Limited Sale Objections only), (i) such counterparty will be deemed to have

21  consented to the assumption and assignment of the Designated Contract to a Successful Bidder,

22  notwithstanding any anti-alienation provision or other restriction on assumption or assignment in

23  the Designated Contract, and shall be forever barred from asserting any objection with regard to

24  such assumption and assignment, including, without limitation, with respect to adequate assurance

25  of future performance by the Successful Bidder; (ii) any and all defaults under such Designated

26  Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated

27  pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Amounts set

28  forth in the Assumption Notice for such Designated Contract, and such counterparty shall be

forever barred from asserting any objection with regard thereto; (iii) the Cure Amount set forth in the Assumption Notice for such Designated Contract shall be controlling, notwithstanding anything to the contrary in such Designated Contract, or any other related document, and such counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Designated Contract against the Debtor and the estate or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and the Sale Order; and (iv) such counterparty shall be deemed to have consented to the applicable Sale Transaction and to any related relief.

PLEASE TAKE FURTHER NOTICE that although the Trustee has made a good-faith effort to identify the Designated Contracts that might be assumed and assigned in connection with a Sale Transaction to the Stalking Horse Bidder of the Purchased Assets, the Trustee may discover certain contracts inadvertently omitted from the Designated Contract list or Successful Bidder(s) may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with a Sale Transaction.  Accordingly, the Trustee has reserved the right, at any time after the service of this Assumption Notice and before 5:00 p.m. (Pacific Standard Time) on the date that is three (3) business days before the date of the Sale Hearing, to (i) supplement the list of Designated Contracts on this Assumption Notice with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts ultimately selected as the Designated Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Amount associated with any Designated Contract.

PLEASE TAKE FURTHER NOTICE that in the event that the Trustee supplements the list of Designated Contracts or modifies the previously stated Cure Amount for a particular Designated Contract, the Trustee will promptly file and serve a revised Assumption Notice on each counterparty affected.  Such counterparties shall file any Contract Objections with respect to the revised Assumption Notice not later than (a) the Sale Objection Deadline, in the event that such revised Assumption Notice was filed and served at least ten (10) days prior to the Sale Objection Deadline, (b) two (2) days prior to the Sale Hearing in the event that such revised Assumption

1  Notice was filed and served at least seven (7) days prior to the commencement of the Sale Hearing,

2  and (c) seven (7) days from the date such revised Assumption Notice was filed and served, in the

3  event that such revised Assumption Notice was filed and served less than seven (7) days prior to

4  the commencement of the Sale Hearing.

5      PLEASE TAKE FURTHER NOTICE that this Assumption Notice is subject to the terms

6  and conditions of the Motion and the Bidding Procedures Order, with such Bidding Procedures

7  Order controlling in the event of any conflict, and the Trustee encourages parties in interest to

8  review such documents in their entirety.  Parties with questions regarding the Assumption and

9  Assignment Procedures contained herein should contact the Trustee's counsel at Danning, Gill,

10  Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, California 90067-6006,

11  Attn: Eric P. Israel.

12      PLEASE TAKE FURTHER NOTICE that the inclusion of a Designated Contract on this

13  Assumption Notice (or a revised Assumption Notice) will not obligate the Trustee to assume any

14  Designated Contract listed thereon or the Successful Bidder(s) to take assignment of such

15  Designated Contract and, as set forth above, the Trustee reserves the right to modify the list of

16  Designated Contracts in accordance with the Bidding Procedures Order, including to remove

17  executory contracts or unexpired leases from such list.  Only those Designated Contracts that are

18  included on a schedule of assumed and assigned executory contracts and unexpired leases attached

19  to the final Purchase Agreement with the Successful Bidder(s) will be assumed and assigned to the

20  Successful Bidder(s), and the Trustee's assumption and assignment of a Designated Contract is

21  subject to approval by the Court and consummation of the Sale Transaction(s).  Absent

22  consummation of the Sale Transaction(s) and entry of a Sale Order approving the assumption and

23

24

25

26

27

28

1606406.1  26932

8

1  assignment of a Designated Contract, such contract will be deemed neither assumed nor assigned,

2  and will in all respects be subject to subsequent assumption or rejection by the Trustee.

3

4  DATED:  August ___, 2020                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

5

6                                              By: _____

7                                                  ERIC P. ISRAEL
                                                   Attorneys for Michael A. McConnell,
8                                                  Chapter 11 Trustee

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4

1  ERIC P. ISRAEL (State Bar No. 132426)
   *eisrael@DanningGill.com*
2  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@DanningGill.com*
3  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
4  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
5  Facsimile: (310) 277-5735

6  Attorneys for Michael A. McConnell,
   Chapter 11 Trustee

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                           **NORTHERN DIVISION**

11

12  In re                                   Case No. 9:19-bk-11573-MB

13  HVI CAT CANYON, INC.,                    Chapter 11

14            Debtor.                        **NOTICE OF SUCCESSFUL [AND
                                             BACKUP] BIDDER**
15                                           **WITH RESPECT TO THE AUCTION OF
                                             THE DEBTOR'S ASSETS**
16

17

18  _____

19          PLEASE TAKE NOTICE that on _____, 2020, Michael A. McConnell, the Chapter 11

20  trustee (the "Trustee") for the estate of HVI Cat Canyon, Inc. (the "Debtor"), filed a *Notice of*

21  *Motion and Motion for Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially*

22  *all of the Estate's Assets, (B) Approving Procedures for Assumption and Assignment of Certain*

23  *Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C)*

24  *Authorizing and Approving the Selection of a Stalking Horse Bidder, (D) Approving Expense*

25  *Reimbursement, (E) Scheduling (i) an Auction and (ii) a Sale Hearing, (F) Approving the Form*

26  *and Manner of all Procedures, Protections, Schedules, and Agreements, and (G) Granting Related*

27  *Relief; and (II)(A) Approving Sale Of Substantially All Of the Estate's Assets, (B) Authorizing the*

28

1606410.1  26932

                                             EXHIBIT 4
                                                                            137

1  *Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C)*

2  *Granting Related Relief (docket no. _____)* (the "Motion"), seeking:

3      (1) entry of an order (the "Bidding Procedures Order") (a) authorizing and approving

4  certain proposed bidding and sale procedures, substantially in the form attached to the Bidding

5  Procedures Order (the "Bidding Procedures"), in connection with one or more transactions (each, a

6  "Sale Transaction") involving the sale ("Sale") of all or a portion of the Debtor's assets (the

7  "Assets"), (b) authorizing and approving certain proposed assumption and assignment procedures

8  in respect of certain executory contracts and unexpired leases (collectively, the "Designated

9  Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), (c)

10  authorizing and approving the selection of Team Maria Joaquin, L.L.C. and Maria Joaquin Basin,

11  L.L.C. as the stalking horse bidders (collectively the "Stalking Horse Bidder"), (d) approving an

12  expense reimbursement to the Stalking Horse Bidder, (e) scheduling dates for (i) one or more

13  auctions (the "Auction"), including the assets under contract to the Stalking Horse Bidder as may

14  be necessary (the "Purchased Assets"), and an auction or auctions of additional estate assets not

15  under contract to the Stalking Horse Bidder, including but not limited to the REDU Assets (as

16  defined below) and (ii) a hearing (the "Sale Hearing") to consider final approval of the Sale, (f)

17  approving the form and manner of notice of any Auction and the Sale Hearing, and all procedures,

18  protections, notices, and agreements related thereto, and (g) granting related relief; and

19      (2) following the Sale Hearing, an order or orders (the "Sale Order") to be filed in advance

20  of the Sale Hearing, (a) approving the Sale(s) to the Successful Bidder(s) for the Assets (as defined

21  in the Bidding Procedures), including for the purchase of assets not under contract to the Stalking

22  Horse Bidder including the assets associated with the REDU operations in Orange County (the

23  "REDU Assets") or, if the Successful Bidder(s) fails to consummate the Sale, to the Backup

24  Bidder(s) (as defined in the Bidding Procedures)), which Sale(s) shall be free and clear of all liens,

25  claims, encumbrances, other than Permitted Encumbrances and Assumed Obligations (as each is

26  defined in the asset purchase agreement entered into between the Trustee and the Stalking Horse

27  Bidder (the "APA"), a copy of which is attached to the Motion as Exhibit 5, and other interests, (b)

28  authorizing the assumption and assignment of the Designated Contracts which the Successful

1   Bidder(s) (or, should the Successful Bidder fail to consummate the Sale, the Backup Bidder) has

2   selected or will select to be assumed and assigned (collectively, the "Selected Designated

3   Contracts"), and (c) granting related relief.[1]

4        PLEASE TAKE FURTHER NOTICE that, on _____ 2020, the Court entered the

5   Bidding Procedures Order *(docket no. _____).*

6        PLEASE TAKE FURTHER NOTICE that on _____, 2020 at 2__:00 _.m. (Pacific

7   Standard Time), pursuant to the Bidding Procedures Order, the Trustee conducted the Auction with

8   respect to the Purchased Assets.  [PLEASE TAKE FURTHER NOTICE that on _____, 2020 at

9   2__:00 _.m. (Pacific Standard Time), pursuant to the Bidding Procedures Order, the Trustee

10   conducted a separate auction with respect to the REDU Assets.]  [PLEASE TAKE FURTHER

11   NOTICE that, as of _____, 2020 at 5:00 p.m. (Pacific Standard Time), the deadline for receipt of

12   Bids by the Bid Notice Parties under the provisions of the Bidding Procedures, the Trustee had not

13   received any Qualified Bids aside from the Stalking Horse Bid, and the Stalking Horse Bidder has

14   therefore been deemed the Successful Bidder in accordance with the Bidding Procedures.]

15        PLEASE TAKE FURTHER NOTICE that, at the conclusion of the Auction, the Trustee, in

16   consultation with its professionals and the Consultation Parties, selected _____ as the

17   Successful Bidder(s) [and _____ as the Backup Bidder(s)] with respect to the Purchased

18   Assets. [and _____ as the Successful Bidder(s) [and _____ as the Backup Bidder(s)]

19   with respect to the REDU Assets.]

20        PLEASE TAKE FURTHER NOTICE that the Sale Hearing to consider approval of a Sale

21   Transaction(s) and the transfer of the Assets free and clear of all liens, claims, interests, and

22   encumbrances in accordance with Bankruptcy Code section 363(f) will take place on _____, 2020,

23   at ___:00 p.m., Pacific Standard Time, before the Honorable Martin R. Barash, Courtroom 201,

24   1415 State Street, Santa Barbara, California.  The hearing will be conducted remotely, using

25   ZoomGov video and audio.  The Zoom connection information will be set forth on the Court's

26

27   _____
     [1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the

28   Motion and Bidding Procedures Order, as applicable.

1  tentative rulings and posted calendar for the date of the Sale Hearing.  The Sale Hearing may be

2  adjourned from time to time without further notice to creditors or other parties in interest other than

3  by announcement of the adjournment in open court or by notice filed on the docket in the Cases.

4  　　　　PLEASE TAKE FURTHER NOTICE that any objections (a) to the manner in which the

5  Auction was conducted, (b) the identity of the Successful Bidder(s) or Backup Bidder(s) that are

6  not the Stalking Horse Bidder, including Designated Contract counterparty objections based on

7  inadequate assurance of future performance by a Successful Bidder other than the Stalking Horse

8  Bidder on executory contracts and unexpired leases contemplated to be assumed and assigned to

9  the Successful Bidder [or Backup Bidder] must be filed with the Court no later than one (1) day

10  prior to the commencement of the Sale Hearing; provided, that any contract counterparty that did

11  not receive an Assumption Notice or received a revised Assumption Notice within seven (7) days

12  prior to the Sale Hearing shall have until 5:00 p.m. (Pacific Standard Time) on the date that is

13  seven (7) days after the later of the date of service of this notice and service of the Assumption

14  Notice to file a Contract Objection.  Attached as Exhibit 1 to a notice previously filed with the

15  Court *(docket no. _____)* was a list of the contracts and leases proposed to be assumed and

16  assigned to the Successful Bidder and/or Backup Bidder (the "Designated Contracts List").

17  　　　　PLEASE TAKE FURTHER NOTICE that, at the Sale Hearing, the Trustee will seek Court

18  approval of the Successful Bid [and the Backup Bid] for the Purchased Assets [and Successful

19  REDU Bidder(s) [and the Backup Bid] for the REDU Assets], and the assumption and assignment

20  of the Designated Contracts to the Successful Bidder [and/or Backup Bidder (as applicable)].

21  Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters

22  relating to the Sale Transaction(s) and there will be no further bidding at the Sale Hearing.  [In the

23  event that the Successful Bidder cannot or refuses to consummate the Sale Transaction(s) because

24  of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the

25  new Successful Bidder and the Trustee shall be authorized, but not required, to close with the

26  Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.]

27

28

1606410.1  26932

4

1       PLEASE TAKE FURTHER NOTICE that this Notice is subject to the terms and conditions

2  of the Motion, the Bidding Procedures and the Bidding Procedures Order, with such Bidding

3  Procedures Order controlling in the event of any conflict, and the Trustee encourages parties in

4  interest to review such documents in their entirety.  Parties with questions regarding this Notice

5  should contact the Trustee's counsel at Danning, Gill, Israel & Krasnoff, LLP, 1901 Avenue of the

6  Stars, Suite 450, Los Angeles, California 90067-6006, Attn: Eric P. Israel.

7

8  DATED:  August ___, 2020          DANNING, GILL, ISRAEL & KRASNOFF, LLP

9

10                By:  _____

11                     ERIC P. ISRAEL
                      Attorneys for Michael A. McConnell,

12                     Chapter 11 Trustee

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 5

*Execution Version*

# PURCHASE AND SALE AGREEMENT

By and Between

## MICHAEL A. MCCONNELL, CHAPTER 11 TRUSTEE FOR

## HVI CAT CANYON, INC.

as **SELLER**

and

## TEAM MARIA JOAQUIN, L.L.C. AND MARIA JOAQUIN BASIN, L.L.C.

as **BUYER**

**August 18, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND CONSTRUCTION ................................................................1

    **1.01** *Defined Terms* ................................................................ 1
    **1.02** *Other Definitional Provisions and Construction.* ................................................. 9

ARTICLE II ASSET ACQUISITION ................................................................10

    **2.01** *Asset Acquisition* ................................................................ 10
    **2.02** *Excluded Assets* ................................................................ 13
    **2.03** *Revenues and Expenses* ................................................................ 14
    **2.04** *Assigned Contracts; Cure Costs.* ................................................................ 14
    **2.05** *Joint and Several Liability* ................................................................ 16

ARTICLE III PURCHASE PRICE ................................................................16

    **3.01** *Purchase Price* ................................................................ 16
    **3.02** *Deposit* ................................................................ 17
    **3.03** *Production Payment* ................................................................ 17
    **3.04** *Accounting for Production Payment* ................................................................ 19
    **3.05** *Seller's Right to Join in Sales* ................................................................ 19
    **3.06** *"As is" and "Where is" Sale* ................................................................ 20
    **3.07** *No Contingencies* ................................................................ 20
    **3.08** *Adjustment to Purchase Price* ................................................................ 20
    **3.09** *Purchase Price Tax Allocation* ................................................................ 21

ARTICLE IV TITLE MATTERS; ENVIRONMENTAL MATTERS ................................................22

    **4.01** *NORM* ................................................................ 22
    **4.02** *Title Matters* ................................................................ 22
    **4.03** *Environmental Matters* ................................................................ 22
    **4.04** *Diligence Termination* ................................................................ 23

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER ................................................23

    **5.01** *Existence* ................................................................ 23
    **5.02** *Legal Power* ................................................................ 23
    **5.03** *Execution* ................................................................ 23
    **5.04** *Brokers* ................................................................ 23
    **5.05** *Litigation* ................................................................ 24
    **5.06** *Leases* ................................................................ 24
    **5.07** *Applicable Contracts* ................................................................ 24
    **5.08** *Permits* ................................................................ 24
    **5.09** *Wells* ................................................................ 24
    **5.10** *Environmental Matters* ................................................................ 24
    **5.11** *Limitation on Representations* ................................................................ 24

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ................................................24

    **6.01** *Existence* ................................................................ 24

**6.02**  *Legal Power* ............................................................................................................ 25
**6.03**  *Execution* ................................................................................................................... 25
**6.04**  *Brokers* ...................................................................................................................... 25
**6.05**  *Investment* ................................................................................................................. 25
**6.06**  *Qualification* ............................................................................................................ 25
**6.07**  *Adequate Assurances* .............................................................................................. 25
**6.08**  *Adequate Assurances Regarding Assigned Contracts* ........................................ 26
**6.09**  *Financial Capability* ............................................................................................... 26
**6.10**  *Reliance* ..................................................................................................................... 26

ARTICLE VII CERTAIN AGREEMENTS OF THE PARTIES ............................................. 26

**7.01**  *Operation of Assets* .................................................................................................. 26
**7.02**  *Preferential Rights to Purchase* ............................................................................ 26
**7.03**  *Breach Notice* ........................................................................................................... 26
**7.04**  *Preservation of Records* .......................................................................................... 27
**7.05**  *Transition of Certain Accounting Matters* ........................................................... 27
**7.06**  *Casualty Loss* ........................................................................................................... 27
**7.07**  *Consents in Favor of Royalty Claimants* .............................................................. 28

ARTICLE VIII BANKRUPTCY COURT APPROVAL ....................................................... 28

**8.01**  *Bankruptcy Court Approval* ................................................................................... 28

ARTICLE IX CONDITIONS TO CLOSING ........................................................................ 29

**9.01**  *Conditions to Obligations of Seller* ...................................................................... 29
**9.02**  *Conditions to Obligations of Buyer* ...................................................................... 29

ARTICLE X CLOSING ........................................................................................................ 30

**10.01**  *Closing* .................................................................................................................... 30
**10.02**  *Actions To Be Taken At Closing* ........................................................................... 31
**10.03**  *Payments* ................................................................................................................. 31

ARTICLE XI LIMITATION AND SURVIVAL .................................................................... 32

**11.01**  *Limitation and Survival of Warranties* ............................................................... 32
**11.02**  *Buyer's Assumption* ............................................................................................... 32

ARTICLE XII TERMINATION ............................................................................................ 33

**12.01**  *Right of Termination* ............................................................................................. 33
**12.02**  *Buyer's Failure to Close* ....................................................................................... 33
**12.03**  *Effect of Termination* ............................................................................................ 33
**12.04**  *Expense Reimbursement* ....................................................................................... 34
**12.05**  *Backup Buyer* ......................................................................................................... 34
**12.06**  *Default by Seller.* ................................................................................................... 35
**12.07**  *Default by Buyer.* ................................................................................................... 35

ARTICLE XIII TAXES .......................................................................................................... 36

**13.01**  *Sales Taxes, Filing Fees, Etc* ................................................................................ 36
**13.02**  *Other Taxes* ............................................................................................................ 36

ARTICLE XIV MISCELLANEOUS ..................................................................................36

    **14.01**   *Disclaimers*.............................................................................................. 36
    **14.02**   *Final Settlement Statement*.................................................................... 38
    **14.03**   *Survival*.................................................................................................. 38
    **14.04**   *Assignability*......................................................................................... 38
    **14.05**   *Seller's Disclaimers*.............................................................................. 38
    **14.06**   *Dispute Resolution* ............................................................................... 38
    **14.07**   *Notices* .................................................................................................. 39
    **14.08**   *Governing Law* ..................................................................................... 40
    **14.09**   *Waiver of Jury Trial*............................................................................. 40
    **14.10**   *No Admissions* ...................................................................................... 40
    **14.11**   *Entire Agreement; Amendments and Waivers*....................................... 40
    **14.12**   *Successors; Third Party Beneficiaries* ................................................. 41
    **14.13**   *Severability* .......................................................................................... 41
    **14.14**   *Further Assurances* .............................................................................. 41
    **14.15**   *Waiver of Consequential Damages* ....................................................... 41
    **14.16**   *Time of the Essence* .............................................................................. 41
    **14.17**   *Multiple Counterparts*.......................................................................... 41
    **14.18**   *Renewals and Extensions and New Leases*............................................ 41

**EXHIBITS:**

| | |
|---|---|
| **Exhibit A** | **Leases** |
| **Exhibit A-1** | **Wells** |
| **Exhibit A-2** | **Sale Area** |
| **Exhibit A-3** | **Miscellaneous Surface Instruments** |
| **Exhibit B** | **Applicable Contracts** |
| **Exhibit C** | **Excluded Assets** |
| **Exhibit D** | **Form of Schedule of Assigned Contracts to be Assumed** |
| **Exhibit E** | **Form of Quitclaim Deed, Assignment and Bill of Sale** |
| **Exhibit F** | **Form of Production Payment Conveyance** |
| **Exhibit G** | **Form of Appeals Escrow Agreement** |
| **Exhibit H** | **Form of Oil Sales Agreement** |
| **Exhibit I** | **Form of Deed of Trust** |

**SCHEDULES:**

| | |
|---|---|
| **Schedule 2.02(r)** | **Insurance Policies** |
| **Schedule 2.04** | **Cure Costs** |
| **Schedule 5.05** | **Litigation** |
| **Schedule 5.08** | **Permits** |
| **Schedule 5.10** | **Environmental Matters** |

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "*Agreement*") is made and entered into on August 18, 2020 (the "*Execution Date*"), by and between Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation ("*Seller*"), the debtor (the "*Debtor*") in Bankruptcy Case No. 9:19-bk-11573-MB (the "*Bankruptcy Case*") in the U.S. Bankruptcy Court for the Central District of California, Santa Barbara Division (the "*Bankruptcy Court*"), and Team Maria Joaquin, L.L.C., a Delaware limited liability corporation, and Maria Joaquin Basin, L.LC., a Delaware limited liability corporation (collectively, "*Buyer*").  Seller and Buyer are sometimes referred to herein collectively as the "*Parties*" and individually as a "*Party*."

## RECITALS

On July 25, 2019 (the "*Bankruptcy Filing Date*"), the Debtor filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

On August 9, 2019, the United States Trustee for the Southern District of New York appointed an Official Committee of Unsecured Creditors.

On August 28, 2019, the Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas, and on September 12, 2019, the Bankruptcy Case was transferred to the Bankruptcy Court.

On October 16, 2019, the Bankruptcy Court entered that certain Order directing the United States Trustee for the Central District of California to appoint a Chapter 11 Trustee.  On October 21, 2019, the Bankruptcy Court approved the appointment of Michael A. McConnell as the Chapter 11 Trustee (in such capacity, the "*Trustee*").

Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Assets (as hereinafter defined), less and except the Excluded Assets (as hereinafter defined), pursuant to Section 363(f) of the Bankruptcy Code and the terms of this Agreement, but only upon the approval of the Bankruptcy Court.

NOW, THEREFORE, for and in consideration of the premises and of the mutual agreements, provisions and covenants herein contained, and the mutual benefits to be derived therefrom, the Parties do hereby covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION

**1.01    *Defined Terms***.  Each capitalized term used herein shall have the meaning ascribed to them in this Article I unless such terms are defined elsewhere in this Agreement.

"*Affiliate*" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"*Agreement*" shall have the meaning set forth in the introduction to this Agreement.

"*Allocated Value*" means, for each Lease, the amount set forth for such Lease in the Allocated Value Letter.

"*Allocated Value Letter*" shall have the meaning set forth in Section 3.08(b)(3).

"*Alternative Transaction*" means the closing of a transaction or series of related transactions (whether by asset sale, equity purchase, plan of reorganization, merger or otherwise) pursuant to which Seller transfers or vests ownership of, economic rights to, or benefits in all or any portion of the Assets to a Third Party, other than ordinary course sales of Hydrocarbons or equipment.

"*Appeals Escrow*" shall have the meaning set forth in Section 9.02(f).

"*Appeals Escrow Agreement*" shall have the meaning set forth in Section 9.02(f).

"*Applicable Contracts*" means all Contracts and Leases, if any, to which Seller is a party that relate to the Assets, including Contracts to the extent they are used by Seller in the operation or development of the Assets, or any other Contracts by which the Assets are bound and that, subject to the other provisions of this Agreement, will be binding on Buyer after the Closing, including purchase and sale agreements; farmin and farmout agreements; bottomhole agreements; crude oil, condensate, and natural gas purchase and sale, gathering, transportation and marketing agreements; Hydrocarbon storage agreements; acreage contribution agreements; area of mutual interest agreements, operating agreements and balancing agreements; pooling declarations or agreements; unitization agreements; processing agreements; surface use agreements; crossing agreements; water supply agreements; saltwater disposal agreements or other waste disposal agreements; facilities or equipment leases; letters of objection; letter agreements; and other similar contracts and agreements held by Seller, in each case, to the extent related to Seller's right, title and interest in the Assets.

"*Assets*" shall have the meaning set forth in Section 2.01.

"*Assigned Contracts*" shall have the meaning set forth in Section 2.01(g).

"*Assignment*" means the Deed, Assignment and Bill of Sale from Seller to Buyer, pertaining to the Assets, substantially in the form attached to this Agreement as Exhibit E.

"*Assumed Obligations*" shall have the meaning set forth in Section 11.02(a).

"*Assumed Real Property Taxes*" shall have the meaning set forth in Section 3.01(b).

"*Auction*" shall have the meaning set forth in the Bidding Procedures.

"*Bankruptcy Case*" shall have the meaning set forth in the introduction to this Agreement.

"*Bankruptcy Code*" shall mean title 11 of the United States Code.

"*Bankruptcy Court*" shall have the meaning set forth in the introduction to this Agreement.

"*Bankruptcy Filing Date*" shall have the meaning set forth in the recitals to this Agreement.

"*Bid Procedures*" shall mean procedures reasonably acceptable to Buyer governing the bid process and submitted to the Bankruptcy Court for approval under the Bidding Procedures Order.

"*Bidding Procedures Order*" shall mean an Order entered by the Bankruptcy Court reasonably acceptable to the Buyer approving the Bid Procedures and Expense Reimbursement.

"*Breach Notice*" shall have the meaning set forth in Section 7.03(a).

"*Business Days*" shall mean any day other than a Saturday, a Sunday, or a day on which banks are closed for business in Los Angeles, California, United States of America.

"*Buyer*" shall have the meaning set forth in the introduction to this Agreement.

"*Cash Payment*" shall have the meaning set forth in Section 3.01(a).

"*Closing*" shall have the meaning set forth in Section 10.01.

"*Closing Date*" shall have the meaning set forth in Section 10.01.

"*Contract*" means any contract or agreement, but excluding, however, any Lease, easement, right-of-way, Permit or other instrument creating or evidencing any oil and gas mineral interests or other real property interests.

"*Contract Notice*" shall have the meaning set forth in Section 2.04(d).

"*Cure Costs*" shall have the meaning set forth in Section 2.04(a).

"*Debtor*" shall have the meaning set forth in the introduction to this Agreement.

"*Deed of Trust*" shall have the meaning set forth in Section 3.03.

"*Deposit*" shall have the meaning set forth in Section 3.02.

"*Designation Deadline*" shall mean 5:00 p.m. (Central Time) on the date that is three (3) Business Days prior to the date of the Auction.

"*Effective Time*" shall mean 12:00 a.m. Pacific Time on August 1, 2020.

"*Environmental Assessment*" shall mean an on-site inspection of the Assets together with review of pertinent records in the possession of Seller relating to the Environmental Condition of the Assets.

"*Environmental Assessment Information*" shall have the meaning set forth in Section 4.03.

"*Environmental Condition*" means a condition that causes an Asset (or Seller with respect to an Asset) not to be in compliance with, subject to liability under or require Remediation under, any Environmental Law.

"*Environmental Disclosures*" shall mean:  (a) any noncompliance of the Assets, or Seller with respect to the Assets, with Environmental Law; (b) any written notice from any Governmental Authority or other third party, or to Seller's Knowledge, any such notice that is threatened of (i) noncompliance or alleged noncompliance under Environmental Law or (ii) an Environmental Liability, in each case concerning any Asset, that has not been fully Remediated or resolved to the satisfaction of all Governmental Authorities exercising jurisdiction over the matter; (c) whether asserted, pending, or, to Seller's Knowledge, threatened, any claims, orders, administrative proceedings, or judgments that cause any of the Assets to be subject to restrictions or ongoing obligations under Environmental Laws; (d) to Seller's Knowledge, any releases of Hazardous Materials or any facts, circumstances, or events relating to the Assets in connection with the ownership or operation of the Assets that could reasonably be expected to give rise to a material Remediation obligation or other material Environmental Liability; (e) any notice or directive, written or oral, whether asserted, pending, or, to Seller's Knowledge, threatened, received by Seller from any Governmental Authority to reduce the volume of fluids injected or disposed of into any saltwater disposal wells that are included in the Assets or to shut in any such saltwater disposal wells.

"*Environmental Laws*" means all laws and regulations of any Governmental Authority having jurisdiction over the Assets in question addressing pollution, protection of the environment and human health or of natural resources, or occupational health and safety, and all amendments to such laws and all regulations implementing any of the foregoing.  "*Environmental Laws*" shall not include laws and regulations arising in response to the COVID-19 pandemic.

"*Environmental Liabilities*" means all obligations, duties, losses, liabilities, claims, fines, expenses, damages, costs (including any remediation or clean-up costs) or penalties created by, related to, or arising out of any Environmental Law or Assigned Contracts, together with any attorneys' or arbitrators' fees and all other related legal fees and costs in connection with any of the foregoing.

"*Escrow Agent*" shall have the meaning set forth in Section 9.02(f).

"*Examination Period*" shall have the meaning set forth in Section 4.02.

"*Excluded Assets*" shall have the meaning set forth in Section 2.02.

"*Excluded Inventory*" shall have the meaning set forth in Section 2.01(k)

"*Excluded Contracts*" shall have the meaning set forth in Section 2.02(k).

"*Execution Date*" shall have the meaning set forth in the introduction to this Agreement.

"*Expense Reimbursement*" has the meaning set forth in Section 12.04.

"*Final Settlement Date*" shall have the meaning set forth in Section 14.02.

"*Final Settlement Statement*" shall have the meaning set forth in Section 14.02.

"*Free and Clear*" means free and clear of any and all liens, claims, encumbrances, and interests in property under Section 363(f) of the Bankruptcy Code except for Permitted Encumbrances and Assumed Obligations.

"*GAAP*" shall mean generally accepted accounting principles as in effect in the United States of America from time to time.

"*General Liabilities*" means all obligations, duties, losses, liabilities, claims, fines, expenses, damages, costs or penalties created by, related to, or arising out of ownership or operation of the Assets, the Assigned Contracts, or any Legal Requirements, excluding Environmental Liabilities, together with any attorneys' or arbitrators' fees and all other related legal fees and costs in connection with any of the foregoing.

"*Governmental Approvals*" shall mean any approvals of any Governmental Authority required in connection with the transactions contemplated by this Agreement, but excluding consents and approvals from Governmental Authorities that are customarily obtained after closing in connection with a sale of assets similar to the Assets.

"*Governmental Authority*" shall mean any governmental, quasi-governmental, state, county, city or other political subdivision of the United States, or any agency, court or instrumentality, or statutory or regulatory body thereof, including the California Department of Conservation's Geologic Energy Management Division, and/or the Federal Regulatory Commission.

"*Grewal Entities*" includes Randeep Grewal, California Asphalt Production, Inc., GIT, Inc., GTL1, LLC, GLR, LLC, GRL, LLC, GSR, LLC, any Person in which Randeep Grewal owns, directly or indirectly, an interest equal or to greater than ten percent (10%), any Insider of the Debtor and any Affiliate of the Debtor, and any Affiliate of any of the foregoing.

"*Grewal ORRIs*" means all overriding royalty interests and production payments with respect to the Assets owned by Grewal Entities.

"*Hazardous Material*" means any substance regulated or that may form the basis of liability under any Environmental Law, including but not limited to any substance defined or regulated as "*hazardous,*" "*toxic,*" a "*pollutant,*" a "*contaminant,*" a "*waste,*" or words of similar meaning and regulatory effect, including but not limited to Hydrocarbons, oil and gas exploration and production waste, and NORM.

"*Hydrocarbons*" means oil, gas and other hydrocarbons (including casinghead gas and condensate) produced or processed in association therewith (whether or not such item is in liquid or gaseous form), including all crude oils, condensates and natural gas liquids at atmospheric pressure and all gaseous hydrocarbons (including wet gas, dry gas and residue gas) or any combination thereof, and sulphur, carbon dioxide and any other minerals extracted from, attributable to or produced in association therewith.

"*Insider*" shall have the meaning in Section 101(31) of the Bankruptcy Code.

"*Knowledge*" shall mean the actual knowledge of Michael A. McConnell, without any requirement of inquiry or investigation.

"*Leases*" shall have the meaning set forth in Section 2.01(a).

"*Legal Requirements*" shall mean all applicable federal, tribal, state and local laws (statutory, judicial or otherwise), judgments, decrees, orders, statutes, ordinances, rules and regulations in effect from time to time.

"*Losses*" shall mean all claims, causes of action, demands, lawsuits, suits, losses, costs, damages, liabilities and expenses of every type, including attorneys' fees and expenses and Environmental Liabilities.

"*Material Adverse Effect*" shall mean a material adverse effect on the Assets or the prospects or value thereof, in each case taken as a whole, excluding matters (such as, without limitation, decreases in the prices received for natural gas, natural gas liquids, crude oil, condensate or other natural resources) that (A) are general, regional, industry-wide or economy-wide developments, conditions, political events, diseases, and pandemics (and, in each case, any escalations thereof or related or resulting events and conditions), (B) result from the pendency of the Bankruptcy Case, (C) result from any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any order of the Bankruptcy Court or this Agreement, or (D) result from the public disclosure of this Agreement or any of the transactions contemplated in this Agreement.

"*Monthly Average*" shall have the meaning set forth in Section 3.03(a).

"*Net Revenue Interest*" with respect to any Property, the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such Property, after giving effect to all royalties, production payments and other burdens upon, measurable by or payable out of production therefrom.

"*NORM*" means naturally occurring radioactive material.

"*Oil Sales Agreement*" shall have the meaning set forth in Section 3.03.

"*Operating Expenses*" shall have the meaning set forth in Section 2.03.

"*Operations Wells*" shall have the meaning set forth in Section 2.01(c).

"*Owned Real Property*" shall have the meaning set forth in Section 2.01(b).

"*Party*" or "*Parties*" shall have the meaning set forth in the introduction to this Agreement.

"*Permit*" shall have the meaning set forth in Section 2.01(e).

"*Permitted Encumbrances*" means with respect to any Asset any and all of the following:

(a)        required notices to and filings with a Governmental Authority in connection with the consummation of the transaction contemplated by this Agreement;

(b)        rights reserved to or vested in a Governmental Authority having jurisdiction to control or regulate such Asset in any manner whatsoever and all Legal Requirements of such Governmental Authorities;

(c)        the terms and conditions of all Assigned Contracts;

(d)        easements, rights-of-way, permits, licenses, servitudes, surface leases, sub-surface leases, grazing rights, logging rights, ponds, lakes, waterways, canals, ditches, reservoirs, equipment, pipelines, utility lines, railways, streets, roads and structures on, over or through such Asset that do not materially affect or impair the ownership, use or operation of such Asset;

(e)        the Assumed Real Property Taxes, all liens securing such Assumed Real Property Taxes, and all other taxes not yet delinquent;

(f)        any obligations or duties affecting such Asset to any municipality or public authority with respect to any franchise, grant, license or permit of record;

(g)        the terms and conditions of the instruments creating such Asset and all royalties, overriding royalties, carried interests, production payments, reversionary interests and other burdens on or deductions from the proceeds of production created or in existence as of the Effective Time (in each case) that do not operate to reduce the Net Revenue Interest for such Asset (if any) set forth on Exhibit A or increase the Working Interest for such Asset (if any) set forth on Exhibit A without a corresponding increase in the corresponding Net Revenue Interest;

(h)        All matters of record that do not constitute Title Defects;

(i)        Title Defects (i) that Buyer waives in writing, (ii) as to which the relevant statute(s) of limitations or prescription would bar any attack or claim against Seller's title, or (iii) resulting from the lack of a survey, unless a survey is expressly required by applicable Legal Requirements;

(j)        materialman's, mechanic's, oil and gas, repairman's, employee's, contractor's, operator's, and other similar liens or encumbrances arising in the ordinary course of business for payments not yet delinquent that are inchoate and have not been perfected pursuant to law or that are contained in joint operating agreements or similar agreements covering the Assets; and

(k)        the Grewal ORRIs.

"*Person*" shall mean any natural person, firm, partnership, association, corporation, limited liability company, company, trust, entity, public body or government.

"*Preferential Purchase Right*" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"*Preliminary Settlement Statement*" shall have the meaning set forth in Section 10.02(f).

"*Production Payment*" shall have the meaning set forth in Section 3.01(a).

"*Production Payment Conveyance*" means the conveyance from Seller to Buyer, pertaining to the Production Payment, substantially in the form attached to this Agreement as Exhibit F.

"*Production Payment Primary Sum*" shall have the meaning set forth in Section 3.03(a).

"*Property*" or "*Properties*" shall have the meaning set forth in Section 2.01(c).

"*Purchase Price*" shall have the meaning set forth in Section 3.01(a).

"*Qualifying Bid*" shall have the meaning set forth in the Bidding Procedures.

"*Qualified Buyers*" shall have the meaning set forth in the Bidding Procedures.

"*Records*" shall have the meaning set forth in Section 2.01(j).

"*Remediation*" means, with respect to any Environmental Condition, the implementation and completion of any remedial, removal, response, construction, permitting, closure, disposal or other corrective actions required under Environmental Laws to correct or remove such Environmental Condition.

"*Retained Proceeds*" shall have the meaning set forth in Section 2.02(n).

"*Sale*" shall have the meaning set forth in Section 8.01(a).

"*Sale Area*" means the lands described in Exhibit A-2.

"*Sale Motion*" means the motion or motions in form and substance reasonably satisfactory to Buyer, filed by Seller pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code seeking entry of the Bidding Procedures Order and the Sale Order and approval of the transactions contemplated by this Agreement.

"*Sale Order*" shall mean an Order of the Bankruptcy Court, in form and substance approved by Buyer, in its reasonable discretion, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Assets to Buyer on the terms and conditions set forth herein, Free and Clear (expect for Permitted Encumbrances and the Assumed Obligations), and containing or supported by findings that (i) notice of the hearing concerning approval of this Agreement and of the transactions contemplated hereby was given in accordance with the Bankruptcy Code, and constitutes such notice as is appropriate under the particular circumstances, and (ii) Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to the protections afforded by Section 363(m) of the Bankruptcy Code. A copy of the proposed sale order shall be delivered to Buyer as soon as reasonably possible, but in no event later than seventeen (17) calendar days prior to the hearing on the Sale Motion, and the Sale Order is to be filed by Seller with the Bankruptcy Court no later than ten (10) days prior to the hearing on the Sale Motion.

"*Securities Act*" shall mean the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder.

"*Seller*" shall have the meaning set forth in the introduction to this Agreement.

"*Sold Production Payment*" shall have the meaning set forth in Section 3.05.

"*Subject Interests*" shall have the meaning set forth in Section 3.05(b).

"*Tax Allocation*" shall have the meaning set forth in Section 3.10.

"*Third Party*" means any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"*Title Defect*" shall mean, subject to the Permitted Encumbrances, that the Seller has materially less than the quantum of interest listed on Exhibit A to a particular Property.

"*Total Cure Costs*" shall mean any and all costs or expenses that are required to be paid under Sections 365(b)(1)(A), and 365(b)(1)(B) of the Bankruptcy Code, as applicable, to cure any defaults under the Assigned Contracts in connection with the assumption and assignment of such Assigned Contracts.

"*Transferee*" shall have the meaning set forth in Section 3.03(f).

"*Trustee*" shall have the meaning set forth in the recitals to this Agreement.

"*Units*" shall have the meaning set forth in Section 2.01(a).

"*Wells*" shall have the meaning set forth in Section 2.01(c).

"*Working Interest*" shall mean with respect to any Property, the interest in such Property that is burdened with the obligation to bear and pay costs of development and operations in connection with such Property, but without regard to the effect of royalties, overriding royalties, production payments or similar burdens measured or payable out of production therefrom.

**1.02    *Other Definitional Provisions and Construction*.**

(a)    As used herein and in any certificate or document made or delivered pursuant hereto, accounting terms not wholly defined in this Agreement shall have the respective meanings given to them under GAAP as in effect on the date of such certificate or document.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    Unless the context requires otherwise (i) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine and neuter; (ii) references to Articles and Sections refer to Articles and Sections of this Agreement; (iii) references to Exhibits and Schedules refer to the Exhibits and Schedules attached to this Agreement, each of which is

made a part hereof for all purposes; (iv) references to money refer to legal currency of the United States of America; and (v) the word "including" means "including, without limitation".

(d)    The Parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(e)    References to "*days*" herein means calendar days, unless otherwise specified.  In the event the date on which Buyer or Seller is required to take any action under the terms of this Agreement is not a Business Day, the action will be taken on the next succeeding Business Day.  All periods of time referred to herein are calculated by excluding the first day and including the last day, and shall include all calendar days (whether or not Business Days) except for the last day, which must be a Business Day.

## ARTICLE II
## ASSET ACQUISITION

2.01    ***Asset Acquisition***.  At the Closing, and upon the terms and subject to the conditions of this Agreement and approval of the Bankruptcy Court, and for the consideration specified in Section 3.01, the Seller agrees to sell, assign, transfer and convey, and Buyer agrees to purchase, pay for and accept, all of Seller's right, title and interest in and to the following assets (less and except for the Excluded Assets, such interest of Seller in such assets, collectively, the "*Assets*"):

(a)    the Hydrocarbons leases (and all leasehold estates created thereby), subleases and oil and gas fee interests, non-leasehold mineral rights, mineral servitudes, working interests, production payments, executive rights, overriding royalties, mineral interests, non-participating mineral interests, net profits interests, Net Revenue Interests, carried interests, options, rights to Hydrocarbons in place, rights of recoupment, reversionary interests, convertible interests, rights to reassignment, pipeline rights-of-way and other similar rights-of-way and easements, and all other oil and gas interests of any kind or character derived therefrom, whether vested or contingent, whether producing or non-producing, in each case, located within the Sale Area, including all such interests described in Exhibit A (Seller's interest in such leases and other interests, the "*Leases*"), together with all rights, privileges, benefits and powers conferred upon Seller as the holder of the Leases with respect to the use and occupation of the surface of the lands covered thereby, and together with any and all rights, titles and interests of Seller in and to any units or pooling arrangements (including statutory forced pooling orders) wherein all or any part of the Leases are pooled or unitized, including the units and pooling arrangements set forth in Exhibit A (Seller's interest in such units or pools, the "*Units*"), and including all interests of Seller derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease;

(b)    all real property owned by Seller, together with all buildings and improvements located thereon and rights and interests appurtenant thereto (collectively, the "*Owned Real Property*");

(c)      each of the Hydrocarbons wells located on or under the Leases or the Units (whether or not completed), including the wells set forth on Exhibit A-1, whether such wells are producing, idle, shut-in or abandoned (Seller's interest in such wells, the "*Wells*"), and (ii) each of the fresh water wells, injection wells, salt water disposal wells and other wells of every nature and kind located on the Leases or Units (the "*Operations Wells*", and collectively with the Leases, Units, Owned Real Property and Wells, the "*Properties*", and each individually a "*Property*");

(d)      all equipment, gathering systems, pipelines, flow lines, water lines, machinery, fixtures, improvements and other real, personal and mixed property, operational or nonoperational that is located on the lands within the Sale Area or otherwise used in connection with the Properties or the other Assets, including well equipment, casing, tubing, pumps, motors, machinery, rods, tanks, pipes, compressors, meters, separators, heaters, treaters, boilers, fixtures, structures, materials and other items and appurtenances relating to or used in connection with the ownership or operation of the Properties or the other Assets;

(e)      to the extent permitted by Legal Requirements, any permit, license, registration, consent, order, approval, variance, exemption, waiver, franchise, right or other authorization (in each case) of any Governmental Authority (the "*Permits*") relating to the ownership or operation of the Properties;

(f)      all of the easements, rights-of-way, surface fee interests, surface leases, surface use agreements and other surface usage rights existing as of the Closing Date to the extent used in connection with the ownership or operation of the Properties or other Assets, including those described in Exhibit A-3;

(g)      all of the Applicable Contracts, including the Contracts set forth on Exhibit B, that are assumed by Seller and assigned to Buyer pursuant to Section 2.04 (collectively, the "*Assigned Contracts*");

(h)      all radio and communication towers, wellhead communication systems and other equipment and automation systems and related telemetry on wells, in each case that are primarily used in connection with the operation of the Properties or the other Assets;

(i)      all offices, warehouses, laydown yards and other similar assets, in each case located on the Properties (including any owned or leased real or personal property relating thereto);

(j)      copies of all books, records and files, reports, Asset tax and accounting records, if any, in each case to the extent relating to the Assets, including: (i) land and title records (including lease files, division files, Third Party brokerage information, run sheets, mineral ownership reports, abstracts of title, surveys, maps, elections, well files, title opinions and title curative documents); (ii) correspondence with Governmental Authorities; (iii) facility files (including construction records); (iv) well files, proprietary seismic data and information, production records, electric logs, core data, pressure data, and all related matters, (v) all licensed geological, geophysical and seismic data and information which is transferable without payment of any fee to a Third Party; and (vi) environmental, regulatory, accounting and Asset tax records; but excluding any of the foregoing items to the extent comprising or otherwise attributable to the

Excluded Assets (the foregoing, subject to such exclusion, the "*Records*"), *provided* the Trustee shall retain the original Records in case such Records are necessary for litigation purposes;

(k)    all Hydrocarbons produced from or allocated to the Properties on and after the Effective Time, as well as all Hydrocarbons in storage or pipeline as of the Effective Time, excluding approximately 10,000 barrels of oil stored in the Las Palmas Project located near Bakersfield, California (the "*Excluded Inventory*");

(l)    Seller's (i) reserve studies, estimates and evaluations, estimates and valuations of assets or unliquidated liabilities, pilot studies, engineering, production, financial or economic studies, reports or forecasts, and any and all similar forward-looking economic, evaluative, or financial information relating to the Assets, and (ii) licensed geological, geophysical or seismic data relating to the Assets, to the extent, in each case, such data or information is transferable and which such transfer does not require the payment of a Third Party fee (unless Buyer agrees in writing to pay such fee);

(m)    except to the extent included in the Excluded Assets, all of Seller's proprietary computer software, patents, trade secrets, copyrights, and other intellectual property, in each case relating to the Assets, *provided* the Trustee's access shall not be limited during the Bankruptcy Case or any action arising from the Bankruptcy Case;

(n)    except to the extent included in the Excluded Assets, all insurance policies relating to the Assets and all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and interests of Seller under any policy or agreement of insurance of Seller to the extent such rights, claims or causes of action relate to the Assets from and after the Effective Time or any of the Assumed Obligations);

(o)    except for the Retained Proceeds, all trade credits, and all other proceeds, income or revenues attributable to the Assets, whether attributable to the period prior to, at or after the Effective Time;

(p)    except to the extent included in the Excluded Assets, all claims, causes of action, manufacturers' and contractors' warranties and other rights of Seller arising under or with respect to any Assets, whether attributable to the period prior to, at or after the Effective Time;

(q)    except to the extent included in the Excluded Assets, all rights and interests of Seller relating to the Assets (i) under any policy or agreement of insurance or (except to the extent related to any Assumed Obligations) indemnity, or (ii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of property;

(r)    all audit rights arising under any of the Assigned Contracts with respect to the Assets, whether attributable to the period prior to, at or after the Effective Time; and

(s)    any vehicles and other rolling stock owned by Seller and used with respect to any of the Assets.

**2.02**    ***Excluded Assets***.  Seller shall reserve, except, and retain all of the following assets (the "*Excluded Assets*"):

(a)    all documents and instruments and other data or information of Seller that may be protected by an attorney-client privilege (other than title opinions, environmental reports or evaluations, and any documents and instruments that relate to or cover Assumed Obligations);

(b)    all documents and instruments and other data or information that cannot be disclosed to Buyer as a result of confidentiality arrangements under agreements with Third Parties (provided that Seller shall use commercially reasonable efforts to obtain waivers of any such confidentiality arrangements or permit Buyer to execute a joinder agreement with respect thereto, without any obligation to incur any out-of-pocket cost or expense or provide any other consideration);

(c)    all claims and causes of action related to (i) Chapter 5 of the Bankruptcy Code, (ii) any commercial tort claims, (iii) claim objections with respect to scheduled or filed claims in the Bankruptcy Case, or (iv) any claims and causes of action against any director or officer of the Debtor, any Insider or Affiliate or any director or officer of an Insider or Affiliate;

(d)    all information and data of Seller which is not transferable or which a transfer requires the payment of a Third Party fee (unless Buyer agrees in writing to pay such fee);

(e)    documents prepared or received by Seller with respect to (i) lists of prospective purchasers for such transactions compiled by Seller, (ii) bids submitted by other prospective purchasers of the Assets or any other interest in the Assets, (iii) analyses by Seller of any bids submitted by any prospective purchaser, (iv) correspondence between or among Seller or its or their respective representatives, and any prospective purchaser other than Buyer, and (v) correspondence between Seller or any of their respective representatives with respect to any of the bids, the prospective purchasers or the transactions contemplated in this Agreement;

(f)    all of the Seller's corporate minute books and corporate tax or financial records that relate to Seller's business generally (without specific reference to the ownership and operation of the Assets); Seller's name, trade names and logos or any ownership interests in Seller;

(g)    all security deposits, letters of credit, performance bonds or sureties;

(h)    the properties specifically identified on Exhibit C;

(i)    all cash and bank accounts of the bankruptcy estate as of the Effective Time;

(j)    all master services agreements;

(k)    all Applicable Contracts (other than the Assigned Contracts), including that certain Credit Agreement dated as of November 8, 2018, by and between the Trustee and UBS AG, Stamford Branch (such contracts or agreements other than the Assigned Contracts, the "*Excluded Contracts*"), and all rights thereunder;

(l)    all engagements and similar letters and agreements with the Seller's legal advisors, it being agreed that Buyer shall have no right to claim, own or waive any attorney-client or similar privilege in favor of the Seller with respect to the ownership or operation of the Assets;

(m)    any assets or properties otherwise expressly identified as Excluded Assets under this Agreement;

(n)    all trade credits, all accounts receivable, if any, and all other proceeds, income or revenues attributable to the Assets at or prior to the Effective Time (the "*Retained Proceeds*");

(o)    Seller's share of all tax refunds or reductions as provided in Section 3.01(b);

(p)    books, records and files that relate solely to any Excluded Assets;

(q)    all Hydrocarbons, real property, leases, equipment or other assets or property of whatever type or character relating or, constituting or used in connection with Seller's property located (i) in Orange County, California and commonly known as the REDU Oil Field; (ii) in Santa Barbara County, California and commonly known as the East Valley Farms Lease, the McKenzie Lease, the Olean Lease, the Union Continental Lease, and the Vincent Lease in the Santa Maria Valley Field; and (iii) in Santa Barbara County, California and commonly known as the Gibson Fee Lease and the Harbordt Lease in the Cat Canyon Field;

(r)    the Excluded Inventory;

(s)    the Purchase Price; and

(t)    all insurance policies listed on Schedule 2.02(r).

**2.03    *Revenues and Expenses*.**  (i) Seller shall remain entitled to all proceeds attributable to the Assets prior to the Effective Time, (ii) Seller shall remain responsible for all operating expenses (including costs of insurance) and capital expenditures incurred in the ownership and operation of the Assets in the ordinary course of business and, where applicable, under and pursuant to the relevant operating or unit agreement or forced pooling order, if any (the "*Operating Expenses*") attributable to the Assets prior to the Effective Time that are actually paid by Seller prior to the Closing Date, and (iii) subject to the occurrence of the Closing, upon Closing Buyer shall be entitled to all of the rights of ownership attributable to the Assets for the period of time from and after the Effective Time, including the right to all production, proceeds of production and other proceeds received at and after the Effective Time (whether attributable to the period before, at or after the Effective Time), and shall be responsible for all Operating Expenses attributable to the Assets that (A) are payable from and after the Effective Time and (B) are attributable to the Assets between the Bankruptcy Filing Date and the Effective Time and are not actually paid by Seller prior to the Closing Date.

**2.04    *Assigned Contracts; Cure Costs*.**

(a)    At the Closing, the Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code, and the Sale Order, any and all costs or expenses that are required to be paid

under Sections 365(b)(1)(A), and 365(b)(1)(B) of the Bankruptcy Code, as applicable, arising on or after the Effective Time, to cure any defaults under the Assigned Contracts in connection with the assumption and assignment of such Assigned Contracts (such costs or expenses required to be paid by Buyer, the "*Cure Costs*").   Seller shall pay any and all costs or expenses that are required to be paid under Sections 365(b)(1)(A), and 365(b)(1)(B) of the Bankruptcy Code, as applicable, arising before the Effective Time, to cure any defaults under the Assigned Contracts in connection with the assumption and assignment of such Assigned Contracts, unless the other parties to the Assigned Contracts consent to other treatment or as so ordered by the Bankruptcy Court.   For the avoidance of doubt, the Buyer shall pay all Cure Costs in cash at closing.   Buyer shall not be required to make any payment of Cure Costs for, and Buyer shall not assume or have any obligation for any liabilities with respect to, any Excluded Contract.   For the avoidance of doubt, and without limiting the generality of the foregoing in any way, Buyer shall be responsible for paying as Cure Costs, any unpaid royalties or other Lease payments arising on or after the Effective Time.

(b)     Schedule 2.04 sets forth each Applicable Contract and Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Applicable Contract (and if no Cure Cost is estimated to be payable in respect of any Applicable Contract, the amount of such Cure Cost designated for such Applicable Contract shall be "$0.00").

(c)     Within ten (10) Business Days after the Execution Date, and subject to Buyer's rights under Section 2.04(e) below to subsequently amend such designations, Buyer will deliver to Seller schedules of the Applicable Contracts to be assumed by Seller and assigned to Buyer (as Assigned Contracts) at the Closing (in the form annexed hereto as Exhibit D).   Seller shall provide sufficient notice under the Bankruptcy Code and local rules of the Bankruptcy Court as required by the Bankruptcy Court to all counterparties to the Assigned Contracts of their assumption or rejection and, with respect to the Assigned Contracts to be assumed, also provide a schedule of Total Cure Costs.   Any Applicable Contracts that are not set forth on such list of Assigned Contracts to be assumed shall be Excluded Contracts and deemed rejected, and shall be an Excluded Asset for all purposes hereof.

(d)     Promptly following the Execution Date (to the extent not completed prior to the Execution Date) and within the time limits set by the Bankruptcy Court, Seller shall deliver a written notice in a form reasonably acceptable to Buyer of the proposed assignments of the Assigned Contracts and the proposed Total Cure Costs for each Assigned Contract to all non-debtor parties to the Assigned Contracts, which notice shall notify each non-debtor party to such Assigned Contract of (i) the proposed Total Cure Cost for such Assigned Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Total Cure Cost (each such notice, a "*Contract Notice*").   To the extent Schedule 2.04 is supplemented from time to time to include additional Assigned Contracts in accordance with Section 2.04(b) above, Seller shall, promptly deliver Contract Notices to the counterparties to such Assigned Contracts of the potential assignment of such Assigned Contracts and the proposed Total Cure Costs for such Assigned Contracts (consistent with Seller's good faith estimates set forth in Schedule 2.04).   To the extent that any objections are received from such non-debtor parties in response to such Contract Notices, Seller shall take all reasonably necessary actions to resolve such disputes with the applicable non-debtor party, and all such resolutions with respect to any Assigned Contract shall be acceptable to Buyer in its reasonable discretion.

(e)    At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Seller of Buyer's election to designate any Assigned Contract (A) as an Excluded Contract and upon such designation such Applicable Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (B) to the extent not already rejected, as an Assigned Contract and upon such designation such Applicable Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.  Notwithstanding anything to the contrary in this Section 2.04, if, at any time after the Designation Deadline, the Total Cure Costs fixed by the Bankruptcy Court for any Assigned Contract or Lease are (i) greater than the amount set forth on the initial schedule of Total Cure Costs filed by Seller with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than five Business Days after entry of an order by the Bankruptcy Court setting such Total Cure Costs, to provide Seller a Contract Notice of Buyer's election to revoke its designation of (y) any such Applicable Contract as an Assigned Contract, as applicable, and thereupon such Applicable Contract shall be deemed to be an Excluded Contract or Excluded Asset.  The Parties shall amend the Buyer election form executed and delivered pursuant to Section 2.04(c) to reflect changes made pursuant to this Section 2.04(e).

(f)    Notwithstanding anything in this Agreement to the contrary, Seller shall not reject or abandon any Applicable Contracts without the prior written consent of Buyer in its sole discretion; provided, that after the Designation Deadline and in consultation with Buyer, Seller may reject Excluded Contracts so long as such Applicable Contracts were identified to Buyer prior to the Designation Deadline.  To the extent prior to such rejection Buyer identifies any Applicable Contract as an Assigned Contract by delivery of a written notice, Seller will use commercially reasonable efforts and work with Buyer in good faith, notwithstanding the expiration of the Designation Deadline, to change the status of such Applicable Contract from an Excluded Contract to an Assigned Contract.  In the event that Seller identifies (whether before or after the Designation Deadline) any additional Applicable Contracts capable of being assumed or rejected that were not previously identified as such, Seller shall promptly notify Buyer of (i) such Applicable Contracts and (ii) Seller's good faith estimate of the amount of the Cure Costs payable in respect of each such Applicable Contract.  For the avoidance of doubt, Buyer may designate each such additional Applicable Contract described in the immediately preceding sentence as an Assigned Contract or Excluded Contract pursuant to this Section 2.04, notwithstanding the passage of the Designation Deadline.

**2.05    *Joint and Several Liability.***  Team Maria Joaquin, L.L.C., a Delaware limited liability corporation, and Maria Joaquin Basin, L.LC., a Delaware limited liability corporation, shall be jointly and severally liable for full performance of, and all obligations under, this Agreement.

**ARTICLE III
PURCHASE PRICE**

**3.01    *Purchase Price*.**

(a)    The unadjusted purchase price for the Assets shall be TWENTY SIX MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS

($26,750,000.00) (the "*Purchase Price*").  The Purchase Price is to be comprised of (i) a NINE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($9,500,000.00) cash payment, payable in cash at Closing, ("*Cash Payment*"), (ii) a FIVE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($5,500,000.00) assumption of property taxes, as described in Section 3.01(b), and (iii) an ELEVEN MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($11,750,000.00) production payment, paid out as set forth in Section 3.03 ("*Production Payment*").  Of the Cash Payment, it is agreed that (a) $500,000.00 shall be held by the Trustee for the sole purpose of pursuing insider litigation claims, to be matched by proceeds of a loan of net cash proceeds in an equal amount by UBS AG to the extent net cash proceeds received by UBS are available, which shall both be contributed to a litigation fund to be designated and controlled by Seller for the benefit of creditors of the Bankruptcy Case to pursue certain litigation claims against Insiders and Affiliates of the Debtor, for the avoidance of doubt, Buyer shall have no interest in, and shall receive no proceeds of, such litigation claims, and (b) $500,000.00 shall be held in the Appeals Escrow.

(b)      Buyer advises that it will make arrangements to assume the real property taxes on the Assets located in Santa Barbara County, California, and Kern County, California.  The exact numbers shall be reasonably agreed to by the parties prior to Closing (the "*Assumed Real Property Taxes*").  As a result, Seller will not be paying or selling Free and Clear of the Assumed Real Property Taxes and the liens securing those taxes on the Assets located there, except to the extent Seller may dispute any of those taxes and tax liens.  The sum of the Assumed Real Property Taxes is anticipated to be $5,946,586.58 as of September 30, 2020.  Before the Closing, the Parties will meet and agree on any adjustment calculation for the Assumed Real Property Taxes.  The Assumed Real Property Taxes are to be calculated as of the Effective Time less any sums which the Trustee disputes.  All tax refunds actually paid or reductions obtained from and after the Closing Date as a result of reassessments underlying the Assumed Real Property Taxes, after payment of any reasonable costs, expenses or attorney fees owed to the consultants and attorney(s) hired by Seller to handle or prosecute the real property tax reassessment (the "*Reassessment Expenses*"), shall be split 50% to Buyer and 50% to Seller.  Any tax refunds or reductions obtained or actually paid before the Closing Date shall belong to the Seller, and Seller shall bear all Reassessment Expenses incurred in obtaining those reassessments.  Buyer and Seller shall cooperate in good faith regarding the reassessment of the Assumed Real Property Taxes.

3.02    *Deposit*.  Contemporaneously with the execution of this Agreement, Buyer has delivered to Seller FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) (the "*Deposit*") to be deposited in the account specified by the Seller.  Thereafter, the Deposit shall be held by Seller in a non-interest bearing account, subject and pursuant to the terms of this Agreement.  If the Closing occurs, then the Deposit shall be retained by Seller and applied to the Cash Payment payable to Seller at Closing.  The Deposit shall become non-refundable to the Buyer and shall be retained by the Seller upon the expiration of the Examination Period, except (x) in the event of a termination of this Agreement based on a breach by Seller as provided in Section 12.06 of this Agreement, or (y) in the event of a failure of Buyer's conditions to Closing as provided in Section 9.02 of this Agreement.

3.03    *Production Payment*.  Contemporaneously with the Closing, Buyer shall execute and deliver to Seller the Production Payment Conveyance substantially in the form attached hereto as Exhibit F and an Oil Sales Agreement substantially in the form attached hereto

as <u>Exhibit H</u>.  Said conveyance shall reserve to Seller a term overriding royalty interest that runs with the land in the Leases, Wells and Units delivered to Buyer at Closing, subject to the terms set out herein. The Production Payment Conveyance and Oil Sales Agreement shall be secured by a deed of trust, mortgage, assignment, security agreement, fixture filing and financing statement substantially in the form of <u>Exhibit I</u> (the "<u>*Deed of Trust*</u>") as well as a perfected security interest in the Cash Collateral Account (as defined in the Production Payment Conveyance).

(a)    The Production Payment shall be calculated based on the amount of all crude oil produced and sold from each Lease, proportionately reduced to Buyer's working interest acquired pursuant to this Agreement.  The term of the Production Payment shall terminate upon the payout of ELEVEN MILLION SEVEN HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($11,750,000.00) ("<u>*Production Payment Primary Sum*</u>") to Seller.  The payment shall be determined based upon the average monthly WTI crude oil spot price, as published by the U.S. Energy Information Agency ("<u>*Monthly Average*</u>").

(b)    The Seller shall only be entitled to payment insofar as the Monthly Average meets the following thresholds:

(1)    The Monthly Average must be at least $35.00 per barrel of oil for a payment to be due;

(2)    If the Monthly Average is or exceeds $35.00, the Seller shall be entitled to fifty percent (50%) of the price per barrel, insofar as it exceeds $35.00, but is less than $40.00.  For example, if the Monthly Average is $39.99, the Seller shall be entitled to a payment of $2.50 for each barrel sold by Buyer;

(3)    If the Monthly Average price is or exceeds $40.00, the Seller shall be entitled to forty percent (40%) of the price per barrel, insofar as it exceeds $40.00, but is less than $45.00;

(4)    If the Monthly Average is or exceeds $45.00, the Seller shall be entitled to thirty percent (30%) of the price per barrel, insofar as it exceeds $45.00, but is less than $50.00.

(5)    If the Monthly Average is or exceeds $50.00, the Seller shall be entitled to twenty percent (20%) of the price per barrel, insofar as it exceeds $50.00, but is less than $60.00;

(c)    For the sake of clarity, if the Monthly Average is $63.00 per barrel, the Seller shall be entitled to a cumulative per barrel payment of $8.00, calculated as follows:

(1)    $0.00 for the value less than $35.00

(2)    $2.50 for the 50% of the value between $35.00 and $40.00

(3)    $2.00 for the 40% of the value between $40.00 and $45.00

(4)    $1.50 for the 30% of the value between $45.00 and $50.00

(5)  $2.00 for the 20% of the value between $50.00 and $60.00

(6)  $0.00 for the value in excess of $60.00

(d)  The Production Payment shall be treated as a term overriding royalty interest.

(e)  For federal income tax purposes, Buyer and Seller intend for the Production Payment to be a production payment retained by Seller on the sale of mineral property under Internal Revenue Code section 636(b) and any payments made to Seller pursuant to such Production Payment shall be payable solely from income derived from the extraction of the mineral in place.  Buyer and Seller agree to treat the Production Payment consistent with Internal Revenue Code section 636(b) and the applicable Treasury regulations.

(f)  Notwithstanding anything to the contrary contained in this Agreement, Seller may at any time prior to Closing by written notice to Buyer (but without any right of consent or approval), assign to UBS AG or its designee (the "*Transferee*") all of Seller's right to be a party to and receive at Closing the Production Payment Conveyance, Oil Sales Agreement and Deed of Trust.   In such event, the Parties and the Transferee shall modify the forms of Production Payment Conveyance, Oil Sales Agreement and Deed of Trust to reflect such arrangement and (i) at Closing Transferee will execute all such documents in place of Seller; (ii)  all originals and copies of such documents to be delivered to Seller will instead be delivered to Transferee; (iii) Seller will have no obligations or rights under any of such documents; (iv) at Closing Buyer shall recognize Transferee as its counterparty to all such documents entitled to all of the rights and benefits thereunder that otherwise would have accrued to Seller; and (v) Transferee shall make to Buyer the representations and warranties set forth in <u>Section 6.01</u> through <u>Section 6.03</u>, *mutatis mutandis*.

**3.04**  ***Accounting for Production Payment***.  Accounting for the Production Payment shall be performed by the Buyer on a monthly basis in accordance with the Production Payment Conveyance.  Seller shall have the right, during normal business hours and on reasonable advance written notice, to review Buyer's books and records relating to Buyer's calculations with respect to the Production Payment.

**3.05**  ***Seller's Right to Join in Sales***.

(a)  Buyer shall not sell all or any part of the Assets without Seller's prior written consent, not to be unreasonably withheld, conditioned or delayed.

(b)  Subject to clause (a), whenever Buyer has, and intends to take, the opportunity to sell all or any part of the Properties burdened by the Production Payment ("*Subject Interests*"), Buyer shall insure that Seller has, and shall cause Seller to have, the option to sell only that portion of the Production Payment that burdens the Subject Interests to be sold by Buyer ("*Sold Production Payment*") as a part of such transaction and on terms and conditions as favorable as that available to Buyer.  In exercising such option, Seller may elect to convey the Sold Production Payment to Buyer (for further sale to the purchaser) or to sell the Sold Production Payment directly to the purchaser of the Subject Interests (the form of any such documentation shall be mutually acceptable to Buyer, Seller and (in the case of a sale directly to

the purchaser of the Subject Interests) any transferee of Buyer).  Buyer shall give Seller at least forty-five (45) days' notice of any such potential sale (or of any material modification in the terms of any sale of which such a notice was previously given).  Seller has no obligation to participate in any such transaction or otherwise to sell all or any part of the Production Payment, in which case the Production Payment Conveyance shall be unaffected by such transaction and shall continue to be in full force and effect on all the terms of the Production Payment Conveyance and continue to be binding on Buyer (to the extent Buyer retains an interest in the Subject Interests following such sale) and any transferee of Buyer.  If Seller does participate in any such transaction, then regardless of any purchase price allocations made by the purchaser in such sale to the Sold Production Payment and the sold Subject Interests, Buyer and Seller shall divide between themselves the aggregate purchase price received by both, net of costs of sale and any transaction taxes (other than income taxes, which shall be the separate obligations of Buyer and Seller). If Buyer and Seller cannot agree on a division of the aggregate purchase price to be received within thirty (30) days of Buyer's notice to Seller of the intended sale, Buyer and Seller will jointly engage a neutral third-party valuation expert acceptable to both Buyer and Seller to make such determination within thirty (30) days (if the sale must close prior to the date such valuation is determined then the proceeds payable to Buyer or Seller from such sale (net of costs of sale required to be paid by Buyer or Seller) shall be held in escrow until the final determination of such valuation).  The valuation expert's final determination shall be binding on both Buyer and Seller.  For the avoidance of doubt, the Production Payment shall run with the land, and any unpaid portion of the Production Payment following a sale by Buyer of any Subject Interest shall remain with such Subject Interest following the transfer and be binding on any transferee.

(c)    Buyer shall not assign, transfer, grant a royalty in, or interest of any kind, direct or indirect in any Subject Interest (and shall obtain from any transferee its written agreement not to assign, transfer, grant a royalty in, or interest of any kind, direct or indirect in any Subject Interest) to a Grewal Entity.

**3.06**    *"As is" and "Where is" Sale*.  The Assets are sold on an "as is" and "where is" basis, with no warranty or representations whatsoever.

**3.07**    *No Contingencies*.  Except as provided in Article IX, this sale is NOT subject to any contingencies. Without limitation, the sale is not contingent upon Buyer obtaining financing.  Buyer understands and agrees that neither its receipt of a commitment from such a lending institution, its acceptance of such a commitment, nor its satisfaction of any condition set forth in such a commitment shall in any way be a condition of Buyer's obligations under this Agreement.

**3.08**    *Adjustment to Purchase Price*.  At Closing, the Purchase Price shall be adjusted as follows:

(a)    The Purchase Price shall be adjusted upward by the following:

(1)    The amount of all actual reasonable and customary Operating Expenses attributable to the Assets, paid by or on behalf of Seller in connection with the operation of the Assets and which are, according to GAAP, attributable to the period of time between the

Effective Time and the Closing Date. However, such expenditures and expenses shall exclude any fines, penalties or other charges levied by any Governmental Authority.

(2)      In accordance with the provisions in <u>Section 14.02</u>, if applicable.

(3)      Any Cure Costs for which Buyer is responsible pursuant to <u>Section 2.04</u>, that are paid by Seller, including, but not limited to, any royalties or other amounts arising on or after the Effective Time under the Leases.

(4)      The value of Hydrocarbons in storage and in pipelines on the Effective Time excluding the Excluded Inventory based upon prevailing market prices for such Hydrocarbons taking into account quality and location.

(5)      The cash portion of the Purchase Price shall be subject to upward adjustment at Closing based on the amount by which the anticipated amount of the Assumed Real Property Taxes is greater than the adjusted amount of actual Assumed Real Property Taxes.

(b)      The Purchase Price shall be adjusted downward by the following:

(1)      The amount of all of cash or other proceeds received by Seller attributable to the Assets for the period of time from and after the Effective Time, including the right to all production, proceeds of production and other proceeds received by Seller and attributable to the Assets for the period of time from and after the Effective Time.

(2)      If applicable, in accordance with <u>Sections 7.02</u>, <u>7.03(b)</u> and <u>14.02</u>.

(3)      For any Lease removed from the Sale pursuant to <u>Section 5.06</u>, an amount equal to the Allocated Value attributable to such Lease.    The Parties shall contemporaneously herewith execute a side letter agreement setting forth agreed values for each Lease (the "*Allocated Value Letter*").    The reduction shall be 50% to the Cash Payment up to a maximum aggregate reduction of $1 million, with the balance reducing the Production Payment Primary Sum.

(4)      The Production Payment Primary Sum shall be subject to downward adjustment at Closing based on the amount by which the anticipated amount of the Assumed Real Property Taxes is less than the adjusted amount of actual Assumed Real Property Taxes.

**3.09    *Purchase Price Tax Allocation*.**  Seller and Buyer agree that for the purpose of making the requisite filings under Section 1060 of the Internal Revenue Code, and the Treasury regulations thereunder, the amount treated for tax purposes as consideration for the Assets shall be allocated among the Assets in a manner consistent with the Allocated Values (the "*Tax Allocation*").  Seller and Buyer each agree to report the federal, state and local income and other tax consequences of the transactions contemplated herein, and in particular to report the information required by Section 1060(b) of the Internal Revenue Code in a manner consistent with the Tax Allocation, and, except as otherwise required by law, neither Party nor their respective Affiliates shall take a tax position that is inconsistent with the allocation. For purposes of the Tax Allocation, Buyer and Seller agree to allocate 20% of the Purchase Price to the Personal Property and 80% of the Purchase Price to the remainder of the Assets.

# ARTICLE IV
# TITLE MATTERS; ENVIRONMENTAL MATTERS

**4.01** *NORM*. **BUYER ACKNOWLEDGES THAT THE OIL AND GAS ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF HYDROCARBONS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE OIL AND GAS ASSETS. EQUIPMENT AND SITES INCLUDED IN THE OIL AND GAS ASSETS MAY CONTAIN NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE OIL AND GAS ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS SUBSTANCES/ AND HAZARDOUS MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS SUBSTANCES OR HAZARDOUS MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE OIL AND GAS ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS SUBSTANCES OR HAZARDOUS MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE OIL AND GAS ASSETS. BUYER SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE OIL AND GAS ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM AND OTHER WASTES), AFTER THE CLOSING DATE.**

**4.02** *Title Matters*. Seller shall permit Buyer and/or its representatives to examine, at all reasonable times and at Buyer's sole expense, in Seller's offices, all abstracts of title, title opinions, title files, ownership maps, lease files, assignments, division orders, operating records and agreements pertaining to the Assets insofar as same may now be in existence and in the possession of Seller. The examination period (the "*Examination Period*") shall begin on the Execution Date and shall terminate at 5:00 p.m., Central Daylight Savings Time on the date that is fifteen (15) Business Days after the Execution Date.

**4.03** *Environmental Matters*. Buyer shall have the right, at its sole cost, risk and expense, to conduct or have conducted an Environmental Assessment of the Assets. No later than the expiration of the Examination Period, Buyer shall provide Seller with copies of all information obtained in the Environmental Assessment ("*Environmental Assessment Information*"), including any reports, data and conclusions but excluding any such communications, reports, or conclusions that are legally privileged, Buyer understands that Seller intends to share Environmental Assessment Information with prospective bidders, *provided, however*, **BUYER MAKES NO REPRESENTATIONS, WARRANTIES, OR CERTIFICATIONS, EXPRESS, STATUTORY, OR IMPLIED AS TO THE ENVIRONMENTAL ASSESSMENT INFORMATION, INCLUDING AS TO THE CONTENT, NATURE, CHARACTER, SCOPE, ACCURACY, COMPLETENESS, OR RELIABILITY OF THE ENVIRONMENTAL ASSESSMENT INFORMATION (INCLUDING ANY DATA,**

**ANALYSIS, OPINION, INFORMATION, CONCLUSION, PROJECTION, OR ADVICE), AND BUYER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY ENVIRONMENTAL ASSESSMENT INFORMATION SHARED OR PROVIDED (WHETHER ORALLY OR IN WRITING) TO SELLER AND/OR ANY PROSPECTIVE BIDDER**. The Environmental Assessment shall be conducted during the Examination Period. Seller agrees to provide Buyer (or its contractor) with reasonable access to the Assets to conduct the Environmental Assessment.  Seller shall have the right to require Buyer (or its contractor) to conform to Seller's (or the operator's, if not Seller) safety and industrial hygiene procedures in the conduct of the Environmental Assessment.  Buyer shall promptly repair (or require its consultant to repair) any and all damages to the Assets or other property caused by such activities, and shall restore the Assets or other property to the same or substantially the same condition as before the Environmental Assessment to the satisfaction of Seller.  The Environmental Assessment shall not be conducted in such a manner as to unreasonably interfere with business operations conducted on or with respect to the Assets.  Buyer agrees to assume responsibility and indemnify and hold harmless Seller for any and all Losses attributable to Buyer's (or its contractor's) performance of the Environmental Assessment (save and except loss of market value because of the discovery of any Environmental Condition detrimental to that particular property, and excluding any such Losses attributable to the willful misconduct or gross negligence of Seller).

      **4.04**    *Diligence Termination*.  Before the expiration of the Examination Period, Seller agrees that Buyer shall have the right, in Buyer's sole discretion, to notify Seller in writing that Seller's title and/or environmental is unsatisfactory to Buyer, in Buyer's sole discretion, and that Buyer elects to terminate this Agreement.  For the avoidance of doubt and notwithstanding anything to the contrary contained herein, except in the event of a breach of this Agreement by Buyer, if Buyer elects to terminate this Agreement before the expiration of the Examination Period pursuant to this <u>Section 4.04</u>, the Deposit shall be refunded to Buyer.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

      Seller represents and warrants as follows:

      **5.01**    *Existence*.  To Seller's Knowledge, the Debtor is a company duly organized and validly existing under the laws of the State of Colorado.  The Trustee for Seller has full legal power, right and authority to carry on its business in the states where the Assets are located.

      **5.02**    *Legal Power*.  Subject to Bankruptcy Court approval of this Agreement and the transactions contemplated herein, Seller has the legal power and right to enter into and perform this Agreement and the transactions contemplated hereby.

      **5.03**    *Execution*.  Subject to Bankruptcy Court approval of this Agreement and the transactions contemplated herein, the execution, delivery and performance of this Agreement are duly and validly authorized by all requisite corporate action on the part of Seller and constitute the legal, valid and binding obligation of Seller enforceable in accordance with its terms.

      **5.04**    *Brokers*.  To Seller's Knowledge, Seller has not employed, directly or indirectly, any broker or finder or incurred, directly or indirectly, any liability for any brokerage

fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement in each case for which Buyer will become directly or indirectly liable.

5.05 **Litigation**. To Seller's Knowledge, Schedule 5.05 is a list of all pending litigation involving or relating to the Assets, other than the Bankruptcy Case.

5.06 **Leases**. To Seller's Knowledge, Exhibit A includes a list of all of the Leases. Seller advises that royalty claimants under some of the Leases contend that the Debtor was behind in royalty payments or in default on the Petition Date. Seller shall be responsible for paying and/or selling the Leases free and clear of any such unpaid royalties or defaults that accrued before the Effective Time, obtaining consents to the assignment of the Leases Free and Clear of any such royalties or defaults, or otherwise obtaining findings in the Sale Order acceptable to Buyer that Seller is entitled to convey the Leases Free and Clear. If Seller fails to comply with its obligations hereunder with respect to any Lease, (in addition to the rights granted under Section 2.04) Buyer shall provide notice to Seller prior to Closing and may remove any such Lease from the Assets subject to a Purchase Price adjustment pursuant to Section 3.08(b)(3) above. For the avoidance of doubt, any Lease to be transferred to Buyer pursuant to this Agreement shall include all Wells regardless of the status of such Well (active, shut-in, etc.). Seller shall have no responsibility for plugging and abandoning costs of a Well if Buyer rejects some but not all Leases associated with such Well.

5.07 **Applicable Contracts**. To Seller's Knowledge, Exhibit B includes a list of all of the Assigned Contracts, excluding the Leases.

5.08 **Permits**. To Seller's Knowledge, Schedule 5.08 includes a list of all of the Permits.

5.09 **Wells**. To Seller's Knowledge, as of the Execution Date Exhibit A-1 is a list of Wells.

5.10 **Environmental Matters**. To Seller's Knowledge, Schedule 5.10 is a list of Environmental Disclosures.

5.11 **Limitation on Representations**. Seller is a third party fiduciary appointed to administer the assets of the Bankruptcy Case. Seller has not seen or inspected the Assets and has not determined the fitness of any of the Assets for any particular use. Seller makes no warranties whatsoever other than as expressly provided in this Article V.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Each Buyer represents and warrants to Seller as follows:

6.01 **Existence**. Buyer is limited liability company, duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full legal power, right and authority to carry on its business in the states where the Assets are located.

**6.02    *Legal Power*.**  Buyer has the legal power and right to enter into and perform this Agreement and Buyer has the legal power and right to perform the transactions contemplated hereby.  The consummation of the transactions contemplated by this Agreement will not violate, or be in conflict with:

(a)    any provision of Buyer's certificate of incorporation or by-laws;

(b)    any material agreement or instrument to which Buyer is a party or by which Buyer is bound; or

(c)    any judgment, order, ruling or decree applicable to Buyer as a party in interest or any Legal Requirement applicable to Buyer.

**6.03    *Execution*.**  The execution, delivery and performance of this Agreement and the transactions contemplated hereby are duly and validly authorized by all requisite corporate action on the part of Buyer.  This Agreement constitutes the legal, valid and binding obligation of Buyer enforceable in accordance with its terms.

**6.04    *Brokers*.**  Buyer has not employed, directly or indirectly, any broker or finder or incurred, directly or indirectly, any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement in each case for which Seller will become directly or indirectly liable.

**6.05    *Investment*.**  Buyer is acquiring the Assets for its own account, for investment and not with a view to, or for offer or resale in connection with, a distribution thereof within the meaning of the Securities Act or a distribution thereof in violation of any applicable securities laws.  Buyer, together with its directors, executive officers and advisors, is familiar with investments of the nature of the Assets, understands that this investment involves risks, has adequately investigated the Assets and has knowledge and experience in financial and business matters and the ownership and operation of oil and gas properties such that it is capable of evaluating, and has evaluated, the merits and risks inherent in purchasing the Assets and is able to bear the economic risks of such investment.

**6.06    *Qualification*.**  Buyer is a Qualified Buyer and has funds readily available to satisfy all of its obligations under this Agreement to be performed at the Closing.  Buyer is not aware of any event or occurrence that is reasonably likely to result in its inability to have the financial capacity to complete its obligations hereunder.

**6.07    *Adequate Assurances*.**  Buyer shall, with Seller's cooperation, use its best good faith efforts to provide adequate assurance as required under the Bankruptcy Code of:  (1) the future performance by Buyer of each such Assigned Contract, and (2) Buyer's qualifications as a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing timely requested and factually accurate affidavits and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

**6.08**    *Adequate Assurances Regarding Assigned Contracts*.    Buyer will be responsible for presenting evidence or providing the Trustee with evidence for the purpose of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**6.09**    *Financial Capability*.    Buyer currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Assets and assumption of the Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement on the terms and subject to the conditions contemplated hereby.

**6.10**    *Reliance*.    Buyer has or will have completed all of the due diligence which it believes are required to consummate this transaction.    Buyer has not and will not rely on any oral or written representation of Seller or any of Seller's agents except as set forth in <u>Article V</u> above.

## ARTICLE VII
## CERTAIN AGREEMENTS OF THE PARTIES

**7.01**    *Operation of Assets*.    Except as contemplated in this Agreement, otherwise consented to by Buyer in writing (which consent will not be unreasonably delayed, withheld or conditioned) or as provided for in any applicable operating agreement or other agreement set forth in any Schedule hereto, during the period of time from the Execution Date through the Closing Date, Seller shall operate its business with respect to the Assets, in all material respects, to the best of his ability, in the ordinary course of business as previously conducted and in compliance with all laws, but Seller in its sole discretion may adjust such operations as it believes necessary to take into account the impacts of the COVID-19 pandemic, including institution of safety measures, and the recent decline in oil prices, provided, however, that Seller shall consult with Buyer prior to (i) curtailing production of oil or gas included within the Assets, or (ii) except in the event of an emergency, shutting in, temporarily abandoning or permanently plugging and abandoning any well included within the Assets.

**7.02**    *Preferential Rights to Purchase*.    Seller shall use its best good faith efforts to sell Free and Clear of or comply with all preferential right to purchase provisions relative to any Property prior to Closing, using the Allocated Value of the affected Property.    If a Third Party who has been offered an interest in any Property pursuant to a preferential right to purchase elects prior to Closing to purchase all or part of such Property pursuant to the aforesaid offer, the interest or part thereof so affected will be eliminated from the Assets and the Purchase Price shall be reduced by the Allocated Value of such interest or part thereof.

**7.03**    *Breach Notice*.

(a)    If, prior to the Closing Date, Buyer discovers the existence of a breach of any of Seller's representations, warranties or covenants contained in this Agreement, Buyer shall notify Seller in writing of such information (the "<u>*Breach Notice*</u>") within five (5) Business Days after such discovery or the day prior to the Auction, whichever is earlier.    The Breach Notice shall contain reasonable details regarding the alleged breach and Buyer's good faith estimate of the

potential Losses associated with such breach. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, any Title Defects are excluded from this Section 7.03.

(b)    Upon receipt of a Breach Notice, the Parties shall in good faith attempt to resolve the dispute and either (i) accept the Buyer's good faith estimate of the potential Losses arising from such breach and agree to reduce the Purchase Price by such amount, in which case such breach shall be waived by Buyer, the Parties shall proceed to Closing in accordance with the terms hereof and the Purchase Price shall be so reduced, (ii) remove the Properties affected by such breach from the Assets to be conveyed to Buyer hereunder, in which case the Parties shall proceed to Closing in accordance with the terms hereof and the affected Properties shall be retained by Seller, and the Purchase Price shall be reduced by Allocated Value of such Properties, or (iii) dispute the existence or the estimated Losses attributable to the alleged breach and submit such disagreement to the Bankruptcy Court in accordance with Article IX, in which case the disputed amount of such breach shall be placed by Buyer into an escrow account pending outcome of the Bankruptcy Court's decision, the Parties shall proceed to Closing, the Property shall be conveyed by Seller to Buyer with a reduction of the Purchase Price by such disputed amount and upon completion of the Bankruptcy Court proceedings with regard to such dispute the escrow amount shall be disbursed in accordance with the Bankruptcy Court's decision.

7.04    *Preservation of Records*.    Buyer shall preserve (or offer to redeliver to Seller) all Records delivered by Seller to Buyer for a period of two (2) years following Closing and will allow Seller access (including the right to make copies at the expense of Seller) to such Records at all reasonable times during business hours.  It is understood and agreed that, except as expressly provided herein, Seller does not represent or warrant to Buyer the accuracy of the Records so delivered.  Seller may, at its election, make and retain copies of any or all such Records prior to Closing at its sole cost and expense.

7.05    *Transition of Certain Accounting Matters*.  With respect to each Property with respect to which Seller is disbursing proceeds of production attributable to other parties entitled thereto, Seller and Buyer agree that Seller shall, at or prior to Closing, deliver or cause to be delivered to Buyer a copy or electronic copy of its "pay list" for each such property and a list of all parties for whom it is holding in suspense proceeds of production attributable to production occurring after the Effective Time.   From and after the Closing Date, Buyer shall become responsible for all disbursements of proceeds of production and such disbursement activities shall be included in the matters which Buyer assumes.  Seller shall not be obligated to provide any additional information or detail with respect to such "pay list" other than such information as Seller currently has available and is utilized in Seller's day to day business.

7.06    *Casualty Loss*.

(a)    If after the Execution Date and prior to the Closing Date any part of the Assets shall be damaged or destroyed by fire or other casualty or if any part of the Assets shall be taken in condemnation or under the right of eminent domain or if proceedings for such purposes shall be pending or threatened, Seller shall as soon as reasonably practicable notify Buyer in writing of such occurrence.  This Agreement shall remain in full force and effect notwithstanding any such destruction, taking or proceeding, or the threat thereof and, subject to Buyer's right to

terminate in <u>Section 4.04</u>, the Parties shall proceed with the transactions contemplated by this Agreement notwithstanding such occurrence (and without reduction of the Purchase Price).

(b)     At the Closing, Seller shall pay to Buyer all sums paid to Seller by third parties by reason of the destruction or taking of such Assets between the Execution Date and the Closing and shall assign, transfer and set over unto Buyer all of the rights, title and interest of Seller in and to any claims, causes of action, unpaid proceeds or other payments from third parties arising out of such destruction or taking.  Seller agrees to maintain until the Closing Date the same or comparable insurance coverage that it has in place on the Execution Date with respect to the Assets.  Except as set forth in the preceding sentence, Seller shall not be obligated to carry or maintain, and shall have no obligation or liability to Buyer for its failure to carry or maintain, any insurance coverage with respect to any of the Assets.

**7.07**     ***Consents in Favor of Royalty Claimants***.  Buyer agrees that, as part of the assumption of the Leases, if a Lease does not already include such a term and if so requested by Seller, Buyer will agree to amend the Lease to provide that no further transfer or assignment by Buyer of such Lease shall be made without prior consent of the lessor under the Lease, and such consent shall not be unreasonably withheld, conditioned or delayed.  Buyer agrees to cooperate in good faith to further reflect this amendment in any Lease as requested, with costs to be shared equally by the lessor under the Lease and the Buyer.

**ARTICLE VIII**
**BANKRUPTCY COURT APPROVAL**

**8.01**     ***Bankruptcy Court Approval***.

(a)     Buyer and Seller acknowledge that this Agreement and the sale of the Assets and assumption and assignment of the Assigned Contracts are subject to Bankruptcy Court approval. Within five (5) Business Days following the Execution Date, the Trustee will, in good faith, using commercially reasonable efforts, file the Sale Motion with the Bankruptcy Court seeking approval of the Bid Procedures, the Bid Procedures Order and the sale of the Assets Free and Clear to Buyer under the Sale Order (the "*Sale*").

(b)     Subject to the payment of the Expense Reimbursement, and the other terms and conditions herein, Buyer agrees and acknowledges that Seller, including its representatives, is and may continue soliciting inquiries, proposals or offers from Third Parties for the Assets, and that Seller shall be free to hold an auction to consider and if received accept a bid higher and better in Seller's sole discretion.

(c)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Seller shall promptly notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

## ARTICLE IX
## CONDITIONS TO CLOSING

9.01    *Conditions to Obligations of Seller*.  The obligations of Seller to proceed with the Closing shall be subject to the waiver by Seller or satisfaction of the following conditions:

(a)    *Representations and Warranties*. The representations and warranties of Buyer contained in this Agreement shall be correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date.

(b)    *Compliance With Covenants*. Each and all of the covenants and agreements of Buyer to be performed on or before the Closing pursuant to the terms hereof shall have been performed and satisfied in all material respects.

(c)    *Governmental Approvals*.  All material Governmental Approvals shall have been obtained.

(d)    *No Contrary Order*.  No Court has entered an order that would stay or prevent in any material manner the ability of either Party to close or consummate the transactions contemplated hereby.

(e)    *Violation of Orders*.  The consummation of the transactions contemplated hereunder shall not violate any order, decision, ruling or decree of any Governmental Authority having competent jurisdiction over the transactions contemplated by this Agreement or require (by any Governmental Authority) any material action on the part of Seller.

(f)    *Sale Order*.  The Sale Order shall have been entered, be unstayed and all conditions to Closing in the Sale Order have been satisfied.

(g)    *No Material Adverse Effect*.  There shall have been no Material Adverse Effect between the Execution Date and the Closing which would likely result in a suit, action or other proceeding which, if successful, would restrict in any material respect or prohibit the consummation of the transactions contemplated hereby.

9.02    *Conditions to Obligations of Buyer*.  The obligations of Buyer to proceed with the Closing shall be subject to the waiver by Buyer or satisfaction of the following conditions:

(a)    *Representations and Warranties*. The representations and warranties of Seller contained in this Agreement shall be correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; provided, however, that Buyer's right not to proceed with the Closing as a result of the breach of Seller's representations and warranties shall only arise in the event that Buyer has a right to terminate this Agreement pursuant to Article XI.

(b)    *Compliance With Covenants.*  Each and all of the covenants and agreements of Seller required to be performed on or before the Closing pursuant to the terms hereof shall have been performed and satisfied in all material respects.

(c)    *Governmental Approvals.*  All material Governmental Approvals shall have been obtained.

(d)    *No Contrary Order.*  No Court has entered an order that would stay or prevent in any material manner the ability of either Party to close or consummate the transactions contemplated hereby.

(e)    *Violation of Orders.*  The consummation of the transactions contemplated hereunder shall not violate any order, decision, ruling or decree of any Governmental Authority having competent jurisdiction over the transactions contemplated by this Agreement or require (by any Governmental Authority) any material action on the part of Buyer.

(f)    *Sale Order.*  The Bankruptcy Court shall have entered the Sale Order, and such order shall not have been reversed, modified, amended or stayed.  Seller shall use its best efforts to obtain entry of a Sale Order that may become final and nonappealable as soon as practicable after entry.  Seller shall defend in good faith, with the cooperation of Buyer, all appeals and post-entry challenges to the Sale Order, with the fees and costs of such defense to be funded by the Appeals Escrow (defined below).  At Closing, Buyer shall deposit into an escrow account at UMB Bank, N.A. (the "*Escrow Agent*") pursuant to the Appeals Escrow Agreement, form of which is attached hereto as <u>Exhibit G</u> (the "*Appeals Escrow Agreement*"), the sum of {FIVE HUNDRED THOUSAND DOLLARS AND NO/100 ($500,000.00)} from the adjusted Purchase Price otherwise payable to Seller, to cover the fees and expenses associated with any appeals of the Sale Order (the "*Appeals Escrow*").  The Appeals Escrow shall survive until the Sale Order becomes final under Federal Rule of Bankruptcy Procedure 8002 and is no longer subject to appeal, stay, reargument or rehearing.  When the Sale Order becomes a final order pursuant to Federal Rule of Bankruptcy Procedure 8002, all Appeals Escrow funds shall belong to the Seller upon the release of such funds, by joint instruction, pursuant to the Appeals Escrow Agreement.

(g)    *No Material Adverse Effect.*  There shall have been no Material Adverse Effect between the Execution Date and the Closing which would likely result in a suit, action or other proceeding which, if successful, would restrict in any material respect or prohibit the consummation of the transactions contemplated hereby.

### ARTICLE X
### CLOSING

**10.01  *Closing*.**  Pending entry of the Sale Order by the Bankruptcy Court, and assuming neither Buyer or Seller has rightfully exercised its option to terminate this Agreement without a breach as provided for herein, the closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place at the offices of Danning, Gill, Israel & Krasnoff, LLP, 1901 Avenue of the Stars, Suite 450, Los Angeles, CA  90067-6006, or such other location as Seller may designate in writing, at a mutually agreeable time not later than eleven (11) days after the entry of the Sale Order (the "*Closing Date*").

10.02  *Actions To Be Taken At Closing*.  At Closing, the following shall occur:

(a)    Seller and both of the entities constituting Buyer shall execute and deliver a deed, assignment and bill of sale of the Assets substantially in the form attached as Exhibit E, together with such other forms of assignment as may be required by Governmental Authorities or reasonably requested by Buyer to facilitate recording;

(b)    Seller shall execute and deliver to Buyer an affidavit, signed under penalties of perjury, that (i) states that Seller is not a "*foreign person*" within the meaning of section 1445 of the Internal Revenue Code and (ii) sets forth Seller's name, taxpayer identification number and office address;

(c)    Buyer shall pay to Seller the adjusted Cash Payment, less the amount to be deposited in the Appeals Escrow;

(d)    Buyer shall deposit in the Appeals Escrow the amount set forth in Section 9.02(f);

(e)    Both of the entities constituting Buyer shall execute and deliver to Seller the Production Payment Conveyance in the form attached hereto as Exhibit F;

(f)    Seller and both of the entities constituting Buyer shall execute and deliver the Oil Sales Agreement in the form attached hereto as Exhibit H;

(g)    Both of the entities constituting Buyer shall execute and deliver to Seller the Deed of Trust in the form attached hereto as Exhibit I;

(h)    Seller and Buyer shall execute and deliver a mutually agreeable settlement statement (the "*Preliminary Settlement Statement*") setting forth the Purchase Price hereunder and an accounting of all cash amounts related to the Assets and the transactions contemplated by this Agreement, including, without limitation, any accounting for taxes pursuant to this Agreement;

(i)    Seller and Buyer shall execute and deliver the Appeals Escrow Agreement, in substantially the form attached hereto as Exhibit G;

(j)    Seller and Buyer shall execute and deliver such other instruments and documents and take such other actions as may be reasonably necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; and

(k)    Seller shall execute and deliver to Buyer, on forms prepared by Seller and reasonably acceptable to the Buyer, transfer orders and letters in lieu thereof directing all purchasers of production to make payments to Buyers of proceeds attributable to production from the Assets from and after the Effective Time.

10.03  *Payments*.  All amounts required to be paid by any Party hereto to another Party hereto shall be made by wire transfer of immediately available funds to an account designated by the payee.  Seller and Buyer shall furnish specific written payment instructions to

the other Party to make such payments and the counter Party may make all payments as so instructed until notified in writing of a change in the payment instructions.

### ARTICLE XI
### LIMITATION AND SURVIVAL

**11.01  *Limitation and Survival of Warranties*.**  Except as expressly provided in this Agreement to the contrary, the Assets are being sold by Seller to Buyer without recourse, covenant, representation or warranty of any kind, express, implied, or statutory.

(a)  *Survival of Seller's Representations*.  All representations and warranties made by Seller in <u>Article V</u> shall terminate at Closing.

**11.02  *Buyer's Assumption*.** If the Closing occurs:

(a)  Buyer hereby assumes and agrees to pay, perform and discharge the following liabilities and obligations (collectively, the "<u>*Assumed Obligations*</u>"):

(1)  all liabilities (including all General Liabilities, but excluding Environmental Liabilities) and obligations that are attributable to the ownership or operation of the Assets and arise on or after the Effective Time, including but not limited to all of Sellers' liabilities under the Assigned Contracts except such liabilities that are satisfied or discharged by payment of Cure Costs;

(2)  all Environmental Liabilities that are attributable to the ownership or operation of the Assets and arise on or after the Effective Time, including but not limited to all of Sellers' Environmental Liabilities under the Assigned Contracts;

(3)  all of Seller's liabilities and obligations to properly plug and abandon all wells located on the Assets and remove all related facilities and equipment now or hereafter located on the Assets and clean up and restore the Assets (including all obligations to clean, close and abandon all pits and impoundments) in accordance with all applicable laws and regulations, and to the satisfaction of all applicable Governmental Authorities (regardless of whether any such obligation to plug, abandon, remove, clean up and restore is attributable to periods of time prior to or after the Effective Time);

(4)  all Cure Costs arising on or after the Effective Time;

(5)  all liabilities and obligations relating to the overriding royalties, including the Grewal ORRIs, that arise on or after the Effective Time;

(6)  the Assumed Real Property Taxes and all taxes as provided in Article XIII of this Agreement; and

(7)  to the extent not already described above in this Section, all liabilities arising from, related to, or associated with the ownership, operation, use or maintenance of any of the Assets to the extent such liabilities accrue and arise after Closing.

(b)     Notwithstanding anything to the contrary in this Agreement, all Environmental Liabilities described in Schedule 5.10 that arise prior to the Effective Time are Environmental Liabilities that shall not be Assumed Obligations.

# ARTICLE XII
# TERMINATION

**12.01    *Right of Termination***.  This Agreement may be terminated at any time at or prior to Closing:

(a)     by Seller on or before the Closing Date if the conditions set forth in Section 9.01 have not been satisfied in all material respects by Buyer or waived by Seller in writing by the Closing Date;

(b)     by Buyer on or before the Closing Date if the conditions set forth in Section 9.02 have not been satisfied in all material respects by Seller or waived by Buyer in writing by the Closing Date;

(c)     by Buyer, if Buyer is not the successful bidder for the Assets at the Auction subject to the provisions of Section 12.05; *provided* that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 12.01(d)(c) until after the thirtieth (30th) day following entry by the Bankruptcy Court of an order authorizing and approving a competing transaction with the successful bidder at the Auction (and, notwithstanding Buyer's not having been the successful bidder at the Auction, until such time (if any) as Buyer terminates this Agreement pursuant to this Section 12.01(d)(c), the obligations of Buyer to consummate the transactions contemplated by this Agreement shall remain unaffected by Buyer's right to terminate this Agreement pursuant to this Section 12.01(d)(c));

(d)     by Buyer, if Seller fails to file the Sale Motion with the Bankruptcy Court on or before the tenth (10th) Business Day after the Execution Date, without Buyer's written consent; and

(e)     by Buyer, if an Order approving the Bidding Procedures, the Expense Reimbursement and Buyer as "stalking horse purchaser" of the Assets is not approved by the Bankruptcy Court on or before the thirtieth (30th) day after the Execution Date.

(f)     by Buyer in accordance with the provisions of Section 4.04; and

**12.02    *Buyer's Failure to Close***.  If Buyer fails to consummate Closing by the Closing Date, unless Buyer has validly exercised its right to terminate this Agreement pursuant to Section 12.01(b), then Seller may terminate the Agreement which shall become null and void and retain the Deposit as its sole and exclusive remedy for Buyer's breach hereof.

**12.03    *Effect of Termination***.  In the event that Closing does not occur as a result of Buyer exercising its right to terminate pursuant to Sections 4.03 or 12.01(b), this Agreement shall be null and void and no Party shall have any further rights or obligations under this Agreement, and the Deposit (without interest) shall be returned to Buyer.  The provisions of Sections 12.03, 12.04, 12.05, 12.06, 12.07, Article XIV, any indemnification obligation of Buyer,

and any other provisions that expressly survive the Closing shall survive the termination of this Agreement.

**12.04** *Expense Reimbursement*.

(a)    In the event the Bankruptcy Court approves an Alternative Transaction and the Alternative Transaction closes, Buyer shall be entitled to payment by Seller of (i) the Deposit, and (ii) an amount not to exceed Three Hundred and No/100 Dollars ($300,000.00) of Buyer's out-of-pocket fees and expenses incurred in connection with this Agreement and other agreements, pleadings, documents, hearings, discovery, and transactions related hereto (the "*Expense Reimbursement*"). Buyer shall provide evidence of all such fees and expenses to Seller. If there is a dispute over the Expense Reimbursement, one or both of the Parties may bring the dispute to the Bankruptcy Court to resolve the dispute, which shall be heard pursuant to Section 14.06 below.

(b)    Seller's obligation to pay the Deposit and the Expense Reimbursement shall survive termination of this Agreement. Seller shall pay the Deposit and Expense Reimbursement to Buyer within ten (10) days after the close of an Alternative Transaction.

(c)    Buyer's right to payment of the Deposit and Expense Reimbursement shall constitute an administrative expense in the Bankruptcy Case pursuant to Section 503(b) or 507(a)(2) of the Bankruptcy Code with priority over any and all administrative expenses of a kind specified in sections 503(b) and 507(a) of the Bankruptcy Code and senior to all other super priority administrative expenses in the Bankruptcy Case.

(d)    Each Party acknowledges that the agreements contained in this Section 12.04 are an integral part of this Agreement and that, without these agreements, the other Party would not enter into this Agreement.

(e)    Buyer represents to Seller that this Section 12.04 is a condition precedent to Buyer's execution of this Agreement and is necessary to ensure that Buyer will continue to pursue the proposed acquisition of the Assets, and Seller acknowledges that the Expense Reimbursement, if payable hereunder, (i) is of substantial benefit to Seller's estate by, among other things, establishing a bid standard or minimum for other bidders and placing estate property in a sales configuration mode attracting other bidders to a potential auction, and (ii) is in his opinion reasonable and appropriate, including in light of the size and nature of the sale of the Assets by Seller to Buyer contemplated hereby and the efforts that have been or will be expended by Buyer, notwithstanding that such sale is subject to higher and better offers, and (iii) was negotiated by the Parties at arm's-length and in good faith.

**12.05** *Backup Buyer*. In the event that the Bankruptcy Court approves the sale of the Assets to another party, Buyer agrees to be a backup buyer for the Assets at the price last bid by the Buyer for the Assets under the Bid Procedures. In that event, the Trustee shall retain the Deposit until the sale closes, and the Deposit will be refunded to the Buyer upon the closing of the sale. Provided however, in the event Buyer becomes the backup buyer, the Trustee shall have no right to retain the Deposit for more than thirty (30) days after the entry of the sale order.

### 12.06  *Default by Seller*.

IN THE EVENT THE CLOSING DOES NOT OCCUR BY REASON OF ANY DEFAULT OF SELLER, THEN BUYER SHALL BE ENTITLED, AS ITS SOLE AND EXCLUSIVE REMEDY (EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION), WHETHER AT LAW OR IN EQUITY, TO TERMINATE THIS AGREEMENT AND RECOVER THE DEPOSIT. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, SELLER SHALL NOT BE IN DEFAULT WITH RESPECT TO ANY OF ITS OBLIGATIONS HEREUNDER UNLESS AND UNTIL SELLER RECEIVES NOTICE FROM BUYER SPECIFYING SUCH DEFAULT AND SELLER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF SUCH NOTICE, EXCEPT THAT NO SUCH CURE PERIOD SHALL APPLY TO A DEFAULT BY SELLER WHICH IS THE FAILURE TO CLOSE THE TRANSACTION ON THE CLOSING DATE. FURTHER, NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IF BUYER OBTAINS ACTUAL KNOWLEDGE, PRIOR TO THE CLOSE OF ESCROW, THAT SELLER HAS BREACHED ANY COVENANT HEREUNDER, IF BUYER ELECTS TO PROCEED TO THE CLOSE OF ESCROW, THEN ANY SUCH BREACH SHALL BE DEEMED WAIVED FOR PURPOSES HEREOF.

### 12.07  *Default by Buyer*.

IN THE EVENT THAT THE CLOSING DOES NOT OCCUR BY REASON OF ANY MATERIAL DEFAULT OF BUYER, BUYER AND SELLER ACKNOWLEDGE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER WILL SUFFER.  THEREFORE BUYER AND SELLER HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD SUFFER IN THE EVENT THAT BUYER SO DEFAULTS IS AND WILL BE, AS SELLER'S SOLE AND EXCLUSIVE REMEDY (WHETHER AT LAW OR IN EQUITY), SELLER'S RETENTION OF THE DEPOSIT.  SAID AMOUNT WILL BE THE FULL, AGREED AND SOLE AMOUNT OF MONETARY DAMAGES FOR THE DEFAULT OF BUYER, ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES, INCLUDING WITHOUT LIMITATION THE REMEDY OF SPECIFIC PERFORMANCE, BEING HEREIN EXPRESSLY WAIVED BY SELLER.  THE PAYMENT OF SUCH AMOUNT IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE §§1671, 1676 AND 1677.  SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE §3389.  THIS AGREEMENT WILL THEREUPON BE TERMINATED AND NEITHER PARTY WILL HAVE ANY FURTHER RIGHTS OR OBLIGATIONS HEREUNDER, PROVIDED HOWEVER THAT NOTHING IN THIS SECTION SHALL LIMIT SELLER'S RIGHT TO INDEMNIFICATION PURSUANT TO ANY INDEMNIFICATION PROVISION IN THIS AGREEMENT.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, BUYER SHALL NOT BE IN DEFAULT WITH RESPECT TO ANY OF ITS OBLIGATIONS HEREUNDER UNLESS AND UNTIL BUYER RECEIVES NOTICE FROM SELLER SPECIFYING SUCH DEFAULT AND BUYER FAILS TO CURE SUCH DEFAULT WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT OF SUCH NOTICE, EXCEPT THAT NO SUCH CURE PERIOD SHALL APPLY TO A DEFAULT

BY BUYER WHICH IS THE FAILURE TO CLOSE THE TRANSACTION ON THE CLOSING DATE.

| | |
|---|---|
| **BUYER'S**<br>**INITIALS** | **SELLER'S**<br>**INITIALS** |

## ARTICLE XIII
## TAXES

**13.01**  *Sales Taxes, Filing Fees, Etc*.  Buyer shall be liable for any sales tax or other transfer tax, as well as any applicable conveyance, transfer and recording fees and real estate transfer stamps or taxes imposed on the transfer of the Assets pursuant to this Agreement.  If Seller is required by applicable state law to report and pay these taxes and/or fees, Buyer shall, upon presentment of an invoice by Seller, promptly deliver a check to Seller in full payment of the invoice.

**13.02**  *Other Taxes*.  Except as set forth below, the sale shall be Free and Clear of all real estate, production, property, severance, excise, ad valorem and other similar such taxes or fees (other than income taxes) relating to production of oil, gas and condensate attributable to the Assets, but the sale will be subject to the Assumed Real Property Taxes.  Such taxes and fees accruing prior to the Effective Time shall be paid or otherwise removed by Seller, and all such taxes relating to such production on and after the Effective Time shall be the responsibility of Buyer.  The Parties shall make an adjustment in calculating the Preliminary Settlement Statement and the Final Settlement Statement, for any portion of such other allowable taxes for which Seller is responsible and from which Seller may not otherwise be able to sell Free and Clear.  In furtherance of doing so, Seller shall provide to Buyer its best estimate of the portion of taxes its will be responsible for at least five (5) Business Days prior to Closing and at least fifty-five days following the Closing, Buyer shall furnish to Seller a schedule of the actual taxes paid and Seller's portion of such taxes.  If there is any dispute as to a Party's proportionate share of taxes, the dispute may be submitted to the Bankruptcy Court for determination.

## ARTICLE XIV
## MISCELLANEOUS

**14.01**  *Disclaimers*.

(a)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article V, (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY EMPLOYEE, REPRESENTATIVE, OR AGENT OF SELLER), AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY SUCH REPRESENTATION OR WARRANTY.

BY BUYER WHICH IS THE FAILURE TO CLOSE THE TRANSACTION ON THE CLOSING DATE.

_____
**BUYER'S
INITIALS**

_MW_
**SELLER'S
INITIALS**

## ARTICLE XIII
## TAXES

**13.01   *Sales Taxes, Filing Fees, Etc.*** Buyer shall be liable for any sales tax or other transfer tax, as well as any applicable conveyance, transfer and recording fees and real estate transfer stamps or taxes imposed on the transfer of the Assets pursuant to this Agreement. If Seller is required by applicable state law to report and pay these taxes and/or fees, Buyer shall, upon presentment of an invoice by Seller, promptly deliver a check to Seller in full payment of the invoice.

**13.02   *Other Taxes.*** Except as set forth below, the sale shall be Free and Clear of all real estate, production, property, severance, excise, ad valorem and other similar such taxes or fees (other than income taxes) relating to production of oil, gas and condensate attributable to the Assets, but the sale will be subject to the Assumed Real Property Taxes. Such taxes and fees accruing prior to the Effective Time shall be paid or otherwise removed by Seller, and all such taxes relating to such production on and after the Effective Time shall be the responsibility of Buyer. The Parties shall make an adjustment in calculating the Preliminary Settlement Statement and the Final Settlement Statement, for any portion of such other allowable taxes for which Seller is responsible and from which Seller may not otherwise be able to sell Free and Clear. In furtherance of doing so, Seller shall provide to Buyer its best estimate of the portion of taxes its will be responsible for at least five (5) Business Days prior to Closing and at least fifty-five days following the Closing, Buyer shall furnish to Seller a schedule of the actual taxes paid and Seller's portion of such taxes. If there is any dispute as to a Party's proportionate share of taxes, the dispute may be submitted to the Bankruptcy Court for determination.

## ARTICLE XIV
## MISCELLANEOUS

**14.01   *Disclaimers.***

(a)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article V, (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY EMPLOYEE, REPRESENTATIVE, OR AGENT OF SELLER), AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY SUCH REPRESENTATION OR WARRANTY.

(b)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article V, SELLER EXPRESSLY DISCLAIMS, AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED BY ANY EMPLOYEE, REPRESENTATIVE, OR AGENT OF SELLER, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF SELLER OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY BUYER REPRESENTATIVE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT.    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article V, SELLER FURTHER DISCLAIMS, AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY ASSETS, RIGHTS OF A BUYER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE CONSIDERATION, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT, BUYER SHALL BE DEEMED TO BE ACQUIRING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT BUYER WILL MAKE OR CAUSE TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(c)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN Article V, SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF HAZARDOUS MATERIALS OR OTHER MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND BUYER ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY SUCH REPRESENTATION OR WARRANTY, AND BUYER SHALL BE DEEMED TO BE ACQUIRING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT

BUYER WILL MAKE OR CAUSE TO BE MADE SUCH ENVIRONMENTAL
INSPECTIONS AS BUYER DEEMS APPROPRIATE.

(d)    Seller and Buyer agree that, to the extent required by applicable law to be
effective, the disclaimers of certain representations and warranties contained in this Section 14.01
are conspicuous disclaimers for the purpose of any applicable law.

**14.02    *Final Settlement Statement*.** As soon as reasonably practicable after sixty
(60) days following the Closing but not later than the one hundred and twentieth (120th) day
following the Closing Date (the "*Final Settlement Date*"), Seller shall prepare and deliver to Buyer
the final settlement statement setting forth the Purchase Price hereunder and an accounting of all
cash amounts related to the Assets and the transactions contemplated by this Agreement, including,
without limitation, any accounting for taxes pursuant to this Agreement, based on the most recent
actual figures for each adjustment (the "*Final Settlement Statement*"). If Seller does not deliver the
Final Settlement Statement to Buyer on or before the Final Settlement Date, the Preliminary
Settlement Statement shall be deemed to be the Final Settlement Statement, and such Final
Settlement Statement shall become final and binding upon the Parties. Within ten (10) days after
the earlier of (i) the expiration of the Final Settlement Date or (ii) the delivery by Seller of the
Final Settlement Statement, (x) Buyer shall pay to Seller the amount by which the final adjusted
Purchase Price exceeds the preliminary adjusted Purchase Price or (y) Seller shall pay to Buyer
the amount by which the preliminary adjusted Purchase Price exceeds the final adjusted Purchase
Price, as applicable.

**14.03    *Survival*.** Buyer's representations, warranties, covenants and agreements in
this Agreement and any document delivered pursuant hereto shall survive the Closing.

**14.04    *Assignability*.** This Agreement, and the rights, interests and obligations
hereunder, shall not be assigned by the Buyer by operation of law or otherwise without the express
written consent of the Seller (which consent may be granted or withheld in the sole discretion of
the Seller).  Any purported assignment by Buyer in violation of the foregoing provisions shall be
void and of no effect.

**14.05    *Seller's Disclaimers*.**  Except as expressly set forth in this Agreement,
Seller disclaims all liability and responsibility for any representation, warranty, statements or
communications (orally or in writing) to any Person (including, any information contained in any
opinion, information or advice that may have been provided to any such Person by any officer,
director, stockholder, partner, employee, agent, consultant, representative or contractor of Seller,
or any engineer or engineering firm, or other agent, consultant or representative) wherever and
however made with respect to the transactions contemplated hereby.

**14.06    *Dispute Resolution*.**    EXCEPT AS OTHERWISE EXPRESSLY
PROVIDED IN THIS AGREEMENT, ANY CONTROVERSY, DISPUTE OR CLAIM
BETWEEN THE PARTIES HERETO ARISING UNDER, OR RELATED TO, THIS
AGREEMENT SHALL BE DETERMINED BY THE BANKRUPTCY COURT (OR, IN THE
EVENT THE BANKRUPTCY CASE HAS ENDED AND THE BANKRUPTCY COURT DOES
NOT REOPEN THE CASE UPON APPLICATION OR SHALL DETERMINE IT DOES NOT
HAVE OR WILL NOT EXERCISE JURISDICTION, THE FEDERAL DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA OR A COURT OF COMPETENT JURISDICTION LOCATED IN THE COUNTY OF LOS ANGELES BARBARA, CALIFORNIA) WHICH SHALL HAVE EXCLUSIVE JURISDICTION TO DETERMINE ANY SUCH DISPUTE, AND EACH PARTY HEREBY CONSENTS TO THE EXERCISE OF SUCH JURISDICTION BY EACH SUCH COURT.

      **14.07** *Notices*. All notices, requests, instructions or other correspondence to be given hereunder by one Party to another shall be in writing and mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered personally (which shall include delivery by a courier or messenger service) or by telecopy transmission with confirmation of receipt, as follows:

If to Seller, addressed to:

      Michael A. McConnell
      201 Main Street, Suite 2500
      Fort Worth, Texas  76102
      E-mail: michael.mcconnell@kellyhart.com

with a copy to (which shall not constitute notice):

      Danning, Gill, Israel & Krasnoff, LLP
      c/o Eric P. Israel
      1901 Avenue of the Stars, Suite 450
      Los Angeles, CA  90067-6006
      E-mail: eisrael@danninggill.com

with a copy to (which shall not constitute notice):

      O'Melveny & Myers LLP
      c/o Evan M. Jones
      400 S. Hope Street, 18th Floor
      Los Angeles, CA 90071
      Email: ejones@omm.com

If to Buyer, addressed to:

      Team Maria Joaquin, L.L.C.
      c/o Scott Nonhof
      16202 Butera Road
      Magnolia, TX 77355
      Email: scott.nonhof@teamoperating.com

with a copy to (which shall not constitute notice):

      Thompson & Knight, LLP
      c/o Richard B. Hemingway
      811 Main Street, Suite 2500

Houston, TX 77002
Email: Richard.Hemingway@tklaw.com

with a copy to (which shall not constitute notice):

Thompson & Knight, LLP
c/o Tye C. Hancock
811 Main Street, Suite 2500
Houston, TX 77002
Email: Tye.Hancock@tklaw.com

Notices given by mail or by personal delivery shall be effective (and deemed to have been given) upon actual receipt. Notices given by telecopier shall be effective upon actual receipt if received and confirmed by return transmission during the recipient's normal business hours or at the beginning of the recipient's next Business Day after receipt if not received during the recipient's normal business hours.

Buyer and Seller may change any address to which notice is to be given to it by giving notice thereof as provided above of such change of address.

14.08    *Governing Law*.    The provisions of this Agreement and the documents delivered pursuant hereto shall be governed by and construed in accordance with the laws of the State of California (excluding any conflicts-of-law rule or principle that might refer same to the laws of another jurisdiction); and exclusive venue for any legal proceeding regarding this Agreement shall be the Bankruptcy Court.

14.09    *Waiver of Jury Trial*.    SELLER AND BUYER DO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, AND ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING BASED UPON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.10    *No Admissions*.    Buyer and Seller agree that neither this Agreement, nor any part hereof, nor any performance under this Agreement, nor any payment of any amount pursuant to any provision of this Agreement shall constitute or be construed as a finding, evidence of, or an admission or acknowledgement of any liability, fault, or past or present wrongdoing, or violation of any law, rule, regulation, or policy, by either Seller or Buyer or by their respective officers, directors, employees, or agents.

14.11    *Entire Agreement; Amendments and Waivers*.    This Agreement (together with all Schedules) constitutes the entire agreement between the Parties pertaining to the subject matter hereof and thereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no representations, warranties, covenants or agreements between the Parties in connection with the subject matter hereof and thereof except as set forth specifically herein or therein.    No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party or Parties to be bound thereby and expressly referencing this Agreement.    No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless

of whether similar) nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

**14.12   *Successors; Third Party Beneficiaries*.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Parties and their respective successors and assigns any rights, benefits or obligations hereunder.

**14.13   *Severability*.**   If any one or more of the provisions contained in this Agreement or in any document delivered pursuant hereto shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such document.

**14.14   *Further Assurances*.**  After Closing, the Parties will take all appropriate action and execute any documents, instruments or conveyances of any kind that may be reasonably necessary to effectuate the intent of this Agreement.

**14.15   *Waiver of Consequential Damages*.**   NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL HAVE ANY LIABILITY UNDER THIS AGREEMENT FOR (AND EACH PARTY HEREBY RELEASES THE OTHER PARTY FROM) EXEMPLARY, PUNITIVE, SPECIAL, INDIRECT, CONSEQUENTIAL, REMOTE OR SPECULATIVE DAMAGES.

**14.16   *Time of the Essence*.**  With respect to all dates and time periods in this Agreement, time is of the essence. If the date specified in this Agreement for giving any notice or taking any action is not on a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (or the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day.

**14.17   *Multiple Counterparts*.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any signature hereto delivered by a Party by facsimile transmission or other electronic transmission shall be deemed an original signature hereto.

### 14.18   *Renewals and Extensions and New Leases*.

This Agreement and the Sale shall apply to all renewals, extensions, modifications, ratifications, reinstatements and other similar arrangements of the Leases (or other determinable interests) which are included in the Assets, whether such renewals, extensions, modifications, ratifications, reinstatements or other similar arrangements have heretofore been obtained by Seller or its predecessors or are hereafter obtained by or for Seller or its predecessors or any Affiliate thereof and whether or not the same are described in Exhibit A.

{signature page to follow}

IN WITNESS WHEREOF, the Parties hereby execute this Agreement as of Execution Date.

**SELLER**:

**HVI CAT CANYON, INC.**, a Colorado corporation

By: _____

Name: Michael A. McConnell

Title:   Chapter 11 Trustee _____

**BUYER**:

**TEAM MARIA JOAQUIN, L.L.C.**, a Delaware limited liability company

By: _____

Name: April Hammel _____

Title:   Secretary _____

**MARIA JOAQUIN BASIN, L.L.C.**, a Delaware limited liability company

By: _____

Name: Houdit O. Makabeh _____

Title:   Secretary _____

**<u>EXHIBIT A</u>**

LEASES

*See attached.*

| Lease/ Fee Property | Field | Lease/ Fee Property Name | Legal Description | Document | Book | Page |
|---|---|---|---|---|---|---|
| Lease | Casmalia | Arellanes | SUBJECT ACREAGE: Portion of Punta de la Laguna Ranch, located in Section 13 of Township 9 North, Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West, of SBB&M, containing 434.64 acres, more or less, in Santa Barbara County, California. | Oil and Gas Lease Dated 8-16-1930 | 220 | 421 |
| | | | | Oil and Gas Lease Dated 4-18-1945 | 649 | 176 |
| | | | | Agreement dated march 30, 1961 by and between T.T. Bonetti et al and Union Oil (Commingling Agreement) | Unrecorded | |
| | | | SUBJECT LEASE: Oil & Gas Lease, dated August 16, 1930, by and between Charles T. Arellanes et al, as Lessor, and 0. C. Field, as Lessee, recorded in Book 220, Page 421, of official records of Santa Barbara county, California, originally covering 600 acres, more or less. | Quitclaim Deed dated October 27, 1960 from Union Oil to Lessors | 1843 | 396 |
| | | | | Quitclaim Deed from Ralph J. Tingle Jr. to Union Oil | 2146 | 446 |
| | | | | Partial Quitclaim Deed dated July 18, 1985 recorded | 39770 | |
| Lease | Casmalia | Bonetti | SUBJECT LEASE: Oil and Gas Lease, dated November 1, 1964, by and between T.B Bonetti et a Lessors and Union Oil Company, as lessor, recorded in Book 2104, Page 1188 of Official Records of Santa Barbara County, California | Oil and Gas Lease Dated 11-1-1964 | 2104 | 1188 |
| | | | | Memorandum of Lease Dated 11-1-1964 | 2335 | 10 |
| | | | | Amendment to Oil and Gas Lease Dated 10-28-70 | 2207 | 241 |
| | | | | Amendment to Oil and Gas Lease 9-30-67 | | |
| Lease | Casmalia | Escolle | SUBJECT ACREAGE: All of those certain lands located in Santa Barbara County, State of California, described as follows: | Oil and Gas Lease Dated 03-14-46 | 688 | 45 |
| Lease | Casmalia | Loope | | Quitclaim Deed Dated 10-16-1946 | 708 | 473 |
| | | | Parcel 1 | Quitclaim Deed Dated 6-3-1966 | 2168 | 81 |
| | | | Commencing at the northeast corner of the Escolle property being the terminous of the eighth course in the lands described in Oil and Gas Lease dated January 7, 1980 between Escolle Tenants-in- Common, as Lessor, and Union Oil Company of California, as Lessee, a Memorandum of which was recorded May 29, 1980 in Book 80, Page 21450, Official Records of Santa Barbara County, California. from which corner No. 13 of Rancho Todos Santos, marked T.5 Memorandum Oil and Gas Lease & Agreement Dated 1-7-80 | not recorded | |
| | | | No. 13. bears North Westerly 64.00 chains to a point on the section line between Sections 21 and 28, T9N-R34W. S.B.B. & M. thence west 25.51 chains to a station: thence north, 35.28 chains to said Corner No. 13, thence from said | 1980-21450 | |
| | | | Lease and Agreement Dated 9-27-83 | 726 | 290 |
| | | | point of commencement, north 89° 17'4" west, 2770.0 feet to the true point of beginning; thence from said true point of beginning the following courses and distances:, ecen 1591.4 feet; south 710.5 feet: west 414.9 feet; south 829.0 | Amendment to Lease Dated 1-31-50 | 907 | 155 |
| | | | feet: east 659.2 feet: 1278.9 feet: south 654.8 feet: to a point on the southerly line of Block II of said Escolle Lease: thence East along said south line 805.8 feet: thence North: 2093.0 feet: thence west 756.7 feet North. 728.2 feet to | Amendment to Oil and Gas Lease Dated 11-18-52 | 1408 | 531 |
| | | | true point of beginning and containing 120 acres. more or less. | Amendment to Oil and Gas Lease Dated 11-6-54 | 1488 | 68 |
| | | | | Amendment to Oil and Gas Lease Dated 12-15-63 | 2032 | |
| | | | Parcel II | Amendment to Oil and Gas Lease 1-1-1983 | 1983-36591 | |
| | | | Commencing at Corner No. 13 of Rancho Todos Santos marked T.S. No. 13, from which a live oak 15 inches in diameter bears south 37°west. 6.30 chains distant: thence along the north line of said Rancho north 83°03' west: 103.25 | Amendment to Oil and Gas Lease Dated 7-27-2004 (Recorded) | 2004-79968 | |
| | | | chains to a station: thence north 77.98 chains to a station: thence north 70.40 chains to the true point of beginning from which the one-quarter section corners between Sections 28 and 29, T9N-R34W. S.B.B. & M. bears south 8.70 | Assignment of Interests in Oil, Gas and Mineral Lease Dated 6-11-1999 | 1999-50820 | |
| | | | chains distance: thence from said true point of beginning the following courses and distances: north 718.2 feet: west 640.6 feet: North 900.4 feet: west 8840 feet: south 1106 feet: east 299.6 feet: south, 512.4 feet to a point on the | Escolle Lease Response.pdf 2 | | |
| | | | southerly line of Block I of said Escolle Lease: thence east along said south line 1231. 1 feet to the true point of beginning and containing 40 acres, more or less. | | | |
| | | | Parcel III | | | |
| | | | Commencing at Corner No. 13 of Rancho Todos Santos marked T.S. No. 13 from which a live oak 15 inches in diameter bears south 37°west: 6.30 distant: thence along the north line of said Rancho north 83°47' west. 103.25 chains to | | | |
| | | | a station: thence south 77.96 chains to a station: thence east 70.40 chains to a station from which the's Section corners between 28 and 29, T9N, R34W, S.B.B.& M. bears South 8.70 chains distant: thence South 176.8 feet to a point in | | | |
| | | | the east line of Block II of said Escolle Lease and the true point of beginning; thence continuing south through said ½ section corners and along said east line 934.0 feet; thence east 934.0 feet; thence north 934.0 feet, thence west 934.0 | | | |
| | | | feet to the true point of beginning and containing 20 acres. | | | |
| | | | SUBJECT ACREAGE: A portion of Rancho Punta de la Laguna, located in Sections 13 and 24 of Township 9 North, Range 35 West, and Sections 19 and 19 of Township 9 North, Range 34 West, containing 491.00 acres, more or less, in Santa Barbara County, California. | | | |
| | | | SUBJECT LEASES: | | | |
| Lease | Casmalia | Morganti | SUBJECT PROPERTY: A part of Rancho Punta de la Laguna, Santa Barbara County California, Commencing at a point on the easterly line of the Southern Pacific Railway on the property line between Juan B. Arrellanes Estate on the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a | Oil and Gas Lease Dated 6-18-30 | 222 | 538 |
| | | | the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a | Partial Quitclaim Deed Dated 1-7-1960 Recorded | 91-009978 | |
| | | | distance of 4325.1 feet to a 2" brass cap pipe monument; thence N. 83 18'W. along the aforementioned property line a distance of 2661.3 feet to a 2" pipe set by S.P. Co. surveyors; thence continuing N. 83 18'W. along th | 1st Amend and Agree dtd 5-16-94 | not recorded | |
| | | | South line of said Rancho 1700 feet. more or less, to the intersection of the Easterly right-of-way line of the Southern Pacific Railroad; thence Northerly along the Easterly right-of-way of the Southern Pacific Railroad to the point of | 2nd Amend and Agree dtd 05-18-1999 | not recorded | |
| | | | commencement, excepting therefrom a 6.89 acre tract of land conveyed to the Associated Oil Company, and containing a net area of 491 acres, more or less. | 3rd Amend and Agree 5-18-2004 | not recorded | |
| | | | | 4th Amend and Agree dtd 12-11-2008 | not recorded | |
| | | | SUBJECT LEASE: Oil and Gas Lease dated August 18, 1930, by and between Giuseppe Morganti, as Lessor, and 0. C. Field, as Lessee, and recorded in Book 222, Page 538 in the Official Records of Santa Barbara | 5th Amend & Agree 6-1-2009 'Waste Water' | not recorded | |
| | | | County, California, as amended. | 6th Amendment and Agreement dtd February 20, 2014 Counterpart A | not recorded | |
| | | | | 6th Amendment and Agreement dtd February 20, 2014 Counterpart B | not recorded | |
| | | | | 6th Amendment and Agreement dtd February 20, 2014 Counterpart C | not recorded | |
| | | | | 7th Amendment and Agreement 5-15-17 | not recorded | |
| | | | | Quitclaim Deed Dated 1-1-1994 | 94-047788 | |
| | | | | Memo of Oil and Gas Lease Dated 11-20-95 | 96-006527 | |
| | | | | Oil and Gas Lease Dated 11-20-95 62 Acre Parcel | not recorded | |
| Lease | Casmalia | Muscio | SUBJECT ACREAGE: The portion of Subdivision No. 16 of the Rancho Punta de la Laguna located in Section 24 of Township 9 North, Range 35 West, containing 30 acres, more or less, in Santa Barbara County, California. | Memorandum of Oil and Gas Lease Dated 11-19-1971 (Recorded) | 2386 | 581 |
| | | | | Oil & Gas Lease Dated 11-19-1971 | | |
| | | | SUBJECT LEASE: Oil and Gas Lease, dated November 19,1971, by and between Ted H. Muscio et al, as Lessors and Union Oil Company, as Lessee, which lease originally covered 253.85 acres, recorded February 14, 1972, in book 2386, Page 581, of Official Records of Santa Barbara County, California | Amend to Oil and Gas Lease Dated 11-10-1976 (Recorded) | 77- | 23650 |
| | | | | Partial Quitclaim Dated 10-24-1984 (Recorded) | 1984-06-1654 | |
| | | | | Lease Amendment Dated 12-30-14 | 2015-0021373 | |
| Lease | Casmalia | Righetti | SUBJECT ACREAGE: Portion of Lot or Subdivision No. 13 of the Rancho Punta de la Laguna, located in Section 13 of Township 9 North, Range 35 West, containing 40.00 acres, more or less, INSOFAR AND ONLY INSOFAR as it covers rights to a depth of 4,500'. | Oil and Gas Lease Dated 2-8-1954 | 301 | 59 |
| | | | | Partial Quitclaim Deed Dated 5-6-1958 Righetti | 1526 | 289 |
| | | | | Agreement Dated 9-30-1959 (Recorded) | 1724 | 284 |
| Lease | Cat Canyon | Cenoco | SUBJECT ACREAGE: Lots 5 & 6 of Section 31 of Township 9 North, Range 32 W, SBB&M, as recorded in volume 1226, Page 437 of Official Records of Santa Barbara County, California, more or less 58.05 acres. | Corporation Grant Deed Dated July 17, 1964 | 2060 | 851 |

| Lease | Cat Canyon | Goodwin A | SUBJECT ACREAGE: The east half of Section 10, Township 9 North, Range 33 West, Santa Bernardino Meridian, as shown on official plat thereof filed in the District Land Office January 7, 1892, said land being shown as Tracts 119 to 124, both inclusive, on map of the Bradley-Gurey Tract, recorded in Book 1, page 32 of Maps and Surveys, in the office of the County Recorder of said county, together with those portions of streets or roads adjoining said lots as shown on said map included with the lines of said east half of Section10. | Oil and Gas Lease by and between Continental Oil Company, as Grantor and OC Fields Gasoline Corp dated June 6, 1956 and recorded on April 1, 1954 in Book 1228 and Page 437. | 1228 | 437 |
| | | | | Oil and Gas Lease Dated 5-1-1957 | not recorded | |
| | | | | Oil and Gas Lease Dated 1-1-1962-Long Form | not recorded | |
| | | | | Oil and Gas Lease Dated 1-1-1962-Short Form | 1937 | 910 |
| | | | | Amendment to Oil and Gas Lease Dated 1-1-1962 | 2146 | 175 |
| | | | EXCEPTING THEREFROM those portions thereof described as follows | Ratification of Lease Agreement Dated 1-1-1962 | 1937 | 915 |
| Lease | Cat Canyon | Lloyd | SUBJECT ACREAGE: The West two-thirds of Section 15, in Township 9 North, Range 33 West, San Bernardino Meridian, in the County of Santa Barbara, State of California, according to the Official Plat thereof. EXCEPTING from the Southwest quarter of the Southwest quarter of said Section 15, one acre of land described in the Deed from Chas. O. Mero, et ux., to the Highland School District, dated May 18, 1894, and recorded in Book 47, Page 124 of Deeds. | 3-2-1965 Lease ONE HALF (To distinguish the lease only) | | |
| | | | | Oil and Gas Lease Dated 3-2-1965 | 2097 | 319 |
| | | | | Oil and Gas Lease Dated 3-2-1965 Long Form | 2097 | 319 |
| | | | Further excepting and reserving therefrom unto Waldo A. Gillette Jr. an undivided 25% interest in and to all mineral rights including oil, gas and other hydrocarbon substances, in, on or under said land, but without the right to enter upon the surface of said land. | Assignment of Oil and Gas Lease Dated June 1, 1970 | 2312 | 758 |
| | | | | Amendment to Oil and Gas Lease Dated 1-20-1970 to extend term for Oil and Gas Lease Dated 3-2-1965 | 2097 | 319 |
| | | | SUBJECT LEASES: | Amendatory Agreement Dated Feb 20, 1989 to Oil and Gas Lease Dated 3-2-1965 (a) | not recorded | |
| | | | 1. Oil and Gas Lease, dated April 21, 1970, by and between Lloyd Corporation, Ltd and Shell Oil Company recorded in Book 2312, Page 761 of Official Records of Santa Barbara County, California. | Amendatory Agreement Dated Feb 20, 1989 to Oil and Gas Lease Dated 3-2-1965 (b) | not recorded | |
| | | | 2. Oil and Gas Lease dated March 7, 1965, by and between A.A. Gillette et al and Lloyd Corporation, Ltd recorded in Book 2097, Page 319 of Official Records of Santa Barbara County, California. | Amendatory Agreement Dated 7-27-1989 to Oil and Gas Lease Dated 3-2-1965 | not recorded | |
| | | | | Amendatory Agreement Dated 6-30-1989 to Oil and Gas LEase Dated 3-2-1965 (552) | not recorded | |
| | | | | Amendatory Agreement Dated 6-30-1989 to Oil and Gas Lease Dated 3-2-1965 (3,195) | not recorded | |
| | | | | Amendatory Agreement Dated 6-30-1989 to Oil and Gas Lease Dated 3-2-1965 (1,065) | not recorded | |
| | | | | Amendatory Agreement Dated 9-14-1987 | not recorded | |
| | | | | Commingling of Leases: Amendment of Oil and Gas Lease Dated 9-14-87 Recorded March 18, 1988 | 88-016240 | |
| | | | | 4-21-1970 Lease ONE HALF (CMT-to distinguish the lease only | | |
| | | | | Oil and Gas Lease Dated 4-21-1970 (recorded) | 2312 | 761 |
| | | | | Operating Provisions 4-21-1970 Lease | not recorded | |
| | | | | Commingling of Leases: Amendment to Oil and Gas Lease Dated 9-14-1987 to Oil and Gas Leases Dated 4-21-1 | not recorded | |
| Lease | Cat Canyon | Los Flores | Parcel One | | | |
| | | | The North Half of the SW Quarter (N1/2 SW ¼) of Section 22 Township 9 N, Range 33 W, S. B. B. & M. in the County of Santa Barbara State of California, according to government survey thereof. | Oil and Gas Lease Dated 12-8-1947 (160 Net Acres) | 762 | 413 |
| | | | | Oil and Gas Lease 7-28-1948 (30 Acres) | 810 | 167 |
| | | | Parcel Two | Amendment of Oil and Gas Lease Dated 6-3-1982 | 82-26612 | |
| | | | That portion of the Rancho Los Alamos, in the County of Santa Barbara, State of California, described as follows: | Agreement Dated 6-30-1986 | not recorded | |
| | | | Beginning at the Southwest corner of section 22, Township 9 North, Range 33 West, S.B.B.&M., | | | |
| | | | At the corner of said Rancho Los Alamos Known as "A No. 11" thence Westerly, along the Westerly prolongation of the Southerly line of said section 22 to its intersection with the Southerly prolongation of the Westerly line of the Easterly ½ of the NEQ (E1/2 NE1/4) of Section 21 in said township 9 North, Range 33 West, S.B.B.&M,; THENCE Northerly, along said last mentioned line or its prolongation to the Southerly line of the North ½ of said Section 21; thence easterly, along said last mentioned line to the Northwest corner of the Southwest quarter of said section 22 above referred to; thence southerly along the westerly line of said section 22 to the point of beginning. | | | |
| | | | SUBJECT LEASES: Oil and Gas Lease, dated December 8, 1947, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 762, Page 413 of Official Records of Santa Barbara County, California. | | | |
| | | | Oil and Gas Lease, dated July 28 8, 1948, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 810, Page 167 of Official Records of Santa Barbara County, California. | | | |
| Lease | Cat Canyon | Palmer Stundel | SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West, SBB&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California. | Oil and Gas Lease March 23, 1905 | Book H of Leases | 209 |
| | | | | Oil and Gas Agreement Dated April 1, 1948 | 777 | 146 |
| | | | | Assignment of Oil and Gas Lease Dated 11-30-1953 Palmer to Union Half Interest | 1196 | 293 |
| | | | | Grant Deed dtd 3-30-1949 (Skin Pond) | 850 | 99 |
| | | | | Quitclaim dtd March 30, 1950 | 910 | 236 |
| | | | | Deed dtd 2-18-1964 Rec Bk 2079 Pg 1477 Twitchell to Union | 2079 | 1476 |
| | | | | Deed dtd 2-24-1964 Rec Bk 2079 Pg 1478 Twitchell to Union | 2079 | 1478 |
| | | | | Royalty Agreement dtd 2-18-1964 by and between Union Oil and Lucielle Rosenthal | 2079 | 1482 |
| Lease | Cat Canyon | Thomas | SUBJECT ACREAGE: East one-third of the South half (E 1/3 of S ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian. | Oil and Gas Lease Dated 10-1-1970 | | |
| | | | | Memorandum of Oil and Gas Lease Part I Bk 2325 Pg 209 | 2345 | 209 |
| | | | SUBJECT LEASE: Oil and Gas Lease, dated October 1, 1970, by and between C.T Thomas et al and Anna Pacifica Corp. recorded in Book 2325, Page 209 of Official Records of Santa Barbara County, California. | Memorandum of Oil and Gas Lease Part II Bk 2325 Pg 604 | 2325 | 604 |
| | | | | Amend Agmn 12-17-88 | not recorded | |
| | | | | Amend Agmn 1-6-89 | not recorded | |
| | | | | Amend Agmn 1-24-94 | not recorded | |
| | | | | Amend Agmn 1-24-94 Part II | not recorded | |
| | | | | Amend Agmn 6-18-96 | not recorded | |
| | | | | Amend Agmn 2-1-2004 (Shut In Royalty) | not recorded | |
| | | | | Amend Agmn 2-1-2004 Thomas Lee | not recorded | |

| Lease | Belridge | Belridge O'Donnell Oil and gas lease dated October 2, 1915 by and between T. A. O'Donnell, et al... | O'Donnell-Indenture of Lease Dated 10-2-1915 | 29 | 208 |
|---|---|---|---|---|---|
| | | SUBJECT TO: without limitation, the effects of prior conveyance of the "Tumblor Zone", per Partial Assignment of Oil and Gas Lease from Union Oil Company to Belridge Oil Company dated May 27, 1953, recorded June 17, 1953 Book 2093 at Page 250 of Official Records; and the effects of a prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated September 24, 1969, recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County | | | |
| Lease | Belridge | Gibson Oil and gas lease dated December 14, 1915 by and between George Gibson, as lessor and Union Oil Company as lessee recorded on April 28, 1916 in Book 29 at Page 17 of the Official Records of Kern County, California covering the... | Indenture of Leased dated 12-14-1915 | 29 | 17 |
| | | | Amend to Oil and Gas Dated 9-29-1971 | 4626 | 649 |
| | | SUBJECT TO: without limitation, the effects of prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969 , recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County, California dated July 1, 1949, recorded November 3, 1949 in Book 1598 at Page 323 of Official Records. | | | |
| Lease | Santa Maria Valley | Adam SUBJECT ACREAGE: That portion of the West Half (W/2) of the Northeast Quarter (NE/4) of Section 24, T9N, R34W, SBBM lying northerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said W/2 of NE/4 of said Section 24, Santa Barbara County, California | Oil and Gas Lease | 2323 | 1239 |
| | | | Amend to Oil and Gas Lease dtd July 1, 1976 Recorded | 2624 | 2637 |
| | | SUBJECT LEASE: Oil & Gas Lease dated July 17, 1976, by and between Thomas B. Adam, II, Frederick 0. Sherrill and Elizabeth Ann Newark, as Lessor, and Union Oil Company of California, as Lessee, said lease or memorandum of which was recorded October 13, 1970, in Book 2323, Page 1238 of Official Records of Santa Barbara, California. | Amendment to Oil and Gas Lease dtd July 13, 1973 Recorded | 2476 | 569 |
| Lease | Santa Maria Valley | Bettiga SUBJECT ACREAGE: That portion of the East Half (E/2) of the Northeast Quarter (NE/4) of Section 24, T3ON, R34W, SBBN lying southerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of E/2 of NE/4 of said Section 24, Santa Barbara County, California | Memorandum of Oil and Gas Lease Bk 2039 Pg 1391 | 2039 | 1931 |
| | | | Oil & Gas Lease Dated 12-26-1933 | 301 | 16 |
| | | SUBJECT LEASE: That certain Oil & Gas Lease dated December 7th, 1995, recorded 5/7/96, Document# 96-028845, by and between James Bettiga under Bettiga Trust #1, dated 11/1/78 and James P Bettiga, Successor Trustee of EiOil and Gas Lease Dated 12-7-1995 Rec 1996-28845 Bettiga Revocable Trust dated 11/30/84, as Lessor and Saba Petroleum, Inc., as Lessee. | Oil & Gas Lease Dated 5-23-1963 | not recorded | |
| | | | Oil and Gas Lease Dated 12-7-1995 Rec 1996-28845 | 1996-28845 | |
| Lease | Santa Maria Valley | Bradley Land Co - Bradley Consolida Township 9 North, Range 33 West, S.B.B. &M. 40109 | Oil and Gas Lease Dated 12-1-1965 (40161) Long Form | 2204 | 922 |
| | | Section 5: S/2 SW/4, NW/4 SW/4 Containing 120 acres, more or less | Memorandum of Oil and Gas Lease Dated 12-1-1965 (40161) 9-14-1967-26359 | | |
| | | | Oil and Gas Lease Dated 2-17-1972 (Long Form) (40109) | | |
| | | SUBJECT LEASE AND DOCUMENTS | Memorandum of Oil and Gas Lease Dated 2-17-1972 (40109) Rec 3-13-1972-8424 | 2390 | 581 |
| | | 1. Oil & Gas Lease dated February 17, 1972, by and between Bradley Land Company and Shell Oil Company said lease was recorded on March 13, 1972 in Book 2390, Page 581 of the Official Records of Santa Barbara County, California. | Oil and Gas Amendment Dated 8-5-1986 (Unrecorded) (40109) | | |
| | | | Memorandum of Oil and Gas Lease dated 1-16-1969 (40159) 3-27-1969-8329 | 2266 | 507 |
| | | 2. 3/13/1972-8424, Book 2390, Page 581 Oil and Gas Lease by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee | Oil and Gas Lease Amendment dated 11-1-1972 (40159; 40161) Rec. 11-22-1972-45991 | 2431 | 1474 |
| | | 3. 7/26/1975-29517 Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee | | | |
| | | 4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40003, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease. | | | |
| | | 5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases. | | | |
| | | 6. 4/13/1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands:<br>Township 9 North, Range 33 West, S.B.B.&M.<br>Section 5: SW/4 SE/4<br>Section 6: S/2 SE/4 SE/4 | | | |

193

40159
Township 9 North, Range 33 West, S.B.B. &M.
Section 6:  SW/4 NW/4, S/2 NW/4 NW/4, N/2 NE/4 SW/4, N/2 NW/4 SW/4
Containing 80 acres, more or less

SUBJECT LEASES:
1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in on March 27, 1969 in Book 2266, Page 307 of the Official Records of Santa
Barbara County, California.

2. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where
consolidated by parties herein.

3. Unrecorded Consolidation Agreement dated 10/1/1973 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessors, wherein parties agree to consolidate and join the leases described
and to be operated as single leasehold with the 40001  8/13/1970-71557, Book 7317, Page 975 lease as the controlling or primary lease.
5. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil
reassigns the following described land:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4  SE/4, Section 6 T9N, R33W, S.B.B.&M.

6. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as
Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in the following described lands:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4
  Section 6, T9N, R33W, S.B.B. &M.

7. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres
in the following described lands:
40161
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: E/2 NW/4, SW/4 NE/4, S2 NW/4 NE/4, NW/4 SE/4, N2 NE/4 SW/4
Containing 200 acres, more or less

SUBJECT LEASES:
1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in Book 2266, Page 307 of the Official Records of Santa Barbara County,
California.

2. Oil and Gas Lease dated December 1, 1965 recorded in Book 2264, Page 922 by and between Bradley Land Company and Standard Oil Company.

3. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where
consolidated by parties herein.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to commingle all production from said consolidated leases.

6. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil
reassigns the following described land:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 N/2 SW/4, SW/4 SE/4,  Section 6 T9N, R33W, S.B.B.&M.

7. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in
the following described lands:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4
  Section 6, T9N, R33W, S.B.B. &M.

8. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc.,  as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres

| Lease | Santa Maria Valley | Bradley Lands Unit | 40014 | Memo Oil and Gas Lease Dated 10-3-1956 (40014) | 1411 | 162 |
| | | | Township 9 North, Range 33 West, S.B.B. &M. | Oil and Gas Lease Dated 10-3-1956 (40014) | | |
| | | | Section 6: NE/4, SE/4, NE/4 | Memo Oil and Gas Lease Dated 4-4-1956 (40015) Rec 4-24-1956 | 1375 | 210 |
| | | | Containing 10 acres, more or less | Oil and Gas Lease Dated 4-4-1956 (40015) | | |
| | | | SUBJECT LEASE AND QUITCLAIM | Memo Oil and Gas Lease dated 6-12-1957 (40014) Rec 9-3-1957-17625 | 1469 | 489 |

194

1. Oil and Gas Lease by and between Bradley Land Company and Union Oil Company of California quitclaimed all title and interest in above described Oil and Gas Lease dated 6/15/1960-19630 recorded in Book 1754 Pg 40.

2. Quitclaim Deed wherein Union Oil of California quitclaimed all title and interest in above described Oil and Gas Lease dated 6/15/1960-19630 recorded in Book 1754 Pg 40.

40015
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: NW/4; SW/4 NE/4; NE/4 SW/4; SE/4
Section 6: NE/4 NE/4
Containing 230 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated April 4, 1956 by and between Bradley land
Company and Onas Coy Millar, Napoleon J. Daigle and Cecil O. Baumberg jointly as Lessee Recorded in Book 1375 and page 210.

40016
Township 9 North, Range 33 West, S.B.B.&M. Section 5: Commencing at a point on the north line of said Section 5, 826 feet east of the northwest corner of said Section 5, running thence easterly along the north line of said section 330 feet; thence at right angles southerly 660 feet; thence at right angles westerly and parallel with the north line of said Section, 660 feet; thence at right angles northerly 660 feet to the north line of said section thence easterly along the north line of said section, 330 feet to the point of beginning containing 10 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated June 12, 1957 by and between Bradley land
Company and Onas Coy Millar, Napoleon J. Daigle and Cecil O. Baumberg jointly as Lessee Recorded on September 9, 1957 in Book 1469 and Page 489.

| Lease | Santa Maria Valley | Bradley–Parcel E | 40001 | Oil, Gas and Mineral Lease Dated 7-1-1970 (40001) Rec. 8/13/1970-21557 | 2317 | 975 |
| | | | Township 9 North, Range 33 West, S.B.B.&M. | | | |
| | | | Section 5: SW/4 SE/4 | | | |
| | | | Section 6: S/2 SE/4 SE/4 | | | |

SUBJECT LEASES:

1. Oil & Gas Lease dated July 1, 1970, by and between Bradley Land Company and Shell Oil Company said lease was recorded in Book 2317, Page 975 of the Official Records of Santa Barbara County, California.

2. Oil & Gas Lease dated July 26, 1973 Recorded in Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

3. Unrecorded Consolidation Agreement dated 10/1/1973 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated July 14, 1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. April 13, 1979 Recorded in Instrument No. 1979-18051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands.

| Lease | Santa Maria Valley | Texaco Bradley Lse | Township 9 North, Range 33 West, S.B.B.&M. | Oil & Gas Lease dated 3-1-1967 (246703) | Unrecorded | 12 |
| | | | | Memorandum of Oil and Gas Lease dated 3/1/1967 (246703) Rec.5/31/1967-14364 | 2192 | 571 |
| | | | Section 4: SWNW, W2SENW, W2E2SENW, S2NWNW, S2N2NWNW, S2SWNENW, NW3WNENW | Modification Agreement dated 1-11-1973 (246703) Rec 1-23-1973-2783 | 2322 | 1188 |
| | | | | Amendment to Oil and Gas Lease - Shut-In Royalty Agreement Dated 6-7-1989 (70209) (24603) | 2443 | |
| | | | Section 5: N2SE, NESESE, SENENE, E2SENE, SWSENE, S2SWNE, NWSWNE, SWSWNWNE, S2NESWNE, E2S WNENE containing 280 acres, more or less | | Unrecorded | |

| Lease | Santa Maria Valley | Kemp | SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less. | Oil and Gas Lease Dated 7-19-1939 | 1940 | 498 |
| Lease | Santa Maria Valley | Kemp-A | SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of 500 feet | Oil and Gas sublease dated June 3, 1952 | 1078 | 71 |
| | | | of the southerly 300 feet containing 40 acres, more or less. | Oil and Gas Lease Dated 6-21-1965 Recorded | 2317 | 872 |
| | | | | Oil and Gas Lease Dated 2-15-1973 | no recording info | |
| | | | | Amendment of Oil and gas Lease dated 8-5-86 (it amended the 7-19-1939 lease) | not recorded | |
| | | | SUBJECT LEASES: | Lease Amendment Dated 1-1-1977 Gilliland | 79-6255 | |
| | | | 1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil | Lease Amendment Dated 1-1-1977 Hunter | 79-6640 | |
| | | | Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes these oil and gas leases dated July 19, 1939 and | Lease Amendment Dated 1-1-1977 Markling, Busch | Not recorded | |
| | | | June 21, 1965. Reserving specifically to Lessor, Norris Oil Co., and Lessors, Markling and Busch, the rights, royalties and privileges associated with the following free producing and/or suspended wells numbered Kemp 3, Kemp 4, | Lease Amendment Dated 1-1-1977 Mitchell | 78-33050 | |
| | | | Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. | Oil, Gas and Mineral Lease dtd 2-15-1973 | 2453 | 1476 |
| | | | | Amend dtd 2-13-1990 of O& G Lse dtd 2-15-1973 | not recorded | |
| | | | 2. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Irene Busch, as Lessor, and Norris | Amend dtd 8-5-1986 of O & G Lse dtd 2-15-1973 | not recorded | |
| | | | Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 19 | | | |

the Oil and Gas Lease covering the SE1/4 section 31, T10N, R33W, excepting therefrom the surface rights... and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessees, Markling and Bunch, the rights, royalties and privileges associated with the following four producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.

3. Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M. Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

4. Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M. Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

| Lease | Santa Maria Valley | Laine | SUBJECT ACREAGE: That portion of the Southeast quarter of Section 13, Township 10 North, Range 34 West, San Bernardino Base and Meridian, in the County of Santa Barbara, State of California described as follows, to wit: | Oil and Gas Lease Agrm dtd 12-17-79 | not recorded |
| | | | | Memo of Lease recorded March 11, 1980 | 1980-9932 |

| Lease | Santa Maria Valley | Moretti | SUBJECT ACREAGE: The North Half(N1/2) of the Northwest Quarter (NW1/4) and the North Half (N1/2) of the South Half (S1/2)of the Northwest Quarter of Section 24, Township 10 North, Range 34 West, SBB&M, 118.56 acres, more or less. | Oil & Gas Lease Dated 11-16-1943 | not recorded |
| | | | | | Memo of Oil and Gas Lease Dated 9-1-1976 (recorded 4-12-77) | 77-16811 |
| | | | SUBJECT LEASE: Oil & Gas Lease dated September 1, 1976, by and between Peter M. Moretti et. Al., as Lessor, and Union Oil Company of California, as Lessee, said lease of memorandum of which was recorded April 12, 1977 as | Oil and Gas Lease Dated 9-1-1976 | not recorded |
| | | | Document #77-16811, of the Official Records of Santa Barbara County, California. | Amendment of Oil and Gas Lease | 2007-0085893 |
| | | | | Partial Quitclaim Deed | 2007-85994 |
| | | | | Memorandum of Amendment to Lease | 2011-0057011 |

| Lease | Santa Maria Valley | Payne | SUBJECT ACREAGE: The Northeast quarter of the Northeast quarter (NE4 NE4) of Section 12 T9N, R34W, S.B.B. & M. and the North half (N1/2) of Section 7, T9N, R33W, S.B.B. & M, containing 360 acres, more or less | 1968 Lease-Bardin | |
| | | | | Oil and Gas Lease dtd Aug 12, 1968 | 2255    439 |
| | | | SUBJECT LEASES: | Ext of O & G Lease dated dtd June 21, 1973 | 2460    721 |
| | | | 1. 8/12/1968-31331 Book 2256 Page 112 Oil and Gas Lease by and between John S. Newton and Margaret W. Newton, his wife, and Jane Borden Hall and Harvey W. Hall, Jr., her husband, as Lessor, and Standard Oil Company of | Amendatory Agmt dtd Apr 2, 1989 | not recorded |
| | | | California, a corporation, Lessee. | Amendatory Agree dtd Apr 19, 1989 | |
| | | | | 1968 Lease-Gillespie | |
| | | | 2. 12/13/1968-38617 Book 2255, Page 439 Oil and Gas Lease by and between Mildred F. Bardin, a widow, as Lessor and Standard Oil Company of California, Lessee. | Oil and Gas Lease dtd Aug 12, 1968 | 2255    463 |
| | | | | Ext of Oil and Gas Lease dtd May 11, 1973 | 2476    849 |
| | | | 3. 12/13/1968-38621 Book 2255, Page 463 Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil Company of California, as Lessee | Amendatory Agree dtd March 24, 1989 | |
| | | | 4. 8/21/1972-32057 Book 2416, Page 911 Assignment and Agreement, wherein Standard Oil Company assigned 50% of its right title and interest and estate as Lessee to Shell Oil Company. | 1970 Lease- | |
| | | | | Oil and Gas Lease dtd Jun 2, 1970-long form | not recorded |
| | | | 5. 8/13/1973-32173 Book 2476, Page 849 Extension of Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil company of California, and Shell Oil Company, as Lessee. | O & G Lease Jun 2, 1970 (Short form) Rec Bk 2298 Pg 308 | 2298    308 |
| | | | 6. 2/6/1970-3352, Book 2298, Page 308 Oil and Gas Lease by and between John David Payne, a single man, and Carey Morrison, Executor of the Estate of Annie Morrison, deceased, Lessor, and Standard Oil Company of California, | Ext of Oil and Gas Lease dtd Nov 14, 1974 Rec Bk 2545 pg 1406 | 2545    1406 |
| | | | as Lessee. | Amendatory Agree dtd April 14, 1989 | |
| | | | 7. 12/27/1974-44642 Book 2545, Page 1406 Extension of Oil and Gas Lease by and between John Dale Payne, a married man, as his sole and separate property, and Carey Morrison, Executor of the Estate of Annie S. Morrison (a.k.a. Annie Morrison), deceased, as Lessor, and Standard Oil Company of California and Shell Oil Company. | | |

| Lease | Santa Maria Valley | R.B. McFadden | SUBJECT ACREAGE: The West Half of the Northwest Quarter (W1/2 NW1/4) of Section 19, Township 10 North, Range 33 West, SBB&M, EXCEPTING THEREFROM the following described parcel: Commencing at a appoint on Oil and Gas Lease dtd June 8, 1964 | | not recorded |
| | | | the Westerly line of the West Half of the Northwest quarter (W1/2 NW1/4) which point is 60 feet North of the Southwest corner thereof and said point of beginning thence Easterly 660 feet; thence Northerly 1320 feet to the point of beginning thence Westerly | Memo of Oil and Gas Lease dtd June 8, 1964 Recorded Bk 2072 Pg 226 | 2072    226 |
| | | | 660 feet; thence Southerly 1320 feet to the point of beginning (60 Acres more or less). | Amendment to Oil and Gas Lease dtd May 22, 1974 Counterpart A | 2527    1287 |
| | | | | Amendment to Oil and Gas Lease dtd May 22, 1974 Counterpart B | 2527    1292 |
| | | | SUBJECT LEASE: Oil & Gas Lease dated June 8, 1964, by and between Ruth B. McFadden, et al., as Lessor and Union Oil Company of California, as Lessee, said lease memorandum of which was recorded September 30, 1964, as | Memo to Amendment to Oil and Gas Lease dtd May 22, 1970 | |
| | | | Document #41819, in Book 2072, Pages 226 of the Official Records of Santa Barbara County, California | Operating Agreement dtd June 1, 1977 | not recorded |

| Lease | Zaca | Brown | SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders | Oil and Gas Lease 9-17-71 recorded 2371 Page 1011 | 2371    1011 |
| | | | Office. Containing 40.01 acres more or less in Santa Barbara County. | Alice Sedgwick to Getty Oil -Oil and Gas Lease 9-23-71 recorded 2371 Page 1014 | 2371    1014 |
| | | | | Lenard K. Fixmire to Getty Oil- July 7, 1976 recorded 2623 Page 950 | 2623    950 |
| | | | SUBJECT LEASES: | William J. Bedford et al. to Getty Oil 6-23-76 instrument 1979-51489 | 1979-51489 |
| | | | 1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the | Dean and Katherin Brown Trustees Oil and Gas Lease dated April 30, 1997 as Instrument No. 1997-036109 | 1997-036109 |
| | | | Official Records of Santa Barbara County. | Extention to Oil and Gas Mineral Lease dated 3-22-2000 Rec 7-11-2000-41978 | 2000-41978 |
| | | | 2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1970 recorded in Book 2626 and Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 300 additional acres. | | |
| | | | 3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024. | | |

**Lease | Zaca | Carranza**

SUBJECT ACREAGE: Township 7 North, Range 31 West SBBM Section 2 and 3 ... beginning at the ... [course] ... in the description for the courses described in the deed of ... Sedgwick and wife, his wife, Indenture of Lease dated 1-1-1951 Recorded July 2, 1951
Francis M. Sedgwick and Alice di T. Sedgwick, his wife, by deed dated April 30, 1942 in Book 551 of Official Records of Santa Barbara County, California, at page 177, which 42nd course is designated as south 30'8"  30' West
#92.20 feet; Thence from said point of beginning, First, South 62°-30' East 1700.00 feet; Thence Second, South 27°-30' West 983.90 feet; Thence Third, North 62°-30' West 2051.29 feet to intersect the 46th course in the description in the above mentioned deed; thence Fourth, North 65°-53' East 113.72 feet along a part of the said 46th course to the southerly end of the 45th course; thence following along the courses described in said deed but in the opposite direction | Partial QC of Oil and Gas Lease - Dated January 13, 1955 Carranza down to 40 AC | 999 | 607

SUBJECT LEASES:
1. Oil and Gas Lease by and between Theodore Chamberlin, Jr., et us and Tidewater Associated Oil Company dated January 1, 1951 recorded in Book 999 and Page 607 in the Official Records of Santa Barbara County.

2. Partial Quitclaim of an Oil and Gas Lease; Tidewater Associated Oil Quitclaims all but 40 acres back to the Lessors, dated 1/15/1955 and recorded in Book 1292 and Page 321. | | 1292 | 321

---

**Lease | Zaca | Chamberlin**

SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM Section 32 and 33: Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was
confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page
258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain
SUBJECT LEASES:
1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the
Official Records of Santa Barbara County.

2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and  Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company,
noting 20 acres held by each producing well, and appears to add 500 additional acres.

3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 1977-032024.
| Theodore Chamberlin Jr. to Tidewater dtd 4-7-1942 bk 545 pg 917 | 545 | 197
| Amendment to Oil and Gas Lease with Getty Oil dated 9-15-76, recorded at Book 2626 Page 2446 | 2626 | 2446
| Modification of Oil and gas lease  dated 6-24-1977 recorded as Instrument Number 1977-032024 | 1977-032024 |

---

**Lease | Zaca | Chamberlin B**

SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM, Section 32 and 33:
Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of
America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho
Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Pc
88, Official Records of County of Santa Barbara, thence S. 4°-25'-40" W. 2577.3 feet; thence S. 0°-06' E. 649 .27 feet to the true point of beginning; thence continuing S. 0°-06' E. 489.37 feet; thence S. 22°-0' W. 710.0 feet; thence N.
65°-0' W. 2730.00 feet, thence N. 30°-0' E. 155 L 14 feet, thence South 55°-30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California.

SUBJECT LEASE: Oil and Gas Lease by and between Theodore Chamberlin Jr. et us and Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa
Barbara County.

---

**Lease | Zaca | Davis**

SUBJECT ACREAGE: Township 7 North, Range, 31 West, S.B.B.M. Sections 33 & 34 AND Township 8 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats
on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 210.07 acres more or less in Santa Barbara County, California.
SUBJECT LEASE:
1. Oil and Gas Lease by and between Harold H. Davis and Tidewater Oil dated January 11, 1939 recorded in the Official Records of Santa Barbara County in Book 449 and Page 451.
| Harold H. Davis et Tux to Tidewater Associated Oil 1-11-1939 Ref Pg 449/451 | 449 | 451
| Dean Brown Oil, Gas and Mineral Lease Dated 5-31-1989 | |
| Dean and Katherin Brown Trustees Oil and Gas Lease dated April 30, 1997 as Instrument No. 1997-036109 | 1997-036109 |
| Alice Sedgwick Wohl et Al to Vintage Petroleum, Oil and Gas Lease 5-1-97 Instrument No. 1997-036108 | 1997-036108 |
| Alice Sedgwick Wohl et al to Vintage Petroleum Extension and Amendment to Oil, Gas and Mineral Lease Recor 2000-0419979 | 2000-0419979 |
| Dean and Katherine Brown Trustees Extension and Amendment to Oil, Gas and Mineral Lease dated 3-22-2000 x 2000-0041978 | |
| Alice Sedwick et all to Getty Oil  9-17-71 recorded 2371 Page 1011 | 2371 | 1011
| Alice Sedwick et all to Getty Oil  9-23-71 recorded 2371 Page 1014 | 2371 | 1014
| Lenard K. Firestone to Getty Oil-July 7, 1976 recorded 2623 Page 950 | 2623 | 950
| Dean Brown et Tux to Getty Oil 7-14-1976 Bk 2623 Pg 1828 | 2623 | 950
| Dean Brown et Tux to Getty Oil 7-14-1976 Bk 2623 Pg 1825 | 2623 | 1828
| Amendment of Oil, Gas and Mineral Lease dated 7-1-90 recorded as document No. 82-13663 | 2623 | 1825

---

**Lease | Zaca | Davis B**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 4 being a portion thereof, and Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the
Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 44.36 acres more or less in Santa Barbara County, California.

---

**Lease | Zaca | Davis C**

SUBJECT ACREAGE: Township 7 North, Range 31 S.B.B.M. Sections 3 and  4 being a portion thereof, AND Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in

the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89.58 acres more or less in Santa Barbara County, California.

SUBJECT LEASES:

1. Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil. Dated 9/17/19 and recorded at Book 2371 Page 1011.

2. Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated 9/13/1971 recorded at Book 2371 Page 1014

3. Leonard K. Firestone, a married man dealing with his separate property, to Getty Oil Dated 7/7/1976 Recorded at Book 2623 and Page 950 now Instrument No. 1976-034108

4. Harold H. Davis and Alice de Forest Sedgwick entered into an Amendment and Agreement of their 1971 leases with Getty Oil Co. dated 6/25/1980 recorded as Instrument No. 1980-024589 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.  This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

5. Leonard K Firestone entered into an Amendment and Agreement of his 1976 lease with Getty Oil Co. dated 4/5/1982 Recorded as Instrument No. 1982-013662 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

6. Dean Brown and Katherine Brown entered into an Amendment and Agreement of their 1976 lease  1976 lease with Getty Oil Co. dated 4/5/1982 recorded as Instrument No. 1982-013663 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90. This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

| Lease | Zaca | Quati | SUBJECT ACREAGE: Township 7 North, Range 33 West S.B.B.M. Sections 3 & 4 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89.58 acres more or less in Santa Barbara County, California. | Oil and Gas Lease by and between Harold H. Davis to Tidewater Oil dated 1/11/1939 recorded at Book 449 anc Page 451 in the Official Records of Santa Barbara County. Addendum to Oil and Gas Lease, dated 7/6/1983, recorded as Instrument # 1983-034552 by and between Ray Stark as landlord and Getty Oil Co. as Tenant.  While this is titled an Addendum to Oil and Gas Lease, it is | 449 1983-034552 | 451 |
| Fee Property | Cat Canyon | Bell | Parcel A: That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, at Page 193 of Maps, in the office of the County Recorder of said County described as follows: Beginning at the northwest corner of said Bell Tract; thence along the west line of said Bell Tract South 01°20'46" West 5279.23 feet; thence leaving said west line South 48°53'45" East 11410.66 feet to the east line of said Bell Tract | Quitclaim Deed from Saba to  Groka SMV dated June 18, 1999 recorded June 21,1999 as Instrument No. 99 Corrective Quitclaim Deed to correct legal description of that certain Quitclaim Deed dated June 18, 1999 recorded June 21,1999 as Instrument No. 99-050021 Coporation Grant Deed  dated February 27, 2002 from Groka SMV to Groka AM | 1999-050821 2002-0007061 2002-0019525 | |
| Fee Property | Cat Canyon | Blochman | SUBJECT ACREAGE: The northwest quarter of Section 26, Township 9 North, Range 33 West, containing 160.0 acres, more or less, in the County of Santa Barbara, State of California. | Quitclaim Deed from Saba to  Groka SMV dated June 18, 1999 recorded June 21,1999 as Instrument No. 99 Corrective Quitclaim Deed to correct legal description of that certain Quitclaim Deed dated June 18, 1999 recorded June 21,1999 as Instrument No. 99-050021 Coporation Grant Deed  dated February 27, 2002 from Groka SMV to Groka AM | 99-050821 99-050821 2002-0019525 | |
| Fee and Lease | Cat Canyon | Palmer Stendel | SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West, SBB&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California. | Quitclaim Deed from Saba to  Groka SMV dated June 18, 1999 recorded June 21,1999 as Instrument No. 99 Corrective Quitclaim Deed to correct legal description of that certain Quitclaim Deed dated June 18, 1999 recorded June 21,1999 as Instrument No. 99-050021 Coporation Grant Deed  dated February 27, 2002 from Groka SMV to Groka AM | 99-050821 99-050821 2002-0019525 | |
| Fee Property | Cat Canyon | Goodwin Fee | SUBJECT ACREAGE: The West half of the Northwest Quarter of the Northwest Quarter of Section 2, Township 9 North, Range 33 West, S.B.B.&M.; the Southwest Quarter of the Northwest Quarter of said Section 2; the West half of the Southwest Quarter of said Section 2; the West half of the Northeast Quarter of the Southwest Quarter of said Section 2; and the Southeast Quarter of the Southwest Quarter of said Section 2; and the Northwest Quarter of Section 11, Township 9 North, Range 33 West, S.B.B.&M. | Corporation Deed from Shell Western E&P, Inc to Vintage Oil Corporation Deed from Vintage to Groka SMV, Inc. | 92-058409 2002-0067767 | |
| Fee Property | Cat Canyon | Security | SUBJECT ACREAGE: The East one-third of the North half (E 1/3 of N ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian. | Corporation Deed from Shell Western E&P, Inc to Vintage Oil Mineral Deed from Vintage Petroleum California to Groka SMV, Inc | 92-058404 2002-0067569 | |
| Own Royalty | Cat Canyon | Los Flores | Parcel One | Vintage Petroleum California to Groka SMV, Inc. :Assignment of Royalty intere | 2002-0069772 | |

The North Half of the SW Quarter of Section 22 Township 9½, [illegible] Range 33 West, S.B.B.&M., in the County of Santa Barbara, State of California, as described in Deed from Fullerton Oil Company, an Arizona corporation, to Edward A. Michael et ux., dated May 23, 1946, and recorded May 23, 1946, in Book, 694, at page 3

Parcel One

That portion of the Rancho Los Alamos, in the County of Santa Barbara, State of California, described as follows:

Beginning at the Southwest corner of section 22, Township 9 North, Range 33 West, S.B.B.&M.;

At the corner of said Rancho Los Alamos Known as "A No. 11" thence Westerly, along the Westerly prolongation of the Southerly line of said section 22 to its intersection with the Southerly prolongation of the Westerly line of the Easterly ½ of the NEQ (E1/2 NE1/4) of Section 21 in said township 9 North, Range 33 West, S.B.B.&M.; THENCE Northerly, along said last mentioned line or its prolongation to the Southerly line of the North ½ of said Section 21; thence easterly, along said last mentioned line to the Northwest corner of the Southwest quarter of said section 22 above referred to; thence southerly along the westerly line of said section 22 to the point of beginning.

SUBJECT LEASES: Oil and Gas Lease, dated December 8, 1947, by and between Los Flores Land & Oil Company and General Petroleum Corporation, recorded in Book 762, Page 413 of Official Records of Santa Barbara County, California.

Oil and Gas Lease, dated July 28 8, 1948, by and between Los Flores Land & Oil Company and General Petroleum Corporation, recorded in Book 810, Page 167 of Official Records of Santa Barbara County, California.

| | | | | | | |
|---|---|---|---|---|---|---|
| Fee Property | Cat Canyon | Fullerton | SUBJECT ACREAGE: Lots 2, 3, 4 and the Southeast Quarter of the Northwest Quarter of Section 31 Township 9 North, Range 32 West, consisting of 129.46 acres of land, more or less, in the County of Santa Barbara, State of California, as reserved in Deed from Fullerton Oil Company, an Arizona corporation, to Edward A. Michael et ux., dated May 23, 1946 and recorded May 23, 1946, in Book, 694, at page 3 | Corporation Grant Deed from Fullerton Oil Company to Edward Michael et Ux. Recorded May 31, 1946 | 694 | 36 |
| Fee Property | Santa Maria Valley | Jim Hopkins | SUBJECT ACREAGE: The northeast quarter of Section 1, Township 9 North, Range 34 West in the County of Santa Barbara, State of California. The north half of the southeast quarter and the east half of the southwest quarter of Section 1, Township 9 North, Range 34 West, S.B.B.&M. in the County of Santa Barbara, State of California, according to the official plat thereo flying below a depth of 100 feet, excepting from said east half of the southwest quarter that portion lying southwesterly of the northeasterly line of the land conveyed to the State of California by the Deed recorded November 8, 1955, as Instrument No. 20665, in Book 1345 at Page 125, official records of said county, be recorded June 21,1999 as Instrument No. 99-050021 | Corrective Quitclaim Deed to correct legal description of that certain Quitclaim Deed dated June 18, 1999 | 1999-050021<br>1999-0093801 | |
| Fee Property | Santa Maria Valley | Union Sugar | SUBJECT ACREAGE: That certain property description attached to that mineral deed dated May 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded May Mineral Deed dated May 15, 1974, by and between Santa Maria Valley Associates and Union Oil Company o 15, 1974, as Document NQ 17453, in Book 2515, Page 1349 of the Official Records of Santa Barbara County, California, and in that certain property description attached to that amendment to mineral deed dated November 15, 1974, by and between Santa Maria Valley Associates and by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded February 6, 1975, as Document No. 3744, in Book 2551, Page 743, of the Official Records of Santa Barbara County, California. As described in that certain Quitclaim Deed, dated February 23, 1995 recorded on June 16,1995, as Instrument No. 95-032703. | Union Oil Company of California recorded February 6, 1977<br>Quitclaim Deed from Sabo to Groka SMV dated June 18, 1999 recorded June 21,1999 as Instrument No. 99<br>Corrective Quitclaim Deed to correct legal description of that certain Quitclaim Deed dated June 18, 1999 recorded June 21,1999 as Instrument No. 99-050021) | 2515<br>2551<br>1999-050021 | 1349<br>743 |
| Fee and Lease | Santa Maria Valley | Kemp | SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 11, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less.<br>SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of the southerly 300 feet containing 40 acres, more or less.<br>SUBJECT LEASES:<br>1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. 4<br><br>2. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Ione Beach, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.<br><br>3. Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.&M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.<br><br>4. Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.&M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft. | Mineral Deed from Vintage to Groka SMV, Inc. for 50% interes | 2002-0067771 | |
| Fee Property | Belridge | McPhail | Grant deed dated April 9, 1964 by and between West American Oil Company as grantor and Union Oil Company as grantee, recorded April 29, 1964 in Volume 3720 at Page 78 of the Official Records of Kern County covering all of Grant Deed Dated 4-29-64 the oil, gas and other hydrocarbon substances underlying and which may be produced from the North half of the Northwest Quarter of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter of Agreement dated 4-25-63 the Northwest Quarter, the West half of the Southeast Quarter of the Northwest Quarter, the North half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter and the Southeast Quarter of the Southeast Quarter of the Northwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M., Kern County, California, lying above a depth which is 120 feet below the stratigraphic equivalent of the vertical depth of 658 feet below the surfa | | 3720<br>3600 | 79<br>302 |

# HVI CAT CANYON OIL AND GAS ASSETS

## North Belridge Field

### McPhail:

Grant deed dated April 9, 1964 by and between West American Oil Company as grantor and Union Oil Company as grantee, recorded April 29, 1964 in Volume 3720 at Page 78 of the Official Records of Kern County covering all of the oil, gas and other hydrocarbon substances underlying and which may be produced from the North half of the Northwest Quarter of the Southwest Quarter of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter of the Northwest Quarter, the West half of the Southeast Quarter of the Northwest Quarter, the North half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter and the Southeast Quarter of the Southeast Quarter of the Northwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M., Kern County, California, lying above a depth which is 120 feet below the stratigraphic equivalent of the vertical depth of 658 feet below the surface of the ground as such vertical depth appeared in the McPhail Well No. 6-7.

### Gibson

Oil and gas lease dated December 14, 1915 by and between George Gibson, as lessor and Union Oil Company as lessee recorded on April 28, 1916 in Book 29 at Page 17 of the Official Records of Kern County, California covering the North half of the North half of the Southeast Quarter and the North half of the Northeast Quarter of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969 , recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County, California dated July 1, 1949, recorded November 3, 1949 in Book 1598 at Page 323 of Official Records.

### O'Donnell:

Oil and gas lease dated October 2, 1915 by and between T. A. O'Donnell, et al., as lessor and Union Oil Company as lessee, recorded on February 18, 1917 in Book 29 at Page 208 of the Official Records of Kern County, California covering the South half of the Southeast Quarter, the South half of the North half of the Southeast Quarter and the South half of the North half of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the "Temblor Zone", per Partial Assignment of Oil and Gas Lease from Union Oil Company to Belridge Oil Company dated May 27, 1953, recorded June 17, 1953 in Book 2093 at Page 250 of Official Records; and the effects of a prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969, recorded November 7, 1969 in Book

1

4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County.

## Casmalia Field:

### Arellanes

SUBJECT ACREAGE: Portion of Punta de la Laguna Ranch, located in Section 13 of Township 9 North, Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West, of SBB&M, containing 381 acres, more or less, in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil & Gas Lease, dated August 16, 1930, by and between Charles T. Arellanes et al, as Lessor, and 0. C. Field, as Lessee, recorded at Book 220, Page 421, of official records of Santa Barbara county, California, as amended.

2. That certain Oil and Gas Lease dated April 18, 1945 by and between Edward Bonetti et al, as Lessor, and Fullerton Oil Company as Lessee, and recorded in Volume 649, Page 176 of Records of Santa Barbara County, California as amended.

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASES INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; All LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1. Agreement dated March 30, 1961 by and between T. R. Bonetti, et al and Union Oil Company Commingling Agreement unrecorded

2. Quitclaim Deed dated October 27, 1960 from Union Oil to the Lessors of record, recorded in Book 1843, Page 296, Santa Barbara County, CA. (surface rights to 500')

3. Partial Quitclaim Deed dated July 18, 1985, recorded as Document No. 039770, Santa Barbara County, CA (certain mining rights and minerals to 1,500')

### Escolle/Lospe

SUBJECT ACREAGE: All of those certain lands located in Santa Barbara County, State of California. described as follows:

2

## Parcel 1

Commencing at the northeast corner of the Escolle property being the terminous of the eighth course in the lands described in Oil and Gas Lease dated January 7. 1980 between Escolle Tenants-in- Common, as Lessor. and Union Oil Company of California. as Lessee. a Memorandum of which was recorded May 29. 1980 in Book 80. Page 21450. Official Records of Santa Barbara County. California. from which comer No. 13 of Rancho Todos Santos. marked T.S. No. 13. bears North Westerly 64.00 chains to a point on the section line between Sections 21 and 28. T9N-R43W. S.B.B. & M. thence west 25.51 chains to a station: thence north, 35.28 chains to said Comer No. 13, thence from said point of commencement, north 89° 17'4" west, 2770.0 feet to the true point of beginning; thence from said true point of beginning the following courses and distances:. west 1591.4 feet; south 710.5 feet: west 414.9 feet; south 829.0 feet: east 658.2 feet: 1278.9 feet: south 654.8 feet: to a point on the southerly line of Block Il of said Escolle Lease: thence East along said south line 805.8 feet: thence North. 2093.0 feet: thence west 736.7 feet North. 728.2 feet to the true point of beginning and containing 120 acres. more or less.

## Parcel II

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13. from which a live oak 15 inches in diameter bears south 37°west. 6.30 chains distant: thence along the north line of said Rancho north 83°03' west. 103.25 chains to a station: thence south 77.98 chains to a station: thence east 70.40 chains to the true point of beginning from which the one-quarter section comers between Sections 28 and 29. T9N-R34W. S.B.B. & M. bears south 8.70 chains distance: thence from said true point of beginning the following crouses and distances: north 718.2 feet: west 646.6 feet: North 900.4 feet: west 8840 feet: south 1106 feet: east 299.6 feet: south. 512.4 feet to a point on the southerly line of Block I of said Escolle Lease: thence east along said south line 1231. 1 feet to the true point of beginning and containing 40 acres, more or less.

## Parcel III

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13 from which a live oak 15 inches in diameter bears south 37°west. 6.30 distant: thence along the north line of said Rancho north 83°43' west. 103.25 chains to a station: thence south 77.96 chains to a station; thence east 70.40 chains to a station from which the¼ Section comers between 28 and 29, T9N, R34W, S.B.B & M. bears South 8.70 chains distant: thence South 176.8 feet to a point on the east line of Block II of said Escolle Lease and the true point of beginning; thence continuing south through said ¼ section comers and along said east line 934.0 feet; thence east 934.0 feet; thence north 934.0 feet; thence west 934.0 feet to the true point of beginning and containing 20 acres.

## SUBJECT LEASES:

1.    Oil and Gas Lease dated September 25, 1947 by and between Escolle Estate Company, as Lessor, and Union Oil Company, as Lessee, and recorded in Volume 736, Page 290 of Official Records of Santa Barbara County, California. as amended.

3

2.      Oil and Gas Lease dated January 7, 1980 by and between Escolle Tenants in Common. Lessors, and Union Oil Company, as Lessee, a memorandum of which was recorded as Document # 80-21450 of Official Records of Santa Barbara County. California, as amended.

## Morganti

SUBJECT PROPERTY: A part of Rancho Punta de la Laguna, Santa Barbara County California, Commencing at a point on the easterly line of the Southern Pacific Railway on the property line between Juan B. Arellanes Estate on the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a distance of 4325.1 feet to a 2" brass cap pipe monument; thence N. 83 18'W. along the South line of Punta de la Laguna Rancho a distance of 2641.3 feet to a 2" pipe set by S.P. Co. surveyors; thence continuing N. 83 18'W. along the South line of said Rancho 1700 feet. more or less, to the intersection of the Easterly right-of-way line of the Southern Pacific Railroad; thence Northerly along the Easterly right-of-way of the Southern Pacific Railroad to the point of commencement, excepting therefrom a 6.89 acre tract of land conveyed to the Associated Oil Company, and containing a net area of 491 acres, more or less.

SUBJECT LEASE(S):

Oil and Gas Lease dated August 18, 1930, by and between Guiseppe Morganti, as Lessor, and 0. C. Field, as Lessee, and recorded in Book 222, Page 538 in the Official Records of Santa Barbara County, California. as amended.

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS. AGREEMENTS. INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING. BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; All EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; AU SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING. BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER: AGREEMENTS:

1. Amendment and Agreement dated May 18, 1994 between The Morganti Ranch, Lessor and Union Oil Company of California, Lessee Commingle and WWD Agmt. w/rental).

## Muscio

SUBJECT ACREAGE: The portion of Subdivision No. 16 of the Rancho Punta de la Laguna located in Section 24 of Township 9 North, Range 35 West, containing 30 acres, more or less, in Santa Barbara County, California.

4

SUBJECT LEASE: Oil and Gas Lease, dated November 19,1971, by and between Ted H. Muscio et al, as Lessors and Union Oil Company, as Lessee, recorded February 14, 1972, in book 2386, Page 581, of Official Records of Santa Barbara County, California

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING. BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; AU SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:
AGREEMENTS:

1.  Partial Quitclaim Deed dated October 24, 1984 by and between Union Oil Company of California and T.H. Muscio, et al. recorded as Document No. 061054, Santa Barbara County, CA;

**Righetti**

SUBJECT ACREAGE: Portion of Lot or Subdivision No. 13 of the Rancho Punta de la Laguna, located in Section 13 of Township 9 North, Range 35 West, containing 40.00 acres, more or less, INSOFAR AND ONLY INSOFAR as it covers rights to a depth of 4,500'.

SUBJECT LEASE: That certain Oil & Gas Lease dated February 8, 1934 by and between E. Righetti, et al, as Lessor, and William W. Porter, II as Lessee, and recorded in Volume 301, Page 59 of the O.R. of Santa Barbara County, California.

Righetti "B" (expired) That certain Oil and Gas Lease dated June 24, 1965, by and between Ernest Righetti et al and Union Oil Company, recorded in Volume 2112, Page 677 of the O.R. of Santa Barbara County, California, as amended.

SAID LEASE IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASES INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT. POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING. BUT NOT LIMITED TO. ALL OF THOSE CONTRACTS. AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

1. Agreement dated September 30, 1959 by and between Alfred Righetti, et al and Union Oil Company of California, recorded in Volume 1724, at Page 284 of the 0. A. of Santa Barbara County, CA. (commingling agreement);

5

3. Re-Assignment and Quitclaim of Royalty Interest dated May 31, 1950 by and between the Trustees of the Casmalia Trust No. I and Bell Petroleum Company recorded in Volume 928 at Page 238, Santa Barbara County, CA

4. Quitclaim Deed dated April 1, 1966 from Ralph J. Tingle, Jr et ux to Union Oil Company recorded in Book 2148, at Page 446

Righetti B (expired)

5. Amendment to Oil and Gas Lease dated July 16, 1981 (executed in counterpart)

6. Agreement dated September 30, 1959 between Alfred Righetti. et al and Union Oil (unrecorded)

7. Partial Quitclaim Deed dated June 1 6, 1983 by and between Union Oil Company of California to the Lessors of record. Recorded in Document No. 83-32008 (quitclaim 460 acres)

## Bonetti

SUBJECT ACREAGE: Portion of Punta de la Laguna, located in Sections 12 and 13 of Township 9 North Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West of Santa Barbara County, California, containing 184 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease, dated November 1, 1964, by and between T.R Bonetti et a as Lessors and Union Oil Company, as lessor, recorded in Book 2104, Page 1188 of Official Records of Santa Barbara County, California, as amended

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS. INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; All FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS. AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

1. Agreement dated November 10, 1970 by and between Artemisa Bonetti, and Union Oil Company of California (Commingling Agmt)

2. Agreement dated October 22, 1971 by and between Airox, Inc. and Union Oil Company of California (stipulation of operations);

3. Partial Quitclaim Deed dated July 18, 1985 by and between Union Oil Company of California and Gunnison Land Company, recorded as Document No. 039771, Santa Barbara County, CA (certain mining rights and minerals to 1,500)

6

**Cat Canyon Field**

**Bell**

Parcel A:

That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, at Page 193 of Maps, in the office of the County Recorder of said County described as follows:

Beginning at the northwest corner of said Bell Tract; thence along the west line of said Bell Tract South 01°26'46" West 5279.23 feet; thence leaving said west line South 48°53'45" East 11410.66 feet to the east line of said Bell Tract; thence along said east line North 05°54'40" East 7504.38 feet to the most northeasterly corner of said Bell Tract; thence along the northerly boundary of said Bell Tract the following five (5) courses:

1. North 89°41'14" West 1522.33 feet;

2. North 00°14'20" East 2644.72 feet;

3. North 89°47'24" West 5273.86 feet;

4. North 00°17'10" East 2643.84feet;

5. North 89°42'26" West 2595.99 feet to the point of beginning [and containing approximately 1454.0 acres, more or less, and being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908, from Teresa Bell, as administratrix of the Estate of Thomas Bell, deceased, to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds at Page 591, Official Records of Santa Barbara County, California.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground.

Excepting therefrom any portion of said land lying outside the exterior boundary of Parcel 1 of Parcel Map No. 14302, filed in Book 50, Pages 50 - 57 of Parcel Maps, in the office of the County Recorder of said County and State.

Parcel B:

Parcel I of Parcel Map No. 14302, County of Santa Barbara, State of California, as shown on map filed in Book 50, Pages 50-57 of Parcel Maps in the office of the County Recorder of Santa Barbara County.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground. Also excepting therefrom the following described land: That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, Page 193 of Maps in the office of the County Recorder of said County described as follows:

Beginning at the Northwest corner of said Bell Tract;

7

Thence along the West line of said Bell Tract South 01°·26' 46" West 5279.23 feet;

Thence leaving said West line South 48° 53' 45" East 11410.66 feet to the East line of said Bell Tract;

Thence along said East line North 05° 54' 40" East 7504.38 feet to the most Northeasterly corner of said Bell Tract;

Thence along the Northerly boundary of said Bell Tract the following five (5)

courses:

1. North 89° 41' 14" West 1522.33 feet;

2. North 00° 14' 20" East 2644.72 feet; .

3. North 89° 47' 24" West 5273.86 feet;

4. North 00° 17' 10" East 2643.84 feet;

5. North 89° 42" 26" West 2595.99 feet to the point of beginning

And being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908 from Teresa Bell, as Administratrix of the Estate of Thomas Bell, deceased to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds, Page 591, Official Records of Santa Barbara County, California.

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS, EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as Granter and Unocal California Pipeline Company, as Grantee (NDPL
pipelines and facilities on Bell and Blochman Fee).

**Blochman**

SUBJECT ACREAGE: The northwest quarter of Section 26, Township 9 North, Range 33 West, containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

EXCEPTING THEREFROM all that portion of said and lying above a depth of 500 feet beneath the surface thereof, as conveyed by Greka SMV, Inc. to Greka AM, Inc. as set forth in Deed recorded February 28, 2002 as Instrument No. 2002-19525 of official records.

8

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS, EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as Granter and Unocal California Pipeline Company, as Grantee (NDPL pipelines and facilities on Bell and Blochman Fee).

**Palmer Stendel**

SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West, SBB&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

EXCEPTING THEREFROM all that portion of said and lying above a depth of 500 feet beneath the surface thereof, as conveyed by Greka SMV, Inc. to Greka AM, Inc. as set forth in Deed recorded February 28, 2002 as Instrument No. 2002-19525 of official records.

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS, EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as Granter and Unocal California Pipeline Company, as Grantee (NDPL pipelines and facilities on Bell and Blochman Fee).

SUBJECT LEASE: Oil and Gas Leased dated March 23, 1905 by and between L. E. Blochman, et ux, as Lessors and E.E. Henderson, as Lessee, recorded in Volume "H" at Page 209 of the Lease Records of Santa Barbara County, California as amended.

**Goodwin Fee**

SUBJECT ACREAGE: The West half of the Northwest Quarter of the Northwest Quarter of Section 2, Township 9 North, Range 33 West, S.B.B.&M.; the Southwest Quarter of the Northwest Quarter of said Section 2; the West half of the Southwest Quarter of said Section 2; the West half of the Northeast Quarter of the Southwest Quarter of said Section 2; and the Southeast Quarter of

9

the Southwest Quarter of said Section 2; and the Northwest Quarter of Section 11, Township 9 North, Range 33 West, S.B.B.&M consisting of 360 acres more or less.

### Goodwin "A"

SUBJECT ACREAGE: The east half of Section 10, Township 9 North, Range 33 West, Santa Bernardino Meridian, as shown on official plat thereof filed in the District Land Office January 7, 1892, said land being shown as Tracts 119 to 124, both inclusive, on map of the Bradley-Garey Tract, recorded in Book 1, page 32 of Maps and Surveys, in the office of the County Recorder of said county, together with those portions of streets or roads adjoining said lots as shown on said map included with the lines of said east half of Section10,

EXCEPTING THEREFROM those portions thereof described as follows:

Commencing at the center of said Section 10; thence northerly along the westerly line of the above described property a distance of 660 feet; thence easterly at right angles to said last mentioned line a distance of 660 feet; thence southerly at right angles to said last mentioned line a distance of 660 feet; thence westerly at right angles to said last mentioned line a distance of 660 feet to the point of beginning, containing 310 acres, more or less

SUBJECT LEASE: Oil and Gas Lease, dated January 1, 1962, by and between G.L Goodwin et al and J.C Hazard et al. recorded in Book 1937, Page 910 of Official Records of Santa Barbara County, California.

### Lloyd

SUBJECT ACREAGE: The West two-thirds of Section 15, in Township 9 North, Range 33 West, San Bernardino Meridian, in the County o£ Santa Barbara, State of California, according to the Official Plat thereof EXCEPTING from the Southwest quarter of the Southwest quarter of said Section 15, 1-acre of land described in the Deed from Chas. 0. More, et ux., to the Highland School District, dated May 18, 1894, and recorded in Book 47, Page 124 of Deeds approximately 419 acres more or less.

SUBJECT LEASES:

1. Oil and Gas Lease, dated April 21, 1970, by and between Lloyd Corporation, Ltd and Shell Oil Company recorded in Book 2312, Page 761 of Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated March 7, 1965, by and between A.A. Gillette et al and Lloyd Corporation, Ltd recorded in Book 2097, Page 319 of Official Records of Santa Barbara County, California.

**Security**

SUBJECT ACREAGE: The East one-third of the North half (E 1/3 of N ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.01 acres more or less.


**Thomas**

SUBJECT ACREAGE: East one-third of the South half (E 1/3 of S ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.07 acres more or less.

SUBJECT LEASE: Oil and Gas Lease, dated October 1, 1970, by and between C.T Thomas et al and Anza Pacifica Corp. recorded in Book 2325, Page 209 of Official Records of Santa Barbara County, California.

**Los Flores**

Parcel One
The North Half of the SW Quarter (N1/2 SW ¼) of Section 22 Township 9 N, Range 33 W, S. B. B. & M. in the County of Santa Barbara State of California, according to government survey thereof.

Parcel Two
That portion of the Rancho Los Alamos, in the County of Santa Barbara, State of California, described as follows:

Beginning at the Southwest corner of section 22, Township 9 North, Range 33 West, S.B.B.&M., At the corner of said Rancho Los Alamos Known as "A No. 11" thence Westerly, along the Westerly prolongation of the Southerly line of said section 22 to its intersection with the Southerly prolongation of the Westerly line of the Easterly ½ of the NEQ (E1/2 NE1/4) of Section 21 in said township 9 North, Range 33 West, S.B.B.&M,; THENCE Northerly, along said last mentioned line or its prolongation to  the Southerly line of the North ½ of said Section 21; thence easterly, along said last mentioned line to the Northwest corner of the Southwest quarter of said section 22 above referred to; thence southerly along the westerly line of said section 22 to the point of beginning.
Consisting of 190 acres more or less.

SUBJECT LEASES:

1.  Oil and Gas Lease, dated December 8, 1947, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 762, Page 413 of Official Records of Santa Barbara County, California.

2.  Oil and Gas Lease, dated July 28, 1948, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 810, Page 167 of Official Records of Santa Barbara County, California.

**Fullerton**

SUBJECT ACREAGE: Lots 2, 3, 4 and the Southeast Quarter of the Northwest Quarter of Section 31 Township 9 North, Range 32 West, consisting of 129.46 acres of land, more or less, in the County of Santa Barbara, State of California, as reserved in Deed from Fullerton Oil Company, an Arizona corporation, to Edward A. Michael et ux., dated May 23, 1946 and recorded May 31, 1946, in Book, 694, at page 36

**Conoco**

SUBJECT ACREAGE: Lots 5 & 6 of Section 31 of Township 9 North, Range 32 W, SBB&M, as recorded in volume 1228, Page 437 of Official Records of Santa Barbara County, California, more or less 58.05 acres.

SUBJECT LEASE: That certain Oil and Gas Lease dated June 18, 1936 by and between Continental Oil Company as Lessor, and O.C. Field Corp., as Lessee, and recorded in Volume 1228 at Page 437 of the O.R. of Santa Barbara County, California as amended

**Santa Maria Valley Field**
**Jim Hopkins**

SUBJECT ACREAGE: The northeast quarter of Section 1, Township 9 North, Range 34 West in the County of Santa Barbara, State of California. The north half of the southeast quarter and the east half of the southwest quarter of Section l, Township 9 North, Range 34 West, S.B.B.&M. in the County of Santa Barbara, State of California, according to the official plat thereto flying below a depth of 100 feet, excepting from said east half of the southwest quarter that portion lying southwesterly of the northeasterly line of the land conveyed to the State of California by the Deed recorded November 8, 1955, as Instrument No. 20085, in Book 1345 at Page 125, official records of said county; being those rights excepted and reserved in that certain quitclaim deed dated December 22, 1994, by and between Union Oil Company of California and Elks Recreation, Inc. lying below a depth of 100 feet consisting of 223 acres more or less.

**Union Sugar**

SUBJECT ACREAGE: That certain property description attached to that mineral deed dated May 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded May 15, 1974, as Document NQ. 17453, in Book 2515, Page 1349 of the Official Records of Santa Barbara County, California, and in that certain property description attached to that amendment to mineral deed dated November 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded February 6, 1975, as Document No. 3744, in Book 2551, Page 743, of the Official Records of Santa Barbara County, California. As described in that certain Quitclaim Deed, dated February 23, 1995 recorded on June 16,1995, as Instrument No. 95-032705 consisting of 1117 acres more or less.

**Bettiga**

SUBJECT ACREAGE: That portion of the East Half (E/2) of the Northeast Quarter (NE/4) of Section 24, TION, R34W, SBBN lying southerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said East Half (E/2) of Northeast (NE/4) of said Section 24, Santa Barbara County, California, 58.7 acres more or less.

SUBJECT LEASES:

1.  5/12/1963-10820, Book 2039, Page 1391, Oil and Gas Lease dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

2.  6/9/1972-21178, Book 2405, Page 316 and dated 4/26/1972, Amendment to Oil and Gas Lease, dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

3.  5/7/1996-28845 Oil and Gas Lease dated 12/7/1995 by and between James Bettiga, Trustee under O. Bettiga Trust #1 dated 11/1/1978 and James P. Bettiga, Successor Trustee of O. Bettiga Revocable Trust dated 11/31/1984, Lessor, and Saba Petroleum, Inc., A corporation, Lessee.

**Adam**

SUBJECT ACREAGE: That portion of the West Half (W/2) of the Northeast Quarter (NE/4) of Section 24, Tl0N, R34W, SBBM lying northerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said W/2 of NE/4 of said Section 24, Santa Barbara County, California, 60 acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated July 17, 1970, by and between Thomas B. Adam, II, Frederick 0. Sherrill and Elizabeth Ann Newark, as Lessor, and Union Oil Company of California, as Lessee, said lease or memorandum of which was recorded October 13, 1970, in Book 2323, Page 1238 of Official Records of Santa Barbara, California.

**Moretti**

SUBJECT ACREAGE: The North Half (N/2) of the Northwest Quarter (NW/4) and the North Half (N/2) of the South Half (S/2) of the Northwest Quarter of Section 24, Township 10 North, Range 34 Wet, SBB&M, 118.56 acres, more or less.  (In Pt. Sal Zone to the surface of the property).

SUBJECT LEASE: Oil & Gas Lease dated September 1, 1976, by and between Peter M. Moretti et. Al., as Lessor, and Union Oil Company of California, as Lessee, said lease of memorandum of which was recorded April 12, 1977 as Document #77-16811, of the Official Records of Santa Barbara County, California.

13

**R.B. McFaddin**

SUBJECT ACREAGE: The West Half of the Northwest Quarter (W/2 NW/4) of Section 19, Township 10 North, Range 33 West, SBB&M, EXCEPTING THEREFROM the following described parcel: Commencing at a appoint on the Westerly line of the West Half of the Northwest quarter (W/2 NW/4) which point is 60 feet North of the Southwest comer thereof and said point of beginning thence Easterly 660 feet; thence Northerly 1320 feet; thence Westerly 660 feet; thence Southerly 1320 feet to the point of beginning, 60 Acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated June 8, 1964, by and between Ruth B. McFaddin, et al, as Lessor and Union Oil Company of California, as Lessee, said lease memorandum of which was recorded September 30, 1964, as Document #41819, in Book 2072, Page 226 of the Official Records of Santa Barbara County, California

**Bradley Lands**
**Bradley 1 Parcel E**
**40001**
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

SUBJECT LEASES:
1. Oil & Gas Lease dated July 1, 1970, by and between Bradley Land Company and Shell Oil Company said lease was recorded in Book 2317, Page 975 of the Official Records of Santa Barbara County, California.

2. Oil & Gas Lease dated July 26, 1973 Recorded in Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee.

3. Lease Amendment and Consolidation Agreement dated 07/05/1973 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40109, 7/5/1973-29517, Book 2473, Page 1102 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated July 14, 1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. April 13, 1979 Recorded in Instrument No. 1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered said lease in the following described lands:

14

<u>Township 9 North, Range 33 West, S.B.B.&M.</u>
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

**Bradley Consolidated**
**<u>40109</u>**
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: S/2 SW4, NW/4 SW/4
Containing 120 acres, more or less

SUBJECT LEASE AND DOCUMENTS

1. Oil & Gas Lease dated February 17, 1972, by and between Bradley Land Company and Shell Oil Company said lease was recorded on March 13, 1972 in Book 2390, Page 581 of the Official Records of Santa Barbara County, California.

2. 3/13/1972-8424, Book 2390, Page 581 Oil and Gas Lease by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

3. 7/26/1973-29517 Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

6. 4/13/1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands:
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

**<u>40159</u>**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6:  SW/4 NW/4, S/2 NW/4 NW/4, N/2 NE/4 SW/4, N2 NW4 SW/4
Containing 80 acres, more or less

15

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in on March 27, 1969 in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

2. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where consolidated by parties herein.

3. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil reassigns the following described land:
   N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4, SW/4 SE/4, Section 6 T9N, R33W, S.B.B.&M.

6. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in the following described lands:
   N/2 NW/4 NW/4; N/2 NW/4 NE/4
   Section 6, T9N, R33W, S.B.B. &M.

7. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres in the following described lands:
   S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
   Section 6, T9N, R33W, S.B.B.&M.

**40161**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: E/2 NW/4, SW/4 NE/4, S2 NW/4 NE/4, NW/4 SE/4, N2 NE/4 SW/4
Containing 200 acres, more or less

16

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated December 1, 1965 recorded in Book 2204, Page 922 by and between Bradley Land Company and Standard Oil Company.

3. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where consolidated by parties herein.

4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

6. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil reassigns the following described land:
N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4, SW/4 SE/4, Section 6 T9N, R33W, S.B.B.&M.

7. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in the following described lands:
N/2 NW/4 NW/4; N/2 NW/4 NE/4
Section 6, T9N, R33W, S.B.B. &M.

8. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres in the following described lands:
S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
Section 6, T9N, R33W, S.B.B.&M.

17

**Bradley Lands Unit**

**40014**

Township 9 North, Range 33 West, S.B.B. &M.

Section 6: NE/4, SE/4, NE/4

Containing 10 acres, more or less

SUBJECT LEASE AND QUITCLAIM

1. Oil and Gas Lease by and between Bradley Land Company and Union Oil Company of California dated October 3, 1956 recorded in Book 1411, Page 162.

2. Quitclaim Deed wherein Union of Oil of California quitclaimed all title and interest in above described Oil and Gas Lease dated 6/15/1960-19030 recorded in Book 1754 Pg 40.

**40015**

Township 9 North, Range 33 West, S.B.B. &M.

Section 5: NW/4; SW/4 NE/4; NE/4 SW/4; SE/4

Section 6: NE/4 NE/4

Containing 230 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated April 4, 1956 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded in Book 1375 and page 210 and (70206) Oil and Gas Lease 5-2-70 Document No. 80-13008 of the Official Records of Santa Barbara County.

**40016**

Township 9 North, Range 33 West, S.B.B. &M. Section 5: Commencing at a point on the north line of said Section 5, 826 feet east of the northwest corner of said Section 5, running thence easterly along the north line of said section 330 fee; thence at right angles southerly 660 feet; thence at right angles westerly and parallel with the north line of said Section, 660 feet; thence at right angles northerly 660 feet to the north line of said section thence easterly along the north line of said section, 330 feet to the point of beginning containing 10 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated June 12, 1957 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded on September 9, 1957 in Book 1469 and Page 489.

**Texaco Bradley Lands**

Township 9 North, Range 33 West, S.B.B. &M.

Section 4: SWNW, W2SENW, W2E2SENW, S2NWNW, S2N2NWNW, S2SWNENW, NWSWNENW

18

217

Section 5: N2SE, NESESE, SENENE, E2SENE, SWSENE, S2SWNE, NWSWNE, SWSWNWNE, S2NESWNE, E2S WNENE containing 280 acres, more or less

SUBJECT LEASES:

1. Oil and Gas Lease by and between Bradley Land Company and Texaco, Inc. dated March 1, 1967 and recorded on May 31, 1967 in Book 2192 and Page 12.

2. 9/30/1970-26546, Book 2322, Page 571 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

3. 1/23/1973-2783, Book 2443, Page 1188 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

4. 5/25/1979-23640, Partial Surrender of Oil and Gas Lease by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee, wherein lessee surrendered 290.373 acres from the 570 acres the original lease contained therein.

**Kemp and Kemp A**

SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less.

SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of 500 feet of the southerly 300 feet containing 40 acres, more or less.

SUBJECT LEASES:

1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. 4

2. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Ione Beach, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting

19

therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.

3. Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M. Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

4. Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M. Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

**Laine**

SUBJECT ACREAGE: That portion of the Southeast Quarter of Sec. 13, T10N-R34W, SBB&M in the County of Santa Barbara, State of California, according to the Government Survey approved April 10, 1873 described as follows:

BEGINNING at a point on the West Line of the Southeast Quarter of said section 13 distant thereon South 0°38'20" West 70 feet from a 3/4 inch pipe with copper disc set at the center of said Section 13; said point of beginning being the Southwest Corner of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at page 430 of Deeds; thence lst South 0°38'20" West 2590.56 feet along the West line of the Southeast Quarter of said Section 13 to a spike in pavement of County Road at the Southwest Corner of the Southeast Quarter of said Section 13; thence 2nd along the South Line of section 13 South 89°18'39" East 1031.20 feet to a point in County Road; thence 3rd North 0°29'40" East 2590.57 feet to a point in the South Line of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at page 430 of Deeds; thence 4th along the South Line of said 30 foot strip North 89°18' 40" West 1024.84 feet, more or less, to the point of beginning.

EXCEPTING THEREFROM a strip of land of a uniform width of 40 feet across the extreme North end of the Southeast Quarter of said Section 13, as conveyed to Santa Maria Valley Railroad Company, a California Corporation, by Deed dated November 18,

1913, and recorded Jan. 22, 1914, in Book 142 at Page 427 of Deeds, Also, excepting the North 430' of the East 180' thereof. Containing 59.08 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease by and between Dorothy M. Laine, as lessor, and Union Oil Company of California, as lessee, recorded on March 11, 1980 as Instrument No. 80-9932, Official Records of Santa Barbara County, California.

### Payne

SUBJECT ACREAGE: The Northeast quarter of the Northeast quarter (NE4 NE4) of Section 12 T9N, R34W, S.B.B. & M. and the North Half (N1/2) of Section 7, T9N, R33W, S.B.B. & M, containing 60 acres, more or less

SUBJECT LEASES:

1. 8/12/1968-31331 Book 2256 Page 113 Oil and Gas Lease by and between John S. Newton and Margaret W. Newton, his wife, and Jane Borden Hall and Harvey W. Hall, Jr., her husband, as Lessor, and Standard Oil Company of California, a corporation, Lessee.

2. 12/13/1968-38617 Book 2255, Page 439 Oil and Gas Lease by and between Mildred F. Bardin, a widow, as Lessor and Standard Oil Company of California, Lessee.

3. 12/13/1968-38621 Book 2255, Page 463 Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil Company of California, as Lessee

4. 2/6/1970-3352, Book 2298, Page 308 Oil and Gas Lease by and between John David Payne, a single man, and Carey Morrison, Executor of the Estate of Annie Morrison, deceased, Lessor, and Standard Oil Company of California, as Lessee.

## ZACA FIELD

### Brown

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 40 acres more or less in Santa Barbara County.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated

21

September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records in Santa Barbara County.

2. Oil and Gas Lease by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records in Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil Dated July 7, 1976 and recorded in Book 2623 and Page 950 in the Official Records in Santa Barbara County.

4. Oil and Gas Lease by and between William J. Bedford & Diane B. Bedford h/w; Roy W. Reeves & Elaine Reeves, h/w and George Tuerk and Sherwood C. Collingsworth to Getty Oil dated June 15, 1979 and recorded as Instrument No. 1979-051489 in the Official Records in Santa Barbara County.

**Davis**

SUBJECT ACREAGE: Township 7 North, Range, 31 West, S.B.B.M. Sections 33 & 34 AND Township 8 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 210 acres more or less in Santa Barbara County, California.

SUBJECT LEASE:
1. Oil and Gas Lease by and between Harold H. Davis and Tidewater Oil dated January 11, 1939 recorded in the Official Records of Santa Barbara County in Book 449 and Page 451.

**Davis B**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 4 being a portion thereof, and Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office Containing 44 acres more or less in Santa Barbara County, California.

SUBJECT LEASES:
1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records of Santa Barbra County.
2. Oil and Gas Lease between by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records of Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil dated July 7, 1976 recorded in Book 2623 and Page 950 in the Official Records of Santa Barbara County.

4. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1825 or now Instrument No. 1976-0034392 in the Official Records of Santa Barbara County.

5. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w, to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1828 or now Inst # 1976-0034393 in the Official Records of Santa Barbara County.

**Davis C**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 and  4 being a portion thereof, AND Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office.

SUBJECT LEASES:
1. Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  Dated 9/17/1971 and recorded at Book 2371 Page 1011.
2. Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated 9/13/1971 recorded at Book 2371 Page 1014
3. Leonard K. Firestone, a married man dealing with his separate property, to Getty Oil Dated 7/7/1976 Recorded at Book 2623 and Page 950 now Instrument No. 1976-034108
4. Harold H. Davis and Alice de Forest Sedgwick entered into an Amendment and Agreement of their 1971 leases with Getty Oil Co. dated 6/25/1980 recorded as Instrument No. 1980-024589 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.
5. Leonard K Firestone entered into an Amendment and Agreement of his 1976 lease with Getty Oil Co. dated 4/5/1982 Recorded as Instrument No. 1982-013662 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.
6. Dean Brown and Katherine Brown entered into an Amendment and Agreement of their 1976 lease  1976 lease with Getty Oil Co. dated 4/5/1982 recorded as Instrument No. 1982-013663 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90. This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

23

**Carranza**

SUBJECT ACREAGE: Township 7 North, Range 31 West SBBM Section 2 and 3: Beginning at the southerly end of the 42nd course in the description for that certain land conveyed by Harold H. Davis and Alice C. Davis, his wife, to Francis M. Sedgwick and Alice de F. Sedgwick, his wife, by deed dated April 30, 1942 in Book 551 of Official Records of Santa Barbara County, California, at page 177, which 42nd course is designated as south 30°8  38' West 492.20 feet; Thence from said point of beginning, First, South 62°-30' East 1700.00 feet; Thence Second, South 27°-30' West 943.90 feet; Thence Third, North 62°-30' West 2051.29 feet to intersect the 46th course in the description in the above mentioned deed; thence Fourth, North 65°-53' East 113.72 feet along a part of the said 46th course to the southerly end of the 45th course; thence following along the courses described in said deed but in the opposite direction Fifth, North 46°-45' East 285.09 feet, Sixth, North 48°-56' East 398.20 feet and Seventh, North 38°-21' East 218.90 feet to the point of beginning and containing 40 acres more or less.

SUBJECT LEASES:
1. Oil and Gas Lease by and between Theodore Chamberlin, Jr., et ux and Tidewater Associated Oil Company dated January 1, 1951 recorded in Book 999 and Page 407 in the Official Records of Santa Barbara County.
2. Partial Quitclaim of an Oil and Gas Lease; Tidewater Associated Oil Quitclaims all but 40 acres back to the Lessors, dated 1/15/1955 and recorded at Book 1292 and Page 321.

**Chamberlin**

SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM Section 32 and 33: Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly comer of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649.27 feet to the true point of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° 0' W. 2730.00 feet; thence N. 30° 6' E. 1551.14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 178 acres in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

24

2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 500 additional acres.

3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024.

**Chamberlin "B"**

SUBJECT ACREAGE: Township 8 North. Range 31 West, SBM, Section 32 and 33:
Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly comer of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649 .27 feet to the true paint of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° O' W. 2730.00 feet; thence N. 30° 6' E. 155 L 14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California.

SUBJECT LEASE: Oil and Gas Lease by and between Theodore Chamberlin Jr. et ux and Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

**Quati**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 & 4 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89 acres more or less in Santa Barbara County, California.
SUBJECT LEASES:

1. Oil and Gas Lease by and between Harold H. Davis to Tidewater Oil dated 1/11/1939 recorded at Book 449 and Page 451 in the Official Records of Santa Barbara County.

2. Partial Quitclaim & Surrender dated 1/20/55 from Tide Water Associated Oil Company to Harold Davis, et al, reserving 299.65 acres, recorded 1295/275.

3. Addendum to Oil and Gas Lease, dated 7/6/1983, recorded as Instrument No. 1983-034552 by and between Ray Stark as landlord and Getty Oil Co. as Tenant. While this is titled an Addendum to Oil and Gas Lease, it is actually a Surface Use Agreement between the surface owner and the Oil Company.

25

# **EXHIBIT A-1**

WELLS

*See attached.*

**EXHIBIT A-1**
**HVI CAT CANYON WELLS**

| API | Well Name | Lease | Latitude | Longitude | Field | County | Legal | Well Type | Well Status | WI | NRI |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083006240000 | **ARELLANES 1-F** | Arellanes | 34.8627052300 | -120.5218429600 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083006080000 | ARELLANES  3 | Arellanes | 34.8639298740 | -120.5181636940 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083006090000 | ARELLANES  4 | Arellanes | 34.8640362302 | -120.5214257360 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204790000 | ARELLANES  6 | Arellanes | 34.8627114450 | -120.5198296270 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204800000 | ARELLANES  7 | Arellanes | 34.8640054284 | -120.5198440280 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083009180000 | ARELLANES  2 | Arellanes | 34.8620900000 | -120.5176200000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083222510000 | ARELLANES 4H | Arellanes | 34.8640668133 | -120.5214980000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083203250000 | ARELLANES  5 | Arellanes | 34.8625000000 | -120.5151500000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083006180000 | ARELLANES  82 | Arellanes | 34.8551266031 | -120.5061312170 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083204180000 | ARELLANES 103 | Arellanes | 34.8537233376 | -120.5068631560 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083207370000 | ARELLANES 104 | Arellanes | 34.8627400000 | -120.5065800000 | Casmalia | Santa Barbara | 18-09N-34W | Oil | P&A | 1.00 | 0.81 |
| 04083205000000 | T. R. BONETTI 3 | Arellanes | 34.8640924870 | -120.5145468240 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083206810000 | T. R. BONETTI 5 | Arellanes | 34.8641700000 | -120.5155700000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083208530000 | T. R. BONETTI 8 | Arellanes | 34.8665630000 | -120.5181600000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083207270000 | T. R. BONETTI 9 | Arellanes | 34.8659365320 | -120.5175116920 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083014880000 | **BELL  5** | Bell Fee | 34.8281170000 | -120.3180230000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083213490000 | BELL  7A | Bell Fee | 34.8050225238 | -120.3115167050 | Cat Canyon | Santa Barbara | 1-08N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083014910000 | BELL  11 | Bell Fee | 34.8241300000 | -120.3374100000 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083014920000 | BELL  12 | Bell Fee | 34.8240951567 | -120.3338904490 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014930000 | BELL  13 | Bell Fee | 34.8277365316 | -120.3382571900 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014940000 | BELL  14 | Bell Fee | 34.8276515145 | -120.3338669670 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083006820000 | BELL  16 | Bell Fee | 34.8093852117 | -120.3107394600 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014960000 | BELL  17 | Bell Fee | 34.8066162231 | -120.3135494390 | Cat Canyon | Santa Barbara | 2-08N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014970000 | BELL  18 | Bell Fee | 34.8072160628 | -120.3111830930 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014980000 | BELL  19 | Bell Fee | 34.8116622550 | -120.3126689170 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014990000 | BELL  20 | Bell Fee | 34.8099021587 | -120.3150921120 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015000000 | BELL  21 | Bell Fee | 34.8128450170 | -120.3102550960 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015010000 | BELL  22 | Bell Fee | 34.8050165610 | -120.3114161960 | Cat Canyon | Santa Barbara | 1-08N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015030000 | BELL  24 | Bell Fee | 34.8169936245 | -120.3290759210 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015040000 | BELL  25 | Bell Fee | 34.8152698780 | -120.3120061010 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015060000 | BELL  27 | Bell Fee | 34.8111137400 | -120.3105098480 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015070000 | BELL  28 | Bell Fee | 34.8096003107 | -120.3125934230 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016590000 | BELL  30 | Bell Fee | 34.8276660428 | -120.3207267130 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016610000 | BELL  32 | Bell Fee | 34.8260081937 | -120.3209313860 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016620000 | BELL  33 | Bell Fee | 34.8258372779 | -120.3183946930 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016630000 | BELL  34 | Bell Fee | 34.8260710000 | -120.3222540000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083006950000 | BELL  36 | Bell Fee | 34.8121011343 | -120.3167137700 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016650000 | BELL  37 | Bell Fee | 34.8236603401 | -120.3205143740 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016660000 | BELL  38 | Bell Fee | 34.8114809961 | -120.3125529490 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015090000 | BELL  39 | Bell Fee | 34.8181071255 | -120.3205648180 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083002270000 | BELL  41 | Bell Fee | 34.8321642252 | -120.3381276550 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |

| 04083015110000 | BELL  42 | Bell Fee | 34.8336190000 | -120.3371330000 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015130000 | BELL  44 | Bell Fee | 34.8259181837 | -120.3360892400 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015140000 | BELL  45 | Bell Fee | 34.8305069883 | -120.3381722180 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015150000 | BELL  46 | Bell Fee | 34.8222077211 | -120.3337414140 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015160000 | BELL  47 | Bell Fee | 34.8276700000 | -120.3228490000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083008040000 | BELL  48 | Bell Fee | 34.8241977100 | -120.3247953600 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083002570000 | BELL  49 | Bell Fee | 34.8315236871 | -120.3320275380 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015170000 | BELL  50 | Bell Fee | 34.8126600298 | -120.3236360410 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015180000 | BELL  51 | Bell Fee | 34.8259650000 | -120.3373820000 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015190000 | BELL  52 | Bell Fee | 34.8349868480 | -120.3358822650 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015200000 | BELL  53 | Bell Fee | 34.8331915084 | -120.3358701510 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015210000 | BELL  54 | Bell Fee | 34.8313855630 | -120.3358608790 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015220000 | BELL  55 | Bell Fee | 34.8295552568 | -120.3358468400 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015230000 | BELL  56 | Bell Fee | 34.8205834588 | -120.3287881400 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015240000 | BELL  57 | Bell Fee | 34.8239088532 | -120.3291985360 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015250000 | BELL  58 | Bell Fee | 34.8279441688 | -120.3292008120 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222430000 | BELL  58H | Bell Fee | 34.8279623491 | -120.3292510010 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015260000 | BELL  59 | Bell Fee | 34.8105532504 | -120.3190730460 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015270000 | BELL  60 | Bell Fee | 34.8205801416 | -120.3337413110 | Cat Canyon | Santa Barbara | 34-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015290000 | BELL  62 | Bell Fee | 34.8136276523 | -120.3142669480 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083006840000 | BELL  64 | Bell Fee | 34.8238145360 | -120.3203645210 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015300000 | BELL  65 | Bell Fee | 34.8259139962 | -120.3338335570 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015310000 | BELL  66 | Bell Fee | 34.8140807738 | -120.3191206840 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015320000 | BELL  67 | Bell Fee | 34.8259587534 | -120.3318171190 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015330000 | BELL  68 | Bell Fee | 34.8257548433 | -120.3274591390 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015350000 | BELL  70 | Bell Fee | 34.8312548433 | -120.3334633010 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015360000 | BELL  71 | Bell Fee | 34.8332639439 | -120.3336022010 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015370000 | BELL  72 | Bell Fee | 34.8332317926 | -120.3317131500 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015380000 | BELL  73 | Bell Fee | 34.8295324865 | -120.3315402170 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015390000 | BELL  74 | Bell Fee | 34.8278791667 | -120.3316985990 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015400000 | BELL  75 | Bell Fee | 34.8241031630 | -120.3316731060 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083006830000 | BELL  76 | Bell Fee | 34.8222350000 | -120.3305980000 | Cat Canyon | Santa Barbara | 27-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015410000 | BELL  77 | Bell Fee | 34.8189250930 | -120.3313245480 | Cat Canyon | Santa Barbara | 34-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015420000 | BELL  79 | Bell Fee | 34.8168182874 | -120.3273898180 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016680000 | BELL  81 | Bell Fee | 34.8202916969 | -120.3184199270 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016690000 | BELL  82 | Bell Fee | 34.8185660000 | -120.3243100000 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015440000 | BELL  83 | Bell Fee | 34.8165186293 | -120.3232709520 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083002660000 | BELL  84 | Bell Fee | 34.8180377183 | -120.3183367150 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015450000 | BELL  85 | Bell Fee | 34.8160318229 | -120.3162001280 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015460000 | BELL  86 | Bell Fee | 34.8222869735 | -120.3250352440 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016700000 | BELL  87 | Bell Fee | 34.8222363119 | -120.3205230440 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016710000 | BELL  88 | Bell Fee | 34.8241347811 | -120.3270106630 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015470000 | BELL  89 | Bell Fee | 34.8204502941 | -120.3272419040 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015480000 | BELL  90 | Bell Fee | 34.8140400000 | -120.3199900000 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | P&A | 1.00 | 0.98 |

227

| 04083011690000 | BELL 91 | Bell Fee | 34.8083639813 | -120.3155136550 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083015490000 | BELL 92 | Bell Fee | 34.8138226501 | -120.3167579190 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083016720000 | BELL 93 | Bell Fee | 34.8180004842 | -120.3161103230 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083007780000 | BELL 95 | Bell Fee | 34.8242126789 | -120.3226099190 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016740000 | BELL 96 | Bell Fee | 34.8077608824 | -120.3125922210 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015500000 | BELL 97 | Bell Fee | 34.8105448991 | -120.3169084790 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083016750000 | BELL 98 | Bell Fee | 34.8221214765 | -120.3184235330 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015510000 | BELL 99 | Bell Fee | 34.8145748712 | -120.3232908310 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083017680000 | BELL 100 | Bell Fee | 34.8147865453 | -120.3254671660 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015520000 | BELL 101 | Bell Fee | 34.8125553671 | -120.3213735190 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015540000 | BELL 103 | Bell Fee | 34.8208507335 | -120.3312178480 | Cat Canyon | Santa Barbara | 34-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015550000 | BELL 104 | Bell Fee | 34.8185351936 | -120.3293481850 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015560000 | BELL 105 | Bell Fee | 34.8273876663 | -120.3269171740 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015580000 | BELL 107 | Bell Fee | 34.8277850000 | -120.3242890000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083001020000 | BELL 108 | Bell Fee | 34.8135706948 | -120.3124610670 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015590000 | BELL 109 | Bell Fee | 34.8222623056 | -120.3360467440 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015600000 | BELL 111 | Bell Fee | 34.8240664270 | -120.3361553660 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015610000 | BELL 112 | Bell Fee | 34.8204769634 | -120.3359224340 | Cat Canyon | Santa Barbara | 34-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015620000 | BELL 113 | Bell Fee | 34.8186059920 | -120.3338442500 | Cat Canyon | Santa Barbara | 34-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015640000 | BELL 115 | Bell Fee | 34.8240181169 | -120.3184510920 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015650000 | BELL 116 | Bell Fee | 34.8203859213 | -120.3151748090 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015660000 | BELL 117 | Bell Fee | 34.8190945373 | -120.3137617410 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015670000 | BELL 118 | Bell Fee | 34.8241395004 | -120.3162504930 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015680000 | BELL 119 | Bell Fee | 34.8154872677 | -120.3142833550 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015690000 | BELL 120 | Bell Fee | 34.8118912717 | -120.3148042080 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015700000 | BELL 122 | Bell Fee | 34.8166078599 | -120.3252085070 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016780000 | BELL 124 | Bell Fee | 34.8221956680 | -120.3229500600 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016790000 | BELL 125 | Bell Fee | 34.8197455616 | -120.3204083630 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083011700000 | BELL 127 | Bell Fee | 34.8063379008 | -120.3136199120 | Cat Canyon | Santa Barbara | 2-08N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016820000 | BELL 130 | Bell Fee | 34.8140712867 | -120.3193597860 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016830000 | BELL 131 | Bell Fee | 34.8240169911 | -120.3173628330 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015720000 | BELL 132 | Bell Fee | 34.8093902437 | -120.3125692690 | Cat Canyon | Santa Barbara | 36-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083003030000 | BELL 133 | Bell Fee | 34.8184831147 | -120.3272697340 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016840000 | BELL 134 | Bell Fee | 34.8135108377 | -120.3135462120 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083001090000 | BELL 135 | Bell Fee | 34.8185923166 | -120.3228918760 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083003240000 | BELL 136 | Bell Fee | 34.8202199457 | -120.3247668250 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083004230000 | BELL 137 | Bell Fee | 34.8085400000 | -120.3165600000 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015730000 | BELL 138 | Bell Fee | 34.8115445930 | -120.3204169470 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015740000 | BELL 139 | Bell Fee | 34.8197403545 | -120.3291743980 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016850000 | BELL 140 | Bell Fee | 34.8202676900 | -120.3161801950 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015750000 | BELL 141 | Bell Fee | 34.8212259628 | -120.3193981560 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016860000 | BELL 142 | Bell Fee | 34.8221922332 | -120.3283279420 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016870000 | BELL 143 | Bell Fee | 34.8117559020 | -120.3223532720 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016890000 | BELL 145 | Bell Fee | 34.8153016079 | -120.3260681670 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |

228

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083016900000 | BELL 146 | Bell Fee | 34.8180177971 | -120.3285581970 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083016910000 | BELL 147 | Bell Fee | 34.8077394502 | -120.3186275870 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015760000 | BELL 148 | Bell Fee | 34.8212266546 | -120.3298798250 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016920000 | BELL 149 | Bell Fee | 34.8138028386 | -120.3245142090 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083015780000 | BELL 151 | Bell Fee | 34.8258034392 | -120.3173552720 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015790000 | BELL 153 | Bell Fee | 34.8082263990 | -120.3131167900 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015800000 | BELL 154 | Bell Fee | 34.8067892258 | -120.3158926880 | Cat Canyon | Santa Barbara | 2-08N-33W | Water Dis | Inactive | 1.00 | 0.98 |
| 04083202000000 | BELL 155 | Bell Fee | 34.8096435866 | -120.3206280250 | Cat Canyon | Santa Barbara | 35-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083203640000 | BELL 156 | Bell Fee | 34.8106700961 | -120.3132299500 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083000450000 | BELL 160 | Bell Fee | 34.8258302187 | -120.3162139690 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015810000 | BELL 161 | Bell Fee | 34.8223851363 | -120.3160695570 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015820000 | BELL 162 | Bell Fee | 34.8231445829 | -120.3192109410 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015830000 | BELL 163 | Bell Fee | 34.8247137710 | -120.3196626490 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015840000 | BELL 164 | Bell Fee | 34.8267264058 | -120.3195169030 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083000200000 | BELL 165 | Bell Fee | 34.8229500000 | -120.3209100000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015850000 | BELL 166 | Bell Fee | 34.8249377001 | -120.3217644910 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083001010000 | BELL 167 | Bell Fee | 34.8268250012 | -120.3220066920 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083201010000 | BELL 168 | Bell Fee | 34.8188611729 | -120.3147345520 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083201260000 | BELL 169 | Bell Fee | 34.8126763478 | -120.3123417470 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083201290000 | BELL 170 | Bell Fee | 34.8149200000 | -120.3123680000 | Cat Canyon | Santa Barbara | 35-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083202150000 | BELL 171 | Bell Fee | 34.8155560839 | -120.3196202500 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083206950000 | BELL 172 | Bell Fee | 34.8245878511 | -120.3140718730 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222480000 | BELL 201H | Bell Fee | 34.8352281354 | -120.3307444660 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222490000 | BELL 202H | Bell Fee | 34.8347993816 | -120.3313878410 | Cat Canyon | Santa Barbara | 27-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222600000 | BELL 340H | Bell Fee | 34.8240687677 | -120.3270039640 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04029502260000 | **BELRIDGE  6** | Belridge | 35.5328330000 | -119.7741050000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04029597200000 | BELRIDGE  14 | Belridge | 35.5341490000 | -119.7729920000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029747770000 | BELRIDGE  21 | Belridge | 35.5326550000 | -119.7720930000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04029747780000 | BELRIDGE  22 | Belridge | 35.5320740000 | -119.7720780000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029747790000 | BELRIDGE  23 | Belridge | 35.5326580000 | -119.7709480000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029747800000 | BELRIDGE  24 | Belridge | 35.5320510000 | -119.7697930000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029747810000 | BELRIDGE  25 | Belridge | 35.5311350000 | -119.7697690000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029762550000 | BELRIDGE  26 | Belridge | 35.5302210000 | -119.7697700000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029762560000 | BELRIDGE  27 | Belridge | 35.5293430000 | -119.7697760000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029762570000 | BELRIDGE  28 | Belridge | 35.5283950000 | -119.7697700000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029762580000 | BELRIDGE  29 | Belridge | 35.5320330000 | -119.7686600000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029762590000 | BELRIDGE  30 | Belridge | 35.5302110000 | -119.7686600000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030033130000 | BELRIDGE  35H | Belridge | 35.5334720000 | -119.7689850000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030043930000 | BELRIDGE  36H | Belridge | 35.5323980000 | -119.7668380000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030061750000 | BELRIDGE  38 | Belridge | 35.5288940000 | -119.7699670000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030066170000 | BELRIDGE  39 | Belridge | 35.5295940000 | -119.7699620000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030066180000 | BELRIDGE  40 | Belridge | 35.5306910000 | -119.7699660000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030340380000 | BELRIDGE 102 | Belridge | 35.5321760000 | -119.7784450000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029881870000 | BELRIDGE 103 | Belridge | 35.5322550000 | -119.7787540000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |

| 04029801890000 | BELRIDGE 104 | Belridge | 35.5319160000 | -119.7785420000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04030223380000 | BELRIDGE 106 | Belridge | 35.5328510000 | -119.7785290000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340390000 | BELRIDGE 108 | Belridge | 35.5321760000 | -119.7779740000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030018540000 | BELRIDGE 110 | Belridge | 35.5333090000 | -119.7772500000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030018550000 | BELRIDGE 111 | Belridge | 35.5324650000 | -119.7772390000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04029881880000 | BELRIDGE 112 | Belridge | 35.5318720000 | -119.7773670000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340400000 | BELRIDGE 113 | Belridge | 35.5331500000 | -119.7782600000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340410000 | BELRIDGE 116 | Belridge | 35.5321760000 | -119.7775370000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340420000 | BELRIDGE 118 | Belridge | 35.5331500000 | -119.7776710000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340430000 | BELRIDGE 120 | Belridge | 35.5322300000 | -119.7771500000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030018570000 | BELRIDGE 122 | Belridge | 35.5318950000 | -119.7762390000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030340440000 | BELRIDGE 127 | Belridge | 35.5321750000 | -119.7766120000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04030341480000 | BELRIDGE 128 | Belridge | 35.5319840000 | -119.7785960000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030341490000 | BELRIDGE 129 | Belridge | 35.5322780000 | -119.7786130000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04030341500000 | BELRIDGE 130 | Belridge | 35.5325660000 | -119.7786370000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.80 |
| 04083026850000 | **BETTIGA 1** | Bettiga | 34.9318814485 | -120.4038332130 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | P&A | 1.00 | 0.81 |
| 04083211730000 | BETTIGA B 1 | Bettiga | 34.9340400000 | -120.3999400000 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | P&A | 1.00 | 0.81 |
| 04083212060000 | BETTIGA B 2 | Bettiga | 34.9357860000 | -120.401160000 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212870000 | BETTIGA B 3 | Bettiga | 34.9357630421 | -120.4024516670 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212300000 | BETTIGA B 4 | Bettiga | 34.9357547830 | -120.4023702450 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212680000 | BETTIGA B 5 | Bettiga | 35.9548056277 | -120.8612544440 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212970000 | BETTIGA B 6 | Bettiga | 34.9357644571 | -120.4025154140 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083015860000 | **BLOCHMAN  1** | Blochman | 34.8288640000 | -120.3211180000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016930000 | BLOCHMAN  2 | Blochman | 34.8292600000 | -120.3233400000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016940000 | BLOCHMAN  3 | Blochman | 34.8307597761 | -120.3226292420 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015870000 | BLOCHMAN  4 | Blochman | 34.8290111260 | -120.3272736370 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016950000 | BLOCHMAN  5 | Blochman | 34.8332839685 | -120.3223701050 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015920000 | BLOCHMAN  10 | Blochman | 34.8297459766 | -120.3272094010 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.97 |
| 04083015930000 | BLOCHMAN  11 | Blochman | 34.8293390000 | -120.3272500000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015940000 | BLOCHMAN  12 | Blochman | 34.8332827181 | -120.3272400090 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015950000 | BLOCHMAN  13 | Blochman | 34.8295087737 | -120.3294069000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015960000 | BLOCHMAN  14 | Blochman | 34.8313385623 | -120.3294676500 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015970000 | BLOCHMAN  15 | Blochman | 34.8331395739 | -120.3293728840 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015980000 | BLOCHMAN  16 | Blochman | 34.8294585899 | -120.3254297860 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083015990000 | BLOCHMAN  18 | Blochman | 34.8313317422 | -120.3249973640 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016000000 | BLOCHMAN  20 | Blochman | 34.8349553759 | -120.3271635590 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.97 |
| 04083016010000 | BLOCHMAN  21 | Blochman | 34.8349239606 | -120.3292980970 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.97 |
| 04083222380000 | BLOCHMAN  21H | Blochman | 34.8348312544 | -120.3292740110 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016970000 | BLOCHMAN  22 | Blochman | 34.8323300000 | -120.3239400000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016020000 | BLOCHMAN  23 | Blochman | 34.8349253516 | -120.3227981550 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016030000 | BLOCHMAN  24 | Blochman | 34.8294830000 | -120.3226400000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083201160000 | BLOCHMAN  29 | Blochman | 34.8314126595 | -120.3239152820 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.97 |
| 04083222590000 | BLOCHMAN 300H | Blochman | 34.8348290545 | -120.3291265130 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222710000 | BLOCHMAN 305H | Blochman | 34.8322923819 | -120.3250220410 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |

| 04083222630000 | BLOCHMAN 310H | Blochman | 34.8333180000 | -120.3290520000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | P&A | 1.00 | 0.97 |
| 04083222640000 | BLOCHMAN 315H | Blochman | 34.8313885403 | -120.3292881790 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222580000 | BLOCHMAN 320H | Blochman | 34.8295032627 | -120.3293395410 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083006230000 | **T. R. BONETTI 1** | Bonetti | 34.8625302255 | -120.5105261510 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083203260000 | T. R. BONETTI 2 | Bonetti | 34.8629647546 | -120.5138104010 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083205460000 | T. R. BONETTI 4 | Bonetti | 34.8644676586 | -120.5132472690 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083206430000 | T. R. BONETTI 6 | Bonetti | 34.8635701006 | -120.5118269950 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083207330000 | T. R. BONETTI 7 | Bonetti | 34.8675930876 | -120.5198475370 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083205450000 | **BRADLEY CONSOLIDATED 1-37** | Bradley Consolidated | 34.8865170000 | -120.3848060000 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083217570000 | BRADLEY CONSOLIDATED 1-47 | Bradley Consolidated | 34.8862441611 | -120.3847824700 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205310000 | BRADLEY CONSOLIDATED 1-48 | Bradley Consolidated | 34.8864957808 | -120.3846502500 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217560000 | BRADLEY CONSOLIDATED 1-49 | Bradley Consolidated | 34.8861902791 | -120.3846214670 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205150000 | BRADLEY CONSOLIDATED 1-57 | Bradley Consolidated | 34.8863006734 | -120.3849344710 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205190000 | BRADLEY CONSOLIDATED 1-68 | Bradley Consolidated | 34.8864469350 | -120.3844989090 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083221090000 | BRADLEY CONSOLIDATED 3- 1R | Bradley Consolidated | 34.8876373282 | -120.3931220650 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204700000 | BRADLEY CONSOLIDATED 3- 2 | Bradley Consolidated | 34.8877614552 | -120.3932528790 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204710000 | BRADLEY CONSOLIDATED 3- 3 | Bradley Consolidated | 34.8877092117 | -120.3928454260 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083214400000 | BRADLEY CONSOLIDATED 3- 4 | Bradley Consolidated | 34.8924505100 | -120.3929305530 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083218230000 | BRADLEY CONSOLIDATED 3- 6 | Bradley Consolidated | 34.8876331192 | -120.3934296650 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083207250000 | BRADLEY CONSOLIDATED 3-21 | Bradley Consolidated | 34.8926037564 | -120.3932113210 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205160000 | BRADLEY CONSOLIDATED 3-26 | Bradley Consolidated | 34.8875726810 | -120.3923296080 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205240000 | BRADLEY CONSOLIDATED 3-31 | Bradley Consolidated | 34.8924886390 | -120.3933060280 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083207260000 | BRADLEY CONSOLIDATED 3-32 | Bradley Consolidated | 34.8923426525 | -120.3930155440 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083218240000 | BRADLEY CONSOLIDATED 3-36 | Bradley Consolidated | 34.8875469447 | -120.3919982110 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205170000 | BRADLEY CONSOLIDATED 3-42 | Bradley Consolidated | 34.8876001092 | -120.3932399480 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204870000 | BRADLEY CONSOLIDATED 3-46 | Bradley Consolidated | 34.8875704487 | -120.3928653640 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205990000 | BRADLEY CONSOLIDATED 3-51 | Bradley Consolidated | 34.8874170000 | -120.3932720000 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205040000 | BRADLEY CONSOLIDATED 3-53 | Bradley Consolidated | 34.8874208743 | -120.3923243880 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204880000 | BRADLEY CONSOLIDATED 3-55 | Bradley Consolidated | 34.8874334487 | -120.3928856200 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083218250000 | BRADLEY CONSOLIDATED 3-56 | Bradley Consolidated | 34.8875327559 | -120.3916590590 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205180000 | BRADLEY CONSOLIDATED 3-66 | Bradley Consolidated | 34.8874293643 | -120.3930610450 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204980000 | BRADLEY CONSOLIDATED 4-22 | Bradley Consolidated | 34.8876067756 | -120.3930613740 | Santa Maria | Santa Barbara | 6-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205320000 | BRADLEY CONSOLIDATED 5-51 | Bradley Consolidated | 34.8826283055 | -120.3800413610 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083218260000 | BRADLEY CONSOLIDATED 5-61 | Bradley Consolidated | 34.8823520028 | -120.3798948720 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205330000 | BRADLEY CONSOLIDATED 5-62 | Bradley Consolidated | 34.8826130880 | -120.3798715020 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205340000 | BRADLEY CONSOLIDATED 5-71 | Bradley Consolidated | 34.8823539733 | -120.3800699440 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083219250000 | BRADLEY CONSOLIDATED 5-72 | Bradley Consolidated | 34.8815238587 | -120.3799911560 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205350000 | BRADLEY CONSOLIDATED 5-73 | Bradley Consolidated | 34.8826003636 | -120.3797024310 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205370000 | BRADLEY CONSOLIDATED 5-84 | Bradley Consolidated | 34.8823379675 | -120.3797447900 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209030000 | BRADLEY CONSOLIDATED WS-1 | Bradley Consolidated | 34.8870550000 | -120.3923220000 | Santa Maria | Santa Barbara | 5-09N-33W | WSW | Inactive | 1.00 | 0.81 |
| 04083207420000 | **BRADLEY 1-PARCEL E 5-77** | Bradley Lands | 34.8826000000 | -120.3667600000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083207430000 | BRADLEY 1-PARCEL E 5-87 | Bradley Lands | 34.8805800000 | -120.3670100000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206310000 | BRADLEY 1-PARCEL E 5-88 | Bradley Lands | 34.8801500000 | -120.3650200000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083202330000 | BRADLEY LANDS 1 | Bradley Lands | 34.8896640000 | -120.3683600000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | P&A | 1.00 | 0.81 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 04083204660000 | BRADLEY LANDS  2 | Bradley Lands | 34.8870896769 | -120.3727963030 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204920000 | BRADLEY LANDS  3 | Bradley Lands | 34.8886953727 | -120.3730217880 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217900000 | BRADLEY LANDS  3-2 | Bradley Lands | 34.8819577186 | -120.3715874520 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204930000 | BRADLEY LANDS  4 | Bradley Lands | 34.8861080000 | -120.3703290000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204940000 | BRADLEY LANDS  5 | Bradley Lands | 34.8856619932 | -120.3731016350 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206050000 | BRADLEY LANDS  6 | Bradley Lands | 34.8841894425 | -120.3728941860 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206600000 | BRADLEY LANDS  7 | Bradley Lands | 34.8819669781 | -120.3666502670 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206890000 | BRADLEY LANDS  8 | Bradley Lands | 34.8841092508 | -120.3708712750 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206900000 | BRADLEY LANDS  9 | Bradley Lands | 34.8839180000 | -120.3686260000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083208580000 | BRADLEY LANDS 10 | Bradley Lands | 34.8837944996 | -120.3673642830 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083208590000 | BRADLEY LANDS 11 | Bradley Lands | 34.8849139848 | -120.3720545380 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083211760000 | BRADLEY LANDS 12 | Bradley Lands | 34.8849301066 | -120.3698264950 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083213460000 | BRADLEY LANDS 15 | Bradley Lands | 34.8885870000 | -120.3686040000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083024050000 | **BRADLEY LANDS UNIT  1-5** | Bradley Lands Unit | 34.8935200993 | -120.3803963430 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083030210000 | BRADLEY LANDS UNIT  1-6 | Bradley Lands Unit | 34.8902430000 | -120.3833780000 | Santa Maria | Santa Barbara | 6-09N-33W | Injection | Inactive | 1.00 | 0.81 |
| 04083024040000 | BRADLEY LANDS UNIT  2-5 | Bradley Lands Unit | 34.8928101391 | -120.3805060620 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083030220000 | BRADLEY LANDS UNIT  2-6 | Bradley Lands Unit | 34.8923270834 | -120.3844421760 | Santa Maria | Santa Barbara | 6-09N-33W | Injection | Inactive | 1.00 | 0.81 |
| 04083024060000 | BRADLEY LANDS UNIT  4-5 | Bradley Lands Unit | 34.8911919050 | -120.3820890340 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024070000 | BRADLEY LANDS UNIT  5-5 | Bradley Lands Unit | 34.8886266427 | -120.3794755570 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024090000 | BRADLEY LANDS UNIT 12-5 | Bradley Lands Unit | 34.8916677469 | -120.3805482760 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024100000 | BRADLEY LANDS UNIT 13-5 | Bradley Lands Unit | 34.8901560188 | -120.3805536240 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024110000 | BRADLEY LANDS UNIT 22-5 | Bradley Lands Unit | 34.8916909267 | -120.3790170120 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024120000 | BRADLEY LANDS UNIT 31-5 | Bradley Lands Unit | 34.8930474204 | -120.3780661390 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024130000 | BRADLEY LANDS UNIT 33-5 | Bradley Lands Unit | 34.8901430556 | -120.3773322620 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205080000 | BRADLEY LANDS UNIT 34-5 | Bradley Lands Unit | 34.8896991526 | -120.3757383810 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083222310000 | BRADLEY LANDS UNIT 44-5 | Bradley Lands Unit | 34.8875913217 | -120.3751988660 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205970000 | BRADLEY LANDS UNIT 53-5 | Bradley Lands Unit | 34.8857686900 | -120.3775831350 | Santa Maria | Santa Barbara | 5-09N-33W | Injection | Inactive | 1.00 | 0.81 |
| 04083222340000 | BRADLEY LANDS UNIT 54-5 | Bradley Lands Unit | 34.8867655068 | -120.3742732880 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024080000 | BRADLEY LANDS UNIT 6-5 | Bradley Lands Unit | 34.8884880000 | -120.3772690000 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083024140000 | BRADLEY LANDS UNIT F10-5 | Bradley Lands Unit | 34.8939121306 | -120.3826939380 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083024150000 | BRADLEY LANDS UNIT F11-5 | Bradley Lands Unit | 34.8922821237 | -120.3824126110 | Santa Maria | Santa Barbara | 5-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083213460000 | **BROWN  47** | Brown | 34.7226741769 | -120.1384175850 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083215350000 | BROWN  58 | Brown | 34.7186668905 | -120.1336730320 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083222440000 | BROWN  82 | Brown | 34.7184745333 | -120.1340177950 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083216790000 | BROWN 507 | Brown | 34.7227013154 | -120.1386319700 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083017870000 | **CARRANZA  1** | Carranza | 34.7199414487 | -120.1262379850 | Zaca | Santa Barbara | 3-07N-31W | Oil | Active | 1.00 | 0.81 |
| 04083017880000 | CARRANZA 11 | Carranza | 34.7199448720 | -120.1240367470 | Zaca | Santa Barbara | 3-07N-31W | Oil | Active | 1.00 | 0.81 |
| 04083017890000 | CARRANZA 21 | Carranza | 34.7197401033 | -120.1218620520 | Zaca | Santa Barbara | 2-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083045580000 | CARRANZA 22 | Carranza | 34.7181509222 | -120.1218284820 | Zaca | Santa Barbara | 2-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083017760000 | **CHAMBERLIN  1** | Chamberlain | 34.7288908836 | -120.1497919430 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017770000 | CHAMBERLIN  4 | Chamberlain | 34.7296603988 | -120.1485144650 | Zaca | Santa Barbara | 33-08N-31W | Water Disposal | Inactive | 1.00 | 0.86 |
| 4083017780000 | CHAMBERLIN 12 | Chamberlin | 34.7312700000 | -120.1494500000 | Zaca | Santa Barbara | 33-08N-31W | Oil | Active | 1.00 | 0.86 |
| 04083017790000 | CHAMBERLIN 22 | Chamberlin | 34.7311779557 | -120.1529868540 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017800000 | CHAMBERLIN 23 | Chamberlin | 34.7298347780 | -120.1516275360 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |

| 04083045590000 | CHAMBERLIN 24 | Chamberlin | 34.7283500000 | -120.1503600000 | Zaca | Santa Barbara | 33-08N-31W | Water Dis | Inactive | 1.00 | 0.86 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083017810000 | CHAMBERLIN 31 | Chamberlin | 34.7331069213 | -120.1549182870 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017820000 | CHAMBERLIN 32 | Chamberlin | 34.7312949848 | -120.1549213660 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017830000 | CHAMBERLIN 33 | Chamberlin | 34.7298486948 | -120.1536292320 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017840000 | CHAMBERLIN 41 | Chamberlin | 34.7331063739 | -120.1571153530 | Zaca | Santa Barbara | 33-08N-31W | Water Dis | Inactive | 1.00 | 0.86 |
| 04083045600000 | CHAMBERLIN 42 | Chamberlin | 34.7318464520 | -120.1564474880 | Zaca | Santa Barbara | 33-08N-31W | Injection | Inactive | 1.00 | 0.86 |
| 04083017850000 | CHAMBERLIN 51 | Chamberlin | 34.7330964429 | -120.1593986940 | Zaca | Santa Barbara | 32-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083210600000 | CHAMBERLIN-B 15 | Chamberlin B | 34.7253297333 | -120.1489594540 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083211670000 | CHAMBERLIN-B 16 | Chamberlin B | 34.7234878298 | -120.1494098940 | Zaca | Santa Barbara | 33-08N-31W | Oil | Active | 1.00 | 0.86 |
| 04083212050000 | CHAMBERLIN-B 25 | Chamberlin B | 34.7254589388 | -120.1524932190 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083211520000 | CHAMBERLIN-B 26 | Chamberlin B | 34.7252095437 | -120.1526145100 | Zaca | Santa Barbara | 33-08N-31W | Oil | Active | 1.00 | 0.86 |
| 04083211310000 | CONOCO 1-31 | Conoco | 34.8094172133 | -120.2786815930 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.84 |
| 04083017900000 | DAVIS 1 | Davis | 34.7254716963 | -120.1461846640 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083204140000 | DAVIS 2 | Davis | 34.7244830880 | -120.1443529200 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083045610000 | DAVIS 3 | Davis | 34.7295700000 | -120.1442300000 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017910000 | DAVIS 4 | Davis | 34.7282950000 | -120.1474760000 | Zaca | Santa Barbara | 33-08N-31W | Oil | P&A | 1.00 | 0.86 |
| 04083002600000 | DAVIS 14 | Davis | 34.7276570000 | -120.1450950000 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083045620000 | DAVIS 24 | Davis | 34.7277590000 | -120.1429020000 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083005770000 | DAVIS 25 | Davis | 34.7256999371 | -120.1435151090 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017920000 | DAVIS 35 | Davis | 34.7257870000 | -120.1407030000 | Zaca | Santa Barbara | 33-08N-31W | Oil | P&A | 1.00 | 0.81 |
| 04083214590000 | DAVIS 36 | Davis | 34.7228080991 | -120.1390575350 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083006630000 | DAVIS 45 | Davis | 34.7258779934 | -120.1386879590 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017930000 | DAVIS 46 | Davis | 34.7240744553 | -120.1386774380 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017940000 | DAVIS 48 | Davis | 34.7245979345 | -120.1383821730 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017950000 | DAVIS 56 | Davis | 34.7240123023 | -120.1361906140 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017960000 | DAVIS 66 | Davis | 34.7236122955 | -120.1347190990 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083017980000 | DAVIS 67 | Davis | 34.7222716076 | -120.1345372200 | Zaca | Santa Barbara | 34-08N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083209710000 | DAVIS B 5 | Davis B | 34.7243836324 | -120.1450319710 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083210610000 | DAVIS B 6 | Davis B | 34.7244540761 | -120.1468563660 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083213310000 | DAVIS B 28 | Davis B | 34.7244094598 | -120.1446921370 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083211390000 | DAVIS C 27 | Davis C | 34.7242390829 | -120.1435881070 | Zaca | Santa Barbara | 33-08N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083212290000 | DAVIS C 37 | Davis C | 34.7226630096 | -120.1389573950 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083211770000 | DAVIS C 38 | Davis C | 34.7242394674 | -120.1437610430 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083214320000 | DAVIS C 69 | Davis C | 34.7188289753 | -120.1335581680 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083215360000 | DAVIS C 81 | Davis C | 34.7185500881 | -120.1338167270 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.81 |
| 04083010630000 | ESCOLLE A 5 | Escolle | 34.8224119832 | -120.4576903700 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083010660000 | ESCOLLE A 7 | Escolle | 34.8242326028 | -120.4576885230 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083010710000 | ESCOLLE A 10 | Escolle | 34.8261310321 | -120.4619573450 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083010730000 | ESCOLLE A 11 | Escolle | 34.8259798007 | -120.4640778600 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083010750000 | ESCOLLE A 12 | Escolle | 34.8279305430 | -120.4619472310 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083010780000 | ESCOLLE A 14 | Escolle | 34.8244607681 | -120.4619625630 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212520000 | ESCOLLE A 16 | Escolle | 34.8352839060 | -120.4638931930 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083011950000 | FULLERTON 1 | Fullerton | 34.8129957763 | -120.2910862020 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083011960000 | FULLERTON 3 | Fullerton | 34.8145962410 | -120.2942572640 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |

| 04083011980000 | FULLERTON  5 | Fullerton | 34.8167262611 | -120.2941411730 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083202340000 | FULLERTON  8 | Fullerton | 34.8136432392 | -120.2929767970 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083203580000 | FULLERTON  9 | Fullerton | 34.8155427641 | -120.2926419000 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083203620000 | FULLERTON  10 | Fullerton | 34.8128890942 | -120.2907993770 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083203570000 | FULLERTON  11 | Fullerton | 34.8151336300 | -120.2903927170 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083203550000 | FULLERTON  12 | Fullerton | 34.8149945744 | -120.2905979720 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083218210000 | FULLERTON  14 | Fullerton | 34.8152317140 | -120.2877351270 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083218880000 | FULLERTON  15 | Fullerton | 34.8138286637 | -120.2886413780 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083012000000 | FULLERTON 101 | Fullerton | 34.8156721257 | -120.2906075370 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083218890000 | FULLERTON 102 | Fullerton | 34.8145303083 | -120.2942260960 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | P&A | 1.00 | 0.98 |
| 04083219480000 | FULLERTON 103 | Fullerton | 34.8168122252 | -120.2941797160 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083219490000 | FULLERTON 104 | Fullerton | 34.8166382650 | -120.2897254630 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083220530000 | FULLERTON 105 | Fullerton | 34.8143975683 | -120.2914504350 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083220540000 | FULLERTON 106 | Fullerton | 34.8156781332 | -120.2926113610 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | P&A | 1.00 | 0.98 |
| 04083220550000 | FULLERTON 107 | Fullerton | 34.8167114099 | -120.2919518090 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083220560000 | FULLERTON 109 | Fullerton | 34.8170515040 | -120.2884400060 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083220570000 | FULLERTON 110 | Fullerton | 34.8122407838 | -120.2897386850 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083220580000 | FULLERTON 111 | Fullerton | 34.8137838858 | -120.2885611020 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04083222570000 | FULLERTON 201H | Fullerton | 34.8172097462 | -120.2885869200 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 83222560000 | FULLERTON 200H | Fullerton | 34.8171997100 | -120.2886350000 | Cat Canyon | Santa Barbara | 31-09N-32W | Steamfloo | Inactive | 1.00 | 0.98 |
| 04083222610000 | FULLERTON 205H | Fullerton | 34.8168820011 | -120.2941942790 | Cat Canyon | Santa Barbara | 31-09N-32W | Oil | Inactive | 1.00 | 0.98 |
| 04029465140000 | **GIBSON 11** | Gibson | 35.5351760000 | -119.7724340000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029478480000 | GIBSON 12 | Gibson | 35.5338340000 | -119.7741120000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029486990000 | GIBSON 13 | Gibson | 35.5349440000 | -119.7741510000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029493340000 | GIBSON 14 | Gibson | 35.5341490000 | -119.7729920000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029525830000 | GIBSON 18 | Gibson | 35.5349720000 | -119.7712710000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029550950000 | GIBSON I-3 | Gibson | 35.5347710000 | -119.7707810000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.86 |
| 04029550170000 | GIBSON I-4 | Gibson | 35.5348190000 | -119.7719020000 | Belridge, Nor | Kern | 36-27S-20E | Injection | Inactive | 1.00 | 0.86 |
| 04083013420000 | **GOODWIN FEE 1** | Goodwin | 34.8730590000 | -120.3223750000 | Cat Canyon | Santa Barbara | 11-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083013430000 | GOODWIN FEE 24 | Goodwin | 34.8820240000 | -120.3223520000 | Cat Canyon | Santa Barbara | 2-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083013440000 | GOODWIN FEE 30 | Goodwin | 34.8858080000 | -120.3255620000 | Cat Canyon | Santa Barbara | 2-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083209680000 | GOODWIN FEE 7-4A | Goodwin | 34.8757024348 | -120.3223165320 | Cat Canyon | Santa Barbara | 11-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083000480000 | **GOODWIN 1** | Goodwin A | 34.8730400000 | -120.3366400000 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083002990000 | GOODWIN A  1 | Goodwin A | 34.8658093087 | -120.3312731220 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083006850000 | GOODWIN A  2 | Goodwin A | 34.8676225123 | -120.3314112120 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Active | 1.00 | 0.81 |
| 04083000060000 | GOODWIN A  3 | Goodwin A | 34.8692000845 | -120.3312215570 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083201110000 | GOODWIN A  4 | Goodwin A | 34.8676598979 | -120.3334435440 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083202990000 | GOODWIN A  5 | Goodwin A | 34.8694336898 | -120.3334411920 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083203340000 | GOODWIN A  6 | Goodwin A | 34.8716440000 | -120.3313030000 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | P&A | 1.00 | 0.81 |
| 04083203420000 | GOODWIN A  7 | Goodwin A | 34.8685326075 | -120.3323553950 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083203500000 | GOODWIN A  8 | Goodwin A | 34.8712688452 | -120.3334375780 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083203820000 | GOODWIN A  10 | Goodwin A | 34.8712948019 | -120.3355887300 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204040000 | GOODWIN A  11 | Goodwin A | 34.8701669884 | -120.3319686780 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083204130000 | GOODWIN A  12 | Goodwin A | 34.8694650651 | -120.3359486520 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |

| 04083204220000 | GOODWIN A 13 | Goodwin A | 34.8653707119 | -120.3334344690 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083205130000 | GOODWIN A 14 | Goodwin A | 34.8667162832 | -120.3323484980 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083205760000 | GOODWIN A 15 | Goodwin A | 34.8703733336 | -120.3344949750 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206330000 | GOODWIN A 16 | Goodwin A | 34.8683035981 | -120.3310661000 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206350000 | GOODWIN A 17 | Goodwin A | 34.8669595049 | -120.3309925720 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206340000 | GOODWIN A 18 | Goodwin A | 34.8685539361 | -120.3345085720 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206390000 | GOODWIN A 19 | Goodwin A | 34.8667229007 | -120.3348052540 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206410000 | GOODWIN A 20 | Goodwin A | 34.8706734426 | -120.3314136600 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083206420000 | GOODWIN A 21 | Goodwin A | 34.8721648746 | -120.3344597490 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209260000 | GOODWIN A 22 | Goodwin A | 34.8668515592 | -120.3375652160 | Cat Canyon | Santa Barbara | 10-09N-33W | Injection | Inactive | 1.00 | 0.81 |
| 04083209500000 | GOODWIN A 23 | Goodwin A | 34.8691421598 | -120.3330563790 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209510000 | GOODWIN A 24 | Goodwin A | 34.8676333931 | -120.3326738170 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209520000 | GOODWIN A 25 | Goodwin A | 34.8685560376 | -120.3334143470 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209950000 | GOODWIN A 26 | Goodwin A | 34.8701534959 | -120.3331764470 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209690000 | GOODWIN A 27 | Goodwin A | 34.8694337318 | -120.3346304920 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209730000 | GOODWIN A 28 | Goodwin A | 34.8712488583 | -120.3322982890 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209740000 | GOODWIN A 29 | Goodwin A | 34.8712559232 | -120.3344716720 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083209960000 | GOODWIN A 30 | Goodwin A | 34.8667314165 | -120.3334514650 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083210190000 | GOODWIN A 31 | Goodwin A | 34.8676800977 | -120.3345509400 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083210210000 | GOODWIN A 32 | Goodwin A | 34.8659512708 | -120.3335391170 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083210440000 | GOODWIN A 33 | Goodwin A | 34.8667161023 | -120.3318272480 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083211200000 | GOODWIN A 35 | Goodwin A | 34.8701944343 | -120.3302992520 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083210150000 | GOODWIN A 36 | Goodwin A | 34.8721446166 | -120.3322730440 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083211020000 | GOODWIN A 37 | Goodwin A | 34.8684726019 | -120.3304305100 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083210970000 | GOODWIN A 38 | Goodwin A | 34.8702915796 | -120.3357821660 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217340000 | GOODWIN A 40 | Goodwin A | 34.8748995987 | -120.3376951820 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217530000 | GOODWIN A 41 | Goodwin A | 34.8760686598 | -120.3382882170 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217540000 | GOODWIN A 42 | Goodwin A | 34.8742896044 | -120.3364001170 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217680000 | GOODWIN A 43 | Goodwin A | 34.8767502600 | -120.3372525660 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Active | 1.00 | 0.81 |
| 04083217690000 | GOODWIN A 44 | Goodwin A | 34.8776138607 | -120.3383800290 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217700000 | GOODWIN A 45 | Goodwin A | 34.8787427197 | -120.3372079640 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217710000 | GOODWIN A 46 | Goodwin A | 34.8777183620 | -120.3357983310 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083217860000 | GOODWIN A 47 | Goodwin A | 34.8758236363 | -120.3366477730 | Cat Canyon | Santa Barbara | 10-09N-33W | Oil | Active | 1.00 | 0.81 |
| 04083210750000 | **G. T. ADAM ET AL B1** | GT Adam | 34.9340379657 | -120.4051589230 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083212390000 | G. T. ADAM ET AL B2 | GT Adam | 34.9340490216 | -120.4051965980 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | P&A | 1.00 | 0.80 |
| 04083213270000 | G. T. ADAM ET AL B3 | GT Adam | 34.9350063010 | -120.4092058200 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083213280000 | G. T. ADAM ET AL B4 | GT Adam | 34.9350502622 | -120.4092083390 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083213950000 | G. T. ADAM ET AL B5 | GT Adam | 34.9379762954 | -120.4071107690 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083220010000 | **JIM HOPKINS  52-1** | Jim Hopkins | 34.8919133734 | -120.4067195520 | Santa Maria ' | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |
| 04083200620000 | JIM HOPKINS 53-1 | Jim Hopkins | 34.8915176533 | -120.4062654240 | Santa Maria ' | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083205850000 | JIM HOPKINS 62-1 | Jim Hopkins | 34.8917133857 | -120.4064850510 | Santa Maria ' | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083202020000 | JIM HOPKINS 63-1 | Jim Hopkins | 34.8879781588 | -120.4063347130 | Santa Maria ' | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |
| 04083206020000 | JIM HOPKINS 64-1 | Jim Hopkins | 34.8880038826 | -120.4064951730 | Santa Maria ' | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |
| 04083205880000 | JIM HOPKINS  71X-1 | Jim Hopkins | 34.8930976196 | -120.4043218650 | Santa Maria ' | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |

| 04083219800000 | JIM HOPKINS 72-1 | Jim Hopkins | 34.8930178525 | -120.4044126630 | Santa Maria | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083205510000 | JIM HOPKINS 73-1 | Jim Hopkins | 34.8898659055 | -120.4042970380 | Santa Maria | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |
| 04083206400000 | JIM HOPKINS 75-1 | Jim Hopkins | 34.8877955393 | -120.4022202690 | Santa Maria | Santa Barbara | 1-09N-34W | Injection | Inactive | 1.00 | 0.90 |
| 04083205400000 | JIM HOPKINS 82-1 | Jim Hopkins | 34.8917099891 | -120.4020818130 | Santa Maria | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083207390000 | JIM HOPKINS 83-1 | Jim Hopkins | 34.8898788556 | -120.4020890820 | Santa Maria | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083205540000 | JIM HOPKINS 84-1 | Jim Hopkins | 34.8880040193 | -120.4021004090 | Santa Maria | Santa Barbara | 1-09N-34W | Waterflood | Inactive | 1.00 | 0.90 |
| 04083221660000 | JIM HOPKINS 283-1 | Jim Hopkins | 34.8895505256 | -120.4021501780 | Santa Maria | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083221970000 | JIM HOPKINS 293 | Jim Hopkins | 34.8916151213 | -120.4017120140 | Santa Maria | Santa Barbara | 1-09N-34W | Oil | Inactive | 1.00 | 0.90 |
| 04083024560000 | **KEMP 1** | Kemp | 34.9008950000 | -120.3910630000 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | P&A | 1.00 | 0.89 |
| 04083024180000 | KEMP 3 | Kemp | 34.8992550000 | -120.3838950000 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083024190000 | KEMP 4 | Kemp | 34.8982279555 | -120.3839137030 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083024580000 | KEMP 5 | Kemp | 34.9005640000 | -120.3852030000 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | P&A | 1.00 | 0.89 |
| 04083025820000 | KEMP 6 | Kemp | 34.9010180000 | -120.3833690000 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | P&A | 1.00 | 0.89 |
| 04083024570000 | KEMP 2 | Kemp | 34.9012460000 | -120.3882020000 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083024200000 | KEMP 7 | Kemp | 34.8952862085 | -120.3844200990 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083201580000 | KEMP 8 | Kemp | 34.8961636684 | -120.3839131950 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083206060000 | KEMP 11 | Kemp | 34.8961688609 | -120.3834552060 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083206210000 | KEMP 12 | Kemp | 34.8968291148 | -120.3843536410 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083206220000 | KEMP 13 | Kemp | 34.9011186472 | -120.3845559100 | Santa Maria | Santa Barbara | 31-10N-33W | Oil | Inactive | 1.00 | 0.89 |
| 04083014360000 | **LAINE 1** | Laine | 34.9385560000 | -120.4060440000 | Santa Maria | Santa Barbara | 13-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083202930000 | **LLOYD ET AL 1** | Lloyd | 34.8585959211 | -120.3378756860 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203080000 | LLOYD ET AL 2 | Lloyd | 34.8613542021 | -120.3368394380 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203090000 | LLOYD ET AL 3 | Lloyd | 34.8631488306 | -120.3368162040 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203280000 | LLOYD ET AL 4 | Lloyd | 34.8615042845 | -120.3405950360 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203440000 | LLOYD ET AL 5 | Lloyd | 34.8585830000 | -120.3381140000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.82 |
| 04083203450000 | LLOYD ET AL 7 | Lloyd | 34.8633808124 | -120.3418568840 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203590000 | LLOYD ET AL 8 | Lloyd | 34.8614526027 | -120.3375099280 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203600000 | LLOYD ET AL 9 | Lloyd | 34.8612998064 | -120.3366235610 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203880000 | LLOYD ET AL 10 | Lloyd | 34.8626086796 | -120.3374104580 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083203710000 | LLOYD ET AL 11 | Lloyd | 34.8615381039 | -120.3377046280 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083204300000 | LLOYD ET AL 12 | Lloyd | 34.8611262108 | -120.3377100220 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083204840000 | LLOYD ET AL 13 | Lloyd | 34.8543101984 | -120.3418684580 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083206270000 | LLOYD ET AL 14 | Lloyd | 34.8611018681 | -120.3397190420 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083205260000 | LLOYD ET AL 15 | Lloyd | 34.8542178219 | -120.3415479690 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083207490000 | LLOYD ET AL 16 | Lloyd | 34.8551491941 | -120.3438688640 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.82 |
| 04083208860000 | LLOYD ET AL 17 | Lloyd | 34.8567306179 | -120.3405462260 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083227880000 | LLOYD ET AL 18 | Lloyd | 34.8614250000 | -120.3369470000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.82 |
| 04083012400000 | **LOS FLORES 1-21** | Los Flores | 34.8423800000 | -120.3550650000 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083012410000 | LOS FLORES 2-21 | Los Flores | 34.8422869382 | -120.3531802970 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012420000 | LOS FLORES 3-21 | Los Flores | 34.8412625659 | -120.3539496150 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012430000 | LOS FLORES 4-21 | Los Flores | 34.8401883479 | -120.3531281330 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083217440000 | LOS FLORES 13-22 | Los Flores | 34.8416205707 | -120.3461687760 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083011550000 | LOS FLORES 15-22 | Los Flores | 34.8423321493 | -120.3469491610 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012440000 | LOS FLORES 16-22 | Los Flores | 34.8407094897 | -120.3469542220 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083012450000 | LOS FLORES  25-22 | Los Flores | 34.8423187976 | -120.3447495060 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012460000 | LOS FLORES  26-22 | Los Flores | 34.8405024774 | -120.3449660310 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012470000 | LOS FLORES  35-22 | Los Flores | 34.8423013354 | -120.3425536770 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012480000 | LOS FLORES  36-22 | Los Flores | 34.8404912472 | -120.3429651150 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083011560000 | LOS FLORES  45-22 | Los Flores | 34.8422886765 | -120.3403459910 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012490000 | LOS FLORES  46-22 | Los Flores | 34.8404823764 | -120.3403602020 | Cat Canyon | Santa Barbara | 22-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083011080000 | LOS FLORES  55-21 | Los Flores | 34.8423758246 | -120.3556685810 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083010210000 | LOS FLORES  65-21 | Los Flores | 34.8423611021 | -120.3535150830 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083011090000 | LOS FLORES  66-21 | Los Flores | 34.8405014449 | -120.3534574870 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012500000 | LOS FLORES  75-21 | Los Flores | 34.8423456041 | -120.3513206730 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012510000 | LOS FLORES  76-21 | Los Flores | 34.8406087572 | -120.3513734930 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012520000 | LOS FLORES  77-21 | Los Flores | 34.8387145403 | -120.3513677140 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012530000 | LOS FLORES  78-21 | Los Flores | 34.8368875444 | -120.3514171550 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012540000 | LOS FLORES  85-21 | Los Flores | 34.8423251896 | -120.3493664720 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083003390000 | LOS FLORES  86-21 | Los Flores | 34.8406527250 | -120.3489789790 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012550000 | LOS FLORES  87-21 | Los Flores | 34.8386914277 | -120.3491016980 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012560000 | LOS FLORES  88-21 | Los Flores | 34.8368799199 | -120.3491309310 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012570000 | LOS FLORES  101-21 | Los Flores | 34.8423565465 | -120.3517569600 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012580000 | LOS FLORES  102-21 | Los Flores | 34.8423459379 | -120.3503532760 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012590000 | LOS FLORES  103-21 | Los Flores | 34.8423299122 | -120.3486775880 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012600000 | LOS FLORES  104-21 | Los Flores | 34.8403686567 | -120.3490430830 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012610000 | LOS FLORES  105-21 | Los Flores | 34.8385915523 | -120.3491401260 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012630000 | LOS FLORES  107-21 | Los Flores | 34.8369819499 | -120.3488568680 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012640000 | LOS FLORES  108-21 | Los Flores | 34.8410582536 | -120.3500582070 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083011660000 | LOS FLORES  110-21 | Los Flores | 34.8396378833 | -120.3503867460 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012670000 | LOS FLORES  111-21 | Los Flores | 34.8390620340 | -120.3518070670 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012680000 | LOS FLORES  112-21 | Los Flores | 34.8384725828 | -120.3505735340 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083012690000 | LOS FLORES  114-21 | Los Flores | 34.8373451093 | -120.3505328410 | Cat Canyon | Santa Barbara | 21-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083014310000 | LOS FLORES 45W-21 | Los Flores | 34.8423862109 | -120.3578742460 | Cat Canyon | Santa Barbara | 21-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083218510000 | **ESCOLLE L  1** | Lospe | 34.8299610000 | -120.4711410000 | Casmalia | Santa Barbara | 28-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083219560000 | ESCOLLE L  2 | Lospe | 34.8312690000 | -120.4732330000 | Casmalia | Santa Barbara | 29-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083219910000 | ESCOLLE L  3 | Lospe | 34.8330810000 | -120.4752580000 | Casmalia | Santa Barbara | 29-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04029525840000 | **MCPHAIL  5-7R** | McPhail | 35.5367740000 | -119.7447210000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.96 |
| 04029237530000 | MCPHAIL  5-8 | McPhail | 35.5357670000 | -119.7740540000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Inactive | 1.00 | 0.96 |
| 04030046760000 | MCPHAIL 37H | McPhail | 35.5387080000 | -119.7744610000 | Belridge, Nor | Kern | 36-27S-20E | Oil | Active | 1.00 | 0.80 |
| 04029550160000 | MCPHAIL I-1 | McPhail | 35.5361190000 | -119.7723200000 | Belridge, Nor | Kern | 36-27S-20E | Injection | Active | 1.00 | 0.96 |
| 04029550150000 | MCPHAIL I-2 | McPhail | 35.5362530000 | -119.7735210000 | Belridge, Nor | Kern | 36-27S-20E | Injection | Inactive | 1.00 | 0.96 |
| 04029599050000 | MCPHAIL I-5 | McPhail | 35.5354490000 | -119.7720490000 | Belridge, Nor | Kern | 36-27S-20E | Injection | Inactive | 1.00 | 0.96 |
| 04083212210000 | **MORETTI 1-23** | Moretti | 34.9375870000 | -120.5416350000 | Santa Maria ' | Santa Barbara | 23-10N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083214040000 | MORETTI B 1 | Moretti | 34.9350030000 | -120.4095500000 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083214050000 | MORETTI B-2 | Moretti | 34.9350520000 | -120.4095500000 | Santa Maria ' | Santa Barbara | 24-10N-34W | Oil | P&A | 1.00 | 0.81 |
| 04083008910000 | **MORGANTI  1** | Morganti | 34.8577136446 | -120.5127030920 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083008920000 | MORGANTI  2 | Morganti | 34.8607774457 | -120.5208878440 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083008930000 | MORGANTI  3 | Morganti | 34.8591456528 | -120.5150234610 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 04083008940000 | MORGANTI  4 | Morganti | 34.8544315200 | -120.5085334540 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083008960000 | MORGANTI  7 | Morganti | 34.8591985859 | -120.5177716830 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083008980000 | MORGANTI  9 | Morganti | 34.8566570244 | -120.5095281510 | Casmalia | Santa Barbara | 18-09N-34W | Oil | P&A | 1.00 | 0.81 |
| 04083006980000 | MORGANTI  11 | Morganti | 34.8553650963 | -120.5112452240 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083006340000 | MORGANTI  12 | Morganti | 34.8541120000 | -120.5092230000 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083007370000 | MORGANTI  25 | Morganti | 34.8565320754 | -120.5110457650 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083009000000 | MORGANTI  33 | Morganti | 34.8524822759 | -120.5134771140 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083008900000 | MORGANTI  34 | Morganti | 34.8554399900 | -120.5183152120 | Casmalia | Santa Barbara | 24-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083009010000 | MORGANTI  43 | Morganti | 34.8523509879 | -120.5164279850 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083009190000 | MORGANTI  54 | Morganti | 34.8540531582 | -120.5179814270 | Casmalia | Santa Barbara | 24-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083006580000 | MORGANTI  56 | Morganti | 34.8593493777 | -120.5123524910 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083009200000 | MORGANTI  57 | Morganti | 34.8554690000 | -120.5173570000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083009060000 | MORGANTI  58 | Morganti | 34.8506040678 | -120.5081253090 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083009070000 | MORGANTI  59 | Morganti | 34.8477577635 | -120.5078761620 | Casmalia | Santa Barbara | 19-09N-34W | Oil | P&A | 1.00 | 0.81 |
| 4083001110000 | MORGANTI  60 | Morganti | 34.8489581001 | -120.5192867840 | Casmalia | Santa Barbara | 24-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083203240000 | MORGANTI  61 | Morganti | 34.8607365459 | -120.5139234570 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083203650000 | MORGANTI  62 | Morganti | 34.8607610000 | -120.5155680000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204190000 | MORGANTI  63 | Morganti | 34.8584226939 | -120.5132384120 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204200000 | MORGANTI  64 | Morganti | 34.8580836996 | -120.5087805200 | Casmalia | Santa Barbara | 18-09N-34W | Oil | Inactive | 1.00 | 0.81 |
| 04083204370000 | MORGANTI  65 | Morganti | 34.8565210000 | -120.5130390000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204780000 | MORGANTI  66 | Morganti | 34.8612599000 | -120.5182199870 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083204810000 | MORGANTI  67 | Morganti | 34.8607192886 | -120.5118214340 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083205110000 | MORGANTI  68 | Morganti | 34.8511172564 | -120.5141518290 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083209820000 | MORGANTI  69 | Morganti | 34.8592057510 | -120.5196347020 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083209850000 | MORGANTI  70 | Morganti | 34.8607820144 | -120.5225520710 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083214060000 | MORGANTI  71 | Morganti | 34.8514050124 | -120.5210480180 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083214070000 | MORGANTI  72 | Morganti | 34.8514181390 | -120.5209965250 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083216190000 | MORGANTI  73 | Morganti | 34.8491604897 | -120.5210859980 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083216200000 | MORGANTI  74 | Morganti | 34.8540690000 | -120.5189050000 | Casmalia | Santa Barbara | 24-09N-35W | Oil | P&A | 1.00 | 0.81 |
| 04083216210000 | MORGANTI  75 | Morganti | 34.8556827960 | -120.5194064650 | Casmalia | Santa Barbara | 13-09N-35W | Injection | Inactive | 1.00 | 0.81 |
| 04083214080000 | **MUSCIO 1** | Muscio | 34.8514240000 | -120.5254440000 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | **1.00** | 0.81 |
| 04083216460000 | MUSCIO 2 | Muscio | 34.8519320000 | -120.5261850000 | Casmalia | Santa Barbara | 24-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083016990000 | **PALMER STENDEL  5** | Palmer Stendel Fee | 34.8314520000 | -120.3199460000 | Cat Canyon | Santa Barbara | 26-09N-33W | Injection | Inactive | **1.00** | 0.98 |
| 04083016240000 | PALMER STENDEL  8 | Palmer Stendel Fee | 34.8326780000 | -120.3168030000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016250000 | PALMER STENDEL  11 | Palmer Stendel Fee | 34.8302480000 | -120.3180480000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016260000 | PALMER STENDEL  12 | Palmer Stendel Fee | 34.8349638273 | -120.3205695950 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222390000 | PALMER STENDEL  12H | Palmer Stendel Fee | 34.8348874084 | -120.3205557730 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083207380000 | PALMER STENDEL  13 | Palmer Stendel Fee | 34.8326290303 | -120.3209991150 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016270000 | PALMER STENDEL  14 | Palmer Stendel Fee | 34.8302910000 | -120.3195680000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083206980000 | PALMER STENDEL  16 | Palmer Stendel Fee | 34.8294900000 | -120.3187630000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016170000 | PALMER STENDEL  B-1 | Palmer Stendel Fee | 34.8295200000 | -120.3196380000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083016180000 | PALMER STENDEL  B-2 | Palmer Stendel Fee | 34.8309370000 | -120.3196440000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222700000 | PALMER-STENDEL 410H | Palmer Stendel Fee | 34.8327390000 | -120.3167940000 | Cat Canyon | Santa Barbara | 26-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083207580000 | **SHELL-STANDARD PAYNE 21-7** | Payne Standard | 34.8766620000 | -120.3995150000 | Santa Maria ' | Santa Barbara | 7-09N-33W | Oil | Inactive | **1.00** | 0.81 |

| 04083209070000 | SHELL-STANDARD PAYNE 32-7 | Payne Standard | 34.8747320000 | -120.3973610000 | Santa Maria | Santa Barbara | 7-09N-33W | Oil | Inactive | 1.00 | 0.81 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083010100000 | **QUATI 87** | Quati | 34.7213790000 | -120.1296950000 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083010110000 | QUATI 98 | Quati | 34.7205340000 | -120.1277370000 | Zaca | Santa Barbara | 3-07N-31W | Oil | Inactive | 1.00 | 0.86 |
| 04083210760000 | **R. B. MCFADDIN 1** | RB McFadden | 34.9313530000 | -120.3970040000 | Santa Maria | Santa Barbara | 19-10N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083211660000 | R. B. MCFADDIN 2 | RB McFadden | 34.9335810158 | -120.3976063790 | Santa Maria | Santa Barbara | 19-10N-33W | Oil | P&A | 1.00 | 0.80 |
| 04083212330000 | R. B. MCFADDIN 3 | RB McFadden | 34.9363270000 | -120.3990730000 | Santa Maria | Santa Barbara | 19-10N-33W | Oil | P&A | 1.00 | 0.80 |
| 04083214130000 | R. B. MCFADDIN 4 | RB McFadden | 34.9363310000 | -120.3991460000 | Santa Maria | Santa Barbara | 19-10N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083220720000 | R. B. MCFADDIN 5 | RB McFadden | 34.9363250000 | -120.3989170000 | Santa Maria | Santa Barbara | 19-10N-33W | Oil | Inactive | 1.00 | 0.81 |
| 04083222130000 | R. B. MCFADDIN 6 | RB McFadden | 34.9363200000 | -120.3987750000 | Santa Maria | Santa Barbara | 19-10N-33W | Injection | P&A | 1.00 | 0.80 |
| 04083010950000 | **RIGHETTI 1** | Righetti | 34.8635780000 | -120.5232790000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.79 |
| 04083010960000 | RIGHETTI 2 | Righetti | 34.8656470000 | -120.5245300000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.79 |
| 04083010970000 | RIGHETTI 3 | Righetti | 34.8625400000 | -120.5248640000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | P&A | 1.00 | 0.79 |
| 04083010980000 | **RIGHETTI 4** | Righetti | 34.8649540000 | -120.5235560000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.79 |
| 04083009080000 | **RIGHETTI B 5** | Righetti B | 34.8625730000 | -120.5270430000 | Casmalia | Santa Barbara | 13-09N-35W | Oil | Inactive | 1.00 | 0.81 |
| 04083203380000 | **SECURITY 25** | Security | 34.8620570000 | -120.3335340000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083202220000 | SECURITY FEE  1 | Security | 34.8603620000 | -120.3335450000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083220710000 | SECURITY FEE 1R | Security | 34.8601948000 | -120.3337722730 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083202580000 | SECURITY FEE  2 | Security | 34.8581220000 | -120.3348880000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083202760000 | SECURITY FEE  3 | Security | 34.8602189792 | -120.3311995740 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083202800000 | SECURITY FEE  4 | Security | 34.8621410254 | -120.3311904080 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083216850000 | SECURITY FEE 4-6 | Security | 34.8609872844 | -120.3325449130 | Cat Canyon | Santa Barbara | 15-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083202840000 | SECURITY FEE  5 | Security | 34.8639264357 | -120.3311747990 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083217590000 | SECURITY FEE 5-5R | Security | 34.8619871597 | -120.3334934650 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083202660000 | SECURITY FEE  6 | Security | 34.8593997046 | -120.3323793540 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083202750000 | SECURITY FEE  7 | Security | 34.8608890000 | -120.3327050000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083202880000 | SECURITY FEE  8 | Security | 34.8632760000 | -120.3326600000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083202650000 | SECURITY FEE  9 | Security | 34.8584190247 | -120.3312836080 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 4083202520000 | SECURITY FEE 12 | Security | 34.8619140000 | -120.3336940000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203000000 | SECURITY FEE 13 | Security | 34.8583963336 | -120.3336901850 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203010000 | SECURITY FEE 14 | Security | 34.8581130000 | -120.3324160000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203020000 | SECURITY FEE 15 | Security | 34.8610640000 | -120.3347710000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083220180000 | SECURITY FEE 15R | Security | 34.8611495006 | -120.3346668350 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083203030000 | SECURITY FEE 16 | Security | 34.8628270000 | -120.3348520000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203040000 | SECURITY FEE 17 | Security | 34.8622026714 | -120.3356252890 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203050000 | SECURITY FEE 18 | Security | 34.8602620157 | -120.3355770790 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083222410000 | SECURITY FEE 18R | Security | 34.8597127746 | -120.3351868780 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083203060000 | SECURITY FEE 19 | Security | 34.8584420000 | -120.3357360000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203070000 | SECURITY FEE 20 | Security | 34.8593760000 | -120.3346580000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203360000 | SECURITY FEE 21 | Security | 34.8626340000 | -120.3335310000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203350000 | SECURITY FEE 22 | Security | 34.8595810000 | -120.3324370000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083220190000 | SECURITY FEE 22R | Security | 34.8599500154 | -120.3324258800 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203030000 | SECURITY FEE 26 | Security | 34.8591283085 | -120.3320337310 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203460000 | SECURITY FEE 27 | Security | 34.8593805942 | -120.3344690430 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203520000 | SECURITY FEE 28 | Security | 34.8598498993 | -120.3352073590 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04083203470000 | SECURITY FEE 29 | Security | 34.8613328159 | -120.3345845680 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203480000 | SECURITY FEE 30 | Security | 34.8611540000 | -120.3326870000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | P&A | 1.00 | 0.98 |
| 04083203490000 | SECURITY FEE 31 | Security | 34.8623956609 | -120.3313541570 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083204440000 | SECURITY FEE 33 | Security | 34.8616892401 | -120.3309579380 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083204160000 | SECURITY FEE 34 | Security | 34.8600255469 | -120.3311625290 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083222290000 | SECURITY FEE 35 | Security | 34.8616404827 | -120.3309256160 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203610000 | SECURITY FEE 37 | Security | 34.8619061531 | -120.3352943700 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203540000 | SECURITY FEE 38 | Security | 34.8636002220 | -120.3350817990 | Cat Canyon | Santa Barbara | 15-09N-33W | Water Dis | Inactive | 1.00 | 0.98 |
| 04083203690000 | SECURITY FEE 39 | Security | 34.8599510123 | -120.3348280470 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083225750000 | SECURITY FEE 39-8B | Security | 34.8609587488 | -120.3347890320 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083203730000 | SECURITY FEE 40 | Security | 34.8618725449 | -120.3310291810 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083216860000 | SECURITY FEE 5-5 | Security | 34.8620320000 | -120.3337230000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 4083227890000 | SECURITY FEE G-81 | Security | 34.8601417500 | -120.3342285200 | Cat Canyon | Santa Barbara | 15-09-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083227900000 | SECURITY FEE G82 | Security | 34.8616330000 | -120.3351610000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083227910000 | SECURITY FEE G83 | Security | 34.8609390000 | -120.3325560000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 4083227920000 | SECURITY FEE G-84 | Security | 34.8616981500 | -120.3308563200 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 04083227930000 | SECURITY FEE G85 | Security | 34.8607860000 | -120.3348280000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083227940000 | SECURITY FEE G86 | Security | 34.8594360000 | -120.3345470000 | Cat Canyon | Santa Barbara | 15-06N-33W | Oil | Active | 1.00 | 0.98 |
| 04083227950000 | SECURITY FEE G87 | Security | 34.8598160000 | -120.3332750000 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 4083227960000 | SECURITY FEE G88 | Security | 34.8604545600 | -120.3312530500 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 4083227970000 | SECURITY FEE G89 | Security | 34.8593483000 | -120.3303909300 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.98 |
| 04083202710000 | SECURITY FEE WD-1 | Security | 34.8602177727 | -120.3335243800 | Cat Canyon | Santa Barbara | 15-09N-33W | Injection | Inactive | 1.00 | 0.98 |
| 04083203370000 | SECURITY FEE WD-2 | Security | 34.8627432232 | -120.3334466150 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Inactive | 1.00 | 0.98 |
| 4083203110000 | **THOMAS 1** | Thomas | 34.8564186100 | -120.3309249900 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 4083203120000 | THOMAS 2 | Thomas | 34.8555030800 | -120.3309555100 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 4083203130000 | THOMAS 3 | Thomas | 34.8564186100 | -120.3324432400 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 4083203310000 | THOMAS 6 | Thomas | 34.8566780100 | -120.3326034500 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 4083206180000 | THOMAS 8 | Thomas | 34.8515548700 | -120.3324661300 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 4083017410000 | THOMAS 88X | Thomas | 34.8512153600 | -120.3313293500 | Cat Canyon | Santa Barbara | 15-09N-33W | Oil | Active | 1.00 | 0.84 |
| 04083026250000 | **UNION SUGAR 2** | Union Sugar | 34.9306313429 | -120.4933150650 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026280000 | UNION SUGAR 4 | Union Sugar | 34.9269860093 | -120.4911654330 | Santa Maria | Santa Barbara | 19-10N-34W | Waterfloo | Inactive | 1.00 | 0.98 |
| 04083026290000 | UNION SUGAR 6 | Union Sugar | 34.9306135919 | -120.4911149530 | Santa Maria | Santa Barbara | 19-10N-34W | Waterfloo | P&A | 1.00 | 0.98 |
| 04083026300000 | UNION SUGAR 7 | Union Sugar | 34.9287981191 | -120.4911443550 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083006940000 | UNION SUGAR 9 | Union Sugar | 34.9324251047 | -120.4910794040 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026340000 | UNION SUGAR 12 | Union Sugar | 34.9324461624 | -120.4932759170 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026360000 | UNION SUGAR 14 | Union Sugar | 34.9306528582 | -120.4955097650 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083212030000 | UNION SUGAR 14-I | Union Sugar | 34.9306488419 | -120.4950996030 | Santa Maria | Santa Barbara | 19-10N-34W | Injection | Inactive | 1.00 | 0.98 |
| 04083026370000 | UNION SUGAR 15 | Union Sugar | 34.9307047802 | -120.4999147450 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | P&A | 1.00 | 0.98 |
| 04083026380000 | UNION SUGAR 16 | Union Sugar | 34.9270178593 | -120.4933630380 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026430000 | UNION SUGAR 21 | Union Sugar | 34.9307605665 | -120.5068565930 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026450000 | UNION SUGAR 22 | Union Sugar | 34.9369510164 | -120.5084225520 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | P&A | 1.00 | 0.98 |
| 04083026470000 | UNION SUGAR 24 | Union Sugar | 34.9365921751 | -120.5104747710 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026490000 | UNION SUGAR 26 | Union Sugar | 34.9288537151 | -120.4955493070 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026500000 | UNION SUGAR 27 | Union Sugar | 34.9325815113 | -120.5068221750 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |

240

| 04083026510000 | UNION SUGAR 28 | Union Sugar | 34.9344712744 | -120.5067557210 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026530000 | UNION SUGAR 30 | Union Sugar | 34.9251738461 | -120.4911945700 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026540000 | UNION SUGAR 31 | Union Sugar | 34.9251940964 | -120.4933951200 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026550000 | UNION SUGAR 32 | Union Sugar | 34.9233573862 | -120.4912116760 | Santa Maria | Santa Barbara | 30-10N-34W | Injection | P&A | 1.00 | 0.98 |
| 04083026560000 | UNION SUGAR 33 | Union Sugar | 34.9325177219 | -120.4998779030 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026570000 | UNION SUGAR 34 | Union Sugar | 34.9306192649 | -120.5090114090 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083026580000 | UNION SUGAR 35 | Union Sugar | 34.9325507065 | -120.5020882080 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | P&A | 1.00 | 0.98 |
| 04083206970000 | UNION SUGAR 42 | Union Sugar | 34.9324674656 | -120.4954870210 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083207280000 | UNION SUGAR 43 | Union Sugar | 34.9288370934 | -120.4933855890 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083208010000 | UNION SUGAR 44 | Union Sugar | 34.9327540178 | -120.4958283000 | Santa Maria | Santa Barbara | 19-10N-34W | Injection | Inactive | 1.00 | 0.98 |
| 04083208520000 | UNION SUGAR 45 | Union Sugar | 34.9306846603 | -120.5021195760 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083209970000 | UNION SUGAR 46 | Union Sugar | 34.9324350874 | -120.4925796010 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083209550000 | UNION SUGAR 47 | Union Sugar | 34.9324786264 | -120.4958015020 | Santa Maria | Santa Barbara | 19-10N-34W | Injection | Inactive | 1.00 | 0.98 |
| 04083211420000 | UNION SUGAR 48 | Union Sugar | 34.9326738833 | -120.4995073470 | Santa Maria | Santa Barbara | 19-10N-34W | Oil | Inactive | 1.00 | 0.98 |
| 04083204410000 | **R.R. BRADLEY 1** | R. R. Bradley | 34.8491660280 | -120.3308821940 | Cat Canyon | Santa Barbara | 22-09N-33W | Injection | Inactive | 1.00 | 0.81 |

## **EXHIBIT A-2**

SALE AREA

*See attached.*





244







# **EXHIBIT A-3**

## MISCELLANEOUS SURFACE INSTRUMENTS

*See attached.*

CAT CANYON FIELD

CAT CANYON FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| MC-6549 | Agreement 10/18/72 Memorandum at Book 2436, Page 1207 | Richard Royden Bradley/Shell Oil Company | PTN Sec 22-T9N-R33W, SBB & M |
| MC-40084 | Agreement 12/9/85 Doc #1986-050584 | Vivian Brickey/ Shell Western E&P Inc. | E/2 Sec 14-T9N-R33W, SBB & M |
| MC-40085 | Surface Lease 2/19/64 Bk 2042, Page 703 | Fred R. Michael, et al/Continental Oil Company | E 3/4 E/2 Sec 23-T9N-R33W, SBB & M |
| MC-40086 | Surface Lease 1/12/63 Bk 1978, Pg 1345 | Fred R. Michael, et al/Continental Oil Company | N/2 SW/4 NE/4 NE/4 Sec 23-T9N-R33W, SBB & M |
| MC-40087 | Right-of-Way Agreement 3/1/70 Bk 2340, Pg 1158 | Fred R. Michael, et al/Continental Oil Company | E 3/4 E/2 Sec 23-T9N-R33W, SBB & M |
| MC-66028 | Surface Use Agreement 6/1/91 Unrecorded | Shell Western E&P Inc./California Production Service, Inc. | PTN NE/4 Sec 15-T9N-R33W, SBB & M |
| MC-66076 | Grazing Lease 6/1/90 Unrecorded | Shell Western E&P Inc./Lambert J. Pereira | S/2 NE/4 and N/2 SE/4 Sec 11-T9N-R33W, SBB & M |
| MC-70091 | License 11/18/86 Unrecorded | Union Oil Company of California/Shell California Production Inc. | A portion of the Los Flores Ranch in the Rancho Los Alamos, T9N-R33W. |

# SANTA MARIA VALLEY

### Rights of Way, Licenses and Easements

| File # | Instrument | Grantor/Grantee | Date | Book/Page* | Brief Legal Description |
|---|---|---|---|---|---|
| 57410 (also 602205) | Right of Way Agreement | Pauline N. Adam, et al. / Union Oil Company of California | 9/4/73 | | 10 ft. wide strip in N/2NW/4 Sec. 1, T9N, R34W, SBB&M |
| 602297 | Right of Way | Terrance W.Sheehy, et al. / Union Oil Company of California | 3/14/85 | 1985-095626 | 10 ft. wide strip in the W/2NE/4 Sec. 24, T10N, R34W, SBB&M |
| 602298 | Right of Way | Peter Moretti, et al. / Union Oil Company of California | 3/19/85 | 87-91173 | 10 ft. wide strip along the easterly boundary of the NW/4 Sec. 24, T10N, R34W, SBB&M |

## SANTA MARIA VALLEY

### Rights of Way, Licenses and Easements

| File # | Instrument | Grantor/Grantee | Date | Book/Page* | Brief Legal Description |
|---|---|---|---|---|---|
| 53853.4 | Private Road Crossing Tracks at Grade Agreement | Santa Maria Valley Railroad Company / Union Oil Company of California | 7 /23/42 | unrecorded | Private road crossing at RR Station 80 + 61, located approx. 1050 ft. east of Stinton Rd. w/in Proj. Sec. 19, T10N, R34W |
| 53853.10 | Limited Lease | Santa Maria Valley Railroad Company / Union Oil Company of California | 2/12/47 | unrecorded | Portion of private road in the N/2 of the RR RW between RR Stations 80 + 61 & 88 + 07, being approx. 1050 ft. east of Stinton Rd. to 1900 ft. east of Stinton Rd. w/in Proj. Sec. 19, T10N, R34W |
| no file # | Letter Agreement | Ottorino Bettiga, et ux / Union Oil Company of California | 9/9/83 | unrecorded | Authorization for a 4" pipeline located on the Bettiga Lease in the NE/4 of Sec. 24, T10N, R34W |
| no file # | Letter Agreement | Ottorino Bettiga, et ux / Union Oil Company of California | 10/18/84 | unrecorded | Authorization for a 3" pipeline located on the Bettiga Lease in the NE/4 of Sec. 24, T10N, R34W |

# SANTA MARIA VALLEY
## Rights of Way, Licenses and Easements

| File # | Instrument | Grantor/Grantee | Date | Book/Page* | Brief Legal Description |
|--------|-----------|-----------------|------|-----------|------------------------|
| 53866 | Right of Way | Ottorino Bettiga, et ux / Union Oil Company of California | 4/8/37 | 398/170 | 25 ft. wide strip in the E/2NE/4 Sec. 24, T10N, R34W, SBB&M |
| 53866.2 | Modification Agreement | Ottorino Bettiga, et ux / Union Oil Company of California | 9/19/47 | 754/115 | East 5 ft. of the E/2NE/4 Sec. 24, T10N, R34W, SBB&M |
| 601752 Hopkins Fee | Right of Way | The HL Limited Partnership / Union Oil Company of California | 8/8/88 | 88 057308 | 15 ft. wide strip in Sec. 12, T9N, R34W |
| 601752 Hopkins Fee | Right of Way | Edge No. 1 / Union Oil Company of California | 8/8/88 | 88 057309 | 15 ft. wide strip in Sec. 1, T9N, R34W |
| 53767.10 | Right of Way | Jerry Mahoney / Union Oil Company of California | 4/25/44 | 610/463 | 250 ft. X 30 ft. beginning at the northeast corner of the SW/4 Sec. 24, T10N, R34W, SBB&M, along the east line of said SW/4 |

The term of said Right of Way (File # 53767.10) is co-extensive with that certain Lease between the same parties, dated 3/26/43, and recorded 5/1/43 in Book 569 at Page 337*, which Lease was reserved by Union Oil.

**Rights of Way, Licenses and Easements**

| File # | Instrument | Grantor/Grantee | Date | Book/Page* | Brief Legal Description |
|---|---|---|---|---|---|
| Hopkins Fee | Quitclaim Deed (Easement Reservations) | Union Oil Company of California / Elks Recreation, Inc. | 12/22/94 | currently in escrow, not yet recorded | Portion of the N/2SE/4 of Sec. 1, T9N, R34W |
| 57416 | Right of Way, as modified 8/12/75 | Amelia R. Tyler, et al. / Union Oil Company of California | 11/15/73 | 2491/1017 | · East 16.5 ft. of the SW/4SW/4 Sec. 1, T9N, R34W, SBB&M |
| 57416.3 | Modification of Right of Way | Ella L. Smith, et al. / Union Oil Company of California | 8/12/75 | | East 16.5 ft. of the SW/4SE/4 Sec. 1, T9N, R34W, SBB&M |
| 57408.1 | Right of Way Agreement | J. Dale Payne, et al. / Union Oil Company of California | 11/24/73 | 2548/758 | North 10 ft. of the East 16.5 ft. of the NW/4NE/4 and North 10 ft. of the NE/4NE/4 Sec. 12, T9N, R33W, SBB&M |
| 57408.2 | Right of Way Agreement | Martin V. Smith, Trustee of the Martin V. Smith & Martha K. Smith 1990 Family Trust dated 10/30/90 | effective 11/23/94 | not yet recorded | North 10 ft. of the East 16.5 ft. of the NW/4NE/4 and North 10 ft. of the NE/4NE/4 Sec. 12, T9N, R33W, SBB&M |

**\*  = Recording Book and Page of the Official Records of the County of Santa Barbara, California.**

# EXHIBIT "A-5"
## Pipelines and Facilities
## Page 1 of 5

**McFADDIN 3" & 2 1/2" FUEL GAS PIPELINE,** which commences at the outlet flange of the eastside fuel gas sales meter within Union's Battles Gas Plant (as said Gas Plant is described on page 8 of Exhibit "B-2", attached hereto), and continues in a northerly direction to a point just north of Battles Road; and thence in a easterly direction, more or less parallel to and north of Battles Road to a point near just east of Rosemary Road; and thence in a northerly direction more or less parallel to and east of Rosemary Road to the McFaddin Well Island, located near the northwest corner of said Sec. 19, which pipeline is shown on the plat attached hereto as Exhibit "A-6".

**McFADDIN 3" & 4" (POLYETHYLENE) GAS GATHERING PIPELINE,** which commences at the inlet flange at the Petro Minerals meter located near the McFaddin Well Island located near the northwest corner of Sec. 19, T10N, R33W and continues in a southerly direction more or less parallel to and east of Rosemary Road to a point just north of Battles Road; and thence in a westerly direction approximately 1300 ft. more or less parallel to and just north of Battles Road; and thence in a southerly direction to a point just south of Battles Road near the old welder's shop located on Union's Battles Surface Fee (as said Surface Fee is described on page 8 of Exhibit "B-2, attached hereto); and thence in a westerly direction to a point near the center of Sec. 24, T10N, R34W; and thence in a southerly direction to the inlet flange of the north intake meter near Union's Battles Gas Plant (as said Gas Plant is described on page 8 of Exhibit "B-2, attached hereto), **which pipeline is shown on the plat attached hereto as Exhibit "A-7".**

**McFADDIN 3", 4", 6", & 8" OIL GATHERING PIPELINE,** which commences at the McFaddin Well Island near the northwest corner of Sec. 19, T10N, R33W; and continues in a southerly direction more or less parallel to and east of Rosemary Road to a point just north of Battles Road; and thence in a westerly direction approximately 1300 ft. more or less parallel to and just north of Battles Road; and thence in a southerly direction to a point just south of Battles Road near the old welder's shop located on Union's Battles Surface Fee (as said Surface Fee is described on page 8 of Exhibit "B-2, attached hereto); and thence in a westerly direction to the Santa Maria Valley Tank Battery (as said Tank Battery is described on page 5 of this Exhibit "A-5"), **which pipeline is shown on the plat attached hereto as Exhibit "A-8".**

# EXHIBIT "A-5"
## Pipelines and Facilities
## Page 2 of 5

**HOPKINS 2" & 6" FUEL GAS PIPELINE,** which commences at the 3" valve on the Bradley II Lease tie-in near the center of the north line Sec. 36, T10N, R34W, and continues in a westerly direction to a point just east of Hwy 101; and thence in a southerly direction more or less parallel to and just east of Hwy 101 to a point near the centerline of said Sec. 36; and thence crossing Hwy 101 in a westerly direction; and thence southerly more or less parallel to and just west of Hwy 101 to the Santa Maria Way valve box near the SE corner of Sec. 35, T10N, R34W; and thence easterly across Hwy 101 to a point in the NE/4 of Sec. 1, T9N, R34W; and thence southeasterly to the Jim Hopkins field distribution system near the Jim Hopkins compressor in the NE/4 of Sec. 1, T9N, R34W, which pipeline is shown on the plat attached hereto as Exhibit "A-10".

**HOPKINS 6" GAS GATHERING PIPELINE,** which commences at the Jim Hopkins Compressor Plant discharge in the NE/4 of Sec. 1, T9N, R34W, and continues in a generally easterly and southeasterly direction to the inlet flange on the welded tee at the Vintage Three Well Island Facility just west of the center of Sec. 6, T9N, R33W, which pipeline is shown on the plat attached hereto as Exhibit "A-11".

**NDPL'S HOPKINS 6" (CRUDE OIL) PIPELINE,** commencing at the inlet flange of the shipping pump on the Hopkins Fee property located in the NE/4 of Sec. 1, T9N, R34W and continuing in a southerly direction to a point near the south line of said Sec. 1; and thence easterly, more or less parallel to and near the southerly boundary of Sec. 1, T9N, R34W and Sec. 6, T9N, R33W, to a point near the Southeast corner of said Sec. 6; and thence northerly, more or less parallel to and near the easterly boundary of said Sec. 6, to a point near the Northeast corner of said Sec. 6 (where this 6" pipeline connects with NDPL's 10" to 12" Bell Pipeline described on Exhibit B-2), **which pipeline is shown on the plat attached as page 1 of Exhibit "A-12".**

**IDLE HOPKINS 6" OIL GATHERING PIPELINE** which commences at the inlet flange of the 6" valve located at a point in the SW/4SW/4 of Sec. 4, T9N, R33W, (known as Union's Sargent Fee) and continues in a southerly direction to a point near or along the south boundary of said Section 4; and thence in an westerly direction, more or less parallel to and near the southerly boundary line of Sections 4, 5 & 6, T10N, R33W and Sec. 1, T10N, R34W, to a point approximately 1400 ft. west of the southeast corner of said Sec. 1; and thence northerly to the Hopkins Dehydration Facility in the NE/4 of said Section 1, which pipeline is shown on the plat attached hereto as page 2 of Exhibit "A-12".

**HOPKINS 4" WASTE WATER PIPELINE,** which commences at the outlet flange at Vintage's Three Well Island Site just west of the center of Sec. 6, T9N, R33W, and continues in a northwesterly and westerly direction to the Hopkin's Dehydration Facility in the NE/4 of Sec. 1, T9N, R34W, which pipeline is as shown on the plat attached hereto as Exhibit "A-13".

# EXHIBIT "A-5"
### Pipelines and Facilities
### Page 3 of 5

**STEAM AND CONDENSATE RETURN PIPELINE SYSTEM,** consisting of two (2) pipelines located entirely within the N/2N/2S/2 of Sec. 24, T10N, R34W, and described as follows:

One 6" steam pipeline which commences at the downstream flange sales meter to Saba near the soft water makeup storage tank within Union's Battles Gas Plant (as said Gas Plant is described on page 8 of Exhibit "B-2", attached hereto), and said steam pipeline continues in a northerly direction to the Santa Maria Valley Tank Battery (as said Tank Battery is described on page 5 of this Exhibit "A-5"); and

One 2" condensate return pipeline from the Santa Maria Valley Tank Battery in a southerly and easterly direction to the upstream connection of the condensate flash vessel at the main switch house within Union's Battles Gas Plant.

which two (2) pipelines are shown on the plat attached hereto as Exhibit "A-14".

**BETTERAVIA ROAD RECTIFIER, ANODE WIRE AND THE PLUGGED & ABANDONED VINCENT #1 WELL,** which rectifier is located within the N/2N/2 of Sec. 25, T10N, R34W, at approximately 100 feet south of the center line of Betteravia Road and approximately one half mile east of State Highway 101, with an anode wire and the plugged & abandoned Vincent #1 Well as the anode, as shown on the plat attached hereto as Exhibit "A-15".

**ELECTRICAL SYSTEM,** consisting of all electrical wiring, conduit, pole lines, service equipment and any appurtenances thereto owned by Seller (hereinafter referred to as "the electrical system") within the boundaries of the Assets described on Exhibits "A-1 through A-3"; and that portion of the electrical system within the boundaries of the following:

- **Union's Battles Gas Plant\*,** as said Gas Plant is described on page 8 of Exhibit "B-2", attached hereto, and
- **Santa Maria Valley Tank Battery\*,** as said Tank Battery is described on page 5 of this Exhibit "A-5", and

**\* INSOFAR AND ONLY INSOFAR** as that portion of the electrical system within the boundaries of Union's Battles Gas Plant and the Santa Maria Valley Tank Battery is shown on the plat attached hereto as Exhibit "A-16".

# EXHIBIT "A-5"
### Pipelines and Facilities
### Page 4 of 5


**TELECOMMUNICATION & SCADA SYSTEM,** consisting of all telecommunication and SCADA equipment, wiring, conduit, field devises and appurtenances owned by Seller within the boundaries of the Assets described on Exhibits "A-1 through A-3", attached hereto and that portion of the telecommunication and SCADA system within the boundaries of the following:

- **Union's Battles Gas Plant\***, as said Gas Plant is described on page 8 of Exhibit "B-2", attached hereto, and
- **Santa Maria Valley Tank Battery\***, as said Tank Battery is described on page 5 of this Exhibit "A-5", and


**\* .INSOFAR AND ONLY INSOFAR** as that portion of the telecommunication and SCADA system is within the boundaries of Union's Battles Gas Plant and the Santa Maria Valley Tank Battery is shown on the plat attached hereto as Exhibit "A-17", which includes the following:

> 1 - automation electronics RTU, Model 6001, Serial # 510
> 1 - Maxon Data Radio, Serial # 921112753
> 1 - Combined Hilo Alarm for the 3000/1000 bbl. Source/Wash Tank System

> Common RTU Alarms for the following:
> RTU 12 Volt Power
> RTU Communication
> Local AC Power

> Battery Alarms for the following:
> Skim Pond Level
> LACT Reject
> LACT
> Ship Tank 1 Level
> Ship Tank 2 Level
> SMV Water Valve
> Fire Pump
> Vapor Recovery Compressor
> Main Oil Gathering Pipeline
> Main Gas Gathering Pipeline
> North Intake Scrubber

# EXHIBIT "A-5"
**Pipelines and Facilities**
**Page 5 of 5**

<u>**SANTA MARIA VALLEY TANK BATTERY,**</u> **consisting of all fixtures, equipment, structures and other personal property, including, but not limited to the gasoline storage tank, located on or under a portion of the NW/4NW/4SE/4 Section 24, T10N, R34W, S.B.B.& M., described below and shown as the shaded area on the survey plat attached hereto as Exhibit A-18":**

> Beginning at the northeast corner of a parcel labeled as "Union Oil Co. 20.2342 acres" as shown on Record of Survey Book 24, Page 160 records of the County of Santa Barbara, California, said corner being a concrete monument marked "LS 2019"; Thence South 89° 42' 54" West along the Northerly line of said parcel 923.58 feet to the TRUE POINT OF BEGINNING; Thence leaving said line South 1° 03' 34" West 140.94 feet; Thence South 85° 12' 35" West 94.31 feet; Thence South 8° 17' 43' East 92.79 feet; Thence North 88° 49' 45" West 103.97 feet; Thence South 1° 34' 30" West 87.35 feet; Thence North 88° 12' 41" West 212.85 feet to the intersection with the westerly line of said "Union Oil Co." parcel; Thence North 0° 12' 02" West along said westerly line 317.16 feet to the northwesterly corner of said parcel; Thence North 89° 42' 54" East along the Northerly line of said parcel 403.41 feet to the TRUE POINT OF BEGINNING, Containing 2.41 acres, more or less.

## SUBJECT TO:

> That certain **Surface Use and License Agreement** dated February 23, 1995, but effective as of November 1, 1994, attached hereto as Exhibit "N"; and

> **Santa Maria Valley Oil and Gas Field Unit Determination No. 560,** dated May 25, 1977, under which Assignor acquired the Santa Maria Valley Tank Battery from said Unit and pursuant to which Unit production is processed at the Santa Maria Valley Tank Battery; and

> The right in favor of any party exercising a Preferential Right to Purchase the Adam, Bettiga, and/or McFaddin Lease(s) to have production from said Lease(s) processed at the Santa Maria Valley Tank Battery for a reasonable charge. This obligation on behalf of Purchaser (as created hereby) and right in favor of any party exercising a Preferential Right to Purchase shall extend to any and all successors and assigns of Purchaser and said parties so long as the Santa Maria Valley Tank Battery is utilized and any of said Lease(s) is valid;

**EXCEPTING AND RESERVING UNTO ASSIGNOR** all pipelines, equipment, facilities, improvements and other personal property described on Exhibits "B-2" through "B-17", attached hereto.

# EXHIBIT "A-6"
## McFaddin Fuel Gas Pipeline
### Page 1 of 1



# EXHIBIT "A-7"
## McFaddin Gas Gathering Pipeline
### Page 1 of 1



# EXHIBIT "A-8"
## McFaddin Oil Gathering Pipeline
### Page 1 of 1



# EXHIBIT "A-9"
### Page 1 of 1

**THIS PAGE WAS INTENTIONALLY LEFT BLANK.**

SM00000701

# EXHIBIT "A-10"
## Hopkins Fuel Gas Pipeline
### Page 1 of 1



# EXHIBIT "A-11"
## Hopkins Gas Gathering Pipeline
### Page 1 of 1



# EXHIBIT "A-12"
## Hopkins Oil Gathering Pipelines
### Page 1 of 2





17                                                                                                    265

# EXHIBIT "A-12"
## Hopkins Oil Gathering Pipelines
### Page  2 of  2





18                                                                                                                          266

# EXHIBIT "A-13"
### Hopkins Waste Water Pipeline
### Page 1 of 1



# EXHIBIT "A-14"
## Steam and Condensate Return Pipeline System



# EXHIBIT "A-15"
## Betteravia Road Rectifer,
## Anode Wire
### Page 1 of 1

## T10N-R34W



21                                    269

# EXHIBIT "A-16"
## Electrical System
### Page 1 of 1



# EXHIBIT "A-17"
## Telecommunication & SCADA System
### Page 1 of 1



BATTLES SURFACE FEE
SCADA SYSTEM

# EXHIBIT "A-18"

## Santa Maria Valley Tank Battery
## Page 1 of 1



**SURFACE USE & LICENSE AGREEMENT** by and between **UNION OIL COMPANY OF CALIFORNIA**, doing business as Unocal, **(LICENSOR)** and **SABA PETROLEUM, INC. (LICENSEE)**, dated February 23, 1995, but Effective as of November 1, 1994.

CAT CANYON FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| MC-70092 | Right-of-Way Agreement 4/7/72 Bk 2530, Pg 456 | United California Bank/Continental Oil Company | PTN Sec 23-T9N-R33W, SBB & M |
| MC-70115 | Salt Water Disposal Agreement 6/13/78 Doc #78-47188 | Gulf Oil Corporation/ Mobil Oil Corporation | PTN NE/4 NE/4 SW/4 Sec 21-T9N-R33W, SBB & M |
| MC-85228 | Grazing Lease 11/1/68 Unrecorded | Shell Oil Company/ Joe E. Azevedo | E/3 N/2 Sec 15-T9N-R33W, SBB & M |
| MC-85280 | Road Agreement 4/1/70 Unrecorded | Lloyd Corporation, Shell Oil Company | W 2/3 Sec 15-T9N-R33W, SBB & M |
| MC-85281 | License 5/1/70 Unrecorded | Richard R. Bradley/ Shell Oil Company | E/2 NW/4 Sec 22-T9N-R33W, SBB & M |
| | Amendment to License 4/12/71 Unrecorded | Richard R Bradley/ Shell Oil Company | E/2 NW/4 Sec 22-T9N-R33W, SBB&M |
| 54654 | Right of Way March 30, 1949 Recorded Book 860 Pg 216 | Palmer Stendel Oil/ Union Oil of CA | Portion of Waste Water Line from Cat Canyon to Battles Station |

CAT CANYON FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| RW-981 | Pipeline License Agreement 3/16/71 Bk 2343, Pg 462 | Gulf Oil Corporation/ Shell Oil Company | PTNS Secs 22, 26, 27 and 33-T9N-R33Z, SBB & M |
| RW-1273 | Letter Agreement 5/10/76 Unrecorded | Continental Oil Company/Shell Oil Company | E/2 Sec 10-T9N-R33W, SBB & M |
| RW-70270 | Pipeline Easement 2/1/89 Doc #89-010490 | First Interstate Bank of California, et al/ Shell Western E&P Inc. | PTN W/2 Sec 14-T9N-R33W, SBB & M |
| RW-70271 | Agreement 1/14/49 Unrecorded | Los Flores Land and Oil Company/General Petroleum Corporation | PTN SE/4 Sec 22-T9N, R33W, SBB & M |
| RW-70272 | Agreement 1/14/49 Unrecorded | Los Flores Land and Oil Company/General Petroleum Corporation | PTN SE/4 Sec 22-T9N-R33W, SBB & M |
| RW-70273 | Agreement 1/14/49 Unrecorded | Los Flores Land and Oil Company/General Petroleum Corporation | PTN SW/4 Sec 22-T9N-R33W, SBB & M |
| RW-70274 | Agreement 9/18/52 Unrecorded | Los Flores Land and Oil Company/General Petroleum Corporation | PTN SW/4 Sec 22 and a PTN of Rancho Los Alamos T9N-R33W, SBB & M |
| RW-70275 | Agreement 4/5/83 Doc #83-26817 | Union Oil Company of California/Mobil Oil Corporation | PTN Secs 22 and 27-T9N-R33W, SBB & M |
| RW-70276 | Agreement 6/15/50 Unrecorded | Standard Oil Company of California/ General Petroleum Corporation | PTN NE/4 Sec 21-T9N-R33W, SBB & M |
| RW-76368 | Grant of Right-of-Way and Easement 12/28/89 Unrecorded | Chevron U.S.A. Inc./ Shell Western E&P Inc. | PTN S/2 NE/4 Sec 21-T9N-R33W, SBB & M |
| RW-70297 - 1 | Grant of Right of Way 4/18/88 Doc-#89-004687 | Geroge Nicholsom, et ux/ Shell Wester E&P, Inc. | PTN SW/4 Sec 9-T9N-R33W, SBB &M |
| RW-70297 - 2 | Grant of Right of Way 4/18/88 Doc-#89-004687 | T9elen N. Long/ Shell Wester E&P, Inc. | PTN SW/4 Sec 9-T9N-R33W, SBB &M |

26

274

CAT CANYON FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| INTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR) LESSEE (GRANTEE) | DESCRIPTION |
|---|---|---|
| Right of Way Agreement 9/21/98 Doc. 98-098882 | Manfred C. Sander, et ux/ Vintage Petroleum, Inc. | A portion of the E/2 NW/4 of Section 21, Township 9 North, Range 33 West, County of Santa Barbara, State of California |
| Grazing Lease Dated 1/19/98 | Vintage Petroleum, Inc./ Mark and Louise Ontiveros | The E/2 of Section 10-T9N-R33W, San Bernardino Meridian, in the County of Santa Barbara, State of California, as shown on Official Plat thereof, said land being shown as Tracts 119 to 124, both inclusive, on Map of the Bradley-Garey Tract, recorded in Book 1, Page 32 of Maps and Surveys, in the office of the County Recorder of said County, together with those portions of streets or roads adjoining said Lots as shown on said Map included within the lines of said East Half of Section 10.

Excepting therefrom all minerals, oil, gas and other hydrocarbons of whatsoever nature, kind or character in, or under said land, as reserved in the Deed from Santa Maria Realty Company, recorded March 8, 1955, as Instrument No. 4285 in Book 1302, Page 325 of Official Records.

ALL EXCEPTING THEREFROM that portion of said land conveyed to Pacific Gas and Electric Company by Deed recorded January 27, 1965, as Instrument No. 2819 in Book 2089, Page 65 of Official Records.

ALSO EXCEPTING THEREFROM that portion of said land conveyed to Bacchus Vineyards, a Partnership, by Deed recorded December 15, 1970, as Instrument No. 34594 in Book 2330, Page 487 of Official Records

ALSO EXCEPTING THEREFROM the existing 20 foot, more or less, roadway on the east side of the property |
| Grazing Lease Dated 1/19/98 | Vintage Petroleum, Inc./ Mark and Louise Ontiveros | SW/4 and S/2 SE/4, Section 11-T9N-R33W, County of Santa Barbara, State of California, |
| MC-6560 Right-of-Way Agreement 6/1/73 Unrecorded | Bradley Land Company/ Shell Oil Company and Standard Oil Company of of California | PTN Sec 36-T10N-R34W, SBB & M |

SANTA MARIA VALLEY/BRADLEY CANYON FIELD,
SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| MC-70059 | Right-of-Way Agreement 2/6/74 Unrecorded | Bradley Land Company/ Shell Oil Company | PTNS Secs 5 and 6 T9N-R33W, SBB & M |
| MC-85315 | Line Well and Pressure Maintenance Agreement 10/1/75 Unrecorded | Shell Oil Company/ Standard Oil Company of California/Union Oil Company of California | PTNS Sec 1-T9N-R34W, SBB & M and PTNS Sec 6-T9N-R33W, SBB & M |
| MC-85315 | Water Agreement 10/1/75 Unrecorded | Union Oil Company of California/ Shell Oil Company/ Standard Oil Company of California | PTNS Sec 1-T9N-R34W SBB & M and PTNS Secs 5 and 6-T9N-R33W,SBB & M |
| RW-1240 | Right-of-Way Agreement 11/7/75 Bk 2597 Pg 1497 | Donald Eric Vincent, et al/Shell Oil Company | W 20' of SW/4 NE/4 Sec 25-T10N- R34W, SBB & M |

## SANTA MARIA VALLEY/BRADLEY CANYON FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

### LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| RW-1241 | Right-of-Way Agreement 12/10/75 Bk 2597 Pg 1503 | Industrial Properties/ Shell Oil Company | W 20' of Parcel A of Parcel Map # 12022 per map filed in Book 14 at pages 52 and 53 in the Office of the Recorder of Santa Barbara County, California |
| RW-1244 | Right-of-Way Agreement 12/15/75 Bk 2599, Pg 1019 | Coast Vacuum Truck Service Inc./Shell Oil Company | The W 20' of Parcel D and the Westerly 20' of that portion of Parcel B lying south of Betteravia Road, as both parcels are shown on Parcel Map #12022. |
| RW-1274 | Pipeline Agreement 4/23/76 Unrecorded | Union Oil Company of California/ Shell Oil Company | PTN S/2 Sec 4-T9N-R33W; SBB & M |
| MC-70022 | Right of Way Agreement 6/25/1975 Bk 2575, Pg 1267 | George H. Nicholson/ Husky Oil | PTN s/2 Sec 9-T9N-R33W SBB&M |
| MC-70035 | Right of way Agreement 11/1/1976 | George H. Nicholson/ Husky Oil | PTN Sec 9-T9N-R33W SBB&M |

SANTA MARIA VALLEY/CLARK AVENUE FIELD, SANTA BARBARA COUNTY, CALIFORNIA

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| RW-70045 | Right-of-Way (Excavation Permit) 12/16/83 Unrecorded | County of Santa Barbara/Husky Oil Company | NW corner of SE/4 NW/4 Sec. 22-T9N-R33W, SBB & M |
| RW-70046 | Right-of-Way Agreement 11/3/83 Unrecorded | Chevron U.S.A. Inc./ Husky Oil Company | PTN NE/4 Sec 21-T9N-R33W, SBB & M |
| RW-70048 | Right-of-Way (Excavation Permit) 6/22/81 Unrecorded | County of Santa Barbara/Husky Oil Company | PTN NW/4 Sec 10-T9N-R33W, SBB & M |
| RW-70049 | Right-of-Way Agreement 6/12/81 Unrecorded | A. F. and C. A. Fugler, Inc./Husky Oil Company | PTN Sec 10-T9N-R33W, SBB & M  PTN Secs 8 and 9-T9N-R33W, SBB & M |
| RW-70050 | Grant of Rights and Easements 9/12/74 Bk 2535, Pg 112 | Southdown Land Company/Gilliland Oil & Land Company | N line of the NW/4 SE/4, N line of the SE/4 NE/4 Sec 17-T9N-R33W, SBB & M |
| RW-70051 | Agreement 9/18/84 Unrecorded | Getty Oil Company/ Marathon Oil Company | W 2700' of S/2 Sec 4-T9N-R33W, SBB & M |
| RW-70348 | Agreement 2/29/80 Unrecorded | Union Oil Company of California/Chevron U.S.A. Inc. | PTN W/2 NW/4 Sec 22-T9N-R33W, SBB & M |
| MC-70021 | Easement and Right-of Way Agreement 12/19/83 Doc #84-19265 | Edward J. Carr, et al/Husky Oil Company | |
| | Right-of-Way Agreement 10/17/97 Doc. No. 97-070648 | O. J. Portwood, et al/ Vintage Petroleum, Inc. | SW/4 Section 9-T9N-R33 County of Santa Barbar State of California |

SANTA MARIA VALLEY/CLARK AVENUE FIELD, SANTA BARBARA COUNTY, CALIFORNIA

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INSTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR)/ LESSEE (GRANTEE) | BRIEF DESCRIPTION |
|---|---|---|---|
| MC-70026 | Surface Lease Agreement 2/1/76 Bk 2608, Pg 1523 | Manfred Sander et ux/Husky Oil Company | W/2 Sec 16 and NW/4 Sec 21-T9N-R33W, SBB & M |
| MC-70028 | Right-of-Way Agreement Bk 2575, Pg 1257 | Bruce N. Gordon, et ux/Husky Oil Company | PTN W/2 SE/4 Sec 9 T9N-R33W, SBB & M |
| MC-70029 EXPIRED | Right-of-Way Agreement 6/23/75 Bk 2575, Pg 1262 | Nodlew, Inc./ Husky Oil Company | PTN W/2 SE/4 Sec 9-T9N-R33W, SBB & M |
| MC-70111 | Grant of Right-of-Way 4/2/80 Doc #80-20226 | McCarthy Joint Ventura "A"/ Chevron U.S.A. Inc. | PTN NW/4 Sec 9-T9N-R33W, SBB & M |
| MC-70128 | Easement Agreement 5/31/84 Unrecorded | Manfred Sander/ Hunter Cat Canyon Development | W/2 Sec 16 and NW/4 Sec 21-T9N-R33W, SBB & M |

279

SANTA MARIA VALLEY/CLARK AVENUE FIELD, SANTA BARBARA COUNTY, CALIFORNIA (continued)

LIST OF RIGHTS-OF-WAY, LICENSES, EASEMENTS AND MISCELLANEOUS AGREEMENTS

| NUMBER | INTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR) LESSEE (GRANTEE) | DESCRIPTION |
|---|---|---|---|
| MC-70041 | Right-of-Way Agreement 4/24/78 78-21004 | McCarthy Joint Venture "Δ"/ Husky Oil Company | County of Santa Barbara, State of California: NW/4, Section 9-T9N-R33W, San Bernardino Base and Meridian. |
| MC-70042 | Letter Agreement 12/18/79 Unrecorded | Joseph D. Gilliland et al/Husky Oil Company | Portion Section 8-T9N-R33W, S.B.B.&M., County of Santa Barbara, State of California. |
| MC-70043 EXPIRED | Right-of-Way Agreement 1/10/85 1986-003746 | Dorothy M. Pringle/ Marathon Oil Company | The East thirty (30) feet of Parcel 3 of Parcel Map 12,302, as shown on map recorded in Book 20 of Parcel maps at Pages 38-40 in the office of the County Recorder of Santa Barbara County, State of California. |
| MC-70044 | Water Disposal Agreement Unrecorded 2/25/85 | Hunter Cat Canyon Development/ Marathon Oil Co. | PTN W/2 Section 17-T9N-R33W, S.B.B..&M. |

## SANTA BARBARA COUNTY, CALIFORNIA

| R/W | GRANTOR | TYPE INSTRUMENT | DATE | RECORDING |
|------|---------|------------------|------|-----------|
| CC-01 | LLOYD CORPORATION, LTD., ET AL | GRANT OF RIGHT OF WAY | 72/01/14 | BK 2385, PG 669 |
| CCL-01 | LLOYD PROPERTIES, L.P. | CATHODIC PROTECTION EASEMENT | 91/10/01 | FILE NO. 91-075635 |
| | LLOYD PROPERTIES, L.P. | CATHODIC PROTECTION EASEMENT | 91/10/01 | FILE NO. 91-075636 |
| | LLOYD PROPERTIES, L.P. | CATHODIC PROTECTION EASEMENT | 91/10/01 | FILE NO. 91-075637 |
| | LLOYD PROPERTIES, L.P. | CATHODIC PROTECTION EASEMENT | 91/10/01 | FILE NO. 91-075638 |
| SMVC-01 | BRADLEY LAND CO/UNOCAL | LETTER AGREEMENT | 72/11/01 | UNRECORDED |
| SMVC-02 | BRADLEY LAND COMPANY | AMENDMENT TO R/W AGREEMENT | 74/04/19 | UNKNOWN |
| | BRADLEY LAND COMPANY | R/W AGREEMENT | 73/02/07 | UNKNOWN |
| | BRADLEY LAND COMPANY | RIGHT OF WAY AGREEMENT | 88/05/20 | UNKNOWN |
| SMVC-03 | COUNTY OF SANTA BARBARA | ENCROACHMENT PERMIT NO. 2244 | 73/01/26 | UNKNOWN |
| SMVC-05 | BRADLEY LAND COMPANY | DESCRIPTION OF ROUTE SELECTED | 57/07/17 | |
| | UNION OIL COMPANY | ASSIGNMENT | 73/04/03 | BK 2457, PG 1029 |
| | UNION OIL COMPANY | BILL OF SALE | 73/04/03 | UNRECORDED |
| SMVC-06 | SHELL OIL COMPANY | BILL OF SALE, ASSIGNMENT AND AGREEMENT | 86/03/24 | UNRECORDED |

## ZACA FIELD, SANTA BARBARA COUNTY, CALIFORNIA

| NUMBER | INTRUMENT DATE OF INSTRUMENT RECORDING DATA | ORIGINAL LESSOR (GRANTOR) LESSEE (GRANTEE) | DESCRIPTION |
|---|---|---|---|
| 1. | Surface Lease Agreement 12/1/95 Unrecorded | Firetone Farming Company Limited Partnership/Vintage Petroleum, Inc. | See Document |
| G-312786-B | Surface Use Agreement 1/25/89 Unrecorded | Texaco Producing Inc../ William B. Chamberlin, et al | 2.24 acres M/L in Sections 32 & 33-T7N-R31W, Santa Barbara County, California. |

2    Drillsite Agreement, dated 7-14-76, Amendment of Drillsite Agreement, dated 6-12-79 Amendment of Drillsite Agreement, dated 11-1-79, Amendment of Drillsite Agreement, dated 7-1-80.

3.    Easement & Right of Way Agreement, dated 7-14-76

4.    Letter Agreement dated 8-29-2001

5.    Amendment to Conditional Consent dated 6/28/02

6.    Lower Sump Surface Agreement dated July 1, 2002

7.    Guaranty Agreement dated July 1, 2002 by Greka Energy Corporation on behalf of Greka SMV, Inc

EXHIBIT "A"
Page 2 of 10

ONE 8" FUEL GAS PIPELINE (from Union's Battles Gas Plant to the tee at Suey Junction): Commencing at the former site of Union's Battles Gas Plant near the center of Section 24, Township 10 North, Range 34 West, S.B.B. & M., and continuing in a westerly direction to the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B. & M., as said pipeline route is depicted below.

Grant of Pipeline Easement and Agreement by and between Union Oil Company of California and Saba Petroleum dated September 25, 1995 recorded on February 1, 1996 as Instrument No. 96-006531 in the Official Records of Santa Barbara County.



# EXHIBIT "A"
## Page 3 of 10

<u>ONE  2" - 6"  FUEL  GAS  PIPELINE (from the tee at Suey Junction to the west end of Saba's Union Sugar Fee):</u> Commencing at the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a generally westerly direction to the west end of Saba's Union Sugar Fee at a point in Projected Section 24, Township 10 North, Range 35 West, S.B.B.& M. north of and adjacent to Brown Road approximately 2300 feet west of the intersection of Brown and Ray Roads, as said pipeline route is depicted below.



EXHIBIT "A"
Page 4 of 10

<u>ONE 6" FUEL GAS PIPELINE (from the tee at Suey Junction to the south boundary of the SMV Unit):</u>  Commencing at the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a southerly direction to the south boundary of the Santa Maria Valley Oil & Gas Unit (a copy of said Unit Agreement was recorded April 1, 1964, in Book 2048, at Page 766 of the Official Records of Santa Barbara County, California) in Section 27, Township 10 North, Range 34 West, S.B.B.& M., as said pipeline route is depicted below.



37                                                                                                285

# EXHIBIT "A"
### Page 5 of 10

<u>ONE 2" - 4" FUEL GAS PIPELINE (from Union's Battles Gas Plant to Saba's Hopkins Fuel Gas Pipeline):</u> Commencing at the former site of Union's Battles Gas Plant near the center of Section 24, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a southerly direction to the 3" valve on the Bradley Lands II Lease tie-in point near the north line of Section 36, Township 10 North, Range 34 West, S.B.B.& M., where said pipeline connects with Saba's fuel gas pipeline described on page 2 of Exhibit "A-5" and Exhibit "A-10" in that certain Assignment and Bill of Sale recorded June 16, 1995, as Instrument # 95-032706, as said pipeline route is depicted below.



**EXHIBIT "A"**
Page 6 of 10

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction west to the west end of Saba's Union Sugar Fee, as said pipeline is described on page 3 of this Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 57076 | J. A. Tonascia, et al./ Union Oil Company of California | 5/29/44 | Bk 780, Pg 358 | 15 ft. strip of land within the N/2SW/4 of Sec. 22, T10N, R34W |
| Right of Way file: RW 53824 | Duskin E. Hobbs, et ux/ Union Oil Company of California | 3/4/37 | Bk 388, Pg 413 | The north 30 ft. of the S/2 of Sec. 21, T10N, R34W |
| Right of Way file: RW 53868.2 | Ed Russell, et ux/ Union Oil Company of California | 7/21/37 | Bk 397, Pg 369 | 30 ft. strip of land within a portion of Subdiv. No. 8, Rancho Punta de la Laguna, aka a portion of Projected Section 21, T10N, R34W |
| Right of Way file: RW 53868.6 | Ed Russell, et ux/ Union Oil Company of California | 10/28/38 | unrecorded | 15 ft. strip of land within a portion of Subdiv. No. 8, Rancho Punta de la Laguna, aka a portion of Projected Section 21, T10N, R34W |

## EXHIBIT "A"
### Page 7 of 10

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction west to the west end of Saba's Union Sugar Fee, as said pipeline is described on page 3 of this Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Agreement file: RW 53853.9 | Santa Maria Valley Railroad Company/Union Oil Company of California | 9/11/44 | unrecorded | RR crossing at RR Sta. 80+61, which is located in Projected Section 19, T10N, R34W |
| Right of Way RW 53170.19 | Union Sugar Company/ Union Oil Company of California | 1/25/46 | Bk 678, Pg 227 | 10 ft. wide strip of land within portions of Ranchos Guadalupe and Punta de la Laguna, aka a of Ranchos Guadalupe and Punta portion of the W/2W/2 of Projected Section 19, T10N, R34W and a portion of Projected Section 24, T10N, R35W |
| Right of Way file: 602206 | Santa Maria Valley Associates / Union Oil Company of California | 9/28/74 | Bk 2539 Pg 1319 | 10 ft. wide strip of land within a portion of Partition No. 5 of Rancho Punta de la Laguna, aka a portion of Projected Section 24, T10N, R35W |

# EXHIBIT "A"
## Page 8 of 10

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction south to the south boundary of the SMV Unit, as said pipeline is described on page 4 of this Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 54167 | Pacific Coast Railway Company/Union Oil Company of California | 2/28/41 | Bk 525, Pg 16 | Strips of land within Sec. 22 & 27, T10N, R34W |
| Agreement file: RW 53853.7 | Santa Maria Valley Railroad Company/Union Oil Company of California | 8/31/44 | Unrecorded | RR crossing near Airport Junction south of McCoy Lane, which is located in Sec. 27, T10N, R34W |

## EXHIBIT "A"
### Page 9 of 10

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from Union's Battles Gas Plant south to the tie-in with Saba's Hopkins Fuel Gas Pipeline, as said pipeline is described on page 5 of this Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 53758.2 | Thomas B. Adam, et ux/ Union Oil Company of California | 12/18/36 | Bk 389, Pg 8 | 25 ft. wide strip of land within the SW/4SE/4 of Sec. 24, T10N, R34W |
| Right of Way file: RW 53807.19 | County National Bank & Trust Company, Trustee under the Will of Margaret T. Vincent | 5/1/57 | Bk 1447, Pg 473 | 16 1/2 ft. wide strip of land within the W/2NW/4NE/4 of Sec. 25, T10N, R34W |
| Right of Way file: RW 53807.20 | County National Bank & Trust Company, Executor of the Estate of Eric C. Vincent | 5/1/57 | Bk 1447, Pg 475 | 16 1/2 ft. wide strip of land within the W/2SW/4NE/4 of Sec. 25, T10N, R34W |
| Right of Way file: RW 53904 | Bradley Land Company/ Union Oil Company of California | 8/11/37 | ----------------------- | 30 ft. wide strip of land described as Strip No. 2 in said Right of Way, located in the SW/4 of Sec. 25, T10N, R34W |

**EXHIBIT "A"**
Page 10 of 10

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from Union's Battles Gas Plant south to the tie-in with Saba's Hopkins Fuel Gas Pipeline, as said pipeline is described on page 5 of this Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data * | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 53904.25 | Bradley Land Company/ Union Oil Company of California | 3/27/57 | Bk 1439, Pg 598 | 1 rod wide strip of land within the N/2N/2NW/4 of Sec. 36, T10N, R34W, more specifically described in Description of Route, recorded in Bk 1478, Pg 557 * |
| Joint Use Agreement file: RW 57296 | State of California/ Union Oil Company of California | | Bk 2390 Pg 1459 | Highway crossing at Eng. Sta. 336+05, which is located in Sec. 27, T10N, R34W |

* All references to recording data are to instruments recorded in the Official Records of the Recorder's office of the County of Santa Barbara, State of California.

## EXHIBIT "B"
### Page 1 of 5

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction west to the west end of Saba's Union Sugar Fee, as said pipeline is described on page 2 of Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 57076 | J. A. Tonascia, et al./ Union Oil Company of California | 5/29/44 | Bk 780, Pg 358 | 15 ft. strip of land within the N/2SW/4 of Sec. 22, T10N, R34W |
| Right of Way file: RW 53824 | Duskin E. Hobbs, et ux/ Union Oil Company of California | 3/4/37 | Bk 388, Pg 413 | The north 30 ft. of the S/2 of Sec. 21, T10N, R34W |
| Right of Way file: RW 53868.2 | Ed Russell, et ux/ Union Oil Company of California | 7/21/37 | Bk 397, Pg 369 | 30 ft. strip of land within a portion of Subdiv. No. 8, Rancho Punta de la Laguna, aka a portion of Projected Section 21, T10N, R34W |
| Right of Way file: RW 53868.6 | Ed Russell, et ux/ Union Oil Company of California | 10/28/38 | unrecorded | 15 ft. strip of land within a portion of Subdiv. No. 8, Rancho Punta de la Laguna, aka a portion of Projected Section 21, T10N, R34W |

# EXHIBIT "B"
### Page 2 of 5

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction west to the west end of Saba's Union Sugar Fee, as said pipeline is described on page 2 of Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Agreement file: RW 53853.9 | Santa Maria Valley Railroad Company/Union Oil Company of California | 9/11/44 | unrecorded | RR crossing at RR Sta. 80+61, which is located in Projected Section 19, T10N, R34W |
| Right of Way- RW 53170.19 | Union Sugar Company/ Union Oil Company of California | 1/25/46 | Bk 678, Pg 227 | 10 ft. wide strip of land within portions of Ranchos Guadalupe and Punta de la Laguna, aka a of Ranchos Guadalupe and Punta portion of the W/2W/2 of Projected Section 19, T10N, R34W and a portion of Projected Section 24, T10N, R35W |
| Right of Way file: 602206 | Santa Maria Valley Associates / Union Oil Company of California | 9/28/74 | Bk 2539 Pg 1319 | 10 ft. wide strip of land within a portion of Partition No. 5 of Rancho Punta de la Laguna, aka a portion of Projected Section 24, T10N, R35W |

## EXHIBIT "B"
### Page 3 of 5

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from the tee at Suey Junction south to the south boundary of the SMV Unit, as said pipeline is described on page 3 of Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|----------|-----------------|------|-----------------|-------------------|
| Right of Way file: RW 54167 | Pacific Coast Railway Company/Union Oil Company of California | 2/28/41 | Bk 525, Pg 16 | Strips of land within Sec. 22 & 27, T10N, R34W |
| Agreement file: RW 53853.7 | Santa Maria Valley Railroad Company/Union Oil Company of California | 8/31/44 | Unrecorded | RR crossing near Airport Junction south of McCoy Lane, which is located in Sec. 27, T10N, R34W |

## EXHIBIT "B"
### Page 4 of 5

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from Union's Battles Gas Plant south to the tie-in with Saba's Hopkins Fuel Gas Pipeline, as said pipeline is described on page 4 of Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 53758.2 | Thomas B. Adam, et ux/ Union Oil Company of California | 12/18/36 | Bk 389, Pg 8 | 25 ft. wide strip of land within the SW/4SE/4 of Sec. 24, T10N, R34W |
| Right of Way file: RW 53807.19 | County National Bank & Trust Company, Trustee under the Will of Margaret T. Vincent | 5/1/57 | Bk 1447, Pg 473 | 16 1/2 ft. wide strip of land within the W/2NW/4NE/4 of Sec. 25, T10N, R34W |
| Right of Way file: RW 53807.20 | County National Bank & Trust Company, Executor of the Estate of Eric C. Vincent | 5/1/57 | Bk 1447, Pg 475 | 16 1/2 ft. wide strip of land within the W/2SW/4NE/4 of Sec. 25, T10N, R34W |
| Right of Way file: RW 53904 | Bradley Land Company/ Union Oil Company of California | 8/11/37 | --------------------- | 30 ft. wide strip of land described as Strip No. 2 in said Right of Way, located in the SW/4 of Sec. 25, T10N, R34W |

## EXHIBIT "B"
### Page 5 of 5

Those portions of the following described Rights of Way & etc. appurtenant to the fuel gas pipeline from Union's Battles Gas Plant south to the tie-in with Saba's Hopkins Fuel Gas Pipeline, as said pipeline is described on page 4 of Exhibit "A":

| Document | Grantor/Grantee | Date | Recording Data* | Legal Description |
|---|---|---|---|---|
| Right of Way file: RW 53904.25 | Bradley Land Company/ Union Oil Company of California | 3/27/57 | Bk 1439, Pg 598 | 1 rod wide strip of land within the N/2N/2NW/4 of Sec. 36, T10N, R34W, more specifically described in Description of Route, recorded in Bk 1478, Pg 557* |
| Joint Use Agreement file: RW 57296 | State of California/ Union Oil Company of California | | Bk 2390 Pg 1459 | Highway crossing at Eng. Sta. 336+05, which is located in Sec. 27, T10N, R34W |

* All references to recording data are to instruments recorded in the Official Records of the Recorder's office of the County of Santa Barbara, State of California.

48                                                                                                                              296

# EXHIBIT "A"
## Page 1 of 4

<u>ONE 8" FUEL GAS PIPELINE (from Union's Battles Gas Plant to the tee at Suey Junction)</u>: Commencing at the former site of Union's Battles Gas Plant near the center of Section 24, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a westerly direction to the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B.& M., as said pipeline route is depicted below.



# EXHIBIT "A"
### Page 2 of 4

**ONE 2" - 6" FUEL GAS PIPELINE (from the tee at Suey Junction to the west end of Saba's Union Sugar Fee):** Commencing at the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a generally westerly direction to the west end of Saba's Union Sugar Fee at a point in Projected Section 24, Township 10 North, Range 35 West, S.B.B.&.M. north of and adjacent to Brown Road approximately 2300 feet west of the intersection of Brown and Ray Roads, as said pipeline route is depicted below.



## EXHIBIT "A"
### Page 3 of 4

**ONE 6" FUEL GAS PIPELINE (from the tee at Suey Junction to the south boundary of the SMV Unit):** Commencing at the tee at Suey Junction, which is located near the center of Section 22, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a southerly direction to the south boundary of the Santa Maria Valley Oil & Gas Unit (a copy of said Unit Agreement was recorded April 1, 1964, in Book 2048, at Page 766 of the Official Records of Santa Barbara County, California) in Section 27, Township 10 North, Range 34 West, S.B.B.& M., as said pipeline route is depicted below.



# EXHIBIT "A"
### Page 4 of 4

<u>ONE 2" - 4" FUEL GAS PIPELINE (from Union's Battles Gas Plant to Saba's
Hopkins Fuel Gas Pipeline):</u> Commencing at the former site of Union's Battles Gas
Plant near the center of Section 24, Township 10 North, Range 34 West, S.B.B.&
M., and continuing in a southerly direction to the 3" valve on the Bradley Lands II
Lease tie-in point near the north line of Section 36, Township 10 North, Range 34
West, S.B.B.& M., where said pipeline connects with Saba's fuel gas pipeline
described on page 2 of Exhibit "A-5" and  Exhibit "A-10" in that certain
Assignment and Bill of Sale recorded June 16, 1995, as Instrument #  95-032706,
as said pipeline route is depicted below.



EXHIBIT "A"
Page 1 of 1

ATTACHED TO AND MADE A PART OF THAT CERTAIN GRANT OF PIPELINE
EASEMENT AND AGREEMENT BY AND BETWEEN UNION OIL COMPANY OF
CALIFORNIA, A CALIFORNIA CORPORATION, DBA UNOCAL, ("UNOCAL") AND
SABA PETROLEUM, INC., A CALIFORNIA CORPORATION ("SABA"), EFFECTIVE
SEPTEMBER 25, 1995.

Commencing at the former site of Union's Battles Gas Plant near the center of
Section 24, Township 10 North, Range 34 West, S.B.B.& M., and continuing in a
westerly direction to the tee at Suey Junction, which is located near the center of
Section 22, Township 10 North, Range 34 West, S.B.B.& M., as said pipeline
route is depicted below.



## PALMER STENDEL MINERAL FEE

EXCEPTING AND RESERVING ALL RIGHTS FROM THE SURFACE OF THE EARTH TO 500 BELOW THE SURFACE OF THE EARTH ALL OF GRANTOR'S RIGHT, TITLE AND INTEREST IN AND TO THE OIL. GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, UNDER AND THAT MAY BE PRODUCED FROM THE SUBJECT ACREAGE, TOGETHER WITH ALL THE TENEMENTS, HEREDITAMENTS AND APPURTENANCES THEREUNTO BELONGING, IF ANY, TO HAVE AND TO HOLD SAID LAND SUBJECT TO ALL CONDITIONS, EXCEPTIONS, RESTRICTIONS. RESERVATIONS, RIGHTS, RIGHTS OF WAYS AND EA SEMENTS, IF ANY.

## BLOCHMAN MINERAL FEE

Grant of Easement
June 4, 1993
Recorded June 11, 1993
Instrument No: 93-044841

EXCEPTING AND RESERVING ALL RIGHTS FROM THE SURFACE OF THE EARTH TO 500' BELOW THE SURFACE OF THE EARTH ALL OF GRANTOR'S RIGHT TITLE AND INTEREST IN AND TO THE OIL, GAS.MIN ERA LS AND OTHER HYDROCARBON SUBSTANCES IN, UNDER AND THAT MAY BE PRODUCED FROM THE SUBJECT ACREAGE, TOGETHER WITH ALL THE TENEMENTS, HEREDITAMENTS AND APPURTENANCES THEREUNTO BELONGING, IF ANY. TO HAVE AND TO HOLD SAID LAND SUBJECT TO ALL CONDITIONS, EXCEPTIONS, RESTRICTIONS, RESERVATIONS, RIGHTS, RIGHTS OF WAYS AND E A S E MENTS, IF ANY.

## FULLERTON MINERAL FEE,

ALL OF GRANTOR'S RIGHT. TITLE AND INTEREST IN ANO TO THE OIL, GAS MINERALS AND OTHER HYDROCARBON SUBSTANCES IN, UNDER AND THAT MAY BE PRODUCED FROM THE SUBJECT ACREAGE. TOGETHER WITH ALL THE TENEMENTS. HEREDITAMENTS AND APPURTENANCES THEREUNTO BELONGING, IF ANY, TO HAVE ANO TO HOLD SAID LAND SUBJECT TO ALL CONDITIONS, EXCEPTIONS, RESTRICTIONS, RESERVATIONS. RIGHTS, RIGHTS OF WAYS AND EASEMENTS, IF ANY.

File No: 56937
Right of Way
Michael James Pruitt and Union Oil Company of California
Date: 10-27-67
Recorded: 2211/1062
Legal Description: Ptn. Section 31 T9N, R32W

302

## UNION CONOCO LEASE

SAID LEASEISI IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT
SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND
ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL
MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION
AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES;
ALL FARMOUT ANO FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS;
ALL LEASE BURDENS; ALL ENCUMBRAN CES; AND INCLUDING, BUT
NOT LIMITED TO, ALL OF THOSE CONTRACTS, A GREEMENTS AND
INSTRUMENTS, TO THE EXTENT ASSIGNABLE, SPECIFICALLY LISTED
HEREINAFTER:
1. Agreement dated August 13, 1970 by and between Continental Oil Company and Union
Oil Company of California [Commingling Agreement, prod. commingled with Union Texaco
lease);

2. Easement as described in Deed recorded March 24, 1968 in favor of Pacific Gas and
Electric Company (elect. pole line);


## BELL MINERAL FEE

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO.,
CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS
OF SAID COUNTY:
ALL OF GRANTOR'S RIGHT, TITLE AND INTEREST IN AND TO THE O IL. GAS,
MINERALS AND OTHER HYDROCARBON S UBSTANCES IN, UNDER AND THAT
MAY BE PRODUCED FROM THE SUBJECT ACREAGE, TOGETHER WITH ALL THE
TENEMENTS, HEREDITAMENTS AND APPURTENANCES THEREUNTO BELONGING,
IF ANY AS MORE FULLY SHOWN ON THE MAP ATTACHED HERETO AS EXHIBIT "A-
1" AND BY THIS REFERENCE MADE A PART HEREOF EXCEPTING AND RESERVING
ALL RIGHT, TITLE AND INTEREST FROM THE SURFACE DOWN TO A DEPTH OF
5OO'BELOW THE SURFACE OF THE GROUND.

Rights of Way, Licenses & Easements

| File # | Instrument | Grantor/Grantee* | Date | Book/Page | Brief Description |
|---|---|---|---|---|---|
| 54756 | Right of Way | Newhall Land & Farming Company | 05/25/49 | 859/169 | Ptn. 38 ft. strip in Sec. 27, T10N R33W |
| 54752 | Right of Way | Union Sugar Co.. | 03/04/49 | 859/177 | Ptn. 30 ft. strip in Sec. 27, T10N R33W |
| 54759 | Right of Way | Phyllis R. Marshall, et al | 05/02/49 | 859/172 | Ptn. Sec. 35, T10N, R33W |
| 54742.2 | Right of Way | Santa Maria Water Company | 10/03/59 | 1676/781 | Ptn. NE/4 Sec. 35, T10N, R33W |
| 54742 | Right of Way | Santa Maria Water Company | 05/02/49 | 859/175 | Ptns. Sec. 35 & 36, T10N, R33W |
| 54733 | Right of Way | A. F. & C. A. Fugler, Inc. | 03/22/49 | 856/180 | S/2NE/4 & SE/4 Sec. 35, T10N R33W |
| 54732 | Right of Way | J. S. Calderon | 02/16/49 | 856/178 | Ptn. SE/4 Sec.35, T10N, R33W |
| 54731 | Right of Way | Lawrence & Louise Mendoza | 02/16/49 | 856/176 | Lot A of the Bailey-Guey Tract a/k/a Ptn. Sec 2, T9N, R33W |
| 54734 | Right of Way | Santa Maria Realty Company | 03/03/49 | 861/339 | Ptn. W/2 Andrew Ave., a/k/a Ptn. Sec. 2, T9N, R33W |
| 54736 | Right of Way | Blochman Union School Dist. of Santa Barbara Cnty. | 02/14/49 | 856/258 | Ptn. W/2 Andrew Ave., a/k/a Ptn. Sec. 2, T9N R33W |
| 54730 | Right of Way | Juan Ardnatz | 03/03/49 | 856/174 | Ptn. Sec. 2, T9N, R33W |
| 54738 | Right of Way | Jesse James Guthrie, et al. | 01/10/49 | 856/184 | NE/4SE/4SE/4 Sec. 2, T9N, R33W |
| 54167 | Right of Way | Pacific Coast Railway Company | 02/28/41 | 525/16 | insofar and only insofar as this Right of Way covers Sec. 1 & 12, T9N, R33W ** |
| 54737 | Right of Way | Delila Hourihan Togazzini | 04/29/40 | 856/182 | SE/4S E/4 S E/4 Sec. 12, T9N, R33W |
| 54654 | Right of Way | Palmer Stendel Oil Corporation | 03/30/49 | 850/216 | NE/4 Sec. 26, E/2W/2SE/4 Sec. 23, Sec. 24, E/2 Sec. 13, Ptn. SE/4 & SW/4NE/4 Sec. 12, T9N, R33W |
| | Right of Way | Palmer Stendel Oil Corporation | 06/05/33 | 283/335 | E/2E/2 & E/2W/2E/2 Sec 23, NE/4 Sec 26, Sec 24, Sec 13, T9N, R33W |

| File # | Instrument | Grantor/Grantee* | Date | Book/Page | Brief Description |
|--------|-----------|------------------|------|-----------|------------------|
| 54461 | Right of Way | Palmer Stendel Oil Corp., et al. | 10/25/44 | 620/227 | NE/4 Sec. 26, T9N, R33W |
| 53446 | Right of Way | Los Flores Land & Oil Co. | 12/14/31 | | Ptn. Rancho de Los Alamos, known as Las Flores Ranch, a/k/a Sec. 28 & W/2 Sec. 27, T9N, R33W (water p/l) |
| 54450 | Right of Way | Tide Water Assoc. Oil Co. | 10/17/44 | 641/171 | Ptn. NW/4 Sec. 25, T9N, R33W (2 p/l) |
| 54449? | Pipeline Right of Way | Williams Holding Co. | 09/16/85 | 1986-027123 | NE/4 & S/2 Sec. 25, T9N, R33W (WWD p/ls) |
| 54449 | Right of Way | Williams Holding Co. | 09/25/44 | 625/214 | NE/4 & S/2 Sec. 25, T9N, R33W (1 p/l +) |
| 54455 | Right of Way | A. F. C. A. Fugler, Inc. | 08/22/44 | 618/247 | W/2SW/4 Sec. 30, T9N, R32W (p/ls) |
| 54451 | Right of Way | R. G. Oil Company | 11/17/44 | 628/202 | W/2SE/4 & E/2SW/4 Sec. 30, T9N, R32W (2 p/l) |
| 54451? | Right of Way Agreement | Husky Oil Company of Delaware | 03/05/75 | | E/2SW/4 & W/2SE/4 Sec. 30, T9N, R32W exp.3/5/95 (1 p/l) |
| 57388 | Right of Way | Williams Holding Co. as modified | 08/01/72 08/20/82 | 2434/295 82-38181 | N/2SE/4 & S/2NE/4 Sec. 31 & N/2SW/4 Sec. 32, T9N, R32W (p/ls) |
| 57363 602204 | License Agmt. | Robert A. & Norma Felburg | 06/26/72 | 2411/728 | Portions of: Sec. 5, T8N, R32W, Sec. 32, T9N, R32W, Rancho Los Alamos (p/ls, incl. 10" oil) |
| 57403 601889 | License Agmt. | Robert A. & Norma Felburg | 07/01/70 | | Ptn. Rancho Los Alamos, a/k/a Ptn. Sec. 5, T8N, R32W (150' x 150' Gas compressor site) |
| 808723? | Lease | E. E. Elliot, et al | 07/16/57 | | Ptn. Los Alamos Rancho, a/k/a Ptn. Sec. 5, T8N, R32W (150' x 150' tank site) |

\*    Unless otherwise so noted, Grantee was Union Oil Company.

\*\*    Assignor specifically reserves and excepts said Right of Way insofar as same covers all other lands.

?    Questionable file number.

<u>**Exhibit "B-2"**</u>
Pipelines

**THE PIPELINES CONVEYED HEREBY INCLUDE, BUT ARE <u>NOT</u> LIMITED TO THE FOLLOWING:**

Fuel Gas Pipeline originating in the SW/4NW/4 Section 28, Township 9 North, Range 34 West, S.B.B.& M. and terminating in the NW/4NW/4 Section    and Section 22, Township 9 North, Range 33 West, S.B.B.& as    the attached Exhibit    attached hereto.

Gas Gathering Pipeline originating at the Gato Ridge Compressor Plant in the SE/4 Section 5, Township 8 North, Range 32 West, S.B.B.&    as a    plastic    to the Fullerton    Battery in the S/2NW/4 Section 31, Township 9 North, Range 32 West, S.B.B.& M. and continuing from the Fullerton Tank Battery as a    steel line to the    Canyon Compressor Plant in Section    Township    North, Range    West,    .B.&    and continuing from the Cat Canyon Compressor Plant as an 6" line to a point in the SE/4SE/4 Section    Township    North, Range    West, S.B.B.& and continuing therefrom as an 8" line to the **Cat** Canyon Wet Gas Sales Point at the Stubblefield Wye in the    Section    Township    North, Range 34 West, S.B.B.& M., as shown on Exhibit "B-4", attached hereto.

Fresh Water Pipeline as shown on the Exhibit "B-5", attached hereto, and subject to <u>all</u> existing Licenses and Agreements, including, but <u>not</u> limited to those listed on Exhibit "B-6", attached hereto.

Waste Water Pipeline originating at the Bell Injection Plant in the SW/4 Section 26, Township 9 North, Range 33 West, S.B.B.& M. and at the Fullerton Tank Farm in S/2NW/4 Section 31, Township 9 North, Range 32 West, S.B.B.& M. thence in a northerly direction from both points of origination to the Pond on the Palmer Stendel fee parcel in Section 24, Township 9 North, Range **33** West, S.B.B.& M.,and continuing in a northerly and westerly direction to the a point immediately to the east of the Battles Gas Plant in Section 24, Township Range 34 West,    M., as shown on Exhibit "B-7",attached hereto.

58                                                                306

Exhibit "3-A"

Attached to and made a part of that certain Assignment and Bill of Sale between
Union Oil Company of California, doing business as Unocal, ("Assignor"), and Saba
Petroleum, Inc. ("Assignee"), and dated





Cat Canyon & Gato Ridge

Water System Licenses

| File # | Licensee | Date of Agmt. |
|--------|----------|---------------|
| 3461.12 | Shell California Production, Inc., now City/Santa Barbara Holding, Inc. | 11/18/86, effective 11/18/86 |
| 3749 | Cal-Coast Acidizing Service | 6/16/89, effective 7/1/89 |
| 3373.15 & 3373.14 | Mobil Oil Corporation, now Vintage Oil | 2/9/70, effective 3/1/70 |
| 3364.15 & 3364.14 | Standard Oil Company, now Chevron, U.S.A. | 2/18/69, effective 3/1/69 |
| 3245.22 | Sun Oil Company of California, now Dominion Oil | 8/14/69, effective 9/1/69 |
| 3685.5 & 3685.4 | Petrominerals Corporation Berwood Corporation | 8/15/68, effective 9/1/68 |
| 3752 | John Twitchell | 12/1/69, effective 1/1/70 |
| 3350.16 | Fred Michael | 10/20/80, effective 9/1/80 |
| 3187.9 | Helen Tognazzi, et al | 12/14/76, effective 11/5/76 |
| 347-108 | Getty Oil, now Texaco | 12/14/90, effective 1/1/91 |
| 3407 | Manfred Sanders | 3/1/70, effective 3/1/70 |
| 3657 | Home-Stake Prod. Co. | 7/31/69, effective 8/1/69 |
| 3686 | Texaco, Inc. | |

Waste Water Pipeline



**Exhibit "9-7"**

Case 9:19-bk-11573-MB    Doc 1221    Filed 08/25/20    Entered 08/25/20 17:02:18    Desc
Main Document    Page 324 of 568
**Waste Water Pipeline**



**Waste Water Pipeline**



# CASMALIA FIELD
## Right of Ways, Easements and Licenses

ARELLANES LEASE, Santa Barbara COUNTY, CALIFORNIA.

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

III.    AGREEMENTS:

    1.    Overriding Royalties totalling 6.8125, as created by the following documents:

        A.    A total 6.125% overriding royalty in favor of Minnewa Bell Ross, et al as recited in Assignment dated March 28, 1951, recorded in Book 982, at Page 80; and as recited in Assignment dated March 28, 1951, recorded in Book 982, at Page 86; and

        B.    A total 1.5625% overriding royalty in favor of Manufacturers Trust as reserved in Assignment of Interest in Overriding Royalty dated June 3, 1953, recorded in Book 1160, at Page 20, and Assignment of Royalty Interest dated June 3, 1953, recorded in Book 714, at Page 44, and Assignment of Royalty Interest dated June 3, 1953, recorded in Book 1159, at Page 464.

    2.    Agreement dated March 30, 1961 by and between T. R. Bonetti, et al and Union Oil Company (Commingling Agreement- unrecorded);

    3.    Quitclaim Deed dated October 27, 1960 from Union Oil to the Lessors of record, recorded in Book 1843, Page 296, Santa Barbara County, CA. (surface rights to 500');

    4.    Quitclaim Deed dated April 1, 1966 from Ralph J. Tingle, Jr., et ux to Union Oil Company, recorded in Book 2146, at Page 446 (UOC reacquires an undivided .875% ORI);

    5.    Partial Quitclaim Deed dated July 18, 1985, recorded as Document No. 039770, Santa Babara County, CA certain mining rts. and minerals to 1,500'1.

66

BONETTI LEASE, Santa Barbara COUNTY, CALIFORNIA.

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1   Agreement dated November 10, 1970 by and between Artemisa Bonetti, and Union Oil Company of California (Commingling Agmt.);

2.  Agreement dated October 22, 1971 by and between Airox, Inc. and Union Oil Company of California (stipulation of operations);

Partial Quitclaim Deed dated July 18, 1985 by and between Union Oil Company of California and Gunnison Land Company, recorded as Document No. 039771, Santa Barbara County, CA (certain mining rts. and minerals to 1,500').

315

ESCOLLE LEASE, Santa Barbara COUNTY, CALIFORNIA

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL
VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S)

INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND
COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND
LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL
LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE
CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1.  Right of Way Agreement dated February 10, 1966 from Ernest Righetti, et al to Union

    Oil Company, recorded in Book 2142, Page 1192, as amended November 12, 1970
    (unrecorded) and February 1, 1977, recorded as Instrument No. 77-11453 (pipelines-
    UOC #56883-annual rental);

    Right of Way Agreement dated April 14, 1967 from Union Oil Company to Pacific Gas
    and Electric Co. (unrecorded);

    Heat Purchase Agreement dated June 17, 1991 between Union Oil Company and Bruce
    Conway (unrecorded);

    Partial Quitclaim Deed dated January 6, 1994 from Union Oil Company to the Lessors
    of record, recorded on June 7, 1994 as Document #94-047788 (quitclaimed all
    acreage except 180 acres).

316

MUSICO LEASE, Santa Barbara COUNTY, CALIFORNIA.

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1. Partial Quitclaim Deed dated October 24, 1984 by and between Union Oil Company of California and T. H. Musico, et al, recorded as Document No. 061054, Santa Barbara County, Ca.;

2. Revocable License Agreement dated October 8, 1969 by and between The Casmite C Corporation and Ted H. Muscio, et al (UOC C-3681.1), as amended (surplus water agreement - unrecorded);

3. Revocable License Agreement dated December 27, 1990 granted to Roy Bognuda (UOC C-3753), as amended (surplus water agreement - unrecorded);

**MORGANTI** LEASE, Santa Barbara COUNTY, CALIFORNIA.

**ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:**

**SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:**

IV.    **AGREEMENTS:**

1.    Overriding Royalties totalling 6.8125% as created by the following documents:

A.    A total 6.125% overiding royalty in favor of Minnewa Bell Ross, et al granted in Royalty Assignments dated February 25, I946 and recorded in Book 917, Page 481; Book 917, Page 478; Book 917, Page 475; Book 917, Page 487; and Book 917, Page 484;

B.    A total 1.5625% overriding royalty in favor of Manufacturers Trust as reserved in Assignments of Interest in Overriding Royalty dated June 3, I953, and recorded in Book 1160, Page I; Book 714, Page 44; and Book 1159, Page 464;

2.    Quitclaim Deed dated April I, 1965 from Ralph J. Tingle, Jr. et ux to Union Oil Compay, recorded in Book 2148, at Page 446, Santa Barbara County, CA (UOC reacquires an undivided .875% ORI);

3.    Pipeline and Road Easement dated April 18, 1946 from G. A. Morganti, et al to Union Oil Company (R/W #55192-access to Arellanes Lease);

4.    Amendment and Agreement dated May 18, 1994 between The Morganti Ranch, Lessor and Union Oil Company of California, Lessee (commingle and WWD Agmt. w/rental).

RIGHETTI LEASE, Santa Barbara COUNTY, CALIFORNIA.

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1.    Overriding Royalties totalling 6.8125% as created by the following documents:

A.    A total 6.125% overriding royalty in favor of Minnewa Bell Ross, et al granted in Royalty Assignments dated February 25, 1946 and recorded in Book 917, Page 481; Book 917, Page 478; Book 917, Page 475; Book 917, Page 487; and Book 917, Page 484;

B.    A total 1.5625% overriding royalty in favor of Manufacturers Trust as reserved in Assignments of Interest in Overriding Royalty dated June 3, 1953, and recorded in Book 1160, Page 1; Book 714, Page 44; and Book 1159, Page 464;

2.    Agreement dated September 30, 1959 by and between Alfred Righetti, et al and Union Oil Company of California, recorded in Volume 1724, at Page 284 of the O.R. of Santa Barbara County, Ca. (commingling agreement);

3.    Re-Assignment and Quitclaim of Royalty Interest dated May 31, 1950 by and between the Trustees of the Casmalia Trust No. I and Bell Petroleum Company, recorded in Volume 928, at Page 238, Santa Barbara County, CA (quitclaim of a gross 3% ORI).

4.    Quitclaim Deed dated April 1, 1966 from Ralph J. Tingle, Jr., et ux to Union Oil Company, recorded in Book 2148, at Page 446 (UOC re-acquires an undivided .875% ORI).

RIGHETTI "B" LEASE, Santa Barbara COUNTY, CALIFORNIA.

ALL LANDS DESCRIBED HEREINAFTER ARE LOCATED IN SANTA BARBARA CO., CALIFORNIA AND ALL DOCUMENT REFERENCES ARE TO THE OFFICIAL RECORDS OF SAID COUNTY:

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1.    Amendment to Oil and Gas Lease dated July 16, 1981 (executed in counterpart);

2.    Agreement dated September 30, 1959 between Alfred Righetti, et al and Union Oil (unrecorded);

3.    Partial Quitclaim Deed dated June 16, 1983 by and between Union Oil Company of California to the Lessors of record, recorded as Document No. 83-32008 (quitclaimed 460 acs.).

## Rights of Way, Licenses, Easements & Other Agreements

| File # | Instrument | Grantor/Grantee* | Date | Book/Page** | Brief Description |
|---|---|---|---|---|---|
| 55192 | License | G. Albert Morganti, et al. | 04/18/46 | | Ptn. Rancho Punta de la Laguna, a/k/a Ptn. Section 13 T9N, R34W |
| 55194.4 | Private Road License | Richfield Oil Corporation | 12/16/53 | | Ptn. Rancho Punta de la Laguna, a/k/a Ptn. Sections 19 & 20, T9N, R34W |
| 56902 | Right of Way, as amended | David N. & Ruthanne Tompkins | 03/25/66 | 2155/1387 | Ptn. Section 20, T9N, R34W |
| 62891 | Right of Way | Richfield Oil Corporation | 11/05/56 | | Ptn. Rancho Punta de la Laguna, a/k/a Ptn. Sections 19 & 20, T9N, R34W |
| 56883 | Right of Way Agreement, as amended | Ernest Righetti, et al. | 02/10/66 | 2142/1192 | Ptn. Rancho Todos Santos Y San Antonio, a/k/a Ptn. Sections 20, 26, 27, 28, 29 & 34 T9N, R34W |
| | Heat Purchase Agreement | Union Oil Company of California/ Bruce Conway | 06/17/91 | unrecorded | Escolle Lease |
| | Amendment & Agreement | Morganti Ranch/ Union Oil Company of California | 05/18/94 | | Morganti Lease |

*  Unless otherwise stated, Grantee = Union Oil Company of California.

** Book/Page references recordation in the Official Records of Santa Barbara County, California.

73

## Description of Conveyed Pipelines

THE PIPELINES CONVEYED HEREBY INCLUDE, BUT ARE <u>NOT</u> LIMITED TO THE FOLLOWING:

One 4" Fuel Gas Pipeline originating at a point on the northerly boundary line of the S/2 of projected Section 27, Township 9 North, Range 34 West, S.B.B.& M. to the Casmalia Compressor Plant in the S/2S/2 Section 13, Township 9 North, Range 35 West, S.B.B.& M. The general route of said fuel gas pipeline is more or less as shown on Exhibit "B-3" attached hereto.

One 2" Oil Pipeline originating at the Lospe Tank Battery at the NE/4NE/4 Section 29, Township 9 North, Range 34 West, S.B.B.& M., to the Casmalia diluent tank/oil gathering system near the Casmalia Tank Battery in the NE/4NW/4 Section 24, Township 9 North, Range 35 West, S.B.B.& M. The general route of said oil pipeline is more or less as shown on "B-4" attached hereto.

The Non-Potable Fresh Water System, consisting of one 2,000 barrel fresh water tank and one 4" fresh water pipeline, which originates at the inlet flange of the 2,000 barrel fresh water tank in the N/2NW/4 of Section 18, Township 9 North, Range 34 West, S.B.B.& M. and services the oil and gas operations, domestic and agricultural uses in Sections 13, 14, & 24, Township 9 North, Range 35 West, S.B.B.& M. and Sections 18 & 19, Township 9 North, Range 34 West, S.B.B.& M. The general route of said water pipeline and the general location of said water tank are more or less as shown on Exhibit "B-5" attached hereto.

**Fuel Gas Pipeline**





Oil Pipeline

T9N, R35W

T9N, R34W



Fresh Water Pipeline

_Juse 13_  , 1994.

T9N, R34W

WATER TANK
(2,000 BBL)

T9N, R34W

13

18

CASMALIA
COMPR. PLT.

CASMALIA
TANK BATTERY

24

19

325

Reserved Rights of Way, Easements and Licenses

| File # | | Grantor / Grantee | | Recording Reference * |
|---|---|---|---|---|
| 53514 | Agreement | Lawrence Harris, et al. / Associated Oil Co. | 11/06/07 | Book 119 Deeds, Page 312 |
| 53514 | Agreement | California Coast Oil Co. / Associated Transportation Co. | 08/25/09 | Book 132 Deeds, Page 174 |
| 53514 | Grant of Right of Way | Teresa Hartnell Blake, et al. / Associated Oil Co. | 06/19/07 | Book 112 Deeds, Page 580 |
| 53514 | Grant of Right of Way | H. C. Bagby / Associated Oil Co. | 04/10/07 | Book 119 Deeds, Page 72 |
| 53514 | Indenture | Brookshire Oil Co. / Associated Oil Co. | 05/24/10 | Book 270 O.R., Page 157 |
| 53548 | Ordinance No. 292 | County of Santa Barbara / William H. Crocker | 05/02/04 | _____ |
| 57793 | Right of Way as amended | Paula Righetti Pyche, et al., as Trustees / Union Oil Co. of CA | 08/30/85 | Instrument 1985-067062 |
| 57794 | Easement | Pacific Gas and Electric Company / Union Oil Co. of CA | 03/28/86 | Instrument 1986-0296 |
| 68222 | Consent to Joint Use | Union Oil Co. of CA / State of California | Undated | |
| 56883 | Right of Way Agreement, as amended | Ernest Righetti, et al. / Union Oil Co. of CA | 02/10/66 | Book 2142 O.R., Page 1192 |
| 64001 (56441) | Consent to Common Use Agreement | State of California | 05/21/68 | |
| 56441 | License American Trust Co. | Wells Fargo Bank | 09/19/60 | _____ |
| 56442 | Right of Way | Mattia & Jennie Bognuda | 05/25/60 | Book 1751, Page 48 |
| 56443 | Right of Way | Richfield Oil Corp. | 07/01/60 | _____ |
| 56444 | License For Pipe Line | T. R. Bonetti | 03/30/61 | _____ |
| 56445 | License For Pipe Line | Estate of Albert Morganti | 03/24/61 | _____ |

* Except as otherwise noted, all recording references are to the Official Records of Santa Barbara County, CA.

NDPL Pipelines consisting of three pipelines as follows:
8" Newlove Pipeline, 6" Lompoc Pipeline & 12" Lompoc to Orcutt Pipeline, all of which originate south of the Subject Property conveyed herein, traversing in a generally northerly direction more or less parallel to and east of State Highway 135 within or near the Subject Property in Sections 34 & 27, Township 9 North, Range 34 West, S.B.B.& M., and continuing in a generally northerly direction beyond the Subject Property.  The general route of said three pipelines is more or less as shown on Exhibit "C-3" attached hereto.

4" Fresh Water Pipeline originating northeast of the Subject Property conveyed herein, traversing in a generally southerly direction and then a generally northwesterly direction within or near the Subject Property in Sections 27, 28 & 29, Township 9 North, Range 34 West, S.B.B.& M. to the Lospe Tank Battery in the NW/4 of Section 29, Township 9 North, Range 34 West, S.B.B.& M.  The general route of said water pipeline is more or less as shown on Exhibit "C-4" attached hereto.

The Casmite Corporation Fresh Water System consisting of the Casmite Water Well, a 4" Fresh Water Pipeline, one 1,000 barrel fresh water tank and all appurtenances thereto, as follows:
Originating at the Casmite Water Well located northwest of the intersection of Highway 1 and Black Road in the NE/4SE/4 of Section 6, Township 9 North, Range 34 West and continuing in a generally southwesterly and southerly direction to the 1,000 barrel fresh water tank located in the N/2NW/4 of Section 18, Township 9 North, Range 34 West, S.B.B.& M. (immediately to the east of the 2,000 barrel fresh water tank conveyed herein as described on Exhibit "B-2" attached hereto and shown on Exhibit "B-" attached hereto), and continuing from said 1,000 barrel fresh water tank in a generally southerly and southwesterly direction to the Casmalia fresh water tank on the east side of Lompoc/Casmalia Road in the NW/4 of Section 25, Township 9 North, Range 35 West, S.B.B.& M.  The general route of said water pipeline and the general locations of said water well and water tank are more or less as shown on Exhibit "C-5" attached hereto.

One Pickled 8" Oil Pipeline originating at the Casmalia Tank Battery in the NE/4NW/4 Section 24, Township 9 North, Range 35 West, S.B.B.& M. and continuing n a generally northeasterly and easterly direction to Unocal's Orcutt Pump Station in the NW/4NW/4 Section 15, Township 9 North, Range 34 West, S.B.B.& M.  The general route of said pickled oil pipeline is more or less as shown on Exhibit "C-6" attached hereto.

Two 4" ~~(inch)~~ Gas ~~Gathering~~ Pipelines, one of which originates at the inlet flange of the meter at the Casmalia Compressor Plant in the S/2S/2 Section 13, Township 9 North, Range 35 West, S.B.B.& M. and continues in a generally southeasterly direction and then northeasterly direction to the inlet flange of the gas meter near the Orcutt Hill Compressor Plant in the NE/4 Section 25, Township 9 North, Range 34 West, S.B.B.& M., as shown on Exhibit "B-4" attached hereto, and one of which originates at the outlet of the gas/oil separator for the Escolle "A" Lease in Section 28, Township 9 North, Range 34 West, S.B.B.& M. and continues in a generally southeasterly direction and then northeasterly direction to the inlet flange of the Escolle meter below the Squires 37 well in the NW/4NW/4 Section 26, Township 9 North, Range 34 West, S.B.B.& M..  The general route of said gas gathering pipelines is more or less as shown on Exhibit "C-7" attached hereto.

One Former Wet Oil 4" Pipeline (to be idled) originating at the outlet of the gas/oil separator for the Escolle "A" Lease in the SE/4 of Section 28, Township 9 North, Range 34 West, S.B.B.& M., and continuing in a generally southeasterly direction and then northeasterly direction to the CalCoast Dehydration Facility in the SW/4 of Section 26, Township 9 North, Range 34 West, S.B.B.& M.  The general route of said pipeline is more or less as shown on Exhibit "C-8" attached hereto.

### Exhibit "C-3"

### Reserved NDPL Pipelines

The following three pipelines located in the SW/4 Section 27, Township 9 North, Range 34 West, S.B.B.& M., as shown below:

8" Newlove Pipeline
6" Lompoc Pipeline
12" Lompoc to Orcutt Pipeline



**Exhibit "C-4"**

**Reserved Fresh**
**Water Pipeline**

urces



**Exhibit "C-5"**



Reserved Casmite
Fresh Water System

UNOCAL

CASMITE
*FRESH WATER
SYSTEM*

| DRN BY R.R. | JULY 15, 1993 |
| APP. BY R.G.S. | SCALE 1"=2000' |

## Exhibit "C-6"

### Reserved Pickled Oil Pipeline



Exhibit "C-7"

Reserved (Wet) Gas Gathering Pipelines



**Exhibit "C-8"**

**Reserved Former Wet Oil 4" Pipeline**



**HIV Cat Canyon, Inc.**

**Right of Ways, Easements, Licenses in Cat Canyon, Santa Maria Valley, Casmalia and Zaca.**

| Title | Parties | Legal Description |
|---|---|---|
| Memorandum of Agreement Date: Jan 11, 2007 Rec NO: 2007-0002772 | Greka Oil and Gas and Dean Teixeira | West 2/3rds of Section15-T9N-R33W of SBB &M |
| Settlement Agreement November 17, 2008 | Greka Oil and Gas and CMT LLC | West 2/3rds of Section15-T9N-R33W of SBB &M |
| Casmite Operating Agreement 10-21-1955 | Union Oil Company of California and The Casmite Operations | Santa Maria Valley |
| Grant of Easement June 4, 1993 Recorded: 6-11-93 Doc No. 93-044821 | Union Oil Company of CA and Unocal California Pipeline Company | T9N, R33W, SBB&M Section 26: W/2 Section 27: E/2 |
| Letter Agreement for Right of Way 11-3-1983 Unrecorded | Union Oil Company of CA and Frederick O. Sherill, Executor of the Estate of Thomas B. Adam II, Frederick O. Sherill and Elizabeth Ann Newark | Adam and Bettiga Lease. |
| 54400 .08 Right of Way 5-20-1957 Unrecorded | Bradley Land Company and Union Oil Company | The Northeast Quarter of the Northeast Quarter (NE¼ NE¼) of Section 6, Township 9 North, Range 33 West, S.B.B.&M.; the northwest Quarter (NW¼); the Southwest Quarter of the Northeast Quarter (SW¼ NE¼); the Northeast Quarter of the Southwest Quarter (NE¼ SW¾); and the Southeast Quarter (SE¼), all in Section 5, Township 9 North, Range 33 West, S.B.B.&M |
| 54648 Road Easement December 24, 1963 Bk 2027 Pg 1186 | Alfred Jacobsen, Dedrun A. Jacobsen and Humble Oil & Refining Company | Strip of land situated in Sec 5, T8N, R32W, SBB&M. |
| 25360 Road Easement Dated 6-12-1963 Recorded 6-14-1963 Book 1996 Page 1141 | Alfred Jacobsen, Dedrun A. Jacobsen Humble Oil & Refining Company | Strip of land situated in Sec 4 and 5, T8N, R32W, SBB&M. |
| Pipeline Right of Way 3-2-1964 Rec: 3-9-1964 | Alfred Jacobsen, Dedrun A. Jacobsen | Strip of land 10 feet in width situated in Section 5, T8N, R32W, S.B.B & M., Santa Barbara County, California |

| Book 2038 Page 1013 | Humble Oil & Refining Company | Section as is shown on the map recorded in Book 24 of Maps at page 31 in the Official Records of Santa Barbara County |
| --- | --- | --- |
| Surface Agreement 1-8-1998 | Janne Azevedo (Jones) and Eddie Pond | Sec 5, T9N, R33W of SBB&M. |
| Right of Way 53807.1 1-28-1937 Unrecorded | Blanche P. Vincent and Union Oil Company | The S/2 of the NE/4 of Section 25 T-10N-R34W and the South/2 of the W/2 of the NW/4 and the S/2 of the W/2 of the W/2 of the E/2 of the NW/4 and the S/2 W/2 of the E/2 of W/2 of the E/2 of the NW/4 of Section 30, T-10N-R33W, SBB&M |
| Right of Way 53807.2 2-25-1937 Unrecorded | Blanche P Vincent and Union Oil Company | The S/2 of the NE/4 of Section 25 T-10N-R34W and the South/2 of the W/2 of the NW/4 and the S/2 of the W/2 of the W/2 of the E/2 of the NW/4 and the S/2 W/2 of the E/2 of W/2 of the E/2 of the NW/4 of Section 30, T-10N-R33W, SBB&M |
| Right of Way 53807.8 Unrecorded | Blanche P. Vincent and Union Oil Company | SE/4 of the NE/4 of Section 25-T10W-R34W, SBB&M. |
| Right of Way Agreement 11-2-2007 | Elks Recreation Inc. and Greka Oil and Gas, Inc | SW/4 of Section 1, T9N-R34W, SBB&M |
| Road Easement Dtd 2-26-1985 Effective 11-15-1984 Unrecorded | William P. Adam and Conoco. Inc. | 25ft access Easement to Portion of Subdivision No. 5 of Rancho Punta de la Laguna per Book W of Deeds at Page 333 in the county of Santa Barbara, State of CA |
| Agreement 8-1-1964 Book 2074 Page 597 | Shell Oil and Standard Company | N/2 of the E/3 of Section 15- T9N-R33W of SBB&M |
| Easement Agreement December 30, 2014 Rec: Doc No. 2015-0021379 | Bognuda Family Trust and HVI Cat Canyon | Portion of Subdivision No. 16 of the Rancho Punta de La Laguna in Santa Barbara County described in Parcel Three in the Trustees Deed Upon Sale recorded February 22, 2002 in Instrument No. 2002-0017393 Official Records of the County |
| Modification Agreement 1-11-1973 Rec 1-19-73 Book 2443 Page 1188 | Bradley Land Company and Texaco | _____ |
| Easement Book 930 Page 369 | Santa Maria Realty Company and | S/2 of the E/2 of Section 10 T-9N-R-33- of SBB&M. |

|  |  |  |
|---|---|---|
|  | Associate Telephone Company |  |
| Right of Way Agreement 9-26-2008 | Manfred and Jean Sanders and Greka Oil and Gas, Inc | E/2 of the NW/4 Section 21, T9N, R33W of SBB&M. |
| Amendment to Conditional Consent June 28, 2002 | Firestone Vineyard, LLC Greka Energy Corporation | A portion of rancho corral de Quati in the County of Santa Barbara, California. |
| License for Road use 9-9-1988 Unrecorded | Berricool and Union Oil Company | Lots 12 to 21 inclusive of the Paderewski Subdivision No. 1, being parts of Subdivisions No's. 8 and 9 of the Punta de Laguna Rancho as shown by map filed in Book 15, Page 26 of Maps, Records of Santa Barbara County |
| License Agreement 9-5-2000 | Nuevo Energy and Greka SMV, Inc | Various locations |
| License Agreement October 14, 2004 | Alexi Realty, Inc and David Kirk et at. | O'Donnell Fee 117-310-002 |
| Grant Deed May 18, 2000 Rec: 5-26-2000 2000-0031967 | Greka SMV, Inc. and Foursquare Church | NE/4 o&N2 SE/4 of T9N, R34W, SBB&M |
| Grant of Pipeline Easement and Agreement 4-4-1996 Rec: 5-7-96 No. 96-028851 | Union Oil Company of California and Saba Petroleum Inc. | Various locations |
| Grant of Pipeline Easement and Agreement 9-25-1995 Rec: 2-1-96 No. 96-006531 | Union Oil Company of California and Saba Petroleum Inc. | Various locations |
| Grant of Easement 8-5-1993 Rec: 7-14-94 No. 96-057642 | Union Oil Company of California and Saba Petroleum Inc. | Section 1 of NE/4 o&N2 SE/4 of T9N, R34W, SBB&M |
| Grant of Easement 2-16-2007 Rec: 2-16-2007 No. 2007-0011713 | Basin Partners LLC and Basin Investments LLC and Greka LLC and Greka, LLC | Section 8, T9N, R33W, SBB&M. |
| Grant of Easement for Location and Maintenance of Facilities Dated: 2-6-2012 Rec: 3-7-2012 No. 2012-0014692 | ERG Operating Company and HVI Cat Canyon | Various locations in Cat Canyon |

| | | |
|---|---|---|
| Grant of Easement<br>2-16-2007<br>2007-0011719 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | The NW/4 of Section 9N-T9N-R33W<br>SBB&M. |
| Grant of Easement<br>2-16-2007<br>2007-0011718 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | THE NW/4 of Section 9N-T9N-<br>R33W SBB&M. |
| Grant of Easement<br>2-16-2007<br>2007-0011717 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | Section 8, T9N-R33W-SBB&M. |
| Grant of Easement<br>2-16-2007<br>2007-0011716 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | The southerly 1,143.15 feet of the<br>westerly 1,143.15 feet of that portion<br>of Section 8 in T9N, R33W, SBB&M |
| Grant of Easement<br>2-16-2007<br>2007-0011715 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | THE NW/4 of Section 9, T9N, R33W<br>SBB&M. |
| Grant of Easement<br>2-16-2007<br>2007-0011714 | Basin Partners LLC and<br>Basin Investments LLC<br>and Greka LLC | The N/2 of the NE/4 Section 9, T9N,<br>R33W, SBB&M. |
| Grant of Easement<br>December 18, 2008<br>Rec: 12-23-2008<br>No.2008-0070666 | Alexi Realty and Greka<br>Oil and Gas, Inc. | Lots Nineteen (19), Twenty (20), and<br>Twenty-one (21), inclusive, of<br>Paderewski Subdivision No. I, in the<br>City of Santa Maria, County of Santa<br>Barbara, State of California,<br>according to the map therefore<br>recorded in Map Book 15, Pages 26<br>and 27, records of Santa Barbara<br>County. |
| Grant of Easement for<br>location and maintenance<br>of Pipelines and Facilities<br>Dated 2-6-2012<br>Rec:3-7-2012<br>No. 2012-0014695 | Williams Holding<br>Company and HVI Cat<br>Canyon, Inc. | Various locations in Cat Canyon |
| Easement Agreement<br>8-18-2014<br>Rec: 10-1-2014<br>No. 2014-0045041 | 2617 Clark Ave. LLC<br>PEDP, Inc<br>Grewal Land Holdings,<br>LLC and<br>Reiter Berry Farms, Inc | Northeast one-quarter of Section 8,<br>Township 9 North, Range 33 West,<br>San Bernardino Meridian, according<br>to the Official Plat thereof, in the<br>County of Santa Barbara and<br>East one-half of Section 8, Township<br>9 North, Range 33 West, San<br>Bernardino Meridian and<br>Northwest Quarter of Section 9<br>Township 9 North, Range 33 West in<br>SBB&M. |
| Easement<br>Dtd:3-19-1965<br>Rec: 3-30-1965<br>Book 2097 Page 1148 | Texaco and Francis<br>Calderon | A strip of land in SE/4 of Section 10,<br>T9N, R33W of SBB&M |

| Grant Deed<br>Dtd:6-12-79<br>Rec: 12-31-1979<br>Doc: 79-60534 | Lakewood Associates and San Clemente Group Development | Lots 1 through 5 inclusive and Lots 8 through 40 Inclusive of Tract 1414, Unit 1 in the County of Santa Barbara. |
|---|---|---|
| Agreement<br>3-15-1965<br>Rec:6-9-65<br>Book: 2108 Page: 121 | Enrico Morganti et al. Standard Oil Company of California | A portion of the Rancho Punta de la Laguna being a strip of land ten feet in width. |
| Consent Agreement<br>2-9-1949<br>Unrecorded | Douglas Oil Company of California and General Petroleum Corporation | SW/4 of Section 22, T9N-R33W, SBB&M. |
| Agreement<br>6-23-1944 | Lloyd Corporation and South Basin Oil Company | The North half of the Northwest quarter and the West two-thirds of the West half of the Northeast quarter and the West two-thirds of the West half of the Southeast quarter of Section Fifteen, Township Nine North, Range Thirty-three West and the W-2/3 of the W/2 of the NE/4 and the N-2/3 of the W/2 of the SE/4 of Sec.15, T.9N-R-33-W of S.B.B.& M. |
| Agreement and Easement<br>2-20-1968<br>Book 2225 Page 707 | Mary Harding Graham, Estate of Rose W. Williams and Dorothy Laine | SE/4 of Section 13 of T9N, R33W of SBBM |
| Adoption Agreement<br>July 5, 2000 | Union Pacific Railroad Company<br>Greka SMV, Inc. | Shuman, CA (Casmalia) |
| Roadway Easement<br>February 7, 1973 | Bradley Land Company and Texaco, Inc. | NW/4 of Section 5, T9N, R33W of SBB&M. |
| Right of Way<br>3-19-1985<br>Rec: No. 87-91173 | Peter Moretti et al/<br>Union Oil Company of California | 10ft wide strip along the easterly boundary of the NW/4 Sec 24, T10N, R34W, SBB&M. |

# **EXHIBIT B**

ASSIGNED CONTRACTS

*See attached.*

**SURFACE LEASES**

| No. | Instrument Title | Field | Lease Name | Address of the Lease Property | Payee | Payee Address |
|---|---|---|---|---|---|---|
| 1 | Exhibit "B" First Amendment to Surface Lease Agreement | Zaca Field | Davis | 5017 Zaca Station Rd., Los Olivos, CA 934 | Grundoon LLC | 620 McMurray Rd. Buellton, CA 93427 |
| 2 | VO-RW-1 Right of Way Agreement  11/10/92 | Santa Maria Valley | Bradley Lands (Section 6 and 31) | 3851 Telephone Rd, Santa Maria, CA 93454<br>3275 Telephone Rd. Santa Maria, CA, 93454<br>3355 Telephone Rd. Santa Maria, CA 93454<br>3515 Telephone Road, Santa Maria, CA 93454<br>3501 Telephone Road, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 3 | VO-RW-6 Right of Way and Roadway Agreement 4/18/94 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 4 | VO-RW-4 Right of Way Agreement 11/23/92 | Santa Maria Valley | Bradley Lands (Section 31) | 3275 Telephone Rd. Santa Maria, CA , 93454<br>3355 Telephone Rd. Santa Maria, CA , 93454<br>3515 Telephone Road, Santa Maria, CA 93454<br>3501 Telephone Road, Santa Maria, CA 93454<br>and No address APN 129-010-013 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 5 | SMVC-6 Amendment to Right of Way  Agreement 2/6/74 | Santa Maria Valley | Bradley Lands (section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454<br>3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 7 | MC-70117 Right Of Way  Agreement 5/1/80 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 8 | CA-40015 Right Of Way Agreement 2/6/74 | Santa Maria Valley | Bradley Lands (Section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454<br>3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 10 | MC-6569 Right Of Way Agreement 7/31/74 | Santa Maria Valley | Bradley Lands (section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 14 | MC-06559 Right of Way Agreement 4/4/73 | Santa Maria Valley | Bradley Lands (Section 6, 31 and 36) | 3851 Telephone Rd, Santa Maria, CA 93454<br>3275 Telephone Rd. Santa Maria, CA 93454<br>3355 Telephone Rd. Santa Maria, CA 93454<br>3515 Telephone Rd., Santa Maria, CA 93454<br>3501 Telephone Rd., Santa Maria, CA 93454<br>1470 Prell Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |

| No. | Instrument Title | Field | Lease Name | Address of the Lease Property | Payee | Payee Address |
|---|---|---|---|---|---|---|
| 15 | MC-6561 Amendment of Right Of Way Agreement 10/15/73 | Santa Maria Valley | Bradley Lands (section 6) | 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 16 | MC-6574-1 Right Of Way Agreement 8/28/75 | Santa Maria Valley | SMV Field (Section 25 and 36) | 1470 Prell Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 17 | MC-06585 Right of Way Agreement 9/1/76 | Santa Maria Valley | Bradley Lands (Section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 18 | MC-6586 Right Of Way Agreement 4/28/76 | Santa Maria Valley | Bradley Lands  (section 6) | 3700 Telephone Rd., Santa Maria, CA 93454 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 19 | SMVC-2A Right Of Way Agreement  2/7/73 | Santa Maria Valley | Bradley Lands (section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 20 | SMVC-2B Right Of Way Agreement  5/20/88 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 21 | SMV 57576 Row Of Way Agreement 6/1/76 | Santa Maria Valley | Bradley Lands (Section 6) | 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 22 | MC-06589 Road Use Agreement 5/22/74 | Santa Maria Valley | Payne 21 (Section 6) | 3851 Telephone Road, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 |
| 23 | VO-RW-3 ROW Agreement dtd 11/23/92 | Santa Maria Valley | Kemp | 3851 Telephone Road, Santa Maria, CA 93454 | Judy A. Rogers | P.O. Box 234 Santa Maria, CA 93456 |
|  |  |  |  |  | Ronald H. Souza | P.O. Box 234 Santa Maria, CA 93456 |
|  |  |  |  |  | Michael J. Souza | P.O. Box 234 Santa Maria, CA 93456 |
| 24 | VO-RW-2 Right Of Way Agreement 11/14/92 | Santa Maria Valley | Kemp | 3851 Telephone Road, Santa Maria, CA 93454 | Garvin Steele | 3501 Telephone Road Santa Maria, CA 93454 |
| 25 | VO-RW-5 Right Of Way Agreement 1/6/94 | Santa Maria Valley | East Valley Farms | 2745 Telephone Rd., Santa Maria, CA 93454 | Roland and Sally Miller | 3028 Sandy Hill Lane Santa Maria, CA 93455 |
| 26 | MC-70033 Right Of Way Agreement 5/1/78 | Clark Ave | Acquistapace | No Physical address- APN- 129-170-033 | Aquistapace Sisters, LLC | 290 Foxenwood Dr. Santa Maria, CA 93455 |
| 27 | MC-70038 Right Of Way Agreement | Clark Ave | Nodlew | 2935 E. Clark Ave., Santa Maria, CA 93454 | Nodlew Inc. | 1646 Premier Court Santa Maria, CA 93454 |
| 28 | MC 66162-Surface Lease-12/11/89 | Cat Canyon | Los Flores | 6151 Dominion Rd., Santa Maria, CA 93454 | E&B Natural Resources | 1600 Norris Rd. Bakersfield, CA, 93308-2234 |
| 29 | MC-6575 Right Of Way Agreement 12/19/91 | Santa Maria valley | Vincent | 1515 Prell Road, Santa Maria, CA 93454 | Donald Vincent | 230 Winchester Canyon Rd. Goleta, CA 93117 |
|  |  |  |  |  | Richard Vincent | 3940 Cuervo Santa Barbara, CA 93110 |
| 30 | MC-70021 Easement and Right Of Way Agreement 12/19/83 | Cat Canyon | Security/Thomas/Lloyd | 5200  Dominion Rd, Santa Maria, CA 93454, | Marianne Friedl | 2053 A Street Santa Maria, CA 93455 |
| 31 | MC70109 Right of Way 3/19/64 | Cat Canyon | Lloyd | 5200  Dominion Rd, Santa Maria, CA 93454, | C.M.T. LLC | 1975 Prell Road Santa Maria, CA 93454 |
| 33 | Letter dated 8/20/43 | Casmalia | Morganti | 5080 Black Rd., Casmalia, CA 93429 | Morganti Ranch, a Limited Partnership | P.O. Box 2075 Orcutt, CA 93455 |
| 34 | Agreement dated 12/29/1965 | Casmalia | Casmalia Field-gas Pipeline under railroad | 5025 Black Rd., Casmalia. CA, 93429 | Railroad Management Company, LLC | P.O. Box 678161 Dallas, TX 75267-8161 |

| No. | Instrument Title | Field | Lease Name | Address of the Lease Property | Payee | Payee Address |
|---|---|---|---|---|---|---|
| 35 | License Agreement dated 9/5/2000 | Santa Maria Valley | Newlove, Folsom, Pinal, Orcut Fee | 4310 Hummel Dr., Orcutt, CA 93455 | Orcutt Fee, LLC | 1555 Orcutt Hill Rd. Orcutt, CA 93455 |
| 36 | License Agreement 9/24/07 | Belridge | McPhail | No Physical Address. APN-68-220-52-00-9 | Aera Energy, LLC | 1000 Ming Ave. Bakersfield, CA 93311 |

**CONTRACTS**

| Counterparty | Field | Service | Primary Contact | Phone | Email | Address |
|---|---|---|---|---|---|---|
| Central Coast Portables | Santa Maria Valley | Portable Rest Rooms | Carlos Gonzales | 805-621-3144 | N/A | 237 Town Center West #203, Santa Maria, CA 93458 |
| Clean Harbors Spill Management Team | Santa Maria Valley | OSPR Spill Response Team | Daniel A. Compton | 661.430.1352 | compton.dan@cleanharbors.com | P.O. Box 9149, 42 Longwater Drive, Norwell, MA 02061-9149 |
| Krummrich Engineering Corporation | Santa Maria Valley/All | Field Management and Engineering, Processing | Paul Codd | 805.444.2985 | pcodd@kecorp.us | 590 Poli Street Ventura, CA 93001 |
| NRC Environmental Services, Inc | Santa Maria Valley | Inland Facilities OSRO Insurance Coverage | Stephanie Barton | 206.730.3993 | sbarton@nrces.com | 3777 Long Beach Blvd, Long Beach, CA 90807 |
| Silvas Oil Company | Santa Maria Valley | Fuel and Lube Oil | Patty Jeschian | 559.233.5171x150 | patty@silvasoil.com | P.O Box 1048, Fresno, CA 93714 |

Exhibit B - Applicable Contracts.XLSX                    3

# **EXHIBIT C**

EXCLUDED ASSETS

None.

## <u>EXHIBIT D</u>

FORM OF SCHEDULES OF ASSIGNED CONTRACTS TO BE ASSUMED

| Contract/Surface Lease | Counterparty | Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

# **EXHIBIT E**

FORM OF DEED, ASSIGNMENT AND BILL OF SALE

*See attached.*

**RECORDING REQUESTED BY AND**
**WHEN RECORDED PLEASE RETURN TO:**

**PLEASE SEND TAX STATEMENTS**
**AND RELATED MATERIALS TO:**

The Same.

_____

*Space above for Recorder's Use Only, Please.*
Special indexing request:  Recorder please index as "Grantor" each of McConnell,
Michael A., as Trustee, HVI Cat Canyon, Inc., and [OTHERS?]

```
DOCUMENTARY TRANSFER TAX (total):
                                  $_____
Including ___ County  @ $_._/$___  $_____
City of _____  @ $_._$_____  $_____

_____ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED

_____ OR COMPUTED ON FULL VALUE LESS LIENS AND
         ENCUMBRANCES REMAINING AT TIME OF SALE

_____
     Signature of Declarant or Agent determining tax.

  Firm Name: _____
```

# QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE

| Affects Assessor's Parcel(s) No.: | See Exhibit A |
|---|---|

THIS QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE (this "Instrument"), [effective as of _____ _, 2020], as of 7:00 a.m. Pacific Standard Time ("Effective Time"), is made by Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc. (the "Grantor"), to Team Maria Joaquin, L.L.C., a Delaware limited liability company ("Team Maria") and Maria Joaquin Basin, L.L.C., a Delaware limited liability corporation ("Maria Joaquin," and collectively with Team Maria, the "Grantee"), pursuant, upon and subject to the terms and provisions of that certain Purchase and Sale Agreement dated _____, 2020, by and between Grantor and Grantee (the "Agreement"), and that certain order [DESCRIBE] authorizing and approving the transaction that is the subject of the Agreement and this Instrument ("Order") reference being made to a fully executed counterpart

original of the Agreement in the hands of each of Grantor and Grantee and to a certified copy of the Order recorded concurrently herewith for further particulars.

## ARTICLE I
### Granting

For Ten Dollars ($10.00) and other good and valuable consideration, the receipt, and sufficiency of which are hereby acknowledged, Grantor does hereby remise, release, quitclaim, transfer, convey, set over, assign and deliver unto Grantee, each of their successors and assigns, as tenants in common each in the percentages set forth opposite each Grantee's name

Team Maria                          _____%

Maria Joaquin                       _____%

effective for all purposes as of the Effective Time and subject to the matters set forth herein, all of Grantor's right, title and interest in and to the following (the "Assets," i.e., (a) through (s), below, excluding however the hereinafter defined and described Excluded Assets):

(a)     the leases (and all leasehold estates created thereby), subleases and oil and gas fee interests, non-leasehold mineral rights, mineral servitudes, working interests, production payments, executive rights, overriding royalties, mineral interests, non-participating mineral interests, net profits interests, net revenue interests, carried interests, options, rights to oil, gas and other hydrocarbons, (including casinghead gas, condensate, sulfur, carbon dioxide and any other minerals extracted from, attributable to or produced in association therewith) ("Hydrocarbons") in place, rights of recoupment, reversionary interests, convertible interests, rights to reassignment, pipeline rights-of-way and other similar rights-of-way and easements, and all other oil and gas interests of any kind or character derived therefrom, whether vested or contingent, whether producing or non-producing, in each case, described in Exhibit A (Grantor's interest in such leases and other interests, the "Leases"), together with all rights, privileges, benefits and powers conferred upon Grantor as the holder of the Leases with respect to the use and occupation of the surface of the lands covered thereby, and together with any and all rights, titles and interests of Grantor in and to any units or pooling arrangements (including statutory forced pooling orders) wherein all or any part of the Leases are pooled or unitized, including the units and pooling arrangements set forth in Exhibit A (Grantor's interest in such units or pools, the "Units"), and including all interests of Grantor derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease;

(b)     all real property described in Exhibit A, together with all buildings and improvements located thereon and rights and interests appurtenant thereto (collectively, the "Owned Real Property");

(c)     each of the Hydrocarbons wells located on or under the Leases or the Units (whether or not completed), including the wells set forth on Exhibit A-1, whether such wells are producing, idle, shut-in or abandoned (Grantor's interest in such wells, the "Wells"), and (ii) each of the fresh water wells, injection wells, salt water disposal wells and other wells of every nature

and kind located on the Leases or Units (the "Operations Wells", and collectively with the Leases, Units, Owned Real Property and Wells, the "Properties", and each individually a "Property");

(d)      all equipment, gathering systems, pipelines, flow lines, water lines, machinery, fixtures, improvements and other real, personal and mixed property, operational or nonoperational that is located on or otherwise used in connection with the Properties or other Assets, including well equipment, casing, tubing, pumps, motors, machinery, rods, tanks, pipes, compressors, meters, separators, heaters, treaters, boilers, fixtures, structures, materials and other items and appurtenances relating to or used in connection with the ownership or operation of the Properties or the other Assets (Grantor's interest in such properties, collectively, the "Personal Property");

(e)      to the extent permitted by Legal Requirements, any permit, license, registration, consent, order, approval, variance, exemption, waiver, franchise, right or other authorization (in each case) of any Governmental Authority (the "Permits") relating to the ownership or operation of the Properties;

(f)      all of the easements, rights-of-way, surface fee interests, surface leases, surface use agreements and other surface usage rights existing as of the Closing Date to the extent used in connection with the ownership or operation of the Properties or other Assets;

(g)      all of the Applicable Contracts, including the contracts set forth on Exhibit B (collectively, the "Assigned Contracts");

(h)      all radio and communication towers, wellhead communication systems and other equipment and automation systems and related telemetry on wells, in each case that are primarily used in connection with the operation of the Properties or the other Assets;

(i)      all offices, warehouses, laydown yards and other similar assets, in each case located on the Properties (including any owned or leased real or personal property relating thereto);

(j)      copies of all books, records and files, reports, Asset tax and accounting records, if any, in each case to the extent relating to the Assets, including:  (i) land and title records (including lease files, division files, Third Party brokerage information, run sheets, mineral ownership reports, abstracts of title, surveys, maps, elections, well files, title opinions and title curative documents); (ii) correspondence with Governmental Authorities; (iii) facility files (including construction records); (iv) well files, proprietary seismic data and information, production records, electric logs, core data, pressure data, and all related matters, (v) all licensed geological, geophysical and seismic data and information which is transferable without payment of any fee to a Third Party; and (vi) environmental, regulatory, accounting and Asset tax records; but excluding any of the foregoing items to the extent comprising or otherwise attributable to the Excluded Assets (the foregoing, subject to such exclusion, the "Records"), provided Grantor shall retain the original Records in case such Records are necessary for litigation purposes;

(k)      all Hydrocarbons produced from or allocated to the Properties on and after the Effective Time, as well as all Hydrocarbons in storage or pipeline as of the Effective Time,

excluding approximately 10,000 barrels of oil stored in the Las Palmas Project located near Bakersfield, California (the "Excluded Inventory");

(l)    Grantor's (i) reserve studies, estimates and evaluations, estimates and valuations of assets or unliquidated liabilities, pilot studies, engineering, production, financial or economic studies, reports or forecasts, and any and all similar forward-looking economic, evaluative, or financial information relating to the Assets, and (ii) licensed geological, geophysical or seismic data relating to the Assets, to the extent, in each case, such data or information is transferable and which such transfer does not require the payment of a Third Party fee (unless Grantee agrees in writing to pay such fee);

(m)    except to the extent included in the Excluded Assets, all of Grantor's proprietary computer software, patents, trade secrets, copyrights, and other intellectual property, in each case relating to the Assets, provided the Trustee's access shall not be limited during the Bankruptcy Case or any action arising from the Bankruptcy Case;

(n)    except to the extent included in the Excluded Assets, all insurance policies relating to the Assets and all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and interests of Grantor under any policy or agreement of insurance of Grantor to the extent such rights, claims or causes of action relate to the Assets from and after the Effective Time or any of the Assumed Obligations);

(o)    except for the Retained Proceeds, all trade credits, and all other proceeds, income or revenues attributable to the Assets, whether attributable to the period prior to, at or after the Effective Time;

(p)    except to the extent included in the Excluded Assets, all claims, causes of action, manufacturers' and contractors' warranties and other rights of Grantor arising under or with respect to any Assets, whether attributable to the period prior to, at or after the Effective Time;

(q)    except to the extent included in the Excluded Assets, all rights and interests of Grantor relating to the Assets (i) under any policy or agreement of insurance or (except to the extent related to any Assumed Obligations) indemnity, or (ii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of property;

(r)    all audit rights arising under any of the Assigned Contracts with respect to the Assets, whether attributable to the period prior to, at or after the Effective Time; and

(s)    any vehicles and other rolling stock owned by Grantor and used with respect to any of the Assets.

NOTWITHSTANDING THE FOREGOING, the Assets shall not include, and there is excepted, reserved and excluded from this Instrument and its effect (collectively, the "Excluded Assets"):

(a)    all documents and instruments and other data or information of Grantor that may be protected by an attorney-client privilege (other than title opinions, environmental reports or evaluations, and any documents and instruments that relate to or cover Assumed Obligations);

(b)    all documents and instruments and other data or information that cannot be disclosed to Grantee as a result of confidentiality arrangements under agreements with Third Parties (provided that Grantor shall use commercially reasonable efforts to obtain waivers of any such confidentiality arrangements or permit Grantee to execute a joinder agreement with respect thereto, without any obligation to incur any out-of-pocket cost or expense or provide any other consideration);

(c)    all claims and causes of action related to (i) Chapter 5 of the Bankruptcy Code, (ii) any commercial tort claims, (iii) claim objections with respect to scheduled or filed claims in the Bankruptcy Case, or (iv) any claims and causes of action against any director or officer of the Debtor, any Insider or Affiliate or any director or officer of an Insider or Affiliate;

(d)    all information and data of Grantor which is not transferable or which a transfer requires the payment of a Third Party fee (unless Grantee agrees in writing to pay such fee);

(e)    documents prepared or received by Grantor with respect to (i) lists of prospective purchasers for such transactions compiled by Grantor, (ii) bids submitted by other prospective purchasers of the Assets or any other interest in the Assets, (iii) analyses by Grantor of any bids submitted by any prospective purchaser, (iv) correspondence between or among Grantor or its or their respective representatives, and any prospective purchaser other than Grantee, and (v) correspondence between Grantor or any of their respective representatives with respect to any of the bids, the prospective purchasers or the transactions contemplated in this Agreement;

(f)    all of the Grantor's corporate minute books and corporate tax or financial records that relate to Grantor's business generally (without specific reference to the ownership and operation of the Assets); Grantor's name, trade names and logos or any ownership interests in Grantor;

(g)    all security deposits, letters of credit, performance bonds or sureties;

(h)    the properties specifically identified on Exhibit C;

(i)    all cash and bank accounts of the bankruptcy estate as of the Effective Time;

(j)    all master services agreements;

(k)    all Applicable Contracts (other than the Assigned Contracts), including that certain Credit Agreement dated as of November 8, 2018, by and between the Trustee and UBS AG, Stamford Branch (such contracts or agreements other than the Assigned Contracts, the "Excluded Contracts"), and all rights thereunder;

(l)    all engagements and similar letters and agreements with the Grantor's legal advisors, it being agreed that Grantee shall have no right to claim, own or waive any attorney-

client or similar privilege in favor of the Grantor  with respect to the ownership or operation of the Assets;

(m)      all trade credits, all accounts receivable, if any, and all other proceeds, income or revenues attributable to the Assets at or prior to the Effective Time (the "Retained Proceeds");

(n)      Grantor's share of all tax refunds or reductions as provided in Section 3.01(b) of the Agreement;

(o)      books, records and files that relate solely to any Excluded Assets;

(p)      all Hydrocarbons, real property, leases, equipment or other assets or property of whatever type or character relating or, constituting or used in connection with Grantee's property located in Orange County, California and commonly known as the REDU Oil Field;

(q)      the Excluded Inventory;

(r)      the Purchase Price; and

(s)      all insurance policies listed on Schedule 2.02(r) of the Agreement.

TO HAVE AND TO HOLD the Assets, together with all and singular the rights, privileges, contracts and appurtenances, in any way appertaining or belonging thereto, unto Grantee, its successors and assigns, forever, subject to the matters set forth herein.

## ARTICLE II
## Disclaimers

(a)      (i) Grantor makes no representations or warranties, express, statutory or implied, and (ii) Grantor expressly disclaims all liability and responsibility for any representation, warranty, statement or information made or communicated (orally or in writing) to Grantee (including any opinion, information, projection or advice that may have been provided to Grantee by any employee, representative, or agent of Grantor), and Grantee acknowledges that it has not relied on any such representation, warranty statement or information.

(b)      Grantor expressly disclaims, and Grantee acknowledges that it has not relied upon, any representation or warranty, express, statutory or implied by any employee, representative, or agent of Grantor, as to (i) title to any of the Assets, (ii) the contents, character or nature of any report of any petroleum engineering consultant, or any engineering, geological or seismic data or interpretation, relating to the Assets, (iii) the quantity, quality or recoverability of hydrocarbons in or from the Assets, (iv) any estimates of the value of the Assets or future revenues generated by the Assets, (v) the production of hydrocarbons from the Assets, (vi) the maintenance, repair, condition, quality, suitability, design or marketability of the Assets, (vii) the content, character or nature of any information memorandum, reports, brochures, charts or statements prepared by or on behalf of Grantor or Third Parties with respect to the Assets, (viii) any other materials or information that may have been made available to Grantee or any Grantee representative in connection with the transactions contemplated by the Agreement or any discussion or presentation relating thereto, and (ix) any implied or express warranty of freedom

from patent or trademark infringement.  Grantor further disclaims, and Grantee acknowledges that it has not relied upon, any representation or warranty, express, statutory or implied, of merchantability, freedom from latent vices or defects, fitness for a particular purpose or conformity to models or samples of materials of any Assets, rights of a Grantee under appropriate statutes to claim diminution of consideration or return of the consideration, it being expressly understood and agreed by the parties that, Grantee shall be deemed to be acquiring the Assets in their present status, condition and state of repair, "as is" and "where is" with all faults or defects (known or unknown, latent, discoverable or undiscoverable), and that Grantee will make or cause to be made such inspections as Grantee deems appropriate.

(c )    Grantor has not and will not make any representation or warranty regarding any matter or circumstance relating to environmental laws, the release of hazardous materials or other materials into the environment or the protection of human health, safety, natural resources or the environment, or any other environmental condition of the Assets, and nothing in the Agreement or otherwise shall be construed as such a representation or warranty, and Grantee acknowledges that it has not relied upon any such representation or warranty, and Grantee shall be deemed to be acquiring the Assets "as is" and "where is" with all faults for purposes of their environmental condition and that Grantee will make or cause to be made such environmental inspections as Grantee deems appropriate.

(d)    Without in any way qualifying the provisions of the foregoing subsections of this Article II, no warranty, representation, statement or information made or communicated by or on behalf of Grantor has been made or communicated for the benefit of any successor or assignee of Grantee or of any other Third Party.

(e)    Grantor and Grantee agree that, to the extent required by applicable law to be effective, the disclaimers of certain warranties contained in this Instrument are "conspicuous" disclaimers for the purposes of any applicable law, rule or order.

**Initials of Grantee: _____**

## ARTICLE III
### Miscellaneous

Section 3.01    <u>Construction</u>.  The captions in this Instrument are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Instrument. Grantor and Grantee acknowledge that they have participated jointly in the negotiation and drafting of this Instrument and as such they agree that if an ambiguity or question of intent or interpretation arises hereunder, this Instrument shall not be construed more strictly against one party than another on the grounds of authorship.

Section 3.02    <u>No Third Party Beneficiaries</u>.  Except only insofar as expressly provided in Section 3.03, nothing in this Instrument shall provide any benefit to any Third Party or entitle any Third Party to any claim, cause of action, remedy or right of any kind, it being the intent of the parties hereto that this Instrument shall otherwise not be construed as a Third Party beneficiary contract.

Section 3.03      Assignment.  Subject to the limitations provided in Article II above, this Instrument shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 3.04      Agreement.  If there is a conflict between this Instrument and the Agreement, the Agreement shall control.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

Section 3.05      Governing Law.  This Instrument, other documents delivered pursuant hereto and the legal relations between the parties hereto shall be governed and construed in accordance with the laws of the State of California, without giving effect to principles of conflicts of laws that would result in the application of the laws of another jurisdiction.

Section 3.06      Counterpart Execution.  This Instrument may be executed in any number of counterparts, and each counterpart hereof shall be effective as to each party that executes the same whether or not all of such parties execute the same counterpart. If counterparts of this Instrument are executed, the signature pages from various counterparts may be combined into one composite instrument for all purposes. All counterparts together shall constitute only one Instrument, but each counterpart shall be considered an original.

Section 3.07      Recording.  To facilitate the recording or filing of this Instrument, the counterpart to be recorded in a given county may contain only that portion of the exhibits that describes Assets located in that county.  In addition to filing this Instrument, the parties hereto shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the conveyance contemplated hereby. Said instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument. The interests conveyed by such separate assignments are the same, and not in addition to the Assets conveyed herein.

Section 3.08      Production Payment.  This Instrument is made subject to that certain Production Payment Conveyance executed contemporaneously with this Instrument and placed of record immediately after this Instrument.

[*Signature Pages to Follow*]

IN WITNESS of which, this Instrument is executed by the parties on the date of their respective acknowledgments below, but shall be effective for all purposes as of the Effective Time.

**GRANTOR:**

Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc.

_____

STATE OF TEXAS          §
                        §
COUNTY OF _____ §

On this ____ day of _____, 2020 before me, _____, Notary Public, personally appeared _____, personally known to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

_____
Notary Public, State of Texas

**GRANTEE**:

Team Maria Joaquin, L.L.C.

By: _____
Name:
Title:


Maria Joaquin Basin, L.L.C.

By: _____
Name:
Title:


STATE OF TEXAS            §
                          §
COUNTY OF _____     §

   On this ___ day of _____, 2020 before me, _____, Notary Public, personally appeared _____, personally known to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


                          _____
                          Notary Public, State of Texas



STATE OF TEXAS            §
                          §
COUNTY OF _____     §

   On this ___ day of _____, 2020 before me, _____, Notary Public, personally appeared _____, personally known to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.


                          _____
                          Notary Public, State of Texas


1604321.1  26932

## EXHIBIT A TO QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE

### Legal Description

[To come.]

## EXHIBIT A-1 TO QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE

## Wells

[To come.]

**EXHIBIT B TO QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE**

**Assigned Contracts**

[To come.]

**EXHIBIT C TO QUITCLAIM DEED, ASSIGNMENT AND BILL OF SALE**

**Excluded Assets**

[To come.]

# **EXHIBIT F**

FORM OF PRODUCTION PAYMENT CONVEYANCE

*See attached.*

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

[INFO FOR COUNSEL TO GRANTEE TO
BE INSERTED]

Space Above This Line for Recorder's Use Only

PRODUCTION PAYMENT CONVEYANCE

FROM

TEAM MARIA JOAQUIN, L.L.C. and MARIA JOAQUIN BASIN, L.L.C.

TO

MICHAEL A. MCCONNELL,

solely in his capacity as Chapter 11 Trustee for

HVI CAT CANYON, INC.

Dated

August [__], 2020

## PRODUCTION PAYMENT CONVEYANCE

THIS PRODUCTION PAYMENT CONVEYANCE (this "Conveyance"), dated as of the date set out at the end hereof, is made from and by Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability company (herein collectively called "Grantor"), to and in favor of Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation (herein called "Grantee"), the debtor in the Bankruptcy Case No. 9:19-bk-11573-MB (the "Bankruptcy Case") in the U.S. Bankruptcy Court for the Central District of California, Santa Barbara Division (the "Bankruptcy Court").

## ARTICLE I

Section 1.1    Defined Terms.    When used in this Conveyance or in any exhibit or schedule hereto (unless otherwise defined in any such exhibit or schedule), the following terms have the respective meanings assigned to them in this section or in the sections, subsections, exhibits and schedules referred to below:

"Affiliate" means, with respect to any Person:  (a) any other Person directly or indirectly owning, controlling or holding with power to vote 10% or more of the outstanding voting securities of such Person, (b) any other Person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by such Person, and (c) any other Person directly or indirectly controlling, controlled by or under common control with such Person.

"Agreed Rate" means a variable rate of interest equal at any time to the Prime Rate, plus ten percent (10%), calculated on the basis of actual days elapsed and a year of 360 days.

"Application Date" means the next-to-last Business Day of each calendar month, starting with [September 29], 2020[1].  As used herein with respect to any Application Period, the "related Application Date" means the Application Date that occurs approximately one month after the end of such Application Period.  For example, if an Application Period ends at 7:00 a.m., California time, on March 1 and the next-to-last Business Day of such March is March 30, the related Application Date is such March 30.

"Application Period" means a period of time beginning at 7:00 a.m., California time, on the first day of any calendar month and ending at 7:00 a.m., California time, on the first day of the next succeeding calendar month.  The first Application Period will begin at the Initial Time and will end at 7:00 a.m., California time, on [September] 1, 2020[2].  As used herein with respect to any Application Date, the "related Application Period" means the Application Period immediately preceding (but not including) such Application Date.  For example, if an Application Date occurs on February 27, the related Application Period is the one which ended at 7:00 a.m., California time, on the preceding February 1.

---

[1] **Note**: Next to last day of the month following the first production month under the Conveyance.

[2] **Note**: First day of the month immediately following the first production month under this Conveyance.

520089.000049 23823611.16

"Barrel" means 42 United States standard gallons at 60 degrees Fahrenheit.  Unless expressly provided otherwise herein, all references herein to a quantity or amount of Oil are expressed and measured in Barrels.

"Business Day" means a day that is not a Saturday, a Sunday, a legal holiday in Los Angeles, California.

"Cash Collateral Account" has the meaning given to such term in Section 2.12(a).

"Dedication Percentage" means, for each calendar month comprising an Application Period, the percentage calculated as (a) the quotient of (i) the Grantee Share for such month, *divided by* (ii) the Monthly Average for such month, *multiplied by* (b) 100.

"Deed of Trust" means that certain Deed of Trust, Mortgage, Assignment, Security Agreement, Fixture Filing and Financing Statement dated August __, 2020 from Buyer to First American Title Insurance Company, as trustee, and Seller.

"Delivery Charges" means the actual costs, if any, incurred by or on behalf of Grantor for separating, gathering, compressing, treating, or processing PP Hydrocarbons prior to a Delivery Point or of transporting PP Hydrocarbons to a Delivery Point and storing PP Hydrocarbons at the Delivery Point (or elsewhere) prior to delivery in a condition satisfactory to meet pipeline specifications and qualifications at such Delivery Point.  For clarity, the term "Delivery Charges" includes all costs and expenses arising from or included in Delivery Services.

"Delivery Point" means (a) as of the Initial Time, for each field within the Subject Interests, the connections at which Oil is delivered into the receiving pipeline or the tanks from which the receiving transporter collects Oil, or (b) such other delivery point or points in the vicinity of such field hereafter from time to time designated by Grantee at which Oil from the Subject Interests in such field is (or reasonably could be, without any additional capital expenditures) sold to a third party or delivered into a pipeline for transportation to a market point.  Unless otherwise agreed by Grantor, any designation by Grantee of a new Delivery Point shall become effective one month after the first day of the next succeeding Application Period.

"Delivery Services" has the meaning given such term in Section 2.5.

"Direct Taxes" means all ad valorem, property, gathering, transportation, pipeline regulating, gross receipts, severance, production, excise, heating content, carbon, value, value added, environmental, occupation, franchise, sales, use, fuel, and other taxes and governmental charges and assessments imposed on or as a result of all or any part of the Subject Interests, the Hydrocarbons produced from Subject Interests or the proceeds thereof, the Production Payment, or the PP Hydrocarbons or the proceeds thereof, regardless of the point at which or the manner in which such taxes, charges or assessments are charged, collected, levied or otherwise imposed.  The only taxes which are not Direct Taxes are federal income taxes, state income taxes, and franchise taxes levied against Grantee and any other taxes levied against the overall net income of Grantee (including interest, penalties and withholding obligations owing to governmental authorities with respect to such income or franchise taxes).  Interest, penalties and withholding obligations owing to governmental authorities with respect to any Direct Taxes shall constitute "Direct Taxes".

"Force Majeure" means (a) unavoidable interruption of Delivery Services caused by catastrophic circumstances (such as freezing of wells or lines of pipe) or (b) unavoidable or sudden mechanical difficulties relating to performance of the Delivery Services; provided that Grantor shall not be authorized as a reason for nonperformance, in part or in full, of the Delivery Services, to claim an event of Force Majeure to the extent and beginning 24 hours after such time as Grantee has designated a new Delivery Point or Delivery Points that allow Grantor the ability to perform or cause to be performed the Delivery Services despite the event of Force Majeure.

"Gas" means natural gas and all other gaseous hydrocarbons, including casinghead gas, whether or not such natural gas and other gaseous hydrocarbons are processed.

"Grantee" means the Person named in the preamble to this Conveyance as the Grantee, and, unless the context in which used shall otherwise require, such term shall also include any successor to such Person as owner at the time in question of any or all of the Production Payment.

"Grantee Share" means, for each calendar month comprising an Application Period, a dollar amount per Barrel of Oil produced from the Subject Interests equal to the sum of the following amounts for each Pricing Interval referenced in the table below, determined based on the Monthly Average for such calendar month: (a) the Pricing Interval Percentage for such Pricing Interval *multiplied by* (b) a dollar amount equal to that portion of the Monthly Average for such month which falls within the upper and lower boundaries, as applicable, of such Pricing Interval.

| Pricing Interval | Monthly Average | Pricing Interval Percentage |
|---|---|---|
| N/A | < $35.00 per Barrel | 0% |
| I | ≥ $35.00 per Barrel but < $40.00 per Barrel | 50% |
| II | ≥ $40.00 per Barrel but < $45.00 per Barrel | 40% |
| III | ≥ $45.00 per Barrel but < $50.00 per Barrel | 30% |
| IV | ≥ $50.00 per Barrel but < $60.00 per Barrel | 20% |
| N/A | ≥ $60.00 per Barrel | 0% |

For the sake of clarity, if the Monthly Average for the calendar month comprising an Application Period is $63.00 per Barrel, the Grantee Share for such Application Period shall be $8.00, calculated as follows:

(a)    $0.00 for the value less than $35.00

(b)    $2.50 for the 50% of the value between $35.00 and $40.00

3

(c)    $2.00 for the 40% of the value between $40.00 and $45.00

(d)    $1.50 for the 30% of the value between $45.00 and $50.00

(e)    $2.00 for the 20% of the value between $50.00 and $60.00

(f)    $0.00 for the value in excess of $60.00

"<u>Grantor</u>" means the Person named in the preamble of this Conveyance as Grantor, and, unless the context in which used shall otherwise require, such term means any successor-owner at the time in question of any or all of the Subject Interests (other than the Production Payment).

"<u>Grewal Entities</u>" includes Randeep Grewal, California Asphalt Production, Inc., GIT, Inc., GTL1, LLC, GLR, LLC, GRL, LLC, GSR, LLC, any Person in which Randeep Grewal owns, directly or indirectly, an interest equal or to greater than ten percent (10%), and any insider or Affiliate of any of the foregoing.

"<u>Hydrocarbons</u>" means Oil and Gas.

"<u>Imbalance Charges</u>" has the meaning given such term in Section 2.6(d).

"<u>Initial Time</u>" means 7:00 a.m., California time, on [August 1, 2020].[3]

"<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

"<u>Lease Measuring Point</u>" means, with respect to any particular Subject Well, the point at which the volume of Oil included in PP Hydrocarbons produced from such Subject Well is initially measured.

"<u>Monthly Average</u>" means, for each calendar month comprising an Application Period, the average monthly West Texas Intermediate (WTI) crude oil spot price at Cushing, Oklahoma for such month, as published by the U.S. Energy Information Agency (EIA), or any successor to such publishing agency.  As of the date of this Conveyance, such pricing information is available on the website of the EIA at: https://www.eia.gov/dnav/pet/pet_pri_spt_s1_m.htm.

"<u>NRI Percentage</u>" means, with respect to each portion of Subject Lands described on Exhibit A, the percentage shown on Exhibit A as the "Net Revenue Interest" for such portion of Subject Lands.  For the avoidance of doubt, the NRI Percentage includes the Dedication Percentage.

"<u>Oil</u>" means crude oil, condensate, and other liquid hydrocarbons, specifically to include condensate or other liquid hydrocarbons separated at the surface (e.g., using conventional separators) but not to include the products of processing.

---

[3] **Note**:  To be the effective date of the conveyance of the Subject Interests from Grantee to Grantor.

4

"Oil Sales Agreement" means the Oil Sales Agreement of even date herewith between Grantor, as buyer, and Grantee, as seller.

"Permitted Assigns" has the meaning given such term in Section 4.2.

"Person" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization or joint venture, court or governmental unit or any agency or subdivision thereof, or any other legally recognizable entity.

"PP Hydrocarbons" means the Dedication Percentage of the NRI Percentage of all Oil in and under and that may be produced from (or, to the extent pooled or unitized, allocated to) any Subject Lands between the Initial Time and the Termination Time.

"PP Proceeds" means, for any particular Application Period, the total dollar amount received or to be received by Grantee during or (to the extent not previously applied) prior to such Application Period from sales of PP Hydrocarbons, determined after deduction of all PP Severance Taxes (whether paid before or after receipt by Grantee).

"PP Severance Taxes" means all severance taxes actually attributable to the PP Hydrocarbons, taking into account any applicable credits, rebates and other factors.

"Primary Sum" means the sum of $[11,750,000][4], and at any time the "unliquidated balance of the Primary Sum" shall be the Primary Sum, less the aggregate amount of PP Proceeds which have been applied thereto at or before such time pursuant to clause (ii) of Section 2.3.

"Prime Rate" means, as of any date of determination, that certain rate quoted in the Wall Street Journal as the U.S. "prime rate" on such date (or, if not quoted on such date, on the preceding date on which it is so quoted).  The parties recognize that such rate may not be the most favorable rate available to borrowers from any relevant institution.

"Production Payment" means the term overriding royalty which is granted herein to Grantee, and all other rights, titles, interests, estates, remedies, powers and privileges appurtenant or incident to such term overriding royalty, whether hereunder, under the Purchase Agreement, by operation of law, or otherwise.

"Purchase Agreement" means the Purchase and Sale Agreement of even date herewith between Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation, as seller, and Grantor, as buyer, with respect to Grantor's purchase of the Subject Interests, as from time to time amended or supplemented.

"Purchasing Subsidiary" means any Subsidiary of Grantor that, with the consent of Grantee, hereafter assumes the obligations of Grantor under the Sales Agreement.

---

[4] **Note**:  Amount to be confirmed after adjustments based on the final calculated taxes owed to Santa Barbara and Kern Counties.

520089.000049 23823611.16

"Retained Interests" means the interests retained by Grantor in the Subject Interests after conveyance of the Production Payment hereunder.

"Subject Hydrocarbons" means that portion of the Oil in and under and that may be produced from (or, to the extent pooled or unitized, allocated to) Subject Lands which is attributable (after deducting all royalties, overriding royalties, production payments and similar burdens, excluding only the Production Payment, which both burden the Subject Interests at the Initial Time and are reflected in the Net Revenue Interest figures set out on Exhibit A) to the Subject Interests.

"Subject Interests" means:

(a)    All of the leasehold interests and other property interests described in Exhibit A attached hereto; and

(b)    Without limitation of the foregoing, all other right, title and interest (of whatever kind or character, whether legal or equitable and whether vested or contingent) of Grantor in and to the oil, gas and other minerals in and under or that may be produced from Subject Lands (including interests in oil, gas or mineral leases to the extent the same cover such lands, overriding royalties, production payments and net profits interests in such lands or such leases, and fee mineral interests, fee royalty interests and other interests in such oil, gas and other minerals) even though Grantor's interest in such oil, gas and other minerals may be incorrectly described in, or omitted from, Exhibit A; and

(c)    All rights, titles and interests of Grantor in and to, or otherwise derived from, all presently existing and valid oil, gas or mineral unitization, pooling, or communitization agreements, declarations or orders and in and to the properties covered and the units created thereby (including all units formed under orders, rules, regulations, or other official acts of any federal, state, or other authority having jurisdiction, voluntary unitization agreements, designations or declarations, and so-called "working interest units" created under operating agreements or otherwise) relating to the properties described in subsections (a) or (b) above in this definition.

"Subject Lands" means the lands and depths described in Exhibit A (where no depth limit is specified, Subject Lands shall include all depths).

"Subject Wells" means all wells now located on the Subject Lands (whether fully drilled and completed or not) or hereafter drilled on the Subject Lands, and (unless production therefrom is expressly excluded by the terms of the descriptions on Exhibit A) any other wells now or hereafter located on lands or leases pooled, communitized or unitized with the Subject Interests.

"Termination Time" has the meaning assigned to it in Section 2.9.

"Total Sum" has the meaning assigned to it in Section 2.2.

Section 1.2    Rules of Construction.    All references in this Conveyance to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Conveyance unless expressly provided otherwise.  Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part

6

of such subdivisions and shall be disregarded in construing the language contained in such subdivisions. The words "this Conveyance", "this instrument", "herein", "hereof", "hereunder" and words of similar import refer to this Conveyance as a whole and not to any particular subdivision unless expressly so limited. Unless the context otherwise requires: "including" and its grammatical variations mean "including without limitation"; "or" is not exclusive; words in the singular form shall be construed to include the plural and vice versa; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time amended or supplemented; and references herein to any Person include such Person's successors and assigns. All references in this Conveyance to exhibits and schedules refer to exhibits and schedules to this Conveyance unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes.

## ARTICLE II

Section 2.1    <u>Conveyance</u>.  Grantor does hereby REMISE, RELEASE, QUITCLAIM, CONVEY, ASSIGN, TRANSFER, SET OVER AND DELIVER unto Grantee, as a production payment, a term overriding royalty interest carved out of and burdening the Subject Interests equal to and measured by all PP Hydrocarbons in and under and that may be produced from (or, to the extent pooled or unitized, allocated to) the Subject Lands, with such production payment to terminate as of the Termination Time.

TO HAVE AND TO HOLD the Production Payment unto Grantee, its successors and Permitted Assigns, until the Termination Time.

Section 2.2    <u>Amount and Term</u>.  The Production Payment shall continue and remain in full force and effect until the receipt and realization by Grantee of the aggregate sum of the amounts specified in the following subsections of this Section 2.2 (herein collectively called the "<u>Total Sum</u>"):

(a)    the full amount of the Primary Sum; plus

(b)    interest on the cumulative amount of any PP Proceeds not paid by Grantor to Grantee as and when required by this Conveyance or the Oil Sales Agreement (as defined below), which unpaid amount shall accrue interest at the lesser of the Agreed Rate and the highest rate permitted by law, from and including the date such payment becomes due and payable to but not including the date paid to Grantee.

It is understood and agreed that the Primary Sum may only be paid from the proceeds of the NRI Percentage of the Oil produced from (or, to the extent pooled or unitized, allocated to) the various Subject Lands, Subject Interests and Subject Wells from time to time, and not from any other source.

Section 2.3    <u>Application of PP Proceeds</u>.  On each Application Date, all PP Proceeds that have actually been received by Grantee (whether from the purchasers of PP Hydrocarbons or from Grantor as provided in Section 2.10) in immediately available funds prior to 2:00 p.m., California time, on such Application Date, shall, to the extent not previously applied, be applied as follows to the Total Sum:

7

(i)  <u>First</u>, to the amounts described in subsection (b) of Section 2.2; and

(ii)  <u>Second</u>, to the reduction of the unliquidated balance of the Primary Sum.

If PP Proceeds applied on any Application Date are insufficient to cover the full amounts specified in the foregoing clause (i), then such unrecovered amounts shall continue to accrue interest as provided in Section 2.2(b).

Section 2.4    <u>Non-Cost-Bearing Interest</u>.  The Production Payment shall be free and clear of, and Grantee shall not be charged or responsible for, (a) all Direct Taxes, other than PP Severance Taxes, (b) all costs and expenses associated with acquiring, exploring, developing, maintaining, producing, operating, reworking, recompleting, and remediating the Subject Interests, (c) all Delivery Charges and (d) any other royalties, overriding royalties or similar charges or burdens that are payable under or with respect to the Subject Lands, Subject Interests, Subject Wells or the Hydrocarbons produced therefrom.  All Direct Taxes (other than PP Severance Taxes), all such other costs and expenses, and all Delivery Charges shall be borne by the Retained Interests and paid by Grantor promptly, on or before the dates the same become due and owing.

Section 2.5    <u>Delivery Services</u>.

(a)  <u>Expected Deliveries</u>.  To the extent not prevented by Force Majeure, Grantor shall deliver, or cause to be delivered, all PP Hydrocarbons at the points at which the Grantor delivers Oil from the same Subject Interests into third party pipelines or to third party transporters or, if requested by Grantee, at one or more other points of sale reasonably convenient to both Grantor and Grantee.  All tasks required to make such delivery (whether gathering, treating, separating, compressing, processing, transporting, storing, loading or otherwise) are herein called the "<u>Delivery Services</u>".  All Delivery Services, whether performed by Grantor or by any other Person, shall be performed without any cost or charge to Grantee or as a lien or charge against the PP Hydrocarbons, whether incurred or assessed by Grantor or any other Person, and all costs so incurred or assessed shall be borne and paid by Grantor as provided in Section 2.4.  The Delivery Services shall be provided to Grantee on a first priority basis, to the extent permitted by law and applicable contracts (meaning, for example, that (A) pipeline and compressor capacity, if owned or controlled by Grantor or any Affiliate of Grantor, shall be afforded to Subject Hydrocarbons prior to affording any such capacity to Grantor, any Affiliates of Grantor or any other Person with respect to any other Hydrocarbons, and (B) pipeline and compressor capacity owned or controlled by any Person other than Grantor or any Affiliate of Grantor shall be afforded to Subject Hydrocarbons prior to affording any such capacity to Grantor or any Affiliate of Grantor with respect to any other Hydrocarbons), and Grantor hereby expressly subordinates any capacity rights it may now or hereafter have to the PP Hydrocarbons.  Grantor shall, to the extent permitted by law and applicable contracts, take whatever action is appropriate to cause any Affiliate of Grantor or any other Person to afford Subject Hydrocarbons the priority capacity described in this subsection (a), including assigning to Grantee, upon Grantee's request following failure by Grantor to provide Delivery Services as required hereunder, any capacity rights Grantor may have under assignable contracts or other arrangements with an Affiliate or any other Person as may be necessary or useful to facilitate delivery of PP Hydrocarbons to each Delivery Point in a condition satisfactory to meet or exceed pipeline specifications or qualifications at such Delivery Point.

8

(b)    Excess Deliveries.  If at any time Grantor delivers to Grantee PP Hydrocarbons in excess of the amount of PP Hydrocarbons required to be delivered to Grantee hereunder, the amount of such excess delivery shall not be returned by Grantee but shall instead be deemed an early delivery by Grantor of future PP Hydrocarbons and shall be considered as fully and finally delivered to Grantee for all purposes hereunder on the date received by Grantee; provided that if any Hydrocarbons are delivered hereunder to Grantee following the termination hereof the proceeds of such Hydrocarbons shall be paid to Grantor.

Section 2.6    Marketing of PP Hydrocarbons.

(a)    Marketing by Grantee.  Except as otherwise provided in Section 2.6(c), Grantee shall take possession of all of the PP Hydrocarbons at the applicable Delivery Points when delivered into third party pipelines, loaded onto third party transporters' vehicles or otherwise sold to a third party at the applicable Delivery Point.  Grantee shall market and sell such PP Hydrocarbons for its own account.  Grantor shall take such actions (including executing all division orders, transfer orders, instructions in lieu thereof and other additional instruments) as are necessary or appropriate to achieve such results, and Grantor will cooperate with Grantee in instructing all purchasers of such PP Hydrocarbons to pay the proceeds thereof directly to Grantee and shall execute such additional instruments (including division orders, transfer orders and instructions in lieu thereof) as may be requested by Grantee or such third party purchasers in connection therewith.  If payment for any PP Hydrocarbons is nonetheless made to Grantor for any reason, all amounts so paid to Grantor shall be held in trust by Grantor for Grantee and Grantor shall immediately pay over such proceeds, in the form received, to Grantee (but without recourse to Grantor on any proper endorsement by Grantor to Grantee).  Grantor shall not enter into any contracts or other arrangements for the sale, transportation, gathering, processing, storage or other marketing of Subject Hydrocarbons which would interfere with Grantee's rights under this Section 2.6 to take possession of and market the PP Hydrocarbons, free and clear of such contracts or other arrangements.

(b)    Cooperation and Assistance. Grantee and Grantor will each be taking quantities of Hydrocarbons from the Subject Interests, and Grantor and Grantee recognize that coordination between Grantee and Grantor will be required with respect thereto.  Grantor agrees to cooperate with, and assist, Grantee in connection with Grantee's receipt and sale of PP Hydrocarbons. Without limitation of the foregoing:

(i)    Not less than ten (10) days prior to the first day of each Application Period, Grantor will notify Grantee and/or its authorized representatives or direct purchasers, in writing, of the total amounts and average daily amounts of Oil which Grantor expects to be produced from the Subject Interests during such Application Period and the portion thereof which Grantor projects will be PP Hydrocarbons.

(ii)    To the extent reasonably practicable, Grantor shall thereafter promptly (but in no event more than once weekly) notify Grantee and/or its authorized representatives or direct purchasers, in writing, of any change in the rate of delivery of PP Hydrocarbons from the Subject Interests that has come to the attention of Grantor.

9

(iii) Grantor and Grantee will cooperate to ensure that nominations to transporters and purchasers are timely made and that such nominations reflect expected deliveries from the various Subject Interests, and Grantee and its authorized representatives shall be entitled to rely upon Grantor's projections for the purpose of scheduling deliveries with transporters and purchasers.  Except as provided in the Oil Sales Agreement, in no event shall Grantor be responsible for the failure, through no fault of Grantor, of such transporters or purchasers to fulfill their obligations under the relevant arrangements.

Should Grantee so request in writing, Grantor will furnish the information provided for above and will make nominations and schedule deliveries in conjunction with Grantee and on behalf of Grantee (and make any revisions to such nominations and reschedule deliveries in conjunction with Grantee) for PP Hydrocarbons (in the form and at the times required by such Persons), directly to the Persons purchasing or transporting PP Hydrocarbons for Grantee. Grantee may at any time rescind any such authorization provided to Grantor by delivering written notice of such rescission to Grantor, and unless otherwise agreed by Grantor, such rescission shall become effective one month after the first day of the next succeeding Application Period.

(c)     Marketing by Grantor pursuant to Sales Agreement.  Notwithstanding the foregoing provisions of this Section 2.6, Grantor and Grantee acknowledge to each other that concurrently herewith Grantee and Grantor are entering into the Oil Sales Agreement, under which Grantor is Grantee's purchaser of PP Hydrocarbons, and that to the extent Grantor (or any future Purchasing Subsidiary of Grantor) is the purchaser of PP Hydrocarbons pursuant to the Oil Sales Agreement, there is no need for Grantor to furnish the information described in Section 2.6(b) (but only so long as the purchasers under the Oil Sales Agreement are directly providing such information to Grantee at the times required by this Conveyance, otherwise Grantor shall be required to furnish such information as required herein) and make or revise nominations to itself (or such Purchasing Subsidiary).  The expiration or termination of the Oil Sales Agreement for any reason shall not affect any Party's rights or obligations under this Conveyance, all of which shall remain in full force and effect on the terms provided herein.

(d)     Responsibility.  If, after the Oil Sales Agreement has expired or terminated for any reason, any charges, costs, penalties or expenses are incurred or payable to any Person solely as a result of Grantee's failure to adjust nominations or scheduled deliveries in accordance with (i) a notification from Grantor to Grantee of any increase or decrease in quantities to be delivered from any Subject Well, or (ii) a notification from Grantee's direct purchaser of any increase or decrease in quantities to be delivered at Delivery Points, where it was reasonably possible for Grantee to make such adjustment without penalty, then, as between the parties hereto, Grantee shall be liable for and shall hold Grantor harmless from any such charges, costs, penalties or expenses.  If any such charges, costs, penalties or expenses (the "Imbalance Charges") are incurred or payable to any Person other than in the circumstances provided for in the preceding sentence (including charges, costs, penalties or expenses caused by failure to deliver projected quantities or failure to provide notice of changes in deliveries, or charges, costs, penalties or expenses incurred when Grantor is making nominations, or revisions to nominations, on behalf of Grantee, as provided for in the last sentence of Section 2.6(b)), then, as between the parties hereto, Grantor shall be liable for and shall indemnify and hold Grantee harmless for such Imbalance Charges.  Each of Grantor and Grantee shall promptly notify the other of any notice received by it from any third party which

10

indicates that an imbalance in deliveries exists or is occurring that may give rise to any such Imbalance Charges.

Section 2.7    Measurement: Hydrocarbons Lost or Used.  As used in this Conveyance, the term "Hydrocarbons" shall not include Oil or Gas produced from any particular Subject Well which are unavoidably lost in the production thereof or in the compression or transportation thereof prior to the Lease Measuring Point for such Subject Well, or which are used by Grantor or the operator of any Subject Well for the production of Subject Hydrocarbons or for the compression or transportation of Subject Hydrocarbons prior to the Lease Measuring Point for such Subject Well, in each case only to the extent the same are lost or used in the course of operations which are being conducted prudently and in a good and workmanlike manner and in accordance with good oil field practices.

Section 2.8    No Proportionate Reduction. It is understood and agreed that, though the Production Payment is conveyed by Grantor to Grantee out of the Subject Interests, the Production Payment shall be equal to the full Dedication Percentage in effect from time to time of the NRI Percentage of the Oil produced from (or, to the extent pooled or unitized, allocated to) the various Subject Lands and shall not be reduced for any reason.  Among other things, the Production Payment and the PP Hydrocarbons shall not be reduced due to (a) the undivided interest owned by Grantor in a lease constituting any Subject Interests being less than the entire interest in such lease, or (b) the interest in Oil underlying any portion of the Subject Lands which is covered by a particular lease (or group of leases) being less than the entire interest in the Oil  underlying such portion of the Subject Lands, or (c) the share of production from (or, to the extent pooled or unitized, allocated to) any portion of Subject Lands which is attributable to the Subject Interests being less than the NRI Percentage set forth on Exhibit A for such portion of the Subject Lands, or (d) Grantor's failure to own, or otherwise have good title to, all or any part of the Subject Interests as described on Exhibit A.

Section 2.9    Termination. The Production Payment shall remain in full force and effect until the time (herein called the "Termination Time") when the full aggregate amount of the Total Sum has been received by Grantee as provided herein. At the Termination Time, all rights, titles and interests herein conveyed in and to any Hydrocarbons thereafter produced shall automatically terminate and vest in Grantor, and, upon request by Grantor, Grantee shall execute and deliver such instrument or instruments (in proper recordable form, if applicable) as may be necessary to evidence such termination of the Production Payment; provided that, notwithstanding the foregoing or anything herein to the contrary, any and all obligations which any Person may have to indemnify or reimburse Grantee or its Affiliates for any reason, or to make payments to Grantee or its Affiliates on account of PP Hydrocarbons produced before the Termination Time, shall survive any termination of the Production Payment.  No pipeline company or other Person purchasing, taking, or processing PP Hydrocarbons shall ever be required to take notice of, or keep informed concerning, the termination of the Production Payment, until actual receipt of written notice from Grantee confirming that such termination has occurred, which Grantee agrees to deliver with reasonable promptness upon request of Grantor.  This Section 2.9 shall survive termination of this Conveyance.

Section 2.10    Payment Mechanics.  All PP Proceeds received by Grantor (instead of directly by Grantee) in any Application Period shall be paid by Grantor to Grantee, prior to 2:00pm,

California time, on the related Application Date (or if received after such date then shall be paid to Grantee within ten (10) days of Grantor's receipt of such funds). No PP Proceeds (whether paid by Grantor or any other Person) shall be deemed received by Grantee or applied to the Production Payment until such PP Proceeds have been so received by Grantee's bank or collection agent in immediately available funds for the account of Grantee. Grantor will make each payment which it owes under this Conveyance (except for payments made pursuant to Section 2.6(a), which shall be made as provided therein) in immediately available funds received at or before 2:00pm, California time, on the date specified for the payment thereof. All such payments by Grantor shall be made by wire transfer of immediately available funds to an account designated by Grantee. Grantee shall furnish specific written payment instructions to Grantor to make such payments and Grantor shall make all payments as so instructed until notified in writing of a change in the payment instructions.

Section 2.11    Deed of Trust. Grantor's obligations under this Conveyance are secured by the Deed of Trust.

Section 2.12    Cash Collateral Account.

(a)    Grantor shall cause to be established and maintained a cash collateral account (the "Cash Collateral Account") at a bank designated by Grantor and reasonably agreed to by Grantee. On or about each Application Date, Grantor shall deposit into the Cash Collateral Account an amount equal to the greater of (x) Twenty Thousand Dollars ($20,000), not to exceed gross revenues of the Subject Hydrocarbons produced from the Subject Lands, Subject Interests and Subject Wells, and (y) fifty percent (50%) of the NRI Percentage of all net proceeds of Subject Hydrocarbons produced from the Subject Lands, Subject Interests and Subject Wells, until the funds in the Cash Collateral Account equal at least One Million Dollars ($1,000,000). For purposes of the calculation of clause (y) above, the 50% of the NRI Percentage shall be net of (i) payment to Grantee of all PP Proceeds, (ii) all severance taxes attributable to the Subject Hydrocarbons and (iii) reasonable actual operating expenses attributable to the Subject Lands, Subject Interests and Subject Wells. So long as the funds in the Cash Collateral Account are equal to or greater than One Million Dollars ($1,000,000), Grantor shall not be required to deposit any additional funds into such account, and Grantor may from time to time withdraw any amounts on deposit in such account in excess of One Million Dollars ($1,000,000). Notwithstanding anything to the contrary in this Section 2.12(a), once the Primary Sum is reduced below [Five Million Eight Hundred Seventy-Five Thousand Dollars ($5,875,000)][5], the parties shall from time to time give joint instructions to the bank that maintains the Cash Collateral Account permitting further withdrawals from and/or directing disposition to Grantor of amounts on deposit in the Cash Collateral Account such that the amount remaining in the Cash Collateral Account after giving effect to such joint instructions is not less than the greater of (x) ten percent (10%) of the then-remaining value of the Primary Sum and (y) Five Hundred Thousand Dollars ($500,000). The obligation to fund the Cash Collateral Account shall not require direct deposit of payments by purchasers of production, but shall be funded by Grantor on a monthly basis as described above.

---

[5] **Note:** Amount to be finalized as 50% of the Primary Sum on the closing date, after giving effect to final adjustments pursuant to Section 3.08(b)(4) of the PSA.

12

(b)      Each month, Grantor shall provide Grantee with a report reasonably demonstrating the amount deposited into the Cash Collateral Account for such month pursuant to Section 2.12(a) and the calculation of such deposited amount.

(c)      Prior to the Auction, Grantor and Grantee shall agree upon forms of a security agreement and account control agreement, each relating to the Cash Collateral Account reasonably agreeable to both and such documents shall be delivered at the Closing.

## ARTICLE III

Section 3.1      <u>Operations</u>.  As between Grantee and Grantor, Grantor shall have exclusive charge, management and control of all operations to be conducted on the Subject Interests.  Grantor shall take or cause to be taken any and all actions that a prudent operator would deem necessary in the operation, maintenance and management thereof and in the production, handling, treating, storage and transportation of Hydrocarbons produced therefrom and shall otherwise act in accordance with good oil field practices; in doing the foregoing Grantor shall not take into account the diminution in Grantor's share of production from the Subject Interests caused by the granting of the Production Payment and Grantor shall make its economic decisions as if Grantor owned the full interest in the Subject Interests undiminished by the Production Payment.

Section 3.2      <u>Renewals and Extensions and New Leases</u>.  This Conveyance and the Production Payment shall apply to all renewals, extensions, modifications, ratifications, reinstatements and other similar arrangements of the leases (or other determinable interests) which are included in the Subject Interests, whether such renewals, extensions, modifications, ratifications, reinstatements or other similar arrangements have heretofore been obtained by Grantor or its predecessors or are hereafter obtained by or for Grantor or its predecessors or any Affiliate thereof and whether or not the same are described in Exhibit A.

Section 3.3      <u>Adverse Claims</u>.  Grantor will, promptly after discovery of such claim or demand, cause written notice to be given to Grantee of every adverse claim or demand overtly threatened in writing by any Person affecting the Subject Interests or the Hydrocarbons produced therefrom in any manner whatsoever, or of any proceedings instituted or threatened in writing with respect thereto; and Grantor at its sole cost will cause all necessary and proper steps to be diligently taken to protect and defend the Subject Interests and such Hydrocarbons against any such adverse claim or demand.

Section 3.4      <u>Government Regulation</u>.  The obligations of Grantor hereunder shall be subject to all applicable federal, state and local laws, rules, regulations and orders (including those of any applicable agency, board, official or commission having jurisdiction).  Grantor shall timely make all material filings with all applicable agencies, boards, officials and commissions having jurisdiction with respect to the Subject Interests or the operation thereof prior to or at the time any such filing becomes due.  Should any statute, or any rules or regulations of any governmental body, or any provisions in private contracts (including those limiting the size of overriding royalties and similar interests but excluding any contracts directly entered into by Grantee) become applicable to the Subject Interests so as to limit the portion of the Hydrocarbons produced from the lands covered by a particular Subject Interest which may be attributable to the Production Payment, the Production Payment shall, as to such Subject Interest and for the period of time during which such

13

statute, rule, regulation or contractual provision is applicable, be limited to the maximum amount of production from such lands which can be attributed to the Production Payment under such statute, rule, regulation or contractual provision.

Section 3.5    Pooling and Unitization. Certain of the Subject Interests may have been pooled or unitized for the production of Hydrocarbons prior to the date hereof, and may, after the date hereof, be pooled or unitized (a) pursuant to any law, rule, regulation or order of any governmental body or official, or (b) voluntarily by Grantor with written notice thereof to Grantee. To the extent certain Subject Interests are so pooled or unitized, such Subject Interests are and shall be subject to the terms and provisions of such pooling and unitization agreements or orders but in no event shall the rights of Grantee with respect to timing and calculation of payments under this Conveyance be modified or impacted thereby.

Section 3.6    Audit. Grantor shall keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to Grantor's obligations under this Conveyance. Grantee shall have the right at all reasonable hours to examine or have examined and copy the records of Grantor to the extent reasonably necessary to verify the accuracy of any quantity of Oil produced or delivered, or the amount of the Total Sum or any other amounts owed to Grantee hereunder, or of any payment made or statement furnished hereunder. If a sum or quantity of Oil are determined to have been overstated or understated by Grantor, the parties shall within thirty (30) days thereafter make such adjustment payment or refund as is applicable. Grantee shall hold any information so obtained in confidence, provided that disclosure thereof shall be permitted: (a) to any of Grantee's Affiliates, investors, officers and employees (provided that such Persons are made aware that such information is required to be held in confidence), (b) to Grantee's auditors, counsel, and other professional advisors (provided that such Persons are made aware that such information is required to be held in confidence), (c) in the course of any arbitration, trial or other legal proceeding between Grantor and Grantee or any of their Affiliates, (d) as required by any applicable securities law or other law (including any subpoena, interrogatory, or other similar requirement for such information to be disclosed), and (e) in connection with any assignment or potential assignment of Grantee's rights hereunder which is or would be permitted under Section 4.2 (provided that each such assignee or potential assignee is made aware that such information is required to be held in confidence).

Section 3.7    Monthly Reporting. On or before each Application Date, Grantor shall furnish to Grantee, a report, in form and substance acceptable to Grantee setting forth (and including relevant calculations) (i) the amount of the Capital Commitment (as defined below) expended as of such Application Date and the items or work that was paid for by such expenditures, (ii) Grantor's calculation of the PP Hydrocarbons allocated to Grantee hereunder in respect of the related Application Period, (iii) to the extent, if any, the Grantor is then marketing the PP Hydrocarbons pursuant to the Oil Sales Agreement, the amount of PP Proceeds paid to Grantee hereunder in respect of the related Application Period, (iv) any deductions or withholdings from such PP Proceeds, and (v) any other matters reasonably requested by Grantee.

Section 3.8    Capital Commitment. Grantor agrees to make capital improvements in and to the Subject Interests, Subject Lands and/or Subject Wells to maintain and boost production by December 31, 2023 in the aggregate amount of not less than $5,000,000.00 (the "Capital Commitment").

14

## ARTICLE IV

Section 4.1    Assignments by Grantor.

(a)    Grantor shall not sell all or any part of the Subject Interests without Grantee's prior written consent, not to be unreasonably withheld, conditioned or delayed.

(b)    Subject to clause (a), whenever Grantor has, and intends to take, the opportunity to sell all or any part of the Subject Interests, Grantor shall insure that Grantee has, and shall cause Grantee to have, the option to sell only that portion of the Production Payment that burdens the Subject Interests to be sold by Grantor ("Sold Production Payment") as a part of such transaction and on terms and conditions as favorable as that available to Grantor.  In exercising such option, Grantee may elect to convey the Sold Production Payment to Grantor (for further sale on to the purchaser) or to sell the Sold Production Payment directly to the purchaser of the Subject Interests (the form of any such documentation shall be mutually acceptable to Grantor, Grantee and the proposed purchaser).  Grantor shall give Grantee at least forty-five (45) days' prior written notice of any such potential sale (or of any material modification in the terms of any sale of which such a notice was previously given).  Grantee has no obligation to participate in any such transaction or otherwise to sell all or any part of the Production Payment, in which case this Conveyance shall be unaffected by such transaction and shall continue to be in full force and effect on all the terms hereof and continue to be binding on Grantor and any transferee of Grantor.  If Grantee does participate in any such transaction, then regardless of any purchase price allocations made by the purchaser in such sale to the Sold Production Payment and the sold Subject Interests, Grantor and Grantee shall divide between themselves the aggregate purchase price received by both, net of costs of sale and any transaction taxes (other than income taxes, which shall be the separate obligations of Grantor and Grantee). If Grantor and Grantee cannot agree on a division of the aggregate purchase price to be received within thirty (30) days of Grantor's notice to Grantee of the intended sale, Grantor and Grantee will jointly engage a neutral third-party valuation expert acceptable to both Grantor and Grantee to make such determination within thirty (30) days (if the sale must close prior to the date such valuation is determined then the proceeds payable to Grantor or Grantee from such sale (net of costs of sale required to be paid by Grantor or Grantee) shall be held in escrow until the final determination of such valuation).  The valuation expert's final determination shall be binding on both Grantor and Grantee.  For the avoidance of doubt, the Production Payment shall run with the land, and any unpaid portion of the Production Payment following a sale by Grantor of any Subject Interest shall remain with such Subject Interest following the transfer and be binding on any transferee.

(c)    Grantor shall not assign, transfer, grant a royalty in, or interest of any kind, direct or indirect in any Subject Interest (and shall obtain from any transferee its written agreement not to assign, transfer, grant a royalty in, or interest of any kind, direct or indirect in any Subject Interest) to a Grewal Entity.

Section 4.2    Assignments by Grantee.  Grantee's interest in the Production Payment may not be sold, transferred, assigned or conveyed except in compliance with this Section.  Grantee and each Permitted Assign (as hereinafter defined) shall have the right to assign or convey its interest in the Production Payment, in whole or in part (and either absolutely or by mortgage or other security instrument), at any time; provided that no change of ownership or right to receive

payment of the Production Payment or of any part thereof, however accomplished, shall be effective or binding upon Grantor until notice thereof shall have been delivered to Grantor by the transferor and by the transferee (which transferee must make to Grantor the representations and warranties set forth in Section 6.01 through Section 6.03 of the Purchase Agreement, *mutatis mutandis*), and then only with respect to payments made after receipt of such notice. Any Person to whom all or any interest in the Production Payment is assigned or conveyed in accordance with the foregoing requirements is herein called a "Permitted Assign". Grantor shall keep records of all Permitted Assigns, their respective interests in the Production Payment, and their addresses, and shall give notice thereof to the other Persons, if any, from time to time holding the interests of Grantee hereunder. If the interests of Grantee under this Conveyance are ever owned by more than one Person, all Persons owning interests hereunder shall designate one Person as their agent to deliver and receive all communications (including consents) and exercise the discretion of Grantee hereunder on their behalf.

Section 4.3    Estoppel. Grantor, at any time and from time to time, within ten (10) days after written request from Grantee, shall execute, acknowledge, and deliver to Grantee, addressed to Grantee and any prospective purchaser, or mortgagee or beneficiary of any rights of Grantee hereunder, an estoppel certificate in form and substance reasonably designated by Grantee. It is intended that any such certificate may be relied upon by Grantee and any prospective purchaser, investor, or mortgagee or deed of trust beneficiary of all or any part of Grantee's rights hereunder. It is acknowledged and agreed that neither Grantor nor any manager, member, officer, or director of Grantor shall have any personal liability for any inaccuracy or misrepresentation set forth is said estoppel certificate; provided, however, that Grantor shall be estopped from denying the truth of any statements made by Grantor therein.

Section 4.4    Binding Effect. All the covenants and agreements of the respective parties herein contained shall be deemed to be covenants running with the Subject Interests and the lands covered thereby or included therein. All of the provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

## ARTICLE V

Section 5.1    "As is" and "Where is" Conveyance. The conveyance of the Production Payment hereunder is made on an "as is" and "where is" basis, with no warranty or representations whatsoever.

## ARTICLE VI

Section 6.1    CHOICE OF LAW; VENUE. THIS CONVEYANCE SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF THAT WOULD CAUSE ANOTHER STATE'S LAW TO APPLY) AND THE LAWS OF THE UNITED STATES OF AMERICA. DURING PENDENCY OF THE BANKRUPTCY CASE, EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING REGARDING THIS CONVEYANCE SHALL BE THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DECLINES JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN LOS ANGELES, CALIFORNIA. EACH PARTY HEREBY CONSENTS TO SUCH JURISDICTION.

Section 6.2     Intentions of the Parties.  Nothing herein contained shall be construed to constitute either party hereto (under state law or for tax purposes) in partnership with the other party.  In addition, the parties hereto intend that the Production Payment shall at all times be treated (and all provisions of this Conveyance shall be construed and treated accordingly):  (a) as a production payment (i.e., a term overriding royalty) and an interest in real property under the laws of each state in which Subject Interests are located; and (b) for federal income tax purposes only, as a production payment retained by Grantee on the sale of the Subject Interests to Grantor under the Purchase Agreement which is treated as a purchase money mortgage loan (and not a "royalty" or other "economic interest" in Hydrocarbons) within the meaning of Internal Revenue Code Section 636(b) and the applicable Treasury regulations and judicial authority relating thereto.

Section 6.3     Ownership of Equipment.  The Production Payment does not include any right, title or interest in and to any of the personal property, fixtures, structures or equipment now or hereafter placed on, or used in connection with, the Subject Interests, and the interest herein conveyed to Grantee is exclusively a production payment (i.e., a term overriding royalty).

Section 6.4     Further Assurances.  Grantor agrees to execute and deliver to Grantee all such other and additional instruments, notices, division orders, transfer orders and other documents and to do all such other and further acts and things as may be necessary to more fully and effectively grant, convey and assign to Grantee the rights, titles, interest and estates conveyed to Grantee hereby or intended to be so conveyed.

Section 6.5     Partition.  Grantor and Grantee acknowledge that neither has any right or interest that would permit it to partition any portion of the Subject Interests as against the other, and each waives any such right.

Section 6.6     Notices and Addresses.  All notices and other communications required or permitted under this Conveyance shall be in writing and, unless otherwise specifically provided, shall be delivered personally or by telecopier or by registered or certified mail, postage prepaid, or by delivery service with proof of delivery, at the respective addresses shown below, and shall be deemed delivered on the date of receipt.  Either party may specify as its proper address any other street address within the continental limits of the United States by giving notice to the other party, in the manner provided in this Section, at least fifteen (15) days prior to the effective date of such change of address.

Grantor's address:

    Team Maria Joaquin, L.L.C. and
    Maria Joaquin Basin, L.L.C.
    c/o Scott Nonhof
    16202 Butera Road
    Magnolia, TX 77355
    Email: scott.nonhof@teamoperating.com

with a copy to (which shall not constitute notice):

    Thompson & Knight, LLP

17

c/o Richard B. Hemingway
811 Main Street, Suite 2500
Houston, TX 77002
Email: Richard.Hemingway@tklaw.com

with a copy to (which shall not constitute notice):

Thompson & Knight, LLP
c/o Tye C. Hancock
811 Main Street, Suite 2500
Houston, TX 77002
Email: Tye.Hancock@tklaw.com

Grantee's address:

Michael A. McConnell
201 Main Street, Suite 2500
Fort Worth, Texas 76102
E-mail: michael.mcconnell@kellyhart.com

with a copy to (which shall not constitute notice):

Danning, Gill, Israel & Krasnoff, LLP
c/o Eric P. Israel
1901 Avenue of the Stars, Suite 450
Los Angeles, CA 90067-6006
E-mail: eisrael@danninggill.com

with a copy to (which shall not constitute notice):

O'Melveny & Myers LLP
c/o Evan M. Jones
400 S. Hope Street, 18th Floor
Los Angeles, CA 90071
Email: ejones@omm.com

Section 6.7    Consents, Waivers, Supplements and Amendments. No consent, waiver, supplement or amendment given by Grantee in connection with this Conveyance or the Production Payment shall be valid or effective unless given be in writing and signed by Grantee.

Section 6.8    Counterparts. This Conveyance is being executed in multiple counterparts, all of which are identical, except that, to facilitate recordation, in certain counterparts hereof only those portions of Exhibit A which contain descriptions of properties located in the recording jurisdiction in which the particular counterpart is to be recorded are included.  All of such counterparts shall constitute one and the same instrument. Complete copies of this Conveyance containing the entirety of Exhibit A, and all schedules hereto, have been retained by Grantor and Grantee.

18

Section 6.9    <u>Joint and Several Liability</u>.  Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability company, shall be jointly and severally liable for full performance by Grantor of, and all obligations of Grantor under, this Agreement; provided, that it is understood and agreed that the Primary Sum may only be paid from the proceeds of the NRI Percentage of the Oil produced from (or, to the extent pooled or unitized, allocated to) the various Subject Lands, Subject Interests and Subject Wells from time to time, and not from any other source; provided further that the foregoing limitation does not limit Grantee's ability to collect funds from Grantor for PP Proceeds that have not been paid to Grantee by Grantor as and when due under the terms of this Conveyance or the Oil Sales Agreement.

*[Remainder of page intentionally left blank.]*

520089.000049 23823611.16

380

This Conveyance is executed by Grantor on the dates set forth in the respective acknowledgements below, and is made effective as to runs of Oil as of the Initial Time.

TEAM MARIA JOAQUIN, L.L.C.

By: _____

Name:

Title:

STATE OF TEXAS            §
                          §
COUNTY OF _____      §

The foregoing instrument was acknowledged before me on this _____ day of August, 2020, by _____ as _____ of Team Maria Joaquin, L.L.C., a Delaware limited liability company, on behalf of such limited liability company.

_____

Notary Public, State of Texas

LIST OF EXHIBITS AND SCHEDULES

Exhibit A - Property descriptions

*[Signatures continue on following page]*

MARIA JOAQUIN BASIN, L.L.C.

By: _____

Name:

Title:

STATE OF TEXAS            §
                         §
COUNTY OF _____     §

     The foregoing instrument was acknowledged before me on this _____ day of August, 2020, by _____ as _____ of Maria Joaquin Basin, L.L.C., a Delaware limited liability company, on behalf of such limited liability company.

_____

Notary Public, State of Texas

EXHIBIT A TO PRODUCTION PAYMENT CONVEYANCE

LEGAL DESCRIPTION

## North Belridge Field

### McPhail:

Grant deed dated April 9, 1964 by and between West American Oil Company as grantor and Union Oil Company as grantee, recorded April 29, 1964 in Volume 3720 at Page 78 of the Official Records of Kern County covering all of the oil, gas and other hydrocarbon substances underlying and which may be produced from the North half of the Northwest Quarter of the Southwest Quarter of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter of the Northwest Quarter, the West half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter, the North half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter and the Southeast Quarter of the Southeast Quarter of the Northwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M., Kern County, California, lying above a depth which is 120 feet below the stratigraphic equivalent of the vertical depth of 658 feet below the surface of the ground as such vertical depth appeared in the McPhail Well No. 6-7.

### Gibson

Oil and gas lease dated December 14, 1915 by and between George Gibson, as lessor and Union Oil Company as lessee recorded on April 28, 1916 in Book 29 at Page 17 of the Official Records of Kern County, California covering the North half of the North half of the Southeast Quarter and the North half of the Northeast Quarter of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969 , recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County, California dated July 1, 1949, recorded November 3, 1949 in Book 1598 at Page 323 of Official Records.

### O'Donnell:

Oil and gas lease dated October 2, 1915 by and between T. A. O'Donnell, et al., as lessor and Union Oil Company as lessee, recorded on February 18, 1917 in Book 29 at Page 208 of the Official Records of Kern County, California covering the South half of the Southeast Quarter, the South half of the North half of the Southeast Quarter and the South half of the North half of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the "Temblor Zone", per Partial Assignment of Oil and Gas Lease from Union Oil Company to Belridge Oil Company dated May 27, 1953, recorded June 17, 1953 in Book 2093 at Page 250 of Official Records; and the effects of a prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969, recorded November 7, 1969 in Book

1

4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County.

## Casmalia Field:

### Arellanes

SUBJECT ACREAGE: Portion of Punta de la Laguna Ranch, located in Section 13 of Township 9 North, Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West, of SBB&M, containing 381 acres, more or less, in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil & Gas Lease, dated August 16, 1930, by and between Charles T. Arellanes et al, as Lessor, and 0. C. Field, as Lessee, recorded at Book 220, Page 421, of official records of Santa Barbara county, California, as amended.

2. That certain Oil and Gas Lease dated April 18, 1945 by and between Edward Bonetti et al, as Lessor, and Fullerton Oil Company as Lessee, and recorded in Volume 649, Page 176 of Records of Santa Barbara County, California as amended.

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASES INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; All LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

AGREEMENTS:

1. Agreement dated March 30, 1961 by and between T. R. Bonetti, et al and Union Oil Company Commingling Agreement unrecorded

2. Quitclaim Deed dated October 27, 1960 from Union Oil to the Lessors of record, recorded in Book 1843, Page 296, Santa Barbara County, CA. (surface rights to 500')

3. Partial Quitclaim Deed dated July 18, 1985, recorded as Document No. 039770, Santa Barbara County, CA (certain mining rights and minerals to 1,500')

### Escolle/Lospe

SUBJECT ACREAGE: All of those certain lands located in Santa Barbara County, State of California. described as follows:

2

384

## Parcel 1

Commencing at the northeast comer of the Escolle property being the terminous of the eighth course in the lands described in Oil and Gas Lease dated January 7. 1980 between Escolle Tenants-in- Common, as Lessor. and Union Oil Company of California. as Lessee. a Memorandum of which was recorded May 29. 1980 in Book 80. Page 21450. Official Records of Santa Barbara County. California. from which comer No. 13 of Rancho Todos Santos. marked T.S. No. 13. bears North Westerly 64.00 chains to a point on the section line between Sections 21 and 28. T9N-R43W. S.B.B. & M. thence west 25.51 chains to a station: thence north, 35.28 chains to said Comer No. 13, thence from said point of commencement, north 89° 17'4" west, 2770.0 feet to the true point of beginning; thence from said true point of beginning the following courses and distances:. west 1591.4 feet; south 710.5 feet: west 414.9 feet; south 829.0 feet: east 658.2 feet: 1278.9 feet: south 654.8 feet: to a point on the southerly line of Block Il of said Escolle Lease: thence East along said south line 805.8 feet: thence North. 2093.0 feet: thence west 736.7 feet North. 728.2 feet to the true point of beginning and containing 120 acres. more or less.

## Parcel II

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13. from which a live oak 15 inches in diameter bears south 37°west. 6.30 chains distant: thence along the north line of said Rancho north 83°03' west. 103.25 chains to a station: thence south 77.98 chains to a station: thence east 70.40 chains to the true point of beginning from which the one-quarter section comers between Sections 28 and 29. T9N-R34W. S.B.B. & M. bears south 8.70 chains distance: thence from said true point of beginning the following crouses and distances: north 718.2 feet: west 646.6 feet: North 900.4 feet: west 8840 feet: south 1106 feet: east 299.6 feet: south. 512.4 feet to a point on the southerly line of Block I of said Escolle Lease: thence east along said south line 1231. 1 feet to the true point of beginning and containing 40 acres, more or less.

## Parcel III

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13 from which a live oak 15 inches in diameter bears south 37°west. 6.30 distant: thence along the north line of said Rancho north 83°43' west. 103.25 chains to a station: thence south 77.96 chains to a station; thence east 70.40 chains to a station from which the¼ Section comers between 28 and 29, T9N, R34W, S.B.B & M. bears South 8.70 chains distant: thence South 176.8 feet to a point on the east line of Block II of said Escolle Lease and the true point of beginning; thence continuing south through said ¼ section comers and along said east line 934.0 feet; thence east 934.0 feet; thence north 934.0 feet; thence west 934.0 feet to the true point of beginning and containing 20 acres.

## SUBJECT LEASES:

1.      Oil and Gas Lease dated September 25, 1947 by and between Escolle Estate Company, as Lessor, and Union Oil Company, as Lessee, and recorded in Volume 736, Page 290 of Official Records of Santa Barbara County, California. as amended.

3

2.     Oil and Gas Lease dated January 7, 1980 by and between Escolle Tenants in Common. Lessors, and Union Oil Company, as Lessee, a memorandum of which was recorded as Document # 80-21450 of Official Records of Santa Barbara County. California, as amended.

## Morganti

SUBJECT PROPERTY: A part of Rancho Punta de la Laguna, Santa Barbara County California, Commencing at a point on the easterly line of the Southern Pacific Railway on the property line between Juan B. Arellanes Estate on the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a distance of 4325.1 feet to a 2" brass cap pipe monument; thence N. 83 18'W. along the South line of Punta de la Laguna Rancho a distance of 2641.3 feet to a 2" pipe set by S.P. Co. surveyors; thence continuing N. 83 18'W. along the South line of said Rancho 1700 feet. more or less, to the intersection of the Easterly right-of-way line of the Southern Pacific Railroad; thence Northerly along the Easterly right-of-way of the Southern Pacific Railroad to the point of commencement, excepting therefrom a 6.89 acre tract of land conveyed to the Associated Oil Company, and containing a net area of 491 acres, more or less.

SUBJECT LEASE(S):

Oil and Gas Lease dated August 18, 1930, by and between Guiseppe Morganti, as Lessor, and 0. C. Field, as Lessee, and recorded in Book 222, Page 538 in the Official Records of Santa Barbara County, California. as amended.

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS. AGREEMENTS. INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING. BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; All EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; AU SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING. BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER: AGREEMENTS:

1. Amendment and Agreement dated May 18, 1994 between The Morganti Ranch, Lessor and Union Oil Company of California, Lessee Commingle and WWD Agmt. w/rental).

## Muscio

SUBJECT ACREAGE: The portion of Subdivision No. 16 of the Rancho Punta de la Laguna located in Section 24 of Township 9 North, Range 35 West, containing 30 acres, more or less, in Santa Barbara County, California.

4

SUBJECT LEASE: Oil and Gas Lease, dated November 19,1971, by and between Ted H. Muscio et al, as Lessors and Union Oil Company, as Lessee, recorded February 14, 1972, in book 2386, Page 581, of Official Records of Santa Barbara County, California

SAID LEASE(S) IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING. BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; AU SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; All ENCUMBRANCES; AND INCLUDING BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:
AGREEMENTS:

1. Partial Quitclaim Deed dated October 24, 1984 by and between Union Oil Company of California and T.H. Muscio, et al. recorded as Document No. 061054, Santa Barbara County, CA;

**Righetti**

SUBJECT ACREAGE: Portion of Lot or Subdivision No. 13 of the Rancho Punta de la Laguna, located in Section 13 of Township 9 North, Range 35 West, containing 40.00 acres, more or less, INSOFAR AND ONLY INSOFAR as it covers rights to a depth of 4,500'.

SUBJECT LEASE: That certain Oil & Gas Lease dated February 8, 1934 by and between E. Righetti, et al, as Lessor, and William W. Porter, II as Lessee, and recorded in Volume 301, Page 59 of the O.R. of Santa Barbara County, California.

Righetti "B" (expired) That certain Oil and Gas Lease dated June 24, 1965, by and between Ernest Righetti et al and Union Oil Company, recorded in Volume 2112, Page 677 of the O.R. of Santa Barbara County, California, as amended.

SAID LEASE IS MADE SUBJECT TO AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE LEASES INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT. POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; ALL FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING. BUT NOT LIMITED TO. ALL OF THOSE CONTRACTS. AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

1. Agreement dated September 30, 1959 by and between Alfred Righetti, et al and Union Oil Company of California, recorded in Volume 1724, at Page 284 of the 0. A. of Santa Barbara County, CA. (commingling agreement);

5

387

3. Re-Assignment and Quitclaim of Royalty Interest dated May 31, 1950 by and between the Trustees of the Casmalia Trust No. I and Bell Petroleum Company recorded in Volume 928 at Page 238, Santa Barbara County, CA

4. Quitclaim Deed dated April 1, 1966 from Ralph J. Tingle, Jr et ux to Union Oil Company recorded in Book 2148, at Page 446

Righetti B (expired)

5. Amendment to Oil and Gas Lease dated July 16, 1981 (executed in counterpart)

6. Agreement dated September 30, 1959 between Alfred Righetti. et al and Union Oil (unrecorded)

7. Partial Quitclaim Deed dated June 1 6, 1983 by and between Union Oil Company of California to the Lessors of record. Recorded in Document No. 83-32008 (quitclaim 460 acres)

## Bonetti

SUBJECT ACREAGE: Portion of Punta de la Laguna, located in Sections 12 and 13 of Township 9 North Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West of Santa Barbara County, California, containing 184 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease, dated November 1, 1964, by and between T.R Bonetti et a as Lessors and Union Oil Company, as lessor, recorded in Book 2104, Page 1188 of Official Records of Santa Barbara County, California, as amended

SAID LEASE(S) IS MADE SUBJECT TO, AND ASSIGNEE HEREBY ACCEPTS IT SUBJECT TO, ALL VALID CONTRACTS, AGREEMENTS. INSTRUMENTS AND ORDERS RELATING TO THE LEASE(S) INCLUDING, BUT NOT LIMITED TO: ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS; ALL EASEMENTS AND LICENSES; All FARMOUT AND FARMIN AGREEMENTS; ALL SURFACE LEASE AGREEMENTS; ALL LEASE BURDENS; ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS. AGREEMENTS AND INSTRUMENTS SPECIFICALLY LISTED HEREINAFTER:

1. Agreement dated November 10, 1970 by and between Artemisa Bonetti, and Union Oil Company of California (Commingling Agmt)

2. Agreement dated October 22, 1971 by and between Airox, Inc. and Union Oil Company of California (stipulation of operations);

3. Partial Quitclaim Deed dated July 18, 1985 by and between Union Oil Company of California and Gunnison Land Company, recorded as Document No. 039771, Santa Barbara County, CA (certain mining rights and minerals to 1,500)

6

**Cat Canyon Field**

**Bell**

Parcel A:

That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, at Page 193 of Maps, in the office of the County Recorder of said County described as follows:

Beginning at the northwest corner of said Bell Tract; thence along the west line of said Bell Tract South 01°26'46" West 5279.23 feet; thence leaving said west line South 48°53'45" East 11410.66 feet to the east line of said Bell Tract; thence along said east line North 05°54'40" East 7504.38 feet to the most northeasterly corner of said Bell Tract; thence along the northerly boundary of said Bell Tract the following five (5) courses:

1. North 89°41'14" West 1522.33 feet;

2. North 00°14'20" East 2644.72 feet;

3. North 89°47'24" West 5273.86 feet;

4. North 00°17'10" East 2643.84feet;

5. North 89°42'26" West 2595.99 feet to the point of beginning [and containing approximately 1454.0 acres, more or less, and being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908, from Teresa Bell, as administratrix of the Estate of Thomas Bell, deceased, to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds at Page 591, Official Records of Santa Barbara County, California.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground.

Excepting therefrom any portion of said land lying outside the exterior boundary of Parcel 1 of Parcel Map No. 14302, filed in Book 50, Pages 50 - 57 of Parcel Maps, in the office of the County Recorder of said County and State.

Parcel B:

Parcel I of Parcel Map No. 14302, County of Santa Barbara, State of California, as shown on map filed in Book 50, Pages 50-57 of Parcel Maps in the office of the County Recorder of Santa Barbara County.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground. Also excepting therefrom the following described land: That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, Page 193 of Maps in the office of the County Recorder of said County described as follows:

Beginning at the Northwest corner of said Bell Tract;

7

389

Thence along the West line of said Bell Tract South 01°·26' 46" West 5279.23 feet;

Thence leaving said West line South 48° 53' 45" East 11410.66 feet to the East line of said Bell Tract;

Thence along said East line North 05° 54' 40" East 7504.38 feet to the most Northeasterly corner of said Bell Tract;

Thence along the Northerly boundary of said Bell Tract the following five (5)

courses:

1. North 89° 41' 14" West 1522.33 feet;

2. North 00° 14' 20" East 2644.72 feet; .

3. North 89° 47' 24" West 5273.86 feet;

4. North 00° 17' 10" East 2643.84 feet;

5. North 89° 42" 26" West 2595.99 feet to the point of beginning

And being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908 from Teresa Bell, as Administratrix of the Estate of Thomas Bell, deceased to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds, Page 591, Official Records of Santa Barbara County, California.

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS, INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS, EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as Granter and Unocal California Pipeline Company, as Grantee (NDPL pipelines and facilities on Bell and Blochman Fee).

**Blochman**

SUBJECT ACREAGE: The northwest quarter of Section 26, Township 9 North, Range 33 West, containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

EXCEPTING THEREFROM all that portion of said and lying above a depth of 500 feet beneath the surface thereof, as conveyed by Greka SMV, Inc. to Greka AM, Inc. as set forth in Deed recorded February 28, 2002 as Instrument No. 2002-19525 of official records.

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY
ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS,
INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING,
BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND
COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS,
EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE
AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED
TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE
EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as
Granter and Unocal California Pipeline Company, as Grantee (NDPL
pipelines and facilities on Bell and Blochman Fee).

**Palmer Stendel**

SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West,
SBB&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

EXCEPTING THEREFROM all that portion of said and lying above a depth of 500 feet beneath
the surface thereof, as conveyed by Greka SMV, Inc. to Greka AM, Inc. as set forth in Deed
recorded February 28, 2002 as Instrument No. 2002-19525 of official records.

EXCEPTING SAID PROPERTY IS CONVEYED SUBJECT TO, AND GRANTEE HEREBY
ACCEPTS IT SUBJECT TO ALL VALID CONTRACTS, AGREEMENTS,
INSTRUMENTS AND ORDERS RELATING TO THE PROPERTY, INCLUDING,
BUT NOT LIMITED TO ALL MATTERS OF RECORD; ALL UNIT, POOLING AND
COMMUNITIZATION AGREEMENTS; ALL OPERATING AGREEMENTS,
EASEMENTS, LICENSES, FARMOUT, FARMING, ALL SURFACE LEASE
AGREEMENTS, ALL ENCUMBRANCES; AND INCLUDING, BUT NOT LIMITED
TO, ALL OF THOSE CONTRACTS, AGREEMENTS, AND INSTRUMENTS, TO THE
EXTENT ASSIGNABLE, SPECIFICALLY LISTED HEREINAFTER:

1. Grant of Easement dated June 4, 1993 by and between Union Oil Company of California, as
Granter and Unocal California Pipeline Company, as Grantee (NDPL
pipelines and facilities on Bell and Blochman Fee).

SUBJECT LEASE: Oil and Gas Leased dated March 23, 1905 by and between L. E. Blochman,
et ux, as Lessors and E.E. Henderson, as Lessee, recorded in Volume "H" at Page 209 of the Lease
Records of Santa Barbara County, California as amended.

**Goodwin Fee**

SUBJECT ACREAGE: The West half of the Northwest Quarter of the Northwest Quarter of
Section 2, Township 9 North, Range 33 West, S.B.B.&M.; the Southwest Quarter of the Northwest
Quarter of said Section 2; the West half of the Southwest Quarter of said Section 2; the West half
of the Northeast Quarter of the Southwest Quarter of said Section 2; and the Southeast Quarter of

9

the Southwest Quarter of said Section 2; and the Northwest Quarter of Section 11, Township 9 North, Range 33 West, S.B.B.&M consisting of 360 acres more or less.

**Goodwin "A"**

SUBJECT ACREAGE: The east half of Section 10, Township 9 North, Range 33 West, Santa Bernardino Meridian, as shown on official plat thereof filed in the District Land Office January 7, 1892, said land being shown as Tracts 119 to 124, both inclusive, on map of the Bradley-Garey Tract, recorded in Book 1, page 32 of Maps and Surveys, in the office of the County Recorder of said county, together with those portions of streets or roads adjoining said lots as shown on said map included with the lines of said east half of Section10,

EXCEPTING THEREFROM those portions thereof described as follows:

Commencing at the center of said Section 10; thence northerly along the westerly line of the above described property a distance of 660 feet; thence easterly at right angles to said last mentioned line a distance of 660 feet; thence southerly at right angles to said last mentioned line a distance of 660 feet; thence westerly at right angles to said last mentioned line a distance of 660 feet to the point of beginning, containing 310 acres, more or less

SUBJECT LEASE: Oil and Gas Lease, dated January 1, 1962, by and between G.L Goodwin et al and J.C Hazard et al. recorded in Book 1937, Page 910 of Official Records of Santa Barbara County, California.

**Lloyd**

SUBJECT ACREAGE: The West two-thirds of Section 15, in Township 9 North, Range 33 West, San Bernardino Meridian, in the County of Santa Barbara, State of California, according to the Official Plat thereof EXCEPTING from the Southwest quarter of the Southwest quarter of said Section 15, 1-acre of land described in the Deed from Chas. 0. More, et ux., to the Highland School District, dated May 18, 1894, and recorded in Book 47, Page 124 of Deeds approximately 419 acres more or less.

SUBJECT LEASES:

1. Oil and Gas Lease, dated April 21, 1970, by and between Lloyd Corporation, Ltd and Shell Oil Company recorded in Book 2312, Page 761 of Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated March 7, 1965, by and between A.A. Gillette et al and Lloyd Corporation, Ltd recorded in Book 2097, Page 319 of Official Records of Santa Barbara County, California.

**Security**

SUBJECT ACREAGE: The East one-third of the North half (E 1/3 of N ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.01 acres more or less.


**Thomas**

SUBJECT ACREAGE: East one-third of the South half (E 1/3 of S ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.07 acres more or less.

SUBJECT LEASE: Oil and Gas Lease, dated October 1, 1970, by and between C.T Thomas et al and Anza Pacifica Corp. recorded in Book 2325, Page 209 of Official Records of Santa Barbara County, California.

**Los Flores**

Parcel One
The North Half of the SW Quarter (N1/2 SW ¼) of Section 22 Township 9 N, Range 33 W, S. B. B. & M. in the County of Santa Barbara State of California, according to government survey thereof.

Parcel Two
That portion of the Rancho Los Alamos, in the County of Santa Barbara, State of California, described as follows:

Beginning at the Southwest corner of section 22, Township 9 North, Range 33 West, S.B.B.&M., At the corner of said Rancho Los Alamos Known as "A No. 11" thence Westerly, along the Westerly prolongation of the Southerly line of said section 22 to its intersection with the Southerly prolongation of the Westerly line of the Easterly ½ of the NEQ (E1/2 NE1/4) of Section 21 in said township 9 North, Range 33 West, S.B.B.&M,; THENCE Northerly, along said last mentioned line or its prolongation to  the Southerly line of the North ½ of said Section 21; thence easterly, along said last mentioned line to the Northwest corner of the Southwest quarter of said section 22 above referred to; thence southerly along the westerly line of said section 22 to the point of beginning.
Consisting of 190 acres more or less.

SUBJECT LEASES:

1.  Oil and Gas Lease, dated December 8, 1947, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 762, Page 413 of Official Records of Santa Barbara County, California.

2.  Oil and Gas Lease, dated July 28, 1948, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 810, Page 167 of Official Records of Santa Barbara County, California.

11

**Fullerton**

SUBJECT ACREAGE: Lots 2, 3, 4 and the Southeast Quarter of the Northwest Quarter of Section 31 Township 9 North, Range 32 West, consisting of 129.46 acres of land, more or less, in the County of Santa Barbara, State of California, as reserved in Deed from Fullerton Oil Company, an Arizona corporation, to Edward A. Michael et ux., dated May 23, 1946 and recorded May 31, 1946, in Book, 694, at page 36

**Conoco**

SUBJECT ACREAGE: Lots 5 & 6 of Section 31 of Township 9 North, Range 32 W, SBB&M, as recorded in volume 1228, Page 437 of Official Records of Santa Barbara County, California, more or less 58.05 acres.

SUBJECT LEASE: That certain Oil and Gas Lease dated June 18, 1936 by and between Continental Oil Company as Lessor, and O.C. Field Corp., as Lessee, and recorded in Volume 1228 at Page 437 of the O.R. of Santa Barbara County, California as amended

**<u>Santa Maria Valley Field</u>**
**Jim Hopkins**

SUBJECT ACREAGE: The northeast quarter of Section 1, Township 9 North, Range 34 West in the County of Santa Barbara, State of California. The north half of the southeast quarter and the east half of the southwest quarter of Section l, Township 9 North, Range 34 West, S.B.B.&M. in the County of Santa Barbara, State of California, according to the official plat thereto flying below a depth of 100 feet, excepting from said east half of the southwest quarter that portion lying southwesterly of the northeasterly line of the land conveyed to the State of California by the Deed recorded November 8, 1955, as Instrument No. 20085, in Book 1345 at Page 125, official records of said county; being those rights excepted and reserved in that certain quitclaim deed dated December 22, 1994, by and between Union Oil Company of California and Elks Recreation, Inc. lying below a depth of 100 feet consisting of 223 acres more or less.

**Union Sugar**

SUBJECT ACREAGE: That certain property description attached to that mineral deed dated May 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded May 15, 1974, as Document NQ. 17453, in Book 2515, Page 1349 of the Official Records of Santa Barbara County, California, and in that certain property description attached to that amendment to mineral deed dated November 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded February 6, 1975, as Document No. 3744, in Book 2551, Page 743, of the Official Records of Santa Barbara County, California. As described in that certain Quitclaim Deed, dated February 23, 1995 recorded on June 16,1995, as Instrument No. 95-032705 consisting of 1117 acres more or less.

**Bettiga**

SUBJECT ACREAGE: That portion of the East Half (E/2) of the Northeast Quarter (NE/4) of Section 24, TION, R34W, SBBN lying southerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said East Half (E/2) of Northeast (NE/4) of said Section 24, Santa Barbara County, California, 58.7 acres more or less.

SUBJECT LEASES:

1. 5/12/1963-10820, Book 2039, Page 1391, Oil and Gas Lease dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

2. 6/9/1972-21178, Book 2405, Page 316 and dated 4/26/1972, Amendment to Oil and Gas Lease, dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

3. 5/7/1996-28845 Oil and Gas Lease dated 12/7/1995 by and between James Bettiga, Trustee under O. Bettiga Trust #1 dated 11/1/1978 and James P. Bettiga, Successor Trustee of O. Bettiga Revocable Trust dated 11/31/1984, Lessor, and Saba Petroleum, Inc., A corporation, Lessee.

**Adam**

SUBJECT ACREAGE: That portion of the West Half (W/2) of the Northeast Quarter (NE/4) of Section 24, Tl0N, R34W, SBBM lying northerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said W/2 of NE/4 of said Section 24, Santa Barbara County, California, 60 acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated July 17, 1970, by and between Thomas B. Adam, II, Frederick 0. Sherrill and Elizabeth Ann Newark, as Lessor, and Union Oil Company of California, as Lessee, said lease or memorandum of which was recorded October 13, 1970, in Book 2323, Page 1238 of Official Records of Santa Barbara, California.

**Moretti**

SUBJECT ACREAGE: The North Half (N/2) of the Northwest Quarter (NW/4) and the North Half (N/2) of the South Half (S/2) of the Northwest Quarter of Section 24, Township 10 North, Range 34 Wet, SBB&M, 118.56 acres, more or less.  (In Pt. Sal Zone to the surface of the property).

SUBJECT LEASE: Oil & Gas Lease dated September 1, 1976, by and between Peter M. Moretti et. Al., as Lessor, and Union Oil Company of California, as Lessee, said lease of memorandum of which was recorded April 12, 1977 as Document #77-16811, of the Official Records of Santa Barbara County, California.

**R.B. McFaddin**

SUBJECT ACREAGE: The West Half of the Northwest Quarter (W/2 NW/4) of Section 19, Township 10 North, Range 33 West, SBB&M, EXCEPTING THEREFROM the following described parcel: Commencing at a appoint on the Westerly line of the West Half of the Northwest quarter (W/2 NW/4) which point is 60 feet North of the Southwest comer thereof and said point of beginning thence Easterly 660 feet; thence Northerly 1320 feet; thence Westerly 660 feet; thence Southerly 1320 feet to the point of beginning, 60 Acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated June 8, 1964, by and between Ruth B. McFaddin, et al, as Lessor and Union Oil Company of California, as Lessee, said lease memorandum of which was recorded September 30, 1964, as Document #41819, in Book 2072, Page 226 of the Official Records of Santa Barbara County, California

**Bradley Lands**
**Bradley 1 Parcel E**
**40001**
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

SUBJECT LEASES:
1. Oil & Gas Lease dated July 1, 1970, by and between Bradley Land Company and Shell Oil Company said lease was recorded in Book 2317, Page 975 of the Official Records of Santa Barbara County, California.

2. Oil & Gas Lease dated July 26, 1973 Recorded in Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee.

3. Lease Amendment and Consolidation Agreement dated 07/05/1973 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40109, 7/5/1973-29517, Book 2473, Page 1102 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated July 14, 1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. April 13, 1979 Recorded in Instrument No. 1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered said lease in the following described lands:

14

Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

**Bradley Consolidated**
**40109**
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: S/2 SW4, NW/4 SW/4
Containing 120 acres, more or less

SUBJECT LEASE AND DOCUMENTS

1. Oil & Gas Lease dated February 17, 1972, by and between Bradley Land Company and Shell Oil Company said lease was recorded on March 13, 1972 in Book 2390, Page 581 of the Official Records of Santa Barbara County, California.

2. 3/13/1972-8424, Book 2390, Page 581 Oil and Gas Lease by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

3. 7/26/1973-29517 Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

6. 4/13/1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands:
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

**40159**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6:  SW/4 NW/4, S/2 NW/4 NW/4, N/2 NE/4 SW/4, N2 NW4 SW/4
Containing 80 acres, more or less

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in on March 27, 1969 in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

2. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where consolidated by parties herein.

3. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil reassigns the following described land:
   N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4, SW/4 SE/4, Section 6 T9N, R33W, S.B.B.&M.

6. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in the following described lands:
   N/2 NW/4 NW/4; N/2 NW/4 NE/4
   Section 6, T9N, R33W, S.B.B. &M.

7. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres in the following described lands:
   S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
   Section 6, T9N, R33W, S.B.B.&M.

## 40161

Township 9 North, Range 33 West, S.B.B. &M.
Section 6: E/2 NW/4, SW/4 NE/4, S2 NW/4 NE/4, NW/4 SE/4, N2 NE/4 SW/4
Containing 200 acres, more or less

16

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated December 1, 1965 recorded in Book 2204, Page 922 by and between Bradley Land Company and Standard Oil Company.

3. 11/22/1972-45991 Book 2431, Page 1474 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Standard Oil Company as Lessee, wherein both 40159 and 40161 leases where consolidated by parties herein.

4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

6. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Standard Oil Company, predecessor in interest to Chevron USA Inc., and Shell Oil, as Lessees, wherein Shell Oil reassigns the following described land:
   N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4, SW/4 SE/4, Section 6 T9N, R33W, S.B.B.&M.

7. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 40 acres in the following described lands:
   N/2 NW/4 NW/4; N/2 NW/4 NE/4
   Section 6, T9N, R33W, S.B.B. &M.

8. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases by and between Standard Oil Company, predecessor in interest to Chevron USA Inc., as Lessee and Bradley Land Company as Lessor, wherein Lessee surrenders 160 acres in the following described lands:
   S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
   Section 6, T9N, R33W, S.B.B.&M.

17

**Bradley Lands Unit**
**40014**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: NE/4, SE/4, NE/4
Containing 10 acres, more or less

SUBJECT LEASE AND QUITCLAIM
1. Oil and Gas Lease by and between Bradley Land Company and Union Oil Company of California dated October 3, 1956 recorded in Book 1411, Page 162.

2. Quitclaim Deed wherein Union of Oil of California quitclaimed all title and interest in above described Oil and Gas Lease dated 6/15/1960-19030 recorded in Book 1754 Pg 40.


**40015**
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: NW/4; SW/4 NE/4; NE/4 SW/4; SE/4
Section 6: NE/4 NE/4
Containing 230 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated April 4, 1956 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded in Book 1375 and page 210 and (70206) Oil and Gas Lease 5-2-70 Document No. 80-13008 of the Official Records of Santa Barbara County.


**40016**
Township 9 North, Range 33 West, S.B.B. &M. Section 5: Commencing at a point on the north line of said Section 5, 826 feet east of the northwest corner of said Section 5, running thence easterly along the north line of said section 330 fee; thence at right angles southerly 660 feet; thence at right angles westerly and parallel with the north line of said Section, 660 feet; thence at right angles northerly 660 feet to the north line of said section thence easterly along the north line of said section, 330 feet to the point of beginning containing 10 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated June 12, 1957 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded on September 9, 1957 in Book 1469 and Page 489.


**Texaco Bradley Lands**
Township 9 North, Range 33 West, S.B.B. &M.

Section 4: SWNW, W2SENW, W2E2SENW, S2NWNW, S2N2NWNW, S2SWNENW, NWSWNENW

18

400

Section 5: N2SE, NESESE, SENENE, E2SENE, SWSENE, S2SWNE, NWSWNE, SWSWNWNE, S2NESWNE, E2S WNENE containing 280 acres, more or less

SUBJECT LEASES:

1. Oil and Gas Lease by and between Bradley Land Company and Texaco, Inc. dated March 1, 1967 and recorded on May 31, 1967 in Book 2192 and Page 12.

2. 9/30/1970-26546, Book 2322, Page 571 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

3. 1/23/1973-2783, Book 2443, Page 1188 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

4. 5/25/1979-23640, Partial Surrender of Oil and Gas Lease by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee, wherein lessee surrendered 290.373 acres from the 570 acres the original lease contained therein.

**Kemp and Kemp A**

SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less.

SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of 500 feet of the southerly 300 feet containing 40 acres, more or less.

SUBJECT LEASES:

1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. 4

2. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Ione Beach, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting

19

therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.

3. Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

4. Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

**Laine**

SUBJECT ACREAGE: That portion of the Southeast Quarter of Sec. 13, T10N-R34W, SBB&M in the County of Santa Barbara, State of California, according to the Government Survey approved April 10, 1873 described as follows:

BEGINNING at a point on the West Line of the Southeast Quarter of said section 13 distant thereon South 0°38'20" West 70 feet from a 3/4 inch pipe with copper disc set at the center of said Section 13; said point of beginning being the Southwest Corner of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at page 430 of Deeds; thence lst South 0°38'20" West 2590.56 feet along the West line of the Southeast Quarter of said Section 13 to a spike in pavement of County Road at the Southwest Corner of the Southeast Quarter of said Section 13; thence 2nd along the South Line of section 13 South 89°18'39" East 1031.20 feet to a point in County Road; thence 3rd North 0°29'40" East 2590.57 feet to a point in the South Line of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at  page 430 of Deeds; thence 4th along the South Line of said 30 foot strip North 89°18' 40" West 1024.84 feet, more or less, to the point of beginning.

EXCEPTING THEREFROM a strip of land of a uniform width of 40 feet across the extreme North end of the Southeast Quarter of said Section 13, as conveyed to Santa Maria Valley Railroad Company, a California Corporation, by Deed dated November 18,

20

1913, and recorded Jan. 22, 1914, in Book 142 at Page 427 of Deeds, Also, excepting the North 430' of the East 180' thereof. Containing 59.08 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease by and between Dorothy M. Laine, as lessor, and Union Oil Company of California, as lessee, recorded on March 11, 1980 as Instrument No. 80-9932, Official Records of Santa Barbara County, California.

### Payne

SUBJECT ACREAGE: The Northeast quarter of the Northeast quarter (NE4 NE4) of Section 12 T9N, R34W, S.B.B. & M. and the North Half (N1/2) of Section 7, T9N, R33W, S.B.B. & M, containing 60 acres, more or less

SUBJECT LEASES:
1. 8/12/1968-31331 Book 2256 Page 113 Oil and Gas Lease by and between John S. Newton and Margaret W. Newton, his wife, and Jane Borden Hall and Harvey W. Hall, Jr., her husband, as Lessor, and Standard Oil Company of California, a corporation, Lessee.

2. 12/13/1968-38617 Book 2255, Page 439 Oil and Gas Lease by and between Mildred F. Bardin, a widow, as Lessor and Standard Oil Company of California, Lessee.

3. 12/13/1968-38621 Book 2255, Page 463 Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil Company of California, as Lessee

4. 2/6/1970-3352, Book 2298, Page 308 Oil and Gas Lease by and between John David Payne, a single man, and Carey Morrison, Executor of the Estate of Annie Morrison, deceased, Lessor, and Standard Oil Company of California, as Lessee.

### ZACA FIELD

### Brown

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 40 acres more or less in Santa Barbara County.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil   dated

21

September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records in Santa Barbara County.

2. Oil and Gas Lease by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records in Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil Dated July 7, 1976 and recorded in Book 2623 and Page 950 in the Official Records in Santa Barbara County.

4. Oil and Gas Lease by and between William J. Bedford & Diane B. Bedford h/w; Roy W. Reeves & Elaine Reeves, h/w and George Tuerk and Sherwood C. Collingsworth to Getty Oil dated June 15, 1979 and recorded as Instrument No. 1979-051489 in the Official Records in Santa Barbara County.

**Davis**

SUBJECT ACREAGE: Township 7 North, Range, 31 West, S.B.B.M. Sections 33 & 34 AND Township 8 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 210 acres more or less in Santa Barbara County, California.

SUBJECT LEASE:
1. Oil and Gas Lease by and between Harold H. Davis and Tidewater Oil dated January 11, 1939 recorded in the Official Records of Santa Barbara County in Book 449 and Page 451.

**Davis B**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 4 being a portion thereof, and Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office Containing 44 acres more or less in Santa Barbara County, California.

SUBJECT LEASES:
1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records of Santa Barbra County.
2. Oil and Gas Lease between by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records of Santa Barbara County.

22

3.  Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil dated July 7, 1976 recorded in Book 2623 and Page 950 in the Official Records of Santa Barbara County.

4.  Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1825 or now Instrument No. 1976-0034392 in the Official Records of Santa Barbara County.

5.  Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w, to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1828 or now Inst # 1976-0034393 in the Official Records of Santa Barbara County.

**Davis C**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 and  4 being a portion thereof, AND Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office.

SUBJECT LEASES:
1.  Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  Dated 9/17/1971 and recorded at Book 2371 Page 1011.
2.  Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated 9/13/1971 recorded at Book 2371 Page 1014
3.  Leonard K. Firestone, a married man dealing with his separate property, to Getty Oil Dated 7/7/1976 Recorded at Book 2623 and Page 950 now Instrument No. 1976-034108
4.  Harold H. Davis and Alice de Forest Sedgwick entered into an Amendment and Agreement of their 1971 leases with Getty Oil Co. dated 6/25/1980 recorded as Instrument No. 1980-024589 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.
5.  Leonard K Firestone entered into an Amendment and Agreement of his 1976 lease with Getty Oil Co. dated 4/5/1982 Recorded as Instrument No. 1982-013662 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.
6.  Dean Brown and Katherine Brown entered into an Amendment and Agreement of their 1976 lease  1976 lease with Getty Oil Co. dated 4/5/1982 recorded as Instrument No. 1982-013663 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90. This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

23

**Carranza**

SUBJECT ACREAGE: Township 7 North, Range 31 West SBBM Section 2 and 3: Beginning at the southerly end of the 42nd course in the description for that certain land conveyed by Harold H. Davis and Alice C. Davis, his wife, to Francis M. Sedgwick and Alice de F. Sedgwick, his wife, by deed dated April 30, 1942 in Book 551 of Official Records of Santa Barbara County, California, at page 177, which 42nd course is designated as south 30°8  38' West 492.20 feet; Thence from said point of beginning, First, South 62°-30' East 1700.00 feet; Thence Second, South 27°-30' West 943.90 feet; Thence Third, North 62°-30' West 2051.29 feet to intersect the 46th course in the description in the above mentioned deed; thence Fourth, North 65°-53' East 113.72 feet along a part of the said 46th course to the southerly end of the 45th course; thence following along the courses described in said deed but in the opposite direction Fifth, North 46°-45' East 285.09 feet, Sixth, North 48°-56' East 398.20 feet and Seventh, North 38°-21' East 218.90 feet to the point of beginning and containing 40 acres more or less.

SUBJECT LEASES:
1. Oil and Gas Lease by and between Theodore Chamberlin, Jr., et ux and Tidewater Associated Oil Company dated January 1, 1951 recorded in Book 999 and Page 407 in the Official Records of Santa Barbara County.
2. Partial Quitclaim of an Oil and Gas Lease; Tidewater Associated Oil Quitclaims all but 40 acres back to the Lessors, dated 1/15/1955 and recorded at Book 1292 and Page 321.

**Chamberlin**

SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM Section 32 and 33: Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly comer of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649.27 feet to the true point of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° 0' W. 2730.00 feet; thence N. 30° 6' E. 1551.14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 178 acres in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

24

2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 500 additional acres.

3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024.

### Chamberlin "B"

SUBJECT ACREAGE: Township 8 North. Range 31 West, SBM, Section 32 and 33:
Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649 .27 feet to the true paint of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° O' W. 2730.00 feet; thence N. 30° 6' E. 155 L 14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California.

SUBJECT LEASE: Oil and Gas Lease by and between Theodore Chamberlin Jr. et ux and Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

### Quati

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 & 4 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89 acres more or less in Santa Barbara County, California.
SUBJECT LEASES:

1. Oil and Gas Lease by and between Harold H. Davis to Tidewater Oil dated 1/11/1939 recorded at Book 449 and Page 451 in the Official Records of Santa Barbara County.

2. Partial Quitclaim & Surrender dated 1/20/55 from Tide Water Associated Oil Company to Harold Davis, et al, reserving 299.65 acres, recorded 1295/275.

3. Addendum to Oil and Gas Lease, dated 7/6/1983, recorded as Instrument No. 1983-034552 by and between Ray Stark as landlord and Getty Oil Co. as Tenant. While this is titled an Addendum to Oil and Gas Lease, it is actually a Surface Use Agreement between the surface owner and the Oil Company.

25

# EXHIBIT G

FORM OF APPEALS ESCROW AGREEMENT

*See attached.*

## <u>APPEALS ESCROW AGREEMENT</u>

This Escrow Agreement (this "**Agreement**") is made and entered into as of this [_____] day of [_____], 2020 by and among Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation ("**Seller**"), the debtor (the "**Debtor**") in Bankruptcy Case No. 9:19-bk-11573-MB (the "**Bankruptcy Case**") in the U.S. Bankruptcy Court for the Central District of California, Santa Barbara Division (the "**Bankruptcy Court**"), and Team Maria Joaquin, L.L.C., a Delaware limited liability corporation, and Maria Joaquin Basin, L.LC., a Delaware limited liability corporation (collectively, "**Buyer**"). Capitalized terms used but not defined in this Agreement have the meaning given to such terms in the Purchase Agreement (as defined below).

## <u>RECITALS</u>

A.      Concurrently with the execution and delivery hereof, Buyer and Seller have entered into that certain Purchase and Sale Agreement dated as of August [___], 2020 (the "**Purchase Agreement**"), relating to the sale by the Seller of its interests in (i) certain oil and gas properties located in the state of California (the "**Assets**").

B.      The Purchase Agreement provides that, at the Closing of the transactions contemplated by the Purchase Agreement, Buyer must pay into an escrow account certain funds to cover the costs of possible appealsand that as security therefor (and not in lieu thereof), an escrow will be established for the protection of the Buyer and Seller.

C.      Buyer and Seller desire that UMB Bank, N.A. act as Escrow Agent, and Escrow Agent is willing to act in such capacity.

## <u>AGREEMENT</u>

NOW, THEREFORE, Buyer, Seller, and Escrow Agent agree to the terms of this Agreement as follows:

1.      **Commencement of Duties.** At Closing, Buyer, in accordance with Section 9.02(f) of the Purchase Agreement, will transfer to the Escrow Agent the aggregate sum of Five Hundred Thousand Dollars ($500,000.00) to cover the fees and expenses associated with any appeals of the Sale Order (the "**Deposit**").  The Desposit, together with all interest, dividends, income, capital gains, and other amounts earned thereon or derived therefrom (the "**Escrow Income**") pursuant to the investments made on such amount pursuant to <u>Section 2</u> if referred to herein as the "**Escrow Funds**").  The Escrow Agent agrees to hold the Escrow Funds in a separate and distinct account, as Escrow Agent for Seller and Buyer, subject to the terms and conditions of this Agreement. The Escrow Agent will not distribute or release the Escrow Funds except in accordance with the express terms and conditions of this Agreement.

2.      **Deposit of Escrow Funds.** Upon receipt of the Escrow Funds, the Escrow Agent will hold the Escrow Funds in escrow pursuant to the terms of this Agreement.  Until such times as the Escrow Funds are distributed by the Escrow Agent as provided herein, the Escrow

1

Funds will be invested and reinvested by the Escrow Agent in accordance with the written instructions of theSeller's Representative, subject to the following limitations:

(a)     Such funds must be invested and revinvested solely (i) at the risk of Seller, and (ii) in the name of the Escrow Agent or its nominee and in such amounts as the Seller's Representative shall designate.  If the Seller's Representative does not provide the Escrow Agent with written instructions directing the investment or reinvestment of any of the Escrow Funds, the Escrow Agent is directed to invest and re-invest such funds in the UMB Bank money market deposit account. The Parties acknowledge that the Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

(b)     The Escrow Agent will be entitled to sell or redeem any such investment necessary to make any distributions required under this Agreement and will not be liable or responsible for any loss resulting from any such sale or redemption.

(c)     Escrow Income, if any, resulting from the investment of the Escrow Funds shall be retained by the Escrow Agent and shall be considreed, for all purposes of this Agreement, to be part of the Escrow Funds.

3.     **Disbursement of Escrow Funds.**  Escrow Agent will disburse Escrow Funds at any time and from time to time, upon receipt of, and in accordance with a Joint Written Direction, "**Joint Written Direction**" means written directions executed by the Buyer's Representative and Seller's Representative directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Agreement.  Such Joint Written Direction must contain complete payment instructions, including wire instructions or an address to which a check will be sent. Prior to any disbursement, Escrow Agent must receive reasonable identifying information regarding the recipient such that Escrow Agent may comply with its regulatory obligations and resonable business practices.

4.     **Duties of the Escrow Agent.** The Escrow Agent will have no duties or responsibilities other than those expressly set forth in this Agreement, and no implied duties or obligations will be read into this Agreement against the Esrow Agent.  The Escrow Agent is not a party to, or bound by, the Purchase Agreement or any other agreement among the other parties hereto, and the Escrow Agent's duties will be determined solely by reference to this Agreement.  The Escrow Agent will have no duty to enforce any obligation of any person, other than as provided herein.  The Escrow Agent will not be subject to any liability to anyone by reason of any failure on the part of any party thereto or any maker, endorser, or other signatory of any document or any other person to perform such person's obligations under any such document.

5.     **Liability of the Escrow Agent; Indemnification.**

(a)     The Escrow Agent acts hereunder as a depository only.  The Escrow Agent is not responsible or liable in any manner for the sufficiency, correctness, genuineness, or validity of this Escrow Agreement or with respect to the form of execution of the

2

same.  The Escrow Agent will not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its own best judgment, and may rely conclusively and will be protected in acting upon any order, notice, demand, certificate, opinion, or advice of counsel (including counsel chosen by the Escrow Agent), statement, instrument, report, or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information therein contained) which is believed by the Escrow Agent to be genuine and to be signed or presented by the proper person(s).  The Escrow Agent will not be held liable for any error in judgment made in good faith by an officer or employee of the Escrow Agent unless it is proved that the Escrow Agent was grossly negligent in ascertaining the pertinent facts or acted intentionally in bad faith. The Escrow Agent will not be bound by any notice of demand, or any waiver, modification, termination, or rescission of this Agreement or any of the terms hereof, unless evidenced by a writing delivered to the Escrow Agent signed by the proper party or parties and, if the duties or rights of the Escrow Agent are affected, unless it gives its prior written consent thereto.

(b)    The Escrow Agent may consult legal counsel in the event of any dispute or question as to the construction of any provisions hereof or its duties hereunder, and it will incur no liability and will be fully protected in acting in accordance with the opinion or instructions of such counsel.

(c)    The Escrow Agent will not be responsible, may conclusively rely upon and will be protected, indemnified, and held harmless by Buyer and Seller, acting jointly and severally, for the sufficiency or accuracy of the form of, or the execution, validity, value, or genuineness of any document or property received, held, or delivered by it hereunder, or of the signature or endorsement thereon, or for any description therein; nor will the Escrow Agent be responsible or liable in any respect on account of the identity, authority, or rights of the persons executing or delivering or purporting to execute or deliver any document, property, or this Agreement.

(d)    In the event that the Escrow Agent becomes involved in any litigation relating to the Escrow Funds, the Escrow Agent is authorized to comply with any decision reached through such litigation.

(e)    Buyer and Seller, jointly and severally, hereby agree to indemnify the Escrow Agent for, and to hold it harmless against any loss, liability, or expense incurred in connection herewith without gross negligence or willful misconduct on the part of the Escrow Agent, including, without limitation, legal or other fees arising out of or in connection with its entering into this Agreement and carrying out its duties hereunder, including, without limitation, the costs and expenses of defending itself against any claim of liability in the premises or any action for interpleader. The Escrow Agent will be under no obligation to institute or defend any action, suit, or legal proceeding in connection herewith, unless first indemnified and held harmless to its satisfaction in accordance with the foregoing, except that the Escrow Agent

3

will not be indemnified against any loss, liability, or expense arising out of its own gross negligence or willful misconduct. Such indemnity will survive the termination or discharge of this Agreement or resignation of the Escrow Agent.

6.    **The Escrow Agent's Fee.**  Escrow Agent will be entitled to fees and expenses for its regular services as Escrow Agent as set forth in Exhibit A.  Additionally, Escrow Agent is entitled to fees for extraordinary services and reimbursement of any out of pocket and extraordinary costs and expenses, including, but not limited to, attorneys' fees. Escrow Agent will have a first lien upon all Escrow Funds for the purposes of paying its fees and expenses.  All of the Escrow Agent's compensation, costs and expenses related to its regular services will be paid by Seller.  All of the Escrow Agent's compensation, costs, and expenses related to its extraordinary services will be paid equally by Seller and Buyer.

7.    **Security Interests.** The Escrow Funds will be held in a trust account; provided in no event shall the Escrow Agent be considered a trustee or fiduciary.  No party to this Escrow Agreement will grant a security interest in any monies or other property deposited with the Escrow Agent under this Escrow Agreement, or otherwise create a lien, encumbrance, or other claim against such monies or borrow against the same.

8.    **Dispute.** In the event of any disagreement between the undersigned or the person or persons named in the instructions contained in this Agreement, or any other person, resulting in adverse claims and demands being made in connection with or for any papers, money, or property involved herein, or affected hereby, the Escrow Agent will be entitled to refuse to comply with any demand or claim, as long as such disagreement continues, and in so refusing to make any delivery or other disposition of any money, papers, or property involved or affected hereby, the Escrow Agent will not be or become liable to the undersigned or to any person named in such instructions for its refusal to comply with such conflicting or adverse demands, and the Escrow Agent shall be entitled to refuse and refrain to act until: (a) the rights of the adverse claimants shall have been fully and finally adjudicated as provided in the Purchase Agreement, or (b) all differences have been adjusted by agreement and the Escrow Agent has been notified thereof in writing, signed by all the interested parties.

9.    **Resignation of Escrow Agent.** Escrow Agent may resign or be removed, at any time, for any reason, by written notice of its resignation or removal to all parties at their respective addresses as set forth herein, at least thirty (30) days before the date specified for such resignation or removal to take effect; upon the effective date of such resignation or removal:

   (a)    all cash and other payments and all other property then held by the Escrow Agent hereunder must be delivered by it to such successor Escrow Agent as may be designated in writing by the Buyer and the Seller, whereupon the Escrow Agent's obligations hereunder will cease and terminate;

   (b)    If no such successor Escrow Agent has been designated by such date, all obligations of the Escrow Agent hereunder will, nevertheless, cease and terminate, and the

4

Escrow Agent's sole responsibility thereafter will be to keep safe all property then held by it and to deliver the same to a person designated in writing by the Buyer and the Seller.

(c)     Further, if no such successor Escrow Agent has been designated by such date, the resigning or removed Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor agent; further, the resigning or removed Escrow Agent may pay into court all monies and property deposited with Escrow Agent under this Agreement.

10.     **Notices.** All notices, demands, and requests required or permitted to be given under the provisions hereof must be in writing and will be deemed to have been sufficiently given, upon receipt, if (a) personally delivered, (b) sent by email to Buyer or Seller and confirmed by phone, or (c) mailed by registered or certified mail, with return receipt requested, delivered as follows:

If to Buyer:

Team Maria Joaquin, L.L.C.
Maria Joaquin Basin, L.L.C.
c/o Scott Nonhof
16202 Butera Road
Magnolia, TX 77355
Email: scott.nonhof@teamoperating.com

With a Copy to (which shall not constitute notice):

Thompson & Knight, LLP
c/o Richard B. Hemingway
811 Main Street, Suite 2500
Houston, TX 77002
Telephone: (713) 653-8640
Email: Richard.Hemingway@tklaw.com

With a Copy to (which shall not constitute notice):

Thompson & Knight, LLP
c/o Tye C. Hancock
811 Main Street, Suite 2500
Houston, TX 77002
Telephone: (713) 653-8640
Email: Tye.Hancock@tklaw.com

5

If to Seller:

Michael A. McConnell
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Email: michael.mcconnell@kellyhart.com

With a Copy to (which shall not constitute notice):

Danning, Gill, Israel & Krasnoff, LLP
c/o Eric P. Israel
1901 Avenue of the Stars, Suite 450
Los Angeles, CA 90067-6006
Email: eisrael@danninggill.com

With a Copy to (which shall not constitute notice):

O'Melveny & Myers LLP
c/o Evan M. Jones
400 S. Hope Street, 18th Floor
Los Angeles, CA 70071
Email: ejones@omm.com

If to the Escrow Agent:

UMB Bank, N.A.
Corporate Trust and Escrow Services
5555 San Felipe, Suite 870
Houston, TX 77056
Attn: Shazia Flores

11.     **Governing Law; Venue.** The provisions of this Agreement will be governed by and construed in accordance with the laws of the State of California (excluding any conflicts-of-law rule or principle that might refer same to the laws of another jurisdiction); and, during pendency of the Bankruptcy Case, exclusive venue for any legal proceeding regarding this Agreement shall be the Bankruptcy Court, and if the Bankruptcy Court declines jurisdiction, any federal or state court of competent jurisdiction located in Los Angeles, California.  Each party hereby consents to such jurisdiction.

12.     **Modification; Waivers.** This Agreement may be amended, modified, or terminated at any time by a writing executed by Buyer, Seller, and the Escrow Agent.  No failure or delay of the Escrow Agent in exercising any right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power, or remedy preclude any other or further exercise of any right, power, or remedy.

6

13. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Copies, telecopies, facsimiles, electronic files, and other reproductions of original executed documents will be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action, or suit in the appropriate court of law.  The parties hereto agree that the transactions described herein may be conducted and related documents may be stored by electronic means.

14. **Headings.** The section headings contained in this Agreement are inserted for convenience only, and will not affect, in any way, the meaning or interpretation of this Agreement.

15. **Entire Agreement.** This Agreement, together with the Purchase Agreement and related exhibits and schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. Notwithstanding the foregoing, in the event of any inconsistency between the statements in the body of this Agreement and those of the Purchase Agreement, (a) with respect to any inconsistency as between Buyer and Seller, the statements in the body of the Purchase Agreement will control; and (b) with respect to any inconsistency as between the Escrow Agent, on the one hand, and either Buyer or Seller or both, on the other hand, the statements in the body of this Agreement will control.

16. **Successor and Assigns**. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent will not be unreasonably withheld or delayed.  No assignment will relieve the assigning party of any of its obligations hereunder.

17. **Severability.** In the event that any one or more of the provisions contained in this Agreement will, for any reason, be held to be invalid, illegal, or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality, or unenforceability will not affect any other provision of this Agreement.

18. **Earnings Allocation; Tax Matters; Regulatory Compliance.** The parties hereto agree that, for tax reporting purposes, all interest or other income, if any, attributable to the Escrow Funds or any other amount held in escrow by the Escrow Agent pursuant to this Agreement will be allocable to the Seller.  Seller will be responsible for all tax reporting. The Buyer and Seller agree to provide the Escrow Agent completed Forms W-9 (or Forms W-8, in the case of non-U.S. persons) and other forms and documents that the Escrow Agent may reasonably request (collectively, "**Tax Reporting Documentation**") at the time of execution of this Agreement and any information reasonably requested by the Escrow Agent to comply with the USA Patriot Act of 2001, as amended from time to time, and the Bank Secrecy Act, as amended from time to time. The parties hereto understand that if such Tax Reporting Documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code, as it may be amended from

7

time to time, to withhold a portion of any interest or other income earned on the investment of monies or other property held by the Escrow Agent pursuant to this Escrow Agreement.

19.    **Representatives.** The Buyer's Representative and Seller's Representative will each present specimen signatures to the Escrow Agent as outlined in Exhibit B-1 and Exhibit B-2 hereto, respectively.

20.    **Termination.** This Agreement will terminate when all of the Escrow Funds have been distributed in accordance with Section 3 of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGES FOLLOW.]

520089.000049 23828936.4

**<u>BUYER</u>:**

**Team Maria Joaquin, L.L.C.,**
a Delaware limited liability company

By: _____

Name:

Title:

SIGNATURE PAGE

**BUYER**:

**Maria Joaquin Basin, L.L.C.**,
a Delaware limited liability company

By: _____
Name:
Title:

SIGNATURE PAGE

**SELLER:**

**HVI Cat Canyon, Inc.,**
a Colorado corporation

By: _____

Name:  Michael A. McConnell

Title:  Chapter 11 Trustee

SIGNATURE PAGE

**ESCROW AGENT:**

**UMB BANK, N.A.,**
solely as Escrow Agent


By: _____
Name: _____
Title: _____

SIGNATURE PAGE

<u>EXHIBIT A TO APPEALS ESCROW AGREEMENT</u>

ESCROW FEES AND EXPENSES

**Acceptance Fee:**                                                    **$1,000.00**

The acceptance fee includes the administrative review of documents, initial set up of accounts, coordination with escrow parties to obtain due diligence documentation and other reasonably required services relating to the escrow closing.

**Annual Fee:**                                                       **$2,500.00**

Annual administration fee for the performance of routine duties of the escrow agent associated with the management and maintenance of the accounts.

<u>Extraordinary Services</u>:

Upon the joint written request by the Buyer's Representative and the Seller's Representatives, the Escrow Agent may provide extraordinary services. Charges for performing extraordinary or other services not contemplated at the time of the execution of the transaction or not covered specifically elsewhere in this schedule will be commensurate with the service to be provided. These extraordinary services may include supplemental agreements, consents, releases, tender offer processing, redemptions and other services, including, but not limited to disbursements involving a dispute or arbitration, or administration while a dispute, controversy or adverse claim is in existence, and will be charged based upon time required at the then standard hourly rate. In addition to the specified fees, all expenses related to the administration of the Escrow Agreement (other than normal overhead expenses of the regular staff) such as, but not limited to, travel, postage, shipping, courier, telephone, facsimile, supplies, legal fees, accounting fees, etc., will be reimbursable. Acceptance and first year annual fees will be payable at the initiation of the escrow and annual fees will be payable in advance thereafter. Other fees and expenses will be billed as incurred.

CUSTOMER INFORMATION REQUIRED BY THE USA PATRIOT ACT:

*To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, vet\* and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statement, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.*

EXHIBIT A

## EXHIBIT B-1 TO APPEALS ESCROW AGREEMENT

Each of the following person(s) is a **Buyer's Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Buyer's behalf:

| | | |
|---|---|---|
| Name | Specimen Signature | Telephone No. |
| Name | Specimen Signature | Telephone No. |
| Name | Specimen Signature | Telephone No. |

**(Note: if only one person is identified above, provide the following information):**
The following person not listed above is authorized for call-back confirmations.

| | |
|---|---|
| Name | Telephone No. |

EXHIBIT B-1

## EXHIBIT B-2 TO APPEALS ESCROW AGREEMENT

Each of the following person(s) is a **Seller's Representative** authorized to executed documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Seller's behalf.

_____       _____       _____
Name                          Specimen Signature            Telephone No.


_____       _____       _____
Name                          Specimen Signature            Telephone No.


_____       _____       _____
Name                          Specimen Signature            Telephone No.


**(Note: if only one person is identified above, provide the following information):**
The following person not listed above is authorized for call-back confirmations.


_____              _____
Name                                 Telephone No.

Exhibit B-2

# EXHIBIT H

FORM OF OIL SALES AGREEMENT

*See attached.*

OIL SALES AGREEMENT

BETWEEN

TEAM MARIA JOAQUIN, L.L.C. and MARIA JOAQUIN BASIN, L.L.C.,

AS BUYER

AND

MICHAEL A. MCCONNELL,

solely in his capacity as Chapter 11 Trustee for

HVI CAT CANYON, INC.,

AS SELLER

Dated

August [___], 2020

## OIL SALES AGREEMENT

This Oil Sales Agreement (this "**Agreement**") is made and entered into as of August [___], 2020, by and between:

- Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability company (collectively, "**Buyer**"), and

- Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc. ("**Seller**"), the debtor in the Bankruptcy Case No. 9:19-bk-11573-MB (the "**Bankruptcy Case**") in the U.S. Bankruptcy Court for the Central District of California, Santa Barbara Division (the "**Bankruptcy Court**").

## RECITALS

**WHEREAS,** Buyer desires to purchase on a firm basis from Seller those quantities of Oil (the "**PP Quantities**") to which Seller is entitled by virtue of its ownership of the Production Payment (below defined);

**WHEREAS,** the entities constituting Buyer also are the same entities constituting Producer (defined below); and

**WHEREAS,** Buyer and Seller desire to enter into this Agreement to provide for the sale and purchase of the PP Quantities on the terms and conditions hereinafter set forth;

**NOW THEREFORE,** in consideration of the premises and the mutual promises covenants and agreements herein contained, Buyer and Seller agree as follows:

## ARTICLE I  DEFINITIONS AND INTERPRETATION

Section 1.1    <u>Definitions</u>.    As used herein, the terms "Agreement", "Buyer", "PP Quantities" and "Seller" have the meaning set forth above, and the following additional terms have the following meanings:

"**Agreed Rate**" means a variable rate of interest equal at any time to the Prime Rate, plus ten percent (10%), calculated on the basis of actual days elapsed and a year of 360 days.

"**Barrel** means 42 United States standard gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit.

"**Business Day**" means a day which is not a Saturday, a Sunday, a legal holiday in Los Angeles, California.

"**Day**" means a period of twenty-four (24) consecutive hours, beginning at 7:00 A.M. California time.

1

"**Deed of Trust**" means that certain Deed of Trust, Mortgage, Assignment, Security Agreement, Fixture Filing and Financing Statement dated August __, 2020 from Buyer to First American Title Company, as trustee, and Seller.

"**Delivered Quantity**" means, for each Month during the term of this Agreement, the total quantity of Oil (expressed in Barrels) delivered hereunder to Buyer during such Month at the Delivery Points.

"**Delivery Points**" means the point or points designated for each Field on Schedule 1 hereto.

"**Field**" means each field or other area of production listed on Schedule 1 hereto.

"**Firm Basis**" means a continuous delivery and receipt of Oil, without interruption except by Force Majeure events.

"**Index Price**" means, for any Month, the average monthly West Texas Intermediate (WTI) crude oil spot price at Cushing, Oklahoma for such month, as published by the U.S. Energy Information Agency (EIA), or any successor to such publishing agency. As of the date of this Agreement, such pricing information is available on the website of the EIA at: https://www.eia.gov/dnav/pet/pet_pri_spt_s1_m.htm. If the EIA fails to report any such price for any month, Seller shall designate a replacement for such source which reports a similar price and is used in the oil and gas industry.

"**Initial Time**" means 7:00 a.m., California time, on the date on which the Production Payment Conveyance becomes effective.

"**Month**" means the period commencing at the beginning of the first Day of a calendar month and ending at the beginning of the first Day of the succeeding calendar month. The period from the Initial Time until the beginning of the first Day of the succeeding calendar month shall be deemed to be a Month.

"**Oil**" means crude oil, condensate, and any other liquid hydrocarbons (other than natural gas liquids obtained through processing at a gas processing plant).

"**Party**" means any party hereto.

"**Person**" means an individual, corporation, partnership, limited liability company, association, joint stock company, trust or trustee thereof, estate or executor thereof, unincorporated organization or joint venture, court or governmental unit or any agency or subdivision thereof, or any other legally recognizable entity.

"**Prime Rate**" means, as of any date of determination, that certain rate quoted in the Wall Street Journal as the U.S. "prime rate" on such date (or, if not quoted on such date, on the preceding date on which it is so quoted). The parties recognize that such rate may not be the most favorable rate available to borrowers from any relevant institution.

2

"**Producer**" means Buyer in its capacity as "Grantor" under the Production Payment Conveyance.

"**Production Payment**" means the production payment conveyed to Seller under the Production Payment Conveyance.

"**Production Payment Conveyance**" means that certain Production Payment Conveyance of even date herewith from Buyer, as grantor, to Seller, as grantee, as such conveyance is from time to time amended or supplemented.

"**Production Payment Documents**" means this Agreement, the Purchase Agreement, the Production Payment Conveyance, the Deed of Trust and each other "Production Payment Document" as such term is defined in the Production Payment Conveyance.

"**Purchase Agreement**" means that certain Purchase and Sale Agreement of even date herewith, between Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., as seller, and Buyer, as buyer, pursuant to which the Subject Interests (as defined in the Production Payment Conveyance) were conveyed to Buyer and the Production Payment was sold, as such agreement is from time to time amended or supplemented.

"**Purchase Amount**" has the meaning given to such term in Section 4.1.

"**Purchase Price**" means, with respect to each Barrel of Oil produced from each Field listed on Schedule 1 hereto during each Month, the Index Price for such Month.

"**Receiving Transporters**" means the third party pipelines, gathering lines, trucking companies or other transporters (other than Buyer, Seller, Producer and their affiliates) which receive Oil at the Delivery Points.

"**Tax**" or "**Taxes**" means any tax levied, assessed or claimed to be due by any federal, state, county, municipal government or any other governmental agency or tribal agency.

Section 1.2    <u>Rules of Construction</u>.    All references in this Agreement to articles, sections, subsections and other subdivisions refer to corresponding articles, sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise.  Titles appearing at the beginning of any of such subdivisions are for convenience only and shall not constitute part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.  The words "this Agreement", "this instrument", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  Unless the context otherwise requires: "including" (and its grammatical variations) means "including without limitation"; "or" is not exclusive; words in the singular form shall be construed to include the plural and *vice versa*; words in any gender include all other genders; references herein to any instrument or agreement refer to such instrument or agreement as it may be from time to time supplemented or amended; and references herein to any Person include such Person's successors and assigns.  All references in this Agreement to exhibits and schedules refer to the exhibits and schedules to this Agreement unless expressly provided otherwise, and all such exhibits and schedules are hereby incorporated herein by reference and made a part hereof for all purposes.

3

## ARTICLE II  QUANTITY

Section 2.1    Quantity.  During the term hereof, and subject to the terms and conditions herein, Seller will sell to Buyer all of the PP Quantities and Buyer will buy from Seller, on a Firm Basis, all of the PP Quantities, as the same are made available for delivery at the Delivery Points. Buyer recognizes that the PP Quantities may vary from Day to Day and from Month to Month and that the Production Payment Conveyance may be supplemented or amended from time to time in ways which may change the PP Quantities, and Buyer recognizes and agrees that (i) Seller has no obligation to deliver any specific quantity of Oil, and that (ii) Buyer is obligated to receive and purchase all PP Quantities delivered, even if such quantities vary in amount or quality.

Section 2.2    Commitment.  Seller hereby commits and dedicates to the performance of this Agreement all of Seller's interest in the PP Quantities.

Section 2.3    AS-IS.  Buyer acknowledges and agrees that all PP Quantities are being sold to Buyer without representation or warranty of any kind or character by or on behalf of Seller on a strictly AS-IS, WHERE IS, WITH ALL FAULTS, BASIS, without recourse of any kind. Seller makes no representations or warranties to the Buyer regarding the PP Quantities, express or implied, as to its production, title, condition, quality, fitness for a general or particular purpose, merchantability or otherwise.

Section 2.4    Independent Consideration.  Contemporaneously with the execution and delivery of this Agreement, Buyer has paid to Seller as further consideration for this Agreement, in cash, the sum of One Hundred Dollars ($100.00) (the "**Independent Consideration**"), in addition to and independent of any other amount to be paid by Buyer to Seller under this Agreement, which Independent Consideration is fully earned by Seller and is non-refundable under any circumstances.

## ARTICLE III  DELIVERY OF OIL

Section 3.1    Transportation.  Pursuant to the Production Payment Conveyance, Producer is responsible for all arrangements necessary to deliver Oil sold hereunder to the Delivery Points, and Buyer shall be responsible for all arrangements necessary to receive Oil at the Delivery Points. The agreement by Buyer to purchase Oil hereunder is on a Firm Basis, and, as such, the obligations of Buyer under this Agreement are not conditioned upon or subject to the ability of Buyer to maintain satisfactory arrangements for the storage or transportation of Oil sold hereunder from the Delivery Points. Buyer will pay any and all costs arising from the acceptance of the Oil sold hereunder at the Delivery Points and from any further transportation, storage or sale of such Oil after such purchase.

Section 3.2    Quality and Measurement.  Inasmuch as Seller has committed to this Agreement all of Seller's interest in the PP Quantities, Seller shall have no obligation to deliver Oil hereunder in any particular quantity or of any particular quality.  All measurements of Oil delivered hereunder shall be performed at no cost to Seller by the Receiving Transporter in accordance with the tariffs, rules, guidelines and policies of the Receiving Transporter.

Section 3.3    Title.  Title, ownership and risk of loss of the Oil sold hereunder shall pass automatically from Seller and vest in Buyer upon delivery of Oil by Producers to Seller at each Delivery Point.

Section 3.4    Penalties and Cashouts.  As between the Parties hereto, Buyer will be solely responsible and liable for, and shall indemnify and hold Seller harmless from and against, any charges or penalties assessed or assessable by Producers, any Receiving Transporter, or any subsequent transporter, against either Buyer or Seller.  Buyer will also be solely responsible and liable for, and shall indemnify and hold Seller harmless from and against, any charges or penalties assessed or assessable by Producers or any transporter prior to any Delivery Point, and any other costs and expenses incurred or payable by either Buyer or Seller, if such charges or penalties prior to any Delivery Point, or other costs or expenses, are incurred as a result of Buyer's failure to take Oil under this Agreement (including any failure to take Oil as a result of not maintaining adequate transportation arrangements and any failure otherwise excused by reason of Force Majeure). If Buyer is liable under this Article to reimburse Seller for any amounts, it will do so within thirty (30) days following receipt of an invoice or schedule detailing those amounts.

## ARTICLE IV  PRICE AND TERM

Section 4.1    Purchase Amounts.  Each Month, Buyer shall pay to Seller an amount equal to the sum of all Purchase Amounts.  As used herein, "**Purchase Amount**" means, for each Month and each Field, the product of: (i) the Delivered Quantity for such Month from such Field, times (ii) the Purchase Price for such Month.

Section 4.2    Term.  Subject to the terms of this Agreement, the term of this Agreement shall commence at the Initial Time and extend to the termination of the Production Payment.

## ARTICLE V  BREACHES AND REMEDIES

Section 5.1    Buyer's Failure to Accept.  If, during any Month, Buyer fails to accept tender of delivery of all or any part of the PP Quantities, Buyer shall be in breach hereof.  Upon any such breach, Seller shall have the right to sell to one or more third party purchasers any PP Quantities not accepted by Buyer, and, as to any PP Quantities so sold, Seller shall be entitled to reimbursement from Buyer for (x) the difference between (a) the price set forth under this Agreement and (b) the amount actually received from such sale; plus (y) all out of pocket costs incurred by Seller in arranging the sale to such third party (including any broker, consultant and/or attorney fees) and all other costs directly arising from Buyer's breach. Seller shall have no obligation, under this contract, under common law, or otherwise, to exercise such right.

Section 5.2    Suspension or Termination by Seller.  Upon any breach of this Agreement by Buyer that is described in the preceding Section 5.1 or any failure by Buyer to pay amounts owing hereunder, and if such breach or failure is not fully cured within five (5) days after notice thereof from Seller, Seller shall have (in addition to the right described in Section 5.1 and all other rights and remedies available to Seller) the rights to:

(a)    terminate this Agreement with respect to all PP Quantities not then previously delivered hereunder, or

5

(b)      suspend this Agreement, with respect to the PP Quantities to be thereafter produced from any one or more Fields, and for the remainder of the then current Month or for any one or more Months thereafter.

If Seller so terminates this Agreement with respect to all PP Quantities not then previously delivered hereunder, then Seller shall have the right to sell such PP Quantities to one or more third party purchasers, and, as to any PP Quantities so sold during the three Months following such termination, Seller shall be entitled to reimbursement from Buyer for (x) the difference between (a) the price set forth under this Agreement and (b) the amount actually received from such sale; plus (y) all out of pocket costs incurred by Seller in arranging the sale to such third party (including any broker, consultant and/or attorney fees) and all other costs directly arising from Buyer's breach or failure.  If Seller so suspends this Agreement with respect to any PP Quantities, then Seller shall have the right to sell such PP Quantities to one or more third party purchasers, and, as to any PP Quantities so sold during the time of such suspension, Seller shall be entitled to reimbursement from Buyer for (x) the difference between (a) the price set forth under this Agreement and (b) the amount actually received from such sale; plus (y) all out of pocket costs incurred by Seller in arranging the sale to such third party (including any broker, consultant and/or attorney fees) and all other costs directly arising from Buyer's breach or failure (provided that no such reimbursement will be due for that period, if any, of any such suspension which exceeds three consecutive months).

Section 5.3      Rights and Remedies Cumulative.  Seller's rights and remedies under Sections 5.1 and 5.2 shall be in addition to any other rights which Seller may have with respect to any or all breaches by Buyer of this Agreement, or with respect to any breaches of any Production Payment Document, and Seller's exercise of rights under any section of this Agreement shall not limit any other rights or remedies of Seller.

Section 5.4. Termination due to Force Majeure.  Notwithstanding anything to the contrary in this Agreement, either Party may in its sole discretion elect to terminate this Agreement with respect to all PP Quantities not then previously delivered hereunder without liability or cost by written notice to the other Party if, due to Force Majeure, the other Party is unable or prevented from performing its obligations under this Agreement for a period longer than three (3) consecutive months.

## ARTICLE VI  PAYMENT

Section 6.1      Payment and Statements.  Buyer shall render payment to Seller for the Oil delivered in any Month on or before the last Business Day of the next succeeding Month.  With such payment, Buyer shall furnish a statement setting forth the amount of Oil delivered hereunder during the Month for which such payment is made, the Purchase Amounts paid therefor, any severance taxes withheld pursuant to Section 7.1, and all calculations used to determine such amounts.  Buyer will pay all amounts owing to Seller hereunder by wire transfer of immediately available funds to such banks and accounts as Seller shall from time to time specify in writing at least five Business Days prior to the effective date for any such change of accounts.  Until further notice, all amounts payable to Seller hereunder shall be sent as follows to:

[Insert wire instructions for Seller]

6

If the interests of Seller in this Agreement ever become owned by more than three Persons in compliance with Section 10.1, then Buyer shall not be required to make wire transfers to more than three such Persons.  If Buyer chooses not to make wire transfers to more than three such Persons, then any additional Person owning a partial interest in the rights of Seller under this Agreement in compliance with Section 10.1 may by notice to Buyer request that payments to such owner be thereafter sent directly to such owner by check, whereupon Buyer will do so.

Section 6.2    Audit.  Each Party shall keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to such Party's obligations under this Agreement, including calculation of the Purchase Price.  Each Party shall have the right at all reasonable hours to examine or have examined and copy the records of any other Party to the extent reasonably necessary to verify the accuracy of any quantity of Oil or of any payment made or statement furnished hereunder.  In the event of any inaccuracy, any necessary adjustments in the billing shall be promptly made (provided that, prior to the termination of deliveries of PP Quantities hereunder, any amounts owing by Seller need not be paid in cash but shall be recouped by adjustments to the next occurring payment(s) by Buyer hereunder).  Each Party shall hold any information so obtained in confidence, provided that disclosure thereof shall be permitted: (a) to any Party's Affiliates, investors, officers and employees (provided that such Persons are made aware that such information is required to be held in confidence), (b) to any Party's auditors, counsel, and other professional advisors (provided that such Persons are made aware that such information is required to be held in confidence), (c) in the course of any arbitration, trial or other legal proceeding between any of the Parties or any of their Affiliates, (d) as required by any applicable securities law or other law (including any subpoena, interrogatory, or other similar requirement for such information to be disclosed), and (e) in connection with any assignment or potential assignment of such Party's rights hereunder which is or would be permitted under Section 10.1 (provided that each such assignee or potential assignee is made aware that such information is required to be held in confidence).

Section 6.3    Late Charges.  Any amounts due Seller under this Agreement that are not received by the time set forth herein for the same to be paid shall, as contemplated by Section 2.2(b) of the Production Payment Conveyance, bear interest at the lesser of the Agreed Rate and the highest allowable rate under applicable law from and including the date on which such payments are due to but not including the date that such payments are actually made.

## ARTICLE VII  TAXES AND CHARGES

Section 7.1    Withholding.  Buyer shall be entitled to deduct and withhold from any amounts otherwise payable or deliverable to Seller or any assignee thereof such amounts as may be required to be deducted or withheld therefrom under applicable law if Seller or any assignee of Seller is not a "United States person" within the meaning of Section 7701 of the Internal Revenue Code of 1986, as amended.  To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes as having been paid to the Seller.  Unless otherwise agreed, Buyer shall withhold any and all severance taxes due on the PP Quantities from the payments due to Seller hereunder, and Buyer shall report and remit such severance taxes, if any, to the appropriate Tax authorities. The statement required to be delivered by Buyer under Section 6.1 shall include the amount of Taxes so withheld and information showing the calculation thereof (and, upon

request, copies of all Tax filings relating to PP Quantities).  Buyer will pay or cause to be paid all Taxes upon PP Quantities after delivery thereof to Buyer (including without limitation sales, use or gross receipts Taxes).

Section 7.2    Refunds.  If any severance taxes withheld pursuant to Section 7.1 are ever refunded or rebated, then Buyer shall, with its next payment hereunder, promptly pay over to Seller the amounts so refunded or rebated, and such refunds and rebates shall be considered adjustments to the Purchase Amounts.  If any severance taxes withheld pursuant to Section 7.1 ever give rise to a credit in Borrower's favor with the appropriate Tax authorities, then Buyer shall claim such credit on Seller's behalf with respect to subsequent severance taxes until such credit is exhausted.

## ARTICLE VIII  INDEMNITY

**Section 8.1    INDEMNITY.  BUYER SHALL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS FROM AND AGAINST ALL LOSS, COST AND EXPENSE, INCLUDING COURT COSTS AND ATTORNEY FEES, FOR ANY CLAIMS, SUITS, JUDGMENTS, DEMANDS ACTIONS OR LIABILITIES GROWING OUT OF THE TRANSACTIONS HEREUNDER OR THE PERFORMANCE (OR NONPERFORMANCE) OF BUYER'S DUTIES HEREUNDER OR ARISING WITH RESPECT TO OIL IN BUYER'S CONTROL OR POSSESSION.**

## ARTICLE IX  FORCE MAJEURE

Section 9.1    Effect of Force Majeure.  If either Party is rendered unable, wholly or in part, by Force Majeure to perform or comply with any obligation or condition of this Agreement, such obligation or condition shall be suspended during the period of the inability so caused and such Party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period; provided, however, that obligations to make payments hereunder shall not be suspended, and the Party claiming the occurrence of an event of Force Majeure shall promptly advise the other Party of that Force Majeure event, and the cause of suspension (other than strikes or lockouts) shall be remedied so far as possible with reasonable dispatch.  The settlement of strikes or lockouts shall be entirely within the discretion of the Party experiencing such.  Notwithstanding the foregoing, if Buyer is prevented from purchasing the PP Quantities due to the occurrence of a Force Majeure event, Seller may during the Force Majeure period sell the PP Quantities to a third party purchaser for its own account and will have no liability to Buyer whatsoever in connection with such sale and may retain all proceeds from such sale(s).

Section 9.2    Meaning of Force Majeure.  For the purposes hereof, "Force Majeure" means any insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, extreme cold or freezing weather, lightning, arrests and restraint of rulers and peoples (federal, state, local, tribal, civil or military) civil disturbances, explosions, breakage of or accident to machinery or line or pipe, orders of any court of governmental authority having jurisdiction, or any other cause, whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome.  Failure to prevent or settle any strike or strikes shall not be considered a matter within the control of the Party claiming suspension.  "Force Majeure" does not include changes in prices or other economic matters (such as the prices at which Buyer is able to resell Oil purchased hereunder or the cost to Buyer for transportation of such Oil).  Any events

8

of Force Majeure affecting the performance under this Agreement by any Party shall not relieve such Party of liability in the event of its concurring negligence or in the event of its failure to make reasonable efforts to remedy the situation and to remove the cause in an adequate manner and with all reasonable dispatch, nor shall such events affecting such performance relieve any Party from its obligations to make payments or amounts then due in respect of Oil theretofore delivered.

## ARTICLE X  MISCELLANEOUS

Section 10.1    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties hereto, provided that, except as provided below, this Agreement shall not be transferred or assigned, by operation of law or otherwise, by Seller or Buyer without the other Party's prior written consent, not to be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, Seller may reasonably withhold its consent if the proposed assignee or transferee of Buyer is not a Producer, and Buyer may reasonably withhold its consent if a proposed assignee or transferee of Seller is not a person or person to whom Seller assigns all or any undivided interest in the Production Payment. Notwithstanding the foregoing, Seller shall be permitted (without requiring Buyer's consent) to transfer or assign this Agreement to a third party to which Seller transfers or assigns all of its interests in the Production Payment.  Seller shall also be permitted (without requiring Buyer's consent) to transfer or assign this Agreement in connection with Seller's transfer or assignment of the Production Payment to any Affiliate of Seller.  If either Buyer or Seller transfers or assigns this Agreement in violation of this Section 10.1, the other Party may terminate this Agreement upon written notice of such termination to the violating Party.  Seller hereby represents and warrants to Buyer (and any assignee of Seller must similarly represent and warrant to Buyer) that Seller (or such assignee, as the case may be) is a "United States person", within the meaning of Section 7701 of the Internal Revenue Code of 1986, as amended, or in the event that Seller or any assignee of Seller is not a "United States person" within the meaning of Section 7701 of the Internal Revenue Code of 1986, as amended, such Seller or assignee shall provide Buyer with any and all information or documentation required to determine any withholding obligation of Buyer.

Section 10.2    Waivers and Amendments. This Agreement and the other Production Payment Documents set forth the entire understanding and agreement of the Parties hereto and thereto with respect to the transactions contemplated herein and therein and supersede all prior discussions and understandings with respect to the subject matter hereof and thereof, and no waiver, modification or amendment of or supplement to this Agreement shall be valid or effective unless the same is in writing and signed by the Party or Parties against whom it is sought to be enforced.

THIS WRITTEN AGREEMENT AND THE OTHER PRODUCTION PAYMENT DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 10.3    Notices.    All notices, requests, consents, demands and other communications (in this section, collectively called "notices") which are required or permitted

9

under this Agreement shall be in writing and shall be deemed sufficiently given or furnished if delivered by personal delivery, by telecopy, by delivery service with proof of delivery, or by registered or certified United States mail, postage prepaid, to Buyer or Seller at its address specified on the signature pages hereto.  Any such notice shall be deemed to have been given (a) in the case of personal delivery or delivery service, as of the date of first attempted delivery at the address and in the manner provided herein, (b) in the case of facsimile, upon receipt, or (c) in the case of registered or certified United States mail, three days after deposit in the mail.  Each of Buyer and Seller may change their respective addresses from time to time by sending a notice of the new address, in the manner provided for in this section, to the others.

**Section 10.4    GOVERNING LAW; VENUE.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA (EXCLUDING ANY CONFLICTS-OF-LAW RULE OR PRINCIPLE THAT MIGHT REFER SAME TO THE LAWS OF ANOTHER JURISDICTION); AND, DURING PENDENCY OF THE BANKRUPTCY CASE, EXCLUSIVE VENUE FOR ANY LEGAL PROCEEDING REGARDING THIS AGREEMENT SHALL BE THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DECLINES JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN LOS ANGELES, CALIFORNIA. EACH PARTY HEREBY CONSENTS TO SUCH JURISDICTION.**

**Section 10.5    WAIVER OF JURY TRIAL.  SELLER AND BUYER DO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING BASED UPON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

Section 10.6    Termination; Limited Survival.  Inasmuch as this Agreement covers the Oil to be produced under the Production Payment Conveyance, this Agreement will terminate at the Termination Time referred to therein.  Notwithstanding the foregoing or anything to the contrary in any Production Payment Document, all waivers or admissions made by Buyer herein and all obligations hereunder which Buyer may have to indemnify or compensate Seller shall survive any termination of this Agreement.

Section 10.7    Severability.  If any term or provision hereof shall be determined to be illegal or unenforceable, all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable law.

Section 10.8    Counterparts.  This Agreement may be separately executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed shall be deemed to constitute one and the same Agreement.

Section 10.9    Deed of Trust.  Buyer's obligations under this Agreement are secured by the Deed of Trust.

Section 10.10    Joint and Several Liability.  Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability company, shall be jointly and severally liable for full performance by Buyer of, and all obligations of Buyer under, this Agreement.

10

*[Remainder of page intentionally left blank]*

11

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

BUYER:     TEAM MARIA JOAQUIN, L.L.C.

By:_____
  Name:
  Title:

MARIA JOAQUIN BASIN, L.L.C.

By:_____
  Name:
  Title:

| | |
|---|---|
| Buyer's address: | Team Maria Joaquin, L.L.C. and<br>Maria Joaquin Basin, L.L.C.<br>c/o Scott Nonhof<br>16202 Butera Road<br>Magnolia, TX 77355<br>Email: scott.nonhof@teamoperating.com |
| with a copy to (which shall not constitute notice): | Thompson & Knight, LLP<br>c/o Richard B. Hemingway<br>811 Main Street, Suite 2500<br>Houston, TX 77002<br>Email: Richard.Hemingway@tklaw.com |
| with a copy to (which shall not constitute notice): | Thompson & Knight, LLP<br>c/o Tye C. Hancock<br>811 Main Street, Suite 2500<br>Houston, TX 77002<br>Email: Tye.Hancock@tklaw.com |

SELLER:     HVI CAT CANYON, INC.

By:_____
  Name:  Michael A. McConnell
  Title:  Chapter 11 Trustee

SIGNATURE PAGE TO OIL SALES AGREEMENT

437

| | |
|---|---|
| Seller's Address: | Michael A. McConnell<br>201 Main Street, Suite 2500<br>Fort Worth, Texas  76102<br>E-mail: michael.mcconnell@kellyhart.com |
| with a copy to (which shall not constitute notice): | Danning, Gill, Israel & Krasnoff, LLP<br>c/o Eric P. Israel<br>1901 Avenue of the Stars, Suite 450<br>Los Angeles, CA  90067-6006<br>E-mail: eisrael@danninggill.com |
| with a copy to (which shall not constitute notice): | O'Melveny & Myers LLP<br>c/o Evan M. Jones<br>400 S. Hope Street, 18th Floor<br>Los Angeles, CA 90071<br>Email: ejones@omm.com |

## Schedule 1 to Oil Sales Agreement

County:          Santa Barbara
Fields(s):       Casmalia
                 Cat Canyon
                 Santa Maria Valley
                 Zaca

The Delivery Points for the above Field(s) are at the connections at which Oil is delivered to the Receiving Transporter or the tanks from which the Receiving Transporter collects Oil.

County:          Kern
Field(s):        Belridge, North

The Delivery Points for the above Field(s) are at the connections at which Oil is delivered to the Receiving Transporter or the tanks from which the Receiving Transporter collects Oil.

520089.000049 23823610.14

# EXHIBIT I

FORM OF DEED OF TRUST

*See attached.*

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

[INFO FOR COUNSEL TO BENEFICIARY
TO BE INSERTED]

Space Above This Line for Recorder's Use Only

DEED OF TRUST, MORTGAGE,
ASSIGNMENT, SECURITY AGREEMENT, FIXTURE FILING
AND FINANCING STATEMENT

FROM

TEAM MARIA JOAQUIN, L.L.C. and MARIA JOAQUIN BASIN, L.L.C.

TO

FIRST AMERICAN TITLE INSURANCE COMPANY, TRUSTEE

AND

MICHAEL A. MCCONNELL, CHAPTER 11 TRUSTEE FOR

HVI CAT CANYON, INC., MORTGAGEE

Dated August [___], 2020

A CARBON, PHOTOGRAPHIC, FACSIMILE, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS, SECURES PAYMENT OF FUTURE ADVANCES, AND COVERS PROCEEDS OF COLLATERAL.

THIS INSTRUMENT COVERS, AMONG OTHER THINGS, (A) GOODS WHICH ARE OR ARE TO BECOME FIXTURES RELATED TO THE REAL PROPERTY DESCRIBED HEREIN, AND (B) AS-EXTRACTED COLLATERAL RELATED TO THE REAL PROPERTY DESCRIBED HEREIN (INCLUDING OIL, GAS AND OTHER MINERALS AND ACCOUNTS ARISING OUT OF THE SALE AT THE WELLHEAD OR MINEHEAD THEREOF).  THIS INSTRUMENT IS TO BE FILED FOR RECORD, AMONG OTHER PLACES, IN THE REAL ESTATE, MORTGAGE, OR COMPARABLE RECORDS OF THE COUNTIES REFERENCED IN EXHIBIT A TO THE CONVEYANCE THAT IS ATTACHED AS ANNEX A HERETO AND SUCH FILING WILL SERVE, AMONG OTHER PURPOSES, AS A FIXTURE FILING AND AS A FINANCING STATEMENT COVERING AS-EXTRACTED COLLATERAL.  THE

[MORTGAGE]

MORTGAGOR HAS AN INTEREST OF RECORD IN THE REAL PROPERTY CONCERNED, WHICH INTEREST IS DESCRIBED IN SECTION 1.1 OF THIS INSTRUMENT.

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE.  A POWER OF SALE MAY ALLOW MORTGAGEE OR TRUSTEE (AS HEREINAFTER DEFINED) TO TAKE THE MORTGAGED PROPERTIES AND SELL THEM WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY MORTGAGOR (AS HEREINAFTER DEFINED) UNDER THIS MORTGAGE.**

DEED OF TRUST, MORTGAGE,
ASSIGNMENT, SECURITY AGREEMENT, FIXTURE FILING
AND FINANCING STATEMENT

THIS DEED OF TRUST, MORTGAGE, ASSIGNMENT, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT (this "*Mortgage*"), dated for reference purposes as of August [___], 2020, is made by Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability (herein collectively called "*Mortgagor*"), whose address for notice is c/o Scott Nonhof, 16202 Butera Road, Magnolia, TX 77355 (with copies to (which shall not constitute notice) Thompson & Knight, LLP, c/o Richard B. Hemingway, 811 Main Street, Suite 2500, Houston, TX 77002 and to Thompson & Knight, LLP, c/o Tye C. Hancock, 811 Main Street, Suite 2500, Houston, TX 77001), to First American Title Insurance Company, whose address is 777 South Figueroa Street, 4th Floor, Los Angeles, CA 90017, as Trustee (the "*Trustee*"), for the benefit of Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation, as mortgagee ("*Mortgagee*") whose address for notice is Michael A. McConnell, 201 Main Street, Suite 2500, Fort Worth, Texas 76102 (with copies to (which shall not constitute notice) Danning, Gill, Israel & Krasnoff, LLP, c/o Eric P. Israel, 1901 Avenue of the Stars, Suite 450, Los Angeles, CA  90067-6006 and to O'Melveny & Myers LLP, c/o Evan M. Jones, 400 S. Hope Street, 18th Floor, Los Angeles, CA 90071).

R E C I T A L S:

A.     By means of a Production Payment Conveyance of even date herewith (the "*Conveyance*") from Mortgagor to Mortgagee, a true and correct copy of which is annexed hereto as Annex B, Mortgagor has conveyed and assigned to Mortgagee the "*Production Payment*", as defined therein and herein so called.  Reference is made to the Conveyance for the meaning of capitalized terms that are defined therein (and not otherwise defined herein), which terms will have the same meanings when used herein.

B.     To induce Mortgagee to purchase the Production Payment, Mortgagor is executing and delivering this Mortgage in order to secure the payment and performance of the covenants and obligations of Mortgagor under (i) the Conveyance, and (ii) that certain Oil Sales Agreement of even date herewith (the "*Oil Sales Agreement*") between Mortgagor and Mortgagee. This Mortgage, the Conveyance, and the Oil Sales Agreement (as each is from time to time amended, supplemented, restated or otherwise modified) are herein collectively called the "*Production Payment Documents*".

C.     The Production Payment is carved out of the Subject Interests.  Mortgagor's retained interests in the Subject Interests (including Mortgagor's reversionary interests therein), after giving effect to the Conveyance (but including any interests in the Subject Interests acquired or owned by Mortgagor as a result of the Conveyance being void, voidable, rejected, set aside or otherwise not given effect to, in whole or in part), are herein called the "*Retained Interests*".

D.     The Mortgaged Properties (as hereinafter defined) include certain interests in the Subject Wells and lands or leases pooled, communitized or unitized with the Subject Interests described in Annex A attached hereto and made a part hereof (the "*Property Exhibit*").  This Mortgage is to be recorded in the jurisdictions set forth in the Property Exhibit.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mortgagor hereby agrees with Trustee and Mortgagee as follows and hereby takes the following actions:

ARTICLE I.

Granting Clauses; Secured Obligations

Section 1.1 Grant and Mortgage.  For and in consideration of the sum of One Hundred Dollars ($100.00) to Mortgagor in hand paid, and in order to secure the payment and performance of the secured obligations herein referred to and the performance of the obligations, covenants, agreements, warranties and undertakings of Mortgagor herein described and for the benefit of Mortgagee and the other obligees referred to herein, Mortgagor hereby GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, ASSIGNS AND SETS OVER to Trustee, and grants to Trustee a POWER OF SALE (pursuant to this Mortgage and applicable law) with respect to, the following described properties, rights and interests (the "***Mortgaged Properties***") SAVE and EXCEPT for the Excluded Structures (as herein defined):

A.      All rights, titles, interests and estates now owned or hereafter acquired by Mortgagor in and to the Retained Interests, the Subject Interests, the Subject Lands and the Subject Wells;

B.      All rights, titles, interests and estates now owned or hereafter acquired by Mortgagor, by agreement or operation of law or otherwise, in and to (i) all presently existing and hereafter created operating agreements, equipment leases, production sales contracts, processing agreements, gathering agreements, transportation agreements, gas balancing agreements, farmout or farm-in agreements, salt water disposal agreements, area of mutual interest agreements, licenses, permits, and other contracts, agreements or regulatory approvals which cover, affect, or otherwise relate to the Retained Interests, the Subject Interests, the Subject Lands, or the Subject Wells or the production, exchange, compression, treating, handling, storage, processing, gathering, transporting, sale, purchase, or marketing of oil, gas, other hydrocarbons, or other minerals produced from or attributable to the Retained Interests, the Subject Interests, the Subject Lands, or the Subject Wells, and (ii) all accounting or business data to the extent relating to the Retained Interests, the Subject Interests, the Subject Lands, the Subject Wells or the oil, gas, other hydrocarbons, or other minerals produced therefrom;

C.      All of Mortgagor's interest (whether now owned or hereafter acquired by agreement or operation of law or otherwise) in and to all improvements, facilities, infrastructure, equipment, fixtures, and other real, immovable, personal or movable property (including all platforms, wells, pumping units, wellhead equipment, tanks, pipelines, flow lines, gathering lines, compressors, dehydration units, separators, meters, buildings, injection facilities, salt water disposal facilities, and power, telephone and telegraph lines), and all easements, servitudes, rights-of-way, surface leases, licenses, permits and other surface rights, which are now or hereafter used, or held for use, in connection with the properties, rights and interests described in clauses A or B above, or in connection with the operation of such properties, rights and interests, or in connection

with the treating, handling, storing, processing, transporting or marketing of oil, gas, other hydrocarbons, or other minerals produced from (or allocated to) such properties, rights and interests;

    D.    All of the Production (as hereinafter defined); and

    E.    All of Mortgagor's rights, estates, powers and privileges appurtenant to the foregoing rights, interests and properties, all renewals or extensions thereof, and all supplements or amendments thereto;

TO HAVE AND TO HOLD the Mortgaged Properties unto Trustee, and its successors or substitutes in this trust, and to its or their successors and assigns, in trust, however, upon the terms, provisions and conditions herein set forth.  Mortgagor will warrant and defend title to the Property (as herein defined) against the claims and demands of all Persons claiming or to claim the same or any part thereof, free and clear of all liens, security interests, and encumbrances except for (i) liens and security interests in respect of this Mortgage and (ii) Permitted Encumbrances (as defined in the Purchase and Sale Agreement of even date herewith between Michael A. McConnell, solely in his capacity as Chapter 11 Trustee for HVI Cat Canyon, Inc., a Colorado corporation, as seller, and Mortgagor, as buyer, with respect to Mortgagor's purchase of the Subject Interests, as from time to time amended or supplemented).

Notwithstanding any provision in this Mortgage to the contrary, in no event is (a) any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation), which is located within an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968, or (b) any interest held by Mortgagor in and to the surface of the lands underlying said Building or Manufactured (Mobile) Home, insofar and only insofar as such lands lie directly below said Building or Manufactured (Mobile) Home (such Buildings, Manufactured (Mobile) Homes and lands are collectively referred to herein as, the "***Excluded Properties***"), included in the definition of "Mortgaged Properties", "Collateral" or "Property" (each as herein defined), and no Excluded Properties are encumbered by this Mortgage.  As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now in effect, (ii) the Flood Disaster Protection Act of 1973 as now in effect, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as now in effect, and (iv) the Flood Insurance Reform Act of 2004 as now in effect.

    Section 1.2 <u>Scope of Mortgage</u>.  This Mortgage is a deed of trust and mortgage, a security agreement, a financing statement and an assignment.  This Mortgage covers real property and personal property (including goods that are or are to become fixtures and as-extracted collateral), and all proceeds thereof.

    Section 1.3 <u>Grant of Security Interest</u>.  In order to further secure the payment and performance of the secured obligations herein referred to and the performance of the obligations, covenants, agreements, warranties, indemnities and undertakings of Mortgagor herein described, Mortgagor hereby grants to Mortgagee a security interest in the entire interest of Mortgagor (whether now owned or hereafter acquired by operation of law or otherwise) in and to:

(a)       all oil, gas, other hydrocarbons, and other minerals at any time produced from or allocated to the Retained Interests, the Subject Interests, the Subject Lands, the Subject Wells, and the other Mortgaged Properties (including, without limitation, all PP Hydrocarbons at any time purchased or otherwise acquired by Mortgagor) and all products processed or obtained from any of the foregoing (herein collectively called the "***Production***"), together with all accounts arising out of the sale of Production and all other proceeds of Production (regardless of whether or not the Production, such accounts and such proceeds constitute "as-extracted collateral" under the Uniform Commercial Code as in effect from time to time as part of the laws applicable to this Mortgage pursuant to Section 5.19 (the "***Applicable UCC***")), and all liens and security interests securing payment of the proceeds of Production, including those liens and security interests provided for under (i) statutes enacted in the jurisdictions in which the Mortgaged Properties are located, or (ii) statutes made applicable to the Mortgaged Properties under federal law (or some combination of federal and state law);

(b)       without limitation of or by any other provisions of this Section 1.3, all payments received in lieu of Production (regardless of whether such payments accrued, or the events which gave rise to such payments occurred on, before or after the date hereof), including "take or pay" payments and similar payments, payments received in settlement of or pursuant to a judgment rendered with respect to take or pay or similar obligations or other obligations under a production sales contract, payments received in buyout or buydown or other settlement of a production sales contract, and payments received under a gas balancing or similar agreement as a result of (or received otherwise in settlement of or pursuant to judgment rendered with respect to) rights held by Mortgagor as a result of Mortgagor (or its predecessors in title) taking or having taken less gas from lands covered by a Mortgaged Property (or lands pooled or unitized therewith) than their ownership of such Mortgaged Property would entitle them to receive (the payments described in this subsection (b) being herein called "***Payments in Lieu of Production***");

(c)       all equipment, inventory, improvements, fixtures, accessions, goods, and other personal property or movable property of whatever nature now or hereafter located on or used or held for use in connection with the Mortgaged Properties (or in connection with the operation thereof or the treating, handling, storing, processing, transporting, or marketing of Production), and all licenses and permits of whatever nature now or hereafter used or held for use in connection with the Mortgaged Properties (or in connection with the operation thereof or the treating, handling, storing, processing, transporting, or marketing of Production), and all renewals or replacements of the foregoing or substitutions for the foregoing;

(d)       all accounts, contracts, contract rights, choses in action (i.e., rights to enforce contracts or to bring claims thereunder) and general intangibles of any kind (regardless of whether the same arose, or the events which gave rise to the same occurred, on or before or after the date hereof) in any way related to the Mortgaged Properties, the operation thereof (whether Mortgagor is operator or non-operator or otherwise), or the treating, handling, separation, stabilization, storing, processing, transporting, gathering, sale or marketing of Production (including any of the same relating to payment of proceeds

of Production or to payment of amounts which could constitute Payments in Lieu of Production);

(e)     all geological, geophysical, engineering, accounting, title, legal, and other technical or business data concerning the Mortgaged Properties, the Production or any other item of Property (as herein defined), which data is now or hereafter in the possession of Mortgagor or in which Mortgagor can otherwise grant a security interest, and all books, files, records, magnetic media, software, and other forms of recording or obtaining access to such data; and

(f)     all proceeds of any of the foregoing Collateral;

provided, however, that if the grant of a security interest or Lien under Section 1.1 or this Section 1.3 with respect to any contract, easement, right of way, surface lease, or personal property lease is prohibited thereunder and the violation of such prohibition would cause Mortgagor to lose its interest in or rights with respect to such contract, easement, right of way, surface lease, personal property lease or other agreement, then Mortgagor shall be deemed not to have granted such security interest or Lien therein or thereon to the extent that such prohibition is enforceable and applicable.

All of the properties, rights and interests described in subsections (a), (b), (c), (d), (e) and (f) above are herein sometimes collectively called the "***Collateral***." The Mortgaged Properties, the Collateral, and the proceeds of the Mortgaged Properties and of the Collateral are herein sometimes collectively called the "***Property***".

Except as otherwise expressly provided in this Mortgage, all terms in this Mortgage relating to the Collateral and the grant of the foregoing security interest which are defined in the Applicable UCC will have the meanings assigned to them in Article 9 (or, absent definition in Article 9, in any other Article) of the Applicable UCC, as those meanings may be amended, revised or replaced from time to time.

Section 1.4 <u>Production Payment Documents; Other Obligations</u>.  This Mortgage is made to secure and enforce the payment and performance of the following obligations, indebtedness and liabilities:

(a)     The full performance and payment when due of all obligations, covenants, and indemnities of and by Mortgagor from time to time owing to Mortgagee under each of the Production Payment Documents;

(b)     Any sums advanced or expenses or costs incurred by Trustee or Mortgagee (or any receiver appointed hereunder) which are made or incurred pursuant to, or permitted by, the terms of any Production Payment Document, plus interest thereon at the Applicable Rate, as defined herein, from the date of the advances or the incurring of such expenses or costs until reimbursed;

(c)     Any and all damages that may be owed by Mortgagor to Trustee, or Mortgagee as a result of any breach, default or rejection by Mortgagor of any Production Payment Document or any provision thereof;

(d)      All costs and expenses of Trustee and Mortgagee in enforcing their rights and remedies hereunder or preserving any collateral or security interest as permitted hereunder; and

(e)      Without limiting the generality of the foregoing, all post-petition interest, expenses, and other duties and liabilities with respect to indebtedness or other obligations described above in this Section 1.4, which would be owed but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding.

Section 1.5 Secured Obligations.  The obligations, indebtedness and liabilities referred to in Section 1.4, and all renewals, extensions and modifications thereof, and all substitutions therefor, in whole or in part, are herein sometimes referred to as the "***secured obligations***" or the "***obligations secured hereby***".  It is intended, agreed and acknowledged that the secured obligations may include obligations, indebtedness and liabilities hereafter arising and that this Mortgage will have effect, as of the date hereof, to secure all secured obligations at any time existing or arising, whether existing or arising on the date hereof or on a later date or whether, having arisen or been advanced, being later repaid in part or in whole.

Section 1.6 Release of Mortgage.  If all secured obligations secured hereby (other than contingent indemnification obligations not yet due and payable) shall be paid in full or performed in full, as applicable, and all of the Production Payment Documents shall be terminated, Mortgagee shall forthwith cause reconveyance, satisfaction, release, discharge and reassignment of this Mortgage to be entered upon the record at the expense of Mortgagor and shall execute and deliver or cause to be executed and delivered such instruments of reconveyance, satisfaction, release, discharge and reassignment as may be appropriate.  Otherwise, this Mortgage shall remain and continue in full force and effect.  The signature, joinder or ratification of Trustee shall not be necessary for any such instrument of reconveyance, satisfaction, release, discharge or reassignment executed by Mortgagee to be effective or enforceable.

ARTICLE II.

Representations, Warranties & Covenants

Section 2.1 Representations, Warranties and Covenants of Mortgagor.  Mortgagor hereby represents, warrants and covenants with Mortgagee as follows:

(a)      Not a Foreign Person.  Mortgagor is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended (hereinafter called the "Code"), Sections 1445 and 7701 (i.e. Mortgagor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and any regulations promulgated thereunder).

(b)      Power to Create Lien and Security.  Mortgagor has full power and lawful authority to grant, bargain, sell, assign, transfer, mortgage, and convey a security interest in all of the Mortgaged Property and the Collateral in the manner and form herein provided

and without obtaining the authorization, approval, consent or waiver of any lessor, sublessor, governmental authority or other party or parties whomsoever.

(c)    <u>Sales and Assignments</u>.  Any sale, transfer, assignment or conveyance of the Subject Interests by Grantor shall be subject to Section 4.1 of the Conveyance.

(d)    <u>Further Identification of Collateral</u>.  Mortgagor will furnish to Mortgagee and Trustee from time to time, at Mortgagor's sole cost and expense, statements and schedules further identifying and describing the Mortgaged Properties and the Collateral and such other reports in connection with the Mortgaged Properties and Collateral as Mortgagee or Trustee may reasonably request, all in reasonable detail.

(e)    <u>Defense of Mortgage</u>.  If the validity of this Mortgage or of any rights, titles, liens or security interests created or evidenced hereby with respect to the Property or any part thereof is ever endangered or questioned or attacked directly or indirectly or if any legal proceedings are instituted against Mortgagor with respect thereto, Mortgagor will give prompt written notice thereof to Mortgagee and at Mortgagor's own cost and expense Mortgagor will diligently endeavor to cure any defect that is claimed, and will take all necessary and proper steps for the defense of such legal proceedings, including the employment of counsel, the prosecution or defense of litigation and the release or discharge of all such adverse claims, and Mortgagee (whether or not named as a party to legal proceedings with respect thereto) is hereby authorized and empowered to take such additional steps as in its judgment and discretion may be necessary or proper for the defense of any such legal proceedings or the protection of the validity of this Mortgage and the rights, titles, liens and security interests created or evidenced hereby, including the employment of independent counsel, the prosecution or defense of litigation, and all expenditures so made of every kind and character will be a demand obligation (which obligation Mortgagor hereby expressly promises to pay) owing by Mortgagor to Mortgagee and will bear interest from the date expended until paid at the Applicable Rate, and the party incurring such expenses will be subrogated to all rights of the Person receiving such payment.

(f)    <u>Further Assurances</u>.  Mortgagor will, on request of Mortgagee, (i) promptly correct any defect, error or omission which may be discovered in the contents of this Mortgage, or in the execution or acknowledgment of this Mortgage; (ii) execute, acknowledge, deliver and record or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage; and (iii) execute, acknowledge, deliver, and file or record any document or instrument (including specifically any financing statement) desired by Mortgagee to protect the liens or the security interests hereunder against the rights or interests of third persons.  Mortgagor agrees to pay all costs connected with any of the foregoing.

(g)    <u>Name and Place of Business</u>.  Mortgagor will not cause or permit any change to be made in its name, identity, state of organization or formation, or corporate, partnership or limited liability company structure, or in its organizational identification number in its state of organization or formation, unless Mortgagor has notified Mortgagee of such change at least ten (10) Business Days prior to the effective date of such change,

and has first taken all action required by Mortgagee for the purpose of further perfecting or protecting the liens and security interests in the Property created hereby.  Mortgagor's exact name is the name set forth in this Mortgage.

Section 2.2 <u>Performance on Mortgagor's Behalf</u>.  Mortgagor agrees that if Mortgagor fails to perform any act or to take any action which Mortgagor is required to perform or take hereunder, or fails to pay any money which Mortgagor is required to pay hereunder, Mortgagee, in Mortgagor's name or its own name may, but will not be obligated to, perform or cause to be performed such act or take such action or pay such money, and any expenses so incurred by Mortgagee and any money so paid by Mortgagee will be a demand obligation owing by Mortgagor to Mortgagee (which obligation Mortgagor hereby expressly agrees to pay), and Mortgagee, upon making such payment, will be subrogated to all of the rights of the Person receiving such payment. Each amount due and owing by Mortgagor to Trustee or Mortgagee pursuant to this Mortgage (to the extent such amount is not bearing interest pursuant to the terms of the other Production Payment Documents) will bear interest from the date of such expenditure or payment or other occurrence which gives rise to such amount being owed to such Person until paid at a rate (the "***Applicable Rate***") equal to the lower of the Agreed Rate and the highest rate of interest that Mortgagee may charge to Mortgagor under applicable law, and all such amounts together with such interest thereon will be a part of the secured obligations and will be secured by this Mortgage.

ARTICLE III.

<u>Assignment of Production, Accounts, and Proceeds</u>

Section 3.1 <u>Assignment of Production and Production Proceeds</u>.  Mortgagor hereby absolutely and unconditionally assigns, transfers, conveys, grants and sets over to Mortgagee (a) all Production, (b) all other as-extracted collateral that relates or accrues to Mortgagor's interests in the Mortgaged Properties and (c) all proceeds of any of the foregoing (including all as-extracted collateral constituting proceeds) and all Payments in Lieu of Production (which proceeds and Payments in Lieu of Production are herein collectively called "***Production Proceeds***"), together with the immediate and continuing right to collect and receive such Production Proceeds. Mortgagor shall direct and instruct any and all purchasers of any Production to pay to Mortgagee all of the Proceeds accruing to Mortgagor's interest until such time as such purchasers have been furnished with evidence that all secured obligations have been paid or performed and that this Mortgage has been released.  Mortgagor agrees that no purchaser of Production will have any responsibility for the application of any funds paid to Mortgagee.

Section 3.2 <u>Effectuating Payment of Proceeds to Mortgagee</u>.

(a)    Mortgagor agrees to execute and deliver any and all transfer orders, division orders and other instruments that may be requested by Mortgagee or that may be required by any purchaser of any Production for the purpose of effectuating payment of the Proceeds to Mortgagee. In addition, Mortgagor's interest in all Production Proceeds that for any reason may be paid to Mortgagor will, when received by Mortgagor, constitute trust funds in Mortgagor's hands and must be immediately paid over to Mortgagee.

(b)      Mortgagor hereby constitutes and appoints Mortgagee as Mortgagor's special attorney-in-fact (with full power of substitution, either generally or for such periods or purposes as Mortgagee may from time to time prescribe) in the name, place and stead of Mortgagor to do any and every act and exercise any and every power that Mortgagor might or could do or exercise personally with respect to all Production and Production Proceeds (the same having been assigned by Mortgagor to Mortgagee pursuant to Section 3.1 hereof), expressly including the right, power and authority to:

(i)      execute and deliver in the name of Mortgagor any and all transfer orders, division orders, letters in lieu of transfer orders, indemnifications, certificates and other instruments of every nature that may be requested or required by any purchaser of Production from any of the Mortgaged Properties for the purposes of effectuating payment of the Production Proceeds to Mortgagee or that Mortgagee may otherwise deem necessary or appropriate to effect the intent and purposes of the assignment contained in Section 3.1; and

(ii)      if under any sales agreements any Production Proceeds are required to be paid by the purchaser to Mortgagor so that under such existing agreements payment cannot be made of such Production Proceeds to Mortgagee, to make, execute and enter into such sales agreements or other agreements as are necessary to direct Production Proceeds to be payable to Mortgagee;

giving and granting unto said attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever necessary and requisite to be done as fully and to all intents and purposes as Mortgagor might or could do if personally present; and Mortgagor will be bound thereby as fully and effectively as if Mortgagor had personally executed, acknowledged and delivered any of the foregoing certificates or documents.  The power of attorney herein conferred is granted for valuable consideration and hence is coupled with an interest and is irrevocable so long as the secured obligations, or any part thereof, remains unpaid.  Mortgagee may, but will not be obligated to, take such action as it deems appropriate in an effort to collect the Production Proceeds and any reasonable expenses (including reasonable attorney's fees) so incurred by Mortgagee will be a demand obligation of Mortgagor and will be part of the secured obligations, and will bear interest each day, from the date of such expenditure or payment until paid, at the Applicable Rate.  Notwithstanding anything to the contrary in the foregoing, Mortgagee hereby agrees not to exercise such power of attorney unless a default has occurred and is continuing hereunder.

(c)      All Persons obligated to pay Production Proceeds or otherwise dealing with Mortgagee or any substitute are irrevocably directed and authorized by Mortgagor to rely without further inquiry or any statement by Mortgagee that a default hereunder has occurred and is continuing, and all such Persons will be fully protected in treating the powers and authorities conferred by subsection (b) above as continuing in full force and effect until advised by Mortgagee that all the secured obligations are fully and finally paid.

Section 3.3 <u>Release From Liability</u>.  Mortgagee and its successors and assigns are hereby released and absolved from all liability for failure to enforce collection of the Production Proceeds

[MORTGAGE]

and from all other responsibility in connection therewith, except the responsibility of each to account to Mortgagor for funds actually received by each.

Section 3.4 <u>No Modification of Payment Obligations</u>. Nothing herein contained shall modify or otherwise alter the obligation of Mortgagor to make prompt payment of all amounts owing on the secured obligations when and as the same become due. Nothing in this Article III is intended to be an acceptance of collateral in satisfaction of the secured obligations.

Section 3.5 <u>Rights of Producers</u>. Mortgagor hereby grants, sells, assigns, sets over and mortgages unto Mortgagee, during the term hereof, all of Mortgagor's rights and interests pursuant to any provision of applicable law granting producers of oil and gas a lien on the oil and gas produced by them and on the resulting accounts receivable, hereby vesting in Mortgagee, all of Mortgagor's rights as an interest owner to the continuing security interest in and lien upon such oil and gas and accounts receivable.

ARTICLE IV.

<u>Remedies Upon Default</u>

Section 4.1 <u>Default</u>. The term "*default*" as used in this Mortgage means the occurrence of any of the following events:

     (a)    failure by Mortgagor to pay any money owing or belonging to Mortgagee that continues unremedied for more than three (3) Business Days after written notice thereof from Mortgagee or Trustee;

     (b)    failure by Mortgagor to cure a breach by Mortgagor in the due performance or observance of any covenant or agreement contained in this instrument or in any of the Production Payment Documents and not constituting a failure to pay any obligation secured hereby that continues unremedied for thirty (30) days following Mortgagor receiving written notice thereof from Mortgagee or Trustee;

     (c)    any of the representations or warranties made by Mortgagor herein or in any other Production Payment Document is false or incorrect in any material respect on any date made or as of which made; or

     (d)    Mortgagor:

         (i)    Becomes insolvent or generally fails to pay, or admits in writing its inability or unwillingness generally to pay, its debts as they become due;

         (ii)    Applies for, consents to, or acquiesces in the appointment of a trustee, receiver, sequestrator or other custodian for the Property or any material part thereof, or makes a general assignment for the benefit of creditors;

         (iii)    In the absence of such application, consent or acquiescence, permits or suffers to exist the appointment of a trustee, receiver, receiver manager, sequestrator or other custodian for the Property or any substantial part thereof, and

10

such trustee, receiver, receiver manager, sequestrator or other custodian is not discharged within sixty (60) days;

(iv)    Commences a voluntary case under any applicable bankruptcy or insolvency law, or applies for or consents to an order of relief in any involuntary case under any such law;

(v)    Suffers the entry against it of a judgment, decree or order for relief by a court of competent jurisdiction in an involuntary proceeding commenced under any applicable bankruptcy or insolvency law, or has any such proceeding commenced against it which remains undismissed for a period of sixty (60) days; or

(vi)    Takes any action authorizing, or in furtherance of, any of the foregoing.

Section 4.2 <u>Pre-Foreclosure Remedies</u>.    Whenever a default has occurred and is continuing, Mortgagee is authorized, prior or subsequent to the institution of any foreclosure proceedings, to enter upon the Property, or any part thereof, and to take possession of the Property and all books and records relating thereto, and to exercise without interference from Mortgagor any and all rights which Mortgagor has with respect to the management, possession, operation, protection or preservation of the Property.  If necessary to obtain the possession provided for above, Mortgagee may invoke any and all remedies to dispossess Mortgagor.  Mortgagor agrees to peacefully surrender possession of the Property if requested by Mortgagee.  All costs, expenses and liabilities of every character incurred by Mortgagee in managing, operating, maintaining, protecting or preserving the Property will constitute a demand obligation (which obligation Mortgagor hereby expressly promises to pay) owing by Mortgagor to Mortgagee and will bear interest from date of expenditure until paid at the Applicable Rate, all of which will constitute a portion of the secured obligations and will be secured by this Mortgage and by any other instrument securing the secured obligations.  In connection with any action taken by Mortgagee pursuant to this Section 4.2, MORTGAGEE WILL NOT BE LIABLE FOR ANY LOSS SUSTAINED BY MORTGAGOR OR ANY AFFILIATE OF MORTGAGOR RESULTING FROM ANY ACT OR OMISSION BY MORTGAGEE (INCLUDING MORTGAGEE'S OWN NEGLIGENCE OR STRICT LIABILITY) IN MANAGING THE PROPERTY, EXCEPT TO THE EXTENT SUCH LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF MORTGAGEE, nor will Mortgagee be obligated to perform or discharge any obligation, duty or liability of Mortgagor arising under any agreement forming a part of the Property or otherwise arising.  Mortgagor shall be liable to Mortgagee for any costs or expenses (including court costs and attorneys' fees) arising from Mortgagee taking possession of the Property pursuant to this Section 4.2.

Section 4.3 <u>Foreclosure</u>.

(a)    <u>Mortgaged Properties</u>.  Whenever a default has occurred and is continuing, Trustee is authorized and empowered and it will be Trustee's special duty at the request of Mortgagee to sell the Mortgaged Properties, or any part thereof, as an entirety or in parcels as Mortgagee may elect, at such place or places and otherwise in the manner and upon such notice as may be required by law or, in the absence of any such requirement, as Trustee may deem

11

[MORTGAGE]

appropriate.  Whenever Trustee has given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

**A POWER OF SALE HAS BEEN GRANTED IN THIS MORTGAGE.  A POWER OF SALE MAY ALLOW TRUSTEE TO TAKE THE MORTGAGED PROPERTIES AND COLLATERAL AND SELL THEM WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY MORTGAGOR UNDER THIS MORTGAGE OR THE OTHER PRODUCTION PAYMENT DOCUMENTS.**

(b)     Whenever a default has occurred and is continuing, Mortgagee may exercise its rights of enforcement with respect to the Collateral under the Applicable UCC or under any other statute in force in any state to the extent the same is applicable law and:

(i)     Mortgagee may enter upon the Mortgaged Properties or otherwise upon Mortgagor's premises to take possession of, assemble and collect the Collateral or to render it unusable;

(ii)     Mortgagor will upon Mortgagee's request assemble the Collateral and make it available at one or more places reasonably designated by Mortgagee to allow Mortgagee to take possession or dispose of the Collateral;

(iii)     written notice sent to Mortgagor as provided herein at least ten (10) days prior to the date of public sale of the Collateral or prior to the date after which private sale of the Collateral will be made will constitute reasonable notice;

(iv)     in the event of a foreclosure of the liens or security interests created or evidenced hereby, the Collateral, or any part thereof, and the Mortgaged Properties, or any part thereof, may, at the option of Mortgagee, be sold, as a whole or in parts, together or separately (for example, when a portion of the Mortgaged Properties is sold, the Collateral related thereto may be sold in connection therewith);

(v)     the expenses of sale provided for in clause FIRST of Section 4.6 will include the reasonable expenses of retaking the Collateral, or any part thereof, holding the same and preparing the same for sale or other disposition;

(vi)     should, under this subsection, the Collateral be disposed of other than by sale, any proceeds of such disposition will be treated under Section 4.6 as if the same were sales proceeds; and

(vii)     Mortgagee or Trustee will have full power and authority to act as Mortgagor's attorney-in-fact, and Mortgagor hereby grants to Mortgagee appropriate powers of attorney to act for and on behalf of Mortgagor, in all dealings with the Department of Interior and all other agencies, departments and subdivisions of the United States of America and of all states in all transactions relating to the Property or any part thereof.  Mortgagor hereby authorizes and directs all such agencies, departments and subdivisions to rely upon any writing from Mortgagee asserting that a default has occurred and is continuing, without inquiry into whether or not such default actually occurred and

12

[MORTGAGE]

is continuing, and Mortgagor agrees that the exercising by Mortgagee of such powers of attorney may be relied upon in all respects and, as between Mortgagor and such agency, department or subdivision, will be binding upon Mortgagor.

(c)     To the extent permitted by applicable law, the sale hereunder of less than the whole of the Property will not exhaust the powers of sale herein granted or the right to judicial foreclosure, and one or more successive sales may be made until the whole of the Property is sold, and, if the proceeds of such sale of less than the whole of the Property is less than the aggregate of the obligations secured hereby, this Mortgage and the liens, privileges and security interests hereof will remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Mortgagor will never have any right to require the sale of less than the whole of the Property.  In the event any sale hereunder is not completed or is defective in the opinion of Mortgagee, such sale will not exhaust the powers of sale hereunder or the right to judicial foreclosure, and Trustee or Mortgagee will have the right to cause a subsequent sale or sales to be made.  Any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law.   Trustee or his or her successor or substitute or Mortgagee, acting under power of sale, respectively, may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale (including the posting of notices and the conduct of sale), and such appointment need not be in writing or recorded except as required by law.  Any and all statements of fact or other recitals made in any deed or deeds, or other instruments of transfer, given in connection with a sale as to nonpayment of the secured obligations or as to the occurrence of any default, or as to all of the secured obligations being due and payable, or as to the request to sell, or as to notice of time, place and terms of sale and the properties to be sold having been duly given, or, with respect to any sale by Trustee, or any successor or substitute trustee, as to the refusal, failure or inability to act of Trustee or any substitute or successor trustee or the appointment of any substitute or successor trustee, or as to any other act or thing having been duly done by any Person, will be taken as prima facie evidence of the truth of the facts so stated and recited.  Notwithstanding any reference herein to any Production Payment Document, all Persons dealing with the Mortgaged Properties will be entitled to rely on any document, or certificate, of Trustee or Mortgagee as to the occurrence of any event or the satisfaction of any condition, such as the existence of a default, and will not be charged with or forced to review any provision of this Mortgage or any other document to determine the accuracy thereof.  With respect to any sale held in foreclosure of the liens or security interests covered hereby, it will not be necessary for Trustee, Mortgagee, any public officer acting under execution or order of the court or any other party to have physically present or constructively in his/her or its possession, either at the time of or prior to such sale, the Property or any part thereof.  Except as provided otherwise by applicable law, Mortgagor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Mortgaged Property or Collateral are insufficient to pay the secured obligations and the fees and disbursements of any attorneys employed by Trustee or Mortgagee to collect such deficiency.

Section 4.4 <u>Effective as Mortgage</u>.  This instrument is effective as a mortgage as well as a deed of trust and whenever a default has occurred and is continuing may be foreclosed as to the Mortgaged Properties, or any portion thereof, in any manner permitted by applicable law, and any foreclosure suit may be brought by Trustee or by Mortgagee.  To the extent, if any, required to cause this instrument to be so effective as a mortgage as well as a deed of trust, Mortgagor hereby mortgages the Mortgaged Properties to Mortgagee to secure the payment and performance of the

13

secured obligations.  In the event a foreclosure hereunder as to the Mortgaged Properties, or any part thereof, is commenced by Trustee, or his substitute or successor, Mortgagee may at any time before the sale of such properties direct Trustee to abandon the sale, and may then or thereafter institute suit for the foreclosure of this Mortgage as to such properties.  If Mortgagee should institute a suit for the foreclosure of this Mortgage, Mortgagee may at any time before the entry of a final judgment in said suit dismiss the same and then or thereafter require Trustee, or Trustee's substitute or successor, to sell the Mortgaged Properties, or any part thereof, in accordance with the provisions of this Mortgage.

Section 4.5 Receiver.  In addition to all other remedies herein provided for, Mortgagor agrees that, whenever a default has occurred and is continuing, Mortgagee will as a matter of right be entitled to the appointment of a receiver or receivers for all or any part of the Property, whether or not such receivership is incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Property or the solvency of any Person or Persons liable for the payment of the obligations secured hereby, and Mortgagor hereby consents to the appointment of such receiver or receivers, waives any and all defenses to such appointment, agrees not to oppose any application therefor by Mortgagee, and agrees that such appointment will not in any manner impair, prejudice or otherwise affect the rights of Mortgagee under Article III hereof.  Mortgagor expressly waives notice of a hearing for appointment of a receiver and the necessity for bond or an accounting by the receiver.  Nothing herein is to be construed to deprive Mortgagee of any other right, remedy or privilege it may now or hereafter have under the law to have a receiver appointed. Any money advanced by Mortgagee in connection with any such receivership will be a demand obligation (which obligation Mortgagor hereby expressly promises to pay) owing by Mortgagor to Mortgagee and will be secured hereby and bear interest, from the date of making such advancement by Mortgagee until paid, at the Applicable Rate.

Section 4.6 Proceeds of Foreclosure.  The proceeds of any foreclosure sale or other enforcement of the liens or security interests created or evidenced hereby will be applied as follows:

FIRST, such proceeds will be applied to the payment of all costs and expenses incident to such foreclosure sale or other enforcement, including all court costs and charges of every character in the event foreclosed by suit or any judicial proceeding and including a reasonable fee to Trustee if such sale was made by Trustee acting under the provisions of Section 4.2(a);

SECOND, such proceeds will be applied to the payment of the secured obligations as provided in the Production Payment Documents; and

THIRD, the remainder, if any, of such proceeds will be paid to Mortgagor, or to Mortgagor's successors or assigns, or to such other Persons as may be entitled thereto by law.

Section 4.7 Mortgagee as Purchaser.  Mortgagee will have the right to become the purchaser at any sale held in foreclosure of the liens or security interests created or evidenced hereby, and Mortgagee will have the right to credit upon the amount of the bid made therefor, to the extent necessary to satisfy such bid, the secured obligations owing to Mortgagee.

14

Section 4.8 <u>Foreclosure as to Matured Debt</u>.   Whenever a default has occurred and is continuing, Mortgagee will have the right to proceed with foreclosure of the liens, privileges or security interests created or evidenced hereby whether or not the entire secured obligations have become due, and in such event, any such foreclosure sale may be made subject to the unmatured part of the secured obligations, and will not in any manner affect the unmatured part of the secured obligations but, as to such unmatured part, this Mortgage will remain in full force and effect as though no sale had been made.   The proceeds of such sale will be applied as provided in Section 4.6 except that the amount paid under clause SECOND thereof will be only the matured portion of the secured obligations and any proceeds of such sale in excess of those provided for in clauses FIRST and SECOND (modified as provided above) will be applied or held by Mortgagee as additional Collateral.   Several sales may be made hereunder without exhausting the right of sale for any unmatured part of the secured obligations.

Section 4.9 <u>Remedies Cumulative</u>.   All remedies herein provided for are cumulative of each other and of all other remedies existing at law or in equity and are cumulative of any and all other remedies provided for in any other Production Payment Document, and, in addition to the remedies herein provided, all such other remedies as may now or hereafter exist at law or in equity for the collection of the secured obligations and the enforcement of the covenants herein and the foreclosure of the liens or security interests created or evidenced hereby will continue to be available, and the resort to any remedy provided for hereunder or under any such other Production Payment Document or provided for by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

Section 4.10 <u>Discretion as to Security</u>.   Mortgagee and Trustee may resort to any security given by this Mortgage or to any other security or guaranty now existing or hereafter given to secure or guarantee the payment of the secured obligations, in whole or in part, and in such portions and in such order as may seem best to Mortgagee in its discretion, and any such action (or any delay in taking or decision not to take such action) will not in any way be considered as a waiver of any of the rights, benefits, liens or security interests created or evidenced by this Mortgage.

Section 4.11 <u>Mortgagor's Waiver of Certain Rights</u>.   To the full extent Mortgagor may do so, Mortgagor agrees that Mortgagor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and Mortgagor, for Mortgagor, Mortgagor's successors and assigns, and for any and all Persons ever claiming any interest in the Property, to the extent permitted by applicable law, hereby waives and releases all rights of appraisement, valuation, stay of execution, redemption, notice of intention to mature or declare due the whole of the secured obligations, notice of election to mature or declare due the whole of the secured obligations and all rights to a marshaling of assets of Mortgagor, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens or security interests hereby created. Mortgagor shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents, or other matters whatever to defeat, reduce or affect the right under the terms of this Mortgage to a sale of the Property for the collection of the secured obligations without any prior or different resort for collection, or the right under the terms of this Mortgage to the payment of the secured obligations out of the proceeds of sale of the Property in preference to every other claimant whatever.   If any law referred to in this section and now in

15

force, of which Mortgagor or Mortgagor's successors or assigns or any other Persons claiming any interest in the Property might take advantage despite this section, is hereafter repealed or ceases to be in force, such law will not thereafter be deemed to preclude the application of this section.

Section 4.12 <u>Mortgagor as Tenant Post-Foreclosure</u>.  In the event there is a foreclosure sale hereunder and at the time of such sale Mortgagor or Mortgagor's representatives, successors or assigns or any other Persons claiming any interest in the Property by, through or under Mortgagor are occupying or using the Property, or any part thereof, each and all will immediately become the tenant of the purchaser at such sale, which tenancy will be a tenancy from day to day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser.  To the extent permitted by applicable law, the purchaser at such sale will have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will.  In the event the tenant fails to surrender possession of such property upon demand, the purchaser will be entitled to institute and maintain a summary action for possession of the property (such as an action for forcible entry and detainer) in any court having jurisdiction.

Section 4.13 <u>Enforcement</u>.  Whenever a default has occurred and is continuing, Mortgagee shall have the right to institute a proceeding or proceedings for the total or partial foreclosure of this Mortgage and any or all other security instruments securing the secured obligations, whether by court action, power of sale, foreclosure under the Uniform Commercial Code or otherwise, under any applicable provision of Law, for all of the secured obligations or any portion of the secured obligations, and any such liens and security interests created by any other security instrument securing the secured obligations shall continue in full force and effect without loss of priority as a lien and security interest securing the secured obligations.  Neither the acceptance of this Mortgage, the Production Payment Documents and any other documents and security instruments securing or evidencing the secured obligations, nor the enforcement of any of the foregoing in any one state, county or jurisdiction, whether by court action, foreclosure, power of sale or otherwise, shall prejudice or in any way limit or preclude enforcement by court action, foreclosure, power of sale or otherwise, of the forgoing documents and instruments through one or more additional proceedings in that state, county or jurisdiction or in any other state, county or jurisdiction.

Section 4.14 **<u>INDEMNITY</u>.  MORTGAGOR SHALL AND DOES HEREBY AGREE TO INDEMNIFY EACH OF MORTGAGEE AND TRUSTEE AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES AND AGENTS ("*INDEMNIFIED PARTIES*") FOR, AND TO HOLD EACH INDEMNIFIED PARTY HARMLESS FROM, ANY AND ALL LIABILITY, LOSS OR DAMAGE WHICH MAY OR MIGHT BE INCURRED BY ANY INDEMNIFIED PARTY BY REASON OF THIS MORTGAGE OR THE EXERCISE OF RIGHTS OR REMEDIES HEREUNDER.  THE LIABILITIES OF MORTGAGOR AS SET FORTH IN THIS SECTION 4.14 SHALL SURVIVE THE TERMINATION OF THIS MORTGAGE.**

ARTICLE V.

<u>Miscellaneous</u>

16

Section 5.1 <u>Effective as Fixture Filing, Financing Statement</u>.  The Property includes, and this Mortgage covers, goods which are or are to become fixtures on the real property described herein and as-extracted collateral related to the real property described herein.  This Mortgage is effective as a financing statement (i) filed as a fixture filing with respect to all fixtures included within the Property, (ii) covering as-extracted collateral with respect to all as-extracted collateral included within the Property, and (iii) covering all other Property.  This Mortgage is to be filed for record in the real property records or other appropriate records of each county where any part of the Mortgaged Properties is situated and may also be filed in the offices of the Bureau of Land Management, the Bureau of Indian Affairs or any tribal, federal, state or local agency (or any successor agencies).  The mailing address of Mortgagor is the address of Mortgagor set forth in the preamble of this Mortgage and the address of Mortgagee from which information concerning the security interests hereunder may be obtained is the address of Mortgagee set forth in the preamble of this Mortgage.  This Mortgage is (and any carbon, photographic, facsimile or other reproduction of this Mortgage will be) sufficient as a financing statement for all purposes.

Section 5.2 <u>Authority to File Financing Statements</u>.  Mortgagor hereby authorizes Mortgagee to file, in any filing or recording offices, one or more financing statements (including a copy of this Mortgage) describing the Collateral as Mortgagee deems appropriate, and any renewal or continuation statements thereof.

Section 5.3 <u>Waivers</u>.  Mortgagee may at any time and from time to time in writing waive compliance by Mortgagor with any covenant herein made by Mortgagor to the extent and in the manner specified in such writing, or consent to Mortgagor's doing any act which hereunder Mortgagor is prohibited from doing, or to Mortgagor's failing to do any act which hereunder Mortgagor is required to do, to the extent and in the manner specified in such writing, or release any part of the Property or any interest therein or any Production Proceeds from the lien and security interest of this Mortgage, all with or without the joinder of Trustee.  Any party liable, either directly or indirectly, for the secured obligations or for any covenant herein or in any other Production Payment Document may be released from all or any part of such obligations without impairing or releasing the liability of any other party.  No such act will in any way impair any rights or powers hereunder except to the extent specifically agreed to in such writing.

Section 5.4 <u>No Impairment of Security</u>.  No lien, privilege, security interest or other security right hereunder will be impaired by any indulgence, moratorium or release, or any renewal, extension or modification, with respect to any secured obligation, or any surrender, compromise, release, renewal, extension, exchange or substitution which may be granted in respect of the Property (including Production Proceeds), or any part thereof or any interest therein, or any release or indulgence granted to any endorser, guarantor or surety of any secured obligations.

Section 5.5 <u>Acts Not Constituting Waiver</u>.  Any default may be waived by Mortgagee without waiving any other prior or subsequent default.  Any default may be remedied by Mortgagee without such remedy constituting a waiver of the default remedied.  No failure to exercise, and no delay in exercising, any right, power or remedy upon any default will be construed as a waiver of such default or as a waiver of the right to exercise any such right, power or remedy at a later date.  No single or partial exercise of any right, power or remedy hereunder will exhaust the same or will preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.  No modification or waiver

17

[Mortgage]

of any provision hereof nor consent to any departure by Mortgagor therefrom will in any event be effective unless the same is in writing and signed by Mortgagee and then such waiver or consent will be effective only in the specific instances, for the purpose for which given and to the extent therein specified. No notice to or demand on Mortgagor in any case will of itself entitle Mortgagor to any other or further notice or demand in similar or other circumstances. Acceptance of any payment in an amount less than the amount then due on any secured obligations will be deemed an acceptance on account only and will not in any way excuse the existence of a default.

Section 5.6 <u>Mortgagor's Successors</u>. In the event the ownership of the Property or any part thereof becomes vested in a Person other than Mortgagor, then, without notice to Mortgagor, Mortgagee and Trustee may deal with such successor or successors in interest, with respect to this Mortgage and to the obligations secured hereby, in the same manner as with Mortgagor, without in any way vitiating or discharging Mortgagor's liability hereunder or for the payment or performance of the obligations secured hereby. No transfer of the Property, no forbearance, and no extension of the time for the payment of the obligations secured hereby shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Mortgagor (or any other Person) for the payment or the performance of the obligations secured hereby.

Section 5.7 <u>Joint and Several Liability</u>. Team Maria Joaquin, L.L.C. and Maria Joaquin Basin, L.L.C., each a Delaware limited liability company, shall be jointly and severally liable for full performance by Mortgagor of, and all obligations of Mortgagor under, this Mortgage; provided, that it is understood and agreed that Mortgagor's obligation to pay the Primary Sum may only be paid from the proceeds of the NRI Percentage of the Oil produced from (or, to the extent pooled or unitized, allocated to) the various Subject Lands, Subject Interests and Subject Wells from time to time, and not from any other source; provided further that the foregoing limitation does not limit Mortgagee's ability to collect funds from Mortgagor for PP Proceeds that have not been paid to Mortgagee by Mortgagor as and when due under the terms of the Conveyance or the Oil Sales Agreement.

Section 5.8 <u>Application of Payments to Certain Obligations</u>. If any part of the secured obligations cannot be lawfully secured by this Mortgage or if any part of the Property cannot be lawfully subject to the liens, privileges and security interests hereof to the full extent of such obligations, then all payments made will be applied on such obligations first in discharge of that portion thereof which is not secured by this Mortgage.

Section 5.9 <u>Compliance With Usury Laws</u>. Mortgagor and Mortgagee intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, it is stipulated and agreed that none of the terms and provisions contained herein shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be collected, charged, taken, reserved, or received by applicable law from time to time in effect.

Section 5.10 <u>Substitute Trustee</u>. Trustee may resign by an instrument in writing addressed to Mortgagee, or Trustee may be removed at any time with or without cause by an instrument in writing executed by Mortgagee. In case of the death, resignation, removal, or disqualification of Trustee, or if for any reason Mortgagee deems it desirable to appoint a substitute or successor trustee to act instead of the herein named trustee or any substitute or successor trustee, then

18

[MORTGAGE]

Mortgagee will have the right and is hereby authorized and empowered to appoint a successor trustee, or a substitute trustee, without other formality than appointment and designation in writing executed by Mortgagee and the authority hereby conferred will extend to the appointment of other successor and substitute trustees successively until the obligations secured hereby have been paid in full, or until the Property is sold hereunder. Such appointment and designation by Mortgagee will be full evidence of the right and authority to make the same and of all facts therein recited. If Mortgagee is a corporation, trust, limited liability company or association and such appointment is executed on its behalf by an officer of such corporation, trust, limited liability company or association, or by an officer of the owner trustee of such trust, such appointment will be conclusively presumed to be executed with authority and will be valid and sufficient without proof of any action by the board of directors or any superior officer of the corporation, limited liability company, owner trustee or association. Mortgagee may act through an agent or attorney-in-fact in substituting trustees. Upon the making of any such appointment and designation, all of the estate and title of Trustee in the Mortgaged Properties will vest in the named successor or substitute Trustee and such successor or substitute will thereupon succeed to, and will hold, possess and execute, all the rights, powers, privileges, immunities and duties herein conferred upon Trustee (other than the benefits of the indemnities, immunities, and releases provided herein and in the other Production Payment Documents, which will inure both to the former Trustee and to the successor or substitute Trustee); and upon the written request of Mortgagee or of the successor or substitute Trustee, the Trustee ceasing to act will execute and deliver an instrument transferring to such successor or substitute Trustee all of the estate and title in the Mortgaged Properties of the Trustee so ceasing to act, together with the rights, powers, privileges, immunities and duties herein conferred upon Trustee, and will duly assign, transfer and deliver any of the properties and moneys held by the Trustee ceasing to act to such successor or substitute Trustee. All references herein to Trustee will be deemed to refer to the Trustee (including any successor or substitute appointed and designated as herein provided) from time to time acting hereunder.

Section 5.11 <u>No Liability for Trustee</u>. **TRUSTEE WILL NOT BE LIABLE FOR ANY ERROR OF JUDGMENT OR ACT DONE BY TRUSTEE IN GOOD FAITH, OR OTHERWISE BE RESPONSIBLE OR ACCOUNTABLE UNDER ANY CIRCUMSTANCES WHATSOEVER (INCLUDING TRUSTEE'S NEGLIGENCE), EXCEPT FOR TRUSTEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.** Trustee will have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. All moneys received by Trustee will, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and Trustee will be under no liability for interest on any moneys received by Trustee hereunder. Mortgagor hereby ratifies and confirms any and all acts which the herein named Trustee or his or her successor or successors, substitute or substitutes, may lawfully do by virtue hereof. Mortgagor will reimburse Trustee for, and indemnify and save Trustee harmless against, any and all liability and expenses (including attorney's fees) which may be incurred by Trustee in the performance of his or her duties. The foregoing exculpation and indemnities will not terminate upon the release, foreclosure or other termination of this Mortgage but will survive any release, termination or foreclosure of this Mortgage, and any conveyance in lieu of foreclosure, and the repayment of the secured obligations and the discharge and release of this Mortgage and the other documents evidencing or securing the secured obligations. Any amount to be paid hereunder by Mortgagor to Trustee will be a

19

[MORTGAGE]

demand obligation owing by Mortgagor to Trustee and will be secured hereby and bear interest at the Applicable Rate.

Section 5.12 <u>Notices</u>.  All notices, requests, consents, demands and other communications required or permitted hereunder must be in writing and mailed by registered or certified mail, return receipt requested, postage prepaid, or delivered personally (which shall include delivery by a courier or messenger service) or by telecopy transmission with confirmation of receipt, to such party at its address for notices as specified in the preamble hereto.  Notices given by mail or by personal delivery shall be effective (and deemed to have been given) upon actual receipt.  Notices given by telecopier shall be effective upon actual receipt if received and confirmed by return transmission during the recipient's normal business hours or at the beginning of the recipient's next Business Day after receipt if not received during the recipient's normal business hours. Notwithstanding the foregoing, or anything else in the Production Payment Documents which may appear to the contrary, any notice given in connection with a foreclosure of the liens or security interests created hereunder, or otherwise in connection with the exercise by Mortgagee or Trustee of their respective rights hereunder, which is given in a manner permitted by applicable law will constitute proper notice, and, without limitation of the foregoing, notice given in a form required or permitted by statute will (as to the portion of the Property to which such statute is applicable) constitute proper notice.

Section 5.13 <u>Invalidity of Certain Provisions</u>.  A determination that any provision of this Mortgage is unenforceable or invalid will not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Mortgage to any Person or circumstance is illegal or unenforceable will not affect the enforceability or validity of such provision as it may apply to other Persons or circumstances.

Section 5.14 <u>Interpretation, etc</u>.  All references in this Mortgage to Exhibits, Schedules, articles, sections, subsections, definitions and other subdivisions refer to the Exhibits, Schedules, articles, sections, subsections, definitions and other subdivisions of this Mortgage unless expressly provided otherwise. References to any document, instrument, or agreement (a) include all exhibits, schedules, and other attachments thereto, and (b) include all amendments, supplements or restatements thereof. Titles appearing at the beginning of any subdivisions hereof are for convenience only and do not constitute any part of such subdivisions and will be disregarded in construing the language contained in such subdivisions.  The words "***this Mortgage***", "***this instrument***", "***herein***", "***hereof***", "***hereby***", "***hereunder***" and words of similar import refer to this Mortgage as a whole and not to any particular subdivision unless expressly so limited.  The phrases "***this section***" and "***this subsection***" and similar phrases refer only to the sections or subsections hereof in which such phrases occur.  The word "***or***" is not exclusive, and the word "***including***" (in its various forms) means "including without limitation".  References to a Person's "***discretion***" refer to such Person's sole and absolute discretion (unless such reference is modified by a reasonableness qualifier).  Pronouns in masculine, feminine and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  Unless otherwise specified, references herein to any particular Person also refer to its successors and permitted assigns.  This Mortgage has been reviewed and negotiated by sophisticated parties with access to legal counsel and no rule of construction will apply hereto or thereto which would require or allow this Mortgage to be construed against any party because of its role in drafting this Mortgage.  **THE PARTIES**

20

[MORTGAGE]

ACKNOWLEDGE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE OR ENFORCEABLE, THE PROVISIONS IN THIS MORTGAGE IN BOLD "SMALL-CAPS" FONT ARE "CONSPICUOUS" FOR THE PURPOSE OF ANY APPLICABLE LAW.

Section 5.15 <u>Recording</u>. Mortgagor will cause this Mortgage and all amendments and supplements thereto and substitutions therefor and all financing statements and continuation statements relating thereto to be recorded, filed, re-recorded and refiled in such manner and in such places as Mortgagee reasonably requests and will pay all such recording, filing, re-recording and refiling taxes, fees and other charges.

Section 5.16 <u>Authority of Mortgagee</u>. All Persons other than Mortgagor and its affiliates are entitled to rely on the releases, waivers, consents, approvals, notifications and other acts of Mortgagee (including the appointment of a substitute or successor trustee, or trustees, hereunder), without inquiry into any such agreements or the joinder of any party other than Mortgagee in such releases, waivers, consents, approvals, notifications or other acts.

Section 5.17 <u>Counterparts</u>. This Mortgage may be executed in multiple counterparts, all of which are identical, except that, to facilitate recordation, certain counterparts hereof may include only that portion of the Property Exhibit which contains descriptions of the properties located in (or otherwise subject to the recording or filing requirements or protections of the recording or filing acts or regulations of) the recording jurisdiction in which the particular counterpart is to be recorded, and all other portions of the Property Exhibit will be included in such counterparts by reference only. All of the counterparts hereof together constitute one and the same instrument. An executed counterpart of this Mortgage containing the entire Property Exhibit is recorded in the real property records of each county in California in which the Property is located.

Section 5.18 <u>Successors and Assigns</u>. The terms, provisions, covenants, representations, indemnifications and conditions hereof will be binding upon Mortgagor and the successors and assigns of Mortgagor with respect to the obligations secured hereby, and will inure to the benefit of Mortgagee, Trustee and their respective successors and permitted assigns, and constitute covenants running with the Mortgaged Properties. All references in this Mortgage to Mortgagor, Mortgagee or Trustee include all such successors and permitted assigns.

Section 5.19 <u>Place of Payment</u>. All secured obligations which may be owing hereunder at any time by Mortgagor shall be payable at the place designated in the Oil Sales Agreement or, if no such designation is made, at the address of Mortgagee indicated in the preamble of this Mortgage or at such other place as Mortgagee may designate in writing.

Section 5.20 **CHOICE OF LAW**. **THIS MORTGAGE SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA AND THE LAWS OF THE UNITED STATES OF AMERICA.**

Section 5.21 **FINAL AGREEMENT OF THE PARTIES**. **THE WRITTEN PRODUCTION PAYMENT DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

21

[MORTGAGE]

[*The remainder of this page is intentionally left blank.*]

22

IN WITNESS WHEREOF, this Mortgage is executed by Mortgagor on the dates set forth in the acknowledgments below, to be effective immediately after the granting of the Conveyance.

TEAM MARIA JOAQUIN, L.L.C.

By:_____

Name:

Title:

STATE OF TEXAS            §
                          §
COUNTY OF _____     §

The foregoing instrument was acknowledged before me on this _____ day of August, 2020, by _____ as _____ of Team Maria Joaquin, L.L.C., a Delaware limited liability company, on behalf of such limited liability company.

_____

Notary Public, State of Texas

*[Signatures continue on following page]*

SIGNATURE PAGE TO MORTGAGE

MARIA JOAQUIN BASIN, L.L.C.

By: _____

Name:

Title:

STATE OF TEXAS              §
                           §
COUNTY OF _____        §

The foregoing instrument was acknowledged before me on this _____ day of August, 2020, by _____ as _____ of Maria Joaquin Basin, L.L.C., a Delaware limited liability company, on behalf of such limited liability company.

_____

Notary Public, State of Texas

SIGNATURE PAGE TO MORTGAGE

ANNEX A TO MORTGAGE

LEGAL DESCRIPTION

ANNEX B TO MORTGAGE

COPY OF CONVEYANCE

## SCHEDULE 2.02(r)

INSURANCE POLICIES

|  | Carrier | Amount of Coverage | Policy Expiration Date |
|---|---|---|---|
| General Liability | Markel International | $2,000,000 | 12/1/2020 |
| Worker's Compensation | Markel International | $1,000,000 | 12/1/2020 |
| Umbrella | Markel International | $5,000,000 | 12/1/2020 |

## **SCHEDULE 2.04**

CURE COSTS

*See attached.*

SURFACE LEASES

| Instrument Title | Field | Lease Name | Address of the Lease Property | Payee | Payee Address | | Pre-Petition Amount Due [1] | Post-Petition Amount Due Through 7/29/20 [2] | Total Cure Amount (H+I) | Buyer's Estimated Cure Amount 8/1/20 through projected Closing of 9/30/20 [3] |
|---|---|---|---|---|---|---|---|---|---|---|
| Exhibit "B" First Amendment to Surface Lease Agreement | Zaca Field | Davis | 5017 Zaca Station Rd., Los Olivos, CA 93441 | Grundoon LLC | 620 McMurray Rd. Buellton, CA 93427 | | $60,000.00 | $0.00 | $60,000.00 | $0.00 |
| VO-RW-1 Right of Way Agreement 11/10/92 | Santa Maria Valley | Bradley Lands (Section 6 and 31) | 3851 Telephone Rd, Santa Maria, CA 93454 3275 Telephone Rd, Santa Maria, CA 93454 3355 Telephone Rd, Santa Maria, CA 93454 3515 Telephone Road, Santa Maria, CA 93454 3501 Telephone Road, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93454 | | $0.00 | $0.00 | $0.00 | $0.00 |
| VO-RW-6 Right of Way and Roadway Agreement 4/18/94 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| VO-RW-4 Right of Way Agreement 11/23/92 | Santa Maria Valley | Bradley Lands (Section 31) | 3275 Telephone Rd. Santa Maria, CA , 93454 3355 Telephone Rd, Santa Maria, CA , 93454 3515 Telephone Rd, Santa Maria, CA 93454 3501 Telephone Road, Santa Maria, CA 93454 and No address APN 129-010-013 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| SMVC-6 Amendment to Right of Way  Agreement  2/6/74 | Santa Maria Valley | Bradley Lands (section 5 and 6) | 3700 Telephone Rd., Santa Maria CA 93454 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-70117 Right Of Way Agreement 5/1/80 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| CA-40015 Right Of Way Agreement 2/6/74 | Santa Maria Valley | Bradley Lands (Section 5 and 6) | 3700 Telephone Rd, Santa Maria, CA 93454 3851 Telephone Rd, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-6569 Right Of Way Agreement 7/31/74 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-06559 Right Of Way Agreement 4/4/73 | Santa Maria Valley | Bradley Lands (Section 6, 31 and 36) | 3851 Telephone Rd, Santa Maria, CA 93454 3275 Telephone Rd, Santa Maria, CA 93454 3355 Telephone Rd, Santa Maria, CA 93454 3515 Telephone Rd, Santa Maria, CA 93454 3501 Telephone Rd, Santa Maria, CA 93454 1470 Preil Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-6561 Amendment of Right Of Way Agreement 10/15/73 | Santa Maria Valley | Bradley Lands (section 6) | 3851 Telephone Rd, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-6574-1 Right Of Way Agreement 8/28/75 | Santa Maria Valley | SMV Field (Section 25 and 36) | 1470 Preil Rd, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932 Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |

Schedule 2.01 to TSA.xlsx

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| MC-06585 Right of Way Agreement 9/1/76 | Santa Maria Valley | Bradley Lands (Section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454<br>3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-6586 Right Of Way Agreement 4/28/76 | Santa Maria Valley | Bradley Lands (section 6) | 3700 Telephone Rd., Santa Maria, CA 93454<br>3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| SMVC-2A Right of Way Agreement 2/7/73 | Santa Maria Valley | Bradley Lands (Section 5 and 6) | 3700 Telephone Rd., Santa Maria, CA 93454<br>3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| SMVC-2B Right of Way Agreement 5/20/88 | Santa Maria Valley | Bradley Lands (Section 5) | 3700 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| SMV 57576 Row Of Way Agreement 6/1/76 | Santa Maria Valley | Bradley Lands (Section 6) | 3851 Telephone Rd., Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-06589 Road Use Agreement 5/22/74 | Santa Maria Valley | Payne 21 (Section 6) | 3851 Telephone Road, Santa Maria, CA 93454 | Bradley Land Company | P.O. Box 1932<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| VO-RW-3 ROW Agreement dtd 11/23/92 | Santa Maria Valley | Kemp | 3851 Telephone Road, Santa Maria, CA 93454 | Judy A. Rogers | P.O. Box 234<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | Ronald H. Souza | P.O. Box 234<br>Santa Maria, CA 93456 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | Michael J. Souza | P.O. Box 234<br>Santa Maria, CA 93456 | $516.66 | $0.00 | $516.66 | $0.00 |
| VO-RW-2 Right of Way Agreement 11/14/92 | Santa Maria Valley | Kemp | 3851 Telephone Road, Santa Maria, CA 93454 | Garvin Steele | 3501 Telephone Road<br>Santa Maria, CA 93454 | $400.00 | $0.00 | $400.00 | $0.00 |
| VO-RW-5 Right of Way Agreement 1/6/94 | Santa Maria Valley | East Valley Farms | 2745 Telephone Rd., Santa Maria, CA 93454 | Roland and Sally Miller | 3028 Sandy Hill Lane<br>Santa Maria, CA 93455 | $600.00 | $0.00 | $600.00 | $0.00 |
| MC-70033 Right Of Way Agreement 5/1/78 | Clark Ave | Aquistapace | No Physical address- APN- 129-170-033 | Aquistapace Sisters, LLC | 290 Foxenwood Dr.<br>Santa Maria, CA 93455 | $1,000.00 | $0.00 | $1,000.00 | $0.00 |
| MC-70038 Right Of Way Agreement | Clark Ave | Nodlew | 2935 E. Clark Ave., Santa Maria, CA 93454 | Nodlew Inc. | 1646 Premier Court<br>Santa Maria, CA 93454 | $1,800.00 | $0.00 | $1,800.00 | $0.00 |
| MC 66162-Surface Lease-12/21/89 | Cat Canyon | Los Flores | 6151 Dominion Rd., Santa Maria, CA 93454 | E&B Natural Resources | 1600 Norris Rd.<br>Bakersfield, CA, 93308-2234 | $100.00 | $0.00 | $100.00 | $0.00 |
| MC-6575 Right Of Way Agreement 12/19/91 | Santa Maria valley | Vincent | 1515 Prell Road, Santa Maria, CA 93454 | Donald Vincent | 230 Winchester Canyon Rd.<br>Goleta, CA 93117 | $1,300.00 | $0.00 | $1,300.00 | $0.00 |

Schedule 3.19 to PSA.xlsx

2

472

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Richard Vincent | 1940 Cuervo, Santa Barbara, CA 93110 | $1,300.00 | $0.00 | $1,300.00 | $0.00 |
| MC-70021 Easement and Right Of Way Agreement 12/19/83 | Cat Canyon | Security/Thomas/Lloyd | 5200  Dominion Rd, Santa Maria, CA 93454, | Marianne Friedl | 2053 A Street Santa Maria, CA 93455 | $0.00 | $0.00 | $0.00 | $0.00 |
| MC-70109 Right of Way 3/19/64 | Cat Canyon | Lloyd | 5200  Dominion Rd, Santa Maria, CA 93454, | C.M.T. LLC | 1975 Frell Road Santa Maria, CA 93454 | $200.00 | $0.00 | $200.00 | $0.00 |
| Letter dated 8/20/43 | Casmalia | Morganti | 5080 Black Rd., Casmalia, CA 93429 | Morganti Ranch, a Limited Partnership | P.O. Box 2075 Orcutt, CA 93455 | $0.00 | $0.00 | $0.00 | $0.00 |
| Agreement dated 12/29/1965 | Casmalia | Casmalia Field-gas Pipeline under railroad | 5025 Black Rd., Casmalia, CA 93429 | Railroad Management Company, LLC | P.O. Box 678161 Dallas, TX 75267-8161 | $908.94 | $0.00 | $908.94 | $0.00 |
| License Agreement dated 9/5/2000 | Santa Maria Valley | Newfove, Folsom, Pinal, Orcut Fee | 4310 Hummel Dr., Orcutt, CA 93455 | Orcutt Fee, LLC | 1555 Orcutt Hill Rd. Orcutt, CA 93455 | $5,000.00 | $0.00 | $5,000.00 | $0.00 |
| License Agreement 9/24/07 | Belridge | McPhail | No Physical Address. APN-68-220-52-00-9 | Aera Energy, LLC | 1000 Ming Ave. Bakersfield, CA 93311 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | Totals | $79,125.60 | $0.00 | $79,125.60 | $0.00 |

**CONTRACTS**

| Counterparty | Field | Service | Primary Contact | Email | Address | Pre-Petition Amount Due | Post-Petition Amount Due Through 7/29/20 | Total Cure Amount [H] | Buyer's Estimated Cure Amount 8/1/20 through projected Closing of 9/30/20 [4] |
|---|---|---|---|---|---|---|---|---|---|
| Central Coast Portables | Santa Maria Valley | Portable Rest Rooms | Carlos Gonzales | N/A | 237 Town Center West #203, Santa Maria, CA 93458 | $1,196.25 | $2,731.68 | $3,927.99 | $0.00 |
| Clean Harbors Spill Management Team | Santa Maria Valley | OSPR Spill Response Team | Daniel A. Compton | compton.dan@cleanharbors.com | P.O. Box 9149, 42 Longwater Drive, | $29,724.96 | $0.00 | $29,724.96 | $0.00 |
| Krummrich Engineering Corporation | Santa Maria Valley/All | Field Management and Engineering, Processing | Paul Codd | pcodd@kecorp.us | 590 Poli Street Ventura, CA 93001 | $0.00 | $0.00 | $0.00 | $0.00 |
| NRC Environmental Services, Inc | Santa Maria Valley | Inland Facilities OSRO Insurance Coverage | Stephanie Barton | sbarton@nrces.com | 3777 Long Beach Blvd, Long Beach, CA 90807 | $0.00 | $0.00 | $0.00 | $0.00 |
| Silvas Oil Company | Santa Maria Valley | Fuel and Lube Oil | Patty Jeschian | patty@silvasoil.com | P.O Box 1048, Fresno, CA 93714 | $38,169.06 | $21,187.26 | $59,356.32 | $0.00 |
| | | | | | Totals | $69,090.27 | $23,918.94 | $93,009.21 | $0.00 |

OIL AND GAS LEASES

| Lease | Field | Lease/ Fee Property Name | Legal Description | Document | Book/Volume | Page | Pre-Petition Amount Due | Post-Petition Amount Due Through 6/30/20 [5] | Total Cure Amount [H4] | Buyer's Estimated Cure Amount 8/1/20 through projected Closing of 9/30/20 [6] |
|---|---|---|---|---|---|---|---|---|---|---|
| Lease | Casmalia | Arrellanes | SUBJECT ACREAGE: Portion of Punta de la Laguna Ranch, located in Section 13 of Township 9 North, Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West, of SBB&M, containing 434.64 acres, more or less, in Santa Barbara County, California. | Oil and Gas Lease Dated 8-16-1930 | 220 | 421 | $176,242.69 | $103.46 | $176,346.15 | $0.00 |
| | | | | Oil and Gas Lease Dated 4-18-1945 | 649 | 176 | | | | |
| | | | | Agreement dated march 30, 1961 by and between T.T. Bonetti et al and Union Oil (Commingling Agreement) | Unrecorded | | | | | |
| | | | SUBJECT LEASE: Oil & Gas Lease, dated August 16, 1930, by and between Charles T. Arellanes et al, as Lessor, and O. C. Field, as Lessee, recorded at Book 220, Page 421, of official records of Santa Barbara county, California, originally covering 600 acres, more or less. | Quitclaim Deed dated October 27, 1960 from Union Oil to Lessors | 1843 | 296 | | | | |
| | | | | Quitclaim Deed from Ralph J. Tingle Jr. to Union Oil | 2146 | 446 | | | | |
| | | | | Partial Quitclaim Deed dated July 18, 1985 recorded | 39770 | | | | | |
| Lease | Casmalia | Bonetti | SUBJECT LEASE: Oil and Gas Lease, dated November 1, 1964, by and between T.R Bonetti et a as Lessors and Union Oil Company, as lessor, recorded in Book 2104, Page 1188 of Official Records of Santa Barbara County, California | Oil and Gas Lease Dated 11-1-1964 | not recorded | | $10,360.12 | $85.55 | $10,445.67 | $0.00 |
| | | | | Memorandum of Lease Dated 11-1-1964 | 2104 | 1188 | | | | |
| | | | | Amendment to Oil and Gas Lease Dated 10-28-70 | 2335 | 10 | | | | |
| | | | | Amendment to Oil and Gas Lease Dated 8-30-67 | 2207 | 241 | | | | |
| Lease | Casmalia | Escolle | SUBJECT ACREAGE: All of those certain lands located in Santa | Oil and Gas Lease Dated 03-14-46 | 688 | 45 | $5,203.22 | $0.00 | $5,203.22 | $0.00 |

Schedule 2.01 to PSA.xlsx

4

| Lease | Casmalia | Lospe | | | |
|-------|----------|-------|---|---|---|

Barbara County, State of California. described as follows:

| | | |
|---|---|---|
| Quitclaim Deed Dated 10-18-1966 | 708 | 473 |
| Quitclaim Deed Dated 8-3-1966 | 2168 | 81 |
| Oil and Gas Lease Dated 1-7-1980 | not recorded | |
| Memorandum Oil and Gas Lease & Agreement Dated 1-7-80 | 1980-21450 | |
| Lease and Agreement Dated 9-25-47 | 736 | 290 |
| Amendment to Lease Dated 1-31-50 | 907 | 155 |
| Amendment to Oil and Gas Lease Dated 11-18-52 | not recorded | |
| Amendment to Oil and Gas Lease Dated 11-6-54 | 1408 | 531 |
| Amendment to Oil and Gas Lease Dated 12-15-63 | 2032 | 68 |
| Amendment to Oil and Gas Lease Dated 1-1-1983 | 1983-36591 | |
| Amendment to Oil and Gas Lease Dated 7-27-2004 (Recorded) | 2004-79968 | |
| Assignment of Interests in Oil, Gas and Mineral Lease Dated 6-11-1999 | 1999-50820 | |

Escolle Lease Response.pdf 2

**Parcel 1**

Commencing at the northeast corner of the Escolle property being the terminous of the eighth course in the lands described in Oil and Gas Lease dated January 7, 1980 between Escolle Tenants-in- Common, as Lessor, and Union Oil Company of California, as Lessee, a Memorandum of which was recorded May 29, 1980 in Book 80, Page 21450, Official Records of Santa Barbara County, California, from which corner No. 13 of Rancho Todos Santos, marked T.S. No. 13, bears North Westerly 64.00 chains to a point on the section line between Sections 21 and 28, T9N-R43W, S.B.B. & M, thence west 25.51 chains to a station; thence north, 35.28 chains to said Corner No. 13, thence from said point of commencement, north 89° 17'4" west, 2770.0 feet to the true point of beginning; thence from said true point of beginning the following courses and distances: west 1591.4 feet; south 710.5 feet; west 414.9 feet; south 829.0 feet; east 658.2 feet; 1278.9 feet; south 654.8 feet; to a point on the southerly line of Block II of said Escolle Lease; thence East along said south line 805.8 feet; thence North, 2093.0 feet; thence west 736.7 feet North, 728.2 feet to the true point of beginning and containing 120 acres, more or less.

**Parcel II**

Commencing at Corner No. 13 of Rancho Todos Santos marked T.S. No. 13, from which a live oak 15 inches in diameter bears south 37°west, 6.30 chains distant; thence along the north line of said Rancho north 83°03' west, 103.25 chains to a station; thence south 77.98 chains to a station; thence east 70.40 chains to the true point of

Schedule 2.03 to FSA.xlsx

beginning from which the one-quarter section corners between Sections 28 and 29. T9N-R34W. S.B.B. & M. bears south 8.70 chains distance: thence from said true point of beginning the following crosses and distances: north 718.2 feet: west 646.6 feet: North 900.4 feet: west 8840 feet: south 1106 feet: east 299.6 feet: south. 512.4 feet to a point on the southerly line of Block I of said Escolle Lease: thence east along said south line 1231. 1 feet to the true point of beginning and containing 40 acres, more or less.

Parcel III

Commending at Corner No. 13 of Rancho Todos Santos marked T.S. No. 13 from which a live oak 15 inches in diameter bears south 37°west. 6.30 distant: thence along the north line of said Rancho north 83°43' west. 103.25 chains to a station: thence south 77.96 chains to a station; thence east 70.40 chains to a station from which theX Section corners between 28 and 29, T9N, R34W, S.B.B & M. bears South 8.70 chains distant: thence South 176.8 feet to a point on the east line of Block II of said Escolle Lease and the true point of beginning; thence continuing south through said X section corners and along said east line 934.0 feet; thence east 934.0 feet; thence north 934.0 feet; thence west 934.0 feet to the true point of beginning and containing 20 acres.

SUBJECT ACREAGE: A portion of Rancho Punta de la Laguna, located in Sections 13 and 24 of Township 9 North, Range 35 West, and Sections 18 and 19 of Township 9 North, Range 34 West, containing 491.00 acres, more or less, in Santa Barbara County, California.

SUBJECT LEASES:
1. Oil and Gas Lease dated September 25, 1947 by and between Escolle Estate Company, as Lessor, and Union Oil Company, as Lessee, and recorded in Volume 736, Page 290 of Official Records of Santa Barbara County, California. as amended.
2. Oil and Gas Lease dated January 7, 1980 by and between Escolle Tenants in Common. Lessors, and Union Oil Company, as Lessee, a memorandum of which was recorded as Document # 80-21450 of Official Records of Santa Barbara County. California, as amended.

Schedule 3.04 to 950.x&x    6

476

| Lease | Casmalia | Morganti | SUBJECT PROPERTY: A part of Rancho Punta de la Laguna, Santa Barbara County California, Commencing at a point on the easterly line of the Southern Pacific Railway on the property line between Juan B. Arrellanes Estate on the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a distance of 4325.1 feet to a 2" brass cap pipe monument; thence N. 83 18'W. along the South line of Punta de la Laguna Rancho a distance of 2641.3 feet to a 2" pipe set by S.P. Co. surveyors; thence continuing N. 83 18'W. along the South line of said Rancho 1700 feet. more or less, to the intersection of the Easterly right-of-way line of the Southern Pacific Railroad; thence Northerly along the Easterly right-of-way of the Southern Pacific Railroad to the point of commencement, excepting therefrom a 6.89 acre tract of land conveyed to the Associated Oil Company, and containing a net area of 491 acres, more or less.<br><br>SUBJECT LEASE: Oil and Gas Lease dated August 18, 1930, by and between Gulseppe Morganti, as Lessor, and O. C. Field, as Lessee, and recorded in Book 222, Page 538 in the Official Records of Santa Barbara County, California. as amended. | Oil and Gas Lease Dated 8-18-30<br>Partial Quitclaim Deed Dated 1-7-1980 Recorded<br>1st Amend and Agree dtd 5-18-94<br>2nd Amend and Agree dtd 05-18-1999<br>3rd Amend and Agree 5-18-2004<br>4th Amend and Agree dtd 12-11-2008<br>5th Amend & Agree 6-1-2009 'Waste Water'<br>6th Amendment and Agreement dtd February 20, 2014 Counterpart A<br>6th Amendment and Agreement dtd February 20, 2014 Counterpart B<br>6th Amendment and Agreement dtd February 20, 2014 Counterpart C<br>7th Amendment and Agreement 5-15-17<br>Quitclaim Deed Dated 1-6-1994<br>Memo of Oil and Gas Lease Dated 11-20-95<br>Oil and Gas Lease Dated  11-20-95 62 Acre Parcel | 222<br>91-009978<br>not recorded<br>not recorded<br>not recorded<br>not recorded<br>not recorded<br>not recorded<br><br>not recorded<br><br>not recorded<br><br>not recorded<br>94-047788<br>96-006527<br>not recorded | 538 | $974,150.78 | $22,176.60 | $996,327.38 | $0.00 |
| Lease | Casmalia | Muscio | SUBJECT ACREAGE: The portion of Subdivision No. 16 of the Rancho Punta de la Laguna located in Section 24 of Township 9 North, Range 35 West, containing 30 acres, more or less, in Santa Barbara County, California.<br><br>SUBJECT LEASE: Oil and Gas Lease, dated November 19,1971, by and between Ted H. Muscio et al, as Lessors and Union Oil Company, as Lessee, which lease originally covered 253.85 acres, recorded February 14, 1972, in book 2386, Page 581, of Official Records of Santa Barbara County, California | Memorandum of Oil and Gas Lease Dated 11-19-1971 (Recorded)<br>Oil & Gas Lease Dated 11-19-1971<br>Amend to Oil and Gas Lease Dated 11-10-1976 (Recorded)<br>Partial Quitclaim Dated 10-24-1984 (Recorded)<br>Lease Amendment Dated 12-30-14 | 2386<br>not recorded<br>77<br><br>1984-061054<br>2015-0021573 | 581<br><br>23650 | $68,990.97 | $153.99 | $69,144.96 | $0.00 |

| Lease | Casmalia | Righetti | SUBJECT ACREAGE: Portion of Lot or Subdivision No. 13 of the Rancho Punta de la Laguna, located in Section 13 of Township 9 North, Range 35 West, containing 40.00 acres, more or less, INSOFAR AND ONLY INSOFAR as it covers rights to a depth of 4,500'.

SUBJECT LEASE: That certain Oil & Gas Lease dated February 8, 1934 by and between E. Righetti, et al, as Lessor, and William W. Porter, II as Lessee, and recorded in Volume 301, Page 59 of the O.R. of Santa Barbara County, California.

Righetti "B" That certain Oil and Gas Lease dated June 24, 1965, by and between Ernest Righetti et al and Union Oil Company, recorded in Volume 2112, Page 677 of the O.R. of Santa Barbara County, California, as amended. | Oil and Gas Lease Dated 2-8-1934 Partial Quitclaim Deed Dated 5-6-1958 Righetti Agreement Dated 9-30-1959 (Recorded) | 301 1526 1724 | 59 289 284 | $153,973.00 | $146.51 | $154,119.51 | $0.00 |
| Lease | Cat Canyon | Conoco | SUBJECT ACREAGE: Lots 5 & 6 of Section 31 of Township 9 North, Range 32 W, SBB&M, as recorded in volume 1228, Page 437 of Official Records of Santa Barbara County, California, more or less 58.05 acres. | Corporation Grant Deed dated July 17, 1964

Oil and Gas Lease by and between Continental Oil Company, as Grantor and OC Fields Gasoline Corp dated June 6, 1936 and recorded on April 1, 1954 in Book 1228 and Page 437. | 2060

1228 | 851

437 | $1,208.31 | $0.00 | $1,208.31 | $0.00 |
| Lease | Cat Canyon | Goodwin A | SUBJECT ACREAGE: The east half of Section 10, Township 9 North, Range 33 West, Santa Bernardino Meridian, as shown on official plat thereof filed in the District Land Office January 7, 1892, said land being shown as Tracts 119 to 124, both | Oil and Gas Lease Dated 5-1-1957 Oil and Gas Lease Dated 1-1-1962-Long From Oil and Gas Lease Dated 1-1-1962-Short Form Amendment to Oil and Gas Lease Dated 1-1-1962 | not recorded not recorded 1937 2146 | 910 175 | $262,426.73 | $62,813.86 | $325,240.59 | $802.16 |

Ratification of Lease Agreement Dated 1-1-1962    1937    915

inclusive, on map of the Bradley-Varley Tract, recorded in
Book 1, page 32 of Maps and Surveys, in the office of the
County Recorder of said county, together with those portions
of streets or roads adjoining said lots as shown on said map
included with the lines of said east half of Section10,

EXCEPTING THEREFROM those portions thereof described as
follows:

Commencing at the center of said Section 10; thence
northerly along the westerly line of the above described
property a distance of 660 feet; thence easterly at right
angles to said last mentioned line a distance of 660 feet;
thence southerly at right angles to said last mentioned line a
distance of 660 feet; thence westerly at right angles to said
last mentioned line a distance of 660 feet to the point of
beginning, containing 310 acres, more or less

SUBJECT LEASE: Oil and Gas Lease, dated January 1, 1962, by
and between G.L Goodwin et al and J.C Hazard et al. recorded
in Book 1937, Page 910 of Official Records of Santa Barbara
County, California.

Schedule 3.19 to PSA.xlsx

9

479

| Lease | Cat Canyon | Lloyd | SUBJECT ACREAGE: The West two-thirds of Section 15, in Township 9 North, Range 33 West, San Bernardino Meridian, in the County of Santa Barbara, State of California, according to the Official Plat thereof. EXCEPTING from the Southwest quarter of the Southwest quarter of said Section 15, one acre of land described in the Deed from Chas. O. More, et ux., to the Highland School District, dated May 18, 1894, and recorded in Book 47, Page 124 of Deeds. Further excepting and reserving therefrom unto Waldo A. Gillette Jr. an undivided 25% interest in and to all mineral rights including oil, gas and other hydrocarbon substances, in, on or under said land, but without the right to enter upon the surface of said land.<br><br>SUBJECT LEASES:<br>1. Oil and Gas Lease, dated April 21, 1970, by and between Lloyd Corporation, Ltd and Shell Oil Company recorded in Book 2312, Page 761 of Official Records of Santa Barbara County, California.<br>2. Oil and Gas Lease dated March 7, 1965, by and between A.A. Gillette et al and Lloyd Corporation, Ltd recorded in Book 2097, Page 319 of Official Records of Santa Barbara County, California. | 3-2-1965 Lease ONE HALF (to distinguish the lease only) | | $26,855.38 | $6,251.63 | $33,107.01 | $171.36 |
| | | | | Oil and Gas Lease Dated 3-2-1965 | 2097 | 319 | | | | |
| | | | | Oil and Gas Lease Dated 3-2-1965 Long Form | not recorded | | | | | |
| | | | | Assignment of Oil and Gas Dated June 1, 1970 | 2312 | 758 | | | | |
| | | | | Amendment to Oil and Gas Lease Dated 1-20-1970 to extend term for Oil and Gas Lease Dated 3-2-1965 | 2097 | 319 | | | | |
| | | | | Amendatory Agreement Dated Feb 20, 1989 to Oil and Gas Lease Dated 3-2-1965 (a) | not recorded | | | | | |
| | | | | Amendatory Agreement Dated Feb 20, 1989 to Oil and Gas Lease Dated 3-2-1965 (b) | not recorded | | | | | |
| | | | | Amendatory Agreement Dated 7-27-1989 to Oil and Gas Lease Dated 3-2-1965 | not recorded | | | | | |
| | | | | Amendatory Agreement Dated 4-30-1989 to Oil and Gas LEase Dated 3-2-1965 (532) | not recorded | | | | | |
| | | | | Amendatory Agreement Dated 4-30-1989 to Oil and Gas Lease Dated 3-2-1965 (3,195) | not recorded | | | | | |
| | | | | Amendatory Agreement Dated 4-30-1989 to Oil and Gas Lease Dated 3-2-1965 (1,065) | not recorded | | | | | |
| | | | | Commingling of Leases: Amendatory Agreement Dated 9-14-1987 | not recorded | | | | | |
| | | | | Commingling of Leases: Amendment of Oil and Gas Lease Dated 9-14-87 Recorded March 18, 1988 | 88-016240 | | | | | |
| | | | | **4-21-1970 Lease ONE HALF (CMT-to distinguish the lease only)** | | | | | | |
| | | | | Oil and Gas Lease Dated 4-21-1970 (recorded) | 2312 | 761 | | | | |
| | | | | Operating Provisions 4-21-1970 Lease | not recorded | | | | | |
| | | | | Commingling of Leases: Amendment to Oil and Gas Lease Dated 9-14-1987 to Oil and Gas Leases Dated 4-21-1970 | not recorded | | | | | |
| Lease | Cat Canyon | Los Flores | Parcel One<br>The North Half of the SW Quarter (N1/2 SW 1/4) of Section 22 Township 9 N, Range 33 W, S. B. B. & M. in the County of Santa Barbara State of California, according to government survey thereof. | Oil and Gas Lease Dated 12-8-1947 (160 Net Acres) | 762 | 413 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | Oil and Gas Lease 7-28-1948 (30 Acres) | 810 | 167 | | | | |
| | | | | Amendment of Oil and Gas Lease Dated 6-3-1982 | 82-26612 | | | | | |
| | | | | Agreement Dated 4-30-1986 | not recorded | | | | | |

Schedule 2.01 to PSA.xls

10

480

**Parcel One**
That portion of the Rancho Los Alamos, in the County of
Santa Barbara, State of California, described as follows:
Beginning at the Southwest corner of section 22, Township 9
North, Range 33 West, S.B.B.&M.,
At the corner of said Rancho Los Alamos Known as "A No. 11"
thence Westerly, along the Westerly prolongation of the
Southerly line of said section 22 to its intersection with the
Southerly prolongation of the Westerly line of the Easterly ½
of the NEQ (E1/2 NE1/4) of Section 21 in said township 9
North, Range 33 West, S.B.B.&M.; THENCE Northerly, along
said last mentioned line or its prolongation to  the Southerly
line of the North ½ of said Section 21; thence easterly, along
said last mentioned line to the Northwest corner of the
Southwest quarter of said section 22 above referred to;
thence southerly along the westerly line of said section 22 to
the point of beginning.

SUBJECT LEASES: Oil and Gas Lease, dated December 8, 1947,
by and between Los Flores Land & Oil Company and General
Petroleum Corporation. recorded in Book 762, Page 413 of
Official Records of Santa Barbara County, California.

Oil and Gas Lease, dated July 28 8, 1948, by and between Los
Flores Land & Oil Company and General Petroleum
Corporation. recorded in Book 810, Page 167 of Official
Records of Santa Barbara County, California.

| Lease | Cat Canyon | Palmer Stendel | SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West, SB&&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California. | Oil and Gas Lease March 28, 1905 | Book H of Leases | 209 | | $24,678.91 | $4,793.48 | $29,472.39 | $362.78 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Oil and Gas Agreement Dated April 1, 1948 | 777 | 146 | | | | | |
| | | | | Assignment of Oil and Gas Lease Dated 11-30-1953 Palmer to Union Half Interest | 1196 | 293 | | | | | |
| | | | | Grant Deed dtd 3-30-1949 (Skim Pond) | 850 | 99 | | | | | |
| | | | | Quitclaim dtd March 30, 1950 | 910 | 236 | | | | | |
| | | | | Deed dtd 2-18-1964 Rec Bk 2079 Pg 1477 Twitchell to Union | 2079 | 1476 | | | | | |
| | | | | Deed dtd 2-24-1964 Rec Bk 2079 Pg 1478 Twitchell to Union | 2079 | 1478 | | | | | |
| | | | | Royalty Agreement dtd 2-18-1964 by and between Union Oil and Lucielle Rosenthal | 2079 | 1482 | | | | | |
| Lease | Cat Canyon | Thomas | SUBJECT ACREAGE: East one-third of the South half (E 1/3 of S ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian. | Oil and Gas Lease Dated 10-1-1970 | not recorded | | | $85,891.08 | $6,197.87 | $92,088.95 | $282.74 |
| | | | | Memorandum of Oil and Gas Lease Part I Bk 2325 Pg 2345 209 | | 209 | | | | | |
| | | SUBJECT LEASE: Oil and Gas Lease, dated October 1, 1970, by and between C.T Thomas et al and Anza Pacifica Corp. recorded in Book 2325, Page 209 of Official Records of Santa Barbara County, California. | | Memorandum of Oil and Gas Lease Part II Bk 2325 Pg 604 | 2325 | 604 | | | | | |
| | | | | Amend Agree 12-17-88 | not recorded | | | | | | |
| | | | | Amend Agree 1-6-89 | not recorded | | | | | | |
| | | | | Amend Agree 1-28-94 | not recorded | | | | | | |
| | | | | Amend Agree 1-28-94 Part II | not recorded | | | | | | |
| | | | | Amend Agree 6-18-96 | not recorded | | | | | | |
| | | | | Amend Agree 2-1-2004 (Shut in Royalty) | not recorded | | | | | | |
| | | | | Amend Agree 2-1-2004 Thomas Law | not recorded | | | | | | |
| Lease | Belridge | McPhail | Grant deed dated April 9, 1964 by and between West American Oil Company as grantor and Union Oil Company as grantee, recorded April 29, 1964 in Volume 3720 at Page 78 of the Official Records of Kern County covering all of the oil, gas and other hydrocarbon substances underlying and which may be produced from the North half of the Northwest Quarter of the Southwest Quarter of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter of the Northwest Quarter, the West half of the Southeast Quarter of the Northwest Quarter, the North half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter and the Southeast Quarter of the Southeast Quarter of the Northwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M., Kern County, California, lying above a depth which is 120 feet below the stratigraphic equivalent of the vertical depth of 658 feet below the surface of the ground as such vertical depth appeared in the McPhail Well No. 6-7. | Grant Deed Dated 4-29-64 | 3720 | 79 | 302 | $664,893.43 | $2,068.05 | $666,961.48 | $1,160.60 |
| | | | | Agreement dated 4-25-63 | 3600 | | | | | | |

Schedule 3.XX to PSA.xlsx

12

| Lease | Belridge | Belridge O'Donnell | Oil and gas lease dated October 2, 1915 by and between T. A. O'Donnell, et al., as lessor and Union Oil Company as lessee, recorded on February 18, 1917 in Book 29 at Page 208 of the Official Records of Kern County, California covering the South half of the Southeast Quarter, the South half of the North half of the Southeast Quarter and the South half of the North half of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.<br><br>SUBJECT TO: without limitation, the effects of prior conveyance of the "Temblor Zone", per Partial Assignment of Oil and Gas Lease from Union Oil Company to Belridge Oil Company dated May 27, 1953, recorded June 17, 1953 in Book 2093 at Page 250 of Official Records; and the effects of a prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969, recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County. | O'Donnell-Indenture of Lease Dated 10-2-1915 | 29 | 208 | $7,142,353.23 | $151,300.29 | $7,293,653.52 | $13,068.14 |
| Lease | Belridge | Gibson | Oil and gas lease dated December 14, 1915 by and between George Gibson, as lessor and Union Oil Company as lessee recorded on April 28, 1916 in Book 29 at Page 17 of the Official Records of Kern County, California covering the North half of the North half of the Southeast Quarter and the North half of the Northeast Quarter of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.<br><br>SUBJECT TO: without limitation, the effects of prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969 , recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County, California dated July 1, 1949, recorded November 3, 1949 in Book 1598 at Page 323 of Official Records. | Indenture of Leased dated 12-14-1915<br>Amend to Oil and Gas Lease Dated 9-29-1971 | 29<br>4626 | 17<br>649 | $60,136.13 | $1,171.69 | $61,307.82 | $0.00 |

Schedule 2.04 to FDS.xlsx

13

483

| Lease | Santa Maria Valley Adam B | SUBJECT ACREAGE: That portion of the West Half (W/2) of the Northeast Quarter (NE/4) of Section 24, T10N, R34W, SBBM lying northerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said W/2 of NE/4 of said Section 24, Santa Barbara County, California | Oil and Gas Lease | 2323 | 1239 | $23,976.68 | $55.54 | $24,032.22 | $0.00 |
| | | | Amend to Oil and Gas Lease dtd July 1, 1976 Recorded | 2624 | 2637 | | | | |
| | | | Amendment to Oil and Gas Lease dtd July 13, 1973 Recorded | 2476 | 569 | | | | |
| | | SUBJECT LEASE: Oil & Gas Lease dated July 17, 1970, by and between Thomas B. Adam, II, Frederick O. Sherrill and Elizabeth Ann Newark, as Lessor, and Union Oil Company of California, as Lessee, said lease or memorandum of which was recorded October 13, 1970, in Book 2323, Page 1238 of Official Records of Santa Barbara, California. | | | | | | | |
| Lease | Santa Maria Valley Bettiga | SUBJECT ACREAGE: That portion of the East Half (E/2) of the Northeast Quarter (NE/4) of Section 24, T10N, R34W, SBBN lying southerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said E/2 of NE/4 of said Section 24, Santa Barbara County, California | Memorandum of Oil and Gas Lease Bk 2039 Pg 1391 | 2039 | 1931 | $1,043.49 | $0.00 | $1,043.49 | $0.00 |
| | | | Oil & Gas Lease Dated 12-26-1983 | 301 | 16 | | | | |
| | | | Oil & Gas Lease Dated 5-23-1963 | not recorded | | | | | |
| | | | Oil and Gas Lease Dated 12-7-1995 Rec 1996-28845 | 1996-28845 | | | | | |
| | | SUBJECT LEASE: That certain Oil & Gas Lease dated December 7th, 1995, recorded 5/7/96, Document# 96-028845, by and between James Bettiga under Bettiga Trust #1, dated 11/1/78 and James P Bettiga, Successor Trustee of O. Bettiga Revocable Trust dated 11/30/84, as Lessor and Saba Petroleum, Inc., as Lessee. | | | | | | | |

| Lease | Santa Maria Valley Bradley Land Co | 40109 | Oil and Gas Dated 3-1-1965 (40161) Long Form | | | $150,368.63 | $0.00 | $150,368.63 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| | - Bradley Consolidated | Township 9 North, Range 33 West, S.B.B. &M. | Memorandum of Oil and Gas Lease Dated 12-1-1965 2204 | 922 | | $3,320.61 | $0.00 | $3,320.61 | $0.00 |
| | | Section 5: S/2 SW4, NW/4 SW/4 | (40161) 9-14-1967-26359 | | | | | | |
| | | Containing 120 acres, more or less | Oil and Gas Lease Dated 2-17-1972 (Long Form) | | | | | | |
| | | | (40109) | | | | | | |
| | | SUBJECT LEASE AND DOCUMENTS | Memorandum of Oil and Gas Lease Dated 2-17-1972 2390 | 581 | | | | | |
| | | 1. Oil & Gas Lease dated February 17, 1972, by and between | (40109) Rec 3-13-1972-8424 | | | | | | |
| | | Bradley Land Company and Shell Oil Company said lease was | Oil and Gas Amendment Dated 8-5-1986 | | | | | | |
| | | recorded on March 13, 1972 in Book 2390, Page 581 of the | (Unrecorded) (40109) | | | | | | |
| | | Official Records of Santa Barbara County, California. | Memorandum of Oil and Gas Lease dated 1-16-1969 2266 | 307 | | | | | |
| | | | (40159) 3-27-1969-8329 | | | | | | |
| | | 2. 3/13/1972-8424, Book 2390, Page 581 Oil and Gas Lease by | Oil and Gas Amendment dated 11-1-1972 | 2431 | 1474 | | | | |
| | | and between Bradley Land Company, Lessor, and Shell Oil | (40159, 40161) Rec. 11-22-1972-45991 | | | | | | |
| | | Company as Lessee | | | | | | | |
| | | | | | | | | | |
| | | 3. 7/26/1973-29517 Book 2473, Page 1102 Lease Amendment | | | | | | | |
| | | and Consolidation Agreement by and between Bradley Land | | | | | | | |
| | | Company, Lessor, and Shell Oil Company as Lessee | | | | | | | |

4. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

6. 4/13/1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands:
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

40159
Township 9 North, Range 33 West, S.B.B. &M.
Section 6:  SW/4 NW/4, S/2 NW/4 NW/4, N/2 NE/4 SW/4, N2
NW4 SW/4
Containing 80 acres, more or less

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between
Bradley Land Company and Standard Oil Company of
California said lease was recorded in on March 27, 1969 in
Book 2266, Page 307 of the Official Records of Santa Barbara
County, California.

2. 11/22/1972-45991 Book 2431, Page 1474 Lease
Amendment and Consolidation Agreement by and between
Bradley Land Company, Lessor, and Standard Oil Company as
Lessee, wherein both 40159 and 40161 leases where
consolidated by parties herein.

3. Unrecorded Consolidation Agreement dated 10/1/1975 by
and between Bradley Land Company, Lessor, Standard Oil
Company and Shell Oil Company as Lessees, wherein parties
agree to consolidate and join the leases described and to be
operated as single leasehold with the 40001, 8/13/1970-
21557, Book 2317, Page 975 lease as the controlling or
primary lease.

4. Unrecorded Amendatory Agreement dated 7/14/1977 by
and between Bradley Land Company, Lessor, Shell Oil
Company and Chevron USA, Inc., as Lessee, agree to comingle
all production from said consolidated leases.

Schedule 3.04 to PSA.doc                                         18

486

5. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases
by and between Bradley Land Company, Lessor, and Standard
Oil Company, predecessor in interest to Chevron USA Inc.,
and Shell Oil, as Lessees, wherein Shell Oil reassigns the
following described land:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4,
  SW/4   SE/4, Section 6 T9N, R33W, S.B.B.&M.

6. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by
and between Standard Oil Company, predecessor in interest
to Chevron Oil Inc., as
Lessee and Bradley Land Company as Lessor, wherein Lessee
surrenders 40 acres in the following described lands:
  N/2 NW/4 NW/4; N/2 NW/4 NE/4
  Section 6, T9N, R33W, S.B.B. &M.

7. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases
by and between Standard Oil Company, predecessor in
interest to Chevron USA Inc., as Lessee and Bradley Land
Company as Lessor, wherein Lessee surrenders 160 acres in
the following described lands:
  S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
  Section 6, T9N, R33W, S.B.B.&M.


40161
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: E/2 NW/4, SW/4 NE/4, S2 NW/4 NE/4, NW/4 SE/4,
N2 NE/4 SW/4
Containing 200 acres, more or less

SUBJECT LEASES:
1. Oil & Gas Lease dated January 16, 1969, by and between
Bradley Land Company and Standard Oil Company of
California said lease was recorded in Book 2266, Page 307 of
the Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated December 1, 1965 recorded in
Book 2204, Page 922 by and between Bradley Land Company
and Standard Oil Company.

3. 11/22/1972-45991 Book 2431, Page 1474 Lease
Amendment and Consolidation Agreement by and between
Bradley Land Company, Lessor, and Standard Oil Company as
Lessee, wherein both 40159 and 40161 leases where

consolidated by parties hereto.

4. Unrecorded Consolidation Agreement dated 10/1/1975 by
and between Bradley Land Company, Lessor, Standard Oil
Company and Shell Oil Company as Lessees, wherein parties
agree to consolidate and join the leases described and to be
operated as single leasehold with the 40001, 8/13/1970-
21557, Book 2317, Page 975 lease as the controlling or
primary lease.

5. Unrecorded Amendatory Agreement dated 7/14/1977 by
and between Bradley Land Company, Lessor, Shell Oil
Company and Chevron USA, Inc., as Lessee, agree to comingle
all production from said consolidated leases.

6. 5/8/1979-20221 Partial Reassignment of Oil and Gas Leases
by and between Bradley Land Company, Lessor, and Standard
Oil Company, predecessor in interest to Chevron USA Inc.,
and Shell Oil, as Lessees, wherein Shell Oil reassigns the
following described land:
  N/2 NW/4 NW/4, N/2 NW/4 NE/4, S/2 SW/4, S/2 N/2 SW/4,
  SW/4 SE/4,  Section 6 T9N, R33W, S.B.B.&M.

7. 3/6/1982-18490 Partial Surrender of Oil and Gas Leases by
and between Standard Oil Company, predecessor in interest
to Chevron USA Inc., as Lessee and Bradley Land Company as
Lessor, wherein Lessee surrenders 40 acres in the following
described lands:
  N/2 NW/4 NW/4; N/2 NW/4 NE/4
  Section 6, T9N, R33W, S.B.B. &M.

8. 10/25/1982-44687 Partial Surrender of Oil and Gas Leases
by and between Standard Oil Company, predecessor in
interest to Chevron USA Inc., as Lessee and Bradley Land
Company as Lessor, wherein Lessee surrenders 160 acres in
the following described lands:
  S/2 SW/4, S/2 N/2 SW/4, SW/4 SE4
  Section 6, T9N, R33W, S.B.B.&M.

| Lease | Santa Marie Valley Bradley Lands Unit | 40014<br>Township 9 North, Range 33 West, S.B.B. &M.<br>Section 6: NE/4, SE/4, NE/4<br>Containing 10 acres, more or less | Memo Oil and Gas lated 10-3-1956 (40014) | 1411 | 162 | $115,674.00 | $23,889.68 | $139,563.68 | $0.00 |

SUBJECT LEASE AND QUITCLAIM
1. Oil and Gas Lease by and between Bradley Land Company and Union Oil Company of California dated October 3, 1956 recorded in Book 1411, Page 162.

Oil and Gas Dated 10-3-1956 (40014)
Memo Oil and Gas Lease Dated 4-4-1956 (40015)  1375  210
Rec 4-24-1956
Oil and Gas Dated 4-4-1956 (40015)
Oil and Gas Lease Dated 6-12-1957 (40016)

2. Quitclaim Deed wherein Union of Oil of California quitclaimed all title and interest in above described Oil and Gas Lease dated 6/15/1960-19030 recorded in Book 1754 Pg 40.

Memo Oil and Gas Lease dated 6-12-1957 (40016)  1469  489
Rec 9-3-1957-17625

40015
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: NW/4; SW/4 NE/4; NE/4 SW/4; SE/4
Section 6: NE/4 NE/4
Containing 230 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated April 4, 1956 by and between Bradley land
Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded in Book 1375 and page 210.

40016
Township 9 North, Range 33 West, S.B.B. &M. Section 5: Commencing at a point on the north line of said Section 5, 826 feet east of the northwest corner of said Section 5, running thence easterly along the north line of said section 330 fee; thence at right angles southerly 660 feet; thence at right angles westerly and parallel with the north line of said Section, 660 feet; thence at right angles northerly 660 feet to the north line of said section thence easterly along the north line of said section, 330 feet to the point of beginning containing 10 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated June 12, 1957 by and between Bradley land
Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded on September 9, 1957 in Book 1469 and Page 489.

| Lease | Santa Maria Valley Bradley- Parcel E | 40001 | Oil, Gas and Mineral Lease dated 7-1-19/0 (40001) | 2317 | 975 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | Township 9 North, Range 33 West, S.B.B.&M. | Rec. 8/13/1970-21557 | | | | | | |
| | | Section 5: SW/4 SE/4 | | | | | | | |
| | | Section 6: S/2 SE/4 SE/4 | | | | | | | |

SUBJECT LEASES:

1. Oil & Gas Lease dated July 1, 1970, by and between Bradley Land Company and Shell Oil Company said lease was recorded in Book 2317, Page 975 of the Official Records of Santa Barbara County, California.

2. Oil & Gas dated July 26, 1973 Recorded in Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee

3. Unrecorded Consolidation Agreement dated 10/1/1975 by and between Bradley Land Company, Lessor, Standard Oil Company and Shell Oil Company as Lessees, wherein parties agree to consolidate and join the leases described and to be operated as single leasehold with the 40001, 8/13/1970-21557, Book 2317, Page 975 lease as the controlling or primary lease.

4. Unrecorded Amendatory Agreement dated July 14, 1977 by and between Bradley Land Company, Lessor, Shell Oil Company and Chevron USA, Inc., as Lessee, agree to comingle all production from said consolidated leases.

5. April 13, 1979 Recorded in Instrument No. 1979-16051 Partial Surrender of Oil and Gas Leases by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee, wherein Lessee surrendered 60 acres in the following described lands.

| Lease | Santa Maria Valley Texaco Bradley Lands | Township 9 North, Range 33 West, S.B.B. &M. | Oil & Gas Lease dtd 3-1-1967 (246703) | Unrecorded | | $1,256.19 | $0.00 | $1,256.19 | $0.00 |
| | | | Memorandum of Oil and Gas Lease dated 3/1/1967 (246703) Rec.5/31/1967-14364 | 2192 | 12 | | | | |
| | | Section 4: SWNW, W2SENW, W2E2SENW, S2NWNW, S2N2NWNW, S2SWNENW, NWSWNENW | Modification Agreement dated 8-5-1970 (246703) Rec 9-30-1970-26546 | 2322 | 571 | | | | |
| | | Section 5: N2SE, NESESE, SENENE, E2SENE, SWSENE, S2SWNE, NWSWNE, SWSWNWNE, S2NESWNE, E2S WNENE containing 280 acres, more or less | Modification Agreement dated 1-11-1973 (246703) Rec 1-23-1973-2783 | 2443 | 1188 | | | | |

SUBJECT LEASES:
1. Oil and Gas Lease by and between Bradley Land Company and Texaco, Inc. dated March 1, 1967 and recorded on May 31, 1967 in Book 2192 and Page 12.

2. 9/30/1970-26546, Book 2322, Page 571 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

3. 1/23/1973-2783, Book 2443, Page 1188 Modification Agreement by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee

4. 5/25/1979-23640, Partial Surrender of Oil and Gas Lease by and between Bradley Land Company, Lessor, and Texaco, Inc., as Lessee, wherein lessee surrendered 290.373 acres from the 570 acres the original lease contained therein.

Amendment to Oil and Gas Lease - Shut-in Royalty Agreement Dated 6-7-1989 (70209) (24603) Unrecorded

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Lease | Santa Marie Valley Kemp | SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less. SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of 500 feet of the southerly 300 feet containing 40 acres, more or less.

SUBJECT LEASES:
1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. 4 | Oil and Gas Lease Dated 7-19-1939 | 1940 | 498 | $64,868.15 | $5,063.07 | $69,931.22 | $0.00 |
| | Santa Marie Valley Kemp A | | Oil and Gas sublease dated June 3, 1952 | 1078 | 71 | $52,367.72 | $0.00 | $52,367.72 | $0.00 |
| | | | Oil and Gas Lease Dated 6-21-1965 Recorded | 2117 | 872 | | | | |
| | | | Oil and Gas Lease Dated 2-15-1973 | no recording info | | | | | |
| | | | Amendment of Oil and gas Lease dated 8-5-86 (it amended the 7-19-1939 lease) | not recorded | | | | | |
| | | | Lease Amendment Dated 1-1-1977 Gilliland | 79-6255 | | | | | |
| | | | Lease Amendment Dated 1-1-1977 Hunter | 79-6640 | | | | | |

Schedule 2.01 to FSA.xlsx

21

2. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Ione Beach, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.

3. Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

4. Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

| | | |
|---|---|---|
| Lease Amendment Dated 1-1-1977 Markling, Beach | Not recorded | |
| Lease Amendment Dated 1-1-1977 Mitchell | 78-33050 | |
| Oil, Gas and Mineral Lease dtd 2-15-1973 | 2453 | 1476 |
| Amend dtd 2-13-1990 of O& G Lse dtd 2-15-1973 | not recorded | |
| Amend dtd 8-5-1986 of O & G Lse dtd 2-15-1973 | not recorded | |

| Lease | Santa Maria Valley Laine | SUBJECT ACREAGE: That portion of the Southeast quarter of Section 13, Township 10 North, Range 34 West, San Bernardino Base and Meridian, in the County of Santa Barbara, State of California described as follows, to wit: | Oil and Gas Lease Agree dat 12-17-79 | not recorded | $1,667.53 | $0.00 | $1,667.53 | $0.00 |
|---|---|---|---|---|---|---|---|---|
| | | Commencing at a point in the north line of the Southeast quarter of Section 13, from which a 1inch pipe with copper disc set at the e1 northwest corner of said quarter section bears North 89°18 '40" West, 1,024.84 feet; thence South 0°29'40" West, 2,660.57 feet at 59.45 feet to a 3/4 inch pipe with copper disc set in the fence line and on the east side of an orchard at 2,626.80 feet a 1 inch pipe with copper disc, set in the to south fence line at 2,660.57 feet to a point in county road on the southside of said quarter section; thence along the south side of said quarter section South 89°18 '39" 797.00 feet to a point in county road; thence leaving said south line North 0°29'49" East 2,660.57 feet at 32.57 feet to a 1 inch pipe with copper disc set in the south fence line, at 2600.42 feet to a 1 inch pipe with copper disc set in the north line at 2,660.57 feet to a point on the north line of said quarter section; thence along the north line of said quarter section North 89°18 '40" West, 779.00 feet to the place of beginning. | Memo of Lease recorded March 11, 1980 | 1980-9932 | | | | |
| | | SUBJECT LEASE: Oil and Gas Lease by and between Dorothy M. Laine, as lessor, and Union Oil Company of California, as lessee, recorded on March 11, 1980 as instrument No. 80-9932, Official Records of Santa Barbara County, California. | | | | | | |
| Lease | Santa Maria Valley Moretti | SUBJECT ACREAGE: The North Half(N/2) of the Northwest Quarter (NW/4) and the North Half (N/2) of the South Half (S/2)of the Northwest Quarter of Section 24, Township 10 North, Range 34 Wet, SB&M, 118.56 acres, more or less. | Oil & Gas Lease Dated 11-16-1943 | not recorded | $486.77 | $0.00 | $486.77 | $0.00 |
| | | | Memo of Oil and Gas Lease Dated 9-1-1976 (recorded 4-12-77) | 77-16811 | | | | |
| | | | Oil and Gas Lease Dated 9-1-1976 | not recorded | | | | |
| | | SUBJECT LEASE: Oil & Gas Lease dated September 1, 1976, by and between Peter M. Moretti et. Al., as Lessor, and Union Oil Company of California, as Lessee, said lease of memorandum of which was recorded April 12, 1977 as Document #77-16811, of the Official Records of Santa Barbara County, California. | Amendment of Oil and Gas Lease | 2007-0085893 | | | | |
| | | | Partial Quitclaim Deed | 2007-85894 | | | | |
| | | | Memorandum of Amendment to Lease | 2011-0077011 | | | | |

| Lease | Santa Maria Valley Payne | | | | | | $483,062.95 | $0.00 | $483,062.95 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|---|

SUBJECT ACREAGE: The Northeast quarter of the Northeast quarter (NE4 NE4) of Section 12 T9N, R34W, S.B.B. & M. and the North half (N1/2) of Section 7, T9N, R33W, S.B.B. & M, containing 360 acres, more or less

**1968 Lease-Bardin**

| | Book | Page |
|---|---|---|
| Oil and Gas Lease dtd Aug 12, 1968 | 2255 | 439 |
| Ext of O & G Lease dtd June 21, 1973 | 2480 | 721 |
| Amendatory Agree dtd Apr 2, 1989 | not recorded | |
| Amendatory Agree dtd Apr 19, 1989 | | |

SUBJECT LEASES:

1. 8/12/1968-31331 Book 2256 Page 112 Oil and Gas Lease by and between John S. Newton and Margaret W. Newton, his wife, and Jane Borden Hall and Harvey W. Hall, Jr., her husband, as Lessor, and Standard Oil Company of California, a corporation, Lessee.

**1968 Lease-Gillespie**

| | Book | Page |
|---|---|---|
| Oil and Gas Lease dtd Aug 12, 1968 | 2255 | 463 |
| Ext of Oil and Gas Lease dtd May 11, 1973 | 2476 | 849 |
| Amendatory Agree dtd March 24, 1989 | not recorded | |

2. 12/13/1968-38617 Book 2255, Page 439 Oil and Gas Lease by and between Mildred F. Bardin, a widow, as Lessor and Standard Oil Company of California, Lessee.

**1970 Lease-**

3. 12/13/1968-38621 Book 2255, Page 463 Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil Company of California, as Lessee

4. 8/21/1972-32057 Book 2416, Page 911 Assignment and Agreement, wherein Standard Oil Company assigned 50% of its right title and interest and estate as Lessee to Shell Oil Company.

5. 8/13/1973-32173 Book 2476, Page 849 Extension of Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil company of California, and Shell Oil Company, as Lessee.

6. 2/6/1970-3352, Book 2298, Page 308 Oil and Gas Lease by and between John David Payne, a single man, and Carey Morrison, Executor of the Estate of Annie Morrison, deceased, Lessor, and Standard Oil Company of California, as Lessee.

| | Book | Page |
|---|---|---|
| Oil and Gas Lease dtd Jan 2, 1970-long form | not recorded | |
| O & G Lease Jan 2, 1970 (Short form) Rec Bk 2298 Pg 308 | 2298 | 308 |
| Ext of Oil and Gas Lease dtd Nov 14, 1974 Rec Bk 2545 pg 1406 | 2545 | 1406 |
| Amendatory Agree dtd April 14, 1989 | not recorded | |

7. 12/27/1974-44642 Book 2545, Page 1406 Extension of Oil and Gas Lease by and between John Dale Payne, a married man, as his sole and separate property, and Carey Morrison, Executor of the Estate of Annie S. Morrison (a.k.a. Annie Morrison), deceased, as Lessor, and Standard Oil Company of California and Shell Oil Company.

494

| Lease | Santa Maria Valley R.B. McFaddin | SUBJECT ACREAGE: The West Half of the Northwest Quarter (W1/2 NW1/4) of Section 19, Township 10 North, Range 33 West, SBB&M, EXCEPTING THEREFROM the following described parcel: Commencing at a appoint on the Westerly line of the West Half of the Northwest quarter (W1/2 NW1/4) which point is 60 feet North of the Southwest corner thereof and said point of beginning thence Easterly 660 feet; thence Northerly 1320 feet; thence Westerly 660 feet; thence Southerly 1320 feet to the point of beginning (60 Acres more or less). | Oil and Gas Lease dtd June 8, 1964 | not recorded | | $18,740.33 | $40.30 | $18,780.63 | $0.00 |
| | | | Memo of Oil and Gas Lease dtd June 8, 1964 Recorded Bk 2072 Pg 226 | 2072 | 226 | | | | |
| | | | Amendment to Oil and Gas Lease dtd May 22, 1974 Counterpart A | 2527 | 1287 | | | | |
| | | | Amendment to Oil and Gas Lease dtd May 22, 1974 Counterpart B | 2527 | 1292 | | | | |
| | | | Memo to Amendment to Oil and Gas Lease dtd May 22, 1970 | | | | | | |
| | | | Operating Agreement dtd June 1, 1977 | not recorded | | | | | |

495

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | SUBJECT LEASE: Oil & Gas Lease dated June 8, 1964, by and between Ruth B. McFaddin, et al, as Lessor and Union Oil Company of California, as Lessee, said lease memorandum of which was recorded September 30, 1964, as Document #41819, in Book 2072, Page 226 of the Official Records of Santa Barbara County, California | | | | | | | |
| Lease | Zaca | Brown | SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 40.01 acres more or less in Santa Barbara County. | Alice Sedgwick to Getty Oil -Oil and Gas Lease 9-17-71 recorded 2371 Page 1011 | 2371 | 1011 | $225,540.45 | $35,571.46 | $261,111.91 | $0.00 |
| | | | | Alice Sedgwick to Getty Oil -Oil and Gas Lease 9-23-71 recorded 2371 Page 1014 | 2371 | 1014 | | | | |
| | | | | Lenard K. Firestore to Getty Oil- July 7, 1976 recorded 2623 Page 950 | 2623 | 950 | | | | |
| | | | SUBJECT LEASES: 1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County. | William J. Bedford et al. to Getty Oil 6-25-79 instument 1979-51489 | 1979-51489 | | | | | |
| | | | | Dean and Katherin Brown Trustees Oil and Gas Lease dated April 30, 1997 as Instrument No. 1997-036109 | 1997-036109 | | | | | |
| | | | 2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 500 additional acres. | Extention to Oil and Gas Mineral Lease dated 3-22-2000 Rec 7-11-2000-41978 | 2000-41978 | | | | | |
| | | | 3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024. | | | | | | | |

| Lease | Zaca | Carranza | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | SUBJECT ACREAGE: Township 7 North, Range 31 West Minus Section 2 and 3: Beginning at the southerly end of the 42nd course in the description for that certain land conveyed by Harold H. Davis and Alice C. Davis, his wife, to Francis M. Sedgwick and Alice de F. Sedgwick, his wife, by deed dated April 30, 1942 in Book 551 of Official Records of Santa Barbara County, California, at page 177, which 42nd course is designated as south 90°8′ 38′ West 492.20 feet; Thence from said point of beginning, First, South 62°-30′ East 1700.00 feet; Thence Second, South 27°-30′ West 943.90 feet; Thence Third, North 62°-30′ West 2051.29 feet to intersect the 46th course in the description in the above mentioned deed; thence Fourth, North 65°-53′ East 113.72 feet along a part of the said 46th course to the southerly end of the 45th course; thence following along the courses described in said deed but in the opposite direction Fifth, North 46°-45′ East 285.09 feet, Sixth, North 48°-56′ East 398.20 feet and Seventh, North 38°-21′ East 218.90 feet to the point of beginning and containing 40 acres more or less. | Indenture of Lease dated 7-1-1951 Recorded July 1, 1951 | 399 | 407 | $41,014.73 | $40,708.05 | $81,722.78 | $290.44 |
| | | | SUBJECT LEASES:<br><br>1. Oil and Gas Lease by and between Theodore Chamberlin, Jr., et ux and Tidewater Associated Oil Company dated January 1, 1951 recorded in Book 999 and Page 407 in the Official Records of Santa Barbara County.<br><br>2. Partial Quitclaim of an Oil and Gas Lease; Tidewater Associated Oil Quitclaims all but 40 acres back to the Lessors, dated 1/15/1955 and recorded at Book 1292 and Page 321. | Partial QC of Oil and Gas Lease - Dated January 13, 1955 Carranza down to 40 AC | 1292 | 321 | | | | |

Schedule 3.09 to FSA.xlsx

37

| Lease | Zaca | Chamberlin | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM Section 32 and 33: Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Latalllade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 256, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649.27 feet to the true point of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° 0' W. 2730.00 feet; thence N. 30° 6' E. 1551.14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California. | Theodore Chamberlin Jr. to Tidewater dtd 4-7-1942 bk 545 pg 917 | 545 | 197 | $10,560.75 | $13,594.99 | $24,155.74 | $232.28 |
| | | | | Amendment to Oil and Gas Lease with Getty Oil dated 9-15-76, recorded at Book 2626 Page 2446 | 2626 | 2446 | | | |
| | | | | Modification of Oil and gas lease  dated 6-24-1977 recorded as instrument Number 1977-032024 | 1977-032024 | | | | |

SUBJECT LEASES:
1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and  Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 500 additional acres.

3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024.

498

| Lease | Zaca | Chamberlin B | SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM, Section 32 and 33:<br><br>Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which one confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649 .27 feet to the true point of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° 0' W. 2730.00 feet; thence N. 30° 6' E. 155 L 14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California.<br><br>SUBJECT LEASE: Oil and Gas Lease by and between Theodore Chamberlin Jr. et ux and Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County. | | | $31,109.45 | $18,985.15 | $50,094.60 | $101.92 |
|---|---|---|---|---|---|---|---|---|---|
| Lease | Zaca | Davis | SUBJECT ACREAGE: Township 7 North, Range, 31 West, S.B.B.M. Sections 33 & 34 AND Township 8 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 210.07 acres more or less in Santa Barbara County, California. | Harold H. Davis et Tux to Tidewater Associated Oil 11-1939 Rod Pg 449/451<br>Dean Brown Oil, Gas and Mineral Lease Dated 5-31-1989<br>Dean and Katherin Brown Trustees Oil and Gas Lease dated April 30, 1997 as Instrument No. 1997-036109 | 1- 449<br><br><br><br>1997-036109 | 451 | $210,138.36 | $56,685.54 | $266,823.90 | $0.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | SUBJECT LEASE:<br>1. Oil and Gas Lease by and between Harold H. Davis and Tidewater Oil dated January 11, 1939 recorded in the Official Records of Santa Barbara County in Book 449 and Page 451. | Alice Sedgwick Wohl et. Arco Vintage Petroleum, Oil 1997-036108 and Gas Lease 5-1-97 Instrument No. 1997-036108 | | | | | |
| | | | | Alice Sedgwick Wohl et al to Vintage Petroleum Extension and Amendment to Oil, Gas and Mineral Lease Recorded 7-11-2000, Instrument No 2000-041979 | 2000-041979 | | | | |
| | | | | Dean and Katherine Brown Trustees Extension and Amendment to Oil, Gas and Mineral Lease dated 3-22-2000 as Instrument No. 2000-0041978 | 2000-0041978 | | | | |
| | | | | Alice Sedwick et all to Getty Oil  9-17-71 recorded 2371 Page 1011 | 2371 | 1011 | | | |
| | | | | Alice Sedwick et all to Getty Oil  9-23-71 recorded 2371 Page 1014 | 2371 | 1014 | | | |
| Lease | Zaca | Davis B | SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 4 being a portion thereof, and Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 44.36 acres more or less in Santa Barbara County, California.<br><br>SUBJECT LEASES:<br>1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records of Santa Barbra County. | | | | $113,215.50 | $20,781.99 | $133,997.49 | $0.00 |

Schedule 5.09 to PSA.xlsx                    30

500

2. Oil and Gas Lease between by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records of Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil dated July 7, 1976 recorded in Book 2623 and Page 950 in the Official Records of Santa Barbara County.

4. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1825 or now Instrument No. 1976-0034392 in the Official Records of Santa Barbara County.

5. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w, to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1828 or now Inst # 1976-0034393 in the Official Records of Santa Barbara County.

| Lease | Zaca | Davis C | SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 and 4 being a portion thereof, AND Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 40.03 acres more or less in Santa Barbara County, California. | $210,194.73 | $33,152.35 | $243,347.08 | $0.00 |

SUBJECT LEASES:
1. Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  Dated 9/17/1971 and recorded at Book 2371 Page 1011.

Schedule 2.09 to PSA.xlsx                                31

2. Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated 9/13/1971 recorded in Book 2371 Page 1014

3. Leonard K. Firestone, a married man dealing with his separate property, to Getty Oil Dated 7/7/1976 Recorded at Book 2623 and Page 950 now Instrument No. 1976-034108

4. Harold H. Davis and Alice de Forest Sedgwick entered into an Amendment and Agreement of their 1971 leases with Getty Oil Co. dated 6/25/1980 recorded as Instrument No. 1980-024589 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.  This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

5. Leonard K Firestone entered into an Amendment and Agreement of his 1976 lease with Getty Oil Co. dated 4/5/1982 Recorded as Instrument No. 1982-013662 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.  This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

6. Dean Brown and Katherine Brown entered into an Amendment and Agreement of their 1976 lease  1976 lease with Getty Oil Co. dated 4/5/1982 recorded as Instrument No. 1982-013663 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90. This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Lease | Zaca | Quati | SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 & 4 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89.58 acres more or less in Santa Barbara County, California. | Oil and Gas Lease by and between Harold H. Davis to Tidewater Oil dated 1/11/1939 recorded at Book 449 and Page 451 in the Official Records of Santa Barbara County. Addendum to Oil and Gas Lease, dated 7/6/1983, recorded as Instrument # 1983-034552 by and between Ray Stark as landlord and Getty Oil Co. as Tenant.  While this is titled an Addendum to Oil and Gas Lease, it is actually a Surface Use Agreement between the surface owner and the Oil Company | 449 | 451 | $138.64 | $5.93 | $144.57 | $0.00 |
| | | | | 1983-034552 | | | | | | |

**TOTALS**                                                    $11,416,109.64    $505,797.03    $11,921,906.67            $16,472.42

**Footnotes:**

[1] Surface Leases assumed pursuant to orders entered on 5/15/20 and 6/23/20.  Prepetition cure amounts for Bradley and Morganti Surface Leases are listed as zero because were paid on or about 8/20/20 pursuant to the 6/23/20 order.  Persuant to the orders the other Surface Lease cure payments will be paid  as part of and at the time of a Court approved sale of such Surface Lease.

[2] Trustee is paying post-petition amounts current.  Therefore, the amount is believed to be zero.

[3] Trustee is paying post-petition amounts current and, therefore, the buyer's amount is predicted to be zero.

[4] Trustee is paying post-petition amounts current and, therefore, the buyer's amount is predicted to be zero.

[5]  Unpaid post-petition royalties reflected through 6/30/20 as HVI has not yet collected July's revenue, to be collected 7/20/20.  Therefore, the post-petition period can only be reflected through 6/30/20.

[6]  Unpaid royalty estimates based upon June 2020 actual unpaid royalty balances by lease.

## <u>SCHEDULE 5.05</u>

LITIGATION

*See attached.*

## Active Legal Proceedings

| No. | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
|---|---|---|---|---|---|---|
| 1 | U.S., et al v. Debtor | CV 11-05097 FMO (SSx) | Civil Penalties under Environmental Law, injunctions, appointment of monitor | U.S. District Court Central District of California 350 W. 1st Street, Suite 4311 Los Angeles, CA 90012-4565 | Active | Retained special counsel Reetz, Fox & Bartlett LLP and Buynak, Fauver, Archbald & Spray, LLP ("Buynak") to assist with this matter on 2/28/20. |
| 2 | Department of Conservation, Division of Oil, Gas and Geothermal Resources / Debtor, Appellant | 1119C | Remedial Order under Environmental Law; life-of-bond request | Director's Office of Appeals California Department of Conservation 801 K Street Sacramento, CA 95814 | Active | Retained special counsel Buynak to assist with this matter on 2/28/20. Got a preliminary ruling in our favor, extended deadline for supplemental briefing while exploring settlement negotiations |
| 3 | McConnell, Chapter 11 Trustee v. GLR, LLC and GRL, LLC | Adv. No. 9:20-ap-01006-MB | Seeking avoidance of property transfers to defendants. Defendants have asserted counterclaims and crossclaims. | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | Adversary proceeding to avoid and recover 3 properties that the debtor quit-claimed to GLR/GRL 6 days before bankruptcy. The amended complaint also seeks to avoid an earlier mineral lease amendment detrimental to the debtor. This was not a milestone as Eric Israel recalls, but UBS supported the action to return the properties. |
| 4 | McConnell, Chapter 11 Trustee v. AAnerud et al. | Adv. No. 9:20-ap-01011-MB | Declaration that the Subject Rights constitute property of the estate under section 541 of the Code, and are not the subjects of executory contracts or unexpired leases under section 365 of the Code. Defendants have asserted counterclaims. | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | This is the adversary proceeding to declare that the oil and gas leases are interests in real property – not true leases subject to section 365. Commencing and prosecuting this adversary proceeding is a milestone under the Second Amendment; and sections 2.3(a)(xvii) and (xviii) and 2.4(a)(xvi) of the Fourth Amendment. |
| 5 | Trustee's 2004 motion for production and inspection of ESI and Server from GIT, Inc. and GIT Inc's Motion for Protective Order | 9:19-bk-11573-MB | 2004 Motion and demand for turnover of server from GIT and Git Motion for protective order. | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | Demand for production of server in possession of GIT and turnover of ESI from GIT server. Falls under books and records milestone under the Second Amendment. Section 2.3(a)(vi) |
| 6 | Trustee's Motion to Assume Lease or Executory Contract | 9:19-bk-11573-MB | The lease assumption seeks to assume surface leases and preserve the section 365 lease of the mineral rights | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | The lease assumption seeks to assume surface leases and preserve the section 365 lease of the mineral rights. This too is a milestone under the Second Amendment at section 2.3(a)(xiv). |
| 7 | Trustee's Motion to Expunge Notices of Oil and Gas Lien | 9:19-bk-11573-MB | The motion seeks to expunge post-petition notices of lien filed by California Asphalt Production, Inc., GTL1, LLC, GIT, Inc. | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | The motion seeks to expunge notice of liens filed under 11 U.S.C. 546. |
| 8 | Motion for Approval and Payment of Administrative Claims | 9:19-bk-11573-MB | The motion seeks administrative claims filed by California Asphalt Production, Inc., GTL1, LLC, GIT, Inc. | U.S. Bankruptcy Court Central District of California (Santa Barbara) | Active | The motion seeks administrative claims filed by California Asphalt Production, Inc., GTL1, LLC, GIT, Inc. To the extent the claimants pursue the claims, the deadline for the claimants to respond is the first business day that is 28 days after the filing of the complaint. UBS is granted leave to intervene in any adversary proceeding. The status conference in the adversary proceeding will be held on November 5, 2020, at 10:00 a.m |
| 9 | OSPR Cease and Desist Order on 1/17/20 | N/A | Cease and Desist Order from Office of Spill Prevention and Response (OSPR) California Department of Fish and Wildlife | Department of Fish and Wildlife Office of Spill Prevention and Response P.O. Box 160562 (Legal Office) Sacramento, CA 95816-0562 | Active | The Trustee is filing all required Spill Prevention Plans and has received temporary reprieve from order while plans are completed and filed. |
| 10 | CalGEM 2019 Idle Well Management Plan default | N/A | On January 2, 2020, the California Geologic Energy Management Division (CalGEM) determined that HVI Cat Canyon failed to comply with the terms of its 2019 Idle Well Management Plan (IWMP), No. G3515-2019. Therefore, HVI Cat Canyon has breached the Terms of Settlement of Notice No. 0011 it executed on May 13, 2019. | State of California Natural Resources Agency - Department of Conservation - California Geologic Energy Management Division 801 K Street, MS 24-01, Sacramento, CA 95814 | Active | Buynak is working with CalGEM to determine how this default will be resolved, the plan submission date was prepetition but we're still assessing how the default will be treated. |
| 11 | Central Coast Regional Water Quality Control Board, Water Well Testing | N/A | HVI is testing agricultural water wells located at areas of historical oil well production and injection operations. This testing is a sensitive issue with the water well owners and can only be conducted with their permission. | Central Coast Regional Water Quality Control Board (Region 3) 895 Aerovista Place, Suite 101 San Luis Obispo, CA 93401-7906 | Active | Recently HVI's land department was able to gain permission from 13 out of 16 water-well owners, Buynak is working on this item, more information to follow. |

## Not Active Legal Proceedings

| No. | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
|---|---|---|---|---|---|---|
| 1 | Hampton Tedder Electric v. Schoggins, et. al. | CIVDS1916517 | Lawsuit against GIT, Inc., f/k/a Greka Integrated, Inc. and David Schoggins to collect on outstanding bill of $29,102.72 for services rendered, plus interest and attorneys' fees. The lawsuit is not against HVI Cat Canyon. However, David Schoggins was an employee of HVI at the time the services were rendered. | Superior Court of California, County of San Bernardino Civil Division 247 West Third Street San Bernardino, CA 92415-0210 | Active but claims are not against Debtor | Counsel for Hampton Tedder advised the Trustee that "at this time will not proceed to litigate my client's claims against [Schoggins] personally, that is, until we first conduct some discovery regarding his role." |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | Union Oil Company of California DBA Unocal v. Debtor, et al | 1125964 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Found on SB Superior Court - stayed by petition filing -- last filed doc 2018 |
| 3 | Corson v. Debtor, et al | 16CV01872 | Employment | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: 2/20/19 Judgment - stayed by petition filing |
| 4 | Northern California Collection Service, Inc. v. Debtor | SCV0041982 | Breach of contract | Placer County Suprior Court 10820 Justice Center Drive Roseville, CA 95678 | Stayed | Unable to find any info on Placer County Superior Court website |
| 5 | Commercial Trade, Inc. v. Debtor, et al. | TCL-19-000045 | Breach of contract | Kern County Superior Court 311 Lincoln Taft, CA 93268 | Stayed | Per CA Superior Court website: 4/9/19 Judgment - stayed by petition filing |
| 6 | Santa Barbara County Air Pollution Control District v. Debtor | 19CV01372 | Breach of contract | Santa Barbara County Superior Court 1100 Anacapa St. Santa Barbara, CA 93121 | Stayed | Per SB Superior Court website: 7/16/19 Judgment - stayed by petition filing if not resolved |
| 7 | Escolle Tenants in Common v. Debtor, et al | 16CV02662 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: still active - 11/20/19 order, filed.  4/21/20 Case Management Conference. Stayed by petition filing - Notice of Stay Filed by Trustee on 3/31/20. |
| 8 | Rival Well Services, Inc. v. Debtor, et al | 17CV02910 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: stayed - removed from Court's control on 8/1/19 |
| 9 | West Coast Welding & Construction v. Debtor, et al | 56-2017-00496706-CU-BC-VTA | Breach of contract | Ventura County Superior Court 800 S. Victoria Ave. Ventura, CA  93009 | Dismissed | Per Ventura Superior Court website: dismissed on 8/17/18 |
| 10 | Associated Pacific Constructors, Inc. v. Debtor | 56-2017-00500700-CU-BC-VTA | Breach of contract | Ventura County Superior Court 800 S. Victoria Ave. Ventura, CA  93009 | Dismissed | Per Ventura Superior Court website: dismissed on 10/5/18 |
| 11 | Hunton Andrews Kurth, LLP v. Debtor, et al | 18-03053-hdh | Adversary Proceeding | U.S. Bankruptcy Court For the Northern District of Texas (Dallas Division) 1100 Commerce St., Rm. 1254 Dallas, TX  75242-1496 | Closed | Per PACER - closed on 3/3/20 |
| 12 | Pacific Petroleum California, Inc. v. Debtor | 18CV05524 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: stayed - removed from Court's control on 8/1/19 |
| 13 | Credit Bureau of Santa Maria, Inc. DBA Coastal Recovery Solutions v. Debtor | 19CV00607 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: still active, filed 1/28/19, stayed by petition filing. Notice of Stay Filed by Trustee on 4/2/20. |
| 14 | Fisher, et al v. Debtor | 19CV01123 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: stayed |
| 15 | Brown, et al v. Debtor | 19CV01140 | Breach of contract | Santa Barbara County Superior Court 312-C East Cook St., Bldg. E Santa Maria, CA 93456-5165 | Stayed | Per SB Superior Court website: stayed - removed from Court's control on 8/1/19 |
| 16 | Jame A. Adams & John S. Adams, Trustees v. Debtor | 30-2019-01079204-CU-BC-CJC | Breach of contract | Orange County Superior Court 700 Civic Center Dr. West Santa Ana, CA  92701 | Stayed | Notice of Stay filed on 10/24/19 - Action Stayed as to Debtor per 11 U.S.C. 362.  However, Court Trial set for 9/1/21 at 9:00 a.m. in Ctrm C34 at Central Justice Center.  Mandatory Settlement Conference scheduled 1/29/21 at 9:00 a.m. in Ctrm C34 at Central Justice Center. |
| 17 | Voigt, Inc. II dba Smitty's Towing, et al v. Debtor, et al | 19CV03092 | Declaratory Relief | Santa Barbara County Superior Court 1100 Anacapa St. Santa Barbara, CA  93121 | Stayed | Per SB Superior Court website: still active, names GTL1 and HVI Cat Canyon - stayed by petition filing |

## SCHEDULE 5.08

PERMITS

| AGENCY | PERMIT TYPE | LOCATION |
|---|---|---|
| APCD | PERMIT TO OPERATE | ALL LEASES INCLUDING REDU AND BELRIDGE |
| CUPA | UNIFIED PROGRAM FACILITY PERMIT | ALL LEASES MINUS REDU |
| SANTA BARBARA COUNTY FIRE | OPERATIONAL PERMIT | ALL SANTA BARBARA CO. LEASES |
| SANTA BARBARA COUNTY PLANNING DIVISION | ANNUAL MAINTENANCE PERMIT | ALL SANTA BARBARA CO. LEASES |
| APCD | HEATER TREATER VARIANCE ORDERS | DAVIS, CHAMBERLIN, BELL, BRADLEY |
| APCD/EPA | TITLE V | BELL, BLOCHMAN, PALMER STENDEL |

## <u>SCHEDULE 5.10</u>

ENVIRONMENTAL MATTERS

*See attached.*

| | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
|---|---|---|---|---|---|---|

**ENVIRONMENTAL DISCLOSURES**

| No. | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
|---|---|---|---|---|---|---|
| | **ACTIVE LEGAL PROCEEDINGS** | | | | | |
| 1 | Department of Conservation, Division of Oil, Gas and Geothermal Resources / Debtor, Appellant | 1119C | Remedial Order under Environmental Law; life-of-bond sought | Director's Office of Appeals California Department of Conservation 801 K Street Sacramento, CA 95814 | Active | Retained special counsel Buynak to assist with this matter on 2/28/20. Got a preliminary ruling in our favor, extended deadline for supplemental briefing while exploring settlement negotiations. Trustee settled and the Settlement Agreement was approved by the Bankruptcy Court on August 10, 2020 for Order No. 1119C. The Settlement Agreement reduces the civil penalty associated with Order No. 1119C from $5,076,420 to $2,000,000 and removes the life of bond requirement. |
| 2 | U.S., et al v. U.S., et al v. HVI Cat Canyon, Inc., f/k/a Greka Oil & Gas, Inc | CV 11-05097 FMO (SSx) | Civil Penalties under Environmental Law, Injunctions, appointment of monitor | U.S. District Court Central District of California 350 W. 1st Street, Suite 4311 Los Angeles, CA 90012-4565 | Active | Retained special counsel Reetz, Fox & Bartlett LLP and Buynak, Fauver, Archbald & Spray, LLP ('Buynak') to assist with this matter on 2/28/20. |
| 3 | OSPR Cease and Desist Order on 1/17/20 | N/A | Cease and Desist Order from Office of Spill Prevention and Response (OSPR) California Department of Fish and Wildlife | Department of Fish and Wildlife Office of Spill Prevention and Response P.O. Box 160362 (Legal Office) Sacramento, California 95816-0362 | Active | The Trustee worked with OSPR to comply with its requests and has now submitted plans for the Security, Bell, Redu and Bradley/Jim Hopkins facilities. All plans have been approved in final form, allowing the Trustee to produce at all of the Debtor's currently operational fields. There are eight other plans that will need to be prepared before certain other facilities can be brought back on line. |
| 4 | CalGEM 2019 Idle Well Management Plan default | N/A | On January 2, 2020, the California Geologic Energy Management Division (CalGEM) determined that HVI Cat Canyon failed to comply with the terms of its 2019 Idle Well Management Plan (IWMP), No. G3515-2019. Therefore, HVI Cat Canyon has breached the Terms of Settlement of Notice No. 0011 it executed on May 13, 2019. | State of California Natural Resources Agency - Department of Conservation - California Geologic Energy Management Division 801 K Street, MS 24-01, Sacramento, CA 95814 | Active | Buynak is working with CalGEM to determine how this default will be resolved, the plan submission date was prepetition but we're still assessing how the default will be treated. |
| 5 | Central Coast Regional Water Quality Control Board, Water Well Testing | N/A | HVI is testing agricultural water wells located at areas of historical oil well production and injection operations. This testing is a sensitive issue with the water well owners and can only be conducted with their permission. | Central Coast Regional Water Quality Control Board (Region 3) 895 Aerovista Place, Suite 101 San Luis Obispo, CA 93401-7906 | Active | Recently HVI's land department was able to gain permission from 13 out of 16 water-well owners. |
| | **NOVS** | | | | | |
| 6 | Santa Barbara County Planning Department NOV Bell Compressor Plant | 19PTV-00000-00094 | Remove vegetation & debris throughout facility site. Address leaking at multiple locations on south side header on 2nd stage Fin Fan. Repair or replace defective section of 6" inlet piping to First Discharge Scrubber 1 vessel. P/L currently has temp. clamp installed. Remove and properly dispose of lube oil impacted soils around the base of compressor pump building struture at west & east sides | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | All items completed re-inspection request sent. |
| 7 | Santa Barbara County Planning Department NOV Bradley 3-Island | 19PTV-00000-00007 | Remove fluid/contents from 5000bbl injection tank #5053-1 labeled as OOS 8-22-16. Out of service tanks must be cleaned out, completely isolated from active service piping systems and access manways removed and replaced with heavy gauge steel mesh grating to restrict authorized access. | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Action plan emailed on 4-23-20. Emptying of tank deferred due to funding. |
| 8 | Santa Barbara County Planning Department NOV Fullerton | 17PTV-00000-00065 | Maintain Roadway Access | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Deferred due to funding. |
| 9 | Santa Barbara County Planning Department NOV Fullerton | 19PTV-00000-00027 | Vegetation & Belt Safety Guard | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Completed email request sent for re-inspection. |
| 10 | Santa Barbara County Planning Department NOV Fullerton | 19PTV-00000-00028 | Remove portable tank. | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Landowner's property, will not allow HVI to move. |
| 11 | Santa Barbara County Planning Department NOV Fullerton | 19PTV-00000-00029 | Remove land owners rebar from location | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Landowner's property, will not allow HVI to move. |

Environmental Disclosure Schedule 5.10 (8-13-20)_AF cmts.8.14.2020_(25889037)_(2)-(1).XLSX

| ENVIRONMENTAL DISCLOSURES | | | | | |
|---|---|---|---|---|---|
| No. | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
| 12 | Santa Barbara County Planning Department NOV Escolle Tank Facility | 19PTV-00000-00088 | ESCOLLE NOV- Remove vegetation and debris throughout facility site location. Remove fluids/contents from within all Out of service tanks, completely isolated from active service piping systems, access manways removed and replaced with heavy gauge steel mesh grating to restrict authorized access. All out of service tanks must be labeled as such and must include the date it was taken out of service. In conjunction with reported petroleum release on May 10, 2019; the 1500bbl Wash Tank must completely free of fluids/contents, permanently taken out of service until repairs completed to address pin hole at south side of tank bottom ring, an external and internal API inspection is to be performed by a certified third party inspection company which verifies tank to be fit for active service. Copies of reports must be submitted to the Petroleum Unit office for reference and records.  At Vapor Recovery Unit (VRU), address unsafe cooling system design on compressor pump. Current installation is not to design standards and could cause equipment failure and/or harm to company personnel and local wildlife. Must be fabricated to original engineered design standards and approved by a licensed engineer to be fit for service. Operator is to submit documentation of approval from licensed engineer. | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | All items will be completed by 8-17-20.  Re-inspection email will be sent once complete. |
| 13 | Santa Barbara County Planning Department NOV Security | 19PTV-00000-00089 | Submit internal/external API report for crude tank #1. Remove and properly dispose of impacted soils at compressor pump area. | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | All items completed re-inspection request sent. |
| 14 | Santa Barbara County Planning Department NOV Fullerton | Grading Permit 15GRD-000090 | Grading violation for failure to complete backfilling operation for spill clean-up. | Planning & Development-Petroleum Unit Energy, Minerals & Compliance 624 E. Foster Rd., Ste. B Santa Maria, CA 93455 | Active | Deferred due to funding. |
| 15 | Santa Barbara County Air Pollution Control District Mutual Settlement Agreement | N/A | Mutual Settlement Agreement for NOV's issued for failure to submit data on annual report | Air Pollution Control District Santa Barbara County 260 N. San Antonio Rd. Ste. A Santa Barbara, CA 93110 | Active | Total Amount 31,000.  Earmarked in budget.  HVI is meeting with mutual settlement officer to try and get fines reduced. |
| 16 | Department of Conservation, Division of Oil, Gas and Geothermal Resources NOV Jim Hopkins | N/A | NOV for failed standard annular pressure test (SAPT) test. | State of California Natural Resources Agency - Department of Conservation - California Geologic Energy Management Division 801 K Street, MS 24-01, Sacramento, CA 95814 | Active | Deferred due to funding. |
| | PROOFS OF CLAIMS (Case No. 9:19-bk-11573 MB) | | | | | |
| 17 | California Department of Fish & Wildlife Claim | 160-1 | Violations of the Clean Water Act, Oil Pollution Act, and other costs associated with release of oil into the waters of the State of California.  - Claim Amount - $1,757,581.42 + contingent and/or prospective claims | Central Coast Regional Water Quality Control Board (Region 3) 895 Aerovista Place, Suite 101 San Luis Obispo, CA. 93401-7906 | Active | Prepetition unsecured claim. Underlying case is U.S. District Court Central District of California Case No. 2:11-cv-05097-FMO-SS. |

| ENVIRONMENTAL DISCLOSURES | | | | | | |
|---|---|---|---|---|---|---|
| No. | Title | ID Number | Nature of Case | Court or agency's name and address | Status | Commentary |
| 18 | California Department of Conservation, Division of Geologic Management Claim | 137-1 | Past due oil and gas assessments (> $1,768,653.86); bond requirements; idle well fees totaling $1,417,100 for calendar years 2016, 2017, and 2018; administrative enforcement orders at Richfield East Dome Unit ("REDU"); decommissioning and plugging and abandonment costs (estimated at $114,155,952.00); and remediation of "in-field" operational violations (estimated $300,000.00 in costs). - Claim Amount $118,984,831.00 + contingent and/or prospective claims | State of California Natural Resources Agency - Department of Conservation - California Geologic Energy Management Division 801 K Street, MS 24-01, Sacramento, CA 95814 | Active | Prepetition unsecured claim. Trustee settled the administrative matter and the Settlement Agreement was apprved by the Bankruptcy Court on August 10, 2020 for Order No. 1119C [Motion for Compromise, Doc. No. 1145; Order approving Compromise Agreement, Doc. No. 1187]. The Settlement Agreement reduces the civil penalty associated with Order No. 1119C from $5,076,420 to $2,000,000 and removes the life of bond requirement.*Note that this Settlement Agreement does not affect other aspects of the Proof of Claim.* |
| 19 | California Department of Toxic Substances Control Claim | 110-1 | Filed as a protective measure in the event that Debtor may have liabilities to the Department for releases of hazardous substances at 13 sites with known contaminants of concern, 26 sites for which Debtor notified a government agency of a hazardous substance release, and over 700 sites where Debtor may be liable for violations of environmental law. Claim Amount - Unliquidated, contingent, and/or of an uncertain amount. | California Department of Toxic Substances Control 1001 I Street Sacramento, CA 95814-2828 | Active | Prepetition unsecured claim. |
| 20 | California State Lands Commission Claim | 95-1 | Failure to perform duties to remove oil and gas infrastructure and improvements on formerly leased lands. Claim Amount - $81,949,559.00 + contingent and/or prospective claims | California State Lands Commission 100 Howe Ave, Suite 100 South Sacramento, CA 95825 | Active | Prepetition unsecured claim. |

EXHIBIT 6

## North Belridge Field

**McPhail:**

Grant deed dated April 9, 1964 by and between West American Oil Company as grantor and Union Oil Company as grantee, recorded April 29, 1964 in Volume 3720 at Page 78 of the Official Records of Kern County covering all of the oil, gas and other hydrocarbon substances underlying and which may be produced from the North half of the Northwest Quarter of the Southwest Quarter of the Northwest Quarter, the Northeast Quarter of the Southwest Quarter of the Northwest Quarter, the West half of the Southeast Quarter of the Northwest Quarter, the North half of the Southeast Quarter of the Southwest Quarter of the Northwest Quarter and the Southeast Quarter of the Southeast Quarter of the Northwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M., Kern County, California, lying above a depth which is 120 feet below the stratigraphic equivalent of the vertical depth of 658 feet below the surface of the ground as such vertical depth appeared in the McPhail Well No. 6-7.

**Gibson**

Oil and gas lease dated December 14, 1915 by and between George Gibson, as lessor and Union Oil Company as lessee recorded on April 28, 1916 in Book 29 at Page 17 of the Official Records of Kern County, California covering the North half of the North half of the Southeast Quarter and the North half of the Northeast Quarter of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969 , recorded November 7, 1969 in Book 4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County, California dated July 1, 1949, recorded November 3, 1949 in Book 1598 at Page 323 of Official Records.

**O'Donnell:**

Oil and gas lease dated October 2, 1915 by and between T. A. O'Donnell, et al., as lessor and Union Oil Company as lessee, recorded on February 18, 1917 in Book 29 at Page 208 of the Official Records of Kern County, California covering the South half of the Southeast Quarter, the South half of the North half of the Southeast Quarter and the South half of the North half of the Southwest Quarter of Section 36, Township 27 South, Range 20 East, MDB&M.

SUBJECT TO: without limitation, the effects of prior conveyance of the "Temblor Zone", per Partial Assignment of Oil and Gas Lease from Union Oil Company to Belridge Oil Company dated May 27, 1953, recorded June 17, 1953 in Book 2093 at Page 250 of Official Records; and the effects of a prior conveyance of the 64 Zone per Assignment & Bill of Sale from Union Oil Company to Belridge Oil Company dated October 28, 1969, recorded November 7, 1969 in Book

1606583.1  26932                            1

EXHIBIT 6

512

4335 at Page 37 of Official Records (and corresponding right, title, and interest in & to that certain "Unit Agreement for the 64 Zone of the North Belridge Oil & Gas Field, Kern County.

**Casmalia Field:**

**Arellanes**

SUBJECT ACREAGE: Portion of Punta de la Laguna Ranch, located in Section 13 of Township 9 North, Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West, of SBB&M, containing 381 acres, more or less, in Santa Barbara County, California.

SUBJECT LEASES:

1.  Oil & Gas Lease, dated August 16, 1930, by and between Charles T. Arellanes et al, as Lessor, and 0. C. Field, as Lessee, recorded at Book 220, Page 421, of official records of Santa Barbara county, California, as amended.

2.  That certain Oil and Gas Lease dated April 18, 1945 by and between Edward Bonetti et al, as Lessor, and Fullerton Oil Company as Lessee, and recorded in Volume 649, Page 176 of Records of Santa Barbara County, California as amended.

**Escolle/Lospe**

SUBJECT ACREAGE: All of those certain lands located in Santa Barbara County, State of California. described as follows:

Parcel 1

Commencing at the northeast comer of the Escolle property being the terminous of the eighth course in the lands described in Oil and Gas Lease dated January 7. 1980 between Escolle Tenants-in- Common, as Lessor. and Union Oil Company of California. as Lessee. a Memorandum of which was recorded May 29. 1980 in Book 80. Page 21450. Official Records of Santa Barbara County. California. from which comer No. 13 of Rancho Todos Santos. marked T.S. No. 13. bears North Westerly 64.00 chains to a point on the section line between Sections 21 and 28. T9N-R43W. S.B.B. & M. thence west 25.51 chains to a station: thence north, 35.28 chains to said Comer No. 13, thence from said point of commencement, north 89° 17'4" west, 2770.0 feet to the true point of beginning; thence from said true point of beginning the following courses and distances:. west 1591.4 feet; south 710.5 feet: west 414.9 feet; south 829.0 feet: east 658.2 feet: 1278.9 feet: south 654.8 feet: to a point on the southerly line of Block Il of said Escolle Lease: thence East along said south line 805.8 feet: thence North. 2093.0 feet: thence west 736.7 feet North. 728.2 feet to the true point of beginning and containing 120 acres. more or less.

Parcel II

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13. from which a live oak 15 inches in diameter bears south 37°west. 6.30 chains distant: thence along the north line of said Rancho north 83°03' west. 103.25 chains to a station: thence south 77.98 chains to a station: thence east 70.40 chains to the true point of beginning from which the one-quarter section comers between Sections 28 and 29. T9N-R34W. S.B.B. & M. bears south 8.70 chains distance: thence from said true point of beginning the following crouses and distances: north 718.2 feet: west 646.6 feet: North 900.4 feet: west 8840 feet: south 1106 feet: east 299.6 feet: south. 512.4 feet to a point on the southerly line of Block I of said Escolle Lease: thence east along said south line 1231. 1 feet to the true point of beginning and containing 40 acres, more or less.

Parcel III

Commencing at Comer No. 13 of Rancho Todos Santos marked T.S. No. 13 from which a live oak 15 inches in diameter bears south 37°west. 6.30 distant: thence along the north line of said Rancho north 83°43' west. 103.25 chains to a station: thence south 77.96 chains to a station; thence east 70.40 chains to a station from which the¼ Section comers between 28 and 29, T9N, R34W, S.B.B & M. bears South 8.70 chains distant: thence South 176.8 feet to a point on the east line of Block II of said Escolle Lease and the true point of beginning; thence continuing south through said ¼ section comers and along said east line 934.0 feet; thence east 934.0 feet; thence north 934.0 feet; thence west 934.0 feet to the true point of beginning and containing 20 acres.

SUBJECT LEASES:

1.     Oil and Gas Lease dated September 25, 1947 by and between Escolle Estate Company, as Lessor, and Union Oil Company, as Lessee, and recorded in Volume 736, Page 290 of Official Records of Santa Barbara County, California. as amended.

2.     Oil and Gas Lease dated January 7, 1980 by and between Escolle Tenants in Common. Lessors, and Union Oil Company, as Lessee, a memorandum of which was recorded as Document # 80-21450 of Official Records of Santa Barbara County. California, as amended.


**Morganti**

SUBJECT PROPERTY: A part of Rancho Punta de la Laguna, Santa Barbara County California, Commencing at a point on the easterly line of the Southern Pacific Railway on the property line between Juan B. Arellanes Estate on the North and G. Morganti on the South, thence S. 89 55' E. along the aforementioned property line at a distance of 4710 feet, more or less, to a 2" brass cap pipe monument set at the Northeast corner of the G. Morganti property at a distance of 4325.1 feet to a 2" brass cap pipe monument; thence N. 83 18'W. along the South line of Punta de la Laguna Rancho a distance of 2641.3 feet to a 2" pipe set by S.P. Co. surveyors; thence continuing N. 83 18'W. along the South line of said Rancho 1700 feet. more or less, to the intersection of the Easterly right-of-way line of the Southern Pacific Railroad; thence Northerly along the Easterly right-of-way of the Southern Pacific Railroad to the point of commencement, excepting therefrom a 6.89 acre tract of land conveyed to the Associated Oil Company, and containing a net area of 491 acres, more or less.

SUBJECT LEASE:

Oil and Gas Lease dated August 18, 1930, by and between Guiseppe Morganti, as Lessor, and 0. C. Field, as Lessee, and recorded in Book 222, Page 538 in the Official Records of Santa Barbara County, California. as amended.

## Muscio

SUBJECT ACREAGE: The portion of Subdivision No. 16 of the Rancho Punta de la Laguna located in Section 24 of Township 9 North, Range 35 West, containing 30 acres, more or less, in Santa Barbara County, California.

SUBJECT LEASE: Oil and Gas Lease, dated November 19,1971, by and between Ted H. Muscio et al, as Lessors and Union Oil Company, as Lessee, recorded February 14, 1972, in book 2386, Page 581, of Official Records of Santa Barbara County, California

## Righetti

SUBJECT ACREAGE: Portion of Lot or Subdivision No. 13 of the Rancho Punta de la Laguna, located in Section 13 of Township 9 North, Range 35 West, containing 40.00 acres, more or less, INSOFAR AND ONLY INSOFAR as it covers rights to a depth of 4,500'.

SUBJECT LEASE: That certain Oil & Gas Lease dated February 8, 1934 by and between E. Righetti, et al, as Lessor, and William W. Porter, II as Lessee, and recorded in Volume 301, Page 59 of the O.R. of Santa Barbara County, California.

Righetti "B" (expired) That certain Oil and Gas Lease dated June 24, 1965, by and between Ernest Righetti et al and Union Oil Company, recorded in Volume 2112, Page 677 of the O.R. of Santa Barbara County, California, as amended.

## Bonetti

SUBJECT ACREAGE: Portion of Punta de la Laguna, located in Sections 12 and 13 of Township 9 North Range 35 West, and Sections 7 and 18 of Township 9 North, Range 34 West of Santa Barbara County, California, containing 184 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease, dated November 1, 1964, by and between T.R Bonetti et a as Lessors and Union Oil Company, as lessor, recorded in Book 2104, Page 1188 of Official Records of Santa Barbara County, California, as amended

## Cat Canyon Field

### Bell

1606583.1  26932                        4

Parcel A:

That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, at Page 193 of Maps, in the office of the County Recorder of said County described as follows:

Beginning at the northwest comer of said Bell Tract; thence along the west line of said Bell Tract South 01°26'46" West 5279.23 feet; thence leaving said west line South 48°53'45" East 11410.66 feet to the east line of said Bell Tract; thence along said east line North 05°54'40" East 7504.38 feet to the most northeasterly comer of said Bell Tract; thence along the northerly boundary of said Bell Tract the following five (5) courses:

1. North 89°41'14" West 1522.33 feet;

2. North 00°14'20" East 2644.72 feet;

3. North 89°47'24" West 5273.86 feet;

4. North 00°17'10" East 2643.84feet;

5. North 89°42'26" West 2595.99 feet to the point of beginning [and containing approximately

1454.0 acres, more or less, and being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908, from Teresa Bell, as administratrix of the Estate of Thomas Bell, deceased, to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds at Page 591, Official Records of Santa Barbara County, California.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground.

Excepting therefrom any portion of said land lying outside the exterior boundary of Parcel 1 of Parcel Map No. 14302, filed in Book 50, Pages 50 - 57 of Parcel Maps, in the office of the County Recorder of said County and State.

Parcel B:

Parcel I of Parcel Map No. 14302, County of Santa Barbara, State of California, as shown on map filed in Book 50, Pages 50-57 of Parcel Maps in the office of the County Recorder of Santa Barbara County.

Excepting all right, title and interest from the surface down to a depth of 500' below the surface of the ground. Also excepting therefrom the following described land: That portion of the Bell Tract of Rancho Los Alamos, in the unincorporated territory of Santa Barbara County, State of California, as per map filed in Book 21, Page 193 of Maps in the office of the County Recorder of said County described as follows:

Beginning at the Northwest comer of said Bell Tract;

Thence along the West line of said Bell Tract South 01°·26' 46" West 5279.23 feet;

1606583.1 26932                                      5

Thence leaving said West line South 48° 53' 45" East 11410.66 feet to the East line of said Bell Tract;

Thence along said East line North 05° 54' 40" East 7504.38 feet to the most Northeasterly comer of said Bell Tract;

Thence along the Northerly boundary of said Bell Tract the following five (5)

courses:

1. North 89° 41' 14" West 1522.33 feet;

2. North 00° 14' 20" East 2644.72 feet; .

3. North 89° 47' 24" West 5273.86 feet;

4. North 00° 17' 10" East 2643.84 feet;

5. North 89° 42" 26" West 2595.99 feet to the point of beginning

And being a portion of the lands conveyed to Grantor in that certain Deed dated June 15, 1908 from Teresa Bell, as Administratrix of the Estate of Thomas Bell, deceased to Union Oil Company of California, recorded June 15, 1908, Book 118 of Deeds, Page 591, Official Records of Santa Barbara County, California.

**Blochman**

SUBJECT ACREAGE: The northwest quarter of Section 26, Township 9 North, Range 33 West, containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

**Palmer Stendel**

SUBJECT ACREAGE: The northeast quarter of Section 26, Township 9 North, Range 33 West, SBB&M containing 160.0 acres, more or less, in the County of Santa Barbara, State of California.

SUBJECT LEASE: Oil and Gas Leased dated March 23, 1905 by and between L. E. Blochman, et ux, as Lessors and E.E. Henderson, as Lessee, recorded in Volume "H" at Page 209 of the Lease Records of Santa Barbara County, California as amended.

**Goodwin Fee**

SUBJECT ACREAGE: The West half of the Northwest Quarter of the Northwest Quarter of Section 2, Township 9 North, Range 33 West, S.B.B.&M.; the Southwest Quarter of the Northwest Quarter of said Section 2; the West half of the Southwest Quarter of said Section 2; the West half of the Northeast Quarter of the Southwest Quarter of said Section 2; and the Southeast Quarter of the Southwest Quarter of said Section 2; and the Northwest Quarter of Section 11, Township 9 North, Range 33 West, S.B.B.&M consisting of 360 acres more or less.

**Goodwin "A"**

SUBJECT ACREAGE: The east half of Section 10, Township 9 North, Range 33 West, Santa Bernardino Meridian, as shown on official plat thereof filed in the District Land Office January 7, 1892, said land being shown as Tracts 119 to 124, both inclusive, on map of the Bradley-Garey Tract, recorded in Book 1, page 32 of Maps and Surveys, in the office of the County Recorder of said county, together with those portions of streets or roads adjoining said lots as shown on said map included with the lines of said east half of Section10,

EXCEPTING THEREFROM those portions thereof described as follows:

Commencing at the center of said Section 10; thence northerly along the westerly line of the above described property a distance of 660 feet; thence easterly at right angles to said last mentioned line a distance of 660 feet; thence southerly at right angles to said last mentioned line a distance of 660 feet; thence westerly at right angles to said last mentioned line a distance of 660 feet to the point of beginning, containing 310 acres, more or less

SUBJECT LEASE: Oil and Gas Lease, dated January 1, 1962, by and between G.L Goodwin et al and J.C Hazard et al. recorded in Book 1937, Page 910 of Official Records of Santa Barbara County, California.

**Lloyd**

SUBJECT ACREAGE: The West two-thirds of Section 15, in Township 9 North, Range 33 West, San Bernardino Meridian, in the County o£ Santa Barbara, State of California, according to the Official Plat thereof EXCEPTING from the Southwest quarter of the Southwest quarter of said Section 15, 1-acre of land described in the Deed from Chas. 0. More, et ux., to the Highland School District, dated May 18, 1894, and recorded in Book 47, Page 124 of Deeds approximately 419 acres more or less.

SUBJECT LEASES:

1. Oil and Gas Lease, dated April 21, 1970, by and between Lloyd Corporation, Ltd and Shell Oil Company recorded in Book 2312, Page 761 of Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated March 7, 1965, by and between A.A. Gillette et al and Lloyd Corporation, Ltd recorded in Book 2097, Page 319 of Official Records of Santa Barbara County, California.

**Security**

SUBJECT ACREAGE: The East one-third of the North half (E 1/3 of N ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.07 acres more or less.

**Thomas**

SUBJECT ACREAGE: East one-third of the South half (E 1/3 of S ½) of Section 15, Township 9 North, Range 33 West, San Bernardino Base and Meridian consisting of 106.07 acres more or less.

SUBJECT LEASE: Oil and Gas Lease, dated October 1, 1970, by and between C.T Thomas et al and Anza Pacifica Corp. recorded in Book 2325, Page 209 of Official Records of Santa Barbara County, California.

**Los Flores**
SUBJECT ACREAGE:
**Parcel One**
The North Half of the SW Quarter (N1/2 SW ¼) of Section 22 Township 9 N, Range 33 W, S. B. B. & M. in the County of Santa Barbara State of California, according to government survey thereof.

**Parcel Two**
That portion of the Rancho Los Alamos, in the County of Santa Barbara, State of California, described as follows:

Beginning at the Southwest corner of section 22, Township 9 North, Range 33 West, S.B.B.&M., At the corner of said Rancho Los Alamos Known as "A No. 11" thence Westerly, along the Westerly prolongation of the Southerly line of said section 22 to its intersection with the Southerly prolongation of the Westerly line of the Easterly ½ of the NEQ (E1/2 NE1/4) of Section 21 in said township 9 North, Range 33 West, S.B.B.&M,; THENCE Northerly, along said last mentioned line or its prolongation to  the Southerly line of the North ½ of said Section 21; thence easterly, along said last mentioned line to the Northwest corner of the Southwest quarter of said section 22 above referred to; thence southerly along the westerly line of said section 22 to the point of beginning.
Consisting of 190 acres more or less.

SUBJECT LEASES:

1.  Oil and Gas Lease, dated December 8, 1947, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 762, Page 413 of Official Records of Santa Barbara County, California.

2.  Oil and Gas Lease, dated July 28, 1948, by and between Los Flores Land & Oil Company and General Petroleum Corporation. recorded in Book 810, Page 167 of Official Records of Santa Barbara County, California.

**Fullerton**

SUBJECT ACREAGE: Lots 2, 3, 4 and the Southeast Quarter of the Northwest Quarter of Section 31 Township 9 North, Range 32 West, consisting of 129.46 acres of land, more or less, in the County of Santa Barbara, State of California, as reserved in Deed from Fullerton Oil Company, an Arizona corporation, to Edward A. Michael et ux., dated May 23, 1946 and recorded May 31, 1946, in Book, 694, at page 36

**Conoco**

SUBJECT ACREAGE: Lots 5 & 6 of Section 31 of Township 9 North, Range 32 W, SBB&M, as recorded in volume 1228, Page 437 of Official Records of Santa Barbara County, California, more or less 58.05 acres.

SUBJECT LEASE: That certain Oil and Gas Lease dated June 18, 1936 by and between Continental Oil Company as Lessor, and O.C. Field Corp., as Lessee, and recorded in Volume 1228 at Page 437 of the O.R. of Santa Barbara County, California as amended

### Santa Maria Valley Field

### Jim Hopkins

SUBJECT ACREAGE: The northeast quarter of Section 1, Township 9 North, Range 34 West in the County of Santa Barbara, State of California. The north half of the southeast quarter and the east half of the southwest quarter of Section l, Township 9 North, Range 34 West, S.B.B.&M. in the County of Santa Barbara, State of California, according to the official plat thereto flying below a depth of 100 feet, excepting from said east half of the southwest quarter that portion lying southwesterly of the northeasterly line of the land conveyed to the State of California by the Deed recorded November 8, 1955, as Instrument No. 20085, in Book 1345 at Page 125, official records of said county; being those rights excepted and reserved in that certain quitclaim deed dated December 22, 1994, by and between Union Oil Company of California and Elks Recreation, Inc. lying below a depth of 100 feet consisting of 165.38 acres more or less.

### Union Sugar

SUBJECT ACREAGE: That certain property description attached to that mineral deed dated May 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded May 15, 1974, as Document NQ. 17453, in Book 2515, Page 1349 of the Official Records of Santa Barbara County, California, and in that certain property description attached to that amendment to mineral deed dated November 15, 1974, by and between Santa Maria Valley Associates, as grantor, and Union Oil Company of California, as grantee, recorded February 6, 1975, as Document No. 3744, in Book 2551, Page 743, of the Official Records of Santa Barbara County, California.
As described in that certain Quitclaim Deed, dated February 23, 1995 recorded on June 16,1995, as Instrument No. 95-032705 consisting of 1117 acres more or less.

### Bettiga

SUBJECT ACREAGE: That portion of the East Half (E/2) of the Northeast Quarter (NE/4) of Section 24, TION, R34W, SBBN lying southerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said East Half (E/2) of Northeast (NE/4) of said Section 24, Santa Barbara County, California, 58.7 acres more or less.

SUBJECT LEASES:

1. 5/12/1963-10820, Book 2039, Page 1391, Oil and Gas Lease dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

2. 6/9/1972-21178, Book 2405, Page 316 and dated 4/26/1972, Amendment to Oil and Gas Lease, dated 5/23/1963 by and between Ottorino Bettiga and Frances G. Bettiga, his wife, Lessor, and Union Oil Company of California, Lessee.

3.  5/7/1996-28845 Oil and Gas Lease dated 12/7/1995 by and between James Bettiga, Trustee under O. Bettiga Trust #1 dated 11/1/1978 and James P. Bettiga, Successor Trustee of O. Bettiga Revocable Trust dated 11/31/1984, Lessor, and Saba Petroleum, Inc., A corporation, Lessee.

**Adam**

SUBJECT ACREAGE: That portion of the West Half (W/2) of the Northeast Quarter (NE/4) of Section 24, Tl0N, R34W, SBBM lying northerly of a line parallel with and 720 feet northerly where measured at right angles from the south line of said W/2 of NE/4 of said Section 24, Santa Barbara County, California, 60 acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated July 17, 1970, by and between Thomas B. Adam, II, Frederick 0. Sherrill and Elizabeth Ann Newark, as Lessor, and Union Oil Company of California, as Lessee, said lease or memorandum of which was recorded October 13, 1970, in Book 2323, Page 1238 of Official Records of Santa Barbara, California.

**Moretti**

SUBJECT ACREAGE: The North Half (N/2) of the Northwest Quarter (NW/4) and the North Half (N/2) of the South Half (S/2) of the Northwest Quarter of Section 24, Township 10 North, Range 34 Wet, SBB&M, 118.56 acres, more or less.  (In Pt. Sal Zone to the surface of the property).

SUBJECT LEASE: Oil & Gas Lease dated September 1, 1976, by and between Peter M. Moretti et. Al., as Lessor, and Union Oil Company of California, as Lessee, said lease of memorandum of which was recorded April 12, 1977 as Document #77-16811, of the Official Records of Santa Barbara County, California.

**R.B. McFaddin**

SUBJECT ACREAGE: The West Half of the Northwest Quarter (W/2 NW/4) of Section 19, Township 10 North, Range 33 West, SBB&M, EXCEPTING THEREFROM the following described parcel: Commencing at a appoint on the Westerly line of the West Half of the Northwest quarter (W/2 NW/4) which point is 60 feet North of the Southwest comer thereof and said point of beginning thence Easterly 660 feet; thence Northerly 1320 feet; thence Westerly 660 feet; thence Southerly 1320 feet to the point of beginning, 60 Acres more or less.

SUBJECT LEASE: Oil & Gas Lease dated June 8, 1964, by and between Ruth B. McFaddin, et al, as Lessor and Union Oil Company of California, as Lessee, said lease memorandum of which was recorded September 30, 1964, as Document #41819, in Book 2072, Page 226 of the Official Records of Santa Barbara County, California

**Bradley Lands**
**Bradley 1 Parcel E**
**40001**
Township 9 North, Range 33 West, S.B.B.&M.
Section 5: SW/4 SE/4
Section 6: S/2 SE/4 SE/4

SUBJECT LEASES:
1. Oil & Gas Lease dated July 1, 1970, by and between Bradley Land Company and Shell Oil Company said lease was recorded in Book 2317, Page 975 of the Official Records of Santa Barbara County, California.

2. Oil & Gas Lease dated July 26, 1973 Recorded in Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee.

   Township 9 North, Range 33 West, S.B.B.&M.
   Section 5: SW/4 SE/4
   Section 6: S/2 SE/4 SE/4


**Bradley Consolidated**
**40109**
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: S/2 SW4, NW/4 SW/4
Containing 120 acres, more or less

SUBJECT LEASES:
1. Oil & Gas Lease dated February 17, 1972, by and between Bradley Land Company and Shell Oil Company said lease was recorded on March 13, 1972 in Book 2390, Page 581 of the Official Records of Santa Barbara County, California.

2. 3/13/1972-8424, Book 2390, Page 581 Oil and Gas Lease by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee of the Official Records of Santa Barbara County, California.

3. 7/26/1973-29517 Book 2473, Page 1102 Lease Amendment and Consolidation Agreement by and between Bradley Land Company, Lessor, and Shell Oil Company as Lessee of the Official Records of Santa Barbara County, California.

**40159**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6:  SW/4 NW/4, S/2 NW/4 NW/4, N/2 NE/4 SW/4, N2 NW4 SW/4
Containing 80 acres, more or less

SUBJECT LEASES:

    1.  Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in on March 27, 1969 in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

**40161**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: E/2 NW/4, SW/4 NE/4, S2 NW/4 NE/4, NW/4 SE/4, N2 NE/4 SW/4
Containing 200 acres, more or less

SUBJECT LEASES:

1. Oil & Gas Lease dated January 16, 1969, by and between Bradley Land Company and Standard Oil Company of California said lease was recorded in Book 2266, Page 307 of the Official Records of Santa Barbara County, California.

2. Oil and Gas Lease dated December 1, 1965 recorded in Book 2204, Page 922 by and between Bradley Land Company and Standard Oil Company of the Official Records of Santa Barbara County, California.

**Bradley Lands Unit**
**40014**
Township 9 North, Range 33 West, S.B.B. &M.
Section 6: NE/4, SE/4, NE/4
Containing 10 acres, more or less

SUBJECT LEASE AND QUITCLAIM

    1.  Oil and Gas Lease by and between Bradley Land Company and Union Oil Company of California dated October 3, 1956 recorded in Book 1411, Page 162.

**40015**
Township 9 North, Range 33 West, S.B.B. &M.
Section 5: NW/4; SW/4 NE/4; NE/4 SW/4; SE/4
Section 6: NE/4 NE/4
Containing 230 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated April 4, 1956 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded in Book 1375 and page 210 of the Official Records of Santa Barbara County, California.

 **40016**

Township 9 North, Range 33 West, S.B.B. &M. Section 5: Commencing at a point on the north line of said Section 5, 826 feet east of the northwest corner of said Section 5, running thence easterly along the north line of said section 330 fee; thence at right angles southerly 660 feet; thence at right angles westerly and parallel with the north line of said Section, 660 feet; thence at right angles northerly 660 feet to the north line of said section thence easterly along the north line of said section, 330 feet to the point of beginning containing 10 acres, more or less

SUBJECT LEASE: Oil and Gas Lease dated June 12, 1957 by and between Bradley land Company and Onas Coy Miller, Napoleon J. Daigle and Cecil O. Basenberg jointly as Lessee Recorded on September 9, 1957 in Book 1469 and Page 489 of the Official Records of Santa Barbara County, California.

**Texaco Bradley Lands**
SUBJECT ACREAGE: Township 9 North, Range 33 West, S.B.B. &M.
Section 4: SWNW, W2SENW, W2E2SENW, S2NWNW, S2N2NWNW, S2SWNENW, NWSWNENW

Section 5: N2SE, NESESE, SENENE, E2SENE, SWSENE, S2SWNE, NWSWNE, SWSWNWNE, S2NESWNE, E2S WNENE containing 280 acres, more or less

SUBJECT LEASE:
  1. Oil and Gas Lease by and between Bradley Land Company and Texaco, Inc. dated March 1, 1967 and recorded on May 31, 1967 in Book 2192 and Page 12 of the Official Records of Santa Barbara County, California.

**Kemp and Kemp A**
SUBJECT ACREAGE: The South East Quarter (SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. containing 160 acres, more or less.

SUBJECT ACREAGE: The East Half of the East Half of the South East Quarter (E/2, E/2, SE1/4) of Section 31, Township 10 North, Range 33, West, S.B.B. & M. excepting therefrom the surface rights to a uniform depth of 500 feet of the southerly 300 feet containing 40 acres, more or less.

SUBJECT LEASES:

  1. Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1474, O.R. Santa Barbara County, California, by and between Lambert J. Pereira and Mabel Alice Pereira, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M. excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing

and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M. 4

2.  Oil and Gas Lease dated February 15, 1973 and recorded on March 28, 1973, in Book 2453, Page 1476, O.R. Santa Barbara County, California, by and between Paul Donald Markling and Phyllis Ione Beach, as Lessor, and Norris Oil Co., as Lessee covering the SE4 of Section 31, T10N, R33W, S.B.B.&M., excepting therefrom the Southerly 300 feet of the surface to a uniform depth of 500 feet. This lease supersedes those oil and gas leases dated July 19, 1939 and June 21, 1965. Reserving specifically to Lessee, Norris Oil Co., and Lessors, Markling and Beach, the rights, royalties and privileges associated with the following five producing and/or suspended wells numbered Kemp 3, Kemp 4, Kemp 7, Kemp 8 and Markling 1, and attendant production facilities, including 40 acres of rental exempt land around said wells. Lands held by production are described as the E/2 E/2 SE/4 of Section 31, T10N, R33W, S.B.B. &M., excepting therefrom the surface rights to a uniform depth of 500 feet on the southerly 300 feet.

3.  Lambert J. Pereira and Mabel Alice Pereira, Husband and Wife as Joint Tenants to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M.  Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

4.  Paul D. Markling and Phyllis Ione Beach as Separate Property to Norris Oil dated February 15, 1973, as described the SE/4 of section 31 Township 10N Range 33 West S.B.B.& M. Exception therefrom the southerly 300 ft. of the surface to a uniform depth of 500 ft.

**Laine**

SUBJECT ACREAGE: That portion of the Southeast Quarter of Sec. 13, T10N-R34W, SBB&M in the County of Santa Barbara, State of California, according to the Government Survey approved April 10, 1873 described as follows:

BEGINNING at a point on the West Line of the Southeast Quarter of said section 13 distant thereon South 0°38'20" West 70 feet from a ¾ inch pipe with copper disc set at the center of said Section 13; said point of beginning being the Southwest Corner of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at page 430 of Deeds; thence lst South 0°38'20" West 2590.56 feet along the West line of the Southeast Quarter of said Section 13 to a spike in pavement of County

Road at the Southwest Corner of the Southeast Quarter of said Section 13; thence 2nd along the South Line of section 13 South 89°18'39" East 1031.20 feet to a point in County Road; thence 3rd North 0°29'40" East 2590.57 feet to a point in the South Line of the 30 foot strip of land described in the Deed to the County of Santa Barbara recorded in Book 142 at  page 430 of Deeds; thence 4th along the South Line of said 30 foot strip North 89°18' 40" West 1024.84 feet, more or less, to the point of beginning.

EXCEPTING THEREFROM a strip of land of a uniform width of 40 feet across the extreme North end of the Southeast Quarter of said Section 13, as conveyed to Santa Maria Valley Railroad Company, a California Corporation, by Deed dated November 18, 1913, and recorded Jan. 22, 1914, in Book 142 at Page 427 of Deeds, Also, excepting the North 430' of the East 180' thereof. Containing 59.08 acres, more or less.

SUBJECT LEASE: Oil and Gas Lease by and between Dorothy M. Laine, as lessor, and Union Oil Company of California, as lessee, recorded on March 11, 1980 as Instrument No. 80-9932, Official Records of Santa Barbara County, California.

**Payne**
SUBJECT ACREAGE: The Northeast quarter of the Northeast quarter (NE4 NE4) of Section 12 T9N, R34W, S.B.B. & M. and the North Half (N1/2) of Section 7, T9N, R33W, S.B.B. & M, containing 60 acres, more or less

SUBJECT LEASES:

1. 8/12/1968-31331 Book 2256 Page 113 Oil and Gas Lease by and between John S. Newton and Margaret W. Newton, his wife, and Jane Borden Hall and Harvey W. Hall, Jr., her husband, as Lessor, and Standard Oil Company of California, a corporation, Lessee.

2. 12/13/1968-38617 Book 2255, Page 439 Oil and Gas Lease by and between Mildred F. Bardin, a widow, as Lessor and Standard Oil Company of California, Lessee.

3. 12/13/1968-38621 Book 2255, Page 463 Oil and Gas Lease by and between Mary Ann Gillespie, a widow, as Lessor, and Standard Oil Company of California, as Lessee

4. 2/6/1970-3352, Book 2298, Page 308 Oil and Gas Lease by and between John David Payne, a single man, and Carey Morrison, Executor of the Estate of Annie Morrison, deceased, Lessor, and Standard Oil Company of California, as Lessee.

## ZACA FIELD

### Brown

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 40 acres more or less in Santa Barbara County.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records in Santa Barbara County.

2. Oil and Gas Lease by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records in Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil Dated July 7, 1976 and recorded in Book 2623 and Page 950 in the Official Records in Santa Barbara County.

4. Oil and Gas Lease by and between William J. Bedford & Diane B. Bedford h/w; Roy W. Reeves & Elaine Reeves, h/w and George Tuerk and Sherwood C. Collingsworth to Getty Oil dated June 15, 1979 and recorded as Instrument No. 1979-051489 in the Official Records in Santa Barbara County.

### Davis

SUBJECT ACREAGE: Township 7 North, Range, 31 West, S.B.B.M. Sections 33 & 34 AND Township 8 North, Range 31 West S.B.B.M. Section 3 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 210 acres more or less in Santa Barbara County, California.

SUBJECT LEASE:

1. Oil and Gas Lease by and between Harold H. Davis and Tidewater Oil dated January 11, 1939 recorded in the Official Records of Santa Barbara County in Book 449 and Page 451.

### Davis B

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Section 4 being a portion thereof, and Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office Containing 44 acres more or less in Santa Barbara County, California.

1606583.1 26932                                    17

SUBJECT LEASES:

1. Oil and Gas Lease by and between Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  dated September 17, 1971 and recorded in Book 2371 and Page 1011 in the Official Records of Santa Barbra County.

2. Oil and Gas Lease between by and between Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil dated September 13, 1971 and recorded in Book 2371 and Page 1014 in the Official Records of Santa Barbara County.

3. Oil and Gas Lease by and between Leonard K. Firestone to Getty Oil dated July 7, 1976 recorded in Book 2623 and Page 950 in the Official Records of Santa Barbara County.

4. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1825 or now Instrument No. 1976-0034392 in the Official Records of Santa Barbara County.

5. Oil and Gas Lease by and between Dean Brown and Katherine Brown h/w, to Getty Oil dated July 14, 1976 and recorded in Book 2623 and Page 1828 or now Inst # 1976-0034393 in the Official Records of Santa Barbara County.

**Davis C**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 and  4 being a portion thereof, AND Township 8 North, Range 31 West S.B.B.M. Section 33 being a portion there of and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office.

SUBJECT LEASES:

1. Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, Harold H. Davis, a married man and Crocker-Citizens National Bank as Guardian of the Estate of Alice C. Davis, an incompetent person to Getty Oil  Dated 9/17/1971 and recorded at Book 2371 Page 1011.

2. Alice de F. Sedgwick Alice de F. Sedgwick a widow, Dean and Katherine Brown h/w, and Harold H. Davis and Alice C. Davis to Getty Oil Dated 9/13/1971 recorded at Book 2371 Page 1014

3. Leonard K. Firestone, a married man dealing with his separate property, to Getty Oil Dated 7/7/1976 Recorded at Book 2623 and Page 950 now Instrument No. 1976-034108

4. Harold H. Davis and Alice de Forest Sedgwick entered into an Amendment and Agreement of their 1971 leases with Getty Oil Co. dated 6/25/1980 recorded as Instrument No. 1980-024589 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired

on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

5. Leonard K Firestone entered into an Amendment and Agreement of his 1976 lease with Getty Oil Co. dated 4/5/1982 Recorded as Instrument No. 1982-013662 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90.   This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

6. Dean Brown and Katherine Brown entered into an Amendment and Agreement of their 1976 lease  1976 lease with Getty Oil Co. dated 4/5/1982 recorded as Instrument No. 1982-013663 adding an additional 249 acres, being additional Parcels 4,5,6,8,12,13 and 14 of Book of Maps 85 Pages 88,89 and 90. This Lease Amendment appears to have expired on its own terms or been effectively released as HVI has no leasehold interests in those additional parcels.

## Carranza

SUBJECT ACREAGE: Township 7 North, Range 31 West SBBM Section 2 and 3: Beginning at the southerly end of the 42nd course in the description for that certain land conveyed by Harold H. Davis and Alice C. Davis, his wife, to Francis M. Sedgwick and Alice de F. Sedgwick, his wife, by deed dated April 30, 1942 in Book 551 of Official Records of Santa Barbara County, California, at page 177, which 42nd course is designated as south 30°8  38' West 492.20 feet; Thence from said point of beginning, First, South 62°-30' East 1700.00 feet; Thence Second, South 27°-30' West 943.90 feet; Thence Third, North 62°-30' West 2051.29 feet to intersect the 46th course in the description in the above mentioned deed; thence Fourth, North 65°-53' East 113.72 feet along a part of the said 46th course to the southerly end of the 45th course; thence following along the courses described in said deed but in the opposite direction Fifth, North 46°-45' East 285.09 feet, Sixth, North 48°-56' East 398.20 feet and Seventh, North 38°-21' East 218.90 feet to the point of beginning and containing 40 acres more or less.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Theodore Chamberlin, Jr., et ux and Tidewater Associated Oil Company dated January 1, 1951 recorded in Book 999 and Page 407 in the Official Records of Santa Barbara County.

2. Partial Quitclaim of an Oil and Gas Lease; Tidewater Associated Oil Quitclaims all but 40 acres back to the Lessors, dated 1/15/1955 and recorded at Book 1292 and Page 321.

## Chamberlin

SUBJECT ACREAGE: Township 8 North, Range 31 West, SBM Section 32 and 33: Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters

Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649.27 feet to the true point of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° 0' W. 2730.00 feet; thence N. 30° 6' E. 1551.14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 178 acres in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Theodore Chamberlin Jr. AND Elizabeth V.L.S. Chamberlin, as lessors to Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

2. Amendment to Oil and Gas Lease by an between Theodore Chamberlin Jr and Getty Oil Company dated September 15, 1976 recorded in Book 2626 and Page 2446, by an between Theodore Chamberlin Jr and Getty Oil Company, noting 20 acres held by each producing well, and appears to add 500 additional acres.

3. Modification of Oil and Gas Lease by and between Theodore Chamberlin Jr and Getty Oil Company dated June 24, 1977 recorded as Instrument No. 19777-032024.


### Chamberlin "B"

SUBJECT ACREAGE: Township 8 North. Range 31 West, SBM, Section 32 and 33:
Beginning at a point on the Northerly line of Rancho Corral de Quati, in the County of Santa Barbara, State of California, title to which was confirmed to Maria Antonia de la Guerra y Lataillade by Letters Patent of the United States of America dated August 7, 1876, and recorded in the Office of the Recorder of the County of Santa Barbara in Book "A" of Patents, at Page 258, 1067.90 feet S. 89° 50' W., from the intersection of the Northerly line of said Rancho Corral de Quati with the Westerly line of Rancho La Zaca, which said point of beginning is also the most Northwesterly corner of that certain tract conveyed to Harold H. Davis by Deed, recorded December 20, 1926, in Book 116, Page 88, Official Records of County of Santa Barbara, thence S. 4° 25' 40" W. 2577.3 feet; thence S. 0° 06' E. 649 .27 feet to the true paint of beginning; thence continuing S. 0° 06' E. 489.37 feet; thence S. 22° 0' W. 710.0 feet; thence N. 65° O' W. 2730.00 feet; thence N. 30° 6' E. 155 L 14 feet, thence South 55° 30' East 2380.00 feet more or less to the point of beginning, containing approximately 80 acres in Santa Barbara County, California.

SUBJECT LEASE: Oil and Gas Lease by and between Theodore Chamberlin Jr. et ux and Tidewater Associated Oil Company as Lessee, dated April 17, 1942 and recorded in Book 545 and Page 197 in the Official Records of Santa Barbara County.

**Quati**

SUBJECT ACREAGE: Township 7 North, Range 31 West S.B.B.M. Sections 3 & 4 being a portion of, and more particularly described in the Official Maps and Plats on file and of record in the Santa Barbara County Clerk and Recorders Office. Containing 89 acres more or less in Santa Barbara County, California.

SUBJECT LEASES:

1. Oil and Gas Lease by and between Harold H. Davis to Tidewater Oil dated 1/11/1939 recorded at Book 449 and Page 451 in the Official Records of Santa Barbara County.

2. Partial Quitclaim & Surrender dated 1/20/55 from Tide Water Associated Oil Company to Harold Davis, et al, reserving 299.65 acres, recorded 1295/275.

3. Addendum to Oil and Gas Lease, dated 7/6/1983, recorded as Instrument No. 1983-034552 by and between Ray Stark as landlord and Getty Oil Co. as Tenant.  While this is titled an Addendum to Oil and Gas Lease, it is actually a Surface Use Agreement between the surface owner and the Oil Company.


## RICHFIELD EAST DOME UNIT (REDU)

SUBJECT ACREAGE: 568 acres, more or less, as more fully described in that certain Unit Agreement for Richfield east Dome Unit, Richfield Oil and Gas Field, recorded on December 30, 1969 at Book 9177, Page 873 of the Official Records of Orange County, California.

SUBJECT LEASES:

1. Oil and Gas Lease dated November 08, 1926 by and between Martin Etchandy, as Lessor, and A. J. Delany, as Lessee, recorded in Book 19, Page 31 of the Lease Records of Orange County, California.

2. Oil and Gas Lease dated August 3, 1928 by and between Martin Etcbandy, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 187, Page 109 of the Lease Records of Orange County, California.

3. Oil and Gas Lease dated May 29, 1929 by and between Lillian a. Jesson, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 275, Page 389 of the Lease Records of Orange County, California.

4. Oil and Gas Lease dated July 5, 1928 by and between John H. Mosley, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 250, Page 419 of the Lease Records of Orange County, California.

5. Oil and Gas Lease dated June 25, 1928 by and between E. Walter Pyne, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 174, Page 298 of the Lease Records of Orange County, California

6. Oil and Gas Lease dated October 7, 1953 by and between Stem Realty, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 2607, Page 335 of the Lease Records of Orange County, California.

7. Oil and Gas Lease dated December 4, 1966 by and between Portfirio E. Duarte, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 502 of the Lease Records of Orange County, California.

8. Oil and Gas Lease dated December 4, 1966 by and between A. E. Hernandez, as Lessor, and RK Summy, Inc., as Lessee, recorded in BooK 8137, Page 379 of the Lease Records of Orange County, California.

9. Oil and Gas Lease dated December 4, 1966 by and between Mauel Pinedo, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 388 of the Lease Records of Orange County, California.

10. Oil and Gas Lease dated December 3, 1966 by and between Ramon P. Tovar, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 397 of the Lease Records of Orange County, California.

11. Oil and Gas Lease dated December 1, 1966 by and between Rudolf Garcia, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 406 of the Lease Records of Orange County, California.

12. Oil and Gas Lease dated December 3, 1966 by and between Louis Vargas, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 415 of the Lease Records of Orange County, California.

13. Oil and Gas Lease dated December I 0, 1966 by and between Rudolph Arias, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 493 of the Lease Records of Orange County, California.

14. Oil and.Gas Lease dated December 10, 1966 by and between Alexander Jimenez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 475 of the Lease Records of Orange County, California.

15. Oil and Gas Lease dated February 3, 1937 by and between John H. Wents, as Lessor, and A. D. Mitchell, as Lessee, recorded in Book 888, Page 151 of the Lease Records of Orange County, California.

16. Oil and Gas Lease dated December 19, 1966 by.and between J. G. Joseph, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 424 of the Lease Records of Orange County, California.

17. Oil and Gas Lease dated December 15, 1966 by and between Phineas Solomon, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 484 of the Lease Records of Orange County, California.

18. Oil and Gas Lease dated December 21, 1966 by and between V. E. Buckmaster, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 433 of the Lease Records of Orange County, California.

19. Oil and Gas Lease dated December 22, 1966 by and between P. A. Waldworth, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 442 of the Lease Records of Orange County, California.

20. Oil and Gas Lease dated December 29, 1965 by and -between Lupa Vasquez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8156, Page 853 of the Lease Records of Orange County, California.

21. Oil and Gas Lease dated January 9, 1967 by and between Roman Catholic Archbishop of Los Angles, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8159, Page 313 of the Lease Records of Orange County, California.

22. Oil and Gas Lease dated January 7, 1967 by and between James R. Roberts, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8155, Page 396 of the Lease Records of Orange County, California.

23. Oil and Gas Lease dated January 13, 1967 by and between Freda Joseph, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8175, Page 248 of the Lease Records of Orange County, California.

24. Oil and Gas Lease dated February 16, 1967 by and between May H. Morrison, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8190, Page 553 of the Lease Records of Orange County, California.

25. Oil and Gas Lease dated February 20, 1967 by and between Gordon Boller, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8244, Page 316 of the Lease Records of Orange County, California.

26. Oil and Gas Lease dated February 23, 1967 by and between Jean E. Hathaway, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8190, Page 545 of the Lease Records of Orange County, California.

27. Oil and Gas Lease dated April 10, 1967 by and between Harold F. Taylor, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8311, Page 002 of the Lease Records of Orange County, California.

28. Oil and Gas Lease dated April 10, 1967 by and between Roy H. Scott, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8310, Page 987 of the Lease Records of Orange County, California.

29. Oil and Gas Lease dated April 10, 1967 by and between John C. Scott, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8336, Page 418 of the Lease Records of Orange County, California.

30. Oil and Gas Lease dated July 29, 1966 by and between Phyllis H. Mirelez, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 272 of the Lease Records of Orange County, California.

31. Oil and Gas Lease dated July 27, 1966 by and between Joe Matinez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 263 of the Lease Records of Orange County, California.

32. Oil and Gas Lease dated July 25, 1966 by and between Efrain G. Savala, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 254 of the Lease Records of Orange County, California.

33. Oil and Gas Lease dated July 28, 1966 by and between Sabas Porras, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 245 of the Lease Records of Orange County, California.

34. Oil and Gas Lease dated August 1, 1966 by and between Antonio Moreno, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 236 of the Lease Records of Orange County, California.

35. Oil and Gas Lease dated August 2, 1966 by and between Helen V. Mirlez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 218 of the Lease Records of Orange County, California.

36. Oil and Gas Lease dated August 3, 1966 by and between E.W. Naess, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 210 of the Lease Records of Orange County, California.

37. Oil and Gas Lease dated May 2, 1968 by and between Jerome Weinberg, Inc., as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8602, Page 510 of the Lease Records of Orange County, California.

38. Oil and Gas Lease dated November 28, 1966 by and between Pauline V. Bayna Fordell, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 192 of the Lease Records of Orange County, California.

39. Oil and Gas Lease dated November 28, 1966 by and between Doris Maussnest, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8751, Page 739 of the Lease Records of Orange County, California.

40. Oil and Gas Lease dated August 6, 1966 by and between Walter B. Morlock, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8855, Page 870 of the Lease Records of Orange County, California.

41. Oil and Gas Lease dated August 9, 1966 by and between Eustaquio A. Vega, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 174 of the Lease Records of Orange County, California.

42. 42. Oil and Gas Lease dated August 10, 1966 by and between theodore Sandoval, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 813 7, Page 183 of the Lease Records of Orange County, California.

43. Oil and Gas Lease dated August 10, 1966 by and between Esther Gonzales, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 280 of the Lease Records of Orange County, California.

44. Oil and Gas Lease dated August 11, 1966 by and between Fred John Yalas, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 200 of the Lease Records of Orange County, California.

45.  Oil and Gas Lease dated August 12, 1966 by and between Apolinar Ramirez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 289 of the Lease Records of Orange County, California.

46. Oil and Gas Lease dated August 12, 1966 by and between Ladisio Recendez, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 298 of the Lease Records of Orange County, California.

47. Oil and Gas Lease dated August 16, 1966 by and between E. R. Schmitt, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 307 of the Lease Records of Orange County, California.

48. Oil and Gas Lease dated August 18, 1966 by and between Family Plan Mortgage Company, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 316 of the Lease Records of Orange County, California.

49. Oil and Gas Lease dated August 19, 1966 by and between W. C. McCall, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 325 of the Lease Records of Orange County, California.

50. Oil and Gas Lease dated August 23, 1966 by and between Leo Harry Sad, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 459 of the Lease Records of Orange County, California.

51. Oil and Gas Lease dated August 26, 1966 by and between Mike G. Olivares, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 334 of the Lease Records of Orange County, California.

52. Oil and Gas Lease dated October 3, 1966 by and between Casimero R. Anguiana, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 343 of the Lease Records of Orange County, California.

53. Oil and Gas Lease dated November 22, 1966 by and between Bryan E. Gatewood, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 467 of the Lease Records of Orange County, California.

54. Oil and Gas Lease dated November 22, 1966 by and between Albert H. Rangel, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 352 of the Lease Records of Orange County, California.

55. Oil and Gas Lease dated November 25, 1966 by and between Bank of America, as Lessor, and RK. Summy, Inc., as Lessee, recorded in Book 8137, Page 361 of the Lease Records of Orange County, California.

56. Oil and Gas Lease dated November 27, 1966 by and between Robert Flores, as Lessor, and RK Summy, Inc., as Lessee, recorded in Book 8137, Page 370 of the Lease Records of Orange County, California.

57. Oil and Gas Lease dated September 15, 1927 by and between Joseph Mondotte, as Lessor, and Continental Oil Company, as Lessee, recorded in Book 96, Page 306 of the Lease Records of Orange County, California.

58. Oil and Gas Lease dated May 27, 1968 by and between Placentia Unified School District, as Lessor, and RK Summy, Jnc., as Lessee, recorded in Book 8693, Page 883 of the Lease Records of Orange County, California.

59. Oil and Gas Lease dated January 31, 1955 by and between A. T. & S. F Railway, as Lessor, and James Herley, as Lessee, recorded in Book 3038, Page 443 of the Lease Records of Orange County, California.

60. Oil and Gas Lease dated June 22, 1967 by and between Hathaway Company, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8311, Page 118 of the Lease Records of Orange County, California.

61. Oil and Gas Lease dated August 28, 1968 by and between Stern Realty Company, as Lessor, and Superior Oil Company, as Lessee, recorded in Book 8720, Page 501 of the Lease Records of Orange County, California.

62. Oil and Gas Lease dated February 24, 1953 by and between Victor Lypps, as Lessor, and James Michelin, as Lessee, recorded in Book 2465, Page 371 of the Lease Records of Orange County, California.

63. Oil and Gas Lease dated March 22, 1954 by and between Emory P. Francis, as Lessor, and James Michelin, as Lessee, recorded in Book 2694, Page 001 of the Lease Records of Orange County, California.

64. Oil and Gas Lease dated May 29, 1940 by and between Walter E. Pyne, as Lessor, and Chiksan Oil Company, Ltd., as Lessee, recorded in Book 1089, Page 591 of the Lease Records of Orange County, California.

65. Oil and Gas.Lease dated May 29, 1940 by and between Rudolph Wetzer, as Lessor, and Chiksan Oil Company, Ltd., as Lessee, recorded in Book 1062, Page 529 of the Lease Records of Orange County, California.

66. Oil and Gas Lease dated May 29, 1940 by and between Harry Helming, as Lessor, and Chiksan Oil Company, Ltd., as Lessee, recorded in Book 1093, Page 361 of the Lease Records of Orange County, California.

67. Oil and Gas Lease dated May 29, 1940 by and between Ellen C. Wauberg, as Lessor, and Chiksan Oil Company, Ltd as Lessee, recorded in Book 1094, Page 243 of the Lease Records of Orange County, California.

68. Oil and Gas Lease dated October 1, 1919 by and between Walter E. Pyne; as Lessor, and National Bank & Trust Company, as Lessee, recorded in Book 13, Page 60 of the Lease Records of Orange County, California.

69. Oil and Gas Lease dated November 16, 1967 by and between Jerome Weinberg, Inc., as Lessor, and Getty Oil Company, as Lessee, recorded in Book 8472, Page 592 of the Lease Records of Orange County, California.

70. Oil and Gas Lease dated January 3, 1927 by and between Samuel P. Mullen, as Lessor, and General Petroleum, as Lessee, recorded in Book 1, Page 355 of the Lease Records of Orange County, California.

71. Oil and Gas Lease dated April 20, 1927 by and between Chanslr-Canf. Midway Oil Company, as Lessor, and general Petroleum, as Lessee, recorded in Book 39, Page 247 of the Lease Records of Orange County, California.

72. Oil and Gas Lease dated March 17, 1919 by and between Nick Hugo, as Lessor, and Oscar R. Howard, as Lessee, recorded in Book 9, Page 354 of the Lease Records of Orange County, California.

73. Oil and Gas Lease dated October 1, 1945 by and between Stem Realty Company, as Lessor, and basin Oil Company, as Lessee, recorded in Book 1380, Page 179 of the Lease Records of Orange County, California.

Unitized in Section 27, 28, 29, 32, 33, and 34 ofT-3-S, R-9-W

Lessor: Richards Fletcher Evans, Rosa B. Evans. Marion S. Flippen, Anna M. Richards, Eliza Travis Flippen, Wade H. Flippen, Jeannette Flippen, Edith H. Flippen
Dated: August 24, 1943
Recorded: V1229/P271

Lessor:  Benoit Oxandabourne, Gracreuse Oxandbourne, Ralph A. Phillips, Frances L. Phillips, Gertrude D. Wilson
Dated: April 25, 1962
Recorded: V6139/P014

Lessor:  Ralph A. Phillips, Frances L. Phillips, Gertrude D. Wilson
Dated: April 25, 1962
Recorded: V6139/P015

1606583.1  26932                          28

Lessor: Lilah 0. Nicchols, Frank H. Nichols, Clara Wells Lambert, Leta W. Abbot
Dated: April 25, 1962
Recorded: V6139/P027

Lessor: Lilah 0. Nicchols, Frank H. Nichols, Clara Wells Lambert, Leta W. Abbot
Dated: April 25, 1962
Recorded: V6139/P028

Lessor: David C. Bright, William C. Bright
Dated: April 25, 1962
Recorded: V6139/P042

Lessor: Charles F. Ahline
Dated: April 25, 1962
Recorded: V6217/P383

Lessor: Charles F. Ahline
Dated: April 25, 1962
Recorded: V6217/P384

Lessor: Charles L. Wilson, Hermine Lucy Jenkins
Dated: September 24, 1944
Recorded: Vl251/P532

Lessor: J.D. Kenner, Crystal M. Kenner
Dated: September 24, 1944
Recorded: V1258/P458

Lessor: Thomas Bradford McMurtrey
Dated: September 24, 1944
Recorded: V1261/Pl01

Lessor: G.W. Wells, Clara L. Wells, D.H. Blume, Annie F. Blume, John H. Nichols, Josephine
    E. Nichols, Colistia A. Wilson, Earl M. Bright, Ralph A. Phillips,
Frances L. Phillips
Dated: September 24, 1944
Recorded: V1261/Pl10

Lessor: Bertie Domann, May E. Dennis, N.T. Edwards, May L. Edwards, W.J. Cheney, Eva F.
    Cheney, Roberta Lee Fixen, Sally W. Koehler, Elizabeth Cobb
Dated: September 24, 1944
Recorded: Vl261/P110

Lessor: Anaheim Union Water Company
Dated: February 10, 1926

1606583.1  26932                              29

540

Recorded: V0057/P081
Lessor: Rosa Yorba Locke, Herman F. Lock
Dated: June 2, 1926
Recorded: V0059/P084

Lessor: Laurie Vejar, Carrie Vejar, Beatrice Vejar De Soto, Ernest De Soto, Ramona Vejar,
    Theresa Vejar McEachin, Earl McEachin, Sophia Vejar Jones, Lawrence Jones
Dated: February 1, 1926
Recorded: V0059/P317

Lessor: Anaheim Union Water Company
Dated: March 15, 1943
Recorded: VI193/P087

Lessor: Adolf Schoepe, Martha Virginia Schoepe
Dated: April 1, 1965
Recorded: V7520/P832

Lessor: Adolf Schoepe, Martha Virginia Schoepe
Dated: May 22, 1967
Recorded: V8317/Pl76

Lessor: Richard F. Hathaway
Dated: May 16, 1949
Recorded: V606/P735

Lessor: Mayme C. Nelson
Dated: July 13, 1949
Recorded: V1897/P292

Lessor: Agapito Munoz
Dated: July 13, 1949
Recorded: V2030/Pl

Lessor: Adelaide V. Krause
Dated: July 5, 1949
Recorded: Vl897/P305

Lessor: Avalon A. Adams, Trustee
Dated: June 26, 1971
Recorded: V9701/P330

Lessor: Municipal Securities Company
Dated: March 23, 1957
Recorded: V3990/P568

Lessor: Louis O. Dorado, Jr. Et Ux
Lessee: R.K. Sunny, Inc
Dated: August 1, 1966
Recorded: 8137/227

Grantor: Mobil Exploration & Production North America, Inc
Grantee: Omimer Petroleum, Inc
Dated: 10/1/90 (mineral deed)
Recorded: 91-100760

Lessor: Ricardo De Casas
Lessee: Hathaway Co.
Dated:  06/22/50
Recorded: 2044/ 379

Lessor: Lola M. Hathaway
Dated: 08/10/29
Lessee: Oscar R. Howard
Recorded: 592 / 329
Tract: 48


Lessor: Lucy A. Kammerer
Dated: 03/08/54
Lessee: Hathaway Co.
Recorded: 2093/ 616
Tract:58

Lessor: Joseph W. Johnson
Dated: 04/10/19
Lessee: Amalgamated Oil
Recorded:10/90
Tract:58

Lessor: P.W. & V.B. Thomson
Dated: 04/30/19
Lessee: Amalgamated Oil
Recorded: 10 /258
Tract:59

Lessor: Emma J. Bayha
Dated: 05/17/19
Lessee: Amalgamated Oil
Recorded: 10/355
Tract:60A

Lessor: Jerome Weinberg, Inc.
Dated: 11/16/67
Lessee: Getty Oil, Inc.
Recorded: 8472 / 592
Tract:60A

Lessor: E.L. Danker
Dated: 09/09/57
Lessee: Hathaway Co.
Recorded: 4051/365
Tract:65

Lessor: Olive Krug
Dated: 04/26/19
Lessee: M.P. Waite
Recorded: 10/310
Tract: 63

Lessor: George W. Issac
Dated: 08/02/19
Lessee: Petro Midway Co.
Recorded: 11/198
Tract: 64

Lessor: Dr. SW Dove et al
Dated: 10/16/19
Lessee: Robert M. Shearer
Recorded: 13/81
Tract: 69

Lessor: Nonnan T. Boisseranc
Dated: 03/30/1920
Lessee: Robert M. Shearer (Lots 5 &10 of Block 35 of Yorba Linda Tract as shown in Book 5,
Pages 17 &18 of Miscel. Maps, Orange County, Ca.)

Lessor: Avalon A. Adams, Trste
Dated: 06/26/71
Lessee:Texaco
Recorded: 9701/284
Tract: 70

Lessor: Avalon A. Adams, Trste
Dated: 06/26/71
Lessee: Texaco
Recorded: 9701/307
Tract: 72-2

Lessor: Ivan Collier
Dated: 10/01/72
Lesee: Texaco
Recorded: 10412/787
Tract: 47

Lessor: Nonnan Boiseranc
Dated: 03/01/71
Leesse: Texaco
Recorded: 9701/381
Tract: 69

Lessor: F.D. & L.D. Thomson
Dated: 02/09/71
Lessee: Getty Oil Co.
Recorded: 10368 / 53
Tract: 59

Lessor:  J.K. Ganong (Koch Est)
Dated: 12/31/71
Lessee: Texaco
Recorded: 11056 /147
Tract: 69


Lessor: Agnes E. Schlecter
Dated: 10/04/27
Lessee: Conoco
Recorded: 95/241
Tract: 43

Lessor: Gerardo R. Navarro
Dated: 07/25/21
Lesee: Sam P. Mullen
Recorded: 27/43
Tract: 44

Lessor: Chansolor-Canfield
Dated: 12/31/28
Lessee: Conoco
Recorded: Ptns. Of Lots 1-10, 16-27, inclusive Midway Oil
Bile 23 of Richfield Townsite, map thereof recorded June 15, 1888 in Book 31, Page 61,
Los Angeles County.

Lessor: E. Walter Payne
Dated: 10/01/19

1606583.1  26932                                    33

544

Lessee: Nat'l Bank & Trst.
Recorded: 18/64
Tract: 48

Lessor: E. Walter Payne
Dated: 01/06/20
Lessee: Harrington-Dumas
 Recorded: 12/294
Tract: 50

Lessor: E.P. Francis '
Dated: 07/30/61
Lessee: State Explor. Co
Recorded: 2412/272
Tract: 51

Lessor: Margaret M. Lee
Dated: 01/29/52
Lessee: State Explor. Co.
Recorded: 2412/266
Tract: 52

Lessor: Stem Realty Co.
Dated: 05/01/51
Lessee: State Explor. Co.
Recorded: 2413/75
Tract: 53

Lessor: Stern Realty Co.
Dated: 05/01/51
Lessee: State Explor.Co.
Recorded: 2413/75
Tract: 55

Lessor: Stern Realty Co.
Dated: 0/18/S3
Lessee: State Explor. Co.
Recorded: 2617/351
Tract: 56

Lessor: Katherine Yamell
Dated: 04/10/28
Lessee: Merchants Petro.
Recorded 158/l
Tract: 61

1606583.1  26932                          34

Lessor: Stern Realty Co.
Dated: 08/30/29
Lessee: Jimsco Oil Co.
Recorded: 308/324
Tract: 64

Lessor: Cloyd Laibe et al
Dated: 11/01/65
Lessee: Union Oil Co.
Recorded: 8287/250:  8305 / 96

Lessor: Merchants Petroleum Co.
Dated: 06/20/28
Lesee: Union Oil Co.
Recorded: 172/233
Tract: 23

Lessor: Stern Realty
Dated:11/01/18
Lessee: Union Oil Co.
Recorded: 7/185
Tract: 4

Lessor: California Trust Co.
Dated: 08/27/54
Lessee: Arrowhead Oil Co.
Recorded: 7407/285
Tract: 41

Lessor: A.Wardman et ux
Dated: 01/04/19
Lessee: F.M. Shelby
Recorded: 9/240
Tract: 62

Lessor: John S. Zuckeman et ux
Dated: 07/12/1929
Lessee: Bradford Bros. Inc.
Recorded: 295/80
Tract: 4

Lessor: E. Walter Payne
Dated: 05/29/40
Lessee: Chiksan Oil Co.
Recorded: 1089/591
Tract: 49

1606583.1  26932                                35

Lessor: Stern Realty Co.
Dated: 10/01/45
Lessee: Basin Oil Co.
Recorded: 1380/179
Tract: 65

**All interest listed above are subject to an override royalty of 2% by RSG:**

1. Assignment of Override Royalty from Greka SMV to Randeep S. Grewal recorded on June 21, 1999 with Instrument No. 99-050022 in the Official Records of Santa Barbara County.

2. Assignment of Override Royalty from Greka SMV to Randeep S. Grewal recorded on October 22, 1999 with Instrument No. 1999-0085577 in the Official Records of Santa Barbara County.

3. Assignment of Override Royalty from Greka SMV to Randeep S. Grewal recorded on August 5, 2002 with Instrument No. 2002-0075685 in the Official Records of Santa Barbara County.

4. Assignment of Interest in Oil and gas Leases from Greka Oil and Gas, Inc. to Randeep S. Grewal recorded October 28, 2002 with Instrument No. 2004000972452 and 2004000972454 in the Official Records of Orange County.

5. Assignment of Overriding Royalty from Saba Petroleum to Randeep S. Grewal recorded on November 24, 1999 as Instrument No. 01991668786 in the Official Records of Kern County.

6. Assignment of Overriding Royalty from Saba Petroleum to Randeep S. Grewal recorded on November 24, 1999 as Instrument No. 01991668787in the Official Records of Kern County.

7. Assignment of Overriding Royalty from Greka AM to Randeep S. Grewal recorded on December 29, 2000 as Instrument No. 0200165971in the Official Records of Kern County.

8. Assignment of Overriding Royalty from Sabacol Inc. to Randeep S. Grewal recorded on December 29, 2000 as Instrument No. 01991668786 in the Official Records of Kern County.

9. Assignment of Overriding Royalty from Randeep S. Grewal to Grewal Royalty, LLC recorded October 28, 2004 as Instrument No. 0204264443 in the Official Records of Kern County.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*): _TRUSTEE'S NOTICE OF MOTION AND MOTION FOR ORDERS: (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) AUTHORIZING AND APPROVING THE SELECTION OF A STALKING HORSE BIDDER, (D) APPROVING EXPENSE REIMBURSEMENT, (E) SCHEDULING (i) AN AUCTION AND (ii) A SALE HEARING, (F) APPROVING THE FORM AND MANNER OF ALL PROCEDURES, PROTECTIONS, SCHEDULES, AND AGREEMENTS, AND (G) GRANTING RELATED RELIEF; AND (II)(A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE ESTATE'S ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATIONS OF MICHAEL A. MCCONNELL, LINDSAY SHERRER, KERMITH BOFFILL AND SAM DELRAHIM AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _August 25, 2020_ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**: On _August 25, 2020_ , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. SERVED BY EMAIL**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on August 25, 2020, I served the following persons and/or entities by email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Attys. for Buyer  Richard B. Hemingway, Esq.  *Richard.Hemingway@tklaw.com*
Attys. for Buyer  Tye C. Hancock, Esq.  *Tye.Hancock@tklaw.com*
Trustee's Real Estate Broker  Lindsay Sherrer  *Lindsay.Sherrer@tenoaksadvisors.com*

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 25, 2020 | Beverly Lew | */s/ Beverly Lew* |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

ADDITIONAL SERVICE INFORMATION (if needed):

## 1.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Anthony A Austin on behalf of Creditor California Department of Toxic Substances Control
anthony.austin@doj.ca.gov

Anthony A Austin on behalf of Interested Party California Department of Toxic Substances Control
anthony.austin@doj.ca.gov

William C Beall on behalf of Counter-Claimant GLR, LLC, a Delaware limited liability company
will@beallandburkhardt.com, carissa@beallandburkhardt.com

William C Beall on behalf of Counter-Claimant GRL, LLC, a Delaware limited liability company
will@beallandburkhardt.com, carissa@beallandburkhardt.com

William C Beall on behalf of Creditor GLR, LLC
will@beallandburkhardt.com, carissa@beallandburkhardt.com

William C Beall on behalf of Defendant GLR, LLC, a Delaware limited liability company
will@beallandburkhardt.com, carissa@beallandburkhardt.com

William C Beall on behalf of Defendant GRL, LLC, a Delaware limited liability company
will@beallandburkhardt.com, carissa@beallandburkhardt.com

William C Beall on behalf of Interested Party GRL, LLC, a Delaware limited liability company
will@beallandburkhardt.com, carissa@beallandburkhardt.com

Bradley D Blakeley on behalf of Defendant RDI Royalty Distributors, Inc
blakeley@blakeleylawgroup.com, bradleydblakeley@gmail.com

Alicia Clough on behalf of Creditor California State Lands Commission
aclough@loeb.com, mnielson@loeb.com,ladocket@loeb.com

Alicia Clough on behalf of Interested Party California State Lands Commission
aclough@loeb.com, mnielson@loeb.com,ladocket@loeb.com

Marc S Cohen on behalf of Creditor California State Lands Commission      mscohen@loeb.com, klyles@loeb.com

Marc S Cohen on behalf of Interested Party California State Lands Commission      mscohen@loeb.com, klyles@loeb.com

Alan D Condren on behalf of Defendant Roman Catholic Archbishop of Los Angeles  , berickson@seedmackall.com

Alan D Condren on behalf of Defendant Elizabeth Esser    , berickson@seedmackall.com

Alan D Condren on behalf of Defendant Stephen Fisher    , berickson@seedmackall.com

Alan D Condren on behalf of Interested Party Stephen Fisher
acondren@seedmackall.com, berickson@seedmackall.com

Alec S DiMario on behalf of Creditor Direct Energy Business Marketing, LLC d/b/a Direct Energy Business
alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com

Alec S DiMario on behalf of Creditor Direct Energy Business, LLC
alec.dimario@mhllp.com, debra.blondheim@mhllp.com;Syreeta.shoals@mhllp.com

Jeremy Faith on behalf of Counter-Claimant California Asphalt Production, Inc., a California corporation
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Jeremy Faith on behalf of Counter-Claimant GIT, INC., a Colorado corporation
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                F 9013-3.1.PROOF.SERVICE

Jeremy Faith on behalf of Counter-Claimant GTL1, LLC a Colorado limited liability company
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Jeremy Faith on behalf of Creditor California Asphalt Production, Inc.
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Jeremy Faith on behalf of Creditor GIT, Inc.
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Jeremy Faith on behalf of Creditor GTL1, LLC
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Jeremy Faith on behalf of Interested Party Courtesy NEF
Jeremy@MarguliesFaithlaw.com,
Helen@MarguliesFaithlaw.com;Angela@MarguliesFaithlaw.com;Vicky@MarguliesFaithlaw.com

Karl J Fingerhood on behalf of Interested Party United States of America on behalf of USEPA and US Coast Guard
karl.fingerhood@usdoj.gov, efile_ees.enrd@usdoj.gov

H Alexander Fisch on behalf of Interested Party California Department of Fish & Wildlife
Alex.Fisch@doj.ca.gov

H Alexander Fisch on behalf of Interested Party California Regional Water Quality Control Board, Central Coast
Alex.Fisch@doj.ca.gov

Don Fisher on behalf of Defendant Corian Cross Holdings, LP        dfisher@ptwww.com, tblack@ptwww.com

Don Fisher on behalf of Interested Party Interested Party        dfisher@ptwww.com, tblack@ptwww.com

Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee        brian.fittipaldi@usdoj.gov

Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee (ND)        brian.fittipaldi@usdoj.gov

Ellen A Friedman on behalf of Interested Party Pacific Gas and Electric Company
efriedman@friedmanspring.com, khollander@friedmanspring.com

Gisele M Goetz on behalf of Defendant Chamberlin Oil LLC
gmgoetz@hbsb.com, ggoetz@collegesoflaw.edu;cecilia@hbsb.com

Gisele M Goetz on behalf of Interested Party Courtesy NEF
gmgoetz@hbsb.com, ggoetz@collegesoflaw.edu;cecilia@hbsb.com

Karen L Grant on behalf of Creditor BUGANKO, LLC        kgrant@silcom.com

Karen L Grant on behalf of Defendant Janet K Ganong        kgrant@silcom.com

Ira S Greene on behalf of Interested Party CTS Properties, Ltd.        Ira.Greene@lockelord.com

Matthew C. Heyn on behalf of Creditor Department of Conservation, Division of Oil, Gas and Geothermal Reources
Matthew.Heyn@doj.ca.gov, mcheyn@outlook.com

Brian L Holman on behalf of Counter-Claimant Bradley Land Company        b.holman@mpglaw.com

Brian L Holman on behalf of Creditor Bradley Land Company        b.holman@musickpeeler.com

Brian L Holman on behalf of Defendant Bradley Land Company        b.holman@mpglaw.com

Tracy K Hunckler on behalf of Interested Party Courtesy NEF
thunckler@daycartermurphy.com, cgori@daycartermurphy.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                        F 9013-3.1.PROOF.SERVICE

Samantha Indelicato on behalf of Interested Party UBS AG, Stamford Branch          sindelicato@omm.com

Eric P Israel on behalf of Attorney Courtesy NEF
eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Eric P Israel on behalf of Attorney Danning, Gill, Israel & Krasnoff, LLP
eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Eric P Israel on behalf of Financial Advisor CR3 Partners, LLP
eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Eric P Israel on behalf of Plaintiff Michael A. McConnell, Chapter 11 Trustee
eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Eric P Israel on behalf of Trustee Michael Arthur McConnell (TR)
eisrael@DanningGill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com

Razmig Izakelian on behalf of Creditor California Asphalt Production, Inc.    razmigizakelian@quinnemanuel.com

Razmig Izakelian on behalf of Creditor GIT, Inc.    razmigizakelian@quinnemanuel.com

Razmig Izakelian on behalf of Creditor GTL1, LLC  razmigizakelian@quinnemanuel.com

Evan M Jones on behalf of Interested Party UBS AG, Stamford Branch          ejones@omm.com, ejones@omm.com

Evan M. Jones on behalf of Interested Party UBS AG, London Branch          ejones@omm.com, ejones@omm.com

Alan H Katz on behalf of Interested Party CTS Properties, Ltd.    akatz@lockelord.com

John C Keith on behalf of Creditor California State Lands Commission          john.keith@doj.ca.gov

Jeannie Kim on behalf of Interested Party Pacific Gas and Electric Company
jekim@sheppardmullin.com, dgatmen@sheppardmullin.com

Anna Landa on behalf of Interested Party Courtesy NEF
Anna@MarguliesFaithlaw.com,
Helen@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com;Angela@MarguliesFaithLaw.com

Mitchell J Langberg on behalf of Creditor Adam B Firestone          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Alice Sedgwick Wohl          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Alice Sedgwick, Dec'd          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Jerome Brevoort Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor John A Feliciano   mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Jonathan Ashley Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Katherine S Hanberg          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Lance H Brown      mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Lela Minturn Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Louise H Feliciano          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor Susanna Sedgwick, Dec'd          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Creditor William Hanberg          mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Adam B Firestone          mlangberg@bhfs.com, dcrudup@bhfs.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                    F 9013-3.1.PROOF.SERVICE

Mitchell J Langberg on behalf of Defendant Alice Sedgwick Wohl    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Alice Sedgwick, Dec'd    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Jerome Brevoort Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant John A Feliciano    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Jonathan Ashley Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Katherine S Hanberg    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Lance H Brown    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Lela Minturn Dwight    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Louise H Feliciano    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant Susanna Sedgwick    mlangberg@bhfs.com, dcrudup@bhfs.com

Mitchell J Langberg on behalf of Defendant William Hanberg    mlangberg@bhfs.com, dcrudup@bhfs.com

Maxim B Litvak on behalf of Creditor Committee Official Committee of Unsecured Creditors    mlitvak@pszjlaw.com

Vincent T Martinez on behalf of Counter-Claimant Escolle Tenants In Common
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor Adam Family Trust
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor Candace Laine Evenson
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor Escolle Tenants In Common
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor The Bognuda Trust
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor The Morganti Ranch, a limited partnership
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Creditor Candace Laine Evenson
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Vincent T Martinez on behalf of Defendant The Bognuda Trust
llimone@twitchellandrice.com, smccomish@twitchellandrice.com

Michael Arthur McConnell (TR)    Michael.mcconnell@kellyhart.com

Brian M Metcalf on behalf of Interested Party UBS AG, London Branch
bmetcalf@omm.com, brian-metcalf-9774@ecf.pacerpro.com

Brian M Metcalf on behalf of Interested Party UBS AG, Stamford Branch
bmetcalf@omm.com, brian-metcalf-9774@ecf.pacerpro.com

Monserrat Morales on behalf of Interested Party Courtesy NEF
Monsi@MarguliesFaithLaw.com,
Vicky@MarguliesFaithLaw.com;Helen@marguliesfaithlaw.com;Angela@MarguliesFaithlaw.com

Alan I Nahmias on behalf of Interested Party Courtesy NEF    anahmias@mbnlawyers.com, jdale@mbnlawyers.com

Jerry Namba on behalf of Defendant CMT, LLC    nambaepiq@earthlink.net, atty_namba@bluestylus.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    F 9013-3.1.PROOF.SERVICE

David L Osias on behalf of Creditor Allen Matkins Leck Gamble Mallory & Natsis LLP
dosias@allenmatkins.com, bcrfilings@allenmatkins.com,kdemorest@allenmatkins.com,csandoval@allenmatkins.com

Darren L Patrick on behalf of Interested Party UBS AG, London Branch
dpatrick@omm.com, darren-patrick-1373@ecf.pacerpro.com;sindelicato@omm.com;ejones@omm.com

Jeffrey N Pomerantz on behalf of Creditor Committee Official Committee of Unsecured Creditors
jpomerantz@pszjlaw.com

Benjamin P Pugh on behalf of Defendant Jane A. Adams      bpugh@ecg.law, mhamburger@ecg.law;calendar@ecg.law

Benjamin P Pugh on behalf of Defendant John S. Adams      bpugh@ecg.law, mhamburger@ecg.law;calendar@ecg.law

Edward S Renwick on behalf of Counter-Claimant Frank M. Boisseranc and Sylvia S Boisseranc as Trustees of the Frank and Sylvia Boisseranc Trust
erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Counter-Claimant Presson Vera OC Land Group, a California Unincorporated Association
erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Counter-Claimant Waldo A. Gillette Jr.      erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Creditor "A" Mineral Owners Group      erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Creditor Goodwin "A" Mineral Owners Group
erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Creditor Presson Vera OC Land Group, a California Unincorporated Association
erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Cross-Claimant Goodwin "A" Mineral Owners Group
erenwick@hanmor.com, iaguilar@hanmor.com

Edward S Renwick on behalf of Litigant Edward S Renwick      erenwick@hanmor.com, iaguilar@hanmor.com

J. Alexandra Rhim on behalf of Counter-Claimant Guarantee Royalties, Inc.      arhim@hrhlaw.com

J. Alexandra Rhim on behalf of Counter-Claimant Laor Liquidating Associates, LP      arhim@hrhlaw.com

J. Alexandra Rhim on behalf of Creditor Guarantee Royalties, Inc.      arhim@hrhlaw.com

J. Alexandra Rhim on behalf of Creditor Laor Liquidating Associates, LP      arhim@hrhlaw.com

J. Alexandra Rhim on behalf of Defendant Guarantee Royalties, Inc.      arhim@hrhlaw.com

J. Alexandra Rhim on behalf of Defendant Laor Liquidating Associates, LP      arhim@hrhlaw.com

Todd C. Ringstad on behalf of Defendant Charles C. Albright      becky@ringstadlaw.com, arlene@ringstadlaw.com

Todd C. Ringstad on behalf of Interested Party Interested Party      becky@ringstadlaw.com, arlene@ringstadlaw.com

Mitchell E Rishe on behalf of Creditor California Department of Conservation, Division of Oil, Gas & Geothermal Resources
mitchell.rishe@doj.ca.gov

Mitchell E Rishe on behalf of Creditor Department of Conservation, Division of Oil, Gas and Geothermal Reources
mitchell.rishe@doj.ca.gov

George E Schulman on behalf of Plaintiff Michael A. McConnell, Chapter 11 Trustee
GSchulman@DanningGill.Com, danninggill@gmail.com;gschulman@ecf.inforuptcy.com

George E Schulman on behalf of Trustee Michael Arthur McConnell (TR)
GSchulman@DanningGill.Com, danninggill@gmail.com;gschulman@ecf.inforuptcy.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                        **F 9013-3.1.PROOF.SERVICE**

Zev Shechtman on behalf of Counter-Defendant Michael A. McConnell, Chapter 11 Trustee
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Counter-Defendant Michael Arthur McConnell (TR)
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Plaintiff Michael A. McConnell, Chapter 11 Trustee
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Zev Shechtman on behalf of Trustee Michael Arthur McConnell (TR)
zshechtman@DanningGill.com, danninggill@gmail.com;zshechtman@ecf.inforuptcy.com

Sonia Singh on behalf of Plaintiff Michael A. McConnell, Chapter 11 Trustee
ssingh@DanningGill.com, danninggill@gmail.com,ssingh@ecf.inforuptcy.com

Sonia Singh on behalf of Trustee Michael Arthur McConnell (TR)
ssingh@DanningGill.com, danninggill@gmail.com,ssingh@ecf.inforuptcy.com

Daniel A Solitro on behalf of Interested Party CTS Properties, Ltd.
dsolitro@lockelord.com, ataylor2@lockelord.com

Ross Spence on behalf of Interested Party County of Santa Barbara, California
ross@snowspencelaw.com, janissherrill@snowspencelaw.com;brittanyDecoteau@snowspencelaw.com

Ross Spence on behalf of Interested Party Harry E. Hagen, as Treasurer-Tax Collector of the County of Santa Barbara, California
ross@snowspencelaw.com, janissherrill@snowspencelaw.com;brittanyDecoteau@snowspencelaw.com

Ross Spence on behalf of Interested Party Santa Barbara Air Pollution Control District
ross@snowspencelaw.com, janissherrill@snowspencelaw.com;brittanyDecoteau@snowspencelaw.com

Christopher D Sullivan on behalf of Creditor Diamond McCarthy LLP
csullivan@diamondmccarthy.com,
mdomer@diamondmccarthy.com;kmartinez@diamondmccarthy.com;quentin.roberts@diamondmccarthy.com;erika.shannon@diamondmccarthy.com;aiemee.low@diamondmccarthy.com

Jennifer Taylor on behalf of Interested Party UBS AG, London Branch        jtaylor@omm.com

John N Tedford, IV on behalf of Trustee Michael Arthur McConnell (TR)
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com

Salina R Thomas on behalf of Interested Party Courtesy NEF        bankruptcy@co.kern.ca.us

Salina R Thomas on behalf of Interested Party Kern County Treasurer Tax Collector   bankruptcy@co.kern.ca.us

Meagan S Tom on behalf of Creditor Netherland, Sewell & Associates, Inc.
meagan.tom@lockelord.com, autodocket@lockelord.com;taylor.warren@lockelord.com;autodocketdev@lockelord.com

Patricia B Tomasco on behalf of Creditor GIT, Inc.
pattytomasco@quinnemanuel.com, barbarahowell@quinnemanuel.com;cristinagreen@quinnemanuel.com

Fred Whitaker on behalf of Interested Party Eller Family Trust        lshertzer@cwlawyers.com, spattas@cwlawyers.com

William E. Winfield on behalf of Attorney Courtesy NEF        wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Creditor Jane Connolly        wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Creditor Robert Kestner        wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Creditor Virginia Tracy        wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Defendant Jane Connolly        wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Defendant Kathleen Seymour        wwinfield@calattys.com, scuevas@calattys.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**

William E. Winfield on behalf of Defendant Robert Kestner    wwinfield@calattys.com, scuevas@calattys.com

William E. Winfield on behalf of Defendant Virginia Tracy    wwinfield@calattys.com, scuevas@calattys.com

Richard Lee Wynne on behalf of Interested Party NewBridge Resources, LLC
richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com

Emily Young on behalf of Creditor Epiq Corporate Restructuring, LLC Claims Agent
pacerteam@gardencitygroup.com, rjacobs@ecf.epiqsystems.com;ECFInbox@epiqsystems.com

Aaron E de Leest on behalf of Attorney Danning, Gill, Israel & Krasnoff, LLP
adeleest@DanningGill.com, danninggill@gmail.com;adeleest@ecf.inforuptcy.com

Aaron E de Leest on behalf of Trustee Michael Arthur McConnell (TR)
adeleest@DanningGill.com, danninggill@gmail.com;adeleest@ecf.inforuptcy.com

## 2. SERVED BY U.S. MAIL

Debtor
HVI Cat Canyon, Inc.
c/o Capitol Corporate Services, Inc.
36 S. 18th Avenue, Suite D
Brighton, CO 80601

Debtor
HVI Cat Canyon,Inc.
630 Fifth Avenue, Suite 2410
New York, NY  10111

Brian Fittipaldi, Esq.
Office of the United States Trustee
1415 State Street, Ste 148
Santa Barbara, CA 93101-2511

The Honorable Martin R. Barash
U.S. Bankruptcy Court
21041 Burbank Blvd., Suite 342
Woodland Hills, CA 91367

## REQUESTS FOR SPECIAL NOTICE

Attys. for Buganko
Philip Ganong, Esq.
Ganong Law Office
PO Box 192
Bakersfield, CA 93302

Frank and Sylvia Boisseranc
300 W. Paseo de Cristobal
San Clemente, CA 92672

Rob Thomson
1920 Wilbur Avenue
San Diego, CA 92109

Atty. for Jane A. Adams and John S.
Adams, Trustees
Nicholas Dellefave, Esq.
Enterprise Counsel Group
3 Park Plaza Ste 1400
Irvine, CA 92614

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                F 9013-3.1.PROOF.SERVICE